# EXHIBIT H



Deposition of:

**30(b)(6) Michael R. Bordelon**

*January 29, 2021*

In the Matter of:

**Bordelon, Mike, et al. Vs. Baldwin County, Alabama, et al.**

Veritext Legal Solutions

877.373.3660 | calendar-al@veritext.com | 800.808.4958

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CASE NUMBER: 1:20-cv-00057-C

MIKE BORDELON, and BREEZY SHORES, LLC,

Plaintiffs,

vs.

BALDWIN COUNTY, ALABAMA, et al.,

Defendants.

VIRTUAL DEPOSITION OF MICHAEL R. BORDELON
VIA ZOOM VIDEOCONFERENCE

* * * * * * * * * * * *

The Videoconference Deposition of Michael R. Bordelon was taken down and reported by Virginia Denese Barrett, Court Reporter and Commissioner for the State of Alabama at Large, on the 29th day of January, 2021, commencing at approximately 9:00 a.m., via Zoom Videoconference.

* * * * * * * * * * * *

Page 2

STIPULATION

IT IS STIPULATED AND AGREED by and between the parties through their respective counsel, that the videoconference deposition of Michael R. Bordelon may be taken before Virginia Denese Barrett, Commissioner, via Zoom Videoconference, on the 29th day of January, 2021.

IT IS FURTHER STIPULATED AND AGREED that it shall not be necessary for any objections except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of the trial, or at the time said deposition is offered in evidence, or prior thereto.

IT IS FURTHER STIPULATED AND AGREED that the notice of filing of the deposition by the Commissioner is waived.

Page 3

EXAMINATION INDEX

| EXAMINATION BY: | PAGE: |
|---|---|
| Ms. Frawley | 5 |
| Mr. Anderson | 207 |
| Ms. Frawley | 209 |

EXHIBIT INDEX

| DEFENDANTS' EXHIBITS: | PAGE: |
|---|---|
| Exhibit 1 - Notice of Deposition | 8 |
| Exhibit 2 - Second Amended Complaint | 60 |
| Exhibit 3 - Building Permit | 61 |
| Exhibit 4 - Architectural Drawing with Photo | 72 |
| Exhibit 5 - Baldwin County Board of Adjustment Regular Meeting Minutes 12/12/19 | 185 |
| Exhibit 6 - Email Chain Between Mark Taupeka and Brad Hicks | 134 |
| Exhibit 7 - Baldwin County Zoning Ordinance | 73 |
| Exhibit 8 - 7/9/19 Letter from Ernie Church to Wayne Dyess | 98 |
| Exhibit 9 - Email Chain from Paul Stanton to Vince Jackson and D. Hart | 95 |
| Exhibit 10 - Updated Damages Disclosure | 11 |

Page 4

APPEARANCES (Via Zoom Videoconference)

FOR THE PLAINTIFFS:
Mr. Kristopher O. Anderson
CLARK PARTINGTON
4725 Maine Street, F-222
Orange Beach, Alabama 36561

FOR THE DEFENDANTS:
Ms. Jamie H. Kidd Frawley
Ms. Haley Lyckman
WEBB MCNEILL WALKER, PC
7475 Halcyon Pointe Drive
Montgomery, Alabama 36117

Page 5

MICHAEL R. BORDELON

The witness, having been first duly sworn or affirmed to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MS. FRAWLEY:

MR. ANDERSON: We would request the opportunity to read and sign.

Q. Good morning, Mr. Bordelon. My name is Jamie Kidd Frawley, and I represent the Defendants.

A. Yes, ma'am.

Q. Could you just start by stating your name for the record?

A. Michael R. Bordelon.

Q. Okay. And, Mr. Bordelon, have you ever been deposed before?

A. I have. When I used to work at Motorola, I was deposed I think once when I was there and once after I left the company. But it was still involving a Motorola patent.

Q. Okay. Well, then you know a little bit of the drill. But I'm just going to go over it

Page 6

briefly. And particularly with this new virtual world we're in, it's very important that we try not to talk over each other. It's also very important that we make sure to say yes or no and not uh-huh or unh-unh because it's hard for the court reporter to distinguish that sometimes. If there is at any point in time anything I say that you don't understand, whether it's because -- I mean, and it may just be because I've asked a bad question. It may also be because of the Internet cutting out or something. Please speak up and let me know, if you would.

A. Yes.

Q. Okay.

MR. ANDERSON: I was just going to go ahead and tell you, you're a little bit more soft spoken. Just make sure you're speaking up to make sure the court reporter can hear you.

Q. Yeah. Yeah. We want to keep this lady happy. She is -- she is one of -- probably

Page 7

the most important person on this call right now making sure that she can hear everything. If at any time this is -- this is not meant to be an endurance test. If at time you need a break, please feel free to say so. The only thing I ask is if there is a question on the table, that you go ahead and answer that question. And then we'll -- then we'll take a break whenever if that's okay with you.

A. It is.

Q. Okay. Also for the record, is there anything other than the passage of time that would affect your memory or ability to testify today, recent health issues, medication, that sort of thing?

A. Not that I'm aware of.

Q. Okay. What is your current occupation?

A. I am currently retired. I retired from Motorola in 2004. I did some private consulting for a few years after that with Chrysler Corporation. And then about five years after that I retired fully, and, you

Page 8

know, I have the investments down here in Gulf Shores and Orange Beach and have been sort of working on my retirement funding efforts.

Q. And where is your current -- where do you currently personally reside?

A. I reside in Louisiana just outside of Baton Rouge at 5855 Plantation Drive, St. Francisville, Louisiana 70775.

Q. Okay. And that is your -- your residence for purposes of taxes and all official purposes?

A. Yes.

(Whereupon, Defendants' Exhibit 1 was marked for identification and attached to the Original transcript.)

Q. Okay. I'm going to show you what has been marked as or what needs to be marked as Exhibit 1. Do you-all see that?

A. Yes.

MR. ANDERSON: We've got the paper copy here as well.

Page 9

Q. Okay. All right. Do you recognize this document?

A. Yes, I do.

Q. Okay. And could you just for the record identify it?

A. Notice of deposition.

Q. Okay. And if you scroll down, you will see that it is to Plaintiff, Breezy Shores, and there's a number of topics. Have you had a chance to review this deposition notice?

A. Yes, I did.

Q. Okay. And are you the authorized representative for Breezy Shores who will be testifying today on these topics?

A. I am.

Q. Okay. I do not want to know the content of any conversations that you've had with your attorneys. But other than telling me about that, what have you done to prepare for this deposition today?

A. I've reviewed the documents, like the deposition and, you know, some documents I've had and summarized what's happened in

the past from the -- like we were filing our land use permits, et cetera, and also reviewed some financials so I could assess some of the requests about what I felt some of the damages were.
Q. Okay. Let's break that down a little bit. When you said read this deposition, did you mean the deposition notice or reviewed a copy of like Vince Jackson's deposition?
A. The deposition notice.
Q. Okay.
A. And I also did review Vince Jackson's testimony.
Q. Okay. You said you reviewed some other documents. So could you be a little bit more specific about -- you mentioned some documents regarding the application. You mean documents that were submitted to Baldwin County?
A. For instance, I went back and looked at with my architect the survey, the site plan. So we wanted to kind of refresh our memories about what that was. And I reviewed some

information from my builder regarding building costs that were originally planned at the time we started the project. And I also last had to update his building cost estimates for if he had to resume building now. There was going to be a difference.
(Whereupon, Defendants' Exhibit 10 was marked for identification and attached to the Original transcript.)
Q. Okay. Let me for purposes of -- so do you see what we actually provided as Defendants' Exhibit 10 here? You said you reviewed documents about damages. Are those documents that you're talking about reflected here in this Exhibit 10?
A. Yes. I do have an updated version of that. It's not a very big difference. I think it is a couple thousand dollars. But I do have -- because I did ask him to sort of refine it to the best of his ability.
Q. Okay. I think -- so -- so what we've got I received from your attorney. Yesterday he

sent what I think was updated and this has been substituted in. Is there a more updated version than what --
A. Yeah. This one, this particular one with the spreadsheet from Steve Jones has one more update to it. It's about two thousand dollars' difference. And I have not provided that to Kris yet. I just got it late last night.
Q. Okay. Can we agree that you'll -- you will provide it to Kris? I know you're obviously here right now. But as soon as you're able, that you'll provide it to Kris so he can send it to us?
A. I will provide it today.
Q. Okay.
MR. ANDERSON: And I'll get it to you right away, Jamie. Let me just note one thing.
MS. FRAWLEY: Yeah.
MR. ANDERSON: We also sent you some rental income numbers that were relevant to the damages disclosure. I just want to make

sure you got that in case you wanted to incorporate that into your exhibit.
MS. FRAWLEY: Okay. Let me -- hold on. Let's go off the record for a second.
(Off-the-record discussion)
Q. And so is this property statement one of the documents that you reviewed?
A. Yes, it is.
Q. And this is -- this is thirty-three total pages here. We'll get back. That will become -- this will become part of Exhibit 10. And then there's this one which is fourteen pages. Is this also a document you reviewed to prepare?
A. Yes.
Q. Okay. All right. So these two documents will be added to -- will also be part of Exhibit 10. And we'll actually talk about them later. I just wanted to make sure that we are right now talking about what you did. Okay. We talked about you reviewed the survey and site plan. You reviewed those documents that we've been provided about

Page 14

financial information and damages. Are there any other documents that you reviewed to prepare for this deposition?
A. Not that I can recall.
Q. Okay. Besides -- again, besides your attorney, did you talk to anybody to prepare for this deposition?
A. I talked to my architect, Mark Pavey, yesterday.
Q. Can you spell his last name?
A. P-A-V-E-Y.
Q. Okay. And I ask you this, too, because Mark has different ways of spelling it. Is it M-A-R-C or M-A-R-K?
A. M-A-R-K.
Q. Okay. And where is he -- is he with a firm or --
A. By himself. He has his own architectural business. He has a couple of employees here in Gulf Shores. And I also talked with Steve Jones, my builder.
Q. Okay. What's the name of Mark's -- Mr. Pavey's architectural firm, if you know?

Page 15

A. I can't remember off the top of my head.
Q. Okay. That's fine. So besides --
A. I can get you his contact number.
Q. That would -- yeah. We would -- we would ask that that be updated. So besides Mark Pavey and Steve Jones, anybody else -- and your attorneys, anybody else you talked to to prepare for the deposition today?
A. Daniel Prickett who manages -- he's the property manager, rental property manager.
Q. Okay. Rental property manager for -- is he employed by Breezy Shores or somebody else?
A. The statement you showed me earlier, if you look at the top, it says Prickett Properties.
Q. Yes.
A. He's the owner of that business.
Q. Okay.
A. He manages -- his company manages the rental income and reservations and most of the repairs for all of my rental properties.
Q. Okay. Anybody else?
A. No.

Page 16

Q. And we've talked about your rental properties. How many rental properties do you have an ownership interest in personally?
A. Well, when you say personally, they're actually owned by an LLC that is owned by a self-directed IRA trust.
Q. Okay.
A. So when I retired from Motorola, my IRA money I had I moved into a self-directed IRA --
Q. Okay.
A. -- which allows me to invest in things other than just stocks and bonds such as rental real estate.
Q. Okay.
A. So that -- all of my properties that I currently own are managed through that. In terms of the number, I have one that's called Breezyville which is in Gulf Shores. I am a minority owner. My LLC is a minority owner in that one with the same partner that I'm a minority owner in with Breezy Shores.

Page 17

I also own another one called Easy Breezy. Again, a partnership. And that's an eighteen-bedroom duplex right next door to Breezy Shores. And I -- my LLC is two thirds owner in that, and the other third is owned by a brother-in-law.
Q. Okay.
A. And then we just sold a property that we had in Gulf Shores. We just closed earlier this month. So we no longer own that one.
Q. Okay. What was that property or what is the name of it?
A. It was called Nice and Breezy.
Q. Okay.
A. It was not a beachfront property. It was across the street from the beach in Gulf Shores.
Q. Are there any -- and I'm going to be -- right now we'll delve into this more. But right now using the term ownership interest sort of broadly, are there any other properties that you have somehow or another an ownership interest in other than these

four or have had in the last five years?
A. General properties including, for instance, my house or a second home that I personally own?
Q. Any other rental properties?
A. No other rental properties.
Q. Okay. Any other commercial properties?
A. No.
Q. Okay. So any other properties that you have any ownership interest in are personal to you, not income producing?
A. Yes.
Q. Okay. All right. You mentioned -- so you have the self-directed IRA trust. So you don't personally outside of the trust have an ownership interest in any sort of corporate entity; is that correct?
A. That's correct. I do have another LLC. Let me modify that. There's a company, an LLC called Breezy Beach Holdings --
Q. Okay.
A. -- that I used to own a condo in. That was not at all affiliated with the self-directed

IRA trust. But I sold that condo last year. And so now Breezy Beach Holdings is strictly kind of a remnant of that -- that investment.
Q. Is -- and was the condo that was owned by Breezy Beach Holdings also in Baldwin County?
A. Yes. It's the Beach Club condo.
Q. Yeah.
A. It's a one -- it's a one-bedroom condo.
Q. Okay. Yeah. I'm familiar with that.
A. Yeah.
Q. Okay. When did you -- when was that condo sold about, approximately?
A. I think it was about the summer. Last summer.
Q. Okay. Summer of 2020?
A. Yes.
Q. Okay. All right. Is Breezy Beach Holdings, LLC, still an active corporation?
A. It is.
Q. Okay. Was it incorporated in Alabama?
A. No. That was incorporated in Louisiana.

Q. Okay. We'll just start with that. Who were -- who are the members of Breezy Beach Holdings other than you?
A. I am -- my wife and I are managers.
Q. Okay.
A. You know, you can have sort of membership managed or manager managed. It's a manager managed LLC.
Q. Okay.
A. My wife ran it.
Q. Okay. What other -- so just going down the list here. Breezyville, who owns Breezyville?
A. Okay. Breezyville is owned by Breezy Beach Properties, LLC. Do you want me to just go ahead and fill you in on that?
Q. Tell me about the members of Breezy Beach Properties.
A. So there are two members in Breezy Beach Properties. One is DLP 1. That is owned by a man named Thomas Lynch, L-Y-N-C-H. And they own eighty percent of Breezy Beach Properties.

Q. Okay.
A. And the other is my -- my self-directed trust IRA which all consolidates under one LLC which is called MRBIRA, LLC. So my initials, you know, IRA, LLC.
Q. And they own the other twenty percent of that?
A. Yeah. They own like seventeen percent, and three percent is a couple of family neighbors that wanted to put a little money in on the investment. So we put them in there under a separate LLC so they could contribute a few thousand dollars. And they all love the investments. It was more of a pain for me, though.
Q. Family.
A. Yes.
Q. What can you do?
A. Right.
Q. Okay. Now, you mentioned -- so Easy Breezy. Who owns Easy Breezy?
A. It's actually EZ Breezy, LLC.
Q. Okay.

A. It actually makes sense.
Q. And who are the members of EZ Breezy, LLC?
A. That would be MRBIRA, LLC, again, which would be my two thirds' ownership and the other one third is my brother-in-law's LLC which I do not remember the name of it but I can provide.
Q. Okay. All right. Breezy Shores, that's owned by Breezy Shores, LLC, correct?
A. Yes.
Q. Okay.
A. That's the one that matches.
Q. Who are the members of Breezy Shores, LLC?
A. It's the same as Breezy Beach Properties. The ratios are a little different.
Q. Okay.
A. DLP 1 currently owns a little over seventy-five percent, and MRBIRA, LLC, owns a little under twenty-five percent. But the plan is for MRBIRA, LLC, and DLP 1 eventually to end up fifty/fifty. And we have to -- the MRBIRA, LLC, will catch up on the capital side which we haven't had a

chance to do yet because the project is kind of on hold now.
Q. Nobody -- no other person or entity has an ownership interest in Breezy Shores, though?
A. No.
Q. Okay. Who owned Nice and Breezy before it sold?
A. Nice and Breezy was -- actually the name of the LLC for Nice and Breezy was M and J Beach Rental III, LLC. And that was owned like fifty-one percent MRBIRA, LLC, and forty-nine percent JBIRA, LLC, which is my wife's self-directed IRA. She worked at Motorola for many years, and she also had a significant IRA fund.
Q. Okay. Is M and J Beach Rental III, LLC, is that like Roman Numeral III or the number 3?
A. Roman Numeral III.
Q. Okay. Is that still an active corporation?
A. It is, but we're soon going to end it. We're just waiting until the final bills --
Q. Quiet down?

A. Exactly.
Q. I'm sorry. I talked over you. I just said we don't need to do that. So is that -- M and J Beach Rentals, LLC, is that also incorporated in Louisiana?
A. Yes.
Q. DLP 1, is that -- where is that incorporated?
A. That's in -- Tommy Lynch lives in Pennsylvania. I'm assuming it's Pennsylvania. It may not be. I don't really remember.
Q. Okay.
A. But I'm thinking it is Pennsylvania.
Q. Okay. And is that -- do you know is that a number 1 or Roman Numeral I as well?
A. It's a numeral 1.
Q. Okay. I'm sorry. Roman Numeral I?
A. No. I'm sorry.
Q. Just the number?
A. Whatever you call that.
Q. Got you.
A. English.

Q. And we've already discussed that MRBIRA, LLC, is a Louisiana company, right?
A. Yes.
Q. Okay. What year did you incorporate the MRBIRA, LLC?
A. That's a good question. I don't remember the exact year. It's been since at least 2012.
Q. Okay. Are you considered an officer of Breezy Shores, LLC?
A. No. My LLC is -- it's -- LLCs are the actual members.
Q. Sure.
A. I am considered a manager.
Q. Okay. As a -- are there any other managers of Breezy Shores, LLC?
A. I am not sure if we ended up classifying Tom Lynch as a manager or not. I'd have to check.
Q. Okay. So other than Tom Lynch who may be a manager, would there be anybody else?
A. No.
Q. Does Breezy Shores have any employees?

Page 26

A. No.
Q. Okay. You mentioned Prickett Properties. Does Breezy Shores have a contract, a management contract with Prickett Properties?
A. I don't think we actually have a signed contract at this time. We usually put that in place when the building is kind of wrapping up and ready to go.
Q. Sure. But you would anticipate that Prickett Properties would be the management company?
A. Yes. They manage all my properties.
Q. Okay. Do you have any other property managers for any -- besides Prickett Properties, are there any other entities that have a management contract with any property that you have an interest in?
A. No. They are the exclusive one.
Q. Okay. Do any of these other properties have direct employees?
A. No.
Q. Okay. So y'all do everything through

Page 27

management companies and contractors?
A. Yes. Especially because we live in Louisiana, we cannot --
Q. Yeah. That makes sense. All right. Let's talk about -- so Breezyville, when was that built?
A. Breezyville finished construction in November of '19.
Q. What kind of property is it?
A. There are four houses on one lot. Each of them are twelve bedrooms. Two are located right on the beach and the other two are right behind the front two buildings and have use of the beach but not on the beach per se. They all share a common ground, a common pool. And there's an extensive parking area for all four buildings set up there with a gate to control access for parking that the City required us to do.
Q. Okay. Is each house considered a single family residence?
A. Yes. Each house has to be rented in its entirety. In general, I don't want any of

Page 28

my properties to be like a hotel. They're for families to come in and to rent them and take over the whole building. They have a large living area and kitchen and access to the beach.
Q. Okay. Where -- you said Breezyville is in Gulf Shores. Where -- do you know?
A. Yes. It's 605 West Beach Boulevard. I tell most people right behind Bahama Bob's.
Q. Okay. That's a much better direction. I know what you're talking about when you say that. Okay. Easy Breezy, tell me what kind of property is that.
A. Easy Breezy is an eighteen-bedroom duplex, nine bedrooms on each side, three stories with a pool elevated on the first level deck and a separate pool for each duplex.
Q. When was it completed?
A. If I remember correctly, it was May of 2015.
Q. And where is it located?
A. Right next door to where the subject property Breezy Shores is which is 3460 Ponce de Leon Court. No. 3464. I get the

Page 29

two of them mixed up.
Q. Where was Nice and Breezy, or where is Nice and Breezy I guess I should ask?
A. 1260 West Beach Boulevard, Gulf Shores, Alabama, about a quarter mile past the overwalk heading west after you -- toward the west.
Q. And tell me, what kind of property is it?
A. It was -- it's a twelve-bedroom house similar to each of the houses that was built in Breezyville. Twelve bedrooms, three story, raised pool on the deck. Like I said, we just sold that property a couple weeks ago.
Q. And it's -- it is a single -- would be considered a single family?
A. Yes. Single family. It's not a duplex. So you have to rent I say all twelve bedrooms. But when we're in off season, we have a configuration where you can rent just seven of the twelve bedrooms. But no one else can rent the other five. It just gives us a smaller unit to offer when it's not peek

season.
Q. And you lock off the other -- you lock off the other bedrooms?
A. Yes. We lock off the top floor. And we do the same at Breezyville for those twelve-bedroom houses in the off season.
Q. Okay. Do you do anything like that with Easy Breezy, lock off part?
A. We don't want to do that with Easy Breezy because each side of Easy Breezy is a separate unit. So in the off season we let them rent just the nine bedroom sides. During the summer you have to rent all eighteen bedrooms through one party.
Q. How did you come to know -- well, let me back up. In DLP 1, is Thomas Lynch the sole I'm going to say owner, have the sole ownership interest in DLP 1?
A. I believe so.
Q. Okay.
A. I can't say for certain.
Q. Okay. How did you come to know Thomas?
A. I go back with Tom over twenty years. I

used to work for him at Motorola in the late '90's, and he later on got promoted to run all of the cell phone business for Motorola. And then he moved me over to work for him in Chicago. So I worked for him at Motorola for several years, and we've remained friends since. He left Motorola and became CEO of Tyco Electronics, but we've always stayed in touch.
Q. When did -- well, when was Breezy Beach Properties, LLC, incorporated?
A. Breezy Beach Properties was incorporated when we bought the lot from Breezyville which I believe was in 2016. I'm not sure about the exact date.
Q. And was DLP 1 a member of Breezy Beach Properties, LLC, from its inception?
A. Yes.
Q. Has DLP 1 been a member of Breezy Shores, LLC, since its inception?
A. Yes.
Q. You've been friends with Tom. How did it come to be that you went into business

together?
A. He was calling one day to set up golf. He was still working at Tyco Electronics then, and he asked me what I was doing. And I said -- because I had stopped consulting with Chrysler and I started investing in some properties down in Gulf Shores, Alabama. He said, Really. I'm looking for investments. Can you send me your information, how the financials look? So I did. He loved it. So he said, I would love to invest down there. So I said, All right. I'll begin looking for some lots that we can build on. And that's what it led to.
Q. How did you pick Gulf Shores to start investing in?
A. That goes back. I actually started in Orange Beach back in 2012. A friend of mine bought a condo in Turquoise in Orange Beach. And it was early on during that time when BP was offering incentives to buy one of those units. So he told me about it, and I went and checked it out. And I invested in

there. That was not with my IRA money. I invested in that with non-IRA funds. And we held that for a couple years and then bought a second condo in Gulf Shores is how I got into Gulf Shores, Crystal Shores West, a smaller condo. And then after owning the condo a couple years, I realized they weren't all that profitable with all the association fees. So I became interested in buying separate housing units so I could control the costs. So I bought a couple places that needed to be renovated as opposed to building construction from new. And then after we ran out of those opportunities as the market recovered, the only way to really get a return out of our money was to build new places. So it's been a transition from condos to renovation of houses to building new houses.
Q. You sold all your interest in the houses that you renovated, though; is that right?
A. Yes. I sold all of them. It was only two.
Q. Okay.

Page 34

A. But I sold both of those.
Q. What was the first new -- new build that you did?
A. The first new building was Easy Breezy.
Q. Okay. How did you -- how did you decide to -- to buy on Ponce de Leon and build Easy Breezy? How did that opportunity come about?
A. Well, as I indicated earlier, we had renovated a couple places. And we began to look at what worked and didn't work on rentals. And it became clear to me that the more bedrooms I could put in a building, the more rent money we could get. But we needed to take the approach of the bedrooms still needed to be pretty good size and be decorated nicely because you're dealing in a market where the per night rent is pretty high. So Easy Breezy was really a pretty big gamble on our part that we would build and put such a big building on a lot. I'd never built a building before. So it was a pretty nervous time. We picked that because

Page 35

that was all -- that was what was available. We were able to buy two lots at the time. There were three lots together. I couldn't afford to buy all three. So we bought two. And I later sold the lot that Breezy Shores was going on to Tom Lynch's LLC for a profit in anticipation of eventually building something there.
Q. Okay. All right. To kind of get into -- you were -- in your answer just now you were saying we. Who are you referring to when you say we?
A. Oh, my partner with Easy Breezy. At the time, I had two partners. My brother-in-law currently still owns a third, and then the other one was Andy Buddy Garrow of Louisiana. I forget the name of his LLC. But he wanted out before the building was even built. And so I bought his third out for what he put in basically at his cost.
Q. Okay. And then with Breezy Shores, so the lot that is now owned by Breezy Shores, LLC, EZ Breezy, LLC, owned at some point,

Page 36

correct?
A. Correct.
Q. Okay. When was that lot sold by EZ Breezy to DLP 1 about?
A. I'm going to say about '17.
Q. And DLP 1 did not do anything to develop that lot, correct?
A. No. Tom totally relied on me to lead the efforts on any building, design work.
Q. Okay. Did DLP 1 then sell that lot back to EZ Breezy?
A. No. No. They contributed the value of that lot in Gulf Shores as their capital investment in Breezy Shores which we evaluated at six hundred thousand dollars which is what I sold it to him for.
Q. So that lot was deeded, though, from DLP 1 to Breezy Shores, LLC?
A. Yes.
Q. And that was done, but there wasn't an exchange of money, per se. It was done by -- as a capital contribution -- DLP's contribution to buy into Breezy Shores?

Page 37

A. Yes.
Q. Okay. When was that done?
A. I think it was early 2018.
Q. Did DLP 1 put in any other capital into Breezy Shores?
A. No.
Q. Okay. Has MRBIRA, LLC, put in capital -- made a capital investment in Breezy Shores?
A. Yes. One hundred and seventy-five thousand to date.
Q. Okay. And that has been done in cash?
A. Yes.
Q. Okay. Does Breezy Shores, LLC, have any indebtedness?
A. No. I can't -- I can't speak for certain about the lot, if Tom ever had any debt on that lot or what. I don't think so. There's no way I can know that previously. Now that's it's in Breezy Shores, there is no debt.
Q. Okay. Okay. So -- so whether or not he had a mortgage you don't know, but Breezy Shores owns that lot free and clear?

A. Yes.
Q. Okay. And there's no other like line of credit or any other form of indebtedness for Breezy Shores?
A. No.
Q. Okay. All right. We talked earlier about you having been in deposition from your time at Motorola. Have you ever personally been a party in any lawsuit?
A. No. The only exception I can think of is when I was twenty-five I filed a small claims.
Q. Okay. That's fine. I don't -- we're not going to talk about things we did in our twenties. It's fine. Yeah. Has any -- other than this lawsuit obviously that Breezy Shores has filed, has Breezy -- this one, has Breezy Shores, LLC, been a plaintiff or a defendant in any other legal proceeding?
A. No.
Q. Okay. Have any of the other -- have any of the other corporate entities in which you



have some kind of an ownership in ever been a party in a legal proceeding?
A. No.
Q. Okay. And just to be clear, going back to -- even going back to the first condos or houses that you -- that we've discussed.
A. No.
Q. Okay. Have any of these properties -- in any of the other properties that you've been involved with, have there -- have you had any other zoning appeals of any kind?
A. I had a lot I had purchased in Fort Morgan, 0 Our Road, 0 O-U-R Road. And I applied for a change in zoning so I could try to break the lot into two lots. I ended up having to go in front of the Fort Morgan Civic Association. They voted it down even though they didn't have actual authority. I decided it was just too big of a hassle to pursue it. So I withdrew my application and I ended up selling the lot.
Q. Okay. Now, you said the Fort Morgan Civic Association. Do you mean the Fort Morgan



Planning and Zoning Advisory Committee?
A. It may have been that. I can't keep track of all their committees. It was some committee that the Gulf Shores Planning Department, Linda Lee, suggested that I put in for that. And she attended that meeting. And like I said, they didn't want anything to do with anyone building any properties that would be used for rent in Fort Morgan. So I didn't make any fuss about it. I just decided to sell the lot.
Q. Okay. When was that about?
A. That should have been in 2019.
Q. Okay. Have you -- have any -- with the homes that you had talked about earlier that you renovated in Gulf Shores, did you own those personally?
A. No.
Q. Okay. Were those all owned through LLCs as well?
A. Yes. Specifically there were two.
Q. Okay.
A. One was called Southern Secret which is



right next door to Nice and Breezy.
Q. Okay.
A. And that was owned fifty percent by my LLC and by another -- the same friend who had talked to me about the Turquoise condo, he had an LLC and owned the other half. And he -- well, I'll say renovated it, spruced it up and rented it for a while and sold it.
Q. Okay.
A. And then the other one was a place called Big Breezy down on Ponce de Leon Court which was a bigger renovation and had been shuttered for four years. And I bought it in bankruptcy. And we had it totally renovated. I sold that later to Tom Lynch which is Tom's first investment down in this area.
Q. Okay.
A. He still owns it today.
Q. Did you have separate LLCs for both Southern Secret and Big Breezy?
A. I did.
Q. Okay.

Page 42

A. Big Breezy was M and J Beach Rental I, and then Southern Secret was M and J Beach Rental II.
Q. Okay.
A. Roman Numeral.
Q. And the condos -- I know we've talked about one was held -- the one at Beach Club was held by Breezy Beach Holdings, LLC. Do you have any other LLCs holding condos?
A. No. Thank goodness.
Q. Okay. All right. So we talked about the zoning issue with 0 Our Road. Other than that, have you been involved in applying for a variance for any property you've been involved in renovating or developing in Gulf Shores?
A. Yes. We asked for a variance on Nice and Breezy. Our builder had inadvertently built -- when he set the foundation for the property, he had crossed over the setback line about a foot. And we requested a variance on that. And what we ended up getting was they allowed us to go ahead and

Page 43

build, but we had to add fireproofed drywall, the outside and inside of the house all the way around which increased the cost significantly. But it allowed us to build.
Q. Any other variance in properties you've developed?
A. Not that I can recall.
Q. Okay. Other than 0 Our Road, any other zoning matter disputes --
A. No.
Q. -- that you're involved in? Okay. Have you been involved -- have you filed ever any sort of -- any other sort of administrative appeal with Baldwin County regarding any of these properties?
A. Yeah. We filed an appeal for Breezy Shores with the matter we're talking about.
Q. Right. But other than Breezy Shores, no other appeals?
A. No.
Q. Okay. Has -- has anybody ever filed any litigation regarding a property that you have an ownership interest in?

Page 44

A. No.
Q. Has anybody -- has any property in which you've had an ownership interest ever had any sort of -- other than what we've talked about already, had any sort of administrative negative action taken against it?
MR. ANDERSON: Object to form.
Q. Yeah. Sorry. That was a bad question. Other than what we've talked about already, has any property that you've been involved in ever received any sort of citation from a governmental entity?
A. Not that I can recall.
Q. Okay. Other than Breezy Shores, of course. We'll talk about that later. Has any property you've been involved in had a stop work order issued?
A. Yes. Nice and Breezy did as part of that variance I discussed where we built the houses set on the setback. So when the survey came back, that's when it was.
Q. Okay.

Page 45

A. And there may have been another temporary stop work on EZ Breezy.
Q. Okay.
A. One time we had something about an elevator issue. So we -- we resolved it within a day or two and resumed.
Q. Okay. Any other stop work orders you remember?
A. Not that I can remember. I remember there was on Nice and Breezy an incident with OSHA, some safety issues on the way the builder was handling some of his workers. I got it resolved, also.
Q. Okay. Who was the builder on Nice and Breezy?
A. Originally it was a gentleman named Mike Adams.
Q. Okay.
A. But I ended up having to dismiss him from the project because he refused to show up for work for an extended period and ended up keeping some money that I had paid him already.

Page 46

Q. Okay.
A. And I ended up getting Steve Jones to come in and finish the build.
Q. Okay. Was -- with the OSHA incident, that was against Mike?
A. Yes. And OSHA communicated to me that he had a history of having problems like that which is another reason I dismissed him.
Q. Sure. And was Mike the one who was responsible for building into the setback originally?
A. Yes, he was, along with a few other things.
Q. Okay. So you don't use Mike anymore?
A. No. I mean --
Q. Yeah. Any other administrative governmental negative actions that you're aware of in properties you've had an ownership interest in?
A. No.
Q. Okay. Have you ever had to do any sort of administrative appeal process with, say, the Alabama Department of -- with ADEM, Alabama Department of Environmental Management?

Page 47

A. Bill Lynn is kind of the person I interfaced with there. He once came back on Easy Breezy and said we didn't have the proper turtle lights put in underneath our parking. So I -- I didn't realize that. We had instructed the electrician to put those in, but I guess somehow they put the wrong thing in. So we came back and replaced them, and Bill was happy.
Q. Any other -- but you-all were notified of that deficiency and you cured it without going through any sort of administrative process or asking for a variance?
A. I got an Email saying, Hey. I went by your place and saw this. You shouldn't have put that. I said, We'll take care of it right away. We did. He said, Thank you. That's how most things we -- any issues that we've had with building permits, we normally would be notified. We would talk about it and address it. We always tried to do what was required. So that's normally how it worked.
Q. Okay. So have you had to go through -- and not just talking about with Baldwin County. But have you gone through an administrative appeal process related to any other properties you have an ownership interest in with any agency in the state of Alabama?

Page 48

A. No. Other than, you know, with Breezy Shores.
Q. Okay. What about have you ever had to go through any kind of administrative appeal process with any property which you have an ownership interest in with any agency of the United States?
A. No.
Q. Okay. Tell me about at Breezy Shores. So we've got -- you know, you've sold that lot to DLP 1 about 2017. How did y'all decide to develop it?
A. I'm not sure I understand the question. Like what motivated us to?
Q. Well, when did y'all decide to develop it?
A. Well, whenever Tom bought the lot from EZ Breezy is sort of when the wheels -- we began the thought process of doing a project there.

Page 49

Q. Okay. So when you had first -- what entity had originally bought that lot? Was that --
A. Well, MRBIRA originally bought the lot, if I remember correctly. And then we sold it, moved it into EZ Breezy, LLC, as its contribution, part of the contribution capital. And then later on EZ Breezy sold that lot back out to Tom.
Q. Okay. So at the time that you sold the lot to Tom -- well, to --
A. DLP 1.
Q. DLP 1. Right. At the time EZ Breezy, LLC, sold the lot to DLP 1, had there already been discussions about developing it?
A. Yes. Nothing detailed. But the idea of building something similar to EZ Breezy was discussed.
Q. Okay. How much had that lot -- what was the original purchase price of that lot I guess by MRBIRA, LLC?
A. I think it was around four hundred twenty-five thousand.

Page 50

Q. At the time that you purchased it with Easy -- or at the time EZ Breezy purchased it,
A. MRBIRA --
Q. Yeah. Sorry. They purchased it and then transferred it into EZ Breezy. Was there ever any intention for EZ Breezy to develop that?
A. Sure. I mean, originally the idea was to be that EZ Breezy would do it. But my partner -- I had to buy the original partner out of a third.
Q. Okay.
A. We could not pull off that investment. So we sold that out which allowed my partner to get some profit on that lot.
Q. Okay.
A. They could not capitalize and build.
Q. Okay. When was EZ Breezy incorporated?
A. It should be around 2014 because it was completed -- the building was completed in '15, I think. And I think it was the year before that. So it was either '13 or '14.
Q. Okay. When was Breezy Shores incorporated?

