# EXHIBIT I

# MIKE BORDELON, et al.

## v

# BALDWIN CO., ALABAMA, et al.

## VINCE JACKSON

### December 29, 2020



www.alabamareporting.com  *  877.478.3376

Page 1

1       IN THE UNITED STATES DISTRICT COURT
2       FOR THE SOUTHERN DISTRICT OF ALABAMA
3            CIVIL ACTION NUMBER
4              1:20-CV-00057C
5
6  MIKE BORDELON and BREEZY SHORES, LLC,
7         Plaintiffs,
8  v.
9  BALDWIN COUNTY, ALABAMA; BALDWIN COUNTY
10  COMMISSION DISTRICT 4 PLANNING AND ZONING BOARD
11  OF ADJUSTMENT; and VINCE JACKSON,
12         Defendants.        CERTIFIED COPY
13
14      VIRTUAL DEPOSITION OF VINCE JACKSON
15           DECEMBER 29, 2020
16              9:00 A.M.
17
18      The deposition of VINCE JACKSON was taken
19  virtually before Tayler Nouwen, CCR, on December
20  29, 2020, by the plaintiffs, commencing at
21  approximately 9:00 a.m., whereupon all parties
22  appeared virtually, pursuant to the stipulations
23  set forth herein.

Page 2

1        S T I P U L A T I O N S
2       IT IS STIPULATED AND AGREED by and
3  between the parties through their respective
4  counsel that the deposition of VINCE JACKSON, may
5  be taken before Tayler Nouwen, Certified Court
6  Reporter, Notary Public, State of Alabama at
7  large, whereupon all parties appeared virtually,
8  on December 29, 2020, commencing at approximately
9  9:00 a.m.
10
11      IT IS FURTHER STIPULATED AND AGREED that
12  the signature to and the reading of the
13  deposition by the witness is not waived, the
14  deposition to have the same force and effect as
15  if full compliance had been had with all laws and
16  rules of Court relating to the taking of
17  depositions.
18
19      IT IS FURTHER STIPULATED AND AGREED that
20  it shall not be necessary for any objections to
21  be made by counsel to any questions, except as to
22  form or leading questions and that counsel for
23  the parties may make objections and assign

Page 3

1  grounds at the time of trial or at the time said
2  deposition is offered in evidence, or prior
3  thereto.
4
5       IT IS FURTHER STIPULATED AND AGREED that
6  notice of filing of the deposition by the
7  Commissioner is waived.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1             I N D E X
2
3
4        EXAMINATION INDEX
5                    PAGE
6  EXAMINATION OF VINCE JACKSON
7     BY MR. ANDERSON        8
8
9
10
11        EXHIBIT INDEX
12  PLAINTIFFS'                    PAGE
13  1 - Land Use Certificate Application    35
14  2 - Plaintiffs' Building Plans       43
15  3 - Jackson Letter July 31st 2019      45
16  4 - Fish and Wildlife Document        75
17  5 - E-mail Chain              77
18  6 - November 2019 Appeal Document      88
19  7 - Staff Report             89
20  8 - Photo of Eazy Breezy House       108
21  9 - Letters and E-mails         113
22  10 - July 3, 2019, Letter        122
23  11 - Parking Ratio Letters        135



Page 5

1   12 - Staff Report              137
2   13 - County Commission Agenda       141
3   14 - Text Amendments           147
4   15 - Favor/Opposition Letters       169
5   16 - Mindy Smith E-mail        175
6   18 - Vince Jackson Interrogatories    179
7   19 - Photo of Stop Work Order       190
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 6

1       A P P E A R A N C E S
2
3   VIRTUALLY APPEARING ON BEHALF OF THE PLAINTIFFS:
4       Kristopher Anderson, Attorney at Law
        Clark Partington
5       4725 Main Street, Suite F-222
        Orange Beach, Alabama 36561
6
7   VIRTUALLY APPEARING ON BEHALF OF THE DEFENDANTS:
8       Jamie Kidd, Attorney at Law
        Webb & Eley, P.C.
9       7475 Halcyon Pointe Drive
        PO Box 240909
10      Montgomery, Alabama 36124
11
        Lauren Collinsworth, Attorney at Law
12      Stone Crosby, P.C.
        7823 Highway 59 South
13      Foley, Alabama 36535
14
15
16
17
18
19
20
21
22
23

Page 7

1       I, Tayler Nouwen, a Certified Court
2   Reporter, and a Notary Public for the State of
3   Alabama at Large, acting as Commissioner, certify
4   that on this date, pursuant to the Alabama Rules
5   of Civil Procedure, and the foregoing stipulation
6   of counsel, there came before me, via
7   videoconference, commencing at approximately 9:00
8   a.m. on December 29, 2020, VINCE JACKSON, witness
9   in the above cause, for oral examination,
10  whereupon the following proceedings were had:
11      THE COURT REPORTER:  The attorneys
12  participating in this proceeding acknowledge that
13  I am not physically present in the room with the
14  witness and that I will be reporting this
15  proceeding remotely.  Counsel further
16  acknowledges that the witness will be sworn in
17  remotely by me.  The parties and their counsel
18  consent to this arrangement and waive any
19  objections to this manner of reporting.  Are
20  there any objections?
21      MR. ANDERSON:  No.
22
23

Page 8

1           VINCE JACKSON
2       Being first duly sworn, was examined
3           and testified as follows:
4
5       THE COURT REPORTER:  Is this usual
6   stipulations?
7       MR. ANDERSON:  Yes.  That's fine.
8       MS. KIDD:  That's fine.  We'd like to do a
9   read and sign, but yeah.
10
11          EXAMINATION
12  BY MR. ANDERSON:
13      Q.  All right.  Good morning, Mr. Jackson.  My
14  name is Kris Anderson, and I represent the
15  plaintiffs in this case.  I'm going to be asking
16  you some questions today.  First, let me ask, can
17  you hear me okay?
18      A.  Yes.
19      Q.  Okay.  Good.  Just to make this as easy as
20  possible as we go through this, I'm just gonna
21  give you some rules for the deposition that really
22  are intended to make things as easy as possible
23  for the court reporter.



ALABAMA
COURT REPORTING

Page 9

1      So the first one is, if you don't
2  understand anything I ask you today, will you let
3  me know?
4      A.  Yes.
5      Q.  It's also really important to give
6  affirmative answers, so no shaking your head and
7  no nodding or saying "uh-uh" or "uh-huh" because
8  all of those show up the same or not at all on a
9  transcript, and so everything just needs to be
10  oral and affirmative; is that okay?
11      A.  Yes, sir.
12      Q.  All right.  If you need to take a break at
13  any point today to use the restroom or anything
14  else, no problem at all.  We can't take a break
15  when there's a question on the table, but if
16  you've answered the question, no problem taking a
17  break any time.
18      And last thing is, your lawyers may object
19  to my questions today.  Generally, the objection
20  is objection to form.  If you hear that, you can
21  still answer, and you're expected to answer.  The
22  only time you wouldn't answer is if your lawyer
23  tells you not to or if we're getting into

Page 10

1  privileged territory, and it's not my intent to
2  talk about anything protected by attorney-client
3  privilege; is that fair?
4      A.  Yes, sir.
5      Q.  All right.  Are you currently taking any
6  medications, anything like that, that would affect
7  your ability to testify here today?
8      A.  No, sir.
9      Q.  Have you given any affidavits,
10  declarations, or any other testimony related to
11  this case to anyone?
12      A.  We have provided information to the
13  attorneys that was requested, but that's all.
14      Q.  Is -- in terms of what you provided to the
15  attorneys, did you sign any declarations or
16  affidavits or anything like that?
17      A.  I believe so.
18      Q.  Okay.
19      MS. KIDD:  He -- there is -- he hasn't --
20  we haven't done any -- there's nothing else
21  sworn.
22      MR. ANDERSON:  Okay.
23      MS. KIDD:  Yeah, yeah.  I know what you're

Page 11

1  asking.  Yeah, no, there's nothing else that's
2  been sworn.
3      MR. ANDERSON:  Okay.
4      Q.  Mr. Jackson, for the record, can you
5  provide your full name and your address?
6      A.  James Vincent Jackson Jr., 1011 Blackburn
7  Avenue, Bay Minette, Alabama 36507.
8      Q.  Have you ever been a party to another
9  lawsuit, so a plaintiff or a defendant?
10      A.  Yes.
11      Q.  Tell me about all of those that you can
12  remember.
13      A.  It was some creditor issues, but they've
14  been resolved.
15      Q.  When did that take place?
16      A.  I don't remember the exact dates.  It's
17  been within the past five years.
18      Q.  And was that in Baldwin County?
19      A.  Yes.
20      Q.  Anything related to your job with Baldwin
21  County?
22      A.  Other than this current case, I've never
23  been sued in my capacity as an employee, if that's

Page 12

1  what you're asking.
2      Q.  Yes, sir.
3      A.  Yes.
4      Q.  Have you ever been a witnesses in any
5  other litigation as part of your job with Baldwin
6  County?
7      A.  Yes.
8      Q.  Which -- can you tell me about each of
9  those cases where you've been a witness?
10      A.  There have been several over the years.
11  I've been in the field for about 28 years.  I've
12  worked for the County for 18 years.  There was --
13  there was a case involving a conditional use
14  approval for a volunteer -- a new volunteer fire
15  department in the Lillian area which went to
16  court, and I testified in that case.
17      There was a case involving a heater
18  dispute.  This was several years ago.  I can't
19  remember the exact year.  I testified in that one.
20  And then there have been others where some of our
21  enforcement cases where we -- we would go to
22  court, but there might be a settlement, and we'd
23  have to go to state on the record that we agreed



Page 13

1  to the settlement.
2      So I -- there are a number of zoning cases
3  over the years that I've been involved with.  I
4  can't tell you exactly how many, I can't tell you
5  the exact years, but those are some that
6  immediately come to mind.
7      **Q.  Would the County have records for each of**
8  **those?  I know I'm asking you about a long time**
9  **period, so I understand if you don't remember --**
10     A.  Yes.
11     **Q.  -- but they'll have those records?**
12     A.  We should, yes.
13         MR. ANDERSON:  Jamie, we'll just ask you
14  to supplement if those aren't already included in
15  what you just produced.
16         MS. KIDD:  So -- okay.  Well, we may need
17  to talk about that because not all of those, I
18  think, would be responsive to the discovery
19  request.  So, for example, the fire -- like, I
20  would not have thought that the firehouse --
21  which I know about that one because I went up --
22  we went up to the Alabama Supreme Court, and I
23  read the brief for it, so I have personal

Page 14

1  knowledge of that, but that was -- that was a
2  challenge from a resident against the fire
3  station.  It didn't involve a variance or
4  anything that I'm remembering.
5         MR. ANDERSON:  Okay.
6         MS. KIDD:  They were trying to stop the
7  fire station, so not everything is responsive.
8         MR. ANDERSON:  Well, we can talk about
9  what's responsive after this.  That's fine.
10         MS. KIDD:  I mean, we'll -- it's all
11  public record.  I'm just saying that I think that
12  there's a lot of permutations that's in these
13  cases.
14         MR. ANDERSON:  Okay.
15         MS. KIDD:  That may not be...
16         MR. ANDERSON:  Understood.
17         THE WITNESS:  If I may, I mean, like I
18  said, there have been a number of different cases
19  where we have had -- I can think of the two that
20  I mentioned where I actually testified.  There
21  have been a number of cases where we've had to
22  provide information to our attorneys, but I can't
23  think of any situations like this current

Page 15

1  situation, if that helps at all.
2      **Q.  (By Mr. Anderson)  Okay.  Have you ever**
3  **been involved in a bankruptcy proceeding?**
4      A.  No.
5      **Q.  Have you ever been arrested?**
6      A.  No.
7      **Q.  Ever convicted of a crime?**
8      A.  No.
9      **Q.  Just give me a quick rundown of your**
10  **educational history; where you graduated, what**
11  **years, high school, college, any graduate degrees.**
12     A.  I graduated from Baker High School in
13  Mobile in 1984.  I graduated from the University
14  of South Alabama with a degree in political
15  science and a minor in English in 1988.  I went to
16  the University of Alabama in 1989 and attended one
17  year of law school, and then I graduated from the
18  University of Alabama in 1993 with a double major
19  in regional and urban planning and geography.
20     **Q.  And what did you do after you graduated**
21  **with the degree in regional and urban planning in**
22  **1993?**
23     A.  That -- the last course requirement that I

Page 16

1  had was to work an internship, and I did the
2  internship with the City of Northport in
3  Tuscaloosa County, and that eventually became a
4  full-time position, which was my first actual
5  planning job out of college.
6      **Q.  What was your title at the City of**
7  **Northport?**
8      A.  Initially, it was planning intern.  In
9  March of 1994, it became Planner 1.
10     **Q.  And did you stay a planner at the City of**
11  **Northport until you left?**
12     A.  Yes.
13     **Q.  When did you leave the City of Northport?**
14     A.  November of 1996.
15     **Q.  And where did you go from there?**
16     A.  City of Tuscaloosa.
17     **Q.  And tell me about your career at the City**
18  **of Tuscaloosa; positions, promotions, and when you**
19  **left.**
20         MS. KIDD:  Object to the form.  Go ahead.
21     A.  The original job title was also Planner 1.
22  Shortly after I arrived with the City, they
23  adopted a new pay plan, so the title was changed



Page 17

1  to planner, and then, eventually, it was called
2  "senior planner," but it didn't involve a
3  probation.  And I stayed -- I was there from
4  November of 1996 until October of 2002.
5      Q.  And why did you leave the City of
6  Tuscaloosa?
7      A.  For a job opportunity in Baldwin County.
8      Q.  So October 2002, you moved to Baldwin
9  County and take a job with the County here?
10     A.  Yes.
11     Q.  And tell me about your career progression
12  with Baldwin County since 2002.
13     A.  I started with the County on October 7th
14  of 2002.  My job title was senior planner, and I
15  remained in that title until late 2010, I became
16  interim planning director.  That would have been
17  October 2010.  And then permanent -- officially
18  planning director, January of 2011.  I remained in
19  that position until September of 2020 when I moved
20  into a different position called "development
21  review planner," and then I resigned from the
22  County December 18th, 2020.
23     Q.  As a planning director from December of

Page 18

1  2010 until September of 2020, what were your
2  duties and responsibilities?
3      A.  Basically, the planning director is
4  charged with the administration and enforcement of
5  the Baldwin County Zoning Ordinance.  You manage
6  the planning department staff, and that requires
7  involvement with day-to-day activities, you know,
8  responding to citizens, approving land use
9  certificates, reviewing zoning and rezoning
10  applications, making staff assignments.
11     I would draft amendments to the text of
12  the zoning ordinance.  There was some involvement
13  with the subdivision regulations, but that was
14  more limited than with the zoning.  Also, one of
15  my responsibilities involved what we refer to as
16  the MS4 program, which is a storm ordinance for
17  the county storm water permit.  And "MS4" stands
18  for Municipal Separate Storm Sewer Systems.  That
19  was kind of an unusual thing that I had to do.
20     But basically, the planning director is
21  responsible for the administration and enforcement
22  of the zoning ordinance, the management of the
23  planning and zoning department, and part of that

Page 19

1  involves interpretations of the zoning ordinance.
2  And along with that, the planning director is
3  considered to be the zoning administrator.
4      Q.  On the Baldwin County website, there is a
5  page for you as planning director, and I'm going
6  to read what it talks about in terms of your
7  primary responsibilities, and would you just let
8  me know if there's anything incorrect or if this
9  sounds correct:  "Mr. Jackson's primary
10  responsibilities include review of land use
11  certificates, implementation of the zoning
12  regulations, preparation of zoning amendments,
13  providing staff assistance to the Planning
14  Commission, and the County's Boards of
15  Adjustment;" is that all correct?
16     A.  Yes.
17     Q.  "As planning director, Vince carries out
18  the executive responsibilities of the planning and
19  zoning department and initiates the county zoning
20  process;" is that correct?
21     A.  Yes.
22     Q.  "He maintains a constant interaction with
23  the Baldwin County Commission, the county

Page 20

1  engineer, and the Baldwin County Planning
2  Commission, and leads the planning and zoning
3  staff's response to each;" is that correct?
4      A.  Yes.
5      Q.  All right.  Are there any other duties and
6  responsibilities for the planning director
7  position that we haven't covered?
8      A.  I can't think of any.
9      Q.  Okay.  When you became the development
10  review planner in October of 2020, what does that
11  position entail?
12     A.  It had more of -- more of an involvement
13  with the subdivision aspect of planning and
14  zoning, but I still continued to maintain, to an
15  extent, the duties of planning director until I
16  left.
17     Q.  Why did you move to that development
18  review planner position in October?
19     A.  It was just an effort to try something
20  different and try to -- try to fit in -- try to
21  fit in where there was a need.  We had taken on
22  the subdivision review about a year earlier and
23  that was where our greatest need was, and so it



Page 21

1  was an effort to really try to have more
2  involvement there.  And this -- you know, also
3  just to -- I think there was a desire, you know,
4  to try some -- try some different things.  The
5  commission was adding some different positions,
6  and it was really just to try a different -- try a
7  different responsibility.
8      Q.  Why was there a desire to try something
9  different.
10         MS. KIDD:  Object to the form.  Go ahead.
11  You can answer.
12      A.  I can't -- I can't answer that.  I mean,
13  we had -- in our most recent commission elections,
14  which was late 2018, we -- three of the four
15  commissioners were new.  And so, you know, over
16  time, things change and there's a desire to do
17  things differently.  We were expanding the staff,
18  taking on different -- different responsibilities,
19  and, you know, it was an effort on my part to try
20  to -- try to do something different and try to
21  find a way that maybe I could be more helpful and
22  effective with some of the day-to-day activities.
23      Q.  Whose decision was it to move you to the

Page 22

1  development review planner position?
2      A.  The -- my supervisor was the county --
3  county administrator and it was based on a mutual
4  decision.  It was a voluntary, you know, it was a
5  -- it was a demotion, but it was a voluntary
6  demotion that was approved by the county
7  commission.
8      Q.  When you say it was a demotion, what do
9  you mean?  Did it have a lower pay?
10      A.  Yes.
11      Q.  But you were a -- you said you were
12  essentially maintaining all of the same
13  responsibilities, but you were also having
14  additional involvement with subdivision
15  regulations; is that correct?
16      A.  Correct.  That's correct.
17      Q.  You said that you left your position with
18  the County and retired effective December of 2020,
19  correct?
20      A.  Correct.
21      Q.  Why did you do that?  Why did you retire?
22      A.  Well, I didn't technically retire.  It was
23  just for personal reasons.  I felt like it was

Page 23

1  time to move on, and I wanted to explore some new
2  opportunities.
3      Q.  What other opportunities are you
4  exploring?
5      A.  Different employment opportunities.
6      Q.  Are you employed now?
7      A.  No.
8      Q.  Who are you seeking employment with?
9      A.  I don't have any applications out at this
10  time.
11      Q.  Who have you sought employment with?
12      A.  I have not sought employment with anyone.
13      Q.  Has anyone sought to employ you?
14      A.  No.
15      Q.  What fields are you looking into?
16      A.  I would probably stick with the planning
17  and zoning field, but I'm keeping an open mind and
18  looking in some other areas as well.  I just -- I
19  can't say what those might be at this point.  I've
20  never done anything else, but I'm -- I'm looking
21  to do something different.  I may even go back to
22  school.  I just don't know yet.
23      Q.  You mentioned that you left to pursue

Page 24

1  other opportunities including some personal
2  opportunities.  Are there any other reasons that
3  you left the County when you did?
4      A.  No.
5      Q.  So it had nothing to do with any
6  disagreements you may have had with any of your
7  superiors within the county?
8      A.  No.
9      Q.  You paused there.  Were you thinking about
10  something?
11         MS. KIDD:  Object to the form.
12      A.  I think it's just best to say that I left
13  for personal reasons and it was time to move on.
14  I want to do something different, and that's
15  really all I can say at this point.
16      Q.  Well, Mr. Jackson, respectfully, I
17  understand why you might be polite or why you
18  might not want to say, but given the nature of
19  this proceeding as a court proceeding, I need to
20  hear the full truth, all of the facts relevant to
21  each of my questions.
22         So were there any disagreements between
23  you and any of your superiors at the county that



Page 25

1  played any role in your departure from the county?
2       MS. KIDD:  Object to the form.
3       A.  What I'll say is this:  I had -- this type
4  of position is very difficult.  It's very
5  stressful.  I think what we're going through today
6  is an indication of that.  Zoning is not an easy
7  thing to deal with.  It's messy.  People have
8  different -- different -- different ideas,
9  different perspectives.  I was in this position
10  for, you know, as an intern starting in October of
11  2010 and then, as I said, officially in January of
12  2011.  Worked through two different county
13  commission administrations.
14       And so in January -- I mean, late -- I
15  guess November of 2018, we had county commission
16  elections, and the administration changed.  And
17  the past couple of years have just really been
18  difficult for me, and they -- it's, you know --
19  it's -- there have been some disagreements, but
20  ultimately, I felt like it was time to move on,
21  that I had -- I had given everything to Baldwin
22  County that I had to give, and the best thing that
23  I can do was move on to something different.  But

Page 26

1  I left on a positive note.  I wish everybody well,
2  and that's really all I can say.
3       Q.  Well, what made the last couple of years
4  difficult?
5       A.  I think -- like I said, we had -- we had
6  an election in November of '18 where we had three
7  new commissioners.  And sometimes you get new
8  commissioners, and they have a different
9  perspective.  And later in their term -- and I
10  guess it was around April of 2019, they brought in
11  a new county administrator who was the previous
12  planning director who I had worked under when I
13  first came to the county.
14       And I think -- I think to some extent, I
15  mean, we've known each other a long time, but it
16  -- to some extent, it was difficult to go back to
17  that original relationship when we're now in
18  different positions.  And it was -- it was just --
19  it was hard.  And Baldwin County is a difficult
20  place to work for because it brings -- there are a
21  lot of pressures.  But there were -- there was a
22  point where I just felt like it was the right
23  thing to do for me to move on.

Page 27

1       Q.  You mentioned some disagreements that had
2  taken place over the past couple of years.  With
3  respect to zoning matters, what disagreements took
4  place over the last couple of years that affected
5  you in your position?
6       MS. KIDD:  Object to the form.
7       A.  I think, to some extent, my -- my approach
8  to interpretations and to zoning in general was a
9  little -- I guess a little less strict, if you
10  will.  When we had elections in late 2010 -- and
11  that was the point where the previous planning
12  director who is now the county administrator left
13  and I became the planning director.  The
14  Commission at that time was not as much favorable
15  to zoning.  And so not only -- not only did we
16  lose our director, but we got new -- we had been a
17  standalone department, and we got put under the
18  county highway department.
19       We lost the majority of our staff, and the
20  commission, at that time, was very clear about
21  what they wanted us to do and what they didn't
22  want us to do.  And so we had to -- we had to
23  adapt and, you know, do things a little

Page 28

1  differently.  And I would say, you know, it was a
2  less favorable environment for planning and
3  zoning, but we maintained.  We did what we needed
4  to do.
5       When we get to the elections of 2018, it's
6  a very different perspective, and, you know, they
7  want us to be more proactive.  They want us to be,
8  you know -- it's just -- they want us to be doing
9  more outreach, and -- I think when you -- I think
10  when you -- you know, I had some interpretations
11  that I had to make.  When the previous planning
12  director was here before, I would say we agreed
13  with each other about 95 percent of the time, but
14  there was some things that we didn't agree on.
15  And when he was planning director, I kept those
16  things to myself out of respect to him as my boss,
17  but when I became planning director, there were
18  some things that I did differently.
19       When he came back as county administrator,
20  you know, that -- there was, I would say, a little
21  bit of conflict there.  But a lot of it, I think,
22  they -- there seems to be a desire to have
23  somebody more -- more charismatic in the position;



Page 29

1  somebody who would be doing outreach, I guess,
2  promotion of zoning.
3      I'm not charismatic at all. I'm, like,
4  anti-charismatic. I am, like, you know -- I'm in
5  my mid 50s. My personality is what it is, and
6  trying to be something different, trying to be
7  outgoing when I'm not, that became -- that became
8  hard for me. And there was -- there were a number
9  of things that I was being told to do, asked to do
10  that made the job very difficult and -- the change
11  to development review planner was an effort to
12  perhaps make the situation better.
13      But I reached a point where I felt like
14  the best thing for me to do was to move on, that
15  that was the best thing for the County and for the
16  planning and zoning department and for my
17  coworkers in the planning and zoning department
18  that I cared about very much and still do.
**19      Q.  What zoning ordinance interpretations --**
**20  so let me preface it. You talked about over the**
**21  last couple of years some disagreements on**
**22  interpretation with the County Administrator,**
**23  Wayne Dyess. Which zoning interpretations did you**

Page 30

**1  all disagree about over the past couple of years?**
2      A.  One of the -- I guess one of the most
3  recent issues had to do with mobile home parks
4  that -- where they existed prior to the adoption
5  of the zoning and whether or not an existing
6  dedicated site within a grandfathered mobile home
7  park could be -- could continue to be used if an
8  older mobile home was moved off. That's one
9  example. That was a recent example.
10      A lot of times, if questions came up --
11  and we'll probably get to this a little bit later
12  -- I would always ask him his opinion because we
13  had worked together for a long time. He was very
14  knowledgeable. I valued his opinion. And so
15  there may be situations where I would be -- where
16  you could, perhaps, look at it both ways. And so
17  I would often ask his opinion, you know, go to him
18  in part to let him know what was going on, but --
19  and in part also to -- you know, to make sure that
20  I would be on the right track as far as what I --
21  you know, what my ultimate decision had to be.
22      And, you know, as far as some of the other
23  differences, there were differences in how I --

Page 31

1  how I interacted with the staff. We could -- I
2  mean, there -- and that's the -- that's really all
3  I can say.
**4      Q.  Did you and -- did Mr. Dyess ever overrule**
**5  you on any interpretation of a zoning ordinance?**
6      MS. KIDD:  Object to the form. Do you
7  mean, like, now as his -- while he's the
8  administrator or previously when he was planning
9  director?
10      MR. ANDERSON:  Yeah. Let me clarify.
**11      Q.  While you are planning director and**
**12  Mr. Dyess is county administrator, did Mr. Dyess**
**13  ever overrule one of your interpretations in favor**
**14  of his interpretation of a Baldwin County Zoning**
**15  Ordinance?**
16      A.  I wouldn't call it literally "overruling,"
17  but the -- but the issue that -- the issue I
18  mentioned with the mobile homes, I mean,
19  basically, what I ended up was conceding that we
20  would view it in the way that he had previously.
21  Would I call that literally overruling me? No.
22  Sometimes -- and a lot of it had more to do, like
23  I said, with the -- just the day-to-day things

Page 32

1  with the department and certain things with the
2  staff.
3      One of the things that I had in the
4  beginning that I had felt strongly about was that
5  we have different types of applications, you know,
6  rezoning applications, variance applications,
7  special exceptions, and additional uses. And we
8  -- when we have those applications go before the
9  planning commission, county commission, and board
10  of adjustment, we would assign different cases to
11  various staff members.
12      And I always felt if you assign a case to
13  the staff member, that they should be given a
14  certain degree of autonomy to provide the staff
15  recommendation that they are comfortable with, as
16  long as they can support it. I would never tell
17  them what to recommend because I felt like if I
18  was simply asking them to present a staff report
19  with my recommendation, than I just may as well do
20  it myself. That was something later on that we
21  disagreed about and that I was unable to continue.
22  There was a point where, basically, I had to tell
23  the staff what to recommend.



Page 33

1    Q.   So in certain instances, Mr. Dyess told
2  you -- instructed you to tell your staff what to
3  recommend in their report, and then they were to
4  conform their report to whatever that directive
5  was?
6        MS. KIDD: Object to the form.
7    A.   Basically, I was told I had to -- I had to
8  decide and take responsibility for the
9  recommendations.  It wasn't necessarily the county
10 administrator was dictating recommendations to me,
11 but I had to decide and then communicate those
12 decisions to the staff.
13   Q.   During the past three years, did you have
14 any other sources of income other than your salary
15 from the county?
16   A.   No.
17   Q.   Are you married?
18   A.   Yes.
19   Q.   Does your wife work in Baldwin County?
20   A.   Yes.
21   Q.   What is her place of employment?
22   A.   Social Security Administration.
23   Q.   Do you have any other adult family in

Page 34

1  Baldwin County?
2    A.   Are you referring to immediate family,
3  aunts and uncles?
4    Q.   Just anyone in your family in Baldwin
5  County.
6    A.   Okay.  I have an uncle who lives in
7  Fairhope.  I honestly can't tell you what he does.
8  I think he may be retired.  He worked in, like,
9  building supply sales and construction in the
10 past.  I don't know -- I really don't know what he
11 does now.  And I believe his -- his wife, my aunt,
12 works for environmental assistants and there --
13 there may be some -- there may be some distant
14 relatives that live in Baldwin County, but my
15 family is not from Baldwin County, originally, so
16 we don't -- I don't have a lot of relatives here.
17   Q.   Any other relatives in South Alabama, so
18 Mobile County, Escambia County, anything like
19 that?
20   A.   My parents live in Mobile and there are a
21 number of -- I have another uncle who lives in
22 Mobile, some first cousins, some second cousins.
23 And my wife's brother lives in Baldwin County.

Page 35

1    Q.   Where does he work?
2    A.   He works for the City of Foley.
3    Q.   Where does your family in Mobile work?
4    A.   My dad is retired.  My parents are both
5  retired.  Then I --
6    Q.   Aunts and uncles and cousins, any that you
7  know?
8    A.   I really don't know.  I mean, I hate to
9  say this:  I don't have much of a relationship
10 with my cousins, and I can't tell you what they
11 do.
12   Q.   Okay.  Got those exhibits printed out.  If
13 you could, please turn to what's been marked as
14 Plaintiffs' Exhibit Number 1.
15
16       (Whereupon, Plaintiffs' Exhibit No. 1 was
17       marked for identification and copy of same is
18       attached hereto.)
19
20   Q.   So the second page is a land use
21 certificate application, and there's two pages to
22 that portion of the exhibit, and it's marked Case
23 Number LU-190197.  This was the land use

Page 36

1  certificate originally issued to Breezy Shores,
2  LLC, for the property at 3450 A-B Ponce De Leon
3  Court, correct?
4    A.   Correct.
5    Q.   Just so I don't have to say that address
6  over and over today, is it okay if I just call
7  that Plaintiffs' property or the subject property,
8  and you'll know what I'm talking about?
9    A.   Yes.
10   Q.   Okay.  If you take a minute to look at the
11 these two pages of the land use certificate
12 application, are there any misstatements or
13 misrepresentations on here?
14       MS. KIDD:  I'm sorry, y'all.  I -- mine
15 froze out for a second.  Kris, I just got back
16 in.  Are you looking at the first exhibit?
17       MR. ANDERSON:  Yes, Exhibit 1.  I think
18 the first page --
19       MS. KIDD:  The building permit?
20       MR. ANDERSON:  -- is a building permit, is
21 what we're looking at.
22       MS. KIDD:  Okay.  Yeah, sorry.  Just
23 wanted to -- all right.  Sorry about that.



Page 37

1    A.  Everything looks to be in order.  I don't
2  see anything -- any misstatements on here.
3    Q.  Who is Crystal Bates?
4    A.  Crystal Bates is a planning technician who
5  works in the Robertsdale Planning and Zoning
6  Office.
7    Q.  I've got a bio for Ms. Bates from the
8  Baldwin County website, and it says, "Crystal
9  joined the planning and zoning department in 2012.
10  Her primary responsibilities include interacting
11  with the public and providing staff support to the
12  Robertsdale office;" is that correct?
13    A.  Correct.
14    Q.  And given that she signed this land use
15  certificate application, do her duties also
16  include reviewing and approving land use
17  certificate applications?
18    A.  Yes.
19    Q.  How long has she been doing that?
20    A.  Probably about five years.
21    Q.  Does she do that pretty often?
22    A.  Yes.
23    Q.  How did you, as planning administrator,

Page 38

1  delegate who processed what land use certificate
2  applications?
3    A.  Well, typically -- okay, this -- this
4  property is located in Planning District 25 which
5  is the Fort Morgan area, and our intent for many
6  years -- and this goes back to a time before I was
7  planning director -- was to have all of those
8  applications processed in the Foley office because
9  we could have a planner who would be most familiar
10  with the issues -- the very specific and
11  particular issues related to Planning District 25
12  in Fort Morgan, and it just made sense that all
13  those applications would go to one particular
14  staffing firm.
15    And so we would always have a planner in
16  that office who we intended for the Fort Morgan
17  District 25 applications to be submitted to.  Now,
18  basically, anybody in the planning department who
19  was classified as a planning technician or
20  planner, senior planner, and above could sign off
21  on a land use certificate.  But in terms of a
22  specific delegation, it was our intention to have
23  these Planning District 25 land uses reviewed by a

Page 39

1  planner in the Foley office.
2    Q.  So how did it come to be that Ms. Bates in
3  the Robertsdale office was processing at least
4  this one -- or you tell me if there were more that
5  she was processing.
6    A.  If you notice when you look at the first
7  page of the land use application, it was submitted
8  to the planning and zoning department March 27th
9  of 2019 but wasn't approved until July 17th of
10  2019.  The application at the time of submission
11  was not complete.  They did not have an ADEM
12  permit, and also I believe that there were some
13  issues with the parking plan that they provided at
14  the time.
15    I'm not -- I was never personally involved
16  with the issuance of ADEM permits, but it was, as
17  I understand it, a lengthy process.  And it
18  happened that at the time that the ADEM permit was
19  finally received, Linda Lee, who was the planner
20  in Foley and who would normally have been the
21  person to review this and who had been reviewing
22  it, was on vacation when they came in with their
23  ADEM permit.

Page 40

1    And unfortunately, other staff members
2  didn't know about some of the issues that had been
3  related to this particular land use application or
4  to Planning District 25.  It would have been
5  better if they had waited for Linda Lee to get
6  back to work, but that isn't what happened.  It
7  was sent to Robertsdale to go ahead and get it
8  processed.  And I think, based on the information
9  that was provided, it appeared that the only thing
10  that was needed was the ADEM permit, and when that
11  was provided, then the land use was approved.
12    Q.  Do you remember the dates of Linda Lee's
13  vacation?
14    A.  Not right offhand.  She was gone --
15    Q.  How do you --
16    A.  -- for about two weeks.
17    Q.  -- remember she was on vacation when this
18  took place?
19    A.  Sir?
20    Q.  How do you remember that Linda Lee was on
21  vacation when this took place?
22    A.  There are certain things that stick in
23  your mind, and I wasn't aware that the land use



Page 41

1  had been approved until after it had been
2  approved, a building permit had been issued, and
3  they were beginning to put pilings in the ground.
4  And so when I looked into -- looked in our
5  database and saw when it was approved, I knew then
6  that that was during the time that Linda Lee had
7  been out.  I can't tell you the exact dates, but
8  she was on vacation.  She was not in the office at
9  the time that they came back with the ADEM permit.
10     Q.  Who does -- or at this time, who did
11  Crystal Bates report to?
12     A.  I was her direct supervisor at the time.
13     Q.  So no one in between you?  She just
14  reported directly to you as the planning
15  administrator?
16     A.  Yes, yes.
17     Q.  If you go back to the first page of this
18  exhibit, is this the building permit that was
19  issued on July 23rd, 2019?
20     A.  Yes, it appears to be.
21     Q.  And, generally speaking, first a developer
22  would need to get a land use certificate and then
23  they would use that land use certificate in order

Page 42

1  to get the building permit; is that is way it
2  goes?
3     A.  Right.  The land use certificate in a
4  zoned area of the county is the first step to
5  obtaining a building permit.
6     Q.  Okay.  Right after the land use
7  certificate application -- still in the same
8  exhibit -- there is a site plan, and it has a
9  stamp that says "Approved plans as reviewed by the
10  Baldwin County Planning and Zoning Department,"
11  and it appears to be Crystal Bates' signature
12  dated July 17th, 2019.
13     A.  Yes.
14     Q.  Would that stamp be applied to this at the
15  same time that Ms. Bates was reviewing the
16  application?
17     A.  Yes.
18     Q.  And so not only did she look at the
19  application, but she also would have looked at
20  this site plan and approved that as well, correct?
21     A.  Correct.
22     Q.  And then if you'll go to the next page in
23  the same exhibit, it's the final page of Exhibit

Page 43

1  Number 1.  This depicts the structure that was
2  going to be completed on Plaintiffs' property; is
3  that correct?
4     A.  I believe so.
5     Q.  And Ms. Bates also would have reviewed
6  this, correct?
7     A.  Yes.
8     Q.  And so all of these plans that were
9  submitted were approved by Ms. Bates on July 17,
10  2019, correct?
11     A.  Correct.
12     Q.  Please go to what's been marked as
13  Plaintiffs' Exhibit Number 2.
14
15     (Whereupon, Plaintiffs' Exhibit Number 2 was
16     marked for identification and copy of same is
17     attached hereto.)
18
19     A.  Okay.
20     Q.  And I'll represent to you these were
21  produced by the County in discovery, but do you
22  recognize these as the plans that Plaintiff -- for
23  the building that Plaintiff was going to build on

Page 44

1  its property?
2     A.  As far as I know, it appears to be.
3     Q.  When these were initially submitted to the
4  county on or about March 27, 2019, when the land
5  use application was completed, there was nothing
6  wrong with the size of this structure or its
7  parking layout, was there?
8        MS. KIDD:  Object to the form.
9     A.  Now, when you're -- you're referring to
10  March 27th or July --
11     Q.  March 27, 2019, when these plans were
12  submitted to the county.
13     A.  Okay.  The issue of stacked parking was
14  brought to our attention later, and it was -- it
15  was at some point after -- it was after this was
16  submitted that it was brought to our attention
17  that the particular provision -- that there was a
18  particular provision in the zoning ordinance that
19  prohibited that type of parking arrangement as
20  shown on the site plan.  And I have, in fact,
21  issued a letter to that effect, I believe, around
22  the first part of July.
23        We had not had a discussion with the



Page 45

1  entire staff about it, but I had discussed it with
2  Linda Lee in talking about this particular
3  application.  In terms of the height, the height
4  as shown at that time would have met zoning
5  requirements.
6     Q.  If you'll turn to what's been marked as
7  Plaintiffs' Exhibit Number 3.
8
9     (Whereupon, Plaintiffs' Exhibit No. 3 was
10    marked for identification and copy of same is
11    attached hereto.)
12
13    Q.  This starts with a letter dated July 31st,
14  2019.  Take a moment and let me know, do you
15  recognize this document?
16    A.  Yes.
17    Q.  Did you write this letter?
18    A.  I did.
19    Q.  Did anyone else assist you or have any
20  input into this letter?
21    A.  No.
22    Q.  Did this letter get sent to Steve Jones on
23  or about July 31st, 2019?

