# EXHIBIT J

**Mike Bordelon and Breezy Shores, LLC**

**v**

**Baldwin Co., AL, et al.**

**LINDA LEE**

**January 27, 2021**



www.alabamareporting.com  *  877.478.3376



**Page 1**

1    IN THE UNITED STATES DISTRICT COURT FOR

2    THE SOUTHERN DISTRICT OF ALABAMA

3    CIVIL ACTION NUMBER

4    1:20-cv-00057-C

5

6  MIKE BORDELON and BREEZY SHORES, LLC,

7    Plaintiffs,

8  v.

9  BALDWIN COUNTY, ALABAMA; BALDWIN COUNTY COMMISSION

10  DISTRICT 4 PLANNING & ZONING BOARD OF ADJUSTMENT;

11  and VINCE JACKSON,

12    Defendants.    [CERTIFIED COPY]

13

14    VIRTUAL DEPOSITION OF LINDA LEE

15    JANUARY 27, 2021

16    9:08 A.M.

17

18    The deposition of Linda Lee was taken

19  virtually before Jordan Groves, CCR, on

20  January 28, 2021, by the plaintiff, commencing at

21  approximately 9:08 a.m., whereupon all parties

22  appeared virtually, pursuant to the stipulations

23  set forth herein.

    ALABAMA COURT REPORTING, INC.

**Page 2**

1    S T I P U L A T I O N S

2    IT IS STIPULATED AND AGREED by and between

3  the parties through their respective counsel that

4  the deposition of Linda Lee, may be taken before

5  Jordan Groves, Certified Court Reporter, Notary

6  Public, State of Alabama at large, whereupon all

7  parties appeared virtually, on January 28, 2021,

8  commencing at approximately 9:08 a.m.

9

10    IT IS FURTHER STIPULATED AND AGREED that

11  the signature to and the reading of the deposition

12  by the witness is not waived, the deposition to

13  have the same force and effect as if full

14  compliance had been had with all laws and rules of

15  Court relating to the taking of depositions.

16

17    IT IS FURTHER STIPULATED AND AGREED that it

18  shall not be necessary for any objections to be

19  made by counsel to any questions, except as to

20  form or leading questions and that counsel for the

21  parties may make objections and assign grounds at

22  the time of trial or at the time said deposition

23  is offered in evidence, or prior thereto.

**Page 3**

1

2    IT IS FURTHER STIPULATED AND AGREED that

3  notice of filing of the deposition by the

4  Commissioner is waived.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**Page 4**

1    I N D E X

2

3    EXAMINATION INDEX

4    PAGE

5  EXAMINATION OF LINDA LEE

6    BY MR. ANDERSON        7

7

8

9    EXHIBIT INDEX

10  PLAINTIFFS'        PAGE

11  1 -  (Building Permit)        12

12  2 -  (Photographs)        32

13  3 -  (7/31/2019 Letter from Vince Jackson  33
     to Steve Jones and Land Use

14    Certificate Application)

15  10 -  (7/3/2019 Letter from Vince Jackson  42
     to Paul Stanton)

16

    21 -  (Database Printout and 7/29/20 Email  52

17    from Mindy Smith)

18

19

20

21

22

23



**ALABAMA**
COURT REPORTING



Page 5

1    A P P E A R A N C E S
2
3  VIRTUALLY APPEARING ON BEHALF OF THE
   PLAINTIFFS:
4
5      Mr. Kristopher O. Anderson
       CLARK PARTINGTON
       4725 Main Street, Suite F-222
6      Orange Beach, Alabama 36561
7
   VIRTUALLY APPEARING ON BEHALF OF THE
8  DEFENDANTS:
9      Ms. Jamie H. Kidd-Frawley
       WEBB McNEILL WALKER, PC
10     7475 Halcyon Pointe Drive
       Montgomery, Alabama 36117
11
       Mr. J. Bradford Boyd Hicks
12     STONE CROSBY, PC
       8820 U.S. Highway 90
13     Daphne, Alabama 36526
14
15
16
17
18
19
20
21
22
23

Page 6

1        I, Jordan Groves, a Certified Court
2  Reporter, and a Notary Public for the State of
3  Alabama at Large, acting as Commissioner, certify
4  that on this date, pursuant to the Federal Rules
5  of Civil Procedure, and the foregoing stipulation
6  of counsel, there came before me, via
7  videoconference, commencing at approximately
8  9:08 a.m. on January 28, 2021, Linda Lee, witness
9  in the above cause, for oral examination,
10  whereupon the following proceedings were had:
11      COURT REPORTER:  The attorneys
12  participating in this proceeding acknowledge that
13  I am not physically present in the proceeding room
14  with the witness and that I will be reporting this
15  proceeding remotely.  They further acknowledge
16  that the witness will be sworn in remotely by me.
17  The parties and their counsel consent to this
18  arrangement and waive any objections to this
19  manner of reporting.
20      Please indicate your agreement by stating
21  your name and your agreement on the record.
22      Mr. Anderson?
23      MR. ANDERSON:  Agreed.  Kris Anderson for

Page 7

1  plaintiffs, I agree to those conditions.
2      MS. KIDD-FRAWLEY:  Jamie Kidd-Frawley for
3  the defendants.  We agree to those conditions.
4      MR. HICKS:  Brad Hicks, also for the
5  defendants, agree to that statement.
6      COURT REPORTER:  Usual stipulations?
7      MS. KIDD-FRAWLEY:  Yes.  But we'd like to
8  do a read and sign.
9      MR. ANDERSON:  Yes.  That's fine with me.
10
11          LINDA LEE,
12     being first duly sworn, was examined
13        and testified as follows:
14
15        EXAMINATION
16  BY MR. ANDERSON:
17   Q.  Good morning, Ms. Lee.  My name is Kris
18  Anderson, and I'm representing the plaintiffs,
19  Mike Bordelon and Breezy Shores, LLC, in this
20  action.
21      Can you hear me all right?
22   A.  Yes.
23   Q.  If you don't understand anything I say

Page 8

1  today, whether it's a confusing question or you
2  just can't hear me all right, will you let me know
3  so I can speak louder or rephrase my question?
4   A.  Yes.
5   Q.  And I also want to let you know, because
6  we are doing this for the purposes of a written
7  transcript, it's very important that you give me
8  affirmative answers like "yes" or "no" instead of
9  "uh-uh" or "uh-huh," which are totally normal in
10  regular conversation, but I won't be able to
11  understand you over Zoom and it won't get recorded
12  on the record.
13      So is that fair to just say -- try to
14  remember to say "yes," "no," or explain your
15  answer rather than "uh-huh" or "uh-uh" or anything
16  like that?
17   A.  Yes.
18   Q.  All right.  And last thing I'll mention is
19  if you need a break at any time today, you can
20  take a break any time you like.  If there's a
21  question on the table that I've asked, you need to
22  answer that, and then you can take a break
23  afterwards.



Page 9

1        Is that all right with you?
2     A.  Yes.
3     Q.  All right.  Can you tell me what you did
4  to prepare for today's deposition?  And to be
5  clear, I don't want to know about any discussions
6  you've had with your attorneys, but I'd like to
7  know what documents you reviewed or anything else
8  you did to prepare for today's deposition.
9     A.  I looked at the appeal application that
10  was submitted, and I looked at the minutes from
11  that meeting.
12     Q.  Did you read or review any portions of
13  Vince Jackson's deposition testimony?
14     A.  No.
15     Q.  Have you signed any affidavits,
16  declarations, or given any other testimony related
17  to this case to anyone?
18        MS. KIDD-FRAWLEY:  Object to the form.
19     A.  No.
20     Q.  Could you state your full name for the
21  record and who you are employed by.
22     A.  Linda Lee, Baldwin County Commission.
23     Q.  Have you ever been a witness or a party to

Page 10

1  any other lawsuits related to Baldwin County?
2     A.  I was deposed once before, but I've never
3  testified in court.
4     Q.  What was the case you were deposed in?
5     A.  To be honest, I can't remember.
6     Q.  About how long ago was it?
7     A.  It was two or three years ago.
8     Q.  And did it have to do with Planning &
9  Zoning?
10     A.  Yes.
11     Q.  How long have you been employed by Baldwin
12  County?
13     A.  14 1/2 years.  It'll be 15 years in May.
14     Q.  So since about 2006?
15     A.  Yes.
16     Q.  And just tell me briefly about your job
17  history with Baldwin County, what position you
18  were hired into and what you've been doing since.
19     A.  In 2006 I was hired in as an office
20  assistant.  In 2007 I was promoted to a planning
21  technician.  In 2012 I was promoted to a planner,
22  and I've been a planner ever since.
23     Q.  What's the -- tell me all the differences

Page 11

1  between an assistant planner and the planner.
2     A.  Okay.  There's not an assistant planner.
3  I was a planning technician.
4     Q.  Planning technician.  I apologize.
5        Tell me all of the differences between a
6  planning technician and a planner.
7     A.  Okay.  A planning technician reviews
8  mainly certificates for residential, do zoning
9  verifications, answer questions from citizens.  A
10  planner does staff reports for rezoning, pier
11  reviews, land use certificates, but we also review
12  commercial and signs.  That's something a planning
13  technician would not do.  You know, assist the
14  public with any questions they may have concerning
15  the zoning ordinance.
16     Q.  So with respect to residential properties
17  and the review of land use certificate
18  applications, does a planning technician do the
19  same thing as a planner?
20     A.  Yes.
21     Q.  Do you have a number of exhibits in front
22  of you on the table there?
23     A.  I don't have any exhibits.

Page 12

1        MR. ANDERSON:  Let's go off the record for
2  one second.
3
4        (At which time, an off-the-record
5        discussion was held.)
6
7        (Whereupon, Plaintiffs' Exhibit 1 was
8        marked for identification and copy of
9        same is attached hereto.)
10
11     Q.  (BY MR. ANDERSON)  Ms. Lee, would you
12  please turn to what's been marked as Plaintiffs'
13  Exhibit Number 1?
14        MR. HICKS:  Hey, real quick.  Ms. Lee had
15  a memory about the previous lawsuit that she --
16  after sitting here, she thinks she can remember
17  the case it was.
18        MR. ANDERSON:  Okay.
19     Q.  Let's start there.  Ms. Lee, can you tell
20  me a little bit more about what you remembered
21  about that previous case that you gave a
22  deposition in?
23     A.  Yes.  I think it was the Lillian Volunteer



Page 13

1  Fire Department.  I don't remember the man across
2  the street's name, but he sued because the
3  building permit was issued and he thought that
4  they never should have received a conditional use
5  to allow on that property across the street from
6  him.
7       MR. HICKS:  You ready to move on to
8  Exhibit 1?
9       MR. ANDERSON:  Yes.
10     Q.  Ms. Lee, could you please turn to what's
11  been marked as Plaintiffs' Exhibit Number 1.
12     A.  Okay.
13     Q.  Would you go to the second page that has
14  Baldwin County Land Use Certificate Application?
15  It's got DF-0305 at the bottom.
16     A.  Yes.
17     Q.  Are you generally familiar with this
18  document and the land use certificate application
19  related to Case Number LU-190197?
20     A.  Yes.
21     Q.  There's a signature at the top of this
22  document.  It says "Accepted by" and then a
23  signature.

Page 14

1       Do you recognize whose signature that is?
2     A.  Yes.
3     Q.  Whose signature is that?
4     A.  Paula Bonner.
5     Q.  And who is Paula Bonner?
6     A.  She is a planning technician in the Foley
7  Planning & Zoning office.
8     Q.  And so when this application was submitted
9  on March 27, 2019, Paula Bonner was the one that
10  accepted it?
11     A.  Correct.  Yes.
12     Q.  After Paula Bonner accepted this
13  application, what happened with it next, to your
14  recollection?
15     A.  It would have come to -- I think at that
16  time she may have been an office assistant or
17  office manager.  I can't remember when she was
18  promoted.  But it would have gone to I think me
19  because I believe the planning technician was gone
20  in March of 2019.
21     Q.  Who would have that planning technician
22  have been?
23     A.  Well, we had a planning technician that

Page 15

1  was Payton Rogers.  But I believe he left in
2  February of '19, and I believe Paula was promoted
3  in April.
4     Q.  All right.  And do you remember when it
5  went to you?
6     A.  No.
7     Q.  On the next page it looks like this was
8  approved by Crystal Bates on July 17, 2019.
9       Who is Crystal Bates?
10     A.  She's a planning technician.  She normally
11  works in the Robertsdale office.
12     Q.  You say she normally works in the
13  Robertsdale office.
14       How many Planning & Zoning offices are
15  there?
16     A.  Two.  Well, three if you count Bay
17  Minette.
18     Q.  Okay.  How is Bay Minette different than
19  the other two?
20     A.  Well, they only have the planning director
21  and the code enforcement officer.  There wasn't an
22  office assistant or a planning technician or
23  anyone up there.