Page 51

A. Should be around the time the lot was -- '17 is my best guess. I'd have to look it up.
Q. Okay. Was it incorporated before or after the lot was sold to DLP 1?
A. I think it was after.
Q. Okay. Do you remember about how long after?
A. I don't.
Q. Yeah. Time is funny. Sometimes it's easier to remember in sequences than the dates.
A. There's so many LLCs and lots going that it's hard on that.
Q. Okay. But just to get -- so at some point the lot went to -- was the lot transferred from MRBIRA, LLC, into EZ Breezy pretty quickly upon EZ Breezy becoming incorporated?
A. Yeah. I think it was pretty much around the same time.
Q. Okay. Okay. Do you know how long you had held it as MRBIRA, LLC, before it was transferred?
A. Not very long. Probably a few months.
Q. Okay. Do you know about how long EZ Breezy

Page 52

held it?
A. Probably a little over a year.
Q. All right. You said earlier that you-all had started talking about developing Breezy Shores during the time -- well, earlier. How -- how long was it -- well, were those discussions -- those discussions had started at the time that the lot was transferred or sold to DLP 1, right?
A. Right. Probably a little prior to that which, you know, because the reason you would take the lot is that we would build something on it.
Q. Okay.
A. So I, you know, communicated with him that whatever the right point in time would be we could do that. I told him we had to finish Easy Breezy first. And then when we got involved with Breezyville, I said I can only do one piece at a time.
Q. So you-all finished Breezyville in November of 2019?
A. Correct.

Page 53

Q. Okay. Prior to that -- so did you-all start -- well, hold on. I'm trying to get the time line. So prior to then would it be fair to say that you'd only had sort of casual we should do these, those type conversations about the development of Breezy Shores?
MR. ANDERSON: Object to the form.
Q. Let me ask you another way. Had you actually prior to finishing Breezyville -- because you said that you wanted to do one project at a time. So prior to finishing Breezyville, had you taken any concrete steps towards developing Breezy Shores like engaged an architect?
A. Prior to Breezyville, yes. We had discussions with Mark Pavey who did Breezyville for us, sketching out ideas of what we might do. But we didn't get earnestly involved in having Mark work on the design because he was also doing Breezyville. And for the same reason, he had to finish that before he could start

really working on Breezy Shores.
Q. Okay. So when was the first contract signed in relation to the development of Breezy Shores?
A. Contract with Mark?
Q. Any kind of contract. Any kind of contract for development.
A. Well, the first contract would have been Mark to design it.
Q. Right.
A. I don't know the answer to that. I'd have to go back and look.
Q. Okay. But it would be fair to say that it was -- that contract was signed after he finished Breezyville or before?
A. Could have been before he -- like I say, he finished -- when we finished. So the project is not, but most of his work was done prior.
Q. Right.
A. So I'd have to go back and look. I'm not even sure we did a separate contract right away. He may have just started working

because he was already working on this project and we did a contract. So I'd have to go back and look exactly when that was.
Q. Other than Mark, who else did you have any discussions with about the development of Breezy Shores?
A. Steve Jones who was going to -- and also Daniel Prickett because I always involved Dan Prickett on plans for new building since he's the rental management guy. He has good advice and recommendations on things to do to make the rental more successful.
Q. Okay. Did you talk to Steve before or after you talked to Mark?
A. I don't know. I don't remember. It all tends to happen near the same time.
Q. All right. Was there anybody else who you -- you or Tom Lynch who is, of course, the other -- anybody else that Breezy Shores talked to about development besides Mark and Steve and Daniel?
A. No.
Q. Okay. Did you or Tom ever consult an

attorney about -- and I'm not talking about conversations with them. I'm just asking did you consult an attorney about the development of Breezy Shores?
A. I later on talked to Mark.
Q. But this is -- I'm just -- when I say development, I'm just talking about the early phases when you were getting, you know, plans drawn up, that sort of thing.
A. Mark Taupeka in the early stages, he helped draft up an operating agreement.
Q. Okay.
A. We actually never signed the operating agreement. We just had a draft of it. Alabama doesn't require an operating agreement. But we sort of wanted to draft it so we -- Tom and I totally understood what we were doing with this. Hence, Mark drafted that up.
Q. Okay. Okay. So you never signed it. Is it -- do you basically follow that agreement, though, would you say?
A. No. I -- I haven't looked at it since. We

did it because -- we did it originally because we thought let's have an operating agreement. And then after the experience we had with Breezyville, we realized, you know, we know what we're doing now. This would be a fifty/fifty deal, and Tom and I trusted each other over twenty years. So we never followed up with it.
Q. Okay. Is there anybody else that you-all talked to during the development phase of Breezy Shores about -- about development?
A. I mean, other than normal, maybe a -- like my decorator.
Q. Okay.
A. You know, there are people that we always work with when we're planning things. You know, there are a couple people like that. That's --
MS. FRAWLEY: Okay. I tell you what. We've been going for about an hour. Let's take a quick five-minute break before we get sort of to the next whatever. So we'll come back at --

Page 58

MR. ANDERSON: Before we go off the record, Jamie, just one point of clarification. You're taking the 30(b)(6) and Mr. Bordelon individually simultaneously; is that right?

MS. FRAWLEY: Yes. I figured that would be -- that's why I started with the things -- I figured that would be faster than asking him the same questions twice.

MR. ANDERSON: Right.

MS. FRAWLEY: Okay. Five minutes.

(Brief recess)

Q. Now that we're back on the record, the first thing I wanted to just ask you, Mr. Bordelon, sometimes we -- you know, when you're talking for about an hour straight, sometimes when you take a break something pops into your mind that you think, Oh, I wish I had said that differently or I need to add that or whatever. Is there anything that sitting here now you want to modify or go back to on your testimony so far?

A. No.

Page 59

Q. Okay. Another thing, too. And we've been talking about so far just kind of organizational stuff. As we get through here, if there is -- I will -- we've had some questions already about you personally versus Breezy Shores. I will try my best to be clear. If there is a time period that, you know, if I ask you a question and you don't know who I'm referring to or what I mean, please -- please tell me because I probably will -- I will mess up a pronoun in this. I just will over the course of the day.

A. I understand. I have trouble keeping track of all of it myself. So --

Q. Yeah. Yeah. The most important thing is to make sure we're all understanding each other. I'm trying not to -- I don't want to ask the same question literally twice every time or else we'd be here for all fourteen hours.

(Whereupon, Defendants' Exhibit 2 was marked for identification

Page 60

and attached to the Original transcript.)

Q. Okay. Moving on. I'm going to show you -- if you'll look at what is -- this is going to be Exhibit 2. Can you just identify this for me?

A. Yeah. Looks like the actual complaint.

Q. Yeah.

A. Yeah.

Q. Okay. And you've seen this document before, Mr. Bordelon?

A. Yes.

Q. Okay. This was filed by both you and Breezy Shores, LLC, correct?

A. I believe so.

Q. Now, you mentioned earlier that y'all don't have an operating agreement. Was there any sort of formal corporate decision by Breezy Shores to file this lawsuit?

MR. ANDERSON: Object to the extent that that seeks a legal conclusion.

MS. FRAWLEY: Yeah. Sure. Let me --

Q. What I'm asking is did you -- and just to

Page 61

put it into more whatever ordinary terms, is there like a document, minutes or something where you as -- I guess as DLP 1 and Thomas Wright -- I'm sorry. You as MRBIRA, LLC, representative and Tom as DLP 1 representative officially said yes, we're going to file this lawsuit and put that in writing?

A. Well, I certainly discussed the decision to file the lawsuit with Tom. And we thought about it for a long time, and we both agreed that we would do it.

Q. Okay. Are there any documents that exist that reflect that?

A. No formal documents.

Q. Okay. Sure. All right. Going back. So when --

(Whereupon, Defendants' Exhibit 3 was marked for identification and attached to the Original transcript.)

Q. Okay. If you'll look at what is Exhibit 3, I'm going to mark this as Exhibit 3. This

Page 62

is currently marked you'll see a sticker on that there that says Plaintiffs' Exhibit 1. That's from the deposition of Vince Jackson. So these are the same documents that we've used in other exhibits. The fourth page of this here, could you identify what this document here is?
A. It's a site plan.
Q. Okay. And then this fifth page, what is this?
A. Just that --
Q. Yeah.
A. This page. Let's see. Looks like it's maybe part of the site plan. I'm not sure what that is.
Q. Okay.
A. I cannot read the lettering on there. Sorry. My eyes are not --
Q. You're fine. Is that -- you can look at your printed copy if that's going to be easier.
A. Unfortunately it's not.
Q. Okay.

Page 63

A. It's kind of -- it looks like -- it should say on there what it is.
Q. Yeah. So --
A. It's from Mark, my architect.
Q. Right. So I'm not trying to be -- this isn't an eye test. I'm just trying just for the record to get it identified. But this would be -- this is an architectural drawing. It was CDG Architecture.
A. A rendering from my architect of the building.
Q. Yeah. So for the record, both four and five are architectural drawings that -- of Breezy Shores that Breezy Shores had contracts with Mark, your architect Mark, to perform, correct?
A. Yes. Mark was in charge of handling the site plan and the building plan, obviously.
Q. Okay. Do you remember when you actually entered -- do you remember when -- so this is dated here on four as April 8th, 2019. Revision date June 12th, 2019. Do you see that? And it may -- I can -- now, I don't

Page 64

know if that's going to help or if that's going to make it any blurrier.
A. Unfortunately it doesn't help. It just gets blurry.
Q. Yeah. Okay. Do you see where the dates are?
A. I do.
Q. Okay. All right. Two hundred percent seems to be the sweet spot. It's a little bit more readable but not so blown up. Okay. How did you-all -- when you were talking to Steve about this, did you tell him how many bedrooms -- what did you tell him about what you wanted him to draw up, produce for you?
A. Well, Steve wouldn't do any drawing. Like Mark does all the drawing.
Q. You're right. I'm sorry. Mark. When -- what were the directions given to Mark in terms of coming up with the plans?
A. Yeah. Yeah. I -- what I guided Mark was we wanted a duplex. We didn't want to put something as big as Easy Breezy. We wanted basically to address a different market,

Page 65

have fewer bedrooms than Easy Breezy so we could sort of get at more of the market. So that was the general guideline. Mark fit sort of what he could fit in the design and the footprint that we had. Because you're limited by what you can build. Even though the lot is pretty big, you're limited by your impact that you have with ADEM. And so that ends up driving more limitations on your capacity than anything along with the number of stories and obviously that also affects what you can put in. So we sort of -- you know, he had tried several drafts of different sizes and different size bedrooms. We sort of settled in and this was the sweet spot, fourteen bedrooms, seven on each side. That way the bedrooms would be big enough for what we wanted the feel to be in our place.
Q. Okay. One thing just as sort of a housekeeping matter. In -- on this -- on the bottom here it says boundary survey and site plan for EZ Breezy, LLC?

A. Yes.
Q. Okay.
A. He had somehow got it mixed up.
Q. Sure.
A. Kind of like we do. So he wrote the wrong one on there.
Q. Okay. I was just making sure that it wasn't anything other than that. There's a lot of Breezy, a lot of LLCs. Okay. Do you remember -- it says date, April 8th, 2019, revision date June 12th, 2019. What -- what were the revisions that were made between April and June of 2019?
A. I don't recall. I mean, obviously, in all of these projects there were constant revisions as you go through the process of getting approval as we were with the planning groups. I imagine they were discussing -- Mark was discussing things with them. I was not in the middle of most of that because that's why I pay him to handle that.
Q. Sure.

A. So I couldn't tell you exactly what they are.
Q. Right. Up -- let's see if I can -- that part that I just highlighted right there, can you tell that, where it says revision note?
A. Added parking spaces per client's request.
Q. Yeah. Do you think could that have been the revision, the June 12th revision?
A. It could have been. I mean, the general direction I gave him was I felt that I wanted to get as much parking room as he could on the site. Again, we're limited by the ADEM permit. If we weren't, I would put in more parking. But because we're limited by that, I stressed to him to handle the pilings in such a way that if we could do fewer pilings, bigger ones, and create more parking, I wanted as much parking as we could get.
Q. Okay. Do you know how many parking spaces this would have been required to have?
A. I don't recall. I believe the number for

that size building was six. It was three per duplex. It was three or four per duplex. I cannot remember right now.
Q. And each of these was seven bedrooms, correct?
A. Correct.
Q. Okay.
A. I can't remember if it's like one vehicle per three bedrooms, but I'm not sure.
Q. Okay. We'll get into that. I don't -- I don't -- this isn't necessarily a memory test. I don't want you to guess right now. We'll get into that later. So your direction to him was basically, you know, build -- get me as -- well, let me go back. Had you directed him that you wanted to do a duplex there?
A. Yes.
Q. Okay. And then you -- would it be fair to say that your direction was within the duplex, make it as sort of big as feasible beach property?
A. You mean the number of rooms and so forth?

Q. Yeah.
A. Not as big as possible. We could have built another Easy Breezy that had the same footprint. But I didn't want to go that big this time. What I mentioned earlier, I wanted to address a different market.
Q. Okay.
A. I did tell him we wanted to come down from that size, but I wanted to still get somewhere in the neighborhood of twelve to fourteen bedrooms. And we settled on seven and seven.
Q. Okay. Do you remember, was there Email correspondence or any sort of documents like back and forth between you -- either you personally or you on behalf of Breezy Shores and Mark about this plan?
A. I don't think so. I mean, it's almost always verbal. And then I would come out and he would have a new draft. We'd sit down and go over it. You know, and then I would make my comments on whatever I'd want to change. And we did that a few times. Of

Page 70

course, once we submitted -- working with the planning group, they would give us feedback on certain things.
Q. Okay. Was Thomas involved in those discussions at all?
A. No. He totally left that up to me. He did come out I think once and kind of looked over everything. We always deferred to Mike.
Q. Was -- Steve, your builder, when did he get involved with the project?
A. Once we sort of had a pretty good layout of the design and the building, then I began asking Steve for estimates on what it would cost to build it. So he'd then begin that process of sizing up cost estimates for me.
Q. Okay. You mentioned earlier that you talked to Daniel Prickett of Prickett Properties fairly early on. Tell me about your conversations with him about Breezy Shores.
A. Dan played a more minor role. His thing we'd talk about is where we'd put the pool because that's -- you know, he has good

Page 71

advice on how renters want things to work. The size of bedrooms, if I wanted -- is it too small of a bedroom? Would that be a problem? The layout of the living area we discussed with him. So, you know, large groups in these houses, how the flow goes so that it works for them. And that's really about it for the most part.
Q. Okay. Did you talk to him about the number of bedrooms that you should have in these units?
A. Not too much. You know, I -- Dan is kind of -- he understands the same that I do. Obviously for him he would like more bedrooms because it's more rental money. I try to worry about things like the market we're trying to address and the level of comfort for the guests. You know, we use Breezy in all of our names. We're actually trying to build a little bit of a brand where people will see that name and go, Okay. It's going to be, you know, a pretty decent place. I want to stay there.

Page 72

Q. Okay. Is there a Breezy or a website associated with the Breezy name in your marketing efforts? Have y'all --
A. No. We don't do any direct marketing. Prickett Properties does all of the advertising for our properties. They go through their own site plus Google and others.
(Whereupon, Defendants' Exhibit 4 was marked for identification and attached to the Original transcript.)
Q. Okay. I'm going to look at what we have marked as -- it should be Exhibit 4 here. Do you remember this -- this page here, this document?
A. Looks -- I think it looks like Easy Breezy.
Q. Okay. Would this be a -- more of the architectural drawings for Easy Breezy?
A. Yeah. It certainly looks like an architectural page.
Q. Okay. So at some point we talked about there was an issue with adding -- one of the

Page 73

notes on that says add parking per request, right?
(Whereupon, Defendants' Exhibit 7 was marked for identification and attached to the Original transcript.)
Q. I'm going to draw your attention to what's been marked as Exhibit 7 which is the -- could you just identify just the first page for the record?
A. Baldwin County Zoning Ordinance, Amended December 1st, 2020.
Q. Okay. And I am going to draw your attention there to -- in ordinance 2.3.25 which is Planning District 25. Let me get it.
MR. ANDERSON: Do you want us to turn to that?
MS. FRAWLEY: Yeah. I was going to -- I've got it up on the screen here, too.
Q. Let's see. There's 2.3.25, Planning District 25. Down in 2.3.25.3(c) for the record which starts on page 2-30 and continues onto page 2-31 -- for the record,

Page 74

it's Defendants' Bates Number 6851 and 6852. Do you see where I am?
A. I do.
Q. Okay. So under this regulation -- now, each of your units had seven bedrooms or more, right? So you're here under this third category; is that correct?
A. Yeah. Both Easy Breezy and Breezy Shores had at least seven per side.
Q. Okay. So that would mean that the minimum parking for the building was four spaces each, right?
A. Well, yeah, if this was the zoning at the time. This was amended December 1st, 2020. So if this was the one at that time, because they do change. If that was, in fact, the time that we did it, yes.
Q. Okay.
MR. ANDERSON: And I'll object to you asking and him speaking on legal conclusions. But the ordinance says what it says.
Q. Okay. And I want you to look back here on

Page 75

Exhibit 3 where we had talked about the parking before. This version shows five spaces per unit, right?
A. Yeah. That drawing shows five.
Q. Okay.
A. That's what I was saying. First of all, we don't draw parking spaces like that. I'm still not sure why it was surveyed and why they drew those on there because that's just a driveway there.
Q. Okay. Tell me what you -- so how -- how would you expect to see that drawn on there?
A. Well, we'd show -- and I think we did reflect this on our building plan later. We show a driveway. And then after you get up the driveway, there's a parking area under the house where you'd park. And we had room for what we needed in terms of cars based on how we interpreted the zoning or I should say how my architect interpreted the zoning.
Q. Was the original -- I'm going to use the term stacked parking. Are you familiar with that term?

Page 76

A. Yes.
Q. Okay. Could you explain what it means to you?
A. Honestly, I don't even remember how the ordinance is written. But in our mind, how we've done our parking is because we rely on the fact that you're not in a hotel. Everybody knows each other. People park their cars the way they want to park them at their house. Some park behind others if they know this one car will never leave or people share and one car goes. So we just make sure we have room for that many vehicles. And that's how we've done it on all our properties. It's never been raised as an issue before.
Q. Okay. And so all of this, though, the main parking was under the house was your plan?
A. Mostly under the house, but some of it can be also on the upper part of the driveway. We've -- we always realized where we put the cars, we wanted people to kind of be within the property line.

Page 77

Q. Okay.
A. Even in the driveway you can go past the property line to extend to the road. We did not encourage people to park on the road or at the end of the driveway.
Q. Okay. With this parking plan, you mentioned people would park behind each other. So not every -- there's not direct ingress and egress from every space; is that right?
MR. ANDERSON: Object to form. You can answer, if you understand.
A. Yeah. I couldn't answer that question in terms of what that means.
Q. Okay.
A. People park -- people park the way they want to park, and they decide how they want to handle ingress and egress. They set that up. We do not paint parking spaces that they have to adhere to. It's free parking within the property. They park -- as you know, people showing up in small cars where they can park small cars where everybody can get in and out fine. And then someone

brings a big dually truck, and one vehicle can be so large that everyone has trouble getting around it and they have to, you know, move it.
Q. I understand that you don't, you know, go out to your renters and knock on the door and tell them -- issue the parking tickets, right? But in terms of -- but there -- well, let me break this down. The ordinance has always required a certain number of parking spaces, right, that kind of have a common -- a common --
MR. ANDERSON: Object to the form. What do you mean when you say always? Is there a time frame for that?
Q. Okay. With Breezy Shores, during the time that you have been developing that, did the ordinance require you to have a certain number of sparking spaces, to your knowledge?
A. The way we interpreted -- again, I mean, my architect. All of my buildings when they've been designed, we determined that we need to

have room for X number of vehicles for whatever size building we had. There was never discussions with the planning group about ingress and egress. It was always you had to have room for the vehicles. And that's how it's been done in all the years I've done it.
Q. Okay. To break it down, you said we. Do you mean you and Mark?
A. Yes. Mark.
Q. Okay. Anybody else included in that question?
A. Yeah. Yeah. My earlier buildings I used a different designer before Mark. Mark did Breezyville and Breezy Shores. And I'm trying to remember his name. I can't think of his name right now, but it was another person who designed -- for instance, our building on Nice and Breezy was another new construction, and we did -- we interpreted it the same way, which was room for this many vehicles. Create that big of a pad. And that was, you know, the discussion.

Q. Okay. And so you were acting for Breezy Shores during the course of those discussions, right? Thomas was not involved?
A. That's right.
Q. Okay. And I just want to make sure we got all the pronouns right. So did you -- well, I'll say -- so did -- did Breezy Shores through you or I guess anybody else review the zoning ordinance before or in the course of developing this property?
A. Mark did. I relied on Mark to --
Q. Okay.
A. -- handle all of the ordinance requirements.
Q. Okay. So you didn't personally look at it. You let -- you talked to Mark about it and trusted that he --
A. Yes. I trusted Mark.
Q. Was there anybody else that you as the agent for Breezy Shores talked to regarding the Baldwin County zoning ordinance? Again, I don't want to know anything about your conversations with your attorney or an

attorney.
A. Well, when the -- after the stop work order was issued, I did talk to Mark about that.
Q. Okay. Before the stop work order was issued, though, when you were in the process -- let's narrow it down to specifically when you were in the process of preparing to submit the -- like for the land -- the land use certificate application. Prior to submitting that, other than Mark, had you -- did you rely on anybody else to get guidance about the zoning ordinance?
A. No. I totally relied on Mark for all the ordinance issues. He was the architect.
Q. Okay. Did you ever rely on or talk to Steve Jones about the zoning ordinance?
A. I may have briefly, you know, just because he's the builder.
Q. Sure.
A. Nothing really specific that I recall.
Q. Did you ever have a conversation about the zoning ordinance with Daniel Prickett?
A. In the early stages, yes.

Q. We're still just talking about when you're preparing to submit the land use certificate and all of that before the stop work order.

A. I don't think so. We kind of treated the parking like we had on all our other buildings. We allowed room for parking and did it that way.

Q. And to be clear, I'm not just talking about the parking. I mean, did you-all talk about -- did you rely on him for anything in terms of interpretations of the zoning ordinance?

MR. ANDERSON: Object to form. Zoning ordinance is, you know, a hundred pages. So is there anything specific you're talking about?

MS. FRAWLEY: Well, I'm trying to find out what conversations he had with Daniel Prickett about the zoning ordinance.

A. I didn't really get into zoning ordinance discussions with Dan in the early stages, honestly.

Q. Okay.

A. After the stop work order we talked a lot.

Q. Okay. Yeah. And we'll get to that. I'm trying to break it down. Other than the parking issues which obviously you had some conversations with Mark about with parking, were there any other conversations you had with Mark prior to the stop work order after -- you know, during the development of Breezy Shores prior to the stop work order about the zoning ordinance?

A. Not that I can recall.

Q. Okay. When did you -- did you and Breezy Shores become aware of the issue with the stacked parking at the same time? In other words, were those -- was any communication -- if I say you when I'm asking questions -- was all the communication for Breezy Shores flowing through you personally?

A. Yes. I'm the only person.

Q. Okay. So when did you find out that there was an issue with the parking?

A. After we got the stop work order.

Q. Okay. Tell me how you found out that the stop work order had been issued.

A. My builder, Steve Jones, found the stop work paper order at the site. We didn't receive any notification from anyone other than we happened to show up at the site.

Q. Okay. And did Steve then call you?

A. He called my phone. My wife answered because I was having an angiogram done that day. So she just responded that I'd call him later. And I did. That's when he informed me. I remember the day because it was the day of my angiogram. It was August 1st.

Q. Sure. So when you did speak to Steve, tell me about that conversation.

A. It was brief. Steve was kind of like distressed going, That stop work order, I don't even know why. So he called. He let me know he called the planning department. He worked his way through. He tried to reach Vince Jackson and could not reach Vince Jackson. He ended up talking to someone that said basically your land, your permit -- your building remit is revoked.

And at that point I got Mark involved. So Mark went and started digging in, and that's when Mark found out that their issue had something to do with parking. And his feedback to me was this is bogus.

Q. When you say you got Mark involved, did you -- so you called Mark and asked him to investigate it?

MR. ANDERSON: Are you talking about Mark Pavey or Mark Taupeka?

MS. FRAWLEY: Okay. Yeah. He just said I got Mark involved.

Q. So tell me what you mean by which Mark and --

MR. ANDERSON: Anything pertaining to Mark Taupeka, I'm objecting and directing him not to answer based on attorney/client.

MS. FRAWLEY: Well, first we need to figure out which Mark he means.

MR. ANDERSON: Fair enough. Go ahead.

A. Mark Pavey.

Q. Okay. That's what I thought.

A. Initially it was Mark Pavey because he's the

one that works with the planning department to work out things. So basically I wanted to know did we mess something up. Whatever it is, find out. And that's when he found out what their issue was.

Q. I'm sorry. You trailed off just right there at the end. That's when he --

A. That's when he, you know, researched and came back to me and said they have some issue about parking.

Q. Okay. Do you know what research Mark Pavey did that you've just referred to?

A. No. He was talking to people in the office. And his office is next door to the planning office. So he usually walks over there. He told me, you know, that -- you know, what the issue was. And he, of course, disagreed with the revocation.

Q. Okay. What did he tell you about what the issue was?

A. I can't remember exactly, but, of course, it had to do with stacked parking and their interpretation of how vehicles need to be

laid out in the plan. He, of course, countered with, you know, This is how it's been done all over everywhere. So why is this an issue and how are you interpreting it this way? And, you know, we just sort of agreed to disagree. And then at that point I had to make a decision about what I would do next.

Q. Okay. So you say he countered. Were you ever involved in any of the conversation or was all of this being related to you by Mark Pavey?

A. It was being related by Mark Pavey.

Q. Okay. So it's your understanding that he was having these conversations and said, I think you're wrong about this. This is the way we've always interpreted it; is that right?

A. That's right.

Q. Okay. Then you said you had to make a decision. So tell me what you mean by that.

A. Well, we were stopped work and the choices then were, you know, what do we do about

continuing. So my approach was I'd rather not get into a big fight and dispute with planning. Let's just fix the issue as they interpret it. And I had to go get an additional ADEM impact permit certificate to add more impact so we could add more parking. Mark said he was -- he did -- Steve Jones told me he talked to Vince Jackson directly and he said if we handled the parking, that we'd be good. So we began that process.

Q. When did -- when did you have this conversation with Steve Jones?

A. Steve sent me a text.

Q. Okay.

A. It was, you know, near that time, you know, shortly after the stop work order. And he sent me a text that said, You know, I've talked with Vince Jackson. He said if we resolved the parking that we'd be good to go. So we began that process.

Q. And to your knowledge, Steve had sent you that text within a -- fairly shortly after

having this conversation with Vince Jackson?

A. Yes.

Q. Okay. Why did you decide to go through the process of getting -- well, let me back up. Did you ever consider fighting the stop work order in any fashion?

A. We did. We did. We considered both an appeal, et cetera. But in the conversations Mark had, his impression was they weren't going to budge. They didn't want to go around this issue. And we had a remedy available which was to get the additional ADEM permit, and that wasn't going to -- you know, it's just one of those things you run into building that we normally would just resolve and move on.

Q. Okay. When you said Mark just now, you meant Mark Pavey?

A. Yes.

Q. Okay. I was just making sure. So Mark Taupeka was not involved in that process at that time; is that right?

A. Yeah. Mark -- I may have had a conversation

Page 90

with Mark.
Q. I don't want to know anything about your conversations with him. I'm just making sure that all the references to Mark are Mark Pavey right now.
A. Yeah. All the interaction with planning was with Mark Pavey.
Q. Okay.
A. His feeling was, you know, that they're making a big deal out of this. He didn't know why. They've never done it before. So we went ahead and said, Well, let's go -- you know, to avoid a conflict, let's go do this.
Q. Okay. At what point did you become aware that the Commission was considering adopting the story ordinance?
A. I don't recall exactly when that was. And Prickett informed me somewhere during that interval that there was discussions around that. And I was under the assumption and I was moving under the impression that it would not affect us because we'd already had

Page 91

a permit. And even though I'm working around this particular issue which I didn't feel I really needed to do it anyway, they would not try to impose this ordinance given we'd already been approved.
Q. Okay. Tell me, you said Dan Prickett had informed you. So Dan Prickett let you know that this was on the agenda before it was passed?
A. No. He was just saying it was coming up for discussion in some of the Fort Morgan meetings and so forth.
Q. Okay. What did he tell you? What else? What was the content of that conversation about that it was coming up for discussion? Did he tell you why or what those discussions were?
A. No. He said in a couple of meetings there was -- for instance, he conveyed to me in one meeting that everybody was complaining about Easy Breezy. There were people in the meeting, and Vince Jackson was at the meeting. And he said Vince Jackson got up

Page 92

and talked about, you know, they were considering changes to ordinances and so forth. And then one person had said, What about this new building which was Breezy Shores. Are you going to let that go up? And Vince responded, according to Dan, that that one was -- they couldn't do anything about. Again, I was like, Well, that makes sense because we were already under an approved permit. I'm not going to worry about this new ordinance and I'm not planning to build any more buildings down there. So I didn't worry about it.
Q. What were you told the complaints were about Easy Breezy?
A. He said people down there were objecting in general to having bigger buildings there and more people in the houses. Specifically one of the guys there, Paul Stanton I think it was, was very vociferous about it. He lives directly across the street. And so Dan went and looked and kind of researched Paul Stanton's rental. He has a rental right

Page 93

across the street. And then he discovered that Paul Stanton was advertising through his rental access to the beach through my lot at Breezy Shores. And he actually had a website describing how people can get through my lot to get out there and that he would actually charge them for wedding pictures on our lot as part of his rental. And so I got upset about that saying, Well, why is Paul Stanton objecting to this building. Is it because it's impacting his rent? And so, you know, we decided not to deal with that at the moment. But it seems to me that that's kind of a problem, that people in that meeting are talking about the building and they're taking advantage of property we have for their own benefit.
Q. Okay. Do you know what -- what do you know about what -- specifically what Paul Stanton was complaining about with Easy Breezy?
A. In general they were complaining about various items, you know, like people parking on the side of the street and so forth. I'm

Veritext Legal Solutions
877-373-3660 800.808.4958

Page 94

not sure what else. And in general when I was at the meeting before trying to get the zoning change for our lot, a lot of people in that civic association just don't want rental properties down in Fort Morgan. Yet some of those same people have rental properties. I just found that out.
Q. Okay. What do you -- what are you basing -- when you say a lot of people don't want rental properties, is that based on direct statements that you've heard?
A. Yeah. I've heard people say they don't want more density. We don't want commercialization of Fort Morgan. They want it to stay natural and unimpacted by commercial opportunities. But, again, they are the same people who have rental properties out there. They just want it to be the size house they have and own but not for someone else. So I just find that a bit hypocritical.
Q. Do you know -- what size houses do you know that they own?

Page 95

A. I don't. I just know Paul Stanton's house is fairly small. It's probably a two or three bedroom.
(Whereupon, Defendants' Exhibit 9 was marked for identification and attached to the Original transcript.)
Q. Okay. I'm going to go to what -- since we're there, what we've marked as Exhibit 9. If you scroll down, this is -- well, it's forwarded. But the substance of this is an Email from Paul Stanton to Vince Jackson. Have you seen this before?
A. I don't know that I have.
Q. Okay. I'll tell you, it was produced to your attorney. I didn't know. It's fine if you haven't looked at it. To look -- so he says right here, During the summer it is very difficult to drive on Ponce de Leon Court because of all the vehicles on the street because there isn't enough parking at Easy Breezy. Do you disagree with that statement?

Page 96

A. I guess I would say I can understand that some of the renters do park on the side of the street for various reasons. I don't know how bad it gets. I'm not there during the summer. I do know when I have gone there at times, there are lots of different vehicles parked on the side of the street. Sometimes they're construction vehicles for people doing construction. And it's easy to try to say it's all because of this one building, but it's for a lot of other reasons, too. I just know in general Paul Stanton has an agenda with us. You know, he filed -- I believe he filed suit against my builder when we were building Easy Breezy claiming that one of his cables got damaged. So he's just always had a problem with what's -- with our rental there.
Q. Okay. This next sentence here says, I have seen the raw sewage overflowing from the grinder pump. Do you know --
A. Yes. Our grinder pump malfunctioned once. We called someone in, and they went in and

Page 97

repaired it. You know, you have to have a grinder pump there because the sewage has to be pumped uphill in that area.
Q. Okay.
A. And so it just malfunctioned.
Q. Okay. Going to what we had previously discussed with Exhibit 2, the second page of that exhibit. Do you recognize that picture?
MR. ANDERSON: We're on a different -- you might be on Exhibit 4.
MS. FRAWLEY: I am. I'm sorry. I was looking at the wrong thing. Yeah. Exhibit 4.
Q. Second page of Exhibit 4. Is that -- it looks like that's Easy Breezy.
A. Yes.
Q. Okay. And so it looks like that Easy Breezy is a duplex, of course. It looks like there -- the cars are parked under and coming out into the road and on the road here. Have you -- when you're there, have you seen similar parking situations?

A. You know, I'm sure that happens at times. We can't control what our renters do. I mean, you know, if they all decide to go one person per vehicle, you know, that's going to create that kind of an issue. We obviously encourage people not to do that. But I can't control what they do.

(Whereupon, Defendants' Exhibit 8 was marked for identification and attached to the Original transcript.)

Q. Okay. I want to go to Exhibit 8 here. And this is a two-page letter. Have you ever seen this letter before? I'll give you a minute to read it.

A. I think I did see this a while back.

Q. Okay. Have you ever had any conversations with Mr. Church? Have you ever met him?

A. No.

Q. Okay. To go sort of paragraph by paragraph, you see here in this second paragraph where it says, Despite the proposed caveat to limit habitability in the additional half

story, our experience is that people who rent out their homes will go to virtually any length to maximize bedroom count and sleeping numbers. We have seen cots on top of cots in hallways, bunk beds in rooms the size of a closet and narrow stairs leading to attics filled with similar bedding. There are homes here where reasonable emergency access to attic areas and third stories is virtually impossible. A spiral staircase to an upstairs area causes unnecessary limitations on emergency responders who are there to potentially save lives. Do you have any reason -- well, we'll go sentence by sentence. One is, We have seen cots on top of cots in hallways and bunk beds in rooms the size of a closet, narrow stairs leading to attics with similar bedding. Do you have any reason to disbelieve that -- or any reason to think that Mr. Church's statement about what he's seen there is not true?

A. It's not true for my building.

Q. Right. But he didn't say specifically your building, right? He just says we have seen.

A. Yeah. I have no idea. I can only talk about my building. Sure.

Q. Do you have any reason to think that his statement about there being homes where reasonable emergency access are virtually impossible, that that's untrue?

A. I have no idea. I haven't been to any other homes in the area.

Q. Okay. Same question. Do you have any reason to think that his statement that a spiral staircase to an upstairs area causes unnecessary limitations on emergency responders who are there to potentially save lives, do you disagree with that statement?

MR. ANDERSON: Object to form.

A. I am not a firefighter. I have no idea. I know our staircases are very wide and it's easy to get up and down them. So I don't know what they're really looking for there. Probably safer than an elevator. An elevator is much worse.

Q. Do you-all have spiral staircases in your buildings?

A. Which building?

Q. Is there one planned -- was there one planned for Breezy Shores? We'll start there.

A. Not a spiral staircase as designed. Define spiral. But it's a staged, you know, stairwell as opposed to a spiral is a narrow staircase.

Q. Is there a spiral staircase in Breezy Shores?

A. There's a stairwell I'll call it.

Q. Okay.

MR. ANDERSON: Are you talking about one of those metal -- all metal spiral staircases that are kind of cylindrical in shape?

MS. FRAWLEY: Yeah. Yeah.