Page 46

1     A.  Yes.
2     Q.  Steve Jones was the contractor for
3  Plaintiffs, correct?
4     A.  Correct.
5     Q.  And then there is a document that is also
6  in Plaintiffs' Exhibit Number 3 that follows that
7  letter.  Was this an enclosure that was sent with
8  that letter?
9     A.  Yes.
10    Q.  And this document is two pages.  It's
11  Defendants' Bates 67 and 68.  Was this the same
12  land use certificate application that was
13  originally submitted, but you changed the office
14  use only sections to indicate that the application
15  was denied.
16    A.  Correct.
17    Q.  And is this your handwriting that says,
18  "Revocation of approval granted on July 17, 2019.
19  See attachment for explanation"?
20    A.  Yes.
21    Q.  And that attachment was the letter that we
22  just looked at, correct?
23    A.  Yes, yes.

Page 47

1     Q.  As zoning administrator or planning
2  administrator, are you bound by the Baldwin County
3  Zoning Ordinance?
4     A.  Yes.
5     Q.  Are you aware of the fact that there's a
6  section in the Baldwin County Zoning Ordinance
7  that specifically provides for revocation of land
8  use certificates?
9     A.  Yes.
10    Q.  I'm just going to quickly read this into
11  the record for your benefit.  Section 18.2.5 of
12  Baldwin County Zoning Ordinance entitled,
13  "Revocation of Land Use Certificate" provides,
14  "The zoning administrator may revoke the land use
15  certificate issued in a case where there has been
16  a false statement or misrepresentation in the
17  application or on the site plan for which the
18  certificate was issued or if after a documented
19  warning has been issued, the applicant has filed
20  to comply with the requirements of these zoning
21  ordinances.  Revocation of the land use
22  certificate shall also cause suspension of the
23  building permit until such time as in a judgement

Page 48

1  of the zoning administrator, the application in
2  compliance with the requirements of these zoning
3  ordinances."
4     So my question is, which part of that
5  section entitled you as zoning administrator to
6  revoke Plaintiffs' land use certificate in this
7  case?
8     MS. KIDD:  Object to the form.
9     A.  I think it was just -- it was a matter of
10  wanting to make sure that they were in compliance.
11  I can only think of -- I -- there was another
12  thing where I went to the county administrator and
13  I said is this something where we can revoke the
14  land use, and he believed that we could.  And, you
15  know, our position was that we had the authority
16  to revoke the land use.
17    Q.  Other than Wayne Dyess, who else did you
18  talk to about this matter?
19    A.  I think, you know, by that time, I believe
20  Linda Lee was back in the office, and I probably
21  informed her that that's what we were doing.  I
22  don't recall having a discussion with anyone else.
23    Q.  So you already testified there was no



Page 49

1  false statement or misrepresentation in the
2  application or on the site line for which the
3  certificate was issued.  Is it also correct that
4  there was no documented warning that was issued
5  after the applicant failed to comply with the
6  requirements of the zoning ordinances?
7        MS. KIDD:  Object to the form.
8     A.   There had been some rapport issues.  I'm
9  not sure what you're asking exactly.
10    Q.   Well, one of the reasons to revoke a land
11 use certificate under the Section 18.2.5 was if
12 there had been a documented warning that had
13 already been issued that the applicant had failed
14 to comply with the requirements of the zoning
15 ordinances.
16       So my question is, as of the date you sent
17 this on July 31st, 2019, had such a documented
18 warning taken place?
19    A.   There had been a stop work notice.  I
20 believe we would have viewed that as the
21 documented warning.
22    Q.   Who issued the stop work notice?
23    A.   That was issued by the code enforcement

Page 50

1  officer.
2     Q.   What was his or her name?
3     A.   Joe Ryan.
4     Q.   And why did Joe Ryan issue that stop work
5  notice?
6     A.   We -- there were citizens who were aware
7  that we had issued a -- we had issued a
8  determination about the applicability of the
9  provision to stacked parking, and I don't know if
10 they had reviewed the file or not, but when they
11 saw that pilings were going in the ground, they
12 first contacted the county administrator who, in
13 turn, contacted me, and that was the point where
14 Mr. Ryan was asked to get down there and see what
15 was going on and issue a stop work notice.
16    Q.   So did you ask Mr. Ryan to go down there
17 and check on things on the ground and issue the
18 stop work notice?
19    A.   Yes.
20    Q.   And that was before you issued this letter
21 on July 31st?
22    A.   The date of the stop work notice is July
23 31st also.  It was -- I don't remember when -- I

Page 51

1  may have asked him the day before.  I don't
2  remember the exact sequence of events.  But the --
3  the revocation was issued later in the day, I
4  believe, because the -- looks like the stop work
5  notice was probably issued about 9:15 and so we
6  probably did the revocation later that day, but I
7  can't -- I can't say what time for certain.
8     Q.   So when a stop work notice is posted, like
9  this one at 9:15 a.m., does that mean that work
10 has to stop immediately, or is there some amount
11 of time that the contractor has to halt work?
12    A.   We expect for work to stop immediately.
13 Now, I think -- I think what happened in this case
14 is when some pilings had been put into the ground,
15 and I think when Mr. Ryan visited the site, there
16 was not anyone there, so he posted the stop work
17 notice on the site.
18    Q.   And when -- so later that day, you sent
19 your letter to Steve Jones.  Did you send that by
20 U.S. Mail or hand delivery, or how did that go
21 out?
22    A.   The letter was drafted on that day and --
23 I don't remember -- I think there might have -- I

Page 52

1  think there was a regular mail copy and an e-mail
2  sent to Mr. Jones.
3     Q.   So by the time Mr. Jones received this
4  revocation, the stop work order was already in
5  place, correct?
6     A.   Yes, yes.
7     Q.   Other than Section 18.2.5 of the Baldwin
8  County Zoning Ordinance entitled "Revocation of
9  Land Use Certificate," is there another ordinance
10 or statute that authorizes you as planning
11 director to revoke a land use certificate?
12       MS. KIDD:  Object to the form.
13    A.   I can't think of a specific -- I can't
14 think of a specific section right offhand.  I
15 think it's just considered part of administration
16 and enforcement.
17    Q.   Is there any written policy in Baldwin
18 County, to your knowledge, that establishes that
19 authority?
20    A.   I'm not aware of a written policy.
21    Q.   Is it your position that Crystal Bates
22 issued the land use certificate in Plaintiffs'
23 Exhibit Number 1 in error?



Page 53

1    A.  Yes.
2    **Q.  Was she reprimanded as a result of making**
3    **that error?**
4    A.  No, because she wasn't aware of the issue,
5    and so she would -- I mean, we talked about it
6    later on, but she was not aware of the issue at
7    the time that she signed the land use certificate.
8    **Q.  Has she issued any other land use**
9    **certificates in error?**
10    A.  Not that I'm aware of.
11    **Q.  Why didn't you let Plaintiffs or Steve**
12    **Jones know what you were doing before you had the**
13    **stop work order issued?**
14    MS. KIDD:  Object to the form.
15    A.  I didn't have -- I really didn't have a
16    lot of direct involvement in the initial aspect of
17    the land use certificates.  Over time as -- after
18    I became planning director, there really -- there
19    really weren't as many land use certificates that
20    I worked on.  This one was being worked on by
21    somebody in the Foley office, and I was made aware
22    of some issues and we had some discussion -- the
23    staff member and I -- about some of the issues and

Page 54

1    what was being asked and what we needed to do, but
2    I didn't have any direct contact with Mr. Jones
3    until after the stop work order and revocation of
4    the land use.
5    I can't say what communication there might
6    have been with Mr. Jones with staff prior to that.
7    Like I said earlier, when the land use certificate
8    was initially submitted, it was -- it was
9    incomplete.  And I know there were some issues
10    with the initial parking plan, but I can't -- I
11    can't speak to what kind of additional
12    communication there might have been with Mr. Jones
13    prior to that.
14    **Q.  In other cases, have you ever communicated**
15    **with an applicant if this kind of issue arises**
16    **before taking a step like issuing a stop work**
17    **order?**
18    MS. KIDD:  Object to the form.
19    A.  There would be cases where I -- where if
20    I was the person issuing the land use certificate,
21    I would tell the applicant -- if there was a
22    reason that I couldn't issue it, I would tell the
23    applicant.  It can be done -- it can be done

Page 55

1    either way.  You can tell an applicant up front
2    that these are the issues and deficiencies that
3    you need to fix before we can issue the land use
4    certificate, or you can just deny it outright and
5    provide them the reasons at that time.
6    Typically, my preference if I was working
7    on a land use certificate was to communicate
8    upfront, these are your deficiencies, this is what
9    we need you to do in order to get an approval.
10    But like I said, I wasn't directly involved.  I
11    was somewhat involved.  I was aware of some of the
12    issues, but I was not directly involved in this
13    particular land use certificate until after the
14    stop work order and the revocation, so I can't --
15    again, I can't say what kind of communication
16    there was.
17    **Q.  So your testimony is that in some cases**
18    **when you're more involved, an applicant will have**
19    **an opportunity to be heard before something is**
20    **revoked, but that didn't happen in this case**
21    **because you were not completely involved with this**
22    **particular application?**
23    A.  When you say --

Page 56

1    MS. KIDD:  Object to the form.  Go ahead,
2    Vince.  Yeah.
3    A.  Can you clarify what you mean by "be
4    heard."
5    **Q.  Well, you testified that you would**
6    **communicate with people in certain instances and**
7    **give them an opportunity to fix whatever was**
8    **deficient in their application before issuing a**
9    **stop work order, and so that's what I mean by an**
10    **opportunity to be heard.**
11    A.  I think that's always the preference.
12    Now, you know, there are times when it's necessary
13    to issue a stop work order.  There are times where
14    it's necessary to revoke the land use.  But the
15    preference is to have all the issues worked out so
16    that you can issue an approval without any --
17    without any question.
18    **Q.  And so is it your testimony that the only**
19    **reason that didn't happen here was that you hadn't**
20    **been involved with this application from the**
21    **beginning?**
22    A.  Lack of direct involvement on my part
23    definitely played a role in it.



Vince Jackson                                                                     57..60

Page 57

1    Q.   Are there any other components or factors
2  that played a role in it?
3       MS. KIDD: Object to the form.
4    A.   Well, as I stated, we, you know -- we did
5  issue an interpretation about stacked parking
6  during that process, and then that -- you know,
7  that played a role in it as well.  But if it had
8  been -- if it had been a case where I was the lone
9  staff person processing an application and had
10  been directly involved in it from the beginning, I
11  would have done as much as possible to try to get
12  everything taken care of so that at the
13  appropriate time, we could issue the land use
14  certificate.
15      And I think that's what -- I think that's
16  what Linda Lee was trying to do.  Unfortunately,
17  when she was on vacation and they came in with
18  their ADEM permit, it was sent to Robertsdale.
19  Robertsdale staff didn't know what she had been
20  working on with them, and they didn't know to ask
21  me.
22    Q.   Do you ever conduct formal hearings before
23  revoking a land use certificate?

Page 58

1    A.   No.  Now, anything that we do -- or that
2  we did -- any type of decision is subject to being
3  appealed to the board of adjustment, and so the
4  revocation of a land use certificate could have
5  been appealed to the board of adjustment.  It was
6  not.
7    Q.   Do you ever conduct in-person meetings
8  with applicants before revoking land use
9  certificates?
10    A.   We -- I mean, if somebody had wanted to
11  come in and meet with me, I would have been glad
12  to meet with them.  But in general -- revoking a
13  land use certificate is not something that happens
14  very often.  So, you know, in general, no there
15  wouldn't be a meeting unless a meeting had been
16  requested.
17    Q.   Has such a meeting ever taken place under
18  your watch as planning administrator?
19    A.   No.  I mean, I can only think of one other
20  situation where I've revoked a land use, and we
21  didn't have a -- we had some discussions with that
22  applicant, but there was not a direct meeting.
23    Q.   What was that other circumstances where a

Page 59

1  land use certificate was revoked?
2    A.   It was -- it involved a situation where
3  somebody wanted to build an accessory structure,
4  and we discovered after the land use certificate
5  was issued that they were trying to build it in an
6  easement.  And we asked them to move it out of the
7  easement or perhaps see if they could get the
8  easement vacated, and they were unwilling to try
9  to move it from where they had placed it, and so
10  we had to revoke the land use certificate.
11      It was not something where a variance
12  would have helped them because the board of
13  adjustment can not grant approval for something to
14  be built in an easement.  But it was a completely
15  different kind of situation from this one.  I
16  think -- I don't remember how it was brought to
17  our attention that the easement was there.  It was
18  not -- it was not on any of the documents that we
19  had available.  I think, perhaps, in that case,
20  the property owner was aware of the easement and
21  brought it to our attention.  But, like I said,
22  completely different -- a different area of the
23  county, different planning district, different

Page 60

1  situation from this.
2    Q.   Approximately what year was that?
3    A.   It was after this, so I can't tell -- you
4  know, it -- I believe it was more recent than this
5  particular issue, but I can't -- I can't tell you
6  the exact date.
7    Q.   Was that -- did you consider that
8  applicant's failure to disclose the easement a
9  misrepresentation in their application?
10    A.   I mean, you could view it that way.
11    Q.   And you said before you revoked that one,
12  there were some discussions directly with that
13  applicant, but they weren't willing to take any
14  steps to resolve the issue?
15    A.   Yeah.  You know, I can't -- I stated
16  before, I really don't remember if we discussed it
17  with them before or after.  Maybe, you know -- we
18  deal with a lot of people -- dealt with a lot of
19  people, a lot of different issues, and so
20  remembering the exact sequence of events -- again,
21  that was not a -- that was not a land use that I
22  actually processed, but when the -- when it was
23  brought to our attention about the easement, you



Page 61

1  know, it was determined that revoking the land use
2  was the best thing to do in part because we felt
3  like maybe it would give us time to rectify the
4  situation.
5      Q.  I just want to make sure I'm clear on you
6  participating in the decision to revoke
7  Plaintiffs' permits.  It was you and Wayne Dyess,
8  but Linda Lee was still on vacation when that
9  decision was made; is that correct?
10     A.  She -- I'm pretty sure she was back by
11  that point.
12     Q.  And so did she have some input into that
13  decision as well?
14     A.  I -- I won't say that she had any input,
15  but I wanted to make her aware since she had been
16  the primary person dealing with them.  I figured
17  that she would probably be contacted first, so I
18  wanted her to know what was going on.
19     Q.  So she didn't have any input, but you
20  informed her when that decision was made so that
21  she would be in the loop?
22     A.  Right.
23     Q.  Did you meet with the Fort Morgan Civic

Page 62

1  Association on June 19th, 2019, to talk about
2  parking limitations and story limitations for new
3  development in Fort Morgan?
4      A.  We had a meeting with the Fort Morgan
5  Zoning Advisory Committee.  There is a zoning
6  advisory committee and there is a civic
7  association.  There are two -- they are two
8  distinct entities.  Now, I think the members of
9  the zoning advisory committee are also members of
10  the civic association and there were members of
11  the civic association who would often attend the
12  zoning advisory committee meetings, so they are --
13  they are two distinct -- they are two distinct
14  entities.
15         The zoning advisory committee is actually
16  created by statute for the purpose of providing
17  recommendations on zoning cases, variances, or
18  changes to the zoning ordinance which would be
19  applicable to Planning District 25 and -- so there
20  was a -- there was some meetings, and I do
21  remember at some point in the summer attending a
22  meeting of the zoning advisory committee, and I
23  think they also used -- at the time, I think they

Page 63

1  also used the same secretary as the civic
2  association, but like I said, they're two distinct
3  entities.
4      Q.  Was it your testimony that that June 19th,
5  2019, meeting was organized by the Fort Morgan
6  Zoning and Advisory Committee?
7      A.  From what I remember, yes.
8      Q.  And are meetings of the Fort Morgan Zoning
9  Advisory Committee open to the public?
10     A.  Yes.
11     Q.  Do you recall where that meeting was held?
12     A.  It was at a church, and the name of the
13  church escapes me at the moment, but it's in their
14  fellowship hall.  If we take a break, I'll go back
15  and look up the name of the church.  I cannot --
16  it's a Baptist church, and it's next door to a
17  fire station.
18     Q.  Did you or Mr. Dyess request that meeting
19  or did the Fort Morgan Zoning Advisory Committee
20  or someone else request that meeting?
21     A.  I can't really remember who requested it.
22  I know, typically, the statute requires them to
23  meet twice a year, what they refer to as their

Page 64

1  semiannual meetings.  And so there will be a
2  semiannual meeting in April and then one in
3  October.  Otherwise, they meet if there are zoning
4  cases for them to review and then make a
5  recommendation.
6         It may have been that they were already
7  meeting and were going to be making some
8  recommendations on zoning cases or variances and
9  they asked us to come or -- I don't remember the
10  exact sequence of how we were asked to be there,
11  but we did -- we did go and we put together some
12  information about some of the zoning changes that
13  we were working on for Planning District 25.
14     Q.  This -- let me know if this refreshes your
15  recollection about the details at all:  I'm
16  looking at a May 2019 newsletter from the Fort
17  Morgan Civic Association, and it notes a June 19th
18  9:00 o'clock meeting and, I quote, "Special
19  request meeting by Wayne Dyess along with Vince
20  Jackson and Billy Joe Underwood to meet with us to
21  discuss county involvement and long-range plans
22  for Fort Morgan amendment to District 25
23  regulations regarding rezoning in the coastal



Page 65

1  **high-hazard area and flood hazard areas and**
2  **development issues slash concerns in Fort Morgan."**
3    A.  It probably -- it could have been that the
4  -- either the commissioner or Mr. Dyess wanted us
5  to do that.  I -- I just don't remember.  I
6  remember that I was asked to be there, and I was
7  asked to put together information about some stuff
8  that we were working on.  I think one thing that
9  we became aware of at some point is that some
10  people involved with the civic association were
11  working on a master plan for Planning District 25,
12  and one of the things that we wanted to stress to
13  them was that master planning -- you know, a
14  master land use plan would have to originate at
15  the county level.
16      So we -- you know, we certainly wanted to
17  work with them, but the County needed to be
18  involved in it.  And we also were working on some
19  amendments to the text of the zoning ordinance
20  that were applicable to Planning District 25, and
21  we wanted to give them, you know, make them aware
22  of what we were working on and have that as an
23  opportunity to gain some feedback.

Page 66

1      Now, the zoning advisory committee kind of
2  used the civic association for publicity, so
3  that -- that was probably why it was in their
4  newsletter.  I think, you know, the civic
5  association would have a pretty far reach as far
6  as getting information out to the residents of the
7  Fort Morgan area.
8      But July 19th, that sounds -- 9:00 o'clock
9  in the morning was the time that the zoning
10  advisory committee would meet.  I think the civic
11  association typically met on Monday nights.  A
12  9:00 o'clock meeting would have been the zoning
13  advisory committee.  But it was open to the
14  public, and if memory serves, there were lots of
15  people there.
16      MS. KIDD:  Is the newsletter to which
17  you're referring, Kris, is that part of -- is
18  that an exhibit?  Are you planning on making that
19  an exhibit or...
20      MR. ANDERSON:  No, I'm not making that an
21  exhibit.  I was just seeing if that would refresh
22  his recollection.
23      MS. KIDD:  Okay.  Has that been -- because

Page 67

1  that's not from us.  Has that been --
2      MR. ANDERSON:  I think I just pulled it
3  off of the Fort Morgan Civic Association's
4  website, but I'm happy to send it to you as well
5  so you'll have a copy.
6      MS. KIDD:  Okay.  All right.
7    Q.  (By Mr. Anderson) Mr. Jackson, you
8  **mentioned some issues that you had already been**
9  **working on that you wanted to make the group aware**
10  **of.  What issues were you already working on as of**
11  **June 19, 2019, in relation to Planning District**
12  **25?**
13    A.  We had -- the biggest thing that we had
14  been working on, we had been asked about some dune
15  walkover regulations.  We had typically not
16  regulated dune walkovers, but there had been some
17  that had been constructed that were very tall and
18  they created a -- kind of an impediment as far as
19  accessing the beach, and so we had been asked to
20  work on some dune walkover regulations.
21      And the change we had made -- we had
22  previously made changes to the parking
23  requirements for Planning District 25 that took

Page 68

1  place in 2017.  So we had the dune walkover
2  regulations, and another thing that we were
3  working on -- and this was related to the height
4  issue that came up later and it will involve a
5  little bit of explanation, so if you could bear
6  with me for just a minute.
7      Prior to 2009, for single -- for -- the
8  height was looked at in terms of the height in
9  feet and a height in number of stories; that was
10  the way we looked at heights.  And for a
11  single-family dwelling and a two-family dwelling,
12  a duplex, the maximum height would have been 35
13  feet and two and a half stories, and that's what
14  it was for many years.
15      In 2009 we removed the height in stories.
16  In part, because we had had some issues with the
17  half-story part of that definition, and so we
18  reasoned that 35 feet was 35 feet, and we would
19  leave it as just the height in feet.  So we made
20  that change some time in 2009.
21      Fast forward ten years to 2019, we had
22  been down in the Fort Morgan area for a meeting.
23  And I don't -- it wasn't the -- it was prior to



Page 69

1  the July meeting, but I don't remember the exact
2  date.  Mr. Dyess was there, and we were riding
3  around just kind of looking at some things in the
4  area after the meeting, and he asked the question,
5  why are some of these -- why are there three-story
6  buildings out here, and so my response was, well,
7  we removed the height in terms of number of
8  stories.  So his question back to me was, why did
9  you do that, and I had to remind him that we did
10  that when he was still here as planning director.
11      Neither he, nor I could remember the
12  compelling reasons for why we did it initially.
13  From my memory, it had most to do with the
14  half-story aspect.  But when I told him that, his
15  response to me was, I think we need to bring back
16  the limit in terms of number of stories.  So I
17  said okay, and so that's what we started working
18  on for the -- for countywide -- for all of the
19  zoned areas of the county unless there were
20  provisions that stated something differently.
21      When we made the people in District 25
22  aware of that change, we started getting some
23  feedback that we really need to limit it to two

Page 70

1  stories.  And that had actually come up a little
2  bit earlier when there was a rezoning application
3  or -- and then they made plans -- development --
4  planned residential development applications in
5  earlier 2019 where they wanted us to limit the
6  height of the structures in the planned
7  development to two stories.
8      And we kind of -- there was kind of a
9  compromise.  It was stated that it would be two
10  and a half.  But, initially, what we wanted to do
11  at the staff level is just simply return to the
12  two-and-a-half story height limit.
13      At some point, we started to hear from the
14  volunteer fire department for planning for Fort
15  Morgan, and that was where there was really a push
16  to limit the number of stories to two based on
17  some safety concerns, and so that was what we
18  ended up putting in the ordinance.  So we had that
19  to discuss with them and then there were the --
20  there was a new language that was added pertaining
21  to the considerations for re-zonings in the flood
22  zones and the coastal high-hazard areas.  That
23  part of it came from Mr. Dyess.

Page 71

1      Q.  When Mr. Dyess -- you were riding around
2  and he said I think we need to bring back a limit
3  on the number of stories, did he say why?
4      A.  No.  I don't recall him providing a
5  reason.  I think -- any time you make changes to
6  the zoning ordinance, sometimes there are
7  unintended consequences.  And although you can say
8  35 feet is 35 feet, when you see a three-story
9  building next to a two-story building, there's a
10  visual difference.  And I think what we saw was
11  these buildings that were -- they were still
12  meeting the 35-feet requirement, but they were
13  having more stories.  They just kind of seemed to
14  loom over the other structures and overcrowd
15  properties.  And so I felt, you know, to some
16  extent that may have been why.  I don't recall
17  that that was a particular reason that was given,
18  but I was asked to do it, so I did it.
19      Q.  And this ride took place after a meeting
20  with -- was it the Fort Morgan Zoning Advisory
21  Committee or was it the Fort Morgan Civic
22  Association?
23      A.  It was the zoning advisory committee.

Page 72

1      Q.  And then you testified that after that
2  conversation, you all made people in District 25
3  aware of the fact that you were working on the
4  story limitation, and they asked for two stories.
5  So my question is, how did you make people and
6  what people aware of that process?
7      A.  There were -- one of the meetings that we
8  attended -- and it may have been the July meeting
9  -- there were -- the fellowship hall where the
10  zoning advisory committee would meet was full.  I
11  mean, there were a lot of people there.  I had put
12  together some booklets just with some drafts of
13  what we were working on and some examples of dune
14  walkover regulations and -- I don't really
15  remember what all was in there, but the -- those
16  were available.  I can't remember how many -- how
17  many copies I made, but I think they were all
18  pretty much gathered up by people who were there.
19      And it seemed to be a cross section of
20  people.  There were some residents there, there
21  were some people that were involved in development
22  down there, there were a lot of people there, and
23  we went through and we kind of discussed these are



Page 73

1  the changes that we're looking at.  I think I
2  might have had a couple of maps available, but it
3  was a -- you know, we -- I think the meeting went
4  well.  Went through everything, answered -- you
5  know, answered questions to the extent that we
6  could.
7       There were -- Fort Morgan and District 25
8  is a very unique area in the county, but it's a
9  very sensitive area, so very environmentally
10 sensitive area.  People -- you have people from
11 all over that own property down there, and they're
12 very -- they're very concerned about the
13 environment.  They're very concerned about how
14 things relate to each other.  And so there were --
15 you know, there were things that were talked about
16 that we couldn't do through zoning.
17      Some of them had to do more with building
18 code or -- you know, there was a question about
19 adoption of a fire code; that's not a zoning
20 issue.  Some of the things -- you know, there are
21 a lot of environmental concerns that really would
22 require action at the state and federal level.
23 But we listened to what people had to say, and we

Page 74

1  -- you know, we addressed what we felt like we
2  could address through zoning in order to help with
3  some of the situations -- some of the concerns
4  down there.
5       Q.  With respect to that July -- sorry.  The
6  June 19th, 2019, meeting that I think was referred
7  to as a "special meeting of the Fort Morgan Zoning
8  Advisory Committee," how would the public have
9  been made aware of the existence of that meeting
10 other than through the Fort Morgan Civic
11 Association's newsletter?
12      MS. KIDD:  Object to the form.
13      A.  I think there would be, you know, there
14 would have been notification on the Fort Morgan
15 Civic Association website.  It's possible that
16 they may have posted some notices throughout the
17 planning district, but I can't really say.
18 They're not an official board or committee of
19 Baldwin County, and it -- I think the statute says
20 only that their meetings shall be open to the
21 public, but I don't think it specifies what type
22 of publicity they do.
23      But the County has no control over it.

Page 75

1  You know, like I said, they are not an official
2  board of Baldwin County.  They are a separate
3  entity.  But there was obviously a good bit of
4  publicity given the number of people who were
5  there that day.
6       Q.  At least in the Fort Morgan Civic
7  Association?
8       A.  I -- I think some of them, you know -- as
9  far as I know, a lot of them were members of the
10 civic association.  I don't know that everybody
11 who was there was.  You know, some of the -- some
12 of it might have been word of mouth; neighbors
13 talking and neighbors.  I don't know.  I just know
14 that that meeting hall was full.
15      Q.  Will you please turn to what's been marked
16 as Plaintiffs' Exhibit Number 4.
17
18      (Whereupon, Plaintiffs' Exhibit No. 4 was
19      marked for identification and copy of same is
20      attached hereto.)
21
22      A.  Okay.
23      Q.  After you revoked the land use certificate

Page 76

1  for Plaintiffs, do you -- would you agree that
2  Plaintiffs went back to U.S. Fish and Wildlife
3  Service with a request for a new incidental take
4  permit based on an altered parking layout?
5       A.  Yes.
6       Q.  Do you recognize this document as
7  something that was then ultimately submitted to
8  your office once that was received by fish and
9  wild -- received from fish and wildlife?
10      A.  Yes, sir.
11      MR. ANDERSON:  Jamie and Lauren, we've
12 been going about an hour and a half.  Do you want
13 to take about a ten-minute break?
14      MS. KIDD:  Sure.
15      MS. COLLINSWORTH:  That sounds good.
16      MR. ANDERSON:  It's 10:54, so let's come
17 back about 11:04.
18      MS. KIDD:  Okay.
19      MR. ANDERSON:  Okay.  Thank you.
20
21      (Break.)
22
23      MR. ANDERSON:  All right.  I'm ready to



Page 77

1  resume whenever y'all are.
2      THE COURT REPORTER:  I'm ready.
3      MS. KIDD:  I'm ready.
4
5      Q.  (By Mr. Anderson)  Mr. Jackson, could you
6  please turn to what's been marked as Plaintiffs'
7  Exhibit Number 5.
8
9      (Whereupon, Plaintiffs' Exhibit No. 5 was
10     marked for identification and copy of same is
11     attached hereto.)
12
13     A.  Yes.
14     Q.  And this is an e-mail chain.  It
15  chronologically starts at the back and then moves
16  towards the front.  But my first question is, on
17  the third page marked as Bates Number 64, there's
18  an e-mail from you dated November 5th at 4:20 p.m.
19     A.  Uh-huh.
20     Q.  And you wrote that a new issue had arisen
21  regarding this property and the proposed duplex
22  structure.  When did you know about that new
23  issue?

Page 78

1      A.  Well, the height limitation was adopted by
2  the county commission on October 15th of 2019.
3  The -- the incident came back with the revised
4  incidental take showing that they now met parking
5  at some point after that.  Looks like they
6  received their incidental paperwork on October
7  25th.  And so Linda Lee -- again, she and I had
8  open communication.  She contacted me when she got
9  that information, and she said, I believe they
10  were proposing to build a three-story house, and
11  so I went -- I called Mr. Dyess, and I said look
12  -- I said, they got -- they finally got their
13  incidental take revision -- because if memory
14  serves, when they first said they were going to go
15  back and get a revised incidental take permit, we
16  were told it would be about six weeks.  So
17  apparently took somewhat longer than that.
18      But -- so I said -- I called Mr. Dyess,
19  and I said this is what's going on, you know, this
20  is that property where we had revoked the land use
21  because of parking.  So they got a revised
22  incidental take permit, but they're wanting to
23  build three stories, and now we have a two-story

Page 79

1  height limitation that we had just recently
2  adopted.  So my question was, do we let it go, or
3  do we have them pull it down to two stories, and
4  he felt like that because it was something the
5  County Commission had just adopted that we
6  couldn't approve something with three stories.
7      It was my understanding that he also
8  talked with the county attorney about it, but
9  also, you know, by that point, the land use
10  certificate -- a new land use certificate would
11  have had to have been submitted anyway.  It wasn't
12  a matter of, you know, somebody simply contacting
13  us by e-mail telling us we have to lift the stop
14  work order.  The process didn't work that way.
15      But yeah, by that point, there had been a
16  height limitation adopted for Planning District 25
17  which prevented us from approving a three-story
18  building.
19     Q.  You said that the process wouldn't work
20  that way in terms of lifting the stop work order.
21  How would the process work?
22     A.  Well, there was no -- the land use
23  certificate had been revoked.  There was no

Page 80

1  pending land use certificate.  So we would have
2  needed -- and also a land use certificate is good
3  for six months from the point at which it's first
4  submitted, so we would have needed to have a new
5  land use certificate submitted along with the
6  revised incidental take permit.
7      Q.  So you're saying a new application would
8  have needed to be submitted?
9      A.  Yes.
10     Q.  Is there an ordinance section or rule that
11  says that?
12     A.  I think there's -- somewhere on the --
13  there is somewhere, maybe, on the land use
14  certificate that says that it's good for six
15  month.  I can't -- or it might be in the
16  ordinance.  I can't remember exactly, but
17  basically, it's good for six months.
18     Q.  Could you have lifted the stop -- could
19  you have made the decision to lift the stop work
20  order and allow Plaintiffs to continue
21  construction under the land use certificate that
22  Crystal Bates had approved?
23     A.  At that point, no.  You know, once they



Page 81

1  were beyond the six months, it needed to be a new
2  land use certificate.
3      Q.  Oh.  If it were not beyond the six months,
4  would you have had the ability to do that?
5      A.  I think --
6          MS. KIDD:  Object to the form.
7      A.  I think if it had been less than six
8  months, I might could have let it stay under the
9  same number.
10     Q.  And when you say it'd stay under the same
11 number, do you mean without the necessity of
12 submitting a new application?
13     A.  Right.  We probably would have just
14 amended the current application.  As long as they
15 were within six months.  So that would have been
16 September -- yeah, sometime in September.
17 September -- up through September 27.
18     Q.  Were you involved in writing the text
19 amendments that imposed the two-story limitation?
20     A.  Yes.
21     Q.  When did you start writing that?
22     A.  Oh, I can't remember the exact date that
23 we started.  You know, like I was saying, you

Page 82

1  know, what we were working on for the Fort Morgan
2  area for District 25 started as a -- as a
3  provision to support dune walkovers.  The decision
4  to do -- you know, do something different with the
5  height, not just for Fort Morgan, but all of the
6  zoned areas of the county -- it came up at some
7  point after a meeting that we had down there.
8  It -- I can't remember the exact date of the
9  meeting.  It would have been before the June
10 meeting that we referenced earlier.
11         So at some point in May or -- April or
12 May, perhaps early June of 2019 was when we
13 started working on including a height of -- you
14 know, restoring the two-and-a-half-story height
15 limit, and then it would -- there was a letter
16 that came out from the fire chief that was really
17 strongly requesting us to have a two-story limit
18 for Fort Morgan for District 25.  So it would have
19 been after that letter was received from the fire
20 chief when we actually put the two-story height
21 limit in there.
22     Q.  You didn't -- your testimony is, that
23 two-story height limit was put into the text

Page 83

1  amendment draft after the letter from the
2  volunteer fire department?
3      A.  I think so.  I can't remember -- I can't
4  remember the exact sequence of events.  Our
5  original desire was to have it as two and a half
6  stories for all of the zoned areas unless there
7  were provisions or an ordinance that say
8  otherwise.  And I think it was at the point where
9  we received and were receiving some communication
10 from the fire chief, that was where we came more
11 convinced that we should -- we should go with the
12 two-story limit as we were being requested.
13         I can't tell you the exact date and time
14 on when I put that into a draft, but it was put in
15 there at some point.  And it was put in there
16 before it went to the planning commission.
17     Q.  You talked about a couple of meetings from
18 the summer of 2019 with the Fort Morgan Zoning
19 Advisory Committee.  Did anyone at any of those
20 meetings express any concern specifically related
21 to Plaintiffs' property on Ponce De Leon?
22     A.  There had been -- there had been issues
23 that had come up before about an adjacent parcel

Page 84

1  that was owned by the plaintiff.  A lot of it had
2  to do -- and I think the first time we were really
3  made aware goes back to 2017 when there was a
4  re-zoning case that we were dealing with down
5  there.  And it wasn't just that property, but it
6  was other -- there were others that were mentioned
7  as well where these large duplexes had been built
8  that were being rented out.  The cars were being
9  parked all over the place.  They were being parked
10 in the street, all over the yards, they were
11 blocking streets, blocking access, and that was --
12 that was where we first became aware of an issue
13 with the property owned by the plaintiff.
14         Now, you know, it wasn't -- what I was
15 made most aware of at the time was, you have this
16 really large duplex.  They're parking everywhere.
17 We think it's being used as a hotel rather than
18 rental property.  That was the information that we
19 were getting.  Who owned it was immaterial.  And I
20 think it wasn't until -- it wasn't until we got
21 the land use application for this particular
22 property that we knew it was the same -- or that I
23 knew, rather, that it was the same ownership.