Page 16

1     Q.  Okay.  So is it the case that sometimes
2  planning staff in Robertsdale will work on things
3  that would normally go to the Foley office or vice
4  versa if someone is out or if there's just a need
5  for that to be done?
6       MS. KIDD-FRAWLEY:  Object to the form.
7       MR. HICKS:  She said object to the form.
8       You can answer.
9       THE WITNESS:  Okay.
10     A.  Yes.
11     Q.  How frequently does something like that
12  happen?
13     A.  Oh, goodness.  You know, only, like, if
14  someone was on vacation and there wasn't anyone
15  else to review something, it may get sent to the
16  other office.
17     Q.  Are --
18     A.  Or she may have been in Foley working.  I
19  don't know.
20     Q.  So Crystal Bates might have been working
21  at Foley on July 17, 2019?
22     A.  Right.  I'm not -- I was on vacation, so I
23  don't know if she was in Foley or Robertsdale.



Page 17

1    Q.  So you were on vacation on this date,
2   July 17, 2019?
3    A.  Yes.
4    Q.  How long -- what were the dates of that
5   vacation?  Where did you go?
6    A.  I can tell you I was gone for two weeks,
7   and I was in Minot, North Dakota.  I cannot tell
8   you the exact dates.  I left before July 16th,
9   maybe around the 13th, and I would have come back
10  two weeks later.
11   Q.  When you're on vacation, do you still
12  answer emails or do anything, or are you totally
13  checked out?
14   A.  Sometimes.  It just depends on what it is.
15   Q.  Is it higher-priority things that you will
16  respond to while you're on vacation, or how do you
17  draw that line?
18   A.  Well, usually, you know, it may be
19  something I forward to someone else so they can
20  call the customer or, you know, contact them to
21  answer their question because I don't have all the
22  information available to me.  All I would have is
23  a cell phone so...

Page 18

1       But if it was something simple -- you
2   know, just answering somebody's quick question --
3   I might answer it.
4    Q.  Do you get your emails on your cell phone?
5    A.  Yes.  On my work cell phone.
6    Q.  Before this date, July 17, 2019, do you
7   recall how, if at all, you had been involved in
8   this land use certificate application?
9    A.  I think so.
10   Q.  You think so what?  In what -- how do you
11  recall being involved in this before this date?
12   A.  Okay.  I believe I would have been the one
13  to tell them that the stacked parking was not
14  going to be allowed, and I think, you know, that
15  was when they went back to the US Fish and
16  Wildlife Service to get additional paint in order
17  to change the parking design.
18   Q.  Didn't that occur on July -- on or after
19  July 31, 2019, when Vince Jackson sent a
20  revocation letter?
21      MS. KIDD-FRAWLEY:  Object to the form.
22   A.  Well, I'm sorry then.  I may have said
23  that wrong.  I probably told them that they had to

Page 19

1   have more parking spaces then.  When they
2   originally submitted, I don't think they knew that
3   the parking requirements had changed and they
4   needed more parking spaces.
5    Q.  When did the parking requirements change?
6    A.  I think they changed in 2017.  I just
7   don't know if this applicant was aware of it.  I'd
8   have to go back and look, but I thought I
9   remembered them not having enough parking spaces
10  and they had -- when they had to go back and get
11  their ADEM permit, I thought they also went and
12  added some parking spaces.
13   Q.  Who did you -- so I'm clear, prior to
14  this, you had been in correspondence with someone
15  on behalf of Plaintiffs about the number of
16  parking spaces on their land use plan; is that
17  correct?
18   A.  I want to say it was Mr. Jones.  That's
19  been two years ago.  It's hard to remember.  But I
20  think it was Mr. Jones.
21   Q.  Would there be any email records of that
22  correspondence?
23   A.  I don't know.  It was probably on the

Page 20

1   telephone.
2    Q.  So you think that prior to this you may
3   have told Mr. Jones that they needed more parking
4   than what was originally -- more parking spaces
5   than what was originally submitted?
6    A.  That -- I'm -- I either told him they
7   needed more parking spaces, or it may have been
8   they had them in the right-of-way, and they
9   weren't allowed in the right-of-way.  I'm trying
10  to think back now because it's been so long ago.
11  But it was one of those two issues.
12      But I feel like I remember there was an
13  issue with either the number of parking spaces or
14  the location of the parking spaces.  It may have
15  been in the right-of-way, and they weren't allowed
16  in the right-of-way.
17   Q.  And when -- well, to your knowledge were
18  those issues rectified and when?
19      MS. KIDD-FRAWLEY:  Object to the form.
20   Q.  Well, let me break it down.
21      To your knowledge were those issues that
22  you -- you said one of those issues you may have
23  raised with Mr. Jones.



Linda Lee                                                                          21..24

Page 21

1      To your knowledge were either of those
2  issues rectified by Mr. Jones?
3      A.  I can't remember.
4      Q.  Do you remember exactly what an issue
5  might have been with spaces in the right-of-way?
6      A.  Well, they would not have been allowed to
7  have the required parking spaces in the
8  right-of-way.  They had to be on the property.
9      Q.  Would any more information about what
10  spaces lied in the right-of-way been in the file
11  that the Planning & Zoning Department maintained
12  for this land use certificate application?
13     A.  Say that again, please.
14     Q.  Would any details as to either of these
15  problems, either the number of spaces or the
16  parking spaces in the right-of-way, been in the
17  file maintained for this land use certificate
18  application?
19     A.  I don't know.
20     Q.  Is it typical practice for the Planning &
21  Zoning Department to maintain records pertaining
22  to a land use certificate application relating to
23  any problems or deficiencies in the application?

Page 22

1      A.  Yes, we keep the records; however, if
2  they, you know, revise the site plan, the first
3  one may not have been kept.
4      Q.  Have you ever been involved with any other
5  land use certificate that was ever revoked after
6  it was issued?
7      A.  Not that I can recall.
8      Q.  How many land use certificate applications
9  have you been involved with, if you can estimate a
10  ballpark number?
11     A.  I don't know.  You're looking at 13 years.
12  You know, it could be a hundred or more a year.  I
13  don't know.
14     Q.  So it -- would it be fair to say at least
15  hundreds, if not thousands?
16     A.  It would be hundreds, for sure.  But yeah,
17  it could be over a thousand total, but per year it
18  would be about a hundred.
19     Q.  If you'd go back to both pages of the land
20  use certificate application, are there any
21  misstatements or misrepresentations on this
22  application, or do you recall any being contained
23  in any of the documents submitted with it?

Page 23

1      A.  I don't see anything on these two pages,
2  and I can't recall if there were any in any other
3  documents.
4      Q.  Are your generally familiar with the work
5  of Crystal Bates?
6      A.  Generally, yes.
7      Q.  Tell me about your interactions or your
8  work history with Ms. Bates.
9      A.  She was the planning technician in the
10  Foley office for I guess maybe two years with
11  me -- two or three years with me -- I forgot how
12  long -- before she moved to the Robertsdale
13  office.
14     Q.  Do you remember when she moved to the
15  Robertsdale?
16     A.  I think it was January of 2017.
17     Q.  In your experience with working with
18  Ms. Bates for two years in the Foley office, did
19  she make any mistakes on the approval of land use
20  certificates that you saw?
21        MS. KIDD-FRAWLEY:  Object to the form.
22     A.  She didn't approve land use certificates
23  when she worked with me.

Page 24

1      Q.  What was she doing while she was working
2  with you?
3      A.  She was the office assistant.  The title,
4  I think, was office manager.  But, basically, she
5  took in the applications.  You know, she did
6  zoning verifications, answered phone calls, but
7  she was not a planning technician at that time.
8      Q.  So was she promoted to planning technician
9  when she moved to Robertsdale?
10     A.  I think it was a year or so later.  It
11  wasn't when she first moved.
12     Q.  So she moved to Robertsdale and then about
13  a year later was promoted to planning technician?
14     A.  I think so.
15     Q.  If you'll go to the page after the
16  application that was signed by Ms. Bates, there's
17  a -- there's plans.  And it says "Approved plans
18  as reviewed by the planning" -- "by the Baldwin
19  County Planning & Zoning Department."
20     A.  I'm looking at it.
21     Q.  So are these the -- generally speaking,
22  what would you call this plan that we're looking
23  at?



Page 25

1    A.  It's a site plan.
2    Q.  So is this a site plan that Ms. Bates
3  would have reviewed on or about July 17, 2019, and
4  approved?
5    A.  I presume so.
6    Q.  Looking at this, do you see anything wrong
7  with the site plan?
8    A.  The parking is stacked.
9        MS. KIDD-FRAWLEY:  Object to the form.
10    Go ahead.
11        MR. HICKS:  Go ahead.
12    A.  This picture is rather small, so it's hard
13  to see clearly.  I can't read the setbacks, but I
14  can see that the parking is -- appears to be, you
15  know, one behind the other, so it is stacked.
16    Q.  What does "stacked" mean?
17    A.  It means that there's one space behind the
18  other and there's no way safe for that car that's
19  farthest in from the road to get out without being
20  blocked.
21    Q.  If you'll look at -- so there are one,
22  two, three, four, five, six, seven, eight, nine --
23  ten parking spaces, and those are designated with

Page 26

1  rectangles with P/S in the middle.
2        Are we on the same page?
3    A.  Yes.  It also looks like two of these
4  spaces are parked so some of them are in the
5  right-of-way.
6    Q.  Where is the right-of-way?
7    A.  Well, it looks like the little circles are
8  the property lines, and then you see the road.
9  But from the property line on his property to the
10  property line across the road, you have a
11  right-of-way.  It's not always just like the paved
12  portion.  It's the right-of-way.
13    Q.  So those little circles designate property
14  lines?
15    A.  That looks like that's a fence for the
16  property line.  That's what it looks like looking
17  at this because -- it's just a rather small
18  picture.
19    Q.  Is it required as part of the site plan's
20  mission to designate exactly where every parking
21  spot -- every parking space lies?
22    A.  Well, in Planning District 25, once they
23  added parking requirements, then yes, we had to

Page 27

1  see that they had the required parking -- the
2  required signs to these parking spaces.  So we had
3  to know where the parking was going to be.
4    Q.  How big must a parking space be?
5    A.  The minimum is 9 feet by 19 feet.
6    Q.  If you'll look in between these parking
7  spaces, would you agree with me that there's quite
8  a bit of space in between all ten of these parking
9  spaces?  There's two columns of five, and then
10  there's quite a bit of space in between?  It looks
11  at least as wide those parking spaces.
12        MS. KIDD-FRAWLEY:  Object to the form.
13    Q.  Would you agree with that?
14    A.  It appears to be.
15    Q.  Is there any reason that that -- other
16  than the stacked parking that you mentioned that
17  we'll get back to, is there any other reason that
18  that area could not be parking spaces?
19        MS. KIDD-FRAWLEY:  Object to the form.
20    A.  I can't say from looking at this because I
21  don't know what they -- you know, what was going
22  to be there in that space.  And I believe some of
23  these are under the house, so there may have been

Page 28

1  pilings there.  But, like I said, just looking at
2  this, I can't tell.
3    Q.  If you'll flip to the next page, this is
4  another rendering of the house to be constructed.
5  It's got two rectangles depicted in front of the
6  house.
7        Do you see that?
8    A.  Yes.
9    Q.  And so I guess going away from the street,
10  towards the Gulf of Mexico, there would be some
11  more parking underneath the house in between the
12  pilings, and that was part of what was on the site
13  plan; is that correct?
14    A.  I think so, yes.
15        MS. KIDD-FRAWLEY:  Object to the form.
16    Q.  Those two rectangles in the front, I guess
17  those would also be parking.
18        Does that appear correct based on your
19  understanding?
20        MS. KIDD-FRAWLEY:  Object to the form.
21    A.  Looking at the site plan and this picture,
22  it appears to be.
23    Q.  And there's more space in between those



Page 29

1  two rectangles; right?
2     A.  It appears to be.
3     Q.  So when Crystal Bates approved these
4  plans, what do you think she was doing wrong?
5        MS. KIDD-FRAWLEY:  Object to the form.
6     A.  I don't think she knew that -- or was
7  aware that they were not allowed to stack those
8  parking spaces.
9     Q.  So -- I apologize.  What did you tell me
10  was -- what "stacked parking" means?
11     A.  One space behind the other one, in front
12  of it.  There's nowhere to -- you can't back
13  straight out if you've got parking spaces and cars
14  are parked there.
15     Q.  Well, what if you had space in between the
16  two rows so that you could back up at an angle and
17  get out in the middle?  Would that still be
18  stacked parking?
19     A.  I don't know how much space they would
20  have in between in order to do it.  To answer your
21  question, I don't know.
22     Q.  So -- and I guess the same question:  If
23  there was space on the side so you had a column of

Page 30

1  spaces one behind the other, but then you had
2  space on the side so the car farthest away from
3  the road could back up to the side, would that
4  still be stacked parking?
5     A.  I don't think so.  I'm not looking at
6  whatever you're trying to describe.  But if they
7  were in at an angle where they could back out and,
8  like you said, there's space, you know, to back
9  out without running into the car next to you, then
10  that would be okay because now you're not blocking
11  that parking space.
12     Q.  There is no requirement for an owner or
13  developer in Planning District 25 to mark the
14  parking spaces in one of these driveways like you
15  would in a commercial parking lot, is there?
16     A.  They have to show us on the site plan
17  where they're going to be.  And so my
18  understanding would be that they would have marked
19  those paces so that anyone that was trying to park
20  in them would know.
21     Q.  Well, is there any ordinance or regulation
22  requiring them to physically paint marking on the
23  ground to show where the parking spaces are?