A. I don't have that in any of my buildings.

Q. Okay. And you said, though, you're not familiar with obviously all the other rentals. So you don't know what other

rentals have or don't have, right?
A. No. I have no comment on other people's homes. I haven't seen any of them.
Q. Okay. Let me scroll down. Okay. This next paragraph here where it says standard two story construction is more likely to adhere to traditional stairway width and not the more narrow stairways we encounter when third stories are used as sleeping areas or when attics are used for habitation, do you disagree with that statement?
A. Again, that's not true for my buildings. Our stairway is the same width all the way up to the top. So I don't know what this is referring to.
Q. Okay. So it would be fair to say you don't really either agree or disagree with it in general?
A. No. I am not a firefighter. I don't --
Q. Okay. Then this next paragraph where it says, A two story limit may not solve all the problems but will at least make fire fighting and medical resources less

problematic, do you disagree with that statement?
A. Yes, I do.
Q. Okay. Tell me why.
A. Because you can have a two-story building that's just as high as a three-story building and you can have the same issue about where a ladder can reach. I don't know why it has anything to do with stories as much as height.
Q. Okay. The third sentence in that paragraph, And parking along narrow roadways limits the ability of first responders to reasonably access homes that need our help. Do you disagree with that statement?
A. Well, narrow roadways are -- they're all through Fort Morgan already.
Q. Sure. Right. But the statement is parking along them makes it harder for first responders. Do you disagree with that?
A. I mean, I don't have an agreement or disagreement with that.
Q. Okay. Now, earlier you mentioned something

about you don't -- you don't know with the ladders why that would matter for stories. Is that --
A. Yeah. I don't know why it's a matter of how many stories you have versus as a matter of how tall the building is. I could see that. Also, you know, we've always just relied on the fact that we build to the building code, to the highest standard of the building code. And we assume that the building code ensures adequate safety for fire fighting and for fires and other hazards.
Q. Are -- well, hold on. I did not mean to stop sharing that. Hold on. Okay. In scrolling down here, the paragraph that goes from the first to the second, As homeowners maximize habitability, there's a coincidental negative influence on infrastructure from sewer to water to garbage collection as well as on evacuation during hurricanes. Road congestion becomes nightmarish. Even Gulf Shores Mayor Craft has stated his concern about Fort Morgan

traffic merging onto Highway 59. Nightmares can soon become reality if growth and density are not better controlled. A two-story limit would help considerably. Do you -- well, let me break that down. First of all, do you disagree with the premise that maximizing habitability causes a negative influence on infrastructure?
A. I don't see how this is directly correlated. It seems common sense to say that if you're going to add more houses in an area, you have to plan more infrastructure to deal with it. Whether that's one particular place or just a collection of lots of small houses, you're adding density either way. So as part of the planning group, they have to take that in consideration when they set up their codes. But when you build a place to our code, we are addressing the appropriate infrastructure as the growth occurs. That's how we assume things are being handled.
Q. Okay. So do you disagree with his statement

that a two-story limit would help considerably in limiting any negative influence on infrastructure?

A. Yes. I disagree because you can solve that problem different ways. I mean, you can have larger lots and fewer buildings and have more stories and have the same density.

Q. Okay.

A. Density is the issue. There's lots of ways to solve that besides a two-story limitation.

Q. Okay. So just so I'm clear, you're -- okay. So your position is that there are multiple ways to address density; is that right?

A. Yes.

Q. Okay. But limiting the stories in the building is one way, right?

MR. ANDERSON: Object to form. Asked and answered. You can answer.

A. Yeah. I mean, yeah. Sure. It's one way. I mean, sure. It's one way. There's some of the others I mentioned.

Q. You mentioned another way would be to take

action on lot size, right?

A. Sure.

Q. Okay. Do you have any idea of how much -- but that only works, right, if you're -- that works for new lots and vacant lots and lot construction. Well, let me back up actually. Strike that. Okay. When you say -- when we talk about limiting lot size, do you mean limiting literally a lot has to be a certain dimension or limiting the ratio of how that can be built to lot size by say increasing setback requirements?

A. I guess what I'm really saying there is if you're trying to control density in an area, there are a lot of ways to do it in terms of the types of bed -- the bedrooms you allow. You could make it a story limitation where people can work around the story limitation by just making smaller bedrooms and adding density that way, in which case I'm not sure that's safer because if the bedrooms are smaller, it's harder to get in through the house. That can create an issue. So

there's no simple answer. The real answer is the planning group should allow for the right codes and ordinances that say we can handle this level of growth.

Q. Okay.

MR. ANDERSON: Jamie, can we take a break for two minutes so I can order lunch so it's here when you're ready to take a longer break for lunch?

MS. FRAWLEY: That's fine.

(Brief recess)

Q. I'll start off by during the break, did you -- is there any part of your testimony in the last -- since we took our last break that you would like to make any alterations to?

A. No.

Q. Okay. We were talking about stories. What do you -- what would you say your definition of a building story would be?

A. A floor where you have a common floor level and then you'd have, you know, another layer of rooms above the floor.

Q. Okay. I'm going to turn to Exhibit 2 which is the second amended complaint. Specifically I'm looking here at paragraph twenty-three of page six. The statement, Upon information and belief, Jackson formulated the new parking interpretation to prevent them, meaning you and Breezy Shores, Plaintiffs, from building a duplex for short-term rental either because Plaintiffs are (a) out-of-state residents or (b) non-members of the Fort Morgan Civic Association or (c) for no rational basis at all. What information and belief -- what is the basis for that statement, information and belief as to that the new parking interpretation was done because of out-of-state residents?

MR. ANDERSON: Object to the extent it seeks information protected by the work product for attorney/client privilege. So I'll just instruct Mr. Bordelon not to answer based on anything with any of our discussions or his other discussions with

counsel. But he can otherwise answer.
Q. Okay. What information do you have that it's because of out-of-state resident?
A. I don't -- don't have anything to say about out of state.
Q. Okay. Have you -- do you believe that the parking ordinance interpretation was changed because you're an out-of-state resident?
A. I don't know why it was changed.
Q. Okay. Do you believe that it was changed because you were not a member of the Fort Morgan Civic Association?
A. I do believe that it's -- it's partly because the Fort Morgan Civic Association does not want buildings -- new buildings going up in their area.
Q. Okay. Do you think that that is connected, that that -- they don't want new buildings going up in the area. Is that connected to the fact that you are from out of state or do you think that that's just a general, that they don't care who is building it. They don't want the new building. And I'm

asking your opinion. I know you --
MR. ANDERSON: Object to form, but you can answer.
A. I mean, it's hard to know. It may be part of the factor. I don't know.
Q. Okay.
A. But I know there's a big resistance to anything new going in Fort Morgan.
Q. Okay. Has anybody ever said anything to you that would make you think that you were being treated differently because you were from out of state?
A. Not directly.
Q. Okay. So not to you directly. Have you heard of any such comments?
A. No.
Q. Okay. Then the -- the third (c) here is for no rational basis at all. Do you believe that the new parking interpretation was -- was put in place for no rational basis at all?
A. I do.
Q. Okay. Tell me why you believe that.

A. Because I cannot find a rational explanation for why it's suddenly being interpreted this way timed exactly with the building of this building when it's not been done ever before. And yet still I look around Fort Morgan and three story buildings are still being built. And there's still no difference in the parking that I can see of those that would make it any better than what we did. So it clearly strikes to me that the planning department targeted us and specifically because residents nearby our building were complaining to them about Easy Breezy. And the complaint at least partially stems from a conflict of interest from Paul Stanton and others who are doing their own rentals, taking advantage of empty lots that were there before. And because we've now consumed those lots, they resent that and they're creating an issue and creating a lot of fuss to stop specifically this building.
Q. Okay.

A. The planning department has succumb to that, and there's not a rational reason. It's strictly politics.
Q. Let's break that down. You mentioned specifically the timing. In -- if you take the timing out of it, do you -- in a vacuum, right, do you believe that the parking interpretation would be irrational under any circumstances?
MR. ANDERSON: Object to form. Under what circumstances? I'm having trouble following that.
Q. Oh, sorry. So what I said was -- you just spoke a lot. So let's take out the timing. Do you believe that under any circumstances this interpretation of the parking would be irrational?
A. Any circumstances I can think of around the types of construction that we're doing, I believe it is irrational.
Q. Okay. And why -- and, again, leaving out the person -- the timing, why do you believe that it is just generally irrational?

A. Because everybody that's renting our places work with each other and they park the way they want and they all are totally content with the way they can get in and out of that facility. So I don't understand the reason for interpreting it this specific way suddenly right when we're building our place.

Q. Okay. But that's -- I'm trying to break it down. So there's -- you're saying it in sort of two parts. You said I don't see a reason to interpret this particular way and suddenly when we're building our place. What I'm trying to figure out is, is your -- are you saying you don't see a reason to ever interpret it this way? Like let's say that you had built Breezy Shores and you weren't involved with this at all and whatever. Okay. So divorcing the timing issue from it, are you saying there's never a reason that you think that this should be applied to properties like Breezy Shores?

MR. ANDERSON: Object to form.

A. Yeah. It's just -- that's a little too broad of a question like ever. I mean, unless you throw up some theoretical situation maybe. But in the case we're talking about which is a specific planning area, these types of buildings and what this was meant to apply to, there is not a rational basis that I see to suddenly start interpreting it this way when for years it's been the other way.

Q. Okay. Maybe this is an easier way. Let's say this had actually been done as a sudden ordinance change before you had started construction. So it wasn't -- it wasn't as you've said. It wasn't suddenly, to use your term. Would you still believe that it was an incorrect interpretation?

MR. ANDERSON: Object to form. Calls for a hypothetical.

A. I don't know how to answer that.

Q. Okay. All right. Have you told me all of the facts, the basis for your belief that the change was, as you said, politically

motivated?

A. I mean, I'm going based on my attending the meetings themselves, the letters I've seen, letters I've received personally from the neighbors across the street. They were fairly threatening. It's very clear to me that there's a small group of people in Fort Morgan, in that area that are upset that new buildings are going up. They had unobstructed views of the beach prior to us building without having owned the lots and provided that unobstructed view. And they've taken financial advantage of it and advertised it that way. And now that we've built that and obstructed their view, whether or not they've built a two-story or a three-story, but it's still obstructed their view. That's really what they've been upset about, at least in part. And they have created enough, you know, turmoil and noise about it that they targeted our new building to prevent it.

Q. This -- and paragraph twenty-four says, Upon

information and belief and in the alternative to Jackson formulating the new parking interpretation, it was Defendant Baldwin County that changed the interpretation for one of the reasons set forth in the preceding paragraph which is out-of-state residents, non-members or for no rational basis at all. Do you -- at this point, do you believe that this was something that Jackson did without -- that they didn't have the authority to do?

MR. ANDERSON: Object to form.

A. Yeah. I don't know what Vince's authority is, to be honest. I just believe that he was unduly influenced by the Fort Morgan Association and they were looking for ways to stop this building. And whatever thing they could find, they made an active effort to do so.

Q. Okay.

A. I do not believe they independently decided it's a good time to enforce a new interpretation of the parking ordinance

because it's the busiest time of the year. I believe they did it in direct response to Fort Morgan pressure. And that pressure was motivated with people who had something to lose by the building going up and reasons not the same as they communicated to the planning group.
Q. You mentioned a few minutes ago about seeing three-story buildings and with similar parking still being built in Gulf Shores; is that fair?
A. Fort Morgan.
Q. I'm sorry. Fort Morgan. Yeah. Is that fair?
A. Yes.
Q. Okay. Could you tell me where have you seen -- what buildings are you referring to?
A. These are in the PUDs they call them.
Q. Okay.
A. Something development. I forget what it stands for. But they are currently allowing three-story buildings to be built.
Q. Okay. Are you aware of any three-story

buildings outside of the PUDs that are being built?
A. I am not directly aware of any.
Q. Okay. Are you aware of any new stacked parking outside of the PUDs that has been approved in Fort Morgan?
A. I'm not aware of anyone that I know of that are building homes that are being told to do their parking this way.
Q. Okay. Tell me a little bit more about that statement. Who do you know that are building homes down there?
A. There's various developers that I -- I've come in contact with through Dan Prickett.
Q. Do you remember any of their names?
A. No. I really can't.
Q. Okay. But have you had conversations with these developers about the stacked parking issue?
A. Not directly.
Q. Okay. So have you received indirect information about these developers?
A. Yeah. I mean, through Dan Prickett, you

know, we know that other people have, you know, built buildings where no one has raised an issue about stacked parking to them.
Q. Okay. Since -- since July of '17?
A. Yeah. I don't know exactly when that switched over. I don't know exactly the times on that.
Q. Okay. And do you know if all of these are in PUDs or are there any being built with stacked parking outside of the PUDs?
A. I'm not sure about outside of the PUDs.
Q. Okay. Have you ever reviewed any of the laws or regulations applicable to PUDs?
A. No.
Q. What's your understanding of what those are?
A. They're just planning developments, you know.
Q. Okay. We're continuing on with your amended complaint here. Here in paragraph twenty-eight it says that you had promptly forwarded the new amended incidental take permit to Defendants Jackson and Baldwin

County, understanding based on prior correspondence that this along with the revised site plan would resolve all outstanding objections and allow the stop work order to be lifted. What correspondence is that referring to?
A. Steve Jones had discussed with Vince Jackson about is this the only thing that's an issue. And that's what was communicated to him. We took care of it. Then the planning, you know, revealed it was to do with construction.
Q. To your knowledge, was that -- because it says correspondence. So to your knowledge, was that written or verbal?
A. I don't know.
Q. Have you ever seen any written correspondence substantively stating that the ITP along with the revised site plan would resolve all objections and allow the stop work order to be lifted?
A. When I -- I had an interaction with Linda Lee that I asked was there anything else

that we needed to deal with, and she said no. And we communicated this was our intent. And then the plan was as soon as we get the ITP, they'll resume.
Q. Okay. When was that interaction?
A. Between the time of the stop work order and the time that we got our ITP. I can't remember exactly.
Q. Okay. Was that -- do you think it was before the new ordinance came in or after?
A. What -- oh, the three-story?
Q. The story ordinance. I'm sorry. Yeah. The story ordinance. Was that before or after?
A. It was probably before I would guess.
Q. And when you say interaction with, was that verbal?
A. I had talked to her on the phone and in Email.
Q. Okay. When -- both. So about how many times did you talk to her on the phone do you think?
A. It's probably just once.
Q. Okay. About how many Emails are you talking

about?
A. Probably just one or two. And there was an Email with Vince Jackson very brief. But I think that was an Email -- I think that was after the ordinance.
Q. Okay. Paragraph twenty-nine here, it says, In response, Defendants Jackson and Baldwin County informed Plaintiffs on November 5th, 2019 that a new height ordinance had been passed affecting planning district 25 on October 15th, 2019. So were you unaware before -- was that November 5th communication the first time you had heard of the new height ordinance actually being passed?
A. I believe so.
Q. And how did they inform you?
A. I don't remember.
Q. Okay. All right. Going down here to paragraph thirty-two, it says, Upon information and belief, Jackson acted unilaterally denying the request to lift the stop work order either because Plaintiffs

are, (a) out-of-state residents or (b) non-members of Morgan Civic Association or (c) for no rational basis at all. First of all, do you -- do you believe that Vince Jackson was acting unilaterally?
A. I -- I don't know.
Q. I'm sorry. You said you don't -- I didn't hear you. You don't know?
A. I don't know. I just know that he was the one that communicated the action.
Q. Okay. Do you have any reason to think that Vince Jackson has a personal vendetta against you?
A. No. Not against me. But I think he's reacting to pressure from the civic association. I think they have an irrational motivation in what they are pushing.
Q. Okay. Do you believe that the refusal to lift the stop work order was specifically because you were an out-of-state resident?
A. I didn't know. I don't know on that one.
Q. Did you believe it was specifically because

you were a non-member of the Fort Morgan Civic Association?
A. In a way, yes, because he was making his decisions based on what they were telling him and I was not a part of that.
Q. Okay. Did you think that it was -- do you believe that that decision was made for no rational basis?
A. Yes.
Q. Why do you believe that?
A. I believe that he, out of the pressure from them without thinking it through, just reacted. And, therefore, it's not a rational basis for doing this other than reaction to pressure from Fort Morgan Civic Association. I believe that the reason for the stop work was conjured.
Q. I'm sorry. You said the reason was?
A. Conjured. In other words, he would have found some other thing to try to stop it if he had to because he was determined to stop it because of pressure from them.
Q. I literally didn't hear the word you said

the reason was.
A. Yeah. Okay. Try again. Yeah. I believe Vince Jackson reacted directly on this as a result of pressure from the Fort Morgan Civic Association and that he would have found another reason to do so.
Q. Okay. Okay. Sorry. You were saying a word and it kept dipping out on the same word.
MR. ANDERSON: He said conjured, C-O-N-J-U-R-E-D.
MS. FRAWLEY: Conjured. Thank you. That's the word. Yeah. I literally couldn't hear.
MR. ANDERSON: Jamie, our lunch just got here. So whenever you're at a good stopping point, we can take a lunch break.
MS. FRAWLEY: We can go ahead. This is fine. Do y'all want to take an hour or less?
MR. ANDERSON: Whatever.
MS. FRAWLEY: Let's do -- let's do forty-five minutes. So say one o'clock. Okay.

(Lunch recess)
Q. Mr. Bordelon, while we were on our break, is there -- is there anything that you want to change regarding your testimony from prior to lunch that occurred to you?
A. No.
Q. All right. Good. Before lunch you had said that it was your belief that the reason for the stop work order were conjured and that basically they would have -- and I'm paraphrasing here -- but they would have come up with some reason to stop work. Is that a fair summarization of your testimony?
A. Yes.
Q. Okay. What facts do you base that on?
A. Well, I know that letters were sent from the Fort Morgan folks to the planning organization and the meetings, at least the one meeting I sat in, it was clear they were putting a lot of pressure on the planning group to not allow any more, you know, buildings, rental buildings, any higher density in the area. And I also look at the

timing of all the places I've built. Parking has never been flagged as an issue even though in some cases it's been less parking than we had at Breezy Shores. And we had this approved, and then to find out suddenly there's a new interpretation right at the time we're ready to build. All of that is way beyond coincidence.
Q. And you said the one meeting you attended. Do you mean the meeting --
A. With the rezoning on the lot that I purchased.
Q. Yeah.
A. The discussion quickly went over onto Easy Breezy. So that whole subject came -- was mostly talked about in the meeting.
Q. Okay. We'll pick back up with Exhibit 2 which is the second amended complaint. And so related to what you were just saying here, this paragraph one thirteen here, it says, Jackson and Baldwin County regularly communicate with, solicit advice, and receive and heed direction from the Fort

Morgan Civic Association as to land use and zoning matters in planning district 25. How do you -- how do you know that they are regularly communicating with, soliciting advice, receiving and heeding direction from the Fort Morgan Civic Association?
A. Well, in the meeting that I was there, there was someone from the planning group there. The one I was at, Linda Lee was there.
Q. Okay.
A. In fact, Linda Lee told me that they listened to influence from their organization. She indicated it wasn't authoritative or binding, but they did take it into account. And furthermore, I saw through evidence other Emails and things that showed that they were really sending a lot of Emails to the planning group, even suggesting things like, you know, can we find something, you know, that's a violation here. So they were all proactively looking for a way to stop this particular building.
Q. Okay. When did you have this conversation

Page 130

with Linda Lee?
A. Well, Linda Lee was at the -- at that meeting. And I recall that I talked to her on the phone. She described -- I was asking why should I have to submit -- you know, talk to the Fort Morgan Civic Association. It's outside their jurisdiction. She explained to me, But we like to put this in front of them first and then listen to the comments back.
Q. And, you know, we talked earlier. There's been some confusion in the case about the civic association. Are you sure it was the civic association or could it have been the planning and zoning advisory board?
MR. ANDERSON: Object to form. Asked and answered.
MS. FRAWLEY: Well, I know. But he stated the civic association again.
A. Well, I'm just reading what's here. I couldn't tell you exactly which one it was. There are people that are members of both, and it gets blurry at times --

Page 131

Q. Okay.
A. -- in those groups.
Q. Okay. You made reference to -- so other than your conversation with Linda Lee, you made reference to Emails you had seen. Are those -- what Emails are you talking about? When did you see them?
A. Well, for instance, Paul Stanton.
Q. Okay.
A. And I think I've seen a couple others from Mr. Church. Others, too.
Q. Okay. Were those all Emails that you'd seen that were produced in discovery in this -- that we had sent; do you know?
A. Yeah. I think all the Emails from them I've only seen through discovery. My direct observations came from my attending the meeting.
Q. Okay. Have you had any conversations with anybody else that gave you reason to believe that Jackson and Baldwin County regularly communicated with, solicited advice and heeded any direction from the Fort Morgan

Page 132

Civic Association as relating to land use and zoning matters in planning district 25?
A. No. I think that's my primary source there.
Q. Okay. Do you know if the -- now, are you aware of -- well, do you know if Jackson and Baldwin County -- let's just say Baldwin County, any of their employees. Are you aware of whether they communicate with, solicit advice, or receive and heed direction from any other parties besides the Fort Morgan Civic Association?
A. I don't know any other.
Q. Okay. Do you know whether any citizen or group is able to submit input on planning and zoning issues?
A. I don't know.
Q. Beyond anything directly related to your properties, have you ever written a letter, whether electronic, formal letter to anybody in Baldwin County on a matter of planning and zoning?
A. Not personally. I believe my architect, Mark, maybe when doing the variance on Nice

Page 133

and Breezy may have for the variance itself. So there was some communication in that. But not me personally directly.
Q. Are you aware of whether there were people who were advocating against the story ordinance as well?
A. You mean that -- in who has input into a planning group?
Q. Yes. Well, to Baldwin County officials. Were there people who were also writing saying don't do this; do you know?
A. I don't know of any specific ones. No.
Q. Okay. Are you aware that the Baldwin County Commission holds public meetings?
A. Yeah. I'm aware they certainly do that at times.
Q. Okay. Do you know anything about the process by which ordinances get changed?
A. I do not.
Q. On paragraph one sixteen here, it says, Upon information and belief, Jackson and Baldwin County heeded such advice and direction and issued the stop work order as a direct

result of Plaintiffs' non-association with the Fort Morgan Civic Association. Other than what we've already talked to, is there any other basis for your belief that the stop work order was issued because of your non-association with the Fort Morgan Civic Association?
A. Not other than what we've already discussed.
Q. Okay. What interest do you individually have in Breezy Shores?
A. I'm sorry. What? I missed your word.
Q. What interest do you individually have in Breezy Shores?
A. Did you say interest?
Q. Yes.
A. All right. Me personally?
Q. Yes.
A. Everything invested in Breezy Shores is through the LLC.
(Whereupon, Defendants' Exhibit 6 was marked for identification and attached to the Original transcript.)

Q. Okay. Let's look at what's been marked as Exhibit 6. Now, we've talked about competing Marks. And in this top line it says from Mark Taupeka. But he was your -- one of your attorneys; is that correct?
A. Yes. Mark was my attorney preceding Kris.
Q. Okay. And so at the time that these Emails were written which was November 2019, Mark was authorized to speak on behalf of Breezy Shores; is that right?
A. Yes. He was our attorney.
Q. Okay. I'm sorry. Hold on. Let's turn to Exhibit 10. Can you identify this for the record?
A. Yes. This is our updated damages disclosure.
Q. Okay. And are you familiar with this document?
A. I am.
Q. Okay. Just going item by item here, the first one is cost to move pilings, three thousand dollars. Tell me about that.
A. We, of course, after the stop work order had

pilings on the ground. Some were in -- stuck in the ground as part of the construction and some were lying on the ground when we got the stop work. We were going to essentially leave them there until we resolved -- came to some resolution on this. I received a letter from a couple of the neighbors across the street, a very threatening letter that said if we did not move those pilings and something happened whether it was a storm would come in and the pilings were to damage their house, they would sue the hell out of me, almost to quote their words. I didn't think they had to word it that way, but I understood their concern. So I said, well, you know, the pilings wouldn't be there if we didn't have the stop work order. So either way, I'll move them. So we elected to move them. It was fifteen hundred dollars to move them off site to another place where it wouldn't be a danger to any of our neighbors. It will cost me fifteen hundred to move them back.

So that's the three thousand.
Q. When was that done?
A. It was done last -- early summer I believe around May or June, somewhere around there because we knew it was getting close to hurricane season.
Q. In 2020?
A. I'm sorry. Yes. 2020.
Q. Okay. Increased cost of building, sixty-two thousand six hundred and fifty-four. Is that -- coming down here to the sixth page of the exhibit, is that reflected here in pages -- in the sixth and seventh pages?
A. Yes. That's my builder's revised estimate of what it would take to build today versus had we built on the original schedule. And I guess we have a slightly updated version of that which would be a couple thousand different.
Q. Okay. Can you tell me what -- what of the line items in this were changed?
A. Well, if you look at total -- if you look at planned expenses, updated expenses, then

Page 138

that would show sort of the difference when you summarize it.
Q. Let me tell you this. I asked you a bad question. So that was my fault. In the new one, the updated, what is changed -- what would be changed from what we're looking at right now?
A. There was a charge for the labor on the pilings that he had omitted.
Q. Okay.
A. And so he sent me an updated version of that. I think it's the singular item.
Q. Okay. Is there anything else on this that has been changed?
A. No. That's what he told me. And I -- that's the only thing I know of that's changed.
Q. Okay. All right. How did it come -- well, how did it come about that this cost plan was developed?
A. The original plan?
Q. Yes.
A. Yeah. Steve Jones, this is how he's done it

Page 139

with me before. He was the builder on Easy Breezy. So he's very familiar with this type of construction. So he -- he always builds a detailed spreadsheet item by item of what he estimates the cost will be. Because off of that, I compute -- we compute his fee as a builder is based off of the material costs of what the building will be. And so -- and then he provides invoices for each of those to the project so we can make sure it's accurate.
Q. What documentation does he give you to support this cost plan?
A. On the original plan, he doesn't provide a whole lot in the beginning of the project. Then as the project matures, I provide a draw of a certain amount. And then before he -- he can get that draw, he must give me every invoice of everything from the previous draw so I actually have actual costs and invoices and receipts. And then he gets the next draw to proceed to the next stage.

Page 140

Q. Did you ask him to prepare this update?
A. I did.
Q. What was your conversation with him when you asked him to prepare it?
A. It was very simple. I said, Can you -- the original plan was done well over a year ago. So I know building material costs have gone up on building a private residence in Arizona as a second home. I know the costs of lumber for me there doubled in the last year. And in talking to people, they all say lumber costs have gone way up. So I was concerned with how much things have gone up since that time. So I asked him to redo the estimates. And then if you look at it, I think a large part of the increase is lumber and a couple other material items. Labor costs may have gone up slightly because after the hurricane damage, there's a lot more repair work and other things going on in the area. So there's a little bit of a labor shortage. I just felt historically on every project Steve has done for me, all of

Page 141

his estimates have been under what the cost usually is by some amount.
Q. Okay. Scrolling down here since we are talking about pilings, you have an updated expense here of pilings at twenty-eight thousand three hundred; is that right?
A. It's the same as the original.
Q. Okay. All right.
A. Because we've already -- they had already purchased them.
Q. Okay. What I'm confused about, then, I'm looking over here. This difference of fourteen thousand sixty-nine which I'm assuming is the difference between the total planned -- well, where is that difference of fourteen thousand sixty-nine dollars coming from?
A. Yeah. If you look at actual expense, he's telling you the actual and what he had originally planned.
Q. Okay.
A. Now, all that means is that's kind of today. Right. That's -- that's what I planned.

Page 142

This is what I've spent. And then here's, you know, the difference. And if we had kept the project going, that number would have caught up because he had to put all the pilings in.

Q. Okay. So other than what we talked about about moving them, the pilings themselves, there's not been a change in cost by the delay, right?

A. That's right. And that's the item -- one of the items in my updated version. He forgot to include that into this revised cost figure because they were in the original line items. They were anticipating moving the pilings. So that was an oversight that we caught. But we identified it to you separately in a number, but he had not captured it in this.

Q. Okay. Okay. What is this column that's difference? That is the difference between the total planned expenses and the actual expenses; is that correct?

A. That's my understanding. Yes.

Page 143

Q. Okay. And is that actual expenses as spent to date?

A. That's my understanding. Yeah.

Q. Okay. So let's talk about this fortified inspection, description, overhead slash profit. Planned expenses, seven seventy-five. Do you see that? It says updated expenses, seven seventy-five. Actual expenses, eleven thousand three hundred and sixty-six for a difference of ten thousand five hundred and ninety-one. What's -- what is that difference resulting from?

A. That's a good question. I'm not sure I understand that one. I'll have to check on that. The only fortified inspection, right, is part of what he really calls the extra work needed -- because we -- I had asked him when he builds these things to -- what we build is called gold standard of building inspection. It's more assurance the building is more solidly built. I'm not sure why he has that.

Page 144

Q. Okay.

A. Honestly, what I think is there is he got it mixed up with the builder's fee. If you look at the difference between the updated on the builder's fee line, there's a difference there I think that matches the eleven -- well, maybe not. No. I guess not.

Q. Okay. Let me --

A. I don't know. I don't know. I think just he's got those things jumbled a bit. He threw this together for me pretty quick. I'll have to ask him about that. We'll clarify that.

Q. Okay. Yeah. Because my -- right. Because I'll tell you, with the builder's fee, I just did the math here of one twenty-six eight ten minus one thirteen six sixty-eight.

A. Right.

Q. That comes out to thirteen thousand one hundred and forty-one dollars and forty-four cents.

Page 145

A. Yes. And that -- yeah. I got you. I don't -- I can't explain that. I'll have to talk to him about that.

Q. Okay. All right.

A. I'm sorry. What it implies is he's got actual expenses on inspections that were more than he planned. Now, when he wouldn't show that as an updated plan is what I've got to ask him.

Q. Right.

A. It definitely needs clarification.

Q. Yes.

MS. FRAWLEY: Okay. I tell you what. There's -- Kris, I'm going to mark this and reserve the right at this time to reopen this deposition for when we -- if we get an updated cost plan, if there are additional questions about that when that gets done.

MR. ANDERSON: We'll certainly supplement that as soon as we can.

MS. FRAWLEY: Sure. I know it will take him a minute to get back to maybe see what some of these numbers are about.

Page 146

MR. ANDERSON: If you could just get through the rest of anything else you have so we can limit the time.

MS. FRAWLEY: Yeah. I was planning to. I just wanted to go ahead and mark that --

MR. ANDERSON: Yeah.

MS. FRAWLEY: -- now.

Q. Because I will say, too, if we look down on -- all right. Because if we look down -- see, for example, my concern is that the difference is not -- all right. If you look at the difference here, say, for miscellaneous utility, the total planned is eleven thousand two hundred. Actual expenses, forty-nine ninety-one. So the difference comes out to say -- that eleven thousand, that's with the idea of that's the difference between what we planned and what we've spent so far.

A. Yeah. And that's how it should be all the way down. That's why it doesn't make sense. It needs to be explained.

Page 147

Q. Okay. But then when you get down to, say, termite treatment, total planned expenses, eighteen hundred. Actual expenses, zero. And then it says difference, zero. So is the zero a placeholder to reflect that there have been -- in categories where there have been no actual expenses made?

A. I think so. I think that's his intent.

Q. Okay.

A. And you do notice that he rolls things up. You know, there's subcategories that roll up into a number.

Q. Sure. Okay.

A. He's not the best mathematician in the world I can tell you.

Q. Well, I mean, math -- you know, look. Math theories are one thing. We can get those straightened out. My concern is making sure that we know what -- even if there is an error in the math itself, that we know what the column is supposed to represent.

A. Absolutely. And we want it to be accurate, also.

Page 148

Q. Okay. So moving down, do you get bids from subcontractors?

A. Steve had -- yeah. He works with a set of subcontractors.

Q. Okay. Do you know if he bids out or if he has designated go-to subcontractors he goes to?

A. Oh, he's very cost conscious.

Q. Okay.

A. But he does have some favorite subcontractors.

Q. So do you know in the places here where it's got increased labor costs, for example, here electrical labor, it shows an increased cost of between forty-five thousand one hundred and thirty-five and forty-six thousand eight hundred and fifty-five. Do you know, is that an estimate Steve did or did he go talk to a contractor about that?

A. He -- at least for most of these he talks to the contractor. And he voiced to me that, you know -- and he's building houses as we speak. So he has a pretty accurate picture

Page 149

of what these things are costing in general. And he voiced to me along with others that just building costs and labor have gone up here in the last year. As I mentioned earlier, between the pandemic, the hurricane, increased demand for repairs, it's -- things have gone up. In fact, honestly, I was surprised at how low the difference was because my house in Arizona, that difference if I did it on my house, it would be much higher than this.

Q. So are -- so you have the increase cost of building as sixty-two thousand six hundred and fifty-four dollars; is that correct?

A. Yeah. And so, again, when we subtract one one two 0 nine 0 six from one one eight three five sixty.

Q. Okay.

A. And then you have to add in -- it's not included here because it's in the sixty -- is that all of it? I think we also have our architectural fee. I can't remember if we separated that in the disclosure or is that

Page 150

locked in there? No. That looks like it's just that number.
Q. Okay.
A. I think we have an architectural cost.
Q. Okay. All right. And, again, I'll just kind of point out that this -- this total expenditure line here, just while we're talking about confusing things in here, I see the -- yeah. I see this and this, and then I guess -- I'm assuming -- if we assume this is actual to date, this number makes -- I can't see where that number comes from.
MR. ANDERSON: Jamie, it's your deposition, so I don't mean to interrupt. I think what we are relying on in terms of this damage calculation is just the difference between the -- what's in the red column and what was in the planned column. So the numbers in the difference columns are not things we're relying on for this calculation. So if that helps.
A. In fact, I don't think Steve even looked at that part of it.

Page 151

Q. Okay.
A. He was tasked with submitting a new plan, and he probably -- you know, in his spreadsheet he didn't do that.
Q. Sure. Okay. Let's just agree that we'll get a cleaned up version of this so we'll have something cleaner to submit.
A. Yeah.
MR. ANDERSON: We will talk about it.
MS. FRAWLEY: Okay. All right.
Q. Lost profits. You have thirteen thousand seven hundred and seventy-nine sixty-five per month. What -- okay. What was your targeted date for when Breezy Shores would have been originally completed?
A. It was -- the original plan, the estimate was it would take a year to do the construction, from the time we broke ground and began putting pilings.
Q. Okay. So it would have -- so originally you planned to have completed this at some point in, say, 2000 --
A. '20.

Page 152

Q. -- 2020?
A. Well, we started in '19. We broke ground in '19. So I think it was July, right? So it would be July of '20.
Q. Okay. All right. Okay. So your plan was to have started this in '20. At some point in the summer of '20, right?
A. Completed. Is that what you meant?
Q. Yes. I'm sorry. When you would have completed it and started renting it?
A. Yeah. Rent would have started in July of '20.
Q. How long does it typically take to get -- after you -- after you've completed building, how long does it take to get it rented up?
A. Usually immediately. What we do is we post ads for its completed construction with a date of when they can reserve it. So, for instance, Easy Breezy was finished in May of '15. And the day I finished the construction, renters moved in that day. That's a little closer than I usually like

Page 153

to cut it, but that one happened to work out that way because we had some last second snafus we had to go through. But usually it starts right away.
Q. Okay. So you would have anticipated that you would have started in -- pretty much as soon as it was completed in the summer of 2020, right?
A. Yes. And what we do in that case is we post pictures of a similar building. For instance, we've had shots of Easy Breezy inside and said similar to this except this many bedrooms and then post the pricing. And people book it on that basis.
Q. Okay. Now, you indicate in this lost profits that the Easy Breezy duplex revenues were obviously down in 2020 because of the COVID-19 pandemic, correct?
A. That's correct.
Q. Okay. Would you -- is there some reason that you would expect that Breezy Shores revenues would be more like the 2019 Easy Breezy revenues and not as opposed to 2020?