ALABAMA
COURT REPORTING

Page 85

1    Q.  So you mentioned the use of the word
2  "hotel," and I'm aware that members of the Fort
3  Morgan Civic Association have used the term
4  "hotel" to describe the property owned by Eazy
5  Breezy, LLC, also on Ponce De Leon.  Is that a
6  term you've ever used to describe any of these
7  properties in Fort Morgan?
8    A.  No.
9       MS. KIDD:  Object to the form.
10   Q.  Can you describe the contours and bounds
11  of the discretion that you exercised in your role
12  as the planning administrator?
13      MS. KIDD:  Object to the form.
14   A.  (No response.)
15   Q.  Do you understand what I mean by the term
16  "discretion," Mr. Jackson?
17   A.  In terms of making a determination or an
18  interpretation?
19   Q.  Yes.
20   A.  Yes.  You want to make sure -- for one
21  thing, you don't want to -- you don't want to do
22  anything that allows something that wouldn't
23  otherwise be allowed.  So that's -- that's why,

Page 86

1  you know -- that -- that's an important aspect of
2  it.  There are certain provisions in the ordinance
3  that are brought, and so I would -- you have to
4  think about, in making a determination, what is
5  the most -- what's most defensible.  And that's
6  what part of our discussion with the parking --
7  with the interpretation surrounding the parking
8  and whether stacked parking could be permitted or
9  not is what was most defensible.
10      But, I mean, you want to stay within the
11  parameters of the zoning ordinance.  You can't --
12  and you can't allow some things that would -- that
13  would be specifically not allowable.
14   Q.  Other than the text of the Baldwin County
15  Zoning Ordinance itself, which I think you've
16  already described, what other limits are there on
17  the exercise of your discretion as planning
18  administrator?
19      MS. KIDD:  Object to the form.
20   A.  I think it would only -- it's only what's
21  in the zoning ordinance.  The statute that gives
22  Baldwin County the authority to have zoning
23  doesn't really address, you know, what the duties

Page 87

1  of a planning director might be and what the
2  limits of discretion might be.
3    Q.  Did Mr. Dyess train you on what the limits
4  of those discretions are, or did anyone else train
5  you?
6       MS. KIDD:  Object to the form.
7    A.  Most of the training that I received
8  throughout my entire career was just what I
9  learned on the job.  There were, you know,
10  sometimes training courses, but I think, you know,
11  discretion and how to -- how to interpret an
12  ordinance is something you learn by doing,
13  something you learn by watching what your
14  directors do.  You know, you can also take a look
15  at case law on certain things, not everything.
16  But to say that I was given a specific training on
17  how to interpret a zoning ordinance, I would say
18  no.
19   Q.  Could you please turn to what's been
20  marked as Plaintiffs' Exhibit Number 6.
21
22      (Whereupon, Plaintiffs' Exhibit Number 6 was
23      marked for identification and copy of same is

Page 88

1  attached hereto.)
2
3    Q.  And this was the appeal of the
4  administrative decision dated 11/18/2019.  Do you
5  recognize this document?
6    A.  Yes.
7    Q.  When this appeal was made, what did you
8  do?
9    A.  We scheduled it for a public hearing, and
10  we wrote a staff report -- staff recommendation
11  explaining the issues and recommending that the
12  staff position be upheld.
13   Q.  Who did you talk to about the appeal?
14   A.  I talked with one of the -- the attorney
15  that was with Stone Crosby that was helping us was
16  Shawn Alvez, and so he and I discussed it a pretty
17  good bit.
18   Q.  I don't want to hear anything about what
19  you talked about with your lawyer, but did you
20  talk to anyone else about it other than Shawn
21  Alvez?
22   A.  I probably made Mr. Dyess aware that it
23  had been submitted and, you know, what our



Page 89

1 position would be. He was there at the meeting.
2 And I don't -- I don't recall having a lot of
3 conversations about it with others. I mean,
4 typically if we -- if we made a decision, and that
5 decision is appealed to the board of adjustment,
6 our recommendation is that the board would uphold
7 the staff position.
8    Q.  All right. Will you please turn to what
9 has been marked as Plaintiffs' Exhibit Number 7.
10
11    (Whereupon, Plaintiffs' Exhibit No. 7 was
12    marked for identification and copy of same is
13    attached hereto.)
14
15    A.  Yes.
16    Q.  And is this the staff report in relation
17 to this appeal that you were just talking about?
18    A.  Yes, sir.
19    Q.  Who authored this staff report?
20    A.  I did.
21    Q.  Did anyone else have any input or
22 authorship in this report?
23    A.  No.

Page 90

1    Q.  On the second page Bates labeled Number.
2 23, it says, "After being made aware that
3 construction had commenced, staff issued a stop
4 work order on July 31st, 2019."
5      Who made whom aware that construction had
6 commenced?
7    A.  A citizen contacted the county
8 administrator who, in turn, contacted me.
9    Q.  Who was that concerned citizen?
10    A.  I don't know for certain. I believe it
11 was a gentleman named Paul Stanton, but I don't
12 know that for certain.
13    Q.  And Paul Stanton is also the president of
14 the Fort Morgan Civic Association, correct?
15    A.  I don't know. If he was, I believe, at
16 the time, someone else was.
17    Q.  Okay.
18    A.  But I don't know about that.
19    Q.  And do you know who within the county was
20 contacted with that information?
21    A.  I believe it was the county administrator
22 because he contacted me.
23    Q.  And is that typical for the county

Page 91

1 administrator to step in based on a single
2 citizen's complaint that something is being built
3 on a property that's already been permitted?
4      MS. KIDD:  Object to the form.
5    A.  Not really. I mean, typically, if there
6 was a concern about a building permit that had
7 been issued, they would start with the inspection
8 department.
9    Q.  Why was -- if you know, why was the county
10 administrator concerned about this case in
11 particular?
12      MS. KIDD:  Object to the form.
13    A.  He and I had already had some discussions
14 about it when the question about the
15 interpretation on parking first came up, so he was
16 somewhat aware, but he was also aware -- you know,
17 aware for many years from his previous time with
18 the county and his more recent time of the issues
19 effecting Planning District 25, and so Planning
20 District 25 was always an area of concern for him.
21 I can't -- I can't speak to it more than that.
22    Q.  As planning administrator, you weren't
23 just responsible for Planning District 25, but you

Page 92

1 were responsible for all of Baldwin County; isn't
2 that correct?
3    A.  The zoned areas of Baldwin County. In
4 terms of zoning -- we had zoning. The county is
5 divided into what we refer to as "planning
6 districts." At that time, there were 30 planning
7 districts, and 18 of the 30 planning districts had
8 zoning. So we had zoning jurisdiction only in the
9 planning districts that had noted their desire to
10 come out of the planning and zoning authority for
11 the Baldwin County Commission.
12      With subdivision authority, it's a little
13 different. That is more countywide, but then you
14 get into some other issues with overlapping
15 jurisdictions. But in terms of zoning, it's
16 limited to a planning district which has voted to
17 kind of be the zoning authority of the county
18 commission, and at that time, there were 18 out of
19 30.
20    Q.  In this staff report within Plaintiffs'
21 Exhibit 7, it says "Land use certificate was
22 issued in error due to issues with the required
23 off-street parking."



Page 93

1    When exactly was that determination made
2  that the land use certificate was issued in error?
3    A.  That would have been on -- probably on
4  July 31st.  You know, I can't remember the exact
5  date, but I think around July 31st is when that
6  determination would have been made.
7    Q.  Okay.  So is it fair to say that it was
8  after Paul Stanton or someone else had made
9  Mr. Dyess aware that construction had commenced?
10   A.  Yes.
11   Q.  This staff report lists a number of -- it
12  says, "Pertinent sections of the zoning ordinance
13  are listed as follows."  Why does it not list
14  Section 18.2.5 that regards the revocation of land
15  use certificates?
16   A.  The issue that was being appealed had to
17  do with the height, and we -- we could have put
18  that in there, but it was really -- we try -- we
19  try to give the board members what they need and
20  not give them too much.  And the requested action
21  was for the -- you know, the stop work order to be
22  lifted, and, I guess, the -- the plan needs to be
23  revised, but when it came down to the -- you know,

Page 94

1  what the board of adjustment is looking at is area
2  and dimensional requirements.  So that is the area
3  and dimensional requirement that they were being
4  asked to look at.
5    We gave them what they -- what we felt
6  like they needed to know.  I mean, there wasn't
7  any -- there wasn't any deliberate reason that
8  that particular section was not included.
9    Q.  Did -- would it be fair to say that you
10  just didn't think it was material to provide that
11  information to the board?
12   A.  Yes.
13    MS. KIDD:  Object to the form.
14   Q.  There are -- if you flip a few pages along
15  starting with Defendants' Bates Number 0027, there
16  were a couple of pages of photographs that were
17  attached to the staff report.  Who took those
18  pictures?
19   A.  I don't know if those could have been
20  taken by Joe Ryan or they could have been taken by
21  some of the citizens out there.  I remember that
22  there was some concern that construction materials
23  were bought to the site before a land use

Page 95

1  certificate or a building permit were even issued.
2  That's somewhat out of order, and so we were asked
3  about that, but it was not anything that we could
4  do in planning department.
5    But I don't remember if those came from a
6  citizen or if those came from Mr. Ryan.
7  Typically, Mr. Ryan, if he's on property, he'll
8  take pictures of what's going on out there, but I
9  can't -- I can't say specifically where those
10  pictures came from.
11   Q.  Is it typical for pictures taken by third
12  parties like citizens to be attached to staff
13  reports submitted to the board of adjustment?
14   A.  Yes.  I mean, we -- we will do our own
15  pictures, we do our own maps.  You can see the two
16  maps on 0029, those were generated by staff.  But
17  we -- you know, we provide things that are
18  submitted that are requested.  A lot of times, the
19  applicant in a particular case will request that
20  additional information be provided.
21    Also, once -- you know, sometimes once the
22  notices go out pertaining to particular
23  application, we'll receive correspondence from

Page 96

1  interested party members -- or property owners,
2  rather.  And so we -- you know, once we get to the
3  point of submitting information to the planning
4  commission or the board of adjustment, depending
5  on the application, we try to provide them with
6  what all we have been provided, you know, so that
7  they can see what type of feedback we're getting
8  from the public.
9    But -- and sometimes, like in the case of
10  -- something with other hearings before the county
11  commission, sometimes the materials might be
12  submitted directly to the commission office rather
13  than planning and zoning.  But usually if we did
14  anything, we include that in the information that
15  we send out.
16   Q.  Do you include everything you receive, or
17  do you only include the things that support the
18  conclusions in the staff report?
19   A.  No, we would -- we will include
20  everything.  You know, if there's -- if there's
21  pro -- pro, con, whatever; letters in favor,
22  letters of opposition, we include those.
23   Q.  On Bates -- on the same exhibit, the Bates



Page 97

1   Number 0032...
2       A.   Uh-huh.
3       Q.   If you flip a few pages, there is a
4   recommendation from the Fort Morgan Advisory
5   Committee.
6       A.   Yes.
7       Q.   This is the group we talked about earlier,
8   and you attended some of their meetings; is that
9   correct?
10      A.   Yes.  And the name of the church is in
11  that-- where they met, Shell Banks Baptist Church.
12      Q.   It references a Chair named Ernie Church
13  --
14      A.   Yes.
15      Q.   -- presenting the request for discussion.
16  Mr. Church was the, I guess, chairman of this Fort
17  Morgan Advisory Committee, correct?
18      A.   Correct.
19      Q.   Wasn't he also serving on the board of
20  adjustment that heard this appeal?
21      A.   Yes.
22      Q.   Is that not a conflict of interest?
23           MS. KIDD:  Object to the form.

Page 98

1       A.   I can't answer that question.
2       Q.   Do you personally consider that a conflict
3   of interest?
4           MS. KIDD:  Object to the form.
5       A.   Personally, I think it's beneficial that
6   members of the zoning advisory committee are also
7   members of the board of adjustment and the
8   planning commission because their knowledge of
9   applications that are pending in District 25 is
10  beneficial.  Now, from -- from a legal standpoint,
11  I can't address that.  You know, our attorneys
12  over the years have been aware that members of the
13  zoning and advisory committee were also members of
14  the board of adjustment and the planning
15  commission.
16      Q.   Have you ever had any personal
17  conversations with Ernie Church?
18      A.   Very limited.  I mean, I don't know that
19  we've ever -- I can't say that we've ever had a
20  one-on-one conversation.  You know, if he and I
21  are at a meeting at the same time, we speak and
22  exchange pleasantries, and that's about it.  I
23  can't say that we've ever had a long in-depth

Page 99

1   conversation, and I don't recall having a lengthy
2   conversation with him about this particular case.
3       Q.   Do you know Gregg Strategier?
4       A.   I know Mr. Strategier from -- yeah, some
5   of the meetings that we attended at Fort Morgan
6   and, also, he and his wife are very interested in
7   the issues affecting the planning district.  I
8   first became acquainted with him when the issue of
9   the dune walkover regulations -- or the need for
10  dune walkover regulations was brought to our
11  attention.  I don't know him personally.  I only
12  know him, you know, just dealing with him somewhat
13  on some of these zoning issues.
14      Q.   Do you recall any in-person conversations
15  with Mr. Strategier regarding parking or height
16  regulations in Planning District 25?
17      A.   I don't know if we necessarily had any
18  in-person conversations.  I know that he and his
19  wife would sometimes speak at the meetings -- at
20  the zoning advisory committee meetings, planning
21  commission meetings, county commission meetings.
22  They would -- they would, you know, state their
23  opinion.  And it wasn't just about these issues.

Page 100

1   We had a planned residential development, I think
2   I may have referenced earlier, called Sea Glade
3   that we worked on, and so there were -- there were
4   also -- you know, there were some -- some feedback
5   from them on the Sea Glade application.
6           I would receive e-mails from them
7   sometimes.  Sometimes it was me being copied on an
8   e-mail; not necessarily, you know, an e-mail that
9   was sent directly to me.  But as far as a lot of
10  conversations about this, I don't think we really
11  had any direct conversations.
12      Q.   Also, in this Exhibit Number 7, there's a
13  number of e-mails that, I think, were included
14  with the staff report and sent to the board of
15  adjustment --
16      A.   Uh-huh.
17      Q.   -- that were received by either you or
18  Linda Lee in your office either in support or in
19  opposition to this appeal; is that correct --
20  generally what those are?
21      A.   Yes, sir.
22      Q.   Do you or Ms. Lee have a practice of ever
23  responding to e-mails like that with questions,



Page 101

1   requests for clarification, or any kind of
2   comments on the -- on what you receive?
3       A.   If there was something where we felt
4   needed -- that there -- you know, some
5   clarification was needed, either clarification of
6   a question or something that we felt needed to be
7   clarified, we might have responded.  Sometimes we
8   would just do a quick thank you just to let the
9   person who sent the e-mail know that it had been
10  received.  But in general, these e-mails
11  expressing either support or opposition, in
12  general, we don't respond to those.  And I'm not
13  saying never.  It would just depend on the
14  situation.
15      Q.   Do you recall if you responded to any of
16  the e-mails with more than a thank you in this
17  case?
18      A.   I don't remember.  I really don't
19  remember.  It's been -- it's been a while -- a
20  little over a year, actually, and I really don't
21  remember.  Just looking through this, it looks
22  like -- looks like more of these were probably
23  sent to Linda Lee than to me.  I remember there

Page 102

1   were a lot of them.  But I would -- you know, if I
2   felt like a response was necessary, we would
3   respond, but in general, we would just -- we would
4   include these letters, these correspondence -- we
5   would include these with the staff report.
6       Q.   If you'll flip through those e-mails,
7   would you agree that the date on all of the
8   e-mails in opposition to the appeal were sent
9   within one day of one another?
10      A.   It appears that the earliest was December
11  2nd, but the majority being submitted on December
12  3rd or 4th.  I see one on -- let's see, one on
13  December 5th.  So a range from December 2nd to
14  December 5th with the majority on the 3rd and 4th.
15      Q.   Would you agree that these e-mails were
16  the result of the organization of the Fort Morgan
17  Civic Association asking its members to oppose
18  this appeal?
19      A.   It could have been.  I mean, that -- they
20  -- the Fort Morgan citizens would have already
21  been somewhat familiar with our process because of
22  the earlier application on the planning
23  residential development for Sea Glade, also the

Page 103

1   earlier rezoning for a portion of the Sea Glade
2   property, and then they -- a number of them sent
3   correspondence when we were working through the
4   text amendments.
5           So, you know, there was some familiarity
6   with the process and including -- getting
7   information including our mail out.  It is
8   possible that some people with the civic
9   association reached out to their members and said,
10  hey, you know, send these to the County.  It's
11  very possible.
12      Q.   Did you know Joe Emerson?
13      A.   I have met Mr. Emerson.  I don't know him
14  personally.
15      Q.   Have you ever had any direct in-person
16  conversations with Mr. Emerson about land use
17  regulations in Fort Morgan?
18      A.   A few.  I believe that at the time -- I
19  believe -- and I'm not 100 percent sure about
20  this.  I believe he may have been the chairperson
21  of the civic association.  I think he's involved
22  in real estate and he -- he was involved with the
23  zoning advisory committee whenever I was there.  I

Page 104

1   remember having a couple of conversations with him
2   about some of the zoning issues down there but,
3   you know, they were just conversations.  It wasn't
4   -- it was just about zoning in Fort Morgan.
5           And sometimes we didn't always agree.  I
6   remember, you know, when -- you know, one instance
7   in particular where we had a difference of
8   opinion, but it had more to do with subdividing
9   property and not zoning.  We had some
10  conversations, but, yeah, I can't -- I can't say
11  specifically what every conversation was about.
12      Q.   Do you recall if any of your conversations
13  with Mr. Emerson were in relation to parking or
14  height or story restrictions in Fort Morgan?
15      A.   I don't think there were any specifically
16  related to parking.  If there were any related to
17  the height limitation, it would have been
18  strictly, this is something we're working on.
19  There wouldn't have been -- you know, it wouldn't
20  have been more substantive than that.
21      Q.   Why did you say it wouldn't have been any
22  more than that?
23      A.   Well, just if somebody came to me and



Page 105

1  said, we need this regulation, our response would
2  have been, "We're working on it," and that would
3  have been the extent of it.
4  **Q.  With respect to all of the individuals**
5  **that wrote opposition e-mails, are there any that**
6  **you had any kind of personal relationship with or**
7  **had met in person regarding any of the issues that**
8  **were being discussed in this appeal?**
9       MS. KIDD:  Object to the form.
10      MR. ANDERSON:  Jamie, would it resolve
11   your objection if I broke that down into --
12      MS. KIDD:  Yeah, that would help.
13   **Q.  (By Mr. Anderson)  Well, let me break it**
14   **down for you, Mr. Jackson.  With respect to all of**
15   **the individuals that wrote these opposition**
16   **e-mails, do you have a personal relationship with**
17   **any of them?**
18      A.  Am I friends with any of them?
19   **Q.  Yeah.**
20      A.  No.
21   **Q.  With respect to these individuals, other**
22   **than Mr. Strategier and Mr. Emerson who we've**
23   **already discussed, are there any others that you**

Page 106

1  **had had in-person discussions about these topics**
2  **with?**
3      A.  I had probably -- I had had some
4  discussions with Mr. Stanton -- Paul Stanton who
5  was mentioned earlier.  But a lot of them -- as I
6  look through this, a lot of the names -- I
7  recognize the names because I've seen them before,
8  but I can't place these people.  You know, these
9  are people I may have met at a meeting, they may
10 have introduced themselves to me, but if I saw
11 them today, I wouldn't know who they were.  So
12 none of these are friends of mine.
13  **Q.  Is it unusual to get this volume of**
14  **e-mails about a specific variance or appeal**
15  **request?**
16     A.  Not necessarily.  There -- we have --
17 we've had a lot of applications over the years
18 that have generated a lot of interest.  Usually
19 the -- when you have something that generates
20 interest, you get correspondence, you get e-mails,
21 you get phone calls.  We've had re-zonings that
22 generated considerable opposition.  We've had
23 other variances, we've had appeals, you know, all

Page 107

1  -- any -- it's an ongoing thing.
2       Not every application that the planning
3  and zoning department gets is going to generate
4  this much correspondence, but it's not unusual if
5  they do.  And typically -- you know, typically, if
6  there's some opposition to somebody doing
7  something, that's where you tend to see more
8  correspondence.  I've had, I think, one zoning
9  case that I can recall where there was
10 considerable support that was expressed for
11 something that someone wanted to do, and that was
12 actually nice change of pace from what we normally
13 see because it wasn't a controversy, you know.  It
14 would have been something that was good for the
15 community.
16      But it's not unusual to have this level --
17 this level of correspondence.  We've had some with
18 a bit more.  This is a lot, but we've had some
19 with more.
20  **Q.  If you know, at the time that this was all**
21  **submitted, was the makeup of the executive board**
22  **of the Fort Morgan Civic Association:  President,**
23  **Joe Emerson; Vice President, Ernie Church;**

Page 108

1  **Treasurer, Greg Strategier; and Secretary, Carol**
2  **Kittrell?**
3      A.  That's probably correct.  But I don't -- I
4  can't attest to that for certain, but that sounds
5  correct.
6  **Q.  Would you please --**
7      A.  I know that I --
8  **Q.  Sorry.**
9      A.  Oh, I was just gonna say that I'm pretty
10 sure that Mr. Emerson was chairman, and I know
11 that Ms. Kittrell was the secretary because she
12 also served as secretary with the zoning advisory
13 committee.
14  **Q.  Would you please turn to what's been**
15  **marked as Plaintiffs' Exhibit Number 8.**
16
17      (Whereupon, Plaintiffs' Exhibit Number 8 was
18      marked for identification and copy of same is
19      attached hereto.)
20
21  **Q.  I'll represent to you this photo was**
22  **produced by the County.  Can you tell me who took**
23  **this photo?**



Page 109

1    A.  It could have been taken -- if it was
2  taken by a county staff person, it was taken by
3  Joe Ryan.
4    Q.  Do you know why this photo was taken or
5  why the County had it?
6    A.  It could have been to show the need for a
7  height limitation or to show that the parking --
8  it might have been -- it might have been to show
9  that those pilings had been put into the ground,
10  or it could have been just taken in conjunction
11  with (inaudible due to technical difficulty.)  I
12  don't know for certain, but if this one was taken
13  by (inaudible due to technical difficulty.)
14       THE COURT REPORTER:  Can you repeat that
15  last part, please?  I'm so sorry.  You're kind of
16  fading away as you speak.
17       THE WITNESS:  I'm sorry.  I'm not a loud
18  talker.  I apologize.
19    A.  If anybody who works for the county took
20  this, it was Mr. Ryan.  I don't know -- you know,
21  I can't say for certain where it came from, but if
22  a county employee took it, it was Joe Ryan, the
23  code enforcement officer.

Page 110

1    Q.  Do you recognize the house that's depicted
2  in this photograph?
3    A.  Yes.
4    Q.  What do you know about that house?
5    A.  It's also owned by the same property owner
6  as the subject property.
7    Q.  I'll represent to you it's owned by Eazy
8  Breezy, LLC, which is under some common ownership,
9  and I'll just, if it's okay with you, refer to it
10  as the Eazy Breezy house.
11    A.  That's fine.
12    Q.  Have you had conversations with anyone
13  about the Eazy Breezy house?
14    A.  There were -- there were -- people started
15  asking about it after it was built.  At the time
16  that it was built, there were no height
17  limitations, there were no special parking
18  requirements, so, you know, what you see in the
19  picture is allowed.  But there were concerns
20  expressed that it was too big, that it overcrowded
21  the lot, and there were definitely concerns about
22  the parking on the street.
23       You know, but they were things that we

Page 111

1  couldn't do anything about.  Like I said, at the
2  time that this was built, it met zoning
3  requirements.  I think this is one of the
4  structures that people want to refer to as a
5  hotel.  You know, we didn't view it as a hotel; we
6  viewed it as a duplex.  A large duplex, for sure,
7  but we viewed it as a duplex.
8       But yes, there were -- you know, there
9  were some calls, I believe, to the planning and
10  zoning department once this was built.  There were
11  others down there, but, yeah, this was one in
12  particular.  And I didn't have any -- I can't say
13  that I had any direct conversations about it.  I
14  was made aware of some calls that some other staff
15  took.  But I don't recall -- except for maybe
16  having some discussions with some of my coworkers
17  in the planning department, I don't recall having
18  any conversations about this structure.
19    Q.  You mentioned calls and some contact from
20  certain people asking about it.  Do you recall who
21  those people were?
22    A.  I believe it was Mr. Stanton, who we
23  already mentioned was one, but I believe there

Page 112

1  were others.
2    Q.  Do you know if Joe Emerson, Ernie Church,
3  Gregg Strategier, or Carol Kittrell voiced any
4  concern or anything else about the Eazy Breezy
5  house?
6    A.  I can't say for certain.  I know -- I
7  don't recall Ms. Kittrell really talking about --
8  you know, speaking at any of our meetings, but I
9  know that -- I know that the Strategiers were more
10  concerned about a number of things, so it's
11  possible that -- whenever they came to one of our
12  public hearings, it's possible that they became
13  concerned about this house.  I don't remember.  It
14  was already going back to at least '17 when we had
15  the initial re-zoning for the proposed (inaudible
16  due to technical difficulty) of Sea Glade, even
17  then, people were talking about it, and they were
18  -- in expressing concerns about what might happen
19  at Sea Glade, they were kind of pointing to this
20  structure and some other structures as well to
21  what they saw as problematic for Planning District
22  25.
23       THE COURT REPORTER:  For what?



Page 113

1    THE WITNESS:  Problematic for Planning
2  District 25.
3    Q.   Would it be fair to say that some of those
4  individuals were trying to get the planning
5  department to prevent Plaintiffs from building
6  something like Eazy Breezy?
7    A.  I can't -- I just don't know.
8    Q.  You just don't know what they were trying
9  to do?
10    A.  I don't know.  I don't know.  I don't know
11  all of the reasons behind the certain issues that
12  people were concerned about down there.
13    Q.   Could you please turn to what's been
14  marked as Plaintiffs' Exhibit Number 9.
15
16    (Whereupon, Plaintiffs' Exhibit Number 9 was
17    marked for identification and copy of same is
18    attached hereto.)
19
20    Q.   These are all letters that relate to case
21  Number TA-19001, and those are text amendments to
22  Article 2, Section 2.3.25 related to Planning
23  District 25.  Are you familiar with these e-mails

Page 114

1  and letters?
2    A.  Yes.
3    Q.   And are these all letters or e-mails that
4  Baldwin County received in relation to the text
5  amendment I just mentioned?
6    A.  Yes.
7    Q.   And that text amendment, part of its
8  intent was to reduce the permissible stories from
9  three to two in Planning District 25, correct?
10    A.  It was to establish a two-story height
11  limit.  I mean, we you know, basically, when we
12  didn't have a height limit in terms of stories, it
13  would have been whatever you could get in 35 feet.
14  So there wasn't a three-story limit that was
15  changed to two.  It was a -- it was a two-story
16  limit that was enacted.
17    Q.   On the first page, Defendants' Bates
18  Number 0144, this is a letter written by Gregg
19  Strategier.  He writes, "Baldwin County Planning
20  and Zoning Department and the Director, Vince
21  Jackson, along with Baldwin County Administrator,
22  Wayne Dyess, have put in substantial energy over
23  the years working with Fort Morgan citizens,

Page 115

1  homeowners, businesses, community leaders, Fort
2  Morgan Planning and Zoning Advisory Committee,
3  Fort Morgan Civic Association, and Fort Morgan
4  Volunteer Fire Department to development the
5  proposed amendments for District 25;" is that
6  correct?
7    A.  There were -- there were people down there
8  that certainly had input into what we did.  Did we
9  spend a lot of time with these individual entities
10  working on this, I wouldn't say that that was
11  necessarily the case, but we certainly, you know,
12  when we went down there to those meetings we made
13  them aware, we took comments into account, so yes,
14  to the extent, we did spend time -- over the years
15  -- I mean, we're really talking about a span of
16  about two years that we started working on this
17  particular issue.  You know, we -- we welcomed
18  their input, we listened, but, you know, it's
19  correct.  Maybe it overstates things a little bit.
20    Q.   Do you know if you worked with any Fort
21  Morgan citizens, homeowners, businesses, community
22  leaders that were not members of the Fort Morgan
23  Civic Association?

Page 116

1    MS. KIDD:  Object to the form.
2    A.  It's possible.  I don't know for sure, but
3  -- I can't say yes or no.
4    Q.   If you know, is it true that all the
5  members of the Fort Morgan Planning and Zoning
6  Advisory Committee are also members of the Fort
7  Morgan Civic Association?
8    MS. KIDD:  Object to the form.
9    A.  I believe that's correct.
10    Q.   And, again, if you know, is it true that
11  all the members of the Fort Morgan Volunteer Fire
12  Department are also members of the Fort Morgan
13  Civic Association?
14    A.  I don't know.  I don't know the answer to
15  that question.
16    Q.   At this time when this was being
17  considered, and you were receiving input on these
18  text amendments, was Ernie Church the head of the
19  volunteer fire department?
20    A.  I can't say.  I want to say there was a
21  letter that came from -- that came from someone
22  else.  I do remember that Mr. Church was involved,
23  but I don't remember -- and he may have been the



Page 117

1  volunteer fireman.  Now that I'm thinking, maybe
2  he was.  But I don't -- I don't remember.  Most of
3  the time, my memory is limited to my involvement.
4  So I didn't have any direct involvement in the
5  volunteer fire department, so -- but he may have
6  been the head of it.  I just really don't know.
7      Q.  One last question about Mr. Strategier's
8  letter.  He writes that you were also working on
9  an occupancy zoning ordinance; is that true?
10         MS. KIDD:  Object to the form.
11     Q.  Well, was that true when he wrote that?
12     A.  No.  We might -- I think what we -- I
13  think the way that came up -- one of the meetings
14  that we attended down here, it might have been the
15  June 2019 meeting, there was some -- some talk of
16  an occupancy ordinance, and it was mentioned by
17  somebody who was there that the City of New
18  Orleans has an occupancy ordinance.  We may have
19  said we would look into it, but we -- that was
20  about as far as it went.  I personally have never
21  worked on an kind of occupancy -- ordinance that
22  would limit occupancy.
23     Q.  If you'll turn in the same exhibit to --

Page 118

1  towards the end.  It's the last two pages of
2  what's been marked as Defendants' Bates 159 and
3  160.
4
5         (Witness complies.)
6
7      Q.  Is this the letter that was received by
8  the County from the Fort Morgan Volunteer Fire
9  Department in relation to the text amendment
10  establishing a height restriction as two stories?
11     A.  Yes, and it was from Mr. Church as
12  president of the board of directors.
13     Q.  So at this time, Ernie Church is the head
14  of the fire -- volunteer fire department, he's the
15  director of the Fort Morgan Civic Association, and
16  he's also on the board of adjustment, correct?
17     A.  Yes.
18     Q.  Is this the only information that was
19  considered with respect to fire safety when the
20  text amendment was being drafted?
21         MS. KIDD:  Object to the form.
22     A.  I don't know that this was the only bit of
23  information, but it was persuasive.

Page 119

1      Q.  What other information was considered by
2  you or anyone else to your knowledge with respect
3  to fire safety in drafting this text amendment
4  related to the two-story limit?
5      A.  I can't really say in what -- when you're
6  talking about fire safety, there's a limit to what
7  be done through zoning.  If you notice they talk
8  about some things like spiral staircases.  Zoning
9  can't regulate that type of thing.  That is a
10  building code issue.  So a lot of the things that
11  had -- are concerns regarding fire safety needed
12  to be addressed in the building code.  The
13  planning and zoning department had no role in the
14  building -- had no jurisdiction over the building
15  code.
16         The height limitation was something that
17  we could do.  And I think it -- you know, when
18  that letter was sent to the county commissioner,
19  that was certainly a persuasive argument in terms
20  of the two-story limitation.  I can't say whether
21  or not there were other letters sent.  There may
22  have been some letters sent to the county
23  administrator, but I don't know.  But this

Page 120

1  particular letter was very, very persuasive in
2  terms of making that argument.
3      Q.  Specifically which parts of this letter
4  were persuasive with respect to the County's
5  consideration of this text amendment?
6         MS. KIDD:  Object to the form.
7      A.  Well, I think the fact that it came from
8  the fire department at all was part of it, and it
9  seems like -- and I can't remember -- there was
10  some discussion that might have been at one of the
11  meetings about the concern -- the -- part of the
12  concern had to do with rescuing people and only
13  having two floors to deal with rather than three
14  floors or perhaps more.
15         This letter had a lot to do with why we
16  ended up with the two-story limit.  I mean, you
17  can see the letter was not addressed to me, but it
18  had a lot to do with why the two-story limit ended
19  up going.  I'm sure there were other things that
20  played into it, but I can't say, sitting here
21  right now, what those things were.
22     Q.  So just the -- what you're testimony is,
23  is just the general fact that the volunteer fire



Page 121

1  department expressed concerns was -- about having
2  anything in excess of two stories was a good
3  reason to pass the text amendment?
4      A.  Yes.
5      Q.  One of the comments made by Mr. Church in
6  this letter is, "We have a ladder capability to
7  second stories, but not to greater heights."  How
8  many -- would you agree that ladders are measured
9  in feet, not in stories?
10     A.  I would guess so.
11         MS. KIDD:  Object to the form.
12     Q.  So would you agree that a ladder of a
13  certain number of feet could reach two stories or
14  three stories or four stories depending on how
15  high each story is?
16     A.  It's possible.  I'm not acquainted enough
17  with fire fighting to know that.
18     Q.  At the end of Mr. Church's letter, he
19  writes, "The bottom line is, a two-story
20  residential limitation reasonably ameliorates both
21  controlled growth and reduced density."
22         Does that suggest the summary of Mr.
23  Church's letter was controlling growth and density

Page 122

1  rather than fire safety?
2      A.  That's one aspect of it.  I can't really
3  read it, but I think that was certainly a concern.
4      Q.  Would you please turn to what's been
5  marked as Plaintiffs' Exhibit Number 10.
6
7      (Whereupon, Plaintiffs' Exhibit Number 10 was
8      marked for identification and copy of same is
9      attached hereto.)
10
11     Q.  This is a letter dated July 3rd, 2019.
12  Did you write this letter?
13     A.  I did.
14     Q.  Did anyone else have any input or
15  authorship in this letter?
16     A.  No, sir.
17     Q.  When did you send this letter?
18     A.  It would have been sent sometime around
19  July 3rd.
20     Q.  Do you know how it was sent?  E-mail?
21  Mail?  Hand delivery?
22     A.  Not hand delivery.  I don't remember if it
23  was just e-mail, regular mail, or both.

Page 123

1      Q.  The first line says, "As requested, I've
2  researched the applicability of Section 15.3.1 of
3  the Baldwin County Zoning Ordinance to stacked
4  parking spaces."
5         Who requested that you do that research?
6      A.  Paul Stanton was the first person to
7  request it.  There were some others, and I don't
8  remember, but there were -- there were more than
9  one that were fishing for a determination about
10  this, but I think the original request was from
11  Paul Stanton, and I think it originally --I think
12  it was originally in an e-mail form to Linda Lee.
13     Q.  So Mr. Stanton requested this to Linda Lee
14  by e-mail some time prior to July 3rd, 2019?
15     A.  Yes.
16     Q.  And then you think that others may have
17  joined in that request.  How did they do so and
18  when?
19     A.  A lot of times the e-mail -- there would
20  be multiple people copied on an e-mail, and so
21  there might have been -- it seems like there was
22  at least one occasion where, you know, there was a
23  follow-up from one of the people that was copied,

Page 124

1  and there may have been some others.  I know
2  that -- like I said, it originated from
3  Mr. Stanton, but I believe there was some others
4  as well.
5      Q.  And do you believe that they would have
6  done so by e-mail?
7      A.  Yes.
8      Q.  Did Mr. Stanton ask you to determine if
9  stacked parking spaces were not permitted?
10     A.  We were aware that Mr. Stanton believed
11  that the section of the zoning ordinance refers to
12  the parking spaces having unimpeded ingress and
13  egress, that that would prevent stacked parking.
14  We were aware that that was the decision being
15  upheld, that he specifically asked us to make that
16  determination, and make a determination that
17  agreed with him that -- you know, we were making
18  determination as to whether -- whether or not this
19  particular section was appropriate.
20     Q.  Were you write, "I have researched the
21  applicability of Section 15.3.1," what do you do
22  to research that applicability?
23     A.  Basically -- basically studied that --



Page 125

1 that particular provision and tried to determine
2 how we would use it as part of the zoning
3 ordinance, and I talked to -- again, I talked to
4 the county administrator about it to see if he had
5 any memory of it, if he had any memory of intent
6 of it, and also to get his feedback (inaudible due
7 to technical difficulty).
8          THE COURT REPORTER:  To get his feedback
9 on what?  I'm so sorry.  You're breaking up so
10 badly.
11          THE WITNESS:  On what a proper
12 determination should be.
13   **Q.  So you talked to Wayne Dyess.  Anything**
14 **else you did in terms of research?**
15   A.  I really don't remember.  But that was the
16 main thing.  The main thing was trying to --
17 trying to -- trying to figure out the intent of
18 that particular paragraph, figure out the intent
19 of, you know, how long that had been part of the
20 ordinance.  And I may have looked at some other
21 ordinances to see if there was similar language,
22 but, you know, that would have been about the
23 extent of it.