Page 31

1        MS. KIDD-FRAWLEY:  Object to the form.
2     A.  Well, in the zoning ordinance it tells you
3  you have to -- you can put some type of marking --
4  you know, like we have those -- what they call --
5  I think they're called wheel ties bumpers or
6  something.  There's supposed to be something that
7  you can tell each parking space.  Otherwise, how
8  would anyone know?
9     Q.  So that is true for every house in
10  Planning District 25, that they're supposed to
11  have parking bumpers --
12     A.  They're only -- sorry, okay.  I'm just --
13  I'm going to try to explain this.  Prior to the
14  ordinance changing, you were only required to have
15  two parking spaces.  And no, it was not required
16  to be shown on the site plan.  You know, you could
17  clearly see they were parking under the house
18  probably.  I'd say two for each dwelling.
19        But after the ordinance changed, when we
20  were required to have a certain number of spaces,
21  that was when they had to show it on the site
22  plan.  It had to show that it was going to meet
23  the size requirement.  And I guess maybe it was a

Page 32

1  presumption, but I presume they were marking the
2  spaces to show that that was where the space was.
3     Q.  Okay.  So apart from the site plan, when
4  we actually talked about the physical house on the
5  ground, are you aware of any ordinance or
6  regulation requiring the spaces to be physically
7  marked with either a parking bumper or curb or
8  painted lines or anything else?
9     A.  It's hard to answer that.  I guess, in my
10  mind, in Article 15, where we describe what the
11  parking spaces are supposed to look like and
12  not -- the design of them -- the design of the
13  parking spaces, that's where it tells you that --
14  you know, that they have to mark the parking
15  spaces.
16     Q.  Well, Article 15 of Baldwin County zoning
17  ordinance, that's what governs with respect to
18  parking spaces in Planning District 25?
19        MS. KIDD-FRAWLEY:  Object to the form.
20     A.  Well, just parking spaces, period, in
21  zoned areas of the county.
22
23        (Whereupon, Plaintiffs' Exhibit 2 was



Page 33

1    marked for identification and copy of
2    same is attached hereto.)
3
4    Q.  If you'll please turn to what's been
5  marked as Plaintiffs' Exhibit Number 2, and it's
6  the plans for the subject property that were
7  produced by the County.
8       So is it correct that these -- well, if
9  you know, were these in the County's possession,
10  in the County's file for this property?
11    A.  It should be.
12    MR. HICKS:  Did you hear her response?
13    MR. ANDERSON:  She said "it should be"?
14  Is that right?
15    THE WITNESS:  Yes.
16    Q.  (BY MR. ANDERSON)  And these plans, would
17  these be maintained by the Building Department or
18  the Planning & Zoning Department?
19    A.  Both.
20
21       (Whereupon, Plaintiffs' Exhibit 3 was
22    marked for identification and copy of
23    same is attached hereto.)

Page 34

1    Q.  Please turn to what's been marked as
2  Plaintiffs' Exhibit Number 3.
3    THE WITNESS:  Do you have Number 3?
4    MR. HICKS:  Sorry.  Page three looks like
5  it's -- just to make sure it's correct here, the
6  Bates labels on 3 appear to be out of order.  I've
7  got 69, 70, then 67, 68.  Is that right?
8    MR. ANDERSON:  That's correct.
9    MR. HICKS:  Okay.
10    THE WITNESS:  Okay.
11    Q.  (BY MR. ANDERSON)  So, Ms. Lee, just
12  looking at the first two pages of Defendants'
13  Bates 69 and 70, do you recognize this letter?
14    A.  Yes.
15    Q.  This letter was written by Vince Jackson;
16  is that correct?
17    A.  Yes.
18    Q.  Did you -- were you involved in writing
19  this letter, discussing what's contained in this
20  letter with Mr. Jackson prior to --
21    A.  No.
22    Q.  -- July 31, 2019?
23    MS. KIDD-FRAWLEY:  Object to the form.

Page 35

1    And let him -- I'm sorry, Ms. Lee.  Make
2  sure to let him finish his whole question.
3    THE WITNESS:  Sorry.
4    MS. KIDD-FRAWLEY:  No, you're fine.
5    Q.  (BY MR. ANDERSON)  So were you involved in
6  any discussions with Mr. Jackson about this letter
7  prior to July 31, 2019?
8    A.  Not that I -- other than asking him -- I
9  don't know.  It's hard to remember.  I was not
10  involved in writing this letter.  We may have
11  discussed, you know, the requirements for the
12  parking but not -- I didn't have any involvement
13  in the actual letter.
14    Q.  So did you discuss revoking the land use
15  certificate 190197 for Plaintiffs' property prior
16  to the date of this letter?
17    A.  Okay.  If memory serves me correctly, I
18  believe Mr. Jackson probably called when someone
19  complained about they had started construction,
20  and that is how we found out that the application
21  had been approved by Crystal.  I would have pulled
22  it to see because I don't think I knew until he
23  called that it was -- that she had approved it.

Page 36

1    Q.  Who called to complain?
2    A.  I don't know.
3    Q.  And what was the basis of the complaint?
4    A.  Like I said, I think someone called
5  because they had started construction.  Maybe they
6  didn't know that it had been approved, you know,
7  that a permit had been issued.  I don't know.  I
8  don't -- I wasn't involved in the phone call, so I
9  don't remember.
10    Q.  Prior to that phone call, had anyone else
11  talked to you in any setting about Plaintiffs'
12  proposed project on this property other than
13  Planning & Zoning staff?
14    A.  No.  I never talked to anyone.  I didn't
15  talk to the person that called about the building
16  permit being issued.  I think Mr. Jackson called
17  me, and that's when I pulled it to see what had
18  happened.
19    Q.  So someone called the Planning & Zoning
20  Department, and then Mr. Jackson called you to
21  pull the file and see what had happened?
22    MS. KIDD-FRAWLEY:  Kris, you're sort of
23  fading in and out for me.



Page 37

1    (At which time, an off-the-record
2    discussion was held.)
3
4    Q.  (BY MR. ANDERSON)  So, Ms. Lee, someone
5    called Planning & Zoning Department, and after
6    that Mr. Jackson called you and asked you to pull
7    the file on this land use certificate.
8        Is that what happened?
9    A.  I believe he called to ask if it had been
10   approved, and that's when I pulled the file and
11   saw that Crystal had approved it.
12   Q.  And what else did he say and what else did
13   you say in that discussion?
14   A.  I do not remember exactly what was said
15   other than we saw that she had approved it and the
16   parking that she approved was not allowed.
17   Q.  So the parking was not allowed because of
18   stacked parking; correct?
19   A.  Correct.
20   Q.  Do you know when Mr. Jackson sent out this
21   letter?
22       MS. KIDD-FRAWLEY:  Object to the form.
23   A.  I would assume he sent it on the 31st.  I

Page 38

1    don't know.
2    Q.  If you'll turn to the next two pages in
3    the same exhibit.  It's Defendants' Bates 67 and
4    68.
5        Can you tell me whose handwriting that is
6    at the top where it says "Approval Revoked:
7    7/31/19"?
8    A.  Mr. Jackson.
9    Q.  Did you review this document or talk to
10   him about this document before it went out with --
11   or it was issued?
12   A.  Not that I can recall.  I mean, no more
13   than the fact that it was going to be done, I
14   guess.
15   Q.  Did you talk with anyone else about this
16   before this was done other than Mr. Jackson?
17   Anyone else in Planning & Zoning or with the
18   County?
19   A.  I don't remember.
20   Q.  Do you remember if you spoke to Wayne
21   Dyess about this?
22   A.  I don't think I've ever talked to Wayne
23   Dyess about this.

Page 39

1    Q.  Okay.  Up until his departure from the
2    County, was Vince Jackson your direct supervisor?
3    A.  Yes.
4    Q.  Why -- well, are you aware that
5    Mr. Jackson was demoted from his position in
6    October of 2020?
7        MS. KIDD-FRAWLEY:  Object to the form.
8    A.  Yes.
9    Q.  What is your understanding as to why he
10   was demoted?
11       MS. KIDD-FRAWLEY:  Object to the form.
12   A.  I don't know why, if it was voluntary.  I
13   don't know.
14   Q.  Has anyone told you why they think he was
15   demoted?
16       MS. KIDD-FRAWLEY:  Object to the form.
17   A.  No.
18   Q.  Have you had any conversations with anyone
19   in Planning & Zoning as to why Mr. Jackson was
20   demoted?
21       MS. KIDD-FRAWLEY:  Object to the form.
22   A.  I have not talked to any other staff about
23   why Mr. Jackson was demoted.

Page 40

1    Q.  Do you have any thoughts as to why he was
2    demoted or --
3        MS. KIDD-FRAWLEY:  Object to the form.
4        COURT REPORTER:  I didn't get the end of
5    your question, Mr. Anderson.
6        MR. ANDERSON:  I'll repeat.
7    Q.  (BY MR. ANDERSON)  Ms. Lee, do you have
8    any thoughts or opinions as to why Mr. Jackson was
9    demoted?
10       MS. KIDD-FRAWLEY:  Object to the form.
11   A.  All I know is Mr. Jackson told us that,
12   you know, he was being -- taking voluntary
13   demotion to the development review planner.  I
14   believe that it was presumed that maybe the
15   planning director position was stressful.  But I
16   don't -- I don't know, you know, why he was
17   demoted.
18   Q.  Are you aware of any disagreements between
19   Vince Jackson and Wayne Dyess relating to zoning
20   or the Planning & Zoning Department?
21       MS. KIDD-FRAWLEY:  Object to the form.
22   A.  I guess I'm aware that they may have, you
23   know, had discussions about Mr. Jackson.  I think



Page 41

1  Mr. Dyess wanted him to visit the offices a little
2  bit more or -- you know, the exact disagreements,
3  we didn't discuss that.  I don't know.
4      Q.  To your knowledge why did Mr. Jackson
5  leave the County altogether in December of 2020?
6      MS. KIDD-FRAWLEY:  Object to the form.
7  She's answered she doesn't know to this whole line
8  of questions repeatedly.
9      MR. ANDERSON:  Well, that was about the
10 demotion.  Now I'm talking about his resignation.
11 So if she doesn't know, she doesn't know, but I'd
12 like to understand what she knows.
13     A.  All I know is he decided that, you know,
14 that wasn't, I guess, for him anymore.  He decided
15 to leave.
16     Q.  Did he tell you why, or did he express any
17 information as to why he was leaving?
18     MS. KIDD-FRAWLEY:  Object to the form.
19     MR. ANDERSON:  What is wrong with that
20 question, Jamie?
21     MS. KIDD-FRAWLEY:  It -- well, for one,
22 technically, it's a "did he tell you why or
23 express."  It's technically compound.  But also

Page 42

1  it's just this whole line of -- I mean, she said
2  she didn't -- she just said she didn't know.
3      MR. ANDERSON:  About the demotion.
4  I'll --
5      MS. KIDD-FRAWLEY:  No, she just said she
6  didn't know about the termination in the last
7  question.
8      Q.  (BY MR. ANDERSON)  Ms. Lee, did you have
9  any discussions with Vince Jackson about his
10 departure?
11     A.  Yes.  But not -- more the fact that he was
12 leaving, but not details as to why he was leaving.
13     Q.  So he gave you no information as to why?
14     A.  No.  We didn't talk about, you know, his
15 feelings, I guess, if that's what you're trying to
16 ask me.
17
18     (Whereupon, Plaintiffs' Exhibit 10 was
19     marked for identification and copy of
20     same is attached hereto.)
21
22     Q.  Would you please turn to what's been
23 marked as Plaintiffs' Exhibit Number 10?