Page 154

A. I'm not sure I understand the question. You're asking if we would have expected the Breezy Shores' revenue in 2020 -- it would have been similar to what happened at Easy Breezy.
Q. Right. Okay.
A. For that year. You know, for the remainder of that '20 year which would have been the last -- we started July and then the last five months. It would have probably been similar to Easy Breezy at that time.
Q. Okay.
A. This year '21 we've already got our summers all booked up. So we expect actually the best year ever for this year. Probably because of the pandemic last year.
Q. But in terms of today because -- so this profit calculation, you say because the COVID-19 pandemic substantially affected revenues in 2020, Plaintiffs' lost profit calculation is based upon a comparison to rental revenue in 2019.
A. Well, we're trying to look at the lost

Page 155

profits over multiple years. So you extrapolate up to the five month window where COVID was versus what we get every other year.
Q. But I'm talking about from lost profits from when you would have opened 2020 today. It would be less than what you're projecting here, right?
A. From July of '20 to the end of '20, essentially now, it would have been similar to what you see in Easy Breezy prorating with the fourteen bedrooms.
Q. Okay. Now, item four here is impact of two-story reconfiguration, sixty-four thousand four hundred and forty-three. It says, Incur additional architectural and engineering costs of approximately fourteen thousand four hundred and forty-three dollars. What -- where did you get that -- that number from?
A. That's the number that we paid to have -- if you look at what I paid Mark Pavey to do the original three-story Breezy Shores, that's

Page 156

that figure. I talked to him just two days ago, and he said to do a new building, whether it's fourteen or eighteen, whatever size, roughly that size, it's going to be roughly that amount of money.
Q. Okay. So if you have to reconfigure to two stories, are you planning on starting from scratch with the plans, then?
A. You have to start from scratch. Yeah. Because it changes the total load the building has on the pilings. So the pilings get placed in totally different places. The way you lay out the rooms. For instance, you know, a three-story configuration, how we do the living room is different than in a two-story. You can't reuse things. You end up starting with a whole new layout and design because all of this stuff is done by software. You just can't -- you can't smash three in two. You've got to start over. That's the way it works.
Q. So -- and then you say cost related to reworking originally purchased material

Page 157

including pilings and windows is fifty thousand. Where does that number come from?
A. That's an estimate on my part because I can't define that until I have a two-story design done. So I just have to kind of slide that one. I mean, it will be probably, you know, different numbers of windows, different types of windows. And it's a very rough estimate whereas the other numbers in there are pretty well defined.
Q. Okay. Sorry. Go back down here. So -- where are windows? Windows. Windows. Okay. So you've already purchased said -- or have you? According to this, it looks like you've already purchased some windows; is that correct?
A. Yes. I would say the majority of the windows, if not all of them.
Q. Okay. But if -- looking at this, though, it looks like if the actual expenses column is accurate, that a lot of the other materials have not already been purchased, right?

Page 158

A. Yeah. I don't -- I don't think his actual on this chart is accurate as of now.
Q. Okay.
A. That part is old. The red part is the new. This is what he's really focused on.
Q. Okay.
A. What we need to do is go back with him and make sure the whole thing is right.
Q. So my -- where are we? But if you built the two-story, obviously two stories does not take up as much building material as one story, right?
A. In general that's true. You've got fewer rooms and so forth.
Q. Sure. Less sheetrock, less --
A. Yes.
Q. Less siding?
A. Yes.
Q. So wouldn't there be an offset between the cost that you have for three story and the cost of a two story?
A. Yeah. I think there would be. It's just no way for me to know what it is without having

Page 159

a two-story design. For instance, I could design a two-story so that the top floor has Cathedral ceilings to create a more spacious look. That would allow more cost. It's another way to do it versus a low ceiling. So it kind of depends on what we end up doing there.
Q. So with that answer in mind, then how did you get to the fifty thousand for reworking the originally purchased materials?
A. That's my point. It's a rough estimate. That's why it's a big round fifty thousand number. I'll have to -- I'd have to have the design done and then I could do a refined number on it. It's -- you know, it could turn out to be more or less, depending on how we redo the house. I mean, we may decide that because there are fewer bedrooms, we want a more lavish living interior to offset the lack of capacity. You know, put nicer appliances in. Who knows? It's just hard to say.
Q. Let's skip fees and costs for now. Future

Page 160

lost profits of -- and this is -- this says one million two hundred and ninety-nine dollars two hundred and twenty-three and twenty cents. In the event the Court awards damages for lost profits but does not permit Plaintiffs to resume construction of the project as originally planned, Plaintiffs will only be able to construct a two-story duplex with ten bedrooms. So that's five per side, right?
A. Yeah. That would be a five-per-side duplex.
Q. Okay. How did you make that determination that you'd do five per side?
A. Just on a -- right down the street about four houses down from that side, the place called Big Breezy. And there's a two-story similar footprint to this one, and it was ten with five on each side. So I know that's roughly what can fit in that footprint with two stories.
Q. Okay.
A. And it is possible you can squeeze twelve in, but then we'd have to have some really

Page 161

tiny bedrooms which I'm not really inclined to do. So I know we can do ten.
Q. Okay. How do you set the rental rates? Is it set per bedroom?
A. No. It's -- it kind of is. It's -- it's sort of based on capacity, you know, the number of people you can sleep. And so obviously the more bedrooms, you can sleep more people. We don't like putting more than usually one bed in a bedroom. Some rooms we have two queens. But we like it to feel pretty spacious in there when we have three families in there so they don't feel too crowded.
Q. Okay.
A. But it is based sort of on occupancy. And Daniel Prickett sets the price on those, you know, their judgment of the market.
Q. Do you have an idea if you were building -- well, in the fourteen bed duplex, seven per side, how -- what was -- what's your target -- what was your targeted occupancy in that building?

Page 162

A. Well, it would have been essentially prorated to the same percentage of fourteen as to eighteen. And that's how we did the numbers. You know, I've owned ten-bedroom, twelve-bedroom, eighteen-bedroom places. And if I look over the history and the rent that we see, sometimes in the off season, this price gets negotiated down a little bit. We have a lot of capacity. So I didn't go by projections. I went by actual what we were -- what Easy Breezy did and over what -- and I looked at our ten-bedroom. And it tends to correlate pretty closely to kind of the number per bedroom
Q. Okay.
A. Which is why as you get higher bedrooms like the eighteen bedrooms, you don't get quite as much per bedroom as the lower bedrooms because it's just a bigger place, a little harder to fill in the off season. The market is a little more limited of those cases. So we felt it was conservative just

Page 163

to do a straight proration of eighteen and fourteen. Because in reality, the fourteen per bedroom, the number would actually be a little higher. But we didn't know how to really compute that. So I just did the straight prorating.
Q. I'm sorry. You said the fourteen per bedroom would actually be -- I didn't hear that word.
A. The fourteen bedroom, per bedroom rate, like total revenue by bedrooms, I would expect if we measured a year after it was done, we'd find that the per bedroom dollar amount, fourteen is a little higher than the eighteen bedroom.
Q. Okay.
A. It's just too difficult for me to quantify.
Q. Okay. How many people does Easy Breezy sleep?
A. I think we advertise forty-four for the whole eighteen bedrooms.
Q. Okay. And is that twenty-two per side?
A. Yes.

Page 164

Q. So how many people would Breezy Shores as you had originally planned it sleep?
A. Roughly fourteen divided by eighteen times -- you can compute it if you'd like.
Q. Well, that's not -- okay.
A. I don't know how much you want to go down this.
Q. No. I mean, when you did the plan --
A. Roughly thirty-four.
Q. So had you not decided before you finished the plan exactly how many people Breezy Shores would sleep? Was that --
A. No. Because you can -- you can adjust that by how you furnish it.
Q. Okay.
A. Fourteen bedrooms can sleep varying numbers depending on how many beds I put in. But we tend to do a mix. The bedrooms that are closest to the beach that have a beach view, we make those master bedrooms and suites with large beds. And then as you get toward the back of the house, we tend to have a little more occupancy and put a couple of

Page 165

queen beds, put a couple kids in the room. So we try to find a balance of sleeping a fair amount of people but not packing them in like sardines.
Q. So you-all had not made that decision yet as to Breezy Shores?
A. We know and I know from all the buildings we've done they all run about the same. Essentially thirty-four based upon the number of bedrooms.
Q. Okay. Okay. So then -- I'm trying to do the --
A. The other thing I would throw out is we did not factor in increased rent over the future years. All of the places other than the COVID year, last year, rent has gone up.
Q. Okay.
A. We did not throw that into this mix.
Q. Okay. On either side, right? On either the --
A. Right.
Q. -- profit or --
A. What I anticipate that we would use. On all

my places, the rent has gone up every year in terms of total rent received every year except for last year due to COVID.
Q. You said earlier that you-all just sold Nice and Breezy --
A. Yes.
Q. -- which was a twelve-bedroom house. But are the -- before -- prior to selling it, did -- what was the -- prior to selling Nice and Breezy, when you were still renting it, what was the rent on that building?
A. Well, that one in comparison is not beachfront. It's the only property I have that's not beachfront. So we get a lower per bedroom number on that because it's across the street.
Q. Okay.
A. That's a difference in rental, whether you're on the beach or across the street.
Q. What about is the rent comparable between Breezyville and Easy Breezy on a per bedroom?
A. Easy Breezy is better than Breezyville.

Q. Okay. So you charge more for Easy Breezy?
A. It has more to do with the number of nights rented. Breezyville is a kind of a large complex.
Q. Okay.
A. If you have a dedicated house and it's also in Fort Morgan, then I've found the houses tend to do better in Fort Morgan. People like to go in the house as a family and get away from the town.
Q. Okay.
A. So Easy Breezy is my best per bedroom house.
Q. Okay. In terms of property value, did you realize an appreciation when you sold Nice and Breezy?
A. We made a very small profit on Nice and Breezy, partly because we incurred a lot of extra building costs due to Mike Adams and the mess-ups he had. We probably put a hundred and fifty thousand more in that building than we needed to.
Q. Okay.
A. Than if it had been built correctly by a

good builder. So we ended up breaking even pretty much on purchase, build cost versus what I sold it for after paying real estate fees. And not counting the rent you received. Just generally cost basis and sales price.
Q. Are any of your other properties up for sale?
A. Yeah. Easy Breezy has been up for sale for over a year now.
Q. Okay. Why -- why do you want to sell Easy Breezy?
A. That's been my pattern on all of this is buy or build, rent it for three or four years, establish rental income. Because most people buy these places based on your demonstration of rental income. And then sell it if I get a price I want. If I don't get a price I want, I just keep them. That's why this one has been for sale for a while. I have a pretty high price on it. Like my grandfather said, everything is for sale. It's just the right price.

Q. The right price. Here is a -- moving down in this document, it says it will be up to the fact finder to determine when construction likely would have originally concluded between January and August of 2020. What is your position on when construction likely would have originally concluded?
A. I think I answered that. It was about a year after we started.
Q. Okay. Okay.
A. July of '20.
Q. Okay. All right. And this future lost profits of the roughly one point three million we'll call it, that's -- that is assuming that you held the project that entire time, right?
A. Yes.
Q. Okay.
A. Or sold it and took the money to do another one that would produce similarly. And, honestly, in actuality, I think we'd probably do better than that because when

I'd sell the property, I'd make a profit on the base. And then we'd do another building that would produce similarly going forward. It's a conservative estimate.

Q. Okay. So let's talk about that. How -- how do you -- how or have you made any projection about what a -- a profit realization on the sale would be in the original fourteen-bedroom design versus the proposed ten-bedroom design?

A. I don't -- I don't have a good number on that off the top of my head. I'd have to go back and look at that.

Q. Okay.

A. Again, it depends on, you know, if we're talking -- are we talking, you know, the original design? There's kind of a -- as you go up in price, there aren't as many comps to go on. So I'd have to go back and see what we thought we could sell it for.

Q. Okay. Do you know what an average price per square foot is in that area?

A. I don't. And it really wouldn't apply in

this case because it gets struck down by all the small houses. What we could go by are large rental units that are fairly new as part of this, because these are fairly new buildings. Plus we sell all our buildings furnished. That's part of it, too.

Q. Okay. Moving over to this 2019 which is also part of Exhibit 10. And these are -- did that switch on my screen sharing? I think -- did I do that right?

A. Yeah. Yeah. Yes. So the Prickett Properties property statement.

Q. Yes. Yes. Booked nights and expenses between 1/1/19 and 12/31/19. This Beach Club property, is that your Beach Club condo?

A. Yeah. They -- so on my statement, they summarize multiple of my places into one. But that's the Beach Club one I told you about that was owned by (inaudible).

COURT REPORTER: I'm sorry. It was owned by who?

A. I'm sorry. It was part of Breezy Beach

Holdings, LLC, this Beach Club Property. It's just all included in one statement. When they give me statements, they don't separate them by properties except for I think Breezyville because it was a different ownership there.

Q. Okay. All right. So going down -- just to make sure, so this first page which is Beach Club D202, you've got -- it's through 2019. Check-in, nights, total revenue. And so where it says total revenue, is that column just whatever the rate was times the nights?

A. It's the -- it's essentially the gross revenue that Prickett collects.

Q. Okay. So not net. That's gross?

A. That's gross.

Q. Okay. This next page where it's got base, a percentage and amount of booking expenses --

A. So the twenty-two percent there is what Prickett charges across all my properties.

Q. Okay.

A. But they're a part of, you know, booking, advertising, booking and handling repairs.

I get the bills for the repairs, but they handle the management of it.

Q. Okay. And then that amount column reflects what you paid them for each booking?

A. That's right.

Q. Okay. Now, when we were talking over here about the -- the net revenue for the lost profits, does that -- when you say net revenue, is that the gross minus those booking expenses?

A. It's a net of the booking expenses and you'll see on some of the properties repair.

Q. Yeah.

A. General maintenance and repair. So that net number subtracts that and the twenty-two percent out.

Q. Okay. There's Easy Breezy East. We have Easy Breezy East/West here.

A. Yes. That's -- that's when both sides are booked by one party which is what we do during peek -- during the summer.

Q. Okay. All right. And then you have those separately it looks like where just East had

been rented. And this says five-bedroom lock-out.
A. Remember I mentioned earlier that in the off season, we lock out the top floor. And that's that configuration. So it's listed on there. It's a separate rental even though the same building. It's just a five-bedroom configuration.
Q. Okay. All right. I knew that we had talked about -- and this may be -- I know we talked about Breezyville that you-all do that.
A. Yeah.
Q. But you also do --
A. Yeah. We also do Easy Breezy. And I think I said earlier we didn't, but that was a mistake because --
Q. Yeah.
A. I mean, we changed it this last year because of the pandemic.
Q. Okay.
A. We had to actually go in and modify the doors and create a lock-out for Easy Breezy.
Q. Okay. So to go through here, then, this --

this page five is the Easy Breezy, just the five bedroom lock-out. Then you have Easy Breezy East/West which is when the entire condo is rented, right?
A. All eighteen bedrooms.
Q. The entire. Okay. And then you have Easy Breezy West which is --
A. Nine bedrooms, west side.
Q. Nine bedrooms. Okay. And then you have Easy Breezy West lock-out, right?
A. Right.
Q. Okay. I noticed on here it looks like -- I'm guessing for ease of whatever -- while you have the -- here we go. So while you have total revenue and booking expenses separated out for the different ways that you can do Easy Breezy, it looks like all of the other expenses are just put under the Easy Breezy East/West; is that right?
A. That's correct. Because most of them affect the overall house and property. So it's no way to really attach them to something.
Q. Sure. Okay. Well, I mean, there's some --

it looks like there is and there isn't, right? There's none for Easy Breezy East in the five bedroom lock-out. There's no expenses. Easy Breezy East/West there are expenses. Easy Breezy West there are expenses.
A. Yeah.
Q. And then there's no for --
A. The logic how we apply that, it doesn't matter to me. I get the bill for all of it. So ...
Q. Okay.
A. I pay the totals. But you will notice that there's a lot of damages from hurricane this year that we don't normally have.
Q. Sure. Yeah. Okay. All right. So it looks to me maybe like they did some separation but not any with the lock-out; is that fair?
A. Yeah. I would say that's probably correct.
Q. Okay. Back over here on Breezyville. Okay. So when you did the -- in the lost profit calculation and you were looking at net revenues, gross revenues and net revenues,

did you rely on these property statements or some other documents?
A. No. Those property statements.
Q. Okay. And so for Easy Breezy East, let's just go through and do this math. So 2019 for Easy Breezy East, it says it's twenty-one thousand six hundred and thirty-three dollars and eighty cents.
A. Yes.
Q. Do you agree with me? Okay. Net amount to owner for property of Easy Breezy East/West is one ninety-five two sixty-nine fifty there; is that right?
A. That's right.
Q. And then net amount to owner for property of Easy Breezy West is thirty-nine thousand six hundred and forty-two dollars and sixty cents?
A. Yes.
Q. Okay. So if you add that all together, it was adding those three numbers that you got that two hundred and fifty-six five forty-six, right? That's what I get.

Page 178

A. Yeah. I think so. I couldn't tell if we got all the numbers. But it should be all the net revenue numbers on all the Easy Breezy configuration.
Q. Okay. All right. I just -- I know some of this seems self explanatory, but we want to make sure that all the documents match.
A. Absolutely. I understand.
Q. Okay. Would you expect the -- because net revenue, of course, is based on property expenses, do you expect the expenses for Breezy Shores had it been built to be roughly equivalent to those in Easy Breezy?
A. It would have been -- probably been similarly prorated from fourteen versus eighteen bedrooms roughly. But it's a good rough estimate.
Q. Okay. Otherwise, it was your intention to use roughly the same types of, say, appliances and fixtures in Breezy Shores as in Easy Breezy?
A. Yes.
Q. Okay. Was -- I think we've talked about

Page 179

this before. Does Easy Breezy have a pool? I believe there was a pool.
A. A pool for each duplex. They're not real big, but --
Q. Sure. That's -- okay. What about Breezy Shores?
A. Yes. It was going to have one pool, not one on each side. One pool to be shared with both sides. It was going to be a bigger pool. It was going to be in ground. So a little more expensive pool than as Easy Breezy.
Q. Does the fact that there's only one pool to share in Breezy Shores versus the two in Easy Breezy, does that affect the rent that would be charged?
A. No. And I can say that with certainty because the ten-bedroom that I owned previously right down the street had a shared pool in the ground, and its per bedroom number was actually higher than Easy Breezy, again, because it's ten versus eighteen. But the pool doesn't seem to

Page 180

really influence that much. If you didn't have a pool at all, that would affect it.
Q. You said the ten-bedroom that you used to have down the street. Which one was that?
A. It's called Big Breezy. It's the one I sold to Tom a couple years ago.
Q. Okay. When did you sell that?
A. Like I said, a couple years ago. It was I'm going to say around -- just about the time when we bought the Breezyville lots. I'm going to say roughly around 2017, in that area. I can't remember exactly.
Q. Okay. What was -- if you remember, what would be -- what kind of difference in the per room rental rate were you getting between that and -- and Easy Breezy?
A. I can't remember. And, honestly, I haven't seen their numbers in the last couple or three years because Tom's owned it. And all my places have gone up over the last three years. So I couldn't tell you right now. I wouldn't say it's a massive difference. It's just because it's a smaller building,

Page 181

you get -- you get more nights. It's not that you get a huge difference in price structure, but you get more nights rented because more people can -- there's a bigger market for a ten-bedroom than there is for an eighteen-bedroom.
Q. Okay. Are there any other -- so other than the updated costs that you're going to provide and these property statements, are there any other documents that you've relied on to calculate your damages?
A. Not that I can think of.
Q. Okay. Have you talked to anybody or sought -- other than the documents, have you sought advice from or input from anybody other than your attorney besides Steve Jones and these property statements in calculating your damages?
A. Well, the property statements would be Dan Prickett.
Q. Correct.
A. And so Dan has provided all the information on the revenue side.

Page 182

Q. Okay.
A. Steve is the only one I've talked with about the cost side of building.
Q. Okay. Did you talk to Mark about -- Mark, the architect, about calculating your damages?
A. No. In terms of what we paid -- I paid him to do the design. We were talking about some costs for design. Yes. I talked to him specifically about his costs.
Q. Okay.
A. But not about cost of building.
Q. Okay. Anybody else that you talked to in coming up with your damage calculations?
A. No.
Q. Okay. You have -- you individually are a plaintiff in this action, right?
A. I believe that's right.
Q. Okay. Have you individually done a damages calculation?
A. No.
Q. Okay. Does this -- this damages disclosure that I have, does this reflect damages only

Page 183

to Breezy Shores, the entity itself?
A. Yes.
Q. Okay. Do you yourself have any personal damages?
A. I have not -- yeah. I have not gotten into that discussion.
Q. Okay. So the problem is that this is my one time to ask you about that. So, you know -- and you are named as a personal plaintiff in this lawsuit. So even -- okay. We'll leave numbers out of it for a minute. What kind of personal damages are you claiming?
A. I have not worked through that yet.
Q. Okay. Do you anticipate working through that?
A. I do. I just don't know at this time.
Q. Okay. Do you have an idea when you will know?
A. I don't.
Q. Okay.
MR. ANDERSON: Jamie, we'll supplement to the extent there's a separate damages calculation for Mr. Bordelon individually, I

Page 184

assume.
MS. FRAWLEY: Then the same thing with him. I'm going to mark this and reserve the right to come back for the limited purposes of if I have any questions about that supplementation.
MR. ANDERSON: Understood.
Q. Okay. You testified earlier that you had relied on -- on your architect really in terms of the zoning ordinance. So have you ever personally -- I should back up. Is that right? Is that still your testimony?
A. Yes. I totally relied on Mark for interpretation of those things.
Q. Okay. So you have never personally reviewed the zoning ordinance, right?
A. No. There have been times pieces of it have been shown to me, what some of the issues were about, but only through say like my attorney.
Q. So it would be fair to say that you don't have any personal knowledge of really the various provisions in here?

Page 185

A. Not in detail how they were worded. No.
Q. Okay. Well, then I will -- if you do not have personal knowledge of them, then I will not make you read them right this second.
(Whereupon, Defendants' Exhibit 5 was marked for identification and attached to the Original transcript.)
Q. This is -- if you go to Exhibit 5. And could you just identify for the record tell us what -- what this document is?
A. Baldwin County Commission District 4, Board of Adjustment regular meeting minutes from December 12th, 2019.
Q. Have you ever seen this document before?
A. I'm not sure.
Q. Okay. Were you personally -- if you scroll down here just in the first page there, it's got AD-19003 Breezy Shores, LLC, property. Do you see where I am?
A. I do.
Q. Okay. It says, Mr. Jackson presented the applicant's request for an appeal to an

Page 186

administrative decision as it pertains to the maximum height in habitable stories for a proposed two-family duplex dwelling. Were you present at that meeting?
A. No.
Q. Okay. Do you have any reason to dispute that this -- these minutes are an accurate representation of what happened at that meeting?
A. Since I wasn't there, there's no way for me to know.
Q. Okay. Sure.
MR. ANDERSON: Hold on. Sorry. And I don't think this was your intent, but I'll object to the extent that question sought any communications between Mr. Bordelon and his attorney.
MS. FRAWLEY: Sure. Yeah. No. I was just wanting to make sure that, you know, he wasn't going to -- the minutes did not -- that he didn't know personally -- you know, the minutes did not accurately reflect -- in other words, that we don't have an

Page 187

authentication problem to put it in lawyer terms, not that I'd ask him that. But -- sorry. Hold on. Off the record for a second.
THE WITNESS: Maybe this would be a good time for a break.
MS. FRAWLEY: Yeah. Why don't we go ahead and we'll take a little bit of a break here. Say ten.
(Brief recess)
Q. First of all, is there anything -- since now that we've had a break and you've had a chance to reflect a little bit on your testimony, is there anything about your testimony since the last -- today that you want to correct or change?
A. No.
Q. Okay. I don't have too much more. Just a couple. In your -- in the second amended complaint it mentions that the MRBIRA, LLC, that we've been discussing -- and this is in paragraph 2(a), its members are you and Sunwest Trust, LLC. Is that still --

Page 188

A. No. It's changed.
Q. Okay.
A. Recently a company called Millennium Trust bought out Sunwest Trust's assets, at least these assets. I was notified a few months ago. So basically we just switched.
Q. Okay.
A. They're the new custodian.
Q. Okay.
A. Millennium Trust.
Q. But they just stepped into the shoes of Sunwest Trust?
A. Yes.
Q. Okay. Have there been any other changes in MRBIRA since you filed the amended -- since this was filed?
A. No.
Q. Okay. In DLP 1, LLC, down in paragraph 2(b) it mentioned some members are Tom Lynch who we've discussed several times and also Mike Bardi. Do you see that?
A. It might be Mark Bardi, I think.
Q. Okay.

Page 189

A. I'm not sure it's a Louisiana LLC. I think it's a Pennsylvania LLC.
Q. We talked about that. Is -- okay. Do you know -- well, since you're not -- since we're not sure if it's Mike or Mark, have you had any conversations with Mr. Bardi about Breezy Shores?
A. No.
Q. Okay.
A. And I'm pretty sure it's Mark.
Q. Okay. Has he been, to your knowledge, involved in any sort of decision making --
A. No.
Q. -- of Breezy Shores? Okay. Do you have any knowledge about how the ownership interest in DLP 1 are split between those two gentlemen?
A. I do not, but I believe Tom is essentially the owner and Mark is a member or manager of that nature.
Q. Okay. In terms of the corporate structure of Breezy Shores -- and I know you don't have an operating agreement. How -- how are

the net revenues -- how would the net revenues be split between MRBIRA and DLP 1?
A. It's split based on the capital ownership.
Q. Okay. Did you-all discuss how you would do like a distribution schedule or tax treatment or anything?
A. We currently have an arrangement on Breezyville, and I leave it up to Tom's accountants to direct the distribution schedule since he's eighty percent owner.
Q. Sure.
A. We tend to do one kind of large distribution at the end of the summer because we get -- over half the yearly revenue occurs during the summer. So we tend to do one big one there, and then we kind of do one toward the end of the year when we know what the final expenses are.
Q. I know we talked earlier about the capital contributions that you had testified that the intent in Breezy Shores is to eventually -- for it to eventually be fifty/fifty; is that right?

A. That's right.
Q. How -- how is that difference -- and you've done some capital contributions so far. What -- do you have a contemplated schedule of how that difference would be made up?
A. Yes. The plan was for me to continue contributing all cash until I caught up to six hundred thousand which was the value contributed with the lot. I was at one seventy-five when the stop work order hit. Actually, I was less than that. But I had legal fees and other things. So I've continued to -- I'm the sole cash -- MRBIRA, LLC, are contributing all the cash until I get to fifty/fifty.
Q. Okay. If you were doing distribution before you reached that fifty/fifty, it would go along with wherever you were at that point when a distribution was made?
A. We discussed that briefly. Tom's opinion is given I'm doing all of the work here, he would just do a fifty/fifty with anything like that.

Q. Between the two?
A. I would still owe him the proper capital, you know, by a certain time frame to get to the fifty/fifty.
Q. Okay. Also in the -- let's look at that time actually. In the second amended complaint here, there is on paragraph -- where is it? Okay. Paragraph fifteen here where it talks about from July 23rd, '19 through July 31st, 2019, Plaintiffs began construction on the site. Plaintiffs expended tens of thousands of dollars and began erecting a piling foundation. We've talked about the pilings already, right?
A. Yeah. I believe so.
Q. Okay. In addition to the pilings, what other expenditures did you have in that particular time frame?
A. You mean during that specific week or prior?
Q. Yeah. I'm just talking about this one from July 23rd, 2019 to July 31, 2019, what were your expenditures in that week?
A. I don't know exactly during that one week

because Steve was managing how things were paid out. I had already -- I think I had already paid Mark for his work.
Q. Okay.
A. And I'd already given Steve money in advance to get in line of procuring things in advance because he felt we'd had no feedback that it was anything, you know, wrong with our permits as we went. So we began relying on that and getting ready for the build.
Q. Had you given them that -- made those expenditures prior to the land use permit and building permit being issued?
A. Some of those were prior to this.
Q. Do you have any idea about how much was done after?
A. You mean after July 23rd?
Q. Yeah.
A. I don't know off the top of my head.
Q. Okay.
A. I mean, there's also what was actually spent and what we became obligated to spend.
Q. Okay.

A. We'd have to break that down.
Q. Okay. Well, what do you mean?
A. Well, for instance, we placed an order in that week and we were obligated to pay. You know, we were obligated to pay that. And that's an incurred expense in my mind obligating us. It was committed.
Q. Going back to the damages, that should -- anything that you've already expended should show up in that cost spreadsheet, right?
A. Yes. So we put in there everything I know about.
Q. Okay. All right. How did you come -- what is your understanding of the process for issuing a land use certificate?
A. Well, I'm not an expert. Again, I relied on Mark for that. The general flow is usually we did a site plan. We do a survey, do a site plan. And then, you know, we submit that in, and you get the land use permit. And then you subsequently get a building permit.
Q. To your knowledge, are there any -- well, do

you know of any reasons why land use certificates might not be issued?
A. I don't know of all the reasons that would be.
Q. Okay. Do you know why a building permit might not be issued?
A. Yeah. I mean some of the reasons I know.
Q. Okay.
A. We have the wrong -- if you don't meet the building code, you know, in your plan, they will let you know and notify you and then you modify your plan accordingly.
Q. Okay. Well, let's discuss that a little bit further. In terms of the stop work order, other than it not being issued, what do you believe should have been done differently prior to it being issued?
MR. ANDERSON: Object to form. You can answer.
A. Well, what normally has occurred in the past with all my other buildings is if there was an issue, we'd get notified and we'd get offered the opportunity to address it.

Q. What kind of opportunity to address it?
A. Well, they would communicate the issue. And in some cases we would come back and say, You're mistaken. We've got it right. And they would go, Oh, okay. And sometimes they're right and I would tell the builder or designer to go in and correct the issue. And then we would submit a revised plan and we would say, Are you satisfied with this. Yes. We continue on. In the permitting process that's how it's always done.
Q. Okay. I know we talked about with the setback issue with Nice and Breezy, that that was one of those. Had you had any other occasions where you were notified that something was wrong?
A. Yeah. I mean, like on Breezyville, we had instances where our site plan did not, for instance, allow enough room for a fire engine to come down between the buildings and be able to suppress the flame from any angle around the building. So we had to go back and modify our site plan to accommodate

that. We had to move a key pad to let you through the gate to the opposite side because of the way the fire truck people wanted it. And so we had to make a lot of modifications to our site plan and continually go back and submit and review. And we got through all of those. But it was, you know, part of the process.
Q. Were those modifications done before or after the land use certificate had been issued in Breezyville?
A. I would say both before and after.
Q. Okay. Was there ever actually a stop work order issued in Breezyville?
A. No.
Q. How did you come to be aware of, say, the fire issue with Breezyville?
A. The builder informed me which was Highland Group.
Q. Okay.
A. And he informed me of a couple of issues that he was talking to the fire marshal about, some of these components.

Page 198

Q. Okay. So what other issues with Breezyville?
A. I would have to go back and look. There were some others. I just can't remember all of them.
Q. Okay. You said that Mark had been talking to -- and I'm assuming this is Mark, the architect, right?
A. Yes. Absolutely. Mark, the architect. Mark Pavey.
Q. I knew what you meant. Just in case six months from now we all read this, that we've got the right Mark. So he had been talking with the fire marshal. To your knowledge, was the County involved in that? Was that something that the -- or was that a fire marshal approval issue?
A. That particular one was fire marshal.
Q. Okay.
A. I can't say specifically there was any County ones. I'd have to go back and look. It was a pretty complex project with four houses.

Page 199

Q. Okay. Had you had any other -- the way things had been done in the past, are there any other examples that you can give right now of times that issues have been worked out informally?
A. There are several others, but I just couldn't enumerate the specifics of them right now. But that can be researched.
Q. Okay. So do you contend that there should have been -- before the stop work order was issued, that there should have been an informal process of picking up the phone. Hey, this is an issue?
A. Absolutely. Someone should have at least communicated with us and offered us an opportunity to resolve it. And I believe it should have been done prior to permits ever being issued.
Q. Okay. Do you contend that there should have been a formal hearing of some kind?
A. Not necessarily.
Q. Okay. When you say offer us an opportunity to resolve it, what -- what other

Page 200

resolutions do you think that there might have been?
A. Well, if they had notified -- they first got the site plan in March. They could have addressed the issue with us then. I could have gotten an ADEM permit and added some more parking. Even if we didn't agree with the interpretation, we could have resolved that way well before July.
Q. Okay. I know you-all did -- so when did you -- let me stop sharing. When did you put in for the -- the first ADEM permit?
A. The original ADEM permit?
Q. Yeah.
A. I don't recall that date.
Q. Okay. Let me --
A. I believe we received the original near the time we got the building permit. That was sort of the last thing we were waiting on.
Q. Right. Yeah. I can tell you you received it in July. Had you applied for it -- and you applied for the land use certificate in March, right?

Page 201

A. Yeah. We submitted that in March.
Q. Okay.
A. And my -- my understanding, my normal process we would have applied for the ADEM near that time, too.
Q. Okay. Same time?
A. It takes forever to get that done.
Q. Okay. Okay. Let's go back to Exhibit 3, this first page of the exhibit. What -- could you just identify what this page is?
A. Building permit.
Q. Have you ever seen this document before?
A. I have. I have glanced at it before. Yes.
Q. Okay. Had you seen it before you filed the lawsuit?
A. Oh, gosh. Probably yes, but probably not -- probably not before the building started. Because, again, you know, Steve Jones handles that. I just get notified we got a building permit. I don't usually get a physical copy of it.
Q. Okay. And then this second and third page of this exhibit, could you just identify

Page 202

what this is here?
A. Baldwin County land use certificate application.
Q. Yeah. I see here it has applicant listed as Steve Jones; is that right?
A. That's right.
Q. Did you review this document before he submitted it?
A. I don't think so.
Q. Okay. When you-all knew the -- when you were looking at the plans or drawing up the plans for Breezy Shores, the original plans, do you know if Mark, the architect, consulted any safety experts or advisors?
A. I think that's just part of what Mark does. He followed the ordinances as they're defined including those for fire and everything else. I don't know who specifically he talked to.
Q. Have you individually or you as Breezy Shores ever contracted with any sort of safety experts regarding building of this property?

Page 203

MR. ANDERSON: Object to the form.
A. We rely -- we always relied on the building code that they address safety within the context of the building code. And we did put in, for instance, a sprinkler system into Breezy Shores' design for added safety for fire.
Q. Sure. And would you agree with me that fire is a concern?
A. Actually, the building has --
Q. Sure.
A. You want to be as safe as you can, and that's why we felt good about the sprinkler system. That's safer than worrying about a fire department rescuing you. It will suppress the fire immediately.
Q. Were you aware that there were structure fires on Ponce de Leon in December?
A. No.
Q. So obviously it did not affect -- it hasn't been any effect to your property Breezy Shores or I guess Easy Breezy?
A. You mean with fire?

Page 204

Q. Yeah.
A. Yeah. I don't know anything about a fire on Ponce de Leon.
Q. Okay. You mentioned that there was some hurricane damage this year; is that right?
A. Yes.
Q. What kind of damage was done to the Easy Breezy property?
A. We had -- our air conditioners were blown down off their platforms. They're elevated on platforms. So with all our air conditioning units, we had some siding blown off that had to be replaced. We had a couple of cracked windows. We got some water damage on one room from a leak in the roof. And, of course, you know, debris, sand in the pool and things like that.
Q. What about was there any damage done to the Breezy Shores property?
A. Well, it's not much you can damage there. There are only some pilings. We had already moved the pilings. So there were just a few pilings in the ground, and they stayed.

Page 205

Q. Okay. You-all didn't have like somebody's boat washed up there, for example?
A. No.
Q. Okay. I'm sorry. I misspoke before. I double checked myself. The fire on Ponce de Leon was in early January. But at any rate, you're not aware of any sort of house fires on that street?
A. Never heard about it.
Q. Okay. Have there been any other -- besides the hurricanes, anything else damaging Easy Breezy?
A. No. I mean, we had actually two separate hurricanes, you know, a couple hurricanes.
Q. Yeah.
A. So the damages I mentioned were of both hurricanes.
Q. How -- did you-all have to cancel or refund rental proceeds for those two hurricanes we've had this year?
A. Well, no. Because part of the arrangement when people book is if -- they have the option to buy trip insurance.

Page 206

Q. Okay.
A. With any hurricane, it would be covered on that. If they don't elect that, they lose their money. That's sort of the risk they take. So we don't cancel.
MS. FRAWLEY: Okay. I think I'm just about done. If you'll just give me like five minutes to look at my notes.
MR. ANDERSON: Sure.
(Brief recess)
Q. Just one more. Have we talked about today all the ways that you believe you, meaning you personally, and you Breezy Shores have been treated differently than residents of the Fort Morgan -- members of the Fort Morgan Civic Association?
A. I believe we've discussed that. Yeah.
Q. Okay. I just wanted to make sure. Are there any other examples beyond what we've talked about of differential treatment that you have?
A. No.
Q. Okay. That's not a pop quiz.