Page 126

1   **Q.  When you talked to Mr. Dyess, what did he**
2 **say?**
3   A.  He didn't -- he didn't remember when the
4 -- when that provision was put in there.  It
5 appeared to be -- that it had been there for quite
6 a while going back to before my employment and
7 before his employment with the County.  He didn't
8 really know what the intent was.  But he felt like
9 that the statement in there about, you know,
10 unrestricted ingress and egress -- in a driveway
11 which provided unrestricted ingress and egress to
12 make the street less crowded was pretty
13 controlling, and that the only defensible position
14 was to say that you couldn't have a stacked
15 arrangement because of that statement.
16   **Q.  Section 15.3.1 of the Baldwin County**
17 **Zoning Ordinance applies to all the zoned portions**
18 **of Baldwin County, correct?**
19   A.  Right.
20   **Q.  Then why did you make your determination**
21 **specific to supplemental parking requirements**
22 **which are found in the local provisions for**
23 **Planning District 25 in which are applicable to**

Page 127

1 **single-family and two-family properties?**
2   A.  In normal parking -- in most situations,
3 stacked parking is not an issue.  In a normal --
4 in a normal parking lot, it -- you're not going to
5 find one parking space stacked -- you know, placed
6 behind another parking space that would
7 potentially prevent a car from having access to a
8 street or alley.
9          In most residential settings in the other
10 zoned areas of the county, the parking ratio for a
11 single-family and two-family structures is only
12 two per unit.  So in those cases, again, they're
13 not going to be stacked one behind the other.  It
14 was the provision for Planning District 25 where
15 we required additional parking spaces based on a
16 number of bedrooms that made stacked parking an
17 issue down there in the first place.  And so that
18 was why the determination was stated the way it
19 was.
20   **Q.  So you're saying that it was -- you did**
21 **not make it generally applicable to all of Baldwin**
22 **County because the parking ratio applicable in**
23 **Planning District 25 only made it an issue in**

Page 128

1 **Planning District 25?**
2   A.  Correct.
3   **Q.  So if I were to build a house on Ono**
4 **Island and built a ten-foot wide driveway so that**
5 **I could only fit two cars in it but they had to be**
6 **in a stacked configuration, that would still be**
7 **permissible under section 15.3.1, correct?**
8   A.  The likelihood that you would do that is
9 slim to none.  Like I said, it never came up
10 before.  It's not an issue in other areas.  We
11 limited it to a situation that is brought about by
12 a situation in this specific planning district.  I
13 can't say for certain whether that would be
14 permitted or not without actually seeing a site
15 plan.
16   **Q.  Why -- I understand your testimony that**
17 **it's unlikely, but why can't you tell just based**
18 **on the text of section 15.3.1 whether that would**
19 **be permissible or not?**
20   A.  I would need to see a site plan.
21          MR. ANDERSON:  Just one second.  Let's go
22 off the record for one minute.
23

Page 129

1    (Break.)
2
3    Q.  (By Mr. Anderson)  Mr. Stanton, who
4  requested this interpretation, lives on the same
5  street as the Plaintiffs' property, correct?
6    A.  Yes.
7    Q.  Do you often research applicability of
8  zoning ordinances at the request of individuals?
9    A.  Yes.
10    Q.  And do you -- have you issued other
11  letters like this before?
12    A.  I've done zoning determinations, quite a
13  few over the years, and, you know, different
14  issues, but we -- there's hardly a day that goes
15  by that -- and I shouldn't say "we" since I'm not
16  with the planning department anymore, you know,
17  but there's hardly a day that goes by that the
18  department doesn't receive a complaint about
19  something somewhere.  And all of those have to be
20  investigated.
21    We have to look at applicable regulations.
22  We have to try to figure out if there's a --
23  perhaps a grandfathered use -- which regulations,

Page 130

1  if any, are applicable.  Sometimes we get a
2  complaint and there's not an issue, it's just that
3  somebody doesn't like what somebody else is doing.
4  I had one recently where somebody complained about
5  where somebody was putting their air conditioner,
6  and it was strictly a matter of -- that he didn't
7  want to see it.  That was one of the last
8  complaints that I had to deal with.
9    You know, some complaints are valid; some
10  complaints are not.  They all -- we take them all
11  seriously.  We research all of them.  We -- in
12  some cases, we have to make the determination of
13  whether there's a grandfathered use or
14  grandfathered situation.
15    Sometimes, people will provide us with
16  affidavits stating that a certain activity is
17  taking place prior to a certain date.  Sometimes
18  we have to look at revenue department information.
19  We have to look at old aerial photographs to the
20  extent that we can, Google Earth.  There are a lot
21  of tools that we have available.  But any time
22  that we get a complaint and any time we get a
23  request, we take -- we treat all of those the

Page 131

1  same, and we do spend time researching and trying
2  to figure out what we can do, you know.  If we
3  can't do anything, is there someone else that
4  might could help.
5    And sometimes -- sometimes these things,
6  these complaints, these requests, sometimes they
7  come in anonymously, but sometimes they don't.
8  Sometimes, we know exactly where they're coming
9  from, but they're all treated the same.
10    Q.  Prior to the date of this letter, July
11  3rd, 2019, is it correct that stacked parking
12  configurations on site plans had always been
13  permitted within Planning District 25?
14    A.  In all honesty, had that section not been
15  brought to our attention, and we had not taken the
16  time -- spent a little time on it, we probably
17  would have continued to permit stacked parking.
18  That's an honest answer.
19    Q.  Did this letter constitute a change in
20  policy at Baldwin County with respect to stacked
21  parking in Planning District 25?
22    A.  I think so because it brought to -- you
23  know, it brought up to fact that there was another

Page 132

1  provision that we needed to look at.  We weren't
2  simply looking at number of spaces and how large
3  the spaces were.  We had to look at whether the
4  spaces had unimpeded access to a street or an
5  alley, you know, whichever the case might be.
6    Q.  When this -- so obviously this letter went
7  to Paul Stanton.  Who else did you tell about this
8  policy change?
9    A.  Mr. Dyess was aware of it and Linda Lee in
10  Foley was also aware.
11    Q.  No one else?
12    A.  I don't remember.  Those are the -- those
13  are the ones that I remember.
14    Q.  Did you or anyone else make the public
15  aware of this policy change through any posting or
16  other means?
17    A.  I don't -- I don't recall, and I don't --
18  it -- I don't recall if we talked about it at one
19  of those meetings we attended in the Fort Morgan
20  area.  I don't recall that there was any kind of
21  public announcement.
22    Q.  This didn't go on the Baldwin County
23  website or anything like that, did it?



Page 133

1    A.  No.
2    Q.  Were applicants with pending land use
3  certificate applications made aware of this policy
4  change at this time?
5    A.  I believe so.  I believe that there were
6  -- and I -- I didn't actually review or process,
7  but I believe that there were some applicants that
8  were made aware of it, and they made -- they made
9  -- it was my understanding that some made some
10  appropriate changes in order to be able to receive
11  approval.
12    Q.  Who made those applicants aware of those
13  -- of that change?
14    A.  It most likely would have been Linda Lee
15  in the Foley office or whoever else in the Foley
16  office they might have talked to.
17    Q.  And would that have taken place right
18  after July 3rd, or over how long of a period of
19  time?
20    A.  It would have been shortly after.
21    MR. ANDERSON:  All right.  Why don't we
22  take an hour for lunch.  It's 12:33, so come back
23  at 1:30; Is that all right with everybody?

Page 134

1    MS. KIDD:  Sure.  Do you know -- do you
2  have a guess on about how long you'll be after
3  lunch?
4    MR. ANDERSON:  Two hours.  Just a guess.
5    MS. KIDD:  Okay.
6    MR. ANDERSON:  Could be a little longer,
7  but maybe shorter.
8    MS. KIDD:  Okay.  All right.  Thank you.
9    MR. ANDERSON:  Thank you.
10
11    (Whereupon, a lunch recess was taken.)
12
13    THE COURT REPORTER:  Before we get going
14  again, would it be possible for the witness to be
15  moved closer to the mic he is speaking into?
16    MS. COLLINSWORTH:  The mic is actually
17  mounted on the wall with the camera, so I can't
18  move it.
19    THE COURT REPORTER:  Okay.  Thank you.  I
20  am ready when everyone else is.
21    MR. ANDERSON:  Is everybody ready to get
22  started?
23    Q.  (By Mr. Anderson)  All right, Mr. Jackson,

Page 135

1  we're back on the record.  Would you please turn
2  to what's been marked as Plaintiffs' Exhibit
3  Number 11.
4
5    (Whereupon, Plaintiffs' Exhibit Number 11 was
6    marked for identification and copy of same is
7    attached hereto.)
8
9    A.  Okay.
10    Q.  And do you recognize these e-mails and
11  letters as being sent in relation to a proposed
12  text amendment related to the parking ratio in
13  Planning District 25?
14    A.  Yes.
15    Q.  Who is Charles Gruber?
16    A.  He's the county commissioner who
17  represents County Commission District 4, which
18  includes Planning District 25, south end of the
19  county.
20    Q.  Do you know Sandra Bennett, Deidra Bell,
21  Mack Bell, Don Ward, Glenn Stevens, or Jerry
22  Ralston?
23    A.  Mr. Stevens, I believe, at one time was on

Page 136

1  the board of adjustment for the county.  He may
2  have also been on the planning commission, but I'm
3  not certain about that, and according to this
4  information, he was the fire chief at the time --
5  let's see.  There was a letter written May 24th,
6  2017, he was the fire chief at that time.  And I
7  don't -- I mean, I remember him.  I wouldn't say
8  that I know him.  I don't know any of the others
9  who sent correspondence.
10    Q.  So you remember Mr. Stevens, and you've
11  had interactions with him related to zoning in
12  Fort Morgan?
13    A.  I remember him.  I don't remember having a
14  direct one-on-one interaction with him.
15    Q.  All of these letters mention what we
16  talked about earlier, the Eazy Breezy house at
17  3468 Ponce De Leon Court.  Was that house the one
18  reason why this parking ratio text amendment was
19  created?
20    A.  That was part of it.  I think there were
21  some others that were of concern, and I believe
22  this -- this started to come up during a time that
23  we were working on the re-zoning for the proposed



Page 137

1  Sea Glade development, and I think there was just
2  a concern overall about increases in density in
3  the Fort Morgan area and what might happen if
4  there were not some limitations placed on parking
5  with the potential for additional structures to be
6  built.
7      **Q.   Since all of these letters, including the**
8  **one from the Fort Morgan Volunteer Fire**
9  **Department, reference the house on Ponce De Leon**
10 **Court, would you agree that they were most likely**
11 **coordinated by a single source such as the Fort**
12 **Morgan Civic Association?**
13     MS. KIDD: Object to the form.
14     A.   It could have been, but I can't say for
15 certain that that's what happened.
16     **Q.   Could you please turn to what's been**
17 **marked as Plaintiffs' Exhibit Number 12.**
18
19     (Whereupon, Plaintiffs' Exhibit Number 12 was
20     marked for identification and copy of same is
21     attached hereto.)
22
23     **Q.   Do you recognize this as the staff report**

Page 138

1  **that was submitted in support of the text**
2  **amendment related to the parking ratio in Planning**
3  **District 25?**
4      A.   Yes.
5      **Q.   Did you author this staff report?**
6      A.   I did.
7      **Q.   Did anyone else have any input or**
8  **authorship in this document?**
9      A.   I remember that there was some suggestive
10 language submitted to the staff.  I don't -- I
11 don't remember who it actually came from, and I --
12 it seems like one of the county commissioners may
13 have had some input as well -- one of the county
14 commissioners at the time.  But, I don't remember
15 exactly.  I mean, I know that there was some
16 suggestive language, and we worked on it to try to
17 make sure that it fit in with the context of our
18 zoning ordinance.
19     **Q.   Do you remember who that county**
20 **commissioner was?**
21     A.   I believe it was Tucker Dorsey.  He's no
22 longer on the commission.
23     **Q.   If you go back to Plaintiffs' Exhibit 11,**

Page 139

1  the letter with Defendants' Bates Number 0082 at
2  the bottom...
3      A.   Yes.
4      **Q.   There, Deidra Bell writes, "We understand**
5  **an amendment has been written in supported by the**
6  **Fort Morgan Civic Association to restrict building**
7  **of mega structures with limited parking in our**
8  **area."**
9          **Was this text amendment written by the**
10 **Fort Morgan Civic Association in part or whole?**
11     A.   I don't know.  I don't know the answer to
12 that.
13     **Q.   Do you know of anyone who was involved in**
14 **writing this text amendment?**
15     A.   (No response.)
16     **Q.   If it refreshes your recollection, the**
17 **text of the text amendment's included in**
18 **Plaintiffs' Exhibit 12.**
19     A.   Yes.  I believe Mr. Paul Stanton may have
20 had a role in it.  We mentioned him previously.
21 Whether he was acting on zone, whether he was
22 acting in conjunction with the civic association,
23 I can't say.  And I'm not -- you know, there was

Page 140

1  some suggestive language that was given to me.  It
2  may have been given to Linda Lee first who, in
3  turn, forwarded it to me.  I just can't remember
4  the details, but I do remember that there was some
5  suggestive language that was given to us.
6      **Q.   Would that all be reflected in the**
7  **County's e-mail records?**
8      A.   Perhaps.
9      **Q.   So sitting here today, you don't recall**
10 **what degree of involvement the Fort Morgan Civic**
11 **Association or any individual had in drafting this**
12 **text amendment?**
13     A.   No, sir.
14     **Q.   But you, alone, authored the staff report**
15 **in support of that amendment, correct?**
16     A.   Yes.
17     **Q.   What was your recommendation of approval**
18 **based upon?**
19     A.   The -- as I've stated previously, the
20 parking ratio for a single-family dwelling or for
21 a duplex had previously been two parking spaces
22 per unit.  It didn't anticipate the number of
23 bedrooms.  And what was happening in Planning



ALABAMA
COURT REPORTING

Page 141

1  District 25 is, we were having -- we were having a
2  structure being built with more bedrooms than what
3  you would normally expect to see in a conventional
4  family dwelling or conventional duplex.
5        So we had been provided information about
6  parking in the street, you know, parking all over
7  the yards, and so we felt like providing a
8  required ratio that would be based on the number
9  of bedrooms, that that would help somewhat
10  alleviate that situation.  If -- some of the
11  things that were brought up had to do with the
12  fact that there would be bunk -- you know,
13  additional bunk beds, there would be bunk beds in
14  the hallway and this and that and that, but that
15  was not something that we addressed.  But we do
16  feel like we could at least come up with a ratio
17  that's consistent with a larger number of bedrooms
18  than what you would normally expect for a
19  single-family dwelling.
20     **Q.  Could you please turn to what's been
21  marked as Plaintiffs' Exhibit Number 13.**
22
23        (Whereupon, Plaintiffs' Exhibit Number 13 was

Page 142

1  marked for identification and copy of same is
2  attached hereto.)
3
4     A.  Okay.
5     **Q.  Do you recognize this document?**
6     A.  Yes.
7     **Q.  What does this relate to?**
8     A.  This is the county commission agenda items
9  submitted for the approval of -- or amendments to
10  the local provisions of Planning District 25.
11  This included the height limitation.  It also
12  included the requirements for dune walkovers.  It
13  renewed the high density residential HDR zoning
14  designation in Planning District 25 and also
15  included some considerations for re-zonings and
16  such in the flood areas -- flood zones and the
17  coastal high-hazard areas.
18     **Q.  Were you involved in drafting the text
19  amendment itself?**
20     A.  I drafted the majority of it.  I drafted
21  the -- the portion related to the dune walkovers.
22  That was -- that was really what started this set
23  of amendments was there were concerns about some

Page 143

1  dune walkovers that had been constructed.  That
2  was not something that we had regulated, and so
3  there was a desire to see us get involved, so I
4  drafted most of that.  It was based on some
5  information that had been provided to me and also
6  based on some of my research.
7        I drafted the provision that renewed the
8  HDR designation, and I also drafted the height
9  limitation.  The other part of the zoning
10  considerations was drafted by the county
11  administrator, and I was just took that and put it
12  into the format of the entire document, but I
13  didn't actually draft that part.
14     **Q.  So you -- is it correct that you, alone,
15  drafted the section on height limitations?**
16     A.  Yes.
17     **Q.  Did you, alone, draft this staff report in
18  support of the text amendments?**
19     A.  Yes.
20     **Q.  So no one else had any input or authorship
21  on this document?**
22     A.  Not as far as the staff report.  There
23  were others who -- you know, who had some input

Page 144

1  into the text amendment itself.  And one thing I
2  wanted to mention on the dune walkovers, like I
3  mentioned, that was based on some suggestive
4  language also some -- you know, my research -- I
5  got some feedback from the building inspector at
6  the time, and I -- I think I -- I want to say that
7  I sent a draft to the fish and wildlife service,
8  and they looked at it and said they thought it was
9  good.  Didn't really offer any suggestions.
10     **Q.  Who else had input or authorship into the
11  text of the height limitations in the text
12  amendment itself?**
13        MS. KIDD:  Object to the form.
14     A.  I mean, I was the one who read it.  I --
15  you know, and I made the county administrator aware of
16  it.  The -- and the billing inspector, he didn't
17  have any role in drafting that part.  He -- I made
18  him aware of it, but, you know, as far as drafting
19  that sentence, I was the one who drafted it.
20     **Q.  Was the building inspector Joe Ryan?**
21     A.  No, no.  Joe Ryan was the code enforcement
22  officer.
23     **Q.  Oh.**



Page 145

1   A.  At the time, the building inspector was
2  Mike Powell.  He's now retired.
3   **Q.  Prior to drafting this staff report, did**
4  **you discuss this subject matter with anybody else**
5  **we haven't already talked about today?**
6   A.  I can't think of anyone.
7   **Q.  Other than what we've already talked about**
8  **today, what sources of data did you rely on in**
9  **drafting the height limitation section of the**
10  **proposed text amendment?**
11       MS. KIDD:  Object to the form.
12   A.  I may have looked at a couple of other
13  zoning ordinances to see if there was a precedent
14  for a two-story limitation.  And there were some,
15  yeah.  I can't say specifically which ordinances I
16  looked at.  One of the things that we did find was
17  that in the older zoning ordinances for Baldwin
18  County -- and I'm going back to before 1999.
19  Prior to 1999, each of the zone planning districts
20  had its own zoning ordinance, and there was a
21  statement in there about the height or structures
22  that were in the flood zone, that you would start
23  measuring at the finished board elevation, and

Page 146

1  that they would be limited to two stories.
2       Now, that provision apparently came out in
3  1999 when a consolidating zoning ordinance was
4  adopted for the zoned areas.  But what we found is
5  that there had, at one time, been a previous
6  precedent, if you will, for a two-story height
7  limitation in zone order site areas.
8   **Q.  And did that precedent play into the**
9  **rationale for recommending this text amendment?**
10   A.  To an extent, yes.
11   **Q.  The pertinent section reads that maximum**
12  **height of single-family and two-family structures**
13  **shall be limited to two habitable stories.  Why**
14  **did you express height in stories as opposed to**
15  **feet or meters or anything that's normally used to**
16  **measure distance or height?**
17       MS. KIDD:  Object to the form.
18   A.  We were requested to have a two-story
19  height limitation.  We weren't requested to change
20  the height in feet.  We were requested to have a
21  two-story height limitation for Planning District
22  25.
23   **Q.  Who made that request?**

Page 147

1   A.  Well, we -- we've talked about that.  That
2  came from -- that came from the residents down
3  there, it came from the volunteer fire department.
4   **Q.  Would you agree with me that a story could**
5  **be 8 feet tall or it could be 20 feet tall**
6  **depending on how high you make the ceilings in**
7  **that particular story?**
8   A.  Yes.
9   **Q.  Could you please turn to what's been**
10  **marked as Plaintiffs' Exhibit Number 14.**
11
12   (Whereupon, Plaintiffs' Exhibit Number 14 was
13   marked for identification and copy of same is
14   attached hereto.)
15
16   **Q.  With respect to these text amendments that**
17  **reduced the maximum stories in Fort Morgan from**
18  **three to two for single and two-family residences,**
19  **would you agree that that limitation could have an**
20  **impact on property values?**
21       MS. KIDD:  Object to the form.
22   A.  I don't know the answer.
23   **Q.  Based on your experience in zoning, would**

Page 148

1  **you agree that a piece of land with fewer**
2  **permitted uses is worth less than a comparable**
3  **piece of land, all else being equal?**
4       MS. KIDD:  Object to the form.
5   A.  I don't know that that would necessarily
6  be the case.  And I'm not an expert on property
7  values, but there are a number of factors that
8  could determine that, but I don't -- I don't
9  believe that that would necessarily be the case.
10   **Q.  What is the basis of that opinion that you**
11  **don't necessarily believe that is the case?**
12   A.  I think there are more things that -- that
13  could determine the value of land in a number of
14  structures.  The location, for one thing, the
15  quality of the construction, closeness to
16  aminities, presentation.  There are a number of
17  things that can -- that can affect that.  And I
18  can't -- I can't say with certainty whether the
19  number of structures would be -- I can't say how
20  it would factor in.
21   **Q.  Would you agree that that with respect to the**
22  **-- to Plaintiffs' property that we're talking**
23  **about here today, the reduction from three**



Page 149

1 permitted stories to two permitted stories affects
2 the value of that property?
3      MS. KIDD:  Object to the form.
4    A.  I don't know the answer to that.  We never
5 received the modified plan with -- I mean, we did
6 see the plan that showed that they had parking,
7 but we never received the modified plan that might
8 have been for a two-story structure versus a
9 three-story structure, so I can't say that that
10 would have reduced the value.
11    Q.  All right.  Going back to Plaintiffs'
12 Exhibit Number 14, this is a transcript from the
13 Baldwin County Planning and Zoning Commission
14 regular meeting, September 5th, 2019.  Do you
15 recall attending that meeting?
16    A.  Yes.
17    Q.  On the second page of this exhibit, it's
18 got 131 at the top.  Starting at line 24, it --
19 having -- it says that -- you stated, "We did
20 initially have a statement in here about stacked
21 parking in some of our initial drafts."
22       Which initial drafts were those that
23 you're talking about here?

Page 150

1    A.  I can't -- I can't remember.  I know that
2 at some point when I was working on the drafts, I
3 put in a statement about the stacked parking.  I
4 felt like it would make it a little more clear,
5 and it would be -- it would -- it would be more --
6 more of a direct statement about the stacked
7 parking.  Like I said, I don't remember the draft,
8 but I did -- I e-mailed it to the county
9 administrator to see what he thought, and his
10 feeling was that it would be redundant and that it
11 would somehow weaken the determination that we are
12 using.
13    Q.  So Wayne Dyess told you not to put it in
14 there because it would be redundant and because it
15 could weaken the position you had already taken in
16 your letter to Paul Stanton; is that correct?
17    A.  That was -- that was the gist of it.  I
18 wouldn't say that he specifically told me not to
19 put it in there, but it was his position that it
20 didn't need to be in there, so I left it out.
21    Q.  Do you know when those initial drafts were
22 authored?
23    A.  It's hard to say.  I -- you know, we --

Page 151

1 like I said earlier, it started with the dune
2 walkover and over time we started to add elements
3 to it.  Yeah, I would have to go back and visit
4 with one of my former coworkers and see what's
5 actually in the database as far as, you know,
6 which drafts were saved and -- I mean, sometimes
7 you would -- you would just, you know, edit an
8 existing draft and save the changes.  I can't say.
9 I would have to see -- and I have access to none
10 of that now, but I'd have to see if I could go
11 back and take a look at the database to see if I
12 can find when those -- you know, the titles those
13 drafts might have been saved under, if they were
14 actually saved.
15      MR. ANDERSON:  Jamie, we can follow-up
16 after the deposition, but we request those drafts
17 to the extent they haven't already been produced.
18      MS. KIDD:  Okay.
19    Q.  Mr. Jackson, on page 132 starting at line
20 3, you state, "There are additional issues related
21 to parking we would like to discuss with some of
22 the residents in the area."
23       First question is, what additional issues

Page 152

1 are you referring to there?
2    A.  There was a -- there was a gentleman who
3 had approached us about some different language
4 pertaining to the parking, and I don't remember --
5 I don't remember what section he was.  There were
6 -- there were a couple of people who seemed to
7 want to bring up the parking discussion as part of
8 this amendment, and we didn't have anything
9 related to parking in this amendment.
10      I can't remember -- I just cannot remember
11 what he was -- what he talked about.  I know that
12 -- you know, there was some concerns expressed
13 about the parking and having to -- having to get
14 back to get -- to get approval for more
15 disturbance and that was a concern that was
16 expressed.  But again, we weren't dealing with it
17 under that amendment.  I honestly can't remember
18 what he was asking about.  I can't even remember
19 his name at this point.
20      And there had been some things that were
21 about the parking -- maybe -- you know, maybe some
22 of them wanting us to relax the additional
23 standards.  I just really don't remember.  But it



Page 153

1   -- it never -- it was not something that ever
2   gained any traction.  It never went anywhere.
3   There was never anything drafted about it.
4      Q.   Do you know -- when you were referring to
5   some of the residents in the area, who were you
6   referring to?
7      A.   I can't remember.  I really can't
8   remember.  When we got to this point of the
9   process, it seemed to be that the biggest concern
10  that was being expressed to us had to do with the
11  height limitation more so than the parking.  I
12  mean, what we were finding was that people, if
13  they did go to fish and wild life to request the
14  additional service that they would need, it seemed
15  that they were gaining their approval.  So I can't
16  remember whether there were any additional -- I
17  just remember that there was a brief discussion.
18  I don't remember what the issue was.
19     Q.   So when you say that the height was the
20  biggest issue being discussed by residents, was
21  that in the context of just reducing growth and
22  density in the area?
23     A.   I think there was a concern, you know,

Page 154

1   that limiting the height would limit people's
2   ability to maximize the property, and I think that
3   was a concern.  It really -- it wasn't apparent to
4   us right away that people -- that that was the
5   biggest concern.  It kind of came up later.  But I
6   think it was just a concern, like I said, that
7   people didn't feel like they would be able to
8   maximize the use of their property.  We actually
9   thought there would be more concern about the
10  considerations for the re-zonings more so than the
11  height limitation.
12     Q.   On page 134 at line 8, you say, "But I
13  want to show some pictures that were provided to
14  us.  This is a picture of a duplex structure that
15  was built without a limit in the number of
16  stories."
17         Were you referring to Eazy Breezy home --
18     A.   I believe so.
19     Q.   -- when you were taking about these
20  pictures?
21     A.   I believe so.
22     Q.   So is it fair to say that part of these
23  text amendments' rationale was to prevent a

Page 155

1   similar type of construction from taking place
2   again?
3      A.   I would say yes, but the Eazy Breezy
4   structure was not the only one.  There were
5   others -- others down there too.
6      Q.   About how many?
7      A.   I remember some people referring to --
8   they called it the Purple Duplex.  I think it was
9   close by.  So that was one for sure, and then
10  there were some others.  I would say maybe three
11  or four others.
12     Q.   Can you estimate how many three story
13  single or two-family homes are in Planning
14  District 25?
15     A.   I can't really say.  I'm gonna say at
16  least ten, but probably more.
17     Q.   Okay.
18     A.   But you're talking about a period of
19  nearly -- basically eight years where structures
20  could have been built without a height limitation
21  on stories, so there could potentially be more
22  than that.  I just can't -- I don't know the exact
23  answer.

Page 156

1      Q.   Are there planning unit developments
2   within Planning District 25?
3      A.   Yes.
4      Q.   Those are commonly referred to as PUDs,
5   right?
6      A.   In the Baldwin County Zoning Ordinance
7   they're referred to as PRDs, planning residential
8   developments.
9      Q.   Okay.  PRDs.  Does the three story --
10  excuse me.  Does the two-story height limitation
11  apply to the PRDs within Planning District 25?
12     A.   It does unless a specific variation has
13  been requested and approved.
14     Q.   Has any such modification been requested
15  and approved in any of the PRDs in Planning
16  District 25?
17     A.   There have been some.  I think there's a
18  -- I want to refer to something specific, so I'm
19  kind of -- in your exhibits -- and you have the
20  text of the local provisions for Planning District
21  25 and each of the currently 18 zoned planning
22  districts have local provisions that are specific
23  to those planning districts.  You'll notice a



ACR   ALABAMA
COURT REPORTING

Page 157

1 couple of things related to height.  Item B,
2 specifically, "No PRD development is allowed to
3 exceed maximum height requirements by more than
4 ten feet or one story."  So even with the PRD
5 process, even if you do request a variation,
6 there's a limit on what variation you can request.
7        Now, another difference, if you look at
8 Item A, that refers to multifamily developments.
9 Now, we're not talking about multifamily here, but
10 you -- as you know, there are some higher
11 condominiums down there, and some of the --
12 there's a limitation of seven habitable stories
13 now.  That was not always the case.  That came
14 later.  So those taller buildings that you see
15 down there, those were -- those were approved
16 through a PRD process.
17         And then -- there are some others.  I
18 can't say how many, but I do know the Sea Glade
19 development, which was the most recent planned
20 residential development that was approved, is
21 allowed to have two-and-a-half stories, but it --
22 I think there is an assumption that being in a
23 planned residential development automatically

Page 158

1 exempts someone from the height limitations.
2 That's not the case.  They can have a higher
3 height, up to three stories, but it has to be
4 approved and specifically stated as part of PRD
5 approval.  If they don't have any specific
6 variation mentioned, then they are required to
7 meet the underlying height requirement which would
8 be two stories.
9   Q.   So if a PRD was approved in 2012 but did
10 not specifically request an exemption from the
11 height limitations, and then the height limitation
12 was reduced to two stories in 2019, does that
13 reduced height limitation now apply to that PRD
14 that was approved in 2012?
15   A.   Yes.
16   Q.   So you mentioned Sea Glade can build up to
17 two-and-a-half stories.  What about Kiva Dunes?
18 Can't you build three stories in Kiva?
19   A.   I believe you can build three stories in
20 Kiva.  Kiva -- Kiva -- there's a development
21 review code for Kiva Dunes that covers a lot of
22 information.  It's also an older development, and
23 so I -- I believe you can build taller buildings.

Page 159

1   Q.   What about --
2   A.   In each of the cases were there's a
3 planned development -- a planned residential
4 development, you'd have to go back to the actual
5 documents of the actual approval and see what was
6 approved at the time.  If they requested and
7 received approval of a different height up to
8 three stories, then that's what we would follow.
9 If they remained silent and didn't request the
10 specification, then we would follow the height
11 requirements in place at the time that they sought
12 building and a land use certificate for
13 structures, and so that would now be two stories.
14   Q.   What is the rationale for treating PRDs
15 differently than structures not in a PRD in
16 Planning District 25?
17        MS. KIDD:  Object to the form.
18   A.   They're not treated -- I mean, they're
19 treated the same throughout the zoned areas of the
20 county.  They're not treated any differently in
21 Planning District 25 than they are elsewhere.
22 Most of the planning districts do have the
23 statement that the height -- initial height can't

Page 160

1 exceed ten feet or one story of the normal
2 requirement.  That's not the case for every
3 planning district, but every planning district is
4 unlikely to have a PRD.
5        PRDs are situations where, typically,
6 there's some type of unique characteristic,
7 something unique about the land.  There might be
8 some type of environmental characteristic that
9 they need to build around; perhaps dwellings,
10 perhaps some slope issues, and so a PRD will allow
11 you to have smaller lot sizes than what we would
12 normally require, dune setbacks, higher building
13 height, but as a tradeoff, you're required to set
14 aside 20 percent of your area as open space and 50
15 percent of your open space has to be usable.
16        Another thing that it allows you to do is
17 to mix housing types.  So you can have a mixture
18 of single-family dwellings, duplexes, and
19 multifamily dwellings regardless of what the
20 underlying zone is.  It also allows you to
21 potentially include some commercial as part of the
22 development, but only up to 20 percent of your
23 total acreage.  And if you do include commercial,

ALABAMA
COURT REPORTING

Page 161

1  then that area -- that acreage is taken out of
2  your density calculation.
3         One thing that a PRD does not allow you to
4  do is increase your density.  So whatever density
5  would have been allowed by the underlying zoning
6  property at the time the PRD was approved is the
7  density which you would be held to.  But the
8  rationale for allowing some reduction in some of
9  the area's initial requirements, and that would
10  include height, is to have innovative design that
11  would help to address any site issues.
12     Q.  If a -- if the volunteer fire department's
13  ladder can't reach a third-story house on Ponce De
14  Leon Court, it couldn't reach a third-story in
15  Kiva Dunes either, could it?
16     A.  That would be my assumption.
17     Q.  And is there any other difference with
18  respect to fire safety between a house on Ponce De
19  Leon Court and a house in Kiva Dunes?
20         MS. KIDD:  Object to the form.
21     A.  Yeah, I -- I can't -- I don't know the
22  rules that the fire department works under.  I
23  think there may be some type of agreement with the

Page 162

1  City of Gulf Shores.  I don't know that for
2  certain, but the -- I think that because there had
3  been some three-story structures that had been
4  constructed down there, I think what the volunteer
5  fire department realized is that that creates a
6  difficulty for them; in part, because if they had
7  to actually go into the structure to rescue
8  people, it was a lot easier for them to deal with
9  two floors versus three.  And that -- you know, I
10  know there was some statements made about their --
11  the size of their ladders and such as that, but I
12  think the interior had something to do with it as
13  well.
14         You know, obviously, if there are
15  structures there that were built before the
16  two-story height limit was enacted, those
17  structures can remain, but the idea was to,
18  hopefully, I think -- I think they thought that if
19  there was a height limitation, that moving forward
20  that would help the situation in the future.
21     Q.  Is it your understanding that if a
22  existing three-story structure is in an area where
23  these text amendments were passed and so three

Page 163

1  stories becomes impermissible, that that renders
2  the existing structure nonconforming which affects
3  it's mortgageability and financeability?
4     A.  It does render it nonconforming in terms
5  of height.  Now, the financial aspects of it, I
6  don't know.  I can't speak to that.
7     Q.  Did you consider the fact that it would
8  render certain structures nonconforming when this
9  was passed?
10     A.  There was some discussion about it.  There
11  are, from time to time, changes throughout the
12  zoning ordinance that do cause structures to be --
13  to become nonconforming.  But the way someone said
14  to me once years ago was, "nonconforming is not
15  necessarily a four letter word, and just because
16  you're nonconforming doesn't change -- it doesn't
17  change anything."  You can continue to use the
18  structure, you can sell the structure.  The only
19  potential problem you might have is if the
20  structure was destroyed or damaged to an extent
21  greater than 50 percent of its value at the time
22  of damage or construction, then it would need to
23  be built back in conformity with the ordinance at

Page 164

1  that time.
2         But that's -- that is not something that
3  comes up very often.  Even in times where we've
4  had hurricanes, it's been very rare that a
5  structure -- that a majority of structures have
6  suffered that kind of damage.  And they're much
7  more likely to have a issue with building code
8  than they are with zoning.  So, you know, I can't
9  speak to the value.  There could be an issue down
10  the road in terms of your ability to rebuild, but
11  it's not something that comes up very often, and
12  there's always the opportunity the request a
13  variance.
14     Q.  No variances have been granted with
15  respect to the height limitation in Planning
16  District 25 since this text amendment was passed?
17     A.  No, sir.  We had one request, but it was
18  turned down.
19     Q.  On page 136 of Exhibit 14 at line 16, it
20  -- you were talking about, "And so we begin a
21  dialogue.  We begin a dialogue with some
22  residents."
23         Which residents were those?