Page 43

1      A.  Yes.
2      MR. HICKS:  We're going to 10?
3      MR. ANDERSON:  Yes.
4      MR. HICKS:  All right.  Hold on.  That
5  might take me a second.
6      MR. ANDERSON:  It's Bates number 71, and
7  it's a July 3, 2019, letter.
8      MR. HICKS:  Yeah, see, what -- when you
9  sent us the new ones with the exhibit numbers, we
10 just printed the first page so we didn't have to
11 reprint the whole thing.  So let me go --
12     MS. KIDD-FRAWLEY:  It's only one page;
13 right?
14     MR. HICKS:  Yeah, but let me go ahead and
15 get the other ones squared away here.  I don't
16 want to get it so disorganized that we can't do it
17 later.
18     MS. KIDD-FRAWLEY:  Yeah.
19     MR. ANDERSON:  Understood.
20
21     (At which time, an off-the-record
22     discussion was held.)
23

Page 44

1      Q.  (BY MR. ANDERSON)  Ms. Lee, could you take
2  a look at this letter and see if you recognize
3  this document?
4      A.  I recognize it.
5      Q.  Who is Paul Stanton?
6      A.  I believe he owns a house across the
7  street.  I don't know if it's directly across the
8  street or catty-corner.  But he's a property owner
9  across the street from Mr. Bordelon's property.
10     Q.  Across the street from Mr. Bordelon's
11 property?
12     A.  Uh-huh.
13     Q.  Or from the Plaintiffs' property?
14     A.  Yes.
15     Q.  It starts off "As requested, I've
16 researched the applicability of Section 15.3.1 of
17 the Baldwin County Zoning Ordinance to stacked
18 parking spaces."  Mr. Jackson testified that
19 Mr. Stanton requested that he conduct this
20 research.
21     Were you involved in --
22     MS. KIDD-FRAWLEY:  Object to the form.
23     Q.  -- that research?



Page 45

1    A.   No, not that I remember.  I don't think
2  so.
3    Q.   Were you privy to any conversations with
4  Paul Stanton?
5        MS. KIDD-FRAWLEY:  Object to the form.
6    A.   All I knew was that Mr. Jackson had talked
7  to Mr. Stanton, but I wasn't privy to the actual
8  conversation, no.
9    Q.   Prior to July 3, 2019, isn't it correct
10  that stacked parking configurations were permitted
11  within Planning District 25?
12    A.   Yes.
13    Q.   And so is it your understanding that this
14  letter changed Baldwin County's policy with
15  respect to stacked parking in Planning District
16  25?
17    A.   Yes.
18    Q.   When did you become aware of this change
19  in policy?
20    A.   Maybe a -- the day after would have been a
21  holiday, so within a couple of days, I think
22  Mr. Jackson sent me a copy of this letter or I
23  asked him for a copy of it.

Page 46

1    Q.   Was it before you went on vacation or
2  after, if you know?
3    A.   It was before I went on vacation.  I knew
4  before I went on vacation.
5    Q.   Did you receive it by email from
6  Mr. Jackson?
7    A.   I think so.
8        MR. ANDERSON:  Jamie, we would request
9  supplementation of just the email from Mr. Jackson
10  to Ms. Lee on this topic.
11        MS. KIDD-FRAWLEY:  Okay.  I'll see if we
12  can...
13        MR. ANDERSON:  Thank you.
14        MS. KIDD-FRAWLEY:  I'll see if we can get
15  that.
16    Q.   (BY MR. ANDERSON)  Ms. Lee, have you
17  observed any other occasions where the policy of
18  the County on a Planning & Zoning issue is changed
19  at the request of a resident?
20    A.   I'm not sure if I understand your
21  question.
22    Q.   I'll phrase it another way.
23        Have you observed any change in policy

Page 47

1  similar to what is contained in this letter from
2  Vince Jackson?
3        MS. KIDD-FRAWLEY:  Object to the form.
4    A.   I don't think so.  Not that I can recall.
5    Q.   You testified that after this letter,
6  Mr. Jackson made you aware of this change in
7  policy by sending a copy of it to you by email.
8        Are you aware if he made anyone else aware
9  of this change in policy?
10    A.   I don't know.  I only know that I asked
11  for a copy, and I think he emailed it to me.  I
12  don't know if he sent it to anyone -- or when he
13  sent it to the rest of the staff.
14
15        (Court reporter clarification.)
16
17    A.   I don't know when he gave it to the rest
18  of the staff.  I -- I just know I asked for it,
19  and that's how I got a copy of it because I knew
20  he had said, you know, he had this request and we
21  were dealing with that application.  So I asked
22  for a copy so I could know what was being done.
23  What was determined, I guess I should say.

Page 48

1    Q.   So before he sent you the -- this letter
2  by email, he had previously made you aware of the
3  fact there was a request from Paul Stanton to
4  revise the policy related to stacked parking?
5    A.   Well, I wouldn't say it was to revise.  I
6  just knew that he was reviewing the policy because
7  he'd gotten a request.  So, I mean, we had a
8  conversation.  I knew that he was making the
9  determination, I guess I should say.
10    Q.   After this was decided in this letter, was
11  this letter or any version of this policy ever
12  made publicly available?
13    A.   I don't know.
14    Q.   Would Mr. Jackson be the one that would
15  have known that or Mr. Dyess?
16    A.   I would presume they would be the ones to
17  know.  I don't.
18    Q.   In this letter Mr. Jackson writes "This
19  determination is specific to the supplemental
20  parking requirements which were found in local
21  provisions for Planning District 25 which were
22  applicable to single-family and two-family
23  properties."



Page 49

1    Why would this only apply in a single
2  planning district as to opposed to the entire
3  county?
4    A.  Because Planning District 25 has local
5  provisions that require the extra parking spaces.
6    Q.  Are there any other planning districts
7  that require a specific number of planning --
8  specific number of parking spaces?
9    A.  No.
10    Q.  Well, couldn't -- well, does a
11  single-family residence in another -- in another
12  planning district require two parking spaces?
13    A.  Two per dwelling, yes.
14    Q.  Isn't it possible to have stacked parking
15  with only two parking spaces?
16    A.  I would presume so.
17    Q.  So doesn't it follow that this stacked
18  parking requirement would also apply to that
19  situation in every other planning district?
20    A.  I think so, yes.
21    Q.  Why is this only applicable to
22  single-family and two-family properties?
23    A.  I'm not mistaken, there are other

Page 50

1  requirements for multi-family -- you know, parking
2  requirements.  So this wasn't in answer to
3  single-family and two-family properties.
4    Q.  Do the parking requirements for other
5  types of properties prohibit stacked parking?
6    A.  My understanding is the answer would be
7  yes.  Basically, what he was saying was, in
8  reading this ordinance, the way that it reads, you
9  would not be allowed to have stacked parking.
10    Q.  In the fall of 2019, there were a number
11  of text amendments passed by Baldwin County in
12  relation to dune walkovers and maximum height in
13  stories.
14    Are you familiar with those text
15  amendments?
16    A.  Yes, I'm familiar with them.
17    Q.  Were you involved in preparing any of the
18  staff reports related to those proposed text
19  amendments before they were passed?
20    MS. KIDD-FRAWLEY:  Object to the form.
21    A.  No.
22    MS. KIDD-FRAWLEY:  Are you talking about
23  just the story or -- you mentioned specifically

Page 51

1  story and dunes.  I didn't know if you were
2  talking about, like, all of the text amendments.
3    MR. ANDERSON:  All of the text
4  amendments --
5    MS. KIDD-FRAWLEY:  Okay.
6    MR. ANDERSON:  -- considered collectively.
7    Q.  (BY MR. ANDERSON)  Were you involved in
8  any of those, Ms. Lee?
9    A.  No.
10    Q.  I believe you testified earlier you've
11  never been involved with or had any knowledge of
12  any other revocation of a land use certificate; is
13  that correct?
14    A.  Not that I can recall.
15    Q.  Are you aware that there is a section of
16  the Baldwin County zoning ordinance that governs
17  the revocation of land use certificate that's
18  Section 18.2.5?
19    A.  Yes.
20    Q.  Are you aware of any other ordinances,
21  statutes, or regulations that pertain to the
22  revocation of a land use certificate?
23    MS. KIDD-FRAWLEY:  Object to the form.

Page 52

1    A.  No, not that I'm aware of.
2    Q.  And I'm going to restate the question to
3  hopefully overcome Ms. Kidd's objection.
4    Are you aware of any other ordinance,
5  statute, or regulation that governs the revocation
6  of land use certificates?
7    MS. KIDD-FRAWLEY:  Object to the form.
8    A.  I'm sorry.  I'm shaking my head no.  No.
9  No.  I'm not aware.
10    MR. ANDERSON:  Jamie, what's the basis of
11  your objection?
12    MS. KIDD-FRAWLEY:  That is a legal
13  conclusion.  You're asking for a legal conclusion
14  talking about statutes that govern.
15    MR. ANDERSON:  Okay.  I'm just asking if
16  she knows of any.
17    MS. KIDD-FRAWLEY:  That's fine.  I mean,
18  I'm not instructing her not to answer, for the
19  record.
20
21    (Whereupon, Plaintiffs' Exhibit 21 was
22    marked for identification and copy of
23    same is attached hereto.)



Linda Lee                                                                                      53..56

Page 53

1   Q.   (BY MR. ANDERSON)  Could you please turn
2   to what's been marked as Plaintiffs' Exhibit
3   Number 21.  Ms. Lee, this is a series of documents
4   that have been produced by Defendants.  The first
5   three pages -- Defendants' Bates numbers 307, 308,
6   and 309 -- appear to be printouts of computer
7   records from Delta Computer Systems.
8        Does this format of printout look familiar
9   to you?
10   A.   I'm going to say I've probably seen this
11  before.  But this is from the Building Department,
12  so I'm not familiar with it.
13   Q.   What computer program do y'all use in
14  Planning & Zoning in relation to record keeping on
15  land use certificates?
16   A.   Okay.  I know we have our database.  I
17  don't know the name of it.  And we're now -- as of
18  November the 2nd of 2020, we use Citizenserve.
19  Prior to that we used an in-house database.
20   Q.   Did that -- what did the interface look
21  like for that older database?  Does it look like
22  this?
23   A.   No.  This is from the Building Department.

Page 54

1   Q.   Okay.  I was just trying to figure out if
2   it would look the same in Planning & Zoning but --
3   A.   No.  No.
4   Q.   Okay.  TThomley -- it looks like a user
5   name to me.  Do you know if that's someone who
6   works in the Building Department?
7   A.   Yes.
8   Q.   What's the -- what's the full name of that
9   individual?
10   A.   Tammy Thomley.
11   Q.   Do you know what Ms. Thomley's position
12  is?
13   A.   I believe her title is bookkeeper, but
14  she's like a permit technician.  She took in the
15  applications.
16   Q.   The first page of this record has an added
17  7/19/2019, change 7/23/2019, and has application
18  for land use "N," what appears to be "no."
19       Are you familiar enough with this system
20  to tell me what this means --
21   A.   I'm not familiar with this system at all
22  to tell you what anything means.  You'd have to
23  talk to the Building Department.

Page 55

1   Q.   Okay.  If you go to the third page, it has
2   a user name that looks like FWaters.
3        Do you know an individual with the last
4   name waters in the Building Department?
5   A.   That's Fabia Waters.
6   Q.   Can you spell that for me?
7   A.   F-a-b-i-a, Fabia.
8   Q.   Oh, Fabia.  Is that a female?
9   A.   Yes.
10   Q.   Do you know Ms. Waters's title?
11   A.   I think her title is -- what were their
12  titles?  I think it was office assistant.  It
13  might be permit technician.  I'm not sure if they
14  changed them.
15   Q.   If you'll go to the last page of this
16  exhibit, it's Defendants' Bates number 324.  This
17  is an email from Mindy Smith in the Building
18  Department to Eddie Harper, Roy Collins, and Rob
19  Madison.  And she writes here "I spoke with Brenda
20  in P&Z."
21        Is that Brenda Pool that we talked about
22  earlier?
23   A.   We -- I don't recall talking to you about

Page 56

1   a Brenda Pool.
2   Q.   I'm sorry, I may have misstated the name.
3        Is there a Brenda in Planning & Zoning?
4   A.   Yeah.  There's a Brenda Brock, but we
5   haven't discussed Brenda today.
6   Q.   Okay.  I was just conflating names.  So
7   Brenda Rob?
8   A.   Brenda Brock, B-r-o-c-k.
9   Q.   Brenda Brock.  Thank you.
10       What's Brenda Brock's position?
11   A.   She's administrative support specialist.
12   Q.   Which office is she --
13   A.   She's in the Foley Planning & Zoning
14  office.
15   Q.   So here Mindy Smith writes "Brenda looked
16  up the LUC 190197 and said that it had been
17  revoked on 7/17/19 due to failure to meet parking
18  requirements."
19       What would have told her that the land use
20  certificate we've talking about was revoked on
21  July 17, 2019, as opposed to July 31, 2019, when
22  that certificate was actually revoked when
23  Mr. Jackson sent the letter?