Page 207

A. Yeah.
Q. Yeah. Just -- I just want to make sure that I understand everything that you're saying.
A. Right.
Q. And then as we've -- as we've gone through today, I know I've asked this several times. Sitting here right now, is there anything that you want to change about your testimony today?
A. No.
MS. FRAWLEY: Okay. Then I think I'm done, unless your attorney may have some questions for you.
MR. ANDERSON: I think I just have one or two just for clarification.

EXAMINATION

BY MR. ANDERSON:
Q. Mr. Bordelon, she asked you some questions about your position on a formal or informal hearing or meeting occurring prior to a stop work order or revocation of land use certificate occurring. And I believe your testimony was that normally an informal

Page 208

hearing should occur. And then she asked you is it your position that a formal hearing should also occur, and you said not necessarily. Can you just clarify what your and Breezy Shores' position is relative to what type of hearing or meeting would be required prior to a stop work order or revocation of a land use certificate?
A. Yes. I guess, you know, my answer is I'd want any means I could have to communicate prior to this stop work order. Normally it's handled informally. But if it's not handled informally, then I would expect a formal hearing. In other words, there has to be some avenue that this gets communicated to us and, hence, an opportunity to resolve before, in my opinion, being handed a stop work order with no information.
Q. Ms. Kidd asked you some questions about how Fort Morgan Civic Association has been differentially treated or members of that association have been differentially

Page 209

treated. To your knowledge, have any members of the Fort Morgan Civic Association ever had a land use certificate revoked?
A. Not that I know of.
Q. To your knowledge, have members of Fort Morgan Civic Association had the opportunity to resolve issues pertaining to land use certificates or building permits or anything of the like before rather than having permits revoked?
A. I'm not sure I quite follow that.
MR. ANDERSON: I'll withdraw the question. That's all I have.
MS. FRAWLEY: I just have a quick follow-up.

EXAMINATION

BY MS. FRAWLEY:
Q. Do you -- do you know all the member -- who all the members are of the Fort Morgan Civic Association?
A. No, I don't know them all.
Q. Okay. So do you know if any of them -- can you -- can you -- hold on. Can you testify

today that a member of the Fort Morgan Civic Association has never had a land use certificate denied or revoked?

A. I don't directly know that.

MS. FRAWLEY: Okay. I don't have anything else.

MR. ANDERSON: All right. Neither do I.

(Whereupon, the deposition was concluded at approximately 3:10 p.m.)

CERTIFICATE

STATE OF ALABAMA
ELMORE COUNTY

I hereby certify that the above and foregoing deposition was taken down by me in stenotype and the questions and answers thereto were transcribed by means of computer-aided transcription, and that the foregoing represents a true and correct transcript of the testimony given by said witness upon said hearing.

I further certify that I am neither of counsel, nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

Signed the 1st day of February, 2021.

Virginia Denise Barrett
ACCR #458, Expires 9/30/21
My Commission Expires 9/9/23

To: Kristopher O. Anderson, Esq.
Re: Signature of Deponent 30(b)(6) Michael R. Bordelon
Date Errata due back at our offices: 3/7/2021

Greetings:
This deposition has been requested for read and sign by the deponent. It is the deponent's responsibility to review the transcript, noting any changes or corrections on the attached PDF Errata. The deponent may fill out the Errata electronically or print and fill out manually.

Once the Errata is signed by the deponent and notarized, please mail it to the offices of Veritext (below).

When the signed Errata is returned to us, we will seal and forward to the taking attorney to file with the original transcript. We will also send copies of the Errata to all ordering parties.

If the signed Errata is not returned within the time above, the original transcript may be filed with the court without the signature of the deponent.

Please Email the completed errata/witness cert page to readandsign@veritext.com
or mail to
Veritext Production Facility
2031 Shady Crest Drive
Hoover, AL 35216
205-397-2397

ERRATA for ASSIGNMENT #4435573
I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

___ There are no changes noted.
___ The following changes are noted:

Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e) (2017). Rule 30(e) states any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them. To assist you in making any such corrections, please use the form below. If additional pages are necessary, please furnish same and attach.

Page _____ Line ______ Change ________________________
____________________________________________________
Reason for change ______________________________
Page _____ Line ______ Change ________________________
____________________________________________________
Reason for change ______________________________
Page _____ Line ______ Change ________________________
____________________________________________________
Reason for change ______________________________
Page _____ Line ______ Change ________________________
____________________________________________________
Reason for change ______________________________
Page _____ Line ______ Change ________________________

Page _____ Line ______ Change ________________________

_______________________________________________________

Reason for change ____________________________________

Page _____ Line ______ Change ________________________

_______________________________________________________

Reason for change ____________________________________

Page _____ Line ______ Change ________________________

_______________________________________________________

Reason for change ____________________________________

Page _____ Line ______ Change ________________________

_______________________________________________________

Reason for change ____________________________________

Page _____ Line ______ Change ________________________

_______________________________________________________

Reason for change ____________________________________

____________________________________

DEPONENT'S SIGNATURE

Sworn to and subscribed before me this ___ day of

_________________, _______.

_________________________________

NOTARY PUBLIC / My Commission Expires:_____________

**0**

**0** 39:13,13 42:12 43:8 149:16,16
**00057** 1:5

**1**

**1** 3:8 8:14,20 20:20 22:17,20 24:7,16 24:17 30:16,18 31:16,19 36:4,6,10 36:17 37:4 48:16 49:12,13,14 51:4 52:9 61:3,5 62:2 188:18 189:16 190:2
**1/1/19** 171:14
**10** 3:22 11:8,13,16 13:12,18 135:13 171:8
**11** 3:22
**12/12/19** 3:14
**12/31/19** 171:14
**1260** 29:4
**12th** 63:22 66:11 67:9 185:14
**13** 50:22
**134** 3:15
**14** 50:22
**15** 50:21 152:21
**15th** 123:11
**17** 36:5 51:1 120:5
**18315** 211:21
**185** 3:12
**19** 27:8 152:2,3 153:18 154:19 192:9
**19003** 185:19
**1:20** 1:5
**1st** 73:12 74:14 84:12 211:18

**2**

**2** 3:9 59:22 60:5 97:7 109:1 128:17 187:22 188:18
**2-30** 73:22
**2-31** 73:23
**2.3.25** 73:14,20
**2.3.25.3** 73:21
**20** 151:23 152:4,6,7 152:12 154:8 155:9 155:9 169:12
**2000** 151:22
**2004** 7:20
**2012** 25:8 32:18
**2014** 50:19
**2015** 28:19
**2016** 31:14
**2017** 48:16 180:11 213:7
**2018** 37:3
**2019** 40:13 52:22 63:21,22 66:10,11 66:13 123:9,11 135:8 153:22 154:22 171:7 172:9 177:5 185:14 192:10,21,21
**2020** 19:17 73:12 74:14 137:7,8 152:1 153:8,17,23 154:3,20 155:6 169:6
**2021** 1:20 2:8 211:18
**2031** 212:21
**205-397-2397** 212:23
**207** 3:4
**209** 3:5
**21** 154:13
**222** 4:5
**23rd** 192:9,21 193:17
**25** 73:15,21 123:10 129:2 132:2
**29th** 1:20 2:7

**3**

**3** 3:10 23:18 61:18 61:22,23 75:1 201:8
**3/7/2021** 212:3
**30** 58:3 212:2 213:6 213:7
**31** 192:21
**31st** 192:10
**3460** 28:22
**3464** 28:23
**35216** 212:22
**36117** 4:10
**36561** 4:5
**3:10** 210:11

**4**

**4** 3:11 72:9,14 97:11,14,15 185:12
**4435573** 213:1
**458** 211:22
**4725** 4:5

**5**

**5** 3:3,12 185:5,9
**5-30** 213:6
**5855** 8:8
**59** 105:1
**5th** 123:8,12

**6**

**6** 3:15 58:3 134:20 135:2 212:2
**60** 3:9
**605** 28:8
**61** 3:10
**6851** 74:1
**6852** 74:1

**7**

**7** 3:17 73:3,8
**7/9/19** 3:18
**70775** 8:9
**72** 3:11
**73** 3:17
**7475** 4:9

**8**

**8** 3:8,18 98:8,12
**8th** 63:21 66:10

**9**

**9** 3:20 95:4,9
**9/30/21** 211:22
**9/9/23** 211:23
**90's** 31:2
**95** 3:20
**98** 3:18
**9:00** 1:21

**a**

**a.m.** 1:21
**ability** 7:14 11:21 103:13
**able** 12:12 35:2 132:14 160:8 196:21
**absolutely** 147:22 178:8 198:9 199:14
**access** 27:18 28:4 93:3 99:9 100:7 103:14
**accommodate** 196:23
**account** 129:15
**accountants** 190:9
**accr** 211:22

**accurate** 139:11 147:22 148:23 157:22 158:2 186:7
**accurately** 186:22
**acted** 123:21
**acting** 80:1 124:5
**action** 44:6 107:1 124:10 182:17 211:16
**actions** 46:16
**active** 19:20 23:20 117:18
**actual** 25:12 39:18 60:7 139:20 141:18 141:19 142:21 143:1,9 145:6 146:15 147:3,7 150:11 157:21 158:1 162:10
**actuality** 169:22
**ad** 185:19
**adams** 45:17 167:18
**add** 43:1 58:20 73:1 88:6,6 105:11 149:19 177:20
**added** 13:17 67:7 200:6 203:6
**adding** 72:23 105:15 107:19 177:21
**addition** 192:16
**additional** 88:5 89:12 98:23 145:17 155:16 213:9
**address** 47:21 64:23 69:6 71:17 106:14 195:23 196:1 203:3
**addressed** 200:5
**addressing** 105:19
**adem** 46:22 65:8 67:14 88:5 89:13 200:6,12,13 201:4
**adequate** 104:11
**adhere** 77:19 102:6
**adjust** 164:13
**adjustment** 3:13 185:13
**administrative** 43:13 44:6 46:15 46:21 47:12 48:2,9 186:1
**adopting** 90:16
**ads** 152:18
**advance** 193:5,7
**advantage** 93:16 112:17 116:13
**advertise** 163:20
**advertised** 116:14
**advertising** 72:6 93:2 172:23
**advice** 55:11 71:1 128:22 129:5 131:22 132:9 133:22 181:15
**advisors** 202:14
**advisory** 40:1 130:15
**advocating** 133:5
**affect** 7:14 90:23 175:20 179:15 180:2 203:20
**affiliated** 18:23
**affirmed** 5:3
**afford** 35:4
**agency** 48:5,11
**agenda** 91:8 96:13
**agent** 80:19
**ago** 29:14 118:8 140:6 156:2 180:6 180:8 188:6
**agree** 12:10 102:17 151:5 177:10 200:7 203:8
**agreed** 2:2,9,16 61:11 87:6
**agreement** 56:11 56:14,16,22 57:3 60:17 103:21 189:23
**ahead** 6:18 7:7 20:16 42:23 85:20 90:12 126:17 146:5 187:8
**aided** 211:9
**air** 204:9,11
**al** 1:9 212:22
**ala** 213:6
**alabama** 1:2,9,19 4:5,10 19:22 29:5 32:8 46:22,22 48:5 56:15 211:3
**allow** 107:16 108:2 121:4,20 127:21 159:4 196:19
**allowed** 42:23 43:4 50:14 82:6
**allowing** 118:21
**allows** 16:13
**alterations** 108:15
**alternative** 117:2
**amended** 3:9 73:11 74:14 109:2 120:19 120:22 128:18 187:19 188:15 192:6
**amount** 139:17 141:2 156:5 163:13 165:3 172:18 173:3 177:10,15
**anderson** 3:4 4:4 5:7 6:17 8:22 12:17 12:21 44:8 53:8 58:1,10 60:20 73:16 74:19 77:10 78:13 82:12 85:9 85:15,20 97:10 100:17 101:15 106:18 108:6 109:18 111:2 113:10 114:23 115:18 117:12 126:9,14,20 130:16 145:19 146:1,7 150:13 151:9 183:21 184:7 186:13 195:18 203:1 206:9 207:14 207:17 209:12 210:7 212:1
**andy** 35:16
**angiogram** 84:7,11
**angle** 196:22
**answer** 7:8 35:10 54:11 77:11,12 85:17 106:19 108:1 108:1 109:22 110:1 111:3 115:20 159:8 195:19 208:9
**answered** 84:6 106:19 130:17 169:9
**answers** 211:8
**anticipate** 26:10 165:23 183:14
**anticipated** 153:5
**anticipating** 142:14
**anticipation** 35:7
**anybody** 14:6 15:6 15:7,22 25:21 43:21 44:2 55:17

55:19 57:9 79:11
80:9,19 81:11
111:9 131:20
132:19 181:13,15
182:13
**anymore**  46:13
**anyway**  91:3
**anywise**  211:16
**appeal**  43:14,16
46:21 48:3,9 89:8
185:23
**appeals**  39:11
43:19
**appearances**  4:1
**appliances**  159:21
178:20
**applicable**  120:14
**applicant**  202:4
**applicant's**  185:23
**application**  10:17
39:20 81:9 202:3
**applied**  39:13
114:22 200:21,22
201:4
**apply**  115:7 170:23
176:9
**applying**  42:13
**appreciation**
167:14
**approach**  34:15
88:1
**appropriate**  105:20
**approval**  66:17
198:17
**approved**  91:5
92:10 119:6 128:5
**approximately**
1:21 19:14 155:17
210:10
**april**  63:21 66:10
66:13

**architect**  10:21
14:8 53:15 63:4,10
63:15 75:20 78:22
81:14 132:22 182:5
184:9 198:8,9
202:13
**architectural**  3:11
14:18,23 63:8,13
72:19,21 149:22
150:4 155:16
**architecture**  63:9
**area**  27:17 28:4
41:17 71:4 75:16
97:3 99:11 100:10
100:13 105:11
107:14 110:16,19
115:6 116:8 127:23
140:21 170:22
180:12
**areas**  99:9 102:9
**arizona**  140:9
149:9
**arrangement**  190:7
205:21
**asked**  6:10 32:4
42:17 85:7 106:18
121:23 130:16
138:3 140:4,14
143:18 207:6,18
208:1,20
**asking**  47:13 56:2
58:9 60:23 70:14
74:20 83:15 111:1
130:4 154:2
**assess**  10:3
**assets**  188:4,5
**assign**  2:13
**assignment**  213:1
**assist**  213:8
**associated**  72:2

**association**  33:9
39:17,23 94:4
109:12 110:12,14
117:16 124:2,16
125:2,16 126:5
129:1,6 130:6,13
130:14,19 132:1,11
134:1,2,6,7 206:16
208:21,23 209:2,6
209:20 210:2
**assume**  104:10
105:21 150:10
184:1
**assuming**  24:10
141:14 150:10
169:16 198:7
**assumption**  90:21
**assurance**  143:21
**attach**  175:22
213:9
**attached**  8:16 11:9
60:1 61:20 72:11
73:5 95:6 98:10
134:22 185:7 212:7
**attended**  40:6
128:9
**attending**  116:2
131:17
**attention**  73:7,13
**attic**  99:9
**attics**  99:7,18
102:10
**attorney**  11:23
14:6 56:1,3 80:23
81:1 85:17 95:16
109:20 135:6,11
181:16 184:20
186:17 207:12
212:12
**attorneys**  9:18 15:7
135:5

**august**  84:11 169:5
**authentication**
187:1
**authoritative**
129:14
**authority**  39:18
117:11,13
**authorized**  9:12
135:9
**available**  35:1
89:12
**avenue**  208:15
**average**  170:21
**avoid**  90:13
**awards**  160:5
**aware**  7:17 46:16
83:12 90:15 118:23
119:3,4,7 132:5,8
133:4,13,15 197:16
203:17 205:7

**b**

**b**  58:3 109:10 124:1
188:18 212:2
**back**  10:20 13:10
30:16,23 32:17,18
36:10 39:4,5 44:22
47:2,8 49:9 54:12
54:21 55:3 57:23
58:13,22 61:16
68:15 69:15 74:23
86:9 89:4 98:16
107:6 128:17
130:10 136:23
145:22 157:12
158:7 164:22
170:13,19 176:20
184:4,11 194:8
196:3,23 197:6
198:3,21 201:8
212:3

**bad** 6:11 44:9 96:4
138:3
**bahama** 28:9
**balance** 165:2
**baldwin** 1:9 3:12
3:17 10:19 19:6
43:14 48:1 73:11
80:21 117:4 120:23
123:7 128:21
131:21 132:6,6,20
133:9,13,21 185:12
202:2
**bankruptcy** 41:14
**bardi** 188:21,22
189:6
**barrett** 1:18 2:6
**base** 127:15 170:2
172:17
**based** 75:18 85:17
94:10 109:22 116:2
121:1 125:4 139:7
154:21 161:6,16
165:9 168:16
178:10 190:3
**basically** 35:20
56:21 64:23 68:14
84:22 86:2 127:10
188:6
**basing** 94:8
**basis** 109:12,14
111:18,20 115:8,22
117:8 124:3 125:8
125:14 134:4
153:14 168:5
**bates** 74:1
**baton** 8:7
**beach** 4:5 8:2 17:16
18:20 19:2,6,8,19
20:2,14,17,19,22
22:14 23:10,16
24:4 27:12,14,14

28:5,8 29:4 31:10
31:12,16 32:18,19
42:1,2,7,8 68:22
93:3 116:10 164:19
164:19 166:19
171:14,15,19,23
172:1,8
**beachfront** 17:15
166:13,14
**becoming** 51:15
**bed** 107:16 161:10
161:20
**bedding** 99:7,19
**bedroom** 17:3
19:10 28:14 29:9
30:6,12 71:3 95:3
99:3 161:4,10
162:4,5,5,13,15,19
163:3,8,10,10,13
163:15 166:7,15,22
167:12 170:9,10
174:1,8 175:2
176:3 179:18,21
180:3 181:5,6
**bedrooms** 27:11
28:15 29:11,18,21
30:3,14 34:13,15
64:13 65:1,14,16
65:17 68:4,9 69:11
71:2,10,15 74:5
107:16,19,21
153:13 155:12
159:19 160:10
161:1,8 162:17,18
162:19 163:11,21
164:16,18,20
165:10 175:5,8,9
178:16
**beds** 99:5,17
164:17,21 165:1

**began** 34:10 48:23
70:13 88:10,21
151:19 192:10,13
193:9
**beginning** 139:15
**behalf** 69:16 135:9
**belief** 109:5,13,15
115:22 117:1
123:21 127:8
133:21 134:4
**believe** 30:19 31:14
60:15 67:23 96:14
110:6,10,13 111:18
111:23 113:7,15,20
113:22 115:16
117:9,14,21 118:2
123:16 124:4,19,23
125:7,10,11,16
126:2 131:20
132:22 137:3 179:2
182:18 189:18
192:15 195:16
199:16 200:17
206:12,17 207:22
**benefit** 93:17
**best** 11:21 51:2
59:6 147:14 154:15
167:12
**better** 28:10 105:3
112:9 166:23 167:8
169:23
**beyond** 128:8
132:17 206:19
**bids** 148:1,5
**big** 11:18 34:20,21
39:19 41:11,21
42:1 64:22 65:7,17
68:21 69:2,4 78:1
79:22 88:2 90:10
111:7 159:12
160:16 179:4 180:5

190:15
**bigger** 41:12 67:18
92:17 162:20 179:9
181:4
**bill** 47:1,9 176:10
**bills** 23:22 173:1
**binding** 129:14
**bit** 5:22 6:18 10:6
10:15 64:9 71:20
94:20 119:10
140:21 144:11
162:9 187:8,13
195:13
**blown** 64:10 204:9
204:12
**blurrier** 64:2
**blurry** 64:4 130:23
**board** 3:12 130:15
185:12
**boat** 205:2
**bob's** 28:9
**bogus** 85:5
**bonds** 16:14
**book** 153:14
205:22
**booked** 154:14
171:13 173:20
**booking** 172:18,22
172:23 173:4,10,11
175:15
**bordelon** 1:6,12,17
2:5 5:1,9,15,16
58:4,15 60:11
109:21 127:2
183:23 186:16
207:18 212:2
**bottom** 65:22
**bought** 31:13 32:19
33:3,11 35:4,19
41:13 48:21 49:3,4
180:10 188:4

**boulevard** 28:8 29:4
**boundary** 65:22
**bp** 32:20
**brad** 3:16
**brand** 71:20
**break** 7:5,9 10:6 39:14 57:21 58:17 78:9 79:8 83:2 105:5 108:7,9,12 108:14 113:4 114:9 126:16 127:3 187:6 187:8,12 194:1
**breaking** 168:1
**breezy** 1:6 9:8,13 15:12 16:23 17:1,4 17:13 18:20 19:2,6 19:19 20:2,14,17 20:19,22 21:20,21 21:22 22:2,8,9,13 22:14 23:4,6,8,9 25:10,16,23 26:3 28:12,14,22 29:2,3 30:8,9,10 31:10,12 31:16,19 34:4,7,19 35:5,13,21,22,23 36:3,11,14,18,23 37:5,8,13,19,22 38:4,17,17,18 41:1 41:11,21 42:1,8,18 43:16,18 44:15,19 45:2,10,15 47:3 48:6,14,22 49:6,8 49:13,17 50:2,5,6,9 50:18,23 51:14,15 51:23 52:4,18 53:7 53:14 54:1,3 55:6 55:19 56:4 57:11 59:6 60:13,18 63:13,14 64:22 65:1,23 66:9 69:3 69:16 70:20 71:19 72:1,2,17,19 74:8,8 78:16 79:15,19 80:1,8,20 83:8,11 83:16 91:21 92:4 92:15 93:4,20 95:22 96:15 97:16 97:18 101:5,11 109:7 112:14 114:17,22 128:4,15 133:1 134:10,13,18 135:9 139:2 151:14 152:20 153:11,16 153:21,23 154:3,5 154:11 155:11,23 160:16 162:11 163:18 164:1,11 165:6 166:5,10,21 166:23 167:1,12,15 167:17 168:9,12 171:23 173:17,18 174:14,22 175:1,3 175:7,10,17,19 176:2,4,5 177:4,6 177:11,16 178:4,12 178:13,20,21 179:1 179:5,12,14,15,22 180:5,16 183:1 185:19 189:7,14,22 190:21 196:13 202:12,20 203:6,21 203:22 204:8,19 205:12 206:13 208:5
**breezyville** 16:20 20:12,13,14 27:5,7 28:6 29:11 30:5 31:13 52:19,21 53:10,13,16,18,22 54:15 57:4 79:15 166:21,23 167:3 172:5 174:11 176:20 180:10 190:8 196:17 197:11,14,17 198:2
**brief** 58:12 84:15 108:11 123:3 187:10 206:10
**briefly** 6:1 81:17 191:20
**brings** 78:1
**broad** 115:2
**broadly** 17:21
**broke** 151:18 152:2
**brother** 17:6 22:5 35:14
**buddy** 35:16
**budge** 89:10
**build** 32:14 33:17 34:2,6,20 43:1,4 46:3 50:17 52:12 65:6 68:15 70:15 71:20 92:12 104:8 105:18 128:7 137:15 143:20 168:2,14 193:10
**builder** 11:1 14:21 42:18 45:12,14 70:10 81:18 84:1 96:15 139:1,7 168:1 196:6 197:18
**builder's** 137:14 144:3,5,16
**building** 3:10 11:2 11:4,5 26:8 28:3 33:13,19 34:4,13 34:21,22 35:7,18 36:9 40:8 46:10 47:19 49:17 50:20 55:9 63:11,18 68:1 70:13 74:11 75:14 79:2,19 84:23 89:15 92:4 93:11 93:16 96:11,15 99:23 100:2,4 101:3 103:5,7 104:6,8,9,10 106:17 108:20 109:8 110:22,23 112:3,4,13,22 114:7,13 116:11,22 117:17 118:5 119:8 119:12 129:22 137:9 139:8 140:7 140:8 143:20,22 148:22 149:3,13 152:15 153:10 156:2,11 158:11 161:19,23 166:11 167:18,21 170:2 174:7 180:23 182:3 182:12 193:13 194:21 195:5,10 196:22 200:18 201:11,17,20 202:22 203:2,4,10 209:8
**buildings** 27:13,17 78:22 79:13 82:6 92:12,17 101:2,20 102:12 106:6 110:15,15,18 112:6 115:6 116:9 118:9 118:17,22 119:1 120:2 127:22,22 165:7 171:5,5 195:21 196:20
**builds** 139:4 143:19
**built** 27:6 29:10 34:22 35:19 42:19 44:20 69:2 107:11 112:7 114:17

116:15,16 118:10 118:22 119:2 120:2 120:10 128:1 137:16 143:22 158:9 167:23 178:12
**bunk** 99:5,17
**busiest** 118:1
**business** 14:19 15:17 31:3,23
**buy** 32:21 34:6 35:2,4 36:23 50:10 168:13,16 205:23
**buying** 33:10

**c**

**c** 1:5 14:14 20:21 73:21 109:12 111:17 124:3 126:10
**cables** 96:16
**calculate** 181:11
**calculating** 181:17 182:5
**calculation** 150:16 150:21 154:18,21 176:22 182:20 183:23
**calculations** 182:14
**call** 7:1 24:21 84:5 84:8 101:13 118:18 169:15
**called** 16:20 17:1 17:13 18:20 21:4 40:23 41:10 84:6 84:17,18 85:7 96:23 143:20 160:16 180:5 188:3
**calling** 32:2
**calls** 115:18 143:17
**cancel** 205:18 206:5
**capacity** 65:10 159:20 161:6 162:9
**capital** 22:23 36:13 36:22 37:4,7,8 49:8 190:3,19 191:3 192:2
**capitalize** 50:17
**captured** 142:18
**car** 76:11,12
**care** 47:16 110:22 121:10
**cars** 75:18 76:9,22 77:21,22 97:20
**case** 1:5 13:1 107:20 115:4 130:12 153:9 171:1 198:11
**cases** 128:3 162:23 196:3
**cash** 37:11 191:7 191:13,14
**casual** 53:5
**catch** 22:22
**categories** 147:6
**category** 74:7
**cathedral** 159:3
**caught** 142:4,16 191:7
**cause** 211:17
**causes** 99:11 100:13 105:7
**caveat** 98:22
**cdg** 63:9
**ceiling** 159:5
**ceilings** 159:3
**cell** 31:3
**cents** 144:23 160:4 177:8,18
**ceo** 31:8
**cert** 212:18
**certain** 30:21 37:15 70:3 78:10,18 107:10 139:17 192:3
**certainly** 61:9 72:20 133:15 145:19
**certainty** 179:17
**certificate** 81:9 82:2 88:5 194:15 197:10 200:22 202:2 207:22 208:8 209:3 210:3 211:1
**certificates** 195:2 209:8
**certify** 211:6,14 213:2
**cetera** 10:2 89:8
**chain** 3:15,20
**chance** 9:10 23:1 187:13
**change** 39:14 69:23 74:16 94:3 115:13 115:23 127:4 142:8 187:16 207:8 213:11,13,14,16,17 213:19,20,22,23 214:1,3,4,6,7,9,10 214:12,13,15
**changed** 110:7,9,10 117:4 133:18 137:21 138:5,6,14 138:17 174:18 188:1
**changes** 92:2 156:10 188:14 212:7 213:4,5,7
**charge** 63:17 93:7 138:8 167:1
**charged** 179:16
**charges** 172:20
**chart** 158:2
**check** 25:19 143:15 172:10
**checked** 32:23 205:5
**chicago** 31:5
**choices** 87:22
**chrysler** 7:22 32:6
**church** 3:18 98:18 131:11
**church's** 99:21
**circumstances** 113:9,11,15,18
**citation** 44:12
**citizen** 132:13
**city** 27:19
**civic** 39:16,22 94:4 109:11 110:12,14 124:2,15 125:2,15 126:5 129:1,6 130:6,13,14,19 132:1,11 134:2,6 206:16 208:21 209:2,6,19 210:1
**civil** 213:6
**claiming** 96:16 183:12
**claims** 38:12
**clarification** 58:3 145:11 207:15
**clarify** 144:14 208:4
**clark** 4:4
**classifying** 25:17
**cleaned** 151:6
**cleaner** 151:7
**clear** 34:12 37:23 39:4 59:7 82:8 106:12 116:6 127:19

**clearly** 112:10
**client** 85:17 109:20
**client's** 67:7
**close** 137:5
**closed** 17:9
**closely** 162:14
**closer** 152:23
**closest** 164:19
**closet** 99:6,17
**club** 19:8 42:7
171:15,15,19 172:1
172:9
**code** 104:8,10,10
105:19 195:10
203:3,4 213:6
**codes** 105:18 108:3
**coincidence** 128:8
**coincidental**
104:18
**collection** 104:20
105:14
**collects** 172:14
**column** 142:19
147:21 150:18,18
157:21 172:11
173:3
**columns** 150:19
**come** 28:2 30:15,22
31:23 34:7 46:2
57:22 69:8,19 70:7
119:14 127:12
136:11 138:18,19
157:2 184:4 194:13
196:3,20 197:16
**comes** 144:21
146:17 150:12
**comfort** 71:18
**coming** 64:19 91:10
91:15 97:20 137:11
141:16 182:14

**commencing** 1:20
**comment** 102:2
**comments** 69:22
111:15 130:10
**commercial** 18:7
94:16
**commercialization**
94:14
**commission** 90:16
133:14 185:12
211:23 214:23
**commissioner** 1:19
2:6,18
**committed** 194:7
**committee** 40:1,4
**committees** 40:3
**common** 27:15,16
78:12,12 105:10
108:21
**communicate**
128:22 132:8 196:2
208:10
**communicated**
46:6 52:15 118:6
121:9 122:2 124:10
131:22 199:15
208:16
**communicating**
129:4
**communication**
83:14,16 123:13
133:2
**communications**
186:16
**companies** 27:1
**company** 5:20
15:19 18:19 25:2
26:12 188:3
**comparable** 166:20
**comparison** 154:21
166:12

**competing** 135:3
**complaining** 91:20
93:20,21 112:13
**complaint** 3:9 60:7
109:2 112:14
120:20 128:18
187:20 192:7
**complaints** 92:14
**completed** 28:18
50:20,20 151:15,21
152:8,10,14,18
153:7 212:18
**complex** 167:4
198:22
**components** 197:23
**comps** 170:19
**compute** 139:6,6
163:5 164:4
**computer** 211:9
**concern** 104:23
136:16 146:11
147:18 203:9
**concerned** 140:13
**concluded** 169:5,8
210:10
**conclusion** 60:21
**conclusions** 74:21
**concrete** 53:13
**conditioners** 204:9
**conditioning**
204:12
**condo** 18:22 19:1,5
19:8,10,13 32:19
33:4,6,7 41:5
171:16 175:4
**condos** 33:18 39:5
42:6,9
**configuration**
29:20 156:14 174:5
174:8 178:4

**conflict** 90:13
112:15
**confused** 141:11
**confusing** 150:8
**confusion** 130:12
**congestion** 104:21
**conjured** 125:17,19
126:9,11 127:9
**connected** 110:17
110:19
**conscious** 148:8
**conservative**
162:23 170:4
**consider** 89:5
**considerably** 105:4
106:2
**consideration**
105:17
**considered** 25:9,14
27:20 29:16 89:7
**considering** 90:16
92:2
**consolidates** 21:3
**constant** 66:15
**construct** 160:9
**construction** 27:7
33:13 79:20 96:8,9
102:6 107:6 113:19
115:14 121:12
136:3 139:3 151:18
152:18,22 160:7
169:4,7 192:11
**consult** 55:23 56:3
**consulted** 202:14
**consulting** 7:21
32:5
**consumed** 112:19
**contact** 15:3
119:14
**contemplated**
191:4

**contend** 199:9,19
**content** 9:16 91:14 114:3
**context** 203:4
**continually** 197:6
**continue** 191:6 196:10
**continued** 191:13
**continues** 73:23
**continuing** 88:1 120:19
**contract** 26:3,4,7 26:17 54:2,5,6,6,8 54:14,22 55:2
**contracted** 202:21
**contractor** 148:19 148:21
**contractors** 27:1
**contracts** 63:14
**contribute** 21:13
**contributed** 36:12 191:9
**contributing** 191:7 191:14
**contribution** 36:22 36:23 49:7,7
**contributions** 190:20 191:3
**control** 27:18 33:11 98:2,7 107:14
**controlled** 105:3
**conversation** 81:21 84:14 87:10 88:13 89:1,23 91:14 129:23 131:4 140:3
**conversations** 9:17 53:6 56:2 70:20 80:23 82:17 83:4,5 87:15 89:8 90:3 98:17 119:17 131:19 189:6
**conveyed** 91:19
**copies** 212:13
**copy** 8:23 10:9 62:20 201:21
**corporate** 18:17 38:23 60:18 189:21
**corporation** 7:22 19:20 23:20
**correct** 18:17,18 22:9 36:1,2,7 52:23 60:14 63:16 68:5,6 74:7 135:5 142:22 149:14 153:18,19 157:17 175:20 176:19 181:21 187:16 196:7 211:11
**corrections** 212:7 213:9
**correctly** 28:19 49:5 167:23
**correlate** 162:13
**correlated** 105:9
**correspondence** 69:14 121:2,6,14 121:18
**cost** 11:4 35:20 43:3 70:15,16 135:21 136:23 137:9 138:19 139:5 139:13 141:1 142:8 142:12 145:17 148:8,14 149:12 150:4 156:22 158:20,21 159:4 168:2,5 182:3,12 194:10
**costing** 149:1
**costs** 11:2 33:11 139:8,21 140:7,9 140:12,18 148:13 149:3 155:17 159:23 167:18 181:8 182:9,10
**cots** 99:4,5,16,16
**counsel** 2:4,12 110:1 211:15
**count** 99:3
**countered** 87:2,9
**counting** 168:4
**county** 1:9 3:12,17 10:19 19:7 43:14 48:1 73:11 80:21 117:4 121:1 123:8 128:21 131:21 132:6,7,20 133:9 133:13,22 185:12 198:15,21 202:2 211:4
**couple** 11:19 14:19 21:9 29:13 33:3,7 33:11 34:10 57:17 91:18 131:10 136:7 137:18 140:17 164:23 165:1 180:6 180:8,18 187:19 197:21 204:14 205:14
**course** 44:15 55:18 59:12 70:1 80:2,10 86:17,21 87:1 97:19 135:23 178:10 204:16
**court** 1:1,18 6:6,20 28:23 41:11 95:20 160:5 171:21 212:16
**covered** 206:2
**covid** 153:18 154:19 155:3 165:16 166:3
**cracked** 204:14
**craft** 104:22
**create** 67:18 79:22 98:5 107:23 159:3 174:22
**created** 116:20
**creating** 112:20,21
**credit** 38:3
**crest** 212:21
**crossed** 42:20
**crowded** 161:14
**crystal** 33:5
**cured** 47:11
**current** 7:18 8:5
**currently** 7:19 8:6 16:18 22:17 35:15 62:1 118:21 190:7
**custodian** 188:8
**cut** 153:1
**cutting** 6:12
**cv** 1:5
**cylindrical** 101:17

**d**

**d** 3:21 126:10
**d202** 172:9
**damage** 136:12 140:19 150:16 182:14 204:5,7,15 204:18,20
**damaged** 96:16
**damages** 3:22 10:5 11:14 12:23 14:1 135:15 160:5 176:14 181:11,18 182:6,19,22,23 183:4,12,22 194:8 205:16
**damaging** 205:11
**dan** 55:9 70:21 71:12 82:20 91:6,7 92:6,21 119:14,23

181:19,22
**danger** 136:22
**daniel** 15:9 55:8,21
70:18 81:22 82:17
161:17
**date** 31:15 37:10
63:22 66:10,11
143:2 150:11
151:14 152:19
200:15 212:3
**dated** 63:21
**dates** 51:9 64:5
**day** 1:20 2:7 32:2
45:5 59:13 84:8,10
84:11 152:21,22
211:18 214:19
**days** 156:1
**de** 28:23 34:6 41:11
95:19 203:18 204:3
205:6
**deal** 57:6 90:10
93:13 105:12 122:1
**dealing** 34:17
**debris** 204:16
**debt** 37:16,20
**december** 73:12
74:14 185:14
203:18
**decent** 71:23
**decide** 34:5 48:16
48:20 77:16 89:3
98:3 159:18
**decided** 39:19
40:11 93:12 117:21
164:10
**decision** 60:18 61:9
87:7,21 125:7
165:5 186:1 189:12
**decisions** 125:4
**deck** 28:16 29:12