Page 165

1    A.   In terms of the dune walkovers, it was
2 primarily the Strategiers.  They had engaged an
3 attorney that had contacted one of our
4 commissioners, and that was where the discussion
5 about the dune walkovers started.  And so when I
6 began working on that, the first thing I did -- I
7 looked at what did the City of Gulf Shores have,
8 what did the City of Orange Beach have because
9 that was something that we really -- we really
10 didn't have a precedent for, and so I wanted to --
11 I wanted to have a guideline.  And over time I
12 also did some research into other states and what
13 their -- what their guidelines were on dune
14 walkovers.
15    But when I say, "And so we began a
16 dialogue.  We began a dialogue with some
17 residents," that was primarily on the dune
18 walkover issue and that would have been the
19 Strategiers in their time.
20    Q.   Do you recall who their attorney was?
21    A.   Neil Johnston from Mobile.  I think he
22 works for Hand Arendall.
23    Q.   The next person to speak after you is Joe

Page 166

1 Emerson, and at the time, he was the president for
2 the Fort Morgan Civic Association, correct?
3    A.   Correct.
4    Q.   The next person to speak after him starts
5 on page 141, and that is Gregg Strategier.  He
6 states, "We have been working closely with the
7 Baldwin County Planning and Zoning Department,
8 with Vince, and the civic association."  Was that
9 all correct when he said this?
10    A.   Oh, the -- the dune walkover, that started
11 with them, and then, you know, information was
12 provided.  How you define "closely," I'm not sure,
13 but there were -- you know, they did have some
14 input about how we started the process for those
15 text amendments.  And, again, that was about dune
16 walkover provisions.
17    Q.   If you'll turn to page 143 of Exhibit 14,
18 and it's Mr. Strategier continuing to speak.  He
19 write -- he says, "I've given you something from
20 Zillow.  This is a structure that's near my home.
21 Actually, the picture of it was up there earlier.
22 I just want to point out a few things and make
23 some comments."

Page 167

1    Do you recall he was talking about the
2 Eazy Breezy house?
3    A.   That was on -- which page was that?
4    Q.   143 starting at line 17.
5    A.   Oh, okay.  Okay.  I believe he was
6 probably talking about Eazy Breezy.
7    Q.   Have you and Mr. Strategier talked about
8 Eazy Breezy before this meeting?
9    A.   I don't recall having a direct
10 conversation with Mr. Strategier about Eazy
11 Breezy.
12    Q.   Okay.  On page 146, Mr. Paul Stanton
13 starts speaking, and that's the same Paul Stanton
14 that requested an interpretation of the parking
15 ordinance, correct?
16    A.   Yes.
17    Q.   And here, he's complaining about Eazy
18 Breezy and the parking at that home on page 146
19 and 147, isn't he?
20    A.   Yes.
21    Q.   On page 150, a gentleman named Tom Martin,
22 and he starts speaking out against the text
23 amendment, and he notes he only learned about it

Page 168

1 that afternoon.  Had everyone from the Fort Morgan
2 Civic Association learned of these proposals
3 before the general public?
4    A.   We started -- we had been given -- you
5 know, we made a presentation -- I believe it was
6 at the June 2019 meeting, it was referenced.  So
7 we had made a presentation about the amendments
8 that we were working on.  I don't remember if
9 Mr. Martin was present at that meetings or not.
10 He could have been.  There were a lot of people
11 there.  This was -- these amendments were
12 advertised according to our procedures for
13 advertising.  We had -- notices were run in the
14 papers.
15    I don't remember -- you know, sometimes --
16 I don't remember -- I want the say that maybe the
17 civic association had put something on their
18 website.  I don't know.  The planning commission
19 agendas are published.  They're put on the county
20 website.  I can't say why Mr. Martin would have
21 only found out about it on that day, but, I mean,
22 this is something that was worked on for a good
23 while.  For a couple of months, it was discussed.



Page 169

1  It was not -- it was advertised properly.  It was
2  not done in secret, so I can't say why somebody
3  would say that they only knew at it that day.
4     Q.  Would you please turn to Plaintiffs' --
5  what's been marked as Plaintiffs' Exhibit Number
6  15.  And I'll represent to you all this was
7  produced by the County.
8
9     (Whereupon, Plaintiffs' Exhibit Number 15 was
10     marked for identification and copy of same is
11     attached hereto.)
12
13     Q.  And I believe the first page is a summary
14  of all the letters that were received in favor or
15  were opposed to the text amendment we've been
16  talking about in relation to the height
17  limitation.
18     A.  Yes.
19     Q.  My first question is, did you receive and
20  review all of these?
21     A.  At some point -- like some of them -- a
22  lot of them were sent to me; some of them were
23  sent to other staff people.  But, you know, some

Page 170

1  of them you could see where I sent them to another
2  staff person to make sure they reviewed them.  But
3  it looks like -- I'm going to say the vast -- or
4  the vast majority of these, they were either sent
5  to me, or I was copied of who they were sent to.
6  So what we were trying to do -- we tried to
7  organize it somewhat.
8     Q.  Since you ultimately drafted the staff
9  report on this text amendment, did you personally
10  review all of these before doing so?
11     A.  I don't know that I personally looked at
12  them.  I think somebody -- you know, they were
13  organized -- I looked at most of them because I
14  wanted to make sure they were being put in the
15  right place.  We didn't want to just give --
16  randomly give -- and it looks like there were
17  about 37 letters here.  We didn't want to just
18  give random letters to the county commissioners
19  for them to have to work through.  We wanted to
20  make sure they knew what was what.
21     But we were -- you know, we did look over
22  these, and I think some of the -- and I think I
23  may have talked about this already -- the

Page 171

1  opposition to the two-story height limit seemed to
2  come up a little bit later, and so we -- perhaps
3  we didn't get those -- it looks like a lot of them
4  were sent on September 5th.  Some of them might
5  have been sent earlier.
6     I just -- we looked at them.  Ultimately,
7  you know, at that point, we were at a place where
8  we were going -- taking this to the county
9  commission, and so it's most important for the
10  county commission to have those.  You know, we --
11  we -- by that time, we had already advertised for
12  proposed amendments, we had already started the
13  process, and so we made our recommendations and
14  it's up to the decision makers.  The planning
15  commission is the recommending body; the county
16  commission is the final decision maker on text
17  amendments for the zoning ordinance.
18     So we wanted to make sure that they had
19  the information.  We -- you know, I did review
20  them to an extent.  I can't say that I've read all
21  37 letters in complete detail, but they were
22  reviewed.
23     Q.  Okay.  Just so I'm clear on your testimony

Page 172

1  is it that you had already drafted your staff
2  report by the time all these came in, so these
3  letters did not really influence your staff report
4  in any way?
5     A.  No.  And typically public sentiment does
6  not influence a sound recommendation.  We make a
7  recommendation based on what we think is right,
8  but there are two public hearings.  A public
9  hearing before the planning commission and a
10  public hearing before the county commission.  So
11  anyone who's interested has an absolute right to
12  come in and state their position, but they also
13  want to -- they can also provide e-mails, letters.
14  And so we want to make sure, any time we have a
15  case like this, whether it's a text amendment or
16  re-zoning, variance, whatever the case might be,
17  we want to make sure that our decision makers have
18  the -- all the information that they need to make
19  a decision.
20     Although we make a staff recommendation,
21  no one is bound to follow that recommendation.
22  The planning commission is not bound to follow it;
23  the county commission is not bound to follow it.



Page 173

1  We want them to have all the information out there
2  so that they can come to their decision.  Just
3  because we recommend something doesn't mean,
4  necessarily, that they will approve it.  And the
5  letters and such that are sent, they might be
6  addressed to me, they might be addressed to
7  another staff member, but those most pertinent for
8  the county commission and the planning commission.
9      Q.  Are you aware of a situation that came up
10  in 2020 where someone sought a new stop work order
11  on site of Plaintiffs' property to have pilings
12  removed?
13      MS. KIDD:  Object to the form.
14      A.  There was -- there were a couple of times
15  that we were asked about the pilings, and we
16  didn't feel -- I talked to the code enforcement
17  officer about it.  We didn't feel like we had
18  anything in zoning that could -- those pilings --
19  that was a building code issue.  And, I think, at
20  one point, they had -- some of the neighbors had
21  sent a letter to Mr. Bordelon asking him to remove
22  the pilings, and they -- I think there was maybe a
23  fence put up or something.  And at some point,

Page 174

1  they did get the building inspection department
2  involved, and that probably was when the pilings
3  were removed.  But I don't know a lot of details
4  about that.  It wasn't a zoning issue; it was a
5  building code issue.
6      Q.  So from a zoning perspective, there was
7  nothing wrong with those pilings being out there
8  on that property?
9      A.  No, I mean --
10      MS. KIDD:  Object to the form.
11      A.  It's better that they not be there, but,
12  you know, as far as building materials being on
13  the property, that's not a zoning issue.  There
14  was nothing we could do about it.
15      Q.  Who is Mindy Smith?
16      A.  Mindy works in the building inspection
17  department.  I can't -- she's a fairly new
18  employee.  I am not sure what her title is.
19      Q.  Could you please turn to what's been
20  marked as Plaintiffs' Exhibit Number 16.
21      A.  Yes.
22
23      (Whereupon, Plaintiffs' Exhibit Number 16 was

Page 175

1  marked for identification and copy of same is
2  attached hereto.)
3
4      Q.  This is an e-mail from Mindy Smith to
5  Eddie Harper, and Roy Collins, and Rob Madison.
6  Who were Eddie Harper, Roy Collins, and Rob
7  Madison?
8      A.  Eddie Harper is the current building
9  official, Roy Collins appears to be someone who
10  works for ADEM at the same level, and I believe
11  Rob Madison is one of the inspectors in the
12  inspection department.
13      Q.  In her e-mail, Mindy writes, "In the
14  neighbors letter, they state that a building
15  permit was never issued.  Rob called the
16  contractor, Steve Jones Contracting, to advise him
17  of the stop work order that would be issued today.
18  Steven said that it was a litigation case
19  involving the County issuing a permit and them
20  revoking it.  However, I've looked through the
21  ADEM file and the building permit file, and I do
22  not see any documentation about any permit being
23  revoked or not being valid."

Page 176

1      So why would she not be able to see
2  documentation about the permit being revoked or
3  not being valid?
4      A.  The land use certificate was revoked.
5  Now, in the zoned areas, you don't have a land
6  certificate if a building permit is not valid.  I
7  don't know that the inspection department at that
8  time that we revoked the land use certificate.  I
9  don't know if they took a similar action to revoke
10  the building permit.  I know they were made aware,
11  but I don't know -- well, I can't say whether or
12  not they took that action.  Also, she would not
13  have -- Ms. Mindy would not have had access to our
14  information.  She's looking -- it looks like she's
15  looking at fish and wildlife, ADEM, and building
16  permit information.  But she wouldn't have had
17  access to our database -- the planning and zoning
18  database.
19      Q.  So I guess you're saying there was no
20  evidence in their system that the building permit
21  was ever revoked after the land use certificate
22  was revoked?
23      A.  Right, that's my understanding.



Page 177

1    Q.  Is it your understanding or your position
2  that when a land use certificate is revoked, the
3  building permit related to it automatically
4  becomes invalid?
5    A.  That's been my understanding.  In a zoned
6  area, you must have an approved land use
7  certificate in order for -- in order to get a
8  building permit.  And I believe where it talks
9  about the -- revoking the land use certificate.
10  In the zoning ordinance, it also says it shall
11  cause the building permit to be revoked.  Now,
12  like I said, I can't speak to whether the
13  inspection department actually took that action or
14  not.
15    Q.  If they -- let's assume for a second that
16  they didn't take that action.  If, after you
17  issued your revocation and asked Joe Ryan to issue
18  the stop work order on July 31, 2019; if Steve
19  Jones Contracting had gone out the next day and
20  kept building anyway, could he be subject to civil
21  or criminal liability --
22    MS. KIDD:  Object to the form.
23    Q.  -- for violating that stop work order?

Page 178

1    A.  We would have gotten the county attorney
2  at the time involved.  What penalties they might
3  have been subject to, I can't say, but if they had
4  continued building, we definitely would have
5  gotten the county attorney involved.
6    Q.  And it would be your position that if they
7  had kept building, it would have been illegal?
8    A.  Yes.
9    Q.  When you issued that revocation and the
10  stop work order July 31st of 2019, did you give
11  any notice to the building department?
12    A.  I believe they were made aware of it.  I
13  don't remember the exact extent, if we e-mailed
14  them or told them, but I do believe they were made
15  aware of it.
16    Q.  Could you please turn to what's been
17  marked as Plaintiffs' Exhibit Number 17.  I'll --
18  and can --
19    MR. ANDERSON:  Jamie, these are the
20  interrogatory responses we received from you
21  previously.
22    MS. KIDD:  Yeah.
23    MR. ANDERSON:  It appears that the

Page 179

1  responses for Baldwin County and Mr. Jackson are
2  identical; is that correct?
3    MS. KIDD:  Probably.  Although, I will
4  tell you that I think we will be sending -- I
5  think that the drafts you received are probably
6  identical.  I will say, though, it's our position
7  that -- and some of that information, of course,
8  came from Vince with there being reviewed,
9  obviously, at this point by Wayne.  And I don't
10  think at this point, since Vince isn't working
11  for them anymore -- unless there's a specific
12  factual question, but in terms of finding the
13  County --
14    MR. ANDERSON:  That's fine.  I just --
15    MS. KIDD:  Yeah.
16    MR. ANDERSON:  I'm going to skip
17  Exhibit -- Tayler, I'm going to skip Exhibit 17
18  and go to Exhibit 18.
19    THE COURT REPORTER:  Okay.
20    MR. ANDERSON:  And These are Vince's
21  response to interrogatories.
22    Q.  So, Mr. Jackson, would you please turn to
23  what's been marked as Plaintiffs' Exhibit 18.

Page 180

1
2    (Whereupon, Plaintiffs' Exhibit Number 18 was
3    marked for identification and copy of same is
4    attached hereto.)
5
6    MS. KIDD:  If you -- I don't meant o rush
7  you.  If you're taking a minute, could we just
8  take a quick, like, five-minute break, maybe?
9    MR. ANDERSON:  Yeah.  That's no problem.
10    MS. KIDD:  Okay.  Thanks.
11
12    (Break.)
13
14    Q.  (By Mr. Anderson) Mr. Jackson, on
15  Plaintiffs' Exhibit 18, could you please turn to
16  page 9 where it has your response to Interrogatory
17  Number 13.
18    A.  Yes.
19    Q.  So in -- first off, this was a draft that
20  we received, but can you confirm that the answer
21  listed to Number 13 is the correct answer to this
22  question?
23    A.  Yes.


ALABAMA
COURT REPORTING

Page 181

1    Q.  So it is your position that the parking
2   ordinance has prohibited stacked parking in
3   Planning District 25 ever since April 6th, 1999?
4    A.  Yes.
5    Q.  But many houses, single and two-family
6   structures were permitted to build with stacked
7   parking layouts between 1999 and 2019, correct?
8    A.  I can't say that many.  I mean, what I
9   will say, and what I -- I believe I said earlier
10  is that we were really not aware of this
11  particular provision and its applicability until
12  recently.  I -- you know, it -- there were some
13  built, I'm sure.  I can't say many, few, but there
14  were some built.
15   Q.  One of the terms used in your answer is,
16  quote, "That would potentially obstruct ingress
17  and egress," unquote.
18    Is there a type of stacked parking that
19  would not obstruct ingress and egress, or would
20  all forms of stacked parking obstruct ingress and
21  egress to each parking space?
22   A.  I'm not sure.  I mean, I suppose it's
23  possible if there was a way for a vehicle to get

Page 182

1   out without another vehicle moving, you could say
2   that it could be allowed, but it -- from what I've
3   seen in most cases where you have stacked parking,
4   some vehicles will not have access or will not
5   have ingress and egress unless another vehicle has
6   to move.
7      Like I said, the only situation I could
8   think of where it might work would be if -- if the
9   vehicles could move without the car behind them
10  having to move, but I don't know what that would
11  be.
12      MS. KIDD:  Okay.  I'm sorry --
13      MS. COLLINSWORTH:  Oh, sorry.  I was gonna
14  say, Jamie, you dropped off.
15      MS. KIDD:  Yeah, I'm back now.  But I
16  didn't hear was there a question?  The last
17  question I heard was just -- just had asked about
18  whether the answer to the Number 13 on the
19  interrogatories was correct.  I guess I should
20  ask the court reporter.  Was there another
21  question past that, or?
22      THE COURT REPORTER:  No, ma'am.  You fell
23  off and came back in the middle of his answer.

Page 183

1      MS. KIDD:  Okay.  All right.  Thank you.
2      THE REPORTER:  Yes, ma'am.
3    Q.  (By Mr. Anderson)  So Mr. Jackson, with
4   respect to what we're calling "stacked parking," a
5   stacked parking configuration only obstructs
6   ingress and egress to an interior space if there's
7   cars parked in the more exterior spaces, correct?
8    A.  Correct.
9    Q.  So with an empty driveway, you know, with
10  no cars there, there's no space that is obstructed
11  from ingress and egress, right?
12   A.  You could make that argument, but the fact
13  is, you would still have parking spaces dedicated,
14  so the potential would still be there for the
15  ingress and egress to be blocked.
16   Q.  Well, doesn't that potential always exist
17  in any parking scenario, because I can go park a
18  crane in the right-of-way in front of my driveway
19  and block all the parking, right?
20   A.  It does, but you're not talking about
21  dedicated parking spaces.
22   Q.  Well, why not?
23   A.  Because in a normal situation, you know,

Page 184

1   if you just pull up behind cars that are already
2   parked, that's one thing.  If you're pulling, you
3   know -- but if you're pulling in -- if you've got
4   parking spaces that are areas that are actually
5   designated as parking spaces, it -- it's different
6   -- it's a different scenario than, simply, you
7   pulled up behind two cars that were parked and
8   blocked them in.  You're not parking in a parking
9   space.  There's a difference.
10   Q.  Even if I'm legally parked on the
11  right-of-way, you're saying there's still a
12  difference?
13   A.  I believe so.
14      MS. KIDD:  Object to the form.  I'm sorry,
15  Kris, did you say -- it bleeped out for me.  Did
16  you say legally or illegally parked.
17      MR. ANDERSON:  I said legally parked on
18  the right-of-way.
19      MS. KIDD:  Okay, Got ya.  Thanks.  Sorry.
20   Q.  Mr. Jackson, I'm just trying to
21  understand.  What is that difference?  Either way
22  the parking spots are blocked whether there's cars
23  in them or not.  So what's the difference?



Page 185

1      MS. KIDD:  Object to the form.

2      A.   The difference is dedicated parking spaces
3   versus areas not dedicated for parking.

4      **Q.   Your answer to Interrogatory 15, just**
5   **since we're dealing with the draft here, can you**
6   **confirm to me this answer is correct?**

7      A.   Yes.

8      **Q.   In your answer, you referenced large**
9   **structures.  Which large structures were you**
10  **referencing?**

11     A.   We were referencing the larger duplexes
12  that remained built down there that were having,
13  you know, sometimes upwards of nine, even more
14  bedrooms.

15     **Q.   And does that include Eazy Breezy?**

16     A.   That would include Eazy Breezy, but Eazy
17  Breezy was not -- was not subject to those
18  regulations because it had already been built.

19     **Q.   And have we already talked about all of**
20  **the people who complained to your department in**
21  **Baldwin County about having to park in the street**
22  **on the property and other places as referenced in**
23  **your answer to Interrogatory Number 15?**

Page 186

1      A.   I believe so.

2      **Q.   How do you know that they were telling the**
3   **truth?**

4      A.   They provided pictures, and we saw.  I
5   mean, sometimes when we were in the area we would
6   see the parking in the streets, and when we had
7   people down there for zoning cases -- it's not --
8   it wasn't -- it was not part -- I mean, it looked
9   very -- we saw it happening down there.

10     **Q.   When the -- those individuals were parking**
11  **on the street, were they violating any law to your**
12  **knowledge?**

13     A.   I can't say if they -- they -- parking in
14  the street, per se, would not be a violation of a
15  zoning ordinance, but, I mean, the one thing it
16  would create an issue with the zoning ordinance
17  would be to say that the parking in the
18  right-of-way was included as part of the parking
19  ratio, the required ratio.  But I don't know that
20  simply parking in the street is illegal, but it's
21  -- in everything that we saw, it was creating a an
22  issue with accidents and being able to get
23  through.

Page 187

1      Now, it's possible that theres's a
2   different department in the county that would have
3   more jurisdiction over the rights-of-way, such as
4   county highway department or the sheriffs
5   department, they might have some type of rule,
6   law, or regulation that would prohibit parking in
7   the right-of-way, but strictly looking at it from
8   a zoning standpoint, there's not a zoning issue
9   with parking in the right-of-way, but it was an
10  issue that was creating accidents and (inaudible
11  due to technical difficulty).

12     MS. KIDD:  Vince, you're starting to trail
13  off a little bit to me -- just -- yeah, try to
14  speak up.  Thank you.

15     **Q.   Mr. Jackson, was one of the reasons that**
16  **you took this new interpretation of the parking**
17  **ordinance to reduce occupancy in structures like**
18  **Eazy Breezy?**

19     A.   I wasn't thinking in terms of reducing
20  occupancy.  It -- there were situations where the
21  parking was -- the parking was just a -- I mean,
22  there were cars everywhere, and that wasn't good
23  for the area.  It wasn't good -- it was not good

Page 188

1   for the adjacent properties.  It wasn't good for
2   the roads.  And we needed to try to find some way
3   to bring some order to that, but reducing
4   occupancy was not a consideration for me in
5   drafting those text amendments.

6      **Q.   After your July 3rd, 2019, letter that**
7   **changed the interpretation of the parking**
8   **ordinance, but only with respect to Planning**
9   **District 25, if someone sought a land use**
10  **certificate in any other planning district and**
11  **relied upon a site plan that utilized stacked**
12  **parking, would stacked parking in such an instance**
13  **be a reason to deny a land use certificate?**

14     A.   I would say yes.  I still think -- I know
15  the interpretation was limited to Planning
16  District 25, but that's the only planning district
17  where we have a requirement for additional
18  residential parking spaces based on bedrooms.

19     I think we would still -- we could still
20  -- the existing could still look at the parking
21  and then make sure that it was -- it required that
22  parking spaces have unobstructed ingress and
23  egress.  I believe that they would still look at



Page 189

1  that, and I believe that they would be right to
2  look at that based upon that paragraph from a
3  parking standpoint.
4      Q.  Do you know if anyone has been looking at
5  that?
6      A.  I believe so because it's -- it has become
7  an issue that's on the planning department's radar
8  now.  And certainly after these issues came up and
9  we ran into the problems that we did, you know, we
10  wanted to make sure that everybody knew.  And so I
11  think it's -- I think it's being looked at.  There
12  are -- I can recall a couple of times during my
13  last week where, you know, someone would ask, is
14  this okay, you know, looking at a parking site
15  plan.  So it's something that's being more closely
16  scrutinized than it was in the past.
17     Q.  Who, to your knowledge, is looking at it,
18  and who asked you about it in your last week?
19     A.  Well, everybody who could potentially
20  review a land use certificate would be looking at
21  it.  Paula Bonner who was a planning technician in
22  the Foley office did asked me about it in the last
23  week that I was there.

Page 190

1      Q.  And she was asking about it for property
2  outside of Planning District 25?
3      A.  I don't recall which planning district it
4  was.  She had just sent me a site plan and asked
5  if the parking was okay and it was.
6      Q.  Last exhibit.  Will you please turn to
7  Plaintiffs' Exhibit Number 19.
8
9      (Whereupon, Plaintiffs' Exhibit Number 19 was
10     marked for identification and copy of same is
11     attached hereto.)
12
13     Q.  I asked you a few questions about this,
14  but how were you involved, if at all, with this
15  stop work notice -- you know, actually, I take
16  that back.  We already talked about this.
17     With respect to the 2020 stop work order
18  that was placed on Plaintiffs' property, how could
19  you stop work when work had already been stopped?
20     A.  I can't answer -- I really can't answer
21  questions about that 2020 stop work order because
22  it didn't involve zoning.  It was issued by the
23  inspection department, and I -- I don't know.  I

Page 191

1  can't answer how -- how they would call it a stop
2  work order.
3      Q.  Okay.  So just to finish out that topic,
4  you were not involved at all in the 2020 stop work
5  order?
6      A.  No, sir.
7      Q.  And the planning and zoning department was
8  not involved at all?
9      A.  I can't say that the inspection department
10  didn't talk to somebody in the planning and zoning
11  department, maybe, about the history we have with
12  the property, but I personally was not involved.
13  And as I stated previously, the removal of the
14  construction materials was not a zoning issue, so
15  it's really not something we would have talked
16  about.
17     Q.  Going back to Plaintiffs' Exhibit 19,
18  which is the July 31st, 2019, stop work notice.
19  Is this an accurate depiction of how the stop work
20  notice was transmitted to the plaintiffs?
21     MS. KIDD:  Object to the form.
22     A.  Yes.  My understanding is, at the time
23  Mr. Ryan visited the property, there was no one

Page 192

1  there.  The building permit placard was posted,
2  and there was -- they had put some pilings in the
3  ground.  Typically, if a stop work -- when a stop
4  work order is issued, it's actually handed to
5  someone on the site, but there was no one present
6  at the time, so it was posted.
7      And I think at some point after that, they
8  did return.  Maybe a day or two later, they
9  returned to the site, and when they saw the stop
10  work notice, they contacted the planning and
11  zoning department.
12     Q.  Does Joe Ryan just enforce planning and
13  zoning regulations, or does he also enforce
14  building code?
15     A.  He does not enforce building code.
16     MS. KIDD:  Object to the form.
17     Q.  So would he have had the authority to
18  nullify or cancel the building permit?
19     A.  No.
20     Q.  There's a blank on the -- well, first of
21  all, this stop work page that's pasted on top of
22  the yellow sign for the building permit, is that a
23  form that the planning and zoning department



Page 193

1 always uses for stop work orders?
2     A.   Yes.
3     Q.   And it's got a three-line blank in the
4 form, and in this case, that blank was filled in
5 with "revoked land use certificate by Baldwin
6 County Planning Director," but it references the
7 Baldwin County Zoning Ordinance, so my question
8 is, do you typically put in the zoning ordinance
9 that's being violated in that blank?
10     MS. KIDD:  Object to the form.
11     A.   It depends on the -- it depends on the
12 situation.  It depends on why the stop work order
13 is being issued.
14     Q.   Well, other than a revoked land use
15 certificate, and we've talked about the only two
16 times during your tenure that's ever happened,
17 what other things could go in this blank other
18 than a citation to the Baldwin County Zoning
19 Ordinance?
20     A.   Well, they could -- they could be working
21 without any permits.  They could have never
22 applied for a permit.  They could have never
23 applied for a land use certificate, and that would

Page 194

1 be -- that would be a reason for a stop work
2 order.
3     Q.   I apologize, Mr. Jackson, I heard no land
4 use certificates, but I didn't hear the first
5 things you said.
6     A.   If they're out there working without a
7 permit or a land use certificate, that would be --
8 that would be a justified reason for a stop work
9 order.
10     Q.   Anything else?
11     A.   If -- yeah, if it was discovered that they
12 were doing something that perhaps the land use
13 certificate had been approved for one thing and
14 they were doing something else, that would be a
15 reason.  The -- in all honesty, the biggest reason
16 is that people will be out there working without
17 an approved land use certificate.  That's the
18 biggest reason for a stop work order.
19     Q.   When this stop work notice was issued, was
20 this the only way it was transmitted to the
21 plaintiffs, by posting it on the building permit
22 yellow sign?
23     A.   Yes.  You know, with a stop work notice,

Page 195

1 usually, in most cases, there would be someone on
2 the site working, and you can -- it can be
3 actually handed to them, but in this case, I
4 believe that the day that he was there, there was
5 no one present onsite at that time.  So, usually,
6 it's either physically handed to the workers or
7 it's posted.
8     Q.   And as a result of this stop work order, I
9 believe you already testified the contractor
10 Steven Jones had to stop doing everything on the
11 site immediately, correct?
12     A.   Yes, correct.
13     Q.   Could he have gone and pulled the pilings
14 that were already installed out of the ground or
15 removed the other pilings without violating this
16 order?
17     A.   Yeah, that would have been okay.  I
18 don't -- I don't think -- a stop work order
19 doesn't prevent you from removing something.  It
20 just prevents you with progressing with what
21 you're already doing.  So I don't -- I don't see
22 that there would have been a problem if he had
23 removed the pilings when the initial stop work

Page 196

1 order was issued.
2     Q.   How are you drawing that distinction?  Is
3 there a section of the ordinance that draws that
4 distinction because I'm just -- to me, it seems
5 like work either way, so I'm --
6     A.   It --
7     MS. KIDD:  Object to the form.
8     A.   It's work either way, but if you're
9 continuing to do the work in furtherance of
10 something that either hasn't been permitted or
11 something that was perhaps permitted, you know, a
12 land use was approved incorrectly, you don't want
13 the -- the more work that continues, the more that
14 situation escalates.
15     If you remove that -- what's already been
16 done, you have basically solved the problem.
17 You corrected the issue, so it's a -- it's a
18 distinction between making the situation worse and
19 making the situation better.
20     Q.   Mr. Jackson, that's all the questions I
21 have for you today.
22     MR. ANDERSON:  Jamie, I'm going to
23 specifically reserve the right to continue



Page 197

1  Mr. Jackson's deposition on a limited basis with
2  respect to any newly produced documents from the
3  County.
4      MS. KIDD:  Okay.  Okay.  Can we take just
5  a minute, and let me look at my notes real quick
6  and see if I have -- okay.
7      MR. ANDERSON:  Sure.
8      MS. KIDD:  I don't think I have anything,
9  just let me...
10     MR. ANDERSON:  Okay.
11
12   (Break.)
13
14     MS. KIDD:  Are we back on?
15     THE COURT REPORTER:  Yes.
16     MS. KIDD:  I don't have anything at this
17  time.
18     MR. ANDERSON:  Okay.
19     MS. KIDD:  Okay great.
20     MR. ANDERSON:  Thank you for your time,
21  Mr. Jackson.
22     THE WITNESS:  Thank you.
23     MS. KIDD:  Thank y'all so much.

Page 198

1
2  (The deposition of VINCE JACKSON was concluded
3  at 3:24 p.m.)
4
5      *  *  *  *  *  *  *  *  *  *  *
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 199

1           C E R T I F I C A T I O N
2
3  STATE OF ALABAMA
4  AT LARGE
5
6      I hereby certify that the above and
   foregoing deposition of VINCE JACKSON was taken
7   down by me in stenotype and the questions and
   answers thereto were transcribed by means of
8   computer-aided transcription, and that the
   foregoing represents a true and correct
9   transcript of the testimony given by said witness
   upon said hearing.
10
11      I further certify that I am neither
   of counsel, nor of kin to the parties to the
12   action, nor am I in anywise interested in the
   results of said cause.
13
14      I further certify that I am duly
   licensed by the Alabama Board of Court Reporting
15   as a Certified Court Reporter as evidenced by the
   ACCR number following my name found below.
16  So certified on this date, January 14, 2020.
17
18
19
20
21  TAYLER NOUWEN, CCR
   And Commissioner for the
22   State of Alabama at Large
   CCR 675, Expires 9/30/21
23  My Commission Expires:  5/20/23



### Exhibits

**Jackson PX-1** 4:13
35:14,16 36:17 42:23
43:1 52:23

**Jackson PX-2** 4:14
43:13,15

**Jackson PX-3** 4:15
45:7,9 46:6

**Jackson PX-4** 4:16
75:16,18

**Jackson PX-5** 4:17
77:7,9

**Jackson PX-6** 4:18
87:20,22

**Jackson PX-7** 4:19
89:9,11 92:20,21 100:12

**Jackson PX-8** 4:20
108:15,17

**Jackson PX-9** 4:21
113:14,16

**Jackson PX-10** 4:22
122:5,7

**Jackson PX-11** 4:23
135:2,3,5 138:23

**Jackson PX-12** 5:1
137:17,19 139:18

**Jackson PX-13** 5:2
141:21,23

**Jackson PX-14** 5:3
147:10,12 149:12 164:19
166:17,18

**Jackson PX-15** 5:4
169:5,6,9

**Jackson PX-16** 5:5
174:20,23

**Jackson PX-18** 5:6
92:7 179:18,23 180:2,15

**Jackson PX-19** 5:7
190:7,9 191:17

---

### -

**--I** 123:11

---

### 0

**0027** 94:15

**0029** 95:16

**0032** 97:1

**0082** 139:1

**0144** 114:18

---

### 1

**1** 4:13 16:9,21 35:14,16
36:17 43:1 52:23

**10** 4:22 122:5,7

**100** 103:19

**1011** 11:6

**108** 4:20

**10:54** 76:16

**11** 4:23 135:3,5 138:23

**11/18/2019** 88:4

**113** 4:21

**11:04** 76:17

**12** 5:1 137:17,19 139:18

**122** 4:22

**12:33** 133:22

**13** 5:2 141:21,23 180:17,
21 182:18

**131** 149:18

**132** 151:19

**134** 154:12

**135** 4:23

**136** 164:19

**137** 5:1

**14** 5:3 147:10,12 149:12
164:19 166:17 199:16

**141** 5:2 166:5

**143** 166:17 167:4

**146** 167:12,18

**147** 5:3 167:19

**15** 5:4 169:6,9 185:4,23

**15.3.1** 123:2 124:21
126:16 128:7,18

**150** 167:21

**159** 118:2

**15th** 78:2

**16** 5:5 164:19 174:20,23

**160** 118:3

**169** 5:4

**17** 43:9 46:18 112:14
167:4 178:17 179:17

**175** 5:5

**179** 5:6

**17th** 39:9 42:12

**18** 5:6 12:12 26:6 92:7,18
156:21 179:18,23 180:2,
15

**18.2.5** 47:11 49:11 52:7
93:14

**18th** 17:22

**19** 5:7 67:11 190:7,9
191:17

**190** 5:7

**1984** 15:13

**1988** 15:15

**1989** 15:16

**1993** 15:18,22

**1994** 16:9

**1996** 16:14 17:4

**1999** 145:18,19 146:3
181:3,7

**19th** 62:1 63:4 64:17
66:8 74:6

**1:20-CV-00057C** 1:4

**1:30** 133:23

---

### 2

**2** 4:14 43:13,15 113:22

**2.3.25** 113:22

**20** 147:5 160:14,22

**2002** 17:4,8,12,14

**2009** 68:7,15,20

**2010** 17:15,17 18:1 25:11
27:10

**2011** 17:18 25:12

**2012** 37:9 158:9,14

**2017** 68:1 84:3 136:6

**2018** 21:14 25:15 28:5

**2019** 4:15,18,22 26:10
39:9,10 41:19 42:12
43:10 44:4,11 45:14,23
46:18 49:17 62:1 63:5
64:16 67:11 68:21 70:5
74:6 78:2 82:12 83:18
90:4 117:15 122:11
123:14 131:11 149:14
158:12 168:6 177:18
178:10 181:7 188:6
191:18

**2020** 1:15,20 2:8 7:8
17:19,22 18:1 20:10
22:18 173:10 190:17,21
191:4 199:16

**23** 90:2

**23rd** 41:19

**24** 149:18

**240909** 6:9

**24th** 136:5

**25** 38:4,11,17,23 40:4
62:19 64:13,22 65:11,20
67:12,23 69:21 72:2 73:7
79:16 82:2,18 91:19,20,
23 98:9 99:16 112:22
113:2,23 114:9 115:5
126:23 127:14,23 128:1
131:13,21 135:13,18
138:3 141:1 142:10,14
146:22 155:14 156:2,11,
16,21 159:16,21 164:16
181:3 188:9,16 190:2