Page 57

1   A.  If I'm not mistaken, on the top of one of
2   your exhibits, did it say it was revoked on 7/17?
3   Q.  Going back to Plaintiffs' Exhibit
4   Number 3, at the top, in what you've testified to
5   was Vince Jackson's handwriting, it says "Approval
6   revoked 7/31/19."
7   A.  I apologize.  I have no idea where she got
8   that date from.
9   Q.  Okay is it possible to edit the database
10  you have in Planning & Zoning after the fact to
11  show that something was revoked on a different
12  date?
13       MS. KIDD-FRAWLEY:  Object to the form.
14  A.  It's possible to --
15       MR. HICKS:  Go ahead.
16  A.  It's possible to change a date.  I don't
17  know of any reason why anyone would.  But, you
18  know, you can change the date, yes.
19       MR. ANDERSON:  Okay.  I'm almost done with
20  Ms. Lee, so can we just take a five-minute break?
21  And I'll be back in just a minute.
22
23       (At which time, a break was taken.)

Page 58

1   Q.  (BY MR. ANDERSON)  Ms. Lee, I just have a
2   few more questions for you and then we'll be done.
3   I want to make sure I get our timeline right of
4   what you know with respect to this land use
5   certificate application.  So March 27, 2019, Steve
6   Jones applied on behalf of plaintiffs.
7       Paula Bonner accepted the application;
8   correct?
9   A.  Yes, as far as I know.
10  Q.  And then sometime after that, it was
11  assigned -- this application was assigned to you,
12  but you don't remember exactly when; is that
13  correct?
14  A.  Right.  It would have been within a day or
15  two.  She wouldn't have given it to me unless she
16  noticed something missing.  So from what I can
17  recall, I believe his ADEM application was not in
18  there, and then we had to wait for it.
19  Q.  Do you recall if you had any conversations
20  with Steve Jones or anyone else, with Plaintiffs,
21  in between that initial issue arising with the
22  ADEM permit being needed and the receipt of the
23  ADEM permit?

Page 59

1   A.  I can't remember.
2   Q.  And so you testified that you remember
3   talking to Steve Jones about either the number of
4   parking spaces or parking spaces being on the
5   right-of-way, but you don't remember when that
6   occurred; correct?
7   A.  Correct.
8   Q.  And you don't remember which thing you
9   talked about, but something to do with parking you
10  recall talking to him about; is that right?
11  A.  Yeah.  I feel like I'm the one that talked
12  to him about the need for the number of parking
13  spaces or the fact that they were in the
14  right-of-way.  I remember we talked about parking.
15  Q.  Okay.  And on or about July 13, 2019, you
16  went on vacation to North Dakota.  You were there
17  for about two weeks.
18       And while you were gone, on July 17 the
19  land use certificate was approved by Crystal
20  Bates; correct?
21  A.  That's correct.  But to be exact, I went
22  to North Dakota, left North Dakota, and went to
23  Texas.  But I was gone a total of two weeks.

Page 60

1   Q.  Okay.  And so you would have returned
2   around July 27, and then this land use certificate
3   was revoked by Vince Jackson on the 31st, and you
4   talked to him about it around that time?
5   A.  Yes.
6   Q.  When this -- when he sent that revocation
7   letter, did you or anyone else at Planning &
8   Zoning call Steve Jones or Plaintiffs and try to
9   work anything out?
10  A.  I didn't call him.  As far as I'm aware,
11  Mr. Jones may have spoken to him, but I don't
12  know.  I don't know who he talked to.
13  Q.  Isn't it a pretty typical practice in your
14  office to call or email applicants about
15  deficiencies to try to work them out rather than
16  revoking a land use certificate?
17       MS. KIDD-FRAWLEY:  Object to the form.
18  A.  Typically, we do try to work things out.
19  But I don't think we've ever had an issue quite
20  like this one.  So, you know, I don't know what
21  the -- if the remedy would have been to revoke it
22  or not.
23  Q.  Why didn't y'all try to work it out in



Page 61

1  this instance?
2      MS. KIDD-FRAWLEY:  Object to the form.
3      A.  I wasn't involved in that decision.
4      Q.  How was this different than other
5  instances where there were deficiencies or issues
6  that needed to be resolved?
7      A.  Well, I guess because usually it's just
8  something that they need to provide us.  You know,
9  we're missing a document or something we need, a
10  revised site plan showing something we've asked
11  for.  I think there were just more issues with
12  this as far as everything that was going on, I
13  guess.  I don't know.
14     Q.  When you say you don't know, would it be
15  Vince Jackson or Wayne Dyess that would know?
16     MS. KIDD-FRAWLEY:  Object to the form.
17     A.  I would presume.  They were the ones
18  making the decisions so...
19     Q.  When Planning & Zoning decisions were
20  made, were they made solely by Vince Jackson or
21  also by Wayne Dyess or both?
22     MS. KIDD-FRAWLEY:  Object to the form.
23     A.  I don't know the answer to that.

Page 62

1      Q.  Are you familiar with another property on
2  Ponce De Leon Court owned by Breezy Shores, LLC?
3      A.  I am.
4      Q.  I apologize.  Easy Breezy, LLC.  It's
5  another duplex on the beach.  Is that what you
6  were --
7      A.  (Inaudible.)
8      Q.  I'm sorry, Ms. Lee.  I didn't get your
9  answer.
10     A.  Yes.  I am familiar with it.
11     Q.  What do you know about it?
12     A.  I know it's a three-story duplex that was
13  built.  I don't remember the exact year.  I know
14  that there's been, you know, complaints about
15  parking situations there.
16     Q.  Were those complaints the reason that the
17  parking -- the stacked parking interpretation was
18  changed by Mr. Jackson in July of 2019?
19     MS. KIDD-FRAWLEY:  Object to the form.
20     A.  I can't speak for Mr. Jackson's
21  reasonings, but I think it was just a matter of it
22  was brought to his attention, and he read that
23  section and made that determination.

Page 63

1      Q.  Okay.  Did anyone ask you to do anything
2  relative to the land use certificate application
3  for Breezy Shores, LLC, because of anything to do
4  with Easy Breezy, LLC, and that duplex?
5      MS. KIDD-FRAWLEY:  Object to the form.
6      A.  (Inaudible.)
7      Q.  Ms. Lee, I didn't hear your answer.
8      A.  No.  No.
9      Q.  Ms. Lee, have you attended any meetings of
10  the Fort Morgan Civic Association?
11     A.  Yes.
12     Q.  Do you -- well, how many, approximately,
13  meetings of the Fort Morgan Civic Association have
14  you attended?
15     A.  I would say less than ten.  I don't know
16  if it was five.
17     Q.  Why did you attend those meetings?
18     A.  Usually if I had a variance case that was
19  in District 25, I would attend the meeting in case
20  they had questions for me.
21     Q.  Is there any other reasons you attended
22  those meetings?
23     A.  No.  Actually, I think they may have

Page 64

1  invited us to their annual meeting, but it was
2  just their annual general meeting.  I don't --
3  there may not have been any cases on it.
4      Q.  Why did you attend their annual general
5  meeting?
6      A.  I think I attended maybe once and just
7  because they invited us.
8      Q.  Were you on the clock, or were you doing
9  that on your own personal time?
10     A.  No, I was on the clock.
11     Q.  Do you know a gentleman named Greg
12  Strategier?
13     A.  I know of him.  I don't know him.
14     Q.  Do you know a gentleman named Joe Emerson?
15     A.  I know of him.  I don't know him
16  personally.
17     Q.  How do you know of Mr. Stategier and
18  Mr. Emerson?
19     A.  I believe they've attended a meeting I was
20  at and made comments about a case.
21     Q.  Were those Fort Morgan Civic Association
22  meetings?
23     A.  No.  It was the Fort Morgan Planning &



Page 65

1  Zoning Advisory Committee.  And I guess that --
2  that was the meeting that I attended.  I've never
3  attended a civic organization meeting.
4      **Q.  Are you sure about that, or could they**
5  **have been on the same day in the same place?**
6      A.  The only meetings I attended, I attended
7  because it was a Fort Morgan Planning & Zoning
8  Advisory Committee meeting at the Shell -- I think
9  it's Baptist Church.  I don't even know where
10  their civic organization meets, but I was never
11  attending a meeting for that organization.
12      **Q.  Other than that letter and request from**
13  **Paul Stanton, what other interactions have you had**
14  **with Paul Stanton or what do you know about him?**
15      MS. KIDD-FRAWLEY:  Object to the form.
16      A.  I cannot recall me having any personal
17  interactions with Mr. Stanton.  I've seen him at a
18  board meeting.  He probably, you know, made
19  comments concerning a case -- a variance case or
20  something.  I want to say it may have been the
21  appeal case, not a variance case, actually, sir.
22      MR. ANDERSON:  Ms. Lee, that's all I have
23  for you today.  Thank you very much for your time.

Page 66

1  MS. KIDD-FRAWLEY:  I don't have any.
2
3  (At which time, the deposition concluded
4  at approximately 11:12 a.m., Central.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 67

C E R T I F I C A T E

1
2
3  STATE OF ALABAMA
4  AT LARGE
5
6      I hereby certify that the above and
   foregoing deposition of Linda Lee was taken down
   by me in stenotype and the questions and answers
7  thereto were transcribed by means of
   computer-aided transcription; transcribed by me or
8  overseen by me, and that the foregoing represents
   a true and correct transcript of the testimony
9  given by said witness upon said hearing.
10      I further certify that I am neither of
   counsel, nor of kin to the parties to the action,
11  nor am I in anywise interested in the result of
   said cause.
12      I further certify that I am duly licensed
13  by the Alabama Board of Court Reporting as a
   Certified Court Reporter as evidenced by the ACCR
14  number following my name found below.
15      So certified on this date, February 11,
   2021.
16
17
18
19
20      /s/ Jordan C. Groves, CCR
21       Jordan C. Groves, CCR
        ACCR #642, Expires 9/30/2021
22       Commissioner for the State
        Of Alabama at Large
23          My Commission Expires 3/19/2023

Linda Lee

i1

**Exhibits**

**Lee PX-1** 4:11 12:7,13
13:8,11

**Lee PX-2** 4:12 32:23
33:5

**Lee PX-3** 4:13 33:21
34:2 57:3,4

**Lee PX-10** 4:15 42:18,23

**Lee PX-21** 4:16 52:21
53:2,3

---

**#**

**#642** 67:21

---

**1**

**1** 4:11 12:7,13 13:8,11

**1/2** 10:13

**10** 4:15 42:18,23 43:2

**11** 67:15

**11:12** 66:4

**12** 4:11

**13** 22:11 59:15

**13th** 17:9

**14** 10:13

**15** 10:13 32:10,16

**15.3.1** 44:16

**16th** 17:8

**17** 15:8 16:21 17:2 18:6
25:3 56:21 59:18

**18.2.5** 51:18

**19** 15:2 27:5

**190197** 35:15 56:16

**1:20-cv-00057-c** 1:4

---

**2**

**2** 4:12 32:23 33:5

**2006** 10:14,19

**2007** 10:20

---

**2012** 10:21

**2017** 19:6 23:16

**2019** 14:9,20 15:8 16:21
17:2 18:6,19 25:3 34:22
35:7 43:7 45:9 50:10
56:21 58:5 59:15 62:18

**2020** 39:6 41:5 53:18

**2021** 1:15,20 2:7 6:8

**21** 52:21 53:3

**25** 26:22 30:13 31:10
32:18 45:11,16 48:21
49:4 63:19

**27** 1:15 14:9 58:5 60:2

**28** 1:20 2:7 6:8

**2nd** 53:18

---

**3**

**3** 4:13 33:21 34:2,3,6
43:7 45:9 57:4

**3/19/2023** 67:23

**307** 53:5

**308** 53:5

**309** 53:6

**31** 18:19 34:22 35:7
56:21

**31st** 37:23 60:3

**32** 4:12

**324** 55:16

**33** 4:13

**36117** 5:10

**36526** 5:13

**36561** 5:6

---

**4**

**4** 1:10

**42** 4:15

---

**5**

**52** 4:16

---

**6**

**67** 34:7 38:3

**68** 34:7 38:4

**69** 34:7,13

---

**7**

**7** 4:6

**7/17** 57:2

**7/17/19** 56:17

**7/19/2019** 54:17

**7/23/2019** 54:17

**7/29/20** 4:16

**7/3/2019** 4:15

**7/31/19** 38:7 57:6

**7/31/2019** 4:13

**70** 34:7,13

**71** 43:6

**7475** 5:10

---

**9**

**9** 27:5

**9/30/2021** 67:21

**90** 5:12

**9:08** 1:16,21 2:8 6:8

---

**A**

**a.m.** 1:16,21 2:8 6:8 66:4

**accepted** 13:22 14:10,
12 58:7

**ACCR** 67:13,21

**acknowledge** 6:12,15

**acting** 6:3

**action** 1:3 7:20 67:10

**actual** 35:13 45:7

**added** 19:12 26:23 54:16

**additional** 18:16

---

**ADEM** 19:11 58:17,22,23

**ADJUSTMENT** 1:10

**administrative** 56:11

**Advisory** 65:1,8

**affidavits** 9:15

**affirmative** 8:8

**agree** 7:1,3,5 27:7,13

**Agreed** 2:2,10,17 3:2
6:23

**agreement** 6:20,21

**ahead** 25:10,11 43:14
57:15

**Alabama** 1:2,9,23 2:6
5:6,10,13 6:3 67:3,13,22

**allowed** 18:14 20:9,15
21:6 29:7 37:16,17 50:9

**altogether** 41:5

**amendments** 50:11,15,
19 51:2,4

**Anderson** 4:6 5:4 6:22,
23 7:9,16,18 12:1,11,18
13:9 33:13,16 34:8,11
35:5 37:4 40:5,6,7 41:9,
19 42:3,8 43:3,6,19 44:1
46:8,13,16 51:3,6,7
52:10,15 53:1 57:19 58:1
65:22