**decorated** 34:17
**decorator** 57:13
**dedicated** 167:6
**deeded** 36:17
**defendant** 38:19
117:3
**defendants** 1:10
3:7 4:7 5:11 8:14
11:7,12 59:22
61:18 72:9 73:3
74:1 95:4 98:8
120:23 123:7
134:20 185:5
**deferred** 70:8
**deficiency** 47:11
**define** 101:7 157:4
**defined** 157:11
202:17
**definitely** 145:11
**definition** 108:19
**delay** 142:9
**delve** 17:19
**demand** 149:6
**demonstration**
168:17
**denese** 1:18 2:6
**denied** 210:3
**density** 94:13 105:3
105:15 106:7,9,14
107:14,20 127:23
**denying** 123:22
**department** 40:5
46:22,23 84:18
86:1 112:11 113:1
203:15
**depending** 159:16
164:17
**depends** 159:6
170:15
**deponent** 212:2,6,7
212:10,16

**deponent's** 212:6
214:18
**deposed** 5:17,19
**deposition** 1:12,16
2:4,14,17 3:8 9:6
9:10,20,22 10:7,8,9
10:10 14:3,7 15:8
38:7 62:3 145:16
150:14 210:9 211:7
212:6 213:8
**described** 130:4
**describing** 93:5
**description** 143:5
**design** 36:9 53:21
54:9 65:4 70:13
156:18 157:5 159:1
159:2,14 170:9,10
170:17 182:8,9
203:6
**designated** 148:6
**designed** 78:23
79:18 101:7
**designer** 79:14
196:7
**desire** 213:7
**despite** 98:22
**detail** 185:1
**detailed** 49:16
139:4
**determination**
160:12
**determine** 169:3
**determined** 78:23
125:21
**develop** 36:6 48:17
48:20 50:6
**developed** 43:6
138:20
**developers** 119:13
119:18,22

**developing** 42:15
49:15 52:4 53:14
78:17 80:11
**development** 53:6
54:3,7 55:5,20 56:4
56:7 57:10,11 83:7
118:20
**developments**
120:17
**difference** 11:6,18
12:7 112:8 138:1
141:12,14,15 142:2
142:20,20 143:10
143:12 144:4,6
146:12,13,17,19
147:4 149:9,10
150:17,19 166:18
180:14,22 181:2
191:2,5
**different** 14:13
22:15 64:23 65:14
65:14 69:6 79:14
96:6 97:10 106:5
137:19 156:12,15
157:7,8 172:5
175:16
**differential** 206:20
**differentially**
208:22,23
**differently** 58:19
111:11 195:16
206:14
**difficult** 95:19
163:17
**digging** 85:2
**dimension** 107:10
**dipping** 126:8
**direct** 26:21 72:4
77:8 94:10 118:2
131:16 133:23
190:9

**directed** 16:7,10 18:14,23 21:2 23:13 68:16
**directing** 85:16
**direction** 28:10 67:11 68:14,20 128:23 129:5 131:23 132:10 133:22
**directions** 64:18
**directly** 88:9 92:21 105:9 111:13,14 119:3,20 126:3 132:17 133:3 210:4
**disagree** 87:6 95:22 100:16 102:11,17 103:1,15,20 105:6 105:23 106:4
**disagreed** 86:17
**disagreement** 103:22
**disbelieve** 99:20
**disclosure** 3:22 12:23 135:16 149:23 182:22
**discovered** 93:1
**discovery** 131:13 131:16
**discuss** 190:4 195:13
**discussed** 25:1 39:6 44:20 49:18 61:9 71:5 97:7 121:7 134:8 188:20 191:20 206:17
**discussing** 66:19,19 187:21
**discussion** 13:5 79:23 91:11,15 128:14 183:6
**discussions** 49:15 52:7,7 53:17 55:5 70:5 79:3 80:3 82:20 90:20 91:17 109:23,23
**dismiss** 45:19
**dismissed** 46:8
**dispute** 88:2 186:6
**disputes** 43:9
**distinguish** 6:7
**distressed** 84:16
**distribution** 190:5 190:9,12 191:16,19
**district** 1:1,2 73:15 73:21 123:10 129:2 132:2 185:12
**divided** 164:3
**division** 1:3
**divorcing** 114:19
**dlp** 20:20 22:17,20 24:7 30:16,18 31:16,19 36:4,6,10 36:17 37:4 48:16 49:12,13,14 51:4 52:9 61:3,5 188:18 189:16 190:2
**dlp's** 36:22
**document** 9:2 13:13 60:10 61:2 62:7 72:16 135:18 169:2 185:11,15 201:12 202:7
**documentation** 139:12
**documents** 9:21,22 10:15,17,18 11:14 11:15 13:7,16,23 14:2 61:13,15 62:4 69:14 177:2 178:7 181:10,14
**doing** 32:4 48:23 53:21 56:18 57:5 96:9 112:16 113:19 125:14 132:23 159:7 191:16,21
**dollar** 163:13
**dollars** 11:19 12:7 21:13 36:15 135:22 136:20 141:16 144:22 149:14 155:19 160:3 177:8 177:17 192:12
**door** 17:3 28:21 41:1 78:6 86:14
**doors** 174:22
**double** 205:5
**doubled** 140:10
**draft** 56:11,14,16 69:20
**drafted** 56:19
**drafts** 65:13
**draw** 64:14 73:7,13 75:7 139:17,18,20 139:22
**drawing** 3:11 63:9 64:15,16 75:4 202:11
**drawings** 63:13 72:19
**drawn** 56:9 75:12
**drew** 75:9
**drill** 5:23
**drive** 4:9 8:8 95:19 212:21
**driveway** 75:10,15 75:16 76:20 77:2,5
**driving** 65:9
**drywall** 43:2
**dually** 78:1
**due** 166:3 167:18 212:3
**duly** 5:2
**duplex** 17:3 28:14 28:17 29:17 64:21 68:2,3,17,21 97:19 109:8 153:16 160:9 160:11 161:20 179:3 186:3
**dwelling** 186:3
**dyess** 3:19

**e**

**e** 14:11 126:10 213:6,7
**earlier** 15:13 17:9 34:9 38:6 40:15 52:3,5 60:16 69:5 70:17 79:13 103:23 130:11 149:5 166:4 174:3,15 184:8 190:19
**early** 32:20 37:3 56:8,10 70:19 81:23 82:20 137:3 205:6
**earnestly** 53:20
**ease** 175:13
**easier** 51:8 62:21 115:11
**east** 173:17,18,23 175:3,19 176:2,4 177:4,6,11
**easy** 17:1 21:20,21 28:12,14 30:8,9,10 34:4,6,19 35:13 47:2 50:1 52:18 64:22 65:1 69:3 72:17,19 74:8 91:21 92:15 93:20 95:22 96:9,15 97:16,18 100:20 112:13 128:14 139:1 152:20

153:11,16,22 154:4 154:11 155:11 162:11 163:18 166:21,23 167:1,12 168:9,11 173:17,18 174:14,22 175:1,2 175:6,10,17,19 176:2,4,5 177:4,6 177:11,16 178:3,13 178:21 179:1,11,15 179:21 180:16 203:22 204:7 205:11
**effect** 203:21
**effort** 117:18
**efforts** 8:4 36:9 72:3
**egress** 77:9,17 79:4
**eight** 120:21 141:5 144:18,19 148:16 149:16
**eighteen** 17:3 28:14 30:14 147:3 156:3 162:3,5,18 163:1 163:15,21 164:3 175:5 178:16 179:23 181:6
**eighty** 20:22 177:8 190:10
**either** 50:22 69:15 102:17 105:15 109:9 123:23 136:18 165:19,19
**elect** 206:3
**elected** 136:19
**electrical** 148:14
**electrician** 47:6
**electronic** 132:19
**electronically** 212:8
**electronics** 31:8 32:3
**elevated** 28:16 204:10
**elevator** 45:4 100:22,23
**eleven** 143:9 144:7 146:15,17
**elmore** 211:4
**email** 3:15,20 47:14 69:13 95:12 122:18 123:3,4 212:18
**emails** 122:23 129:16,18 131:5,6 131:12,15 135:7
**emergency** 99:9,12 100:7,14
**employed** 15:12
**employees** 14:19 25:23 26:21 132:7
**empty** 112:17
**encounter** 102:8
**encourage** 77:4 98:6
**ended** 25:17 39:15 39:21 42:22 45:19 45:21 46:2 84:21 168:1
**ends** 65:9
**endurance** 7:4
**enforce** 117:22
**engaged** 53:15
**engine** 196:20
**engineering** 155:17
**english** 24:23
**ensures** 104:11
**entered** 63:20 213:8
**entire** 169:17 175:3 175:6
**entirety** 27:23
**entities** 26:16 38:23
**entity** 18:17 23:3 44:13 49:2 183:1
**enumerate** 199:7
**environmental** 46:23
**equivalent** 178:13
**erecting** 192:13
**ernie** 3:18
**errata** 212:3,7,8,10 212:12,13,15,18 213:1
**error** 147:20
**especially** 27:2
**esq** 212:1
**essentially** 136:5 155:10 162:1 165:9 172:13 189:18
**establish** 168:15
**estate** 16:15 168:3
**estimate** 137:14 148:18 151:16 157:3,9 159:11 170:4 178:17
**estimates** 11:5 70:14,16 139:5 140:15 141:1
**et** 1:9 10:2 89:8
**evacuation** 104:20
**evaluated** 36:15
**event** 160:4
**eventually** 22:21 35:7 190:22,22
**everybody** 76:8 77:22 91:20 114:1
**evidence** 2:14 129:16
**exact** 25:7 31:15
**exactly** 24:1 55:3 67:1 86:21 90:18
112:3 120:6,7 122:8 130:21 164:11 180:12 192:23
**examination** 3:1,2 5:5 207:16 209:16
**example** 146:11 148:13 205:2
**examples** 199:3 206:19
**exception** 38:10
**exchange** 36:21
**exclusive** 26:19
**exhibit** 3:6,8,9,10 3:11,12,15,17,18 3:20,22 8:14,20 11:7,13,16 13:2,11 13:18 59:22 60:5 61:18,22,23 62:2 72:9,14 73:3,8 75:1 95:4,9 97:7,8,11,13 97:15 98:8,12 109:1 128:17 134:20 135:2,13 137:12 171:8 185:5 185:9 201:8,9,23
**exhibits** 3:7 62:5
**exist** 61:13
**expect** 75:12 153:21 154:14 163:11 178:9,11 208:13
**expected** 154:2
**expended** 192:12 194:9
**expenditure** 150:7
**expenditures** 192:17,22 193:12
**expense** 141:5,18 194:6

**expenses** 137:23,23 142:21,22 143:1,6 143:8,9 145:6 146:16 147:2,3,7 157:21 171:13 172:18 173:10,11 175:15,18 176:4,5 176:6 178:11,11 190:18
**expensive** 179:11
**experience** 57:3 99:1
**expert** 194:16
**experts** 202:14,22
**expires** 211:22,23 214:23
**explain** 76:2 145:2
**explained** 130:8 146:23
**explanation** 112:1
**explanatory** 178:6
**extend** 77:3
**extended** 45:21
**extensive** 27:16
**extent** 60:20 109:18 183:22 186:15
**extra** 143:17 167:18
**extrapolate** 155:2
**eye** 63:6
**eyes** 62:18
**ez** 21:22 22:2 35:23 36:3,11 45:2 48:21 49:6,8,13,17 50:2,5 50:6,9,18 51:14,15 51:23 65:23

**f**

**f** 4:5
**facility** 114:5 212:20

**fact** 74:16 76:7 104:8 110:20 129:11 149:7 150:22 169:3 179:13
**factor** 111:5 165:14
**facts** 115:22 127:15
**fair** 53:4 54:13 68:19 85:20 102:16 118:11,14 127:13 165:3 176:18 184:21
**fairly** 70:19 88:23 95:2 116:6 171:3,4
**familiar** 19:11 75:22 101:22 135:17 139:2
**families** 28:2 161:13
**family** 21:9,16 27:21 29:16,17 167:9 186:3
**far** 58:22 59:2 146:20 191:3
**fashion** 89:6
**faster** 58:8
**fault** 138:4
**favorite** 148:10
**feasible** 68:21
**february** 211:18
**fee** 139:7 144:3,5 144:16 149:22
**feedback** 70:3 85:5 193:7
**feel** 7:5 65:18 91:3 161:12,13
**feeling** 90:9
**fees** 33:9 159:23 168:4 191:12
**felt** 10:4 67:11 140:22 162:23

193:7 203:13
**fewer** 65:1 67:18 106:6 158:13 159:18
**fifteen** 136:20,23 192:8
**fifth** 62:9
**fifty** 22:21,21 23:11 41:3 57:6,6 137:10 148:17 149:14 157:1 159:9,12 167:20 177:12,22 190:23,23 191:15 191:15,17,17,22,22 192:4,4
**fight** 88:2
**fighting** 89:5 102:23 104:11
**figure** 85:19 114:14 142:13 156:1
**figured** 58:6,8
**file** 60:19 61:7,10 212:12
**filed** 38:11,17 43:12,16,21 60:13 96:14,14 188:15,16 201:14 212:15
**filing** 2:17 10:1
**fill** 20:16 162:21 212:7,8
**filled** 99:7
**final** 23:22 190:17
**financial** 14:1 116:13
**financials** 10:3 32:10
**find** 82:16 83:19 86:4 94:20 112:1 117:18 128:5 129:20 163:13 165:2

**finder** 169:3
**fine** 15:2 38:13,15 62:19 77:23 95:16 108:10 126:18
**finish** 46:3 52:17 53:23
**finished** 27:7 52:21 54:15,17,17 152:20 152:21 164:10
**finishing** 53:10,12
**fire** 102:22 104:11 196:19 197:3,17,22 198:14,16,18 202:17 203:7,8,15 203:16,23 204:2 205:5
**firefighter** 100:18 102:19
**fireproofed** 43:1
**fires** 104:12 203:18 205:8
**firm** 14:16,23
**first** 5:2 28:16 34:2 34:4 39:5 41:16 49:2 52:18 54:2,8 58:13 73:9 75:6 85:18 103:13,19 104:16 105:5 123:13 124:3 130:9 135:21 172:8 185:18 187:11 200:3,12 201:9
**fit** 65:3,4 160:19
**five** 7:22 18:1 22:18 22:19 29:22 37:9 38:11 49:23 57:21 58:11 63:12 75:2,4 126:22 143:7,8,11 148:15,16,17 149:17 151:12 154:10 155:2

160:10,11,13,18 174:1,8 175:1,2 176:3 177:12,22 191:10 206:8
**fix** 88:3
**fixtures** 178:20
**flagged** 128:2
**flame** 196:21
**floor** 30:4 108:21 108:21,23 159:2 174:4
**flow** 71:6 194:17
**flowing** 83:17
**focused** 158:5
**folks** 127:17
**follow** 56:21 209:11,15
**followed** 57:8 202:16
**following** 113:12 213:5
**follows** 5:4
**foot** 42:21 170:22
**footprint** 65:5 69:4 160:17,20
**foregoing** 211:7,10
**forever** 201:7
**forget** 35:17 118:20
**forgot** 142:11
**form** 2:11 38:3 44:8 53:8 77:10 78:13 82:12 100:17 106:18 111:2 113:10 114:23 115:18 117:12 130:16 195:18 203:1 213:7,9
**formal** 60:18 61:15 132:19 199:20 207:19 208:2,14
**formulated** 109:6
**formulating** 117:2
**fort** 39:12,16,22,23 40:9 91:11 94:5,14 103:17 104:23 109:11 110:11,14 111:8 112:5 116:7 117:15 118:3,12,13 119:6 125:1,15 126:4 127:17 128:23 129:6 130:6 131:23 132:11 134:2,6 167:7,8 206:15,15 208:21 209:2,5,19 210:1
**forth** 68:23 69:15 91:12 92:3 93:23 117:6 158:14
**fortified** 143:4,16
**forty** 23:12 126:22 144:22,22 146:16 148:15,16 155:15 155:18 163:20 177:17,23
**forward** 170:3 212:12
**forwarded** 95:11 120:22
**found** 83:22 84:1 85:3 86:4 94:7 125:20 126:6 167:7
**foundation** 42:19 192:13
**four** 18:1 27:10,17 41:13 49:22 63:12 63:21 68:2 74:11 116:23 137:10 144:22 149:14 155:13,14,15,18 160:15 163:20 164:9 165:9 168:14 198:22
**fourteen** 13:13 59:20 65:16 69:11 141:13,16 155:12 155:17 156:3 161:20 162:2 163:2 163:2,7,10,14 164:3,16 170:9 178:15
**fourth** 62:5
**frame** 78:15 192:3 192:18
**francisville** 8:9
**frawley** 3:3,5 4:8 5:6,10 12:20 13:3 57:19 58:6,11 60:22 73:18 82:16 85:11,18 97:12 101:19 108:10 126:11,17,21 130:18 145:13,21 146:4,8 151:10 184:2 186:18 187:7 206:6 207:11 209:14,17 210:5
**free** 7:5 37:23 77:19
**friend** 32:18 41:4
**friends** 31:7,22
**front** 27:13 39:16 130:9
**fully** 7:23
**fund** 23:15
**funding** 8:3
**funds** 33:2
**funny** 51:8
**furnish** 164:14 213:9
**furnished** 171:6
**further** 2:9,16 195:14 211:14
**furthermore** 129:15
**fuss** 40:10 112:21
**future** 159:23 165:14 169:13

**g**

**gamble** 34:20
**garbage** 104:20
**garrow** 35:16
**gate** 27:18 197:2
**general** 18:2 27:23 65:3 67:10 92:17 93:21 94:1 96:12 102:18 110:21 149:1 158:13 173:14 194:17
**generally** 113:23 168:5
**gentleman** 45:16
**gentlemen** 189:17
**getting** 42:23 46:2 56:8 66:17 78:3 89:4 137:5 180:15 193:10
**give** 70:2 98:14 139:12,18 172:3 199:3 206:7
**given** 64:18 91:4 191:21 193:5,11 211:12 213:8
**gives** 29:22
**glanced** 201:13
**go** 5:23 6:17 7:7 13:4 20:15 26:9 30:23 39:16 42:23 47:23 48:8 54:12 54:21 55:3 58:1,22 66:16 68:15 69:4 69:21 71:21 72:6 77:2 78:5 85:20 88:4,21 89:3,10

90:13,14 92:5 95:8 98:3,12,20 99:2,15 126:17 146:5 148:6 148:18 153:3 157:12 158:7 162:10 164:6 167:9 170:12,18,19,19 171:2 174:21,23 175:14 177:5 185:9 187:7 191:17 196:5 196:7,22 197:6 198:3,21 201:8
**goes** 32:17 71:6 76:12 104:15 148:6
**going** 5:23 6:17 8:18 11:6 17:18 20:11 23:21 30:17 35:6 36:5 38:14 39:4,5 47:12 51:10 55:7 57:20 60:3,4 61:7,16,23 62:20 64:1,2 71:22 72:13 73:7,13,18 75:21 84:16 89:10,13 92:5,10 95:8 97:6 98:4 105:11 109:1 110:16,19 111:8 116:2,9 118:5 123:19 135:20 136:5 140:20 142:3 145:14 156:4 170:3 172:7 179:7,9,10 180:9,11 181:8 184:3 186:20 194:8
**gold** 143:20
**golf** 32:2
**good** 5:9 25:6 34:16 55:10 70:12,23 88:10,20 117:22 126:15 127:7 143:14 168:1 170:11 178:16 187:6 203:13
**goodness** 42:10
**google** 72:7
**gosh** 201:16
**gotten** 183:5 200:6
**governmental** 44:13 46:15
**grandfather** 168:22
**greetings** 212:5
**grinder** 96:21,22 97:2
**gross** 172:13,15,16 173:9 176:23
**ground** 27:15 136:1,2,4 151:18 152:2 179:10,20 204:23
**grounds** 2:13
**group** 70:2 79:3 105:16 108:2 116:7 118:7 127:21 129:8 129:18 132:14 133:8 197:19
**groups** 66:18 71:6 131:2
**growth** 105:2,20 108:4
**guess** 29:3 47:7 49:20 51:2 61:3 68:12 80:9 96:1 107:13 122:14 137:17 144:7 150:10 203:22 208:9
**guessing** 175:13
**guests** 71:18
**guidance** 81:11
**guided** 64:20
**guideline** 65:3
**gulf** 8:2 14:20 16:20 17:9,16 28:7 29:4 32:7,15 33:4,5 36:13 40:4,16 42:15 104:22 118:10
**guy** 55:10
**guys** 92:19

**h**

**h** 4:8 20:21
**habitability** 98:23 104:17 105:7
**habitable** 186:2
**habitation** 102:10
**halcyon** 4:9
**haley** 4:8
**half** 41:6 98:23 190:14
**hallways** 99:5,16
**handed** 208:18
**handle** 66:22 67:16 77:17 80:14 108:4 173:2
**handled** 88:9 105:22 208:12,13
**handles** 201:19
**handling** 45:12 63:17 172:23
**happen** 55:16
**happened** 9:23 84:4 136:10 153:1 154:4 186:8
**happens** 98:1
**happy** 6:23 47:9
**hard** 6:6 51:11 111:4 159:22
**harder** 103:19 107:22 162:21
**hart** 3:21
**hassle** 39:19
**hazards** 104:12
**head** 15:1 170:12 193:19
**heading** 29:6
**health** 7:15
**hear** 6:20 7:2 124:8 125:23 126:13 163:8
**heard** 94:11,12 111:15 123:13 205:9
**hearing** 199:20 207:20 208:1,3,6 208:14 211:13
**heed** 128:23 132:9
**heeded** 131:23 133:22
**heeding** 129:5
**height** 103:10 123:9,14 186:2
**held** 33:3 42:7,8 51:20 52:1 169:16
**hell** 136:13
**help** 64:1,3 103:14 105:4 106:1
**helped** 56:10
**helps** 150:21
**hey** 47:14 199:13
**hicks** 3:16
**high** 34:19 103:6 168:21
**higher** 127:22 149:11 162:17 163:4,14 179:21
**highest** 104:9
**highland** 197:18
**highlighted** 67:4
**highway** 105:1
**historically** 140:22

**history** 46:7 162:6
**hit** 191:10
**hold** 13:3 23:2 53:2
  104:13,14 135:12
  186:13 187:3
  209:23
**holding** 42:9
**holdings** 18:20
  19:2,6,19 20:3 42:8
  172:1
**holds** 133:14
**home** 18:3 140:9
**homeowners**
  104:16
**homes** 40:15 99:2,8
  100:6,10 102:3
  103:14 119:8,12
**honest** 117:14
**honestly** 76:4 82:21
  144:2 149:8 169:22
  180:17
**hoover** 212:22
**hotel** 28:1 76:7
**hour** 57:20 58:16
  126:18
**hours** 59:21
**house** 18:3 27:20
  27:22 29:9 43:2
  75:17 76:10,18,19
  94:19 95:1 107:23
  136:12 149:9,10
  159:17 164:22
  166:7 167:6,9,12
  175:21 205:7
**housekeeping**
  65:21
**houses** 27:10 29:10
  30:6 33:19,19,20
  39:6 44:21 71:6
  92:18 94:22 105:11
  105:15 148:22

160:15 167:7 171:2
  198:23
**housing** 33:10
**huge** 181:2
**huh** 6:5
**hundred** 36:15
  37:9 49:22 64:8
  82:13 136:20,23
  137:10 141:6
  143:10,11 144:22
  146:15 147:3
  148:15,17 149:13
  151:12 155:15,18
  160:2,3 167:20
  177:7,17,22 191:8
**hurricane** 137:6
  140:19 149:6
  176:14 204:5 206:2
**hurricanes** 104:21
  205:11,14,14,17,19
**hypocritical** 94:21
**hypothetical**
  115:19

**i**

**idea** 49:16 50:8
  100:3,9,18 107:3
  146:18 161:19
  183:17 193:15
**ideas** 53:18
**identification** 8:15
  11:8 59:23 61:19
  72:10 73:4 95:5
  98:9 134:21 185:6
**identified** 63:7
  142:16
**identify** 9:5 60:5
  62:6 73:9 135:13
  185:10 201:10,23
**ii** 42:3
**iii** 23:10,16,17,19

**imagine** 66:18
**immediately**
  152:17 203:16
**impact** 65:8 88:5,6
  155:13
**impacting** 93:11
**implies** 145:5
**important** 6:2,4 7:1
  59:16
**impose** 91:4
**impossible** 99:10
  100:8
**impression** 89:9
  90:22
**inadvertently**
  42:18
**inaudible** 171:20
**incentives** 32:21
**inception** 31:17,20
**incident** 45:10 46:4
**incidental** 120:22
**inclined** 161:1
**include** 142:12
**included** 79:11
  149:20 172:2
**including** 18:2
  157:1 202:17
**income** 12:22 15:20
  18:11 168:15,17
**incorporate** 13:2
  25:4
**incorporated** 19:22
  19:23 24:5,8 31:11
  31:12 50:18,23
  51:3,16
**incorrect** 115:17
**increase** 140:16
  149:12
**increased** 43:3
  137:9 148:13,14
  149:6 165:14

**increasing** 107:12
**incur** 155:16
**incurred** 167:17
  194:6
**indebtedness** 37:14
  38:3
**independently**
  117:21
**index** 3:1,6
**indicate** 153:15
**indicated** 34:9
  129:13
**indirect** 119:21
**individually** 58:4
  134:9,12 182:16,19
  183:23 202:20
**influence** 104:18
  105:8 106:3 129:12
  180:1
**influenced** 117:15
**inform** 123:17
**informal** 199:12
  207:19,23
**informally** 199:5
  208:12,13
**information** 11:1
  14:1 32:10 109:5
  109:13,14,19 110:2
  117:1 119:22
  123:21 133:21
  181:22 208:19
**informed** 84:10
  90:19 91:7 123:8
  197:18,21
**infrastructure**
  104:19 105:8,12,20
  106:3
**ingress** 77:8,17
  79:4
**initially** 85:23

**initials** 21:5
**input** 132:14 133:7
  181:15
**inside** 43:2 153:12
**inspection** 143:5,16
  143:21
**inspections** 145:6
**instance** 10:20 18:2
  79:18 91:19 131:8
  152:20 153:11
  156:13 159:1 194:3
  196:19 203:5
**instances** 196:18
**instruct** 109:21
**instructed** 47:6
**insurance** 205:23
**intent** 122:3 147:8
  186:14 190:21
**intention** 50:6
  178:18
**interaction** 90:6
  121:22 122:5,15
**interest** 16:3 17:20
  17:23 18:10,16
  23:4 26:18 30:18
  33:20 43:23 44:3
  46:17 48:4,11
  112:15 134:9,12,14
  189:15
**interested** 33:9
  211:16
**interfaced** 47:1
**interior** 159:20
**internet** 6:12
**interpret** 88:4
  114:12,16
**interpretation**
  86:23 109:6,16
  110:7 111:19 113:8
  113:16 115:17
  117:3,5,23 128:6

184:14 200:8
**interpretations**
  82:11
**interpreted** 75:19
  75:20 78:21 79:20
  87:17 112:2
**interpreting** 87:4
  114:6 115:9
**interrupt** 150:14
**interval** 90:20
**invest** 16:13 32:12
**invested** 32:23 33:2
  134:18
**investigate** 85:8
**investing** 32:6,16
**investment** 19:4
  21:11 36:14 37:8
  41:16 50:13
**investments** 8:1
  21:14 32:9
**invoice** 139:19
**invoices** 139:9,21
**involved** 39:10
  42:13,15 43:11,12
  44:11,17 52:19
  53:20 55:8 70:4,11
  80:4 85:1,6,12
  87:10 89:21 114:18
  189:12 198:15
**involving** 5:21
**ira** 16:7,9,11 18:14
  19:1 21:3,5 23:13
  23:15 33:1,2
**irrational** 113:8,17
  113:20,23 124:17
**issue** 42:12 45:5
  72:23 76:16 78:7
  83:12,20 85:3 86:5
  86:10,17,20 87:4
  88:3 89:11 91:2
  98:5 103:7 106:9

107:23 112:20
  114:20 119:19
  120:3 121:9 128:2
  195:22 196:2,7,13
  197:17 198:17
  199:13 200:5
**issued** 44:18 81:3,5
  83:23 133:23 134:5
  193:13 195:2,6,15
  195:17 197:11,14
  199:11,18
**issues** 7:15 45:11
  47:18 81:14 83:3
  132:15 184:18
  197:21 198:1 199:4
  209:7
**issuing** 194:15
**item** 135:20,20
  138:12 139:4,4
  142:10 155:13
**items** 93:22 137:21
  140:17 142:11,14
**itp** 121:19 122:4,7

**j**

**j** 23:9,16 24:4 42:1
  42:2 126:10
**jackson** 3:21 62:3
  84:20,21 88:9,19
  89:1 91:22,23
  95:12 109:5 117:2
  117:10 120:23
  121:7 123:3,7,21
  124:5,12 126:3
  128:21 131:21
  132:5 133:21
  185:22
**jackson's** 10:9,12
**jamie** 4:8 5:10
  12:18 58:2 108:6
  126:14 150:13
  183:21

**january** 1:20 2:7
  169:5 205:6
**jbira** 23:12
**jones** 12:5 14:21
  15:6 46:2 55:7
  81:16 84:1 88:8,13
  121:7 138:23
  181:16 201:18
  202:5
**judgment** 161:18
**july** 120:5 152:3,4
  152:11 154:9 155:9
  169:12 192:9,10,21
  192:21 193:17
  200:9,21
**jumbled** 144:11
**june** 63:22 66:11
  66:13 67:9 137:4
**jurisdiction** 130:7

**k**

**k** 14:14,15
**keep** 6:22 40:2
  168:19
**keeping** 45:22
  59:14
**kept** 126:8 142:3
**key** 197:1
**kidd** 4:8 5:10
  208:20
**kids** 165:1
**kin** 211:15
**kind** 10:22 19:3
  23:1 26:8 27:9
  28:12 29:8 35:9
  39:1,11 47:1 48:9
  54:6,6 59:2 63:1
  66:5 70:7 71:12
  76:22 78:11 82:4
  84:15 92:22 93:14
  98:5 101:17 141:22
  150:6 157:5 159:6

161:5 162:14 167:3
170:17 180:14
183:11 190:12,16
196:1 199:20 204:7
**kitchen** 28:4
**knew** 137:5 174:9
198:11 202:10
**knock** 78:6
**know** 5:22 6:13 8:1
9:16,22 12:11
14:23 20:6 21:5
24:15 28:7,11
30:15,22 37:18,22
42:6 48:6,15 51:19
51:23 52:11,15
54:11 55:15 56:9
57:4,5,15,17 58:15
59:8,9 64:1 65:13
67:21 68:14 69:21
70:23 71:5,12,18
71:22 76:11 77:21
78:4,5 79:23 80:22
81:17 82:13 83:7
84:17,18 86:3,8,11
86:16,16 87:2,5,23
88:16,16,18 89:14
90:2,9,11,13 91:7
92:1 93:12,18,18
93:22 94:22,22
95:1,14,16 96:4,5
96:12,13,21 97:1
98:1,3,4 100:19,21
101:8,23 102:14
103:9 104:1,4,7
108:22 110:9 111:1
111:4,5,7 115:20
116:20 117:13
119:7,11 120:1,1,2
120:6,7,9,18
121:11,16 124:6,8
124:9,9,22,22

127:16,21 129:3,19
129:20 130:5,11,18
131:14 132:4,5,12
132:13,16 133:11
133:12,17 136:16
138:16 140:7,9
142:2 144:10,10
145:21 147:11,16
147:19,20 148:5,12
148:17,22 151:3
154:7 156:14 157:7
158:23 159:15,21
160:18 161:2,6,18
162:4 163:4 164:6
165:7,7 170:15,16
170:21 172:22
174:10 178:5 183:8
183:16,18 186:11
186:19,21,21 189:4
189:22 190:17,19
192:3,23 193:8,19
194:5,11,19 195:1
195:3,5,7,10,11
196:12 197:8
200:10 201:18
202:13,18 204:2,16
205:14 207:6 208:9
209:4,18,21,22
210:4
**knowledge** 78:20
88:22 121:13,14
184:22 185:3
189:11,15 194:23
198:14 209:1,5
**knows** 76:8 159:22
**kris** 12:8,11,13
135:6 145:14
**kristopher** 4:4
212:1

**l**

**l** 2:1 20:21
**labor** 138:8 140:17
140:22 148:13,14
149:3
**lack** 159:20
**ladder** 103:8
**ladders** 104:2
**lady** 6:22
**laid** 87:1
**land** 10:2 81:8,8
82:2 84:22 129:1
132:1 193:12
194:15,20 195:1
197:10 200:22
202:2 207:21 208:8
209:3,7 210:2
**large** 1:19 28:4
71:5 78:2 140:16
164:21 167:3 171:3
190:12
**larger** 106:6
**late** 12:9 31:1
**lavish** 159:19
**law** 17:6 35:14
**law's** 22:5
**laws** 120:14
**lawsuit** 38:9,16
60:19 61:7,10
183:10 201:15
**lawyer** 187:1
**lay** 156:13
**layer** 108:22
**layout** 70:12 71:4
156:17
**lead** 36:8
**leading** 2:11 99:6
99:18
**leak** 204:15
**leave** 76:11 136:5
183:10 190:8

**leaving** 113:21
**led** 32:14
**lee** 40:5 121:23
129:9,11 130:1,2
131:4
**left** 5:20 31:7 70:6
**legal** 38:19 39:2
60:21 74:20 191:12
**length** 99:3
**leon** 28:23 34:6
41:11 95:19 203:18
204:3 205:6
**letter** 3:18 98:13,14
132:18,19 136:7,9
**lettering** 62:17
**letters** 116:3,4
127:16
**level** 28:16 71:17
108:4,21
**lift** 123:22 124:20
**lifted** 121:5,21
**lights** 47:4
**limit** 98:23 102:21
105:4 106:1 146:3
**limitation** 106:11
107:17,18
**limitations** 65:9
99:12 100:14
**limited** 65:6,7
67:13,15 162:22
184:4
**limiting** 106:2,16
107:8,9,10
**limits** 103:12
**linda** 40:5 121:22
129:9,11 130:1,2
131:4
**line** 38:2 42:21 53:3
76:23 77:3 135:3
137:21 142:14
144:5 150:7 193:6