**25th** 78:7

**27** 44:4,11 81:17

**27th** 39:8 44:10

**28** 12:11

**29** 1:15,20 2:8 7:8

**2nd** 102:11,13



**3**

**3** 4:15,22 45:7,9 46:6
151:20

**30** 92:6,7,19

**31** 177:18

**31st** 4:15 45:13,23 49:17
50:21,23 90:4 93:4,5
178:10 191:18

**3450** 36:2

**3468** 136:17

**35** 4:13 68:12,18 71:8
114:13

**35-feet** 71:12

**36124** 6:10

**36507** 11:7

**36535** 6:13

**36561** 6:5

**37** 170:17 171:21

**3:24** 198:3

**3rd** 102:12,14 122:11,19
123:14 131:11 133:18
188:6

**4**

**4** 1:10 4:16 75:16,18
135:17

**43** 4:14

**45** 4:15

**4725** 6:5

**4:20** 77:18

**4th** 102:12,14

**5**

**5** 4:17 77:7,9

**5/20/23** 199:23

**50** 160:14 163:21

**50s** 29:5

**59** 6:12

**5th** 77:18 102:13,14

149:14 171:4

**6**

**6** 4:18 87:20,22

**64** 77:17

**67** 46:11

**675** 199:22

**68** 46:11

**6th** 181:3

**7**

**7** 4:19 89:9,11 92:21
100:12

**7475** 6:9

**75** 4:16

**77** 4:17

**7th** 17:13

**8**

**8** 4:7,20 108:15,17 147:5
154:12

**88** 4:18

**89** 4:19

**9**

**9** 4:21 113:14,16 180:16

**9/30/21** 199:22

**95** 28:13

**9:00** 1:16,21 2:9 7:7
64:18 66:8,12

**9:15** 51:5,9

**A**

**A-B** 36:2

**a.m.** 1:16,21 2:9 7:8 51:9

**ability** 10:7 81:4 154:2
164:10

**absolute** 172:11

**access** 84:11 127:7
132:4 151:9 176:13,17
182:4

**accessing** 67:19

**accessory** 59:3

**accidents** 186:22
187:10

**account** 115:13

**ACCR** 199:15

**accurate** 191:19

**acknowledge** 7:12

**acknowledges** 7:16

**acquainted** 99:8 121:16

**acreage** 160:23 161:1

**acting** 7:3 139:21,22

**action** 1:3 73:22 93:20
176:9,12 177:13,16
199:12

**activities** 18:7 21:22

**activity** 130:16

**actual** 16:4 159:4,5

**adapt** 27:23

**add** 151:2

**added** 70:20

**adding** 21:5

**additional** 22:14 32:7
54:11 95:20 127:15
137:5 141:13 151:20,23
152:22 153:14,16 188:17

**address** 11:5 36:5 74:2
86:23 98:11 161:11

**addressed** 74:1 119:12
120:17 141:15 173:6

**ADEM** 39:11,16,18,23
40:10 41:9 57:18 175:10,
21 176:15

**adjacent** 83:23 188:1

**adjustment** 1:11 19:15
32:10 58:3,5 59:13 89:5
94:1 95:13 96:4 97:20
98:7,14 100:15 118:16
136:1

**administration** 18:4,21
25:16 33:22 52:15

**administrations** 25:13

**administrative** 88:4

**administrator** 19:3 22:3
26:11 27:12 28:19 29:22
31:8,12 33:10 37:23
41:15 47:1,2,14 48:1,5,
12 50:12 58:18 85:12
86:18 90:8,21 91:1,10,22
114:21 119:23 125:4
143:11 144:15 150:9

**adopted** 16:23 78:1
79:2,5,16 146:4

**adoption** 30:4 73:19

**adult** 33:23

**advertised** 168:12 169:1
171:11

**advertising** 168:13

**advise** 175:16

**advisory** 62:5,6,9,12,15,
22 63:6,9,19 66:1,10,13
71:20,23 72:10 74:8
83:19 97:4,17 98:6,13
99:20 103:23 108:12
115:2 116:6

**aerial** 130:19

**affect** 10:6 148:17

**affected** 27:4

**affecting** 99:7

**affects** 149:1 163:2

**affidavits** 10:9,16
130:16

**affirmative** 9:6,10

**afternoon** 168:1

**agenda** 5:2 142:8

**agendas** 168:19

**agree** 28:14 76:1 102:7,
15 104:5 121:8,12
137:10 147:4,19 148:1,
21

**agreed** 2:2,11,19 3:5
12:23 28:12 124:17

**agreement** 161:23

**ahead** 16:20 21:10 40:7
56:1



**air** 130:5

**Alabama** 1:2,9 2:6 6:5, 10,13 7:3,4 11:7 13:22 15:14,16,18 34:17 199:3, 14,22

**alleviate** 141:10

**alley** 127:8 132:5

**allowable** 86:13

**allowed** 85:23 110:19 157:2,21 161:5 182:2

**allowing** 161:8

**altered** 76:4

**Alvez** 88:16,21

**ameliorates** 121:20

**amended** 81:14

**amendment** 64:22 83:1 114:5,7 118:9,20 119:3 120:5 121:3 135:12 136:18 138:2 139:5,9,14 140:12,15 142:19 144:1, 12 145:10 146:9 152:8,9, 17 164:16 167:23 169:15 170:9 172:15

**amendment's** 139:17

**amendments** 5:3 18:11 19:12 65:19 81:19 103:4 113:21 115:5 116:18 142:9,23 143:18 147:16 162:23 166:15 168:7,11 171:12,17 188:5

**amendments'** 154:23

**aminities** 148:16

**amount** 51:10

**Anderson** 4:7 6:4 7:21 8:7,12,14 10:22 11:3 13:13 14:5,8,14,16 15:2 31:10 36:17,20 66:20 67:2,7 76:11,16,19,23 77:5 105:10,13 128:21 129:3 133:21 134:4,6,9, 21,23 151:15 178:19,23 179:14,16,20 180:9,14 183:3 184:17 196:22 197:7,10,18,20

**announcement** 132:21

**anonymously** 131:7

**answers** 9:6 199:7

**anti-charismatic** 29:4

**anticipate** 140:22

**anymore** 129:16 179:11

**anywise** 199:12

**apologize** 109:18 194:3

**apparent** 154:3

**apparently** 78:17 146:2

**appeal** 4:18 88:3,7,13 89:17 97:20 100:19 102:8,18 105:8 106:14

**appealed** 58:3,5 89:5 93:16

**appeals** 106:23

**appeared** 1:22 2:7 40:9 126:5

**APPEARING** 6:3,7

**appears** 41:20 42:11 44:2 102:10 175:9 178:23

**applicability** 50:8 123:2 124:21,22 129:7 181:11

**applicable** 62:19 65:20 126:23 127:21,22 129:21 130:1

**applicant** 47:19 49:5,13 54:15,21,23 55:1,18 58:22 60:13 95:19

**applicant's** 60:8

**applicants** 58:8 133:2,7, 12

**application** 4:13 35:21 36:12 37:15 39:7,10 40:3 42:7,16,19 44:5 45:3 46:12,14 47:17 48:1 49:2 55:22 56:8,20 57:9 60:9 70:2 80:7 81:12,14 84:21 95:23 96:5 100:5 102:22 107:2

**applications** 18:10 23:9 32:5,6,8 37:17 38:2,8,13, 17 70:4 98:9 106:17 133:3

**applied** 42:14 193:22,23

**applies** 126:17

**apply** 156:11 158:13

**approach** 27:7

**approached** 152:3

**approval** 12:14 46:18 55:9 56:16 59:13 133:11 140:17 142:9 152:14 153:15 158:5 159:5,7

**approve** 79:6 173:4

**approved** 22:6 39:9 40:11 41:1,2,5 42:9,20 43:9 80:22 156:13,15 157:15,20 158:4,9,14 159:6 161:6 177:6 194:13,17 196:12

**approving** 18:8 37:16 79:17

**approximately** 1:21 2:8 7:7 60:2

**April** 26:10 64:2 82:11 181:3

**area** 12:15 38:5 42:4 59:22 65:1 66:7 68:22 69:4 73:8,9,10 82:2 91:20 94:1,2 132:20 137:3 139:8 151:22 153:5,22 160:14 161:1 162:22 177:6 186:5 187:23

**area's** 161:9

**areas** 23:18 65:1 69:19 70:22 82:6 83:6 92:3 127:10 128:10 142:16,17 146:4,7 159:19 176:5 184:4 185:3

**Arendall** 165:22

**argument** 119:19 120:2 183:12

**arisen** 77:20

**arises** 54:15

**arrangement** 7:18 44:19 126:15

**arrested** 15:5

**arrived** 16:22

**Article** 113:22

**aspect** 20:13 53:16 69:14 86:1 122:2

**aspects** 163:5

**assign** 2:23 32:10,12

**assignments** 18:10

**assist** 45:19

**assistance** 19:13

**assistants** 34:12

**association** 62:1,7,10, 11 63:2 64:17 65:10 66:2,5,11 71:22 74:15 75:7,10 85:3 90:14 102:17 103:9,21 107:22 115:3,23 116:7,13 118:15 137:12 139:6,10, 22 140:11 166:2,8 168:2, 17

**Association's** 67:3 74:11

**assume** 177:15

**assumption** 157:22 161:16

**attached** 35:18 43:17 45:11 75:20 77:11 88:1 89:13 94:17 95:12 108:19 113:18 122:9 135:7 137:21 142:2 147:14 169:11 175:2 180:4 190:11

**attachment** 46:19,21

**attend** 62:11

**attended** 15:16 72:8 97:8 99:5 117:14 132:19

**attending** 62:21 149:15

**attention** 44:14,16 59:17,21 60:23 99:11 131:15

**attest** 108:4

**attorney** 6:4,8,11 79:8 88:14 165:3,20 178:1,5

**attorney-client** 10:2

**attorneys** 7:11 10:13,15 14:22 98:11

**aunt** 34:11

**aunts** 34:3 35:6

**author** 138:5

**authored** 89:19 140:14 150:22

**authority** 48:15 52:19
86:22 92:10,12,17
192:17

**authorizes** 52:10

**authorship** 89:22
122:15 138:8 143:20
144:10

**automatically** 157:23
177:3

**autonomy** 32:14

**Avenue** 11:7

**aware** 40:23 47:5 50:6
52:20 53:4,6,10,21 55:11
59:20 61:15 65:9,21 67:9
69:22 72:3,6 74:9 84:3,
12,15 85:2 88:22 90:2,5
91:16,17 93:9 98:12
111:14 115:13 124:10,14
132:9,10,15 133:3,8,12
144:15,18 173:9 176:10
178:12,15 181:10

---

**B**

**back** 23:21 26:16 28:19
36:15 38:6 40:6 41:9,17
48:20 61:10 63:14 69:8,
15 71:2 76:2,17 77:15
78:3,15 84:3 112:14
126:6 133:22 135:1
138:23 145:18 149:11
151:3,11 152:14 159:4
163:23 182:15,23 190:16
191:17 197:14

**badly** 125:10

**Baker** 15:12

**Baldwin** 1:9 11:18,20
12:5 17:7,8,12 18:5 19:4,
23 20:1 25:21 26:19
31:14 33:19 34:1,4,14,
15,23 37:8 42:10 47:2,6,
12 52:7,17 74:19 75:2
86:14,22 92:1,3,11
114:4,19,21 123:3
126:16,18 127:21 131:20
132:22 145:17 149:13
156:6 166:7 179:1
185:21 193:5,7,18

**bankruptcy** 15:3

**Banks** 97:11

**Baptist** 63:16 97:11

**based** 22:3 40:8 70:16
76:4 91:1 127:15 128:17
140:18 141:8 143:4,6
144:3 147:23 172:7
188:18 189:2

**basically** 18:3,20 31:19
32:22 33:7 38:18 80:17
114:11 124:23 155:19
196:16

**basis** 148:10 197:1

**Bates** 37:3,4,7 39:2
41:11 42:15 43:5,9 46:11
52:21 77:17 80:22 90:1
94:15 96:23 114:17
118:2 139:1

**Bates'** 42:11

**Bay** 11:7

**beach** 6:5 67:19 165:8

**bear** 68:5

**bedrooms** 127:16
140:23 141:2,9,17
185:14 188:18

**beds** 141:13

**began** 165:6,15,16

**begin** 164:20,21

**beginning** 32:4 41:3
56:21 57:10

**BEHALF** 6:3,7

**believed** 48:14 124:10

**Bell** 135:20,21 139:4

**beneficial** 98:5,10

**benefit** 47:11

**Bennett** 135:20

**big** 110:20

**biggest** 67:13 153:9,20
154:5 194:15,18

**billing** 144:16

**Billy** 64:20

**bio** 37:7

**bit** 28:21 30:11 68:5 70:2
75:3 88:17 107:18
115:19 118:22 171:2
187:13

**Blackburn** 11:6

**blank** 192:20 193:3,4,9,
17

**bleeped** 184:15

**block** 183:19

**blocked** 183:15 184:8,22

**blocking** 84:11

**board** 1:10 32:9 58:3,5
59:12 74:18 75:2 89:5,6
93:19 94:1,11 95:13 96:4
97:19 98:7,14 100:14
107:21 118:12,16 136:1
145:23 199:14

**Boards** 19:14

**body** 171:15

**Bonner** 189:21

**booklets** 72:12

**Bordelon** 1:6 173:21

**boss** 28:16

**bottom** 121:19 139:2

**bought** 94:23

**bound** 47:2 172:21,22,
23

**bounds** 85:10

**Box** 6:9

**break** 9:12,14,17 63:14
76:13,21 105:13 129:1
180:8,12 197:12

**breaking** 125:9

**Breezy** 1:6 4:20 36:1
85:5 110:8,10,13 112:4
113:6 136:16 154:17
155:3 167:2,6,8,11,18
185:15,16,17 187:18

**bring** 69:15 71:2 152:7
188:3

**brings** 26:20

**broke** 105:11

**brother** 34:23

**brought** 26:10 44:14,16
59:16,21 60:23 86:3
99:10 128:11 131:15,22,
23 141:11

**build** 43:23 59:3,5 78:10,
23 128:3 158:16,18,19,
23 160:9 181:6

**building** 4:14 34:9
36:19,20 41:2,18 42:1,5
43:23 47:23 71:9 73:17
79:18 91:6 95:1 113:5
119:10,12,14 139:6
144:5,20 145:1 159:12
160:12 164:7 173:19
174:1,5,12,16 175:8,14,
21 176:6,10,15,20 177:3,
8,11,20 178:4,7,11
192:1,14,15,18,22
194:21

**buildings** 69:6 71:11
157:14 158:23

**built** 59:14 84:7 91:2
110:15,16 111:2,10
128:4 137:6 141:2
154:15 155:20 162:15
163:23 181:13,14
185:12,18

**bunk** 141:12,13

**businesses** 115:1,21

---

**C**

**calculation** 161:2

**call** 31:16,21 36:6 191:1

**called** 17:1,20 78:11,18
100:2 155:8 175:15

**calling** 183:4

**calls** 106:21 111:9,14,19

**camera** 134:17

**cancel** 192:18

**capability** 121:6

**capacity** 11:23

**car** 127:7 182:9

**care** 57:12

**cared** 29:18

**career** 16:17 17:11 87:8

**Carol** 108:1 112:3

**carries** 19:17

**cars** 84:8 128:5 183:7,10
184:1,7,22 187:22



**case** 8:15 10:11 11:22
12:13,16,17 32:12 35:22
47:15 48:7 51:13 55:20
57:8 59:19 84:4 87:15
91:10 95:19 96:9 99:2
101:17 107:9 113:20
115:11 132:5 148:6,9,11
157:13 158:2 160:2
172:15,16 175:18 193:4
195:3

**cases** 12:9,21 13:2
14:13,18,21 32:10 54:14,
19 55:17 62:17 64:4,8
127:12 130:12 159:2
182:3 186:7 195:1

**CCR** 1:19 199:21,22

**ceilings** 147:6

**certainty** 148:18

**certificate** 4:13 35:21
36:1,11 37:15,17 38:1,21
41:22,23 42:3,7 46:12
47:13,15,18,22 48:6
49:3,11 52:9,11,22 53:7
54:7,20 55:4,7,13 57:14,
23 58:4,13 59:1,4,10
75:23 79:10,23 80:1,2,5,
14,21 81:2 92:21 93:2
95:1 133:3 159:12 176:4,
6,8,21 177:2,7,9 188:10,
13 189:20 193:5,15,23
194:7,13,17

**certificates** 18:9 19:11
47:8 53:9,17,19 58:9
93:15 194:4

**certified** 2:5 7:1 199:15,
16

**certify** 7:3 199:6,11,14

**chain** 4:17 77:14

**Chair** 97:12

**chairman** 97:16 108:10

**chairperson** 103:20

**challenge** 14:2

**change** 21:16 29:10
67:21 68:20 69:22
107:12 131:19 132:8,15
133:4,13 146:19 163:16,
17

**changed** 16:23 25:16
46:13 114:15 188:7

**characteristic** 160:6,8

**charged** 18:4

**charismatic** 28:23 29:3

**Charles** 135:15

**check** 50:17

**chief** 82:16,20 83:10
136:4,6

**chronologically** 77:15

**church** 63:12,13,15,16
97:10,11,12,16 98:17
107:23 112:2 116:18,22
118:11,13 121:5

**Church's** 121:18,23

**circumstances** 58:23

**citation** 193:18

**citizen** 90:7,9 95:6

**citizen's** 91:2

**citizens** 18:8 50:6 94:21
95:12 102:20 114:23
115:21

**City** 16:2,6,10,13,16,17,
22 17:5 35:2 117:17
162:1 165:7,8

**civic** 61:23 62:6,10,11
63:1 64:17 65:10 66:2,4,
10 67:3 71:21 74:10,15
75:6,10 85:3 90:14
102:17 103:8,21 107:22
115:3,23 116:7,13
118:15 137:12 139:6,10,
22 140:10 166:2,8 168:2,
17

**civil** 1:3 7:5 177:20

**clarification** 101:1,5

**clarified** 101:7

**clarify** 31:10 56:3

**Clark** 6:4

**classified** 38:19

**clear** 27:20 61:5 150:4
171:23

**close** 155:9

**closely** 166:6,12 189:15

**closeness** 148:15

**closer** 134:15

**coastal** 64:23 70:22
142:17

**code** 49:23 73:18,19
109:23 119:10,12,15
144:21 158:21 164:7
173:16,19 174:5 192:14,
15

**college** 15:11 16:5

**Collins** 175:5,6,9

**Collinsworth** 6:11
76:15 134:16 182:13

**comfortable** 32:15

**commenced** 90:3,6
93:9

**commencing** 1:20 2:8
7:7

**comments** 101:2 115:13
121:5 166:23

**commercial** 160:21,23

**commission** 1:10 5:2
19:14,23 20:2 21:5,13
22:7 25:13,15 27:14,20
32:9 78:2 79:5 83:16
92:11,18 96:4,11,12
98:8,15 99:21 135:17
136:2 138:22 142:8
149:13 168:18 171:9,10,
15,16 172:9,10,22,23
173:8 199:23

**commissioner** 3:7 7:3
65:4 119:18 135:16
138:20 199:21

**commissioners** 21:15
26:7,8 138:12,14 165:4
170:18

**committee** 62:5,6,9,12,
15,22 63:6,9,19 66:1,10,
13 71:21,23 72:10 74:8,
18 83:19 97:5,17 98:6,13
99:20 103:23 108:13
115:2 116:6

**common** 110:8

**commonly** 156:4

**communicate** 33:11
55:7 56:6

**communicated** 54:14

**communication** 54:5,
12 55:15 78:8 83:9

**community** 107:15
115:1,21

**comparable** 148:2

**compelling** 69:12

**complained** 130:4
185:20

**complaining** 167:17

**complaint** 91:2 129:18
130:2,22

**complaints** 130:8,9,10
131:6

**complete** 39:11 171:21

**completed** 43:2 44:5

**completely** 55:21 59:14,
22

**compliance** 2:15 48:2,
10

**complies** 118:5

**comply** 47:20 49:5,14

**components** 57:1

**compromise** 70:9

**computer-aided** 199:8

**con** 96:21

**conceding** 31:19

**concern** 83:20 91:6,20
94:22 112:4 120:11,12
122:3 136:21 137:2
152:15 153:9,23 154:3,5,
6,9

**concerned** 73:12,13
90:9 91:10 112:10,13
113:12

**concerns** 65:2 70:17
73:21 74:3 110:19,21
112:18 119:11 121:1
142:23 152:12

**concluded** 198:2

**conclusions** 96:18

**conditional** 12:13

**conditioner** 130:5

**condominiums** 157:11



**conduct** 57:22 58:7

**configuration** 128:6 183:5

**configurations** 131:12

**confirm** 180:20 185:6

**conflict** 28:21 97:22 98:2

**conform** 33:4

**conformity** 163:23

**conjunction** 109:10 139:22

**consent** 7:18

**consequences** 71:7

**considerable** 106:22 107:10

**consideration** 120:5 188:4

**considerations** 70:21 142:15 143:10 154:10

**considered** 19:3 52:15 116:17 118:19 119:1

**consistent** 141:17

**consolidating** 146:3

**constant** 19:22

**constitute** 131:19

**constructed** 67:17 143:1 162:4

**construction** 34:9 80:21 90:3,5 93:9 94:22 148:15 155:1 163:22 191:14

**contact** 54:2 111:19

**contacted** 50:12,13 61:17 78:8 90:7,8,20,22 165:3 192:10

**contacting** 79:12

**context** 138:17 153:21

**continue** 30:7 32:21 80:20 163:17 196:23

**continued** 20:14 131:17 178:4

**continues** 196:13

**continuing** 166:18

**196:9**

**contours** 85:10

**Contracting** 175:16 177:19

**contractor** 46:2 51:11 175:16 195:9

**control** 74:23

**controlled** 121:21

**controlling** 121:23 126:13

**controversy** 107:13

**conventional** 141:3,4

**conversation** 72:2 98:20 99:1,2 104:11 167:10

**conversations** 89:3 98:17 99:14,18 100:10, 11 103:16 104:1,3,10,12 110:12 111:13,18

**convicted** 15:7

**convinced** 83:11

**coordinated** 137:11

**copied** 100:7 123:20,23 170:5

**copies** 72:17

**copy** 35:17 43:16 45:10 52:1 67:5 75:19 77:10 87:23 89:12 108:18 113:17 122:8 135:6 137:20 142:1 147:13 169:10 175:1 180:3 190:10

**correct** 19:9,15,20 20:3 22:15,16,19,20 36:3,4 37:12,13 42:20,21 43:3, 6,10,11 46:3,4,16,22 49:3 52:5 61:9 90:14 92:2 97:9,17,18 100:19 108:3,5 114:9 115:6,19 116:9 118:16 126:18 128:2,7 129:5 131:11 140:15 143:14 150:16 166:2,3,9 167:15 179:2 180:21 181:7 182:19 183:7,8 185:6 195:11,12 199:8

**corrected** 196:17

**correspondence** 95:23 102:4 103:3 106:20 107:4,8,17 136:9

**counsel** 2:4,21,22 7:6, 15,17 199:11

**county** 1:9 5:2 11:18,21 12:6,12 13:7 16:3 17:7,9, 12,13,22 18:5,17 19:4, 19,23 20:1 22:2,3,6,18 24:3,7,23 25:1,12,15,22 26:11,13,19 27:12,18 28:19 29:15,22 31:12,14 32:9 33:9,15,19 34:1,5, 14,15,18,23 37:8 42:4,10 43:21 44:4,12 47:2,6,12 48:12 50:12 52:8,18 59:23 64:21 65:15,17 69:19 73:8 74:19,23 75:2 78:2 79:5,8 82:6 86:14, 22 90:7,19,21,23 91:9,18 92:1,3,4,11,17 96:10 99:21 103:10 108:22 109:2,5,19,22 114:4,19, 21 118:8 119:18,22 123:3 125:4 126:7,16,18 127:10,22 131:20 132:22 135:16,17,19 136:1 138:12,13,19 142:8 143:10 144:15 145:18 149:13 150:8 156:6 159:20 166:7 168:19 169:7 170:18 171:8,10, 15 172:10,23 173:8 175:19 178:1,5 179:1,13 185:21 187:2,4 193:6,7, 18 197:3

**County's** 19:14 120:4 140:7

**countywide** 69:18 92:13

**couple** 25:17 26:3 27:2,4 29:21 30:1 73:2 83:17 94:16 104:1 145:12 152:6 157:1 168:23 173:14 189:12

**courses** 87:10

**court** 1:1 2:5,16 7:1,11 8:5,23 12:16,22 13:22 24:19 36:3 77:2 109:14 112:23 125:8 134:13,19 136:17 137:10 161:14,19 179:19 182:20,22 197:15 199:14,15

**cousins** 34:22 35:6,10

**covered** 20:7

**covers** 158:21

**coworkers** 29:17 111:16 151:4

**crane** 183:18

**create** 186:16

**created** 62:16 67:18 136:19

**creates** 162:5

**creating** 186:21 187:10

**creditor** 11:13

**crime** 15:7

**criminal** 177:21

**Crosby** 6:12 88:15

**cross** 72:19

**crowded** 126:12

**Crystal** 37:3,4,8 41:11 42:11 52:21 80:22

**current** 11:22 14:23 81:14 175:8

---

**D**

**dad** 35:4

**damage** 163:22 164:6

**damaged** 163:20

**data** 145:8

**database** 41:5 151:5,11 176:17,18

**date** 7:4 49:16 50:22 60:6 69:2 81:22 82:8 83:13 93:5 102:7 130:17 131:10 199:16

**dated** 42:12 45:13 77:18 88:4 122:11

**dates** 11:16 40:12 41:7

**day** 51:1,3,6,18,22 75:5 102:9 129:14,17 168:21 169:3 177:19 192:8 195:4

**day-to-day** 18:7 21:22 31:23

**De** 36:2 83:21 85:5 136:17 137:9 161:13,18



ALABAMA
COURT REPORTING

**deal** 25:7 60:18 120:13
130:8 162:8

**dealing** 61:16 84:4 99:12
152:16 185:5

**dealt** 60:18

**December** 1:15,19 2:8
7:8 17:22,23 22:18
102:10,11,13,14

**decide** 33:8,11

**decision** 21:23 22:4
30:21 58:2 61:6,9,13,20
80:19 82:3 88:4 89:4,5
124:14 171:14,16
172:17,19 173:2

**decisions** 33:12

**declarations** 10:10,15

**dedicated** 30:6 183:13,
21 185:2,3

**defendant** 11:9

**Defendants** 1:12 6:7

**Defendants'** 46:11
94:15 114:17 118:2
139:1

**defensible** 86:5,9
126:13

**deficiencies** 55:2,8

**deficient** 56:8

**define** 166:12

**definition** 68:17

**degree** 15:14,21 32:14
140:10

**degrees** 15:11

**Deidra** 135:20 139:4

**delegate** 38:1

**delegation** 38:22

**deliberate** 94:7

**delivery** 51:20 122:21,22

**demotion** 22:5,6,8

**denied** 46:15

**density** 121:21,23 137:2
142:13 153:22 161:2,4,7

**deny** 55:4 188:13

**department** 12:15 18:6,
23 19:19 27:17,18 29:16,
17 32:1 37:9 38:18 39:8
42:10 70:14 83:2 91:8
95:4 107:3 111:10,17
113:5 114:20 115:4
116:12,19 117:5 118:9,
14 119:13 120:8 121:1
129:16,18 130:18 137:9
147:3 161:22 162:5
166:7 174:1,17 175:12
176:7 177:13 178:11
185:20 187:2,4,5 190:23
191:7,9,11 192:11,23

**department's** 161:12
189:7

**departure** 25:1

**depend** 101:13

**depending** 96:4 121:14
147:6

**depends** 193:11,12

**depicted** 110:1

**depiction** 191:19

**depicts** 43:1

**deposition** 1:14,18 2:4,
13,14 3:2,6 8:21 151:16
197:1 198:2 199:6

**depositions** 2:17

**describe** 85:4,6,10

**design** 161:10

**designated** 184:5

**designation** 142:14
143:8

**desire** 21:3,8,16 28:22
83:5 92:9 143:3

**destroyed** 163:20

**detail** 171:21

**details** 64:15 140:4
174:3

**determination** 50:8
85:17 86:4 93:1,6 123:9
124:16,18 125:12 126:20
127:18 130:12 150:11

**determinations** 129:12

**determine** 124:8 125:1
148:8,13

**determined** 61:1

**developer** 41:21

**development** 17:20
20:9,17 22:1 29:11 62:3
65:2 70:3,4,7 72:21
100:1 102:23 115:4
137:1 157:2,19,20,23
158:20,22 159:3,4
160:22

**developments** 156:1,8
157:8

**dialogue** 164:21 165:16

**dictating** 33:10

**difference** 71:10 104:7
157:7 161:17 184:9,12,
21,23 185:2

**differences** 30:23

**differently** 21:17 28:1,
18 69:20 159:15,20

**difficult** 25:4,18 26:4,16,
19 29:10

**difficulty** 109:11,13
112:16 125:7 162:6
187:11

**dimensional** 94:2,3

**direct** 41:12 53:16 54:2
56:22 58:22 100:11
103:15 111:13 117:4
136:14 150:6 167:9

**directive** 33:4

**directly** 41:14 55:10,12
57:10 60:12 96:12 100:9

**director** 17:16,18,23
18:3,20 19:2,5,17 20:6,
15 26:12 27:12,13,16
28:12,15,17 31:9,11 38:7
52:11 53:18 69:10 87:1
114:20 118:15 193:6

**directors** 87:14 118:12

**disagree** 30:1

**disagreed** 32:21

**disagreements** 24:6,22
25:19 27:1,3 29:21

**disclose** 60:8

**discovered** 59:4 194:11

**discovery** 13:18 43:21

**determined** 61:1

**discretion** 85:11,16
86:17 87:2,11

**discretions** 87:4

**discuss** 64:21 70:19
145:4 151:21

**discussed** 45:1 60:16
72:23 88:16 105:8,23
153:20 168:23

**discussion** 44:23 48:22
53:22 86:6 97:15 120:10
152:7 153:17 163:10
165:4

**discussions** 58:21
60:12 91:13 106:1,4
111:16

**dispute** 12:18

**distance** 146:16

**distant** 34:13

**distinct** 62:8,13 63:2

**distinction** 196:2,4,18

**district** 1:1,2,10 38:4,11,
17,23 40:4 59:23 62:19
64:13,22 65:11,20 67:11,
23 69:21 72:2 73:7 74:17
79:16 82:2,18 91:19,20,
23 92:16 98:9 99:7,16
112:21 113:2,23 114:9
115:5 126:23 127:14,23
128:1,12 131:13,21
135:13,17,18 138:3
141:1 142:10,14 146:21
155:14 156:2,11,16,20
159:16,21 160:3 164:16
181:3 188:9,10,16 190:2,
3

**districts** 92:6,7,9 145:19
156:22,23 159:22

**disturbance** 152:15

**divided** 92:5

**document** 4:16,18 45:15
46:5,10 76:6 88:5 138:8
142:5 143:12,21

**documentation** 175:22
176:2

**documented** 47:18
49:4,12,17,21

**documents** 59:18 159:5
197:2



ALABAMA
COURT REPORTING

**Don** 135:21

**door** 63:16

**Dorsey** 138:21

**double** 15:18

**draft** 18:11 83:1,14
143:13,17 144:7 150:7
151:8 180:19 185:5

**drafted** 51:22 118:20
142:20 143:4,7,8,10,15
144:19 153:3 170:8
172:1

**drafting** 119:3 140:11
142:18 144:17,18 145:3,
9 188:5

**drafts** 72:12 149:21,22
150:2,21 151:6,13,16
179:5

**drawing** 196:2

**draws** 196:3

**Drive** 6:9

**driveway** 126:10 128:4
183:9,18

**dropped** 182:14

**due** 92:22 109:11,13
112:16 125:6 187:11

**duly** 8:2 199:14

**dune** 67:14,16,20 68:1
72:13 82:3 99:9,10
142:12,21 143:1 144:2
151:1 160:12 165:1,5,13,
17 166:10,15

**Dunes** 158:17,21
161:15,19

**duplex** 68:12 77:21
84:16 111:6,7 140:21
141:4 154:14 155:8

**duplexes** 84:7 160:18
185:11

**duties** 18:2 20:5,15
37:15 86:23

**dwelling** 68:11 140:20
141:4,19

**dwellings** 160:9,18,19

**Dyess** 29:23 31:4,12
33:1 48:17 61:7 63:18
64:19 65:4 69:2 70:23

71:1 78:11,18 87:3 88:22
93:9 114:22 125:13
126:1 132:9 150:13

---

**E**

**e-mail** 4:17 5:5 52:1
77:14,18 79:13 100:8
101:9 122:20,23 123:12,
14,19,20 124:6 140:7
175:4,13

**e-mailed** 150:8 178:13

**e-mails** 4:21 100:6,13,23
101:10,16 102:6,8,15
105:5,16 106:14,20
113:23 114:3 135:10
172:13

**earlier** 20:22 54:7 70:2,5
82:10 97:7 100:2 102:22
103:1 106:5 136:16
151:1 166:21 171:5
181:9

**earliest** 102:10

**early** 82:12

**Earth** 130:20

**easement** 59:6,7,8,14,
17,20 60:8,23

**easier** 162:8

**easy** 8:19,22 25:6

**Eazy** 4:20 85:4 110:7,10,
13 112:4 113:6 136:16
154:17 155:3 167:2,6,8,
10,17 185:15,16 187:18

**Eddie** 175:5,6,8

**edit** 151:7

**educational** 15:10

**effect** 2:14 44:21

**effecting** 91:19

**effective** 21:22 22:18

**effort** 20:19 21:1,19
29:11

**egress** 124:13 126:10,11
181:17,19,21 182:5
183:6,11,15 188:23

**election** 26:6

**elections** 21:13 25:16

27:10 28:5

**elements** 151:2

**elevation** 145:23

**Eley** 6:8

**Emerson** 103:12,13,16
104:13 105:22 107:23
108:10 112:2 166:1

**employ** 23:13

**employed** 23:6

**employee** 11:23 109:22
174:18

**employment** 23:5,8,11,
12 33:21 126:6,7

**empty** 183:9

**enacted** 114:16 162:16

**enclosure** 46:7

**end** 118:1 121:18 135:18

**ended** 31:19 70:18
120:16,18

**energy** 114:22

**enforce** 192:12,13,15

**enforcement** 12:21
18:4,21 49:23 52:16
109:23 144:21 173:16

**engaged** 165:2

**engineer** 20:1

**English** 15:15

**entail** 20:11

**entire** 45:1 87:8 143:12

**entities** 62:8,14 63:3
115:9

**entitled** 47:12 48:5 52:8

**entity** 75:3

**environment** 28:2 73:13

**environmental** 34:12
73:21 160:8

**environmentally** 73:9

**equal** 148:3

**Ernie** 97:12 98:17 107:23
112:2 116:18 118:13

**error** 52:23 53:3,9 92:22
93:2

**escalates** 196:14

**Escambia** 34:18

**escapes** 63:13

**essentially** 22:12

**establish** 114:10

**establishes** 52:18

**establishing** 118:10

**estate** 103:22

**estimate** 155:12

**events** 51:2 60:20 83:4

**eventually** 16:3 17:1

**evidence** 3:2 176:20

**evidenced** 199:15

**exact** 11:16 12:19 13:5
41:7 51:2 60:6,20 64:10
69:1 81:22 82:8 83:4,13
93:4 155:22 178:13

**examination** 4:4,6 7:9
8:11

**examined** 8:2

**examples** 72:13

**exceed** 157:3 160:1

**exceptions** 32:7

**excess** 121:2

**exchange** 98:22

**excuse** 156:10

**executive** 19:18 107:21

**exemption** 158:10

**exempts** 158:1

**exercise** 86:17

**exercised** 85:11

**exhibit** 4:11 35:14,16,22
36:16,17 41:18 42:8,23
43:13,15 45:7,9 46:6
52:23 66:18,19,21 75:16,
18 77:7,9 87:20,22 89:9,
11 92:21 96:23 100:12
108:15,17 113:14,16
117:23 122:5,7 135:2,5
137:17,19 138:23 139:18
141:21,23 147:10,12
149:12,17 164:19 166:17
169:5,9 174:20,23



178:17 179:17,18,23
180:2,15 190:6,7,9
191:17

**exhibits** 35:12 156:19

**exist** 183:16

**existed** 30:4

**existence** 74:9

**existing** 30:5 151:8
162:22 163:2 188:20

**expanding** 21:17

**expect** 51:12 141:3,18

**expected** 9:21

**experience** 147:23

**expert** 148:6

**Expires** 199:22,23

**explaining** 88:11

**explanation** 46:19 68:5

**explore** 23:1

**exploring** 23:4

**express** 83:20 146:14

**expressed** 107:10
110:20 121:1 152:12,16
153:10

**expressing** 101:11
112:18

**extent** 20:15 26:14,16
27:7 71:16 73:5 105:3
115:14 125:23 130:20
146:10 151:17 163:20
171:20 178:13

**exterior** 183:7

---

**F**

**F-222** 6:5

**fact** 44:20 47:5 72:3
120:7,23 131:23 141:12
163:7 183:12

**factor** 148:20

**factors** 57:1 148:7

**facts** 24:20

**factual** 179:12

**fading** 109:16

**failed** 49:5,13

**failure** 60:8

**fair** 10:3 93:7 94:9 113:3
154:22

**Fairhope** 34:7

**fairly** 174:17

**false** 47:16 49:1

**familiar** 38:9 102:21
113:23

**familiarity** 103:5

**family** 33:23 34:2,4,15
35:3 141:4

**Fast** 68:21

**favor** 31:13 96:21 169:14

**Favor/opposition** 5:4

**favorable** 27:14 28:2

**federal** 73:22

**feedback** 65:23 69:23
96:7 100:4 125:6,8 144:5

**feel** 141:16 154:7 173:16,
17

**feeling** 150:10

**feet** 68:9,13,18,19 71:8
114:13 121:9,13 146:15,
20 147:5 157:4 160:1

**fell** 182:22

**fellowship** 63:14 72:9

**felt** 22:23 25:20 26:22
29:13 32:4,12,17 61:2
71:15 74:1 79:4 94:5
101:3,6 102:2 126:8
141:7 150:4

**fence** 173:23

**fewer** 148:1

**field** 12:11 23:17

**fields** 23:15

**fighting** 121:17

**figure** 125:17,18 129:22
131:2

**figured** 61:16

**file** 50:10 175:21

**filed** 47:19

**filing** 3:6

**filled** 193:4

**final** 42:23 171:16

**finally** 39:19 78:12

**financeability** 163:3

**financial** 163:5

**find** 21:21 127:5 145:16
151:12 188:2

**finding** 153:12 179:12

**fine** 8:7,8 14:9 110:11
179:14

**finish** 191:3

**finished** 145:23

**fire** 12:14 13:19 14:2,7
63:17 70:14 73:19 82:16,
19 83:2,10 115:4 116:11,
19 117:5 118:8,14,19
119:3,6,11 120:8,23
121:17 122:1 136:4,6
137:8 147:3 161:12,18,
22 162:5