**angle** 29:16 30:7

**annual** 64:1,2,4

**answering** 18:2

**answers** 8:8 67:6

**anymore** 41:14

**anywise** 67:11

**apologize** 11:4 29:9
57:7 62:4

**appeal** 9:9 65:21

**appeared** 1:22 2:7

**APPEARING** 5:3,7

**appears** 25:14 27:14
28:22 29:2 54:18

**applicability** 44:16

**applicable** 48:22 49:21



**applicant** 19:7

**applicants** 60:14

**application** 4:14 9:9
13:14,18 14:8,13 18:8
21:12,18,22,23 22:20,22
24:16 35:20 47:21 54:17
58:5,7,11,17 63:2

**applications** 11:18 22:8
24:5 54:15

**applied** 58:6

**apply** 49:1,18

**approval** 23:19 38:6
57:5

**approve** 23:22

**approved** 15:8 24:17
25:4 29:3 35:21,23 36:6
37:10,11,15,16 59:19

**approximately** 1:21 2:8
6:7 63:12 66:4

**April** 15:3

**area** 27:18

**areas** 32:21

**arising** 58:21

**arrangement** 6:18

**Article** 32:10,16

**assign** 2:21

**assigned** 58:11

**assist** 11:13

**assistant** 10:20 11:1,2
14:16 15:22 24:3 55:12

**Association** 63:10,13
64:21

**assume** 37:23

**attached** 12:9 33:2,23
42:20 52:23

**attend** 63:17,19 64:4

**attended** 63:9,14,21
64:6,19 65:2,3,6

**attending** 65:11

**attention** 62:22

**attorneys** 6:11 9:6

**aware** 19:7 29:7 32:5
39:4 40:18,22 45:18

47:6,8 48:2 51:15,20
52:1,4,9 60:10

---

**B**

**B-R-O-C-K** 56:8

**back** 17:9 18:15 19:8,10
20:10 22:19 27:17 29:12,
16 30:3,7,8 57:3,21

**Baldwin** 1:9 9:22 10:1,
11,17 13:14 24:18 32:16
44:17 45:14 50:11 51:16

**ballpark** 22:10

**Baptist** 65:9

**based** 28:18

**basically** 24:4 50:7

**basis** 36:3 52:10

**Bates** 15:8,9 16:20 23:5,
8,18 24:16 25:2 29:3
34:6,13 38:3 43:6 53:5
55:16 59:20

**Bay** 15:16,18

**beach** 5:6 62:5

**behalf** 5:3,7 19:15 58:6

**big** 27:4

**bit** 12:20 27:8,10 41:2

**blocked** 25:20

**blocking** 30:10

**board** 1:10 65:18 67:13

**Bonner** 14:4,5,9,12 58:7

**bookkeeper** 54:13

**Bordelon** 1:6 7:19

**Bordelon's** 44:9,10

**bottom** 13:15

**Boyd** 5:11

**Brad** 7:4

**Bradford** 5:11

**break** 8:19,20,22 20:20
57:20,23

**Breezy** 1:6 7:19 62:2,4
63:3,4

**Brenda** 55:19,21 56:1,3,
4,5,7,8,9,10,15

**briefly** 10:16

**Brock** 56:4,8,9

**Brock's** 56:10

**brought** 62:22

**building** 4:11 13:3 33:17
36:15 53:11,23 54:6,23
55:4,17

**built** 62:13

**bumper** 32:7

**bumpers** 31:5,11

---

**C**

**call** 17:20 24:22 31:4
36:8,10 60:8,10,14

**called** 31:5 35:18,23
36:1,4,15,16,19,20 37:5,
6,9

**calls** 24:6

**car** 25:18 30:2,9

**cars** 29:13

**case** 9:17 10:4 12:17,21
13:19 16:1 63:18,19
64:20 65:19,21

**cases** 64:3

**catty-corner** 44:8

**CCR** 1:19 67:20,21

**cell** 17:23 18:4,5

**Central** 66:4

**certificate** 4:14 11:17
13:14,18 18:8 21:12,17,
22 22:5,8,20 35:15 37:7
51:12,17,22 56:20,22
58:5 59:19 60:2,16 63:2

**certificates** 11:8,11
23:20,22 52:6 53:15

**certified** 2:5 6:1 67:13,
15

**certify** 6:3 67:5,10,12

**change** 18:17 19:5 45:18
46:23 47:6,9 54:17
57:16,18

**changed** 19:3,6 31:19
45:14 46:18 55:14 62:18

**changing** 31:14

**checked** 17:13

**Church** 65:9

**circles** 26:7,13

**citizens** 11:9

**Citizenserve** 53:18

**civic** 63:10,13 64:21
65:3,10

**Civil** 1:3 6:5

**clarification** 47:15

**CLARK** 5:5

**clear** 9:5 19:13

**clock** 64:8,10

**code** 15:21

**collectively** 51:6

**Collins** 55:18

**column** 29:23

**columns** 27:9

**commencing** 1:20 2:8
6:7

**comments** 64:20 65:19

**commercial** 11:12
30:15

**Commission** 1:9 9:22
67:23

**Commissioner** 3:4 6:3
67:22

**Committee** 65:1,8

**complain** 36:1

**complained** 35:19

**complaint** 36:3

**complaints** 62:14,16

**compliance** 2:14

**compound** 41:23

**computer** 53:6,7,13

**computer-aided** 67:7

**concluded** 66:3

**conclusion** 52:13

**conditional** 13:4



**conditions** 7:1,3

**conduct** 44:19

**configurations** 45:10

**conflating** 56:6

**confusing** 8:1

**consent** 6:17

**considered** 51:6

**constructed** 28:4

**construction** 35:19
36:5

**contact** 17:20

**contained** 22:22 34:19
47:1

**conversation** 8:10 45:8
48:8

**conversations** 39:18
45:3 58:19

**copy** 12:8 33:1,22 42:19
45:22,23 47:7,11,19,22
52:22

**correct** 14:11 19:17
28:13,18 33:8 34:5,8,16
37:18,19 45:9 51:13
58:8,13 59:6,7,20,21
67:8

**correctly** 35:17

**correspondence** 19:14,
22

**counsel** 2:3,19,20 6:6,17
67:10

**count** 15:16

**county** 1:9 9:22 10:1,12,
17 13:14 24:19 32:16,21
33:7 38:18 39:2 41:5
44:17 46:18 49:3 50:11
51:16

**County's** 33:9,10 45:14

**couple** 45:21

**court** 1:1,23 2:5,15 6:1,
11 7:6 10:3 40:4 47:15
62:2 67:13

**CROSBY** 5:12

**Crystal** 15:8,9 16:20
23:5 29:3 35:21 37:11
59:19

**curb** 32:7

**customer** 17:20

---

**D**

**Dakota** 17:7 59:16,22

**Daphne** 5:13

**database** 4:16 53:16,19,
21 57:9

**date** 6:4 17:1 18:6,11
35:16 57:8,12,16,18
67:15

**dates** 17:4,8

**day** 45:20 58:14 65:5

**days** 45:21

**De** 62:2

**dealing** 47:21

**December** 41:5

**decided** 41:13,14 48:10

**decision** 61:3

**decisions** 61:18,19

**declarations** 9:16

**defendants** 1:12 5:8
7:3,5 53:4

**Defendants'** 34:12 38:3
53:5 55:16

**deficiencies** 21:23
60:15 61:5

**Delta** 53:7

**demoted** 39:5,10,15,20,
23 40:2,9,17

**demotion** 40:13 41:10
42:3

**Department** 13:1 21:11,
21 24:19 33:17,18 36:20
37:5 40:20 53:11,23
54:6,23 55:4,18

**departure** 39:1 42:10

**depends** 17:14

**depicted** 28:5

**deposed** 10:2,4

**deposition** 1:14,18 2:4,
11,12,22 3:3 9:4,8,13

12:22 66:3 67:6

**depositions** 2:15

**describe** 30:6 32:10

**design** 18:17 32:12

**designate** 26:13,20

**designated** 25:23

**details** 21:14 42:12

**determination** 48:9,19
62:23

**determined** 47:23

**developer** 30:13

**development** 40:13

**DF-0305** 13:15

**differences** 10:23 11:5

**direct** 39:2

**directly** 44:7

**director** 15:20 40:15

**disagreements** 40:18
41:2

**discuss** 35:14 41:3

**discussed** 35:11 56:5

**discussing** 34:19

**discussion** 12:5 37:2,13
43:22

**discussions** 9:5 35:6
40:23 42:9

**disorganized** 43:16

**district** 1:1,2,10 26:22
30:13 31:10 32:18 45:11,
15 48:21 49:2,4,12,19
63:19

**districts** 49:6

**document** 13:18,22
38:9,10 44:3 61:9

**documents** 9:7 22:23
23:3 53:3

**draw** 17:17

**Drive** 5:10

**driveways** 30:14

**due** 56:17

**duly** 7:12 67:12

**dune** 50:12

**dunes** 51:1

**duplex** 62:5,12 63:4

**dwelling** 31:18 49:13

**Dyess** 38:21,23 40:19
41:1 48:15 61:15,21

---

**E**

**earlier** 51:10 55:22

**Easy** 62:4 63:4

**Eddie** 55:18

**edit** 57:9

**effect** 2:13

**email** 4:16 19:21 46:5,9
47:7 48:2 55:17 60:14

**emailed** 47:11

**emails** 17:12 18:4

**Emerson** 64:14,18

**employed** 9:21 10:11

**end** 40:4

**enforcement** 15:21

**entire** 49:2

**estimate** 22:9

**evidence** 2:23

**evidenced** 67:13

**exact** 17:8 41:2 59:21
62:13

**examination** 4:3,5 6:9
7:15

**examined** 7:12

**exhibit** 4:9 12:7,13 13:8,
11 32:23 33:5,21 34:2
38:3 42:18,23 43:9 52:21
53:2 55:16 57:3

**exhibits** 11:21,23 57:2

**experience** 23:17

**Expires** 67:21,23

**explain** 8:14 31:13

**express** 41:16,23

**extra** 49:5



## F

**F-222**  5:5

**F-A-B-I-A**  55:7

**Fabia**  55:5,7,8

**fact**  38:13 42:11 48:3 57:10 59:13

**fading**  36:23

**failure**  56:17

**fair**  8:13 22:14

**fall**  50:10

**familiar**  13:17 23:4 50:14,16 53:8,12 54:19, 21 62:1,10

**farthest**  25:19 30:2

**February**  15:2 67:15

**Federal**  6:4

**feel**  20:12 59:11

**feelings**  42:15

**feet**  27:5

**female**  55:8

**fence**  26:15

**figure**  54:1

**file**  21:10,17 33:10 36:21 37:7,10

**filing**  3:3

**fine**  7:9 35:4 52:17

**finish**  35:2

**Fire**  13:1

**Fish**  18:15

**five-minute**  57:20

**flip**  28:3

**Foley**  14:6 16:3,18,21,23 23:10,18 56:13

**follow**  49:17

**force**  2:13

**foregoing**  6:5 67:6,8

**forgot**  23:11

**form**  2:20 9:18 16:6,7 18:21 20:19 23:21 25:9

27:12,19 28:15,20 29:5 31:1 32:19 34:23 37:22 39:7,11,16,21 40:3,10,21 41:6,18 44:22 45:5 47:3 50:20 51:23 52:7 57:13 60:17 61:2,16,22 62:19 63:5 65:15