213:11,14,17,20,23 214:1,4,7,10,13
**list** 20:12
**listed** 174:5 202:4
**listen** 130:9
**listened** 129:12
**literally** 59:19 107:9 125:23 126:12
**litigation** 43:22
**little** 5:22 6:18 10:6 10:15 21:10 22:15 22:17,19 52:2,10 64:9 71:20 115:1 119:10 140:21 152:23 162:8,20,22 163:4,14 164:23 179:11 187:8,13 195:13
**live** 27:2
**lives** 24:9 92:20 99:14 100:16
**living** 28:4 71:4 156:15 159:19
**llc** 1:6 16:6,21 17:4 18:18,19 19:20 20:8,15 21:4,4,5,12 21:22 22:2,3,5,9,13 22:18,20,22 23:9 23:10,11,12,16 24:4 25:2,5,10,11 25:16 31:11,17,20 35:6,17,22,23 36:18 37:7,13 38:18 41:3,6 42:8 49:6,13,21 51:14 51:20 60:14 61:4 65:23 134:19 172:1 185:19 187:20,23 188:18 189:1,2 191:14
**llcs** 25:11 40:19 41:20 42:9 51:10 66:9
**load** 156:10
**located** 27:11 28:20
**lock** 30:2,2,4,8 174:2,4,22 175:2 175:10 176:3,18
**locked** 150:1
**logic** 176:9
**long** 51:6,19,22,23 52:6 61:11 152:13 152:15
**longer** 17:10 108:9
**look** 15:14 32:10 34:11 51:2 54:12 54:21 55:3 60:4 61:22 62:19 72:13 74:23 80:15 95:17 112:5 127:23 135:1 137:22,22 140:15 141:18 144:4 146:9 146:10,12 147:16 154:23 155:22 159:4 162:6 170:13 192:5 198:3,21 206:8
**looked** 10:20 56:23 70:7 92:22 95:17 150:22 162:12
**looking** 32:8,13 97:13 100:21 109:3 117:16 129:21 138:6 141:12 157:20 176:22 202:11
**looks** 60:7 62:13 63:1 72:17,17,20 97:16,18,19 150:1 157:15,21 173:23 175:12,17 176:1,16
**lose** 118:5 206:3
**lost** 151:11 153:15 154:20,23 155:5 160:1,5 169:13 173:7 176:21
**lot** 27:10 31:13 34:21 35:5,22 36:3 36:7,10,13,17 37:16,17,23 39:12 39:15,21 40:11 48:15,21 49:3,4,9 49:10,14,19,20 50:15 51:1,4,13,13 52:8,12 65:7 66:8,9 82:23 93:4,6,8 94:3 94:3,9 96:11 107:1 107:6,8,9,11,15 112:21 113:14 127:20 128:11 129:18 139:15 140:19 157:22 162:9 167:17 176:14 191:9 197:4
**lots** 32:13 35:2,3 39:15 51:10 96:6 105:14 106:6,9 107:5,5 112:18,19 116:11 180:10
**louisiana** 8:7,9 19:23 24:5 25:2 27:3 35:17 189:1
**love** 21:14 32:11
**loved** 32:11
**low** 149:8 159:5
**lower** 162:19 166:14
**lumber** 140:10,12 140:16
**lunch** 108:7,9 126:14,16 127:1,5 127:7
**lyckman** 4:8
**lying** 136:3
**lynch** 20:21 24:9 25:18,20 30:16 41:15 55:18 188:19
**lynch's** 35:6
**lynn** 47:1

**m**

**m** 14:14,14,15 23:9 23:16 24:4 42:1,2
**ma'am** 5:12
**mail** 212:10,19
**main** 76:17
**maine** 4:5
**maintenance** 173:14
**majority** 157:18
**making** 7:2 66:7 89:20 90:3,10 107:19 125:3 147:18 189:12 213:8,8
**malfunctioned** 96:22 97:5
**man** 20:21
**manage** 26:13
**managed** 16:18 20:7,7,8
**management** 26:4 26:11,17 27:1 46:23 55:10 173:2
**manager** 15:10,10 15:11 20:7,7 25:14 25:18,21 189:19
**managers** 20:4 25:15 26:15
**manages** 15:9,19 15:19
**managing** 193:1
**manually** 212:8

**march** 200:4,23
201:1
**mark** 3:15 14:8,12
15:5 53:17,20 54:5
54:9 55:4,14,20
56:5,10,18 61:23
63:4,15,15,17
64:16,17,18,20
65:3 66:19 69:17
79:9,10,14,14
80:12,12,16,18
81:3,10,13 83:4,6
85:1,2,3,6,7,10,10
85:12,13,16,19,21
85:23 86:11 87:11
87:13 88:7 89:9,17
89:18,20,23 90:1,4
90:5,7 132:23
135:4,6,8 145:14
146:5 155:22 182:4
182:4 184:3,13
188:22 189:5,10,19
193:3 194:17 198:6
198:7,9,10,13
202:13,15
**mark's** 14:22
**marked** 8:15,19,19
11:8 59:23 61:19
62:1 72:10,14 73:4
73:8 95:5,9 98:9
134:21 135:1 185:6
**market** 33:15 34:18
64:23 65:2 69:6
71:16 161:18
162:22 181:5
**marketing** 72:3,4
**marks** 135:3
**marshal** 197:22
198:14,17,18
**massive** 180:22

**master** 164:20
**match** 178:7
**matches** 22:12
144:6
**material** 139:8
140:7,17 156:23
158:11
**materials** 157:22
159:10
**math** 144:17
147:16,16,20 177:5
**mathematician**
147:14
**matter** 43:9,17
65:21 104:2,4,5
132:20 176:10
**matters** 129:2
132:2
**matures** 139:16
**maximize** 99:3
104:17
**maximizing** 105:7
**maximum** 186:2
**mayor** 104:22
**mcneill** 4:9
**mean** 6:10 10:8,18
39:23 46:14 50:8
57:12 59:10 66:14
67:10 68:23 69:18
74:10 78:14,21
79:9 82:9 85:13
87:21 98:3 103:21
104:13 106:5,20,21
107:9 111:4 115:2
116:2 119:23
128:10 133:7
147:16 150:14
157:6 159:17 164:8
174:18 175:23
192:19 193:17,21
194:2 195:7 196:17

203:23 205:13
**meaning** 109:7
206:12
**means** 76:2 77:13
85:19 141:22
208:10 211:9
**meant** 7:4 89:18
115:7 152:8 198:11
**measured** 163:12
**medical** 102:23
**medication** 7:16
**meet** 195:9
**meeting** 3:13 40:6
91:20,22,23 93:15
94:2 127:19 128:9
128:10,16 129:7
130:3 131:18
185:13 186:4,9
207:20 208:6
**meetings** 91:12,18
116:3 127:18
133:14
**member** 31:16,19
110:11 125:1
189:19 209:18
210:1
**members** 20:2,17
20:19 22:2,13
25:12 109:11 117:7
124:2 130:22
187:22 188:19
206:15 208:22
209:2,5,19
**membership** 20:6
**memories** 10:22
**memory** 7:14 68:11
**mentioned** 10:16
18:13 21:20 26:2
60:16 69:5 70:17
77:6 103:23 106:22
106:23 113:4 118:8

149:4 174:3 188:19
204:4 205:16
**mentions** 187:20
**merging** 105:1
**mess** 59:11 86:3
167:19
**met** 98:18
**metal** 101:16,16
**michael** 1:12,16 2:5
5:1,15 212:2
**middle** 66:20
**mike** 1:6 45:16
46:5,9,13 70:9
167:18 188:20
189:5
**mile** 29:5
**millennium** 188:3
188:10
**million** 160:2
169:15
**mind** 58:18 76:5
159:8 194:6
**mine** 32:18
**minimum** 74:10
**minor** 70:21
**minority** 16:21,21
16:23
**minus** 144:18 173:9
**minute** 57:21 98:15
145:22 183:11
**minutes** 3:13 58:11
61:2 108:7 118:8
126:22 185:13
186:7,20,22 206:8
**miscellaneous**
146:14
**missed** 134:11
**misspoke** 205:4
**mistake** 174:16
**mistaken** 196:4

**mix** 164:18 165:18
**mixed** 29:1 66:3
  144:3
**modifications**
  197:5,9
**modify** 18:19 58:21
  174:21 195:12
  196:23
**moment** 93:13
**money** 16:10 21:10
  33:1,17 34:14
  36:21 45:22 71:15
  156:5 169:20 193:5
  206:4
**montgomery** 4:10
**month** 17:10
  151:13 155:2
**months** 51:22
  154:10 188:5
  198:12
**morgan** 39:12,16
  39:22,23 40:9
  91:11 94:5,14
  103:17 104:23
  109:11 110:12,14
  111:8 112:6 116:8
  117:15 118:3,12,13
  119:6 124:2 125:1
  125:15 126:4
  127:17 129:1,6
  130:6 131:23
  132:11 134:2,6
  167:7,8 206:15,16
  208:21 209:2,6,19
  210:1
**morning** 5:9
**mortgage** 37:22
**motivated** 48:19
  116:1 118:4
**motivation** 124:17

**motorola** 5:18,21
  7:20 16:9 23:14
  31:1,3,5,7 38:8
**move** 78:4 89:16
  135:21 136:10,19
  136:19,20,23 197:1
**moved** 16:10 31:4
  49:6 152:22 204:22
**moving** 60:3 90:22
  142:7,14 148:1
  169:1 171:7
**mrbira** 21:4 22:3
  22:18,20,22 23:11
  25:1,5 37:7 49:4,21
  50:3 51:14,20 61:4
  187:20 188:15
  190:2 191:13
**multiple** 106:13
  155:1 171:18

**n**

**n** 2:1 20:21 126:10
**name** 5:9,13 14:10
  14:22 17:12 22:6
  23:8 35:17 71:21
  72:2 79:16,17
**named** 20:21 45:16
  183:9
**names** 71:19
  119:15
**narrow** 81:6 99:6
  99:18 101:9 102:8
  103:12,16
**natural** 94:15
**nature** 189:20
**near** 55:16 88:16
  200:17 201:5
**nearby** 112:12
**necessarily** 68:11
  199:21 208:4
**necessary** 2:10
  213:9

**need** 7:5 24:3 58:19
  78:23 85:18 86:23
  103:14 158:7
**needed** 33:12 34:14
  34:16 75:18 91:3
  122:1 143:18
  167:21
**needs** 8:19 145:11
  146:23
**negative** 44:6 46:16
  104:18 105:8 106:2
**negotiated** 162:8
**neighborhood**
  69:10
**neighbors** 21:10
  116:5 136:8,22
**neither** 210:7
  211:14
**nervous** 34:23
**net** 172:15 173:7,8
  173:11,14 176:22
  176:23 177:10,15
  178:3,9 190:1,1
**never** 34:22 56:13
  56:20 57:7 76:11
  76:15 79:3 90:11
  114:20 128:2
  184:15 205:9 210:2
**new** 6:1 33:13,17
  33:19 34:2,2,4 55:9
  69:20 79:19 92:4
  92:11 107:5 109:6
  109:15 110:15,18
  110:23 111:8,19
  116:8,21 117:2,22
  119:4 120:22
  122:10 123:9,14
  128:6 138:4 151:2
  156:2,17 158:4
  171:3,4 188:8

**nice** 17:13 23:6,8,9
  29:2,2 41:1 42:17
  44:19 45:10,14
  79:19 132:23 166:4
  166:9 167:14,16
  196:13
**nicely** 34:17
**nicer** 159:21
**night** 12:9 34:18
**nightmares** 105:1
**nightmarish**
  104:22
**nights** 167:2
  171:13 172:10,12
  181:1,3
**nine** 23:12 28:15
  30:12 123:6 141:13
  141:16 146:16
  149:16 151:12
  160:3 175:8,9
  177:12,16
**ninety** 143:11
  146:16 160:3
  177:12
**noise** 116:21
**non** 33:2 109:11
  117:7 124:2 125:1
  134:1,6
**normal** 57:12 201:3
**normally** 47:19,22
  89:15 176:15
  195:20 207:23
  208:11
**notarized** 212:10
**notary** 214:23
**note** 12:18 67:6
**noted** 213:4,5
**notes** 73:1 206:8
**notice** 2:17 3:8 9:6
  9:10 10:8,10
  147:10 176:13

**noticed** 175:12
**notification** 84:3
**notified** 47:10,20
  188:5 195:22
  196:15 200:3
  201:19
**notify** 195:11
**noting** 212:7
**november** 27:8
  52:21 123:8,12
  135:8
**number** 1:5 9:9
  15:3 16:19 23:17
  24:16,20 65:11
  67:23 68:23 71:9
  74:1 78:10,19 79:1
  142:3,17 147:12
  150:2,11,12 155:20
  155:21 157:2
  159:13,15 161:7
  162:14 163:3
  165:10 166:15
  167:2 170:11
  173:15 179:21
**numbers** 12:22
  99:4 145:23 150:19
  157:7,10 162:4
  164:16 177:21
  178:2,3 180:18
  183:11
**numeral** 23:17,19
  24:16,17,18 42:5

**o**

**o** 2:1 4:4 39:13
  126:10 212:1
**o'clock** 126:22
**object** 44:8 53:8
  60:20 74:19 77:10
  78:13 82:12 100:17
  106:18 109:18
  111:2 113:10

114:23 115:18
  117:12 130:16
  186:15 195:18
  203:1
**objecting** 85:16
  92:16 93:10
**objections** 2:10,12
  121:4,20
**obligated** 193:22
  194:4,5
**obligating** 194:7
**observations**
  131:17
**obstructed** 116:15
  116:17
**obviously** 12:11
  38:16 63:18 65:11
  66:14 71:14 83:3
  98:6 101:22 153:17
  158:10 161:8
  203:20
**occasions** 196:15
**occupancy** 161:16
  161:22 164:23
**occupation** 7:18
**occur** 208:1,3
**occurred** 127:5
  195:20
**occurring** 207:20
  207:22
**occurs** 105:21
  190:14
**october** 123:11
**offer** 29:23 199:22
**offered** 2:14 195:23
  199:15
**offering** 32:21
**office** 86:13,14,15
**officer** 25:9
**offices** 212:3,10

**official** 8:11
**officially** 61:6
**officials** 133:9
**offset** 158:19
  159:20
**oh** 35:13 58:18
  113:13 122:11
  148:8 196:5 201:16
**okay** 5:16,22 6:16
  7:10,12,18 8:10,18
  9:1,4,7,12,16 10:6
  10:11,14 11:11,22
  12:10,16 13:3,16
  13:21 14:5,12,16
  14:22 15:2,11,18
  15:22 16:8,12,16
  17:7,11,14 18:7,9
  18:13,21 19:11,13
  19:17,19,22 20:1,5
  20:9,11,14 21:1,20
  21:23 22:8,11,16
  23:6,16,20 24:13
  24:15,18 25:4,9,15
  25:20 26:2,14,20
  26:23 27:20 28:6
  28:10,12 30:7,20
  30:22 33:23 34:5
  35:9,21 36:3,10
  37:2,7,11,13,21,21
  38:2,6,13,22 39:4,8
  39:22 40:12,14,19
  40:22 41:2,9,18,23
  42:4,11 43:8,11,21
  44:15,23 45:3,7,14
  45:18 46:1,4,13,20
  47:23 48:8,14 49:2
  49:10,19 50:12,16
  50:18,23 51:3,6,12
  51:19,19,23 52:14
  53:1 54:2,13 55:13
  55:23 56:12,20,20

57:9,14,19 58:11
  59:1 60:3,10,13
  61:13,16,22 62:9
  62:16,23 63:19
  64:5,8,10 65:20
  66:2,7,9 67:21 68:7
  68:10,19 69:7,13
  70:4,17 71:9,22
  72:1,13,18,22
  73:13 74:4,10,18
  74:23 75:5,11 76:2
  76:17 77:1,6,14
  78:16 79:8,11 80:1
  80:6,13,15 81:4,15
  82:22 83:1,11,19
  83:22 84:5 85:11
  85:22 86:11,19
  87:9,14,20 88:15
  89:3,17,20 90:8,15
  91:6,13 93:18 94:8
  95:8,15 96:19 97:4
  97:6,18 98:12,17
  98:20 100:11
  101:14,21 102:4,4
  102:16,20 103:4,11
  103:23 104:14
  105:23 106:8,12,12
  106:16 107:3,7
  108:5,18 109:1
  110:2,6,10,17
  111:6,9,14,17,23
  112:23 113:21
  114:9,19 115:11,21
  117:20 118:16,19
  118:23 119:4,10,17
  119:21 120:5,9,13
  120:19 122:5,9,19
  122:23 123:6,19
  124:11,19 125:6
  126:2,7,7,23
  127:15 128:17

129:10,23 131:1,3 131:9,12,19 132:4 132:13 133:13,17 134:9 135:1,7,12 135:17,20 137:9,20 138:10,13,18 141:3 141:8,11,21 142:6 142:19,19 143:1,4 144:1,9,15 145:4 145:13 147:1,9,13 148:1,5,9 149:18 150:3,5 151:1,5,10 151:13,20 152:5,5 153:5,15,20 154:6 154:12 155:13 156:6 157:12,14,20 158:3,6 160:12,21 161:3,15 162:16 163:16,18,22 164:5 164:15 165:11,11 165:17,19 166:17 167:1,5,11,13,22 168:11 169:11,11 169:13,19 170:5,14 170:21 171:7 172:7 172:15,17,21 173:3 173:6,17,22 174:9 174:20,23 175:6,9 175:12,23 176:12 176:16,20,20 177:4 177:10,20 178:5,9 178:18,23 179:5 180:7,13 181:7,13 182:1,4,11,13,16 182:19,22 183:3,7 183:10,14,17,20 184:8,15 185:2,17 185:22 186:6,12 187:18 188:2,7,9 188:14,18,23 189:3 189:9,11,14,21 190:4 191:16 192:5 192:8,16 193:4,20 193:23 194:2,13 195:5,8,13 196:5 196:12 197:13,20 198:1,6,19 199:1,9 199:19,22 200:10 200:16 201:2,6,8,8 201:14,22 202:10 204:4 205:1,4,10 206:1,6,18,23 207:11 209:22 210:5

**old** 158:4

**omitted** 138:9

**once** 5:19,20 47:2 70:1,7,12 96:22 122:22 212:10

**ones** 67:18 133:12 198:21

**opened** 155:6

**operating** 56:11,13 56:15 57:2 60:17 189:23

**opinion** 111:1 191:20 208:18

**opportunities** 33:15 94:16

**opportunity** 5:8 34:7 195:23 196:1 199:16,22 208:17 209:6

**opposed** 33:13 101:9 153:23

**opposite** 197:2

**option** 205:23

**orange** 4:5 8:2 32:18,19

**order** 44:18 81:2,4 82:3,23 83:6,8,21 83:23 84:2,16 88:17 89:6 108:7 121:5,21 122:6 123:23 124:20 127:9 133:23 134:5 135:23 136:18 191:10 194:3 195:14 197:14 199:10 207:21 208:7,11,18

**ordering** 212:13

**orders** 45:7

**ordinance** 3:17 73:11,14 74:21 76:5 78:9,18 80:10 80:14,21 81:12,14 81:16,22 82:11,13 82:18,19 83:9 90:17 91:4 92:11 110:7 115:13 117:23 122:10,12 122:13 123:5,9,14 133:6 184:10,16

**ordinances** 92:2 108:3 133:18 202:16

**ordinary** 61:1

**organization** 127:18 129:13

**organizational** 59:3

**original** 8:16 11:9 49:20 50:10 60:1 61:20 72:11 73:5 75:21 95:6 98:10 134:22 137:16 138:21 139:14 140:6 141:7 142:13 151:16 155:23 170:9,17 185:7 200:13,17 202:12 212:13,15

**originally** 11:2 45:16 46:11 49:3,4 50:8 57:1 141:20 151:15,20 156:23 159:10 160:7 164:2 169:4,7

**osha** 45:11 46:4,6

**outside** 8:7 18:15 43:2 119:1,5 120:11,12 130:7

**outstanding** 121:4

**overall** 175:21

**overflowing** 96:20

**overhead** 143:5

**oversight** 142:15

**overwalk** 29:6

**owe** 192:2

**owned** 16:6,6 17:6 19:5 20:14,20 22:9 23:6,10 35:22,23 40:19 41:3,6 116:11 162:4 171:20,22 179:18 180:19

**owner** 15:17 16:21 16:22,23 17:5 30:17 177:11,15 189:19 190:10

**ownership** 16:3 17:20,23 18:10,16 22:4 23:4 30:18 39:1 43:23 44:3 46:17 48:4,11 172:6 189:15 190:3

**owning** 33:6

**owns** 20:12 21:21 22:17,18 35:15 37:23 41:19

**p**

**p** 2:1 14:11
**p.m.** 210:11
**packing** 165:3
**pad** 79:22 197:1
**page** 3:2,7 62:5,9 62:13 72:15,21 73:9,22,23 97:7,15 98:13 109:4 137:11 172:8,17 175:1 185:18 201:9,10,22 212:18 213:11,14 213:17,20,23 214:1 214:4,7,10,13
**pages** 13:10,13 82:13 137:13,13 213:9
**paid** 45:22 155:21 155:22 173:4 182:7 182:7 193:2,3
**pain** 21:15
**paint** 77:18
**pandemic** 149:5 153:18 154:16,19 174:19
**paper** 8:22 84:2
**paragraph** 98:20 98:20,21 102:5,20 103:11 104:15 109:3 116:23 117:6 120:20 123:6,20 128:20 133:20 187:22 188:18 192:7,8
**paraphrasing** 127:11
**park** 75:17 76:8,9 76:10 77:4,7,15,15 77:16,20,22 96:2 114:2
**parked** 96:7 97:20
**parking** 27:17,19 47:4 67:7,12,15,19 67:19,21 73:1 74:11 75:2,7,16,22 76:6,18 77:6,18,19 78:7,11 82:5,6,9 83:3,4,13,20 85:4 86:10,22 88:7,10 88:20 93:22 95:21 97:23 103:12,18 109:6,15 110:7 111:19 112:8 113:8 113:16 117:3,23 118:10 119:5,9,18 120:3,11 128:2,4 200:7
**part** 13:11,17 30:8 34:20 44:19 49:7 62:14 67:4 71:8 76:20 93:8 105:16 108:13 111:4 116:19 125:5 136:2 140:16 143:17 150:23 157:3 158:4 158:4 171:4,6,8,23 172:22 197:8 202:15 205:21
**partially** 112:15
**particular** 12:4 91:2 105:13 114:12 129:22 192:18 198:18
**particularly** 6:1
**parties** 2:3,12 132:10 211:15 212:13
**partington** 4:4
**partly** 110:13 167:17
**partner** 16:22 35:13 50:10,10,14
**partners** 35:14
**partnership** 17:2
**parts** 114:11
**party** 30:14 38:9 39:2 173:20
**passage** 7:13
**passed** 91:9 123:10 123:15
**patent** 5:21
**pattern** 168:13
**paul** 3:20 92:19,22 93:2,10,19 95:1,12 96:12 112:16 131:8
**pavey** 14:8 15:6 53:17 85:10,21,23 86:11 87:12,13 89:18 90:5,7 155:22 198:10
**pavey's** 14:23
**pay** 66:21 176:13 194:4,5
**paying** 168:3
**pc** 4:9
**pdf** 212:7
**peek** 29:23 173:21
**pennsylvania** 24:10 24:11,14 189:2
**people** 28:9 57:15 57:17 71:21 76:8 76:12,22 77:4,7,15 77:15,21 86:13 91:21 92:16,18 93:5,15,22 94:3,6,9 94:12,17 96:9 98:6 99:1 107:18 116:7 118:4 120:1 130:22 133:4,10 140:11 153:14 161:7,9 163:18 164:1,11 165:3 167:8 168:16 181:4 197:3 205:22
**people's** 102:2
**percent** 20:22 21:6 21:8,9 22:18,19 23:11,12 41:3 64:8 172:19 173:16 190:10
**percentage** 162:2 172:18
**perform** 63:15
**period** 45:21 59:7
**permit** 3:10 67:14 84:23 88:5 89:13 91:1 92:10 120:23 160:6 193:12,13 194:20,22 195:5 200:6,12,13,18 201:11,20
**permits** 10:2 47:19 193:9 199:17 209:8 209:10
**permitting** 196:10
**person** 7:1 23:3 47:1 79:18 83:18 92:3 98:4 113:22
**personal** 18:10 124:12 183:3,9,12 184:22 185:3
**personally** 8:6 16:4 16:5 18:3,15 38:8 40:17 59:5 69:16 80:15 83:17 116:4 132:22 133:3 134:16 184:11,15 185:17 186:21 206:13
**pertaining** 85:15 209:7
**pertains** 186:1

**phase** 57:10
**phases** 56:8
**phone** 31:3 84:6 122:17,20 130:4 199:12
**photo** 3:11
**physical** 201:21
**pick** 32:15 128:17
**picked** 34:23
**picking** 199:12
**picture** 97:9 148:23
**pictures** 93:8 153:10
**piece** 52:20
**pieces** 184:17
**piling** 192:13
**pilings** 67:17,18 135:21 136:1,10,12 136:17 138:9 141:4 141:5 142:5,7,15 151:19 156:11,11 157:1 192:14,16 204:21,22,23
**place** 26:8 41:10 47:15 65:19 71:23 105:14,18 111:20 114:8,13 136:21 160:15 162:20
**placed** 156:12 194:3
**placeholder** 147:5
**places** 33:12,17 34:10 114:1 128:1 148:12 156:12 162:5 165:15 166:1 168:16 171:18 180:20
**plaintiff** 9:8 38:19 182:17 183:9
**plaintiffs** 1:7 4:3 62:2 109:8,9 123:8 123:23 134:1 154:20 160:6,8 192:10,11
**plan** 10:21 13:22 22:20 62:8,14 63:18,18 65:23 69:17 75:14 76:18 77:6 87:1 105:12 121:3,19 122:3 138:19,21 139:13 139:14 140:6 145:8 145:17 151:2,16 152:5 164:8,11 191:6 194:18,19 195:10,12 196:8,18 196:23 197:5 200:4
**planned** 11:2 101:4 101:5 137:23 141:15,20,23 142:21 143:6 145:7 146:14,19 147:2 150:18 151:21 160:8 164:2
**planning** 40:1,4 57:16 66:18 70:2 73:15,20 79:3 84:18 86:1,14 88:3 90:6 92:12 105:16 108:2 112:11 113:1 115:5 118:7 120:17 121:11 123:10 127:17,20 129:2,8 129:18 130:15 132:2,14,20 133:8 146:4 156:7
**plans** 55:9 56:9 64:19 156:8 202:11 202:12,12
**plantation** 8:8
**platforms** 204:10 204:11
**played** 70:21
**please** 6:13 7:5 59:10,10 212:10,18 213:9,9
**plus** 72:7 171:5
**point** 6:8 35:23 51:12 52:16 58:2 72:22 85:1 87:6 90:15 117:9 126:16 150:6 151:21 152:6 159:11 169:14 191:18
**pointe** 4:9
**politically** 115:23
**politics** 113:3
**ponce** 28:23 34:6 41:11 95:19 203:18 204:3 205:5
**pool** 27:16 28:16,17 29:12 70:22 179:1 179:2,3,7,8,10,11 179:13,20,23 180:2 204:17
**pop** 206:23
**pops** 58:18
**position** 106:13 169:6 207:19 208:2 208:5
**possible** 69:2 160:22
**post** 152:17 153:9 153:13
**potentially** 99:13 100:15
**preceding** 117:6 135:6
**premise** 105:6
**prepare** 9:19 13:14 14:3,6 15:8 140:1,4
**preparing** 81:7 82:2
**present** 186:4
**presented** 185:22
**pressure** 118:3,3 124:15 125:11,15 125:22 126:4 127:20
**pretty** 34:16,18,19 34:23 51:14,17 65:7 70:12 71:22 144:12 148:23 153:6 157:10 161:12 162:14 168:2,21 189:10 198:22
**prevent** 109:7 116:22
**previous** 139:20
**previously** 37:18 97:6 179:19
**price** 49:20 161:17 162:8 168:6,18,19 168:21,23 169:1 170:18,21 181:2
**pricing** 153:13
**prickett** 15:9,14 26:2,4,11,15 55:8,9 70:18,18 72:5 81:22 82:18 90:19 91:6,7 119:14,23 161:17 171:11 172:14,20 181:20
**primary** 132:3
**print** 212:8
**printed** 62:20
**prior** 2:15 52:10 53:1,3,10,12,16 54:19 81:9 83:6,8 116:10 121:1 127:5 166:8,9 192:19 193:12,14 195:17 199:17 207:20

208:7,11
**private** 7:20 140:8
**privilege** 109:20
**proactively** 129:21
**probably** 6:23 51:22 52:2,10 59:11 95:2 100:22 122:14,22 123:2 151:3 154:10,15 157:7 167:19 169:23 176:19 178:14 201:16,16 201:17
**problem** 71:4 93:14 96:17 106:5 183:7 187:1
**problematic** 103:1
**problems** 46:7 102:22
**procedure** 213:6
**proceed** 139:22
**proceeding** 38:20 39:2
**proceeds** 205:19
**process** 46:21 47:13 48:3,10,23 66:16 70:16 81:5,7 88:11,21 89:4,21 133:18 194:14 196:11 197:8 199:12 201:4
**procuring** 193:6
**produce** 64:14 169:21 170:3
**produced** 95:15 131:13
**producing** 18:11
**product** 109:20
**production** 212:20
**profit** 35:6 50:15 143:6 154:18,20 165:22 167:16 170:1,7 176:21
**profitable** 33:8
**profits** 151:11 153:16 155:1,5 160:1,5 169:14 173:8
**project** 11:3 23:1 45:20 48:23 53:12 54:18 55:2 70:11 139:10,15,16 140:23 142:3 160:7 169:16 198:22
**projecting** 155:7
**projection** 170:7
**projections** 162:10
**projects** 66:15
**promoted** 31:2
**promptly** 120:21
**pronoun** 59:11
**pronouns** 80:7
**proper** 47:3 192:2
**properties** 15:15 15:21 16:2,2,17 17:22 18:2,5,6,7,9 20:15,18,20,23 22:14 26:2,5,11,13 26:16,20 28:1 31:11,12,17 32:7 39:8,9 40:8 43:5,15 46:17 48:4 70:18 72:5,6 76:15 94:5,7 94:10,18 114:22 132:18 168:7 171:12 172:4,20 173:12
**property** 13:6 15:10,10,11 17:8 17:11,15 26:14,18 27:9 28:13,22 29:8 29:13 42:14,20 43:22 44:2,11,17 48:10 68:22 76:23 77:3,20 80:11 93:17 166:13 167:13 170:1 171:12,15 172:1 175:21 177:1,3,11 177:15 178:10 181:9,17,19 185:19 202:23 203:21 204:8,19
**proposed** 98:22 170:10 186:3
**prorated** 162:2 178:15
**prorating** 155:11 163:6
**proration** 163:1
**protected** 109:19
**provide** 12:11,13 12:15 22:7 139:14 139:16 181:9
**provided** 11:12 12:8 13:23 116:12 181:22
**provides** 139:9
**provisions** 184:23
**public** 133:14 214:23
**puds** 118:18 119:1 119:5 120:10,11,12 120:14
**pull** 50:13
**pump** 96:21,22 97:2
**pumped** 97:3
**purchase** 49:20 168:2
**purchased** 39:12 50:1,2,4 128:12 141:10 156:23 157:14,16,23 159:10
**purposes** 8:11,12 11:11 184:4
**pursuant** 213:6
**pursue** 39:20
**pushing** 124:18
**put** 21:10,11 26:7 34:13,21 35:20 37:4,7 40:5 47:4,6 47:7,15 61:1,7 64:21 65:12 67:14 70:22 76:21 111:20 130:8 142:4 159:21 164:17,23 165:1 167:19 175:18 187:1 194:11 200:12 203:5
**putting** 127:20 151:19 161:9

**q**

**quantify** 163:17
**quarter** 29:5
**queen** 165:1
**queens** 161:11
**question** 6:11 7:7,8 25:6 44:9 48:18 59:8,19 77:12 79:12 100:11 115:2 138:4 143:14 154:1 186:15 209:13
**questions** 2:11 58:9 59:5 83:15 145:18 184:5 207:13,18 208:20 211:8
**quick** 57:21 144:12 209:14
**quickly** 51:15 128:14
**quiet** 23:23

**quite**  162:18
  209:11
**quiz**  206:23
**quote**  136:14

**r**

**r**  1:12,17 2:5 5:1,15
  14:14,14,15 39:13
  126:10 212:2
**raised**  29:12 76:15
  120:3
**ran**  20:10 33:14
**rate**  163:10 172:12
  180:15 205:7
**rates**  161:3
**ratio**  107:10
**rational**  109:12
  111:18,20 112:1
  113:2 115:8 117:8
  124:3 125:8,14
**ratios**  22:15
**raw**  96:20
**reach**  84:20,20
  103:8
**reached**  191:17
**reacted**  125:13
  126:3
**reacting**  124:15
**reaction**  125:15
**read**  5:8 10:7 62:17
  98:15 185:4 198:12
  212:6 213:2
**readable**  64:10
**readandsign**
  212:18
**reading**  130:20
**ready**  26:9 108:8
  128:7 193:10
**real**  16:15 108:1
  168:3 179:3
**reality**  105:2 163:2

**realization**  170:8
**realize**  47:5 167:14
**realized**  33:7 57:4
  76:21
**really**  24:12 32:8
  33:16 34:19 54:1
  71:7 81:20 82:19
  91:3 100:21 102:17
  107:13 116:18
  119:16 129:17
  143:17 158:5
  160:23 161:1 163:5
  170:23 175:22
  180:1 184:9,22
**reason**  46:8 52:11
  53:22 99:14,19,20
  100:5,12 113:2
  114:5,12,15,21
  124:11 125:16,18
  126:1,6 127:8,12
  131:20 153:20
  186:6 213:13,16,19
  213:22 214:3,6,9
  214:12,15
**reasonable**  99:8
  100:7
**reasonably**  103:13
**reasons**  96:3,12
  117:5 118:5 195:1
  195:3,7 213:8
**recall**  14:4 43:7
  44:14 66:14 67:23
  81:20 83:10 90:18
  130:3 200:15
**receipts**  139:21
**receive**  84:2 128:23
  132:9
**received**  11:23
  44:12 116:4 119:21
  136:7 166:2 168:5
  200:17,20

**receiving**  129:5
**recess**  58:12 108:11
  127:1 187:10
  206:10
**recognize**  9:1 97:8
**recommendations**
  55:11
**reconfiguration**
  155:14
**reconfigure**  156:6
**record**  5:14 7:12
  9:4 13:4,5 58:2,13
  63:7,12 73:10,22
  73:23 135:14
  185:10 187:3
**recovered**  33:15
**red**  150:17 158:4
**redo**  140:14 159:17
**reference**  131:3,5
**references**  90:4
**referred**  86:12
**referring**  35:11
  59:9 102:15 118:17
  121:6
**refine**  11:21
**refined**  159:15
**reflect**  61:14 75:14
  147:5 182:23
  186:22 187:13
**reflected**  11:16
  137:12
**reflects**  173:3
**refresh**  10:22
**refund**  205:18
**refusal**  124:19
**refused**  45:20
**regarding**  10:17
  11:1 43:14,22
  80:20 127:4 202:22
**regular**  3:13
  185:13

**regularly**  128:21
  129:4 131:21
**regulation**  74:4
**regulations**  120:14
**related**  48:3 87:11
  87:13 128:19
  132:17 156:22
**relating**  132:1
**relation**  54:3
**relative**  208:5
**relevant**  12:22
**relied**  36:8 80:12
  81:13 104:7 181:10
  184:9,13 194:16
  203:2
**rely**  76:6 81:11,15
  82:10 177:1 203:2
**relying**  150:15,20
  193:9
**remainder**  154:7
**remained**  31:6
**remedy**  89:11
**remember**  15:1
  22:6 24:12 25:6
  28:19 45:8,9,9 49:5
  51:6,9 55:15 63:19
  63:20 66:10 68:3,8
  69:13 72:15 76:4
  79:16 84:10 86:21
  119:15 122:8
  123:18 149:22
  174:3 180:12,13,17
  198:4
**remit**  84:23
**remnant**  19:3
**rendering**  63:10
**renovated**  33:12,21
  34:10 40:16 41:7
  41:15
**renovating**  42:15

**renovation**  33:18
41:12
**rent**  28:2 29:18,20
29:22 30:12,13
34:14,18 40:9
93:12 99:2 152:11
162:6 165:14,16
166:1,2,11,20
168:4,14 179:15
**rental**  12:22 15:10
15:11,19,21 16:1,2
16:14 18:5,6 23:10
23:16 42:1,3 55:10
55:12 71:15 92:23
92:23 93:3,8 94:5,6
94:10,17 96:18
109:9 127:22
154:22 161:3
166:18 168:15,17
171:3 174:6 180:15
205:19
**rentals**  24:4 34:12
101:23 102:1
112:17
**rented**  27:22 41:8
152:16 167:3 174:1
175:4 181:3
**renters**  71:1 78:6
96:2 98:2 152:22
**renting**  114:1
152:10 166:10
**reopen**  145:15
**repair**  140:20
173:12,14
**repaired**  97:1
**repairs**  15:21 149:6
172:23 173:1
**replaced**  47:8
204:13
**reported**  1:17