**firehouse** 13:20

**fireman** 117:1

**firm** 38:14

**fish** 4:16 76:2,8,9 144:7
153:13 176:15

**fishing** 123:9

**fit** 20:20,21 128:5 138:17

**five-minute** 180:8

**fix** 55:3 56:7

**flip** 94:14 97:3 102:6

**flood** 65:1 70:21 142:16
145:22

**floors** 120:13,14 162:9

**Foley** 6:13 35:2 38:8
39:1,20 53:21 132:10
133:15 189:22

**follow** 159:8,10 172:21,
22,23

**follow-up** 123:23 151:15

**force** 2:14

**foregoing** 7:5 199:6,8

**form** 2:22 9:20 16:20
21:10 24:11 25:2 27:6
31:6 33:6 44:8 48:8 49:7
52:12 53:14 54:18 56:1
57:3 74:12 81:6 85:9,13
86:19 87:6 91:4,12 94:13
97:23 98:4 105:9 116:1,8
117:10 118:21 120:6
121:11 123:12 137:13
144:13 145:11 146:17
147:21 148:4 149:3
159:17 161:20 173:13
174:10 177:22 184:14
185:1 191:21 192:16,23
193:4,10 196:7

**formal** 57:22

**format** 143:12

**forms** 181:20

**Fort** 38:5,12,16 61:23
62:3,4 63:5,8,19 64:16,
22 65:2 66:7 67:3 68:22
70:14 71:20,21 73:7
74:7,10,14 75:6 82:1,5,
18 83:18 85:2,7 90:14
97:4,16 99:5 102:16,20
103:17 104:4,14 107:22
114:23 115:1,3,20,22
116:5,6,11,12 118:8,15
132:19 136:12 137:3,8,
11 139:6,10 140:10
147:17 166:2 168:1

**forward** 68:21 162:19

**forwarded** 140:3

**found** 126:22 146:4
168:21 199:15

**friends** 105:18 106:12

**front** 55:1 77:16 183:18

**froze** 36:15

**full** 2:15 11:5 24:20 72:10
75:14

**full-time** 16:4

**furtherance** 196:9

**future** 162:20

---

**G**

**gain** 65:23

**gained** 153:2



**gaining** 153:15

**gathered** 72:18

**gave** 94:5

**general** 27:8 58:12,14 101:10,12 102:3 120:23 168:3

**generally** 9:19 41:21 100:20 127:21

**generate** 107:3

**generated** 95:16 106:18, 22

**generates** 106:19

**gentleman** 90:11 152:2 167:21

**geography** 15:19

**gist** 150:17

**give** 8:21 9:5 15:9 25:22 56:7 61:3 65:21 93:19,20 170:15,16,18 178:10

**glad** 58:11

**Glade** 100:2,5 102:23 103:1 112:16,19 137:1 157:18 158:16

**Glenn** 135:21

**good** 8:13,19 75:3 76:15 80:2,14,17 88:17 107:14 121:2 144:9 168:22 187:22,23 188:1

**Google** 130:20

**graduate** 15:11

**graduated** 15:10,12,13, 17,20

**grandfathered** 30:6 129:23 130:13,14

**grant** 59:13

**granted** 46:18 164:14

**great** 197:19

**greater** 121:7 163:21

**greatest** 20:23

**Greg** 108:1

**Gregg** 99:3 112:3 114:18 166:5

**ground** 41:3 50:11,17

51:14 109:9 192:3 195:14

**grounds** 3:1

**group** 67:9 97:7

**growth** 121:21,23 153:21

**Gruber** 135:15

**guess** 25:15 26:10 27:9 29:1 30:2 93:22 97:16 121:10 134:2,4 176:19 182:19

**guideline** 165:11

**guidelines** 165:13

**Gulf** 162:1 165:7

---

**H**

**habitable** 146:13 157:12

**Halcyon** 6:9

**half** 68:13 70:10 76:12 83:5

**half-story** 68:17 69:14

**hall** 63:14 72:9 75:14

**hallway** 141:14

**halt** 51:11

**hand** 51:20 122:21,22 165:22

**handed** 192:4 195:3,6

**handwriting** 46:17

**happen** 55:20 56:19 112:18 137:3

**happened** 39:18 40:6 51:13 137:15 193:16

**happening** 140:23 186:9

**happy** 67:4

**hard** 26:19 29:8 150:23

**Harper** 175:5,6,8

**hate** 35:8

**hazard** 65:1

**HDR** 142:13 143:8

**he'll** 95:7

**head** 9:6 116:18 117:6 118:13

**hear** 8:17 9:20 24:20 70:13 88:18 182:16 194:4

**heard** 55:19 56:4,10 97:20 182:17 194:3

**hearing** 88:9 172:9,10 199:9

**hearings** 57:22 96:10 112:12 172:8

**heater** 12:17

**height** 45:3 68:3,8,9,12, 15,19 69:7 70:6,12 78:1 79:1,16 82:5,13,14,20,23 93:17 99:15 104:14,17 109:7 110:16 114:10,12 118:10 119:16 142:11 143:8,15 144:11 145:9, 21 146:6,12,14,16,19,20, 21 153:11,19 154:1,11 155:20 156:10 157:1,3 158:1,3,7,11,13 159:7, 10,23 160:13 161:10 162:16,19 163:5 164:15 169:16 171:1

**heights** 68:10 121:7

**held** 63:11 161:7

**helped** 59:12

**helpful** 21:21

**helping** 88:15

**helps** 15:1

**hereto** 35:18 43:17 45:11 75:20 77:11 88:1 89:13 108:19 113:18 122:9 135:7 137:21 142:2 147:14 169:11 175:2 180:4 190:11

**hey** 103:10

**high** 15:11,12 121:15 142:13 147:6

**high-hazard** 65:1 70:22 142:17

**higher** 157:10 158:2 160:12

**highway** 6:12 27:18 187:4

**history** 15:10 191:11

**home** 30:3,6,8 154:17 166:20 167:18

**homeowners** 115:1,21

**homes** 31:18 155:13

**honest** 131:18

**honestly** 34:7 152:17

**honesty** 131:14 194:15

**hotel** 84:17 85:2,4 111:5

**hour** 76:12 133:22

**hours** 134:4

**house** 4:20 78:10 110:1, 4,10,13 112:5,13 128:3 136:16,17 137:9 161:13, 18,19 167:2

**houses** 181:5

**housing** 160:17

**hurricanes** 164:4

---

**I**

**idea** 162:17

**ideas** 25:8

**identical** 179:2,6

**identification** 35:17 43:16 45:10 75:19 77:10 87:23 89:12 108:18 113:17 122:8 135:6 137:20 142:1 147:13 169:10 175:1 180:3 190:10

**illegal** 178:7 186:20

**illegally** 184:16

**immaterial** 84:19

**immediately** 13:6 51:10, 12 195:11

**impact** 147:20

**impediment** 67:18

**impermissible** 163:1

**implementation** 19:11

**important** 9:5 86:1 171:9

**imposed** 81:19



**in-depth** 98:23

**in-person** 58:7 99:14,18 103:15 106:1

**inaudible** 109:11,13 112:15 125:6 187:10

**incident** 78:3

**incidental** 76:3 78:4,6, 13,15,22 80:6

**include** 19:10 37:10,16 96:14,16,17,19,22 102:4, 5 160:21,23 161:10 185:15,16

**included** 13:14 94:8 100:13 139:17 142:11, 12,15 186:18

**includes** 135:18

**including** 24:1 82:13 103:6,7 137:7

**income** 33:14

**incomplete** 54:9

**incorrect** 19:8

**incorrectly** 196:12

**increase** 161:4

**increases** 137:2

**INDEX** 4:4,11

**indication** 25:6

**individual** 115:9 140:11

**individuals** 105:4,15,21 113:4 129:8 186:10

**influence** 172:3,6

**information** 10:12 14:22 40:8 64:12 65:7 66:6 78:9 84:18 90:20 94:11 95:20 96:3,14 103:7 118:18,23 119:1 130:18 136:4 141:5 143:5 158:22 166:11 171:19 172:18 173:1 176:14,16 179:7

**informed** 48:21 61:20

**ingress** 124:12 126:10, 11 181:16,19,20 182:5 183:6,11,15 188:22

**initial** 53:16 54:10 112:15 149:21,22 150:21

159:23 161:9 195:23

**initially** 16:8 44:3 54:8 69:12 70:10 149:20

**initiates** 19:19

**innovative** 161:10

**input** 45:20 61:12,14,19 89:21 115:8,18 116:17 122:14 138:7,13 143:20, 23 144:10 166:14

**inspection** 91:7 174:1, 16 175:12 176:7 177:13 190:23 191:9

**inspector** 144:5,16,20 145:1

**inspectors** 175:11

**installed** 195:14

**instance** 104:6 188:12

**instances** 33:1 56:6

**instructed** 33:2

**intended** 8:22 38:16

**intent** 10:1 38:5 114:8 125:5,17,18 126:8

**intention** 38:22

**interacted** 31:1

**interacting** 37:10

**interaction** 19:22 136:14

**interactions** 136:11

**interest** 97:22 98:3 106:18,20

**interested** 96:1 99:6 172:11 199:12

**interim** 17:16

**interior** 162:12 183:6

**intern** 16:8 25:10

**internship** 16:1,2

**interpret** 87:11,17

**interpretation** 29:22 31:5,14 57:5 85:18 86:7 91:15 129:4 167:14 187:16 188:7,15

**interpretations** 19:1 27:8 28:10 29:19,23

31:13

**interrogatories** 5:6 179:21 182:19

**interrogatory** 178:20 180:16 185:4,23

**introduced** 106:10

**invalid** 177:4

**investigated** 129:20

**involve** 14:3 17:2 68:4 190:22

**involved** 13:3 15:3 18:15 39:15 55:10,11,12, 18,21 56:20 57:10 59:2 65:10,18 72:21 81:18 103:21,22 116:22 139:13 142:18 143:3 174:2 178:2,5 190:14 191:4,8, 12

**involvement** 18:7,12 20:12 21:2 22:14 53:16 56:22 64:21 117:3,4 140:10

**involves** 19:1

**involving** 12:13,17 175:19

**Island** 128:4

**issuance** 39:16

**issue** 31:17 44:13 50:4, 15,17 53:4,6 54:15,22 55:3 56:13,16 57:5,13 60:5,14 68:4 73:20 77:20,23 84:12 93:16 99:8 115:17 119:10 127:3,17,23 128:10 130:2 153:18,20 164:7,9 165:18 173:19 174:4,5, 13 177:17 186:16,22 187:8,10 189:7 191:14 196:17

**issued** 36:1 41:2,19 44:21 47:15,18,19 49:3, 4,13,22,23 50:7,20 51:3, 5 52:22 53:8,13 59:5 90:3 91:7 92:22 93:2 95:1 129:10 175:15,17 177:17 178:9 190:22 192:4 193:13 194:19 196:1

**issues** 11:13 30:3 38:10, 11 39:13 40:2 49:8

53:22,23 54:9 55:2,12 56:15 60:19 65:2 67:8,10 68:16 83:22 88:11 91:18 92:14,22 99:7,13,23 104:2 105:7 113:11 129:14 151:20,23 160:10 161:11 189:8

**issuing** 54:16,20 56:8 175:19

**Item** 157:1,8

**items** 142:8

---

**J**

**Jackson** 1:11,14,18 2:4 4:6,15 5:6 7:8 8:1,13 11:4,6 24:16 64:20 67:7 77:5 85:16 105:14 114:21 134:23 151:19 179:1,22 180:14 183:3 184:20 187:15 194:3 196:20 197:21 198:2 199:6

**Jackson's** 19:9 197:1

**James** 11:6

**Jamie** 6:8 13:13 76:11 105:10 151:15 178:19 182:14 196:22

**January** 17:18 25:11,14 199:16

**Jerry** 135:21

**job** 11:20 12:5 16:5,21 17:7,9,14 29:10 87:9

**Joe** 50:3,4 64:20 94:20 103:12 107:23 109:3,22 112:2 144:20,21 165:23 177:17 192:12

**Johnston** 165:21

**joined** 37:9 123:17

**Jones** 45:22 46:2 51:19 52:2,3 53:12 54:2,6,12 175:16 177:19 195:10

**Jr** 11:6

**judgement** 47:23

**July** 4:15,22 39:9 41:19 42:12 43:9 44:10,22 45:13,23 46:18 49:17 50:21,22 66:8 69:1 72:8



74:5 90:4 93:4,5 122:11,
19 123:14 131:10 133:18
177:18 178:10 188:6
191:18

**June** 62:1 63:4 64:17
67:11 74:6 82:9,12
117:15 168:6

**jurisdiction** 92:8 119:14
187:3

**jurisdictions** 92:15

**justified** 194:8

---

### K

**keeping** 23:17

**Kidd** 6:8 8:8 10:19,23
13:16 14:6,10,15 16:20
21:10 24:11 25:2 27:6
31:6 33:6 36:14,19,22
44:8 48:8 49:7 52:12
53:14 54:18 56:1 57:3
66:16,23 67:6 74:12
76:14,18 77:3 81:6 85:9,
13 86:19 87:6 91:4,12
94:13 97:23 98:4 105:9,
12 116:1,8 117:10
118:21 120:6 121:11
134:1,5,8 137:13 144:13
145:11 146:17 147:21
148:4 149:3 151:18
159:17 161:20 173:13
174:10 177:22 178:22
179:3,15 180:6,10
182:12,15 183:1 184:14,
19 185:1 187:12 191:21
192:16 193:10 196:7
197:4,8,14,16,19,23

**kin** 199:11

**kind** 18:19 54:11,15
55:15 59:15 66:1 67:18
69:3 70:8 71:13 72:23
92:17 101:1 105:6
109:15 112:19 117:21
132:20 154:5 156:19
164:6

**Kittrell** 108:2,11 112:3,7

**Kiva** 158:17,18,20,21
161:15,19

**knew** 41:5 84:22,23
169:3 170:20 189:10

**knowledge** 14:1 52:18

98:8 119:2 186:12
189:17

**knowledgeable** 30:14

**Kris** 8:14 36:15 66:17
184:15

**Kristopher** 6:4

---

### L

**labeled** 90:1

**Lack** 56:22

**ladder** 121:6,12 161:13

**ladders** 121:8 162:11

**land** 4:13 18:8 19:10
35:20,23 36:11 37:14,16
38:1,21,23 39:7 40:3,11,
23 41:22,23 42:3,6 44:4
46:12 47:7,13,14,21
48:6,14,16 49:10 52:9,
11,22 53:7,8,17,19 54:4,
7,20 55:3,7,13 56:14
57:13,23 58:4,8,13,20
59:1,4,10 60:21 61:1
65:14 75:23 78:20 79:9,
10,22 80:1,2,5,13,21
81:2 84:21 92:21 93:2,14
94:23 103:16 133:2
148:1,3,13 159:12 160:7
176:4,5,8,21 177:2,6,9
188:9,13 189:20 193:5,
14,23 194:3,7,12,17
196:12

**language** 70:20 125:21
138:10,16 140:1,5 144:4
152:3

**large** 2:7 7:3 84:7,16
111:6 132:2 185:8,9
199:4,22

**larger** 141:17 185:11

**late** 17:15 21:14 25:14
27:10

**Lauren** 6:11 76:11

**law** 6:4,8,11 15:17 87:15
186:11 187:6

**laws** 2:15

**lawsuit** 11:9

**lawyer** 9:22 88:19

**lawyers** 9:18

**layout** 44:7 76:4

**layouts** 181:7

**leaders** 115:1,22

**leading** 2:22

**leads** 20:2

**learn** 87:12,13

**learned** 87:9 167:23
168:2

**leave** 16:13 17:5 68:19

**Lee** 39:19 40:5,20 41:6
45:2 48:20 57:16 61:8
78:7 100:18,22 101:23
123:12,13 132:9 133:14
140:2

**Lee's** 40:12

**left** 16:11,19 20:16 22:17
23:23 24:3,12 26:1 27:12
150:20

**legal** 98:10

**legally** 184:10,16,17

**lengthy** 39:17 99:1

**Leon** 36:2 83:21 85:5
136:17 137:9 161:14,19

**letter** 4:15,22 44:21
45:13,17,20,22 46:7,8,21
50:20 51:19,22 82:15,19
83:1 114:18 116:21
117:8 118:7 119:18
120:1,3,15,17 121:6,18,
23 122:11,12,15,17
131:10,19 132:6 136:5
139:1 150:16 163:15
173:21 175:14 188:6

**letters** 4:21,23 5:4 96:21,
22 102:4 113:20 114:1,3
119:21,22 129:11 135:11
136:15 137:7 169:14
170:17,18 171:21 172:3,
13 173:5

**level** 65:15 70:11 73:22
107:16,17 175:10

**liability** 177:21

**licensed** 199:14

**life** 153:13

**lift** 79:13 80:19

**lifted** 80:18 93:22

**lifting** 79:20

**likelihood** 128:8

**Lillian** 12:15

**limit** 69:16,23 70:5,12,16
71:2 82:15,17,21,23
83:12 114:11,12,14,16
117:22 119:4,6 120:16,
18 154:1,15 157:6
162:16 171:1

**limitation** 72:4 78:1
79:1,16 81:19 104:17
109:7 119:16,20 121:20
142:11 143:9 145:9,14
146:7,19,21 147:19
153:11 154:11 155:20
156:10 157:12 158:11,13
162:19 164:15 169:17

**limitations** 62:2 110:17
137:4 143:15 144:11
158:1,11

**limited** 18:14 92:16
98:18 117:3 128:11
139:7 146:1,13 188:15
197:1

**limiting** 154:1

**limits** 86:16 87:2,3

**Linda** 39:19 40:5,12,20
41:6 45:2 48:20 57:16
61:8 78:7 100:18 101:23
123:12,13 132:9 133:14
140:2

**list** 93:13

**listed** 93:13 180:21

**listened** 73:23 115:18

**lists** 93:11

**literally** 31:16,21

**litigation** 12:5 175:18

**live** 34:14,20

**lives** 34:6,21,23 129:4

**LLC** 1:6 36:2 85:5 110:8

**local** 126:22 142:10
156:20,22

**located** 38:4

**location** 148:14



ALABAMA
COURT REPORTING

**lone** 57:8

**long** 13:8 26:15 30:13 32:16 37:19 81:14 98:23 125:19 133:18 134:2

**long-range** 64:21

**longer** 78:17 134:6 138:22

**looked** 41:4 42:19 46:22 68:8,10 125:20 144:8 145:12,16 165:7 170:11, 13 171:6 175:20 186:8 189:11

**loom** 71:14

**loop** 61:21

**lose** 27:16

**lost** 27:19

**lot** 14:12 26:21 28:21 30:10 31:22 34:16 53:16 60:18,19 72:11,22 73:21 75:9 84:1 89:2 95:18 100:9 102:1 106:5,6,17, 18 107:18 110:21 115:9 119:10 120:15,18 123:19 127:4 130:20 158:21 160:11 162:8 168:10 169:22 171:3 174:3

**lots** 66:14

**loud** 109:17

**lower** 22:9

**LU-190197** 35:23

**lunch** 133:22 134:3,11

**M**

**Mack** 135:21

**made** 2:21 26:3 29:10 38:12 53:21 61:9,20 67:21,22 68:19 69:21 70:3 72:2,17 74:9 80:19 84:3,15 88:7,22 89:4 90:2,5 93:1,6,8 111:14 115:12 121:5 127:16,23 133:3,8,9,12 144:15,17 146:23 162:10 168:5,7 171:13 176:10 178:12,14

**Madison** 175:5,7,11

**mail** 51:20 52:1 103:7 122:21,23

**main** 6:5 125:16

**maintain** 20:14

**maintained** 28:3

**maintaining** 22:12

**maintains** 19:22

**major** 15:18

**majority** 27:19 102:11, 14 142:20 164:5 170:4

**make** 2:23 8:19,22 28:11 29:12 30:19 48:10 61:5, 15 64:4 65:21 67:9 71:5 72:5 85:20 124:15,16 126:12,20 127:21 130:12 132:14 138:17 147:6 150:4 166:22 170:2,14, 20 171:18 172:6,14,17, 18,20 183:12 188:21 189:10

**maker** 171:16

**makers** 171:14 172:17

**makeup** 107:21

**making** 18:10 53:2 64:7 66:18,20 85:17 86:4 120:2 124:17 196:18,19

**manage** 18:5

**management** 18:22

**manner** 7:19

**maps** 73:2 95:15,16

**March** 16:9 39:8 44:4,10, 11

**marked** 35:13,17,22 43:12,16 45:6,10 75:15, 19 77:6,10,17 87:20,23 89:9,12 108:15,18 113:14,17 118:2 122:5,8 135:2,6 137:17,20 141:21 142:1 147:10,13 169:5,10 174:20 175:1 178:17 179:23 180:3 190:10

**married** 33:17

**Martin** 167:21 168:9,20

**master** 65:11,13,14

**material** 94:10

**materials** 94:22 96:11 174:12 191:14

**matter** 48:9,18 79:12 130:6 145:4

**matters** 27:3

**maximize** 154:2,8

**maximum** 68:12 146:11 147:17 157:3

**means** 132:16 199:7

**meant** 180:6

**measure** 146:16

**measured** 121:8

**measuring** 145:23

**medications** 10:6

**meet** 58:11,12 61:23 63:23 64:3,20 66:10 72:10 158:7

**meeting** 58:15,17,22 62:4,22 63:5,11,18,20 64:2,7,18,19 66:12 68:22 69:1,4 71:12,19 72:8 73:3 74:6,7,9 75:14 82:7, 9,10 89:1 98:21 106:9 117:15 149:14,15 167:8 168:6

**meetings** 58:7 62:12,20 63:8 64:1 72:7 74:20 83:17,20 97:8 99:5,19, 20,21 112:8 115:12 117:13 120:11 132:19 168:9

**mega** 139:7

**member** 32:13 53:23 173:7

**members** 32:11 40:1 62:8,9,10 75:9 85:2 93:19 96:1 98:6,7,12,13 102:17 103:9 115:22 116:5,6,11,12

**memory** 66:14 69:13 78:13 117:3 125:5

**mention** 136:15 144:2

**mentioned** 14:20 23:23 27:1 31:18 67:8 84:6 85:1 106:5 111:19,23 114:5 117:16 139:20 144:3 158:6,16

**messy** 25:7

**met** 45:4 66:11 78:4

97:11 103:13 105:7 106:9 111:2

**meters** 146:15

**mic** 134:15,16

**mid** 29:5

**middle** 182:23

**Mike** 1:6 145:2

**mind** 13:6 23:17 40:23

**Mindy** 5:5 174:15,16 175:4,13 176:13

**mine** 36:14 106:12

**Minette** 11:7

**minor** 15:15

**minute** 36:10 68:6 128:22 180:7 197:5

**misrepresentation** 47:16 49:1 60:9

**misrepresentations** 36:13

**misstatements** 36:12 37:2

**mix** 160:17

**mixture** 160:17

**mobile** 15:13 30:3,6,8 31:18 34:18,20,22 35:3 165:21

**modification** 156:14

**modified** 149:5,7

**moment** 45:14 63:13

**Monday** 66:11

**Montgomery** 6:10

**month** 80:15

**months** 80:3,17 81:1,3, 8,15 168:23

**Morgan** 38:5,12,16 61:23 62:3,4 63:5,8,19 64:17,22 65:2 66:7 67:3 68:22 70:15 71:20,21 73:7 74:7,10,14 75:6 82:1,5,18 83:18 85:3,7 90:14 97:4,17 99:5 102:16,20 103:17 104:4, 14 107:22 114:23 115:2, 3,21,22 116:5,7,11,12



118:8,15 132:19 136:12
137:3,8,12 139:6,10
140:10 147:17 166:2
168:1

**morning** 8:13 66:9

**mortgageability** 163:3

**mounted** 134:17

**mouth** 75:12

**move** 20:17 21:23 23:1
24:13 25:20,23 26:23
29:14 59:6,9 134:18
182:6,9,10

**moved** 17:8,19 30:8
134:15

**moves** 77:15

**moving** 162:19 182:1

**MS4** 18:16,17

**multifamily** 157:8,9
160:19

**multiple** 123:20

**Municipal** 18:18

**mutual** 22:3

**N**

**named** 90:11 97:12
167:21

**names** 106:6,7

**nature** 24:18

**necessarily** 33:9 99:17
100:8 106:16 115:11
148:5,9,11 163:15 173:4

**necessity** 81:11

**needed** 28:3 40:10 54:1
65:17 80:2,4,8 81:1 94:6
101:4,5,6 119:11 132:1
188:2

**neighbors** 75:12,13
173:20 175:14

**Neil** 165:21

**newly** 197:2

**newsletter** 64:16 66:4,
16 74:11

**nice** 107:12

**nights** 66:11

**nodding** 9:7

**nonconforming** 163:2,
4,8,13,14,16

**normal** 127:2,3,4 160:1
183:23

**Northport** 16:2,7,11,13

**Notary** 2:6 7:2

**note** 26:1

**noted** 92:9

**notes** 64:17 167:23
197:5

**notice** 3:6 39:6 49:19,22
50:5,15,18,22 51:5,8,17
119:7 156:23 178:11
190:15 191:18,20 192:10
194:19,23

**notices** 74:16 95:22
168:13

**notification** 74:14

**Nouwen** 1:19 2:5 7:1
199:21

**November** 4:18 16:14
17:4 25:15 26:6 77:18

**nullify** 192:18

**number** 1:3 13:2 14:18,
21 29:8 34:21 35:14,23
43:1,13,15 45:7 46:6
52:23 68:9 69:7,16 70:16
71:3 75:4,16 77:7,17
81:9,11 87:20,22 89:9
90:1 93:11 94:15 97:1
100:12,13 103:2 108:15,
17 112:10 113:14,16,21
114:18 121:13 122:5,7
127:16 132:2 135:3,5
137:17,19 139:1 140:22
141:8,17,21,23 147:10,
12 148:7,13,16,19
149:12 154:15 169:5,9
174:20,23 178:17 180:2,
17,21 182:18 185:23
190:7,9 199:15

**O**

**object** 9:18 16:20 21:10
24:11 25:2 27:6 31:6
33:6 44:8 48:8 49:7

52:12 53:14 54:18 56:1
57:3 74:12 81:6 85:9,13
86:19 87:6 91:4,12 94:13
97:23 98:4 105:9 116:1,8
117:10 118:21 120:6
121:11 137:13 144:13
145:11 146:17 147:21
148:4 149:3 159:17
161:20 173:13 174:10
177:22 184:14 185:1
191:21 192:16 193:10
196:7

**objection** 9:19,20
105:11

**objections** 2:20,23 7:19,
20

**obstruct** 181:16,19,20

**obstructed** 183:10

**obstructs** 183:5

**obtaining** 42:5

**occasion** 123:22

**occupancy** 117:9,16,18,
21,22 187:17,20 188:4

**October** 17:4,8,13,17
20:10,18 25:10 64:3
78:2,6

**off-street** 92:23

**offer** 144:9

**offered** 3:2

**offhand** 40:14 52:14

**office** 37:6,12 38:8,16
39:1,3 41:8 46:13 48:20
53:21 76:8 96:12 100:18
133:15,16 189:22

**officer** 50:1 109:23
144:22 173:17

**official** 74:18 75:1 175:9

**officially** 17:17 25:11

**older** 30:8 145:17 158:22

**one-on-one** 98:20
136:14

**ongoing** 107:1

**Ono** 128:3

**onsite** 195:5

**open** 23:17 63:9 66:13

74:20 78:8 160:14,15

**opinion** 30:12,14,17
99:23 104:8 148:10

**opportunities** 23:2,3,5
24:1,2

**opportunity** 17:7 55:19
56:7,10 65:23 164:12

**oppose** 102:17

**opposed** 146:14 169:15

**opposition** 96:22
100:19 101:11 102:8
105:5,15 106:22 107:6
171:1

**oral** 7:9 9:10

**Orange** 6:5 165:8

**order** 5:7 37:1 41:23
52:4 53:13 54:3,17 55:9,
14 56:9,13 74:2 79:14,20
80:20 90:4 93:21 95:2
133:10 146:7 173:10
175:17 177:7,18,23
178:10 188:3 190:17,21
191:2,5 192:4 193:12
194:2,9,18 195:8,16,18
196:1

**orders** 193:1

**ordinance** 18:5,12,16,22
19:1 29:19 31:5,15 44:18
47:3,6,12 52:8,9 62:18
65:19 70:18 71:6 80:10,
16 83:7 86:2,11,15,21
87:12,17 93:12 117:9,16,
18,21 123:3 124:11
125:3,20 126:17 138:18
145:20 146:3 156:6
163:12,23 167:15 171:17
177:10 181:2 186:15,16
187:17 188:8 193:7,8,19
196:3

**ordinances** 47:21 48:3
49:6,15 125:21 129:8
145:13,15,17

**organization** 102:16

**organize** 170:7

**organized** 62:5 170:13

**original** 16:21 26:17
83:5 123:10

**originally** 34:15 36:1
46:13 123:11,12



**originate** 65:14

**originated** 124:2

**Orleans** 117:18

**outgoing** 29:7

**outreach** 28:9 29:1

**outright** 55:4

**overcrowd** 71:14

**overcrowded** 110:20

**overlapping** 92:14

**overrule** 31:4,13

**overruling** 31:16,21

**overstates** 115:19

**owned** 84:1,13,19 85:4
    110:5,7

**owner** 59:20 110:5

**owners** 96:1

**ownership** 84:23 110:8

---

**P**

**P.C.** 6:8,12

**p.m.** 77:18 198:3

**pace** 107:12

**pages** 35:21 36:11 46:10
    94:14,16 97:3 118:1

**papers** 168:14

**paperwork** 78:6

**paragraph** 125:18 189:2

**parameters** 86:11

**parcel** 83:23

**parents** 34:20 35:4

**park** 30:7 183:17 185:21

**parked** 84:9 183:7 184:2,
    7,10,16,17

**parking** 4:23 39:13 44:7,
    13,19 50:9 54:10 57:5
    62:2 67:22 76:4 78:4,21
    84:16 86:6,7,8 91:15
    92:23 99:15 104:13,16
    109:7 110:17,22 123:4
    124:9,12,13 126:21
    127:2,3,4,5,6,10,15,16,
    22 131:11,17,21 135:12

136:18 137:4 138:2
139:7 140:20,21 141:6
149:6,21 150:3,7 151:21
152:4,7,9,13,21 153:11
167:14,18 181:1,2,7,18,
20,21 182:3 183:4,5,13,
17,19,21 184:4,5,8,22
185:2,3 186:6,10,13,17,
18,20 187:6,9,16,21
188:7,12,18,20,22 189:3,
14 190:5

**parks** 30:3

**part** 12:5 18:23 21:19
    30:18,19 44:22 48:4
    52:15 56:22 61:2 66:17
    68:16,17 70:23 86:6
    109:15 114:7 120:8,11
    125:2,19 136:20 139:10
    143:9,13 144:17 152:7
    154:22 158:4 160:21
    162:6 186:8,18

**participating** 7:12 61:6

**parties** 1:21 2:3,7,23
    7:17 95:12 199:11

**Partington** 6:4

**parts** 120:3

**party** 11:8 96:1

**pass** 121:3

**passed** 162:23 163:9
    164:16

**past** 11:17 25:17 27:2
    30:1 33:13 34:10 182:21
    189:16

**pasted** 192:21

**Paul** 90:11,13 93:8 106:4
    123:6,11 132:7 139:19
    150:16 167:12,13

**Paula** 189:21

**paused** 24:9

**pay** 16:23 22:9

**penalties** 178:2

**pending** 80:1 98:9 133:2

**people** 25:7 56:6 60:18,
    19 65:10 66:15 69:21
    72:2,5,6,11,18,20,21,22
    73:10,23 75:4 103:8
    106:8,9 110:14 111:4,20,
    21 112:17 113:12 115:7

120:12 123:20,23 130:15
152:6 153:12 154:4,7
155:7 162:8 168:10
169:23 185:20 186:7
194:16

**people's** 154:1

**percent** 28:13 103:19
    160:14,15,22 163:21

**period** 13:9 133:18
    155:18

**permanent** 17:17

**permissible** 114:8
    128:7,19

**permit** 18:17 36:19,20
    39:12,18,23 40:10 41:2,
    9,18 42:1,5 47:23 57:18
    76:4 78:15,22 80:6 91:6
    95:1 131:17 175:15,19,
    21,22 176:2,6,10,16,20
    177:3,8,11 192:1,18,22
    193:22 194:7,21

**permits** 39:16 61:7
    193:21

**permitted** 86:8 91:3
    124:9 128:14 131:13
    148:2 149:1 181:6
    196:10,11

**permutations** 14:12

**person** 39:21 54:20 57:9
    61:16 101:9 105:7 109:2
    123:6 165:23 166:4
    170:2

**personal** 13:23 22:23
    24:1,13 98:16 105:6,16

**personality** 29:5

**personally** 39:15 98:2,5
    99:11 103:14 117:20
    170:9,11 191:12

**perspective** 26:9 28:6
    174:6

**perspectives** 25:9

**persuasive** 118:23
    119:19 120:1,4

**pertaining** 70:20 95:22
    152:4

**pertinent** 93:12 146:11
    173:7

**phone** 106:21

**photo** 4:20 5:7 108:21,23
    109:4

**photograph** 110:2

**photographs** 94:16
    130:19

**physically** 7:13 195:6

**picture** 110:19 154:14
    166:21

**pictures** 94:18 95:8,10,
    11,15 154:13,20 186:4

**piece** 148:1,3

**pilings** 41:3 50:11 51:14
    109:9 173:11,15,18,22
    174:2,7 192:2 195:13,15,
    23

**placard** 192:1

**place** 11:15 26:20 27:2,4
    33:21 40:18,21 49:18
    52:5 58:17 68:1 71:19
    84:9 106:8 127:17
    130:17 133:17 155:1
    159:11 170:15 171:7

**places** 185:22

**plaintiff** 11:9 43:22,23
    84:1,13

**plaintiffs** 1:7,20 6:3 8:15
    46:3 53:11 76:1,2 80:20
    113:5 191:20 194:21

**Plaintiffs'** 4:12,14 35:14,
    16 36:7 43:2,13,15 45:7,
    9 46:6 48:6 52:22 61:7
    75:16,18 77:6,9 83:21
    87:20,22 89:9,11 92:20
    108:15,17 113:14,16
    122:5,7 129:5 135:2,5
    137:17,19 138:23 139:18
    141:21,23 147:10,12
    148:22 149:11 169:4,5,9
    173:11 174:20,23 178:17
    179:23 180:2,15 190:7,9,
    18 191:17

**plan** 16:23 39:13 42:8,20
    44:20 47:17 54:10 65:11,
    14 93:22 128:15,20
    149:5,6,7 188:11 189:15
    190:4

**planned** 70:4,6 100:1
    157:19,23 159:3



**planner** 16:9,10,21 17:1, 2,14,21 20:10,18 22:1 29:11 38:9,15,20 39:1,19

**planning** 1:10 15:19,21 16:5,8 17:16,18,23 18:3, 6,20,23 19:2,5,13,17,18 20:1,2,6,13,15 23:16 26:12 27:11,13 28:2,11, 15,17 29:16,17 31:8,11 32:9 37:4,5,9,23 38:4,7, 11,18,19,23 39:8 40:4 41:14 42:10 47:1 52:10 53:18 58:18 59:23 62:19 64:13 65:11,13,20 66:18 67:11,23 69:10 70:14 74:17 79:16 83:16 85:12 86:17 87:1 91:19,22,23 92:5,6,7,9,10,16 95:4 96:3,13 98:8,14 99:7,16, 20 102:22 107:2 111:9, 17 112:21 113:1,4,22 114:9,19 115:2 116:5 119:13 126:23 127:14,23 128:1,12 129:16 131:13, 21 135:13,18 136:2 138:2 140:23 142:10,14 145:19 146:21 149:13 155:13 156:1,2,7,11,15, 20,21,23 159:16,21,22 160:3 164:15 166:7 168:18 171:14 172:9,22 173:8 176:17 181:3 188:8,10,15,16 189:7,21 190:2,3 191:7,10 192:10, 12,23 193:6