**format**  53:8

**Fort**  63:10,13 64:21,23 65:7

**forward**  17:19

**found**  35:20 48:20 67:14

**frequently**  16:11

**front**  11:21 28:5,16 29:11

**full**  2:13 9:20 54:8

**FWATERS**  55:2

## G

**gave**  12:21 42:13 47:17

**general**  64:2,4

**generally**  13:17 23:4,6 24:21

**gentleman**  64:11,14

**give**  8:7

**Good**  7:17

**goodness**  16:13

**govern**  52:14

**governs**  32:17 51:16 52:5

**Greg**  64:11

**ground**  30:23 32:5

**grounds**  2:21

**Groves**  1:19 2:5 6:1 67:20,21

**guess**  23:10 28:9,16 29:22 31:23 32:9 38:14 40:22 41:14 42:15 47:23 48:9 61:7,13 65:1

**Gulf**  28:10

## H

**Halcyon**  5:10

**handwriting**  38:5 57:5

**happen**  16:12

**happened**  14:13 36:18, 21 37:8

**hard**  19:19 25:12 32:9 35:9

**Harper**  55:18

**head**  52:8

**hear**  7:21 8:2 33:12 63:7

**hearing**  67:9

**height**  50:12

**held**  12:5 37:2 43:22

**hereto**  12:9 33:2,23 42:20 52:23

**Hey**  12:14

**Hicks**  5:11 7:4 12:14 13:7 16:7 25:11 33:12 34:4,9 43:2,4,8,14 57:15

**higher-priority**  17:15

**Highway**  5:12

**hired**  10:18,19

**history**  10:17 23:8

**Hold**  43:4

**holiday**  45:21

**honest**  10:5

**house**  27:23 28:4,6,11 31:9,17 32:4 44:6

**hundred**  22:12,18

**hundreds**  22:15,16

## I

**idea**  57:7

**identification**  12:8 33:1, 22 42:19 52:22

**important**  8:7

**in-house**  53:19

**Inaudible**  62:7 63:6

**INDEX**  4:3,9

**individual**  54:9 55:3

**information**  17:22 21:9 41:17 42:13

**initial**  58:21

**instance**  61:1

**instances**  61:5

**instructing**  52:18

**interactions**  23:7 65:13, 17

**interested**  67:11

**interface**  53:20

**interpretation**  62:17

**invited**  64:1,7

**involved**  18:7,11 22:4,9 34:18 35:5,10 36:8 44:21 50:17 51:7,11 61:3

**involvement**  35:12

**issue**  20:13 21:4 46:18 58:21 60:19

**issued**  13:3 22:6 36:7,16 38:11

**issues**  20:11,18,21,22 21:2 61:5,11

## J

**Jackson**  1:11 4:13,15 18:19 34:15,20 35:6,18 36:16,20 37:6,20 38:8,16 39:2,5,19,23 40:8,11,19, 23 41:4 42:9 44:18 45:6, 22 46:6,9 47:2,6 48:14, 18 56:23 60:3 61:15,20 62:18

**Jackson's**  9:13 57:5 62:20

**Jamie**  5:9 7:2 41:20 46:8 52:10

**January**  1:15,20 2:7 6:8 23:16

**job**  10:16

**Joe**  64:14

**Jones**  4:13 19:18,20 20:3,23 21:2 58:6,20 59:3 60:8,11

**Jordan**  1:19 2:5 6:1 67:20,21

**July**  15:8 16:21 17:2,8 18:6,18,19 25:3 34:22



35:7 43:7 45:9 56:21
59:15,18 60:2 62:18

**K**

**keeping** 53:14

**Kidd's** 52:3

**Kidd-frawley** 5:9 7:2,7
9:18 16:6 18:21 20:19
23:21 25:9 27:12,19
28:15,20 29:5 31:1 32:19
34:23 35:4 36:22 37:22
39:7,11,16,21 40:3,10,21
41:6,18,21 42:5 43:12,18
44:22 45:5 46:11,14 47:3
50:20,22 51:5,23 52:7,
12,17 57:13 60:17 61:2,
16,22 62:19 63:5 65:15
66:1

**kin** 67:10

**knew** 19:2 29:6 35:22
45:6 46:3 47:19 48:6,8

**knowledge** 20:17,21
21:1 41:4 51:11

**Kris** 6:23 7:17 36:22

**Kristopher** 5:4

**L**

**labels** 34:6

**land** 4:13 11:11,17
13:14,18 18:8 19:16
21:12,17,22 22:5,8,19
23:19,22 35:14 37:7
51:12,17,22 52:6 53:15
54:18 56:19 58:4 59:19
60:2,16 63:2

**large** 2:6 6:3 67:4,22

**laws** 2:14

**lawsuit** 12:15

**lawsuits** 10:1

**leading** 2:20

**leave** 41:5,15

**leaving** 41:17 42:12

**Lee** 1:14,18 2:4 4:5 6:8
7:11,17 9:22 12:11,14,19
13:10 34:11 35:1 37:4
40:7 42:8 44:1 46:10,16

51:8 53:3 57:20 58:1
62:8 63:7,9 65:22 67:6

**left** 15:1 17:8 59:22

**legal** 52:12,13

**Leon** 62:2

**letter** 4:13,15 18:20
34:13,15,19,20 35:6,10,
13,16 37:21 43:7 44:2
45:14,22 47:1,5 48:1,10,
11,18 56:23 60:7 65:12

**licensed** 67:12

**lied** 21:10

**lies** 26:21

**Lillian** 12:23

**Linda** 1:14,18 2:4 4:5 6:8
7:11 9:22 67:6

**lines** 26:8,14 32:8

**LLC** 1:6 7:19 62:2,4 63:3,
4

**local** 48:20 49:4

**location** 20:14

**long** 10:6,11 17:4 20:10
23:12

**looked** 9:9,10 56:15

**lot** 30:15

**louder** 8:3

**LU-190197** 13:19

**LUC** 56:16

**M**

**made** 2:19 47:6,8 48:2,
12 61:20 62:23 64:20
65:18

**Madison** 55:19

**Main** 5:5

**maintain** 21:21

**maintained** 21:11,17
33:17

**make** 2:21 23:19 34:5
35:1 58:3

**making** 48:8 61:18

**man** 13:1

**manager** 14:17 24:4

**manner** 6:19

**March** 14:9,20 58:5

**mark** 30:13 32:14

**marked** 12:8,12 13:11
30:18 32:7 33:1,5,22
34:1 42:19,23 52:22 53:2

**marking** 30:22 31:3 32:1

**matter** 62:21

**maximum** 50:12

**Mcneill** 5:9

**means** 25:17 29:10
54:20,22 67:7

**meet** 31:22 56:17

**meeting** 9:11 63:19
64:1,2,5,19 65:2,3,8,11,
18

**meetings** 63:9,13,17,22
64:22 65:6

**meets** 65:10

**memory** 12:15 35:17

**mention** 8:18

**mentioned** 27:16 50:23

**Mexico** 28:10

**middle** 26:1 29:17

**Mike** 1:6 7:19

**mind** 32:10

**Mindy** 4:17 55:17 56:15

**Minette** 15:17,18

**minimum** 27:5

**Minot** 17:7

**minute** 57:21

**minutes** 9:10

**misrepresentations**
22:21

**missing** 58:16 61:9

**mission** 26:20

**misstated** 56:2

**misstatements** 22:21

**mistaken** 49:23 57:1

**mistakes** 23:19

**Montgomery** 5:10

**Morgan** 63:10,13 64:21,
23 65:7

**morning** 7:17

**move** 13:7

**moved** 23:12,14 24:9,11,
12

**multi-family** 50:1

**N**

**named** 64:11,14

**names** 56:6

**needed** 19:4 20:3,7
58:22 61:6

**normal** 8:9

**North** 17:7 59:16,22

**Notary** 2:5 6:2

**notice** 3:3

**noticed** 58:16

**November** 53:18

**number** 1:3 11:21 12:13
13:11,19 19:15 20:13
21:15 22:10 31:20 33:5
34:2,3 42:23 43:6 49:7,8
50:10 53:3 55:16 57:4
59:3,12 67:14

**numbers** 43:9 53:5

**O**

**object** 9:18 16:6,7 18:21
20:19 23:21 25:9 27:12,
19 28:15,20 29:5 31:1
32:19 34:23 37:22 39:7,
11,16,21 40:3,10,21
41:6,18 44:22 45:5 47:3
50:20 51:23 52:7 57:13
60:17 61:2,16,22 62:19
63:5 65:15

**objection** 52:3,11

**objections** 2:18,21 6:18

**observed** 46:17,23

**occasions** 46:17



**occur** 18:18

**occurred** 59:6

**October** 39:6

**off-the-record** 12:4
37:1 43:21

**offered** 2:23

**office** 10:19 14:7,16,17
15:11,13,22 16:3,16
23:10,13,18 24:3,4 55:12
56:12,14 60:14

**officer** 15:21

**offices** 15:14 41:1

**older** 53:21

**opinions** 40:8

**opposed** 49:2 56:21

**oral** 6:9

**Orange** 5:6

**order** 18:16 29:20 34:6

**ordinance** 11:15 30:21
31:2,14,19 32:5,17 44:17
50:8 51:16 52:4

**ordinances** 51:20

**organization** 65:3,10,11

**originally** 19:2 20:4,5

**overcome** 52:3

**overseen** 67:8

**owned** 62:2

**owner** 30:12 44:8

**owns** 44:6

---

**P**

**P&z** 55:20

**P/s** 26:1

**paces** 30:19

**pages** 22:19 23:1 34:12
38:2 53:5

**paint** 18:16 30:22

**painted** 32:8

**park** 30:19

**parked** 26:4 29:14

**parking** 18:13,17 19:1,3,
4,5,9,12,16 20:3,4,7,13,
14 21:7,16 25:8,14,23
26:20,21,23 27:1,2,3,4,6,
8,11,16,18 28:11,17
29:8,10,13,18 30:4,11,
14,15,23 31:7,11,15,17
32:7,11,13,14,18,20
35:12 37:16,17,18 44:18
45:10,15 48:4,20 49:5,8,
12,14,15,18 50:1,4,5,9
56:17 59:4,9,12,14
62:15,17

**part** 26:19 28:12

**participating** 6:12

**parties** 1:21 2:3,7,21
6:17 67:10

**PARTINGTON** 5:5

**party** 9:23

**passed** 50:11,19

**Paul** 4:15 44:5 45:4 48:3
65:13,14

**Paula** 14:4,5,9,12 15:2
58:7

**paved** 26:11

**Payton** 15:1

**PC** 5:9,12

**period** 32:20

**permit** 4:11 13:3 19:11
36:7,16 54:14 55:13
58:22,23

**permitted** 45:10

**person** 36:15

**personal** 64:9 65:16

**personally** 64:16

**pertain** 51:21

**pertaining** 21:21

**phone** 17:23 18:4,5 24:6
36:8,10

**Photographs** 4:12

**phrase** 46:22

**physical** 32:4

**physically** 6:13 30:22
32:6

**picture** 25:12 26:18
28:21

**pier** 11:10

**pilings** 28:1,12

**place** 65:5

**plaintiff** 1:20

**plaintiffs** 1:7 5:3 7:1,18
19:15 58:6,20 60:8

**Plaintiffs'** 4:10 12:7,12
13:11 32:23 33:5,21 34:2
35:15 36:11 42:18,23
44:13 52:21 53:2 57:3

**plan** 19:16 22:2 24:22
25:1,2,7 28:13,21 30:16
31:16,22 32:3 61:10

**plan's** 26:19

**planner** 10:21,22 11:1,2,
6,10,19 40:13

**planning** 1:10 10:8,20
11:3,4,6,7,12,18 14:6,7,
19,21,23 15:10,14,20,22
16:2 21:11,20 23:9 24:7,
8,13,18,19 26:22 30:13
31:10 32:18 33:18 36:13,
19 37:5 38:17 39:19
40:15,20 45:11,15 46:18
48:21 49:2,4,6,7,12,19
53:14 54:2 56:3,13 57:10
60:7 61:19 64:23 65:7