**reporter**  1:18 6:6
6:20 171:21
**represent**  5:10
147:21
**representation**
186:8
**representative**  9:13
61:5,6
**represents**  211:11
**request**  5:7 67:7
73:1 123:22 185:23
**requested**  42:21
212:6
**requests**  10:4
**require**  56:15
78:18
**required**  27:19
47:22 67:22 78:10
208:7
**requirements**
80:14 107:12
**rescuing**  203:15
**research**  86:11
**researched**  86:8
92:22 199:8
**resent**  112:19
**reservations**  15:20
**reserve**  145:15
152:19 184:3
**reside**  8:6,7
**residence**  8:10
27:21 140:8
**resident**  110:3,8
124:21
**residents**  109:10,17
112:12 117:7 124:1
206:14
**resistance**  111:7
**resolution**  136:6
**resolutions**  200:1

**resolve**  89:16 121:3
121:20 199:16,23
208:17 209:7
**resolved**  45:5,13
88:20 136:6 200:8
**resources**  102:23
**respective**  2:3
**responded**  84:8
92:6
**responders**  99:13
100:15 103:13,20
**response**  118:2
123:7
**responsibility**
212:6
**responsible**  46:10
**rest**  146:2
**result**  126:4 134:1
211:17
**resulting**  143:12
**resume**  11:5 122:4
160:6
**resumed**  45:6
**retired**  7:19,19,23
16:9
**retirement**  8:3
**return**  33:16
**returned**  212:12,15
**reuse**  156:16
**revealed**  121:11
**revenue**  154:3,22
163:11 172:10,11
172:14 173:7,9
175:15 178:3,10
181:23 190:14
**revenues**  153:16,22
153:23 154:20
176:23,23,23 190:1
190:2
**review**  9:10 10:12
80:9 197:6 202:7

212:7
**reviewed**  9:21 10:3
10:8,14,23 11:13
13:7,14,21,22 14:2
120:13 184:15
**revised**  121:3,19
137:14 142:12
196:8
**revision**  63:22
66:11 67:5,9,9
**revisions**  66:12,16
**revocation**  86:18
207:21 208:8
**revoked**  84:23
209:3,10 210:3
**reworking**  156:23
159:9
**rezoning**  128:11
**right**  7:1 9:1 12:12
12:18 13:16,20
17:3,19,20 18:13
19:19 21:19 22:8
25:2 27:4,12,13
28:9,21 32:12
33:21 35:9 38:6
41:1 42:11 43:18
47:16 49:13 52:3,9
52:10,16 54:10,20
54:22 55:17 58:5
58:10 61:16 63:5
64:8,17 67:3,4 68:3
68:12 73:2 74:6,12
75:3 77:9 78:8,11
79:17 80:3,5,7 86:6
87:18,19 89:22
90:5 92:23 95:18
100:1,2 102:1
103:18 106:14,17
107:1,4 108:3
113:7 114:7 115:21
123:19 127:7 128:6

134:16 135:10 138:7,18 141:6,8 141:23 142:9,10 143:16 144:15,20 145:4,10,15 146:10 146:12 150:5 151:10 152:3,5,7 153:4,8 154:6 155:8 157:23 158:8 158:12 160:10,14 165:19,21 168:23 169:1,13,17 171:10 172:7 173:5,22 174:9 175:4,10,11 175:19 176:2,16 177:13,14,23 178:5 179:19 180:21 182:17,18 184:4,12 184:16 185:4 190:23 191:1 192:14 194:10,13 196:4,6 198:8,13 199:3,8 200:20,23 202:5,6 204:5 207:4,7 210:7

**risk** 206:4

**road** 39:13,13 42:12 43:8 77:3,4 97:21,21 104:21

**roadways** 103:12 103:16

**role** 70:21

**roll** 147:11

**rolls** 147:10

**roman** 23:17,19 24:16,18 42:5

**roof** 204:16

**room** 67:12 75:17 76:13 79:1,5,21 82:6 156:15 165:1 180:15 196:19 204:15

**rooms** 68:23 99:5 99:17 108:23 156:13 158:14 161:11

**rouge** 8:8

**rough** 157:9 159:11 178:17

**roughly** 156:4,5 160:19 164:3,9 169:14 178:13,16 178:19 180:11

**round** 159:12

**rule** 213:6,7

**run** 31:2 89:14 165:8

**s**

**s** 2:1

**safe** 203:12

**safer** 100:22 107:21 203:14

**safety** 45:11 104:11 202:14,22 203:3,6

**sale** 168:8,9,20,23 170:8

**sales** 168:6

**sand** 204:17

**sardines** 165:4

**sat** 127:19

**satisfied** 196:9

**save** 99:13 100:15

**saw** 47:15 129:15

**saying** 35:11 47:14 75:6 91:10 93:9 107:13 114:10,15 114:20 126:7 128:19 133:11 207:3

**says** 15:14 62:2 65:22 66:10 67:5 73:1 74:21,22 95:18 96:19 98:22 100:2 102:5,21 116:23 120:21 121:14 123:6,20 128:21 133:20 135:4 143:7 147:4 155:16 160:1 169:2 172:11 174:1 177:6 185:22

**schedule** 137:16 190:5,10 191:4

**scratch** 156:8,9

**screen** 73:19 171:9

**scroll** 9:7 95:10 102:4 185:17

**scrolling** 104:15 141:3

**se** 27:15 36:21

**seal** 212:12

**season** 29:19 30:1,6 30:11 137:6 162:7 162:21 174:4

**second** 3:9 13:4 18:3 33:4 97:7,15 98:21 104:16 109:2 128:18 140:9 153:2 185:4 187:4,19 192:6 201:22

**secret** 40:23 41:21 42:2

**see** 8:20 9:7 11:12 62:1,13 63:22 64:5 67:3 71:21 73:20 74:2 75:12 98:16 98:21 104:6 105:9 112:8 114:11,15 115:8 131:7 143:7 145:22 146:11 150:9,9,12 155:11 162:7 170:20 173:12 185:20 188:21 202:4

**seeing** 118:8

**seeks** 60:21 109:19

**seen** 60:10 95:13 96:20 97:22 98:14 99:4,16,22 100:2 102:3 116:3 118:17 121:17 131:5,10,12 131:16 180:18 185:15 201:12,14

**self** 16:7,10 18:14 18:23 21:2 23:13 178:6

**sell** 36:10 40:11 168:11,18 170:1,20 171:5 180:7

**selling** 39:21 166:8 166:9

**send** 12:14 32:9 212:13

**sending** 129:17

**sense** 22:1 27:4 92:9 105:10 146:22

**sent** 12:1,21 88:14 88:18,22 127:16 131:14 138:11

**sentence** 96:19 99:15,15 103:11

**separate** 21:12 28:17 30:11 33:10 41:20 54:22 172:4 174:6 183:22 205:13

**separated** 149:23 175:16

**separately** 142:17 173:23

**separation** 176:17

**sequences** 51:9

**set** 27:17 32:2 42:19 44:21 77:17

105:17 117:5 148:3
161:3,4
**setback** 42:20
44:21 46:10 107:12
196:13
**sets** 161:17
**settled** 65:15 69:11
**seven** 29:20 65:16
68:4 69:11,12 74:5
74:9 143:6,8
151:12 161:20
**seventeen** 21:8
**seventh** 137:13
**seventy** 22:18 37:9
143:7,8 151:12
191:10
**sewage** 96:20 97:2
**sewer** 104:19
**shady** 212:21
**shape** 101:18
**share** 27:15 76:12
179:14
**shared** 179:8,20
**sharing** 104:14
171:9 200:11
**sheetrock** 158:15
**shoes** 188:11
**shores** 1:6 8:2 9:8
9:13 14:20 15:12
16:20,23 17:4,9,17
22:8,9,13 23:4
25:10,16,23 26:3
28:7,22 29:4 31:19
32:7,15 33:4,5,5
35:5,21,22 36:13
36:14,18,23 37:5,8
37:13,19,22 38:4
38:17,18 40:4,16
42:16 43:16,18
44:15 48:7,14
50:23 52:5 53:7,14

54:1,4 55:6,19 56:4
57:11 59:6 60:14
60:19 63:14,14
69:16 70:20 74:8
78:16 79:15 80:2,8
80:20 83:8,12,16
92:5 93:4 101:5,12
104:22 109:7
114:17,22 118:10
128:4 134:10,13,18
135:10 151:14
153:21 154:3
155:23 164:1,12
165:6 178:12,20
179:6,14 183:1
185:19 189:7,14,22
190:21 202:12,21
203:6,22 204:19
206:13 208:5
**short** 109:9
**shortage** 140:22
**shortly** 88:17,23
**shots** 153:11
**show** 8:18 45:20
60:3 75:13,15 84:4
138:1 145:8 194:10
**showed** 15:13
129:17
**showing** 77:21
**shown** 184:18
**shows** 75:2,4
148:14
**shuttered** 41:13
**side** 22:23 28:15
30:10 65:16 74:9
93:23 96:2,7
160:10,11,13,15,18
161:21 163:22
165:19 175:8 179:8
181:23 182:3 197:2

**sides** 30:12 173:19
179:9
**siding** 158:17
204:12
**sign** 5:8 212:6
**signature** 211:21
212:2,16 214:18
**signed** 26:6 54:2,14
56:13,20 211:18
212:10,12,15
**significant** 23:15
**significantly** 43:4
**similar** 29:10 49:17
97:23 99:7,18
118:9 153:10,12
154:4,11 155:10
160:17
**similarly** 169:21
170:3 178:15
**simple** 108:1 140:5
**simultaneously**
58:5
**single** 27:20 29:15
29:16,17
**singular** 138:12
**sit** 69:20
**site** 10:21 13:22
62:8,14 63:18
65:23 67:13 72:7
84:2,4 121:3,19
136:21 192:11
194:18,19 196:18
196:23 197:5 200:4
**sitting** 58:21 207:7
**situation** 115:4
**situations** 97:23
**six** 36:15 68:1
109:4 137:10
143:10 144:17,18
148:16 149:13,16
177:7,16,22,23

191:8 198:11
**sixteen** 133:20
**sixth** 137:11,13
**sixty** 137:9 141:13
141:16 143:10
144:19 149:13,17
149:20 151:12
155:14 177:12,17
**size** 34:16 65:14
68:1 69:9 71:2 79:2
94:19,22 99:6,17
107:1,8,11 156:4,4
**sizes** 65:14
**sizing** 70:16
**sketching** 53:18
**skip** 159:23
**slash** 143:5
**sleep** 161:7,8
163:19 164:2,12,16
**sleeping** 99:4 102:9
165:2
**slide** 157:6
**slightly** 137:17
140:18
**small** 38:11 71:3
77:21,22 95:2
105:14 116:7
167:16 171:2
**smaller** 29:23 33:6
107:19,22 180:23
**smash** 156:19
**snafus** 153:3
**soft** 6:19
**software** 156:19
**sold** 17:8 19:1,14
23:7 29:13 33:20
33:22 34:1 35:5
36:3,16 41:8,15
48:15 49:5,8,10,14
50:14 51:4 52:9
166:4 167:14 168:3

169:20 180:5
**sole**  30:17,17
  191:13
**solicit**  128:22 132:9
**solicited**  131:22
**soliciting**  129:4
**solidly**  143:22
**solve**  102:21 106:4
  106:10
**somebody**  15:12
**somebody's**  205:1
**soon**  12:12 23:21
  105:2 122:3 145:20
  153:7
**sorry**  24:2,18,19
  44:9 50:4 61:4
  62:18 64:17 86:6
  97:12 113:13
  118:13 122:12
  124:7 125:18 126:7
  134:11 135:12
  137:8 145:5 152:9
  157:12 163:7
  171:21,23 186:13
  187:3 205:4
**sort**  7:16 8:3 11:20
  17:21 18:16 20:6
  43:13,13 44:4,5,12
  46:20 47:12 48:22
  53:4 56:9,16 57:22
  60:18 65:2,4,12,15
  65:20 68:21 69:14
  70:12 87:5 98:20
  114:11 138:1 161:6
  161:16 189:12
  200:19 202:21
  205:7 206:4
**sought**  181:13,14
  186:15
**source**  132:3

**southern**  1:2,3
  40:23 41:20 42:2
**space**  77:9
**spaces**  67:7,21
  74:11 75:3,7 77:18
  78:11,19
**spacious**  159:3
  161:12
**sparking**  78:19
**speak**  6:13 37:15
  84:13 135:9 148:23
**speaking**  6:19
  74:20
**specific**  10:16
  81:20 82:14 114:6
  115:5 133:12
  192:19
**specifically**  40:21
  81:6 92:18 93:19
  100:1 109:3 112:12
  112:21 113:5
  124:20,23 182:10
  198:20 202:19
**specifics**  199:7
**spell**  14:10
**spelling**  14:13
**spend**  193:22
**spent**  142:1 143:1
  146:20 193:21
**spiral**  99:10 100:13
  101:1,7,8,9,11,16
**split**  189:16 190:2,3
**spoke**  113:14
**spoken**  6:19
**spot**  64:9 65:16
**spreadsheet**  12:5
  139:4 151:4 194:10
**sprinkler**  203:5,13
**spruced**  41:7
**square**  170:22

**squeeze**  160:22
**st**  8:9
**stacked**  75:22
  83:13 86:22 119:4
  119:18 120:3,11
**stage**  139:23
**staged**  101:8
**stages**  56:10 81:23
  82:20
**staircase**  99:11
  100:13 101:7,10,11
**staircases**  100:19
  101:1,17
**stairs**  99:6,18
**stairway**  102:7,13
**stairways**  102:8
**stairwell**  101:9,13
**standard**  102:5
  104:9 143:20
**stands**  118:21
**stanton**  3:20 92:19
  93:2,10,19 95:12
  96:13 112:16 131:8
**stanton's**  92:23
  95:1
**start**  5:13 20:1
  32:15 53:1,23
  101:5 108:12 115:8
  156:9,20
**started**  11:3 32:6
  32:17 52:4,7 54:23
  58:7 85:2 115:13
  152:2,6,10,11
  153:6 154:9 169:10
  201:17
**starting**  156:7,17
**starts**  73:22 153:4
**state**  1:19 48:5
  109:10,17 110:3,5
  110:8,20 111:12
  117:7 124:1,21

211:3
**stated**  104:23
  130:19
**statement**  13:6
  15:13 95:23 99:21
  100:6,12,16 102:11
  103:2,15,18 105:23
  109:4,14 119:11
  171:12,17 172:2
  213:8
**statements**  94:11
  172:3 177:1,3
  181:9,17,19
**states**  1:1 48:12
  213:7
**stating**  5:13 121:18
**stay**  71:23 94:15
**stayed**  31:9 204:23
**stems**  112:15
**stenotype**  211:8
**stepped**  188:11
**steps**  53:14
**steve**  12:5 14:21
  15:6 46:2 55:7,13
  55:21 64:12,15
  70:10,14 81:15
  84:1,5,13,15 88:8
  88:13,14,22 121:7
  138:23 140:23
  148:3,18 150:22
  181:16 182:2 193:1
  193:5 201:18 202:5
**sticker**  62:1
**stipulated**  2:2,9,16
**stocks**  16:14
**stop**  44:17 45:2,7
  81:2,4 82:3,23 83:6
  83:8,21,23 84:1,16
  88:17 89:5 104:14
  112:21 117:17
  121:4,21 122:6

123:23 124:20
125:17,20,21 127:9
127:12 129:22
133:23 134:5
135:23 136:4,18
191:10 195:14
197:13 199:10
200:11 207:20
208:7,11,18
**stopped** 32:5 87:22
**stopping** 126:16
**stories** 28:15 65:11
99:10 102:9 103:9
104:2,5 106:7,16
108:18 156:7
158:10 160:20
186:2
**storm** 136:11
**story** 29:12 90:17
99:1 102:6,21
103:5,6 105:4
106:1,10 107:17,18
108:20 112:6
116:16,17 118:9,22
118:23 122:11,12
122:13 133:5
155:14,23 156:14
156:16 157:4
158:10,12,20,21
159:1,2 160:9,16
**straight** 58:16
163:1,6
**straightened**
147:18
**street** 4:5 17:16
92:21 93:1,23
95:21 96:3,7 116:5
136:8 160:14
166:16,19 179:19
180:4 205:8

**stressed** 67:16
**strictly** 19:2 113:3
**strike** 107:7
**strikes** 112:10
**struck** 171:1
**structure** 181:3
189:21 203:17
**stuck** 136:2
**stuff** 59:3 156:18
**subcategories**
147:11
**subcontractors**
148:2,4,6,11
**subject** 28:21
128:15
**submit** 81:8 82:2
130:5 132:14 151:7
194:19 196:8 197:6
**submitted** 10:18
70:1 201:1 202:8
**submitting** 81:10
151:2
**subscribed** 214:19
**subsequently**
194:21
**substance** 95:11
213:7
**substantially**
154:19
**substantively**
121:18
**substituted** 12:2
**subtract** 149:15
**subtracts** 173:15
**successful** 55:12
**succumb** 113:1
**sudden** 115:12
**suddenly** 112:2
114:7,13 115:8,15
128:6

**sue** 136:13
**suggested** 40:5
**suggesting** 129:19
**suit** 96:14
**suites** 164:20
**summarization**
127:13
**summarize** 138:2
171:18
**summarized** 9:23
**summer** 19:15,16
19:17 30:13 95:18
96:5 137:3 152:7
153:7 173:21
190:13,15
**summers** 154:13
**sunwest** 187:23
188:4,12
**supplement** 145:20
183:21
**supplementation**
184:6
**support** 139:13
**supposed** 147:21
**suppress** 196:21
203:16
**sure** 6:4,19,20 7:2
13:1,19 25:13,17
26:10 31:14 46:9
48:18 50:8 54:22
59:17 60:22 61:16
62:14 66:4,7,23
68:9 75:8 76:13
80:6 81:19 84:13
89:20 90:4 94:1
98:1 100:4 103:18
106:20,21 107:2,20
120:12 130:13
139:11 143:14,23
145:21 147:13,18
151:5 154:1 158:8

158:15 172:8
175:23 176:16
178:7 179:5 185:16
186:12,18,19 189:1
189:5,10 190:11
203:8,11 206:9,18
207:2 209:11
**surprised** 149:8
**survey** 10:21 13:22
44:22 65:22 194:18
**surveyed** 75:8
**sweet** 64:9 65:15
**switch** 171:9
**switched** 120:7
188:6
**sworn** 5:2 214:19
**system** 203:5,14

**t**

**t** 2:1,1
**table** 7:7
**take** 7:9 28:3 34:15
47:16 52:12 57:21
58:17 105:17
106:23 108:6,8
113:5,14 120:22
126:16,18 129:14
137:15 145:22
151:17 152:13,15
158:11 187:8 206:5
**taken** 1:17 2:5 44:6
53:13 116:13 211:7
**takes** 201:7
**talk** 6:3 13:18 14:6
27:5 38:14 44:16
47:20 55:13 70:22
71:9 81:3,15 82:9
100:3 107:8 122:20
130:6 143:4 145:3
148:18 151:9 170:5
182:4

**talked** 13:21 14:8 14:20 15:7 16:1 24:2 38:6 40:15 41:5 42:6,11 44:4 44:10 55:14,20 56:5 57:10 70:17 72:22 75:1 80:16 80:20 82:23 88:8 88:19 92:1 122:17 128:16 130:3,11 134:3 135:2 142:6 156:1 174:9,10 178:23 181:13 182:2,9,13 189:3 190:19 192:14 196:12 202:19 206:11,20
**talking** 11:15 13:20 28:11 43:17 48:1 52:4 56:1,7 58:16 59:2 64:11 82:1,8 82:14 84:21 85:9 86:13 93:15 101:15 108:18 115:5 122:23 131:6 140:11 141:4 150:8 155:5 170:16,16 173:6 182:8 192:20 197:22 198:6,13
**talks** 148:20 192:9
**tall** 104:6
**target** 161:21
**targeted** 112:11 116:21 151:14 161:22
**tasked** 151:2
**taupeka** 3:15 56:10 85:10,16 89:21 135:4
**tax** 190:5
**taxes** 8:11
**tell** 5:3 6:18 20:17 28:8,12 29:8 48:14 57:19 59:10 64:12 64:13 67:1,5 69:8 70:19 75:11 78:7 83:22 84:13 85:13 86:19 87:21 91:6 91:13,16 95:15 103:4 111:23 118:16 119:10 130:21 135:22 137:20 138:3 144:16 145:13 147:15 178:1 180:21 185:10 196:6 200:20
**telling** 9:18 125:4 141:19
**temporary** 45:1
**ten** 143:11 144:18 160:9,18 161:2 162:4,13 170:10 179:18,22 180:3 181:5 187:9
**tend** 164:18,22 167:8 190:12,15
**tends** 55:16 162:13
**tens** 192:12
**term** 17:20 75:22 75:23 109:9 115:16
**termite** 147:2
**terms** 16:19 61:1 64:19 75:18 77:13 78:8 82:10 107:15 150:15 154:17 166:2 167:13 182:7 184:10 187:2 189:21 195:14
**test** 7:4 63:6 68:12
**testified** 5:4 184:8 190:20
**testify** 7:15 209:23
**testifying** 9:14
**testimony** 10:13 58:22 108:13 127:4 127:13 184:12 187:14,15 207:8,23 211:12 213:2,7
**text** 88:14,18,23
**thank** 42:10 47:17 126:11
**theoretical** 115:3
**theories** 147:17
**thereto** 2:15 211:8
**thing** 7:6,16 12:19 47:7 56:9 58:14 59:1,16 65:20 70:21 97:13 117:17 121:8 125:20 138:16 147:17 158:8 165:13 184:2 200:19
**things** 16:13 38:14 46:12 47:18 55:11 57:16 58:8 66:19 70:3 71:1,16 86:2 89:14 105:21 129:16,19 140:13 140:20 143:19 144:11 147:10 149:1,7 150:8,20 156:16 184:14 191:12 193:1,6 199:2 204:17
**think** 5:19 11:18,22 12:1 19:15 26:6 37:3,17 38:10 49:22 50:21,21 51:5,17 58:18 67:8 69:18 70:7 72:17 75:13 79:16 82:4 87:16 92:19 98:16 99:20 100:5,12 110:17,21 111:10 113:18 114:21 122:9,21 123:4,4 124:11,14,16 125:6 131:10,15 132:3 136:14 138:12 140:16 144:2,6,10 147:8,8 149:21 150:4,15,22 152:3 158:1,22 163:20 169:9,22 171:10 172:5 174:14 178:1 178:23 181:12 186:14 188:22 189:1 193:2 200:1 202:9,15 206:6 207:11,14
**thinking** 24:14 125:12
**third** 17:6 22:5 35:15,19 50:11 74:6 99:9 102:9 103:11 111:17 201:22
**thirds** 17:5 22:4
**thirteen** 128:20 144:18,21 151:11
**thirty** 13:9 123:20 148:16 164:9 165:9 177:8,16
**thomas** 20:21 30:16 30:22 61:3 70:4 80:3
**thought** 48:23 57:2 61:10 85:22 170:20
**thousand** 11:19 12:6 21:13 36:15 37:9 49:23 135:22

137:1,10,18 141:6
141:13,16 143:9,11
144:21 146:15,18
148:15,16 149:13
151:11 155:15,18
157:2 159:9,12
167:20 177:7,16
191:8
**thousands** 192:12
**threatening** 116:6
136:9
**three** 13:9 21:9
28:15 29:11 35:3,4
68:1,2,9 95:3 103:6
109:4 112:6 116:17
118:9,22,23 122:11
135:21 137:1 141:6
143:9 149:17
155:15,18,23
156:14,20 158:20
160:4 161:13
168:14 169:14
177:8,21 180:19,20
**threw** 144:12
**throw** 115:3 165:13
165:18
**tickets** 78:7
**time** 2:13,14 6:8
7:3,5,13 11:3 26:7
32:20 34:23 35:2
35:14 38:7 45:4
49:10,13 50:1,2
51:1,8,18 52:5,8,16
52:20 53:3,12
55:16 59:7,20
61:11 69:5 74:14
74:15,17 78:15,16
83:13 88:16 89:22
117:22 118:1 122:6
122:7 123:13 128:7
135:7 140:14

145:15 146:3
151:18 154:11
169:17 180:9 183:8
183:16 187:6 192:3
192:6,18 200:18
201:5,6 212:15
**timed** 112:3
**times** 69:23 96:6
98:1 120:8 122:20
130:23 133:16
164:3 172:12
184:17 188:20
199:4 207:6
**timing** 113:5,6,14
113:22 114:19
128:1
**tiny** 161:1
**today** 7:15 9:14,20
12:15 15:8 41:19
137:15 141:22
154:17 155:6
187:15 206:11
207:6,9 210:1
**told** 32:22 52:17
86:16 88:8 92:14
115:21 119:8
129:11 138:15
171:19
**tom** 25:17,20 30:23
31:22 35:6 36:8
37:16 41:15 48:21
49:9,11 55:18,23
56:17 57:6 61:5,10
180:6 188:19
189:18
**tom's** 41:16 180:19
190:8 191:20
**tommy** 24:9
**top** 15:1,14 30:4
99:4,16 102:14
135:3 159:2 170:12

174:4 193:19
**topics** 9:9,14
**total** 13:9 137:22
141:14 142:21
146:14 147:2 150:6
156:10 163:11
166:2 172:10,11
175:15
**totally** 36:8 41:14
56:17 70:6 81:13
114:3 156:12
184:13
**totals** 176:13
**touch** 31:9
**town** 167:10
**track** 40:2 59:14
**traditional** 102:7
**traffic** 105:1
**trailed** 86:6
**transcribed** 211:9
**transcript** 8:17
11:10 60:2 61:21
72:12 73:6 95:7
98:11 134:23 185:8
211:11 212:7,13,15
213:2
**transcription**
211:10
**transferred** 50:5
51:13,21 52:8
**transition** 33:18
**treated** 82:4 111:11
206:14 208:22
209:1
**treatment** 147:2
190:6 206:20
**trial** 2:13
**tried** 47:21 65:13
84:19
**trip** 205:23

**trouble** 59:14 78:2
113:11
**truck** 78:1 197:3
**true** 99:22,23
102:12 158:13
211:11
**trust** 16:7 18:14,15
19:1 21:3 187:23
188:3,10,12
**trust's** 188:4
**trusted** 57:6 80:17
80:18
**truth** 5:3,3,4
**try** 6:3 39:14 59:6
71:16 91:4 96:10
125:20 126:2 165:2
**trying** 53:2 59:18
63:5,6 71:17,20
79:16 82:16 83:2
94:2 107:14 114:9
114:14 154:23
165:11
**turmoil** 116:20
**turn** 73:16 109:1
135:12 159:16
**turquoise** 32:19
41:5
**turtle** 47:4
**twelve** 27:11 29:9
29:11,18,21 30:6
69:10 160:22 162:5
166:7
**twenties** 38:15
**twenty** 21:6 22:19
30:23 38:11 49:23
57:7 109:4 116:23
120:21 123:6 141:5
144:17 160:4,4
163:22 172:19
173:15 177:7

**twice** 58:9 59:19
**two** 12:6 13:16 17:4 20:19 22:4 27:11 27:12,13 29:1 33:22 35:2,4,14 39:15 40:21 45:6 64:8 95:2 98:13 102:5,21 103:5 105:4 106:1,10 108:7 114:11 116:16 123:2,20 137:9 146:15 149:13,16 155:14 156:1,6,16,20 157:4 158:10,10,21 159:1,2 160:2,3,9 160:16,20 161:11 163:22 172:19 173:15 177:12,17 177:22 179:14 186:3 189:16 192:1 205:13,19 207:15
**tyco** 31:8 32:3
**type** 53:5 139:3 208:6
**types** 107:16 113:19 115:6 157:8 178:19
**typically** 152:13

**u**

**u** 2:1 39:13 126:10
**uh** 6:5
**unaware** 123:11
**underneath** 47:4
**undersigned** 213:2
**understand** 6:9 48:18 59:14 77:11 78:5 96:1 114:5 143:15 154:1 178:8 207:3
**understanding** 59:17 87:14 120:16 121:1 142:23 143:3 194:14 201:3
**understands** 71:13
**understood** 56:17 136:15 184:7
**unduly** 117:15
**unfortunately** 62:22 64:3
**unh** 6:5,5
**unilaterally** 123:22 124:5
**unimpacted** 94:15
**unit** 29:23 30:11 75:3
**united** 1:1 48:12
**units** 32:22 33:10 71:11 74:5 171:3 204:12
**unnecessary** 99:12 100:14
**unobstructed** 116:10,12
**untrue** 100:8
**update** 11:4 12:6 140:1
**updated** 3:22 11:17 12:1,3 15:5 135:15 137:17,23 138:5,11 141:4 142:11 143:8 144:4 145:8,17 181:8
**uphill** 97:3
**upper** 76:20
**ups** 167:19
**upset** 93:9 116:8,19
**upstairs** 99:11 100:13
**use** 10:2 27:14 46:13 71:18 75:21 81:9 82:2 115:15 129:1 132:1 165:23 178:19 193:12 194:15,20 195:1 197:10 200:22 202:2 207:21 208:8 209:3,7 210:2 213:9
**usually** 26:7 86:15 141:2 152:17,23 153:3 161:10 194:17 201:20
**utility** 146:14

**v**

**v** 14:11
**vacant** 107:5
**vacuum** 113:7
**value** 36:12 167:13 191:8
**variance** 42:14,17 42:22 43:5 44:20 47:13 132:23 133:1
**various** 93:22 96:3 119:13 184:23
**varying** 164:16
**vehicle** 68:8 78:1 98:4
**vehicles** 76:14 79:1 79:5,22 86:23 95:20 96:7,8
**vendetta** 124:12
**verbal** 69:19 121:15 122:16
**veritext** 212:10,20
**veritext.com** 212:18
**version** 11:17 12:3 75:2 137:17 138:11 142:11 151:6
**versus** 59:6 104:5 137:15 155:3 159:5 168:2 170:9 178:15 179:14,22
**videoconference** 1:13,16,22 2:4,7 4:1
**view** 116:12,15,18 164:19
**views** 116:10
**vince** 3:21 10:9,12 62:3 84:20,21 88:8 88:19 89:1 91:22 91:23 92:6 95:12 121:7 123:3 124:4 124:12 126:3
**vince's** 117:13
**violation** 129:20
**virginia** 1:18 2:5
**virtual** 1:12 6:2
**virtually** 99:2,10 100:7
**vociferous** 92:20
**voiced** 148:21 149:2
**voted** 39:17
**vs** 1:8

**w**

**waiting** 23:22 200:19
**waived** 2:18
**walker** 4:9
**walks** 86:15
**want** 6:22 9:16 12:23 20:15 27:23 30:9 40:7 58:21 59:18 64:21 68:12 69:4,22 71:1,23 73:16 74:23 76:9 77:15,16 80:6,22 89:10 90:2 94:4,9 94:12,13,14,18 98:12 110:15,18,23

114:3 126:18 127:4 147:22 159:19 164:6 168:11,18,19 178:6 187:16 203:12 207:2,8 208:10
**wanted** 10:22 13:1 13:19 21:10 35:18 53:11 56:16 58:14 64:14,21,22 65:18 67:12,19 68:16 69:6,8,9 71:2 76:22 86:2 146:5 197:4 206:18
**wanting** 186:19
**washed** 205:2
**water** 104:19 204:15
**way** 33:16 37:18 43:3 45:11 53:9 65:17 67:17 76:9 77:15 78:21 79:21 82:7 84:19 87:5,17 102:13 105:15 106:17,20,21,23 107:20 112:3 114:2 114:4,6,12,16 115:9,10,11 116:14 119:9 125:3 128:8 129:22 136:15,18 140:12 146:22 153:2 156:13,21 158:23 159:5 175:22 186:10 197:3 199:1 200:9
**wayne** 3:19
**ways** 14:13 106:5,9 106:14 107:15 117:16 175:16 206:12
**we've** 8:22 11:22 13:23 16:1 25:1 31:6,8 39:6 42:6 44:4,10 47:18 48:15 57:20 59:1,4 62:4 76:6,14,21 87:17 95:9 104:7 112:19 116:14 134:3,8 135:2 141:9 146:20 153:11 154:13 165:8 178:23 187:12,21 188:20 192:13 196:4 198:12 205:20 206:17,19 207:5,5
**webb** 4:9
**website** 72:1 93:5
**wedding** 93:7
**week** 192:19,22,23 194:4
**weeks** 29:14
**went** 10:20 31:23 32:22 47:14 51:13 85:2 90:12 92:21 96:23 128:14 162:10 193:9
**west** 28:8 29:4,6,7 33:5 173:18 175:3 175:7,8,10,19 176:4,5 177:11,16
**wheels** 48:22
**wide** 100:19
**width** 102:7,13
**wife** 20:4,10 84:6
**wife's** 23:13
**window** 155:2
**windows** 157:1,8,8 157:13,13,13,16,19 204:14
**wish** 58:19
**withdraw** 209:12
**withdrew** 39:20
**witness** 5:2 187:5 211:12 212:18
**word** 125:23 126:7 126:8,12 134:11 136:15 163:9
**worded** 185:1
**words** 83:14 125:19 136:14 186:23 208:14
**work** 5:18 31:1,4 34:11 36:9 44:18 45:2,7,21 53:20 54:18 57:16 71:1 81:2,4 82:3,23 83:6 83:8,21,23 84:1,16 86:2 87:22 88:17 89:5 107:18 109:19 114:2 121:5,21 122:6 123:23 124:20 125:17 127:9,12 133:23 134:5 135:23 136:4 136:18 140:20 143:18 153:1 191:10,21 193:3 195:14 197:13 199:10 207:21 208:7,11,18
**worked** 23:13 31:5 34:11 47:22 84:19 183:13 199:4
**workers** 45:12
**working** 8:3 32:3 54:1,23 55:1 70:1 91:1 183:14
**works** 71:7 86:1 107:4,5 148:3 156:21
**world** 6:2 147:14
**worry** 71:16 92:10 92:13
**worrying** 203:14
**worse** 100:23
**wrapping** 26:9
**wright** 61:4
**writing** 61:8 133:10
**written** 76:5 121:15,17 132:18 135:8
**wrong** 47:7 66:5 87:16 97:13 193:8 195:9 196:16
**wrote** 66:5

x

**x** 79:1

y

**y** 14:11 20:21
**y'all** 26:23 48:16,20 60:16 72:3 126:18
**yeah** 6:22,22 12:4 12:20 15:4 19:9,11 19:12 21:8 27:4 38:15 43:16 44:9 46:15 50:4 51:8,17 59:16,16 60:7,8,9 60:22 62:12 63:3 63:12 64:5,20,20 67:8 69:1 72:20 73:18 74:8,13 75:4 77:12 79:13,13 83:1 85:11 89:23 90:6 94:12 97:13 100:3 101:19,19 104:4 106:20,20 115:1 117:13 118:13 119:23 120:6 122:12 126:2

126:2,12 128:13
131:15 133:15
138:23 141:18
143:3 144:15 145:1
146:4,7,21 148:3
149:15 150:9 151:8
152:11 156:9 158:1
158:22 160:11
168:9 171:11,11,17
173:13 174:12,14
174:17 176:7,16,19
178:1 183:5 186:18
187:7 192:15,20
193:18 195:7
196:17 200:14,20
201:1 202:4 204:1
204:2 205:15
206:17 207:1,2
**year**   19:1 25:4,7
  50:21 52:2 118:1
  140:6,11 149:4
  151:17 154:7,8,13
  154:15,15,16 155:4
  163:12 165:16,16
  166:1,2,3 168:10
  169:10 174:18
  176:15 190:17
  204:5 205:20
**yearly**   190:14
**years**   7:21,23 18:1
  23:14 30:23 31:6
  33:3,7 41:13 57:7
  79:6 115:9 155:1
  165:15 168:14
  180:6,8,19,21
**yesterday**   11:23
  14:9

**z**

**zero**   147:3,4,5
**zoning**   3:17 39:11
  39:14 40:1 42:12

43:9 73:11 74:13
75:19,20 80:10,21
81:12,16,22 82:11
82:12,18,19 83:9
94:3 129:2 130:15
132:2,15,21 184:10
184:16
**zoom**   1:13,21 2:6
  4:1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.