**plans** 4:14 42:9 43:8,22 44:11 64:21 70:3 131:12

**play** 146:8

**played** 25:1 56:23 57:2,7 120:20

**pleasantries** 98:22

**PO** 6:9

**point** 9:13 23:19 24:15 26:22 27:11 29:13 32:22 44:15 50:13 61:11 62:21 65:9 70:13 78:5 79:9,15 80:3,23 82:7,11 83:8,15 96:3 150:2 152:19 153:8 166:22 169:21 171:7 173:20,23 179:9,10 192:7

**Pointe** 6:9

**pointing** 112:19

**policy** 52:17,20 131:20 132:8,15 133:3

**polite** 24:17

**political** 15:14

**Ponce** 36:2 83:21 85:5 136:17 137:9 161:13,18

**portion** 35:22 103:1 142:21

**portions** 126:17

**position** 16:4 17:19,20 20:7,11,18 22:1,17 25:4, 4, 27:5 28:23 48:15 52:21 88:12 89:1,7 126:13 150:15,19 172:12 177:1 178:6 179:6 181:1

**positions** 16:18 21:5 26:18

**positive** 26:1

**posted** 51:8,16 74:16 192:1,6 195:7

**posting** 132:15 194:21

**potential** 137:5 163:19 183:14,16

**potentially** 127:7 155:21 160:21 181:16 189:19

**Powell** 145:2

**practice** 100:22

**PRD** 157:2,4,16 158:4,9, 13 159:15 160:4,10 161:3,6

**PRDS** 156:7,9,11,15 159:14 160:5

**precedent** 145:13 146:6, 8 165:10

**preface** 29:20

**preference** 55:6 56:11, 15

**preparation** 19:12

**present** 7:13 32:18 168:9 192:5 195:5

**presentation** 148:16 168:5,7

**presenting** 97:15

**president** 90:13 107:22, 23 118:12 166:1

**pressures** 26:21

**pretty** 37:21 61:10 66:5 72:18 88:16 108:9 126:12

**prevent** 113:5 124:13 127:7 154:23 195:19

**prevented** 79:17

**prevents** 195:20

**previous** 26:11 27:11 28:11 91:17 146:5

**previously** 31:8,20 67:22 139:20 140:19,21 178:21 191:13

**primarily** 165:2,17

**primary** 19:7,9 37:10 61:16

**printed** 35:12

**prior** 3:2 30:4 54:6,13 68:7,23 123:14 130:17 131:10 145:3,19

**privilege** 10:3

**privileged** 10:1

**pro** 96:21

**proactive** 28:7

**probation** 17:3

**problem** 9:14,16 163:19 180:9 195:22 196:16

**problematic** 112:21 113:1

**problems** 189:9

**Procedure** 7:5

**procedures** 168:12

**proceeding** 7:12,15 15:3 24:19

**proceedings** 7:10

**process** 19:20 39:17 57:6 72:6 79:14,19,21 102:21 103:6 133:6 153:9 157:5,16 166:14 171:13

**processed** 38:1,8 40:8 60:22

**processing** 39:3,5 57:9

**produced** 13:15 43:21 108:22 151:17 169:7 197:2

**program** 18:16

**progressing** 195:20

**progression** 17:11

**prohibit** 187:6

**prohibited** 44:19 181:2

**promotion** 29:2

**promotions** 16:18

**proper** 125:11

**properly** 169:1

**properties** 71:15 85:7 127:1 188:1

**property** 36:2,7 38:4 43:2 44:1 59:20 73:11 77:21 78:20 83:21 84:5, 13,18,22 85:4 91:3 95:7 96:1 103:2 104:9 110:5,6 129:5 147:20 148:6,22 149:2 154:2,8 161:6 173:11 174:8,13 185:22 190:1,18 191:12,23

**proposals** 168:2

**proposed** 77:21 112:15 115:5 135:11 136:23 145:10 171:12

**proposing** 78:10

**protected** 10:2

**provide** 11:5 14:22 32:14 55:5 94:10 95:17 96:5 130:15 172:13

**provided** 10:12,14 39:13 40:9,11 95:20 96:6 126:11 141:5 143:5 154:13 166:12 186:4

**providing** 19:13 37:11 62:16 71:4 141:7

**provision** 44:17,18 50:9 82:3 125:1 126:4 127:14 132:1 143:7 146:2 181:11

**provisions** 69:20 83:7 86:2 126:22 142:10 156:20,22 166:16



**public** 2:6 7:2 14:11
37:11 63:9 66:14 74:8,21
88:9 96:8 112:12 132:14,
21 168:3 172:5,8,10

**publicity** 66:2 74:22
75:4

**published** 168:19

**PUDS** 156:4

**pull** 79:3 184:1

**pulled** 67:2 184:7 195:13

**pulling** 184:2,3

**Purple** 155:8

**purpose** 62:16

**pursuant** 1:22 7:4

**pursue** 23:23

**push** 70:15

**put** 27:17 41:3 51:14
64:11 65:7 72:11 82:20,
23 83:14,15 93:17 109:9
114:22 126:4 143:11
150:3,13,19 168:17,19
170:14 173:23 192:2
193:8

**putting** 70:18 130:5

---

### Q

**quality** 148:15

**question** 9:15,16 48:4
49:16 56:17 69:4,8 72:5
73:18 77:16 79:2 91:14
98:1 101:6 116:15 117:7
151:23 169:19 179:12
180:22 182:16,17,21
193:7

**questions** 2:21,22 8:16
9:19 24:21 30:10 73:5
100:23 190:13,21 196:20
199:7

**quick** 15:9 101:8 180:8
197:5

**quickly** 47:10

**quote** 64:18 181:16

---

### R

**radar** 189:7

**Ralston** 135:22

**ran** 189:9

**random** 170:18

**randomly** 170:16

**range** 102:13

**rapport** 49:8

**rare** 164:4

**ratio** 4:23 127:10,22
135:12 136:18 138:2
140:20 141:8,16 186:19

**rationale** 146:9 154:23
159:14 161:8

**re-zoning** 84:4 112:15
136:23 172:16

**re-zonings** 70:21
106:21 142:15 154:10

**reach** 66:5 121:13
161:13,14

**reached** 29:13 103:9

**read** 8:9 13:23 19:6
47:10 122:3 144:14
171:20

**reading** 2:12

**reads** 146:11

**ready** 76:23 77:2,3
134:20,21

**real** 103:22 197:5

**realized** 162:5

**reason** 54:22 56:19 71:5,
17 94:7 121:3 136:18
188:13 194:1,8,15,18

**reasoned** 68:18

**reasons** 22:23 24:2,13
49:10 55:5 69:12 113:11
187:15

**rebuild** 164:10

**recall** 48:22 63:11 71:4,
16 89:2 99:1,14 101:15
104:12 107:9 111:15,17,
20 112:7 132:17,18,20
140:9 149:15 165:20
167:1,9 189:12 190:3

**receive** 95:23 96:16
100:6 101:2 129:18
133:10 169:19

**received** 39:19 52:3
76:8,9 78:6 82:19 83:9
87:7 100:17 101:10
114:4 118:7 149:5,7
159:7 169:14 178:20
179:5 180:20

**receiving** 83:9 116:17

**recent** 21:13 30:3,9 60:4
91:18 157:19

**recently** 79:1 130:4
181:12

**recess** 134:11

**recognize** 43:22 45:15
76:6 88:5 106:7 110:1
135:10 137:23 142:5

**recollection** 64:15
66:22 139:16

**recommend** 32:17,23
33:3 173:3

**recommendation**
32:15,19 64:5 88:10 89:6
97:4 140:17 172:6,7,20,
21

**recommendations**
33:9,10 62:17 64:8
171:13

**recommending** 88:11
146:9 171:15

**record** 11:4 12:23 14:11
47:11 128:22 135:1

**records** 13:7,11 140:7

**rectify** 61:3

**reduce** 114:8 187:17

**reduced** 121:21 147:17
149:10 158:12,13

**reducing** 153:21 187:19
188:3

**reduction** 148:23 161:8

**redundant** 150:10,14

**refer** 18:15 63:23 92:5
110:9 111:4 156:18

**reference** 137:9

**referenced** 82:10 100:2
168:6 185:8,22

**references** 97:12 193:6

**referencing** 185:10,11

**referred** 74:6 156:4,7

**referring** 34:2 44:9
66:17 152:1 153:4,6
154:17 155:7

**refers** 124:11 157:8

**reflected** 140:6

**refresh** 66:21

**refreshes** 64:14 139:16

**regional** 15:19,21

**regular** 52:1 122:23
149:14

**regulate** 119:9

**regulated** 67:16 143:2

**regulation** 105:1 187:6

**regulations** 18:13 19:12
22:15 64:23 67:15,20
68:2 72:14 99:9,10,16
103:17 129:21,23 185:18
192:13

**relate** 73:14 113:20
142:7

**related** 10:10 11:20
38:11 40:3 68:3 83:20
104:16 113:22 119:4
135:12 136:11 138:2
142:21 151:20 152:9
157:1 177:3

**relating** 2:16

**relation** 67:11 89:16
104:13 114:4 118:9
135:11 169:16

**relationship** 26:17 35:9
105:6,16

**relatives** 34:14,16,17

**relax** 152:22

**relevant** 24:20

**relied** 188:11

**rely** 145:8

**remain** 162:17

**remained** 17:15,18
159:9 185:12

**remember** 11:12,16
12:19 13:9 40:12,17,20



50:23 51:2,23 59:16
60:16 62:21 63:7,21 64:9
65:5,6 69:1,11 72:15,16
80:16 81:22 82:8 83:3,4
93:4 94:21 95:5 101:18,
19,21,23 104:1,6 112:13
116:22,23 117:2 120:9
122:22 123:8 125:15
126:3 132:12,13 136:7,
10,13 138:9,11,14,19
140:3,4 150:1,7 152:4,5,
10,17,18,23 153:7,8,16,
17,18 155:7 168:8,15,16
178:13

**remembering** 14:4
60:20

**remind** 69:9

**remotely** 7:15,17

**removal** 191:13

**remove** 173:21 196:15

**removed** 68:15 69:7
173:12 174:3 195:15,23

**removing** 195:19

**render** 163:4,8

**renders** 163:1

**renewed** 142:13 143:7

**rental** 84:18

**rented** 84:8

**repeat** 109:14

**report** 4:19 5:1 32:18
33:3,4 41:11 88:10
89:16,19,22 92:20 93:11
94:17 96:18 100:14
102:5 137:23 138:5
140:14 143:17,22 145:3
170:9 172:2,3

**reported** 41:14

**reporter** 2:6 7:2,11 8:5,
23 77:2 109:14 112:23
125:8 134:13,19 179:19
182:20,22 183:2 197:15
199:15

**reporting** 7:14,19
199:14

**reports** 95:13

**represent** 8:14 43:20
108:21 110:7 169:6

**represents** 135:17
199:8

**reprimanded** 53:2

**request** 13:19 63:18,20
64:19 76:3 95:19 97:15
106:15 123:7,10,17
129:8 130:23 146:23
151:16 153:13 157:5,6
158:10 159:9 164:12,17

**requested** 10:13 58:16
63:21 83:12 93:20 95:18
123:1,5,13 129:4 146:18,
19,20 156:13,14 159:6
167:14

**requesting** 82:17

**requests** 101:1 131:6

**require** 73:22 160:12

**required** 92:22 127:15
141:8 158:6 160:13
186:19 188:21

**requirement** 15:23
71:12 94:3 158:7 160:2
188:17

**requirements** 45:5
47:20 48:2 49:6,14 67:23
94:2 110:18 111:3
126:21 142:12 157:3
159:11 161:9

**requires** 18:6 63:22

**rescue** 162:7

**rescuing** 120:12

**research** 123:5 124:22
125:14 129:7 130:11
143:6 144:4 165:12

**researched** 123:2
124:20

**researching** 131:1

**reserve** 196:23

**residences** 147:18

**resident** 14:2

**residential** 70:4 100:1
102:23 121:20 127:9
142:13 156:7 157:20,23
159:3 188:18

**residents** 66:6 72:20
147:2 151:22 153:5,20
164:22,23 165:17

**resigned** 17:21

**resolve** 60:14 105:10

**resolved** 11:14

**respect** 27:3 28:16 74:5
105:4,14,21 118:19
119:2 120:4 131:20
147:16 148:21 161:18
164:15 183:4 188:8
190:17 197:2

**respectfully** 24:16

**respective** 2:3

**respond** 101:12 102:3

**responded** 101:7,15

**responding** 18:8 100:23

**response** 20:3 69:6,15
85:14 102:2 105:1
139:15 179:21 180:16

**responses** 178:20 179:1

**responsibilities** 18:2,
15 19:7,10,18 20:6 21:18
22:13 37:10

**responsibility** 21:7 33:8

**responsible** 18:21
91:23 92:1

**responsive** 13:18 14:7,9

**restoring** 82:14

**restrict** 139:6

**restriction** 118:10

**restrictions** 104:14

**restroom** 9:13

**result** 53:2 102:16 195:8

**results** 199:12

**resume** 77:1

**retire** 22:21,22

**retired** 22:18 34:8 35:4,5
145:2

**return** 70:11 192:8

**returned** 192:9

**revenue** 130:18

**review** 17:21 19:10
20:10,18,22 22:1 29:11
39:21 64:4 133:6 158:21
169:20 170:10 171:19

**reviewed** 38:23 42:9
43:5 50:10 170:2 171:22
179:8

**reviewing** 18:9 37:16
39:21 42:15

**revised** 78:3,15,21 80:6
93:23

**revision** 78:13

**revocation** 46:18 47:7,
13,21 51:3,6 52:4,8 54:3
55:14 58:4 93:14 177:17
178:9

**revoke** 47:14 48:6,13,16
49:10 52:11 56:14 59:10
61:6 176:9

**revoked** 55:20 58:20
59:1 60:11 75:23 78:20
79:23 175:23 176:2,4,8,
21,22 177:2,11 193:5,14

**revoking** 57:23 58:8,12
61:1 175:20 177:9

**rezoning** 18:9 32:6
64:23 70:2 103:1

**ride** 71:19

**riding** 69:2 71:1

**right-of-way** 183:18
184:11,18 186:18 187:7,
9

**rights-of-way** 187:3

**road** 164:10

**roads** 188:2

**Rob** 175:5,6,11,15

**Robertsdale** 37:5,12
39:3 40:7 57:18,19

**role** 25:1 56:23 57:2,7
85:11 119:13 139:20
144:17

**room** 7:13

**Roy** 175:5,6,9

**rule** 80:10 187:5

**rules** 2:16 7:4 8:21
161:22

**run** 168:13



**rundown** 15:9

**rush** 180:6

**Ryan** 50:3,4,14,16 51:15
94:20 95:6,7 109:3,20,22
144:20,21 177:17 191:23
192:12

---

**S**

**safety** 70:17 118:19
119:3,6,11 122:1 161:18

**salary** 33:14

**sales** 34:9

**Sandra** 135:20

**save** 151:8

**saved** 151:6,13,14

**scenario** 183:17 184:6

**scheduled** 88:9

**school** 15:11,12,17
23:22

**science** 15:15

**scrutinized** 189:16

**Sea** 100:2,5 102:23 103:1
112:16,19 137:1 157:18
158:16

**secret** 169:2

**secretary** 63:1 108:1,11,
12

**section** 47:6,11 48:5
49:11 52:7,14 72:19
80:10 93:14 94:8 113:22
123:2 124:11,19,21
126:16 128:7,18 131:14
143:15 145:9 146:11
152:5 196:3

**sections** 46:14 93:12

**Security** 33:22

**seeking** 23:8

**sell** 163:18

**semiannual** 64:1,2

**send** 51:19 67:4 96:15
103:10 122:17

**sending** 179:4

**senior** 17:2,14 38:20

**sense** 38:12

**sensitive** 73:9,10

**sentence** 144:19

**sentiment** 172:5

**separate** 18:18 75:2

**September** 17:19 18:1
81:16,17 149:14 171:4

**sequence** 51:2 60:20
64:10 83:4

**served** 108:12

**serves** 66:14 78:14

**service** 76:3 144:7
153:14

**serving** 97:19

**set** 1:23 142:22 160:13

**setbacks** 160:12

**settings** 127:9

**settlement** 12:22 13:1

**Sewer** 18:18

**shaking** 9:6

**Shawn** 88:16,20

**Shell** 97:11

**sheriffs** 187:4

**Shores** 1:6 36:1 162:1
165:7

**shorter** 134:7

**shortly** 16:22 133:20

**show** 9:8 109:6,7,8
154:13

**showed** 149:6

**showing** 78:4

**shown** 44:20 45:4

**sign** 8:9 10:15 38:20
192:22 194:22

**signature** 2:12 42:11

**signed** 37:14 53:7

**silent** 159:9

**similar** 125:21 155:1
176:9

**simply** 32:18 70:11
79:12 132:2 184:6

186:20

**single** 68:7 91:1 137:11
147:18 155:13 181:5

**single-family** 68:11
127:1,11 140:20 141:19
146:12 160:18

**sir** 9:11 10:4,8 12:2 40:19
76:10 89:18 100:21
122:16 140:13 164:17
191:6

**site** 30:6 42:8,20 44:20
47:17 49:2 51:15,17
94:23 128:14,20 131:12
146:7 161:11 173:11
188:11 189:14 190:4
192:5,9 195:2,11

**sitting** 120:20 140:9

**situation** 15:1 29:12
58:20 59:2,15 60:1 61:4
101:14 128:11,12 130:14
141:10 162:20 173:9
182:7 183:23 193:12
196:14,18,19

**situations** 14:23 30:15
74:3 127:2 160:5 187:20

**size** 44:6 162:11

**sizes** 160:11

**skip** 179:16,17

**slash** 65:2

**slim** 128:9

**slope** 160:10

**smaller** 160:11

**Smith** 5:5 174:15 175:4

**Social** 33:22

**solved** 196:16

**sought** 23:11,12,13
159:11 173:10 188:9

**sound** 172:6

**sounds** 19:9 66:8 76:15
108:4

**source** 137:11

**sources** 33:14 145:8

**south** 6:12 15:14 34:17
135:18

**SOUTHERN** 1:2

**space** 127:5,6 160:14,15
181:21 183:6,10 184:9

**spaces** 123:4 124:9,12
127:15 132:2,3,4 140:21
183:7,13,21 184:4,5
185:2 188:18,22

**span** 115:15

**speak** 54:11 91:21 98:21
99:19 109:16 163:6
164:9 165:23 166:4,18
177:12 187:14

**speaking** 41:21 112:8
134:15 167:13,22

**special** 32:7 64:18 74:7
110:17

**specific** 38:10,22 52:13,
14 87:16 106:14 126:21
128:12 156:12,18,22
158:5 179:11

**specifically** 47:7 83:20
86:13 95:9 104:11,15
120:3 124:15 145:15
150:18 157:2 158:4,10
196:23

**specification** 159:10

**specifies** 74:21

**spend** 115:9,14 131:1

**spent** 131:16

**spiral** 119:8

**spots** 184:22

**stacked** 44:13 50:9 57:5
86:8 123:3 124:9,13
126:14 127:3,5,13,16
128:6 131:11,17,20
149:20 150:3,6 181:2,6,
18,20 182:3 183:4,5
188:11,12

**staff** 4:19 5:1 18:6,10
19:13 21:17 27:19 31:1
32:2,11,13,14,18,23
33:2,12 37:11 40:1 45:1
53:23 54:6 57:9,19 70:11
88:10,12 89:7,16,19 90:3
92:20 93:11 94:17 95:12,
16 96:18 100:14 102:5
109:2 111:14 137:23
138:5,10 140:14 143:17,
22 145:3 169:23 170:2,8



ALABAMA
COURT REPORTING

172:1,3,20 173:7

**staff's** 20:3

**staffing** 38:14

**staircases** 119:8

**stamp** 42:9,14

**standalone** 27:17

**standards** 152:23

**standpoint** 98:10 187:8
189:3

**stands** 18:17

**Stanton** 90:11,13 93:8
106:4 111:22 123:6,11,
13 124:3,8,10 129:3
132:7 139:19 150:16
167:12,13

**start** 81:21 91:7 145:22

**started** 17:13 69:17,22
70:13 81:23 82:2,13
110:14 115:16 134:22
136:22 142:22 151:1,2
165:5 166:10,14 168:4
171:12

**starting** 25:10 94:15
149:18 151:19 167:4
187:12

**starts** 45:13 77:15 166:4
167:13,22

**state** 2:6 7:2 12:23 73:22
99:22 151:20 172:12
175:14 199:3,22

**stated** 57:4 60:15 69:20
70:9 127:18 140:19
149:19 158:4 191:13

**statement** 47:16 49:1
126:9,15 145:21 149:20
150:3,6 159:23

**statements** 162:10

**states** 1:1 165:12 166:6

**stating** 130:16

**station** 14:3,7 63:17

**statute** 52:10 62:16
63:22 74:19 86:21

**stay** 16:10 81:8,10 86:10

**stayed** 17:3

**stenotype** 199:7

**step** 42:4 54:16 91:1

**steps** 60:14

**Steve** 45:22 46:2 51:19
53:11 175:16 177:18

**Steven** 175:18 195:10

**Stevens** 135:21,23
136:10

**stick** 23:16 40:22

**STIPULATED** 2:2,11,19
3:5

**stipulation** 7:5

**stipulations** 1:22 8:6

**Stone** 6:12 88:15

**stop** 5:7 14:6 49:19,22
50:4,15,18,22 51:4,8,10,
12,16 52:4 53:13 54:3,16
55:14 56:9,13 79:13,20
80:18,19 90:3 93:21
173:10 175:17 177:18,23
178:10 190:15,17,19,21
191:1,4,18,19 192:3,9,21
193:1,12 194:1,8,18,19,
23 195:8,10,18,23

**stopped** 190:19

**stories** 68:9,13,15 69:8,
16 70:1,7,16 71:3,13
72:4 78:23 79:3,6 83:6
114:8,12 118:10 121:2,7,
9,13,14 146:1,13,14
147:17 149:1 154:16
155:21 157:12,21 158:3,
8,12,17,18,19 159:8,13
163:1

**storm** 18:16,17,18

**story** 62:2 70:12 72:4
104:14 121:15 147:4,7
155:12 156:9 157:4
160:1

**Strategier** 99:3,4,15
105:22 108:1 112:3
114:19 166:5,18 167:7,
10

**Strategier's** 117:7

**Strategiers** 112:9 165:2,
19

**street** 6:5 84:10 110:22
126:12 127:8 129:5

132:4 141:6 185:21
186:11,14,20

**streets** 84:11 186:6

**stress** 65:12

**stressful** 25:5

**strict** 27:9

**strictly** 104:18 130:6
187:7

**strongly** 32:4 82:17

**structure** 43:1 44:6 59:3
77:22 111:18 112:20
141:2 149:8,9 154:14
155:4 162:7,22 163:2,18,
20 164:5 166:20

**structures** 70:6 71:14
111:4 112:20 127:11
137:5 139:7 145:21
146:12 148:14,19 155:19
159:13,15 162:3,15,17
163:8,12 164:5 181:6
185:9 187:17

**studied** 124:23

**stuff** 65:7

**subdividing** 104:8

**subdivision** 18:13
20:13,22 22:14 92:12

**subject** 36:7 58:2 110:6
145:4 177:20 178:3
185:17

**submission** 39:10

**submitted** 38:17 39:7
43:9 44:3,12,16 46:13
54:8 76:7 79:11 80:4,5,8
88:23 95:13,18 96:12
102:11 107:21 138:1,10
142:9

**submitting** 81:12 96:3

**substantial** 114:22

**substantive** 104:20

**sued** 11:23

**suffered** 164:6

**suggest** 121:22

**suggestions** 144:9

**suggestive** 138:9,16
140:1,5 144:3

**Suite** 6:5

**summary** 121:22 169:13

**summer** 62:21 83:18

**superiors** 24:7,23

**supervisor** 22:2 41:12

**supplement** 13:14

**supplemental** 126:21

**supply** 34:9

**support** 32:16 37:11
82:3 96:17 100:18
101:11 107:10 138:1
140:15 143:18

**supported** 139:5

**suppose** 181:22

**Supreme** 13:22

**surrounding** 86:7

**suspension** 47:22

**sworn** 7:16 8:2 10:21
11:2

**system** 176:20

**Systems** 18:18

----

**T**

**TA-19001** 113:21

**table** 9:15

**taking** 2:16 9:16 10:5
21:18 54:16 130:17
154:19 155:1 171:8
180:7

**talk** 10:2 13:17 14:8
48:18 62:1 88:13,20
117:15 119:7 191:10

**talked** 29:20 53:5 73:15
79:8 83:17 88:14,19 97:7
125:3,13 126:1 132:18
133:16 136:16 145:5,7
147:1 152:11 167:7
170:23 173:16 185:19
190:16 191:15 193:15

**talker** 109:18

**talking** 36:8 45:2 75:13
89:17 112:7,17 115:15
119:6 148:22 149:23
155:18 157:9 164:20


ALABAMA
COURT REPORTING

167:1,6 169:16 183:20

**talks** 19:6 177:8

**tall** 67:17 147:5

**taller** 157:14 158:23

**Tayler** 1:19 2:5 7:1
179:17 199:21

**technical** 109:11,13
112:16 125:7 187:11

**technically** 22:22

**technician** 37:4 38:19
189:21

**telling** 79:13 186:2

**tells** 9:23

**ten** 68:21 155:16 157:4
160:1

**ten-foot** 128:4

**ten-minute** 76:13

**tend** 107:7

**tenure** 193:16

**term** 26:9 85:3,6,15

**terms** 10:14 19:6 38:21
45:3 68:8 69:7,16 79:20
85:17 92:4,15 114:12
119:19 120:2 125:14
163:4 164:10 165:1
179:12 181:15 187:19

**territory** 10:1

**testified** 8:3 12:16,19
14:20 48:23 56:5 72:1
195:9

**testify** 10:7

**testimony** 10:10 55:17
56:18 63:4 82:22 120:22
128:16 171:23 199:9

**text** 5:3 18:11 65:19
81:18 82:23 86:14 103:4
113:21 114:4,7 116:18
118:9,20 119:3 120:5
121:3 128:18 135:12
136:18 138:1 139:9,14,
17 140:12 142:18 143:18
144:1,11 145:10 146:9
147:16 154:23 156:20
162:23 164:16 166:15
167:22 169:15 170:9
171:16 172:15 188:5

**that--** 97:11

**theres's** 187:1

**thereto** 3:3 199:7

**thing** 9:18 18:19 25:7,22
26:23 29:14,15 40:9
48:12 61:2 65:8 67:13
68:2 85:21 107:1 119:9
125:16 144:1 148:14
160:16 161:3 165:6
184:2 186:15 194:13

**things** 8:22 21:4,16,17
27:23 28:14,16,18 29:9
31:23 32:1,3 40:22 50:17
65:12 69:3 73:14,15,20
86:12 87:15 95:17 96:17
110:23 112:10 115:19
119:8,10 120:19,21
131:5 141:11 145:16
148:12,17 152:20 157:1
166:22 193:17 194:5

**thinking** 24:9 117:1
187:19

**third-story** 161:13,14

**thought** 13:20 144:8
150:9 154:9 162:18

**three-line** 193:3

**three-story** 69:5 71:8
78:10 79:17 114:14
149:9 162:3,22

**time** 3:1 9:17,22 13:8
21:16 23:1,10 24:13
25:20 26:15 27:14,20
28:13 30:13 38:6 39:10,
14,18 41:6,9,10,12 42:15
45:4 47:23 48:19 51:7,11
52:3 53:7,17 55:5 57:13
61:3 62:23 66:9 68:20
71:5 83:13 84:2,15 90:16
91:17,18 92:6,18 98:21
103:18 107:20 110:15
111:2 115:9,14 116:16
117:3 118:13 123:14
130:21,22 131:1,16
133:4,19 135:23 136:4,6,
22 138:14 144:6 145:1
146:5 151:2 159:6,11
161:6 163:11,21 164:1
165:11,19 166:1 171:11
172:2,14 176:8 178:2
191:22 192:6 195:5
197:17,20

**times** 30:10 56:12,13
95:18 123:19 164:3
173:14 189:12 193:16

**title** 16:6,21,23 17:14,15
174:18

**titles** 151:12

**today** 8:16 9:2,13,19
10:7 25:5 36:6 106:11
140:9 145:5,8 148:23
175:17 196:21

**told** 29:9 33:1,7 69:14
78:16 150:13,18 178:14

**Tom** 167:21

**tools** 130:21

**top** 149:18 192:21

**topic** 191:3

**topics** 106:1

**total** 160:23

**track** 30:20

**traction** 153:2

**tradeoff** 160:13

**trail** 187:12

**train** 87:3,4

**training** 87:7,10,16

**transcribed** 199:7

**transcript** 9:9 149:12
199:9

**transcription** 199:8

**transmitted** 191:20
194:20

**Treasurer** 108:1

**treat** 130:23

**treated** 131:9 159:18,19,
20

**treating** 159:14

**trial** 3:1

**true** 116:4,10 117:9,11
199:8

**truth** 24:20 186:3

**Tucker** 138:21

**turn** 35:13 45:6 50:13
75:15 77:6 87:19 89:8

90:8 108:14 113:13
117:23 122:4 135:1
137:16 140:3 141:20
147:9 166:17 169:4
174:19 178:16 179:22
180:15 190:6

**turned** 164:18

**Tuscaloosa** 16:3,16,18
17:6

**two-and-a-half** 70:12
157:21 158:17

**two-and-a-half-story**
82:14

**two-family** 68:11 127:1,
11 146:12 147:18 155:13
181:5

**two-story** 71:9 78:23
81:19 82:17,20,23 83:12
114:10,15 119:4,20
120:16,18 121:19 145:14
146:6,18,21 149:8
156:10 162:16 171:1

**type** 25:3 44:19 58:2
74:21 96:7 119:9 155:1
160:6,8 161:23 181:18
187:5

**types** 32:5 160:17

**typical** 90:23 95:11

**typically** 38:3 55:6 63:22
66:11 67:15 89:4 91:5
95:7 107:5 160:5 172:5
192:3 193:8

---

**U**

**U.S.** 51:20 76:2

**uh-huh** 9:7 77:19 97:2
100:16

**uh-uh** 9:7

**ultimate** 30:21

**ultimately** 25:20 76:7
170:8 171:6

**unable** 32:21

**uncle** 34:6,21

**uncles** 34:3 35:6

**underlying** 158:7
160:20 161:5



**understand** 9:2 13:9 24:17 39:17 85:15 128:16 139:4 184:21

**understanding** 79:7 133:9 162:21 176:23 177:1,5 191:22

**Understood** 14:16

**Underwood** 64:20

**unimpeded** 124:12 132:4

**unintended** 71:7

**unique** 73:8 160:6,7

**unit** 127:12 140:22 156:1

**UNITED** 1:1

**University** 15:13,16,18

**unobstructed** 188:22

**unquote** 181:17

**unrestricted** 126:10,11

**unusual** 18:19 106:13 107:4,16

**unwilling** 59:8

**upfront** 55:8

**upheld** 88:12 124:15

**uphold** 89:6

**upwards** 185:13

**urban** 15:19,21

**usable** 160:15

**usual** 8:5

**utilized** 188:11

---

**V**

**vacated** 59:8

**vacation** 39:22 40:13, 17,21 41:8 57:17 61:8

**valid** 130:9 175:23 176:3, 6

**valued** 30:14

**values** 147:20 148:7

**variance** 14:3 32:6 59:11 106:14 164:13 172:16

**variances** 62:17 64:8 106:23 164:14

**variation** 156:12 157:5,6 158:6

**vast** 170:3,4

**vehicle** 181:23 182:1,5

**vehicles** 182:4,9

**versus** 149:8 162:9 185:3

**Vice** 107:23

**videoconference** 7:7

**view** 31:20 60:10 111:5

**viewed** 49:20 111:6,7

**Vince** 1:11,14,18 2:4 4:6 5:6 7:8 8:1 19:17 56:2 64:19 114:20 166:8 179:8,10 187:12 198:2 199:6

**Vince's** 179:20

**Vincent** 11:6

**violated** 193:9

**violating** 177:23 186:11 195:15

**violation** 186:14

**VIRTUAL** 1:14

**virtually** 1:19,22 2:7 6:3, 7

**visit** 151:3

**visited** 51:15 191:23

**visual** 71:10

**voiced** 112:3

**volume** 106:13

**voluntary** 22:4,5

**volunteer** 12:14 70:14 83:2 115:4 116:11,19 117:1,5 118:8,14 120:23 137:8 147:3 161:12 162:4

**voted** 92:16

---

**W**

**waited** 40:5

**waive** 7:18

**waived** 2:13 3:7

**walkover** 67:15,20 68:1 72:14 99:9,10 151:2 165:18 166:10,16

**walkovers** 67:16 82:3 142:12,21 143:1 144:2 165:1,5,14

**wall** 134:17

**wanted** 23:1 27:21 36:23 58:10 59:3 61:15,18 65:4,12,16,21 67:9 70:5, 10 107:11 144:2 165:10, 11 170:14,19 171:18 189:10

**wanting** 48:10 78:22 152:22

**Ward** 135:21

**warning** 47:19 49:4,12, 18,21

**watch** 58:18

**watching** 87:13

**water** 18:17

**Wayne** 29:23 48:17 61:7 64:19 114:22 125:13 150:13 179:9

**ways** 30:16

**weaken** 150:11,15

**Webb** 6:8

**website** 19:4 37:8 67:4 74:15 132:23 168:18,20

**week** 189:13,18,23

**weeks** 40:16 78:16

**welcomed** 115:17

**whichever** 132:5

**wide** 128:4

**wife** 33:19 34:11 99:6,19

**wife's** 34:23

**wild** 76:9 153:13

**wildlife** 4:16 76:2,9 144:7 176:15

**witnesses** 12:4

**word** 75:12 85:1 163:15

**work** 5:7 16:1 26:20 33:19 35:1,3 40:6 49:19, 22 50:4,15,18,22 51:4,8, 9,11,12,16 52:4 53:13 54:3,16 55:14 56:9,13 65:17 67:20 79:14,19,20, 21 80:19 90:4 93:21 170:19 173:10 175:17 177:18,23 178:10 182:8 190:15,17,19,21 191:2,4, 18,19 192:3,4,10,21 193:1,12 194:1,8,18,19, 23 195:8,18,23 196:5,8, 9,13

**worked** 12:12 25:12 26:12 30:13 34:8 53:20 56:15 100:3 115:20 117:21 138:16 168:22

**workers** 195:6

**working** 55:6 57:20 64:13 65:8,11,18,22 67:9,10,14 68:3 69:17 72:3,13 82:1,13 103:3 104:18 105:2 114:23 115:10,16 117:8 136:23 150:2 165:6 166:6 168:8 179:10 193:20 194:6,16 195:2

**works** 34:12 35:2 37:5 109:19 161:22 165:22 174:16 175:10

**worse** 196:18

**worth** 148:2

**write** 45:17 122:12 124:20 166:19

**writes** 114:19 117:8 121:19 139:4 175:13

**writing** 81:18,21 139:14

**written** 52:17,20 114:18 136:5 139:5,9

**wrong** 44:6 174:7

**wrote** 77:20 88:10 105:5, 15 117:11

---

**Y**

**y'all** 36:14 77:1 197:23

**ya** 184:19

**yards** 84:10 141:7



**year**  12:19 15:17 20:22
  60:2 63:23 101:20

**years**  11:17 12:10,11,12,
  18 13:3,5 15:11 25:17
  26:3 27:2,4 29:21 30:1
  33:13 37:20 38:6 68:14,
  21 91:17 98:12 106:17
  114:23 115:14,16 129:13
  155:19 163:14

**yellow**  192:22 194:22

---

**Z**

---

**Zillow**  166:20

**zone**  139:21 145:19,22
  146:7 160:20

**zoned**  42:4 69:19 82:6
  83:6 92:3 126:17 127:10
  146:4 156:21 159:19
  176:5 177:5

**zones**  70:22 142:16

**zoning**  1:10 13:2 18:5,9,
  12,14,22,23 19:1,3,11,
  12,19 20:2,14 23:17 25:6
  27:3,8,15 28:3 29:2,16,
  17,19,23 30:5 31:5,14
  37:5,9 39:8 42:10 44:18
  45:4 47:1,3,6,12,14,20
  48:1,2,5 49:6,14 52:8
  62:5,9,12,15,17,18,22
  63:6,8,19 64:3,8,12
  65:19 66:1,9,12 71:6,20,
  23 72:10 73:16,19 74:2,7
  83:18 86:11,15,21,22
  87:17 92:4,8,10,15,17
  93:12 96:13 98:6,13
  99:13,20 103:23 104:2,4,
  9 107:3,8 108:12 111:2,
  10 114:20 115:2 116:5
  117:9 119:7,8,13 123:3
  124:11 125:2 126:17
  129:8,12 136:11 138:18
  142:13 143:9 145:13,17,
  20 146:3 147:23 149:13
  156:6 161:5 163:12
  164:8 166:7 171:17
  173:18 174:4,6,13
  176:17 177:10 186:7,15,
  16 187:8 190:22 191:7,
  10,14 192:11,13,23
  193:7,8,18