**plans** 24:17 29:4 33:6,16

**Pointe** 5:10

**policy** 45:14,19 46:17,23
47:7,9 48:4,6,11

**Ponce** 62:2

**Pool** 55:21 56:1

**portion** 26:12

**portions** 9:12

**position** 10:17 39:5
40:15 54:11 56:10

**possession** 33:9

**practice** 21:20 60:13

**prepare** 9:4,8

**preparing** 50:17

**present** 6:13

**presume** 25:5 32:1
48:16 49:16 61:17

**presumed** 40:14

**presumption** 32:1

**pretty** 60:13

**previous** 12:15,21

**previously** 48:2

**printed** 43:10

**printout** 4:16 53:8

**printouts** 53:6

**prior** 2:23 19:13 20:2
31:13 34:20 35:7,15
36:10 45:9 53:19

**privy** 45:3,7

**problems** 21:15,23

**Procedure** 6:5

**proceeding** 6:12,13,15

**proceedings** 6:10

**produced** 33:7 53:4

**program** 53:13

**prohibit** 50:5

**project** 36:12

**promoted** 10:20,21
14:18 15:2 24:8,13

**properties** 11:16 48:23
49:22 50:3,5

**property** 13:5 21:8 26:8,
9,10,13,16 33:6,10 35:15
36:12 44:8,9,11,13 62:1

**proposed** 36:12 50:18

**provide** 61:8

**provisions** 48:21 49:5

**public** 2:6 6:2 11:14

**publicly** 48:12

**pull** 36:21 37:6

**pulled** 35:21 36:17 37:10

**purposes** 8:6

**pursuant** 1:22 6:4

**put** 31:3



ALABAMA
COURT REPORTING

## Q

**question** 8:1,3,21 17:21
18:2 29:21,22 35:2 40:5
41:20 42:7 46:21 52:2

**questions** 2:19,20 11:9,
14 41:8 58:2 63:20 67:6

**quick** 12:14 18:2

## R

**raised** 20:23

**read** 7:8 9:12 25:13
62:22

**reading** 2:11 50:8

**reads** 50:8

**ready** 13:7

**real** 12:14

**reason** 27:15,17 57:17
62:16

**reasonings** 62:21

**reasons** 63:21

**recall** 18:7,11 22:7,22
23:2 38:12 47:4 51:14
55:23 58:17,19 59:10
65:16

**receipt** 58:22

**receive** 46:5

**received** 13:4

**recognize** 14:1 34:13
44:2,4

**recollection** 14:14

**record** 6:21 8:12 9:21
12:1 52:19 53:14 54:16

**recorded** 8:11

**records** 19:21 21:21
22:1 53:7

**rectangles** 26:1 28:5,16
29:1

**rectified** 20:18 21:2

**regular** 8:10

**regulation** 30:21 32:6
52:5

**regulations** 51:21

**related** 9:16 10:1 13:19
48:4 50:18

**relating** 2:15 21:22
40:19

**relation** 50:12 53:14

**relative** 63:2

**remedy** 60:21

**remember** 8:14 10:5
12:16 13:1 14:17 15:4
19:19 20:12 21:3,4 23:14
35:9 36:9 37:14 38:19,20
45:1 58:12 59:1,2,5,8,14
62:13

**remembered** 12:20 19:9

**remotely** 6:15,16

**rendering** 28:4

**repeat** 40:6

**repeatedly** 41:8

**rephrase** 8:3

**reporter** 2:5 6:2,11 7:6
40:4 47:15 67:13

**reporting** 1:23 6:14,19
67:13

**reports** 11:10 50:18

**representing** 7:18

**represents** 67:8

**reprint** 43:11

**request** 46:8,19 47:20
48:3,7 65:12

**requested** 44:15,19

**require** 49:5,7,12

**required** 21:7 26:19
27:1,2 31:14,15,20

**requirement** 30:12
31:23 49:18

**requirements** 19:3,5
26:23 35:11 48:20 50:1,
2,4 56:18

**requiring** 30:22 32:6

**research** 44:20,23

**researched** 44:16

**residence** 49:11

**resident** 46:19

**residential** 11:8,16

**resignation** 41:10

**resolved** 61:6

**respect** 11:16 32:17
45:15 58:4

**respective** 2:3

**respond** 17:16

**response** 33:12

**rest** 47:13,17

**restate** 52:2

**result** 67:11

**returned** 60:1

**review** 9:12 11:11,17
16:15 38:9 40:13

**reviewed** 9:7 24:18 25:3

**reviewing** 48:6

**reviews** 11:7,11

**revise** 22:2 48:4,5

**revised** 61:10

**revocation** 18:20 51:12,
17,22 52:5 60:6

**revoke** 60:21

**revoked** 22:5 38:6
56:17,20,22 57:2,6,11
60:3

**revoking** 35:14 60:16

**rezoning** 11:10

**right-of-way** 20:8,9,15,
16 21:5,8,10,16 26:5,6,
11,12 59:5,14

**road** 25:19 26:8,10 30:3

**Rob** 55:18 56:7

**Robertsdale** 15:11,13
16:2,23 23:12,15 24:9,12

**Rogers** 15:1

**room** 6:13

**rows** 29:16

**Roy** 55:18

**rules** 2:14 6:4

**running** 30:9

## S

**safe** 25:18

**section** 44:16 51:15,18
62:23

**sending** 47:7

**series** 53:3

**serves** 35:17

**Service** 18:16

**set** 1:23

**setbacks** 25:13

**setting** 36:11

**shaking** 52:8

**Shell** 65:8

**Shores** 1:6 7:19 62:2
63:3

**show** 30:16,23 31:21,22
32:2 57:11

**showing** 61:10

**shown** 31:16

**side** 29:23 30:2,3

**sign** 7:8

**signature** 2:11 13:21,23
14:1,3

**signed** 9:15 24:16

**signs** 11:12 27:2

**similar** 47:1

**simple** 18:1

**single** 49:1

**single-family** 48:22
49:11,22 50:3

**sir** 65:21

**site** 22:2 25:1,2,7 26:19
28:12,21 30:16 31:16,21
32:3 61:10

**sitting** 12:16

**situation** 49:19

**situations** 62:15



**size** 31:23

**small** 25:12 26:17

**Smith** 4:17 55:17 56:15

**solely** 61:20

**somebody's** 18:2

**sort** 36:22

**SOUTHERN** 1:2

**space** 25:17 26:21 27:4, 8,10,22 28:23 29:11,15, 19,23 30:2,8,11 31:7 32:2

**spaces** 19:1,4,9,12,16 20:4,7,13,14 21:5,7,10, 15,16 25:23 26:4 27:2,7, 9,11,18 29:8,13 30:1,14, 23 31:15,20 32:2,6,11, 13,15,18,20 44:18 49:5, 8,12,15 59:4,13

**speak** 8:3 62:20

**speaking** 24:21

**specialist** 56:11

**specific** 48:19 49:7,8

**specifically** 50:23

**spell** 55:6

**spoke** 38:20 55:19

**spoken** 60:11

**spot** 26:21

**squared** 43:15

**stack** 29:7

**stacked** 18:13 25:8,15, 16 27:16 29:10,18 30:4 37:18 44:17 45:10,15 48:4 49:14,17 50:5,9 62:17

**staff** 11:10 16:2 36:13 39:22 47:13,18 50:18

**Stanton** 4:15 44:5,19 45:4,7 48:3 65:13,14,17

**start** 12:19

**started** 35:19 36:5

**starts** 44:15

**state** 2:6 6:2 9:20 67:3, 22

**Stategier** 64:17

**statement** 7:5

**STATES** 1:1

**stating** 6:20

**statute** 52:5

**statutes** 51:21 52:14

**stenotype** 67:6

**Steve** 4:13 58:5,20 59:3 60:8

**STIPULATED** 2:2,10,17 3:2

**stipulation** 6:5

**stipulations** 1:22 7:6

**STONE** 5:12

**stories** 50:13

**story** 50:23 51:1

**straight** 29:13

**Strategier** 64:12

**street** 5:5 13:5 28:9 44:7, 8,9,10

**street's** 13:2

**stressful** 40:15

**subject** 33:6

**submitted** 9:10 14:8 19:2 20:5 22:23

**sued** 13:2

**Suite** 5:5

**supervisor** 39:2

**supplemental** 48:19

**supplementation** 46:9

**support** 56:11

**supposed** 31:6,10 32:11

**sworn** 6:16 7:12

**system** 54:19,21

**Systems** 53:7

---

**T**

**table** 8:21 11:22

**taking** 2:15 40:12

**talk** 36:15 38:9,15 42:14 54:23

**talked** 32:4 36:11,14 38:22 39:22 45:6 55:21 59:9,11,14 60:4,12

**talking** 41:10 50:22 51:2 52:14 55:23 56:20 59:3, 10

**Tammy** 54:10

**technically** 41:22,23

**technician** 10:21 11:3,4, 6,7,13,18 14:6,19,21,23 15:10,22 23:9 24:7,8,13 54:14 55:13

**telephone** 20:1

**tells** 31:2 32:13

**ten** 25:23 27:8 63:15

**termination** 42:6

**testified** 7:13 10:3 44:18 47:5 51:10 57:4 59:2

**testimony** 9:13,16 67:8

**Texas** 59:23

**text** 50:11,14,18 51:2,3

**thereto** 2:23 67:7

**thing** 8:18 11:19 43:11 59:8

**things** 16:2 17:15 60:18

**thinks** 12:16

**Thomley** 54:10

**Thomley's** 54:11

**thought** 13:3 19:8,11

**thoughts** 40:1,8

**thousand** 22:17

**thousands** 22:15

**three-story** 62:12

**ties** 31:5

**time** 2:22 8:19,20 12:4 14:16 24:7 37:1 43:21 57:23 60:4 64:9 65:23 66:3

**timeline** 58:3

**title** 24:3 54:13 55:10,11

**titles** 55:12

**today** 8:1,19 56:5 65:23

**today's** 9:4,8

**told** 18:23 20:3,6 39:14 40:11 56:19

**top** 13:21 38:6 57:1,4

**topic** 46:10

**total** 22:17 59:23

**totally** 8:9 17:12

**transcribed** 67:7

**transcript** 8:7 67:8

**transcription** 67:7

**trial** 2:22

**true** 31:9 67:8

**TTHOMLEY** 54:4

**turn** 12:12 13:10 33:4 34:1 38:2 42:22 53:1

**two-family** 48:22 49:22 50:3

**type** 31:3

**types** 50:5

**typical** 21:20 60:13

**Typically** 60:18

---

**U**

**U.S.** 5:12

**uh-huh** 8:9,15 44:12

**uh-uh** 8:9,15

**underneath** 28:11

**understand** 7:23 8:11 41:12 46:20

**understanding** 28:19 30:18 39:9 45:13 50:6

**Understood** 43:19

**UNITED** 1:1

**user** 54:4 55:2

**Usual** 7:6



## V

**vacation** 16:14,22 17:1,
5,11,16 46:1,3,4 59:16

**variance** 63:18 65:19,21

**verifications** 11:9 24:6

**versa** 16:4

**version** 48:11

**vice** 16:3

**videoconference** 6:7

**Vince** 1:11 4:13,15 9:13
18:19 34:15 39:2 40:19
42:9 47:2 57:5 60:3
61:15,20

**VIRTUAL** 1:14

**virtually** 1:19,22 2:7 5:3,
7

**visit** 41:1

**voluntary** 39:12 40:12

**Volunteer** 12:23

## W

**wait** 58:18

**waive** 6:18

**waived** 2:12 3:4

**WALKER** 5:9

**walkovers** 50:12

**wanted** 41:1

**waters** 55:4,5

**Waters's** 55:10

**Wayne** 38:20,22 40:19
61:15,21

**WEBB** 5:9

**weeks** 17:6,10 59:17,23

**wheel** 31:5

**wide** 27:11

**Wildlife** 18:16

**work** 16:2 18:5 23:4,8
60:9,15,18,23

**worked** 23:23

**working** 16:18,20 23:17
24:1

**works** 15:11,12 54:6

**writes** 48:18 55:19 56:15

**writing** 34:18 35:10

**written** 8:6 34:15

**wrong** 18:23 25:6 29:4
41:19

## Y

**y'all** 53:13 60:23

**year** 22:12,17 24:10,13
62:13

**years** 10:7,13 19:19
22:11 23:10,11,18

## Z

**zoned** 32:21

**zoning** 1:10 10:9 11:8,15
14:7 15:14 21:11,21
24:6,19 31:2 32:16 33:18
36:13,19 37:5 38:17
39:19 40:19,20 44:17
46:18 51:16 53:14 54:2
56:3,13 57:10 60:8 61:19
65:1,7

**Zoom** 8:11