## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA

Mike Bordelon and Breezy Shores, LLC

    **Plaintiffs,**

**VS.**                        **CASE NO. 1:20-CV-00057-C**

Baldwin County, et al.

    **Defendants.**

### TRIAL EXHIBITS

|  | FOR IDENTIFICATION ONLY | ADMITTED IN EVIDENCE |
|---|---|---|
| Building Permit (Plaintiff's Exhibit #1 to Vincent Jackson's Deposition Transcript) | 1 | ✔ |
| Appeal of Administrative Decision, Addendum and Owner Authorization | 2 | ✓ |
| Public Hearing Notice of Appeal by the Baldwin County Commission #4, Planning & Zoning Board of Adjustment | 3 | |
| Notice of Action, upholding administrative decision and denying Appeal | 4 | |
| Notice of Appeal filed December 16, 2019 with the Circuit Court for Baldwin County, Alabama | 5 | |
| Land Use Certificate Application | 6 | |
| Land Use Certificate Application marked "Approved Revoked 7/31/19" (Defendants' Bates #0067-0068) | 7 | |
| Presentation of Claim Pursuant to Ala. Code §6-5-20 | 8 | |
| Declaration of Mike Bordelon (PageId#1745) | 9 | |
| Sworn Declaration of Steve Jones | 10 | |
| Expert Witness Report of Frank Reed | 11 | ✓ |

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA

Mike Bordelon and Breezy Shores, LLC

    **Plaintiffs,**

**VS.**                  **CASE NO. 1:20-CV-00057-C**

Baldwin County, et al.

    **Defendants.**

### TRIAL EXHIBITS

| | FOR IDENTIFICATION ONLY | ADMITTED IN EVIDENCE |
|---|---|---|
| Baldwin County Ordinances, 18.1.1 and 18.2.5 (Exhibit #7 to Mike Bordelon's Deposition Transcript) | 12 ***OMITTED*** | |
| July 31, 2019 Letter to Steve Jones from Vince Jackson (Defendants' Bates #0069-0070) (Plaintiff's Exhibit #3 to Vincent Jackson's Deposition Transcript) | 13 | ✓ |
| Photograph (Plaintiff's Exhibit #8 to Vincent Jackson's Deposition Transcript) | 14 | |
| Baldwin County Planning & Zoning Department, Staff Report (Plaintiff's Exhibit #13 to Vincent Jackson's Deposition Transcript) | 15 | |
| Text Amendments, Letters in Favor, and Letters in Opposition (Plaintiff's Exhibit #15 to Vincent Jackson's Deposition Transcript) | 16 | |
| July 29, 2020 email from Mindy Smith to Eddie Harper (Plaintiff's Exhibit #16 to Vincent Jackson's Deposition Transcript) | 17 | |
| Baldwin County Commission District 4. Board of Adjustment December 12, 2019 Regula Meeting Minutes (Exhibit #5 to Mike Bordelon's Deposition Transcript) | 18 | ✓ |

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA

Mike Bordelon and Breezy Shores, LLC

**Plaintiffs,**

**VS.**                              **CASE NO. 1:20-CV-00057-C**

Baldwin County, et al.

**Defendants.**

## TRIAL EXHIBITS

| | FOR IDENTIFICATION ONLY | ADMITTED IN EVIDENCE |
|---|---|---|
| Plaintiffs' Most Recent Damage Disclosure | 19 | |
| Bordelon_00000001-6 | 20 | ✓ |
| Bordelon_00000077-78 | 21 | ✓ |
| Bordelon_00000089-91 | 22 | |
| Bordelon_00000097-98 | 23 | ✓ |
| Bordelon_00000106-108 | 24 | |
| Defendants' Bates # 8074-8077 | 25 | ✓ |
| Defendants' Bates # 8135-8136 | 26 | ✓ |
| Defendants' Bates # 8141-8154 | 27 | ✓ |
| Defendants' Bates # 8156-8159 | 28 | |
| Defendants' Bates # 8170-8176 | 29 | |
| Defendants' Bates # 8189-8190 | 30 | |
| Defendants' Bates # 8199 | 31 | ✓ |
| Defendants ESI_00000025-26 | 32 | |
| Defendants ESI_00000034-35 with text format | 33 | |



3

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA**

Mike Bordelon and Breezy Shores, LLC

     **Plaintiffs,**

**VS.**                                  **CASE NO. 1:20-CV-00057-C**

Baldwin County, et al.

     **Defendants.**

## TRIAL EXHIBITS

| | FOR IDENTIFICATION ONLY | ADMITTED IN EVIDENCE |
|---|:---:|:---:|
| Defendants ESI_00000092-97 | 34 | ✓ |
| Defendants ESI_00000100-107 | 35 | ✓ |
| Defendants ESI_00000152 with text format | 36 | ✓ |
| Defendants ESI_00000153-154 | 37 | |
| U.S. Fish and Wildlife Touhy Production ("FWS") FSW 0001-3 | 38 | |
| FSW 0005 | 39 | |
| FSW 0073-77 | 40 | ✓ |
| FWS 0080-83 | 41 | ✓ |
| Baldwin County Zoning Ordinance 18.4.2; 18.10 (version effective December 16, 2019) | 42 | |
| Baldwin County Zoning Ordinances (Exhibit A to Defendants' Motion for Summary Judgment) | 43 | ✓ |
| 2017 Parking Ordinance Amendments (Exhibit B to Defendants' Motion for Summary Judgment) | 44 | |
| 2019 Height Ordinance Amendments (Exhibit C to Defendants' Motion for Summary Judgment) | 45 | ✓ |

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA

Mike Bordelon and Breezy Shores, LLC

**Plaintiffs,**

**VS.**                                              **CASE NO. 1:20-CV-00057-C**

Baldwin County, et al.

**Defendants.**

## TRIAL EXHIBITS

|  | **FOR IDENTIFICATION ONLY** | **ADMITTED IN EVIDENCE** |
|---|---|---|
| June 2019 Letter re: Determination on Parking Interpretation (Exhibit D to Defendants' Motion for Summary Judgment) | 46 | ✓ |
| Pictures of Stop Work Order dated 7/31/19 | 47 | ✓ |
| Emails Requesting Lifting of Stop Work Orders (Exhibit F to Defendants' Motion for Summary Judgment) | 48 | ✓ |
| Board of Adjustment Staff Report, Case No. AD-19002 (Def. Bates No. 22-54) | 49 | ✓ |
| Examples of Other Variance Details (Exhibit M to Defendants' Motion for Summary Judgment) | 50 | |
| Plaintiff's Bates No. 36 | 51 | |
| Plaintiff's Bates No. 65 | 52 | |
| Plaintiff's Bates No. 67-69 | 53 | ✓ |
| Plaintiff's Bates No. 72-73 | 54 | ✓ |
| Plaintiff's Bates No. 119-120 | 55 | |

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ALABAMA**

Mike Bordelon and Breezy Shores, LLC

     **Plaintiffs,**

**VS.**               **CASE NO. 1:20-CV-00057-C**

Baldwin County, et al.

     **Defendants.**

## TRIAL EXHIBITS

|  | FOR IDENTIFICATION ONLY | ADMITTED IN EVIDENCE |
|---|---|---|
| Plaintiff's Bates No. 121-125 | 56 | ✓ |
| Plaintiff's Bates No. 136 | 57 | |
| Plaintiff's Bates No. 141-172 | 58 | |
| Plaintiff's Bates No. 182-184 | 59 | |

*1-24-2022*

```
8:55:17 AM  -                         - Docket No.: 1:20-cv-00057
                                      Judge: Judge William Cassady
                                      Plaintiff Attorney: John Yates, Kristopher
                                      Anderson, John Yates, Kristopher Anderson
                                      Plaintiff: Breezy Shores, LLC, Mike Bordelon
                                      Defense Attorney: Haley Lyckman, Jamie
                                      Frawley, Haley Lyckman, Jamie Frawley, Haley
                                      Lyckman, Jamie Frawley
                                      Defendant: Baldwin County Commission
                                      District 4 Planning and Zoning Board of
                                      Adjustment, Baldwin County, AL, Vince
                                      Jackson
                                      Notes: Bench Trial - Day One
8:55:17 AM  -                         - Start Recording
8:55:18 AM  -                         -
8:55:50 AM  - Judge Cassady          - Bench Trial.  Attorneys Kristopher Anderson
                                      and John Yates for the Plaintiffs, and
                                      Attorneys Jamie Frawley and Haley Lyckman
                                      for the Defendants.  Court Reporter Tatelyn
                                      Nolan.

                                      Preliminary Matters.  Attorneys and
                                      witnesses are allowed not to wear masks
                                      while speaking.  Breaks will be given.
                                      Concluding at 5:00 each day depending on
                                      witnesses.
8:59:09 AM  - Opening Statements     -
8:59:24 AM  - Kristopher O.          -
              Anderson
8:59:58 AM  -                        -
9:12:31 AM  - Jamie Frawley          -
9:19:52 AM  - Judge Cassady          -
9:20:28 AM  -                        - Pause
9:20:51 AM  -                        - Resume
9:20:51 AM  - Plaintiff's           - Crystal Bates, sworn.  Trial Exhibit 1,
              witness - Anderson       Trial Exhibit 13
9:31:46 AM  - Cross - Frawley        - Trial Exhbit 1 admitted without objection.
9:37:58 AM  - Re-Direct -            - Trial Exhibit 13 admitted without objection.
              Anderson
9:39:53 AM  - Questions to           -
              witness by Judge
              Cassady
9:45:09 AM  - Witness Excused        -
9:46:06 AM  -                        - Pause
10:01:22 AM -                        - Resume
10:01:25 AM - Plaintiff's           - Linda Lee, sworn.  (Trial Exhibit 1); Trial
              witness - Anderson       Exhibit 35; Trial Exhibit 34; Trial Exhibit
                                       46; Trial Exhibit 36; Trial Exhibit 26;
                                       Trial Exhbit 25; Trial Exhbiit 21.  All
                                       exhibits admitted without objection.
10:45:04 AM - Recessed 20           -
              minutes
10:45:19 AM -                        - Stop Recording
11:06:41 AM -                        - Start Recording
11:06:42 AM - Back from Recess      -
11:06:59 AM - Cross/Direct -         - (Trial Exh 34) (Trial Exh 1)
              Frawley
11:19:29 AM - Direct - Anderson     -
11:26:14 AM - Questions to           -
              witness by Judge
              Cassady
11:28:06 AM - Witness excused       -
11:28:24 AM -                        -
```

1

| | | |
|---|---|---|
| 11:29:12 AM | - Plaintiff's witness - Anderson | - Vince Jackson, sworn. (Trial Exh 1) (Trial Exh 25); Trial Exhibit 27; Trial Exhibit 47; |
| 12:25:41 PM | - Recessed for Lunch - Return at 2:00 | - |
| 12:26:03 PM | - | - Stop Recording |
| 1:55:48 PM | - | - Start Recording |
| 1:55:49 PM | - Judge Cassady - Back from Lunch Break | - |
| 1:56:03 PM | - Anderson | - Continuation of testimony from Vince Jackson.  (Trial Exh 13) (Trial Exh 35) (Trial Exh 34) (Trial Exh 36)(Trial Exh 46) (Trial Exh 26) |
| 3:25:11 PM | - 20-minute break to speak with counsel | - (outside presence of witness) |
| 3:25:15 PM | - | - Stop Recording |
| 3:47:08 PM | - | - Start Recording |
| 3:47:09 PM | - Back from Afternoon Break | - |
| 3:47:19 PM | - Anderson | - Continuation of testimony of Vince Jackson. Trial Exhibit 31; Trial Exhibit 40; Trial Exhibit 20; Trial Exhibit 56; Trial Exhibit 41; Trial Exhibit 48; Trial Exhibit 54; Trial Exhibit 43;  Object to the admission of Trial Exhibit 40, admitted for limited purposes.  All other exhibits admitted. |
| 4:59:54 PM | - Judge Cassady - Reconvene at 9:00 a.m. | - |
| 5:00:10 PM | - Adjourned | - |
| 5:00:16 PM | - | - Stop Recording |

Trial Exhibit 1   Admitted
1   in
7-24-2022   Evidence

BUILDING PERMIT
Jurisdiction of BALDWIN COUNTY COMMISSION
Issue Date  7/  /2019
Permit Number     126349

Job Address                          Legal Description
3450 A&B PONCE DE LEON CT            Lot 58
GULF SHORES   LOT 58                 Tract 69 08 01 0 003 052 . 003
Owner Name/Address                        Contractor Name/Address
BREEZY SHORES LLC                    STEVE JONES CONTRACTOR
5855 PLANTATION DR                   JAMES S JONES
ST FRANCISVILLE   LA 70775-          23234 CARNOUSTIE DR
Phone 251-209-0383                   FOLEY          AL 36535-
Architect/Engineer                   Registration

Building Use RES
Class Of Work:   NEW    ADDITION   ALTERATION   REPAIR   MOVE   REMOVE
                  X

Describe Work                        Special Conditions
4 STORY DUPLEX 14BR/11BA             *A FINAL ELEVATION CERT W/PICTURES
H-7618 UNH-1872                      MUST BE TURNED IN AND APPROVED
                                     BEFORE FINAL INSPECT CAN BE SETUP**

Valuation of Work: $      618150     :Pln Fee          :Permit Fee   3090.75

Application Accepted by              :Type Const   : Occ Group : Division
Plans Checked by                     :  VB         :  R3       :

Approved for Issuance by             : Heated Area : Non-Heated : Flood Zone
                                     :  7618       : 1872       : VE14+1
        === NOTICE ===
SEPARATE PERMITS ARE REQUIRED FOR    : No. of Dwelling Units
HEATING, VENTILATING OR AIR COND,
PLUMBING, ELECTRICAL                 : No. of Stories 4
THIS PERMIT BECOMES NULL AND VOID
IF WORK OR CONSTRUCTION AUTHORIZED   :Spec. Approvals : Req : Rec : Not Req
IS NOT COMMENCED WITHIN 6 MONTHS,
OR IF CONSTRUCTION OR WORK IS SUS-   :ZONING          :     :     :
PENDED OR ABANDONED FOR A PERIOD
OF 6 MONTHS AT ANY TIME AFTER WORK   :HEALTH DEPT     :     :     :
IS COMMENCED.
                                     :SEWER           :     :     :
PLAN CK: CK    M.O.    CASH
                                     :CULVERT         :     :     :
PERMIT:  CK    M.O.    CASH

I HEREBY CERTIFY THAT I HAVE READ AND EXAMINED THIS APPLICATION AND KNOW
THE SAME TO BE TRUE AND CORRECT. ALL PROVISIONS OF LAWS AND ORDINANCES
GOVERNING THIS TYPE OF WORK WILL BE COMPLIED WITH WHETHER SPECIFIED HEREIN
OR NOT. THE GRANTING OF A PERMIT DOES NOT PRESUME TO GIVE AUTHORITY TO
VIOLATE OR CANCEL THE PROVISIONS OF ANY FEDERAL STATE OR LOCAL LAW REGULATI
CONSTRUCTION OR THE PERFORMANCE OF CONSTRUCTION.
THE BUILDING OFFICIAL, UPON NOTIFICATION,SHALL MAKE THE INSPECTIONS SET
FORTH IN THE CODES ADOPTED.
------------------------------------------------------------
SIGNATURE OF CONTRACTOR OR AUTHORIZED AGENT          (DATE)

------------------------------------------------------------
SIGNATURE OF OWNER (IF OWNER BUILDER)                (DATE)

The granting of this permit in no way purports to vest any right
in the permittee to any Lands, Easements, Right-of-Ways or other
rights of any kind of nature held by any other party, private or
public.

PLAINTIFF
EXHIBIT

1

JACKSON

Office Use Only

Case No. LU – 19019   Accepted-By: _____   Date: 3/27/19

Application Fee: ~~$350~~   ☑ Paid   Check # 3579   Receipt # 11290

# *Baldwin County*
# *Land Use Certificate Application*

| Main Office (Mailing) | Main Office (Physical) | Foley Office |
|---|---|---|
| 22251 Palmer Street | 22070 Highway 59 | 201 East Section Avenue |
| Robertsdale, AL 36567 | Robertsdale, AL 36567 | Foley, AL 36535 |
| Phone: (251) 580-1655 | Phone: (251) 580-1655 | Phone: (251) 972-8523 |
| Fax: (251) 580-1656 | Fax: (251) 580-1656 | Fax: (251) 972-8520 |

AN APPROVED LAND USE CERTIFICATE DOES NOT CONSTITUTE APPROVAL
FOR A BUILDING PERMIT

## Applicant

Are you the property owner? ☐ YES ☑ NO
(If you are not the property owner you must submit Owner Authorization Form signed by the property owner)

Name: Steve Jones   Date: 3/19/19

Mailing Address: 23234 Carnoustie Dr

City: Foley   State: AL   Zip code: 36535

Telephone: (251) 209-0383 Fax: (___) ___-____   e-mail: sjonescontractor@acellal.com

## Site Information

Parcel ID Number: 05-69-08-01-0-003-052.003

Physical Address (E-911): 3450 A-B Ponce de Leon Ct. Gulf Shores 36564

Subdivision/Lot/Unit No: Lot 58 Ft Morgan Peninsula

Lot Size (acres or square feet): .1609   Lot Dimensions: 75' X 239' & 247'±

Are there existing structures on the property? ☐ YES ☑ NO

If yes, please describe: _____

## Water and Sewer Information
(Check Appropriate Box)

VF 19-KT

☐ Septic Tank System   ☐ Well

☑ Sewer System   ☑ Water System

Name of System: Gulf Shores   Name of System: Gulf Shores

(Over, Please Continue to Reverse Side)

Page 1 of 2

LU

DF - 0305

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 11 of 800   PageID #: 2025
Case 1:20-cv-00057-C   Document 44   Filed 05/21/21   Page 205 of 434   PageID #: 460

3

## Project Description

Use: (Check One)

☐ Single Family   ☐ Two-Family   ☑ Multi- Family   ☐ Commercial

☐ Industrial   ☐ Alterations/Repairs   ☐ Piers/Boathouse   ☐ Accessory Structure

☐ Other (specify) _____

Description of work and the proposed use: _Construct Multi-Family two unit duplex_
_approximately 7600 sq ft._

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This certificate is valid for a six (6) month period after date of issuance. I hereby certify that the information stated on and submitted with this application is true and correct. I also understand that the submittal of incorrect information will result in the revocation of this permit and any worked performed will be at the risk of the applicant. I understand further that any changes which vary from the approved plans will result in the requirement of a new Land Use Certificate.

Applicant Signature: _____   Date: _3/19/19_

---

Erosion Control Plan Submitted:   ☑ YES   ☐ NO

Proposed Installation Date: _4/4/19_   License No. : _15871_
Comments: _Silt Fence_

Preparer Signature: _____   Date: _3/19/19_

---

After application has been reviewed:

☐ I will pick up the approved application after I have been contacted.

☑ I would like the approved application to be forward to the appropriate Building Inspection office.

---

### Office Use Only

Zoning Classification: _RTF-4_   Planning District: _05_   Flood Zone: _VE/AE_

☑ Culvert Permit   ☑ Sewer Release   ☑ Water Release   ☑ Site Plan   ☐ Construction Plans   ☑ Agent Authorization

☐ State Lands Permit Confirmation # _____   ☐ U.S. Army Corp. Permit   ☑ U.S. Fish & Wildlife Permit

Potential Wetlands   ☑ YES   ☐ NO   ARB   ☐ YES   ☑ NO   Study Area: _____   FLU District: _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Decision: ☑ APPROVED   ☐ DENIED

Comments: _provided ADEM permit for CCL on 7/17/19_

Zoning Administrator (or designee) Signature: _Crystal Bates_   Date: _7-17-19_

LU

DF - 0306



APPROVED PLANS
AS REVIEWED BY THE
BALDWIN COUNTY
PLANNING & ZONING DEPARTMENT

SITE DATA
TOTAL PROPERTY AREA...............26,786 SQ. FT.
TOTAL HOUSE AREA.....................4,358 SQ. FT.
TOTAL DRIVEWAY AREA................1,111 SQ. FT.
AREA OF DRIVEWAY ON PROPERTY........613 SQ. FT.
AREA OF DRIVEWAY IN RIGHT-OF-WAY.....498 SQ. FT.

GRAPHIC SCALE

DF - 0334

4



# Breezy Shores - Ft.Morgan
### Ponce de Leon Court - Lot 58
### Ft.Morgan, AL 36542









DF - 0335



Trial Exhibit 13    1

1-24-2022

**Admitted in Evidence**



# BALDWIN COUNTY COMMISSION

## PLANNING AND ZONING DEPARTMENT

| Main Office (Physical) | Main Office (Mailing) | Foley Office |
|---|---|---|
| 22070 Highway 59 | 22251 Palmer Street | 201 East Section Avenue |
| Robertsdale, AL 36567 | Robertsdale, AL 36567 | Foley AL 36535 |
| Phone: (251) 580-1655 | | Phone: (251) 972-8523 |
| Fax: (251) 580-1656 | | Fax: (251) 972-8520 |

www.planning.baldwincountyal.gov

July 31, 2019

Steve Jones
23234 Carnoustie Drive
Foley, AL 36535

RE: Land Use Certificate, LU-190197

Dear Mr. Jones:

The purpose of this letter is to inform you that the approval granted for the above referenced LU-190197 has been revoked, and the Land Use Certificate is hereby denied. The reason for this denial is based on a failure to meet off-street parking requirements as specified in Section 15.3.1 of the *Baldwin County Zoning Ordinance*. Specifically, two of the required spaces partially extend into the right-of-way of Ponce de Leon Court. In addition, the driveways, as shown on the site plan, do not provide unobstructed ingress and egress to each space.

Section 15.3.1 is quoted as follows:

15.3.1 *Off-street parking space defined.* An off-street parking space is an area of not less than 171 square feet which is permanently reserved for the temporary storage of one automobile. The minimum dimension of an off-street parking space is 9' x 19'. Off-street parking spaces may not be located in a street or alley and must be connected with a street or alley by a driveway which affords unobstructed ingress and egress to each space.

Please provide a revised Land Use Certificate application and site plan which addresses the above listed requirements. Furthermore, and in accordance with Section 18.2.6 of the zoning ordinance, you may appeal the denial of the Land Use Certificate to the County Commission District No. 4 Board of Adjustment in writing within twenty (20) calendar days after the date of this notice.

PLAINTIFF
EXHIBIT

**3**

JACKSON

Defendants' Bates #0069

If you should have any questions or should require additional information, please email me at vjackson@baldwincountyal.gov, or give me a call at (251) 580-1655 extension 7238. Thank you in advance for your prompt attention to this matter.

Sincerely,

Vince Jackson
Planning Director

Defendants' Bates #0070

**Trial Exhibit 21**

Admitted in Evidence



Attorney Client

**From:** sjonescontractor@gmail.com
**Date:** August 16, 2019 at 6:20:53 PM MST
**To:** Mike Bordelon <mikebcajun@webmail.us>
**Subject: Fwd: <EXTERNAL> ABM-1 Breezy Shores R1.pdf**

Mike. FYI, I spoke to Linda Lee at planning and zoning today while at the building department and she sent this email to me.

Steve

Sent from my iPhone

Begin forwarded message:

**From:** Linda Lee <LLee@baldwincountyal.gov>
**Date:** August 16, 2019 at 10:34:10 AM CDT
**To:** "sjonescontractor@gmail.com" <sjonescontractor@gmail.com>
**Subject: RE: <EXTERNAL> ABM-1 Breezy Shores R1.pdf**

BORDELON_00000077

Mr. Jones,

I spoke with the Planning Director and he said that the County's attorney, David Conner was supposed to notify Mr. Bordelon's attorney that you all would not be allowed to start construction without an approved ITP from USFWS.

Thank you,

Linda Lee
Planner
Baldwin County Planning & Zoning Department
(251) 972-8523

-----Original Message-----
From: sjonescontractor@gmail.com [mailto:sjonescontractor@gmail.com]
Sent: Friday, August 16, 2019 10:25 AM
To: Linda Lee <LLee@baldwincountyal.gov>
Subject: <EXTERNAL> ABM-1 Breezy Shores R1.pdf

BORDELON_00000078

**Trial Exhibit 25**

1-24-2022

**Admitted in Evidence**

| | |
|---|---|
| **From:** | Paul Stanton |
| **To:** | Vince Jackson |
| **Cc:** | Billie Jo Underwood; Al Bennett; Bill Bennett; Eugene Krabs; Sandy Bennett; Megan Bennett; Lynda Crum; Jamie Strategier |
| **Subject:** | <EXTERNAL> 3450 Ponce De Leon Ct Gulf Shores, AL 36542 (Fort Morgan) Breezy Shores |
| **Date:** | Tuesday, July 30, 2019 5:11:49 PM |
| **Attachments:** | Image.png<br>Image-1.png<br>Image-2.png<br>Image-3.png |

Vince,

It looks like pylons are being driven (two pylons in the ground today 7/30/19) and construction has started even though I was told this builder did not pass his parking plan and wouldn't be receiving a permit.

I want to know if he has met the parking requirements.

If so, please provide me with a site plan.

In addition, please send me a copy of the ADEM Permit and his associated site plan.

If this has NOT been approved,

Construction and Pyle driving should stop immediately tomorrow morning (7/31/19.)

Please call me at (251) 295-5255 as soon as possible today or tomorrow morning as I plan to be at this construction site at 6am tomorrow morning.

Thanks

Paul Stanton

3487 Ponce De Leon Court

Gulf Shores, AL 36542

(251) 295-5255



Defendants' Bates # 8074

**DATE** _July 2u 7_

**OWNER** _Breezy Shores LLC_

**CONTRACTOR** _Steve Jones Contractor_

**PHONE #**

| BALDWIN COUNTY BUILDING DEPARTMENT | Approved plans MUST BE retained on job and this card KEPT POSTED until final inspection has been made. Such building SHALL NOT BE OCCUPIED until FINAL INSPECTION has been made and approved | Minimum Inspection Required |
| --- | --- | --- |

**BALDWIN COUNTY BUILDING DEPARTMENT**

• Foley   Office (251) 972-6837   Fax (251) 972-6820
201 East Section Avenue, Foley, AL 36535

• Fairhope   Office (251) 990-4641   Fax (251) 990-4642
1100 Fairhope Avenue, Fairhope, AL 36532

Approved plans MUST BE retained on job and this card KEPT POSTED until final inspection has been made. Such building SHALL NOT BE OCCUPIED until FINAL INSPECTION has been made and approved

**Minimum Inspection Required**
WORK SHALL NOT PROCEED UNTIL EACH DIVISION HAS APPROVED THE VARIOUS STAGES OF CONSTRUCTION

| Underground | Aboveground | Finals |
| --- | --- | --- |
| ☐ Plumbing | ☐ Plumbing | ☐ Plumbing |
| ☐ Electrical | ☐ Electrical | ☐ Electrical |
| ☐ Mechanical | ☐ Mechanical | ☐ Mechanical |
| ☐ Gas | ☐ Gas | ☐ Gas |
| ☐ Footing-Slab | ☐ Framing | ☐ Building |
| ☐ Pilings | | |

## ADDRESS AND LOT #

_3450 A & B_
_Ponce De Leon Ct_

_Golf_
_Shores_

_Duplex_

**POST THIS CARD ON SITE AND VISIBLE FROM STREET**

Defendants' Bates # 8075



Defendants' Bates # 8076



Get Outlook for iOS

This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. - If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. - If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.

Defendants' Bates # 8077

**Trial Exhibit 26**

*1-24-2022* **Admitted**
**in**
**Evidence**

| | |
|---|---|
| **From:** | Paul Stanton |
| **To:** | Vince Jackson |
| **Subject:** | <EXTERNAL> RE: Zoning Determination Pertaining to Section 15.3.1 of the Zoning Ordinance.doc |
| **Date:** | Monday, July 8, 2019 1:21:18 PM |

Thanks Vince. This is great.

I agree with your determination and thank you for helping the residents of Fort Morgan.

It is my understanding from talking to my neighbors that two houses burned on Fort Morgan this week and it is hard enough for Fire Trucks and other utilities to get down there without all these duplexes with all the cars without adequate parking.

I am hoping this will impact this situation favorably moving forward.

Paul Stanton

**From:** Vince Jackson [mailto:VJACKSON@baldwincountyal.gov]
**Sent:** Monday, July 8, 2019 12:00 PM
**To:** Paul Stanton <paul.stanton@electrolux.com>
**Subject:** FW: Zoning Determination Pertaining to Section 15.3.1 of the Zoning Ordinance.doc

NOTICE: This email originated from outside of Electrolux. Be careful of attachments and links. Report suspicious emails using Report Message button.

Paul,

This is a follow-up to see if you have any comments or questions on the attached determination letter.

Thanks,

Vince

**From:** Vince Jackson
**Sent:** Wednesday, July 03, 2019 12:45 PM
**To:** Paul Stanton <paul.stanton@electrolux.com>
**Subject:** Zoning Determination Pertaining to Section 15.3.1 of the Zoning Ordinance.doc

Paul,

When you have a chance, please review the attached letter, and let me know if this is what you are looking for in terms of an interpretation. I'll ask Wayne to review it as well.

Thanks,

Vince

=================================================================
This message (including any attachments) contains information that may be confidential and/or

Defendants' Bates # 8135

privileged. It is intended only for the person(s) to whom it is addressed. - If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. - If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.

=========================================================================

Defendants' Bates # 8136

**Trial Exhibit 34**

1-24-2022
**Admitted**
**in**
**Evidence**

| | |
|---|---|
| **From:** | Linda Lee |
| **To:** | Vince Jackson |
| **Subject:** | RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan) |
| **Date:** | Friday, May 17, 2019 1:09:42 PM |
| **Attachments:** | image003.png |

I don't think we've required an actual parking plan. Payton would approve them
based on the length and width of the driveway. I know I have one recently where
the applicant said they had 4 parking spaces under the house (had to be stacked)
and I approved it.

Maybe what the County needs to do is place 'No Parking in the ROW' signs and start
enforcing that.

## Linda Lee
Planner
Baldwin County Planning & Zoning Department
(251) 972-8523

**From:** Vince Jackson
**Sent:** Friday, May 17, 2019 12:59 PM
**To:** Linda Lee <LLee@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

I've always viewed it as a complete application being when the clock starts as well.

You're right about section 15.3. I just believe it's intended for situations which are different from what we are talking
about here. Another concern, is that I know we have probably approved land uses down there with stacked parking.
We can't just up and decide to reverse course.

Once we have a confirmation from the building department. I'll email him.

I'm sure they haven't issued anything, but I want to be able to definitively say so.

**From:** Linda Lee
**Sent:** Friday, May 17, 2019 12:50 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

I totally agree. I feel like he's trying to catch us in some kind of trap. Although the
Zoning Ordinance doesn't explicitly state that section 15.3 is referencing parking
lots, it also has never been used to require parking plans for residential
developments. At least, not to my knowledge. And lots of things have been left to
the Planning Director's interpretation of what is the intent of the ordinance. Since
the Land Use was denied I don't know why he's harping on this section. It doesn't
say that it can't be revisited once all required documents are received. And really
we've always considered that to mean 'complete applications.' If something is
missing, technically the clock hasn't started.

(c) The land use certificate shall be issued or denied within 7 days otherwise it shall be deemed to be approved.

Linda Lee
Planner
Baldwin County Planning & Zoning Department
(251) 972-8523

**From:** Vince Jackson
**Sent:** Friday, May 17, 2019 12:38 PM
**To:** Linda Lee <LLee@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

I might be the one who gets fired. This barrage of emails and demanding specific answers TODAY, is beyond ridiculous.

**From:** Linda Lee
**Sent:** Friday, May 17, 2019 12:34 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

Sure.  They're gone to lunch right now.

Linda Lee
Planner
Baldwin County Planning & Zoning Department
(251) 972-8523

**From:** Vince Jackson
**Sent:** Friday, May 17, 2019 12:33 PM
**To:** Linda Lee <LLee@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

Just to be safe, would you check with the inspection department to make sure they haven't issued anything?

I'm sure they haven't, but stranger things have happened.

**From:** Linda Lee
**Sent:** Friday, May 17, 2019 12:24 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

Is it okay if I email him that you will be responding to his questions?

Linda Lee

DEFENDANTS ESI_00000093

Planner
Baldwin County Planning & Zoning Department
(251) 972-8523

**From:** Vince Jackson
**Sent:** Friday, May 17, 2019 12:20 PM
**To:** Linda Lee <LLee@baldwincountyal.gov>
**Subject:** Fwd: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

**I will answer that in my response. I'm not in the office right this minute, but will send it when I get back.**

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Paul Stanton <paul.stanton@electrolux.com>
Date: 5/17/19 12:10 PM (GMT-06:00)
To: Linda Lee <LLee@baldwincountyal.gov>, Vince Jackson <VJACKSON@baldwincountyal.gov>
Cc: Billie Jo Underwood <BUnderwood@baldwincountyal.gov>, Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
Subject: RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

Mrs. Lee,
Can I please have an answer to my question below.

What is the status of the Land Use Application?

I see in an earlier email you stated that is was submitted on March 27, 2019 but it was denied because it was missing an ADEM Permit.
What is the status now and has it been approved or denied? **The ordinance states that you only allow 7 Days??**
Thanks,
Paul Stanton
(251) 295-5255

**From:** Paul Stanton
**Sent:** Friday, May 17, 2019 12:20 PM
**To:** Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

Mrs. Lee,
According to 18.2 of the Zoning Ordinance a Land Use Certificate must be approved or denied within 7 days.
What is the current status on the Land Use Certificate and when was it filed? It would appear that it is longer than 7 days?
Is that correct??
Please advise.
Thanks,
Paul Stanton

**From:** Linda Lee [mailto:LLee@baldwincountyal.gov]
**Sent:** Friday, May 17, 2019 11:44 AM

DEFENDANTS ESI_00000094

**To:** Paul Stanton <paul.stanton@electrolux.com>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

NOTICE: This email originated from outside of Electrolux. Be careful of attachments and links. Report suspicious emails using Report Message button.

Mr. Stanton,

Please note that in my email on April 17th, I stated that I have requested a parking plan that includes the size of the parking spaces based on the Zoning Ordinance Requirements. This information will be required to be submitted prior to the issuance of a Land Use Certificate.

As to Section 15.3.1, it is staff's opinion that the language pertaining to 'unobstructed ingress and egress' refers to a more traditional parking lot found in commercial settings.

Also, stacked parking is not addressed in the parking standards for Planning District 25. We are aware that it is an issue and it may be addressed in a future text amendment.

Respectfully,

Linda Lee
Planner
Baldwin County Planning & Zoning Department
(251) 972-8523

**From:** Paul Stanton [mailto:paul.stanton@electrolux.com]
**Sent:** Friday, May 17, 2019 09:50 AM
**To:** Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)
**Importance:** High

Linda,

Thank you for the parking plan. The plans indicate 5 and 4 parking spaces respectively for each unit. I don't see the dimensions listed. As I understand the parking rules, each space must be 171 square feet and 9 x 19. With no dimensions listed can you verify the size? Also,
Section 15.3.1. says the following "Off-street parking spaces may not be located in a street or alley and must be connected with a street or alley by a driveway which affords **unobstructed ingress and egress** to each space." Are stacked parking spaces considered unobstructed ingress and egress. In my opinion the are not since stacked in front cant leave if a car is behind them. I consider this an obstruction

I hope you understand my concern and urgency. The parking issues along the roads on Ponce De Leon are currently very bad and this will make it worse. I consider this a dire public safety issue as roads are typically blocked with cars preventing emergency access.

DEFENDANTS ESI_00000095

I would greatly appreciate a reply to my questions.

Thank you,
Paul Stanton

**From:** Linda Lee [mailto:LLee@baldwincountyal.gov]
**Sent:** Wednesday, April 17, 2019 4:44 PM
**To:** Paul Stanton <paul.stanton@electrolux.com>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

NOTICE: This email originated from outside of Electrolux. Be careful of attachments and links. Report suspicious emails using Report Message button.

Mr. Stanton,

On March 27, 2019 a Land Use Certificate Application was submitted for 3450 A-B Ponce de Leon Court. The application has not been approved due to the applicant did not submit an ADEM permit, therefore the Land Use Certificate Application was considered to be incomplete. I have attached copies of the application, the floor plans, the elevations page and the parking plan submitted. As you can see in the email below dated April 2, 2019, I requested a parking plan that includes the size of the parking spaces based on the Zoning Ordinance requirements. To date, I haven't received the requested information.

According to the plans submitted there are seven (7) bedrooms in each dwelling unit. Based on that information, four (4) parking spaces are required for each dwelling unit. The parking plan submitted shows five (5) parking spaces per dwelling unit.

We typically base the number of bedrooms on the rooms labeled as such on the floor plans.

According to the Building Inspection Department his ADEM permit application goes out of its public comment period on May 24th. Once an ADEM permit is issued we will review the Land Use Certificate Application.

Please contact me if you have any other questions.

DEFENDANTS ESI_00000096

| | |
|---|---|
| From: | Linda Lee |
| To: | "slopescontractor@outlook.com" |
| Subject: | 3450 A-B Ponce de Leon Court |
| Date: | Tuesday, April 02, 2019 11:36:00 AM |

Mr. Jones,

While we are waiting for your ADEM permit, can you please provide the following information?

- Parking plan showing size of parking spaces – the Zoning Ordinance requires parking spaces be 9'x19'
- On the site plan included with the construction plans – please add site impact information. I'm sure it doesn't exceed the amount allowed, I just prefer to have it on the site plan I stamp approved.

You can email this information to me.

Thank you,

*Linda Lee*
Planner
Baldwin County Planning & Zoning Dept.
201 East Section Avenue
Foley, AL 36535
Tel: (251) 972-8523
Fax: (251) 972-8520
E-mail: llee@baldwincountyal.gov

DEFENDANTS ESI_00000097

Trial Exhibit 35

*1-24-2022*

**Admitted
in
Evidence**

2.3.25.3   Local Provisions for Planning District 25

(a) Multiple family buildings in the "RMF-6, Multiple Family" district may be erected to a maximum height or seven (7) habitable stories. The required side yards shall be increased by 4-feet for each additional story over two (2) habitable stories. The maximum impervious surface ratio shall not exceed .50.

(b) No PRD development is allowed to exceed maximum height requirements by more than 10-feet or 1 story.

(c) Off-street Parking.

As a supplement to Section 15.2, Parking Schedule, the following off-street parking requirements shall be applicable to single family dwellings and two family dwellings:

1. Up to Four (4) Bedrooms: Two (2) spaces per dwelling unit.

2. Up to Six (6) Bedrooms: Three (3) spaces per dwelling unit.

3. Seven (7) Bedrooms and more: Four (4) spaces per dwelling unit, plus one (1) additional space per dwelling unit for every bedroom over eight (8).

DEFENDANTS ESI_00000100

| | |
|---|---|
| **From:** | Paul Stanton |
| **To:** | Linda Lee; Vince Jackson |
| **Cc:** | Billie Jo Underwood; Wayne Dyess |
| **Subject:** | RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan) |
| **Date:** | Friday, May 17, 2019 11:42:53 AM |
| **Attachments:** | image002.png |

Mrs Lee,

Thank you for quick response.  However, I respectfully disagree with this determination.  I see no reference in the ordinance, specifically in the parking rules, that a define a "traditional  parking lot found in commercial settings".

If I have overlooked something please direct me to the section of the ordinance you are referring to.  As I read the ordinance, a distinction is made between off street parking and parking lots.  Off street parking is not the same as a parking lot in your ordinance.  As a matter of fact, your ordinance provides required spaces based on use of which single family and two family is listed requiring off street parking.  The parking rules for Fort Morgan is a supplement to that.

**I respectfully request an a determination by the Zoning Administrator which is appealable. Can you direct me to necessary forms and fees for an appeal of this determination.**

I respect the job you do and appreciate your quick response.  However, we have all made significant investment in our property and want to protect what we have.  I do believe an error has been made in the interpretation of the parking rules.

Thank you,

Paul Stanton

(251) 295-5255

3487 Ponce De Leon Ct.

Gulf Shores, AL  36542

**From:** Paul Stanton
**Sent:** Friday, May 17, 2019 12:20 PM
**To:** Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

Mrs. Lee,
According to 18.2 of the Zoning Ordinance a Land Use Certificate must be approved or denied within 7 days.

DEFENDANTS ESI_00000101

What is the current status on the Land Use Certificate and when was it filed? It would appear that it is longer than 7 days?

Is that correct??

Please advise.

Thanks,

Paul Stanton

**From:** Linda Lee [mailto:LLee@baldwincountyal.gov]
**Sent:** Friday, May 17, 2019 11:44 AM
**To:** Paul Stanton <paul.stanton@electrolux.com>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

NOTICE: This email originated from outside of Electrolux. Be careful of attachments and links. Report suspicious emails using Report Message button.

Mr. Stanton,

Please note that in my email on April 17th, I stated that I have requested a parking plan that includes the size of the parking spaces based on the Zoning Ordinance Requirements. This information will be required to be submitted prior to the issuance of a Land Use Certificate.

As to Section 15.3.1, it is staff's opinion that the language pertaining to 'unobstructed ingress and egress' refers to a more traditional parking lot found in commercial settings.

Also, stacked parking is not addressed in the parking standards for Planning District 25. We are aware that it is an issue and it may be addressed in a future text amendment.

Respectfully,

Linda Lee
Planner
Baldwin County Planning & Zoning Department
(251) 972-8523

**From:** Paul Stanton [mailto:paul.stanton@electrolux.com]
**Sent:** Friday, May 17, 2019 09:50 AM
**To:** Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess

DEFENDANTS ESI_00000102

<Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)
**Importance:** High

Linda,

Thank you for the parking plan.  The plans indicate 5 and 4 parking spaces respectively for each unit.  I don't see the dimensions listed.  As I understand the parking rules, each space must be 171 square feet and 9 x 19.  With no dimensions listed can you verify the size?  Also, Section 15.3.1. says the following "Off-street parking spaces may not be located in a street or alley and must be connected with a street or alley by a driveway which affords **unobstructed ingress and egress** to each space."  Are stacked parking spaces considered unobstructed ingress and egress.  In my opinion the are not since stacked in front cant leave if a car is behind them.  I consider this an obstruction

I hope you understand my concern and urgency.  The parking issues along the roads on Ponce De Leon are currently very bad and this will make it worse.  I consider this a dire public safety issue as roads are typically blocked with cars preventing emergency access.

I would greatly appreciate a reply to my questions.

Thank you,
Paul Stanton

**From:** Linda Lee [mailto:LLee@baldwincountyal.gov]
**Sent:** Wednesday, April 17, 2019 4:44 PM
**To:** Paul Stanton <paul.stanton@electrolux.com>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

NOTICE: This email originated from outside of Electrolux. Be careful of attachments and links. Report suspicious emails using Report Message button.

Mr. Stanton,

On March 27, 2019 a Land Use Certificate Application was submitted for 3450 A-B Ponce de Leon Court.  The application has not been approved due to the applicant did not submit an ADEM permit, therefore the Land Use Certificate Application was considered to be incomplete.  I have attached copies of the application, the floor plans, the elevations page and the parking plan submitted.  As you can see in the email below dated April 2, 2019, I requested a parking plan that includes the size of the parking spaces based on the Zoning Ordinance requirements.  To date, I haven't received the requested information.

According to the plans submitted there are seven (7) bedrooms in each dwelling unit.  Based on that information, four (4) parking spaces are required for each dwelling unit.  The parking

DEFENDANTS ESI_00000103

plan submitted shows five (5) parking spaces per dwelling unit.

We typically base the number of bedrooms on the rooms labeled as such on the floor plans.

According to the Building Inspection Department his ADEM permit application goes out of its public comment period on May 24th.  Once an ADEM permit is issued we will review the Land Use Certificate Application.

Please contact me if you have any other questions.

| | |
|---|---|
| From: | Linda Lee |
| To: | "stonescontractor@outlook.com" |
| Subject: | 3450 A-B Ponce de Leon Court |
| Date: | Tuesday, April 02, 2019 11:36:00 AM |

Mr. Jones,

While we are waiting for your ADEM permit, can you please provide the following information?

- Parking plan showing size of parking spaces – the Zoning Ordinance requires parking spaces be 9'x19'
- On the site plan included with the construction plans – please add site impact information.  I'm sure it doesn't exceed the amount allowed, I just prefer to have it on the site plan I stamp approved.

You can email this information to me.

Thank you,

Linda Lee

Planner
Baldwin County Planning & Zoning Dept.
201 East Section Avenue
Foley, AL 36535
Tel: (251) 972-8523
Fax: (251) 972-8520
E-mail: llee@baldwincountyal.gov

DEFENDANTS ESI_00000104

2.3.25.3   Local Provisions for Planning District 25

(a) Multiple family buildings in the "RMF-6, Multiple Family" district may
be erected to a maximum height or seven (7) habitable stories. The
required side yards shall be increased by 4-feet for each additional
story over two (2) habitable stories. The maximum impervious
surface ratio shall not exceed .50.

(b) No PRD development is allowed to exceed maximum height
requirements by more than 10-feet or 1 story.

(c) Off-street Parking.

As a supplement to Section 15.2, Parking Schedule, the following
off-street parking requirements shall be applicable to single family
dwellings and two family dwellings:

*Baldwin County Zoning Ordinances*                                              2-31

1. Up to Four (4) Bedrooms: Two (2) spaces per dwelling unit.

2. Up to Six (6) Bedrooms: Three (3) spaces per dwelling unit.

3. Seven (7) Bedrooms and more: Four (4) spaces per dwelling unit,
   plus one (1) additional space per dwelling unit for every bedroom
   over eight (8).

Respectfully,

Linda Lee
Planner
Baldwin County Planning & Zoning Department
(251) 972-8523

-----Original Message-----
From: Paul Stanton [mailto:paul.stanton@electrolux.com]
Sent: Wednesday, April 17, 2019 11:59 AM
To: Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson
<VJACKSON@baldwincountyal.gov>
Cc: Billie Jo Underwood <BUnderwood@baldwincountyal.gov>
Subject: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542
(Fort Morgan)

Mrs Linda,

DEFENDANTS ESI_00000105

So nice to see you again this morning!

As discussed, can you please scan and send me any plans you may have that were filed with your office for the vacant lot next door (west) to: 3468 Ponce De Leon Court, Gulf Shores, AL 36542 I would need all plans pertaining to our new Parking Amendment for this property.

1. Do you know the total number of parking spaces?2. Do you know the number bedrooms labeled on plans as bedrooms.
3. Are there any other areas that aren't labeled but look like bedrooms.

Also, my understanding is the parking is determined by the number of bedrooms correct?
1. What determines what is a bedroom i.e. closets windows etc.?
2. If beds or bunks are placed in non bedrooms does that trigger extra parking and is even legal?

Thank you!

Paul Stanton

3487 Ponce De Leon Ct.

Gulf Shores, AL 36542

(251) 295-5255

Sent from my iPhone

===================================================================
This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. - If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. - If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.
===================================================================
===================================================================== This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. - If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. - If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.
===================================================================
===================================================================
This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. - If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. - If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any

DEFENDANTS ESI_00000106

unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.

DEFENDANTS ESI_00000107

Trial Exhibit 36

1-24-2022

**Admitted**
**in**
**Evidence**

DEFENDANTS ESI_00000152



DEFENDANTS ESI_00000152

DEFENDANTS ESI_00000152.txt

From:
To:
Subject:
Date:
Attachments:

Paul Stanton
Vince Jackson
Re: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542
(Fort Morgan) - 3450 A-B Ponce De Leon Court Breezy Shores
Wednesday, June 26, 2019 2:09:35 PM
image004.png

Vince,
Can you meet tomorrow?
Please tell me where and what time please.
Thanks
Paul Stanton
Get Outlook for iOS
From: Vince Jackson <VJACKSON@baldwincountyal.gov>
Sent: Wednesday, June 26, 2019 8:14:54 AM
To: Paul Stanton
Subject: RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL
36542 (Fort Morgan) - 3450 A-B Ponce De Leon Court Breezy Shores
NOTICE: This email originated from outside of Electrolux. Be careful of attachments
and links. Report suspicious emails using Report Message button.

Paul,
If possible, I would like to discuss this with you either by telephone or in a
meeting.
Ultimately, I think you will be pleased, but I would like to discuss some possible
ramifications, and explain a little of how we got here. If I tried to put it in an
email, it would probably be rambling and incoherent. I apologize for this taking a
while, but we often have situations where it is necessary to take the time to make
sure we are doing what is right.
If a phone call is ok, let me know, and I should be able to call you later today. If
you would prefer to meet, let me know that as well. My schedule is pretty tight, but
I'm sure I can make something happen.
Thanks,
Vince
From: Paul Stanton [mailto:paul.stanton@electrolux.com]
Sent: Monday, June 24, 2019 6:43 PM
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Cc: Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess
<Wayne.Dyess@baldwincountyal.gov>; Greg & Jamie Strategier
<samsplace41805@gmail.com>; jarrettcrum@bellsouth.net; crumamma@aol.com;
wbenn53@aol.com; abennett@frontiernet.net; Sandy Bennett <sg_bennett@yahoo.com>;
meganbennettal@gmail.com; mac_deidra@bellsouth.net

Page 1

DEFENDANTS ESI_00000152.txt

Subject: FW: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan) - 3450 A-B Ponce De Leon Court Breezy Shores
Importance: High
Vince,
I am again asking for an Official Determination from the County on the parking as it relates to 3450 A-B Ponce de Leon Court Breezy Shores Duplex (proposed next to the "Giant Blue Duplex". My repeated emails have NOT been answered.
Can you please give me an official determination from the county that would be appealable on the parking issue contained in the email below...
I would like something official from the county on this so we can appeal as it relates to parking.
Section 18.1 bestows the responsibility of enforcement and administration of the Zoning Ordinance to the Zoning Administrator, which I presume is you.
I AGAIN ask for you to please give me an official determination regarding whether or not Stacked Parking complies with the requirement in Section 15.3 regarding unobstructed ingress and egress of each parking space to the street.
I fear the longer this decision is delayed, the more damage is done and projects which are not in compliance proceed.
I again ask for your determination on this matter.
As a property owner on Ponce De Leon Court, I am directly affected by your determination.
Again, I urge you to make your determination as expediently as possible please!
Thanks,
Paul Stanton
3487 Ponce De Leon Court
Gulf Shores (Fort Morgan), AL 36542

From: Paul Stanton
Sent: Thursday, June 20, 2019 1:40 AM
To: vjackson@baldwincountyal.gov
Cc: wayne.dyess@baldwincountyal.gov; wbenn53@aol.com; Sandy Bennett <sg_bennett@yahoo.com>; abennett@frontiernet.net; crumamma@aol.com; Greg & Jamie Strategier <samsplace41805@gmail.com>; mac_deidra@bellsouth.net; jarrettcrum@bellsouth.net
Subject: FW: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan) - 3450 A-B Ponce De Leon Court Breezy Shores
Importance: High
Vince,
I still don't have an official determination on the parking as it relates to 3450 A-B Ponce de Leon Court Breezy Shores.
Can you please give me an official determination from the county that would be appealable on the parking issue contained in the email below...
I would like something official from the county on this so we can appeal as it relates to parking.
Section 18.1 bestows the responsibility of enforcement and administration of the Zoning Ordinance to the Zoning Administrator, which I presume is you.
I AGAIN ask for you to please give me an official determination regarding whether or not Stacked Parking complies with the requirement in Section 15.3 regarding

DEFENDANTS ESI_00000152.txt

unobstructed ingress and egress of each parking space to the street.
I fear the longer this decision is delayed, the more damage is done and projects
which are not in compliance proceed.
I again ask for your determination on this matter.
As a property owner on Ponce De Leon Court, I am directly affected by your
determination.
Again, I urge you to make your determination as expediently as possible please!
Thanks,
Paul Stanton
3487 Ponce De Leon Court
Gulf Shores (Fort Morgan), AL 36542

From: Paul Stanton
Sent: Monday, May 20, 2019 7:28 PM
To: Vince Jackson <vjackson@baldwincountyal.gov>
Subject: Fwd: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores,
AL 36542 (Fort Morgan)
Vince this is an email I sent Friday to Mrs Linda Lee and she sent me a response
stating that you would be responding to all my emails from here on out. You were
copied.
I don't believe I got a response.
Can you please give me an official determination from the county that would be
appealable on the parking issue contained in the email below...
I would like something official from the county on this so we can appeal as it
relates to parking.
Thanks,
Paul Stanton
3487 Ponce De Leon Ct.
Fort Morgan (Gulf Shores),AL 36542
Get Outlook for iOS
From: Paul Stanton <paul.stanton@electrolux.com>
Sent: Saturday, May 18, 2019 11:54 AM
To: Bill Bennett; Al Bennett; Sandy Bennett
Subject: Fwd: Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542
(Fort Morgan)

Get Outlook for iOS

From: Vince Jackson <vjackson@baldwincountyal.gov>
Sent: Friday, May 17, 2019 3:31 PM
To: Paul Stanton; Linda Lee
Cc: Billie Jo Underwood; Wayne Dyess
Subject: RE: Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542
(Fort Morgan)
NOTICE: This email originated from outside of Electrolux. Be careful of attachments
and links. Report suspicious emails using Report Message button.

Paul,

Page 3

DEFENDANTS ESI_00000152.txt

Thank you for this information. If you notice any additional activity over the
weekend, please let me know.
Thanks,
Vince
From: Paul Stanton [mailto:paul.stanton@electrolux.com]
Sent: Friday, May 17, 2019 3:05 PM
To: Vince Jackson <VJACKSON@baldwincountyal.gov>; Linda Lee
<LLee@baldwincountyal.gov>
Cc: Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess
<Wayne.Dyess@baldwincountyal.gov>
Subject: Re: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL
36542 (Fort Morgan)

Here's another picture with the Hotel in it so you'll have his address...
Get Outlook for iOS

From: Paul Stanton <paul.stanton@electrolux.com>
Sent: Friday, May 17, 2019 3:02 PM
To: Vince Jackson; Linda Lee
Cc: Billie Jo Underwood; Wayne Dyess
Subject: Re: Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542
(Fort Morgan)

Vince,
Thank you so much for responding. Please see the above picture I took of this lot
this morning. This is what makes me believe they are about to start construction on
this lot.
Also, many of the contractors in Fort Morgan do not follow the rules set forth by
the county and most are unaware of an changes to ordinances such as the new Parking
Ordinance. That is the reason the community is watching this project like a hawk.
This type of behavior by these contractors combined with the congestion and parking
issues that we already have on Ponce De Leon Court make this even worse.
Furthermore, these giant "Hotel" pylons if left here could be like battering rams
and go right through someone's house if we were to have a tropical storm enter the
gulf.
We are entering hurricane season and these giant pylons are a Risk to the community
to leave these out here. My opinion is that they just thought they would go ahead
and get started by putting a few pylons in the ground and then what would we do
about it. Right? That's how we do things down at Fort Morgan.
Lastly, if the necessary permits are denied and not in order i think this material
should be removed from this lot in light of hurricane season and as this presents a
risk to the surrounding Fort Morgan community.
Please let me know what you can do to help.
Thanks again for all your help Vince.
Paul Stanton
Get Outlook for iOS

From: Vince Jackson <vjackson@baldwincountyal.gov>

DEFENDANTS ESI_00000152.txt

Sent: Friday, May 17, 2019 1:53 PM
To: Paul Stanton; Linda Lee
Cc: Billie Jo Underwood; Wayne Dyess
Subject: RE: Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542
(Fort Morgan)
NOTICE: This email originated from outside of Electrolux. Be careful of attachments
and links. Report suspicious emails using Report Message button.

Mr. Stanton,
Please let us know what is taking place which indicates that construction may be
about to commence. Neither a land use certificate, nor a building permit have been
issued. The land use certificate was denied on April 1, 2019, because it was
incomplete, and a building permit cannot be issued in a zoned Planning District
without an approved land use certificate. As a result, there should be no
construction activity. As a follow-up, we have confirmed with the Inspection
Department that a building permit has not been issued. The land use certificate and
the building permit cannot be issued until the ADEM permit has been issued. Our Code
Enforcement Officer is not
in the office today, but I can ask him to visit the site Monday so that we can
figure out what might be going on.
As stated above, the land use certificate application was denied, and that is its
current status. It was denied due to the lack of the ADEM permit, and also due to
the fact that additional information was needed on parking. Because the land use
certificate has not been issued, the staff has not yet made a determination as to
the compliance of the proposed duplex. We will do so when the required information
has been received.
If you should have any questions, or should need additional information please let
me know.
Thanks,
Vince Jackson
Baldwin County Planning and Zoning

From: Paul Stanton [mailto:paul.stanton@electrolux.com]
Sent: Friday, May 17, 2019 12:11 PM
To: Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson
<VJACKSON@baldwincountyal.gov>
Cc: Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess
<Wayne.Dyess@baldwincountyal.gov>
Subject: RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL
36542 (Fort Morgan)
Mrs. Lee,
Can I please have an answer to my question below.
What is the status of the Land Use Application?
I see in an earlier email you stated that is was submitted on March 27, 2019 but it
was denied because it was missing an ADEM Permit.
What is the status now and has it been approved or denied?The ordinance states that
you only allow 7 Days??
Thanks,

DEFENDANTS ESI_00000152.txt

Paul Stanton
(251) 295-5255
From: Paul Stanton
Sent: Friday, May 17, 2019 12:20 PM
To: Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson
<VJACKSON@baldwincountyal.gov>
Cc: Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess
<Wayne.Dyess@baldwincountyal.gov>
Subject: RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL
36542 (Fort Morgan)
Mrs. Lee,
According to 18.2 of the Zoning Ordinance a Land Use Certificate must be approved or
denied within 7 days.
What is the current status on the Land Use Certificate and when was it filed? It
would appear that it is longer than 7 days?
Is that correct??
Please advise.
Thanks,
Paul Stanton
From: Linda Lee [mailto:LLee@baldwincountyal.gov]
Sent: Friday, May 17, 2019 11:44 AM
To: Paul Stanton <paul.stanton@electrolux.com>; Vince Jackson
<VJACKSON@baldwincountyal.gov>
Cc: Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess
<Wayne.Dyess@baldwincountyal.gov>
Subject: RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL
36542 (Fort Morgan)
NOTICE: This email originated from outside of Electrolux. Be careful of attachments
and links. Report suspicious emails using Report Message button.

Mr. Stanton,
Please note that in my email on April 17th, I stated that I have requested a parking
plan that includes the size of the parking spaces based on the Zoning Ordinance
Requirements. This information will be required to be submitted prior to the
issuance of a Land Use Certificate.
As to Section 15.3.1, it is staff's opinion that the language pertaining to
'unobstructed ingress and egress' refers to a more traditional parking lot found in
commercial settings.
Also, stacked parking is not addressed in the parking standards for Planning
District 25. We are aware that it is an issue and it may be addressed in a future
text amendment.
Respectfully,

♀Linda Lee
Planner
Baldwin County Planning & Zoning Department
(251) 972-8523

DEFENDANTS ESI_00000152.txt

From: Paul Stanton [mailto:paul.stanton@electrolux.com]
Sent: Friday, May 17, 2019 09:50 AM
To: Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson
<VJACKSON@baldwincountyal.gov>
Cc: Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess
<Wayne.Dyess@baldwincountyal.gov>
Subject: RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL
36542 (Fort Morgan)
Importance: High

Linda,
Thank you for the parking plan. The plans indicate 5 and 4 parking spaces
respectively for each unit. I don't see the dimensions listed. As I understand the
parking rules, each space must be 171 square feet and 9 x 19. With no dimensions
listed can you verify the size? Also,
Section 15.3.1. says the following "Off-street parking spaces may not be located in
a street or alley and must be connected with a street or alley by a driveway which
affords unobstructed ingress and egress to each space." Are stacked parking spaces
considered unobstructed ingress and egress. In my opinion the are not since stacked
in front cant leave if a car is behind them. I consider this an obstruction
I hope you understand my concern and urgency. The parking issues along the roads on
Ponce De Leon are currently very bad and this will make it worse. I consider this a
dire public safety issue as roads are typically blocked with cars preventing
emergency access.
I would greatly appreciate a reply to my questions.
Thank you,
Paul Stanton

From: Linda Lee [mailto:LLee@baldwincountyal.gov]
Sent: Wednesday, April 17, 2019 4:44 PM
To: Paul Stanton <paul.stanton@electrolux.com>; Vince Jackson
<VJACKSON@baldwincountyal.gov>
Cc: Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess
<Wayne.Dyess@baldwincountyal.gov>
Subject: RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL
36542 (Fort Morgan)
NOTICE: This email originated from outside of Electrolux. Be careful of attachments
and links. Report suspicious emails using Report Message button.

Mr. Stanton,
On March 27, 2019 a Land Use Certificate Application was submitted for 3450 A-B
Ponce de Leon Court. The application has not been approved due to the applicant did
not submit an ADEM permit, therefore the Land Use Certificate Application was
considered to be incomplete. I have attached copies of the application, the floor
plans, the elevations page and the parking plan submitted. As you can see in the
email below dated April 2, 2019, I requested a parking plan that includes the size
of the parking spaces based on the Zoning Ordinance requirements. To date, I haven't
received the

Page 7

DEFENDANTS ESI_00000152.txt

requested information.
According to the plans submitted there are seven (7) bedrooms in each dwelling unit.
Based on that information, four (4) parking spaces are required for each dwelling
unit. The parking plan submitted shows five (5) parking spaces per dwelling unit.
We typically base the number of bedrooms on the rooms labeled as such on the floor
plans.
According to the Building Inspection Department his ADEM permit application goes out
of its public comment period on May 24 th. Once an ADEM permit is issued we will
review the Land Use Certificate Application.
Please contact me if you have any other questions.

Respectfully,
Linda Lee
Planner
Baldwin County Planning & Zoning Department
(251) 972-8523
-----Original Message----From: Paul Stanton [mailto:paul.stanton@electrolux.com]
Sent: Wednesday, April 17, 2019 11:59 AM
To: Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson
<VJACKSON@baldwincountyal.gov>
Cc: Billie Jo Underwood <BUnderwood@baldwincountyal.gov>
Subject: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL
36542 (Fort Morgan)
Mrs Linda,
So nice to see you again this morning!
As discussed, can you please scan and send me any plans you may have that were filed
with your office for the vacant lot next door (west) to: 3468 Ponce De Leon Court,
Gulf Shores, AL 36542 I would need all plans pertaining to our new Parking Amendment
for this property.
1. Do you know the total number of parking spaces?2. Do you know the number bedrooms
labeled on plans as bedrooms.
3. Are there any other areas that aren't labeled but look like bedrooms.
Also, my understanding is the parking is determined by the number of bedrooms
correct?
1. What determines what is a bedroom i.e. closets windows etc.?
2. If beds or bunks are placed in non bedrooms does that trigger extra parking and
is even legal?
Thank you!
Paul Stanton
3487 Ponce De Leon Ct.
Gulf Shores, AL 36542
(251) 295-5255

Sent from my iPhone
================================================================== This
message (including any attachments) contains information that may be confidential
and/or privileged. It is intended only for the person(s) to whom it is addressed. -
If you are not the intended recipient, please notify the sender by replying to this

Page 8

DEFENDANTS ESI_00000152.txt
message with "Received in error" as the subject and then delete it from your
mailbox. - If you are not the intended recipient, you are not authorized to read,
print, retain, copy or disseminate this message or any part of it, and any
unauthorized use
may be unlawful. The sender is not responsible for the accuracy or completeness of
this message when it has been transmitted over a public network, as Internet
communication is not secure.
===================================================================
=================================================================== This
message (including any attachments) contains information that may be confidential
and/or privileged. It is intended only for the person(s) to whom it is addressed. -
If you are not the intended recipient, please notify the sender by replying to this
message with "Received in error" as the subject and then delete it from your
mailbox. - If you are not the intended recipient, you are not authorized to read,
print, retain, copy or disseminate this message or any part of it, and any
unauthorized use may be unlawful. The sender is not responsible for the accuracy or
completeness
of this message when it has been transmitted over a public network, as Internet
communication is not secure.
===================================================================
=================================================================== This
message (including any attachments) contains information that may be confidential
and/or privileged. It is intended only for the person(s) to whom it is addressed. -
If you are not the intended recipient, please notify the sender by replying to this
message with "Received in error" as the subject and then delete it from your
mailbox. - If you are not the intended recipient, you are not authorized to read,
print, retain, copy or disseminate this message or any part of it, and any
unauthorized use may be unlawful. The sender is not responsible for the accuracy or
completeness
of this message when it has been transmitted over a public network, as Internet
communication is not secure.
===================================================================
=================================================================== This
message (including any attachments) contains information that may be confidential
and/or privileged. It is intended only for the person(s) to whom it is addressed. -
If you are not the intended recipient, please notify the sender by replying to this
message with "Received in error" as the subject and then delete it from your
mailbox. - If you are not the intended recipient, you are not authorized to read,
print, retain, copy or disseminate this message or any part of it, and any
unauthorized use may be unlawful. The sender is not responsible for the accuracy or
completeness
of this message when it has been transmitted over a public network, as Internet
communication is not secure.
===================================================================
=================================================================== This
message (including any attachments) contains information that may be confidential
and/or privileged. It is intended only for the person(s) to whom it is addressed. -
If you are not the intended recipient, please notify the sender by replying to this

Page 9

DEFENDANTS ESI_00000152.txt

message with "Received in error" as the subject and then delete it from your
mailbox. - If you are not the intended recipient, you are not authorized to read,
print, retain, copy or disseminate this message or any part of it, and any
unauthorized use may be unlawful. The sender is not responsible for the accuracy or
completeness
of this message when it has been transmitted over a public network, as Internet
communication is not secure.
====================================================================


==================================================================== This
message (including any attachments) contains information that may be confidential
and/or privileged. It is intended only for the person(s) to whom it is addressed. -
If you are not the intended recipient, please notify the sender by replying to this
message with "Received in error" as the subject and then delete it from your
mailbox. - If you are not the intended recipient, you are not authorized to read,
print, retain, copy or disseminate this message or any part of it, and any
unauthorized use may be unlawful. The sender
is not responsible for the accuracy or completeness of this message when it has been
transmitted over a public network, as Internet communication is not secure.
====================================================================

♀

Page 10



**Trial Exhibit 46**

7-24-2024
Admitted
in
Evidence

# BALDWIN COUNTY COMMISSION

## PLANNING AND ZONING DEPARTMENT

| Main Office (Physical) | Main Office (Mailing) | Foley Office |
|---|---|---|
| 22070 Highway 59 | 22251 Palmer Street | 201 East Section Avenue |
| Robertsdale, AL 36567 | Robertsdale, AL 36567 | Foley AL 36535 |
| Phone: (251) 580-1655 | | Phone: (251) 972-8523 |
| Fax: (251) 580-1656 | | Fax: (251) 972-8520 |

**www.planning.baldwincountyal.gov**

July 3, 2019

Paul Stanton
3487 Ponce De Leon Court
Gulf Shores, AL 36542

RE: Determination Concerning Section 15.3.1 of the *Baldwin County Zoning Ordinance*

Dear Mr. Stanton:

As requested, I have researched the applicability of Section 15.3.1 of the *Baldwin County Zoning Ordinance* to stacked parking spaces. This section is quoted as follows:

15.3.1 *Off-street parking space defined.* An off-street parking space is an area of not less than 171 square feet which is permanently reserved for the temporary storage of one automobile. The minimum dimension of an off-street parking space is 9' x 19'. Off-street parking spaces may not be located in a street or alley and must be connected with a street or alley by a driveway which affords unobstructed ingress and egress to each space.

After careful consideration, it is my determination, as Zoning Administrator, that Section 15.3.1 does in fact prohibit stacked parking spaces in a manner which would potentially obstruct ingress and egress to each space. This determination is specific to the supplemental parking requirements which are found in the Local Provisions for Planning District 25 and which are applicable to single-family and two-family properties (Section 2.3.25.3(c)).

If you should have any questions or should require additional information, please email me at vjackson@baldwincountyal.gov, or give me a call at (251) 580-1655 extension 7238.

Sincerely,

Vince Jackson
Planning Director/Zoning Administrator

**Trial Exhibit 20**  1-24-20

Admitted
in
Evidence

## Attorney Client

**From:** Steve Jones <sjonescontractor@outlook.com>
**Subject: Fwd: Re: LU-190197, Revocation of Approval and Attached Letter, 2019-07-31.pdf**
**Date:** August 1, 2019 at 1:02:38 PM CDT
**To:** "child.design@mindspring.com" <child.design@mindspring.com>, "dwayne@cdg-arch.com" <dwayne@cdg-arch.com>, Mike Bordelon <mikebcajun@webmail.us>

These are the options for resolution of the stop work order

Steve

Sent from my iPhone

Begin forwarded message:

**From:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Date:** August 1, 2019 at 1:00:02 PM CDT
**To:** Steve Jones <sjonescontractor@outlook.com>
**Subject: RE: Re: LU-190197, Revocation of Approval and Attached Letter, 2019-07-31.pdf**


The options would be the following:


- Revise the plans to show that each space has unobstructed ingress/egress.
- Request a variance from off-street parking requirements.
- Appeal the denial of the land use certificate to the Board of Adjustment, as stated in the letter.
- Ask for a staff determination pertaining to parking, which may also be appealed to the Board.
- Another option, and I imagine that this is not something the owner would want to do, would be to reduce the number of bedrooms, which would in turn reduce the required number of parking spaces.


If you should have questions, please let me know.

BORDELON_00000001

**From:** Steve Jones [mailto:sjonescontractor@outlook.com]
**Sent:** Thursday, August 01, 2019 12:15 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** Re: LU-190197, Revocation of Approval and Attached Letter, 2019-07-31.pdf

Vince,  would you mind listing the options that can be taken to resolve this issue. You mentioned requesting a variance and couple other potential solutions but I was driving at the time and could not write them down.

Thanks

Steve Jones

Sent from my iPhone

On Aug 1, 2019, at 11:45 AM, Vince Jackson <VJACKSON@baldwincountyal.gov> wrote:

Mr. Jones,

Thank you for speaking with me. A copy of the denied land use application, and the letter stating the reasons is attached.

There are options which might help to resolve this issue, and if you should have questions or need additional information in that regard, please let me know. In the meantime, it is important to discontinue working until we have a resolution.

Thank you for your co-operation.

Sincerely,

Vince Jackson, Planning Director

Baldwin County Planning and Zoning Department

(251) 580-1655 Extension 7238

Begin forwarded message:

**From:** "Mark D. Pavey, AIA" <child.design@mindspring.com>
**Subject: FW: Re: LU-190197, Revocation of Approval and Attached Letter, 2019-07-31.pdf**
**Date:** August 1, 2019 at 2:49:32 PM CDT
**To:** "'Mike Bordelon'" <mikebcajun@webmail.us>


Mike,

Steve Jones talked to Vince Jackson this afternoon, see below.

MP

Sent from my iPhone


Begin forwarded message:

**From:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Date:** August 1, 2019 at 1:00:02 PM CDT
**To:** Steve Jones <sjonescontractor@outlook.com>
**Subject: RE: Re: LU-190197, Revocation of Approval and Attached Letter, 2019-07-31.pdf**

The options would be the following:

- Revise the plans to show that each space has unobstructed ingress/egress.
- Request a variance from off-street parking requirements.
- Appeal the denial of the land use certificate to the Board of Adjustment, as stated in the letter.
- Ask for a staff determination pertaining to parking, which may also be appealed to the Board.
- Another option, and I imagine that this is not something the owner would want to do, would be to reduce the number of bedrooms, which would in turn reduce the required number of parking spaces.

If you should have questions, please let me know.


**From:** Steve Jones [mailto:sjonescontractor@outlook.com]
**Sent:** Thursday, August 01, 2019 12:15 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** Re: LU-190197, Revocation of Approval and Attached Letter, 2019-07-31.pdf

Vince, would you mind listing the options that can be taken to resolve this issue. You mentioned requesting a variance and couple other potential solutions but I was driving at the time and could not write them down.

Thanks

Steve Jones

Sent from my iPhone


On Aug 1, 2019, at 11:45 AM, Vince Jackson <VJACKSON@baldwincountyal.gov> wrote:

BORDELON_00000003

Mr. Jones,

Thank you for speaking with me. A copy of the denied land use application, and the letter stating the reasons is attached.

There are options which might help to resolve this issue, and if you should have questions or need additional information in that regard, please let me know. In the meantime, it is important to discontinue working until we have a resolution.

Thank you for your co-operation.

Sincerely,

Vince Jackson, Planning Director
Baldwin County Planning and Zoning Department
(251) 580-1655 Extension 7238

Begin forwarded message:

**From:** Steve Jones <sjonescontractor@outlook.com>
**Subject: Fwd: LU-190197, Revocation of Approval and Attached Letter, 2019-07-31.pdf**
**Date:** August 1, 2019 at 12:30:50 PM CDT
**To:** Mike Bordelon <mikebcajun@webmail.us>, "dwayne@cdg-arch.com" <dwayne@cdg-arch.com>

Mike, planning and zoning revoked our permit yesterday. They sited article 15-3.1. Primarily because each parking space is required to have its own ingress and egress to the road.

I have reached out to Mark Pavey and he is working on ways to adjust the parking to get the usable space to work.

I have spoken to Vince Jackson about the stop work and he has provided us with some options to take to get this resolved.

I have attached the stop work and land use revocation to this email. I will talk with you later

I hope all is well with your surgery. Sorry to have to bother you with this

Steve

Sent from my iPhone

Begin forwarded message:

**From:** "Mark D. Pavey, AIA" <child.design@mindspring.com>
**Date:** August 1, 2019 at 12:23:45 PM CDT
**To:** "'Dwayne Starling'" <dwayne@cdg-arch.com>, "'Steve Jones'" <sjonescontractor@outlook.com>
**Subject: RE: LU-190197, Revocation of Approval and Attached Letter, 2019-07-31.pdf**

Does Mike have this letter?

BORDELON_00000004

**From:** Dwayne Starling <dwayne@cdg-arch.com>
**Sent:** Thursday, August 1, 2019 12:19 PM
**To:** Mark D. Pavey, AIA <child.design@mindspring.com>
**Subject:** Fwd: LU-190197, Revocation of Approval and Attached Letter, 2019-07-31.pdf

---------- Forwarded message ---------
From: **Steve Jones** <sjonescontractor@outlook.com>
Date: Thu, Aug 1, 2019 at 12:11 PM
Subject: Fwd: LU-190197, Revocation of Approval and Attached Letter, 2019-07-31.pdf
To: dwayne@cdg-arch.com <dwayne@cdg-arch.com>

Dwayne.

This is a copy of the correspondence and stop work order from the county. Let me know if you are able to
come up with additional parking

Steve

Sent from my iPhone

Begin forwarded message:

**From:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Date:** August 1, 2019 at 11:45:27 AM CDT
**To:** "sjonescontractor@outlook.com" <sjonescontractor@outlook.com>
**Subject: LU-190197, Revocation of Approval and Attached Letter, 2019-07-31.pdf**

Mr. Jones,

Thank you for speaking with me. A copy of the denied land use application, and the letter stating the
reasons is attached.

There are options which might help to resolve this issue, and if you should have questions or need
additional information in that regard, please let me know. In the meantime, it is important to discontinue
working until we have a resolution.

Thank you for your co-operation.

BORDELON_00000005

Sincerely,

Vince Jackson, Planning Director

Baldwin County Planning and Zoning Department

(251) 580-1655 Extension 7238

--

**Dwayne Starling**

CDG Architecture

251-716-0432

BORDELON_00000006

**Trial Exhibit 27**

*1-24-2022*
**Admitted**
**in**
**Evidence**

| | |
|---|---|
| From: | Greg & Jamie Strategier |
| To: | Vince Jackson |
| Cc: | Billie Jo Underwood; Wayne Dyess; jarrettcrum@bellsouth.net; crumamma@aol.com; wbenn53@aol.com; abennett@frontiernet.net; Sandy Bennett; meganbennettal@gmail.com; mac_deidra@bellsouth.net; Joe Emerson; Wanda Dortch thisband Capt. Phil; Lynn Brush; Lynn Brush; RMCDONALD76@comcast.net; dkhandmh@gmail.com; Philip Cox; ecaces4@gmail.com; ecaces4@bellsouth.net; Jenny & Andy Openshaw; Ange & Jim Holland; Bart Harrison; Linda Wellingham; Charles F. Gruber; cjkittrell@southalabama.edu; klovins68@icloud.com; Jeb Ball; Joe Davis; Miss Thelma Strong; chan@goefish.com; Randy Ulrich; Jamie Strategier |
| Subject: | BCCAP #18-007 & Parking Problems |
| Date: | Tuesday, June 25, 2019 10:58:56 AM |
| Attachments: | image006.png |

Dear Vince,

Re:  BCCAP case number 18-007 is for Breezy Shores, LLC, 3450 A & B  Ponce de Leon Court.  Mike Bordelon, 5855 Plantation Circle, St. Francisville, LA 70775

AND PARKING PROBLEMS IN FORT MORGAN.

I agree with Paul & Mr. Jarrett about the parking nightmare, the need for strict enforcement of parking regulations (2.3.25.3 (c) Off-Street Parking) and Proposed stricter parking regulations (2.3.25.4) prohibiting "Stacked Parking".  Many residents and home owners RESIDING on Ponce de Leon Court are copied on this email and they have been harassed by this parking nightmare for years.  The residents have complained and are tracking the current parking nightmare, as well as, BCCAP #18-007, the application for another extra large duplex that would add to the parking problems and safety risks.  We all want Baldwin County to resolve the parking nightmare and restrict parking on new building permit applications.  None of the residents on Ponce de Leon want to see the parking problem get worse!  This is where we live and own our private residences.  Yes, it is a constant battle to just try to pass down our own street in a vehicle, bike, stroller or walk our dog, but it is also a safety hazard.

During the Fort Morgan Advisory Board Meeting on Wednesday, June 19, 2019 many residents stood up and spoke about the their personal parking & sewage problems in Fort Morgan and specifically along Ponce de Leon Court.  The current parking problem is not only a nightmare and hassle for home owners & visitors, but it is a safety problem for everyone - including the renters in these oversized duplex buildings (mini condos sleeping over 50 people) and visitors to Baldwin County in both private and public beaches.

PARKING NIGHTMARE:  We absolutely have an existing parking nightmare along Ponce de Leon Court that has not been resolved, but we can certainly solve some of the parking problems by not adding to this parking nightmare.  If another large duplex is requesting a building permit along Ponce de Leon Court next to the existing oversized duplex "EZ-Breezy"' located at 3468 Ponce de Leon Court, GF Shores, AL 36542, then there MUST be restrictions so this safety risk doesn't intensify.  The existing oversized duplex called "EZ-Breezy" is owned and operated by the same developer, Mike Bordelon, 5855 Plantation Circle, St. Francisville, LA 70775.  Mr. Bordelon is aware of the existing parking problem and should have addressed this safety risk before he is allowed another permit that would escalate the parking problem.  After all, this effects his property and his customers, too.

PARKING SAFETY RISK:  Parking Along Ponce de Leon Court IS an OBSTACLE FOR FIRE, POLICE, AMBULANCE, RESCUE VEHICLES, Etc.  When safety rescue vehicles cannot pass down the street to reach a house in need of assistance, then lives could be endanger and/or worse.

We already have a narrow street that is overrun with sand, so adding just one parked car along Ponce de Leon Court makes it impassable.  My husband, other residents on PDL and The county have to clear the streets from sand when wind, rain & Gulf of Mexico washes sand into the street blocking vehicles (including safety rescue vehicles) from safely passing down Ponce de Leon Court.

Due to the parking nightmare, residents and/or visitors who need to exit their home for an emergency are

Defendants' Bates # 8141

prevented from exiting their own homes along Ponce de Leon Court in their vehicles.

<u>PARKING NIGHTMARE FOR PUBLIC:</u> Parking is a problem at all Public Beach & Water Access areas in Fort Morgan.  No one should be parking in the sand or on the beaches.  No one should be blocking streets.  No one should be breaking sewage lines.  No one should be prevented Safety Rescue due to Parking Problems.  Yet, this has become "the norm" for Fort Morgan.

It is not acceptable for any resident to be denied safety rescue or to safely exit due to parking problems. We have an opportunity now to fix the current parking nightmare & AVOID future parking obstacles.  If permitting and regulations are part of the problem, then we implore Baldwin County to please put up "NO PARKING" signs enforceable with penalty fees!

<u>PARKING & SEWAGE PROBLEM:</u> Parking anywhere ON & OFF Ponce de Leon Court is an additional problem because that is also where the residential sewage lines are run which are broken by parked vehicles spewing raw sewage on private properties, public streets and public beaches.  On any given day, the public, visitors and renters park along Ponce de Leon Court.  If one of their tires is in the sand which is 90% unavoidable, then they end up stuck in the sand.  When they leave the beach for the day, the "stuck" vehicle ends up digging a hole in the sand resulting in broken sewage lines gushing raw sewage on private and public property.  On several occasions, I have personally called the Baldwin County Sewage to come out, repair and clean up the broken sewage lines spewing raw sewage all over private and public properties.  I know many other residents along Ponce de Leon Court have also called to have the sewage repaired when vehicles get stuck in the sand & break the sewage lines.  I had conversations with Baldwin County Sewage workers who told me that this happens all too often and signage would help.  The workers told me they have requested signage identifying sewage lines & "No Parking" signs, but no progress has been made with signage.  No Vehicle should be allowed to park along this street.  No vehicle should be encouraged to get stuck in the sand.  No vehicle should be allowed to break sewage lines spewing raw sewage all over our private properties, public streets & public beach areas.  Please assist and ensure that proper "No Parking" signage enforceable with penalty fees are placed on Ponce de Leon Court and elsewhere in Fort Morgan, so that streets are not blocked and sewage lines are not broken spewing raw sewage into private and public properties.

<u>PERSONAL NOTE:</u> Just think if this was happening in your neighborhood?  Would you allow a large house of 44 - 64 different weekly renters to park all along your street; blocking your driveways; preventing you access to your own street & home; obstructing emergancy vehicles so they cannot reach your home in case of an emergency; and damaging sewage lines spewing raw sewage onto your private property, public streets and public sidewalks?  I'm sure you would not allow this current parking nightmare to continue.  You would not want the current parking nightmare to multiply with the addition of another "rental income house" holding more than 44 people at once to become an increasing parking nightmare on your street.  I do not you believe you would welcome this massive parking problem in your neighbored.  And we are not asking for any different.

<u>OVERALL STATEMENT:</u>  We know that residing on Fort Morgan Pensiula is unique and we have all chosen to purchase our property here.  We did not purchase our property with the current parking nightmare, irritating inconveniences, unsanitary conditions, overall difficulties, and safety concerns that exist now.  These difficult situations become worse anytime Baldwin County makes a decision that is not in the best interest of the current residents in Fort Morgan.

Yes, Fort Morgan is different, but it is within Baldwin County jurisdiction and should be protected & served by the county just as the rest of Baldwin County is protected & serviced.  Fort Morgan should not have less enforcement, lower standards, or an insufficient infrastructure any different than other parts of Baldwin County.  In fact, due to Fort Morgan being a Penisula, it's uniquely delicate environment, historical nature and damaging elements, Fort Morgan should have stricter enforcement, more stringent regulations, better infrastructure and be handled with kid gloves, so that it will be here in the future for the next generation to enjoy Mother Nature's Beauty and Historical Alabama.

<u>SUMMARY:</u> The Parking Nightmare is not acceptable!  Baldwin County must address the current parking nightmares and avoid future parking problems by restricting building permits and requiring

Defendants' Bates # 8142

stringent parking regulations.  Residents have been reporting the parking problems for years.

Please let us know:

- What Baldwin County has planned to resolve the current parking nightmare?
- When and how will Baldwin County limit new permit applications BCCAP 18-007 and others like it so Parking is not a problem?
- How Baldwin County plans to enforce parking regulations?
- When & Where will Baldwin County install "No Parking w/penalty fee" signs in Fort Morgan?
- What do residents need to do to make sure parking regulations are enforced?
- When can residents expect the parking nightmare to be resolved?
- What, if anything, can Fort Morgan Residents do to assist?

Commissioner "Skip" Gruber spoke with Fort Morgan Civic Association earlier this year.  Commissioner Gruber stated that he has been critiqued in the past for speaking up for Fort Morgan.  His response is that as an unincorporated part of Baldwin County, Fort Morgan needs more assistance than the incorporated jurisdictions that have their own governing body.  We are not requesting any favoritism or special attention.  Fort Morgan just wants he be served and protected by Baldwin County.


Sincerely,

Jamie Strategier

3510 Ponce de Leon Court

Gulf Shores, AL 36542

504-616-3275




Sent from Jamie Strategier's iPhone


On Jun 24, 2019, at 6:42 PM, Paul Stanton <paul.stanton@electrolux.com> wrote:

> Vince,
> **I am again asking for an Official Determination from the County on the parking as it relates to 3450 A-B Ponce de Leon Court Breezy Shores Duplex (proposed next to the "Giant Blue Duplex". My repeated emails have NOT been answered.**
> Can you **please** give me an official determination from the county that would be appealable on the parking issue contained in the email below...
> I would like something official from the county on this so we can appeal as it relates to parking.
>
> **Section 18.1 bestows the responsibility of enforcement and administration of the Zoning Ordinance to the Zoning Administrator, which I presume is you.**
>
> **I AGAIN ask for you to please give me an official determination regarding whether or not Stacked Parking complies with the requirement in Section 15.3 regarding**

Defendants' Bates # 8143

**unobstructed ingress and egress of each parking space to the street.**

I fear the longer this decision is delayed, the more damage is done and projects which are not in compliance proceed.

I again ask for your determination on this matter.

As a property owner on Ponce De Leon Court, I am directly affected by your determination.

Again, I urge you to make your determination as expediently as possible please!

Thanks,

Paul Stanton
3487 Ponce De Leon Court
Gulf Shores (Fort Morgan), AL  36542

**From:** Paul Stanton
**Sent:** Thursday, June 20, 2019 1:40 AM
**To:** vjackson@baldwincountyal.gov
**Cc:** wayne.dyess@baldwincountyal.gov; wbenn53@aol.com; Sandy Bennett
<sg_bennett@yahoo.com>; abennett@frontiernet.net; crumamma@aol.com; Greg & Jamie
Strategier <samsplace41805@gmail.com>; mac_deidra@bellsouth.net; jarrettcrum@bellsouth.net
**Subject:** FW: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort
Morgan) - 3450 A-B Ponce De Leon Court Breezy Shores
**Importance:** High

Vince,
I still don't have an official determination on the parking as it relates to 3450 A-B Ponce de Leon Court Breezy Shores.
Can you please give me an official determination from the county that would be appealable on the parking issue contained in the email below...
I would like something official from the county on this so we can appeal as it relates to parking.

Section 18.1 bestows the responsibility of enforcement and administration of the Zoning Ordinance to the Zoning Administrator, which I presume is you.

I AGAIN ask for you to please give me an official determination regarding whether or not Stacked Parking complies with the requirement in Section 15.3 regarding unobstructed ingress and egress of each parking space to the street.

I fear the longer this decision is delayed, the more damage is done and projects which are not in compliance proceed.

I again ask for your determination on this matter.

As a property owner on Ponce De Leon Court, I am directly affected by your determination.

Defendants' Bates # 8144

Again, I urge you to make your determination as expediently as possible please!

Thanks,

Paul Stanton
3487 Ponce De Leon Court
Gulf Shores (Fort Morgan), AL  36542

---

**From:** Paul Stanton
**Sent:** Monday, May 20, 2019 7:28 PM
**To:** Vince Jackson <vjackson@baldwincountyal.gov>
**Subject:** Fwd: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542
(Fort Morgan)

Vince this is an email I sent Friday to Mrs Linda Lee and she sent me a response stating that you
would be responding to all my emails from here on out. You were copied.
I don't believe I got a response.

Can you please give me an official determination from the county that would be appealable on the
parking issue contained in the email below...
I would like something official from the county on this so we can appeal as it relates to parking.
Thanks,
Paul Stanton
3487 Ponce De Leon Ct.
Fort Morgan (Gulf Shores),AL 36542

Get Outlook for iOS

**From:** Paul Stanton <paul.stanton@electrolux.com>
**Sent:** Saturday, May 18, 2019 11:54 AM
**To:** Bill Bennett; Al Bennett; Sandy Bennett
**Subject:** Fwd: Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

Get Outlook for iOS

**From:** Vince Jackson <vjackson@baldwincountyal.gov>
**Sent:** Friday, May 17, 2019 3:31 PM
**To:** Paul Stanton; Linda Lee
**Cc:** Billie Jo Underwood; Wayne Dyess
**Subject:** RE: Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

NOTICE: This email originated from outside of Electrolux. Be careful of attachments and links. Report suspicious

Defendants' Bates # 8145

emails using Report Message button.

Paul,

Thank you for this information. If you notice any additional activity over the weekend, please let me know.

Thanks,

Vince

**From:** Paul Stanton [mailto:paul.stanton@electrolux.com]
**Sent:** Friday, May 17, 2019 3:05 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>; Linda Lee <LLee@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** Re: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

<image003.jpg>
Here's another picture with the Hotel in it so you'll have his address...

Get Outlook for iOS

**From:** Paul Stanton <paul.stanton@electrolux.com>
**Sent:** Friday, May 17, 2019 3:02 PM
**To:** Vince Jackson; Linda Lee
**Cc:** Billie Jo Underwood; Wayne Dyess
**Subject:** Re: Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

<image004.jpg>
Vince,

Thank you so much for responding. Please see the above picture I took of this lot this morning. This is what makes me believe they are about to start construction on this lot.

Also, many of the contractors in Fort Morgan do not follow the rules set forth by the county and most are unaware of an changes to ordinances such as the new Parking Ordinance. That is the reason the community is watching this project like a hawk. This type of behavior by these contractors combined with the congestion and parking issues that we already have on Ponce De Leon Court make this even worse.

Furthermore, these giant "Hotel" pylons if left here could be like battering rams and go right through someone's house if we were to have a tropical storm enter the gulf.
We are entering hurricane season and these giant pylons are a Risk to the community to leave these out here. My opinion is that they just thought they would go ahead and get started by putting a few pylons in the ground and then what would we do about it. Right? That's how we do things

Defendants' Bates # 8146

down at Fort Morgan.

Lastly, if the necessary permits are denied and not in order i think this material should be removed from this lot in light of hurricane season and as this presents a risk to the surrounding Fort Morgan community.

Please let me know what you can do to help.

Thanks again for all your help Vince.

Paul Stanton

Get Outlook for iOS

---

**From:** Vince Jackson <vjackson@baldwincountyal.gov>
**Sent:** Friday, May 17, 2019 1:53 PM
**To:** Paul Stanton; Linda Lee
**Cc:** Billie Jo Underwood; Wayne Dyess
**Subject:** RE: Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

NOTICE: This email originated from outside of Electrolux. Be careful of attachments and links. Report suspicious emails using Report Message button.

Mr. Stanton,

Please let us know what is taking place which indicates that construction may be about to commence. Neither a land use certificate, nor a building permit have been issued. The land use certificate was denied on April 1, 2019, because it was incomplete, and a building permit cannot be issued in a zoned Planning District without an approved land use certificate. As a result, there should be no construction activity. As a follow-up, we have confirmed with the Inspection Department that a building permit has not been issued. The land use certificate and the building permit cannot be issued until the ADEM permit has been issued. Our Code Enforcement Officer is not in the office today, but I can ask him to visit the site Monday so that we can figure out what might be going on.

As stated above, the land use certificate application was denied, and that is its current status. It was denied due to the lack of the ADEM permit, and also due to the fact that additional information was needed on parking. Because the land use certificate has not been issued, the staff has not yet made a determination as to the compliance of the proposed duplex. We will do so when the required information has been received.

If you should have any questions, or should need additional information please let me know.

Thanks,

Vince Jackson
Baldwin County Planning and Zoning

Defendants' Bates # 8147

**From:** Paul Stanton [mailto:paul.stanton@electrolux.com]
**Sent:** Friday, May 17, 2019 12:11 PM
**To:** Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess
<Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

Mrs. Lee,
Can I please have an answer to my question below.

What is the status of the Land Use Application?

I see in an earlier email you stated that is was submitted on March 27, 2019 but it was denied
because it was missing an ADEM Permit.
What is the status now and has it been approved or denied?**The ordinance states that you only
allow 7 Days??**
Thanks,
Paul Stanton
(251) 295-5255

**From:** Paul Stanton
**Sent:** Friday, May 17, 2019 12:20 PM
**To:** Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess
<Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

Mrs. Lee,
According to 18.2 of the Zoning Ordinance a Land Use Certificate must be approved or denied
within 7 days.
What is the current status on the Land Use Certificate and when was it filed? It would appear that it
is longer than 7 days?
Is that correct??
Please advise.
Thanks,
Paul Stanton

**From:** Linda Lee [mailto:LLee@baldwincountyal.gov]
**Sent:** Friday, May 17, 2019 11:44 AM
**To:** Paul Stanton <paul.stanton@electrolux.com>; Vince Jackson
<VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess
<Wayne.Dyess@baldwincountyal.gov>

Defendants' Bates # 8148

**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

NOTICE: This email originated from outside of Electrolux. Be careful of attachments and links. Report suspicious emails using Report Message button.

Mr. Stanton,

Please note that in my email on April 17th, I stated that I have requested a parking plan that includes the size of the parking spaces based on the Zoning Ordinance Requirements. This information will be required to be submitted prior to the issuance of a Land Use Certificate.

As to Section 15.3.1, it is staff's opinion that the language pertaining to 'unobstructed ingress and egress' refers to a more traditional parking lot found in commercial settings.

Also, stacked parking is not addressed in the parking standards for Planning District 25. We are aware that it is an issue and it may be addressed in a future text amendment.

Respectfully,

Linda Lee
Planner
Baldwin County Planning & Zoning Department
(251) 972-8523

**From:** Paul Stanton [mailto:paul.stanton@electrolux.com]
**Sent:** Friday, May 17, 2019 09:50 AM
**To:** Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)
**Importance:** High

Linda,

Thank you for the parking plan. The plans indicate 5 and 4 parking spaces respectively for

Defendants' Bates # 8149

each unit. I don't see the dimensions listed. As I understand the parking rules, each space must be 171 square feet and 9 x 19. With no dimensions listed can you verify the size? Also, Section 15.3.1. says the following "Off-street parking spaces may not be located in a street or alley and must be connected with a street or alley by a driveway which affords **unobstructed ingress and egress** to each space." Are stacked parking spaces considered unobstructed ingress and egress. In my opinion the are not since stacked in front cant leave if a car is behind them. I consider this an obstruction

I hope you understand my concern and urgency. The parking issues along the roads on Ponce De Leon are currently very bad and this will make it worse. I consider this a dire public safety issue as roads are typically blocked with cars preventing emergency access.

I would greatly appreciate a reply to my questions.

Thank you,
Paul Stanton


**From:** Linda Lee [mailto:LLee@baldwincountyal.gov]
**Sent:** Wednesday, April 17, 2019 4:44 PM
**To:** Paul Stanton <paul.stanton@electrolux.com>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL 36542 (Fort Morgan)

NOTICE: This email originated from outside of Electrolux. Be careful of attachments and links. Report suspicious emails using Report Message button.

Mr. Stanton,

On March 27, 2019 a Land Use Certificate Application was submitted for 3450 A-B Ponce de Leon Court. The application has not been approved due to the applicant did not submit an ADEM permit, therefore the Land Use Certificate Application was considered to be incomplete. I have attached copies of the application, the floor plans, the elevations page and the parking plan submitted. As you can see in the email below dated April 2, 2019,I requested a parking plan that includes the size of the parking spaces based on the Zoning Ordinance requirements. To date, I haven't received the requested information.

According to the plans submitted there are seven (7) bedrooms in each dwelling unit. Based on that information, four (4) parking spaces are required for each dwelling unit.

Defendants' Bates # 8150

The parking plan submitted shows five (5) parking spaces per dwelling unit.

We typically base the number of bedrooms on the rooms labeled as such on the floor plans.

According to the Building Inspection Department his ADEM permit application goes out of its public comment period on May 24th. Once an ADEM permit is issued we will review the Land Use Certificate Application.

Please contact me if you have any other questions.

<image005.jpg>

2.3.25.3   Local Provisions for Planning District 25

(a) Multiple family buildings in the "RMF-6, Multiple Family" district may be erected to a maximum height or seven (7) habitable stories. The required side yards shall be increased by 4-feet for each additional story over two (2) habitable stories. The maximum impervious surface ratio shall not exceed .50.

(b) No PRD development is allowed to exceed maximum height requirements by more than 10-feet or 1 story.

(c) Off-street Parking.

As a supplement to Section 15.2, Parking Schedule, the following off-street parking requirements shall be applicable to single family dwellings and two family dwellings:

_Baldwin County Zoning Ordinances_                                                      2-31

1. Up to Four (4) Bedrooms: Two (2) spaces per dwelling unit.

2. Up to Six (6) Bedrooms: Three (3) spaces per dwelling unit.

3. Seven (7) Bedrooms and more: Four (4) spaces per dwelling unit, plus one (1) additional space per dwelling unit for every bedroom over eight (8).

Respectfully,

Linda Lee
Planner
Baldwin County Planning & Zoning Department

Defendants' Bates # 8151

(251) 972-8523

-----Original Message-----
From: Paul Stanton [mailto:paul.stanton@electrolux.com]
Sent: Wednesday, April 17, 2019 11:59 AM
To: Linda Lee <LLee@baldwincountyal.gov>; Vince Jackson
<VJACKSON@baldwincountyal.gov>
Cc: Billie Jo Underwood <BUnderwood@baldwincountyal.gov>
Subject: <EXTERNAL> Plans for Lot next to 3468 Ponce De Leon Ct. Gulf Shores, AL
36542 (Fort Morgan)

Mrs Linda,
So nice to see you again this morning!
As discussed, can you please scan and send me any plans you may have that were filed
with your office for the vacant lot next door (west) to: 3468 Ponce De Leon Court, Gulf
Shores, AL 36542 I would need all plans pertaining to our new Parking Amendment for
this property.

1. Do you know the total number of parking spaces?2. Do you know the number
bedrooms labeled on plans as bedrooms.
3. Are there any other areas that aren't labeled but look like bedrooms.

Also, my understanding is the parking is determined by the number of bedrooms
correct?
1. What determines what is a bedroom i.e. closets windows etc.?
2. If beds or bunks are placed in non bedrooms does that trigger extra parking and is
even legal?
Thank you!
Paul Stanton
3487 Ponce De Leon Ct.
Gulf Shores, AL 36542
(251) 295-5255


Sent from my iPhone
========================================================================
This message (including any attachments) contains information that may be
confidential and/or privileged. It is intended only for the person(s) to whom it is
addressed. - If you are not the intended recipient, please notify the sender by replying to
this message with "Received in error" as the subject and then delete it from your
mailbox. - If you are not the intended recipient, you are not authorized to read, print,

Defendants' Bates # 8152

retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.

======================================================================
================================================================= This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. - If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. - If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.

==============================================================
================================================================= This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. - If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. - If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.

==============================================================
================================================================= This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. - If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. - If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.

==============================================================
==============================================================================

This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. - If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. - If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.
==============================================================================

Defendants' Bates # 8153

**From:** Paul Stanton
**To:** Lloyd Schoen
**Subject:** RE <EXTERNAL> 3450 Ponce De Leon Ct Gulf Shores AL 36542 (Fort Morgan) Breezy Shores
**Date:** Wednesday, July 31, 2019 4:01:55 PM

Vince,
Per our conversation this morning, I think you stated you sent another email earlier to me and "Wayne?"
I have searched all our emails from today and that is the only email I have received from you.
If I have missed something, I sincerely apologize in advance but I don't see anything.
Please advise
Paul Stanton

Get Outlook for iOS

**From:** Vince Jackson <VJACKSON@elethrius.county.al.gov>
**Sent:** Wednesday, July 31, 2019 7:34:28 AM
**To:** Paul Stanton <paul.stanton@electrilus.com>
**Subject:** RE <EXTERNAL> 3450 Ponce De Leon Ct Gulf Shores AL 36542 (Fort Morgan) Breezy Shores

NOTICE: This email originated from outside of Electrilus. Be careful of attachments and links. Report suspicious emails using Report Message button.

I'll call as soon as I can. The Code Enforcement Off icer is already on his way down.

**From:** Paul Stanton [mailto:paul.stanton@electrilus.com]
**Sent:** Wednesday, July 31, 2019 7:34 AM
**To:** Vince Jackson <VJACKSON@aldwynscountyal.gov>
**Subject:** Re <EXTERNAL> 3450 Ponce De Leon Ct Gulf Shores AL 36542 (Fort Morgan) Breezy Shores

Vince
Can you please call me this morning, 251-295-5255.
Then guys will try to put as many pylons in the ground as possible before anyone gets here this morning.
Is there a way to get someone out here this morning please?
Thanks
Paul Stanton

Get Outlook for iOS

**From:** Vince Jackson <VJACKSON@aldwynscountyal.gov>
**Sent:** Tuesday, July 30, 2019 5:56:54 PM
**To:** Paul Stanton <paul.stanton@electrilus.com>
**Cc:** Billie Jo Underwood <Billie.underwood@aldwynscountyal.gov>, Al Bennett <agennett@bundarout.net>, Bill Bennett <wbenn2536@aol.com>, Eugene Krabs <eugene.krabs@aol.com>, Sandy Bennett <ss_bennett@yahoo.com>, Megan Bennett <meganbennett@gmail.com>, Lynda Crum <lyndacrum@aol.com>, Janice Stratagem <jstratagem1987@gmail.com>
**Subject:** Re <EXTERNAL> 3450 Ponce De Leon Ct Gulf Shores AL 36542 (Fort Morgan) Breezy Shores

NOTICE: This email originated from outside of Electrilus. Be careful of attachments and links. Report suspicious emails using Report Message button.

Paul

I am aware of the situation. I will send someone down tomorrow to issue a stop work order. I will contact you tomorrow with more information

Thanks

Vince

Sent from my Verizon Samsung Galaxy smartphone

-------- Original message --------
From: Paul Stanton <paul.stanton@electrilus.com>
Date: 7/30/19 5:11 PM (GMT-06:00)
To: Vince Jackson <VJACKSON@aldwynscountyal.gov>
Cc: Billie Jo Underwood <Billie.underwood@aldwynscountyal.gov>, Al Bennett <agennett@bundarout.net>, Bill Bennett <wbenn2536@aol.com>, Eugene Krabs <eugene.krabs@aol.com>, Sandy Bennett <ss_bennett@yahoo.com>, Megan Bennett <meganbennett@gmail.com>, Lynda Crum <lyndacrum@aol.com>, Janice Stratagem <jstratagem1987@gmail.com>
Subject: <EXTERNAL> 3450 Ponce De Leon Ct Gulf Shores AL 36542 (Fort Morgan) Breezy Shores

Vince
It looks like pylons are being driven (bass pylons in the ground today, 7/30/19) and construction has started even though I was told this builder did not pass his parking plan and would not be receiving a permit

I want to know if he has met the parking requirements:
If so, please provide me with a site plan.
In addition, please send me a copy of the ADEM Permit and his associated site plan.

If this has NOT been approved:
Construction and Pyle driving should stop immediately tomorrow morning (7/31/19.)

Please call me at (251) 295-5255 as soon as possible today or tomorrow morning as I plan to be at this construction site at 6am tomorrow morning

Thanks
Paul Stanton
3447 Ponce De Leon Court
Gulf Shores AL 36542
(251) 295-5255

[image]
[image]
[image]
[image]

Get Outlook for iOS https://aka.ms/...

================================================= This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.
================================================= This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.
================================================= This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.

Defendants' Bates # 8154

**Trial Exhibit 31**

1-24-2022

From: Wayne Dyess
To: Vince Jackson
Subject: RE: Zoning Determination Pertaining to Section 15.3.1 of the Zoning Ordinance.doc
Date: Wednesday, July 3, 2019 1:28:32 PM
Attachments: image001.png

**Admitted
in
Evidence**

Looks good to me  Be prepared to debate what "unobstructed" means  I would refer to Miriam and Webster s definition:

| | JOIN MWU | GAMES | BROWSE THESAURUS | WORD OF THE DAY | WORDS AT PLAY |
| Merriam-Webster SINCE 1828 | unobstructed | | | | |
| | DICTIONARY | | THESAURUS | | |

# unobstructed adjective

un·ob·struct·ed  |  \ ˌən-əb-ˈstrək-təd 🔊, -ˌäb-\

### Definition of *unobstructed*

: clear or free from obstructions or obstacles : not obstructed
// an *unobstructed* view of the river

And/or use Black s Law Dictionary for:

Obstruction: A hindrance, obstacle, or barrier  Delay, impeding or hindering

From: Vince Jackson
Sent: Wednesday, July 3, 2019 12:50 PM
To: Wayne Dyess <Wayne Dyess@baldwincountyal gov>
Subject: Zoning Determination Pertaining to Section 15 3 1 of the Zoning Ordinance doc

I know you re out of pocket today, but when you have a chance, please look over this letter I have drafted for Paul Stanton  I didn t get a chance to talk with him, so I decided to just go ahead and put something together  I made it specific to the supplemental parking requirements for Planning District 25, so we can hopefully avoid issues in the other Planning Districts

Let me know your thoughts, and I will make changes as necessary

I hope you re doing ok

Thanks,

Vince

Defendants' Bates # 8199

3/12/2021

Mail - Lynn, William - Outlook

0073

**Trial Exhibit 40**

1-24-2022

[EXTERNAL] Fwd: Planning District 25 Proposed Text Amendments to Local Provisions **Admitted**
2019 Revised.docx

*[handwritten]* **in**

**Evidence**

Thu 8/22/2019 1:25 PM

To: Lynn, William <william_lynn@fws.gov>

📎 4 attachments (2 MB)

Planning District 25 Proposed Text Amendments to Local Provisions 2019 Revised.docx; ATT00001.htm; Planning District 25 CHHA and FHA.pdf; ATT00002.htm;

Dear Bill~

We hope that Fort Morgan's Endangered Sea Turtles Nests and Alabama Beach Mice are being protected from the crowded beach visitors this Summer.  We have been working for years to try and have Baldwin County amend Dune Walkover Zoning Ordinance in order to protect the Sand Dunes, Endangered Alabama Beach Mice, & Sea Turtles in District 25 and finally have made significant progress to this end.

We've been working with Vince Jackson, Baldwin County's Planning & Zoning Director regarding Amendments to several Ordinances in District 25.  Vince sent us the final draft of these proposed Ordinances that will be **voted by the Baldwin County Planning & Zoning Commission On September 5, 2019**.  (See attached below). If the Commission approves the Ordinances, then Baldwin County Commissioners will be voting on these Ordinances in October, 2019 and these could be effective by the end of the Endangered Sea Turtle Nesting Season 2019.

We've been researching and reviewing all of the Proposed Amendments to the Ordinances in District 25 (See Attachment below).  **These Ordinances will have a positive effect on the Endangered Alabama Beach Mice & Sea Turtles,  help protect the Sand Dunes and Endangered Alabama Beach Mice Homes & Sea Turtle Nests and will benefit the mission of US Fish and Wildlife Services in District 25.**

One of the Proposed Ordinances will limit building height of new homes in District 25 to two (2) stories instead of the current 3 stories.  This will help keep the crowds of weekly renters in singles and doubles down, so we will not see anymore homes that could house 44 new guests each week who are unfamiliar with USFWS and neglect the Endangered Alabama Beach Mice and Endangered Sea Turtles in District 25.

Another one of the Proposed Amended Ordinances will prevent the building of these the extra large Dune Walkovers to no higher than 3 feet above dunes instead of the current no limit on height that we see Dune Walkovers being built 15-20 feet over the sandy beaches.  These extra large structures ultimately end up being floating and flying damaging debris around Fort Morgan.  The new Dune Walkover Ordinance will limit width, height, length, quantity and prohibit electrical lighting.  The extra large structures will be prohibited by new the zoning regulations and they will also be prevented from reaching the wet beach where they interfere with Endangered Sea Turtles, Endangered Sea Turtles

Bordelon et. al. v. Baldwin County et al. No.: 31:20-CV-00057-C

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 73 of 800  PageID #: 2087
Case 1:20-cv-00057-C  Document 44  Filed 05/21/21  Page 423 of 434  PageID #: 678
3/12/2021                                   Mail - Lynn, William - Outlook

Nests and Share the Beach Volunteers. The new[0074] Dune Walkover Ordinance also prevents building dune walkovers during Endangered Sea Turtle Nesting Season (May 1 - Nov 1). If this Ordinance is approved then USFWS will see only limited quantity and significantly smaller structures being built on the sandy beaches in District 25 instead the uncontrolled mega structures that are harming or killing the Endangered Alabama Beach Mice & Endangered Sea Turtles.

The rest of the Proposed Ordinances in District 25 are new regulations that will keep the Current Zoning Map in District 25 from increasing density. (a) There is an Exemption for District 25 from the new High Density Residential District (HDR). (b) The Coastal High Hazard Area and (c) the Flood Hazard Area Proposed Ordinances will protect the future populations and property of District 25. **Increasing density and intensity through rezoning will be prohibited and Fort Morgan will be limited to low density single family use if these Proposed Ordinances are Approved.**

All of the Proposed Amended Ordinances in District 25 will have a positive effect on The Endangered Alabama Beach Mice and Endangered Sea Turtles mainly through limiting the extra large structures and buildings we have been seeing in Fort Morgan and by preventing zoning increases that would add considerable populations to Fort Morgan and the sandy beaches. We could have less crowds on the beaches and sand dunes; therefore, protecting Endangered Alabama Beach Mice, Endangered Sea Turtles & their Nests if these Ordinances are Approved.

We are requesting US Fish & Wildlife Services in District 25 (Fort Morgan) show their support of these Proposed Amended Ordinances. We would appreciate you sending a letter to the Baldwin County Planning & Zoning Commission and Baldwin County Commissioners showing your support of these Ordinances before they will be voting on September 5, 2019.

You may contact Vince Jackson, Baldwin County's Planning & Zoning Director, regarding these Proposed Ordinances in District 25. Vince can deliver your letter to Baldwin County's Planning & Zoning Commission Members and the Commissioners.

We hope you will support the Proposed New Ordinances in District 25 (see attached file below). Please feel free to contact us if you have any questions. We are happy to meet with you about the new ordinances.

Thank you for your continued work to protect the Sand Dunes, the Endangered Alabama Beach Mice, the Endangered Sea Turtles and their Nests!



Bordelon et. al. v. Baldwin County et al. No.: 31:20-CV-00057-C

https://outlook.office365.com/mail/search/id/AAQkADU5NTM4N2U3LTFhNGMtNGI2Ny04Y2IzLTQ0NWNjNDFkOGU3MwAQAGpy3J%2F11OpHqWkd...  2/3

3/12/2021                                         Mail - Lynn, William - Outlook
                                                  0075

Begin forwarded message:

> **From:** Vince Jackson <VJACKSON@baldwincountyal.gov>
> **Date:** August 20, 2019 at 5:03:33 PM CDT
> ███████████████████████████████████
> **Subject: Planning District 25 Proposed Text Amendments to Local Provisions 2019 Revised.docx**
>
> ███
>
> Attached, please find the proposed amendments to the local provisions for Planning District 25. The section pertaining to the limit on habitable stories is placed at (e). We removed a previously proposed statement pertaining to stacked parking due to the fact that it is already addressed in Article 15 (Section 15.3.1), and I made a determination to that effect on July 3, 2019. In discuss it with the County Administrator, we determined that including another provision would be redundant and would potentially jeopardize the determination. As a result, it was removed. The attached map goes along with the considerations for flood prone areas.
>
> If you should have any questions, please let me know.
>
> Thanks,
>
> Vince

MESSAGE DISCLAIMER: This message, including any attachments, is intended for the use of the addressee(s) only, and it may contain information that is confidential, privileged or legally protected. Unauthorized review, distribution or copying of this message or of any accompanying attachments is prohibited. If you have received this message in error, please contact me by return email or by telephone, and permanently  delete it and any accompanying attachments from any system on which they may be stored.

Bordelon et. al. v. Baldwin County et al. No.: 31:20-CV-00057-C

https://outlook.office365.com/mail/search/id/AAQkADU5NTM4N2U3LTFhNGMtNGI2Ny04Y2IzLTQ0NWNjNDFkOGU3MwAQAGpy3J%2F11OpHqWkd…     3/3

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 75 of 800   PageID #: 2089
Case 1:20-cv-00057-C   Document 44   Filed 05/21/21   Page 425 of 434   PageID #: 680
4/22/2021                                    Mail - Lynn, William - Outlook

0076

## [EXTERNAL] Yesterday's meeting



Wed 8/21/2019 3:19 PM

**To:** Lynn, William <william_lynn@fws.gov>

📎 3 attachments (243 KB)

Planning District 25 Proposed Text Amendments to Local Provisions 2019 Revised.docx; 3450 Ponce de Leon.jpg; Stop Work Order 3450 A&B Ponce de Leon.jpg;

Bill

Thank you for taking the time to meet with me yesterday at ▮▮▮▮▮▮. I really appreciate your guidance and I enjoyed seeing an ABM house. Maybe one day I'll get to see an ABM.

As we discussed, we are more than happy to allow USFWS access to this property do anything you would like to do on the property, spray for the evasive grass, plant anything and I will run some sand fencing in the lower lying areas and see what happens. Please just outline in an email what you would like for me to convey to USFWS so to allow you to access our property and spray, plant etc.

If available, please send to me contact information for the Dune Doctors, I would like to see about scheduling the sand fencing and planting for November.

Also, I forgot to ask if USFWS has issued an ITP for 3450 A&B Ponce de Leon and if so, what is the current status of the ITP. I wanted to confirm you are aware that pilings have been delivered and driven without proper permitting from Baldwin County and currently there is a stop work order for 3450 A&B Ponce de Leon from Baldwin County.

Finally, Vince Jackson updated the ordinances I previously provided to you. I have attached the revised ordinances. Two major changes. First, the stacked parking revision. Baldwin County Planning & Zoning has determined that each parking space must have unobstructed access and egress and that this requirement is already in the current ordinances. So, the language related to stacked parking has been removed. As an aside, 3450 A&B Ponce de Leon is the first structure in District 25 to be required to comply with this new "interpretation" for parking. This is a huge win for the beach. This new parking interpretation is why the owner has been reaching out to USFWS. Second, the ordinance now proposes a limit of 2 stories for all single- and two-family structures. This 2-story limit will greatly reduce the number of bedrooms that can be built in one of these duplexes.

Again, please help us delay 3450 A&B Ponce de Leon anyway you can. This new parking interpretation and the proposed 2 story limit will dramatically reduce the size of these mega structures. Please make sure that if any changes to the ITP or footprint occur that you require a new public notice in accordance with the endangered species act.

And thanks again for meeting me yesterday it was truly insightful.

Bordelon et. al. v. Baldwin County et al. No.: 31:20-CV-00057-C

https://outlook.office365.com/mail/id/AAQkADU5NTM4N2U3LTFhNGMtNGI2Ny04Y2IzLTQ0NWNjNDFkOGU3MwAQAIbQbQ6vKkKiiOd6sYraMYM%3D   1/2

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 76 of 800   PageID #: 2090
Case 1:20-cv-00057-C   Document 44   Filed 05/21/21   Page 426 of 434   PageID #: 681
4/22/2021                        Mail - Lynn, William - Outlook

This message, including any attachments, is intended for the use of the addressee(s) only, and it may contain information that is confidential, privileged or legally protected. Unauthorized review, distribution or copying of this message or of any accompanying attachments is prohibited. If you have received this message in error, please contact me by return email or by telephone, and permanently delete it and any accompanying attachments from any system on which they may be stored.

3/12/2021

Mail - Lynn, William - Outlook
0080

**Trial Exhibit 41**

## Re: <EXTERNAL> Re: [EXTERNAL] Proposed Planning District 25 Zoning Text Amendments

1-24-202   *Admitted in Evidence*

**Lynn, William** <william_lynn@fws.gov>
Wed 10/9/2019 7:07 AM

**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>

Yes, I can see where the current residents on streets like, Bernard, Buchanan, Boykin and others are having their rustic charm of a neighborhood ruined by an industrial 3-story rental house going up next door.  But this is my personal opinion.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Bill Lynn
Certified Wildlife Biologist
Alabama ES Field Office
1208B Main Street
Daphne, AL 36526
251-441-5868 Office
251-441-6222 Fax
http://www.fws.gov/daphne/
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

***OUR VISION*: "Together, we will connect lands and waters to sustain fish, wildlife and plants by being visionary leaders, bold innovators and trusted partners, working with and for people."**

*NOTE: This email correspondence and any attachments to and from this sender is subject to the Freedom of Information Act (FOIA) and may be disclosed to third parties.*

On Tue, Oct 8, 2019 at 4:59 PM Vince Jackson <VJACKSON@baldwincountyal.gov> wrote:

Thanks, Bill. The provision in the proposed amendments which has generated the most controversy is the two story height limit. That was not what I expected. I believe there is support for it on the Commission, but we are receiving considerable push back nonetheless.

**From:** Lynn, William [mailto:william_lynn@fws.gov]
**Sent:** Tuesday, October 08, 2019 10:39 AM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** Re: <EXTERNAL> Re: [EXTERNAL] Proposed Planning District 25 Zoning Text Amendments

Vince,

This is usually a requirement in our permits.  However, we realize the economics of piling installation during the construction phases (less costly to install all at once) and we make exceptions.  It also is

3/12/2021                                      Mail - Lynn, William - Outlook
                                                     0081

typically less impactive (not having to come back to install later - i.e., once and done).  We give
guidelines to the builders to follow and allow boardwalk installation to occur during this
time period.


Overall, we do recommend boardwalk installation not occur during sea turtle nesting season.  If
boardwalk installation does occur during this time, then we ask for close coordination with the
Service prior to work occurring.


Thanks,


Bill

*********************************

Bill Lynn

Certified Wildlife Biologist

Alabama ES Field Office

1208B Main Street

Daphne, AL 36526

251-441-5868 Office

251-441-6222 Fax

http://www.fws.gov/daphne/

*********************************


*OUR VISION*: "**Together, we will connect lands and waters to sustain fish, wildlife and plants
by being visionary leaders, bold innovators and trusted partners, working with and for
people.**"


*NOTE: This email correspondence and any attachments to and from this sender is subject to the Freedom of
Information Act (FOIA) and may be disclosed to third parties.*


On Tue, Oct 8, 2019 at 8:38 AM Vince Jackson <VJACKSON@baldwincountyal.gov> wrote:

3/12/2021                                           Mail - Lynn, William - Outlook
                                                         0082

Thanks, Bill. One thing that has been specifically  mentioned is the provision pertaining to the sea
turtle nesting season. It has been stated that there is no precedent for local government
enforcement, and it should therefore be removed. Any thoughts on that one?


Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: "Lynn, William" <william_lynn@fws.gov>
Date: 10/8/19 7:42 AM (GMT-06:00)
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> Re: [EXTERNAL] Proposed Planning District 25 Zoning Text Amendments

Vince,

I have reviewed.  The dune walkover section looks good to me.  We usually recommend a
boardwalk height of 3 to 5 feet above the dune line to allow for dune growth.  We also
recommend handrails or some form of handrails to encourage guest to stay on the boardwalk
and run through the dunes.  The proposed parking regulations are already having a good effect in
the site plans I am reviewing.  Previously, applicant would sink all their footprint into the building,
decks and leave inadequate space for parking.  I could only review site plans to ensure it meets
the permit footprint limit.  With these regulations, the applicants are ensuring adequate parking
now.

Thanks,

Bill
*********************************
Bill Lynn
Certified Wildlife Biologist
Alabama ES Field Office
1208B Main Street
Daphne, AL 36526
251-441-5868 Office
251-441-6222 Fax
http://www.fws.gov/daphne/<https://gcc02.safelinks.protection.outlook.com/?
url=http%3A%2F%2Fwww.fws.gov%2Fdaphne%2F&data=02%7C01%7C%7Cb1fbaaeff5c4411a302
108d74bed077d%7Ca1dbbb3c47f8420e932cbb4942e61768%7C0%7C0%7C637061353717721987
&sdata=ZMnhbnDMVL5Cf1Ec8GTdYY0fv2XFpLnxzYNuQGi8tOQ%3D&reserved=0>
*********************************

OUR VISION: "Together, we will connect lands and waters to sustain fish, wildlife and plants by
being visionary leaders, bold innovators and trusted partners, working with and for people."

NOTE: This email correspondence and any attachments to and from this sender is subject to the
Freedom of Information Act (FOIA) and may be disclosed to third parties.

Mail - Lynn, William - Outlook

0083

On Mon, Oct 7, 2019 at 5:23 PM Vince Jackson
<VJACKSON@baldwincountyal.gov<mailto:VJACKSON@baldwincountyal.gov>> wrote:
Hi Bill,

We have prepared a series of proposed zoning text amendments pertaining to Planning District 25 (Fort Morgan). These are based on issues which have been brought to our attention and were drafted at the request of Fort Morgan area residents. If you have a chance, I wondering if you might have some comments...particularly on the dune walkover section. The proposed amendments are included in the attached staff report, with additions underlined and highlighted in red. Although there is considerable support, we have received a good deal of pushback...particularly on the proposed two story height limitation for single family and duplex structures.

If you should have any questions or should need additional information, please let me know.

Thanks,

Vince

Trial Exhibit 43   1-24-2022

Admitted
in
Evidence

# Baldwin County
# Zoning Ordinance



## Amended as of December 1, 2020

### Baldwin County Commission

Baldwin County Planning and Zoning Commission

Defendants' Bates # 6805

# Table of Contents

**Article 1**         **Purpose, Enactment and Title**                         **Page   1-1**

        Section  1.1   Purpose

        Section  1.2   Short Title

        Section  1.3   Authority

        Section  1.4   Jurisdiction

        Section  1.5   Repeal of Regulations and Ordinances

        Section  1.6   Conflict with Other Law

        Section  1.7   Validity

        Section  1.8   Disclaimer of Liability

        Section  1.9   Adoption

**Article 2**         **Planning Districts, Boundaries and Local Provisions  Page   2-1**

        Section  2.1   Establishment of Planning Districts

        Section  2.2   Establishment of Zoning Districts

        Section  2.3   Establishment of Zoning in Planning Districts
                2.3.1     Planning District 1
                2.3.2     Planning District 2
                2.3.3     Planning District 3
                2.3.4     Planning District 4
                2.3.5     Planning District 5
                2.3.6     Planning District 6
                2.3.7     Planning District 7
                2.3.8     Planning District 8
                2.3.9     Planning District 9
                2.3.10    Planning District 10
                2.3.11    Planning District 11
                2.3.12    Planning District 12
                2.3.13    Planning District 13
                2.3.14    Planning District 14
                2.3.15    Planning District 15
                2.3.16    Planning District 16
                2.3.17    Planning District 17
                2.3.18    Planning District 18
                2.3.19    Planning District 19
                2.3.20    Planning District 20
                2.3.21    Planning District 21

Defendants' Bates # 6806

*Baldwin County Zoning Ordinances*            *Table of Contents*

2.3.22   Planning District 22
2.3.23   Planning District 23
2.3.24   Planning District 24
2.3.25   Planning District 25
2.3.26   Planning District 26
2.3.27   Planning District 27
2.3.28   Planning District 28
2.3.29   Planning District 29
2.3.30   Planning District 30
2.3.31   Planning District 31
2.3.32   Planning District 32
2.3.33   Planning District 33

**Article 3**    **Rural Districts**    **Page   3-1**

Section  3.1   RR, Rural District
3.1.1      Generally
3.1.2      Permitted Uses
3.1.3      Special Exceptions
3.1.4      Conditional Use
3.1.5      Area and Dimensional Ordinances
3.1.6      Area and Dimensional Modifications

Section  3.2   RA, Rural Agriculture District
3.2.1      Generally
3.2.2      Permitted Uses
3.2.3      Special Exceptions
3.2.4      Conditional Uses
3.2.5      Area and Dimensional Ordinances
3.2.6      Area and Dimensional Modifications

Section  3.3   CR, Conservation Resource District
3.3.1      Generally
3.3.2      Permitted Uses
3.3.3      Special Exceptions
3.3.4      Conditional Uses
3.3.5      Area and Dimensional Ordinances

**Article 4**    **Residential Districts**    **Page   4-1**

Section  4.1   RSF-E, Residential Single Family Estate District
4.1.1      Generally
4.1.2      Permitted Uses
4.1.3      Conditional Uses
4.1.4      Special Exception
4.1.5      Area and Dimensional Ordinances
4.1.6      Area and Dimensional Modifications

Section  4.2   RSF-1, Single Family District
4.2.1      Generally
4.2.2      Permitted Uses

Defendants' Bates # 6807

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 84 of 800   PageID #: 2098
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 5 of 293   PageID #: 697

*Baldwin County Zoning Ordinances*                                              *Table of Contents*

4.2.3     Conditional Uses
4.2.4     Special Exception
4.2.5     Area and Dimensional Ordinances

Section   4.3    RSF-2, Single Family District
4.3.1     Generally
4.3.2     Permitted Uses
4.3.3     Conditional Uses
4.3.4     Special Exception
4.3.5     Area and Dimensional Ordinances

Section   4.4    RSF-3, Single Family District
4.4.1     Generally
4.4.2     Permitted Uses
4.4.3     Conditional Uses
4.4.4     Special Exception
4.4.5     Area and Dimensional Ordinances

Section   4.5    RSF-4, Single Family District
4.5.1     Generally
4.5.2     Permitted Uses
4.5.3     Conditional Uses
4.5.4     Special Exception
4.5.5     Area and Dimensional Ordinances

Section   4.6    RTF-4, Two Family District
4.6.1     Generally
4.6.2     Permitted Uses
4.6.3     Conditional Uses
4.6.4     Special Exception
4.6.5     Area and Dimensional Ordinances

Section   4.7    RSF-6, Single Family District
4.7.1     Generally
4.7.2     Permitted Uses
4.7.3     Conditional Uses
4.7.4     Special Exceptions
4.7.5     Area and Dimensional Ordinances

Section   4.8    RTF-6, Two Family District
4.8.1     Generally
4.8.2     Permitted Uses
4.8.3     Conditional Uses
4.8.4     Special Exceptions
4.8.5     Area and Dimensional Ordinances

Section   4.9    RMF-6, Multiple Family District
4.9.1     Generally
4.9.2     Permitted Uses
4.9.3     Conditional Uses
4.9.4     Special Exceptions

Defendants' Bates # 6808

*Baldwin County Zoning Ordinances*                                   *Table of Contents*

         4.9.5    Area and Dimensional Ordinances (single and two family)
         4.9.6    Area and Dimensional Ordinances (multiple family)
         4.9.7    Townhouses

Section 4.10  HDR, High Density Residential District
         4.10.1    Generally
         4.10.2    Permitted Uses
         4.10.3    Conditional Uses
         4.10.4    Area and Dimensional Ordinances (single and two family)
         4.10.5    Area and Dimensional Ordinances (multiple family)
         4.10.6    Townhouses
         4.10.7    Open Space Requirement
         4.10.8    Lighting Standards
         4.10.9    Landscaping and Buffering

Section 4.11  RMH, Residential Manufactured Housing Park District
         4.11.1    Generally
         4.11.2    Permitted Uses
         4.11.3    Conditional Uses
         4.11.4    Area and Dimensional Ordinances
         4.11.5    Compliance with Subdivision Regulations

**Article 5**        **Commercial Districts**        **Page  5-1**

Section 5.1      B-1, Professional Business District
         5.1.1    Purpose and Intent
         5.1.2    Permitted Uses
         5.1.3    Conditional Uses
         5.1.4    Mixed Uses
         5.1.5    Area and Dimensional Ordinances
         5.1.6    Lighting Standards
         5.1.7    Distance Between Structures
         5.1.8    Landscaping and Buffering

Section 5.2      B-2, Neighborhood Business District
         5.2.1    Purpose and Intent
         5.2.2    Permitted Uses
         5.2.3    Conditional Uses
         5.2.4    Mixed Uses
         5.2.5    Area and Dimensional Ordinances
         5.2.6    Lighting Standards
         5.2.7    Distance Between Structures
         5.2.8    Landscaping and Buffering

Section 5.3      B-3, General Business District
         5.3.1    Purpose and Intent
         5.3.2    Permitted Uses
         5.3.3    Conditional Uses
         5.3.4    Area and Dimensional Ordinances
         5.3.5    Lighting Standards
         5.3.6    Distance Between Structures

Defendants' Bates # 6809

*Baldwin County Zoning Ordinances* _____ *Table of Contents*

          5.3.7    Landscaping and Buffering

Section  5.4    B-4, Major Commercial District
          5.4.1    Purpose and Intent
          5.4.2    Permitted Uses
          5.4.3    Conditional Uses
          5.4.4    Area and Dimensional Ordinances
          5.4.5    Lighting Standards
          5.4.6    Distance Between Structures
          5.4.7    Landscaping and Buffering

Section  5.5    RV-1, Recreational Vehicle Park District
          5.5.1    Purpose and Intent
          5.5.2    Permitted Uses
          5.5.3    Density
          5.5.4    Land Area
          5.5.5    Standards

Section  5.6    RV-2, Recreational Vehicle Park District
          5.6.1    Purpose and Intent
          5.6.2    Permitted Uses
          5.6.3    Density
          5.6.4    Land Area
          5.6.5    Standards

Section  5.7    LB, Limited Business District
          5.7.1    Purpose and Intent
          5.7.2    Permitted Uses
          5.7.3    Conditional Uses
          5.7.4    Mixed Uses
          5.7.5    Special Exceptions
          5.7.6    Area and Dimensional Ordinances
          5.7.7    Lighting Standards
          5.7.8    Landscaping and Buffering

**Article 6    Recreation Districts**                      **Page   6-1**

Section  6.1    MR, Marine Recreation District
          6.1.1    Generally
          6.1.2    Permitted Uses
          6.1.3    Conditional Use
          6.1.4    Area and Dimensional Ordinances

Section  6.2    OR, Outdoor Recreation District
          6.2.1    Generally
          6.2.2    Permitted Uses
          6.2.3    Area and Dimensional Ordinances

**Article 7    Tourist District**                          **Page   7-1**

Section  7.1    TR, Tourist Resort District

Defendants' Bates # 6810

*Baldwin County Zoning Ordinances*                                              *Table of Contents*

|  | 7.1.1 | Generally |
|  | 7.1.2 | Permitted Uses |
|  | 7.1.3 | Special Exceptions |
|  | 7.1.4 | Area and Dimensional Ordinances |

**Article 8**     **Industrial Districts**                          **Page  8-1**

Section 8.1     M-1, Light Industrial District
|  | 8.1.1 | Generally |
|  | 8.1.2 | Permitted Uses |
|  | 8.1.3 | Conditional Uses |
|  | 8.1.4 | Area and Dimensional Ordinances |

Section 8.2     M-2, General Industrial District
|  | 8.2.1 | Generally |
|  | 8.2.2 | Permitted Uses |
|  | 8.2.3 | Conditional Uses |
|  | 8.2.4 | Area and Dimensional Ordinances |

**Article 9**     **Planned Development Districts**                **Page  9-1**

Section 9.1     Purpose

Section 9.2     Planned Developments, Generally

Section 9.3     Planned Residential Developments

Section 9.4     PRD Establishment Procedures, Generally

Section 9.5     Submittals

Section 9.6     Planned Industrial Development (PID)

Section 9.7     Planned Commercial Development (PCD) (Reserved)

Section 9.8     Planned Development Plan Review

Section 9.9     Plan Amendments

Section 9.10    Approvals

Section 9.11    Annual Written Reports

**Article 10**    **Overlay Districts**                             **Page  10-1**

Section 10.1    Thoroughfare Corridor Overlay District
|  | 10.1.1 | Purpose |
|  | 10.1.2 | Area of Application |
|  | 10.1.3 | Requirements |

Section 10.2    Flood Hazard Overlay District

Defendants' Bates # 6811

*Baldwin County Zoning Ordinances*                                         *Table of Contents*

10.2.1   Purpose
10.2.2   Area of Application
10.2.3   Requirements

Section  10.3   Historic Resource Overlay District
10.3.1   Purpose
10.3.2   Area of Application
10.3.3   Requirements

Section  10.4   Wetland Protection Overlay District
10.4.1   Purpose
10.4.2   Area of Application
10.4.3   Wetland Protection District Boundaries
10.4.4   Permit Requirements
10.4.5   Subdivisions in the Wetland Protection Overlay District

Section  10.5   Gulf Beach Overlay District
10.5.1   Purpose
10.5.2   Established Boundaries
10.5.3   Applicability
10.5.4   Development Standards

**Article 11       Conservation Developments                    Page   11-1**

Section  11.1   Purpose and Intent

Section  11.2   Definitions

Section  11.3   General Ordinances

Section  11.4   Application Requirements

Section  11.5   Open Space
11.5.1   Standards to Determine Open Space and
             Buildable Area.
11.5.2   Permitted Uses
11.5.3   Prohibited Uses
11.5.4   Ownership and Management
11.5.5   Legal Instrument For Permanent Protection
11.5.6   Tax Assessment

**Article 12       General Requirements                         Page   12-1**

Section  12.1 General Requirements
12.1.1   Generally
12.1.2   Use of Land
12.1.3   Use of Structures
12.1.4   Area and Dimensional Requirements
12.1.5   Off Street Parking and Loading
12.1.6   Signs
12.1.7   Stormwater Management

Defendants' Bates # 6812

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 89 of 800   PageID #: 2103
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 10 of 293   PageID #: 702

*Baldwin County Zoning Ordinances*                                          *Table of Contents*

12.1.8   Erosion Control
12.1.9   Landscaping

Section   12.2   Temporary Structures and Uses

Section   12.3   Utility Structures

Section   12.4   Height Modifications

Section   12.5   Yard Requirements

Section   12.6   Coastal Areas

Section   12.7   Adult Entertainment

Section   12.8   Highway Construction Setbacks

Section   12.9   Substandard Lots of Record

Section   12.10   Rules for Determining Zoning District Boundaries

Section   12.11   Density

**Article 13        Design Standards                              Page   13-1**

Section   13.1   Accessory Uses and Structures
          13.1.1   Generally
          13.1.2   Residential Districts
          13.1.3   Accessory Dwellings
          13.1.4   Observation Towers

Section   13.2   Satellite Dishes and Radio and TV Antennas
          13.2.1   Satellite Dishes
          13.2.2   Radio and TV Antennas

Section   13.3   Home Occupations
          13.3.1   Home Occupations
          13.3.2   Home Occupations, Rural

Section   13.4   Utilities
          13.4.1   Septic Tanks
          13.4.2   Water and Sewer Connections
          13.4.3   Utility Plan
          13.4.4   Other

Section   13.5   Sewage Treatment Plants

Section   13.6   Buildings and Access
          13.6.1   Buildings to be on Lots
          13.6.2   Access

Defendants' Bates # 6813

Section  13.7   Cemeteries
        13.7.1   Purpose
        13.7.2   Procedures and Standards

Section  13.8   Recreational Vehicle (RV) Park
        13.8.1   Purpose
        13.8.2   Procedures and Standards

Section  13.9   Wireless Telecommunication Facilities
        13.9.1   Purpose
        13.9.2   Procedures and Standards

Section  13.10  Bed and Breakfast Establishments
        13.10.1  Purpose
        13.10.2  Standards

Section  13.11  Stormwater Management

Section  13.12  Erosion Control

Section  13.13  Wind Energy Conversion Systems

Section  13.14  Mini-Warehouses

Section  13.15  Office-Warehouses

**Article 14        Reserved**                                        **Page  14-1**

**Article 15        Parking and Loading Requirements**                **Page  15-1**

Section  15.1   Generally

Section  15.2   Parking Schedule
        15.2.1   Dwellings
        15.2.2   Institutional
        15.2.3   Health Facilities
        15.2.4   Business and Office
        15.2.5   Recreation and Amusement
        15.2.6   Industrial, Warehouse and Similar
                 Establishments

Section  15.3   Design Standards and Improvement Requirements
        15.3.1   Off-Street Parking Space Defined
        15.3.2   Parking Area Dimensions
        15.3.3   Width of Two-Way Access Driveways
        15.3.4   Paving Standards
        15.3.5   Drainage
        15.3.6   Landscaping
        15.3.7   Off-Street Loading and Unloading Spaces
        15.3.8   Curb Cuts and Vision Clearance
        15.3.9   Storage and Parking of Trailers and

Defendants' Bates # 6814

*Baldwin County Zoning Ordinances*                                    *Table of Contents*

Commercial Vehicles

**Article 16          Sign Requirements**                                    **Page   16-1**

Section   16.1     Purpose

Section   16.2     Measurement Determinations
          16.2.1     Number of Signs
          16.2.2     Sign Face Area
          16.2.3     Sign Height
          16.2.4     Distance Between Signs
          16.2.5     Façade Area

Section   16.3     Exempt Signs

Section   16.4     Prohibited Signs

Section   16.5     Permitted Signs
          16.5.1     Generally
          16.5.2     All Parcels
          16.5.3     Commercially Developed Parcels
          16.5.4     Undeveloped Parcels
          16.5.5     One-Family and Two-Family Residences
          16.5.6     Three-Family and Four-Family Residences
          16.5.7     Residential Development, Farms and Ranches

Section   16.6   Design, Construction, Location and Maintenance
                 Standards
          16.6.1     Compliance with Building and Electrical
                     Codes Required
          16.6.2     Illumination Standards
          16.6.3     Placement and Clearance Standards
          16.6.4     Relationship to Building Features
          16.6.5     Maintenance

Section   16.7     Administration
          16.7.1     Sign Certificate
          16.7.2     Variances
          16.7.3     Nonconforming Signs
          16.7.4     Abandoned Signs
          16.7.5     Illegal Signs

**Article 17          Landscaping and Buffers**                              **Page   17-1**

Section   17.1     Landscaping Plan

Section   17.2     Buffers of Unlike Land Uses and Zoning Designations

Section   17.3     Tree Protection

Section   17.4     Parking Lots

Defendants' Bates # 6815

**Article 18  Administration**    **Page 18-1**

Section  18.1   Administration, Interpretation and Enforcement

Section  18.2   Land Use Certificates

Section  18.3   Building Permits

Section  18.4   Certificate of Occupancy

Section  18.5   Appeals to the Board of Adjustment

Section  18.6   Variances
  18.6.1   Authorization
  18.6.2   Standards for Approval

Section  18.7   Hearing of Appeals and Variances
  18.7.1   Application Procedure
  18.7.2   Submission Requirements

Section  18.8   Special Exceptions
  18.8.1   Authorization
  18.8.2   Application Procedure
  18.8.3   Submission Requirements
  18.8.4   Standards for Approval
  18.8.5   Conditions and Restrictions on Approval

Section  18.9   Decisions of the Board of Adjustment

Section  18.10  Appeal From Decision of the Board of Adjustment

Section  18.11  Conditional Uses
  18.11.1  Authorization
  18.11.2  Application Procedure
  18.11.3  Submission Requirements
  18.11.4  Standards for Approval
  18.11.5  Conditions and Restrictions on Approval

Section  18.12  Tolling Provisions

**Article 19  Amendments to Official Zoning Map and Ordinances Page  19-1**

Section  19.1   Purpose

Section  19.2   Initiation Map Amendment

Section  19.3   Initiation Text Amendment

Section  19.4   Planning Director Preparation

Defendants' Bates # 6816

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 93 of 800   PageID #: 2107
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 14 of 293   PageID #: 706

*Baldwin County Zoning Ordinances* _____ *Table of Contents*

Section   19.5   Staff Review

Section   19.6   Factors for Reviewing Proposed Amendments

Section   19.7   More Restrictive Rezoning

Section   19.8   Examination and Copying of Application and Other Documents

Section   19.9   Revocations of Approvals

Section   19.10   Reliance on Information Presented by Applicant

Section   19.11   Presentation or Submittal of Incorrect Information

Section   19.12   Withdrawal of Applications

Section   19.13   Concurrent Applications

Section   19.14   Limitations on Rezoning of Land

Section   19.15   Application Fee

Section   19.16   Public Notice and Hearings

Section   19.17   Agricultural Land

**Article 20         Nonconformities                         Page   20-1**

Section   20.1   Intent

Section   20.2   Rules Applicable to Nonconformities
          20.2.1    Incompatibility and Enlargement
          20.2.2    Work in Progress
          20.2.3    Nonconforming Use of Open Land
          20.2.4    Nonconforming Use of Buildings
          20.2.5    Discontinuance of Nonconforming Use
          20.2.6    Destruction, Repair or Alteration of
                    Nonconforming Use or Structure
          20.2.7    Nonconforming Lots
          20.2.8    Subdivision of Lots
          20.2.9    Special Treatment due to These Ordinances
                    or Other Government Action
          20.2.10   Repairs and Maintenance
          20.2.11   Nonconforming Structures Unsafe Due to
                    Lack of Maintenance
          20.2.12   Nonconforming Accessory Uses and
                    Structures
          20.2.13   Illegal Uses and Structures Prohibited

**Article 21         Enforcement                              Page   21-1**

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 94 of 800   PageID #: 2108
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 15 of 293   PageID #: 707

*Baldwin County Zoning Ordinances*                                    *Table of Contents*

Section  21.1  Zoning Enforcement and Appeals

Section  21.2  Violations

Section  21.3  Notice of Violation

Section  21.4  Additional Penalties

Section  21.5  Appeals

**Article 22        Definitions**                                     **Page 22-1**

Section  22.1  Usage

Section  22.2  Words and Terms Defined

**Article 23        Table of Permitted Uses**                         **Page 23-1**

Section  23.1  Use of Land and Structures

Section  23.2  Permitted Uses

Section  23.3  Special Exceptions

Section  23.4  Conditional Uses

Section  23.5  Prohibited Uses

Section  23.6  Unlisted Uses

**Figure 1          Table of Permitted Uses**                         **Page 23-2**

**Figure 2          Area and Dimensional Ordinances**                 **Page 23-17**

**Appendix A        District Boundaries for Zoned Planning Districts** **Page   A-1**

**Appendix B        Minimum Buffer Requirements**                     **Page   B-1**

**Appendix C        Planning District 25 CHHA and FHA Map**           **Page   C-1**

Defendants' Bates # 6818

# Article 1    Purpose, Enactment and Title

### Section 1.1  Purpose

The purpose of these ordinances is to promote the health, safety, morals and general welfare; to encourage the use of lands and natural resources in Baldwin County in accordance with their character and adaptability; to limit the improper use of land; to provide for the orderly development and growth of Baldwin County; to reduce hazards to life and property; to establish the location and size of and the specific uses for which dwellings, buildings and structures may hereafter be erected or altered, and the minimum open spaces and sanitary, safety and protective measures that shall be required for such buildings, dwellings, and structures; to avoid congestion on the public roads and streets; to provide safety in traffic and vehicular parking; to facilitate the development of an adequate system of transportation, education, recreation, sewage disposal, safe and sufficient water supply and other public requirements; to conserve life, property and natural resources and the expenditure of funds for public improvements and services to conform with the most advantageous uses of land, resources and properties, for the general good and benefit to the people of Baldwin County.

### Section 1.2  Short Title

These ordinances shall be known and may be cited as the "Baldwin County Zoning Ordinances."

### Section 1.3  Authority

The rules and ordinances herein set forth are hereby adopted in accordance with the requirements of Act 91-719 of the Alabama Legislature as amended by Act No. 93-668, Act No. 98-665, Act No. 2006-609 and Act No. 2010-719.

### Section 1.4  Jurisdiction

These zoning ordinances shall be in force and effect in those planning districts established in Baldwin County in compliance with the requirements of Act 91-719, as amended, which elect to come within the planning and zoning authority of the Baldwin County Commission.

#### 1.4.1  *Temporary Moratoriums after Zoning Referendum Approvals*

(a) A temporary one hundred eighty (180) day moratorium is imposed regarding structures and land uses located in any planning district which has voted to institute county zoning.

Defendants' Bates # 6819

(b) During said one hundred eighty (180) day period, the Advisory Committee of the district, Baldwin and County Planning and Zoning Commission, and staff shall work diligently to develop and present to the Baldwin County Commission a proposed zoning map and comprehensive development ordinances for adoption.

(c) If zoning and development ordinances are adopted by the Baldwin County Commission prior to the expiration of the one hundred eighty (180) day temporary moratorium period, said moratorium shall then terminate without further action of the Commission.

(d) This moratorium shall not be applicable to applications for structures and uses properly submitted prior to an affirmative vote for zoning, a family division of land, subdivision of land by court order, single family homes and attachments/additions thereto.

## Section 1.5  Repeal of Regulations and Ordinances

This is a comprehensive enactment of zoning ordinances for Baldwin County in compliance with the requirements of Act 91-719, as amended. All prior zoning regulations and ordinances adopted pursuant to Act 91-719, as amended, are hereby superseded and repealed.

## Section 1.6  Conflict with Other Laws

Whenever the requirements of these ordinances are at variance with the requirements of any other lawfully adopted statutes, rules, regulations or ordinances, the more restrictive, or that imposing the higher standards, shall govern.

## Section 1.7  Validity

Each phrase, sentence, paragraph, section or other provision of these ordinances is severable from all other such phrases, sentences, paragraphs, sections and provisions. Should any phrase, sentence, paragraph, section or provision of these ordinances be declared by the courts to be unconstitutional or invalid, such declaration shall not affect any other portion or provision of these ordinances.

## Section 1.8  Disclaimer of Liability

These ordinances shall not create liability on the part of the Baldwin County Commission or its assigns, the Baldwin County Planning & Zoning Commission, the Baldwin County Planning District Advisory Committees, the Baldwin County Boards of Adjustment, or any officer or employee thereof for any damages that

Defendants' Bates # 6820

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 97 of 800  PageID #: 2111
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 18 of 293  PageID #: 710

*Baldwin County Zoning Ordinances*                                                1-3

may result from reliance on these ordinances or any administrative decision lawfully made hereunder.

## Section 1.9  Adoption

The *Baldwin County Zoning Ordinances* were adopted by the Baldwin County Commission on the 6th day of April, 1999 (Resolution No. 99-46). They shall take effect and be in force from and after the date of adoption. The zoning maps approved for each planning district that elects to come within the planning and zoning authority of the Baldwin County Commission are hereby adopted and made a part of these ordinances.

This ordinance was most recently amended by the Baldwin County Commission on the 16th day of October, 2018 (Resolution #2019-008).

_____
County Commission Chairman

_____
County Administrator

## Article 2   Planning Districts, Boundaries and Local Provisions

### Section 2.1   Establishment of Planning Districts

In accordance with Act No. 91-719 of the Legislature of Alabama as amended, the unincorporated areas of Baldwin County are divided into planning districts. Neither the Baldwin County Commission nor the Baldwin County Planning and Zoning Commission shall exercise their planning and zoning authority in any planning district established under Act No. 91-719 as amended until the majority of qualified electors of the planning district voting in an election shall have voted their desire to come within the planning and zoning authority of the Baldwin County Commission.

### Section 2.2   Establishment of Zoning Districts

The following zoning districts, which shall be available for all Planning Districts which have voted to come under the zoning authority of the Baldwin County Commission, are hereby established for the unincorporated areas of Baldwin County:

| | |
|---|---|
| RR | Rural District |
| RA | Rural Agricultural District |
| CR | Conservation Resource District |
| RSF-E | Residential Single Family Estate District |
| RSF-1 | Single Family District |
| RSF-2 | Single Family District |
| RSF-3 | Single Family District |
| RSF-4 | Single Family District |
| RTF-4 | Two Family District |
| RSF-6 | Single Family District |
| RTF-6 | Two Family District |
| RMF-6 | Multiple Family District |
| HDR | High Density Residential District |
| RMH | Residential Manufactured Housing Park District |
| B-1 | Professional Business District |
| B-2 | Local Business District |
| B-3 | General Business District |
| B-4 | Major Commercial District |
| RV-1 | Recreational Vehicle Park District |
| RV-2 | Recreational Vehicle Park District |
| LB | Limited Business District |
| MR | Marine Recreation District |
| OR | Outdoor Recreation District |
| TR | Tourist Resort District |
| M-1 | Light Industrial District |
| M-2 | General Industrial District |
| PRD | Planned Residential Development District |
| PID | Planned Industrial Development District |

Defendants' Bates # 6822

### Section 2.3   Establishment of Zoning in Planning Districts

2.3.1   *Planning District 1.*   County zoning has not been instituted in this district.

2.3.2   *Planning District 2.*   County zoning has not been instituted in this district.

2.3.3   *Planning District 3.*   County zoning has not been instituted in this district.

### 2.3.4   *Planning District 4.*

2.3.4.1   Effective Date

On July 13, 1993, a majority of qualified electors in Planning District 4 voted to institute County Zoning. On February 21, 1995, the County Commission adopted the Planning District 4 Zoning Map and Ordinances.

2.3.4.2   District Boundaries

A legal description of the boundaries for Planning District 4 may be found under Appendix A.

2.3.4.3   Local Provisions for Planning District 4

  (a) Industrial Uses shall not discharge into any river or natural surface body of water.

  (b) The Tensaw River shall be used exclusively for transportation purposes to and from specific sites. Commercial barge storage shall not be allowed.

  (c) No Landfills are allowed.

  (d) No sewage treatment plants are allowed.

  (e) The following development standards shall apply to Planned Industrial Developments (PID):

    1. *Setbacks.* The following minimum setbacks shall be required:

       Minimum front yard                         100-feet
       Minimum rear yard                            75-feet
       Minimum side yard                            50-feet
       Minimum side yard abutting a street   100-feet

Defendants' Bates # 6823

2. *Building height.*  A maximum building height of 60-feet or 4 stories shall be observed. Any portion of a structure greater than 30-feet in height shall be located a minimum of 1,000-feet from any residential district.

3. *Lot size.*  A minimum lot size of 3 acres and a minimum lot width of 200-feet shall be required.

2.3.5  *Planning District 5.*  County zoning has not been instituted in this district.

2.3.6  *Planning District 6.*  County zoning has not been instituted in this district.

2.3.7  *Planning District 7.*  County zoning has not been instituted in this district.

2.3.8  *Planning District 8.*  Abolished by action of the Baldwin County Commission (April 15, 2003).

2.3.9  *Planning District 9.*  County zoning has not been instituted in this district.

2.3.10 *Planning District 10.*

2.3.10.1  Effective Date

On October 3, 2006, a majority of qualified electors in Planning District 10 voted to institute County Zoning.  On May 15, 2007, the County Commission adopted the Planning District 10 Zoning Map and Ordinance.

2.3.10.2  District Boundaries

A legal description of the boundaries for Planning District 10 may be found under Appendix A.

2.3.10.3  Local Provisions for Planning District 10

(a) Industrial uses shall not discharge into any river or natural surface body of water including wetlands.

(b) No additional Landfills.

(c) All utilities for new subdivisions shall be placed underground.

(d) Accessory dwellings are permitted by right in the residential districts in Planning District 10 unless restricted by a property owners association and provided they are contained entirely within the

Defendants' Bates # 6824

structure of a single family dwelling and provided they do not exceed 60% of the size, in square feet, of the principal residence.

(e) Cemeteries shall be allowed by right in the RA, Rural Agriculture District and the RSF-E, Residential Single Family Estate District.

(f) Roadway Buffers

1.) A fifty (50) foot wide vegetative buffer shall be required adjacent and parallel to the right-of-way of the following roads: State Road 225

2.) When existing vegetation exists to adequately screen adjoining properties which achieves the purposes of the section, the vegetation shall be retained. When the existing vegetation is insufficient to achieve the purposes of this section, the buffer must be supplemented with native vegetation.  When no vegetation exists or supplementation is required, a minimum of one (1) canopy tree per forty (40) linear feet must be preserved or planted. Canopy tree planting standards shall be as those found in *Section 17.2.9* of these ordinances.

3.) This requirement does not apply to intersecting roadways including driveways, or utility easements.

4.) Nuisance trees, as defined herein, shall not be included in a roadway buffer. This section conflicts with other buffer regulations contained in the *Baldwin County Zoning Ordinance*, the more stringent shall apply.

(g) Except for piers, gazebos, boathouses, hunting and fishing camp houses, and house boats, no dwelling shall be located within sixty (60) feet of the mean high tide line of any tidal body of water unless the building area available on the lot is insufficient to accommodate such dwelling outside the sixty (60) foot setback. Approved sewage disposal facilities are required for structures as required by law. For the purposes of this section, fishing and hunting camp houses shall mean a structure which may offer permanent or temporary shelter such as a cabin and is not intended to act as a permanent residence or occupation.  A fishing or camp houses primary purpose is providing shelter for camping, sporting, or other recreational activities.

(h) A Planned Residential Development may also be established under the RR, Rural District.

Defendants' Bates # 6825

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 102 of 800   PageID #: 2116
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 23 of 293   PageID #: 715

*Baldwin County Zoning Ordinances*                                                    2-5

(i) Off premise signs are prohibited. For the purposes of this section an *off premise sign* is defined as a sign which directs attention to a business, commodity, service, or entertainment conducted, sold or offered at a location other than the premises on which the sign is located. However, exempt signs contained in *Section 16.3* are also exempt from this section.

(j) *Regulation of Walls and Fences.* Generally, this section shall only apply in the following residential zones: RSF-1, RSF-2, RSF-3, RSF-4, RSF-6, RTF-4, RTF-6 and RMF-6.

1.) Walls and fences erected shall be maintained in good repair and sound structural condition.

2.) Walls and fences erected shall be subject to vision clearance standards outlined in *Section 15.3.8(b).*

3.) No fence or wall shall be erected or placed within any street right-of-way or easement, or closer than ten (10) feet from mean high tide line.

4.) *Height*

A. *Determination of Height.* The height of fences and walls shall be measured from the ground level at the fence location. However, if the Planning Director determines that ground levels have been altered so as to provide for a higher fence, the Planning Director shall determine the ground level for the purposes of measuring the fence or wall height. In determining whether the ground level has been altered to increase height, the Planning Director may consider, but will not be limited to, the following:

i. General ground elevation of the entire lot
ii. Average elevation over the length of the fence
iii. Ground elevation on both sides

B. *Front Yard.* A fence or wall located in the front yard shall not exceed four (4) feet in height and shall not be constructed in a manner in which results in a solid wall or fence. The fence or wall should be of an open mesh design.

For the purposes of this section, open mesh design may include picket-type fencing provided that the minimum space between vertical members must be of one and one-half times the width and thickness of the vertical members or bars. In no case may

Defendants' Bates # 6826

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 103 of 800  PageID #: 2117
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 24 of 293  PageID #: 716

*Baldwin County Zoning Ordinances*                                                    *2-6*

the space between vertical members or bars be less than four inches.

C. *Side and Rear Yard.* A fence or wall located in the side or rear yard shall not exceed eight (8) feet in height and may be constructed in a manner in which a solid wall or fence is created.

D. *Corner lots and Double Frontage Lots.* On lots which have frontage on more than one street, fence in the front yards shall not exceed a maximum height of four (4) feet. A fence or wall in a side yard shall not exceed a maximum height of four (4) feet, forward of the front primary façade of adjoining homes or structures and must be of open mesh design.

A primary façade is the side of a building that faces the roadway or has the primary entrance. For the purposes of side yard fencing, the line which delineates the primary façade shall be drawn from a point of the façade which has the greatest length facing the roadway or side which includes the primary entrance.

E. *Decorative Features.* Decorative caps or ornamental features of up to twelve (12) inches may be added along the top of fence posts.

(k) Adult Use Ordinance.

1.) *Purpose.* The intent of these provisions is to establish reasonable and uniform regulations for adult uses and entertainment, whether existing or proposed, that will protect the health, safety, property values, and general welfare of the people, businesses, and industries of the county. It is not the intent to legislate with respect to matter of obscenity.

2.) *Definitions.* Definitions contained in the *Code of Alabama 13A-12-200.1* are hereby adopted.

A. The term *adult use* includes without limitation, adult bookstores, adult video stores, adult movie house, and adult-only entertainment establishments.

B. The term *Adult Book Store* or *Adult Video Store* shall not apply to a video or book store that does not engage in and a material part of whose principal business is not the sale or rental of adult material.

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 104 of 800  PageID #: 2118
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 25 of 293  PageID #: 717

*Baldwin County Zoning Ordinances*                                                    2-7

C. If, in the discretion of the Planning and Zoning Director or his/her designee, a material portion of the business's displayed merchandise and/or interior business space does consists of the offer for sale or rental of adult books, videos or merchandise it shall be deemed an adult use.  However, should the business satisfactorily demonstrate that the wholesale and retail sales value, derived from all adult use portions of the business does not exceed thirty (30) percent of total wholesale and  retail sales value or revenue of the business; the term shall not apply.

D. The term *pre-existing* shall mean:

i. The establishment or structure is already being lawfully used or lawfully occupied.

ii. A building permit for the structure has been lawfully issued and has not expired.

3.) *Special Operating License.*  It shall be unlawful for any person, association, partnership, corporation, or other business entity to open, engage in, operate, conduct, expand, enlarge, or carry on in or upon premises an adult use without first meeting the criteria contained herein and issuance of a Special Operating License from the Baldwin County Commission. Special Operating Licenses shall not be transferable, assignable or negotiable, and a licensee shall not attempt to transfer, assign, negotiate or otherwise convey and rights under such License to any other person or business.

A. With respect to license issuance, the following additional standards shall apply in addition to standards stated elsewhere herein:

i. Where there is evidence that, even though there is compliance with the minimum distance requirements set forth herein, the type and number of schools or number of churches or other facilities in the vicinity must not cause minors to frequent the immediate area.

ii. Where there is evidence that the proposed area for the use is already adequately supplied with such adult use.

iii. The license shall be revoked if the business establishment is convicted of violating, or otherwise determined to have violated these regulations.

Defendants' Bates # 6828

B. An applicant for a Special Operating License shall file a completed application made on a form provided by the County. An application shall be considered complete when it contains each required signature and the information and/or items:

i. The applicant's full true name and any other names used by the applicants in the preceding five years.

ii. Current business address or mailing address of the applicant.

iii. Written proof of age, in the form of a driver's license or a copy of a birth certificate accompanied with photo identification issued by a governmental agency.

iv. The business name, location, legal description, mailing address and phone number.

v. A statement of whether an applicant has been convicted of or has pled guilty or nolo contender to a specific criminal activity, and if so, each specified criminal activity involved, including date, place, and jurisdiction of each as well as dates of conviction and release from confinement.

vi. A sketch or drawing showing the configuration of the premises, including a statement of total floor space occupied by the business marked with dimensions.

viii. A survey, in accordance with *Section 2.3.10.3.4(C),* indicating radial distances.

ix. Payment of application fee and investigative fee.

C. Upon the submission of a complete application, which meets the criteria of this section, the County Commission shall schedule a public hearing on the issuance of the Special Operating License.

4.) *Standards.* The standards contained herein shall apply to all adult uses as defined in S*ection 2.3.10.3(k) (2).*

A. *Zoning Districts Where Establishment Permitted.* No adult use shall be located on any premises unless the location is zoned M-2, General Industrial District.

Defendants' Bates # 6829

B. *Distance Minimums*. In addition to the zoning district requirements set forth in *Section 2.3.10.3.4(A),* an adult use shall not be allowed to open, engage in, operate, conduct, expand, enlarge, or carry on in or upon premises, within any of the following distances:

    i. One thousand (1,000) feet of a pre-existing adult use.

    ii. Five hundred (500) feet of a pre-existing commercial establishment that in any manner sells or dispenses alcohol for on-premises consumption.

    iii. Twenty-five hundred (2,500) feet of a pre-existing place of worship or related book store.

    iv. Twenty-five hundred (2,500) feet of a pre-existing education institution or public library.

    v. Twenty-five hundred (2,500) feet of a public park and/or playground.

    vi. Twenty-five hundred (2,500) feet from a residential use and areas zoned residential within the county.

    vii. Twenty-five hundred (2,500) feet of a day care center or day care home.

    viii. Twenty-five hundred (2,500) of a video arcade, skating rink or other places frequented by minors.

C. *Measurement of Distance*.  All distance measurements shall be by radial distances determined by a straight line from the nearest property to line to nearest property line. Distance measurements shall be established by a surveyor licensed in the State of Alabama.  A Survey shall be provided at the time an Adult Use permit application is submitted to the County for consideration, such survey to be provided by the applicant and at applicant's expense.

D. Any performance or displays of merchandise or any other exhibit depicting adult uses, shall be conducted within the interior of buildings or premises and shall be arranged or screened to prevent public viewing from outside such buildings or premises.

Defendants' Bates # 6830

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 107 of 800   PageID #: 2121
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 28 of 293   PageID #: 720

*Baldwin County Zoning Ordinances*                                                           *2-10*

(l) *Planned Residential Developments.* The phrase "Planned Residential Development" shall include the approved site plan and any and all accompanying documents, and other relevant materials considered during the approval process, including minor and major modifications approved through Section 9.9 Plan Modifications of the *Baldwin County Zoning Ordinances* (collectively the "PRD").

(m)Any Planned Residential Development (PRD) located within District 10, which has been approved by the Baldwin County Planning and Zoning Commission, through the *Baldwin County Subdivision Regulations,* shall be considered conforming in all respects and therefore shall not be subject to *Article 20 Nonconformities, Section 20.2.5* and *20.2.6*; of the *Baldwin County Zoning Ordinance*; subject however, to the following conditions:

1.) The developer must commence start of construction within two (2) years of said approval by the Baldwin County Planning and Zoning Commission ("Initial Period"), or as may be extended by the Baldwin County Commission.  Request for such extensions must be filed by the developer within the Initial Period and with the Baldwin County Commission at the offices of Planning and Zoning in Bay Minette, Alabama.  Extensions may be granted only upon the developer's demonstration, to the satisfaction of the Baldwin County Commission, that the need for extension results from an event or condition that the developer could not have anticipated or avoided and that such event or condition caused the start of construction during the Initial Period to be impossible or impractical. No more than two (2) one (1) year extensions may be granted.

"Start of Construction" means the first placement of permanent construction of a structure depicted on an approved PRD site plan, such as pouring of slabs or footings, installation of piles, construction of columns, or any work beyond the stage of excavation of a foundation. Permanent construction does not include land preparation, such as clearing, grading and filling; nor does it include the installation of streets and/or walkways; nor does it include excavation of footings, piers or foundations or the erection of temporary forms.

2.) The PRD shall govern, and all development activity shall be in accordance with the PRD.  In circumstances where the PRD is inconsistent with the *Zoning Ordinance,* the PRD shall govern.  Any use or structure indicated as commercial on an approved PRD site plan shall be considered as a by-right use in accordance with the commercial zoning designations provided in the *Zoning Ordinance.*

Defendants' Bates # 6831

(n) *Minor Modifications of Site Plan.* Request for minor modifications to an approved PRD may be approved by the Planning Director/Zoning Administrator. A "minor modification" is one which, in the Director's opinion, does not materially change, alter or diminish the intent and character of the PRD and its approval.

The following, without limitation, may be deemed "minor modifications":

1.) Changes such as the alignment, direction or lengths of roads or streets.

2.) Adjustments or shifts in dwelling units, not resulting in increased overall density or additional buildings.

3.) Slight shifts in building orientations and locations; or

4.) Decreases in building height or density.

(o) *Major Modifications of Site Plan.* Request for major modifications to an approved PRD may be submitted and approved through Section 9.9 Plan Modifications of the *Baldwin County Zoning Ordinances.* A "major modification" is one which, in the Zoning Administrator/Planning Director's opinion, affects the intent and character of the PRD and its approval.

The following, without limitation, shall be deemed "major modifications":

1.) Changes that will result in the addition of land.

2.) Increases in the number of buildings, density or building height(s).

3.) Significant increases in the foot print of building(s).

4.) Change of land uses within the PRD.

5.) Reduction of setbacks; or

6.) Significant changes in building location(s)

(p) *Zoning Designation Assignment and Reversionary Clause.* A Planned Residential Development approved prior to the adoption of the zoning map and ordinance, shall be assigned the "PRD" designation on the Official Zoning Map for District 10. In such case

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 109 of 800   PageID #: 2123
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 30 of 293   PageID #: 722

_Baldwin County Zoning Ordinances_                                                        _2-12_

when a Planned Residential Development fails to comply with any or all of the conditions in Section 2.3.10.2 (l), (m), (n) and (o) above, the PRD shall be subject to Article 20 Nonconformities, Section 20.2.5 and 20.2.6 of the _Baldwin County Zoning Ordinance_s, and shall automatically revert to RSF-1and the PRD classification removed.

2.3.11 **Planning District 11.**   Abolished by action of the Baldwin County Commission (April 15, 2003).

2.3.12 **Planning District 12.**

2.3.12.1   Effective Date

On June 20, 2006, a majority of qualified electors in Planning District 12 voted to institute County Zoning.  On November 7, 2006, the County Commission adopted the Planning District 12 Zoning Map and Ordinances.

2.3.12.2   District Boundaries

A legal description of the boundaries for Planning District 12 may be found under Appendix A.

2.3.12.3   Local Provisions for Planning District 12

(a) Industrial uses shall not discharge into any river or natural surface body of water including wetlands.

(b) No additional Landfills.

(c) All utilities for new subdivisions shall be placed underground.

(d) Accessory dwellings are permitted by right in residential districts provided they do not exceed sixty (60) percent of the size, in square feet, of the principal residence.

(e) Cemeteries shall be allowed by right in the RA, Rural Agriculture District and the RSF-E, Residential Single Family Estate District.

(f) Adult Use Ordinance.

1.) _Purpose._   The intent of these provisions is to establish reasonable and uniform ordinances for adult uses and entertainment, whether existing or proposed, that will protect the health, safety, property values, and general welfare of the people, businesses, and industries of the county.  It is not the intent to legislate with respect to matter of obscenity.

Defendants' Bates # 6833

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 110 of 800   PageID #: 2124
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 31 of 293   PageID #: 723

*Baldwin County Zoning Ordinances*                                                         *2-13*

2.) *Definitions.*  Definitions contained in the *Code of Alabama 13A-12-200.1* are hereby adopted.

A. The term *adult use* includes without limitation, Adult bookstores, adult video stores, adult movie house, and adult-only entertainment establishments.

B. The term *Adult Book Store* or *Adult Video Store* shall not apply to a video or book store that does not engage in and a material part of whose principal business is not the sale or rental of adult material.

C. If, in the discretion of the Planning and Zoning Director or his/her designee, a material portion of the business's displayed merchandise and/or interior business space does consists of the offer for sale or rental of adult books, videos or merchandise it shall be deemed an adult use.  However, should the business satisfactorily demonstrate that the wholesale and retail sales value, derived from all adult use portions of the business does not exceed thirty (30) percent of total wholesale and  retail sales value or revenue of the business; the term shall not apply.

D. The term *pre-existing* shall mean:

i. The establishment or structure is already being lawfully used or lawfully occupied.

ii. A building permit for the structure has been lawfully issued and has not expired.

3.) *Special Operating License.*  It shall be unlawful for any person, association, partnership, corporation, or other business entity to open, engage in, operate, conduct, expand, enlarge, or carry on in or upon premises an adult use without first meeting the criteria contained herein and issuance of a Special Operating License from the Baldwin County Commission. Special Operating Licenses shall not be transferable, assignable or negotiable, and a licensee shall not attempt to transfer, assign, negotiate or otherwise convey and rights under such License to any other person or business.

A. With respect to license issuance, the following additional standards shall apply in addition to standards stated elsewhere herein:

Defendants' Bates # 6834

i. Where there is evidence that, even though there is compliance with the minimum distance requirements set forth herein, the type and number of schools or number of churches or other facilities in the vicinity must not cause minors to frequent the immediate area.

ii. Where there is evidence that the proposed area for the use is already adequately supplied with such adult use.

iii. The license shall be revoked if the business establishment is convicted of violating, or otherwise determined to have violated these ordinances.

B. An applicant for a Special Operating License shall file a completed application made on a form provided by the County. An application shall be considered complete when it contains each required signature and the information and/or items:

i. The applicant's full true name ad any other names used by the applicants in the preceding five years.

ii. Current business address or mailing address of the applicant.

iii. Written proof of age, in the form of a driver's license or a copy of a birth certificate accompanied with photo identification issued by a governmental agency.

iv. The business name, location, legal description, mailing address and phone number.

v. A statement of whether an applicant has been convicted of or has pled guilty or nolo contender to a specific criminal activity, and if so, each specified criminal activity involved, including date, place, and jurisdiction of each as well as dates of conviction and release from confinement.

vi. A sketch or drawing showing the configuration of the premises, including a statement of total floor space occupied by the business marked with dimensions.

viii. A survey, in accordance with *2.3.12.3.4(C)*, indicating radial distances.

ix. Payment of application fee and investigative fee.

Defendants' Bates # 6835

C. Upon the submission of a complete application, which meets the criteria of this section, the County Commission shall schedule a public hearing on the issuance of the Special Operating License.

4.) *Standards.* The standards contained herein shall apply to all adult uses as defined in *Section 2.3.12.3(f) (2).*

A. *Zoning Districts Where Establishment Permitted.* No adult use shall be located on any premises unless the location is zoned M-2.

B. *Distance Minimums.* In addition to the zoning district requirements set forth in *Section 2.3.12.3.4(A),* an adult use shall not be allowed to open, engage in, operate, conduct, expand, enlarge, or carry on in or upon premises, within any of the following distances:

i. One thousand (1,000) feet of a pre-existing adult use.

ii. Five hundred (500) feet of a pre-existing commercial establishment that in any manner sells or dispenses alcohol for on-premises consumption.

iii. Twenty-five hundred (2,500) feet of a pre-existing place of worship or related book store.

iv. Twenty-five hundred (2,500) feet of a pre-existing education institution or public library.

v. Twenty-five hundred (2,500) feet of a public park and/or playground.

vi. Twenty-five hundred (2,500) feet from a residential use and areas zoned residential within the county.

vii. Twenty-five hundred (2,500) feet of a day care center or day care home.

viii. Twenty-five hundred (2,500) of a video arcade, skating rink or other places frequented by minors.

C. *Measurement of Distance.* All distance measurements shall be by radial distances determined by a straight line from the nearest property to line to nearest property line. Distance measurements shall be established by a surveyor licensed in

Defendants' Bates # 6836

the State of Alabama. A Survey shall be provided at the time an Adult Use permit application is submitted to the County for consideration, such survey to be provided by the applicant and at applicant's expense.

D. Any performance or displays of merchandise or any other exhibit depicting adult uses, shall be conducted within the interior of buildings or premises and shall be arranged or screened to prevent public viewing from outside such buildings or premises.

2.3.13 **Planning District 13.** County zoning has not been instituted in this district.

2.3.14 **Planning District 14.** County zoning has not been instituted in this district.

2.3.15 **Planning District 15.**

2.3.15.1 Effective Date

On February 21, 2006, a majority of qualified electors in Planning District 15 voted to institute County Zoning. On August 1, 2006, the County Commission adopted the Planning District 15 Zoning Map and Ordinances.

2.3.15.2 District Boundaries

A legal description of the boundaries for Planning District 15 may be found under Appendix A.

2.3.15.3 Local Provisions for Planning District 15

(a) Advisory Committee Philosophy.

It is the intent of the District 15 Advisory Committee to encourage residential zoning for the vast majority of District 15, and furthermore, to encourage zoning in the areas of RSF-E, Residential Single Family Estate District, and RSF-1, Single Family District, when possible in order to protect the values of homes and properties already established throughout the district. While we understand the need for affordable housing and commercial growth when properly zoned, we believe that protecting property values should be higher priority in making future zoning decisions.

(b) Industrial uses shall not discharge into any river or natural surface body of water including wetlands.

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 114 of 800   PageID #: 2128
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 35 of 293   PageID #: 727

(c) No additional Landfills.

(d) All utilities for new major subdivisions shall be placed underground.

(e) No additional recreation vehicle parks allowed.

(f) Accessory dwellings are permitted by right in the residential districts in Planning District 15 unless restricted by a property owners association and provided they are contained entirely within the structure of a single family dwelling and provided they do not exceed 60% of the size, in square feet, of the principal residence.

(g) Cemeteries shall be allowed by right in the RA, Rural Agriculture District and the RSF-E, Residential Single Family Estate District.

(h) Off premise signs are prohibited. For the purposes of this section an *off premise sign* is defined as a sign which directs attention to a business, commodity, service, or entertainment conducted, sold or offered at a location other than the premises on which the sign is located. However, exempt signs contained in *Section 16.3* are also exempt from this section.

### 2.3.16 *Planning District 16.*

#### 2.3.16.1   Effective Date

On June 9, 1992, a majority of qualified electors in Planning District 16 voted to institute County Zoning. On March 4, 1993, the County Commission adopted the Planning District 16 Zoning Map and Ordinances.

#### 2.3.16.2   District Boundaries

A legal description of the boundaries for Planning District 16 may be found under Appendix A.

#### 2.3.16.2   Local Provisions

No local provisions.

### 2.3.17 *Planning District 17.*   County zoning has not been instituted in this district.

### 2.3.18 *Planning District 18.*   County zoning has not been instituted in this district.

Defendants' Bates # 6838

2.3.19 *Planning District 19.*      Abolished by action of the Baldwin County Commission (April 15, 2003).

### 2.3.20 *Planning District 20.*

#### 2.3.20.1  Effective Date

On February 6, 2001, a majority of qualified electors in Planning District 20 voted to institute County Zoning. On April 2, 2002, the County Commission adopted the Planning District 20 Zoning Map and Ordinances.

#### 2.3.20.2  District Boundaries

A legal description of the boundaries for Planning District 20 may be found under Appendix A.

#### 2.3.20.3  Local Provisions for Planning District 20

(a) No PRD development is allowed to exceed maximum height requirements by more than 10-feet.

(b) Accessory dwellings are permitted by right in residential districts provided they do not exceed sixty (60) percent of the size, in square feet, of the principal residence.

(c) Marine recreation uses, not permitted by right under the B-2, Local Commercial District, may be allowed as conditional uses in a B-2 zone, subject to the approval of the Planning Commission.

(d) A recreational vehicle park may be allowed as a conditional use, under the B-2 zoning designation, subject to the approval of the Planning Commission.

### 2.3.21 *Planning District 21.*

#### 2.3.21.1  Effective Date

On December 30, 2008, a majority of qualified electors in Planning District 21 voted to institute County Zoning. On June 2, 2009, the County Commission adopted the Planning District 21 Zoning Map and Ordinance.

#### 2.3.21.2  District Boundaries

A legal description of the boundaries for Planning District 21 may be found under Appendix A.

2.3.21.3 Local Provisions for Planning District 21

(a) Industrial uses shall not discharge into any river or natural surface body of water including wetlands.

(b) Septic Tanks and Sewage Treatment Plants.

1.) As provided under Section 13.5, Utilities, Section 13.6, Sewage Treatment Plants and Article XXIII, Table of Permitted Uses, onsite systems, cluster systems, decentralized systems and package plants, with no more than 30 residential structures or 20 commercial structures, none of which shall exceed 5000 square feet per unit, connected to the above, shall be permitted subject to all applicable standards and requirements of the Baldwin County Health Department. Nothing herein shall be construed to prohibit the running of sewer lines in Planning District 21.

2.) Centralized treatment facilities shall not be allowed.

3.) For purposes of this section, the following definitions shall be used:

- *Centralized System:* A collection and treatment system containing collection sewers and a centralized treatment facility. Centralized systems are used to collect and treat large volumes of wastewater. The collection system typically requires large-diameter pipes, major excavation and frequent manhole access. At the treatment facility, the wastewater is treated to standards required for discharge to a surface water body. The large amount of biosolids (sludge) generated in treatment are treated and either land applied, placed on a surface disposal site or incinerated.

- *Cluster System:* A decentralized wastewater collection and treatment system where two or more dwellings, but less than entire community is served. The wastewater from several homes is often pretreated onsite by individual septic tanks before being transported through alternative sewers to an off-site nearby treatment unit that is relatively simple to operated and maintain when compared to centralized systems.

- *Decentralized System:* An onsite or cluster wastewater system that is used to treat and dispose of relatively small volumes of wastewater, generally

Defendants' Bates # 6840

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 117 of 800   PageID #: 2131
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 38 of 293   PageID #: 730

*Baldwin County Zoning Ordinances*                                                    *2-20*

from dwellings and businesses that are located relatively close together. Onsite and cluster systems are also commonly used in combination.

- *Onsite System:* A natural system or mechanical device used to collect, treat and discharge or reclaim wastewater from an individual dwelling without the use of community wide sewers or a centralized treatment facility. A conventional onsite system includes a septic tank and a leach field. Alternative types of onsite systems include at-grade systems, mound systems, sand filters and small aerobic units.

- *Package Plant:* Prefabricated treatment units that can serve apartment buildings, condominiums, office buildings and a specified number of homes. Package plants are generally used as cluster systems, but can also be used in an onsite wastewater treatment train. They are usually of the activated sludge or trickling filter type, and require skilled maintenance programs.

(c) No landfills.

(d) All utilities for new subdivisions shall be placed underground, with the exception of subdivisions consisting of lots with minimum areas of 3 acres.

(e) Accessory dwellings are permitted by right in the residential districts in Planning District 21 provided they do not exceed 60% of the size, in square feet, of the principal residence, up to a maximum of 1200 square feet.

(f) No PRD development is allowed to exceed the maximum height requirements of the underlying zoning designation by more than 10-feet or 1 story.

(g) Marinas, as provided under Article 22, Table of Permitted Uses, shall be allowed subject to Conditional Use approval of the Baldwin County Planning Commission.

(h) Wireless Telecommunication Facilities.

In addition to the provisions and standards of Section 13.10, the following requirements shall be applicable to wireless telecommunications facilities in Planning District 21:

Defendants' Bates # 6841

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 118 of 800   PageID #: 2132
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 39 of 293   PageID #: 731

*Baldwin County Zoning Ordinances*                                                    *2-21*

1.) Wireless telecommunication facilities, as provided under Article 22, Table of Permitted Uses, shall be subject to the Conditional Use approval of the Baldwin County Planning Commission, unless located on an alternative support structure or co-located on an existing antenna support structure.

2.) Maximum height shall be limited to 180-feet.

3.) Only monopole structures are allowed.

4.) No more than one tower shall be allowed on a given parcel.

5.) To the greatest extent possible, concealment techniques shall be employed in order for towers to blend with the surrounding natural landscape. In the event concealment techniques are not used, justification shall be submitted to the Planning Commission at the time of application.

(i) Adult Use Ordinance.

1.) *Purpose.*   The intent of these provisions is to establish reasonable and uniform regulations for adult uses and entertainment, whether existing or proposed, that will protect the health, safety, property values, and general welfare of the people, businesses, and industries of the county.   It is not the intent to legislate with respect to matter of obscenity.

2.) *Definitions.*  Definitions contained in the *Code of Alabama 13A-12-200.1* are hereby adopted.

A. The term *adult use* includes without limitation, adult bookstores, adult video stores, adult movie house, and adult-only entertainment establishments.

B. The term *Adult Book Store* or *Adult Video Store* shall not apply to a video or book store that does not engage in and a material part of whose principal business is not the sale or rental of adult material.

C. If, in the discretion of the Planning and Zoning Director or his/her designee, a material portion of the business's displayed merchandise and/or interior business space does consists of the offer for sale or rental of adult books, videos or merchandise it shall be deemed an adult use.  However, should the business satisfactorily demonstrate that the wholesale and retail sales value, derived from all adult use portions of the business does not exceed thirty (30) percent of total wholesale and retail sales value or revenue of the business; the term shall not apply.

Defendants' Bates # 6842

D. The term *pre-existing* shall mean:

i. The establishment or structure is already being lawfully used or lawfully occupied.

ii. A building permit for the structure has been lawfully issued and has not expired.

3.) *Special Operating License.* It shall be unlawful for any person, association, partnership, corporation, or other business entity to open, engage in, operate, conduct, expand, enlarge, or carry on in or upon premises an adult use without first meeting the criteria contained herein and issuance of a Special Operating License from the Baldwin County Commission. Special Operating Licenses shall not be transferable, assignable or negotiable, and a licensee shall not attempt to transfer, assign, negotiate or otherwise convey and rights under such License to any other person or business.

A. With respect to license issuance, the following additional standards shall apply in addition to standards stated elsewhere herein:

i. Where there is evidence that, even though there is compliance with the minimum distance requirements set forth herein, the type and number of schools or number of churches or other facilities in the vicinity must not cause minors to frequent the immediate area.

ii. Where there is evidence that the proposed area for the use is already adequately supplied with such adult use.

iii. The license shall be revoked if the business establishment is convicted of violating, or otherwise determined to have violated these regulations.

B. An applicant for a Special Operating License shall file a completed application made on a form provided by the County. An application shall be considered complete when it contains each required signature and the information and/or items:

i. The applicant's full true name and any other names used by the applicants in the preceding five years.

ii. Current business address or mailing address of the applicant.

Defendants' Bates # 6843

iii. Written proof of age, in the form of a driver's license or a copy of a birth certificate accompanied with photo identification issued by a governmental agency.

iv. The business name, location, legal description, mailing address and phone number.

v. A statement of whether an applicant has been convicted of or has pled guilty or nolo contender to a specific criminal activity, and if so, each specified criminal activity involved, including date, place, and jurisdiction of each as well as dates of conviction and release from confinement.

vi. A sketch or drawing showing the configuration of the premises, including a statement of total floor space occupied by the business marked with dimensions.

viii. A survey, in accordance with *Section 2.3.21.3.4(C),* indicating radial distances.

ix. Payment of application fee and investigative fee.

C. Upon the submission of a complete application, which meets the criteria of this section, the County Commission shall schedule a public hearing on the issuance of the Special Operating License.

4.) *Standards.* The standards contained herein shall apply to all adult uses as defined in S*ection 2.3.21.3(j) (2).*

A. *Zoning Districts Where Establishment Permitted.*  No adult use shall be located on any premises unless the location is zoned M-2, General Industrial District.

B. *Distance Minimums.*   In addition to the zoning district requirements set forth in *Section 2.3.21.3.4(A),* an adult use shall not be allowed to open, engage in, operate, conduct, expand, enlarge, or carry on in or upon premises, within any of the following distances:

i. One thousand (1,000) feet of a pre-existing adult use.

ii. Five hundred (500) feet of a pre-existing commercial establishment that in any manner sells or dispenses alcohol for on-premises consumption.

Defendants' Bates # 6844

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 121 of 800  PageID #: 2135
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 42 of 293  PageID #: 734

*Baldwin County Zoning Ordinances*                                                        2-24

iii. Twenty-five hundred (2,500) feet of a pre-existing place of worship or related book store.

iv. Twenty-five hundred (2,500) feet of a pre-existing education institution or public library.

v. Twenty-five hundred (2,500) feet of a public park and/or playground.

vi. Twenty-five hundred (2,500) feet from a residential use and areas zoned residential within the county.

vii. Twenty-five hundred (2,500) feet of a day care center or day care home.

viii. Twenty-five hundred (2,500) of a video arcade, skating rink or other places frequented by minors.

C. *Measurement of Distance.* All distance measurements shall be by radial distances determined by a straight line from the nearest property to line to nearest property line. Distance measurements shall be established by a surveyor licensed in the State of Alabama. A Survey shall be provided at the time an Adult Use permit application is submitted to the County for consideration, such survey to be provided by the applicant and at applicant's expense.

D. Any performance or displays of merchandise or any other exhibit depicting adult uses, shall be conducted within the interior of buildings or premises and shall be arranged or screened to prevent public viewing from outside such buildings or premises.

(k) Setback from Water Body.

A minimum setback of one-hundred (100) feet setback shall be required for all new development abutting a water body. The construction setback shall be 100-feet perpendicular distance from the lowest point of elevation (centerline) of an intermittent stream or drainage basin. This shall be applicable if the property is reflected as having an intermittent stream or waterway on it, adjacent to it or within the setback distance of the subject property according to any one of the three following maps: BC Hydro Shape file by Woolpert and Associates, USGS or the Soil Survey. In the event there is a permanent stream or waterway or standing water body on, adjacent to or within the setback distance of a parcel, the set back shall be 100-feet perpendicular distance, measured from the mean high tide line.

Defendants' Bates # 6845

For the purposes of this section, the following definition shall apply:

*Water body.* Any bay, bayou, lagoon, inlet, pond, lake, or other area with a discernable shoreline that ordinarily or intermittently contains water, or a river, stream, or creek with permanent flow. The term does not include storm water detention, retention facilities, or artificial pond, lake, or reservoir.

The following activities are allowed within the setback area:

> (1) Boardwalks;
>
> (2) Nature trails;
>
> (3) Other conservation relates or open space related structure;
>
> (4) Roads and Bridges;
>
> (5) Vehicular Access ways (minimum necessary to provide access to a site);
>
> (6) Utility Installation;
>
> (7) Storm water management facilities when no other viable alternative exists;
>
> (8) Docks, piers and boat launching areas.

(l) Recreational Vehicles.

> (1) Recreational vehicles shall be licensed and registered.
>
> (2) Recreational vehicles shall be road ready in accordance with the Baldwin County Flood Damage Prevention Ordinance.

### 2.3.22 *Planning District 22.*

#### 2.3.22.1   Effective Date

On September 25, 2001, a majority of qualified electors in Planning District 22 voted to institute County Zoning. November 19, 2002, the County Commission adopted the Planning District 22 Zoning Map and Ordinances.

#### 2.3.22.2   District Boundaries

A legal description of the boundaries for Planning District 22 may be found under Appendix A.

Defendants' Bates # 6846

2.3.22.3   Local Provisions for Planning District 22

(a) Accessory dwellings are permitted by right in residential districts, provided they do not exceed 60% of the size, in square feet, of the principal residence.

(b) No PRD development is allowed to exceed maximum height requirements by more than 10-feet.

### 2.3.23 *Planning District 23.*

2.3.23.1   Effective Date

On March 25, 2003, a majority of qualified electors in Planning District 23 voted to institute County Zoning. On September 2, 2003, the County Commission adopted the Planning District 23 Zoning Map and Ordinances.

2.3.23.2   District Boundaries

A legal description of the boundaries for Planning District 23 may be found under Appendix A.

2.3.23.3   Local Provisions for Planning District 23

(a) Planned Residential Developments.   The maximum height of a PRD shall not exceed the maximum height of the underlying zoning district by more than ten (10) feet.

(b) The following provisions shall be applicable only to the Spanish Cove Subdivision Development:

1. *Setbacks.*

Residential Lots:
Front Yard          30-feet
Rear Yard           10-feet
Side Yard           10-feet

Recreational Vehicle Lots:
Front Yard          20-feet
Rear Yard           7-feet
Side Yard           7-feet

Corner Lots.   The street side yard setbacks shall be a minimum of 10-feet.

Defendants' Bates # 6847

Accessory Structures.   When abutting an area zoned OR, accessory structures may be located 3 feet from the rear property line.

2. *Use Modifications.*  Recreational vehicles, Park Models, and park trailers may be used as a dwelling on a recreational vehicle lot in the area commonly referred to as the "Land Harbor" section of the Spanish Cove Development. Specifically, this area is Lot 1 through 999, as per recorded plat of the Spanish Cove Subdivision.

3. *Contiguous Lots.*  An owner of a lot which contains a principal structure and also owns a contiguous undeveloped lot may store a recreational vehicle, boat or utility trailer on the contiguous lot.

4. *Accessory Dwellings.*  Accessory dwellings shall be permitted in accordance with *Section 13.1.3.*

5. *Temporary Occupancy of Recreational Vehicle.* Temporary occupancy of a recreational vehicle may be permitted with the approval from the Board of Adjustments.  Temporary Occupancy shall mean a maximum of four (4) months per calendar year.

6. *Accessory Structures.* Accessory structures, as defined herein, shall be permitted on all lots regardless of whether or not there is a principal structure.

## 2.3.24 *Planning District 24.*

### 2.3.24.1   Effective Date

On May 12, 1992, a majority of qualified electors in Planning District 24 voted to institute County Zoning. On April 7, 1993, the County Commission adopted the Planning District 24 Zoning Map and Ordinances.

### 2.3.24.2   District Boundaries

A legal description of the boundaries for Planning District 24 may be found under Appendix A.

### 2.3.24.3   Local Provisions for Planning District 24

(a) All utilities shall be placed underground.

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 125 of 800   PageID #: 2139
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 46 of 293   PageID #: 738

_Baldwin County Zoning Ordinances_                                                    2-28

(b) Roof mounted satellite receiving dishes are not permitted, except roof mounted satellite receiving dishes not exceeding 24 inches in diameter are permitted below the ridge of the roof.

(c) Ono Harbour multi-slip piers

1. The four multi-slip piers, with each berth assigned to specific lots as though a single family pier, are unique to Ono Harbour and are authorized as a special provision in Planning District 24.

2. In the event that the multi-slip piers may be damaged or destroyed to an extent of more than fifty percent (50%) of the fair market value of the piers immediately prior to damage or destruction, repair and rebuilding or the multi-slip piers to the configuration and number of slips existing at the time of damage or destruction shall be permitted as a matter of right, irrespective of the provisions contained within Article 20, Nonconformities, and subject to the approval and issuance of all required permits.

3. Boat lifts shall be permitted for each slip, subject to the approval and issuance of all required permits.

In the event additional lots are platted in Ono Harbour, additional slips may be added to the existing multi-slip piers, subject to Conditional Use approval of the Baldwin County Planning Commission.

(d) Ono Island community support facilities

1.  Community support facilities are essential and unique to Ono Island and are authorized as a special provision in Planning District 24. The community support facilities in question are listed as follows:

  A.  Ono Fire Station
  B.  Ono Island POA Office Building
  C.  Ono Island twin-ramp boat launching facility
  D.  Ono Island maintenance equipment storage facility
  E.  Ono Island Community Center
  F.  Ono Island Recreation Center
  G.  Ono Island tennis courts, play center and associated facilities
  H.  Ono Island, ONOMAR bulkheaded multi-slip mooring canal

2.  In the event that the above listed community support facilities may be damaged or destroyed to an extent of more than fifty percent (50 %) of the fair market value of the facilities immediately prior to damage or

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 126 of 800   PageID #: 2140
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 47 of 293   PageID #: 739

*Baldwin County Zoning Ordinances*                                                    *2-29*

destruction, repair and rebuilding of the community support facilities to the conditions existing at the time of damage or destruction shall be permitted as a matter of right, irrespective of the provisions contained within Article 20, Nonconformities, and subject to the approval and issuance of all required permits.

3.      There shall be no commercial activities conducted within the Ono Island community support facilities.

4.  In the event that it should become necessary to enlarge or expand the existing Ono Island community support facilities, such expansion may be permitted, subject to Conditional Use approval of the Baldwin County Planning Commission.

5.  New community support facilities for Ono Island may be allowed under the OR, Outdoor Recreation District, zoning designation, subject to the Conditional Use approval of the Baldwin County Planning Commission.

6.  Food trucks which are a part of and incidental to community and social events held at Ono Island community support facilities are permitted. As used herein, the term "food truck" shall refer to a vehicle which is used to vend food and beverage products. The following standards shall apply:

    A.      Food trucks shall be located on the grounds of the community support facility hosting the community or social event.
    B.      Food trucks are permitted on each property a maximum of no more than two (2) days per calendar week.
    C.      No more than three (3) food trucks shall operate on any property at any one (1) time.
    D.      Food trucks shall be allowed to operate after 7:00 am and no later than 9:00 pm.
    E.      No signage shall be allowed other than signs permanently attached to the food truck and one (1) portable menu sign to be located on the ground at the customer waiting area.
    F.      The food truck operator shall provide a waste receptacle for public use. The area shall be kept neat and orderly at all times and garbage or trash shall be removed daily.
    G.      Additional food trucks, extended frequency and extended hours of operation may be allowed upon the recommendations of the Ono Island Property Owner's Association (POA) and subject to the Special Exception approval of the Board of Adjustment for County Commission District 4.

Defendants' Bates # 6850

(e) Accessory dwellings are permitted by right in residential districts in Planning District 24 provided they are contained entirely within the structure of a single family dwelling and provided they do not exceed sixty percent (60%) of the size, in square feet, of the principal residence.

(f) There shall be no limit on the number of habitable stories for a single family dwelling in the RSF-2, Single Family district provided that maximum building height shall not exceed forty (40) feet and the ridge of the roof shall not exceed forty-five (45) feet measured from the proposed finished grade.

(g) A water storage tank/tower may be allowed as a conditional use under the OR, Outdoor Recreation zoning designation, subject to the approval of the Baldwin County Planning and Zoning Commission.

### 2.3.25 *Planning District 25.*

#### 2.3.25.1 Effective Date

On June 19, 1992, a majority of qualified electors in Planning District 25 voted to institute County Zoning. On November 16, 1993, the County Commission adopted the Planning District 25 Zoning Map and Ordinances.

#### 2.3.25.2 District Boundaries

A legal description of the boundaries for Planning District 25 may be found under Appendix A.

#### 2.3.25.3 Local Provisions for Planning District 25

(a) Multiple family buildings in the "RMF-6, Multiple Family" district may be erected to a maximum height or seven (7) habitable stories. The required side yards shall be increased by 4-feet for each additional story over two (2) habitable stories. The maximum impervious surface ratio shall not exceed .50.

(b) No PRD development is allowed to exceed maximum height requirements by more than 10-feet or 1 story.

(c) Off-street Parking.

As a supplement to Section 15.2, Parking Schedule, the following off-street parking requirements shall be applicable to single family dwellings and two-family dwellings:

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 128 of 800   PageID #: 2142
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 49 of 293   PageID #: 741

*Baldwin County Zoning Ordinances*                                                     *2-31*

      1. Up to Four (4) Bedrooms: Two (2) spaces per dwelling unit.

      2. Up to Six (6) Bedrooms: Three (3) spaces per dwelling unit.

      3. Seven (7) Bedrooms and more: Four (4) spaces per dwelling unit, plus one (1) additional space per dwelling unit for every bedroom over eight (8).

(d) HDR, High Density Residential District, shall not be available in Planning District 25.

(e) The maximum height of single family and two-family structures shall be limited to two (2) habitable stories.

(f) Dune Walkovers.

    1. As used in this section, the following definition shall apply:

    *Dune walkover.* A raised walkway constructed for the purpose of protecting the beach and dune system between mean high tide and the construction control (CCL) line from damage that may result from anticipated pedestrian traffic to the beach, and which is no more than six (6) feet in width for multiple family/commercial/public structures, no more than four (4) feet in width for single family/two family structures, constructed without roof or walls, elevated at least one (1) foot above the dune, and extends seaward of the vegetation line.

    2. Land Use Certificate.

      A. A land use certificate which meets the requirements of Section 18.2, as well as the standards found herein, shall be submitted to and approved by the Zoning Administrator, or his/her designee, prior to the issuance of a building permit.

      B. A recent survey showing the location, size and alignment of all proposed structures and the ADEM CCL and property lines shall be submitted along with the required land use certificate application. Said survey shall be prepared and stamped by a Professional Land Surveyor registered in the State of Alabama.

    3. A dune walkover shall be constructed to the following standards:

      A. There shall be no more than one (1) dune walkover per parcel.

Defendants' Bates # 6852

B. Dune walkovers shall begin at the existing ground level elevation of the principal landward structure.

C. The maximum width of the dune walkover structure shall be no more than four (4) feet for single family/two family structures and no more than six (6) feet for multiple family/commercial/public structures. Maximum widths shall be applicable to all sections of the dune walkover structure, including but not limited to steps, ramps, landings and decks.

D. The minimum elevation from the bottom of floor joists of the dune walkover shall be no less than one (1) foot and no more than three (3) feet above the maximum elevation of the dune system being traversed.

E. No vertical or horizontal structures shall be allowed above thirty-eight (38) inches from the walking surface, i.e., roofs, walls, pergolas, etc.

F. Handrails, if any, shall be no higher than thirty-six (36) to thirty-eight (38) inches above the walking service for Single and Two Family Dwellings.

G. The dune walkover shall terminate ten (10) feet seaward of the vegetative line of the dune.

H. The location and length of the dune walkover is to be coordinated through and approved by the delegated authority of the Alabama Department of Environmental Management (ADEM) and the U.S. Fish and Wildlife Service.

I. No lighting shall be utilized on a dune walkover.

J. No dune walkover construction shall occur during the sea turtle nesting season from May 1 through November 1.

(g) Planning and Zoning Considerations in the Coastal High Hazard Area and Flood Hazard Areas in Planning District 25 (Fort Morgan).

1. Purpose:

A. Fort Morgan contains areas of significant natural beauty, history and unique wildlife. With such assets comes unique vulnerabilities. These vulnerabilities include, but are not limited to, tropical storm damage, flooding, wetland habitat,

Defendants' Bates # 6853

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 130 of 800   PageID #: 2144
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 51 of 293   PageID #: 743

*Baldwin County Zoning Ordinances*                                                                    *2-33*

protected or endangered species, Native American archeological sites and National Historic Landmarks. Further, Act 2015-411, which amends Act 91-719, requires "In performing its functions related to planning and zoning, the Baldwin County Planning and Zoning Commission and the Baldwin County Commission shall specifically consider the historical nature of existing development within the Fort Morgan District, the historical and environmental character of the district, and the unique needs of the district related to hurricane safety and infrastructure for potential evacuation."

B. The most imminent threat is to property and lives subject to tropical storm events. The Coastal High Hazard Area (CHHA) is an area particularly vulnerable to the effects of damage from tropical storm events. The CHHA contains the most vulnerable areas of Fort Morgan and thus protection and oversite is needed and justified to protect future populations and property.

2. Objectives of these considerations in the Coastal High Hazard Area (CHHA) and Flood Hazard Area (FHA) are to:

A. Limit the amount of infrastructure, both private and public in the Coastal High Hazard Area (CHHA)

B. Limit the magnitude of public loss and mitigation of private loss and investment

C. Increase the degree of protection to private property and lives of residents and visitors in storm events

D. Reduce the risk and exposure of lives and property during storm events

3. Coastal High-Hazard Area Defined:

The Coastal High-Hazard Area (CHHA) of Baldwin County is: "the area below the elevation of the Category 1 Storm Surge Line as established by a Sea, Lake, and Overland Surges from Hurricane (SLOSH) computerized storm surge model." Baldwin County will use the CHHA Map, provided by National Oceanic and Atmospheric Administration (NOAA), as the delineation of the CHHA and will use the most current SLOSH model to maintain the map. Additionally, in the interest of public safety regarding ingress and egress from and through said hazard areas, any "enclaves" which are not located in either the flood

Defendants' Bates # 6854

zone or Category 1 storm surge areas, but are surrounded by such hazard areas, will be considered as part of the Coastal Hazard Area. The CHHA Map is attached herein as attachment "A". Because the boundaries of the CHHA are subject to change, site design and building typology in the CHHA will be based on the CHHA line in effect at the time of development. In addition to the CHHA, areas subject to this consideration also are V-Zones[1] and Coastal Barrier Resources System[2] (CBRS) areas as indicated on the FEMA Flood Maps.

http://noaa.maps.arcgis.com/apps/MapSeries/index.html?appid=d9ed7904dbec441a9c4dd7b277935fad&entry=1

https://alabamaflood.com/map

4. Rezoning Considerations in the Coastal High Hazard Area of Fort Morgan:

Increases in density and intensity through rezoning or similar land use changes in the Coastal High Hazard Area (CHHA) in Fort Morgan are prohibited.

5. Rezoning Considerations in Flood Hazard Areas of Fort Morgan:

Increases in density and intensity through rezoning or similar land use changes in the Flood Hazard Areas (FHA) in Fort Morgan should be limited to low density single family uses.

https://alabamaflood.com/map

---

[1] According to FEMA and the National Flood Insurance Program, any building located in an A or V zone is considered to be in a Special Flood Hazard Area, and is lower than the Base Flood Elevation. V zones are the most hazardous of the Special Flood Hazard Areas. V zones generally include the first row of beachfront properties. The hazards in these areas are increased because of wave velocity - hence the V designation. Flood insurance is mandatory in V zone areas.

[2] The Coastal Barrier Resources Act (CBRA) of 1982 established the John H. Chafee Coastal Barrier Resources System (CBRS), a defined set of coastal barrier units located along the Atlantic, Gulf of Mexico, Great Lakes, Puerto Rico, and U.S. Virgin Island coasts. These areas are delineated on a set of maps that are enacted into law by Congress and maintained by the Department of the Interior through the U.S. Fish and Wildlife Service (Service). Most new Federal expenditures and financial assistance are prohibited within the CBRS. The prohibition that is most significant to homeowners and insurance agents is the denial of Federal flood insurance through the National Flood Insurance Program (NFIP) for new or substantially improved structures within the CBRS. CBRA does not prevent development, and it imposes no restrictions on development conducted with non-Federal funds. Congress enacted CBRA to minimize the loss of human life, wasteful Federal expenditures, and the damage to natural resources associated with coastal barriers.

Defendants' Bates # 6855

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 132 of 800   PageID #: 2146
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 53 of 293   PageID #: 745

*Baldwin County Zoning Ordinances*                                                                      *2-35*

6. Development Exemptions and Clustering

Lots of record, as defined by the Baldwin County Subdivision Regulations, may be developed in accordance with subdivision regulations. When properties contain either CHHA or FHA areas, clustering of development through Planned developments, away from areas of highest hazard exposure is strongly encouraged. Lands outside the clustered development should be set aside through conservation easements or similar methods of preservation.

### 2.3.26 *Planning District 26.*

2.3.26.1   Effective Date

On June 9, 1992, a majority of qualified electors in Planning District 26 voted to institute County Zoning. On September 21, 1993, the County Commission adopted the Planning District 26 Zoning Map and Ordinances.

2.3.26.2   District Boundaries

A legal description of the boundaries for Planning District 26 may be found under Appendix A.

2.3.26.3   Local Provisions for Planning District 26

(a) One accessory dwelling per lot shall be permitted by right in the RSF-1 and RSF-2 districts, provided the accessory dwelling does not exceed 60% of the size, in square feet, of the principal dwelling.

(b) The required side yard setbacks for RSF-1 and RSF-2 lots existing on or before May 19, 2020, and which do not meet the minimum lot width requirements for the underlying zoning designation, may be reduced to 3-feet on one side and 10-feet on the other side provided a minimum of 13-feet separation remains between buildings.

(c) The following zoning districts shall not be available in Planning District 26, and all references in the zoning ordinance to such districts are deleted, except as to lots or parcels included in such districts as of May 19, 2020:

1. RSF-3, Single Family District
2. RSF-4, Single Family District
3. RTF-4, Two Family District
4. RSF-6, Single Family District

Defendants' Bates # 6856

    5.  RTF-6, Two Family District
    6.  RMF-6, Multiple Family District
    7.  HDR, High Density Residential District

(d) Planned Residential Development (PRD) Districts, Article 9, shall not be available in Planning District 26, and all references to Planned Residential Districts, for Planning District 26, in the zoning ordinance are deleted.

(e) The following uses shall not be allowed either as a Permitted Use, Conditional Use or Special Exception in any commercial district in Planning District 26:

    1.  Boarding, rooming or lodging house, dormitory
    2.  Car wash
    3.  Cemetery
    4.  Discount/variety store
    5.  Drug store
    6.  Laundry, self service
    7.  Mini-warehouse
    8.  Neighborhood convenience store, greater than 4,000 square feet
    9.  Nightclub, bar, tavern
    10. Recreational vehicle park
    11. Restaurant, drive-in
    12. Restaurant, fast food

2.3.27 **Planning District 27.**   County zoning has not been instituted in this district.

2.3.28 **Planning District 28.**

    2.3.28.1   Effective Date

On October 13, 1992, a majority of qualified electors in Planning District 28 voted to institute County Zoning. On July 6, 1993, the County Commission adopted the Planning District 28 Zoning Map and Ordinances.

    2.3.28.2   District Boundaries

A legal description of the boundaries for Planning District 28 may be found under Appendix A.

    2.3.28.3   Local Provision for Planning District 28

No cemeteries are allowed.

### 2.3.29 *Planning District 29.*

#### 2.3.29.1   Effective Date

On October 16, 2001, a majority of qualified electors in Planning District 29 voted to institute County Zoning. On April 2, 2002, the County Commission adopted the Planning District 29 Zoning Map and Ordinances.

#### 2.3.29.2   District Boundaries

A legal description of the boundaries for Planning District 29 may be found under Appendix A.

#### 2.3.29.3   Local Provisions for Planning District 29

(a) Accessory dwellings are permitted by right in residential districts, provided they do not exceed 60% of the size, in square feet, of the principal residence.

(b) No PRD development is allowed to exceed maximum height requirements by more than 10-feet.

### 2.3.30 *Planning District 30.*

#### 2.3.30.1   Effective Date

On July 20, 1993, a majority of qualified electors in Planning District 30 voted to institute County Zoning. On February 21, 1995, the County Commission adopted the Planning District 30 Zoning Map and Ordinances.

#### 2.3.30.2   District Boundaries

A legal description of the boundaries of Planning District 30 may be found under Appendix A.

#### 2.3.30.3   Local Provisions for Planning District 30

Accessory dwellings are permitted by right in residential districts, provided they do not exceed 60% of the size, in square feet, of the principal residence.

Defendants' Bates # 6858

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 135 of 800  PageID #: 2149
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 56 of 293  PageID #: 748

*Baldwin County Zoning Ordinances*                                                                                2-38

### 2.3.31  *Planning District 31.*

#### 2.3.31.1  Effective Date

On September 7, 1993, a majority of qualified electors in Planning District 31 voted to institute County Zoning. On November 21, 1995, the County Commission adopted the Planning District 31 Zoning Map and Ordinances.

#### 2.3.31.2  District Boundaries

A legal description of the boundaries for Planning District 31 may be found under Appendix A.

#### 2.3.31.3  Local Provision for Planning District 31

No recreational vehicle parks are allowed.

### 2.3.32 *Planning District 32.*

#### 2.3.32.1    Effective Date

On September 13, 1994, a majority of qualified electors in Planning District 32 voted to institute County Zoning. On December 19, 1995, the County Commission adopted the Planning District 32 Zoning Map and Ordinances.

#### 2.3.32.2    District Boundaries

A legal description of the boundaries for Planning District 32 may be found under Appendix A.

#### 2.3.32.3    Local Provisions for Planning District 32

(a) Accessory dwellings are permitted by right in residential districts, provided they do not exceed sixty (60) percent of the size, in square feet, of the principal residence.

(b) No industrial use is permitted which has any emission of fluids or gases into any streams, tidal marshes, wetlands, bay waters, or underground aquifers. No commercial or industrial use is permitted on any shores that require industrial tug boat or barge docking, loading, unloading, building, repair or refitting.

(c) No PRD development is allowed to exceed maximum height requirements by more than ten (10) feet.

Defendants' Bates # 6859

2.3.33 *Planning District 33.*

2.3.33.1   Effective Date

On December 18, 2001, a majority of qualified electors in Planning District 33 voted to institute County Zoning. On August 6, 2002, the County Commission adopted the Planning District 33 Zoning Map and Ordinances.

2.3.33.2   District Boundaries

A legal description of the boundaries for Planning District 33 may be found under Appendix A.

2.3.33.3   Local Provisions for Planning District 33

(a) Accessory dwellings are permitted by right in residential districts, provided they do not exceed sixty (60) percent of the size, in square feet, of the principal residence.

(b) No PRD development is allowed to exceed maximum height requirements by more than ten (10) feet.

Defendants' Bates # 6860

## Article 3   Rural Districts

### Section 3.1  RR, Rural District

3.1.1  *Generally.* This zoning district is provided to accommodate the rural areas of Baldwin County.  Rural District ordinances are designed to protect the rural character of the area.

3.1.2  *Permitted uses.*  Except as provided by Section *2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.
> (b) The following transportation, communication, and utility uses: water well (public or private).
>
> (c) Marine recreation uses.
>
> (d) Outdoor recreation uses.
>
> (e) The following general commercial uses: animal clinic and/or kennels; farm implement sales; farmer's market/truck crops; nursery; landscape sales.
>
> (f)  Local commercial uses.
>
> (g) Professional service and office uses.
>
> (h) The following institutional uses: church or similar religious facility; child care center; child care institution; day care home; fire station; library; post office; school (public or private).
>
> (i)  Agricultural uses.
>
> (j)  Single family dwellings including manufactured housing and mobile homes.
>
> (k) Accessory structures and uses.

3.1.3  *Special exceptions.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as special exceptions:

> (a) Light industrial uses.

Defendants' Bates # 6861

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 138 of 800   PageID #: 2152
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 59 of 293   PageID #: 751

*Baldwin County Zoning Ordinances*                                                  *3-2*

(b) General commercial uses not permitted by right, except race track.

(c) Institutional uses not permitted by right, except correctional, detention, or penal institution and sanitarium.

(d) Boarding house, rooming house, lodging house, or dormitory.

(e) Fraternity or sorority house.

3.1.4  *Conditional use.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts,* the following uses and structures designed for such uses may be allowed as conditional uses:

Transportation, communication, and utility uses not permitted by right.

3.1.5  *Area and dimensional ordinances.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Minimum Front Yard | 30-feet |
| Minimum Rear Yard | 30-feet |
| Minimum Side Yards | 10-feet |
| Minimum Lot Area | 40,000 Square Feet |
| Minimum Lot Width at Building Line | 120-feet |
| Minimum Lot Width at Street Line | 120-feet |

3.1.6  *Area and dimensional modifications.* Within the RR district, area and dimensional requirements may be reduced, as set forth below, where property is divided among the following legally related family members: spouse, children, siblings, parents, grandparents, grandchildren, or step-related individuals of the same status.

| | |
|---|---|
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Minimum Lot Area | 20,000 Square Feet |
| Minimum Lot Width at Building Line | 80-Feet |
| Minimum Lot Width at Street Line | 80-Feet |

Defendants' Bates # 6862

### Section 3.2   RA Rural Agricultural District

3.2.1 _Generally_.  This zoning district provides for large, open, unsubdivided land that is vacant or is being used for agricultural, forest or other rural purposes.

3.2.2 _Permitted uses_.   Except as provided by _Section 2.3: Establishment of Zoning in Planning Districts_, the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.

> (b) The following transportation, communication, and utility uses: water well (public or private).

> (c) Outdoor recreation uses.

> (d) The following general commercial uses: animal clinic and/or kennel; farm implement sales; farmers market/truck crops; nursery; landscape sales; country club.

> (e) The following local commercial uses: fruit and produce store.

> (f) The following institutional uses: church or similar religious facility; school (public or private).

> (g) Agricultural uses.

> (h) Single family dwellings including manufactured housing and mobile homes.

> (i)  Accessory structures and uses.

3.2.3 _Special exceptions_.  Except as provided by _Section 2.3: Establishment of Zoning in Planning Districts_, the following uses and structures designed for such uses may be allowed as special exceptions:

> (a) The following general commercial uses: recreational vehicle park (see _Section 13.9: Recreational Vehicle Parks_).

> (b) The following local commercial uses: bed and breakfast or tourist home (see _Section 13.11: Bed and Breakfast Establishments_).

3.2.4 _Conditional uses_.  Except as provided by _Section 2.3: Establishment of Zoning in Planning Districts_, the following uses and structures designed for such uses may be allowed as conditional uses:

(a) Transportation, communication, and utility uses not permitted by right.

(b) Institutional uses not permitted by right.

3.2.5 *Area and dimensional ordinances.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Minimum Front Yard | 40-Feet |
| Minimum Rear Yard | 40-Feet |
| Minimum Side Yards | 15-Feet |
| Minimum Lot Area | 3 Acres |
| Minimum Lot Width at Building Line | 210-Feet |
| Minimum Lot Width at Street Line | 210-Feet |

3.2.6 *Area and dimensional modifications.* Within the RA district, area and dimensional requirements may be reduced, as set forth below, where property is divided among the following legally related family members: spouse, children, siblings, parents, grandparents, grandchildren, or step-related individuals of the same status.

| | |
|---|---|
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Minimum Lot Area | 40,000 Square Feet |
| Minimum Lot Width at Building Line | 120-Feet |
| Minimum Lot Width at Street Line | 120-Feet |

Defendants' Bates # 6864

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 141 of 800   PageID #: 2155
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 62 of 293   PageID #: 754

_Baldwin County Zoning Ordinances_                                                    _3-5_

### Section 3.3   CR Conservation Resource District

3.3.1   _Generally._   This zoning district provides for large, open, unsubdivided land which is environmentally constrained and that is vacant or is being used for agricultural, forest or other rural purposes.

3.3.2   _Permitted uses._   Except as provided by _Section 2.3: Establishment of Zoning in Planning Districts_, the following uses and structures designed for such uses shall be permitted:

>   (a) The following general industrial uses: extraction or removal of natural resources on or under land.

>   (b) The following transportation, communication, and utility uses: water well (public or private).

>   (c) Outdoor recreation uses.

>   (d) The following local commercial uses: fruit and produce store.

>   (e) The following institutional uses: church or similar religious facility; school (public or private).

>   (f)  Agricultural uses.

>   (g) Single family dwellings including manufactured housing and mobile homes.

>   (h) Accessory structures and uses.

3.3.3   _Special exceptions._   Except as provided by _Section 2.3: Establishment of Zoning in Planning Districts_, the following uses and structures designed for such uses may be allowed as special exceptions:

>   (a) The following general commercial uses: recreational vehicle park (see _Section 13.9: Recreational Vehicle Parks_).

>   (b) The following local commercial uses: bed and breakfast or tourist home (see _Section 13.11: Bed and Breakfast Establishments_).

3.3.4   _Conditional uses._   Except as provided by _Section 2.3: Establishment of Zoning in Planning Districts_, the following uses and structures designed for such uses may be allowed as conditional uses: Institutional uses not permitted by right.

3.3.5   *Area and dimensional regulations.*   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional regulations set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Minimum Front Yard | 100-Feet |
| Minimum Rear Yard | 100-Feet |
| Minimum Side Yards | 50-Feet |
| Minimum Lot Area | 5 Acres |
| Minimum Lot Width at Building Line | 250-Feet |
| Minimum Lot Width at Street Line | 250-Feet |

Defendants' Bates # 6866

## Section 4.1  RSF-E, Residential Single Family Estate District

4.1.1  *Generally*.  This zoning district is provided to afford the opportunity for the choice of a very low density residential environment consisting of single family homes on estate size lots.

4.1.2  *Permitted uses*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.
>
> (b) The following transportation, communication, and utility uses: water well (public or private).
>
> (c) Agricultural uses.
>
> (d) Single family dwellings including manufactured housing and mobile homes.
>
> (e) Accessory structures and uses.
>
> (f)  The following institutional use: church or similar religious facility.

4.1.3  *Conditional uses.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as conditional uses:

> (a) Outdoor recreation uses.
>
> (b) The following institutional uses: day care home; fire station; school (public or private).
>
> (c) The following general commercial uses: country club.

4.1.4  *Special exception*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following use and structures designed for such use may be allowed as a special exception:

> The following local commercial use: bed and breakfast or tourist home (see *Section 13.11: Bed and Breakfast Establishments*).

4.1.5  *Area and dimensional ordinances*.   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway*

Defendants' Bates # 6867

*Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35-Feet |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 40-Feet |
| Minimum Rear Yard | 40-Feet |
| Minimum Side Yards | 15-Feet |
| Minimum Lot Area | 80,000 Square Feet |
| Minimum Lot Width at Building Line | 165-Feet |
| Minimum Lot Width at Street Line | 165-Feet |
| Maximum Ground Coverage Ratio | .35 |

4.1.6   *Area and dimensional modifications.* Within the RSF-E district, area and dimensional requirements may be reduced, as set forth below, where property is divided among the following legally related family members: spouse, children, siblings, parents, grandparents, grandchildren, or step-related individuals of the same status.

| | |
|---|---|
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Minimum Lot Area | 40,000 Square Feet |
| Minimum Lot Width at Building Line | 120-Feet |
| Minimum Lot Width at Street Line | 120-Feet |

### Section 4.2   RSF-1, Single Family District

4.2.1   *Generally.*  This zoning district is provided to afford the opportunity for the choice of a low density residential environment consisting of single family homes on large lots.

4.2.2   *Permitted uses.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

(a) The following general industrial uses: extraction or removal of natural resources on or under land.

(b) The following transportation, communication, and utility uses: water well (public or private).

(c) The following agricultural uses: Silviculture.

(d) Single family dwellings including manufactured housing and mobile homes.

(e) Accessory structures and uses.

(f)  The following institutional use: church or similar religious facility.

4.2.3  *Conditional uses.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as conditional uses:

(a) Outdoor recreation uses.

(b) The following institutional uses: day care home; fire station; school (public or private).

(c) The following general commercial uses: country club.

4.2.4  *Special exception*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following use and structures designed for such use may be allowed as a special exception:

The following local commercial use: bed and breakfast or tourist home (see *Section 13.10: Bed and Breakfast Establishments*).

4.2.5  *Area and dimensional ordinances*.   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35-Feet |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Minimum Lot Area | 30,000 Square Feet |
| Minimum Lot Width at Building Line | 100-Feet |
| Minimum Lot Width at Street Line | 50-Feet |
| Maximum Ground Coverage Ratio | .35 |

Defendants' Bates # 6869

**Section 4.3  RSF-2, Single Family District**

4.3.1  *Generally*. This zoning district is provided to afford the opportunity for the choice of a moderate density residential environment consisting of single family homes.

4.3.2  *Permitted uses*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.

> (b) The following transportation, communication, and utility uses: water well (public or private).

> (c) The following agricultural uses: Silviculture.

> (d) Single family dwellings including manufactured housing and mobile homes.

> (e) Accessory structures and uses.

> (f) The following institutional use: church or similar religious facility.

4.3.3  *Conditional uses*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as conditional uses:

> (a) Outdoor recreation uses.

> (b) The following institutional uses: day care home; fire station; school (public or private).

> (c) The following general commercial uses: country club.

4.3.4  *Special exception*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following use and structures designed for such use may be allowed as a special exception:

> The following local commercial use: bed and breakfast or tourist home (see *Section 13.11: Bed and Breakfast Establishments*).

4.3.5  *Area and dimensional ordinances*.   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

Defendants' Bates # 6870

| | |
|---|---|
| Maximum Height of Structure in Feet | 35-Feet |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Minimum Lot Area | 15,000 Square Feet |
| Minimum Lot Width at Building Line | 80-Feet |
| Minimum Lot Width at Street Line | 40-Feet |
| Maximum Ground Coverage Ratio | .35 |

## Section 4.4    RSF-3, Single Family District

4.4.1 *Generally*. This zoning district is provided to afford the opportunity for the choice of a moderate density residential environment consisting of single family homes.

4.4.2 *Permitted uses*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.

> (b) The following transportation, communication, and utility uses: water well (public or private).

> (c) The following agricultural uses: Silviculture.

> (d) Single family dwellings including manufactured housing and mobile homes.

> (e) Accessory structures and uses.

> (f) The following institutional use: church or similar religious facility.

4.4.3 *Conditional uses*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as conditional uses:

> (a) Outdoor recreation uses.

> (b) The following institutional uses: day care home; fire station; school (public or private).

> (c) The following general commercial uses: country club.

Defendants' Bates # 6871

4.4.4 *Special exception.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following use and structures designed for such use may be allowed as a special exception:

> The following local commercial use: bed and breakfast or tourist home (see *Section 13.11: Bed and Breakfast Establishments*).

4.4.5 *Area and dimensional ordinances.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35-Feet |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Minimum Lot Area | 10,000 Square Feet |
| Minimum Lot Width at Building Line | 80-Feet |
| Minimum Lot Width at Street Line | 40-Feet |
| Maximum Ground Coverage Ratio | .35 |

## Section 4.5      RSF-4, Single Family District

4.5.1 *Generally.* This zoning designation is provided to afford the opportunity for the choice of a moderate density residential development consisting of single family homes.

4.5.2 *Permitted uses.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.

> (b) The following transportation, communication, and utility uses: water well (public or private).

> (c) The following agricultural uses: Silviculture.

> (d) Single family dwellings including manufactured housing and mobile homes.

> (e) Accessory structures and uses.

> (f) The following institutional use: church or similar religious facility.

4.5.3 *Conditional uses.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as conditional uses:

(a) Outdoor recreation uses.

(b) The following institutional uses: day care home; fire station; school (public or private).

(c) The following general commercial uses: country club.

4.5.4 *Special exception.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following use and structures designed for such use may be allowed as a special exception:

The following local commercial use: bed and breakfast or tourist home (see *Section 13.11: Bed and Breakfast Establishments*).

4.5.5 *Area and dimensional ordinances.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Minimum Lot Area per Dwelling Unit | 7,500 Square Feet |
| Minimum Lot Width at Building Line | 60-Feet |
| Minimum Lot Width at Street Line | 30-Feet |
| Maximum Ground Coverage Ratio | .35 |

## Section 4.6  RTF-4, Two Family District

4.6.1 *Generally.* The intent of this zoning designation is to provide the opportunity for two family residential development.

4.6.2 *Permitted uses.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

(a) The following general industrial uses: extraction or removal of natural resources on or under land.

Defendants' Bates # 6873

(b) The following transportation, communication, and utility uses: water well (public or private).

(c) The following agricultural uses: Silviculture.

(d) Two family dwellings.

(e) Single family dwellings including manufactured housing and mobile homes.

(f) Accessory structures and uses.

(g) The following institutional use: church or similar religious facility.

4.6.3  *Conditional uses.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as conditional uses:

(a) Outdoor recreation uses.

(b) The following institutional uses: day care home; fire station; school (public or private).

(c) The following general commercial uses: country club.

4.6.4  *Special exception*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following use and structures designed for such use may be allowed as a special exception:

The following local commercial use: bed and breakfast or tourist home (see *Section 13.11: Bed and Breakfast Establishments*).

4.6.5  *Area and dimensional ordinances*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Maximum Density | 4 Dwelling Units per Acre |
| Minimum Lot Area/Dwelling Unit | 7,500 Square Feet |
| Minimum Lot Width at Building Line | 60-Feet |

Defendants' Bates # 6874

Minimum Lot Width at Street Line          30-Feet
Ground Coverage Ratio                          .35

### Section 4.7  RSF-6, Single Family District

4.7.1  *Generally*. This zoning designation is provided to afford the opportunity for the choice of a high density residential development consisting of single family homes.

4.7.2  *Permitted uses*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.
>
> (b) The following transportation, communication, and utility uses: water well (public or private).
>
> (c) The following agricultural uses: Silviculture.
>
> (d) Single family dwellings including manufactured housing and mobile homes.
>
> (e) Accessory structures and uses.
>
> (f)  The following institutional use: church or similar religious facility.

4.7.3  *Conditional uses*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as conditional uses:

> (a) Outdoor recreation uses.
>
> (b) The following institutional uses: day care home; fire station; school (public or private).
>
> (c) The following general commercial uses: country club.

4.7.4  *Special exceptions*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as special exceptions:

> (a) The following local commercial use: bed and breakfast or tourist home. (See *Section 13.11: Bed and Breakfast Establishments*).
>
> (b) Boarding house, rooming house, lodging house, or dormitory.

Defendants' Bates # 6875

(c) Fraternity or sorority house.

4.7.5 *Area and dimensional ordinances.*   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Minimum Lot Area per Unit | 6,500 Square Feet |
| Minimum Lot Width at Building Line | 60-Feet |
| Minimum Lot Width at Street Line | 30-Feet |
| Maximum Ground Coverage Ratio | .35 |

## Section 4.8  RTF-6, Two Family District

4.8.1 *Generally*. The intent of this zoning designation is to provide the opportunity for two family residential development.

4.8.2 *Permitted uses*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

(a) The following general industrial uses: extraction or removal of natural resources on or under land.

(b) The following transportation, communication, and utility uses: water well (public or private).

(c) The following agricultural uses: Silviculture.

(d) Two family dwellings.

(e) Single family dwellings including manufactured housing and mobile homes.

(f) Accessory structures and uses.

(g) The following institutional use: church or similar religious facility.

4.8.3 *Conditional uses*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as conditional uses:

Defendants' Bates # 6876

(a) Outdoor recreation uses.

(b) The following institutional uses: day care home; fire station; school (public or private).

(c) The following general commercial uses: country club.

4.8.4 *Special exceptions.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as special exceptions:

(a) The following local commercial use: bed and breakfast or tourist home. (see *Section 13.11: Bed and Breakfast Establishments*).

(b) Boarding house, rooming house, lodging house, or dormitory.

(c) Fraternity or sorority house.

4.8.5 *Area and dimensional ordinances.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Maximum Density | 6 Dwelling Units per Acre |
| Minimum Lot Area per Unit | 6,500 Square Feet |
| Minimum Lot Width at Building Line | 60-Feet |
| Minimum Lot Width at Street Line | 30-Feet |
| Maximum Ground Coverage Ratio | .35 |

Defendants' Bates # 6877

## Section 4.9   RMF-6, Multiple Family District

4.9.1   *Generally*. The intent of this zoning designation is to provide the opportunity for multiple family residential development.

4.9.2   *Permitted uses*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.

> (b) The following transportation, communication, and utility uses: water well (public or private).

> (c) The following agricultural uses: Silviculture.

> (d) Multiple family dwellings.

> (e) Two family dwellings.

> (f)  Single family dwellings including manufactured housing and mobile homes.

> (g) Accessory structures and uses.

> (h) The following institutional use: church or similar religious facility.

4.9.3   *Conditional uses*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as conditional uses:

> (a) Outdoor recreation uses.

> (b) The following institutional uses: day care home; fire station; school (public or private).

> (c) The following general commercial uses: country club.

4.9.4   *Special exceptions*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as special exceptions:

> (a) The following local commercial use: bed and breakfast or tourist home (see *Section 13.11: Bed and Breakfast Establishments*).

> (b) Boarding house, rooming house, lodging house, or dormitory.

> (c) Fraternity or sorority house.

4.9.5   *Area and dimensional ordinances (single family and two family)*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas,*

Defendants' Bates # 6878

*Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Maximum Density | 6 Dwelling Units per Acre |
| Minimum Lot Area/Dwelling Unit | 6,500 Square Feet |
| Minimum Lot Width at Building Line | 60-Feet |
| Minimum Lot Width at Street Line | 30-Feet |
| Maximum Ground Coverage Ratio | .35 |

4.9.6   *Area and dimensional ordinances (multiple family)*.   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height in Habitable Stories | 3 |
| Minimum Front Yard | 25-Feet |
| Minimum Rear Yard | 25-Feet |
| Minimum Side Yards | 25-Feet |
| Maximum Density | 6 Dwelling Units per Acre |
| Minimum Lot Area | 22,000 Square Feet |
| Minimum Lot Width at Building Line | 100-Feet |
| Minimum Lot Width at Street Line | 50-Feet |
| Maximum Ground Coverage Ratio | .80 |

4.9.7   *Townhouses*.   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 25-Feet |
| Minimum Rear Yard | 25-Feet |
| Minimum Side Yards 10-Feet | (exterior wall side yards) |
| Maximum Density | 6 Dwelling Units per Acre |
| Minimum Lot Area/Dwelling Unit | 2,500 Square Feet |
| Minimum Lot Width at Building Line | 25-Feet |
| Minimum Lot Width at Street Line | 25-Feet |
| Maximum Ground Coverage Ratio | .80 |

Defendants' Bates # 6879

**Section 4.10 HDR, High Density Residential District**

4.10.1 *Generally*. The intent of this zoning designation is to provide the opportunity for multiple family residential development, including apartments, condominiums, duplexes and townhouses, in a high density setting.

4.10.2 *Permitted uses*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

     (a) Extraction or removal of natural resources on or under land.

     (b) Water well (public or private).

     (c) Silviculture.

     (d) Multiple family dwellings (apartments and condominiums).

     (e) Two family dwellings.

     (f) Townhouses.

     (g) Single Family Dwellings.

     (h) Accessory structures and uses.

     (i) Church or similar religious facility.

4.10.3 *Conditional uses*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as conditional uses:

     (a) Outdoor recreation uses.

     (b) The following institutional uses: day care home; fire station; school (public or private).

     (c) Country club.

4.10.4 *Area and dimensional ordinances (single family and two family)*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Maximum Density | 12 Dwelling Units per Acre |
| Minimum Lot Area/Dwelling Unit | 6,500 Square Feet |

Defendants' Bates # 6880

| | |
|---|---|
| Minimum Lot Width at Building Line | 60-Feet |
| Minimum Lot Width at Street Line | 30-Feet |
| Maximum Ground Coverage Ratio | .35 |

4.10.5 *Area and dimensional ordinances (multiple family).* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 50 |
| Maximum Height in Habitable Stories | 4 |
| Minimum Front Yard | 25-Feet |
| Minimum Rear Yard | 25-Feet |
| Minimum Side Yards | 25-Feet |
| Maximum Density | 12 Dwelling Units per Acre |
| Minimum Lot Area | 22,000 Square Feet |
| Minimum Lot Width at Building Line | 100-Feet |
| Minimum Lot Width at Street Line | 50-Feet |
| Maximum Ground Coverage Ratio | .80 |

4.10.6 *Townhouses.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 25-Feet |
| Minimum Rear Yard | 25-Feet |
| Minimum Side Yards | 10-Feet (exterior wall side yards) |
| Maximum Density | 12 Dwelling Units per Acre |
| Minimum Lot Area/Dwelling Unit | 2,500 Square Feet |
| Minimum Lot Width at Building Line | 25-Feet |
| Minimum Lot Width at Street Line | 25-Feet |
| Maximum Ground Coverage Ratio | .80 |

4.10.7 *Open space requirement.* A minimum of 10% of the gross land area developed under the HDR designation shall be set aside as permanent open space to include amenities, common areas and recreation facilities.

4.10.8 *Lighting standards.* The maximum height of exterior lights shall be 25-feet. The intensity, location, and design of lighting shall be such that not more than one-foot candle of light is cast upon adjacent property or public rights-of-way. Light fixtures shall be designed to cast light downward. Where necessary, cut-off devices shall be used to minimize glare off premises. No light shall be aimed directly toward properties designated single family residential, which are located within 200-feet of the source of the light.

Defendants' Bates # 6881

4.10.9 *Landscaping and buffering.* All HDR, High Density Residential District, properties shall meet the requirements of *Article 17: Landscaping and Buffers.*

4.10.10 HDR, High Density Residential District, shall not be available in Planning District 25.

## Section 4.11      RMH, Residential Manufactured Housing Park District

4.11.1 *Generally.*   The intent of this zoning district is to provide the opportunity for manufactured housing parks.

4.11.2 *Permitted uses.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts,* the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.
>
> (b) The following transportation, communication, and utility uses: water well (public or private).
>
> (c) The following agricultural uses: Silviculture.
>
> (d) Mobile home/manufactured home.
>
> (e) Manufactured Housing Park.
>
> (f)  Accessory structures and uses.
>
> (g) The following institutional use: church or similar religious facility.

4.11.3 *Conditional uses.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts,* the following uses and structures designed for such uses may be allowed as conditional uses:

> (a) Outdoor recreation uses.
>
> (b) The following institutional uses: day care home; fire station; school (public or private).
>
> (c) The following general commercial uses: country club.

4.11.4 *Area and dimensional ordinances.*   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

> (a) *Development area.* A manufactured housing park shall have a minimum lot area of 1 contiguous acre.
>
> (b) *Space size.* Each manufactured housing space shall have a minimum area of 5,000 square feet and a minimum width of fifty (50) feet for single wide homes and a minimum area of 6,500 square feet and a minimum width of fifty (50) feet

Defendants' Bates # 6882

for multisectional units. Manufactured housing parks not served by a public water or sewer system may have larger minimum area requirements as established by the Health Department.

(c) *Setbacks*.

    1. Each manufactured housing park shall have a front yard of 50-feet extending for the full width of the subject parcel.

    2. Each manufactured housing park shall have a rear yard and a side yard on both sides of the parcel devoted to said use of not less than 30-feet.

    3. There shall be a front yard setback of at least 10-feet from all interior park roads.

    4. Manufactured homes shall be so located on each space that there shall be at least a 20-foot clearance between manufactured homes.  Where manufactured homes are parked end to end, the end to end clearance may not be less than 20-feet and shall not be less than 20-feet to any building within the park.

(d) *Density*.  The maximum density of a manufactured housing park shall not exceed six (6) spaces per acre.

(e) *Height*.  The maximum height of a structure shall not exceed 35-feet.

4.11.5 *Compliance with Subdivision Regulations*.  All manufactured housing parks are subject to the provisions of *Article 9: Manufactured Housing Parks* of the *Baldwin County Subdivision Regulations*.

Defendants' Bates # 6883

# Article 5   Commercial Districts

## Section 5.1  B-1, Professional Business District

5.1.1  *Purpose and intent.*  The B-1, Professional Business and Office District, is intended to allow a concentration of office type buildings and land uses that are most compatible with, and located near, residential areas. Most B-1 commercial, professional and business office districts will be placed in close proximity to residential areas, and therefore serve as a transitional zoning district between residential areas and higher intensity commercial zoning districts. The types of office uses permitted are those that do not have high traffic volumes throughout the day, which extend into the evening hours. They will have morning and evening short-term peak conditions. The market support for these office uses should be those with a localized basis of market support as opposed to office functions requiring inter-jurisdictional and regional market support. Because office functions have significant employment characteristics, which are compounded when aggregations occur, certain personal service uses shall be permitted, to provide a convenience to office-based employment. Such convenience commercial uses shall be made an integral part of an office building as opposed to the singular use of a building.

5.1.2  *Permitted uses.*  The following uses are permitted as of right, or as uses accessory to permitted uses in the B-1, Professional Business and Office District:

(a)    Accessory structures and uses
(b)    Bank
(c) Barber shop or beauty parlor
(d)    Child care center
(e)    Child care institution
(f) Church or similar religious facility
(g)    Clinic or dentist office (medical, dental, psychiatric)
(h)    Club or lodge
(i) Extraction or removal of natural   resources on or under land
(j)  Fire station
(k) Laboratory (scientific, medical or  dental)
(l)  Library
(m) Office
(n)    Optician
(o)    Police station
(p)    Post office
(q)    School (public or private)
(r)  Silviculture
(s) Studio for dance, music, photography, painting, etc.
(t) Water well (public or private)

5.1.3  *Conditional uses.*  The following uses are permissible as conditional uses in the B-1 Commercial Professional and Business Office District, subject to the standards and procedures established in *Section 18.11: Conditional Uses*:

(a) Arboretum
(b) Ball field

Defendants' Bates # 6884

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 161 of 800   PageID #: 2175
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 82 of 293   PageID #: 774

*Baldwin County Zoning Ordinances*                                                                                    *5-2*

(c) Golf course
(d) Park or playground
(e) Riding academy
(f) Swimming pool (outdoor)
(g) Tennis court (outdoor)
(h) Wildlife sanctuary
(i) Dwellings, in combination with commercial uses, subject to the standards listed under *Section 5.1.4: Mixed uses*

5.1.4 *Mixed uses*. Mixed residential and commercial uses may be permissible as conditional uses in the (B-1) commercial professional and Business office district, subject to the standards and procedures established in *Section 18.11: Conditional Uses*, and subject to the following criteria:

(a) The commercial uses in the development may be limited in hours of operation, size of delivery trucks, and type of equipment;

(b) The residential uses shall be designed so that they are compatible with the commercial uses;

(c) Residential and commercial uses shall not occupy the same floor of a building;

(d) Residential and commercial uses shall not share the same entrances;

(e) The number of residential dwelling units shall be controlled by the dimensional standards of the B-1 district. A dwelling unit density of .5 (1/2) dwelling units per 1,000 square feet of the gross floor area devoted to commercial uses, may be allowed (structures with less than 2,000 square feet devoted to commercial uses shall be allowed one dwelling unit). In no case, however, shall the overall dwelling unit density for a mixed use project exceed 4 dwelling units per acre;

(f) Building height shall not exceed three stories;

(g) A minimum of 30 percent of the mixed use development shall be maintained as open space. The following may be used to satisfy the open space requirements: areas used to satisfy water management requirements, landscaped areas, recreation areas, or setback areas not covered with impervious surface or used for parking (parking lot islands may not be used unless existing native vegetation is maintained);

(h) The mixed commercial/residential structure shall be designed to enhance compatibility of the commercial and residential uses through

Defendants' Bates # 6885

such measures as, but not limited to, minimizing noise associated with commercial uses; directing commercial lighting away from residential units; and separating pedestrian and vehicular access ways and parking areas from residential units, to the greatest extent possible, and;

(i) Off-street parking spaces for the mixed residential and commercial uses shall be the sum total of the residential and commercial uses computed separately (See *Article 15: Parking and Loading Requirements)*.

5.1.5  *Area and dimensional ordinances.*

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height of Structure in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 25-Feet |
| Minimum Side Yards | 15-Feet |
| Minimum Lot Area | 20,000 Square Feet |
| Maximum Impervious Surface Ratio | .60 |
| Minimum Lot Width at Building Line | 80-Feet |
| Minimum Lot Width at Street Line | 60-Feet |

5.1.6  *Lighting standards*.  The maximum height of exterior lights shall be 25-feet. The intensity, location, and design of lighting shall be such that not more than one foot candle of light is cast upon adjacent property or public rights-of-way. Light fixtures shall be designed to cast light downward. Where necessary, cut-off devices shall be used to minimize glare off premises. No light shall be aimed directly toward a property designated residential, which is located within 200-feet of the source of the light.

5.1.7  *Distance between structures.*  If there is a separation between any two principal structures on the same parcel, said separation shall be a minimum of 15-feet or a distance equal to one-half the sum of their heights, whichever is the greater.

5.1.8  *Landscaping and buffering.* All B-1, Professional Business and Office District, uses shall meet the requirements of *Article 17: Landscaping and Buffers.*

Defendants' Bates # 6886

*Baldwin County Zoning Ordinances* _____ 5-4

## Section 5.2  B-2, Neighborhood Business District

5.2.1 *Purpose and intent.*   The purpose and intent of the B-2 Neighborhood Business District is to provide a limited commercial convenience facility, servicing nearby residential neighborhoods, planned and developed as an integral unit.

5.2.2 *Permitted uses.* The following uses are permitted as of right, or as uses accessory to permitted uses in the B-2, Neighborhood Business District:

(a) All uses permitted by right under the B-1 zoning designation
(b) Antique store
(c) Apparel and accessory store
(d) Appliance store including repair
(e) Art gallery or museum
(f) Art supplies
(g) Bait store
(h) Bakery retail
(i) Bed and breakfast or tourist home
(j) Bicycle sales and service
(k) Boarding, rooming or lodging house, dormitory
(l) Book store
(m) Café
(n) Camera and photo shop
(o) Candy store
(p) Catering shop or service
(q) Copy shop
(r) Delicatessen
(s) Discount/variety store (not to exceed 8,000 square feet)
(t) Drug store (not to exceed 8,000 square feet)
(u) Fixture sales

(v) Floor covering sales or service
(w) Florist
(x) Fraternity or sorority house
(y) Fruit and produce store
(z) Gift shop
(aa) Hardware store, retail
(bb) Ice cream parlor
(cc) Interior decorating shop
(dd) Laundry, self service
(ee) Lawnmower sales and service
(ff) Locksmith
(gg) Music store
(hh) Neighborhood convenience store
(ii) News stand
(jj) Paint and wallpaper store
(kk) Picture framing and/or mirror silvering
(ll) Restaurant
(mm) Shoe repair shop
(nn) Shoe store
(oo) Sign shop
(pp) Sporting goods store
(qq) Tailor shop
(rr) Tobacco store
(ss) Toy store

5.2.3 *Conditional uses.* The following uses are permissible as conditional uses in the B-2, Neighborhood Business District, subject to the standards and procedures established in *Section 18.11: Conditional Uses*:

(a) Air conditioning sales and service
(b) Amusement arcade

(c) Animal clinic/kennels
(d) Arboretum
(e) Ball field

Defendants' Bates # 6887

(f) Business machine sales and service

(g)    Car wash

(h)    Country club

(i) Discount/variety        store (exceeding    8,000    square feet)

(j) Drug store (exceeding 8,000 square    feet)

(k) Exterminator service office

(l) Golf course

(m)Liquor store

(n)    Mini-warehouse

(o)    Night club, bar, tavern

(p)    Office    equipment    and supplies sales

(q)    Park or playground

(r)    Pawn shop

(s)    Pet shop

(t)    Plumbing shop

(u)    Restaurant    sales    and supplies

(v)    Riding academy

(w)    Rug and/or drapery cleaning service

(x)    Seafood store

(y)    Swimming pool (outdoor)

(z)    Tennis court (outdoor)

(aa) Water storage tank

(bb) Wildlife sanctuary

(cc) Wireless telecommunication facility

(dd) Dwellings, in combination with commercial uses, subject to the standards listed under *Section 5.2.4: Mixed uses*

5.2.4 *Mixed uses.* Mixed residential and commercial uses may be permissible as conditional uses in the B-2 Neighborhood Business District, subject to the standards and procedures established in *Section 18.11: Conditional Uses*, and subject to the following criteria:

(a) The commercial uses in the development may be limited in hours of operation, size of delivery trucks and type of equipment.

(b) The residential uses shall be designed so that they are compatible with the commercial uses.

(c) Residential and commercial uses shall not occupy the same floor of a building.

(d) Residential and commercial uses shall not share the same entrances.

(e) The number of residential dwelling units shall be controlled by the dimensional standards of the B-2 district. A dwelling unit density of .5 (1/2) dwelling units per 1,000 square feet of the gross floor area devoted to commercial uses, may be allowed (structures with less than 2,000 square feet devoted to commercial uses shall be allowed one dwelling unit). In no case, however, shall the overall dwelling unit density for a mixed use project exceed 4 dwelling units per acre.

(f) Building height shall not exceed three stories.

Defendants' Bates # 6888

(g) A minimum of 30 percent of the mixed use development shall be maintained as open space. The following may be used to satisfy the open space requirements: areas used to satisfy water management requirements, landscaped areas, recreation areas, or setback areas not covered with impervious surface or used for parking (parking lot islands may not be used unless existing native vegetation is maintained).

(h) The mixed commercial/residential structure shall be designed to enhance compatibility of the commercial and residential uses through such measures as, but not limited to, minimizing noise associated with commercial uses; directing commercial lighting away from residential units; and separating pedestrian and vehicular access ways and parking areas from residential units, to the greatest extent possible.

(i) Off-street parking spaces for the mixed residential and commercial uses shall be the sum total of the residential and commercial uses computed separately (See _Article 15: Parking and Loading Requirements)_.

Defendants' Bates # 6889

5.2.5  _Area and dimensional ordinances._

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height of Structure in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 25-Feet |
| Minimum Side Yards | 15-Feet |
| Minimum Lot Area | 20,000 Square Feet |
| Maximum Impervious Surface Ratio | .60 |
| Minimum Lot Width at Building Line | 80-Feet |
| Minimum Lot Width at Street Line | 60-Feet |

5.2.6  _Lighting standards_.  The maximum height of exterior lights shall be 25-feet. The intensity, location, and design of lighting shall be such that not more than one foot candle of light is cast upon adjacent property or public rights-of-way. Light fixtures shall be designed to cast light downward. Where necessary, cut-off devices shall be used to minimize glare off premises. No light shall be aimed directly toward a property designated residential, which is located within 200-feet of the source of the light.

5.2.7  _Distance between structures._  If there is a separation between any two principal structures on the same parcel, said separation shall be a minimum of 15-feet or a distance equal to one-half the sum of their heights, whichever is the greater.

5.2.8  _Landscaping and buffering._ All B-2, Neighborhood Business District, uses shall meet the requirements of _Article 17: Landscaping and Buffers_.

Defendants' Bates # 6890

_Baldwin County Zoning Ordinances_          _5-8_

## Section 5.3  B-3, General Business District

5.3.1  *Purpose and intent.*  The purpose of this district is to provide for a variety of retail uses and services in free-standing parcels or shopping centers to serve the community's general commercial needs. This district shall only be applied at appropriate locations: to conveniently meet these needs; in conformance with the goals, objectives and policies and location criteria of the Comprehensive Plan; compatible with the surrounding land uses and zoning districts; where it will not adversely impact the facilities and services of the County; where it will not set a precedent for the introduction of inappropriate uses into an area; and so as not to encourage non-residential strip development along streets

5.3.2  *Permitted uses.*  The following uses are permitted as of right, or as uses accessory to permitted uses in the B-3, General Business District:

(a)  All uses permitted by right under the B-2 zoning designation
(b)  Air conditioning sales and service
(c)  Amusement arcade
(d)  Animal clinic/kennel
(e)  Arboretum
(f)  Auto convenience market
(g)  Automobile service station
(h)  Bakery, wholesale
(i)  Ball field
(j)  Bicycle sales and service
(k)  Bowling alley
(l)  Business machine sales and service
(m)  Business school or college
(n)  Butane gas sales
(o)  Cemetery
(p)  City hall or courthouse
(q)  Country club
(r)  Department store
(s)  Discount/variety store
(t)  Drug store
(u)  Elevator maintenance service
(v)  Exterminator service office
(w)  Farmer's market/truck crops
(x)  Firing range
(y)  Fitness center or gym
(z)  Florist
(aa) Fraternity or sorority house

(bb) Fruit and produce store
(cc) Funeral home
(dd) Golf course
(ee) Golf driving range
(ff)  Grocery store
(gg) Landscape sales
(hh) Marine store and supplies
(ii)  Miniature golf
(jj)  Mini-warehouse
(kk) Night club, bar, tavern
(ll)  Nursery
(mm) Office equipment and supplies sales
(nn) Park or playground
(oo) Pawn shop
(pp) Pet shop
(qq) Plumbing shop
(rr)  Printing/publishing establishment
(ss) Restaurant sales and supplies
(tt)  Riding academy
(uu) Rug and/or drapery cleaning service
(vv) Seafood store
(ww) Sign shop
(xx) Skating rink
(yy) Stone monument sales
(zz) Swimming pool (outdoor)
(aaa) Taxidermy
(bbb) Teen club or youth center

Defendants' Bates # 6891

(ccc) Tennis court (outdoor)                    (eee)  YMCA, YWCA
(ddd)  Wildlife sanctuary

Defendants' Bates # 6892

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 169 of 800   PageID #: 2183
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 90 of 293   PageID #: 782

_Baldwin County Zoning Ordinances_                                                    5-10

5.3.3 _Conditional uses._ The following uses are permissible as conditional uses in the B-3: General Commercial District, subject to the standards and procedures established in _Section 18.11: Conditional Use_:

(a) Airport
(b) Ambulance/EMS service
(c) Amusement park
(d) Armory
(e) Auditorium, stadium, coliseum
(f) Automobile parts sales
(g) Automobile repair (mechanical and body)
(h) Automobile storage (parking lot, parking garage)
(i) Barge docking
(j) Boat sales and service
(k) Broadcasting station
(l) Building materials
(m) Bus and railroad terminal facility
(n) College or university
(o) Convalescent or nursing home
(p) Correctional or penal institution
(q) Dog pound
(r) Electric power substations
(s) Farm implements
(t) Flea market
(u) Freight depot, rail or truck
(v) Home improvement center
(w) Hotel or motel

(x) Hospital
(y) Landfill
(z) Maintenance facility/storage yard for schools, government agencies, and telephone and cable companies
(aa) Manufactured housing sales, service and repair
(bb) Marina
(cc) Motorcycle sales service and repair
(dd) Movie theatre
(ee) Radio/television tower
(ff) Railroad facility
(gg) Recreational vehicle park
(hh) Recreational vehicle sales service, and repair
(ii) Restaurant, drive-in
(jj) Restaurant, fast-food
(kk) Sewage treatment plat
(ll) Taxi dispatching station
(mm) Taxi terminal
(nn) Telephone exchange
(oo) Water or sewage pumping station
(pp) Water storage tank
(qq) Wireless telecommunication facility
(rr) Zoo

5.3.4 _Area and dimensional ordinances._

| | |
|---|---|
| Maximum Height of Structure in Feet | 40 |
| Maximum Height of Structure in Habitable Stories | 3 |
| Minimum Front Yard | 40-Feet |
| Minimum Rear Yard | 25-Feet |
| Minimum Side Yards | 15-Feet |
| Minimum Lot Area | 20,000 Square Feet |
| Maximum Impervious Surface Ratio | .70 |
| Minimum Lot Width at Building Line | 80-Feet |
| Minimum Lot Width at Street Line | 60-Feet |

5.3.5  *Lighting standards*.  The maximum height of exterior lights shall be 25-feet. The intensity, location, and design of lighting shall be such that not more than one foot candle of light is cast upon adjacent property or public rights-of-way. Light fixtures shall be designed to cast light downward. Where necessary, cut-off devices shall be used to minimize glare off premises. No light shall be aimed directly toward a property designated residential, which is located within 200-feet of the source of the light.

5.3.6  *Distance between structures*.  If there is a separation between any two principal structures on the same parcel, said separation shall be a minimum of 15-feet or a distance equal to one-half the sum of their heights, whichever is the greater.

5.3.7  *Landscaping and buffering.* All B-3, General Business District, uses shall meet the requirements of *Article 17: Landscaping and Buffers.*

Defendants' Bates # 6894

### Section 5.4  B-4, Major Commercial District

5.4.1 *Purpose and intent.*  The B-4, Major Commercial District, is intended for business uses which require a location with access to an arterial or major collector road (as defined by the Functional Classification System attached as Appendix) or which have close proximity to major intersections. Due to the nature of the businesses permitted within the B-4 district, this zoning designation should be limited to property fronting on principal arterials, major arterials or minor arterials.  Ingress and egress to a roadway should promote safe and smooth traffic flow for the general traveling public.  It is also the intent of this district to provide areas for businesses which, because of their intensity, outside storage areas, or large volumes of traffic, would have significant negative impacts on adjoining properties. These uses often have an actual or potential negative impact on surrounding properties due to late hours of operation, noise, and or light.

5.4.2 *Permitted uses.*  The following uses are permitted as of right, or as uses accessory to permitted uses in the B-4, Major Commercial District:

(a) All uses permitted by right under the B-3 zoning designation
(b) Amusement park
(c) Auto convenience market
(d) Automobile parts sales
(e) Automobile repair (mechanical and body)
(f) Automobile sales
(g) Automobile service station
(h) Automobile storage (parking lot, parking garage)
(i) Boat sales and service
(j) Building materials
(k) Farm implements
(l) Flea market
(m) Home improvement center
(n) Hotel or motel
(o) Manufactured housing sales, service and repair
(p) Marina
(q) Motorcycle sales service and repair
(r) Movie theatre
(s) Recreational vehicle park
(t) Recreational vehicle sales, service and repair
(u) Restaurant, drive-in
(v) Restaurant, fast food

5.4.3 *Conditional uses.* The following uses are permissible as conditional uses in the B-4, Major Commercial District, subject to the standards and procedures established in *Section 18.11: Conditional Uses*:

(a) Airport
(b) Ambulance/EMS service
(c) Armory
(d) Auditorium, stadium, coliseum
(e) Barge docking
(f) Broadcasting station
(g) Bus and railroad terminal facility
(h) College or university
(i) Convalescent or nursing home
(j) Correctional or penal institution
(k) Dog pound
(l) Electric power substations

Defendants' Bates # 6895

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 172 of 800   PageID #: 2186
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 93 of 293   PageID #: 785

_Baldwin County Zoning Ordinances_                                              _5-13_

(m) Freight depot, rail or truck
(n) Hospital
(o) Landfill
(p) Maintenance facility/storage yard for schools, government agencies, and telephone and cable companies
(q) Race track
(r) Radio and television station and transmitting tower
(s) Railroad facility
(t) Sewage treatment plat
(u) Taxi dispatching station
(v) Taxi terminal
(w) Telephone exchange
(x) Water or sewage pumping station
(y) Water storage tank
(z) Wireless telecommunication facility
(aa) Zoo

Defendants' Bates # 6896

5.4.4  *Area and dimensional ordinances.*

| | |
|---|---|
| Maximum Height of Structure in Feet | 40 |
| Maximum Height of Structure in Habitable Stories | 3 |
| Minimum Front Yard | 40-Feet |
| Minimum Rear Yard | 25-Feet |
| Minimum Side Yards | 15-Feet |
| Minimum Lot Area | 20,000 Square Feet |
| Maximum Impervious Surface Ratio | .70 |
| Minimum Lot Width at Building Line | 80-Feet |
| Minimum Lot Width at Street Line | 60-Feet |

5.4.5  *Lighting standards.*  The maximum height of exterior lights shall be 25-feet. The intensity, location, and design of lighting shall be such that not more than one foot candle of light is cast upon adjacent property or public rights-of-way. Light fixtures shall be designed to cast light downward. Where necessary, cut-off devices shall be used to minimize glare off premises. No light shall be aimed directly toward a property designated residential, which is located within 200-feet of the source of the light.

5.4.6  *Distance between structures.*  If there is a separation between any two principal structures on the same parcel, said separation shall be a minimum of 15-feet or a distance equal to one-half the sum of their heights, whichever is the greater.

5.4.7  *Landscaping and buffering.*  All B-4, Major Commercial District, uses shall meet the requirements of *Article 17, Landscaping and Buffers.*

Defendants' Bates # 6897

*Baldwin County Zoning Ordinances*                                                                    5-2

**Section 5.5  RV-1, Recreational Vehicle Park District**

5.5.1  *Purpose and intent.*  The purpose of this section is to establish a zoning designation for recreational vehicle parks.

5.5.2  *Permitted uses.*  The following uses are permitted as of right, or as uses accessory to permitted uses in the RV-1, Recreational Vehicle Park District:

   (a) Extraction or removal of natural resources on or under the land.

   (b) Water well (public or private).

   (c) Silviculture.

   (d) Recreational Vehicle Park.

   (e) Accessory structures and uses.

   (f) Church or similar religious facility.

5.5.3  *Density.* The maximum number of recreational vehicle sites developed under RV-1 shall be 15 sites per acre.

5.5.4  *Land Area.* The minimum land area shall be three (3) acres.

5.5.5  *Standards.* Recreational vehicle parks developed under the RV-1 designation shall meet all standards, procedures and requirements found in Section 13.8 of the zoning ordinance.

Defendants' Bates # 6898

### Section 5.6  RV-2, Recreational Vehicle Park District

5.6.1  *Purpose and intent.*  The purpose of this section is to establish a zoning designation for lower density recreational vehicle parks.

5.6.2  *Permitted uses.*  The following uses are permitted as of right, or as uses accessory to permitted uses in the RV-2, Recreational Vehicle Park District:

(a) Extraction or removal of natural resources on or under the land.

(b) Water well (public or private).

(c) Silviculture.

(d) Recreational Vehicle Park.

(e) Accessory structures and uses.

(f)  Church or similar religious facility.

5.6.3  *Density.* The maximum number of recreational vehicle sites developed under RV-2 shall be 6 sites per acre.

5.6.4  *Land Area.* The minimum land area shall be three (3) acres.

5.6.5  *Standards.* Recreational vehicle parks developed under the RV-2 designation shall meet all standards, procedures and requirements found in Section 13.8 of the zoning ordinance.

Defendants' Bates # 6899

*Baldwin County Zoning Ordinances*                                                          5-4

## Section 5.7  LB, Limited Business District

5.7.1 *Purpose and intent.* The LB, Limited Business District, is intended to allow specific uses in areas where commercial development is warranted, but where limitations and special requirements are needed due to environmental, historic and other unique characteristics. This designation may also serve as transitional zoning between residential areas and higher intensity commercial zoning districts.

5.7.2 *Permitted uses.* The uses listed below are permitted as of right, or as uses accessory to permitted uses in the LB, Limited Business District. Unless otherwise stated herein, said uses shall be limited to structures and other improvements not to exceed 4,000 square feet of gross floor area.

(a)  Accessory structures and uses
(b)  Antique store
(c)  Apparel and accessory store
(d)  Art gallery or museum
(e)  Art supplies
(f)  Bakery, retail
(g)  Bank
(h)  Barber shop or beauty parlor
(i)  Book store
(j)  Café
(k)  Camera and photo shop
(l)  Candy store
(m)  Catering shop or service
(n)  Church or similar religious facility*
(o)  Club or lodge ("lodge" to be defined as "club" at Section 22.2, Words and Terms Defined)
(p)  Delicatessen
(q)  Extraction or removal of natural resources on or under the land
(r)  Florist
(s)  Fruit and produce store
(t)  Gift shop
(u)  Ice cream parlor
(v)  Library

(w)  Medical office (medical, dental, psychiatric)
(x)  Music store
(y)  Neighborhood convenience store (not to include gasoline sales)
(z)  News stand
(aa)  Office
(bb)  Restaurant (not to include drive-up facilities)
(cc)  Shoe store
(dd)  Silviculture
(ee)  Studio for dance, music, photography, painting, etc.
(ff)  Tailor shop
(gg)  Toy store

Defendants' Bates # 6900

*Churches or similar religious facilities shall not be limited to 4,000 square feet of gross floor area.

5.7.3 *Conditional uses.* The uses listed below are permissible as conditional uses in the LB, Limited Business District, subject to the standards and procedures established in *Section 18.11: Conditional Uses*:

- (a) Uses listed as permitted by right under Section 5.7.2 in which structures and improvements exceed 4,000 square feet up to a maximum of 8,000 square feet. Churches and other places of worship shall be exempt from this square footage restriction.
- (b) Dwellings, in combination with commercial uses, subject to the standards listed under *Section 5.1.4: Mixed uses*.

5.7.4 *Mixed uses.* Mixed residential and commercial uses may be permissible as conditional uses in the LB, Limited Business District, subject to the standards and procedures established in *Section 18.11: Conditional Uses*, and subject to the following criteria:

    (a) The commercial uses in the development may be limited in hours of operation, size of delivery trucks, and type of equipment;

    (b) The residential uses shall be designed so that they are compatible with the commercial uses;

    (c) Residential and commercial uses may occupy the same floor of a building, but shall not share the same entrances;

    (d) The number of residential dwelling units shall be not exceed the number of commercial units;

    (e) The mixed commercial/residential structure shall be designed to enhance compatibility of the commercial and residential uses through such measures as, but not limited to, minimizing noise associated with commercial uses; directing commercial lighting away from residential units; and separating pedestrian and vehicular access ways and parking areas from residential units, to the greatest extent possible, and;

    (f) Off-street parking spaces for the mixed residential and commercial uses shall be the sum total of the residential and commercial uses computed separately (See *Article 15: Parking and Loading Requirements)*.

Defendants' Bates # 6901

5.7.5  *Special exceptions.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the uses and structures designed for such uses listed below may be allowed as special exceptions subject to the standards and procedures established in *Section 18.8: Special Exceptions*.

(a) Bed and breakfast or tourist home, subject to the standards listed under *Section 13.10: Bed and Breakfast Establishments*).
(b) Outdoor music of an acoustic nature which is not amplified.

5.7.6  *Area and dimensional standards.*

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | (a) |
| Minimum Side Yards | (b) |
| Minimum Lot Area | 20,000 Square Feet |
| Maximum Impervious Surface Ratio | .60 |
| Minimum Lot Width at Building Line | 80-Feet |
| Minimum Lot Width at Street Line | 60-Feet |

(a) No minimum except where abutting a residential district, in which case there shall be a minimum rear yard of 25-feet abutting the residential district.

(b) No minimum except where abutting a residential district, in which case there shall be a minimum side yard of 15-feet abutting the residential district.

5.7.7  *Lighting standards.*  The maximum height of exterior lights shall be 25-feet. The intensity, location, and design of lighting shall be such that not more than one foot candle of light is cast upon adjacent property or public rights-of-way. Light fixtures shall be designed to cast light downward. Where necessary, cut-off devices shall be used to minimize glare off premises. No light shall be aimed directly toward a property designated residential, which is located within 200-feet of the source of the light.

5.7.8  *Landscaping and buffering.* All LB, Limited Business District, uses shall meet the requirements of *Article 17: Landscaping and Buffers*.

Defendants' Bates # 6902

*Baldwin County Zoning Ordinances*                                                                 *6-1*

## Article 6    Recreation Districts

### Section 6.1  MR, Marine Recreation District

6.1.1  *Generally*.  This zoning district is intended to provide for water related recreation activities.

6.1.2  *Permitted uses*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

>  (a) The following general industrial uses: extraction or removal of natural resources on or under land.
>
>  (b) The following transportation, communication, and utility uses: water well (public or private).
>
>  (c) Marine recreation uses.
>
>  (d) Outdoor recreation uses.
>
>  (e) The following general commercial uses: country club; hotel or motel; night club, bar, tavern.
>
>  (f) The following local commercial uses: bed and breakfast or tourist home; cafe; convenience store; delicatessen; gift shop; restaurant.
>
>  (g) The following professional service and office uses: office.
>
>  (h) The following institutional uses: church or similar religious facility.
>
>  (i)  The following agricultural uses: Silviculture.
>
>  (j)  Single Family dwellings including manufactured housing and mobile homes.
>
>  (k) Accessory structures and uses.

6.1.3  *Conditional use*.  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as a conditional use:

>  The following institutional uses: day care home.

Defendants' Bates # 6903

6.1.4  *Area and dimensional ordinances.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 45 |
| Maximum Height of Structure in Habitable Stories | 4 |
| Minimum Front Yard | 25-Feet |
| Minimum Rear Yard | 25-Feet |
| Minimum Side Yards | 10-Feet |
| Minimum Lot Area | 80,000 Square Feet |
| Maximum Impervious Surface Ratio | .80 |
| Minimum Lot Width at Building Line | 165-Feet |
| Minimum Lot Width at Street Line | No Minimum |

Defendants' Bates # 6904

## Section 6.2      OR, Outdoor Recreation District

6.2.1 *Generally.*      This zoning district is intended to provide for outdoor recreation activities.

6.2.2 *Permitted uses.*   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts,* the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.
>
> (b) The following transportation, communication, and utility uses: water well (public or private).
>
> (c) Outdoor recreation uses.
>
> (d) The following institutional uses: church or similar religious facility.
>
> (e) The following agricultural uses: Silviculture.
>
> (f) Accessory structures and uses.

6.2.3 *Area and dimensional ordinances.*   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height of Structure in Habitable Stories | 2½ |
| Minimum Front Yard | 40-Feet |
| Minimum Rear Yard | 40-Feet |
| Minimum Side Yards | 20-Feet |
| Minimum Lot Area | 3 Acres |
| Maximum Impervious Surface Ratio | .80 |
| Minimum Lot Width at Building Line | 210-Feet |
| Minimum Lot Width at Street Line | No Minimum |

Defendants' Bates # 6905

Case 1:20-cv-00057-C    Document 77    Filed 02/02/22    Page 182 of 800    PageID #: 2196
Case 1:20-cv-00057-C    Document 45-1    Filed 05/21/21    Page 103 of 293    PageID #: 795

*Baldwin County Zoning Ordinances*                                                    *7-1*

## Article 7    Tourist District

### Section 7.1 TR, Tourist Resort District

7.1.1    *Generally.*   This zoning district is intended to provide for tourist lodging facilities and associated resort and recreation activities.

7.1.2    *Permitted uses.*   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts,* the following uses and structures designed for such uses shall be permitted:

(a)        The following general industrial uses: extraction or removal of natural resources on or under land.

(b)        The following transportation, communication, and utility uses: water well (public or private).

(c)        Outdoor recreation uses.

(d)        The following general commercial uses: country club; hotel or motel.

(e)        The following institutional uses: church or similar religious facility.

(f)        The following agricultural uses: Silviculture.

(g)        The following major commercial uses: automobile storage (parking lot/garage) as an accessory use for a hotel on an abutting/contiguous parcel.

(h)        Accessory structures and accessory uses such as food service, gift or novelty shops, and barber or beauty shops conducted primarily for the convenience of visitors or patrons on the premises and contained within a principal building.

7.1.3    *Special exceptions.*   Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts,* the following uses and structures designed for such uses may be allowed as special exceptions:

(a)        The following marine recreation uses: marina.

(b)        The following general commercial uses: night club, bar, tavern.

(c)        The following local commercial uses: bed and breakfast or tourist home; cafe; convenience store; delicatessen; gift shop; restaurant.

(d)        The following professional service and office uses: office.

Defendants' Bates # 6906

7.1.4 *Area and dimensional ordinances.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article XX: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 45 |
| Maximum Height of Structure in Habitable Stories | 4 |
| Minimum Front Yard | 40-Feet |
| Minimum Rear Yard | 40-Feet |
| Minimum Side Yards | 20-Feet |
| Minimum Lot Area | 5 Acres |
| Maximum Impervious Surface Ratio | .80 |
| Minimum Lot Width at Building Line | 270-Feet |
| Minimum Lot Width at Street Line | 270-Feet |

7.1.5  *Off-street parking requirements.* In determining compliance with the off-street parking requirements of Article 15, off-street parking spaces, located on abutting/contiguous parcels, may be included in the parking calculations for permitted uses and structures. As used in this section, abutting/contiguous parcel shall mean any parcel that is immediately adjacent to, touching, or separated from such a common border by a right-of-way, alley, or easement.

(a) The abutting/contiguous parcel used for off-street parking shall have the same owner as the parcel which is the location for the permitted, principal use.

(b) Off-street parking authorized under this Article 7.1.5 shall be an accessory use for the permitted, principal use on the abutting/contiguous parcel only.

(c) When the abutting/contiguous parcel is not separated from the permitted, principal use by a right-of-way, the off-street parking areas shall be connected to the permitted, principal use by a pedestrian walkway or sidewalk which meets the requirements of the Americans with Disabilities Act (ADA).

(d) When the abutting/contiguous parcel is separated by a right-of-way, the road or street shall be no wider than two (2) lanes and shall be classified no higher than a Minor Arterial according the Alabama Department of Transportation (ALDOT) Functional Classification System. Safe and convenient crosswalks, subject to ADA requirements shall be provided.

(e) Off-street parking located on an abutting/contiguous parcel shall not be converted to a different use which would reduce the number of parking spaces below that which would be required for the permitted, principal use on the adjacent parcel.

Defendants' Bates # 6907

## Article 8　　Industrial Districts

### Section 8.1　M-1, Light Industrial District

8.1.1 *Generally.*　The purpose of this zoning district is to provide a suitable protected environment for manufacturing, research and wholesale establishments which are clean, quiet and free of hazardous or objectionable emissions, and generate little industrial traffic.

8.1.2 *Permitted uses.*　Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts,* the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.
>
> (b) Light industrial uses.
>
> (c) Transportation, communication, and utility uses except landfills and sewer treatment plants.
>
> (d) Outdoor recreation uses.
>
> (e) Marine recreation uses.
>
> (f) General commercial uses except race tracks.
>
> (g) Local commercial uses.
>
> (h) Professional service and office uses.
>
> (i) Institutional uses.
>
> (j) Agricultural uses.
>
> (k) Accessory structures and uses.

8.1.3 *Conditional uses.*　Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts,* the following uses and structures designed for such uses may be allowed as conditional uses:

> (a) Transportation, communication, and utility uses not permitted by right per *Section 21.2(a) (3) Permitted uses.*

Defendants' Bates # 6908

(b) General commercial uses not permitted by right per _Section 21.2(a)
(6): Permitted uses._

8.1.4 _Area and dimensional ordinances._   Except as provided by _Section 2.3:
Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications,
Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8:
Highway Construction Setbacks, Section 18.6 Variances,_ and _Article 20:
Nonconformities,_ the area and dimensional ordinances set forth below shall be
observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 45 |
| Maximum Height of Structure in Habitable Stories | 4 |
| Minimum Front Yard | 25-Feet |
| Minimum Rear Yard | see (a & b) |
| Minimum Side Yards | see (a & b) |
| Minimum Lot Area | 40,000 Square Feet |
| Maximum Impervious Surface Ratio | .80 |
| Minimum Lot Width at Building Line | 120-Feet |
| Minimum Lot Width at Street Line | No Minimum |

(a) No minimum except where abutting a residential district, in which
case there shall be a minimum yard of 25-feet abutting the residential
district.

(b) The required yards shall be increased by one foot for each foot of
building height in excess of 35-feet.

Defendants' Bates # 6909

### Section 8.2  M-2, General Industrial District

8.2.1  *Generally.*  It is the intent of this zoning district to provide opportunity for the location of industrial, manufacturing, processing, warehousing, or research and testing operations that, due to employment of heavy equipment or machinery or to the nature of the materials and processes employed, require special location and development safeguards to prevent pollution of the environment by noise, vibration, odors or other factors, and may also require extensive sites for storage and parking, may require extensive community facilities or generate heavy motor traffic.

8.2.2  *Permitted uses.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

> (a) The following general industrial uses: extraction or removal of natural resources on or under land.
>
> (b) Light industrial uses.
>
> (c) Transportation, communication, and utility uses except landfills and sewer treatment plants.
>
> (d) Outdoor recreation uses.
>
> (e) Marine recreation uses.
>
> (f) General commercial uses except race tracks.
>
> (g) Local commercial uses.
>
> (h) Professional service and office uses.
>
> (i) Institutional uses.
>
> (j) Agricultural uses
>
> (k) Accessory structures and uses.

8.2.3  *Conditional uses.*  Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts,* the following uses and structures designed for such uses may be allowed as conditional uses:

> (a) Transportation, communication, and utility uses not permitted by right.

Defendants' Bates # 6910

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 187 of 800  PageID #: 2201
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 108 of 293  PageID #: 800

_Baldwin County Zoning Ordinances_                                                    _8-4_

(b) Light industrial uses not permitted by right.

(c) General commercial uses not permitted by right.

8.2.4 *Area and dimensional ordinances.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 45 |
| Maximum Height of Structure in Habitable Stories | 4 |
| Minimum Front Yard | 25-Feet |
| Minimum Rear Yard | see (a & b) |
| Minimum Side Yards | see (a & b) |
| Minimum Lot Area | 3 Acres |
| Maximum Impervious Surface Ratio | .80 |
| Minimum Lot Width at Building Line | 210-Feet |
| Minimum Lot Width at Street Line | No Minimum |

(a) No minimum except where abutting a residential district, in which case there shall be a minimum yard of 30-feet abutting the residential district.

(b) The required yards shall be increased by one foot for each foot of building height in excess of 35-feet.

Defendants' Bates # 6911

## Article 9   Planned Development Districts

### Section 9.1  Purpose

It is the purpose of this article to permit Planned Developments which are intended to encourage the development of land as planned communities, encourage flexible and creative concepts of site planning; preserve the natural amenities of the land by encouraging scenic and functional open areas; accomplish a more desirable environment than would be possible through the strict application of the minimum requirements of these ordinances; provide for an efficient use of land resulting in smaller networks of streets and utilities where access to regional systems is impractical and thereby lowering development and housing costs; and provide a stable environmental character compatible with surrounding areas.

*Definitions.* Words and phrases used in this section shall have the meanings as set forth in this section.  Words and phrases not defined in this section but defined elsewhere in the zoning ordinances shall be given the meanings as set forth in such ordinances.  All other words and phrases shall be given their common, ordinary meaning unless the context clearly requires otherwise.

> *Large scale planned developments*: A development of land, occupying 1000 contiguous acres or more, that is under unified control and is planned and developed as a whole in a single development operation or programmed series of development stages.  A large scale planned development containing 4 units or less is exempt from these provisions.  Large Scale Planned Developments are required to obtain Conceptual Site Plan approval (reviewed first by Planning Commission and recommendation sent to the County Commission for final consideration), and then obtain Final Site Plan approval for each phase of development, as outline herein.

> *Small scale planned developments:*  A development of land, occupying at least 5 acres and less than 1000 contiguous acres, that is under unified control and is planned and developed as a whole in a single development operation or programmed series of development stages.  A small scale planned development containing 4 units or less is exempt from these provisions. Small Scale Planned Developments are required to obtain Final Site Plan approval as outlined herein.

### Section 9.2  Planned Developments, Generally

9.2.1  *Unified control.*  The parcel or parcels of land for a Planned Development shall be in unified control, and shall be owned or controlled by a single person, corporation, agency, or like organization.  The applicant shall provide the county appropriate and necessary documents to indicate ownership.  No application shall be considered until this section is fully complied with.  An application must be filed by the owner or authorized agent of all property included in the project.   In the case of multiple

Defendants' Bates # 6912

ownerships, the approved final development plan shall be binding on all owners and any successors. The developer shall maintain and provide for unified control of the Planned Development until the project is complete. The entity designated to provide unified control shall ensure that all conditions of development are met. Individual properties may be sold after appropriate approvals and recordings have been completed and that proper recordings have been made which insures the continuance of the Planned Development as approved. Responsibility for unified control may be assigned to an individual or entity such as a homeowner's association that will provide for the maintenance of any common property and improvements.

9.2.2 Specific variations in off-street parking and loading requirements, sign requirements, landscaping requirements and area and dimensional requirements, including lot sizes, lot widths, setbacks and building height, may be approved by the County Commission, upon recommendation by the Planning Commission, and shall be shown on the approved Final Site Plan.

9.2.3 Where a planned development involves the subdivision of land, a subdivision plat shall be approved in accordance with the procedures established in the Baldwin *County Subdivision Regulations.*

9.2.4 *Approval of a planned development.* Approval of a large scale Planned Residential Development conceptual plan, small scale Planned Residential Development and Planned Industrial Development final site plan shall constitute a zoning map amendment for the subject property. The zoning designation "PRD" or "PID" shall be assigned on the official zoning map for the respective planning district.

### Section 9.3 Planned Residential Developments

9.3.1 *Permitted uses.* Within the "Planned Residential Development" districts, the following uses and structures designed for such uses may be permitted as shown on the approved site plan:

> (a) Single family dwellings including manufactured housing and mobile homes.
>
> (b) Two family dwellings.
>
> (c) Multiple family dwellings including townhouses.
>
> (d) Non-residential land uses in accordance with limitations and restrictions contained herein.
>
> (e) Maintenance facilities and utility facilities.
>
> (f) Accessory structures and uses.

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 190 of 800   PageID #: 2204
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 111 of 293   PageID #: 803

*Baldwin County Zoning Ordinances*                                                                    *9-3*

9.3.2 *Required zoning districts*. A Planned Residential District may be established under the following zoning designations:

> RA: Rural Agricultural District
> RSF-E: Residential Single Family Estate District
> RSF-1: Single Family District
> RSF-2: Single Family District
> RSF-3: Single Family District
> RSF-4: Single Family District
> RTF-4: Two Family District
> RSF-6: Single Family District
> RTF-6: Two Family District
> RMF-6: Multiple Family District
> RMH: Residential Manufactured Housing Park District
> HDR: High Density Residential District
> RV-1: Recreational Vehicle Park District
> RV-2: Recreational Vehicle Park District

In Planning District 10, a Planned Residential District may also be established in the Rural District (RR) zone.

9.3.3 *Commercial land uses*. Commercial land uses including institutional uses, office and professional service uses, local commercial uses and general commercial uses may not occupy more than twenty (20) percent of the gross acreage of the PRD. The following location criteria shall be met to the County's satisfaction:

> (a) The location of commercial land uses demonstrates a rational development scheme.

> (b) The commercial land use is centrally located and interrelated to the development as a whole.

> (c) The commercial land use is located in the interior of the development, uses that front an exterior or a perimeter street or road should be limited.

> (d) Commercial zoning classifications are shown on the conceptual plan and final development plan.

9.3.4 *Open space and common area reservation*. A minimum of 20% of the gross land area of the planned development shall be set aside for permanent open space for passive and/or active recreation such as parks, recreational facilities, pedestrian ways, and/or for conserving sensitive elements of the site.

> (a) Unless constructed as an amenity, stormwater detention ponds, retention ponds, or similar holding basins for stormwater shall not be counted in determining open space. Steep slopes, internal street rights-of-way,

Defendants' Bates # 6914

driveways, off-street parking areas, and off-street loading areas or similar uses shall not be counted in determining open space.

(b) All jurisdictional wetlands located within the development shall be set aside in the required open space.

(c) A minimum of fifty (50) percent of the required open space must be usable for passive or active recreation purposes. The usable open space shall not include steep slopes, streams, ponds, watercourses, wetlands, floodways and/or floodplains.

9.3.4.1 The required open space may be owned in common by the residents of the development. Any open space set aside for conservation shall be subjected to a conservation easement granted to a qualified land trust, conservation organization or government agency. Such conservation easement shall be in legal form satisfactory to the County.

9.3.4.2 Open space, common area or recreational facilities shall be provided in a manner which coincides with each development phase of a project. The amount and type shall be adequate to serve the needs of the residents or users within each phase.

9.3.5 *Development density*. All provisions concerning maximum density permitted in the underlying zoning district are applicable to Planned Residential Developments therein and shall not be exceeded. Land reserved for non-residential uses shall not be included in the allowable development density. Land set aside for open space shall be included in the allowable development density. For mixed use buildings where the gross floor area used for non-residential uses exceeds ten (10) percent of the total gross floor area, the entire footprint shall be considered as land reserved for non-residential uses.

9.3.6 *Development area.*

(a) *Development area, small scale.* A small scale planned residential development, occupying a minimum of five (5) contiguous acres and less than one-thousand (1,000) contiguous acres may be established within those Planning Districts which permit planned residential developments (See *Section 2.3: Establishment of Zoning in Planning District*).

(b) *Development area, large scale.* A large scale planned residential development, occupying one thousand (1,000) contiguous acres or more may be established within those Planning Districts which permit planned residential developments (See *Section 2.3: Establishment of Zoning in Planning Districts*).

## Section 9.4   PRD Establishment Procedures, Generally

9.4.1 The procedure to establish a small scale or large scale PRD shall be the same as a change in the zoning district boundaries as specified in *Article 19*.   The planned development shall be shown on the Zoning Map by outline of the tract of land included and the notation "PRD".

9.4.2  Prior to filing of an application for approval of a planned development, a pre-application conference should be held with the Zoning Administrator or his/her designee.  The purpose of the conference is to consider informally the concept of the proposed planned development and the way in which it will meet the objectives of this section.  No specific documents are required for the pre-application conference, but the applicant shall be responsible for providing sufficient information on which to base tentative conclusions as to the appropriateness and feasibility of the proposed planned development under the provisions of these ordinances.

9.4.3  *Small scale procedure*.  To establish a PRD Small Scale, the applicant shall file an application and required submittals in accordance with the final site plan requirements found in Section *9.5.5: Final Site Plan Requirements*.  All development thereafter shall be in conformance with an approved final site plan.

9.4.4  *Large scale procedure*.  To establish a large scale PRD the applicant shall file an application and required submittals in accordance with *Section 9.5: Submittals*.

9.4.5  Development of a large-scale PRD may be done in phases, subject to the condition that all the property to be included in such phased PRD shall be submitted as a conceptual plan and approved by the County.

9.4.6  If the Conceptual Plan and required submittals are approved by the County, the applicant(s) must then and in that event, submit Final Site Plans in accordance with the approved phasing schedule and in accordance with *Section 9.5.1*, for each phase of the project prior to any commencement of development activity.

9.4.7  A final site plan shall be submitted and heard in accordance with *Article 19*.

## Section 9.5  Submittals

9.5.1  *Conceptual site plan requirements*.

9.5.2  The following shall be submitted as part of a Large Scale Planned Residential Development Conceptual Site Plan and shall include four (4) copies of the following:

> (a) Proposed land uses, housing types, or building types by generalized area.

> (b) Proposed common areas and open space, showing proposed uses (i.e. recreation, detention, park, school, church, etc…).

Defendants' Bates # 6916

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 193 of 800   PageID #: 2207
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 114 of 293   PageID #: 806

*Baldwin County Zoning Ordinances*                                                                    *9-6*

(c) Proposed pedestrian pathways and bicycle paths.

(d) The proposed location of the internal major and minor street system, the adjacent external street system and connections to the adjacent external street system, and typical sections of proposed streets.

(e) The location, type and total gross square footage of all non-residential uses.

(f) A development schedule with a generalized phasing schedule, if appropriate.

(g) Plans for traffic and circulation inside and outside the development in the immediate vicinity.

9.5.3 A Conceptual Plan written summary shall be submitted to the County, and shall include the following:

(a) A Narrative that generally describes the entire project.

(b) A statement of the present ownership and a legal description of the property.

(c) Proposed land uses and development standards, density, height, yard requirements, typical lot configurations, and proposed restrictive covenants.

(d) Tables showing the maximum number, type and density of dwelling units proposed for each phase or site and land use.

(e) Statement regarding proposed dedication or reservation of land for public uses, including streets, easements, parks and school sites.

(f) Statement regarding water, sewer, electrical, telephone, fire protection, and solid waste collection service for the proposed development.

(g) Statement regarding the general method proposed for stormwater management and erosion control.

(h) A traffic study shall be performed and submitted with written summary. The study shall cover an area of influence from the proposed development to the nearest north-south major arterial and east-west major arterial.

(i) A statement indicating the type of legal instrument that will be created to provide for the management of common areas.

Defendants' Bates # 6917

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 194 of 800   PageID #: 2208
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 115 of 293   PageID #: 807

*Baldwin County Zoning Ordinances*                                                     *9-7*

(j)  A proposing parking and loading schedule for each land use type.

9.5.4   A Conceptual Utility Service Plan shall be submitted and include the following:

(a) A Generalized Utility Plan indicating the location and size of existing water and sewer lines, as well as any proposed offsite utility upgrades.

(b) A Statement of Utility Service Commitment for the water, sewer, electric and telephone utility providers.  This Statement of Commitment must include that the utility provider is willing and financially capable of providing service to the development at present and in the future.  It should also make reference to any immediate or future infrastructure upgrades that will be required due to said development, and at what stage of development these upgrades will be necessary.

(c) A letter from the fire chief of the fire district that will serve the development, stating that the department is capable of providing fire protection for the development and that the utilities, general layout, and building types will not reflect negatively on the current ISO rating of the citizens in that fire district. If a new fire district is to be created, then a similar letter from the responsible individual who intends to create such fire district is required.   Proof of the creation of said fire district is required prior to Preliminary Plat or Final Site Plan approval.

9.5.5   *Final development and site plan requirements.*

9.5.5.1    Final Development Plan Application Required Submittals.

(a) Be made on forms available at the offices of the Baldwin County Planning & Zoning Department.

(b) Be accompanied by the required application fee according to the current schedule of fees established by the County Commission for the particular category of application.

(c) Be accompanied by five (5) sets of plans preferably at a scale of 1" = 100' and two (2) sets of plans on 11x17 size paper.

(d) Be submitted to the Baldwin County Planning & Zoning Department in accordance with meeting date and deadlines approved by the Baldwin County Planning Commission.

(e) Be accompanied by a transmittal letter listing all of the drawings, letters, calculations, attachments, and other information submitted for the application.

(f)  Be submitted within the effective period of approval as per *Section 9.10.2.*

Defendants' Bates # 6918

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 195 of 800   PageID #: 2209
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 116 of 293   PageID #: 808

*Baldwin County Zoning Ordinances*                                                    *9-8*

(g) Be accompanied by a stormwater management plan with a schematic diagram of the proposed stormwater collection system and method of retention/detention.

(h) Be accompanied by a statement or narrative on anticipated impacts on any public services as necessary.

(i) Be accompanied by preliminary statements on how maintenance and ownership of common facilities will be handled and maintained.

(j)  Boundary of the site shown by a heavy line.

(k) A plan at an appropriate scale demonstrating the following:

> 1. The location, grouping, distance dimensions and height of all uses and facilities.
>
> 2. In the case of residential development, the number of residential units proposed, their location, number of stories and overall building height.
>
> 3. A vehicular and pedestrian circulation system including driveways, walkways, parking areas and streets to be dedicated, if any.
>
> 4. A system of open space and/or recreational uses.
>
> 5. A written summary of the project including a description of the development design concept, target market, anticipated sales price (for residential) and any other pertinent information.

(l)  A proposed landscaping plan including buffering.

(m) Existing and proposed streets, including the following information:

> 1. Right-of-way widths
>
> 2. A typical design cross section indicating road surface type, width, drainage features and sidewalks/bike paths.

(n) If submitted as part of a large scale PRD, a Final Development plan shall comply in all respects to corresponding approved Conceptual Plan with the exception of minor changes allowed under *Section 9.9: Plan Modifications*.

9.5.5.2     A final site plan shall be prepared by a licensed engineer, architect or land surveyor and shall be clearly and legibly drawn at a convenient scale of not less than one (1) inch equals 100-feet, and the sheets shall be numbered in sequence if more

Defendants' Bates # 6919

than one (1) sheet is used.  All text shall be a minimum of 1/10 of an inch in height. The sheet shall not exceed 24 x 36 inches.  The site plan shall show the following:

(a) Name and address of owner(s) of record.

(b) Proposed name of the planned development, date, north point, scale, and location.

(c) Name of licensed engineer, architect or land surveyor.

(d) Vicinity map showing the location of the planned development.

(e) Exact boundaries of the site shown with bearings and distances.

(f)  Names and addresses of the owners of land immediately adjoining the site as their names appear upon the plats in the office of the county tax assessor and their addresses appear in the directory of the county or on the tax records of the county.

(g) Wooded areas, wetlands and any other conditions affecting the site.

(h) The location of existing streets, buildings, water courses, railroads, transmission lines, drainage structures, public utilities, jurisdiction lines, and any public utility easements on the site and on adjacent land within 100-feet of the site.

(i)  Proposed rights-of-way or easements including location, widths, purposes, and street names.

(j)  The location and size of all lots.

(k) Proposed minimum building setback lines shown and labeled on each lot.

(l)  Proposed parks, school sites, or other public open spaces, if any.

(m) Site data:

  1. Acreage in total tract.

  2. Smallest lot size.

  3. Total number of lots.

  4. Linear feet in streets.

  5. Amount of impervious surface.

Defendants' Bates # 6920

6. Density.

(n) Any area within or adjacent within 100-feet of the proposed planned development subject to inundation by the base flood as defined herein, or subject to periodic inundation by storm drainage overflow or ponding, shall be clearly shown and identified on the site plan.

(o) Special flood hazard areas and/or coastal high hazard areas as indicated on the latest Flood Insurance Rate Map (FIRM) for the area, along with a statement to that effect.

(p) An acceptable wetlands jurisdictional determination from a certified environmental consultant if the proposed planned development contains wetlands or if the Zoning Administrator or his/her designee determines potential wetlands from the Generalized Wetland map as defined herein, or through a site visit by County Staff.

(q) The name of each utility company proposed to provide water, sewer, electrical, and telephone service.

(r) Proposed land uses and the location of proposed buildings and other structures including walls and fences (when appropriate).

(s) Number and location of parking spaces.

(t) The method proposed to maintain private common open areas, buildings or other facilities, including copies of all legal documents necessary to accomplish this.

(u) A schedule of development (when appropriate).

(v) Topography, including existing contours at intervals of 2-feet.

(w) When the final site plan is part of a large scale PRD, the phase of the project and its location shall be given on the final development site plan.

## Section 9.6  Planned Industrial Development (PID)

9.6.1 _Development area._ A planned industrial development, occupying 10 acres or more may be established in the B-3, B-4, M-1, and M-2 zoning districts within those Planning Districts which permit planned industrial developments (See _Section 2.3: Establishment of Zoning in Planning Districts_).

9.6.2 _Permitted uses._ Within the "PID Planned Industrial Development" districts, the following uses and structures designed for such uses may be permitted:

Defendants' Bates # 6921

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 198 of 800   PageID #: 2212
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 119 of 293   PageID #: 811

*Baldwin County Zoning Ordinances*                                                                  *9-11*

(a) General industrial uses which do not create any danger to health or safety in surrounding areas and which do not create any objectionable noise, vibration, smoke, dust, odor, heat or glare.

(b) Light industrial uses.

(c) Accessory structures and uses.

(d) Maintenance facilities and utility facilities.

9.6.3 *Prohibited uses.*   Any usage that creates a nuisance or discharge, storage and/burial of any liquid waste, solid waste or airborne particulate matter in violation of Federal, State, or County law is prohibited.   Examples of prohibited uses include chemical plants, plastic manufacturers, and paper manufacturers.

9.6.4 *Development standards.*

(a) *Buffers.*   A minimum buffer of 25-feet shall be required around the entire perimeter of a planned industrial development. Where a boundary abuts a wetland area, the buffer shall be a minimum of 50-feet wide, except for docking facilities.   Where the distance between property lines is greater than 1000-feet, the required buffer shall be increase to 100-feet. The buffer shall contain or shall be planted with trees and shrubs of sufficient density and of sufficient height (but in no case less than 8-feet high at the time of planting) to afford adequate visual and noise protection. All screen planting shall be maintained in a clean and neat condition so as to accomplish its purpose continuously.

(b) *Setbacks.*   A setback of 50-feet from all property lines which form the perimeter of a planned industrial development shall be required.   Within Planning District 4 the following setbacks shall also apply:

| | |
|---|---|
| Minimum front yard | 100-feet |
| Minimum rear yard | 75-feet |
| Minimum rear yard | 50-feet |
| Minimum side yard abutting street | 100-feet |

(c) *Building height.*   A maximum building height of 60-feet or 4 stories shall be observed.   The required setback shall be increased one (1) foot for each foot of building height in excess of 35-feet. In Planning District 4, any portion of a structure greater than 30-feet in height shall be located a minimum of 1000-feet from any residential district.

Defendants' Bates # 6922

(d) *Lot size.* No minimum lot sizes are required except in Planning District 4 a minimum lot size of 3 acres and a minimum lot width of 200-feet shall be required.

(e) *Open space requirement.* A minimum of 10% of the gross land area of the planned industrial development shall be set aside for permanent open space.

(f) *Outside storage areas.* Outside storage of any materials, supplies, or products shall not be permitted within any required setback or buffer area and shall be properly screened.

(g) *Lighting.* Lighting fixtures used to illuminate signs, parking areas, or for other purposes shall be so arranged that the source of light does not shine directly into adjacent properties or into traffic.

(h) *Traffic.* A professional traffic analysis indicating that the proposed development will be so related to streets and arteries that the traffic generated can be accommodated without causing objectionable volumes of traffic on residential streets shall be required.

(i) *Environmental permits.* All development in a planned industrial development shall adhere to ADEM and EPA air and noise pollution standards and requirements of the Clean Air and Clean Water Acts. Before commencing construction, all developments shall obtain or demonstrate an ability to obtain all permits as may be required by any applicable Federal and State of Alabama environmental laws and ordinances. All subsequent operations within an approved development shall comply with all such environmental requirements.

## Section 9.7  Planned Commercial Development (PCD) (Reserved)

Reserved for future Planned Commercial Development (PCD) District.

## Section 9.8  Planned Development Plan Review

9.8.1  Approval of a planned development shall be based on the County Commission's consideration of the following:

(a) That the value and character of the property or properties adjacent to the tract of land under consideration will not be adversely affected.

(b) That the proposed development promotes the objectives and purpose of the master plan.

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 200 of 800   PageID #: 2214
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 121 of 293   PageID #: 813

*Baldwin County Zoning Ordinances*                                                              *9-13*

(c) That the proposed development is consistent with the intent and purpose of these ordinances to promote public health, safety, morals and general welfare.

(d) That the proposed development meets the requirements of these ordinances as well as the requirements of all other regulating bodies.

(e) That public services are currently or will be available at a level which will adequately serve the development.

## Section 9.9  Plan Amendments

9.9.1  *Amendment of site plan*.  Plan amendments may be requested at any time during the development process or life span of the development.  The purpose of plan amendments is to provide flexibility with regard to site planning and design so as to address development issues that may arise as the implementation of a planned development occurs so long as the intent of the original approval is still met.

Minor Administrative Amendments may be allowed when the following criteria are met as determined by the Planning Director.  Request for minor administrative amendments must be accompanied by written requests addressing each criterion along with accompanying information including original and proposed amendments to site plans. The following criteria shall be used to determine minor administrative amendments:

a.    There is no increase in the number of dwelling units; and
b.    There is no increase in the height of structures; and
c.    There are no changes to the boundaries of the planned development; and
d.    There is no change in the approved land uses intensities; and
e.    There is no reduction in the amount and quality of open space; and
f.     There is no substantial change to the approved land use patterns or the general location of streets and driveways; provided however, that "substantial changes" for the purpose of this section shall not include changes in locations of buildings, roads, streets, driveways or amenities required by a state, federal or judicial regulatory ruling issued after original approval of the subject Planned Development.

Changes that are not determined minor administrative amendments of the planned development are major changes in the approved conceptual site plan or final site plan and thus shall require approval through the PRD amendment process as set out herein.

9.9.2  *Amendment procedures*.  Substantive changes in the conceptual or final site plan shall be considered amendments to the plan and shall be subject to the same procedures specified for approval of the planned development.  In large scale planned developments, request for modifications may be requested for a phase of the

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 201 of 800   PageID #: 2215
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 122 of 293   PageID #: 814

_Baldwin County Zoning Ordinances_                                                    _9-14_

development.   Only the phase in which the modification is being requested shall be subject to the modification procedures.

### Section 9.10 Approvals

9.10.1 _Conceptual site plan period of approval_.  Conceptual site plan approval shall be effective for a period of four (4) years from the date of approval by the County Commission. In the case of a phased PRD development, the final site plan for the first phase shall be submitted for approval in order to start construction.  Each successive phase must be submitted to the County and start construction within two (2) years of the completion of the previously approved phase.

9.10.2 The approval of a final site plan shall be effective for a period of two (2) years.  If no construction has commenced within two (2) years, the developer shall have thirty (30) calendar days from the date of expiration to file for a one (1) year extension.  If no extension is requested the PRD site plan approval shall be automatically revoked.  If the Planned Development was accompanied by a rezoning, the Commission may at their discretion take necessary action to re-institute the zoning district which was present on the subject property prior to Planned Development approval.  A maximum of two (2) one (1) year extension may be granted.    If an extension is granted the proposed development must conform to the zoning ordinances in place at the time the extension is granted.

9.10.3 _Extensions._   Extensions may be granted only upon a demonstration, to the satisfaction of the County, that the need for extension results from an event that the developer could not have anticipated or controlled which event or effect makes the commencement or continuation impossible or impractical.

### Section 9.11 Annual Written Reports

The developer shall submit a written report to the County each year the development is under construction.  The report shall be submitted no later than thirty (30) days after the month and date of initial approval. If the report is not submitted, the permits and approvals may be withheld, or site plan approval revoked by action of the County Commission. The report shall be considered an attachment to the original Planned Development application.  The report shall include at a minimum, the following:

> (a) General project status.
>
> (b) Total number of lots platted or buildings constructed.
>
> (c) Total number of dwellings constructed.
>
> (d) Infrastructure improvements completed to date.
>
> (e) Status of future phases if appropriate.

Defendants' Bates # 6925

(f)  Completion of phases.

(g) Anticipated commencement of future phases.

Defendants' Bates # 6926

## Article 10  Overlay Districts

### Section 10.1 Thoroughfare Corridor Overlay District

10.1.1 *Purpose.*  The purpose of the thoroughfare corridor overlay district is to provide orderly development along controlled access highways, to encourage the most appropriate use of adjacent lands, to maintain the scenic natural beauty of the area, and to promote the safe and efficient movement of traffic.  These thoroughfares establish an image of the quality of life in Baldwin County for visitors and residents alike.  Controlled access is required to enhance trade, capital investment, tourism and the general welfare.  These ordinances will facilitate the adequate provision of transportation by promoting the safe and efficient movement of traffic and by encouraging development which reduces or eliminates visual clutter and poor site layout.

As an overlay district, the thoroughfare corridor district does not replace the requirements of the underlying zoning district, but provides additional development requirements and standards which must be met by any development on the property.

10.1.2 *Area of application.*  The thoroughfare corridor overlay district applies to roadways located in areas under the planning and zoning jurisdiction of Baldwin County which are designated as controlled access highways by the County Commission specifically for the purpose of enforcing the provisions of this Section.

10.1.3 *Requirements.*

> (a) Public and commercial access to highways designated as controlled access highways shall be limited to intersections connecting with county roads and service roadways as defined herein.  Access is not permitted by conventional driveways.  However, until such time as service roadways are available, driveway access is permitted to and from residential houses and farming activity adjacent to the controlled access highway.

> (b) *Service roadways.* A service roadway is intended to service businesses, residential areas, and public enterprise along controlled access highways in order to provide safely spaced and adequately designated exits and entrances to the artery. Transition between the controlled access highway and the service roadways shall be accommodated with appropriate on and off lanes as part of the controlled access highway.  These lanes shall be surfaced in a similar manner as the controlled access highways and shall be designed in accordance with good practice for this type of transition.

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 204 of 800   PageID #: 2218
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 125 of 293   PageID #: 817

*Baldwin County Zoning Ordinances*                                                    10-2

(c) *Minimum access interval for controlled access highways.* No more than one public access connector and/or crossover per half-mile is permitted for a given side of the controlled access highway. A "connector" in this case includes all intersections with county roads and service roadways. This minimum access interval does not apply between county road intersections that were already in existence before a route was designated a controlled access highway nor does the minimum interval apply to private driveways to and from residential houses and farms before service roadways are available. Private driveway connections directly connecting to the right-of-way of the controlled access highway shall be abandoned when a convenient service road becomes available for access, unless this places an unusual hardship on the owner. All connectors shall be designed and clearly marked in accordance with Alabama Department of Transportation standards. The minimum access interval is not intended to limit the distance between businesses on service roadways or otherwise alter the ordinance of minimum lot sizes covered in other sections herein.

(d) *Permitted service roadway layouts.*

　　1. *Parallel and contiguous rights-of-way.* If the service roadway right-of-way and the controlled access highway right-of-way are parallel and contiguous, a greenbelt of no less than 15 feet in width shall be maintained between the shoulders or curbs of the two roadways.

　　2. *Parallel and noncontiguous rights-of-ways.* If commercial or residential lots are included between the service roadway right-of-way and the controlled access highway right-of-way, the businesses or residential buildings shall face the service roadway, not the controlled access highway. In this case, the rear yard setbacks shall include an additional 15 feet, or a total of 25 feet. This rear yard extension shall contain a greenbelt of at least 10 feet in width, or a suitable fence screen, between the controlled access highway right-of-way and the building or use activity on the lot.

　　3. *Service roadways perpendicular to the controlled access highways.* Commercial or residential lots along these service roadways shall have an additional setback of any side yard adjacent to the right-of-way of the controlled access highway of 15-feet in addition to the side yard setback requirement or a total of 25-feet. This side yard extension shall contain a greenbelt of at least 15- feet in width, or a suitable fence screen between the controlled

Defendants' Bates # 6928

access highway right-of-way and the building or use activity on the lot.

## Section 10.2 Flood Hazard Overlay District

10.2.1 *Purpose.*  The purpose of the flood hazard overlay district is to ensure enforcement of the *Baldwin County Flood Damage Prevention Ordinance* which was adopted to promote the public health, safety, and general welfare and to minimize public and private losses due to flood conditions in specific areas by provisions intended to:

> (a) Restrict or prohibit uses which are dangerous to health, safety and property due to water or erosion hazards, or which result in damaging increases in erosion or in flood heights or velocities.

> (b) Require that uses vulnerable to floods, including facilities which serve such uses, be protected against flood damage at the time of initial construction.

> (c) Control the alteration of natural floodplains, stream channels, and natural protective barriers which are involved in the accommodation of flood waters.

> (d) Control filling, grading, dredging and other development which may increase erosion or flood damage.

> (e) Prevent or regulate the construction of flood barriers which will unnaturally divert flood waters or which may increase flood hazards to other lands.

As an overlay district, the flood hazard district does not replace the requirements of the underlying zoning district, but provides additional development requirements and standards which must be met by any development on the property.

10.2.2 *Area of application.*  The flood hazard overlay district applies to lands under the planning and zoning jurisdiction of Baldwin County which are subject to either tidal or fluvial flooding as determined by the Federal Emergency Management Agency (FEMA) and delineated on the Flood Insurance Rate Map(s) (FIRM) of Unincorporated Baldwin County.

10.2.3 *Requirements.*  Areas which lie in flood hazard districts as determined by FEMA and delineated on the FIRM are subject to the requirements of the *Baldwin County Flood Damage Prevention Ordinance* adopted February 17, 1987 (as amended).

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 206 of 800   PageID #: 2220
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 127 of 293   PageID #: 819

*Baldwin County Zoning Ordinances*                                                    *10-4*

### Section 10.3 Historic Resource Overlay District

10.3.1 *Purpose.*  The purpose of the historic resource overlay district is to ensure enforcement of the rules and ordinances adopted pursuant to Act No. 80-497 as amended by Act No. 89-960 of the Legislature of Alabama which authorizes Baldwin County to protect the historical architectural character of the County.

As an overlay district, the historic resource district does not replace the requirements of the underlying zoning district, but provides additional development requirements and standards which must be met by any development on the property.

10.3.2 *Area of application.*  The historic resource overlay district applies to lands under the planning and zoning jurisdiction of Baldwin County which are designated as historic districts or preservation districts by the County Commission under the authority of Act No. 80-497 as amended by Act No 89-960.  Historic districts or preservation districts designated by the County Commission are:

      (a) Magnolia Springs Preservation District

      (b) Montrose Preservation District

      (c) Battle's Wharf / Point Clear Preservation District

10.3.3 *Requirements.*  Areas which lie in historic districts or preservation districts as designated by the County Commission are subject to the requirements of the Architectural & Preservation District Review Board of Baldwin County and any and all rules and ordinances adopted pursuant to Act No. 80-497 as amended by Act No. 89-960 of the Legislature of Alabama (refer to *Standards for Architectural Review and Development in Baldwin County Historic Districts*).

### Section 10.4 Wetland Protection Overlay District

10.4.1 *Purpose.*      The wetlands within Baldwin County, Alabama are indispensable and fragile natural resources with significant development constraints due to flooding, erosion and soils limitations.  In their natural state, wetlands serve man and nature.  They provide habitat areas for fish, wildlife and vegetation; water quality maintenance and pollution control; flood control; erosion control; natural resource education; scientific study; and open space and recreational opportunities.  In addition wise use of forested wetlands is essential to the economic well-being of Baldwin County.  A considerable number of these important natural resources have been lost or impaired by draining, dredging, filling, excavating, building, pollution and other acts.  Piecemeal or cumulative losses will, over time, destroy additional wetlands.  Damaging or destroying wetlands threatens public safety and the general welfare.  It is therefore

Defendants' Bates # 6930

necessary for Baldwin County to ensure maximum protection for wetlands by discouraging development activities that may adversely affect wetlands.

The purpose of the wetland protection overlay district is to promote wetland protection, while taking into account varying ecological, economic development, recreational and aesthetic values and to protect wetlands from alterations that will significantly affect or reduce their primary functions for water quality, floodplain and erosion control, groundwater recharge and wildlife habitat.

10.4.2 *Area of application.*  The wetland protection overlay district applies to wetlands under the planning and zoning jurisdiction of Baldwin County.  The Generalized Wetland Map adopted as part of these zoning ordinances shows the general location of wetlands and should be consulted by persons contemplating activities in or near wetlands.  The Generalized Wetland Map, together with all explanatory matter thereon and attached thereto, is hereby adopted by reference and declared to be a part of these zoning ordinances.  The Generalized Wetland Map shall be kept on file in the offices of the Planning & Zoning Department.

10.4.3 *Wetland protection district boundaries.*  The Generalized Wetland Map is a general reference document and wetland boundaries indicated on the map are approximations.     The   Generalized   Wetland   Map   is   to   alert developers/landowners if they are within proximity to a wetland, which means that there is a high likelihood of the presence of a jurisdictional wetland and a need for the developer/landowner to seek U.S. Army Corps of Engineers guidance as to whether a Section 404 permit will be required prior to any activity. The Generalized Wetland Map does not represent the boundaries of jurisdictional wetlands within the jurisdiction of Baldwin County and cannot serve as a substitute for a delineation of wetland boundaries by the U.S. Army Corps of Engineers, as required by Section 404 of the Clean Water Act, as amended. Any local government action under this section does not relieve the land owner from federal or state permitting requirements.

10.4.4 *Permit requirements.*    A  U.S.  Army  Corps  of  Engineers  wetlands jurisdictional determination if the proposed planned development contains wetlands or if the Zoning Administrator or his/her designee determines potential wetlands from the Generalized Wetland map as defined herein, or through a site visit by County Staff. The setback for development from a wetland must be a minimum of 30 feet.

If the area proposed for development is located in or within the wetland protection district boundary, as determined from the Generalized Wetland Map, a U.S. Army Corps of Engineers jurisdictional determination shall be required prior to the issuance of a Land Use Certificate. If the Corps determines that wetlands are present on the proposed development site and that a Section 404 Permit or Letter of Permission is required, a Land Use Certificate will be issued only following issuance of the Section 404 Permit or Letter of Permission.  Any

Defendants' Bates # 6931

application for subdivision approval on property which contains wetlands or if the Zoning Administrator or his/her designee determines potential wetlands from the Generalized Wetland map defined herein through a site visit by County Staff, will have to obtain a U.S. Army Corps of Engineers wetlands jurisdictional determination. If the Corps determines that wetlands are present and that a Section 404 Permit or Letter of Permission is required, development may not proceed until the Section 404 Permit or Letter of Permission is issued.

10.4.5 *Subdivisions in the Wetland Protection Overlay District.* Where a parcel of land proposed to be subdivided contains an area of wetlands delineated as jurisdictional by the Army Corps of Engineers, said wetlands shall be subject to Section 404(b)(1) guidelines concerning fill material disposal into wetlands. Lots may be platted where sufficient upland areas exist to provide a building site for the principal structure and necessary ancillary facilities. Fill may be used where necessary to provide access to lots where approval for such fill has been received from the Army Corps of Engineers and other appropriate governmental agencies.

Wetlands delineated as jurisdictional by the Army Corps of Engineers and not permitted for fill shall be set aside as common area or shall be contained within an easement dedicated to protect the wetland. Said common area or maintenance easement shall extend a minimum of 30-feet beyond the limits of the wetland. Maintenance responsibility shall be vested in the trustees of the subdivision, by virtue of the trust indenture.

### Section 10.5 Gulf Beach Overlay District

10.5.1 *Purpose.* The Gulf Beach Overlay District is implemented to protect the natural environment, to encourage open space development design and to protect the public health, safety and welfare of the public. This overlay district shall only apply in Planning District 25 in the area herein defined in *Section 10.5.2.*

10.5.2 *Established boundaries.* The Gulf Beach Overlay District boundaries shall be as depicted on the Planning District 25 Official Zoning Map. Changes to said boundary shall constitute a zoning map amendment.

10.5.3 *Applicability.* The Gulf Beach Overlay District relaxation of maximum building heights shall be applicable only to Planned Residential Developments (PRD) lawfully approved before May 4, 2004.

10.5.4 *Development standards.*

> (a) *Building height.* Building heights may lawfully exceed the maximum building height contained in applicable sections of the Zoning Ordinances.

Defendants' Bates # 6932

(b) *PRD site plan minor changes.*   Minor changes defined in *Section 9.9.1* may be made to an approved PRD site plan.

(c) *PRD site plan substantial changes.*   Substantial changes defined in *Section 9.9.1* which requires PRD amendment or modification shall be subject to applicable maximum height ordinances of 8 habitable stories in Planning District 25.

(d) *PRD site plan approval period.*   Site plan approval periods and extensions given in *Section 9.10: Approvals*, shall be in full force and effect in the overlay district.   Expiration of a PRD site plan shall require subsequent site plans to be in full compliance with all applicable ordinances.

(e) *Compliance with ordinances.*   The overlay district shall only relax the maximum building heights of 8 habitable stories in the area defined in *Section 10.5.2*.   This section shall in no way remove, modify or supersede other applicable County ordinances which may apply.

Defendants' Bates # 6933

## Article 11   Conservation Developments

### Section 11.1 Purpose and Intent

To provide a development option that permits flexibility of design in order to promote environmentally sensitive and efficient uses of the land; to preserve in perpetuity unique or sensitive natural resources such as groundwater, floodplains, wetlands, streams, steep slopes, woodlands, and wildlife habitat; to preserve important historic and archaeological sites; to permit clustering of houses and structures on less environmentally sensitive soils which will reduce the amount of infrastructure, including paved surfaces and utility easements, necessary for residential development; to reduce erosion and sedimentation by minimizing land disturbance and removal of vegetation in residential development through a reduced building footprint; to promote interconnected greenways and corridors throughout the community; to promote contiguous green space with adjacent jurisdictions; to encourage interaction in the community by clustering houses and orienting them closer to the street, providing public gathering places and encouraging use of parks and community facilities as focal points in the neighborhood; to encourage street designs which reduce traffic speeds and reliance on major arteries; to promote construction of convenient landscaped walking trails and bike paths both within the subdivision and connected to neighboring communities, businesses, and facilities to reduce reliance on automobiles; to conserve scenic views and reduce perceived density by maximizing the number of houses with direct access to and views of open space; to preserve prime agricultural and forest lands and reduce the economic pressures for converting such land to urbanized uses.

### Section 11.2 Definitions

Words and phrases used in this article shall have the meanings as set forth in this section.   Words and phrases not defined in this section but defined elsewhere in the zoning ordinances shall be given the meanings as set forth in such ordinances.   All other words and phrases shall be given their common, ordinary meaning unless the context clearly requires otherwise.

*Conservation Development*: A development of land, occupying 10 contiguous acres or more, that is under unified control and is planned and developed as a whole in a single development operation or programmed series of development stages.   The development may cover more than one parcel as long as all parcels are contiguous, but the entirety of each included parcel shall be included in the gross area of the development. The requirements for approval are similar to those for subdivisions of the same size according to the *Baldwin County Subdivision Regulations*, with the only differences being contained in this article.   A Conservation Development requires a certain amount of permanently protected Open

Defendants' Bates # 6934

Space and does not require minimum lot or yard sizes. A Conservation Development must be clearly indicated as such on its Preliminary and Final Plats.

*Open Space*: The portion of the Conservation Development that has been set aside for permanent protection. Activities within the Open Space are restricted in perpetuity through the use of an approved legal instrument.

*Buildable Area*: The approximate acreage in a Conservation Development available for development as calculated according to Section 11.5 of this article. This figure does not represent the true acreage available for development; it is instead used only as an input to other calculations, such as a calculation to determine the minimum acreage of Open Space.

### Section 11.3 General Ordinances

11.3.1 *Applicability of Ordinances*. This Conservation Development option is available as a use by right in all residential zones (ER, R-1(a), R-1(b), R-2(a), R-2(b), R-3, R-4, and R-6) and in the Rural (RR) zone and the Rural Agriculture (RA) zone. The Applicant shall comply with all other provisions of the zoning code and with all other applicable laws, except those that are expressly addressed by and inconsistent with the provisions contained herein. A Conservation Development does not require amending or adjusting the Zoning Map.

11.3.2 *Unified Control*. The parcel or parcels of land for a Conservation Development shall be in unified control, and shall be owned or controlled by either a single person, corporation, agency, group of individuals, or like organizations. The Applicant shall provide the County appropriate and necessary documents to indicate ownership. No application shall be considered until this section is fully complied with. An application must be filed by the owner or authorized agent of all property included in the project. In the case of multiple ownership, the approved final development plan shall be binding on all owners and any successors. The developer shall maintain and provide for unified control of the Conservation Development until the project is complete. The entity designated to provide unified control shall ensure that all conditions of development are met. Individual properties may be sold after appropriate approvals and recordings have been completed and the proper recordings have been made which ensures the continuance of the Conservation Development as approved. Responsibility for unified control shall be assigned to a Homeowners Association that will provide for the maintenance of any common property and Open Space and for improvements.

11.3.3 *Development Area*. A Conservation Development shall have a minimum development area of 10 contiguous acres.

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 212 of 800   PageID #: 2226
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 133 of 293   PageID #: 825

_Baldwin County Zoning Ordinances_                                                    _11-3_

11.3.4 _Lot and Yard Size._  No minimum areas or widths are required by these ordinances for lots, and no minimum areas are required by these ordinances for yards.

11.3.5 _Building Setbacks._  The minimum side yard setback shall be a minimum of 3 feet for a single family designation. The front and rear setbacks shall be a minimum of 20 feet.

11.3.6 _Maximum Height._  The maximum height of structures shall be the same number of habitable stories allowed by the zoning district to a Planned Residential Development (PRD), with the exceptions mentioned elsewhere in these zoning ordinances.

11.3.7 _Permitted Uses._  For a Conservation Development, the following uses and structures may be permitted if allowed by the zoning district and specific zoning designation:

> (a) Single family dwellings including manufactured housing and mobile homes.

> (b) Two family dwellings.

> (c) Multiple family dwellings including townhouses.

> (d) Non-residential land uses in accordance with limitations and restrictions contained herein.

> (e) Maintenance facilities and utility facilities.

> (f) Accessory structures and uses.

11.3.8 _Commercial Land Uses._  Commercial land uses including institutional uses, office and professional service uses, local commercial uses, and general commercial uses may not occupy more than ten (10) percent of the gross acreage of the Conservation Development.  The commercial land uses shall be centrally located.  They shall be designed and operated to serve primarily the needs of the development and, to the extent feasible, shall be located in the interior of the development.

11.3.9 _Maximum Dwelling Units Determination._  The maximum number of dwelling units in the Conservation Development shall be determined by multiplying the gross acreage of the Conservation Development by the maximum density permitted in the zoning designation.  For Conservation Developments under more than one zoning designation, the maximum number of dwelling units in the Conservation Development shall be determined by summing the results of, for each zoning designation, multiplying the gross acreage of the Conservation

Defendants' Bates # 6936

Development in the zoning designation by the maximum density permitted in the zoning district.  Where fractional numbers result for any of these calculations, the figure shall be rounded to the next lower number.  Land reserved for commercial uses shall not be included in the gross acreage of the Conservation Development as used in this calculation.  For mixed use buildings where the gross floor area used for commercial uses exceeds 10% of the total gross floor area, the entire footprint shall be considered as land reserved for commercial uses.

11.3.10     *Maximum Dwelling Units Bonuses.*    The maximum number of dwelling units in the Conservation Development may be increased if Bonus Thresholds (as provided in Section 11.5) are exceeded, provided that the site is capable of accommodating the additional units without compromising the purpose of this ordinance, there is no adverse effect on public safety, the surrounding infrastructure can support the additional units, and adequate efforts were made to arrange the Open Space so that it links to greenways, trails, or other areas of Open Space on nearby parcels.  If Bonus Threshold 1 is met, the determined maximum number of dwelling units may be increased by 5%.   If Bonus Threshold 2 is met, the determined maximum number of dwelling units may be increased by 10%.   These bonuses are not cumulative; rather, the permitted 10% increase for a Conservation Development that achieves Bonus Threshold 2 is measured from the maximum number of dwelling units as determined without applying any other dwelling units bonuses.  Where fractional numbers result, the figure shall be rounded to the next lower number.   The Applicant may meet with Zoning Administrator to determine whether the local infrastructure can handle the extra units, whether the infrastructure may require upgrading, whether the additional units comport with the purpose of this ordinance, and whether the additional units impact public safety.

11.3.11     *Flexible Standards.*    The County encourages and will consider sensible methods to reduce impervious surfaces without compromising stormwater management or public safety.  Any applicant requesting such a reduction and/or waiver of pertinent ordinances shall submit a statement of justification for the reduction and/or waiver along with the required site plan and shall obtain the written approval of the County Engineer or his/her designee.  The Planning Commission may approve such methods if they:

      (a) Improve site design.

      (b) Protect the natural features of the site.

      (c) Maintain harmony with neighboring uses.

      (d) Promote the objectives and purpose of the master plan.

      (e) Promote the intent and purpose of these ordinances.

Defendants' Bates # 6937

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 214 of 800   PageID #: 2228
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 135 of 293   PageID #: 827

*Baldwin County Zoning Ordinances*                                                                          *11-5*

11.3.12       *Conceptual Site Plan.*   Where a rezoning is applied for and the Applicant wishes to subsequently develop the rezoned property as a Conservation Development, the Applicant may submit a Conceptual Site Plan in conjunction with the rezoning application for parcels greater than 1000 acres. This Conceptual Site Plan and the process for subsequently amending this Conceptual Site Plan shall follow the guidelines for a Large Scale Planned Residential Development Conceptual Site Plan as described in *Section 9.5 Submittals* and elsewhere in these zoning ordinances.   It shall be clearly indicated on the Conceptual Site Plan that the described future subdivision is a Conservation Development.  In addition, the Conceptual Site Plan shall show the planned location of protected Open Space and the portions of Open Space that are comprised of buildable area as calculated in Section 11.5 of this Article.   It shall also describe the total acreage of buildable area in the Conservation Development and the total acreage of buildable area in the proposed protected Open Space, where "buildable area" is as calculated in Section 11.5 of this Article.    Neither approval of this Conceptual Site Plan nor approval of the proposed rezoning shall be construed as ensuring the approval of future Preliminary or Final Plats.

### Section 11.4 Application Requirements

11.4.1 *Site Analysis Features Required.*   The Applicant must show the following features on the Conservation Development site plan submitted in accordance with requirements contained in Article IX, Section 9.5.5.5.1. In addition, the Applicant must show the following features on a site analysis map to be submitted concurrent with the submission of Conservation Development Site Plan:

(a) All streams, rivers, lakes, and other hydrologic features.

(b) General vegetation characteristics.

(c) General soil types as determined from the latest soil survey by the Natural Resources Conservation Service of the United States Department of Agriculture.

(d) The planned location of protected Open Space, and the portions of Open Space that are comprised of buildable area as calculated in Section 11.5 of this Article.

(e) The total acreage of buildable area in the Conservation Development and the total acreage of buildable area in the protected Open Space, where "buildable area" is as calculated in Section 11.5 of this Article.

Defendants' Bates # 6938

(f)  All Primary and Secondary Conservation Areas labeled by type, as described in Section 11.5 of this Article.

(g) Potential connections with existing green space and trails.

(h) Location and total area of proposed impervious surfaces.

Should the Applicant choose to submit a separate site analysis map, it must include the following features as on a Conservation Development Site Plan: exact property boundaries, topographic contours, delineated wetlands, special flood hazard areas and/or coastal high hazard areas, existing roads, and existing structures.

11.4.2 *Open Space Management Plan Required.*  An open space management plan, as described in Section 11.5, shall be prepared and submitted with the Conservation Development Site Plan.

11.4.3 *Instrument of Permanent Protection Required.*  A conservation easement, as described in Section 11.5, shall be placed on the Open Space no later than the recording of the Final Plat.  County Staff shall review and approve the conservation easement to ensure that it meets the minimum guidelines set forth in these ordinances.  The conservation easement and the Final Plat shall be filed simultaneously and shall make reference to each other.  Each shall not be complete without the other.

11.4.4 *Zoning Administrator Approval.*  The Zoning Administrator holds the right to permit or deny the proposed development according to the purposes set forth in this section.

11.4.5 *Other Requirements.*  The Applicant shall adhere to all other zoning and subdivision ordinances.  A subdivision plat shall be approved in accordance with the procedures established in the *Baldwin County Subdivision Regulations*.  It shall be clearly indicated on the Preliminary and Final Plats that the proposed subdivision is a Conservation Development.  The Applicant may submit a list of commitments, and approval may be based on the fulfillment of these conditions. Should these commitments not be upheld, the plat shall not be considered as having been approved.

### Section 11.5 Open Space

11.5.1 *Standards to Determine Open Space and Buildable Area.*

(a) Buildable area is defined as the gross area of the conservation development minus the Open Space. The minimum restricted Open Space shall comprise all of the Primary Conservation Areas, as defined below.  In addition, the minimum restricted Open Space shall

Defendants' Bates # 6939

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 216 of 800   PageID #: 2230
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 137 of 293   PageID #: 829

*Baldwin County Zoning Ordinances*                                                    *11-7*

include buildable areas totaling not less than 20% of the total buildable area of the Conservation Development, with emphasis given to Secondary Conservation Areas, as defined below. In making this and other determinations, the buildable area shall include the entire gross area of the Conservation Development except the following:

1. Primary Conservation Areas, as defined below, unless the Applicant has demonstrated that including a particular area would constitute an unusual hardship and be counter to the purposes of this article.

2. Natural bodies of open water including free-flowing streams over 5,000 square feet of contiguous area excluding man-made stormwater detention ponds, impoundments, and amenity lakes.

3. Areas where development would otherwise be prohibited by law, regulation, or
local ordinance, except where variances or permits have been obtained.

(b) The following are considered Primary Conservation Areas and are required to be included within the Open Space, unless the Applicant demonstrates that this provision would constitute an unusual hardship and be counter to the purposes of this article:

1. Riparian zones of at least 75 foot width on each side from the centerline of every perennial and intermittent stream shown on the United States Geological Survey (USGS) quadrangle topographic maps.

2. Slopes above 25% of at least 5000 square feet contiguous area.

3. Wetlands determined to be jurisdictional by the U.S. Army Corps of Engineers pursuant to Section 404 of the Clean Water Act except for minor road crossings necessary for access to other upland buildable areas.

4. Land seaward of the coastal construction zone limit, except where a variance has been obtained from the appropriate state and County authorities.

5. Total area of jurisdictional wetlands filled within 5 years prior to the submittal of the application on the parcel or parcels.

Defendants' Bates # 6940

(c) The following are considered Secondary Conservation Areas and should be included within the Open Space to the maximum extent feasible:

1. Non-jurisdictional wetlands that meet the definition of a wetland given in the 1987 U.S. Army Corps of Engineers Wetlands Delineation Manual.

2. Existing healthy, native forests (e.g. longleaf pine) of at least one acre contiguous area.

3. The 100-year floodplain.

4. Important historic sites, archaeological sites, cemeteries, and burial grounds.

5. Other significant natural features such as individual healthy trees of significant size and scenic viewsheds such as ridge lines, peaks, and rock outcroppings, particularly those that can be seen from public roads.

6. Prime agricultural lands of at least five acres contiguous area.

7. Existing trails that connect the Conservation Development to neighboring areas.

8. Populations of endangered or threatened species, or habitat for such species.

9. Beach access in coastal areas.

(d) Above-ground utility rights-of-way, small areas of impervious surface, and areas within 10 feet of a road surface or building may be included within the protected Open Space but cannot be counted towards the 20% minimum buildable area requirement (exception: historic structures and existing trails may be counted). Large areas of impervious surface such as roads and parking lots shall be excluded from the Open Space, except as specifically authorized in other sections.

(e) At least 60% of the total required Open Space, which includes any Open Space required to attain Bonus Thresholds, shall be in a contiguous area. Where feasible, the Open Space shall adjoin any neighboring areas of Open Space in other parcels, any other protected areas, and any non-protected natural areas that would be candidates for inclusion as part of a future area of protected Open Space. Two

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 218 of 800   PageID #: 2232
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 139 of 293   PageID #: 831

*Baldwin County Zoning Ordinances*                                                        *11-9*

sections of Open Space on either side of a roadway are considered to be contiguous, provided that each of the two sections of Open Space comprises at least 15% of the total Open Space.

(f) The Open Space shall be directly accessible to the largest practicable number of lots within the development. Non-adjoining lots shall be provided with safe, convenient access to the Open Space.

(g) Conservation Developments may meet certain Bonus Thresholds by protecting additional Open Space. This Open Space is subject to the same rules and conditions as described elsewhere in these ordinances. The buildable area of the Conservation Development shall be as calculated above. And, as above, all Primary Conservation Areas shall be included in the Open Space. The Bonus Thresholds are as follows:

1. *Bonus Threshold 1.* The minimum restricted Open Space shall include buildable area totaling not less than 35% of the total buildable area of the Conservation Development.

2. *Bonus Threshold 2.* The minimum restricted Open Space shall include buildable area totaling not less than 50% of the total buildable area of the Conservation Development.

11.5.2 *Permitted Uses.*

(a) At the discretion of the Applicant, uses of Open Space may include the following:

1. Conservation of natural, archaeological or historical resources.

2. Meadows, woodlands, wetlands, wildlife corridors, game preserves, or similar conservation-oriented areas.

3. Walking or bicycle trails, provided they are constructed of porous paving materials.

4. Passive recreation areas, such as open fields.

5. Active recreation areas, provided that they are limited to no more than 10% of the buildable Open Space and are not located within Primary Conservation Areas. Active recreation areas may include impervious surfaces. Active recreation areas in excess of this limit must be located outside of the protected Open Space.

Defendants' Bates # 6942

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 219 of 800   PageID #: 2233
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 140 of 293   PageID #: 832

*Baldwin County Zoning Ordinances*                                          *11-10*

6. Agriculture, horticulture, silviculture, or pasture uses, provided that all applicable best management practices are used to minimize environmental impacts, provided such activities are not conducted within Primary Conservation Areas (except where minimal management practices are necessary for the maintenance of a healthy, viable forest or wetland), and provided such uses do not involve the clearing of forests, the filling of wetlands, or the conversion of forests to monocultures or plantations.

7. Subsurface wastewater disposal/reuse systems located on soils particularly suited to such uses and in compliance with Alabama Department of Environmental Management (ADEM) Underground Injection Control (UIC) permitted activities or Chapter 420-3-1 "Onsite Sewage Disposal and Subdivision-Onsite Sewage Systems, Water Supplies and Solid Waste Management" of the *Rules of the State Board of Health Bureau of Environmental Services*. Such facilities shall be located outside of Primary Conservation Areas. They should be naturally attractive and designed to function as native habitats, supporting native flora and fauna. The allowed systems do not include potable water or above-ground sewage treatment plants.

8. Easements for drainage, access, and underground utility lines.

9. Sidewalks.

10. Other conservation-oriented uses compatible with the purposes of this ordinance.

(b) Whether or not to allow public access to the protected Open Space is at the discretion of the Applicant.

11.5.3 *Prohibited Uses.*

(a) The uses of Open Space shall not include the following:

1. Golf courses.

2. Roads, parking lots, and impervious surfaces, except as specifically authorized in the previous sections.

3. Agriculture, horticulture, silviculture, or pasture uses that do not use all applicable best management practices to minimize environmental impacts, that are conducted within Primary Conservation Areas (except where minimal management practices

Defendants' Bates # 6943

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 220 of 800   PageID #: 2234
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 141 of 293   PageID #: 833

*Baldwin County Zoning Ordinances*                                                    *11-11*

are necessary for the maintenance of a healthy, viable forest or wetland), or that involve the clearing of forests, the filling of wetlands, or the conversion of forests to monocultures or plantations.

4. Impoundments.

5. Man-made lakes.

6. Commercial uses not specifically authorized in the previous section.
7. Mining uses.

8. Potable water or above-ground sewage treatment plants.

9. Stormwater management facilities and wastewater disposal systems not specifically authorized in the previous section.

10. Other activities as determined by the Applicant and recorded on the legal instrument providing for permanent protection.

(b) These prohibited uses shall be clearly indicated in the legal instrument providing for permanent protection.

### 11.5.4 *Ownership and Management.*

(a) Ownership of Open Space. A Homeowners Association representing residents of the Conservation Development shall own the Open Space. Membership in the Homeowners Association shall be mandatory and automatic for all homeowners of the development and their successors. The Homeowners Association shall have lien authority to ensure the collection of dues from all members. The responsibility for maintaining the Open Space and any facilities located thereon shall be borne by the Homeowners Association.

(b) Management Plan. The Applicant shall submit a Plan for the Management of Open Space and Common Facilities ("Plan") that:

1. Provides guidelines for the maintenance and operation of the Open Space and any facilities located thereon, including provisions for ongoing maintenance and for long-term capital improvements.

2. Estimates the costs and staffing requirements needed for maintenance and operation of, and insurance for, the Open Space

Defendants' Bates # 6944

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 221 of 800   PageID #: 2235
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 142 of 293   PageID #: 834

*Baldwin County Zoning Ordinances*                                                    *11-12*

and outlines the means by which such funding will be obtained or provided.

3. Provides that any changes to the Plan be approved by the Planning Commission.

4. Provides for enforcement of the Plan.

(c) In the event the party or parties responsible for maintenance of the Open Space fail to maintain all or any portion in accordance with the submitted management plan, Baldwin County may enter the premises and take corrective action or cause corrective action to be taken, including the provision of extended maintenance. The costs of such action and/or maintenance shall be chargeable to the said responsible party or parties, and/or to the Homeowners Association, and/or to the individual property owners that make up the Homeowners Association, and may include administrative costs and penalties. Such costs shall become a lien on all development properties.

11.5.5 *Legal Instrument for Permanent Protection.*

(a) The Open Space shall be protected in perpetuity by a binding legal instrument that is recorded with the deed. The instrument shall be a permanent conservation easement in favor of:

1. A land trust or similar conservation-oriented non-profit organization with legal authority to accept such easements. The organization shall be bona fide and in perpetual existence and the conveyance instruments shall contain an appropriate provision for retransfer in the event the organization becomes unable to carry out its functions.

2. The Baldwin County Commission.

(b) The holders of the conservation easement shall produce a baseline documentation report to establish the condition of the property at the time the easement is transferred and to provide a basis for future monitoring and enforcement.   The holders of the conservation easement shall also monitor and enforce the easement and defend it from challenges.   The easement holders may request funds from the Applicant to cover or defray these costs, and the Applicant shall pay the requested funds.   Such funds must be dedicated to these easement activities. The amount of funding shall be determined by the Applicant and the easement holders no later than the time of transferal.

(c) The instrument for permanent protection shall include clear restrictions on the use of the Open Space. These restrictions shall

Defendants' Bates # 6945

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 222 of 800   PageID #: 2236
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 143 of 293   PageID #: 835

*Baldwin County Zoning Ordinances*                                                *11-13*

include all restrictions contained in this article, as well as any further restrictions the Applicant chooses to place on the use of the Open Space.

(d) For an area to be counted towards the Open Space requirement, the legal instrument for permanent protection shall not have been established more than 6 months prior to the submission of the first Preliminary Plat (or, if none is required, the first Final Plat) that clearly indicates that the proposed subdivision is to be a Conservation Development.

(e) The County may, in its discretion, require a form conservation easement, and, in that event, the Applicant shall grant such easement as provided, except only that the Applicant may add such use restrictions as the Applicant desires. The County may, however, accept any easement from an Applicant which, in the County's sole discretion, substantially complies with these ordinances.

11.5.6 *Tax Assessment.* Once a legal instrument for permanent protection has been placed upon the Open Space, the Homeowners Association may request that the Baldwin County Revenue Commission reassess the Open Space to reflect its more limited use.

Defendants' Bates # 6946

## Article 12  General Requirements

### Section 12.1 General Requirements

12.1.1 *Generally.* The general ordinances contained in this Section shall apply in all zoning districts except as specifically provided in herein.

12.1.2 *Use of land.* No land shall be used except for a use permitted in the zoning district in which it is located.   Other provisions of these ordinances notwithstanding, any tract of farmland under cultivation or pastureland and timberland presently being used for such purposes may continue to be used for such purposes regardless of the zoning district in which they may be located.

12.1.3 *Use of structures.* No structure shall be erected, converted, enlarged, reconstructed, moved or structurally altered, nor shall any structure be used, except for a use permitted in the zoning district in which such structure is located and subject to the special provisions specified in these ordinances.

12.1.4 *Area and dimensional requirements.*   No structure shall be erected, converted, enlarged, reconstructed, moved or structurally altered except in conformity with the area and dimensional ordinances of the zoning district in which the structure is located.   No lot may be subdivided except in conformity with the area and dimensional ordinances of the zoning district in which the lot is located.

12.1.5  *Off-street parking and loading.* No structure shall be erected, converted, enlarged, reconstructed, moved or structurally altered except in conformity with the off-street parking and loading provisions of these ordinances.

12.1.6 *Signs.* No sign or sign structure shall be erected except in conformity with the sign provisions of these ordinances.

12.1.7 *Stormwater management.* No development may precede except in conformity with the stormwater management provisions of these ordinances.

12.1.8 *Erosion control.* No development may proceed except in conformity with the erosion control provisions of these ordinances.

12.1.9 *Landscaping.*  No structure shall be erected, converted, enlarged, reconstructed, moved or structurally altered except in conformity with the landscaping provisions of these ordinances.

### Section 12.2 Temporary Structures and Uses

Defendants' Bates # 6947

12.2.1 Temporary structures for use incidental to construction work shall be permitted in any district during the period that construction work is in progress.

12.2.2 A recreational vehicle may be occupied as living quarters on a temporary basis for up to 18 months pending the repair or rebuilding of a primary dwelling following any disaster which may render the primary dwelling uninhabitable. A recreational vehicle, when used as temporary living quarters, may only be occupied by the owner/occupant of the primary dwelling being repaired or rebuilt, and must be located on the same parcel with the subject primary dwelling. In addition, the recreational vehicle must meet the location and setback requirements specified for accessory structures in residential districts (See *Section 13.1.2 (a)*). An approved land use certificate (See Section 18.2) shall be obtained from the Planning and Zoning Department, prior to the use of a recreational vehicle as temporary living quarters in order to ensure compliance with these ordinances.

12.2.3 *Model Home Sales Centers.* Model home sales centers are intended to facilitate the sale of the model design or of products similar in design to the model. Model home sales centers shall be of a temporary nature and may be allowed in any residential zoning district or residential component of a PRD, by the issuance of a temporary use permit.

> 12.2.3.1 Model home sales centers located within residential zoning districts, or within a residential component of a PRD, shall be restricted to the promotion of a product or products permitted within the residential zoning district or PRD in which the model home or model sales center is located and further subject to the following:
>
> > (a) Model homes shall only be permitted in dwellings that have not been previously used as a residence.
> >
> > (b) A model home sales center is not intended to allow the full scope of real estate activities and shall be restricted primarily to the sale and marketing of the model or products similar to the model. A model home shall not include offices for builders, contractors, developers or similar activities.
> >
> > (c) Model homes occupied by a sales office and/or representative must have all required landscaping, all-weather parking, and handicap access on-site or adjacent to the site.
> >
> > (d) A temporary use permit for a model home sales center shall be issued initially for a period of two (2) years. Extensions in excess of this period shall be given upon demonstration of a need to continue the temporary sales center use.

Defendants' Bates # 6948

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 225 of 800   PageID #: 2239
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 146 of 293   PageID #: 838

_Baldwin County Zoning Ordinances_                                                    _12- 3_

12.2.3.2 Temporary use permits for model unit sales centers in multi-family projects shall not be issued prior to final approval of the project site development plan.

12.2.3.3 All model home sales center site plans shall adequately address the following standards:

(a) Traffic circulation and safety within the site as follows:

1. All parking spaces shall be arranged in a manner for convenient and safe access for vehicles and pedestrians.

2. No parking spaces shall be arranged to cause vehicles to be moved in order for other vehicles to enter or exit a site.

(b) Minimum parking requirements:

1. Four (4) parking spaces for each model home sales center.

2. One (1) paved parking space for disabled persons per parking lot shall be provided (included as part of the number of required parking spaces), along with a paved access aisle and barrier-free access to the home.

3. All parking spaces shall be constructed of concrete, asphalt, or other all-weather surface.

12.2.3.4 Setbacks and Lighting

(a) Vehicular use areas shall be set back a minimum of five (5) feet from the property line.

(b) Lighting shall be limited so as not to cause glare or light onto adjacent properties.

12.2.4 _Emergency Uses._ The County Commission shall have the right and the power to grant special temporary permits, for periods not to exceed six (6) months, for the location and use on any lot, in any zoning district, of a temporary building or use, subject to such terms, conditions or special limitations as the Commission may prescribe or impose. The Commission may renew or extend any such special temporary permit in six (6) month increments. It is the intent of this section to provide for flexibility of land use in community rebuilding, recovery and reorganization during periods immediately following disasters, including, but not limited to, floods, hurricanes, fires, or other disasters or such other emergency purposes as may be determined by the Commission.

Defendants' Bates # 6949

## Section 12.3 Utility Structures

Utility structures, including, but not limited to, poles, wires, cross arms, transformers attached to poles, guy wires, insulators, conduits and other facilities necessary for the transmission or distribution of electric power or to provide telephone or telegraph service and pipe lines, vents, valves, hydrants, regulators, meters and other facilities necessary for the transmission or distribution of gas, oil, water or other fluids, may be constructed, erected, repaired, maintained, or replaced within any district in Baldwin County. This is not to be construed to include transportation, communication and utility uses as herein defined.

## Section 12.4 Height Modifications

12.4.1 The height limits for the various districts shall not apply to the following structures not used for human habitation: church spires, belfries, cupolas, elevator penthouses, mechanical penthouses or domes, provided that such features are limited to that height necessary for their proper functioning. Further, the height limits for the various districts shall not apply to chimneys, ventilators, skylights, water tanks, parapet walls, cornices, radio and television transmitting and receiving antennas, telecommunications towers, or necessary mechanical appurtenances usually carried above the roof level, provided that such features are limited to that height necessary for their proper functioning.

12.4.2 Public, semipublic or public service buildings, including but not limited to hospitals, schools and churches, when permitted in a district with height limitations of less than 60-feet, may be erected to a maximum height of 60-feet, provided the side yards are increased by one foot for each foot of additional building height above the height limitation for the district in which the building is located.

## Section 12.5 Yard Requirements

12.5.1 Every part of a required yard or court shall be open from its lowest point to the sky unobstructed, except for the ordinary projection of sills, cornices, buttresses, ornamental features, chimneys, flues, and eaves, provided such projections shall not extend more than 2-feet beyond the yard area requirements. (For additional provisions see *Section 22.2, Definitions* "Accessory Structure" and "Structure")

12.5.2 Yard requirements shall be modified subject to the following conditions:

> (a) Through lots shall provide the required front yard on each street.

Defendants' Bates # 6950

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 227 of 800  PageID #: 2241
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 148 of 293  PageID #: 840

_Baldwin County Zoning Ordinances_                                              _12- 5_

(b) Decks and unroofed porches may project into a required front yard for a distance not to exceed 5-feet and a required rear yard not to exceed 10-feet.

(c) Uncovered steps and handicap ramps may project into a required front, or side yard for a distance not to exceed 5-feet and a rear yard not to exceed 10-feet.

(d) On a corner lot, the side yard from the side lot line which abuts a street shall be a minimum of 20-feet.

(e) Where a subdivision has been approved by the Planning Commission in accordance with the _Baldwin County Subdivision Regulations_ prior to the enacting of zoning ordinances with front, rear or side yard setbacks different than the minimums required herein, the setbacks as recorded on the plat shall apply.

(f) All buildings or structures located within coastal high hazard areas (V-zones) shall be located 50-feet landward of the reach of the mean high tide.

## Section 12.6 Coastal Areas

Areas of Baldwin County lying seaward of the continuous 10-foot contour are subject to the requirements of the Alabama Coastal Area Management Program as defined in the Alabama Coastal Area Management Plan (ACAMP) and to the ADEM Division 8 Administrative Code.

## Section 12.7 Adult Entertainment

Adult entertainment establishments shall comply with the provisions of Act No. 96-458 of the Legislature of Alabama which prohibits certain types of entertainment, attire, and conduct, having certain nudity, or sexual conduct, or the depiction or simulation thereof, upon the premises of an establishment within the unincorporated areas of Baldwin County, Alabama, which is licensed to sell, serve, or dispense alcoholic beverages or otherwise allow the consumption of alcoholic beverages on the premises.

## Section 12.8 Highway Construction Setbacks

In accordance with Act No. 94-572 of the Legislature of Alabama enacted April 21, 1994, the following construction setbacks shall apply from any state or county road or highway:

(a) _Principal arterials._ Principal arterials require a setback of 125-feet from the centerline of the right-of-way.

Defendants' Bates # 6951

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 228 of 800  PageID #: 2242
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 149 of 293  PageID #: 841

*Baldwin County Zoning Ordinances*                                                    *12- 6*

(b) *Minor arterials.* Minor arterials require a setback of 100-feet from the centerline of the right-of-way.

(c) *Major collectors.* Major collectors require a setback of 75-feet from the centerline of the right-of-way.

(d) *Minor collectors.* Minor collectors require a setback of 50-feet from the centerline of the right-of-way.

## Section 12.9 Substandard Lots of Record

Where a lot of record at the time of the effective date of these zoning ordinances had less area or width than herein required for the zoning district in which it is located, said lot may nonetheless be used as a building site.

## Section 12.10 Rules for Determining Zoning District Boundaries

The boundaries of the zoning districts are shown on the maps adopted for the planning districts that have elected to come under the planning and zoning authority of the Baldwin County Commission. Where uncertainty exists with respect to the boundaries of any of the zoning districts as shown on the zoning map, the following rules shall apply:

(a) Unless otherwise indicated, the district boundaries are indicated as approximately following property lines, land lot lines, center lines of streets, highways, alleys, shorelines of streams, reservoirs, or other bodies of water, or civil boundaries, and they shall be construed to follow such lines.

(b) Where district boundaries are approximately parallel to the center lines of streets, highways, or railroads, streams, reservoirs, or other bodies of water, or said lines extended, such district boundaries shall be construed as being parallel thereto and at such distance there from as indicated on the zoning map.  If no distance is given, such dimensions shall be determined by the use of the scale shown on the zoning map.

(c) Where a public road, street or alley or other public property is officially vacated or abandoned, the ordinances applicable to the property to which it is reverted shall apply to such vacated or abandoned road, street or alley.

(d) In the event territory now lying within the corporate limits of a municipality, located in any planning district subject to zoning, is removed from the corporate limits of such municipality the affected

Defendants' Bates # 6952

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 229 of 800   PageID #: 2243
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 150 of 293   PageID #: 842

*Baldwin County Zoning Ordinances*                                                      12- 7

territory shall be automatically zoned to the lowest density single family district available in the respective planning district until rezoned by the Baldwin County Commission.

**Section 12.11 Density**

12.11.1 *Density*. The number of dwelling units per acre of land.  To determine the maximum number of dwelling units permitted on a lot, multiply the lot area, in acres, by the maximum density allowed in the zoning district.  Where fractional numbers result, the figure shall be rounded to the nearest lower number.

12.11.2 *Wetland Density*: The density for jurisdictional wetlands, as defined herein, shall be one-half the density allowed by the underlying zoning. Where fractional numbers result, the figure shall be rounded to the nearest lower number.

Defendants' Bates # 6953

## Article 13  Design Standards

### Section 13.1 Accessory Uses and Structures

13.1.1 *Generally.*  Any use may be established as an accessory use to any permitted principal use in any district provided that such accessory use:

> (a) Is customarily incidental to and is maintained and operated as a part of the principal use.

> (b) Is not hazardous to and does not impair the use or enjoyment of nearby property in greater degree than the principal use with which it is associated.

> (c) Does not create levels of noise, odors, vibration and lighting, or degrees of traffic congestion, dust or pollutants, in a greater amount than customarily created by principal use.

> (d) Is not located in a required yard.

13.1.2 *Residential districts.*  In residential districts an accessory use or structure will conform to the following requirements:

> (a) An accessory structure may be located in a rear or side yard but shall not be closer than 5-feet to any side or rear lot line.

> (b) An accessory structure may not be located in the front yard of a lot, except that on waterfront lots accessory structures may be located between the principal building and the waterfront property line but not within the required front yard setback.

> (c) An accessory structure may not exceed the height limit for the district in which it is located and may not occupy more than 30% of the rear yard.

> (d) No accessory structure, other than a pier and boathouse, may be located on a lot by itself.

13.1.3  *Accessory dwellings.* Accessory dwellings are permitted by right as follows: under residential zoning designations; in Planning Districts 12, 20, 22, 26, 29, 30, 32, 33 and in the Spanish Cove Subdivision Development in Planning District 23, provided they do not exceed 60% of the size in square feet of the principal residence; in Planning Districts 10 and 15 unless restricted by a property owners association provided they are contained entirely within the structure of a single family dwelling and provided they do not exceed 60% of the size, in square feet, of the principal residence; in Planning District 24 provided they are contained entirely within the structure of a single family dwelling and provided they do not exceed 60% of the size, in square feet, of the principal residence; and in Planning District 21 provided they do not exceed 60% of the size, in square feet, of the principal residence up to a maximum of 1200 square feet..

13.1.4 *Observation towers*.  An observation tower may be located above the main roof level of a single family or two family dwelling provided the finished floor area including stairways may not exceed 180 square feet and the tower may not exceed the height

limit (in feet) for the district in which it is located.  Observation towers shall not include kitchen or bathroom facilities.

## Section 13.2 Satellite Dishes and Radio and TV Antennas

13.2.1 _Satellite dishes._  Satellite receiving dishes are permitted accessory uses in any zoning district except as provided in _Section 2.3.24.4(b)_. In any zoning district the satellite receiving dish shall be located behind the front building setback line and must be setback 10-feet from any interior or rear lot line. In residential districts where the satellite receiving dish is detached from the principal building, its maximum height may not exceed the height limit for the zoning district. Roof mounted satellite receiving dishes must conform to the zoning district's height limit.

13.2.2 _Radio and TV antennas_.  Private radio and TV antennas for individual homes or for amateur use are permitted as accessory structures in any district and may be placed on roofs or in rear or side yards but shall be no closer than 10-feet from any interior or rear lot line.

## Section 13.3 Home Occupations

13.3.1 _Home occupations._  Home occupations within residential districts shall be clearly incidental to the residential use of the dwelling and shall not change the essential residential character of the dwelling or adversely affect the uses permitted in the district of which it is a part.  No home occupation shall be permitted which might interfere with the general welfare of the surrounding residential district due to potential noise, increased pedestrian and vehicular traffic or any other condition which would constitute an objectionable use of residentially zoned property. Limitations on the type of home occupation are as follows:

> (a) The area used for a home occupation shall not exceed 20% of the gross floor area in the principal building.
>
> (b) The home occupation shall be confined entirely to the principal building or an accessory structure located on the same lot as the principal building.
>
> (c) No display of products shall be visible from the street and only articles made on the premises may be sold; except that non-durable articles (consumable products) that are incidental to a service, which service shall be the principal use in the home occupation, may be sold on the premises.
>
> (d) The home occupation must be carried on solely by family members and no person outside the family may be employed on the premises.

13.3.2 _Home occupations, rural._  Home occupations within the RR or RA districts shall be limited to accessory uses which are customarily associated with agricultural uses or rural nonfarm households.  Limitations on the type of rural home occupation are as follows:

> (a) The rural home occupation shall be confined to the principal building or an accessory structure located on the same lot as the principal building.

Defendants' Bates # 6955

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 232 of 800   PageID #: 2246
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 153 of 293   PageID #: 845

*Baldwin County Zoning Ordinances*                                                                                    *13-3*

(b) No display of products shall be visible from the street and only articles made on the premises may be sold; except that non-durable articles (consumable products) that are incidental to a service, which service shall be the principal use in the home occupation, may be sold on the premises.

(c) The rural home occupation must be carried on solely by family members and no person outside the family may be employed on the premises.

## Section 13.4 Utilities

13.4.1 *Septic tanks.* In areas where there are no sewerage facilities, septic tanks may be used in accordance with current regulations of the Alabama Department of Public Health, the Baldwin County Health Department, and the Baldwin County Coastal Area Program, where applicable. No new septic systems will be permitted seaward of the Coastal Construction Line.

13.4.2 *Water and sewer connections.* All projects in all districts shall meet all requirements of the Health Department. If the projects are to be served by water and/or sewer, documentation shall be provided that the appropriate utilities have the capacity and agree to provide service.

13.4.3 *Utility plan.* A utility plan is required for all major projects. Such plan shall be submitted in conjunction with an application for a land use certificate as herein provided. The plan shall show plans and specifications for the proposed water supply, sewage disposal, refuse collection, fire protection, electricity, street lighting, telephone and gas.

13.4.4 *Other.* To the extent feasible, utilities for all major projects shall be placed underground.

## Section 13.5 Sewage Treatment Plants

Sewage treatment plants shall be constructed according to the best available technology and shall provide at least tertiary treatment. See also *Section 2.3.4.3 (d)* and *Section 2.3.21.3(b).*

## Section 13.6 Buildings and Access

13.6.1 *Buildings to be on lots.* Every building hereafter erected, converted, enlarged, reconstructed, moved, or structurally altered shall be located on a lot which provides access to a public street and there shall be no more than one (1) principal residential building on a lot except as follows:

In any district where multifamily structures, motels, or hotels are permitted, two or more such residential structures may be permitted on a lot provided that no building shall be located closer to another building on the same lot than a distance equal to half the sum of the heights of both buildings. In addition, the front or rear of any building may be no closer to the front or rear of any other building than 40-feet. The side of any building shall be no closer to the side, front or rear of any other building than 30-feet.

Defendants' Bates # 6956

13.6.2 *Access.*  Each principal building shall be placed on a lot or parcel which provides access to a public street.  Subdivisions shall be provided with access as required by the *Baldwin County Subdivision Regulations.*

## Section 13.7 Cemeteries

13.7.1 *Purpose.* The purpose of this section is to establish minimum standards for cemeteries (See *Section 2.3.26.4(a)* and *Section 2.3.28.4*).

13.7.2 *Procedures and standards.*

(a) Any new cemetery, except a family plot or church yard, shall be located on a site containing not less than 10 acres.

(b) There shall be a buffer of 50-feet around the perimeter of the property and all structures, graves and burial lots shall be setback no less than 50-feet from any property line or right-of-way.

(c) The entire cemetery property shall be landscaped and maintained.

(d) The site proposed for a cemetery shall not interfere with the development of a system of streets or a highway in the vicinity of such site.

## Section 13.8 Recreational Vehicle (RV) Parks

13.8.1 *Purpose.* The purpose of this section is to establish minimum standards for recreational vehicle parks.

13.8.2 *Procedures and standards.*

(a) *Land use certificate required.*  All recreational vehicle parks are subject to the standards contained in this section and will be required to obtain a land use certificate prior to being granted a building permit.

(b) *Where permitted.*  Except as provided in *Section 2.3.26.4(b)* and *Section 2.3.31.4*, recreational vehicle parks are permitted as follows:

1.    High Density

A. RV-1, B-4, M-1 and M-2 by right.
B. B-3 by conditional use approval.
C. RR, RA and CR by special exception approval.

2.    Low Density

A. RV-1, RV-2, B-4, M-1 and M-2 by right.
B. B-2, B-3 and OR by conditional use approval.
C. RR, RA and CR by special exception approval.

(c) *Occupancy.*  A recreational vehicle shall not be occupied as a living quarter unless it is located in a recreational vehicle park as herein provided or as provided in *Section 12.2.2.*  No recreational vehicle shall be used as a

Defendants' Bates # 6957

permanent dwelling. Continuous occupancy extending beyond 4 months in any 12-month period shall be considered permanent occupancy.

(d) *Storage and parking.* Recreational vehicles may be parked or stored in residential districts as provided in *Section 15.3.9: Storage and parking of trailers and commercial vehicles.*

(e) *Maximum density.*

    1.    High Density: 15 campsites per acre
    2.    Low Density: 6 campsites per acre

(f) *Land area.* The minimum land area of a recreational vehicle park shall be three (3) acres.

(g) *Use.* Use of spaces in recreational vehicle parks is limited to recreational vehicles.

(h) *Water and sewer facilities.*

    1. *Water.*  Each recreational vehicle park shall be served with a public/private water supply system capable of providing domestic water use and fire protection.

    2. *Sewer.*  Each recreational vehicle park shall be served with sanitary sewer facilities meeting all requirements of the Baldwin County Health Department.

(i) *Setbacks.*

    1. No space shall be so located that any part intended for occupancy for sleeping purposes shall be within 30-feet of any property line.

    2. Recreational vehicles must be separated from each other and from other structures by at least 10-feet.

(j) *Access.*

    1. No recreational vehicle park shall be located except with direct access to a paved county, state or federal highway, with a minimum lot width of not less than 50-feet for the portion used for entrance and exit.

    2. No entrance or exit shall be through an existing residential subdivision.

    3. Access drives must be a minimum of 24-feet wide for a two-way street and 12-feet wide for a one-way street and must be improved with a suitable hard surface permanent type of pavement such as asphalt, concrete, limestone or other similar surface approved by the Planning Commission.

(k) *Accessory uses.*  Management headquarters, recreational facilities, toilets, showers, laundry facilities and other uses and structures customarily

Defendants' Bates # 6958

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 235 of 800   PageID #: 2249
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 156 of 293   PageID #: 848

_Baldwin County Zoning Ordinances_                                                          _13-6_

incidental to the operation of a recreational vehicle park are permitted as accessory uses.

(l) *Sites.*

1. Each recreational vehicle site must be at least 1,600 square feet in area.

2. Each recreational vehicle site must contain a parking pad improved with a suitable all-weather surface.

3. Each recreational vehicle site must contain at least one (1) off-street parking space improved with a suitable all-weather surface.

(m) *Buffering.* In the event a recreational vehicle park is located adjacent    to residentially zoned property, a landscaped buffer with a minimum width         of 30-feet shall be provided. Said buffer shall consist of a combination of        canopy trees, understory trees and shrubs which shall be of sufficient       height  to  create  a visual barrier. No buffer will be required if the           recreational    vehicle    park    is located adjacent to agricultural, commercial,         industrial or recreational property.

(n) *Existing recreational vehicle parks.* Recreational vehicle parks which     exist at the time of zoning adoption or amendment are grandfathered and     may continue to operate lawfully provided that the operation is not          discontinued for more than one (1) calendar year or 365 consecutive days      The owner of an existing RV park may conduct maintenance and repairs        which may include the replacement of accessory structures, hook-ups and   utilities subject to the following conditions:

1.  The cost of replacement shall not exceed 50 percent of the value of the park.

2.  The recreational vehicle park shall not be expanded.

3.  The footprints of accessory structures shall not be enlarged or moved.

4.  The number of recreational vehicle spaces shall not be increased.

If the owner of an existing recreational vehicle park wishes to expand the recreational vehicle park, construct additional spaces and facilities or re-arrange spaces and facilities, the park shall at that time be brought into conformity with all requirements of this section.

## Section 13.9 Wireless Telecommunications Facilities

13.9.1 *Purpose.* The purpose of this section is to establish minimum standards for wireless telecommunications facilities.  The underlying principals of these standards are to: (1) achieve a balance among the number, height, and density of wireless telecommunications facilities that is appropriate for our communities; (2) encourage and maximize the use of existing and approved towers, buildings and other structures to accommodate new wireless telecommunications facilities; (3) ensure the compatibility of towers with, and avoid adverse impacts to, nearby properties; and (4) discourage the proliferation of towers throughout the Planning Districts which have elected to come under the planning and zoning jurisdiction of the Baldwin County Commission.

Defendants' Bates # 6959

13.9.2 *Procedures and standards.*

(a) *Land use certificate required.* All wireless telecommunications facilities are subject to the standards contained in this section and will be required to obtain a land use certificate prior to being granted a building permit.

(b) *Where permitted.* Wireless telecommunications facilities shall be permitted by right in the M-1 and M-2 districts and by conditional use approval in the RR, RA, B-2, and B-3 districts. Antennas located on existing towers (co-location antennas) and antennas located on alternative support structures shall be permitted by right in all zoning districts.

(c) *Height.*

1. Antennas located on alternative support structures shall not exceed 15-feet in height above the existing structure on which they are placed.

2. Tower height shall be limited to that height necessary for proper functioning.

(d) *Setbacks.* Wireless telecommunications towers, guys, and accessory structures must comply with the minimum yard requirements of the zoning district in which they are located.  Additionally, towers (but not guys and accessory structures) may be placed no closer than a distance equal to the height of the wireless telecommunications facility from any residential structure on adjacent property.  Where a tower is permitted in a zoning district adjacent to any residential district the required setback from all residentially zoned property lines shall be a distance equal to the height of the tower.

(e) *Lot size.* Lot size must conform to the minimum lot size requirements of the zoning district in which the Wireless telecommunications facility is located. In the event of a lease, the minimum leased area for wireless telecommunication facilities shall be 5,000 square feet.

(f) *Co-location.*

1. No new antenna support structure shall be permitted unless the applicant demonstrates that no existing antenna support structure can accommodate the applicant's needs.

2. Documentation that reasonable efforts have been made to achieve co-location shall be submitted.  Applications for new antenna support structures must include an affidavit from the applicant verifying that no existing sites are available for co-location.

3. Monopole structures shall have the ability to accommodate at least one additional set of antennas.  Guyed structures and self supporting towers shall have the ability to accommodate at least two additional sets of antennas.

Defendants' Bates # 6960

(g) *Aesthetics.* The aesthetic properties of each individual wireless telecommunications facility shall be approved as part of the site plan review process.

1. *Appearance.* The design of the tower shall be of a type that has the least visual impact on the surrounding area.

A. Towers and antennas shall be painted a neutral or blending color so as to reduce visual obtrusiveness, unless subject to any applicable FAA standards. If an antenna is installed on a structure other than a tower, the antenna and supporting telecommunications facilities must be of a neutral color that is identical to, or closely compatible with, the color of the supporting structure.

B. No signage, symbols, or advertisements may be attached to the pole, tower or antenna.

C. Towers camouflaged to resemble woody trees or indigenous vegetation in order to blend in with the native landscape will be subject to administrative review, as are types of concealment techniques (see *Concealment techniques*).

2. *Accessory structures.*

A. The design of the compound and its accessory structures shall, to the extent possible, maximize use of building materials, colors, textures, screening and landscaping that effectively blend the tower facilities within the surrounding natural setting and built environment.

B. In or adjacent to developed properties, accessory structures must be aesthetically and architecturally compatible with the surrounding environment. Materials such as wood, brick, and stucco should be used as appropriate. The use of metal or metallic-looking materials shall be avoided in as much as shall be practical.

3. *Non vegetative screening.*

A. Non vegetative screening will be required when it is necessary to reduce the visual impact of a wireless telecommunications compound on adjacent public ways, properties or the neighborhood in which it is located. In or adjacent to developed properties, non vegetative screening shall be provided in a manner that is compatible with the surrounding character of development, buildings, natural vegetation, and landscaping. Such screening, as required and subject to site plan review, shall have a minimum height of 8-feet, and may consist of one or the following: brick masonry walls, solid wood fencing, berms, or opaque barriers. All non vegetative screening shall be properly maintained by the property owner or lessor.

Defendants' Bates # 6961

B. In isolated nonresidential areas, alternative non vegetative screening methods may be accepted, such as the use of earth-toned, vinyl-coated steel security fencing.

C. In certain locations where the visual impact of the tower would be minimal, such as remote, agricultural or rural locations or developed heavy industrial areas, the non vegetative screening requirement may be reduced or waived.

D. Wireless telecommunications facilities utilizing underground vaults rather than above ground equipment buildings may be exempted from screening requirements.

4. *Landscaping.*

A. Landscaping will be required to reduce the visual impact of a compound and its accessory structures on adjacent public ways, properties or the neighborhood in which it is located. In or adjacent to developed properties, landscaping shall be provided in a manner that is compatible with the surrounding character of development, buildings, and natural vegetation.

B. The perimeter of the compound shall be landscaped with a buffer of plant materials that effectively screens the view of the compound from adjacent property and public ways. The standard buffer shall consist of a landscaped strip of at least 4-feet wide outside the perimeter of the compound. In locations where the visual impact of the tower would be minimal, the landscaping requirement may be reduced or waived.

C. A row of trees a minimum of 8-feet tall and a maximum of 10-feet apart shall be planted around the perimeter of the compound fence. A continuous hedge at least 30 inches high at planting capable of growing to at least 36 inches in height within 18 months shall be planted in front of the tree line.

D. All landscaping shall be of the evergreen variety. All landscaping shall be xeriscape tolerant or irrigated and properly maintained by the property owner or lessor to ensure good health and variety.

(h) *Lighting.*

1. Towers shall not be artificially lighted unless required by the FAA or other authority for safety purposes. If lighting is required, "dual lighting" (red at night/strobe during day) shall be preferred unless restricted by the FAA. Lighting must be shielded or directed upward to the greatest extent possible so as to minimize the amount of light that fall onto nearby properties, particularly residences.

Defendants' Bates # 6962

Case 1:20-cv-00057-C Document 77 Filed 02/02/22 Page 239 of 800 PageID #: 2253
Case 1:20-cv-00057-C Document 45-1 Filed 05/21/21 Page 160 of 293 PageID #: 852

_Baldwin County Zoning Ordinances_                                    _13-10_

2. Basic security lighting for the compound may be permitted, but shall be focused only on the compound itself, and shall be directed away from any adjacent property.

(i) _Environmental impact._ All wireless telecommunications facilities shall comply with the National Environmental Policy Act. If an environmental assessment is required by the Federal Communications Commission (FCC), a copy of the assessment, as well as documentation of the FCC's subsequent approval thereof, must be submitted at the time of application.

(j) _Safety._

1. _Radio frequency._ The applicant shall be required to submit documentation that the proposed wireless telecommunications facility complies with the FCC standards for radio frequency emissions, as adopted by the FCC on August 1, 1996.

2. _Structural._ A Professional Engineer shall certify that all antenna support structures and wireless telecommunications equipment are erected and/or installed so as to comply with the co-location requirements as specified in _Section 13.10.2 (f): Co-location_, and wind loading and other structural standards contained in the Building Code as adopted by Baldwin County and the applicable technical codes established by the Electronic Industries Association (EIA/TIA 222-E "Structural Standards for Steel Antenna towers and Antenna Supporting Structures) or the Telecommunications Industry Association. This shall apply to new and modified structures and facilities.

3. _Security of site._ Fencing shall be required to ensure that antenna support structures and their accessory buildings are fully secured. Sufficient anti-climbing measures must be incorporated into each facility, as needed, to reduce potential for trespass and injury.

(k) _Obsolete towers._ In the event the use of any wireless telecommunications facility has been discontinued for the period of 180 days, the wireless telecommunications facility shall be deemed to be abandoned. Determination of the date of the abandonment shall be made by the Zoning Administrator. Upon such abandonment, the owner/operator of the wireless telecommunications facility shall have an additional 180 days within which to reactivate the use of the wireless telecommunications facility to another owner/operator who makes actual use of the wireless telecommunications facility, or dismantle and remove the wireless telecommunications facility.

## Section 13.10 Bed and Breakfast Establishments

13.10.1 _Purpose._ A bed and breakfast establishment may be approved as a special exception under the RA, RSF-E, RSF-1, RSF-2, RSF-3, RSF-4, RTF-4, RSF-6, RTF-6, RMF-6 and TR zoning designations, subject to the approval of the Board of Adjustment for the planning district in which the bed and breakfast would be located.

13.10.2   *Standards.* A special exception for a bed and breakfast establishment may be approved only upon determination that the application and evidence presented clearly indicate that all of the following standards will be met:

> (a) No more than eight (8) guest rooms shall be included in any one establishment.

> (b) Except for serving meals to overnight guests, the establishment shall not engage in the restaurant business. Guest rooms shall not contain cooking facilitates.

> (c) Guest stays shall be limited to two weeks.

> (d) At least one off-street parking space shall be provided for each guest room, plus two for the owner.

> (e) All requirements, standards, and conditions contained in *Section 18.8.4* of these zoning ordinances shall be met.

## Section 13.11 Stormwater Management

A stormwater management plan is required for all major projects. Such plan shall be prepared by a licensed engineer and shall be submitted in conjunction with an application for a land use certificate as herein provided. No development may proceed until a land use certificate has been approved. The Zoning Administrator shall, in consultation with the Building Official and County Engineer or his/her designee, determine that reasonable provisions for properly handling surface drainage have been made in the applicant's design.

## Section 13.12 Erosion Control

13.12.1 *Purpose and Intent.*   It is the purpose of this ordinance to further the maintenance of safe and healthful conditions, prevent and control water pollution, prevent and control soil erosion, protect spawning grounds, protect fish and aquatic life, control building sites, control placement of structures and land uses, preserve ground cover and scenic beauty, and promote sound economic growth. This will be done by minimizing the amount of sediment and other pollutants carried by runoff or discharged from land disturbing construction activity.

13.12.2 *Definitions.* Words and phrases used in this article shall have the meanings as set forth in this section.  Words and phrases not defined in this section but defined elsewhere in the zoning ordinances shall be given the meanings as set forth in such ordinances.  All other words and phrases shall be given their common, ordinary meaning unless the context clearly requires otherwise.

> *Agricultural activity.* Planting, growing, cultivating and harvesting crops for human or livestock consumption and pasturing or outside yarding of livestock, including sod farms and silviculture. This includes waterways, drainage ditches, diversions, terraces, excavating, filling, and similar practices on farm fields.

Defendants' Bates # 6964

*Best management practice (BMP).* Structural or non-structural measures, practices, techniques or devices employed to avoid or minimize soil, sediment, or pollutants carried in runoff to waters of the state.

*Construction site.* An area upon which one or more land disturbing construction activities occur, including areas that are part of a larger common plan of development or sale where multiple separate and distinct land disturbing construction activities may be taking place at different times on different schedules but under one plan.

*Erosion.* The process by which the land's surface is worn away by the action of wind, water, ice or gravity.

*Erosion and sediment control plan.* A plan developed to address pollution caused by soil erosion and sedimentation during land disturbing construction activity.

*Qualified Credentialed Inspector (QCI).* An operator, operator employee, or operator designated qualified person who has successfully completed initial training and annual refresher Qualified Credentialed Inspection Program (QCIP) training, and holds a valid certification from a Department approved cooperating training entity.

*Qualified Credentialed Professional (QCP).* A staff member of the Alabama Department of Environmental Management (ADEM) designated by the Director of ADEM, a licensed Professional Engineer, an Alabama Natural Resources Conservation Service professional designated by the State Conservationist, a Certified Professional In Erosion And Sediment Control, or other registered professionals (geologists, soil scientists, land surveyors, landscape architects).

*Sediment.* Settleable solid material that is transported by runoff, suspended within runoff or deposited by runoff away from its original location.

*Site.* The entire area included in the legal description of the land on which the land disturbing construction activity is proposed in the permit application.

*Water(s).* Includes, but is not limited to, water on or beneath the surface of the ground, including natural or artificial watercourses, streams, rivers, lakes, ponds, or diffused surface water and water percolating, standing, or flowing beneath the surface of the ground.

*Watercourse.* A natural or artificial channel through which water flows.

13.12.3 *General Design Principles.* The following principles apply to all land disturbing activities within the jurisdiction of the Baldwin County Planning and Zoning authority and should be considered when preparing construction plans and/or submissions required under this ordinance:

(a) To minimize the potential for soil erosion, development should fit the topography and soils of the site. Areas with extreme slopes where cuts and fill would be required should be avoided.

Defendants' Bates # 6965

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 242 of 800   PageID #: 2256
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 163 of 293   PageID #: 855

*Baldwin County Zoning Ordinances*                                                                                   *13-13*

(b) Natural vegetation should be maintained and protected wherever and whenever possible. Areas immediately adjacent to watercourses, wetlands and lakes should be left undisturbed wherever possible.

(c) All construction activities on a site should be conducted in a logical sequence so that the smallest practical area of land will be exposed for the shortest practical period of time during development.

(d) Sediment basins, silt traps and filters should be installed prior to the beginning of construction to remove as much sediment as possible from runoff leaving the site or entering watercourses, wetlands, lakes or reservoirs.

(e) The selection of soil erosion and sedimentation control measures should be based on the size of the project, the frequency of climatic events likely to accelerate erosion, the season during which the project is being constructed, and the potential for damage should erosion and sedimentation occur.

(f) In the design of erosion and sedimentation control measures the requirements for proper maintenance will be considered.

(g) Provision should be made to accommodate the increased runoff caused by altered surface and soil conditions both during and after development. Drainage ways should be designed so that their final gradients and resultant velocities will not cause erosion.

(h) Provision should be made for the proper transport of soil from the site without tracking or spilling soil along the transport route.

(i) Permanent vegetation and erosion control structures should be installed and temporary structures removed prior to the issuance of final occupancy permits.

(j) Any land disturbance activity which takes place in a right-of-way will require approval from the governing agency.

13.12.4 *Design Criteria, Standards and Specifications.* All erosion and sediment control measures, including, but not limited to those required to comply with this ordinance, shall meet the design criteria, standards and specifications given in the most current version of the Alabama Handbook for Erosion Control, Sediment Control and Storm Water Management on Construction Sites and Urban Areas.

13.12.5 *Specific Requirements.* Control of erosion and sediment through the entire duration of the land disturbing activity is the responsibility of the applicant. The following measures shall be utilized where required to provide the necessary control.

(a) Runoff from off-site and flowing through the land in question may be diverted around the land disturbing activity by means of swales, channels, ditches, culverts or storm sewers. The diversion may be a temporary installation, utilized only until the land disturbing activity is complete, or it

Defendants' Bates # 6966

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 243 of 800  PageID #: 2257
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 164 of 293  PageID #: 856

_Baldwin County Zoning Ordinances_                                                    _13-14_

may be a permanent part of the proposed improvement on the land. Such diversion shall not be such that it causes drainage or erosion problems down stream and does not require impact to existing wetlands not covered by existing permits

(b) Any detention basin proposed for the site should be utilized during construction as a sediment basin to trap as much soil as possible. Such basins shall be designed for this purpose, utilizing over excavation for temporary sediment storage, temporary perforated standpipes and or stone filters as required by proper engineering design.

(c) Temporary sediment traps may be required in areas where runoff exits the site and is likely to carry sediment from eroded soils on the site. The temporary traps shall be sized proportionate with the expected flow rate from the site.

(d) Ingress and egress to the site shall be by way of coarse stone drive(s) of sufficient length to cause soil picked up by the tires of vehicles to be dropped before the vehicle enters the roadway. Drives shall be designed and situated so that they provide maximum protection against tracking of soil or mud onto the roadway. For single family and duplex home sites the stone drive should coincide with the final location of the drive to the residence.

(e) Drain inlets and entrances to culverts shall be protected with an installation of acceptable inlet protection.

(f) All disturbed ground left inactive for a period of thirteen (13) days shall be seeded, sodded or stabilized with mulch or equivalent.

(g) Storage piles of soil left for longer than 3 days shall be completely encircled with silt fence. If left inactive or unused for longer than twenty-one (21) days the pile shall be seeded, sodded, or covered with a mulching fabric or tarpaulins.

(h) Stone check dams shall be used in open drainage courses to slow velocities of the runoff.

(i) Based on individual site characteristics, silt fence shall be installed along the down slope edges of all disturbed areas on the site. Silt fence shall be installed in such a manner to prevent sediment from leaving the site.

(j) _Prevention of wetland degradation._ Temporary sediment barriers shall be installed where needed on all exposed slopes which meet or exceed four horizontal to one vertical (4:1) and are within twenty-five (25) feet of wetlands, waters of the state, or any surface water feature not bounded entirely by the limits of the development site. These shall be placed and maintained such that drainage will not overflow or bypass the barrier and shall remain in place until the slope is leveled or permanently stabilized.

Defendants' Bates # 6967

(k) *Dust control.* All development which will result in exposure of bare soil during dry periods shall follow short-term stabilization methods as follows:

    1.) Maintain soils in a damp condition as determined by sight or touch.

    2.) Establish a stabilized surface through watering or other approved methods.

(l)  *Stabilization.* Within 10 days of ceasing activity, an operator shall implement at least one (1) of the following long-term stabilization techniques for any disturbed surface area where construction activities are not scheduled to occur for at least thirty (30) days:

    1.) Revegetation that results in seventy-five percent (75%) ground coverage provided that an active watering system is in place at all times.

    2.) Establish a stabilized surface through watering with physical access restriction surrounding the area or other approved methods.

13.12.6 *Maintenance of Erosion Control Measures.* All erosion control measures shall be maintained throughout the course of the construction or until the growth of vegetation has made them unnecessary. If silt fence is temporarily removed to allow access to a portion of the site it shall be re-installed at the end of the work day. The applicant is responsible for the maintenance of all erosion control measures.

13.12.7 *Erosion Control Plan.* An erosion control plan shall be submitted with each application as follows:

(a) *Minor Projects - Single Family Homes and Accessory Structures (areas of disturbance less than 1 acre)* The erosion control plan for single family home sites shall be made a part of the site plan provided with the application for a Land Use Certificate. It shall be prepared by an Alabama Licensed Professional Land Surveyor, Engineer, Architect, Landscape Architect, a Certified Professional in Erosion and Sediment Control, a QCI, a licensed home builder or a licensed general contractor.  The site plan shall show, as a minimum, the direction of surface slopes, any watercourses on the lot, and the location of all erosion control installations proposed.

(b) *Major Projects – All other Residential and Non-Residential Sites (areas of disturbance greater than or equal to 1 acre).*The erosion control plan for multi-family and all non-residential sites shall conform to the following:

    1.) The plan shall be prepared by an Alabama Licensed Professional Land Surveyor, Engineer, Architect, Landscape Architect or QCP.

    2.) The plan shall be drawn to a scale adequate to clearly show the site and the required information. In no case shall the plan be drawn to a scale less than 1"=100'.

Defendants' Bates # 6968

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 245 of 800   PageID #: 2259
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 166 of 293   PageID #: 858

*Baldwin County Zoning Ordinances*                                                                   *13-16*

3.) The plan may incorporate one or more sheets as necessary to clearly convey the intent of the plan. The plan may also incorporate text to explain any specifics of the plan cover the specifications for the materials required or convey the development phasing.

4.) As a minimum the plan shall show all existing and proposed:

A. Site boundaries, lots, etc.

B. All watercourses (with sizes), ponds, lakes, wetlands.

C. Apparent floodplains, floodway fringes, and floodways.

D. Soil types and their erodability. The information provided in the Soil Survey of Baldwin County, Alabama as published by the U.S. Dept. of Agriculture, Natural Resources Conservation Service, is appropriate.

E. Vegetative cover such as crops, grass, weeds, and/or trees. The use of exotic or invasive species as proposed vegetative cover is discouraged.

F. Utilities, structures, road pavements and other improvements.

G. Existing contours at an interval not greater than 2 feet. An adequate number of spot elevations may be provided in lieu of the contours.

H. Locations and dimensions (where applicable) of all proposed erosion control measures.

## 13.12.8 *Permits*

(a) *General.* A land disturbance permit shall be obtained for all minor and major projects. The permit shall be on a form provided by the Baldwin County Planning and Zoning Department. For small scale projects a Land Use certificate shall be used in lieu of a land disturbance permit.

(b) *Permit Conditions.* All permits shall require the applicant to:

1.) Notify the Planning and Zoning Department at least 24 hours before beginning any major project land disturbing activity.

2.) Notify the Planning and Zoning Department of any modifications of the erosion control plan within 7 days of change.

3.) Install and maintain all erosion control measures as identified in the erosion control plan.

4.) Maintain all road drainage systems, storm water drainage systems and other facilities as identified in the erosion control plan.

5.) Remove sediment resulting from land disturbing activities from adjacent surfaces and/or drainage courses in accordance with all State and Federal regulations.

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 246 of 800   PageID #: 2260
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 167 of 293   PageID #: 859

*Baldwin County Zoning Ordinances*                                            *13-17*

6.) Allow the Planning and Zoning Department to enter the site to verify compliance with the erosion control plan.

7.) Submit a revised plan for approval if the nature of the project changes from that proposed under the permit.

8.) Submit copies of all necessary state and federal permits

(d) *Permit Fees.* All fees for a Land Disturbance Permit shall be paid prior to permit issuance.

(e) *Length of Permit Validity.* In the event that the land disturbing activities are not started within 6 months and/or the work is not completed within three (3) years from the date of the permit said permit shall become invalid and a new permit shall be obtained.

## 13.12.9 *Enforcement*

(a) *Stop Work Notice.* The Planning & Zoning Department may issue a stop work notice in accordance with the zoning ordinance for any work not conforming to the requirements of this ordinance. The stop work notice may be lifted only after the work has been made to conform to this ordinance. If, after the stop work order has been issued for a period of not less than ten (10) calendar days and the work is not in compliance with this ordinance the Department may serve notice of zoning violation.

(b) *Fines for Violation.* In addition to any and all other remedies set forth in this ordinance for a violation thereof, the Planning Director or his/her designee may, for any violation of this ordinance, levy a fine against the violator(s) of up to $150.00 for each occurrence, each day being a separate occurrence. The Department shall notify the violator(s) of such fine, in writing.

## 13.12.10 *Exemptions.*  This ordinance shall apply to any land-disturbing activity undertaken by any person on any land except for the following activities. These activities may be subject to regulation by State and Federal agencies.

(a)     The construction of single family residences when such construction is located on lots exceeding three (3) acres and construction activity disturbs less than one (1) acre and is not a part of a larger common plan of development or sale.

(b) Surface mining.

(c) Such minor land-disturbing activities as home gardens and individual home landscaping, repairs, maintenance work, and other related activities which result in minor soil erosion.

(d) Agricultural activities as defined herein.

Defendants' Bates # 6970

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 247 of 800   PageID #: 2261
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 168 of 293   PageID #: 860

Baldwin County Zoning Ordinances                                                                  13-18

(e) Any project carried out under the technical supervision of the Natural Resources Conservation Service of the United States Department of Agriculture, the State of Alabama or Baldwin County Commission.

(f) Construction or maintenance projects, or both, undertaken or financed in whole or in part, or both, by the Department of Transportation; or any road construction or maintenance project, or both, undertaken by any county or municipality.

(g) Forestry land management practices, including harvesting; provided, however, that the Alabama's Best Management Practices for Forestry are followed.

## Section 13.13 Wind Energy Conversion Systems

13.13.1 *Purpose and Intent.* It is the purpose and intent of this section to provide standards and regulations for the safe and effective construction, placement, operation and use of small wind energy conversion systems for onsite home, farm and commercial use.

13.13.2 *Applicability.* This section shall apply to wind energy conversion systems (WECS) used for electrical energy generation. Microturbines and Small WECS shall be regulated as accessory structures under all zoning designations. Large and Utility Scale systems shall not be permitted.

13.13.3 *Definitions.* Words and phrases used in this section shall have the meanings as set forth in this section. Words and phrases not defined in this section, but defined elsewhere in the zoning ordinance, shall be given the meanings as set forth in applicable provisions of the zoning ordinance. All other words and phrases shall be given their common, ordinary meaning, unless the context clearly requires otherwise.

*WECS or system.* A machine which can convert kinetic energy in wind into a usable form of electrical or mechanical energy, such as a wind turbine, windmill or any other wind generated energy production facilities or equipment. As used within this section, a WECS includes all parts of the turbine and the tower upon which it is installed, including any associated facilities or equipment, but does not include power transmission equipment.

*Microturbine.* A WECS which generates one kilowatt or less of electrical energy.

*Small WECS.* One WECS, with a rated capacity of 50 kilowatts (kw) or less, to be used to provide electrical energy on site. Excess electricity may be sold back to an electric utility provider providing service to the site through net metering, net billing or similar programs.

*Large WECS.* One WECS with a rated capacity of more than 50 kw, but less than 100 kw.

*Utility Scale WECS.* One WECS with a rated capacity of more than 100 kw.

Defendants' Bates # 6971

*Wind Farm*. Two or more utility-scale WECS on the same parcel or group of adjacent parcels under common ownership or the subject of leases by a common lessee.

*Tower Height*. The height from base grade to the top of the WECS, including the uppermost extension of any horizontal axis blades, when extended or rotated to their highest position.

*Windmill*. A machine which converts the energy of the wind into rotational energy by means of vanes called sails, which is used exclusively for irrigation, agricultural drainage, farm water supply, and domestic and community water supply.

*Windpump*. A windmill used for pumping water, either as a source of fresh water from wells, or for draining low-lying areas of land.

13.13.4 *Where Permitted*. WECS are permitted in certain zoning districts, subject to the rated capacity thresholds listed below, and in accordance with the requirements of the underlying zoning designation:

(a) Microturbine (1 kw or less).

Permitted by right under all zoning designations.

(b) Small WECS (Greater than 1 kw, but less than 10 kw).

Permitted by right: RR, RA, CR, B-1, B-2, B-3, B-4, RV-1, RV-2,     MR, OR, TR, M-1 and M-2

Permitted by Special Exception: RSF-E, RSF-1, RSF-2, RSF-3,     RSF-4, RTF-4, RSF-6, RTF-6, RMF-6 and RMH

(c) Small WECS (10 kw, to less than 50 kw).

Permitted by right: RR, RA, CR, B-1, B-2, B-3, B-4, RV-1, RV-2,     MR, OR, TR, M-1 and M-2

Permitted by Special Exception: RSF-E, RSF-1, RSF-2, RSF-3,     RSF-4, RTF-4, RSF-6, RTF-6, RMF-6 and RMH

(d) Large WECS (Greater than 50 kw, but less than 100 kw).

Not Permitted under any zoning designation.

(e) Utility Scale WECS (100 kw or greater).

Not Permitted under any zoning designation.

(f) Wind Farms.

Not permitted under any zoning designation.

(g)      Windmills and Windpumps.

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 249 of 800   PageID #: 2263
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 170 of 293   PageID #: 862

*Baldwin County Zoning Ordinances*                                          *13-20*

Permitted by right: RR, RA, CR, B-1, B-2, B-3, B-4, RV-1, RV-2,    MR, OR, TR, M-1 and M-2

Permitted by Special Exception: RSF-E, RSF-1, RSF-2, RSF-3,    RSF-4, RTF-4, RSF-6, RTF-6, RMF-6 and RMH

13.13.5   *Number of WECS Units.*

(a) Microturbines. The maximum number of microturbines which may be installed on a lot is listed as follows:

1. Residential lots, less than five acres in size, may install a maximum of 1 microturbine.
2. Residential lots of five acres or greater in size may install a maximum of 2 microturbines.
3. Agricultural, commercial and industrial lots, less than five acres in size, may install a maximum of 1 microturbine.
4. Agricultural, commercial and industrial lots of five acres or greater in size may install up to 5 microturbines.

(b) Small WECS. The maximum number of small WECS units which may be installed on one lot shall be based on the following acreage requirements:

1. For lots one acre to less than 10 acres, one WECS shall be allowed.
2. For lots 10 acres to less than 20 acres, two WECS shall be allowed.
3. For lots 20 acres or greater, a maximum of three WECS shall be allowed.
4. If the WECS generate greater than five kilowatts each, and are limited to 50-feet in height, a maximum of two WECS may be installed per five acres. Additionally, the separation between them shall be twice the height of the tallest tower.

13.13.6   *Development Standards.* The following development standards shall WECS. Microturbines shall be required to comply with Paragraphs (a), (e), (h), (j), (k) and (m):

(a) General Development Standards. All WECS shall maintain a minimum setback which is no closer laterally than one and one-half times the height of the tower to an overhead electrical power line, excluding secondary electrical service lines or service drops. Additional development standards shall be applied according to rated capacity per WECS unit, as follows:

1. Microturbines: Area and dimensional requirements of the underlying zoning designation.

2. WECS greater than 1kw, but less than 10kw:

Minimum Lot Size – 1 acre
Setbacks – Tower height
Maximum Height – 80 feet

Defendants' Bates # 6973

3.  WECS 10 kw or greater, but less than 50kw:

    Minimum Lot Size – 5 acres
    Setbacks – Tower height
    Maximum Height – 100 feet

4.  Windmills and windpumps

    Minimum Lot Size – 1 acre
    Setbacks – Tower height
    Maximum Height – 50 feet in residential zoning districts; or 100 feet in agricultural, commercial or industrial zoning districts.

(b) Safety. All WECS shall be completely enclosed by a locked protective fence at least six feet high, unless located upon a roof or other location with limited access.

(c) Guy Wires. Anchor points of any guy wires, if utilized, for a system tower shall be located within the property on which the system is located. Guy wires shall not cross any above-ground electric distribution lines. The points of attachment for the guy wires shall be either enclosed by a fence of at least six feet in height or sheathed in bright orange or yellow coverings from three to eight feet off the ground.

(d) Tower Access. Towers must either:

1.  Have tower-climbing apparatus located no closer than 12 feet from the ground;

2.  Have a locked anti-climb device installed on the tower; or

3.  Have a tower-access limitation approved by the Board of Adjustment.

(e) Rotor Safety. Each WECS must be equipped with both manual and automatic controls to limit the rotational speed of the blade within the design limits of the rotor.

(f) Electromagnetic Interference. The WECS shall be designed, installed and operated so that no disrupting electromagnetic interference is caused. Disruptive interference from the facility shall be promptly rectified to include discontinued operation of one or more WECS.

(g) Utility Notification and Undergrounding. For inter-connected systems, no wind turbine shall be installed until written notice and evidence has been given that the electric utility service provider has been notified and has indicated that the proposed interconnection is acceptable. On-site electrical wires associated with the system shall be installed underground, except for "tie-ins" to the electric utility service provider and its transmission poles, towers and lines. This standard may be modified by variance, if the project terrain is found to be unsuitable due to the need for excessive grading, biological impacts or similar factors.

Defendants' Bates # 6974

(h) Noise. A maximum noise level of 50 decibels, measured when the WECS is rotating at its highest design speed, is permitted. The noise level shall be measured at the property lines and shall not exceed 50 decibels under any circumstance.

(i) Site Access. Construction of onsite roadways shall be minimized. Temporary access roads utilized for initial installation shall be graded and revegetated to their natural condition after completion of installation.

(j) Site Aesthetics. WECS shall be designed and located in a manner to minimize adverse visual impacts as follows:

1. Structural components including, but not limited to, towers, blades and fencing shall be of nonreflective and of an unobtrusive, neutral or blending color.

2. When adjacent to a scenic corridor or byway, WECS shall not cause a significantly adverse visual impact to the corridor or byway.

3. Landscaping. With the exception of microturbines, landscaping will be required to reduce the visual impact of a WECS, and its accessory structures on adjacent public ways, properties or the neighborhood in which it is located.  Landscaping shall be provided in a manner that is compatible with the surrounding character of development, buildings, and natural vegetation.

(k) Exterior Lighting.

1. Towers shall not be artificially lighted, unless required by the Federal Aviation Administration (FAA) or other authority for safety purposes, due to proximity to airports.  If lighting is required, "dual lighting" (red at night/strobe during day) shall be preferred unless restricted by the FAA. Lighting must be shielded or directed upward to the greatest extent possible so as to minimize the amount of light that falls onto nearby properties, particularly residences.

2. Basic security lighting for the compound may be permitted, but shall be focused only on the compound itself and shall be directed away from any adjacent property.

(l) Signage. Signage shall be considered as part of Land Use or Special Exception approval and shall be limited as follows:

1. Signs warning of high voltage electricity shall be posted at a height of five feet above ground on stationary portions of the WECS or its tower and at gated entry points to the project site.

2. No other sign or logo shall be placed or painted on any WECS or tower.

3. No more than two identification signs relating to a WECS project shall be located on the site.

Defendants' Bates # 6975

4. Signs shall not exceed 16 square feet in display area or eight feet in height from base grade.

(m) Compliance with FAA Regulations. All WECS shall comply with applicable FAA regulations, if compliance is required due to proximity to airports.

13.13.7 *Application Submittal Requirements.* All applications for a WECS   shall   include the following:

(a) Name, address and contact information for owner and authorized agent. If the owner or authorized agent is an entity, the names of the owners, shareholders, members, managers and officers shall be provided;

(b) Distance to residentially zoned lots (if project site is zoned commercial or industrial), public and private airports and airstrips and schools within one-quarter mile of the proposed project as measured from its nearest property line;

(c) Maximum rated generating capacity of the WECS unit(s) proposed for installation;

(d) Manufacturer's rated generating capacity of the WECS unit(s);

(e) A statement by the manufacturer certifying that the rotor and overspeed controls have been designed and fabricated for the proposed use in accordance with good engineering practice, and have been certified by a national program such as National Electrical Code (NEC), American National Standards Institute (ANSI) or Underwriters Laboratories (UL);

(f) Certification by a State licensed structural, mechanical or civil engineer that the tower structures are designed and constructed with the pertinent provisions of the International Building Code;

(g) Written evidence that the electric utility provider for the proposed site has been informed of the applicant's intent to install an interconnected customer owned electricity generator. If the applicant does not plan to connect the system to the electricity grid, the applicant shall include a statement to that effect;

(h) A description of the proposed measures to minimize the adverse noise, transmission interference, visual and safety impacts to adjacent properties, and methods to prevent public access to the structure.

(i) All additional submission requirements for Land Use Certificate approval and Special Exception approval as applicable and as found within the zoning ordinance.

(j) The Building Inspector shall have the authority to waive the application requirements set forth above in Section 5.2 (b), (e) and (f) above for microturbines mounted to the side or roof of a structure, if the information is deemed unnecessary due to the size and height of the turbine.

13.13.8 Variances.   Applications for variances from this section shall meet the requirements of Section 18.6 and Section 18.7 of the zoning ordinance.

Defendants' Bates # 6976

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 253 of 800   PageID #: 2267
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 174 of 293   PageID #: 866

_Baldwin County Zoning Ordinances_          _13-24_

13.13.9 Fines and Penalties. In addition to any other fines, penalties or remedies for the violation the provisions of this section, any person or entity violating the provisions of this section or any other regulations regarding the permitting, construction, placement and use of WECS shall be subject to a fine of up to one thousand dollars ($1,000) and costs of court for each offense as determined by the court. Each day the violation continues shall constitute a separate offense.

## Section 13.14      Mini-Warehouses

13.14.1 _Purpose._ The purpose of this section is to establish minimum standards for mini-warehouse facilities.

13.14.2 _Procedures and standards._

(a) _Land use certificate required._ All mini-warehouse facilities are subject to the standards contained in this section and will be required to obtain a land use certificate prior to being granted a building permit.

(b) _Where permitted._ Mini-warehouse facilities are permitted as follows:

1. Special Exception – RR, Rural District, and RA, Rural Agricultural District

2. Conditional Use – RMF-6, Multiple Family District, HDR, High Density Residential District, B-1, Professional Business District and B-2, Neighborhood Business District

3. By Right – B-3, General Business District, B-4, Major Commercial District, M-1, Light Industrial District and M-2 General Industrial District

(c) _Land area._ The minimum land area of a mini-warehouse facility shall be three (3) acres.

(d) _Coverage._ Building coverage shall not exceed forty (40) percent of the total lot area.

(e) _Access._

1. No mini-warehouse facility shall be located except with direct access to a paved county, state or federal highway, with a minimum lot width of not less than 50-feet for the portion used for entrance and exit.

2. All storage spaces shall be served by an access driveway of 11-feet minimum width for each direction of travel. Access drives shall be improved with a suitable hard surface permanent type of pavement such as asphalt, concrete, gravel, limestone or another similar surface.

(f) _Buffering._ In the event a mini-warehouse facility is located adjacent to residentially developed or zoned property, a landscaped buffer with a minimum width of 30-feet shall be provided. Said buffer shall consist of a

Defendants' Bates # 6977

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 254 of 800  PageID #: 2268
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 175 of 293  PageID #: 867

*Baldwin County Zoning Ordinances*                                                      *13-25*

combination of canopy trees, understory trees and shrubs which shall be of sufficient height to create a visual barrier.

(g) *Design and other requirements*.

1. *Facades*. Facades which are visible from a public right-of-way shall be constructed of masonry, wood or other materials which will present a pleasing appearance and which will be compatible with the surrounding area.

2. *Fencing*. The entire site of a mini-warehouse facility shall be enclosed by security fencing. The minimum height for fencing, along the side and rear property lines, shall be eight (8) feet, for fencing constructed to the exterior of required buffers, or six (6) feet for fencing constructed to the interior of required buffers. Fencing shall be composed of materials designed for such use including masonry, iron, steel, chain link (painted or vinyl coated only), wood or a combination thereof. Fencing along the front of a mini-warehouse facility may be decorative in nature and may be built to a minimum height of four (4) feet.

3. *Lighting*. The maximum height of exterior lights shall be 20-feet. Light fixtures shall be designed to cast light downward. No light shall be aimed directly toward a property designated residential, which is located within 200-feet of the source of the light.

4. *Compartments*. Each storage compartment shall have an independent entrance under the exclusive control of the tenant. The use of storage compartments shall be limited to the storage of personal property and no other use shall be permitted within such compartments.

5. *Outdoor storage*. Outdoor storage of goods and materials, with the exception of boats, recreational vehicles and trailers, shall be prohibited. Boats, recreational vehicles and trailers may be stored on site only if located in an enclosed building or if fully screened from public view by fences, walls, landscaping or a combination thereof.

6. *Parking and landscaping*. Unless otherwise stated herein, all mini-warehouse facilities shall meet the requirements of *Article 15: Parking and Loading Requirements* and *Article 17: Landscaping and Buffers*.

**Section 13.15      Office-Warehouses**

13.15.1 *Purpose.* The purpose of this section is to establish minimum standards for office-warehouse facilities.

13.15.2 *Procedures and standards*.

(a) *Land use certificate required.*  All office-warehouse facilities are subject to the standards contained in this section and will be required to obtain a land use certificate prior to being granted a building permit. As used in this section, the term *"office-warehouse"* shall refer to a commercial facility with

Defendants' Bates # 6978

offices/showrooms and associated storage specific to each office/showroom. This section shall in no way supersede uses which are permitted by right in the M-1 and M-2 zoning districts.

(b) *Where permitted.* Office-warehouse facilities are permitted as follows:

1. Special Exception – RR, Rural District

2. Conditional Use – B-1, Professional Business District and B-2, Neighborhood Business District

3. By Right – B-3, General Business District, B-4, Major Commercial District, M-1, Light Industrial District and M-2 General Industrial District

(c) *Coverage.* Building coverage shall not exceed forty (40) percent of the total lot area.

(d) *Buffering.* In the event an office-warehouse facility is located adjacent to residentially developed or zoned property, a landscaped buffer with a minimum width of 30-feet shall be provided. Said buffer shall consist of a combination of canopy trees, understory trees and shrubs which shall be of sufficient height to create a visual barrier.

(f) *Design and other requirements.*

1. *Facades.* Facades which are visible from a public right-of-way shall be constructed of masonry, wood or other materials which will present a pleasing appearance and which will be compatible with the surrounding area.

2. The office/showroom component of this use shall comprise up to 25 percent of the total floor area.

3. No single building shall contain more than five (5) office-warehouse units.

4. *Lighting.* The maximum height of exterior lights shall be 20-feet. Light fixtures shall be designed to cast light downward. No light shall be aimed directly toward a property designated residential, which is located within 200-feet of the source of the light.

5. *Exterior display and storage.* There shall be no exterior display or storage of equipment or materials. All equipment and materials shall be housed inside a structure or behind a privacy fence of eight (8) feet minimum height located behind a structure.

6. *Parking and landscaping.* Unless otherwise stated herein, all office-warehouse facilities shall meet the requirements of *Article 15: Parking and Loading Requirements* and *Article 17: Landscaping and Buffers*.

Defendants' Bates # 6979

## Article 14   Reserved

Defendants' Bates # 6980

## Article 15  Parking and Loading Requirements

### Section 15.1 Generally

15.1.1 Off-street automobile storage or parking spaces shall be provided with vehicular access to a street or alley, and shall be equal to at least the minimum requirements for the specific land use as herein provided.

15.1.2 The required number of parking spaces for any number of separate uses may be combined in one lot, but the required space assigned to one use may not be assigned to another use at the same time, except that portion of the parking space required for an existing church whose peak attendance will be at night or on Sundays may be assigned to a use which will be closed at night or on Sundays.

15.1.3 Where business and multifamily unit developments require large numbers of parking spaces, such spaces may be accommodated in parking decks provided that no such parking deck shall exceed 3 levels above ground or 25% of the height of the principal structure, whichever is greater. Parking deck design shall be compatible with the design of the principal structure.

15.1.4 Any use not specified by these ordinances shall require one (1) parking space for each 300 square feet of gross floor area in the building.  Where the use is mixed, total requirements for off-street parking shall be the sum of the requirements for the various uses computed separately.

### Section 15.2 Parking Schedule

15.2.1 *Dwellings*.

(a) *One and two family dwellings*. 2 spaces for each dwelling unit.

(b) *Multiple family dwellings*. 1.6 spaces for each unit.

(c) *Hotels, motels, and tourist homes*. 1.25 spaces for each guest bedroom.

(d) *Manufactured Housing Park*. 2 spaces per unit.

(e) *Dormitory, boarding house or rooming house*. One space for each guest bedroom.

15.2.2 *Institutional*.

Defendants' Bates # 6981

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 258 of 800   PageID #: 2272
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 179 of 293   PageID #: 871

*Baldwin County Zoning Ordinances*                                          *15-2*

(a) *Churches or other place of worship.* One space for each 4 seats in the main auditorium or sanctuary.

(b) *Private clubs, lodges, country clubs and fraternal buildings.* One space for each 200 square feet of gross floor area.

(c) *Theaters, auditoriums, coliseums, stadiums and similar places of assembly.*  One space for each 4 seats or seating spaces.

(d) *Libraries, museums, art galleries and similar uses.* One space for each 500 square feet of gross floor area.

(e) *College or university.* 10 spaces per classroom.

(f)  *High school.* 7 spaces per classroom.

(g) *Elementary or middle school.* 2.5 spaces per classroom.

(h) *Business or trade school.* One space per 4 seats.

(i)  *Kindergartens, play schools, or day care centers.* One space per employee.

15.2.3 *Health facilities.*

(a) *Hospitals, sanitariums, nursing homes, homes for aged and similar institutional uses.* 1 space for each 4 beds.

(b) *Kennels and animal hospitals (veterinarian).* One space per 500 square feet of gross floor area.

(c) *Medical, dental and health offices.* One space for each 200 square feet of gross floor area.

(d) *Mortuaries and funeral homes.* One space for each 4 parlor or chapel seats.

15.2.4 *Business and office.*

(a) *Commercial establishments and offices including but not limited to food stores, banks, furniture stores, or personal service establishments.* One space for each 200 square feet of gross floor area.

(b) *Restaurants, night clubs, bars, cafes, and similar eating/drinking places.* One space for each 100 square feet of gross floor area.

Defendants' Bates # 6982

(c) *Shopping centers.* One space per 200 square feet of gross floor area.

15.2.5 *Recreation and amusement.*

(a) *Skating rinks, dance halls, exhibition halls, pool rooms and other places of amusement or assembly without fixed seating arrangements.* One space for each 200 square feet of floor area.

(b) *Bowling alleys.* 4 spaces for each alley.

(c) *Marinas.* One space for each slip or berth plus 1 space for each 500 square feet of dry boat storage area.

(d) *Golf course.* 4 spaces per golf hole.

(e) *Golf driving range.* One space for each driving tee area.
(f) *Amusement park.* One space per 200 square feet of area within enclosed buildings, plus One space for every 3 persons that the outdoor facilities are designed to accommodate.

15.2.6 *Industrial, warehouse and similar establishments.*

(a) *Industrial/manufacturing.* One space for each 500 square feet of gross floor area.

(b) *Warehouses.* One space for each 1,000 square feet of gross floor area.

(c) *Mini warehouses.* 2 parking spaces shall be provided for the manager's quarters plus one additional space for every 25 storage cubicles to be located at the project office for use of clients.

## Section 15.3   Design Standards and Improvement Requirements

15.3.1 *Off-street parking space defined.* An off-street parking space is an area of not less than 171 square feet which is permanently reserved for the temporary storage of one automobile. The minimum dimension of an off-street parking space is 9' x 19'. Off-street parking spaces may not be located in a street or alley and must be connected with a street or alley by a driveway which affords unobstructed ingress and egress to each space.

15.3.2 *Parking area dimensions.* The design and dimensions of the parking area shall be in accordance with the following dimensions table:

| Angle of Parking | Curb Length Per Car | Stall Depth | Access Driveway Width |
|---|---|---|---|
| 0 | 23'0" | 9'0" | 12'0" |
| 20 | 20'4" | 15'0" | 11'0" |
| 30 | 18'0" | 17'4" | 11'0" |
| 40 | 14'0" | 19'2" | 12'0" |
| 45 | 12'9" | 19'10" | 13'0" |
| 50 | 11'9" | 20'5" | 12'0" |
| 55 | 11'1" | 20'3" | 15'6" |
| 60 | 10'5" | 21'0" | 18'0" |
| 70 | 9'8" | 21'0" | 19'0" |
| 80 | 9'8" | 20'4" | 24'0" |
| 90 | 9'0" | 19'0" | 24'0" |

15.3.3 *Width of two-way access driveways.* The minimum width of two-way access driveways within and to parking areas shall be 24-feet.

15.3.4 *Paving standards.* Parking spaces and driveways shall be improved with a suitable hard surface permanent type of pavement such as asphalt, concrete, limestone or other similar surface approved by the Planning Commission.

15.3.5 *Drainage.* Off-street parking facilities shall be drained to prevent damage to abutting property and streets and to prevent pollutants from draining onto the adjacent lots. Landscaped areas and perimeter areas shall be so graded as to receive a reasonable portion of the rainfall from the surrounding pavement. Protective curbing around landscaped areas will leave openings for the flow of water onto unpaved areas. No runoff shall be directed to the beaches or to surface waters.

15.3.6 *Landscaping.* Parking lots shall be landscaped in accordance with *Section 17.4: Parking Lots.*

15.3.7 *Off-street loading and unloading space.* Off-street loading/unloading spaces shall be provided as hereinafter required by this Ordinance.

(a) *Size of spaces.* Each off-street loading/unloading space shall have minimum dimensions of 14-feet in height, 12-feet in width, and 55-feet in length. However, upon sufficient demonstration that a particular loading space will be used exclusively by shorter trucks, the Board of Adjustment may reduce the minimum length accordingly to as little as 35-feet.

(b) *Connection to street or alley.* Each required off-street loading/unloading space shall have direct access to a street or alley or

Defendants' Bates # 6984

have a driveway which offers satisfactory ingress and egress for trucks.

(c) *Floor area over 10,000 square feet.* There shall be provided for each hospital, institution, hotel, commercial, or industrial building or similar use requiring the receipt or distribution of materials or merchandise and having a floor area of more than 10,000 square feet, at least one off- street loading/unloading space for each 10,000 square feet of floor space or fraction thereof. Such space shall be so located as not to hinder the free movement of pedestrians and vehicles over a sidewalk, street or alley.

(d) *Floor area less than 10,000 square feet.* There shall be provided for each commercial or industrial building requiring the receipt or distribution of materials or merchandise and having a floor area of less than 10,000 square feet, sufficient off-street loading/unloading space (not necessarily a full space if shared by an adjacent establishment) so located as not to hinder the free movement of pedestrians and vehicles over a sidewalk, street or alley.

(e) *Bus and trucking terminals.* There shall be provided sufficient space to accommodate the maximum number of buses or trucks to be stored or to be loaded at the terminal at any one time.

(f) *Location.* All required off-street loading/unloading spaces shall be located on the same lot as the building which they are intended to serve, or on an adjacent lot when shared with the use occupying said adjacent lot.

(g) *Permanent reservation.* Areas reserved for off-street loading/unloading in accordance with the requirement of these ordinances shall not be reduced in area or changed to any other use unless the permitted use which is served is discontinued or modified except where equivalent loading/unloading space is provided and approved by the Board of Adjustments.

15.3.8 *Curb cuts and vision clearance.* The requirements for controlling curb cuts and maintaining vision clearance shall be as follows:

(a) *Curb cuts.* No curb cut shall exceed 50-feet in length, nor shall curb cuts be closer than 100-feet to other curb cuts or closer than 50-feet to any intersection of two streets measured along the curb line.

(b) *Vision clearance.* In all use districts, no fence, wall, shrubbery, sign, marquee, or other obstruction to vision between the heights of 2½ feet and 10-feet from the street level shall be permitted within 20-feet of the

Defendants' Bates # 6985

intersection of the right-of-way lines of two streets or railroad lines, or of a street intersection with a railroad line.

15.3.9 *Storage and parking of trailers and commercial vehicles.*

(a) Recreational vehicles, trailers and commercial vehicles shall not be parked or stored on any lot in any residential district except in accordance with the following requirements:

1. No more than one commercial vehicle per dwelling shall be permitted; and in no case shall a commercial vehicle used for hauling explosives, gasoline or liquefied petroleum products be permitted.

2. Recreational vehicles, trailers and commercial vehicles may not be parked within a required front or side yard.

3. Recreational vehicles shall not be occupied either temporarily or permanently while parked or stored in any residential district except as provided by *Section 12.2.2: Temporary Structures.*

4. A recreational vehicle, trailers or commercial vehicle may not be located on a lot in any residential district by itself.

(b) Junked vehicles or automotive vehicles without current license plates shall not be parked or stored in any residential district other than in completely enclosed buildings.

Defendants' Bates # 6986

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 263 of 800  PageID #: 2277
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 184 of 293  PageID #: 876

*Baldwin County Zoning Ordinances*                                      *16-1*

# Article 16  Sign Requirements

### Section 16.1 Purpose

The purpose of this article is to provide the minimum control of signs that ensures the protection of the public safety and general welfare. These provisions are intended to lessen the hazards to pedestrian and vehicular traffic, prevent unsightly and detrimental development which has a blighting influence upon the community, prevent signs from reaching such excessive size or numbers that they obscure one another to the detriment of all concerned, preserve the general character and aesthetic quality of the various areas within the county, and promote a positive county image reflecting order, harmony and pride.

### Section 16.2 Measurement Determinations

16.2.1 *Number of signs.* In general, the number of signs shall be the number of noncontiguous sign faces. Multiple noncontiguous sign faces may be counted as a single sign if all the sign faces are included in the geometric figure used for determining the sign area.

16.2.2 *Sign face area.*

(a) *Individual signs.* The sign face area of individual signs shall be computed by means of the smallest square, circle, rectangle, triangle or combination thereof that will encompass the extreme limits of the writing representation, emblem, or other display, together with any material or color forming an integral part of the background of the display or used to differentiate the sign from the backdrop or structure against which it is placed. This does not include the supporting framework, bracing, or decorative fence or wall when such fence or wall otherwise meets applicable ordinances and is clearly incidental to the display itself.

(b) *Multifaced signs.* The sign face area of a sign with more than one face shall be computed by adding together the area of all sign faces visible from any one point. When two sign faces are placed back to back so that both faces cannot be viewed from any point at the same time and when the sign faces are part of the same sign structure and are no more than 36 inches apart, the sign face area shall be computed by the measurement of one of the faces.

16.2.3 *Sign height.* The height of a sign shall be computed as the distance from the base of the sign at normal grade prior to construction or the newly established grade after construction, exclusive of filling, berming, mounding, or excavating solely for the purpose of locating the sign.  In cases in which the

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 264 of 800   PageID #: 2278
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 185 of 293   PageID #: 877

*Baldwin County Zoning Ordinances*                                                    16-2

normal grade cannot be reasonably determined, sign height shall be computed on the assumption that the elevation of the normal grade at the base of the sign is equal to the elevation of the nearest point of the crown of a public street or the grade of the land at the principal entrance to the principal structure on the parcel, whichever is lower.

16.2.4 *Distance between signs.* The minimum required distance between signs shall be measured along street rights-of-way from the closest parts of any two signs.

16.2.5 *Façade area.* The façade area shall be measured by determining the area within a two-dimensional geometric figure coinciding with the edges of the walls, windows, doors, parapets, marquees, and roof slopes of greater than 45 degrees that form a side of a building or unit.

## Section 16.3 Exempt Signs

(a) Signs that are not designed or located so as to be legible from any street or adjoining property.

(b) Signs of 2 square feet or less and signs that include no letters, symbols, logos or designs in excess of 2 inches in vertical or horizontal dimension, provided that such sign, or combination of such signs, does not constitute a sign prohibited by these ordinances.

(c) One construction sign with a total sign face area of 32 square feet or less and a maximum height of 10-feet per street frontage located on property where building is actually in progress under a current building permit.

(d) Signs necessary to promote health, safety and welfare, and other regulatory, statutory, traffic control or directional signs erected on public property with permission as appropriate from Baldwin County, the State of Alabama, or the United States.

(e) Legal notices and official instruments.

(f) Decorative flags and bunting for a celebration, convention, or commemoration of significance to the entire community when authorized by the Baldwin County Commission for a prescribed period of time.

(g) Holiday lights and decorations.

(h) Merchandise displayed behind storefront windows so long as no part of the display moves or contains flashing lights.

(i)  Memorial signs or tablets, historical markers, name of building and dates of erection when cut into any masonry surface or when constructed of bronze or other incombustible materials and attached to the surface of a building.

(j)  Signs incorporated into machinery or equipment by a manufacturer or distributor, which identify or advertise only the product or service dispensed by the machine or equipment, such as signs customarily affixed to vending machines, newspaper racks, telephone booths and gasoline pumps.

(k) Advertising and identifying signs located on taxicabs, buses, trailers, trucks or vehicle bumpers.

(l)  Public warning signs to indicate the dangers of trespassing, swimming, animals or similar hazards.

(m)Works of art that do not constitute advertising.

(n) Signs carried by a person.

(o) Signs affixed to water tanks by the water utility with a sign face area of 200 square feet or less per sign for water tanks with a storage capacity of less than 500,000 gallons and a sign face area of 350 square feet or less per sign for water tanks with a storage capacity of 500,000 gallons or more. A maximum of 2 such signs are permitted per water tank.

## Section 16.4  Prohibited Signs

It shall be unlawful to erect, cause to be erected, maintain or cause to be maintained, any sign not expressly authorized by, or exempted from, these ordinances.   The following signs are expressly prohibited unless otherwise exempted or expressly authorized by this article:

(a) Any sign with a sign face area greater than 200 square feet except as provided in _Section 16.3: Exempt Signs_.

(b) Signs that are in violation of the building code or electrical code adopted by Baldwin County.

(c) Any sign that, in the opinion of the Zoning Administrator, does or will constitute a safety hazard.

(d) Portable signs.

Defendants' Bates # 6989

(e) Signs with visible moving, revolving, or rotating parts or visible mechanical movement of any description or other apparent visible movement achieved by electrical, electronic, or mechanical means, except for traditional barber poles.

(f) Signs with lights or illuminations that flash, move, rotate, scintillate, blink, flicker or vary in intensity or color except for "time and temperature" signs.

(g) Strings of light bulbs used on commercially developed parcels for commercial purposes, other than traditional holiday decorations.

(h) Wind signs consisting of one or more banners, flags, pennants, ribbons, spinners, streamers or captive balloons, or other objects or material fastened in such a manner as to move freely upon being subjected to pressure by wind.

(i) Signs which incorporate projected images, which emit any sound that is intended to attract attention, or which involve the use of live animals.

(j) Signs that emit audible sound, odor, or visible matter such as smoke or steam.

(k) Signs or sign structures that interfere in any way with free use of any fire escape, emergency exit, or standpipe, or that obstruct any window to such an extent that light or ventilation is reduced to a point below that required by any provision of these ordinances or any other ordinance of Baldwin County.

(l) Signs that resemble any official sign or marker erected by any governmental agency, or that by reason of position, shape or color, would conflict with the proper functioning of any traffic sign or signal, or be of a size, location, movement, content, color or illumination that may be reasonably confused with or construed as, or conceal, a traffic control device.

(m)Signs that obstruct the vision of pedestrians, cyclists, or motorist traveling on or entering public streets.

(n) Non-governmental signs that use the words "stop," "look," "danger" or any similar word, phrase or symbol.

Defendants' Bates # 6990

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 267 of 800   PageID #: 2281
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 188 of 293   PageID #: 880

*Baldwin County Zoning Ordinances*                                                    *16-5*

(o) Signs, within 10-feet of public right-of-way or 100-feet of traffic-control lights, that contain red or green lights that might be confuse with traffic control lights.

(p) Signs that contain any lighting or control mechanism that causes unreasonable interference with radio, television or other communication signals.

(q) Signs that are painted, pasted, or printed on any curbstone, flagstone, pavement, or any portion of any sidewalk or street, except house numbers and traffic control signs.

(r) Signs placed upon benches, bus shelters or waste receptacles, except as may be authorized in writing.

(s) Signs erected on public property or on private property located on public property (such as private utility poles) other than signs erected by a public authority for public purposes or as otherwise permitted by these ordinances.

(t) Signs erected over or across any public street except as may otherwise be expressly authorized by these ordinances and except governmental signs erected by or on the order of a public officer.

(u) Roof signs placed above the roof line of a building or on or against a roof slope of less than 45 degrees.

(v) Vehicle signs with a total sign area in excess of 10 square feet when the vehicle is parked for more than sixty consecutive minutes within 100-feet of any street right-of-way; is visible from the street right-of- way that the vehicle is within 1000-feet of and is not regularly used in the conduct of the business advertised on the vehicle. A vehicle used primarily for advertising shall not be considered a vehicle used in the conduct of the business.

## Section 16.5 Permitted Signs

16.5.1 *Generally.* The signs enumerated in this section shall be subject to all the terms of this article including the requirement that a sign certificate be obtained prior to erection of any sign in excess of one (1) sign on a parcel or a total sign face area of 6 square feet on a parcel. Exemption from the requirement to obtain a sign certificate, does not necessarily indicate exemption from any other requirement or permit that may be required by this or any other agency.

16.5.2 *All parcels.*

(a) *Directional signs.* Directional signs limited in area to 4 square feet, giving directions to motorists regarding the location of parking areas and access drives shall be permitted on all parcels and shall not be counted as part of an occupant's allowable sign area.

(b) *Flags.* Not more than 3 flags or insignias of religious, charitable, fraternal or other organizations may be displayed on any one parcel of land. Such flags shall not exceed 60 square feet in area and shall not be flown from a pole the top of which is more than 40- feet in height. All flags must be flown in accordance with protocol established by the Congress of the United States for the Stars and Stripes. Any flag not meeting the above requirements shall be considered a banner and shall be subject to the appropriate ordinances.

(c) *Utility signs.* Public utility signs that identify the location of underground utility lines and facilities, high voltage lines and facilities, and other utility facilities and appurtenances are permitted so long as they do not exceed 3-feet in height, and so long as the sign face does not exceed ½ square foot.

16.5.3 *Commercially developed parcels.*

16.5.3.1   *Freestanding signs.* Signs may be placed in a freestanding location on a commercially developed parcel subject to the following limitations:

|  | <100' frontage on a public right-of-way | >100' & <200' frontage on a public right-of-way | >200' & <300' frontage on a public right-of-way | >300' frontage on a public right-of-way |
|---|---|---|---|---|
| Maximum number of signs | 1 | 1 | 2 | 3 |
| Maximum total sign area (square feet) | 48 | 72 | 96 | 144 |
| Maximum sign area for individual sign | 48 | 72 | 72 | 72 |
| Minimum setback from side property line (feet) | 15 | 20 | 50 | 50 |
| Minimum distance from any other freestanding sign on the same site (feet) | N/A | N/A | 100 | 100 |
| Maximum height (feet) | 20 | 20 | 20 | 20 |

Defendants' Bates # 6992

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 269 of 800   PageID #: 2283
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 190 of 293   PageID #: 882

*Baldwin County Zoning Ordinances*                                                              *16-7*

*Multiple frontages.* For a parcel having frontage on two (2) or more public streets, each frontage shall be considered separately for the purposes of determining compliance with the above provisions for freestanding signs, but the permitted sign area for one frontage may not be combined with that permitted on another frontage to increase the permitted sign area on one frontage.

16.5.3.2 *Building signs.* Signs not expressly prohibited by this article may be attached to the wall of a building on a commercially developed parcel subject to the following limitations:

(a) Building signs shall be limited to a maximum height of 30-feet above grade, except that on a building of more than 30-feet in height, a single sign is allowed above 30-feet on each side of the building.

(b) Each multiple occupancy complex may display one building sign on each side of the principal building or building in the complex, not to exceed a sign face area of 200 square feet or 5% of the facade area of the building side, whichever is smaller.

(c) Each occupant of a multiple occupancy complex may display 3 building signs on any exterior portion of the complex that is part of the occupant's unit, not including common or jointly owned portions, not to exceed a sign face area of 200 square feet each or a total combined sign face area of 10% of the facade area of such exterior portion, whichever is smaller.

(d) Each occupant not located in a multiple occupancy complex may display 3 building signs on each side of the building in which the occupant is located, not to exceed a sign face area of 200 square feet each or a total combined face area of 10% of the facade area of the building side, whichever is smaller.

16.5.3.3 *Time and temperature signs.* Time and temperature signs are permitted on commercially developed parcels notwithstanding a general prohibition on changing or animated signs. These signs may only display numerical information. They may be freestanding or attached to a building and are subject to the ordinances applicable to such signs. They shall be counted as part of the occupant's allowable sign area.

16.5.4 *Undeveloped parcels.* Undeveloped parcels may display one square foot of signage per 10-feet of frontage up to a maximum of 96 square feet. No individual sign shall exceed 64 square feet nor exceed 10-feet in height. Signs must be spaced at least 100-feet apart.

16.5.5 *One-family and two-family residences.* A parcel on which is located a single one-family or two- family residence may display not more than 2 signs with an aggregate sign area of not more than 10 square feet.  No individual sign shall exceed 6 square feet nor exceed 4-feet in height.

16.5.6 *Three-family and four-family residences.*  A parcel on which is located a single three-family or four-family residence may display not more than 4 signs with an aggregate sign area of not more than 16 square feet.  No individual sign shall exceed 6 square feet nor exceed 4-feet in height.

16.5.7 *Residential developments, farms and ranches.* A sign may be displayed at the entrance to a residential development, farm or ranch subject to the following restrictions.  One sign is permitted at each entrance from an abutting street. The sign may be a single sign with 2 faces of equal size or may be 2 single-faced structures of equal size located on each side of the entrance. No face of the sign shall exceed 48 square feet in size, and may be illuminated in steady light only.

**Section 16.6      Design, Construction, Location and Maintenance Standards**

16.6.1 *Compliance with building and electrical codes required.* All permitted signs, and the illumination thereof, shall be designed, constructed and maintained in conformity with applicable provisions of the building and electrical codes adopted by Baldwin County. Wherever there is inconsistency between these ordinances and the building or electrical code, the more stringent requirements shall apply.

16.6.2 *Illumination standards.*

(a) Sign lighting may not be designed or located to cause confusion with traffic lights.

(b) Illumination by floodlights or spotlights is permissible so long as none of the light emitted shines directly onto an adjoining property or into the eyes of motorists or pedestrians using or entering public streets.

(c) Illuminated signs shall not have lighting mechanisms that project more than 18 inches perpendicularly from any surface of the sign over public space.

16.6.3 *Placement and clearance standards.*

(a) Signs shall be located such that there is at every intersection or driveway, a clear view between heights of 3 and 10-feet in a triangle

Case 1:20-cv-00057-C Document 77 Filed 02/02/22 Page 271 of 800 PageID #: 2285
Case 1:20-cv-00057-C Document 45-1 Filed 05/21/21 Page 192 of 293 PageID #: 884

formed by the corner of points on the curb 70-feet from the intersection or entranceway.

(b) Supports for signs or sign structures shall not be placed in or upon a public right of way or public easement, except under the terms of a lease between the owner of the easement or right of way and the owner of the sign.

(c) No freestanding sign shall project over a public right of way.

(d) No sign or sign structure shall be erected that impedes use of any fire escape, emergency exit, or standpipe.

(e) All sign over pedestrian ways shall provide a minimum of 7 ½ feet of clearance.

(f) All signs over vehicular ways shall provide a minimum of 13 ½ feet of clearance.

16.6.4 _Relationship to building features._

(a) A building sign shall not extend beyond any edge of the surface to which it is attached, nor disrupt a major architectural feature of the building.

(b) A building sign may project no more than 4-feet perpendicularly from the surface to which it is attached.

(c) The combined area of permanent and temporary signs placed on or behind windows shall not exceed 25% of the total window area at the same floor level on the side of the building or unit upon which the signs are displayed.

16.6.5 _Maintenance._ All signs, including their supports, braces, guys and anchors, electrical parts and lighting fixtures, and all painted and display areas, shall be maintained in accordance with the building and electrical codes adopted by Baldwin County, and shall present a neat and clean appearance. The vegetation around, in front of, behind, and underneath the base of freestanding signs for a distance of 10-feet shall be neatly trimmed and free of unsightly weeds, and no rubbish or debris that would constitute a fire or health hazard shall be permitted under or near the sign.

**Section 16.7     Administration**

16.7.1 _Sign certificate._

Defendants' Bates # 6995

16.7.1.1 *Applicability.* No person shall erect a sign without first obtaining a sign certificate therefore, except for the following actions which shall not require a certificate:

(a) Changing the copy, announcement or message on a sign.

(b) Cleaning, painting, electrical or comparable maintenance or repair of a sign that does not alter any regulated feature of the sign.

(c) Erecting a sign for which a sign certificate is not required in accordance with *Section 16.3: Exempt Signs* and *Section 16.5: Permitted Signs.*

16.7.1.2 *Procedure.* All sign certificates shall be procured in accordance with the following procedure:

(a) A written application shall be submitted to the Zoning Administrator for review and processing. The application will be accepted only upon determination that all requisite documentation and fees accompany the application form.   The application shall include such supplementary information as may be specifically requested by the Zoning Administrator to determine compliance with these ordinances.

(b) The Zoning Administrator shall review the application and plans and specifications to determine whether the proposed sign conforms to all applicable requirements of these ordinances.

(c) Following review and determination as to conformance with these ordinances, the Zoning Administrator shall, in a reasonably expeditious manner, either approve or deny the application for the sign certificate. In case of denial, the Zoning Administrator shall specify the section or sections of these ordinances with which the proposed sign is not in conformance.

(d) If an approved sign requires a permit from the Department of Building Inspections, the Zoning Administrator shall forward a copy of the completed application form and associated plans and specifications to the Building Official who shall determine whether the proposed sign conforms to all applicable requirements of the building ordinances and who shall, in a reasonably expeditious manner, either approve or deny an application for a permit to construct the sign.

16.7.1.3 *Submission requirements.* No request for a sign certificate shall be considered complete until all of the following has been submitted to the Zoning Administrator:

Defendants' Bates # 6996

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 273 of 800   PageID #: 2287
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 194 of 293   PageID #: 886

*Baldwin County Zoning Ordinances*                                                      *16-11*

(a) *Application form.* The application shall be submitted to the department on forms made available by the department.

(b) *Statement of authorization.* Any application form which is signed by an individual other than the property owner shall be accompanied by a notarized statement of authorization consenting to the sign placement or, if the property or building upon which the sign is to be located is leased, evidence of the executed lease shall accompany the application form. In the event the building or property is leased and the application form is signed by an individual other than the lessor, the application shall be accompanied by a notarized statement of authorization signed by the lessor consenting to the sign placement and evidence of the executed lease.

(c) *Plans and specifications.* Plans and specifications for any proposed sign shall be submitted in duplicate, drawn to scale and include the following:

1. Lot frontage on all street rights-of-way.

2. Facade area of any wall on which a sign is proposed to be placed.

3. Dimensions for the supporting members of the sign.

4. Maximum and minimum height of sign, as measured from finished grade.

5. Dimensions and elevations (including the message) of the sign.

6. Location of the sign in relation to property lines, public rights-of-way, easements, buildings, and other signs on the property.

7. For illuminated signs, the type, placement, intensity and hours of illumination.

8. Construction and electrical specifications, for the purpose of enabling determination that the sign meets all applicable structural and electrical requirements of the building code.

9. Value of the proposed sign.

10. Number, type, location and surface area of all existing signs on the same property and/or building on which the sign is to be located.

*Baldwin County Zoning Ordinances*                                                                16-12

(d) *Application fee.* The applicant for a sign certificate shall be required to pay an application fee according to the current schedule of fees established by the County Commission for the particular category of application.  This fee shall be nonrefundable irrespective of the final disposition of the application.

16.7.1.4 *Sign certificate expiration.* A sign certificate shall be valid for a maximum of 180 days after issuance.

16.7.2 *Variances.* Any request for a variance from the standards set forth in this article shall be processed according to the procedures and criteria for variances as set forth in *Article 18:  Administration*.

16.7.3 *Nonconforming signs.*

16.7.3.1 A nonconforming sign is any sign within the jurisdiction of the *Baldwin County Zoning Ordinances* on the effective date of this article or any sign existing within a Planning District added to such jurisdiction after the effective date of this article which is prohibited by, or does not conform to the requirements of these ordinances.

16.7.3.2 Subject to the limitations imposed by *Section 16.7.5: Illegal signs,* a nonconforming sign may be continued and shall be maintained in good condition as required by these ordinances, but it shall not be:

(a) Structurally changed to another nonconforming sign, but its pictorial content may be changed.

(b) Structurally altered to prolong the life of the sign, except to meet safety requirements.

(c) Expanded or altered in any manner that increases the degree of nonconformity.

(d) Reestablished after damage or destruction if the estimated cost of reconstruction exceeds 50% of the appraised replacement cost as determined by the Zoning Administrator.

(e) Continued in use when a conforming sign or sign structure shall be erected on the same parcel or unit.

(f) Continued in use when the structure housing the occupancy is demolished or requires renovations the cost of which exceeds 50% of the assessed value of the structure.

16.7.4 *Abandoned signs.*

Defendants' Bates # 6998

(a) Except as otherwise provided in this article, any sign that is located on property which becomes vacant and unoccupied, pertains to a business which does not maintain a current business license, or pertains to a time, event or purpose which no longer applies, shall be deemed to have been abandoned.  Any abandoned sign shall be prohibited and shall be removed by the owner of the sign or the owner of the property.  The frame of an abandoned sign shall not be required to be removed if it conforms to all applicable terms contained in these ordinances (including the sign face area for sign replacement yielded by such frame).

(b) Any sign structure which supported an abandoned sign and which structure conforms to all applicable terms contained in these ordinances shall be allowed to remain in place.  However, in the event a sign structure which supported or supports an abandoned sign is inconsistent with any term contained in these ordinances (including the sign face area for sign replacement yielded by the frame), then the sign structure and frame shall be either altered to comply with the terms contained herein or removed by the owner of such structure or property.

16.7.5 *Illegal signs.*

(a) The following signs shall be considered to be illegal and a violation of the terms of this article:

1. A sign erected or maintained after the effective date of these ordinances inconsistent with the terms contained herein.

2. A nonconforming sign which was erected inconsistent with the terms governing location, height, surface area or other regulatory measure applicable at the time of its erection.

3. An abandoned sign.

(b) Upon determination by the Zoning Administrator that a certain sign is illegal, the Zoning Administrator shall act to remedy the violation, which may include:

1. The issuance of a notice of violation to the individual who owns, is responsible for or benefits from the display of such sign prescribing the action necessary to make the sign legal and conforming to the terms contained herein or ordering the removal of the illegal sign and also prescribing the time which the individual is afforded to accomplish such action.

Defendants' Bates # 6999

2. The removal of any illegal sign located on public property or on private property located on public property, including any such sign located within a street right-of-way in which case the county shall have the right to recover from the individual erecting such a sign the full costs of removal and disposal.

(c) Failure to bring any illegal sign into conformance with the terms contained in this article or any other violation of the terms contained in this article shall be considered a violation of the *Baldwin County Zoning Ordinances* and shall be subject to the remedies and penalties provided by such ordinances and by state law.

Defendants' Bates # 7000

## Article 17  Landscaping and Buffers

### Section 17.1        Landscaping Plan

A landscaping plan is required for all major projects.  Such plan shall be submitted in conjunction with an application for a land use certificate as herein provided. The plan shall clearly show what existing trees, shrubbery, and other vegetation will be retained, and what trees, shrubbery, and other vegetation will be added to complete the landscaping of the property.  The developers shall attempt to retain as many trees as possible on the property unless the trees are a safety hazard to pedestrians, property, or vehicular traffic, or that their removal is necessary to construct the proposed improvements.  In such case, the landscape plan shall indicate replacement trees at least 6 feet tall and one inch in diameter for each indigenous tree of at least three (3) inches in diameter removed, unless the property already has a tree density which does not allow adequate space or light for additional trees.  The landscape plan shall show the locations of the proper number of replacement trees. Replacement trees and other vegetation to be installed shall be native species or noninvasive exotics which are not likely to out-compete native vegetation and do not require excessive pesticides, fertilizer, or water to maintain growth.

> (a) A major project which abuts a freeway/expressway, arterial or collector shall maintain a minimum of ten (10) feet of the required setback as a buffer along the entire width of the property which abuts said freeway/expressway, arterial or collector except where curb cuts provide ingress and egress. Said buffer shall be planted with trees, shrubs and grass or other ground cover so that an attractive appearance is presented as detailed in the required landscape plan.

> (b) A minimum of five (5) feet side and rear landscaping may be required in the landscape plan depending on the topography and arrangement of parking facilities.  If required, such areas shall be planted with a combination of trees, shrubs and grass or other ground cover adequate to break the expanse of contiguous parking areas and to present an attractive appearance as determined by the Zoning Administrator.   Adjacent property owners may jointly agree on the establishment of a common landscaped area between their properties that meets the requirement of this Section; provided that such agreement and the planting and maintenance of the common area shall be binding upon both parties and their successors, interests and assigns.

> (c) Junk yards shall be buffered with vegetation so as to achieve a complete visual screen of the yard and its ancillary operations.

**Section 17.2        Buffers of Unlike Land Uses and Zoning Designations**

17.2.1 *Purpose and intent.* Where unlike land uses or zoning designations occur, a buffer shall be required along the entire length of all such common boundaries. Said buffer shall be of the width specified below and shall be planted with canopy trees, understory trees and shrubs of sufficient density and of sufficient height (but in no case less than 8-feet high at the time of planting for canopy trees and 4-feet high at the time of planting for understory trees) to afford adequate sight, sound and debris protection. All screen planting shall be maintained in a clean and healthy condition.

17.2.2 *Buffer Requirements.* Landscaped buffers shall be located at the perimeter of the building site for any given use, and shall not be located in any portion of a public right-of-way. The required buffer widths are listed below. Additional information may be found at Appendix B:

> (a) Multiple Family uses (RMF-6) when adjacent to a Rural District (RR, RA and CR), Residential Single Family Estate District (RSF-E) or Single Family District (RSF-1, RSF-2, RSF-3, RSF-4 and RSF-6) shall require a minimum buffer of **25-feet**.

> (b) Multiple Family uses (RMF-6) when adjacent to a Two Family District (RTF-4 and RTF-6) or Professional Business District (B-1) shall require a minimum buffer of **10-feet**.

> (c) Institutional uses, Professional Business uses (B-1), Neighborhood Business uses (B-2), General Business uses (B-3), Major Commercial uses (B-4) and Marine Recreation (MR) uses when adjacent to a Rural District (RR, RA and CR), Residential Single Family Estate District (RSF-E) or Single Family District (RSF-1, RSF-2, RSF-3, RSF-4 and RSF-6) shall require a minimum buffer of **25-feet**.

> (d) Institutional uses, Professional Business uses (B-1), Neighborhood Business uses (B-2), General Business uses (B-3), Major Commercial uses (B-4) and Marine Recreation (MR) uses when adjacent to a Two Family District (RTF-4 and RTF-6) or Multiple Family District (RMF-6) shall require a minimum buffer of **10-feet**.

> (e) Manufactured Housing Parks (RMH) when adjacent to a Residential Single Family Estate District (RSF-E) or Single Family District (RSF-1, RSF-2, RSF-3, RSF-4 and RSF-6) shall require a minimum buffer of **25-feet**.

> (f) Manufactured Housing Park (RMH) when adjacent to a Two Family District (RTF-4 and RTF-6), Multiple Family District (RMF-6) or

Professional Business District (B-1) shall require a minimum buffer of **10-feet**.

(g) Light Industrial uses (M-1), General Industrial uses (M-2) and Transportation, Communication and Utility uses when adjacent to any residential property shall require a minimum buffer of **75-feet**.

(h) Light Industrial uses (M-1), General Industrial uses (M-2) and Transportation, Communication and Utility uses when adjacent to any Business District (B-1, B-2, B-3 and B-4) shall require a minimum buffer of **50-feet**.

17.2.3 *Landscaped buffer design and materials.*

(a) *Existing native plant material.* The use of existing native species of plant material is strongly encouraged in landscaped buffers. Existing natural ground cover should be retained where possible by avoiding scraping, grading and sodding within the landscaped buffer. Where the planting requirements of *Section 17.2.2* require additional trees or shrubs to be installed in an existing natural area, it should be done in a manner which minimizes disturbances to native species.

(b) *Mixed-use development.* Where a building site is used for a single mixed-use development, landscaped buffers shall not be required between the various constituent uses. Landscaped buffers required at the perimeter of the development shall be based upon the individual uses on each portion of the property.

17.2.4 *Use of landscaped buffers.*

(a) *Open space.* Landscaped buffers may be counted toward satisfying open space requirements, and may be used for passive recreation. They may contain pedestrian or bike trails, provided that the total width of the buffer yard is maintained. In no event, however, shall the following uses be permitted in landscaped buffers: playfields, stables, swimming pools, tennis courts, parking lots and vehicular use areas, dumpsters, equipment storage and other open storage, buildings or overhangs.

(b) *Stormwater retention/detention facilities.* The Planning and Zoning Director shall be authorized to allow stormwater retention/detention facilities to encroach into landscaped buffers a maximum of twenty-five (25) percent of buffer width, where it is found that all planting requirements of this section are met and the visual screen provided by the landscaped buffer will be fully achieved.

(c) *Ingress and Egress.* Ingress and egress to the proposed use and utilities may cross the buffer provided they minimize the amount of buffer devoted to this use.

(d) *Lighting, fences, walls and Signs.* Lighting, fences, walls and identification signs may be located within the required buffer.

(e) *Pedestrian walkways.* Sidewalks, walkways and paths may be allowed within the required buffer, provided that:

    1. The total width of buffer is maintained.

    2. All other requirements of this ordinance are met.

17.2.5 *Definitions.*

(a) *Canopy Trees.* For the purposes of this section, a tree is defined as a plant species having an average mature crown spread of fifteen (15) feet or greater when growing in Baldwin County and having a trunk(s) that eventually can be maintained in a clean condition, clear of lateral woody growth of five (5) feet or greater. Canopy tree species as defined shall be a minimum of eight (8) feet overall height immediately after planting with at least a two (2) inch diameter (caliper). Trees having average, eventual mature crown spread of less than fifteen (15) feet may be substituted by grouping the same so as to create the equivalent of a fifteen (15) foot crown spread. A grouping of three (3) large growing palms will be the equivalent to one (1) required canopy tree. All trees shall be located no closer than three (3) feet from the edge of any designated planting area.

(b) *Understory trees.* Understory tree species as defined shall be a minimum of four (4) feet overall height immediately after planting with at least a one (1) inch diameter (caliper).

(c) *Shrubs.* For the purposes of this section a shrub shall be defined as any self supporting woody evergreen or flowering species generally growing or maintained at a height of five (5) feet or less. Shrubs shall be a minimum of twenty-four (24) inches in height when measured immediately after planting and planted a maximum of thirty-six (36) inches on center.

17.2.6 *Plant and Structure Location.* All plant materials shall be installed to achieve the purposes for which that planting is required. The required planting should generally be in an irregular line and should be spaced at random intervals in order to achieve maximum growth for each plant and tree species.

Defendants' Bates # 7004

(a) Canopy trees shall be located no closer than ten (10) feet from any structure.  Under story trees and shrubs shall be planted no closer than three (3) feet from any structure.

(b) To avoid a power line conflict, vegetation that exceeds twenty-five (25) feet in height at maturity shall not be included closer than thirty (30) feet of the vertical plane of an existing power line.

(c) Visibility Triangles contained in *Section 16.6.3* shall be maintained.

17.2.7 *Landscape Plans.* Whenever the provisions with this section apply, a landscaping plan shall be submitted for review. The landscape plan may be submitted in conjunction with a Land Use Certificate for a structure or be submitted through a separate Land Use Certificate, and may be included on the site plan which is required for Land Use Certificate approval.

The landscape plan must be drawn to scale, with a narrative and any necessary calculations, and include the following:

(a) Dimensions and North Arrow.

(b) Preserved trees.

(c) Locations of proposed signs and lightning.

(d) Locations of proposed sidewalks or other paths and ingress and egress locations and widths.

(e) Proposed location and spacing of all required plantings.

(f) Overhead and underground utilities existing and proposed.

(g) Subject property zoning and current use and adjoining property zoning and current use.

The landscape buffer plan shall be submitted along with a Land Use Certificate. Prior to the issuance of a Certificate of Occupancy (CO) the Planning and Zoning Department shall conduct an inspection to insure the buffer is installed as required.

17.2.8 *Responsibility for Maintenance.* The property owner on which the buffer is located shall be responsible for maintenance of the buffer. Dead or dying trees or shrubs shall be replaced as soon as practicable so as to provide the intended screening and buffering affect.  If, in the determination of the Zoning Administrator, dead or dying trees or shrubs are present, the property owner will be notified and the trees or shrubs must be replaced. Failure to replace trees or

Defendants' Bates # 7005

shrubs after notification shall be deemed a violation of the *Baldwin County Zoning Ordinances*.

17.2.9 *Recommended Species*

**(i)    Shrubs (deciduous)**

Aesculus sylvatica (buckeye)
Alnus serrulata (smooth alder)
Amelanchier arborea (downy serviceberry, shadbush, Juneberry)
Amorpha fruticosa (false indigo, Indigo bush)
Baccharis halimifolia (sea myrtle, groundsel bush)
Callicarpa americana (American beautyberry, French mulberry)
Calycanthus floridus (Carolina allspice, sweet shrub)
Castanea pumila (chinquapin)
Ceanothus americanus (New Jersey tea, red root)
Cephalanthus occidentalis (buttonbush)
Clethra alnifolia (summer sweet)
Cornus alternifolia (pogoda dogwood, alternate-leaved dogwood)
Corylus americana (American hazelnut or filbert)
Diervilla sessilifolia (southern bush honeysuckle)
Dirca palustris (leatherwood, ropebark)
Erythrina herbacea (coral bean)
Euonymus americana (strawberry bush, brook euonymus, hearts-a-bustin')
Euonymus atropurpurea (wahoo, burning bush)
Forestiera acuminata (swamp privet)
Fothergilla major (witch alder)
Frangula caroliniana (Carolina buckthorn)
Hibiscus coccineus (wild red mallow)
Hydrangea arborescens (wild hydrangea)

Hydrangea quercifolia (oakleaf hydrangea)
Hypericum hypericoides ssp. hypericoides (St. Andrew's cross)
Hypericum prolificum (shrubby St. John's wort)
Ilex verticillata (winterberry, black alder)
Itea virginica (Virginia willow, sweetspire, tassel-white)
Lindera benzoin (spicebush)
Lycium carolinianum (Christmas berry, matrimony vine)
Lyonia ligustrina (male-berry, male-blueberry)
Physocarpus opulifolius (ninebark)
Rhododendron atlanticum (dwarf, or coastal azalea)
Rhododendron canescens (wild, piedmont, or sweet azalea)
Rhododendron calendulaceum (flame azalea)
Rhododendron viscosum (swamp azalea)
Rhododendron arborescens (smooth azalea)
Rhus hirta (staghorn sumac)
Rhus copallinum (dwarf or winged sumac)
Rhus glabra (smooth sumac)
Ribes cynosbati (prickly gooseberry, dogberry)
Rosa carolina (Carolina rose)
Rosa setigera (Illinois or prairie rose)
Sambucus canadensis (elderberry, common elder)
Sideroxylon lanuginosum ssp. lanuginosum (chittamwood, gum elastic tree)
Spiraea tomentosa (steeplebush,

Defendants' Bates # 7006

hardhack)
Staphylea trifolia (bladdernut)
Stewartia malacodendron (silky camellia)
Styrax americanus (American silverbells)
Symphoricarpos orbiculatus (coralberry, Indian currant)
Vaccinium arboreum (sparkleberry, farkleberry)
Vaccinium corymbosom (highbush blueberry)

Viburnum acerifolium (maple leaf viburnum)
Viburnum dentatum (southern arrowwood)
Viburnum nudum (possumhaw viburnum)
Viburnum nudum var. cassinoides (wild raisin)
Viburnum prunifolium (black haw, nanny berry)
Viburnum rufidulum (southern or rusty black haw)

## (ii)   Shrubs (evergreen)

Epigaea repens (trailing arbutus)
Gordonia lasianthus (loblolly bay, gordonia)
Ilex glabra (inkberry, bitter gallberry)
Ilex vomitoria (yaupon)
Illicium floridanum (Florida anise tree)
Juniperus communis (common juniper)

Kalmia latifolia (mountain laurel)
Leucothoe axillaris (coast leucothoe)
Myrica cerifera (wax myrtle, southern bayberry, candleberry)
Rhododendron carolinianum (Carolina rhododendron)
Rhododendron catawbiense (purple rhododendron, red laurel)
Sabal minor (dwarf palmetto)
Serenoa repens (saw palmetto)

## (iii)   Trees (deciduous)

Acer barbatum (Florida maple, southern sugar maple)
Acer leucoderme (chalk maple)
Acer negundo (box elder)
Acer rubrum (red maple)
Acer saccharum (sugar maple)
Aesculus flava (sweet buckeye, yellow buckeye)
Aesculus glabra (Ohio buckeye, horse chestnut)
Aesculus pavia var. pavia (red buckeye)
Betula lenta (cherry birch)

Betula nigra (river birch)
Carpinus caroliniana (blue beech, hornbeam, muscle wood)
Carya alba (mockernut hickory)
Carya cordiformis (bitternut, swamp hickory)
Carya illinoinensis (pecan)
Carya ovata (shagbark hickory)
Celtis laevigata (sugarberry, hackberry)
Celtis occidentalis (hackberry, sugarberry)
Cercis canadensis (redbud)
Chionanthus virginicus (fringe tree,

old man's beard)
Cladrastis kentukea (yellowwood)
Cornus florida (flowering dogwood)
Cotinus obovatus (smoke tree)
Crataegus mollis (downy hawthorn)
Crataegus crus-galli (cockspur hawthorn)
Cyrilla racemiflora (leatherwood, yiti)
Diospyros virginiana (persimmon)
Fagus grandifolia var. caroliniana (beech)
Fraxinus americana (white ash)
Fraxinus pensylvanica (green ash)
Gleditsia triacanthos (honey locust)
Gymnocladus dioica (Kentucky coffee tree)
Halesia diptera (American snowdrop tree, two-winged silverbell)
Halesia tetraptera (Carolina silverbell)
Hamamelis virginiana (witch hazel)
Ilex decidua (possum-haw, deciduous holly)
Juglans cinerea (butternut, white walnut)
Juglans nigra (black walnut)
Liquidambar styraciflua (sweet gum)
Liriodendron tulipifera (tulip tree)
Magnolia acuminata (cucumber tree)
Magnolia pyramidata (pyramid magnolia)
Magnolia tripetala (umbrella tree)
Magnolia virginiana (sweetbay, swampbay)
Malus angustifolia (southern crabapple, wild crabapple)
Nyssa sylvatica (black gum, tupelo)

Ostrya virginiana (ironwood, hop hornbeam)
Oxydendrum arboreum (sourwood)
Platanus occidentalis (sycamore, plane-tree)
Populus deltoides (eastern cottonwood)
Prunus americana (wild plum)
Prunus angustifolia (chickasaw plum)
Prunus mexicana (Mexican plum)
Prunus serotina (black cherry)
Ptelea trifoliata (wafer ash, common hop tree)
Quercus alba (white oak)
Quercus bicolor (swamp white oak)
Quercus coccinea (scarlet oak)
Quercus falcata (southern red oak, Spanish oak)
Quercus laurifolia (laurel oak)
Quercus lyrata (overcup oak)
Quercus macrocarpa (bur oak)
Quercus marilandica (blackjack oak)
Quercus muhlenbergii (chinkapin oak, chestnut oak)
Quercus phellos (willow oak)
Quercus prinus (rock chestnut oak)
Quercus rubra (red oak)
Quercus shumardii (shumard oak)
Quercus stellata (post oak)
Quercus velutina (black oak)
Salix nigra (black willow)
Sassafras albidum (sassafras)
Taxodium distichum (bald cypress)
Ulmus americana (American elm)
Ulmus rubra (red elm, slippery elm)

---

**(iv)   Trees (evergreen)**

Chamaecyparis thyoides (white cedar)
Ilex opaca (American holly,

Christmas holly)
Juniperus virginiana (eastern red cedar)
Magnolia grandiflora (southern

Defendants' Bates # 7008

magnolia)
Magnolia macrophylla (umbrella
tree)
Persea borbonia (red bay)
Pinus echinata (shortleaf pine)
Pinus elliotii (slash, pitch, or yellow
slash pine)
Pinus glabra (spruce pine)
Pinus palustris (longleaf pine)
Pinus taeda (loblolly pine)
Pinus virginiana (Virginia pine)
Prunus caroliniana (cherry laurel)
Quercus virginiana (live oak, coastal
live oak, southern live oak)
Tsuga canadensis (eastern hemlock)

**Section 17.3          Tree Protection**

During construction and development, trees that are to be preserved shall be protected from activities that may injure or kill them. To the extent possible, trees within the required setbacks or buffer strips shall be preserved.

**Section17.4          Parking Lots**

The design and appearance of parking areas is intended to be compatible with the character of the community. A landscaping plan shall be submitted for the construction of the off-street parking areas accommodating 6 or more parking spaces. The following standards shall apply:

> (a) A landscaped area of at least five (5) feet wide shall be provided between parking areas and any adjacent public streets and contiguous properties. Landscaping shall include the placement of shade trees at intervals of approximately six (6) parking spaces. Such trees shall be a minimum height of six (6) feet at planting.

> (b) Interior portions of the parking area shall be broken by provision of landscaped islands (a minimum of six (6) feet wide) between every ten (10) to fifteen (15) spaces.  Each island shall provide at least one (1) shade tree having a minimum height of six (6) feet at planting.

> (c) A continuous landscape strip a minimum of five (5) feet wide shall be provided between every four (4) rows of parking. Landscaping shall include the placement of shade trees at intervals of approximately six (6) parking spaces. Such trees shall be a minimum height of six (6) feet at planting.

> (d) Landscaped areas shall be protected from vehicular encroachment by the use of curbing or wheel stops.

> (e) The owner, tenant and/or agent, if any, shall be jointly and severally responsible for watering and maintaining all landscaping in a healthy, neat, and orderly condition, replacing it when necessary, and keeping it free of refuse and debris.

Defendants' Bates # 7010

## Article 18   Administration

### Section 18.1 Administration, Interpretation and Enforcement

18.1.1 The duty of administering and enforcing the provisions of these zoning ordinances is hereby conferred upon the Zoning Administrator.

18.1.2 The Zoning Administrator is authorized and empowered to administer and enforce the provisions of these zoning ordinances to include receiving applications, inspecting sites, and issuing land use certificates for projects and uses and structures which are in conformance with the provisions of these zoning ordinances.

18.1.3 The Zoning Administrator shall keep records of all permits and certificates issued and maps, plats, and other documents with notations of all special conditions involved.  He shall file and safely keep copies of all sketches and plans submitted, and the same shall form a part of the records of his office and shall be made as a public record.

18.1.4 Where the exact location of a boundary cannot be determined by the methods described in *Section 12.10: Rules for Determining Zoning District Boundaries*, the Zoning Administrator shall interpret the map and render a decision.  Any such decision may be appealed to the Board of Adjustment.

18.1.5 In any case where a requested use is not specifically provided, the Zoning Administrator shall determine the appropriate zoning classification by reference to the most clearly analogous use or uses that are specifically provided.

### Section 18.2 Land Use Certificates

18.2.1 *Authorization.*   A land use certificate shall be obtained from the Zoning Administrator prior to the commencement of development and issuance of any building permit including electrical, HVAC and plumbing permits.

18.2.2 *Application procedure.*

> (a) The Zoning Administrator shall receive the application for a land use certificate upon determination that it complies with all applicable submission requirements.

> (b) Where appropriate, the Zoning Administrator shall circulate the application to the Building Official, County Engineer, and/or Coastal Program Director for review and comment.

Defendants' Bates # 7011

(c) The land use certificate shall be issued or denied within 7 days otherwise it shall be deemed to be approved.

18.2.3 *Application submittal.*

(a) *Application form.*   The land use certificate shall be on a form provided by the Zoning Administrator.

(b) *Plans and specifications.*  Each application for a land use certificate shall be accompanied by an accurate site plan drawn to scale showing: the actual shape, dimensions and size of the lot to be built upon, the size, shape, height, floor area and location of the buildings to be erected; dimensions and locations of existing buildings; width of front, side and rear yards; existing and proposed parking; ingress to and egress from the site; and such other information as may be reasonably requested to determine compliance with these zoning ordinances including but not limited to a landscaping plan, erosion control plan, stormwater management plan, and utilities plan.

(c) *State and Federal permits.*  Written evidence of applications for all required permits showing compliance with ordinances of the Corps of Engineers, Alabama Department of Environmental Management, Alabama Coastal Area Management Program and Baldwin County Health Department shall accompany the application for a land use certificate, and the land use certificate may be conditioned upon the actual receipt of said permits by the applicant.

(d) *Application fee.*  The applicant for a land use certificate shall be required to pay an application fee according to the current schedule of fees established by the County Commission for the particular category of application.  This fee shall be nonrefundable irrespective of the final disposition of the application.

18.2.4 *Conditions and restrictions on approval.*  A land use certificate shall be valid for the issuance of a building permit for 180 days after issuance.  After that time a new land use certificate must be obtained.  A record of the application and site plan shall be kept in the files of the Zoning Administrator for a period of not less than 3 years.

18.2.5 *Revocation of land use certificate.*  The Zoning Administrator may revoke a land use certificate issued in a case where there has been a false statement or misrepresentation in the application or on the site plan for which the Certificate was issued or if after a documented warning has been issued the applicant has failed to comply with the requirements of these zoning ordinances.  Revocation of the land use certificate shall also cause suspension of the building permit until

Defendants' Bates # 7012

such time as in the judgment of the Zoning Administrator, the applicant is in compliance with the requirements of these zoning ordinances.

18.2.6 *Right of appeal.* The applicant may appeal the denial of the land use certificate to the Board of Adjustments in writing within twenty (20) calendar days after the rejection of the application.

## Section 18.3 Building Permits

It shall be unlawful to commence the excavation for or the construction of any building or other structures, including accessory structures, or to store building materials or erect temporary field offices, or to commence the moving, alteration, or repair of any structure, including accessory structures, until the Building Official has issued a permit for such work including a statement that the plans, specifications and intended use of such structure in all respects conform with the provisions of these zoning ordinances. Applications for building permits including electrical, HVAC and plumbing permits shall be made to the Building Official on forms provided for that purpose.

## Section 18.4 Certificate of Occupancy

No land or building or other structure or part thereof hereafter erected, moved or altered in its use shall be used until the Building Official shall have issued a Certificate of Occupancy stating that such land or structure or part thereof is found to be in conformity with the provisions of these zoning ordinances. It shall be the duty of the Building Inspector to make a final inspection thereof, and to issue a Certificate of Occupancy if the building or premises or part thereof is found to conform to the provisions of these zoning ordinances or, if such certificate is refused, to state the refusal in writing with the cause.

## Section 18.5 Appeals to the Board of Adjustment

18.5.1 The Board of Adjustment shall hear and decide appeals where it is alleged there is an error in any order, requirement, decision or determination made by the Zoning Administrator or other administrative official in the enforcement of these zoning ordinances.

18.5.2 Appeals to the Board of Adjustment may be taken by any person aggrieved or by any officer or department of Baldwin County affected by any decision of any administrative officer representing the County in an official capacity in the enforcement of these zoning ordinances. Such appeal shall be taken within 30 days of said decision by filing with the officer from whom the appeal is taken and with the Board of Adjustment a notice of appeal specifying the grounds thereof. The officer from whom the appeal is taken shall transmit forthwith to the Board of Adjustment all papers constituting the record upon which the action was taken.

Defendants' Bates # 7013

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 290 of 800   PageID #: 2304
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 211 of 293   PageID #: 903

*Baldwin County Zoning Ordinances*                                          *18-4*

18.5.3 An appeal stays all proceedings in furtherance of the action appealed from unless the officer from whom the appeal is taken certifies to the Board of Adjustment after the notice of appeal shall have been filed with him that by reason of facts stated in the certificate a stay would in his opinion cause imminent peril to life or property.   Such proceedings shall not be stayed otherwise than by a restraining order which may be granted by the Board of Adjustment or by a Court of Record on application and notice to the officer from whom the appeal is taken and on due cause shown.

**Section 18.6 Variances**

18.6.1 *Authorization.*   The Board of Adjustment shall authorize upon application in specific cases such variance from the terms of these zoning ordinances as will not be contrary to the public interest where, owing to special conditions, a literal enforcement of the provisions of these zoning ordinances will result in unnecessary hardship and so that the spirit of these zoning ordinances shall be observed and substantial justice done; provided, however, that the foregoing provisions shall not authorize the Board of Adjustment to approve a use or structure in a zoning district restricted against such use or structure.

18.6.2 *Standards for approval.*   A variance may be authorized based upon the existence of the following conditions:

> (a) Exceptional narrowness, shallowness or shape of a specific piece of property existing at the time of the enactment of these zoning ordinances.

> (b) Exceptional topographic conditions or other extraordinary situation or condition of a specific piece of property.

> (c) That the granting of the application is necessary for the preservation of a property right and not merely to serve as a convenience to the applicant or based solely upon economic loss.

> (d) That the granting of the application will not impair an adequate supply of light and air to adjacent property or unreasonably increase the congestion in public streets, or increase the danger of fire, or imperil the public safety, or unreasonably diminish or impair established property values within the surrounding areas, or in any other respect impair the health, safety, comfort, morals, or general welfare of the inhabitants of Baldwin County.

> (e) Any owner of record of real property upon the date of the adoption by the Baldwin County Commission of the zoning ordinances for the planning district in which said property is located shall automatically

Defendants' Bates # 7014

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 291 of 800  PageID #: 2305
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 212 of 293  PageID #: 904

*Baldwin County Zoning Ordinances*                                                          *18-5*

obtain a variance, if needed, for a single family dwelling notwithstanding the type of dwelling to be placed or constructed on the property.

## Section 18.7 Hearing of Appeals and Variances

18.7.1 *Application procedure.*

(a) Any appeal or application for variance must be submitted to the Planning & Zoning Department at least 15 days prior to the regularly scheduled meeting of the Board of Adjustment.

(b) The Zoning Administrator shall, upon determination that the application complies with all applicable submission requirements, receive the application and schedule it for public hearing by the Board of Adjustment.

(c) The Zoning Administrator shall, 5 days before the scheduled public hearing by the Board of Adjustment, provide notice of such hearing by certified mail to adjacent property owners as their names appear in the county tax records.

(d) The Board of Adjustment shall render a decision at the conclusion of the public hearing or within 45 days from the date of the public hearing if it is determined that action must be deferred to allow for additional input and review.

(e) Any application may be withdrawn prior to action thereon by the Board of Adjustment at the discretion of the applicant initiating the request upon written notice to the Zoning Administrator.

18.7.2 *Submission requirements.* No appeal or application for variance shall be considered complete until all of the following has been submitted:

(a) *Application form.* The application shall be submitted on forms to be provided by the Zoning Administrator.

(b) *Plans and specifications.* Each application shall be accompanied by an accurate site plan drawn to scale and such other information as may be reasonably requested to support the application.

(c) *State and Federal permits.* Written evidence of applications for all required permits showing compliance with regulations of the Corps of Engineers, Alabama Department of Environmental Management, Alabama Coastal Area Management Program and Baldwin County Health Department shall accompany the application.

Defendants' Bates # 7015

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 292 of 800   PageID #: 2306
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 213 of 293   PageID #: 905

*Baldwin County Zoning Ordinances*                                                          *18-6*

(d) *Application fee*. The applicant shall be required to pay an application fee according to the current schedule of fees established by the County Commission for the particular category of application. This fee shall be nonrefundable irrespective of the final disposition of the application; however, where an applicant is successful in reversing a decision of the Zoning Administrator the fee shall be returned to the applicant.

(e) *Association approval.* Prior approval from active neighborhood associations, boards or committees, if applicable, shall accompany all Board of Adjustment applications and requests.

## Section 18.8 Special Exceptions

18.8.1 *Authorization.*   The Board of Adjustment may, under the prescribed standards and procedures contained herein, authorize the construction or initiation of any use that is expressly permitted as a special exception in a particular zoning district; however, the county reserves full authority to deny any request for a special exception, to impose conditions on the use, or to revoke approval at any time, upon finding that the permitted use will or has become unsuitable and incompatible in its location as a result of any nuisance or activity generated by the use.

18.8.2 *Application procedure.*

(a) An application for special exception approval must be submitted to the Planning & Zoning Department at least 15 days prior to the regularly scheduled meeting of the Board of Adjustment.

(b) The Zoning Administrator shall, upon determination that the application complies with all applicable submission requirements, receive the application and schedule it for public hearing by the Board of Adjustment.

(c) The Zoning Administrator shall, 5 days before the scheduled public hearing by the Board of Adjustment, provide notice of such hearing by certified mail to the owners of property adjacent to the proposed special exception as their names appear in the county tax records.

(d) The Board of Adjustment shall render a decision at the conclusion of the public hearing or within 45 days from the date of the public hearing if it is determined that action must be deferred to allow for additional input and review.

Defendants' Bates # 7016

(e) Any petition for special exception approval may be withdrawn prior to action thereon by the Board of Adjustment at the discretion of the applicant initiating the request upon written notice to the Zoning Administrator.

18.8.3 *Submission requirements.*  No request for special exception approval shall be considered complete until all of the following has been submitted:

(a) *Application form.*  The application shall be submitted on forms to be provided by the Zoning Coordinator.

(b) *Plans and specifications.* Each application for special exception approval shall be accompanied by an accurate site plan drawn to scale showing: the actual shape, dimensions and size of the lot to be built upon, the size, shape, height, floor area and location of the buildings to be erected; dimensions and locations of existing buildings; width of front, side and rear yards; existing and proposed parking; ingress to and egress from the site; and such other information as may reasonably be requested to determine compliance with these Zoning Ordinances including but not limited to a landscaping plan, erosion control plan, stormwater management plan, and utilities plan.

(c) *State and Federal permits.*  Written evidence of applications for all required permits showing compliance with regulations of the Corps of Engineers, Alabama Department of Environmental Management, Alabama Coastal Area Management Program and Baldwin County Health Department shall accompany the application for conditional use approval, and the conditional use may be conditioned upon the actual receipt of said permits by the applicant.

(d) *Application fee.*  The applicant for a special exception shall be required to pay an application fee according to the current schedule of fees established by the County Commission for the particular category of application.  This fee shall be nonrefundable irrespective of the final disposition of the application.

(e) *Association approval.* Prior approval from active neighborhood associations, boards or committees, if applicable, shall accompany all Board of Adjustment applications and requests.

18.8.4 *Standards for approval.*  A special exception may be approved by the Board of Adjustment only upon determination that the application and evidence presented clearly indicate that all of the following standards have been met:

(a) The proposed use shall be in harmony with the general purpose, goals, objectives and standards of the Baldwin County Master Plan,

Defendants' Bates # 7017

these ordinances, or any other official plan, program, map or ordinance of Baldwin County.

(b) The proposed use shall be consistent with the community welfare and not detract from the public's convenience at the specific location.

(c) The proposed use shall not unduly decrease the value of neighboring property.

(d) The use shall be compatible with the surrounding area and not impose an excessive burden or have substantial negative impact on surrounding or adjacent uses or on community facilities or services.

18.8.5 *Conditions and restrictions on approval.*  In approving a special exception, the Board of Adjustment may impose conditions and restrictions upon the property benefited by the special exception as may be necessary to comply with the standards set out above, to reduce or minimize any potentially injurious effect of such special exception upon the property in the neighborhood, and to carry out the general purpose and intent of the ordinances.  In approving any special exception, the Board of Adjustment may specify the period of time for which such approval is valid for the commencement of the proposed special exception.  The Board of Adjustment may, upon written request, grant extensions to such time allotments not exceeding 6 months each without notice or hearing.  Failure to comply with any such condition or restriction imposed by the Board of Adjustment shall constitute a violation of these ordinances.  Those special exceptions which the Board of Adjustment approves subject to conditions shall have specified by the Board of Adjustment the time allotted to satisfy such conditions.

### Section 18.9 Decisions of the Board of Adjustment

In exercising its authority, the Board of Adjustment may reverse or affirm, wholly or partly, or modify the order, requirement, decision or determination appealed from and make such order, requirement, decision or determination as should be made and, to that end, shall have all the powers of the officer from whom the appeal is taken.  The concurring vote of 4 members of the Board of Adjustment shall be necessary to reverse any order, requirement, decision or determination of any such administrative official or to decide in favor of the applicant on any matter upon which it is required to act.

### Section 18.10 Appeal from Decision of the Board of Adjustment

Any party aggrieved by a final judgment or decision of the Board of Adjustment may, within 15 days thereafter, appeal the final judgment to the Circuit Court of Baldwin County, Alabama, by filing with the Circuit Court and the Board of Adjustment a written notice of appeal specifying the judgment or decision from which the appeal is taken.  In case of such appeal, the Board of Adjustment shall

Defendants' Bates # 7018

cause a transcript of the proceedings and the action to be certified to the Court where the appeal is taken, and the action of such court shall be tried de novo.

## Section 18.11 Conditional Uses

18.11.1  *Authorization.*  The Planning Commission may, under the prescribed standards and procedures contained herein, authorize the construction or initiation of any use that is expressly permitted as a conditional use in a particular zoning district; however, the county reserves full authority to deny any request for a conditional use, to impose conditions on the use, or to revoke approval at any time, upon finding that the permitted use will or has become unsuitable and incompatible in its location as a result of any nuisance or activity generated by the use.

18.11.2  *Application procedure.*

(a) An application for conditional use approval must be submitted to the Planning & Zoning Department at least 30 days prior to the regularly scheduled meeting of the Planning Commission.

(b) The Zoning Administrator shall, upon determination that the application complies with all applicable submission requirements, receive the application and schedule it for public hearing by the Planning Commission.

(c) The Zoning Administrator shall, 5 days before the scheduled public hearing by the Planning Commission, provide notice of such hearing by certified mail to the owners of property adjacent to the proposed conditional use as their names appear in the county tax records.

(d) The Planning Commission shall render a decision at the conclusion of the public hearing or within 45 days from the date of the public hearing if it is determined that action must be deferred to allow for additional input and review.

(e) Any petition for conditional use approval may be withdrawn prior to action thereon by the Planning Commission at the discretion of the applicant initiating the request upon written notice to the Zoning Administrator.

18.11.3  *Submission requirements.*  No request for conditional use approval shall be considered complete until all of the following has been submitted:

(a) *Application form.*  The application shall be submitted on forms to be provided by the Zoning Administrator.

Defendants' Bates # 7019

(b) *Plans and specifications.* Each application for conditional use approval shall be accompanied by an accurate site plan drawn to scale showing: the actual shape, dimensions and size of the lot to be built upon, the size, shape, height, floor area and location of the buildings to be erected; dimensions and locations of existing buildings; width of front, side and rear yards; existing and proposed parking; ingress to and egress from the site; and such other information as may reasonably be requested to determine compliance with these zoning ordinances including but not limited to a landscaping plan, erosion control plan, stormwater management plan, and utilities plan.

(c) *State and Federal permits.* Written evidence of applications for all required permits showing compliance with regulations of the Corps of Engineers, Alabama Department of Environmental Management, Alabama Coastal Area Management Program and Baldwin County Health Department shall accompany the application for conditional use approval, and the conditional use may be conditioned upon the actual receipt of said permits by the applicant.

(d) *Application fee.* The applicant for a conditional use shall be required to pay an application fee according to the current schedule of fees established by the County Commission for the particular category of application. This fee shall be nonrefundable irrespective of the final disposition of the application.

18.11.4 *Standards for approval.* A conditional use may be approved by the Planning Commission only upon determination that the application and evidence presented clearly indicate that all of the following standards have been met:

(a) The proposed use shall be in harmony with the general purpose, goals, objectives and standards of the Baldwin County Master Plan, these ordinances, or any other official plan, program, map or ordinance of Baldwin County.

(b) The proposed use shall be consistent with the community welfare and not detract from the public's convenience at the specific location.

(c) The proposed use shall not unduly decrease the value of neighboring property.

(d) The use shall be compatible with the surrounding area and not impose an excessive burden or have substantial negative impact on surrounding or adjacent uses or on community facilities or services.

18.11.5 *Conditions and restrictions on approval.* In approving a conditional use, the Planning Commission may impose conditions and restrictions upon the

property benefited by the conditional use approval as may be necessary to comply with the standards set out above, to reduce or minimize any potentially injurious effect of such conditional use upon the property in the neighborhood, and to carry out the general purpose and intent of the ordinances.  In approving any conditional use, the Planning Commission may specify the period of time for which such approval is valid for the commencement of the proposed conditional use.  The Planning Commission may, upon written request, grant extensions to such time allotments not exceeding 6 months each without notice or hearing. Failure to comply with any such condition or restriction imposed by the Planning Commission shall constitute a violation of these ordinances.  Those conditional uses which the Planning Commission approves subject to conditions shall have specified by the Planning Commission the time allotted to satisfy such conditions.

**Section 18.12 Tolling Provisions**

If subsequent to the filing of a any application/petition, the applicant/petitioner is enjoined by order of a court of competent jurisdiction from commencement of construction, the time from the entry of such order against applicant/petitioner until such time as the order is lifted or becomes final and unappealable, shall not be counted toward or against the time allowed/required by these ordinances for applicant to commence construction. The provisions of this section shall retroactively apply to all pending applications/petitions.

Defendants' Bates # 7021

## Article 19  Amendments to Official Zoning Map and Ordinances

### Section 19.1 Purpose

The Official Zoning Map may be amended from time to time in accordance with the procedures and standards set forth in this Section.  The purpose of this Section is not to relieve particular hardships, not to confer special privileges or rights on any person, but only to make adjustments to the Official Zoning Map that are necessary in light of changed conditions or changes in public policy or that are necessary to advance the general welfare of the County.  Zoning text amendments may be necessary to further the County land use policies and to keep pace with current development trends.

### Section 19.2 Initiation Map Amendment.

An amendment to the Official Zoning Map may be initiated:

(a) By application of any person owning the property proposed for change on the Official Zoning Map, or by written authorization by the owner for an agent to act on the owner's behalf

(b) By a motion of the Planning and Zoning Commission.

(c) By a motion of the County Commission.

### Section 19.3 Initiation Text Amendment

An amendment to the text of the Zoning Ordinances may be initiated:

(a) By a motion of the County Commission.

(b) By a motion of the Planning and Zoning Commission.

### Section 19.4 Planning Director Preparation

The Planning Director shall prepare and file the applications initiated by the Planning and Zoning Commission and the County Commission.

### Section 19.5 Staff Review

Within a reasonable time after the receipt of an application, the Planning Director shall deliver to the Planning and Zoning Commission and the County Commission a written report summarizing the facts of the case, including all relevant documents and incorporating or summarizing the comments and recommendations of the Planning and Zoning Department, and schedule a date

Defendants' Bates # 7022

for a public hearing. The County Commission shall be furnished with minutes, recommendations and other relevant information from the Planning Commission.

## Section 19.6 Factors for Reviewing Proposed Amendments

In deciding whether to recommend approval of a proposed amendment, or in deciding whether to adopt a proposed amendment, the Planning Commission and County Commission shall consider whether the proposed amendments is consistent with the following factors:

(a) Is the requested change compatible with the existing development pattern and the zoning of nearby properties?

(b) Has there been a change in the conditions upon which the original zoning designation was based? Has land uses or conditions changed since the zoning was established?

(c) Does proposed zoning better conform to the Master Plan?

(d) Will the proposed change conflict with existing or planned public improvements?

(e) Will the proposed change adversely affect traffic patterns or congestion?

(f) Is the proposed amendment consistent with the development patterns in the area and appropriate for orderly development of the community? The cost of land or other economic considerations pertaining to the applicant shall not be a consideration in reviewing the request

(g) Is the proposed amendment the logical expansion of adjacent zoning districts?

(h) Is the timing of the request appropriate given the development trends in the area?

(i) Will the proposed change adversely impact the environmental conditions of the vicinity or the historic resources of the County?

(j) Will the proposed change adversely affect the health, safety and welfare of the County and the vicinity?

(k) Other matters which may be appropriate.

### Section 19.7 More Restrictive Rezoning

The County Commission may not approve a rezoning other than the rezoning published in the newspaper unless the change is more restrictive than the proposed rezoning published.

### Section 19.8 Examination and Copying of Application and Other Documents

At any time upon reasonable request, and under the supervision of the Planning Director or his/her designee, any person may examine an application filed. Copies of such materials shall be made upon payment of the appropriate fee as determined by County Commission policy.

### Section 19.9 Revocations of Approvals

Applicants shall be responsible for ensuring that all development proceeds in accordance with terms and conditions of any approval issued to the applicant. A determination by the Planning Director that the terms and conditions of the approval have been violated shall subject the approval to be revoked.

### Section 19.10 Reliance on Information Presented by Applicant

The County staff shall have the right to rely on the accuracy of statements, documents and all other information presented to them by applicant, their attorney or agent, in review of an application issued under these ordinances.

### Section 19.11 Presentation or Submittal of Incorrect Information

In the event that an applicant, their attorney or agent submits or presents false or incorrect information, whether or not such information is presented fraudulently or deceitfully to the staff, Planning and Zoning Commission, or County Commission concerning a material fact or consideration relating to an application for a rezoning, conditional use, or other type of approval issued under these ordinances, the following action may be taken:

When such false or incorrect information was a material fact or consideration in approving an application for rezoning, amendment, modification, or repeal, the Planning Director shall notify the applicant in writing of the false or incorrect information given and all actions necessary to resolve those problems resulting from the false or incorrect information given. If the problems cannot be resolved within ten (10) days or such other time period stated in notification, the Planning Commission or County Commission shall hold a public hearing, of which the applicant shall be notified with at least seven (7) days notice by certified mail, return receipt requested. Upon the conclusion of the public hearing the Planning Commission or County Commission may amend, revoke, or void approval. Prior to such action, the Commission must find that the applicant, his agent, or

Defendants' Bates # 7024

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 301 of 800   PageID #: 2315
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 222 of 293   PageID #: 914

*Baldwin County Zoning Ordinances*                                                      *19-4*

attorney, presented fraudulently or deceitfully, to the Board of Adjustment, Planning Commission, or County Commission concerning a material fact or consideration relating to an application or an applicant, whether or not such information is presented fraudulently or deceitfully to the staff, Board of Adjustment, Planning Commission, or County Commission concerning a material fact or consideration relating to an application. Any work performed by or at the request of the applicant on the subject property shall be at the risk of the applicant. If the Planning Commission or County Commission does amend, revoke, or void an application approval, the Planning Director shall void any type of approval or permit issued.

### Section 19.12 Withdrawal of Applications

Applications for rezoning, conditional use, special exceptions and variance requests must be withdrawn by the applicant or authorized agent in the manner set forth as follows:

> (a) An applicant may withdraw an application by filing written notice of the withdrawal with the Planning Director seven (7) days prior to the public hearing. If the application will be before the County Commission a written notice shall be filed with the County Commission Chairman seven (7) days prior to the public hearing.

> (b) When an applicant wishes to withdraw an application less than seven (7) days prior to the public hearing, it shall be at the discretion of the governing body to either grant the withdrawal or to hear the application as submitted.

### Section 19.13 Concurrent Applications

An application for rezoning of land, conditional use, special exception or variance on all or part of the same land may be made concurrently.  In such cases, the effective date of the conditional use, special exception or variance shall be held in abeyance until action has been taken by the County Commission on the application for rezoning of such land.

### Section 19.14 Limitations on Rezoning of Land

19.14.1   Whenever the County Commission has amended the zoning map and changed a zoning classification of land, another application shall not then be considered for rezoning of any part or all of the same land for a period of one (1) year from the effective date of such amendment.

19.14.2   Whenever the County Commission has denied an application for rezoning, no further application shall be filed for the same land for a period of one (1) year from the date of such action. In the event that two (2) or more

Defendants' Bates # 7025

applications for rezoning of any part or all of the same land has been denied, no further applications shall be filed for a period of two (2) years from the date of such action denying the last application filed.

## Section 19.15 Application Fee

19.15.1 Application fees shall be determined based on the current fee schedule adopted by the County Commission.

19.15.2 Fees shall be nonrefundable irrespective of the final action on the application. No fee shall be refunded after the submittal deadline.

## Section 19.16 Public Notice and Hearings

19.16.1 Any proposed rezoning, amendment, supplement, modification, or repeal shall be submitted to the Planning Commission for its consideration and recommendation to the County Commission.

19.16.2 An application for rezoning must be submitted to the Planning and Zoning Department. The application must be on official County forms and must be accompanied by data, maps, and plans which are adequate to support the application. The application shall be heard by the Planning Commission at its next regular meeting after receipt of a correctly completed application. All dates and times shall be determined by the adopted meeting schedule of the Planning and Zoning Commission.

19.16.3 Before acting on any proposed rezoning, amendment, supplement, modification or repeal, a public hearing shall be held by the Planning Commission with proper legal notice published in a newspaper of general circulation in the County at least two weeks prior to the hearing, and in the case of a rezoning, notice by certified mail at least 5 days prior to the hearing, to the applicant and to all adjacent property owners as their names appear in the County tax records.

19.16.4 A conspicuously located sign, indicating the proposed amendment, shall be posted on the subject property no less than three weeks prior to the date of the hearing. The case number and contact information shall be listed.

19.16.5 The Baldwin County Commission shall fix a reasonable time for consideration of a proposed rezoning, amendment, supplement, modification, or repeal and give public notice thereof. Notice of said action shall be published in a newspaper in a newspaper of general circulation, in the County, in the legal notices for three consecutive weeks prior to the public hearing and one time in the regular section of the newspaper in the form of a ¼ page display advertisement at least 5 days prior to the public hearing. The public notice shall state that the proposed rezoning, amendment, supplement, modification, or

Defendants' Bates # 7026

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 303 of 800   PageID #: 2317
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 224 of 293   PageID #: 916

*Baldwin County Zoning Ordinances*                                                                    19-6

repeal will be considered by the County Commission pursuant to Act No. 91-719 as amended.

19.16.6   *Copies available.* A copy of the proposed rezoning, amendment, supplement, modification, or repeal shall be made available for public inspection at the nearest County Courthouse or satellite County Courthouse, which locations will be included in the notice. The notice shall also state the time, place, and location where persons may be heard in opposition to, or in favor of such proposed rezoning, amendment, supplement, modification, or repeal. No such amendment, supplement, modification, or repeal shall become effective until adopted by the Baldwin County Commission after a public hearing where all citizens and parties in interest shall have an opportunity to be heard.

19.16.7   The County Commission shall render a final decision on the proposed rezoning, amendment, supplement, modification, or repeal at the conclusion of the public hearing or within 60 days from the date of the public hearing if it is determined that action must be deferred in order to allow for additional input and review.

## Section 19.17 Agricultural Land

In any planning district which has elected to come under the planning and zoning jurisdiction of the Baldwin County Commission, undeveloped land or land zoned or used for agricultural purposes or timber growing, shall automatically be rezoned to the RSF-1 Single family District upon the submission of a complete application by the owner.

Defendants' Bates # 7027

## Article 20  Nonconformities

### Section 20.1 Intent

In the County, there exists uses, structures and combinations of such which were lawful before the adoption of these ordinances or amendments thereto, but which would be prohibited, regulated or restricted under the terms of these ordinances or amendments thereto. It is the intent of this section to permit them to continue with restrictions until they are removed or destroyed, but not to encourage their survival. It is further the intent of these ordinances that such nonconformities shall not be enlarged, expanded or intensified, nor shall they be used as grounds for adding other structures. Changes in nonconformities other than their discontinuance shall be discouraged.

### Section 20.2 Rules Applicable to Nonconformities

20.2.1 *Incompatibility and enlargement.* Nonconforming uses are declared by these ordinances to be incompatible with permitted uses within the districts involved. A nonconforming use of a structure or a nonconforming use of a structure and land or water in combination, shall not be extended, enlarged or intensified except in conformance with these ordinances. No nonconforming use shall be moved in whole or in part to any portion of the lot or parcel other than that occupied by such use at the effective date of adoption or amendments of the zoning ordinances. Replacement of nonconforming structures shall be prohibited.

20.2.2 *Work in progress.* To avoid undue hardship, nothing in these ordinances shall require a change in plans, construction or designed use of buildings on which a building permit has been properly issued prior to the adoption of these ordinances or amendments thereto. If actual construction has not begun under a permit properly issued before the adoption of these ordinances or amendments thereto, within six (6) months of the date of issuance of the permit, said permit shall become invalid and shall not be renewed except in conformity with the ordinances.

20.2.3 *Nonconforming use of open land.* Where open land is being used for a nonconforming use, such nonconforming use shall not be extended or enlarged either on the same or adjoining property.

20.2.4 *Nonconforming use of buildings.* Except as otherwise provided herein, the lawful use of a building existing at the effective date of these ordinances or amendments thereto may be continued although such use does not conform to the provisions contained herein.

20.2.5 *Discontinuance of nonconforming use.* No building or portion thereof, used in whole or in part, for a nonconforming use which is abandoned for more than

Defendants' Bates # 7028

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 305 of 800  PageID #: 2319
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 226 of 293  PageID #: 918

one (1) calendar year or 365 consecutive days, shall be used except in conformity with these ordinances. The intent to abandon shall be presumed from the cessation of business or the removal of equipment, goods, structures or other aspects of such nonconforming use of the property.

20.2.6 *Destruction, repair or alteration of nonconforming use or structure.*

(a) No building or structure which has been damaged, repaired or altered by any means to an extent of more than fifty percent (50%) of the fair market value of the building or structure immediately prior to damage, repair or alteration, shall be restored except in conformance with these ordinances, and all rights as a nonconforming use or structure are then terminated.

(b) If a building is damaged, repaired or altered by less than fifty percent (50%), such damage may be repaired to the size and use as before the time of damage, repair or alteration provided that such repair of reconstruction is complete within one (1) calendar year or 365 consecutive days of the date of such damage.

(c) Historic nonconforming structures or a nonconforming portion of an historic structure over 50 years old may be considered a valid nonconforming structure upon the determination of the Baldwin County Historical Development Commission that said structure is historic in nature and the respective Board of Adjustment confirms the valid nonconforming status. A valid nonconforming status shall permit reconstruction, repair, or alteration irrespective of the fifty percent (50%) rule as given in *Section 20.2.6(a)*.

(d) Upon the determination by the Planning Director that a structure is potentially damaged, being repaired or altered by more than fifty percent (50%) of the fair market value, the following method shall be employed to make a final determination:

1. An appraisal by a licensed appraiser shall be submitted to the Planning and Zoning Department.

2. A licensed contractor shall perform a cost estimate for repairs to the structure and submit it to the Planning and Zoning Department.

3. The Planning Director shall prepare a report with the appraisal and cost estimate and submit it to the Baldwin County Planning and Zoning Commission for a final determination.

Defendants' Bates # 7029

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 306 of 800   PageID #: 2320
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 227 of 293   PageID #: 919

4. The Baldwin County Planning and Zoning Commission shall make a determination or may request additional information as deemed appropriate to make a final determination.

5. Nothing herein shall be construed to excuse any owner, occupant or contractor from compliance with building codes, zoning ordinances or any other health or safety requirements imposed by local, state or federal laws, or ordinances in effect at the time of the repair or rebuilding.

6. The applicant shall be responsible for all costs associated with a determination.

20.2.7 *Nonconforming lots.* A nonconforming lot or parcel is a lot or parcel which fails to meet the dimensional requirements (i.e. minimum lot area, width, frontage etc.) of the zoning ordinances, but was lawfully created according to Alabama State Law and was a lot of record prior to the effective date of the zoning ordinances or any amendments thereto and has been determined to be vested.

(a) Any nonconforming lot or parcel may be used as a building site.

(b) A nonconforming lot or parcel must comply with permitted uses and other standards as described in the zoning ordinances.

20.2.8 *Subdivision of lots.* No portion of a lot shall be sold or subdivided in a manner which does not comply with the lot width and area requirements established by the zoning ordinances. A nonconforming lot may be increased in size even if such increase does not allow the lot to meet the minimum lot width and lot area requirements established by the zoning ordinances. Furthermore, the adjoining lot or lots, from which the land is removed to create the increase to the subject lot, shall not become nonconforming or does not increase in nonconformity.

20.2.9 *Special treatment due to these ordinances or other government action.* Should a government agency obtain, after the effective date of this amendment, a portion of a conforming lot for public purposes and thereby create a nonconforming lot, it may be possible to erect or construct, on said lot, the principal and accessory structures otherwise authorized provided that all other requirements of these ordinances are met.

20.2.10 *Repairs and maintenance.* On any nonconforming structure or portion of a nonconforming structure or any structure containing a nonconforming use, work may be done on ordinary repairs, only to replace or repair, provided that the cubic content of the structure shall not be increased. Ordinary repairs may include painting, roofing, siding, re-paving of access roads and parking/loading areas, replacement of landscape elements and other like activities.

Defendants' Bates # 7030

20.2.11 *Nonconforming structures unsafe due to lack of maintenance.* Any portion of a nonconforming structure that becomes physically unsafe or unlawful due to lack of repairs and maintenance, and which is declared unsafe or unlawful by a duly authorized county official, but which the owner wishes to repair, restore or rebuild, must be repaired, restored or rebuilt in conformance with the provisions of this chapter.

20.2.12 *Nonconforming accessory uses and structures.*

(a) No nonconforming accessory use or structure shall continue after the principal use or structure is terminated by abandonment, damage or destruction unless such accessory use or accessory structure is made to conform to the standards for the zoning district in which it is located.

(b) Any nonconforming accessory use or accessory structure shall be brought into conformity with these ordinances whenever a substantial improvement to, addition to or change in principal use or structure on the property is proposed or approved.

(c) Any part of a nonconforming accessory use or accessory structure which is destroyed to an extent of more than fifty percent (50%) of the fair market value of the building or structure immediately prior to damage, shall not be restored except in conformity with these ordinances, and all rights as a nonconforming use or structure are then terminated.

(d) No additional structure which does not conform to the requirements of these ordinances shall be erected in connection with a nonconforming use of land.

20.2.13 *Illegal uses and structures prohibited.* All of the foregoing provisions relating to nonconforming uses and structures shall apply to all nonconforming uses or structures existing or created on the effective date of these ordinances and to all uses and structures which become nonconforming by reason of any amendment thereof. The provisions shall not apply, however, to any use established, or structures erected or expanded, in violation regardless of the time of establishment or erection.

Defendants' Bates # 7031

## Article 21   Enforcement

### Section 21.1 Zoning Enforcement and Appeals

21.1.1 *Violations, penalties and remedies; generally*

21.1.2 Whenever a violation of these ordinances is identified or is alleged to have occurred, any person aggrieved may file a complaint.  Such complaint shall fully state the cause and basis thereof, and shall be filed with the Planning and Zoning Director at his/her office at the Planning and Zoning Department in Bay Minette, Alabama.

Whenever the Planning and Zoning Director or his/her designee has knowledge of a violation or an alleged violation, a thorough investigation may be initiated. After such investigation, and upon the finding of a violation, the violation procedures contained in this Article shall be initiated.

21.1.3 Violation of the provisions of these ordinances, including violation of conditions and safeguards established in connection with a grant of a variance, special exception, conditional use, land use certificate or appeal, shall be addressed and punishable in accordance with sections contained herein.

21.1.4 In the event that any building or structure is erected, constructed, reconstructed, altered, repaired, converted, or maintained, or  in the event that any building, structure, or land is used in violation of these ordinances, the Planning and Zoning Director may institute or cause the institution of any appropriate action or proceeding to:

> (a) Prevent the unlawful erection, construction, reconstruction, alteration, repair, conversion, maintenance, or use of the building, structure, or land.

> (b) Prevent the occupancy of the building, structure, or land.

> (c) Prevent any illegal act, conduct, business, or use in or about the premises.

> (d) Restrain, correct, or abate the violation.

### Section 21.2 Violations

21.2.1 *Persons in violation*.  Any person(s), whether owner, lessee, principal, agent, employee, or occupant of any land or part thereof, and any architect, engineer, builder, contractor, agent or other person who: (a) violates any provision of these ordinances, (b) permits, participates, assists, directs, creates

Defendants' Bates # 7032

or maintains any such violation, (c) fails to comply with any of the requirements hereof, including conditions, stipulations, or safeguards attached to any approval, permit, variance, special exception, conditional use or the like, or (d) who erects, constructs or reconstructs any building or structure, or uses any building, structure or land in violation of any written statement or plan submitted and approved pursuant to these ordinances, shall be in violation.

21.2.2 Any person(s) in violation of these ordinances shall be held responsible for such violation and be subject to the penalties and remedies as provided herein and as provided by law.

21.2.3 *Separate violation.* Each and every person who commits, permits, participates in, assists, directs, creates or maintains a violation may be found individually in violation of a separate offense. Each day that any violation continues to exist shall constitute an additional and separate violation.

21.2.4 *Structures and uses in violation.* Any structure or lot erected, constructed, altered, occupied or used contrary to any provision(s) of these ordinances or other applicable ordinances, stipulation, condition, approvals and variance shall be declared to be unlawful.

## Section 21.3 Notice of Violation

21.3.1 *Issuance.* The Planning and Zoning Director or his/her designee shall issue a written notice of violation upon receipt of a complaint or knowledge of violation, to all persons in violation. The Notice of Violation may be served by certified mail, return receipt requested, or pursuant to Alabama Rules of Civil Procedure. The Notice of Violation shall allow a reasonable time to correct or abate such violation.

21.3.2 *Notice requirements.* The Notice of Violation shall ("Notice") clearly identify the property and particular alleged violation involved, the action necessary to correct it, the time permitted for such correction, and penalties for failure to comply. The Notice shall include but not be limited to:

> (a) A description of the location of the property involved, either by street address or by legal description.
>
> (b) A statement indicating the nature of the violation.
>
> (c) A statement showing the time within which all necessary remedial action must be accomplished, which time may not be less than 10 days nor more than 90 days from the date of such written Notice.
>
> (d) The name of the person(s) upon whom the Notice of Violation is served.

Defendants' Bates # 7033

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 310 of 800   PageID #: 2324
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 231 of 293   PageID #: 923

*Baldwin County Zoning Ordinances*                                                    *21-3*

(e) A statement advising that upon the failure to comply with requirements of the Notice, such enforcement procedure as may be required under these zoning ordinances shall be taken.

21.3.3 *Violations threatening health, safety and welfare.* The Planning and Zoning Director may shorten or eliminate the time period to correct a violation if he/she determines that the alleged violation presents an imminent and serious threat to the public health, safety, or welfare, or the violation is irreparable or irreversible. The Notice of Violation shall, in such case, state that an immanent and serious threat to public health, safety, or welfare exists or the violation is irreparable or irreversible, along with the allowed time period for correction if any.

21.3.4 *Noncompliance.* When the Planning and Zoning Director or his/her designee determines that the violation has not been corrected or abated by end of the prescribed time period, he/she shall issue a written notice forwarding the matter to the County Legal Department and/or the Baldwin County District Attorneys office for further action.

21.3.5 *Compliance.* Upon the submission by the violator of evidence of compliance deemed adequate by the Planning and Zoning Director, the Director may deem the violation to be resolved and compliance achieved.

21.3.6 *Diligent efforts to comply.* When, after issuance of a Notice of Violation but prior to commencement of any judicial proceedings, the Planning and Zoning Director determines that the person in violation is making a diligent effort to comply with the requirements of the Notice, the Planning and Zoning Director may issue a written stay of further enforcement actions pending full compliance. The stay shall list the diligent efforts to comply and should be provided to the violator(s). No enforcement actions shall be stayed longer than ninety (90) days.

21.3.7 *Repeat violations.* When any Notice of Violation is issued to any person for substantially the same violation for which a previous Notice of Violation has been issued to such person, no period shall be allowed for correction or abatement of the violation. Rather, in such event, the Planning and Zoning Director shall immediately cause the matter to be forwarded to the County Legal Department and/or the Baldwin County District Attorneys Office for further action.

21.3.8 *Fines.* Any person(s) violating any of the provisions herein shall be fined not more than $150.00 for each separate violation, plus all costs of court, with each day such violation continues constituting a separate violation (see 21.2.3, above). The fines provided for herein shall commence and accrue upon receipt of the Notice of Violation or the expiration of the allowed period for correction, whichever is later. Said fines shall continue to accrue until paid, but shall not accrue on days during which the violation is properly on appeal.

Defendants' Bates # 7034

### Section 21.4 Additional Penalties

21.4.1 *Stop work order.* The Planning and Zoning Director may issue, or cause to be issued, a Stop Work Order on a premises, lot or parcel that is in alleged violation of any provision of these ordinances, or is being maintained in a dangerous or unsafe manner. A Stop Work Order may be issued in place of or in conjunction with any other actions and procedures identified in these ordinances. Such Order shall be in writing and shall be given to the owner of the property, or to his agent, or to the person doing the work, and shall state conditions under which work may be resumed. Upon receipt of a Stop Work Order, all work associated with the violation shall immediately cease. Any person who continues to work shall be in violation of these ordinances and subject to penalties and remedies contained herein. The Stop Work Order may be appealed to the respective Board of Adjustment for which the activity is located.

21.4.2 *Cease and abate orders.* The Planning and Zoning Director may issue, or cause to be issued, a Cease and Abate Order to any person(s) maintaining any condition, or engaged in any activity or operation, which violates these ordinances. Such Order shall be in writing and shall be given to the owner of the property, or to the person maintaining such condition or engaged in such activity and operation. Upon receipt of a Cease and Abate Order, all conditions, activities and operations associated with the violation shall immediately cease and be abated. Any person who continues or fails to abate such condition, activity or operation shall be subject to penalties and remedies contained herein.

21.4.3 *Revocation of permits.* The Planning and Zoning Director may revoke, or cause the revocation of, permits or approvals in those cases where an administrative determination has been duly made that false statements or misrepresentations of material fact(s) were made in the application or plans upon which the permit or approval was based.

### Section 21.5 Appeals

21.5.1 *Appeal of administrative enforcement decision.* Any person(s) aggrieved by a decision of the Planning and Zoning Director or his or her designee in regards to zoning enforcement may file an appeal, made on forms provided by the County, to the respective Board of Adjustment where the alleged violation has occurred. An appeal must be filed within fifteen (15) days of the date of the Notice of Violation. An appeal is deemed filed with a Board of Adjustment when received by the respective Board Chairman.

21.5.2 *Appeal of Board of Adjustment decision.* In exercising its authority, the Board of Adjustment may reverse or affirm, wholly or partly, or modify the order, requirement, decision or determination appealed from and make such order, requirement, decision or determination as the Board deems proper and, to that end, shall have all the powers of the officer from whom the appeal is taken. The

Defendants' Bates # 7035

concurring vote of 4 members of the Board of Adjustment shall be necessary to reverse, affirm or modify any order, requirement, decision or determination of any such administrative official or to decide in favor of the applicant on any matter upon which it is required to act.

21.5.3 *Appeal to Circuit Court from final decision of Board of Adjustment.* Any party aggrieved by a final judgment or decision of a board of adjustment may within 15 days thereafter, appeal there from to the Circuit Court of Baldwin County, Alabama, by filing with the circuit court and the board of adjustment a written notice of appeal specifying the judgment or decision from which the appeal is taken and specifying in sufficient detail the grounds for appeal so that the non-appealing party may reasonably frame a responsive pleading.   For purposes of this section, an appeal shall be filed with the board of adjustment at the Baldwin County Planning and Zoning Department at its office in Bay Minette, Alabama, and shall be deemed filed when received at the Baldwin County Planning and Zoning Department regardless of the method delivery.

Defendants' Bates # 7036

## Article 22   Definitions

### Section 22.1 Usage

Except as otherwise provided herein, all words shall have the customary dictionary meaning. The present tense includes the future tense and the future tense includes the present tense. The singular number includes the plural and the plural includes the singular. The word "person" includes a firm, corporation, association, organization, trust, or partnership. The word "building" includes "structure." The words "shall" and "will" are always mandatory. The word "used" or "occupied" as applied to any land or buildings shall be construed to include the words "intended, arranged, or designed to be used or occupied."

### Section 22.2 Words and Terms Defined

As used in these ordinances, the following words and terms shall have the meaning defined:

*A zone.* (See Floodplain).

*Abutting/contiguous property.* Any property that is immediately adjacent to, touching, or separated from such a common border by a right-of-way, alley, or easement.

*Accessory dwelling.* A second dwelling unit that is either contained within the structure of a single family dwelling unit or in a separate accessory structure on the same lot as the principal residential building for use as a complete, independent living facility with provisions within the accessory dwelling for cooking, eating, sanitation, and sleeping. Such a dwelling is an accessory use to the principal residential building and includes accessory apartments, garage apartments and guest houses.

*Accessory structure.* A subordinate structure detached from but located on the same lot as the principal structure, the use of which is incidental and accessory to that of the principal structure. Except as provided in *Section 10.4, Wetland Protection Overlay District,* bulkheads, fences, walls, retaining walls, fountains, trellises, pergolas, air conditioner platforms, walkways and similar features which provide a decorative, security or support function shall not be considered accessory structures for purposes of these zoning ordinances.

*Accessory structure compound.* A fenced, secured enclosure in which a wireless telecommunications facility and its equipment, buildings, access roads, parking area and other accessory devices / auxiliary structures are located.

Defendants' Bates # 7037

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 314 of 800   PageID #: 2328
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 235 of 293   PageID #: 927

*Baldwin County Zoning Ordinances*                                                    *22-2*

*Accessory use.*   A use on the same lot with, and of a nature customarily incidental and subordinate to, the principal use.

*Agriculture/agricultural uses.* The use of land for agricultural purposes, including farming, dairying, pasturage, agriculture, horticulture, floriculture, viticulture, and animal and poultry husbandry and related accessory uses.

*Airport.*   Any area of land or water designed and set aside for the landing and taking off of aircraft, and may include necessary facilities for the housing and maintenance of aircraft.

*Alteration.*   Any change in structural parts, stairways, type of construction, kind of class of occupancy, light or ventilation, means of ingress and egress, or other changes affecting or regulated by the building code or these zoning ordinances, including extension or expansion, except for minor changes or repairs not involving the aforesaid features.

*Alteration, structural.*   Any change in the supporting members of a building (such as bearing walls, beams, columns, and girders) except such change as may be required for its safety; any addition to a building.

*Alternative support structure.*   Any structure other than a wireless telecommunications tower, which may include, but is not limited to, buildings, water towers, light poles, power poles, telephone poles, and other essential public utility structures.

*Amusement arcade.*   A building or part of a building in which five (5) or more pinball machines, video games, or other similar player operated devices are maintained.

*Antenna.*   An electromagnetic device which conducts radio signals, through an attached cable or wave guide, to or from a radio transmitter or receiver. Typically, this includes "whips," "cornucopia horns," "panels" and parabolic "dishes."

*Antenna support structure.*   Any structure on which telecommunications antennas and cabling can be attached.   Typically, this includes steel towers with guy-wires (guyed towers); wooden, steel or concrete single poles (monopoles); self-supporting steel towers with three or four "legs" (self-supporting/lattice towers); rooftops of existing buildings or structures (such as elevated water storage tanks).   (see also *tower*).

*Area and dimensional ordinances.*   Numerical standards established for a lot, yard or building in a particular zone.

Defendants' Bates # 7038

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 315 of 800   PageID #: 2329
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 236 of 293   PageID #: 928

*Baldwin County Zoning Ordinances*                                          *22-3*

*As of right.* Uses that are specifically authorized by the zoning ordinances. (See also *permitted use).*

*Attic.* An unfinished area below the roof and above the ceiling of the living or garage area of a single family or two family dwelling which is generally used for storage and/or the location of mechanical equipment but not for human habitation.

*Auto convenience market.* A retail establishment where motor vehicle fuel is retailed directly to the public on the premises in combination with retailing of items typically found in a neighborhood convenience store. An auto convenience market may include a drive-through car wash but may not include automobile service bays.

*Automobile repair.* The repair, rebuilding or reconditioning of motor vehicles or parts thereof, including collision service, painting, and steam cleaning of vehicles.

*Automobile service station.* Any building or land used for retail sale and dispensing of automobile fuels or oils; may furnish supplies, equipment and minor services to private passenger vehicles incidental to sale and dispensing of automobile fuels and oils.

*Automobile wrecking.* The dismantling or wrecking of used motor vehicles, mobile homes, trailers, or the storage, sale or dumping of dismantled, partially dismantled, obsolete or wrecked vehicles or their parts.

*Bar or tavern.* An establishment serving alcoholic beverages in which the principal business is the sale of such beverages at retail for consumption on the premises.

*Base flood.* The flood having a one (1) percent chance of being equaled or exceeded in any given year.

*Base flood elevation.* The elevation for which there is a one (1) percent chance in any given year that flood levels will equal or exceed it.

*Basement.* A story all or partly underground but having at least one-half of its height below the average level of the adjoining ground.

*Bed and breakfast.* The renting of rooms in a private residence for brief periods of time together with the provision of breakfast for the guests by the home owner. All service is to be provided by the home owner.

*Board of Adjustment.* A board appointed by the County Commission in planning districts that elect to come within the planning and zoning jurisdiction of the Baldwin County Commission to hear and decide appeals, special exceptions and

Defendants' Bates # 7039

variances from the terms of the zoning ordinances.

*Boarding house, rooming house, lodging house, or dormitory.* A building or part thereof, other than a hotel, motel, or restaurant, where meals and/or lodging are provided for compensation, for three or more unrelated persons where no cooking or dining facilities are provided in individual rooms.

*Boathouse.* A structure constructed over water designed or intended to be used for the purpose of docking, storing and protecting one (1) or more watercraft.

*Boat repair.* Major overhauling or repair of small craft and pleasure boats that requires open air, partially covered or enclosed dry dock facilities and such heavy equipment, yard space and dock facilities as may be necessary.

*Boat slip.* A facility for the mooring of watercraft.

*Buffer.* Land which is maintained in either a natural or landscaped state and is used to screen and/or mitigate the impacts of development on surrounding areas, properties, or rights-of-way.

*Building.* Any structure attached to the ground and intended for shelter, housing, or enclosure for persons, animals, or chattels.

*Building height.* The vertical distance measured from the average elevation of the proposed finished grade at the front of the building to the highest point of the roof for flat roofs, to the deck line of mansard roofs, and the mean height between eaves and ridge for gable, hip and gambrel roofs. In A-zones building height will be measured from the finished floor elevation. In V-zones building height will be measured from the bottom of the lowest supporting girder.

*Building Official.* Individual appointed by the Baldwin County Commission to carry out inspections required by the building code.

*Building line.* (See *Setback line*).

*Car wash.* An area of land and/or structure with machine or hand operated facilities used principally for the cleaning, washing, polishing, or waxing of motor vehicles.

*Cemetery.* Land used or intended to be used for the burial of the human and animal dead and dedicated for cemetery purposes, including crematories, mausoleums, and mortuaries if operated in connection with and within the boundaries of such cemetery.

*Certificate of occupancy.* Official certification that a premise conforms to provisions of the zoning ordinances and building code, and may be used or

Defendants' Bates # 7040

occupied. Such certificate is granted for new construction or for the substantial alteration or additions to existing structures. A structure may not be occupied unless such certificate is issued by the Building Official.

*Child care facility.* A facility established for the care of children as defined in §38-7-2 of the *Code of Alabama, 1975.* For the purpose of these ordinances, this definition includes the following:

(a) *Child care center.* This includes facilities licensed as day care centers and nighttime centers in accordance with §38-7-2 of the *Code of Alabama, 1975.* Day care centers and nighttime centers serve more than twelve (12) children.

(b) *Child care institution.* This includes facilities licensed as group homes and child care institutions in accordance with §38-7-2 of the *Code of Alabama, 1975.* These facilities provide full time care.

(c) *Day care home.* A child care facility which is a family home and which receives not more than six children for care during the day in accordance with §38-7-2 of the *Code of Alabama, 1975.*

*Church or similar religious facility.* A place or structure(s) of assembly, and associated structures located on the same site, where religious worship, including education and outreach, is primarily or exclusively conducted.

*Clinic.* A place used for the care, diagnosis and treatment of sick, ailing, infirm, or injured persons, and those who are in need of medical or surgical attention, but who are not provided with board.

*Club.* A building or portion thereof or premises owned or operated for a social, literary, political, educational, or recreational purpose but not operated or maintained for profit. Does not include casinos, night clubs, or other institutions operated for a profit.

*Cluster development.* A site planning technique that concentrates buildings and structures in specific areas on a lot, site, or parcel to allow the remaining land to be used for recreation, open space, and/or preservation of features and/or structures with environmental, historical, cultural, or other significance. The techniques used to concentrate buildings may include, but shall not be limited to, reduction in lot areas, setback requirements, and/or bulk requirements, and with the resultant open space being devoted by deed restrictions for one or more reasons.

*Coastal construction line (CCL).* A line in coastal Alabama determined by the Alabama Coastal Area Management Plan (ACAMP) seaward of which no construction is permitted.

Defendants' Bates # 7041

*Coastal high hazard areas (V-zones)*.  Areas that are subject to high velocity waters caused by, but not limited to hurricane wave wash.

*Co-location*.  The placement of more than one wireless communications antenna by one or more telecommunications service providers on a single existing or new antenna support structure.

*Commercial occupant*.  A commercial use, i.e., any use other than residential or agricultural.

*Commercial vehicle*.  Any vehicle designed and used for transportation of people, goods, or things, other than private passenger vehicles and trailers for private nonprofit transport of goods and boats.

*Commercially developed parcel*.  A parcel of property on which there is at least one walled or roofed structure used, or designed to be used, for other than residential or agricultural purposes.

*Common open space*.  Open space within a development, not in individually owned lots or dedicated for public use, but which is designed and intended for the common use and/or enjoyment of the residents of the development.

*Concealment techniques*.  Design techniques used to blend a wireless telecommunications facility, including any antennas thereon, unobtrusively into the existing surroundings so as to not have the appearance of a wireless telecommunications facility.  Such structures shall be considered wireless telecommunications facilities and not spires, belfries, cupolas, or other appurtenances usually required to be placed above the roof level for purposes of applying height limitations. Due to their height, such structures must be designed with sensitivity to elements such as building bulk, massing, and architectural treatment of both the wireless telecommunications facility and surrounding development.  Concealed towers on developed property must be disguised to appear as either a part of the structure housing, a principal use, or an accessory structure that is normally associated with the principal use occupying the property.   Concealed towers developed on unimproved property must be disguised to blend in with the existing vegetation.  *Example*: a tower of such design and treated with architectural material so camouflaged to resemble a woody tree with a single trunk and branches on its upper part (also known as a "monopole").

*Conditional use*.  A use that, owing to some special characteristics attendant to its operation or installation, is permitted in a zoning district subject to approval by the Planning Commission, and subject to special requirements, different from those usual requirements for the zoning district in which the conditional use may be located.

Defendants' Bates # 7042

*Condominium.*  A development where all land, including that under the buildings in the development, is held in single ownership for the common use of unit owners or tenants; also a living unit within such a development.

*Conservation easement.*  An easement granting a right or interest in real property that is appropriate to retaining land or water areas predominately in their natural scenic, open, or wooded condition; retaining such areas as suitable habitat for fish, plants, wildlife; or maintaining existing land uses.

*Construction sign.*  Any sign giving the name or names of principal contractors, architects, and lending institutions responsible for construction on the site where the sign is placed, together with other information included thereon.

*Convalescent or nursing home.*  A building, or portion thereof, wherein for compensation, living accommodations and care are provided for persons suffering from illness, other than mental or contagious, which is not of sufficient severity to require hospitalization, or for persons requiring further institutional care after being discharged from a hospital other than a mental hospital; includes extended care facilities.

*Copy.*  The linguistic content of a sign.

*Copy shop.*  A retail establishment that provides duplicating services using photocopying, blueprint, and offset printing equipment, and may include collating and binding of booklets and reports.

*County.*  Baldwin County, Alabama.

*County Commission.*  The Baldwin County Commission.

*Deck.*  A flat uncovered area generally adjoining a house, building, or pool which may be used as an outdoor sitting or recreation area.

*Density.*  The number of dwelling units per acre of land.

*Department.*  The Baldwin County Planning and Zoning Department.

*Development.*  The construction, reconstruction, repair, demolition, conversion, structural alteration, relocation, removal, or enlargement of any building or structure; any extension of utilities; any construction of streets; any construction of drainage structures; any mine, excavation, land fill, or land disturbance; and/or any change in use, or alteration or extension of the use, of land.

Defendants' Bates # 7043

*Dwelling.*  A building or portion thereof used exclusively for residential purposes, including single-family, two-family, and multiple-family dwellings, but not including hotels, boarding houses, rooming houses, lodging houses or dormitories.

*Dwelling, multiple-family.*  A building designed for or occupied by three or more families, with separate toilets and facilities for cooking and sleeping for each dwelling unit.

*Dwelling, single-family.* A detached building designed for and occupied by one family as a home, with toilets and facilities for cooking and sleeping.

*Dwelling, two-family.*  A building designed for or occupied by two families only, with separate toilets and facilities for cooking and sleeping for each dwelling unit, separated by a common wall and sharing a common roof and foundation.

*Dwelling unit.*  Any building, portion thereof, or other enclosed space or area used as or intended for use as the home of one family, with separate toilets and facilities for cooking and sleeping, either permanently or temporarily.

*Electric sign.*  Any sign containing electric wiring.

*Erect a sign.*  To construct, reconstruct, build, relocate, raise, assemble, place, affix, attach, create, paint, draw, or in any other way bring into being or establish a sign.  It shall not include any of the foregoing activities when performed as an incident to the change of message, or routine maintenance.

*Erected.*  The word "erected" includes built, constructed, reconstructed, moved upon or any physical operations on the premises required for building. Excavations fill, drainage, and the like shall be considered a part of erection.

*Excavation.*  Any mechanical removal of rock, sand, gravel, or other unconsolidated materials from a location.

*Expansion, building or use.*  The addition of enclosed or unenclosed rooms or storage spaces, porches, or parking area, to an existing building or use on a parcel of land.

*FAA.*  Federal Aviation Administration.

*Family.*  One or more persons living together as a single housekeeping  unit and using common cooking facilities, as distinguished from a group occupying a boarding or rooming house or hotel.

*FCC.*  Federal Communications Commission.

Defendants' Bates # 7044

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 321 of 800  PageID #: 2335
Case 1:20-cv-00057-C  Document 45-1  Filed 05/21/21  Page 242 of 293  PageID #: 934

*Flea market.*  An occasional or periodic sales activity held within a building, structure, or open area where groups of individual sellers offer goods, new and used, for sale to the public, not to include private garage sales.

*Flood or flooding.*  A general and temporary condition of partial or complete inundation of normally dry land areas from:

   (a) the overflow of inland or tidal waters.

   (b) the unusual and rapid accumulation of runoff of surface waters from any source.

*Flood insurance rate map (FIRM).*  An official map of a community on which the Federal Emergency Management Agency has delineated both the areas of special flood hazard and the risk premium zones applicable to a community.

*Floodplain.*  Those areas defined by the U.S. Geological Survey or the U.S. Army Corps of Engineers as subject to flooding once in 100 years, based on topography.

*Floodway.*  That portion of the floodplain, including the channel, which is reasonably required to discharge the bulk of the regional flood waters.  Floods of less frequent recurrence are usually contained completely within the floodway.  For the purpose of these ordinances, floodways shall be defined as follows:

   (a) The floodways as identified or delineated in the *Flood Insurance Study* for Baldwin County, Alabama.

   (b) Along Small Streams and Watercourses.  All lands lying within 25 feet of the top of the bank of the channel (measured horizontally), unless the developer demonstrates to the satisfaction of the County Planning Commission that a lesser distance (but not less than 15 feet) is adequate based on the watershed characteristics and probable storm runoff for the base flood.

*Floor area, gross.*  The sum of the gross enclosed horizontal area of all the floors of a building, except a basement or area under the first habitable story, measured from the exterior faces of exterior walls and/or supporting columns.

*Food processing.*  The preparation, storage, or processing of food products on a large scale.  Examples of these activities include bakeries, dairies, canneries, and other similar activities or businesses.

*Frontage.*  The length of the property line of any one parcel along a street on which it borders.

Defendants' Bates # 7045

*Funeral home.*  A building or part thereof used for human funeral services.  Such building may contain space and facilities for: a) embalming and the performance of other services used in preparation of the dead for burial or cremation; b) the performance of autopsies and other surgical procedures; c) the storage of caskets, funeral urns, and other related funeral supplies; and d) the storage of funeral vehicles.  Where a funeral home is permitted, a funeral chapel is also permitted.

*Garage, private.*   A building or part thereof designed and/or used for inside parking of self propelled private passenger vehicles by the occupants of the house or other principal structure on the premises or by the occupants of or employees of a particular firm.

*General commercial uses.*  This land use includes those commercial activities which require outdoor storage, have higher trip generations than local commercial uses, or have potential for greater nuisance to adjacent properties due to noise, light and glare, or typical hours of operation.

*General industrial uses.*  This land use includes those industrial, manufacturing, processing, warehousing, or research and testing operations that, due to employment of heavy equipment or machinery or to the nature of the materials and processes employed, require special location and development safeguards to prevent pollution of the environment by noise, vibration, odors or other factors.

*Generalized Wetland Map.*   Refers to the National Wetland Inventory (NWI) Maps, the Baldwin County Digital Wetland layer and/or any other digital data depicting the general locations of wetlands or hydric soils and their degree of functionality within the jurisdiction of Baldwin County.

*Height.*  When referring to a tower or other structure, the distance measured from the ground level at the base of the tower to the highest point on the tower or structure, including if said highest point is an antenna placed on a structure or tower.

*Home improvement center.*  An establishment which sells various household goods, tools, building materials, household appliances, garden supplies, nursery products, paint, glass, etc. Retail stock may be kept outdoors.

*Home occupation.*  Any occupation for gain or support customarily conducted entirely within a residential dwelling unit and carried on solely by the inhabitant thereof, and which use is clearly incidental and secondary to the use of the dwelling for dwelling purposes, and does not change the character thereof.

*Home occupation, rural.*  An accessory use to a customary farming operation or a nonfarm household located in a rural area designed for gainful employment involving the sale of goods and/or services that is conducted either from within

Defendants' Bates # 7046

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 323 of 800   PageID #: 2337
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 244 of 293   PageID #: 936

*Baldwin County Zoning Ordinances*                                                    *22-11*

the dwelling and/or from accessory buildings located on the same lot as the dwelling unit occupied by the family conducting the home occupation.

*Hospital.* An institution providing health services primarily for human in-patient medical or surgical care for the sick or injured and including related facilities such as laboratories, outpatient departments, training facilities, central services facilities, and staff offices that are an integral part of the facilities.

*Hotel.* Except as otherwise provided, a transient commercial lodging establishment consisting of one or more buildings used for this purpose, including accessory uses such as eating and drinking facilities, recreation facilities and parking. This category includes motels and motor hotels. Lodgings may consist of sleeping rooms only or may include cooking facilities also but are not intended for permanent occupancy.

*Illuminated sign.* A sign which contains a source of light or which is designed to reflect light from an artificial source including indirect lighting, neon, incandescent lights, back-lighting, and shall also include signs with reflectors that depend upon automobile headlights for an image.

*Impervious surface.* Any hard-surfaced, man-made area that does not readily absorb water, including but not limited to: building roofs; streets; sidewalks; parking and driveway areas paved with asphalt, concrete, gravel, limestone, oyster shells, sand, clay or similar materials; and paved recreation areas.

*Impervious surface ratio (ISR).* A ratio derived by dividing the total of all impervious surfaces on a lot by the lot area.

*Institutional uses.* This group of uses includes: educational facilities (public or private); pre school and child day care facilities; churches, temples, and similar religious facilities; nursing homes, residential care facilities, and halfway housing; cemeteries with or without funeral homes; hospitals; clubs; libraries; museums; emergency service activities such as buildings, garages, parking, and/or dispatch centers for ambulances, fire, police and rescue; and all other similar institutional uses.

*Junk vehicle.* Any vehicle that does not have a current license tag and that the owner has abandoned or left to deteriorate.

*Junk yard.* Place, structure or lot where junk, waste, discarded, salvaged, or similar materials such as old metals, wood, slush, lumber, glass, paper, rags, cloth, bagging, cordage, barrels, containers, etc., are bought, sold, exchanged, baled, packed, disassembled, or handled, including auto wrecking yards, used lumber yards, house-wrecking yards, and yards or places for storage or handling of salvaged house wrecking and structural steel materials. This definition shall not include pawn shops and establishments for the sale, purchase, or storage of

usable secondhand cars, salvaged machinery, used furniture, radios, stoves, refrigerators or similar household goods and appliances.  Nor shall it apply to the processing of used, discarded, or salvaged materials as part of manufacturing operations.

*Jurisdictional determination*.  An official, written statement or map signed by the U.S. Army Corps of Engineers.

*Jurisdictional wetland*.  A wetland area that is regulated by the U.S. Army Corps of Engineers under Section 404 of the Clean Water Act. It can meet the definitional requirements for wetlands (i.e. hydrophitic vegetation, hydric soils and hydrology) as determined by the U.S. Corps of Engineers, 1987 Federal Wetland Delineation Manual.

*Kennel*.  A facility which houses dogs, cats, or other household pets and where grooming, breeding, boarding, training, or selling of animals is conducted as a business. This definition does not include the raising of a litter by an owner who intends to sell or give away the puppies as soon as they are old enough.

*Land area*.  (See *Lot area*).

*Land use certificate*.  Certificate issued by the Zoning Administrator indicating that a proposed use of land is in conformity with the zoning ordinances, a prerequisite to issuance of a building permit.

*Land use plan*.  A map and supporting written documentation indicating the projected or proposed utilization of land resulting from planning and zoning studies.

*Landfill*.  A disposal site for the controlled burial of solid waste according to applicable governmental rules and ordinances.

*Lateral riparian rights*.  The apportionment of riparian rights between adjoining riparian owners is made by extending lines from the ends of the side lines at right angles to the line of the water front if the latter is straight or substantially so, subject to variation where the line of navigation is not parallel with the shore line, without regard to the direction of the dividing line of the upland parcels.  In case of a decided convexity or concavity of the shore, riparian rights are apportioned ratably between the riparian owners, as by straight lines drawn out to the line of navigability at such points as will divide the latter proportionately to the several frontages on the shore, or by line perpendicular to a tangent drawn on a circular shore.

*Licensed Engineer*.  An engineer properly licensed and registered in the State of Alabama.

Defendants' Bates # 7048

*Light industrial uses.*  This land use includes manufacturing, research and wholesale establishments which are clean, quiet, and free of hazardous or objectionable emissions, and generate little industrial traffic.

*Local commercial uses.* This land use includes limited retail convenience goods and personal service establishments as well as professional service and office uses.

*Lot.*  A piece, parcel, or plot of land occupied or intended to be occupied by one main building, accessory buildings, uses customarily incidental to such main buildings and such open spaces as are provided in these zoning ordinances, or as are intended to be used with such piece, parcel, or plot of land.

*Lot area.*  The total horizontal area within the lot lines of a lot.

*Lot, corner.*  A lot abutting upon 2 or more streets at their intersection or upon 2 parts of a street which form an interior angle of less than 135 degrees.  The point of intersection of the street lines is the corner.

*Lot depth.*  The mean (average) horizontal distance between the front and rear lot lines, measured at right angles to the street lines.

*Lot, flag.*  A lot with access provided to the bulk of the lot by means of a narrow corridor.

*Lot, interior.*  A lot other than a corner lot.

*Lot line.*  The boundary line of a lot.

*Lot line, front.*  On an interior lot, the lot line abutting a street; on a corner lot, the shorter lot line abutting a street; on a through lot, the lot line abutting the street providing the primary means of access to the lot; on a flag lot, the interior lot line most parallel to and nearest  the street from which access is obtained; or on a waterfront lot, the lot line abutting the water.

*Lot line, rear.*  The lot line opposite and most distance from the front lot line.

*Lot line, side.*  Any lot line other than a front or rear lot line.  A side lot line of a corner lot separating a lot from a street is called a side street lot line.  A side lot line separating a lot from another lot is called an interior lot line.

*Lot of record.*  A lot which is a part of a recorded plat or a plot described by metes and bounds, the map and/or description of which has been recorded according to Alabama Law.

Defendants' Bates # 7049

*Lot of record, substandard.*   A lot of record which has less than the required minimum area or width as established by the zoning district in which it is located and provided that such lot was of record as a legally created lot on the effective date of these zoning ordinances.

*Lot, through.*   A lot, but not a corner lot, that abuts upon two streets, the two frontages being noncontiguous.

*Lot width.*   The horizontal distance between side lot lines, measured at the required front setback line.

*Major project.*   Any multifamily residential use, manufactured housing park, institutional use, professional service and office use, local commercial use, general commercial use, outdoor recreation use, marine recreation use, transportation, communication and utility use, light industrial use, or general industrial use.

*Manufactured housing.*   Single family detached housing that is built to the National Manufactured Housing Construction and Safety Standards Act of 1974, and shall include structures known as manufactured homes or mobile homes.

*Manufactured housing park.*   A parcel of land under single ownership that has been planned and improved for the placement of 5 or more manufactured homes for dwelling purposes and for the production of income.  Home sites within the manufactured housing park are leased to individual homeowners.

*Marina.*   A facility for storing, servicing, fueling, berthing, and securing and launching of private pleasure craft that may include the sale of fuel and incidental supplies for boat owners, crews, and guests, servicing and repair of boats, and sale and charter of boats.  Dry boat storage may also be provided.  A yacht club shall be considered a marina, but a hotel or similar use, where docking of boats and provision of services thereto is incidental to other activities, shall not be considered a marina, nor shall boat docks accessory to a multifamily structure where no boat related services are rendered.

*Marine recreation uses.*   This land use includes areas where water related recreational activities are the primary use. Activities may include all activities allowed as outdoor recreation activities as herein defined. In addition, permitted activities may include marinas, boat sales, boat servicing, boat storage, sale of fuel and supplies, and provision of lodging, food, beverages and entertainment.

*Marquee.*   A structure projecting from and supported by a building which extends beyond the building line or property line and fully or partially covers a sidewalk, public entrance or other pedestrian way.

Defendants' Bates # 7050

_Master plan._    The master plan for the physical development of the unincorporated areas of Baldwin County as adopted by the Baldwin County Commission.

_Mini-warehouse._    A building or group of buildings in a controlled access compound that contain varying sizes of individual, compartmentalized and controlled-access stalls, cubicles and/or lockers used for storage only.

_Minor project._    Any agricultural use or single family or two family residential structure and related accessory structures.

_Mobile home._ (See _Manufactured housing_).    A transportable, factory built home, designed to be used as a year round residential dwelling and built prior to the enactment of the Federal Manufactured Housing Construction and Safety Standards Act of 1974, which became effective June 15, 1976.

_Monument sign._    A monument sign is a freestanding sign, a wall with a permanently attached, or a decorative wall that incorporates a sign.  Monument signs are typically constructed low to the ground from natural materials such as stone, brick, or wood and surrounded with additional landscape plantings.  A monument sign shall be no more than 10 feet in height except where further restricted and shall have the lowest portion of its sign face no more than 3 feet above the ground.

_Motel._ (See _Hotel_).

_Multiple occupancy sign._ A parcel of property, or parcels of contiguous properties, existing as a unified or coordinated project, with a building or buildings housing more than one occupant.

_Neighborhood convenience store._    Any retail establishment offering for sale prepackaged food products, household items, and other goods commonly associated with the same and having a gross floor area of less than 5,000 square feet.    Neighborhood convenience stores shall not include fuel pumps or the selling of fuel for vehicles.

_Nightclub._    A restaurant, dining room, bar, or other similar establishment providing food or refreshments wherein floor shows or other forms of entertainment by persons are provided for guests.

_Nonconforming structure._    A structure lawfully occupying a site that does not conform with the standards of the zone in which it is located, including, but not limited to, front setback, side setbacks, rear setback, height, coverage, distances between structures and parking facilities.

*Nonconforming uses.* The use of a structure or premises, existing at the effective date of these ordinances, or any amendment thereto, for any purpose not permitted for a new use in the district in which it is located.

*Nursery.* Land, building, structure, or combination thereof for the storage, cultivation, transplanting of live trees, shrubs, or plants offered for wholesale or retail sale on the premises including products used for gardening or landscaping.

*Nursing home.* (See *Convalescent or nursing home*).

*Offices.* Space or rooms used for professional, administrative, clerical, and similar uses.

*Open space.* An area open to the sky that is intended to provide light and air, and is designed for either environmental, scenic or recreation purposes. Open space may include, but is not limited to, lawns, landscaped areas, buffers, natural areas, wooded areas, unenclosed walkways, decks, patios, fountains and outdoor recreation uses. Streets, driveways, parking lots, buildings and structures that are roofed shall not be included as open space.

*Open space, common.* (see *Common open space*).

*Outdoor recreation uses.* This land use includes areas where outdoor recreational activities are the primary use such as public parks or other recreational areas whether public or private. Activities may include picnicking, jogging, cycling, arboretums, hiking, golf courses, play grounds, ball fields, outdoor ball courts, stables, outdoor swimming pools, and water-related or water-dependent uses such as boat ramps, fishing docks and piers, and similar outdoor recreational uses. Specifically excluded from this group of uses are amusement parks, firing ranges, marinas, miniature golf courses, golf driving ranges, race tracks, and similar commercial or quasi-recreational activities inconsistent with the allowable outdoor recreation uses described.

*Overlay district.* A district that is superimposed over one or more zoning districts or parts of districts and that imposes specified requirements that are in addition to those otherwise applicable for the underlying zone.

*Parcel.* A unit of land within legally established property lines. If, however, the property lines are such as to defeat the purposes of these sign ordinances or lead to absurd results, a "parcel" may be designated for a particular site by the Zoning Administrator.

*Parking garage.* A building designed and used for the storage of automotive vehicles operated as a business enterprise with a service charge or fee being paid to the owner or operator for the parking or storage of privately owned vehicles.

Defendants' Bates # 7052

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 329 of 800   PageID #: 2343
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 250 of 293   PageID #: 942

*Parking lot.*  An area not within a building where motor vehicles may be stored for the purposes of temporary, daily, or overnight off-street parking.

*Parking space, off-street.*  An area adequate for parking an automobile with room for opening doors on both sides, together with properly related access to a public street or alley and maneuvering room, but shall be totally outside of any street or alley right-of-way.

*Pennant.*  Any lightweight plastic, fabric, or other material, whether containing a message or not, suspended from rope, wire, string, or other material, whether containing a message or not, suspended from a rope, wire, string, or other similar device, designed to move in the wind.

*Permitted use.*  A use by right that is specifically authorized in a particular zoning district.  It is contrasted with special exceptions and conditional uses that are authorized only if certain requirements are met and after review and approval by the Board of Adjustment and Planning Commission respectively.

*Pier.*  An elevated deck structure, usually pile supported, extending out into the water from the shore.

*Planned development.*  A development of land that is under unified control and is planned and developed as a whole in a single development operation or programmed series of development stages.

*Planning Commission.*  The Baldwin County Planning and Zoning Commission.

*Planning Director.*   The Director of the Baldwin County Planning & Zoning Department.

*Planning districts.*  The districts into which the County is divided for planning purposes and for the purpose of holding elections to determine if an area will be subject to the County's planning and zoning authority.

*Porch.*  A roofed-over space attached to the outside of an exterior wall of a building, which has no enclosure other than the exterior wall(s) to which it is attached.  Open mesh screening shall not be considered an enclosure. Porches shall be considered as a part of the main building and shall not project into a required front yard.

*Portable sign.*  Any sign not permanently attached to the ground or other permanent structure, or a sign designed to be transported, including, but not limited to , signs designed to be transported by means of wheels; signs converted to A-frames or T-frames; menu or sandwich board signs; balloons or other inflatable devises used as signs; umbrellas used for advertising; and signs

attached to or painted on vehicles parked and visible from the public right-of-way, unless such vehicle is used in the normal day to day operations of the business.

*Principal structure.*  A building in which the primary use of the lot on which the building is located is conducted.

*Printing and publishing.*  Includes printing and publishing of newspapers, books and periodicals by letterpress, lithography, offset, gravure, or screen methods. May also include book binding.

*Professional service and office uses.*  This group of uses includes business and professional offices, medical offices or clinics, financial institutions without drive-up windows, and personal service businesses where the service is performed on an individual-to-individual basis as opposed to services which are performed on objects or personal property.  Examples of personal service businesses are barber shops, beauty shops, or photography studios.  This group of uses may include a dispatching/communications/office center for the distribution of goods, but specifically excludes the warehousing or actual distribution of goods.

*Projecting sign.*  A sign affixed to a building or wall in such a manner that its leading edge extends more than 6 inches beyond the surface of the building or wall.

*Race track.*   Facility for the racing of horses, dogs, motor vehicles and motorcycles.

*Recreational vehicle.*  A self-propelled vehicle used for temporary housing of individuals and families during travel.  This category also includes travel trailers, campers, camping trailers, motor homes, small mobile homes used for vacation purposes and similar transient residential vehicles.

*Recreational vehicle park.*  A lot of land upon which one or more recreational vehicle sites are located, established, or maintained for occupancy by recreational vehicles of the general public as temporary living quarters for recreation or vacation purposes.

*Residential district.*  Includes the following zoning districts: RSF-E, RSF-1, RSF-S, RSF-3, RSF-4, RTF-4, RSF-6, RTF-6, RMF-6 and RMH.

*Residential dock or pier.*  A dock or pier constructed adjacent to a residential lot for gratis recreational purposes and/or mooring of private boats.

*Restaurant.*  An establishment which primarily serves food and refreshments for consumption on the premises to its patrons.

Defendants' Bates # 7054

*Restaurant, drive-in.* A restaurant or public eating business so conducted that food, meals or refreshments are brought to the motor vehicles for consumption by the customer or patron.

*Restaurant, fast-food.* Any establishment whose principal business is the sale of foods and refreshments in ready to consume individual servings, for consumption either within the restaurant building or for carryout, and where either: 1) foods and refreshments are usually served in paper, plastic, or other disposable containers, and where customers are not served their food and refreshments by a restaurant employee at the same table or counter where the items are consumed; or 2) the establishment includes a drive-up or drive-through service facility or offers curb service.

*Rezoning.* An amendment to the zoning district boundaries as delineated on the zoning map.

*Right-of-way.* A strip of land taken or dedicated for use as a public way.  In addition to the roadway, it normally incorporates the curbs, lawn strips, sidewalks, lighting, and drainage facilities, and may include special features (required by the topography or treatment) such as grade separation, landscaped areas, viaducts, and bridges.

*Roof line.* A horizontal line intersecting the highest point or points of a roof.

*Satellite receiving dishes.* A dish-shaped antenna designed to receive television broadcasts relayed by microwave signals from earth-orbiting communications satellites.  This definition also includes satellite earth stations, or television dish antennas.

*School.* A facility that provides a curriculum of elementary and secondary academic instruction, including kindergartens, elementary schools, junior high schools, and high schools.

*Setback line.* A line defining the limits of a yard in which no building or structure, other than an accessory structure, may be located.

*Shopping center.* A group of commercial establishments planned, constructed and managed as an entity with customer and employee parking provided on-site, provision for goods delivery separated from customer access, and designed to serve a community or neighborhood.

*Sign.* Any writing, pictorial presentation, number, illustration, decoration, flag, banner, pennant, or other device which is used to announce, direct, attention to, identify, advertise or otherwise make anything known.  The term sign shall not be deemed to include the terms "building" or "landscaping" or any architectural embellishment of a building not intended to communicate information.

Defendants' Bates # 7055

*Sign face area.*  The area of any regular geometric shape which contains the entire surface area of a sign upon which copy may be placed.

*Sign structure.*  Any construction used or designed to support a sign.

*Silviculture.*  The care and cultivation of forest trees.

*Site plan.*  The development plan for one or more lots on which is shown the existing and/or proposed conditions of the lot(s).

*Special exception.*  A land use permitted that is not similar in nature to the uses permitted in the district but that is desired in the community and for which a suitable district is not available.  Such use may be permitted upon approval of the Board of Adjustment and in compliance with any special conditions which may be required.

*Special flood hazard areas.*  Land in the floodplain subject to a one (1) percent or greater chance of flooding in any given year.

*Stable, public.*  A building where horses are kept for commercial use including boarding, hire, and sale.

*Stable, private.*  An accessory building in which horses are kept for the use of the occupants of the principal building.

*Stormwater management.*  The process of ensuring that the magnitude and frequency of stormwater runoff do not increase the hazards associated with flooding and that water quality is not compromised by untreated stormwater flow.

*Story.*  That portion of a building included between the surface of any floor and the surface of the next floor above it, or if there is no floor above it, then the space between such floor and the ceiling next above it.

*Story, habitable.*  A story having its floor elevated at or above base flood elevation as determined from the flood insurance rate maps, regardless of the intended use of the story or its floor area.

*Story, half (½).*  A space under a sloping roof in which not more than one-half (½) of the floor area is finished off for use. A half story containing independent apartment or living quarters shall be counted as a full story.

*Street.*  The full right-of-way of a thoroughfare which affords the principal means of access to abutting property.

Defendants' Bates # 7056

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 333 of 800   PageID #: 2347
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 254 of 293   PageID #: 946

(a) *Expressway or freeway.*  A facility which has the main function to accommodate a high volume of traffic for a considerable distance through the prohibiting of ingress and egress except at controlled intervals.  A freeway involves complete control of access while an expressway permits access at grade intersections at infrequent intervals.

(b) *Arterial.*  A street that connects areas which produce large numbers of trip generations.  An arterial functions to move traffic and to provide access to land uses, particularly high trip generating commercial activities.

(c) *Collector.*  A collector has the primary function of collecting traffic from an area and moving it to the arterial street system while also providing substantial service to abutting land use.

(d) *Minor street.*  A minor street is one whose primary function is to service abutting land use.  This includes cul-de-sacs, marginal access streets, residential access streets and country lanes.

(e) *Marginal access street.*  A minor street separating abutting land areas from arterial streets.  A service road in commercial areas intended to remove terminal traffic from arterials and allow them to fulfill their high volume, high speed function.  An access street in residential areas intended to remove local traffic from arterials and to buffer abutting residential lots from the detrimental effects of highway traffic use by park strips, screen plantings, or other measures, as well as to limit the number of direct driveway accesses to arterials for safety purposes.

(f) *Cul-de-sac.*  A minor street with only one outlet and having an appropriate terminal for the safe and convenient reversal of traffic movement.

*Structure.*  Any object, the whole or parts of which are constructed, erected or arranged by human agency, the use of which requires a location on the ground or attached to something having a location on the ground. Except as provided in *Section 10.4, Wetland Protection Overlay District,* bulkheads, fences, walls, retaining walls, fountains, trellises, pergolas, air conditioner platforms, walkways and similar features which provide a decorative, security or support function shall not be considered structures for purposes of these zoning ordinances.

*Subdivision.*  The division or redivision of a parcel of land into two or more parcels as provided for in the *Baldwin County Subdivision Regulations.*

*Tourist home.*  A building, or part thereof, other than a motel or hotel, where sleeping accommodations are provided for transient guests, with or without meals, and which also serves as the residence of the operator.

Defendants' Bates # 7057

*Tower.*  Any structure that is designed and constructed primarily for the purpose of supporting one or more antenna, including self supporting lattice towers, guyed towers, or monopole towers.   The term includes radio and television transmission towers, microwave towers, common carrier towers, cellular telephone towers and the like.  (see also *antenna support structure)*

*Townhouse.*  An attached dwelling unit having a separate ground floor entrance and separate private yard space, with common walls on one or both sides of the dwelling unit.

*Transportation, communication, and utility uses.* This group of activities  includes those uses which provide essential or important public services, and which may have characteristics of outdoor storage, or potential nuisance to adjacent properties due to noise, light and glare, or appearance.   Uses include the following, and substantially  similar activities, based upon similarity of characteristics:

> (a) Broadcasting stations and radio, television and telephone transmission towers.

> (b) Utility facilities, such as water plants, wastewater treatment plants, sanitary landfill operations and electric power substations.

> (c) Maintenance facilities and storage yards for schools, government agencies, and telephone and cable companies.

> (d) Airports, airfields, and truck or bus terminals.

> (e) Railroad stations, terminals, yards and service facilities.

*Unit.*  That part of a multiple occupancy complex housing one occupant.

*Use*.  The specific purpose for which land or a building is designated, arranged, intended, or for which it is or may be occupied or maintained.

*V-zone.*  (See *Coastal high hazard areas*).

*Variance.* A departure from the provisions of these ordinances relating to building and other structural setbacks, lot dimensions such as width, depth, or area, structure, or building height, open space, buffers, parking or loading requirements, lot coverage, impervious areas, landscaping, and similar type ordinances. A variance may not involve the actual use of the property, building or structures, procedural requirements, or definitions.

*Vehicle sign.*  Any sign affixed to a vehicle.

Defendants' Bates # 7058

*Waterway.*  Any body of water, including any creek, canal, river, lagoon, lake, bay or gulf, natural or artificial.

*Wetlands.*  Wetlands are areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions.  Wetlands generally include swamps, marshes, bogs and similar areas.

*Wholesale establishment.*  Business establishments that generally sell commodities in large quantities or by the place to retailers, jobbers, other wholesale establishments, or manufacturing establishments. These commodities are basically for further resale, for use in the fabrication of a product, or for use by a business service.

*Window sign.*  Any sign, picture, symbol, or combination thereof designed to communicate information about a business, commodity, event, sale, or service that is placed inside or upon a window and is visible from the exterior of the window.

*Wireless telecommunications facility.*  A facility that transmits and/or receives electromagnetic signals.  It includes antennas, microwave dishes, horns, and other types of equipment for the transmission or receipt of such signals, telecommunications towers, broadcasting towers, radio towers, television towers, telephone transmission towers or similar structures supporting said equipment, equipment buildings, parking area, access roads and other accessory structures.

*Yard.*  A space on the same lot with a principal building, such space being open, unoccupied and unobstructed by buildings or structures from ground to sky except where encroachments and accessory buildings are expressly permitted and complying with applicable building codes.

*Yard, front.*  An open, unoccupied space on the same lot with the principal building, extending the full width of the lot and situated between the right-of-way line and the front line of the building projected to the side lines of the lot.  The depth of the front yard shall be measured between the front lines of the building and the right-of-way line.  On corner lots the front yard shall be considered as parallel to the street upon which the lot has its least dimension.  On waterfront lots the front yard shall be considered from the front line of the principal building to the waterfront property line.

*Yard, rear.*  An open space on the same lot with the principal building, such space being unoccupied except possibly by an accessory building, extending the full width of the lot between the rear line of the principal building projected to the side lines of the lot and the rear lot line.  On all corner lots the rear yard shall be at the opposite end of the lot from the front yard.

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 336 of 800   PageID #: 2350
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 257 of 293   PageID #: 949

*Baldwin County Zoning Ordinances*                                          *22-24*

*Yard, side.* An open, unoccupied space on the same lot with a principal building, situated between the side line of the building and the adjacent side line of the lot extending from the rear line of the front yard to the front line of the rear yard. If no front yard is required, the rear boundary of the side yard shall be the rear line of the lot. On corner lots, the side yard shall be considered as parallel to the street upon which the lot has its greatest dimension.

*Zoning Administrator.* The Planning Director or his/her designee. The Zoning Administrator shall be responsible for administering these zoning ordinances.

*Zoning amendment.* A change or revision of the zoning ordinances or zoning map.

*Zoning district.* A section of the County delineated on the zoning map wherein all requirements for use of land and building and development standards are uniform.

*Zoning map.* The map or maps which are a part of these zoning ordinances and which delineate the boundaries of various zoning districts within those planning districts that elect to come under the planning and zoning jurisdiction of the Baldwin County Commission.

Defendants' Bates # 7060

# Article 23   Table of Permitted Uses

### Section 23.1 Use of Land and Structures

Except as provided in *Section 2.3: Establishment of Zoning in Planning Districts*, no building, structure or land shall be used or occupied and no building or part thereof shall be erected, constructed, moved or altered except in conformity with the use ordinances specified in the table of permitted uses for the zoning district in which it is or is to be located.

### Section 23.2 Permitted Uses

Uses in the table of permitted uses identified by (P) are permitted as of right, subject to the conditions specified in the Table or elsewhere in these ordinances.

### Section 23.3 Special Exceptions

Uses in the table of permitted uses identified by (S) are permitted upon special exception approval by the Board of Adjustment.

### Section 23.4 Conditional Uses

Uses in the table of permitted uses identified by (C) are permitted upon conditional use approval by the Planning Commission.

### Section 23.5 Prohibited Uses

Where any use or analogous use has blank spaces under any zones listed in the headings of the table of permitted uses, such use is specifically prohibited in such zones.

### Section 23.6 Unlisted Uses

In any case where a requested use is not specifically provided, the Zoning Administrator shall determine the appropriate zoning classification by reference to the most clearly analogous use or uses that are specifically provided.

Defendants' Bates # 7061

*Baldwin County Zoning Ordinances*                                                                                        23-2

## Figure 1: Table of Permitted Uses

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB | LB (>400sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RESIDENTIAL USES** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Accessory structures and uses | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | C | P | P | | P | P |
| Boarding, rooming or lodging house, dormitory | S | | | | | | | | S | S | S | | | | | P | P | P | | | | | | | | P | P |
| Fraternity or sorority house | S | | | | | | | | S | S | S | | | | | P | P | P | | | | | | | | P | P |
| Mail order house | S | | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Manufactured housing park | | | | | | | | | | | | | | P | | | | | | | | | | | | | |
| Mobile home/ manufactured home | P | P | P | P | P | P | P | P | P | P | P | P | P | P | | | | | | | | | P | | | | |
| Multiple family dwellings | | | | | | | | | | | | | P | P | | | | | | | | | | | | | |
| Single family dwelling, including mobile/manufactured home | P | P | P | P | P | P | P | P | P | P | P | P | P | P | | | | | | | | | P | | | | |
| Two family dwelling | | | | | | | | | P | | P | P | P | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **AGRICULTURE USES** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Agriculture | P | P | P | P | | | | | | | | | | | | | | | | | | | | | | P | P |

Defendants' Bates # 7062

*Baldwin County Zoning Ordinances* 23-3

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB | LB (>400 ft) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Animal raising | P | P | P | P | | | | | | | | | | | | | | | | | | | | | | P | P |
| Dairying | P | P | P | P | | | | | | | | | | | | | | | | | | | | | | P | P |
| Farming | P | P | P | P | | | | | | | | | | | | | | | | | | | | | | P | P |
| Floriculture | P | P | P | P | | | | | | | | | | | | | | | | | | | | | | P | P |
| Hatchery, poultry and fish | P | P | P | P | | | | | | | | | | | | | | | | | | | | | | P | P |
| Horticulture | P | P | P | P | | | | | | | | | | | | | | | | | | | | | | P | P |
| Pasturage | P | P | P | P | | | | | | | | | | | | | | | | | | | | | | P | P |
| Silviculture | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | C | P | P | P | P | P |
| Stables | P | P | P | P | | | | | | | | | | | | | | | | | | | | | | P | P |
| Viticulture | P | P | P | P | | | | | | | | | | | | | | | | | | | | | | P | P |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **INSTITUTIONAL USES** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Ambulance/EMS Service | S | C | C | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Art gallery or museum | S | C | C | | | | | | | | | | | | | | P | P | | | P | C | | | | P | P |
| Auditorium, stadium, coliseum | S | C | C | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Business school or college | S | C | C | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Cemetery (See Sections 2.3 and 13.7) | C | C/ P | C | P | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Church or similar religious facility | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P* | P* | P | P | P | P | P |
| City hall or courthouse | S | C | C | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Club or lodge | S | C | C | | | | | | | | | | | | P | P | P | P | | | P | C | | | | P | P |

*Baldwin County Zoning Ordinances*                                                                                          23-4

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB (<4000 sf) | LB (>4000 sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| College or university | S | C | C | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Convalescent or nursing home | S | C | C | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Correctional, detention, or penal institution | | C | C | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Child care center | P | C | C | | | | | | | | | | | C | P | P | P | P | | | | | | | | P | P |
| Child care institution | P | C | C | | | | | | | | | | | C | P | P | P | P | | | | | | | | P | P |
| Day care home | P | C | C | C | C | C | C | C | C | C | C | C | C | | | | | | | | | | C | | | | |
| Dog Pound | S | C | C | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Fire station | S | C | C | C | C | C | C | C | C | C | C | C | C | C | P | P | P | P | | | | | | | | P | P |
| Funeral home | S | C | C | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Hospital | S | C | C | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Library | P | C | C | | | | | | | | | | | | P | P | P | P | | | P | C | | | | P | P |
| Police station | S | C | C | | | | | | | | | | | | P | P | P | P | | | | | | | | P | P |
| Post office | P | C | C | | | | | | | | | | | | P | P | P | P | | | | | | | | P | P |
| Sanitarium | | | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| School (public or private) | P | P | P | C | C | C | C | C | C | C | C | C | C | C | P | P | P | P | | | | | | | | P | P |
| Teen club or youth center | S | C | C | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| YMCA, YWCA | S | C | C | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Zoo | S | C | C | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **PROFESSIONAL SERVICE & OFFICE USE** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bank | P | | | | | | | | | | | | | | P | P | P | P | | | P | C | | | | P | P |

Defendants' Bates # 7064

*Baldwin County Zoning Ordinances*                                                                                      23-5

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB (additional) | LB (>4000 sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Barber shop or beauty parlor | P | | | | | | | | | | | | | | P | P | P | P | | | P | C | | | | P | P |
| Clinic or doctor office (medical, dental, psychiatric) | P | | | | | | | | | | | | | | P | P | P | P | | | | | | | | P | P |
| Medical Office (medical, dental, psychiatric) | | | | | | | | | | | | | | | | | | | | | P | C | | | | | |
| Office | P | | | | | | | | | | | | | | P | P | P | P | | | P | C | P | | S | P | P |
| Optician | P | | | | | | | | | | | | | | P | P | P | P | | | | | | | | P | P |
| Laboratory, scientific, medical, dental | P | | | | | | | | | | | | | | P | P | P | P | | | | | | | | P | P |
| Mixed commercial/ residential | | | | | | | | | | | | | | | C | C | | | | | | C | | | | | |
| Studio for dance, music, photography, painting, etc. | P | | | | | | | | | | | | | | P | P | P | P | | | P | C | | | | P | P |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **LOCAL COMMERCIAL USES** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |

Defendants' Bates # 7065

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB (seasonal) | LB (<4000 sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Accessory structures and uses such as food service, gift or novelty shops, and barber or beauty shops conducted primarily for the convenience of visitors or patrons on the premises and contained within a principal building (see Section 13.1) | | | | | | | | | | | | | | | | | | | | | | | | | P | | |
| Antique store | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Apparel and accessory store | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Appliance store including repair | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Art supplies | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Automobile parts sales | P | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Bakery retail | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Bed and breakfast or tourist home (see Section 13.11) | P | S | S | S | S | S | S | S | S | S | S | S | | | | P | P | P | | | | | P | | S | P | P |
| Bicycle sales and service | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Book store | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Café | P | | | | | | | | | | | | | | | P | P | P | | | P | C | P | | S | P | P |

Defendants' Bates # 7066

*Baldwin County Zoning Ordinances*      23-7

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB (<8000 sf) | LB (>8000 sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Camera and photo shop | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Candy store | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Catering shop or service | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Copy shop | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Delicatessen | P | | | | | | | | | | | | | | | P | P | P | | | P | C | P | | S | P | P |
| Discount/variety store (not to exceed 8,000 square feet) | S | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Drug store (not to exceed 8,000 square feet) | S | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Fixture sales | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Floor covering sales or service | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Florist | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Fruit and produce store | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Gift shop | P | | | | | | | | | | | | | | | P | P | P | | | P | C | P | | S | P | P |
| Hardware store, retail | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Ice cream parlor | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Interior decorating shop | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Laundry, self service | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Laundry and dry cleaning store | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Locksmith | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Music store | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |

Defendants' Bates # 7067

*Baldwin County Zoning Ordinances*                                                                 23-8

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB (<4000sf) | LB (>4000sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Neighborhood convenience store | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| News stand | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Paint and wallpaper store | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Picture framing and/or mirror silvering | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Restaurant | P | | | | | | | | | | | | | | | P | P | P | | | P | C | P | | S | P | P |
| Shoe repair shop | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Shoe store | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Sign shop | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Sporting goods store | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Tailor shop | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| Tobacco store | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Toy store | P | | | | | | | | | | | | | | | P | P | P | | | P | C | | | | P | P |
| **GENERAL COMMERCIAL USES** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Air conditioning sales and service | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Animal clinic/kennels | P | P | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Amusement arcade | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Bakery, wholesale | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Bowling alley | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |

Defendants' Bates # 7068

*Baldwin County Zoning Ordinances*  23-9

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB | LB | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Business machine sales and service | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Butane gas sales | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Car wash | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Convenience store | P | | | | | | | | | | | | | | | P | P | P | | | | | | | | P | P |
| Country club | S | P | | C | C | C | C | C | C | C | C | C | C | C | | C | P | P | | | | | P | | P | P | P |
| Department store | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Discount/variety store (exceeding 8,000 square feet) | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Drug store (exceeding 8,000 square feet) | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Elevator maintenance service | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Exterminator service office | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Farmer's market/truck crops | P | P | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Firing range | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Fitness center or gym | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Golf driving range | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Grocery store | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Landscape sales | P | P | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Lawnmower sales and service | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Liquor store | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Miniature golf | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Mini-warehouse | S | S | | | | | | | | | | C | C | | C | C | P | P | | | | | | | | P | P |

Defendants' Bates # 7069

*Baldwin County Zoning Ordinances*                                                                 23-10

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB (<4000sf) | LB (>4000 sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Night club, bar, tavern | S | | | | | | | | | | | | | | | C | P | P | | | | | P | | S | P | P |
| Nursery | P | P | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Office equipment and supplies sales | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Office Warehouse | S | | | | | | | | | | | | | | C | C | P | P | | | | | | | | P | P |
| Pawn shop | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Pet shop | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Plumbing shop | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Printing and publishing establishment | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Race track | | | | | | | | | | | | | | | | | | C | | | | | | | | C | C |
| Restaurant sales and supplies | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Rug and/or drapery cleaning service | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Seafood store | S | | | | | | | | | | | | | | | C | P | P | | | | | | | | P | P |
| Skating rink | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Stone monument sales | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Taxidermy | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| **MAJOR COMMERCIAL USES** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Amusement park | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Auto convenience market | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |

Defendants' Bates # 7070

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 347 of 800   PageID #: 2361
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 268 of 293   PageID #: 960

*Baldwin County Zoning Ordinances*                                                                 23-11

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB (seasonal) | LB (>400sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Automobile parts sales | P | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Automobile repair (mechanical and body) | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Automobile sales | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Automobile service station | S | | | | | | | | | | | | | | | | P | P | | | | | | | | P | P |
| Automobile storage (parking lot/garage) | S | | | | | | | | | | | | | | | | C | P | | | | | | | P | P | P |
| Building materials | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Farm implements | P | P | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Flea market | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Home improvement center | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Hotel or motel | S | | | | | | | | | | | | | | | | C | P | | | | | MR→P | | P | P | P |
| Manufactured housing sales, service and repair | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Motorcycle sales, service and repair | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Movie theatre | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Recreational vehicle park (see Sections 13.9 and 2.3) | S | S | S | | | | | | | | | | | | | | C | P | P | P | | | | | | P | P |
| Recreational vehicle sales, service and repair | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| Restaurant, drive-in | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |

Defendants' Bates # 7071

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 348 of 800   PageID #: 2362
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 269 of 293   PageID #: 961

*Baldwin County Zoning Ordinances*                                                                23-12

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB (common) | LB (>400 sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Restaurant, fast food | S | | | | | | | | | | | | | | | | C | P | | | | | | | | P | P |
| **OUTDOOR RECREATION USES** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Arboretums | P | P | P | C | C | C | C | C | C | C | C | C | C | C | C | C | P | P | | | | | P | P | P | P | P |
| Ball fields | P | P | P | C | C | C | C | C | C | C | C | C | C | C | C | | P | P | | | | | P | P | P | P | P |
| Golf course | P | P | P | C | C | C | C | C | C | C | C | C | C | C | C | C | P | P | | | | | P | P | P | P | P |
| Park or playground | P | P | P | C | C | C | C | C | C | C | C | C | C | C | C | C | P | P | | | | | P | P | P | P | P |
| Riding academy | P | P | P | C | C | C | C | C | C | C | C | C | C | C | C | C | P | P | | | | | P | P | P | P | P |
| Swimming pool (outdoor) | P | P | P | C | C | C | C | C | C | C | C | C | C | C | C | C | P | P | | | | | P | P | P | P | P |
| Tennis court (outdoor) | P | P | P | C | C | C | C | C | C | C | C | C | C | C | C | C | P | P | | | | | P | P | | P | P |
| Wildlife sanctuary | P | P | P | C | C | C | C | C | C | C | C | C | C | C | C | C | P | P | | | | | P | P | P | P | P |
| **MARINE RECREATION USES** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bait store | P | | | | | | | | | | | | | | | P | P | P | | | | | P | | | P | P |
| Boat sales and service | P | | | | | | | | | | | | | | | | C | P | | | | | P | | | P | P |
| Marina | P | | | | | | | | | | | | | | | | C | P | | | | | P | | S | P | P |
| Marine store and supplies | P | | | | | | | | | | | | | | | | P | P | | | | | P | | | P | P |

Defendants' Bates # 7072

*Baldwin County Zoning Ordinances*                                                                         *23-13*

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB (optional) | LB (>400 sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TRANSPORTATION, COMMUNICATION & UTILITY USES** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Airport | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Armory | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Broadcasting station | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Barge docking | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Bus and railroad terminal facilities | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Electric power substations | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Freight depot, rail or truck | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Landfill (See Section 2.3, Local Provisions) | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | C | C |
| Maintenance facility/storage yard for schools, government agencies, and telephone and cable companies | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Radio and television station and transmitting tower | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Railroad facilities | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Sewage treatment plant | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | C | C |

Defendants' Bates # 7073

*Baldwin County Zoning Ordinances*　　23-14

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB (<40000 sf) | LB (>40000 sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Taxi dispatching station | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Taxi terminal | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | |
| Telephone exchange | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Water plant | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Water storage tank | C | C | | | | | | | | | | | | | | C | C | C | | | | | | | C | P | P |
| Water or sewage pumping station | C | C | | | | | | | | | | | | | | | C | C | | | | | | | | P | P |
| Water well (public or private) | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| Wireless telecommunication facilities (see Section 13.10) | C | C | | | | | | | | | | | | | | C | C | C | | | | | | | | P | P |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| **LIGHT INDUSTRIAL USES** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Automobile manufacture | | S | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Bottling works | | S | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Cabinet shop | | S | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Contractor's yard | | S | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Grain milling storage and elevators | | S | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Ice plant | | S | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Lumberyard | | S | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Machine shop | | S | | | | | | | | | | | | | | | | | | | | | | | | P | P |

Defendants' Bates # 7074

*Baldwin County Zoning Ordinances*      *23-15*

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB | LB (>4000 sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Machinery, tools and construction equipment sales and service | S | | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Manufacturing, repair, assembly or processing establishments of a light industrial nature including: food and milk products; clothing; musical instruments; scientific, optical, medical & electronic equipment; souvenirs and novelties; toys, sporting goods & athletic goods; laboratories for testing materials, chemical analysis and photo processing | S | | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Millwork | S | | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Sand and gravel storage yard | S | | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Sawmill or planing mill | S | | | | | | | | | | | | | | | | | | | | | | | | | P | P |

*Baldwin County Zoning Ordinances*                                                                 23-16

| | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RMH | B-1 | B-2 | B-3 | B-4 | RV-1 | RV-2 | LB (restricted) | LB (>4000 sf) | MR | OR | TR | M-1 | M-2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Warehouse and storage facilities | S | | | | | | | | | | | | | | | | | | | | | | | | | P | P |
| Welding shop | S | | | | | | | | | | | | | | | | | | | | | | | | | P | P |

| **GENERAL INDUSTRIAL USES** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Automobile wrecking and salvage | | | | | | | | | | | | | | | | | | | | | | | | | | | C |
| Concentrated animal feeding (CAFO) | | | | | | | | | | | | | | | | | | | | | | | | | | | C |
| Electric power generating plant | | | | | | | | | | | | | | | | | | | | | | | | | | | C |
| Extraction or removal of natural resources on or under land | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P | P |
| Junk yard | | | | | | | | | | | | | | | | | | | | | | | | | | | C |
| Meat slaughtering and/or packing | | | | | | | | | | | | | | | | | | | | | | | | | | | C |
| Shipbuilding and repair yard | | | | | | | | | | | | | | | | | | | | | | | | | | | C |
| Stone cutting and processing | | | | | | | | | | | | | | | | | | | | | | | | | | | C |

Defendants' Bates # 7076

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 353 of 800   PageID #: 2367
Case 1:20-cv-00057-C   Document 45-1   Filed 05/21/21   Page 274 of 293   PageID #: 966

*Baldwin County Zoning Ordinances*                                                                23-17

| | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Manufacturing, repair, assembly, processing, fabrication establishments of a general industrial nature including: acetylene gas; acid; asbestos; ammonia; bleaching powder; chlorine; asphalt or asphalt products; cement or cement products; lime; gypsum; plaster of paris; coal tar or derivatives thereof; creosote or creosote treatment; clay, tile or vitrified products; emery cloth or sandpaper; explosives or fireworks; fertilizer; glue; size or gelatin; linoleum; matches; paint; oil; shellac; turpentine; varnish; rubber and gutta percha products; plastics; soca compounds; petroleum refining; tanning; curing or storage of hides and skins; boiler works; foundry or forge operation; incineration; fat rendering; storage of | | | | | | | | | | | | | | | | | | | | | | | C |

*Baldwin County Zoning Ordinances*                                                                                    23-18

| junk, iron or rags; distillation of bones, coal, or wood | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Defendants' Bates # 7078

*Baldwin County Zoning Ordinances*         *23-19*

## Figure 2: Area and Dimensional Ordinances

| | Zoning District Name | Minimum Lot Area | Minimum Lot Width (Feet) | Maximum Density (DU's per acre) | Minimum Front Yard (Feet) | Minimum Rear Yard (Feet) | Minimum Side Yards (Feet) | Maximum Height (Feet/stories) | Maximum GCR |
|---|---|---|---|---|---|---|---|---|---|
| RR | Rural District | 40,000 sq. ft. | 120/120 | N/A | 30 | 30 | 10 | 35 | N/A |
| RA | Rural Agricultural District | 3 Acres | 210/210 | N/A | 40 | 40 | 15 | 35 | N/A |
| CR | Conservation Resource District | 5 Acres | 250/250 | N/A | 100 | 100 | 50 | 50 | N/A |
| RSF-E | Residential Single Family Estate | 80,000 sq. ft. | 165/165 | N/A | 40 | 40 | 15 | 35 | .35 |
| RSF-1 | Single Family District | 30,000 sq. ft. (a) | 100/50 | N/A | 30 | 30 | 10 | 35 | .35 |
| RSF-2 | Single Family District | 15,000 sq. ft. (a) | 80/40 | N/A | 30 | 30 | 10 | 35 | .35 |
| RSF-3 | Single Family District | 10,000 sq. ft. (a) | 80/40 | N/A | 30 | 30 | 10 | 35 | .35 |
| RSF-4 | Single Family District | 7,500 sq. ft. (a) | 60/30 | N/A | 30 | 30 | 10 | 35 | .35 |
| RTF-4 | Two Family District | | | | | | | | |
| | Single Family | 7,500 sq. ft. (a) | 60/30 | N/A | 30 | 30 | 10 | 35 | .35 |
| | Two Family | 7,500 sq. ft. (a) | 60/30 | 4.0 per acre | 30 | 30 | 10 | 35 | .35 |
| RSF-6 | Single Family District | 6,500 sq. ft. (a) | 60/30 | N/A | 30 | 30 | 10 | 35 | .35 |
| RTF-6 | Two Family District | | | | | | | | |
| | Single Family | 6,500 sq. ft. (a) | 60/30 | N/A | 30 | 30 | 10 | 35 | .35 |
| | Two Family | 6,500 sq. ft. (a) | 60/30 | 6.0 per acre | 30 | 30 | 10 | 35 | .35 |
| RMF-6 | Multiple Family District | | | | | | | | |
| | Single Family | 6,500 sq. ft. (a) | 60/30 | N/A | 30 | 30 | 10 | 35 | .35 |
| | Two Family | 6,500 sq. ft. (a) | 60/30 | 6.0 per acre | 30 | 30 | 10 | 35 | .35 |

Defendants' Bates # 7079

|      | Use | Min Lot Area | Width | Density | | | | Height |
|------|-----|-----|-----|-----|-----|-----|-----|-----|
|      | Townhouses .80 | 2,500 sq. ft. (a) | 25/25 | 6.0 per acre | 25 | 25 | 10 | 35 |
|      | Multiple Family .80 | 22,000 sq. ft. | 100/50 | 6.0 per acre | 25 | 25 | 25 | 35 |
| HDR  | High Density Residential District | | | | | | | |
|      | Single Family .35 | 6,500 sq. ft. (a) | 60/30 | 12.0 per acre | 30 | 30 | 10 | 35 |
|      | Two Family .35 | 6,500 sq. ft. (a) | 60/30 | 12.0 per acre | 30 | 30 | 10 | 35 |
|      | Townhouses .80 | 2,500 sq. ft. (a) | 25/25 | 12.0 per acre | 25 | 25 | 10 | 35 |
|      | Multiple Family .80 | 22,000 sq. ft. | 100/50 | 12.0 per acre | 25 | 25 | 25 | 35 |
| RMH  | Residential Manufactured Housing N/A | (i) | (i) | 6.0 per acre | (i) | (i) | (i) | 35 |
| B-1  | Professional Business District .60 | 20,000 sq. ft. | 80/60 | N/A | 30 | 25 | 15 | 35/2.5 |
| B-2  | Local Business District .60 | 20,000 sq. ft. | 80/60 | N/A | 30 | 25 | 15 | 35/2.5 |
| B-3  | General Business District .70 | 20,000 sq. ft. | 80/60 | N/A | 40 | 25 | 15 | 40/3.0 |
| B-4  | Major Commercial District .70 | 20,000 sq. ft. | 80/60 | N/A | 40 | 25 | 15 | 40/3.0 |
| RV-1 | Recreational Vehicle Park N/A | 3 Acres | 50 | 15.0 per acre | (j) | (j) | (j) | N/A |
| RV-2 | Recreational Vehicle Park N/A | 3 Acres | 50 | 6.0 per acre | (j) | (j) | (j) | N/A |
| LB   | Limited Business District .60 | 20,000 sq. ft. | 80/60 | N/A | 30 | (k) | (k) | 35 |
| MR   | Marine Recreation District .80 | 80,000 sq. ft. | 165 | N/A | 25 | 25 | 10 | 45/4.0 |
| OR   | Outdoor Recreation District .80 | 3 Acres | 210 | 40 | 40 | 20 | 35/2.5 | 35/2.5 |
| TR   | Tourist Resort District .80 | 5 Acres | 270 | N/A | 40 | 40 | 20 | 45/4.0 |
| M-1  | Light Industrial District .80 | 40,000 sq. ft. | 120 | N/A | 25 | (d) | (d) | 45/4.0 (e) |
| M-2  | General Industrial District .80 | 3 Acres | 210 | N/A | 25 | (f) | (f) | 45/4.0 (e) |

Defendants' Bates # 7080

(a)  Per dwelling unit.
(b)  No minimum required except where abutting a residential district, in which case there shall be a minimum yard of 20-feet abutting the residential district.
(c)  The required yards shall be increased by one foot for each one foot of building height in excess of 45-feet.
(d)  No minimum except where abutting a residential district, in which case there shall be a minimum yard of 25-feet abutting the residential district.
(e)  The required yards shall be increased by one foot for each one foot of building height in excess of 35-feet.
(f)  No minimum except where abutting a residential district, in which case there shall be a minimum yard of 30-feet abutting the residential district.
(g)  See *Section 9.3: Planned Residential Development (PRD)*.
(h)  See *Section 9.6: Planned Industrial Development (PID)*.
(i)  See *Section 4.11: Residential Manufactured Housing Park District*.
(j)  See *Section 13.9: Recreational Vehicle (RV) Parks*.
(k)  See Section 5.7: *LB, Limited Business District*.

**Note: For modifications to the regulations listed above, refer to** *Section 2.3: Establishment of Zoning in Planning Districts, Section 3.1: RR Rural District, Section 3.2: RA Rural Agricultural District, Section 4.1: RSF-E Residential Single Family Estate District, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas and Section 12.8: Highway Construction Setbacks.*

Defendants' Bates # 7081

## Appendix A   District Boundaries for Zoned Planning Districts

The legal descriptions for the zoned Planning Districts in Baldwin County are listed as follows:

1.   ***Planning District 1.***

   County zoning has not been instituted in this district.

2.   ***Planning District 2.***

   County zoning has not been instituted in this district.

3.   ***Planning District 3.***

   County zoning has not been instituted in this district.

4.   ***Planning District 4.***

   Beginning at the Southeast corner of Section 36, Township 2 South, Range 2 East, run thence Northwardly along the section lines to the intersection with the Northern right-of-way of I-65; run thence Westwardly along the Northern right-of-way to its intersection with Mobile River; run thence Southwardly along the meanderings of Mobile River to its intersection with the Northern right-of-way of the Seaboard Railroad; run thence Eastwardly along the Northern right-of-way of the Seaboard Railroad to the Eastern shoreline of the Tensaw River; run thence Southwardly along the Eastern shoreline of the Tensaw River to its intersection with the Apalachee River; run thence Southwardly along the Eastern shoreline of the Apalachee River to the intersection with the Southern line of Township 3 South; run thence Eastwardly along the Southern line of Township 3 South to White House Creek; run thence Northwardly and Eastwardly along White House Creek to the intersection with the Southern line Township 2 South; run thence Eastwardly along the Southern boundary of Township 2 South to the point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

5.   ***Planning District 5.***

   County zoning has not been instituted in this district.

6.   ***Planning District 6.***

   County zoning has not been instituted in this district.

Defendants' Bates # 7082

7. **Planning District 7.**

   County zoning has not been instituted in this district.

8. **Planning District 8.**

   Abolished by action of the Baldwin County Commission (April 15, 2003).

9. **Planning District 9.**

   County zoning has not been instituted in this district.

10. **Planning District 10.**

   Beginning at the intersection of Mobile River with the Northern right-of-way of the Seaboard Railroad; run thence Eastwardly along the Northern right-of-way of the Seaboard Railroad to the Eastern shoreline of the Tensaw River; run thence Southwardly along the Eastern shoreline of the Tensaw River to its intersection with the Apalachee River; run thence Southwardly along the Eastern shoreline of the Apalachee River to its intersection with the Southern line of Township 3 South; run thence Eastwardly along the Southern line of Township 3 South to the Northeast corner of Section 4 South, Township 4 South, Range 2 East; run thence South to the Southeast corner of Section 8, Township 4 South, Range 2 East; run thence Eastwardly to the Northeast corner of Section 15 Township 4 South, Range 2 East; run thence Southwardly to the intersection of I-10; run thence Southwardly to the East right-of-way of State Highway 181 to its intersection of U.S. Highway 90; run thence Westwardly along the North right-of-way of U.S. Highway 90 to Section line 33; run thence Northwardly to the South right-of-way of I-10; run thence Westwardly along the Southern right-of-way of I-10 to its intersection with the Northern right-of-way of U.S. Highway 98; run thence Westwardly along the Northern right-of-way of U.S. Highway 98 to the point of intersection with Spanish River, said point being the Mobile/Baldwin Counties line; run thence Northwardly along said County line as it meanders to the Mobile River; thence continuing Northwardly along the Mobile River to the intersection with the Northern right-of-way of the Seaboard Railroad, said point being the point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

11. **Planning District 11.**

   Abolished by action of the Baldwin County Commission (April 15, 2003).

*Baldwin County Zoning Ordinances* _____ *A-3*

12.   ***Planning District 12.***

Beginning at the Northeast corner of the Southeast quarter of the Southwest quarter of the Northwest quarter of Section 1, Township 6 South, Range 3 East; run thence Westwardly to the Eastern section line of Section 4, Township 6 South, Range 3 East; run thence Northwardly to the Northeast corner of Section 9, Township 4 South, Range 3 East; run thence Eastwardly to the Southeast corner of Section 1, Township 4 South, Range 3 East; run thence Northwardly along the section line to the Northwest corner of Section 6, Township 4 South, Range 4 East; run thence Eastwardly along the section lines to its intersection with Hollinger Creek; run thence Southwardly along the meanderings of Hollinger Creek to its intersection with the Eastern boundary of Range 4 East; run thence Southwardly along the Eastern Boundary of Range 4 East to the Southeast corner of the Northeast quarter of the Northeast quarter of Section 12, Township 6 South, Range 4 East; run thence Westwardly to the Southeast corner of the Northwest quarter of the Northeast quarter of Section 8, Township 6 South, Range 4 East; run thence Northwardly to the South right-of-way of U.S. Highway 90; thence meandering along the boundaries of Planning District 31 to the South right-of-way of County Road 54; run thence Southwardly to the Southern right-of-way of County Road 54; run thence Westwardly meandering along the corporate limits of Robertsdale to the Southwest corner of the Northwest quarter of the Southeast quarter of the Northwest quarter of Section 1, Township 6 South, Range 3 East, point of beginning.  The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

13.   ***Planning District 13.***

County zoning has not been instituted in this district.

14.   ***Planning District 14.***

County zoning has not been instituted in this district.

15.   ***Planning District 15.***

Beginning at the intersection of U.S. Highway 90 and Eastern right-of-way State Highway 181; thence run Southwardly along the center State Highway 181 to the Southwest corner of the Section 11, Township 5 South, Range 2 East; thence run Eastwardly along Section lines to the Southeast corner of Section 7, Township 5 South, Range 3 East; thence run Northwardly along section lines to the Northwest corner of Section 5, Township 5 South, Range 3 East; thence run Eastwardly to the Northeast corner of Section 4, Township 5 South, Range 3 East; thence run

Defendants' Bates # 7084

Southwardly to the Southeast corner of the Northeast quarter of Section 4, Township 6, Range 3 East; thence run Westwardly to the Southwest corner of the Northwest quarter of Section 2, Township 6 South, Range 2 East; thence run Northwardly to the Northwest corner of the Southwest quarter of the Northwest quarter of Section 2, Township 6 South, Range 2 East; thence run S90 00' 00" W, 1225 feet to a point; thence run S 0 09' 09" E, 200 feet to a point: thence run S90 00' 00" W, 200 feet to a point; thence run N 0 09' 09" W, 200 feet to a point; thence run Westwardly to the Northwest corner of the Northeast quarter of the Southeast quarter of the Northwest quarter of Section 3, Township 6 South , Range 2 East; thence run Southwardly to the Southwest corner of the Southeast quarter of the Southeast quarter of the Northwest Quarter of Section 3, Township 6 South, Range 2 East; thence run Westwardly to the Southwest corner of the Northwest quarter of Section 3, Township 6 South, Range 2 East; thence run Northwardly to the Northeast corner of the Southeast quarter of the Northeast quarter of the Southeast quarter of Section 28, Township 5 South, Range 2 East;  thence run Westwardly to the West section line of Section 28, Township 5 South, Range 2 East; thence run Northwardly to the Northwest corner of Section 9, Township 5 South, Range 2 East; thence run Eastwardly to the Eastern right-of-way of County Road 13; thence run Northwardly along section lines to center of U.S. Highway 90; thence run Eastwardly along U.S. Highway 90 to point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

16.   **Planning District 16.**

Beginning at a point where the Eastern Shore of Mobile Bay intersects the South Corporate limits of Daphne; then meandering Eastwardly along the South Corporate limits of Daphne to the Western right-of-way of Scenic Highway 98; thence Southwardly along the Western right-of-way of Scenic Highway 98 (also designated as Main street) to where it intersects with the half section line of Section 30, Township 5 South, Range 2 East; run thence Eastwardly along the half section lines to the Eastern Section line of Section 28, Township 5 South Range 2 East; run thence Southwardly along the section lines to the Northern right-of-way of State Highway 104; run thence Westwardly along the Northern right-of-way to the intersection with the Westward extension of State Highway 104 and Mobile Bay; run thence Northwardly along the meanderings of Mobile Bay to the point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

17.   **Planning District 17.**

Defendants' Bates # 7085

County zoning has not been instituted in this district.

18.   ***Planning District 18.***

County zoning has not been instituted in this district.

19   ***Planning District 19.***

Abolished by action of the Baldwin County Commission (April 15, 2003).

20.   ***Planning District 20.***

Beginning at the Southwest corner of the Southeast quarter of Section 29, Township 7 South, Range 3 East; run thence Westwardly to the Shoreline of Weeks Bay; run thence Southwardly to the Southwest point of parcel 56-07-36-0-001-001.000; run thence Southeastwardly to the Northeast corner of parcel 56-07-40-0-001-002.002; run thence Southeastwardly to the Southwest corner of Parcel 60-03-37-0-000-001.000; thence run Northeast along the Southern boundary of said parcel to the Southeast corner; run thence Southeast along the Western boundary of Grant Section 32, Township 8 South, Range 3 East, to the Northwest corner of Parcel 60-03-32-0-000-008.001; run thence Northeast along the Northern boundary of said parcel to the Centerline of Lipscomb Road; run thence Southeast along the centerline of said road to the intersection of Lipscomb Road and Baldwin County Highway 26; run thence Northeast along the centerline of Baldwin County Highway 26 to the point of intersection of the Western boundary Grant Section 31, Township 8 South, Range 3 East; run thence Northwest along the Western boundary of said Grant Section line 1541 feet to the Southwest corner of Parcel 60-03-31-0-000-023.000; run thence Northeast along the Southern boundary of said parcel to the imaginary intersection extended centerline of Mullet Lane and said parcel line; run thence Northwest along the centerline of said lane to the intersection of Mullet Lane and 3rd Avenue; run thence Northeast along said avenue to the intersection of 3rd Avenue and Collins Lane; run thence Southeast along the centerline of said lane to the intersection of Collins Lane and Baldwin County Highway 26; run thence Eastwardly along the centerline of Baldwin County Highway 26 to a point located 475 feet West of the Southeast Corner of Section 32, Township 7 South, Range 3 East; run thence North 1480 feet to a point; run thence East 296 feet to a point; run thence North to the center of Weeks Creek; run thence Eastwardly along the meandering centerline of Weeks Creek to a point described as the intersection of said creek and a line parallel and North 1343.5 feet of the Southern boundary of Section 33, Township 7 South, Range 3 East; run thence East along said parallel line to a point 1343.5 feet North of the Southeast corner of Section 33, Township 7 South, Range 3 East, also described as the intersection of Keith Lane and the centerline of Baldwin

County Highway 49; run thence North along Baldwin County Highway 49, 491 feet to a point; run thence Southeast 1205.6 feet to a point, also known as the Southwest corner of Parcel Number 55-08-43-0-000-006.000 Grant Section 43, Township 7 South Range 3 East; run thence Northeast 368 feet to a point, also known as the Northwest corner of said parcel; run thence Southeast, parallel to the North line of said parcel, 1721.6 feet to the centerline of Sherman Road a.k.a. Weeks Road; run thence South along the centerline of said road to a point defined as the intersection of said road and the Southern boundary of Section 34, Township 7 South, Range 3 East; run thence East along said Section line to the intersection of Grant 43 and said Section line; run thence Northeast along Grant 43 to the Northeast corner of Grant 43, Township 7 South, Range 3 East; run thence Northwest along the North boundary of Grant 43 to the intersection of said Grant 43 and the Western boundary of Section 34, Township 7 South, Range 3 East, also described as the Centerline of Baldwin County Highway 49;  run thence North along said centerline to the intersection of Baldwin County Highway 49 and Baldwin County Highway 26; run thence along the centerline of Baldwin County Highway 26 to the Eastern Section line of Section 34, Township 7 South, Range 3 East; run thence North along said Eastern Section line to the Northeast corner of Section 34, Township 7 South, Range 3 East; run thence West to the Southwest corner of Section 27, Township 7 South, Range 3 East; continue West 175 feet to a point; run thence North to the intersection of the Magnolia River; run thence Southwesterly along the meandering centerline of said river feet to a point, described as the Southwest corner of Parcel 55-08-38-0-000-50.001; run thence along the Western boundary of said parcel to a point along the centerline of U.S. Highway 98; run thence West along the centerline of said highway to a point 550 feet West of Section Grant 38, Township 7 South, Range 3 East; run thence North 300 feet to a point; run thence West 150 feet to a point; run thence North 150 feet to a point; run thence West to a point which intersects the West boundary of the Northeast quarter of Section 28; run thence North along West line of the Northeast quarter of Section 28, Township 7 South, Range 3 East to the Northeast corner of the Southeast quarter of the Northwest quarter of Section 28, Township 7 South, Range 3 East; run thence West to the Northwest corner of the Southwest quarter of the Northwest quarter of Section 28, Township 7 South, Range 3 East; run thence North 700 feet; run thence West 2660 feet; run thence South the Point of Beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

21.   **Planning District 21.**

Beginning at the Northwest corner of Parcel 56-07-40-0-000-001.000; run thence Southeastwardly along the Western boundary of said parcel to the

Southwest corner of parcel 60-03-37-0-000-001.000; thence run Northeastwardly along the Southern boundary of parcel 60-03-37-0-000-005.000 to the Southeast corner; run thence Southeastwardly along the Western boundary of Grant Section 32, Township 8 South, Range 3 East, to the Northwest corner of Parcel 60-03-32-0-000-008.001; run thence Northeastwardly along the Northern boundary of said parcel to the Centerline of Lipscomb Road; run thence Southeastwardly along the centerline of said road to the intersection of Lipscomb Road and Baldwin County Highway 26; run thence Northeastwardly along the centerline of Baldwin County Highway 26 to the point of intersection of the Western boundary Grant Section 31, Township 8 South, Range 3 East; run thence Northwestwardly along the Western boundary of said Section line 1541 feet to the Southwest corner of Parcel 60-03-31-0-000-023.000; run thence Northeastwardly along the Southern boundary of said parcel to the imaginary intersection extended centerline of Mullet Lane and said parcel line; run thence Northwestwardly along the centerline of said lane to the intersection of Mullet Lane and 3rd Avenue; run thence Northeastwardly along said avenue to the intersection of 3rd Avenue and Collins Lane; run thence Southeastwardly along the centerline of said lane to the intersection of Collins Lane and Baldwin County Highway 26; run thence Eastwardly along the centerline of Baldwin County Highway 26 to a point located 475 feet West of the Southeast Corner of Section 32, Township 7 South, Range 3 East; run thence North 1480 feet to a point; run thence East 296 feet to a point; run thence North to the center of Weeks Creek; run thence Eastwardly along the meandering centerline of Weeks Creek to a point described as the intersection of said creek and a line parallel and North 1343.5 feet of the Southern boundary of Section 33, Township 7 South, Range 3 East; run thence Eastwardly along said parallel line to a point 1343.5 feet North of the Southeast corner of Section 33, Township 7 South, Range 3 East, also described as the intersection of Keith Lane and the centerline of Baldwin County Highway 49; run thence Northwardly along the centerline of Baldwin County Highway 49, 491 feet to a point; run thence Southeastwardly 1205.6 feet to a point, also known as the Southwest corner of Parcel Number 55-08-43-0-000-006.000 Grant Section 43, Township 7 South Range 3 East; run thence Northeastwardly 368 feet to a point, also known as the Northwest corner of said parcel; run thence Southeastwardly, parallel to the North line of said parcel, 1721.6 feet to the centerline of Sherman Road a.k.a. Weeks Road; run thence Southwardly along the centerline of said road to a point defined as the intersection of said road and the Southern boundary of Section 34, Township 7 South, Range 3 East; run thence Eastwardly along said Section line to the intersection of Grant 43 and said Section line; run thence Northeast along Grant 43 to the Northeast corner of Grant 43, Township 7 South, Range 3 East; run thence Northwestwardly along the North boundary of Grant 43 to the intersection of said Grant 43 and the Western boundary of Section 34, Township 7 South, Range 3 East, also

Defendants' Bates # 7088

described as the Centerline of Baldwin County Highway 49;  run thence Northwardly along said centerline to the intersection of Baldwin County Highway 49 and Baldwin County Highway 26; run thence along the centerline of Baldwin County Highway 26 to the Eastern Section line of Section 34, Township 7 South, Range 3 East; run thence Northwardly along said Eastern Section line to the Northwest corner of the Northwest quarter of the Southwest quarter Section 35, Township 7 South, Range 3 East; run thence Eastwardly to the Southwest corner of the Northeast quarter of the Northeast quarter of Section 36, Township 7 South, Range 3 East; run thence Southwardly to the Southwest corner of parcel 60-06-13-0-000-010.061; run thence Westwardly to the Northwest corner of the Southeast quarter of the Southeast quarter of Section 15, Township 8 South, Range 3 East;  run thence Southwardly along the Western right-of-way of Molsbee Road to the Northeast corner of the Southeast quarter of the Southeast quarter of Section 27, Township 8 South, Range 3 East; run thence Westwardly along the quarter section line to the Eastern shoreline of Bon Secour Bay; run thence Northwardly along the meanderings of the Eastern shoreline of Bon Secour Bay to the Southwest shoreline of Weeks Bay; run thence Northwardly along the meanderings of the Western shoreline of Weeks Bay to the Southeast corner of Section 26, Township 7 South, Range 2 East; run thence Eastwardly along an imaginary line to the Eastern shore of Weeks Bay; run thence Southwardly along the meanderings of the Southeastern shoreline of Weeks Bay to the Southwest tip of parcel 56-07-36-0-001-001.000; run thence Southeast across the bay to point of beginning.   The planning districts described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

22.   **Planning District 22.**

Beginning at the Northwest corner of Section 3, Township 7 South, Range 4 East; run thence Eastwardly along the section line to its intersection with Three Mile Creek; thence Northwardly along the meandering of said Creek to its intersection with Black Water River; thence Eastwardly along the meandering of said river to its intersection with Perdido River; thence Southwardly along said River to its intersection with Perdido Bay; thence along the meandering of the Western shoreline to the North right-of-way line of U.S. Highway 98; thence Westwardly along said North right-of-way to the East right-of-way of County Road 97; thence Southwardly along said East right-of-way to its intersection with the centerline of Soldier Creek; thence Northeastwardly along the meanderings of the creek to its intersection with the South section line of Section 27, Township 7 South, Range 5 East; thence Westwardly along section lines to a point of intersection with the South line of Section 28, Township 7 South, Range 5 East and the centerline of County Road 87; thence Southwardly along said road to a point of intersection with the South right-of-way line of

County Road 20; thence Westwardly, Northwardly and Westwardly following said South right-of-way line to its intersection with Sandy Creek; thence Northwardly along the meandering of the creek to its intersection with the North boundary of the South half of Section 10, Township 7 South, Range 4 East; thence Westwardly along the half section line of Section 10, Township 7 South, Range 4 East to the Southwest corner of the Northwest quarter of Section 10, Township 7 South, Range 4 East; thence Northwardly along the West line of said Section and of Section 3, Township 7 South, Range 3 East, to the point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

23. ***Planning District 23.***

Beginning at the Southwest corner of Section 27, Township 7 South, Range 6 East; run thence Eastwardly to the Northeast corner of Spanish Cove Subdivision; run thence Southeastwardly along Spanish Cove to the Eastern right-of-way of County Road 99; run thence Southwardly along the Eastern right-of-way to County Road 99 to the Southwest corner of Parcel 52-08-25-2-002-011.000; run thence Eastwardly to Perdido Bay; meandering along the coastline to Perdido Bay to the Southeast corner of Parcel 63-02-03-0-000-001.002; run thence Westwardly to the East right-of-way of County Road 99; run thence Southwestwardly to the Southeast corner of Parcel 63-02-03-0-000-002.004; run thence Westwardly 2000 feet to the Southeast corner of  Parcel 63-02-03-0-000-002.010;   run thence Northwardly to Section line 33; run thence Eastwardly to the Southeast parcel 52-08-33-4-001-081.000; run thence Northwardly and Eastwardly along the Western boundary of Spanish Cove to point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

24. ***Planning District 24.***

Ono Island. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

25. ***Planning District 25.***

Beginning at the Western most tip of Fort Morgan; thence meandering eastwardly along the shoreline of the Gulf of Mexico to the East section line of Section 28; run thence Northwardly to the Southern Shoreline of Bon Secour Bay; meandering Westwardly along the shoreline to the point of beginning. The planning district described herein shall exclude the

corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

26.  **Planning District 26.**

Beginning at the intersection of Molokai Lane and Scenic Highway 98; run thence Southwardly 600 feet East of U.S. Scenic Highway 98 to a point on the Northern right-of-way of County Road 32; run thence Eastwardly along the Northern right-of-way of County Road 32 to the mid section line of Section 5, Township 7 South, Range 2 East; run thence Southwardly along the mid section line to the Northern right-of-way of a farm road having a 60 foot right-of-way; run thence Westwardly along the Northern right-of-way of said farm road to the Eastern right-of-way of County Road 3; run thence Southwardly along the Eastern right-of-way of County Road 3 to the Southern section line of Section 8, Township 7 South, Range 2 East; run thence Westwardly along said section line to the Southwest corner of said Section 8; run thence Southwardly along the section lines to the Northwest corner of Section 29, Township 7 South, Range 2 East; run thence Eastwardly along the Northern section line to the Northeast corner of said Section 29; run thence Southwardly along the Eastern section line of said Section 29 to the Southeast corner; run thence Eastwardly along section lines to the Western shoreline of Weeks Bay; thence follow the meandering of the Western shoreline of Weeks Bay South to Mobile Bay; thence run Northwardly along the meandering of the Eastern shoreline of Mobile Bay to its intersection of the South right-of-way of Molokai Lane; run thence Eastwardly along the Southern right-of-way of Molokai Lane to the point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

27.  **Planning District 27.**

County zoning has not been instituted in this district.

28.  **Planning District 28.**

Beginning at the intersection of Interstate 10 and Turkey Branch; run thence Southeastwardly along the meandering of Turkey Branch to its intersection with Fish River; run thence Northeastwardly along the meandering of Fish River to its intersection with Bay Branch; run thence Northwardly along Bay Branch to its intersection with Interstate 10; run thence Westwardly along Interstate 10 to a point on Turkey Branch; said point being point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

29.   ***Planning District 29.***

Beginning at the point of the East right-of way line of County Road 91 and the North right-of-way line of U.S. Highway 98; run thence Southwardly along the east right-of-way of County Road 91 to a point where the extension of County Road 91 would intersect Perdido Bay; run thence Northwardly along the eastern shoreline to Soldier Creek; continue Northwardly along the meandering of Soldier Creek to its intersection with East right-of-way line of County Road 97; run thence Northwardly along the east right-of-way line of County Road 97 to its intersection with the North right-of-way line of U.S. Highway 98; run thence Eastwardly along the North right-of-way line of U.S. Highway 98 to the point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

30.   ***Planning District 30.***

Beginning at the intersection of the Eastern right-of-way line of State Highway 59 and the South right-of-way line of County Road 20; run thence east along County Road 20 following its turn South and East to its intersection with Hammock Creek; run thence Southwesterly along the meanderings of the Western shoreline of Hammock Creek to Wolf Bay; continue Southwesterly along an imaginary line to a point on the Western shoreline of Wolf Bay; run thence Southwardly along the meanderings of the Western shoreline of Wolf Bay to its intersection with Portage Creek; run thence Westerly along the Northern shoreline of Portage Creek to its intersection with the Intracoastal Waterway; run thence Westwardly along the meanderings of the Intracoastal Waterway to the West section line of Section 10, Township 9 South, Range 4 East ; run thence Northwardly, following the meanderings of the City of Gulf Shores corporate limits to the intersection with Eastern most right-of-way of State Highway 59; run thence Northwardly along the Eastern right-of-way line of State Highway 59; said point being point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

31.   ***Planning District 31.***

Beginning at a point on the North right-of-way line of County Road 62 and the East right-of-way line of County Road 83; then thence Westwardly along the North right-of- way line of County Road 62 continuing along imaginary line that is the extension of the North right-of-way of County Road 62 to the East right-of-way of U.S. Highway 90 (also known as State Highway 59); run thence Southwardly along the East right-of-way or U.S. Highway 90 until it intersects with the Northern-most corporate limits of the

City of Robertsdale; run thence Eastwardly and Southwardly along the meanderings of the Corporate limits of the City of Robertsdale to its intersection with the North right-of-way line of U.S. Highway 90 (also known as State Highway 16); run thence Eastwardly along the North right-of-way line of U.S. Highway 90 to its intersection with the East right-of-way line of County Road 83; run thence northerly along the East right-of-way of County Road 83 to a point on the North right-of-way line of County Road 62, said point being the point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

32.    **_Planning District 32._**

Beginning where the Eastern right-of-way of County Road 97 intersects with the centerline of Soldier Creek; run thence Southwardly along the meanderings of the centerline of Soldier Creek to its intersection with the centerline of Perdido Bay; run thence along the meandering of the centerline of Perdido Bay to its intersection with the centerline of Arnica Bay; run thence along the meanderings of the centerline of Arnica Bay to the centerline of Bay La Launch; run thence along the meandering of the centerline of Bay La Launch to its intersection with the Western shoreline of Wolf Bay; run thence Northwardly along the Western boundary of Wolf Bay to its intersection with an imaginary line extending Southwestwardly from the Western shoreline of Hammock Creek; run thence Northeastwardly along this imaginary line to the Western shoreline of Hammock Creek; run thence Northeastwardly along the meanderings of the Western shoreline of Hammock Creek to its intersection with the South right-of-way line of County Road 20; run thence Westwardly to the centerline of Stucki Road; run thence Northwardly along the centerline of Stucki Road to the South section line of Section 28, Township 7 South, Range 5 East; run thence Eastwardly along said section line continuing along the south section line of Section 27, Township 7 South, Range 5 East to the centerline of Soldier Creek; run thence Eastwardly along the centerline of Soldier Creek to the point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

33.    **_Planning District 33._**

Beginning at the intersection of the North right-of-way to U.S. Highway 98 and the East right-of-way of County Road 91; run thence Eastwardly along the West right-of-way of U.S. Highway 98; run thence Southeastwardly to the shoreline of Perdido Bay; run thence Southwestwardly along the shoreline to the Southeast corner of Parcel 52-08-25-2-002-011.000; run thence Westwardly along the parcel line to the Eastern right-of-way of County Road 99; run thence Northwestwardly along the East right-of-way

*Baldwin County Zoning Ordinances*                                                *A-13*

County Road 99 to the most Northern corner of parcel 52-08-25-2-002-001.000; run thence along the boundary of Spanish Cove to the Southwest corner of Section line 27, Township 7 South, Range 6 East; run thence Southwardly along section lines to the North right-of-way of Ridgewood Drive; run thence along the boundary of Spanish Cove to the Northeast corner of Parcel 52-08-34-0-000-003.000; run thence Southwardly to the Southeast corner of Parcel 63-02-03-0-000-003.000; run thence Eastwardly to the shoreline of Perdido Bay; run thence Southwestwardly along the shoreline to a nonexistent point where the East right-of-way of County Road 91 would intersect the shoreline of Perdido Bay; run thence Northwardly to the East right-of-way of County Road 91; run thence Northwardly along the East right-of-way of County Road 91 to point of beginning. The planning district described herein shall exclude the corporate limits of all municipalities in Baldwin County as such corporate limits presently or may hereafter exist.

Defendants' Bates # 7094

## Appendix B  Minimum Buffer Requirements

| | Zoning Classification/Use of your property | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adjacent Property Zoning/Use This Column | RR | RA | CR | RSF-E | RSF-1 | RSF-2 | RSF-3 | RSF-4 | RTF-4 | RSF-6 | RTF-6 | RMF-6 | HDR | RI |
| RR | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 25' | 25' |  |
| RA | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 25' | 25' |  |
| CR | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 25' | 25' |  |
| RSF-E | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 25' | 25' | 2 |
| RSF-1 | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 25' | 25' | 2 |
| RSF-2 | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 25' | 25' | 2 |
| RSF-3 | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 25' | 25' | 2 |
| RSF-4 | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 25' | 25' | 2 |
| RTF-4 | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 10' | 10' | 1 |
| RSF-6 | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 25' | 25' | 2 |
| RTF-6 | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 0' | 10' | 10' | 1 |
| RMF-6 | 25' | 25' | 25' | 25' | 25' | 25' | 25' | 25' | 10' | 25' | 10' | 0' | 0' | 1 |
| HDR | 25' | 25' | 25' | 25' | 25' | 25' | 25' | 25' | 10' | 25' | 10' | 0' | 0' | 1 |
| RMH | 0' | 0' | 0' | 25' | 25' | 25' | 25' | 25' | 10' | 25' | 10' | 10' | 10' |  |
| B-1 | 25' | 25' | 25' | 25' | 25' | 25' | 25' | 25' | 10' | 25' | 10' | 10' | 10' | 1 |
| B-2 | 25' | 25' | 25' | 25' | 25' | 25' | 25' | 25' | 10' | 25' | 10' | 10' | 10' | 1 |


BALDWIN COUNTY COMMISSION
PLANNING AND ZONING DEPARTMENT

# PLANNING DISTRICT 25
# FLOOD HAZARD AREA & COASTAL HIGH HAZARD AREA



N
W — E
S

0    0.25    0.5    1
Miles

The information contained in this representation of digital data distributed by the Baldwin County Commission's Planning and Zoning Department is derived from a variety of public and private sources and is considered to be dependable. However, the accuracy, completeness, and currency thereof are not guaranteed. The Baldwin County Commission makes no warranties, expressed or implied, as to the accuracy, completeness, currency, reliability, or suitability of information or data contained in or generated from the County Geographic Database for any particular purpose. Additionally, the Baldwin County Commission or any agent, servant, or employee thereof assume no liability associated with the use of this data, and assume no responsibility to maintain it in any matter or form. For more information concerning this map call 251.580.1655.



## Legend

///  Coastal High Hazard Area

Flood_Hazard_Area_in_PD_25

Gulf Beach Overlay District

Planning Districts

Tax Parcel

City Limits

— 911 STREETS

**County Maintained**

ASPHALT

GRAVEL/DIRT



Case 1:20-cv-00057-C   Document 45-5   Filed 05/21/21   Page 14 of 14   PageID #: 1241

Trial Exhibit 47

Admitted in evidence

1-24-2022

Trial Exhibit 48

Admitted
in  1-24-2022
Evidence

**From:** Mark Taupeka <mark@taupekalaw.com>
**Sent:** Tuesday, November 12, 2019 4:19 PM
**To:** Brad Hicks <Bhicks@stonecrosby.com>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> FW: Your Incidental Take Permit

Thanks Brad. My client will appeal.

**From:** Brad Hicks [mailto:bhicks@stonecrosby.com]
**Sent:** Tuesday, November 12, 2019 4:17 PM
**To:** Mark Taupeka <mark@taupekalaw.com>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> FW: Your Incidental Take Permit

Mark,

Thank you for the follow up. I did not mean to imply that there would be any change to the options Vince set forth in his November 5, 2019 email. That is Vince's determination to make. I did review this matter as you requested. After reviewing the file and case law I did not find anything that would require the County to issue a land use certificate to your client for a building that exceeds the height requirements in the zoning ordinance. I always welcome additional information if there is something you have not already provided, but I do not see any reason for you to delay.

Best regards,

Brad

**From:** Mark Taupeka [mailto:mark@taupekalaw.com]
**Sent:** Tuesday, November 12, 2019 10:52 AM
**To:** Brad Hicks <bhicks@stonecrosby.com>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> FW: Your Incidental Take Permit

Good morning Brad, when do you expect to have an answer for me? If it is unfavorable to my client, we will appeal to the BOA and need time to do so. Since Vince's email to me denying my client's permit was November 5, my understanding is the appeal deadline is 20 calendar days therefrom, which is November 25. Thanks, Mark

**From:** Brad Hicks [mailto:bhicks@stonecrosby.com]
**Sent:** Thursday, November 07, 2019 9:59 AM
**To:** Mark Taupeka <mark@taupekalaw.com>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> FW: Your Incidental Take Permit

1

Defendants' Bates #0062

Received. We will review the file and case law.

Best regards,

Brad

**From:** Mark Taupeka [mailto:mark@taupekalaw.com]
**Sent:** Wednesday, November 06, 2019 11:09 AM
**To:** Brad Hicks <bhicks@stonecrosby.com>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> FW: Your Incidental Take Permit

As I told you in my voicemail Brad, it would be patently unfair to deny my client's revised site plan I emailed to David August 2nd in rather immediate response to Vince's July 31st letter stopping work on the site, despite my client having been issued a permit from the building department, ordering thousands of dollars-worth of materials and delivered to the site.  The March site plan needed to be revised only for parking per Vince's letter.  I informed David by multiple emails that my client needed to revise his ITP with Bill at USF&W, that the site plan was revised, that it was submitted and that it would take time to be approved.  I think you will agree with me it would be an egregious injustice to deny my client's revised site plan just because the time it took to get the revised ITP from USF&W went beyond the passage of the new Planning District 25 text amendments in October.  Please make the right decision at this stage before we have to engage in a lengthy and costly legal battle.  Respectfully, Mark

**From:** Brad Hicks [mailto:bhicks@stonecrosby.com]
**Sent:** Wednesday, November 06, 2019 10:51 AM
**To:** Mark Taupeka <mark@taupekalaw.com>; Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> FW: Your Incidental Take Permit

Thanks Vince, this looks interesting. Mark called and left a message with me today. Should we discuss before I call him back?

Brad

**From:** Mark Taupeka [mailto:mark@taupekalaw.com]
**Sent:** Tuesday, November 05, 2019 5:00 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Cc:** Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>; Brad Hicks <bhicks@stonecrosby.com>
**Subject:** RE: <EXTERNAL> FW: Your Incidental Take Permit

Vince, let's review.  My client did not appeal the July 31, 2019 stop work order (2.5 months before October 15) due to the parking issue even though the building department had issued him a permit; I reached out to you, Wayne and David Conner saying my client wished to comply with the parking requirements and asked for a conditional permit since he had ordered tens of thousands of dollars-worth of materials in reliance on his county permit, the condition being compliance with the parking requirements, which means he had to revise his site plan and ask for an amended incidental take permit from Bill Lynn and USF&W, which would take time, and you all knew that; my client did what he said and got his revised ITP which would bring his site plan in compliance with the parking requirements, but since it is after the October 15 passage of the new Planning District 25 text amendments, you are saying his revised site plan is not conforming even though his initial site plan was submitted March 19, 2019 and approved by the county March 27, 2019?  I even emailed David the revised site plan August 2, 2019.  See attached emails from me to David August 2, 2019.  Does this change your determination Vince?

2

Defendants' Bates #0063

**From:** Vince Jackson [mailto:VJACKSON@baldwincountyal.gov]
**Sent:** Tuesday, November 05, 2019 4:20 PM
**To:** Mark Taupeka <mark@taupekalaw.com>
**Cc:** Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** RE: <EXTERNAL> FW: Your Incidental Take Permit

Mark,

A new issue has arisen regarding this property and the proposed duplex structure.

On October 15, 2019, the County Commission adopted a series of text amendments to the Local Provisions for Planning District 25. One of the new provisions is a two (2) habitable story height limit for single family and two-family dwellings. According to the plans presented, the duplex proposed for the subject property would have three (3) habitable stories. A copy of the Commission resolution showing the amended language. It should be noted that the amendments were unanimously recommended for approval by the Planning Commission and unanimously approved by the County Commission.

When the stop work order was imposed, the land use certificate application was rescinded and denied. As a result, there was no pending application at the time the text amendments were adopted . A new land use certificate application, which shows compliance with all current zoning requirements including the maximum height limit, will be required to move forward. I have discussed this with Wayne, and he has in turn discussed this with Brad Hicks. We agree that a duplex (two-family dwelling) with three habitable stories cannot be approved.

The property owner has the following options:

- Revise the plans so that the maximum height is no more than two habitable stories.
- Apply to the Board of Adjustment for a variance from the two-habitable story maximum height limit.
- Appeal this determination to the Board of Adjustment.
-

Please contact me if you should have questions or should need additional information.

Thanks,
Vince

**From:** Mark Taupeka [mailto:mark@taupekalaw.com]
**Sent:** Monday, November 04, 2019 10:35 AM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> FW: Your Incidental Take Permit

Good morning Vince,

Please see the below and attached, lift the Stop Work Order in due haste and advise me when such has been done.

Thank you,

**Mark H. Taupeka**
TAUPEKA LAW, LLC
25299 Canal Road, Suite A-6
Orange Beach, Alabama 36561

3

Defendants' Bates #0064

251-301-8500 office
251-599-6655 mobile
mark@taupekalaw.com
**www.taupekalaw.com**


**From:** Mike Bordelon [mailto:mikebcajun@webmail.us]
**Sent:** Friday, November 01, 2019 4:39 PM
**To:** Mark Taupeka <mark@taupekalaw.com>
**Subject:** Fwd: Your Incidental Take Permit

Hi Mark,

I received my incidental take permit a week ago (see attached) and forwarded it to the county (Linda Lee).
They were also provided the stamped revised site plan which complies with the parking ordinance
that caused the Stop Work order.

Linda has advised my builder that she cannot lift the stop work order. Vince Jackson has to do it.
My builder (Steve Jones) has reached out to Mr Jackson but he has not been responsive and the Stop Work order
still has not been lifted.

Would you mind reaching out to your guy at the county attorney's office to see if there is a reason they have not
lifted the Stop Work Order? I cannot see any reason this should not happen immediately.

Thanks!

Mike


Begin forwarded message:

**From:** "Lynn, William" <william_lynn@fws.gov>
**Subject: Your Incidental Take Permit**
**Date:** October 25, 2019 at 12:29:53 PM CDT
**To:** Michael Bordelon <mikebcajun@webmail.us>
**Cc:** Kim Nelson <KNELSON@baldwincountyal.gov>, David Dell <david_dell@fws.gov>,
Christine Willis <christine_willis@fws.gov>

Dear Mr. Bordelon,

Attached is a digital copy of your ITP permit modification.  A hard copy will be mailed to your address.  Please review the
permit and its conditions with your contractors.  When you are ready to get your certificate of occupancy, please contact
this office to arrange an inspection to ensure permit compliance.  Feel free to contact me if you have any questions.

Sincerely,

Bill Lynn


--
*******************************

4

Defendants' Bates #0065

Bill Lynn
Fish & Wildlife Biologist
Certified Wildlife Biologist
Alabama ES Field Office
1208B Main Street
Daphne, AL 36526
251-441-5868 Office
251-441-6222 Fax
http://www.fws.gov/daphne/
*********************************

*OUR VISION*: "Together, we will connect lands and waters to sustain fish, wildlife and plants by being visionary leaders, bold innovators and trusted partners, working with and for people."

*NOTE: This email correspondence and any attachments to and from this sender is subject to the Freedom of Information Act (FOIA) and may be disclosed to third parties.*

Defendants' Bates #0066

**Trial Exhibit 56**



Attorney Client

**From:** Mark Taupeka
**Sent:** Monday, August 19, 2019 2:01 PM
**To:** David Conner <dconner@blackburnpc.com>
**Cc:** vjackson@baldwincountyal.gov; wayne.dyess@baldwincountyal.gov
**Subject:** RE: Stop Work Order

By the way, my client does not plan to appeal the denial of the Land Use Certificate to the BOA, but rather to provide a revised LUC application and site plan after receiving an approved revised ITP from USF&W.

---

**From:** Mark Taupeka
**Sent:** Monday, August 19, 2019 7:41 AM
**To:** David Conner <dconner@blackburnpc.com>
**Cc:** vjackson@baldwincountyal.gov; wayne.dyess@baldwincountyal.gov
**Subject:** RE: Stop Work Order

Good morning gentlemen, I would like to have heard the news below from you guys instead of from my client's builder.  Nevertheless, would you please address my client's question below.

Thank you,

**Mark H. Taupeka**
TAUPEKA LAW, LLC
25299 Canal Road, Suite A-6
Orange Beach, Alabama 36561
251-301-8500 office
251-599-6655 mobile
mark@taupekalaw.com
https://link.edgepilot.com/s/3187be85/XdY7Mqjrakq1UfhEMa9lSg?
u=http://www.taupekalaw.com/

BORDELON_00000121

Mark,

Did the attorney contact you (see below)?
Does this imply that once we get the ITP permit
we can start construction?

Mike

Begin forwarded message:

**From:** sjonescontractor@gmail.com
**Subject: Fwd: ABM-1 Breezy Shores R1.pdf**
**Date:** August 16, 2019 at 6:20:53 PM MST
**To:** Mike Bordelon <mikebcajun@webmail.us>

Mike. FYI, I spoke to Linda Lee at planning and zoning today while at the building department
and she sent this email to me.

Steve

Sent from my iPhone

Begin forwarded message:

**From:** Linda Lee <LLee@baldwincountyal.gov>
**Date:** August 16, 2019 at 10:34:10 AM CDT
**To:** "sjonescontractor@gmail.com" <sjonescontractor@gmail.com>
**Subject: RE: ABM-1 Breezy Shores R1.pdf**

Mr. Jones,

I spoke with the Planning Director and he said that the County's attorney, David Conner was
supposed to notify Mr. Bordelon's attorney that you all would not be allowed to start construction
without an approved ITP from USFWS.

Thank you,

Linda Lee
Planner
Baldwin County Planning & Zoning Department
(251) 972-8523

-----Original Message-----
From: sjonescontractor@gmail.com [mailto:sjonescontractor@gmail.com]
Sent: Friday, August 16, 2019 10:25 AM
To: Linda Lee <LLee@baldwincountyal.gov>
Subject: ABM-1 Breezy Shores R1.pdf

**From:** Mark Taupeka
**Sent:** Tuesday, August 13, 2019 1:00 PM
**To:** David Conner <dconner@blackburnpc.com>
**Cc:** vjackson@baldwincountyal.gov; wayne.dyess@baldwincountyal.gov
**Subject:** RE: Stop Work Order

BORDELON_00000122

David, are you guys meeting this week as you indicated last week you would?  Would you like my client, his architect and/or builder to meet with you this week to discuss their plans?  My client's deadline file an appeal with the Board of Adjustment is a week from today (Tuesday, August 20).  If we can resolve this favorably amongst ourselves this week, that would be ideal.  Otherwise, the courtesy of knowing this week we will not be able to work this out is respectfully requested, so my client can have time to prepare and submit an appeal by the deadline if he so chooses to do so.

Thank you,

Mark

**From:** Mark Taupeka
**Sent:** Friday, August 09, 2019 1:19 PM
**To:** David Conner
<dconner@blackburnpc.com>; wayne.dyess@baldwincountyal.gov; vjackson@baldwincountyal.gov
**Subject:** FW: Stop Work Order

Gentlemen, please see the below from my client and the attached.  Feel free to reach out to Bill Lynn with USF&W.  My client will do, agree to and sign whatever is needed to resume work with a final CO conditioned on meeting the county's parking requirements.  Thank you for helping me and my client think creatively and within the confines of your authority.  Please let me know as soon as possible as my client had delivered tens of thousands of dollars' worth of materials to the construction site in reliance on the issuance of the county's building permit.

P.S.  See further below for emails with Bill Lynn.

**Mark H. Taupeka**
TAUPEKA LAW, LLC
25299 Canal Road, Suite A-6
Orange Beach, Alabama 36561
251-301-8500 office
251-599-6655 mobile
mark@taupekalaw.com
https://link.edgepilot.com/s/3187be85/XdY7Mqjrakq1UfhEMa9lSg?
u=http://www.taupekalaw.com/

**From:** Michael Bordelon [mailto:mikebcajun@webmail.us]
**Sent:** Friday, August 09, 2019 12:07 PM
**To:** Mark Taupeka <mark@taupekalaw.com>
**Cc:** Mike Bordelon <mikebcajun@webmail.us>
**Subject:** Re: Stop Work Order

Thanks Mark,

Attached is my application for the additional take I sent to Bill. I already sent the revised site plan to you (let me know
if you don't have it). I am waiting to hear back from Bill Lynn on the application, but it usually takes about 6 weeks to
get it approved. I can assure them we have months to spare to get the parking in place since it is

BORDELON_00000123

done last in the
construction phase.

Mike

---

**From:** Mike Bordelon [mailto:mikebcajun@webmail.us]
**Sent:** Friday, August 02, 2019 10:52 AM
**To:** Mark Taupeka <mark@taupekalaw.com>
**Subject:** Fwd: [EXTERNAL] Purchase of additional impact

Mark,

Here is the email from Bill Lynn of Wildlife and Fisheries saying I can add the impact for the price quoted below.
I will have the application and money to him by Monday.

Thanks

Mike

Begin forwarded message:

**From:** "Lynn, William" <william_lynn@fws.gov>
**Subject: Re: [EXTERNAL] Purchase of additional impact**
**Date:** August 1, 2019 at 2:19:25 PM MST
**To:** Mike Bordelon <mikebcajun@webmail.us>

Yes, that is correct.  Attached is the paperwork to modify the permit(s).  There will be a $50.00 application fee for each permit and the additional square footage will be subject to the $2.30 per square foot GCP fee.

I will also need a site plan which details the modification.

Thanks,

Bill
*********************************
Bill Lynn
Certified Wildlife Biologist
Alabama ES Field Office
1208B Main Street
Daphne, AL 36526
251-441-5868 Office
251-441-6222 Fax
https://link.edgepilot.com/s/02856eb1/3QsDhHeOMkeWYShFSt6BGQ?
u=http://www.fws.gov/daphne/
*********************************

***OUR VISION*: "Together, we will connect lands and waters to sustain fish, wildlife and plants by being visionary leaders, bold innovators and trusted partners, working with and for people."**

BORDELON_00000124

**NOTE: This email correspondence and any attachments to and from this sender is subject to the Freedom of Information Act (FOIA) and may be disclosed to third parties.**

On Thu, Aug 1, 2019 at 3:28 PM Mike Bordelon <mikebcajun@webmail.us> wrote:
Hi Bill,

I was told by Dan Prickett that there was now an option to purchase additional impact area for the beach mouse (for an existing permit).

If this is correct, I would be interested in doing so for two properties I have.
Lot 58 and 59 on Ponce de Leon CT in Fort Morgan have exiting permits, but I could use some extra
space for parking. Apparently there is a new ordinance that places restrictions on parking resulting in a need for more parking area.

I plan use the extra impact to add additional parking area only.

If this is an option, would you be so kind as to send me any documentation I need to fill out to accomplish this along with any restrictions that would be in place?

I appreciate any help you can provide on this.

Regards,

Mike Bordelon

BORDELON_00000125



**Trial Exhibit 54**

**From:** Vince Jackson [mailto:VJACKSON@baldwincountyal.gov]
**Sent:** Wednesday, October 02, 2019 2:13 PM
**To:** Mark Taupeka <mark@taupekalaw.com>
**Subject:** RE: <EXTERNAL> 15.3.1

Mark,

I apologize for the delay in getting back with you. This section has been part of the zoning ordinance since at least 1999. It previously had a different article and section number, and was given its current number (15.3.1) in late 2004 or early 2005 when we reorganized the ordinance. The amendment which is most pertinent to parking in Planning District 25 was approved on August 15, 2017. This was where the Local Provisions for Planning District 25 were amended to require additional parking spaces based on the number of bedrooms in single family and two family dwellings. This amendment was applicable to Planning District 25 only. I have attached a copy of the resolution.

If you should have questions or should need additional information, please let me know.

Thanks,

Vince

**From:** Mark Taupeka [mailto:mark@taupekalaw.com]
**Sent:** Thursday, September 19, 2019 3:42 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> 15.3.1

When did the change to this section in the zoning ordinance go into effect Vince, and can you provide me the documentation thereof please?

BORDELON_00000072

Thank you<

**Mark H. Taupeka**
TAUPEKA LAW, LLC
25299 Canal Road, Suite A-6
Orange Beach, Alabama 36561
251-301-8500 office
251-599-6655 mobile
mark@taupekalaw.com
**https://link.edgepilot.com/s/0e6c326f/LfcREL8rYk6WwJ7VRh8V7g?**
**u=http://www.taupekalaw.com/**

BORDELON_00000073

1-25-2022

| | | |
|---|---|---|
| 9:02:47 AM | - | - Docket No.: 1:20-cv-00057 Judge: Judge William Cassady Plaintiff Attorney: John Yates, Kristopher Anderson, Plaintiff: Breezy Shores, LLC, Mike Bordelon Defense Attorney: Haley Lyckman, Jamie Frawley, Defendant: Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson Notes: Bench Trial - Day Two |
| 9:02:47 AM | - | - Start Recording |
| 9:02:49 AM | - Judge Cassady | - Bench Trial (continuation).  Present are Kristopher Anderson and John Yates for the Plaintiff, and Jamie Frawley and Haley Lyckman for the Defendants.  Tatelyn Noda, Court Reporter. Witness Vince Jackson remains on the stand.  Preliminaries |
| 9:04:45 AM | - Frawley - Statements to the Court | - |
| 9:06:57 AM | - Frawley - Direct | - Witness:  Vince Jackson (remains under oath).  (Trial Exh 43); Trial Exhibit 44 (withdrawn); Trial Exhibit 45; |
| 10:06:15 AM | - | - Stop Recording |
| 10:06:39 AM | - | - Start Recording |
| 10:06:42 AM | - Recessed | - |
| 10:06:52 AM | - | - Stop Recording |
| 10:20:32 AM | - | - Start Recording |
| 10:20:34 AM | - Judge Cassady | - |
| 10:20:54 AM | - Frawley - Continuation | - Trial Exhibit 2; Trial Exhibit 49 |
| 10:28:06 AM | - Questions to witness by Judge | - |
| 10:44:19 AM | - Anderson | - Cross |
| 10:52:52 AM | - Judge - Additional Questions to Witness | - |
| 11:02:18 AM | - | - |
| 11:02:20 AM | - Frawley | - Reserves the right to recall Vince Jackson. |
| 11:02:51 AM | - Anderson | - |
| 11:03:51 AM | - | - Stop Recording |
| 11:04:04 AM | - | - Start Recording |
| 11:04:04 AM | - | - |
| 11:04:21 AM | - Judge Cassady | - |
| 11:04:36 AM | - Anderson | - Witness:  Wayne Alan Dyess, sworn.  (Trial Exh 43) |
| 11:17:20 AM | - Frawley | - Cross.  Trial Exhibit 18; |
| 11:34:50 AM | - Anderson | - Re-Direct. |
| 11:38:46 AM | - Frawley | - Re-Cross |
| 11:39:59 AM | - Questions to the witness by the Judge | - |
| 11:41:56 AM | - Witness excused | - |
| 11:42:06 AM | - Lunch break until 2:00 p.m. | - |
| 11:42:23 AM | - | - |
| 11:42:25 AM | - | - Stop Recording |
| 2:01:43 PM | - | - Start Recording |
| 2:01:44 PM | - Yates | - Steve Jones, sworn.  (Trial Exhibit 1); Trial Exhibit 53; |
| 2:02:23 PM | - | - |

1

```
2:31:10 PM  - Frawley          - Moved to strike all testimony regarding
                                 increase.
2:33:03 PM  - Anderson         - Response
2:33:42 PM  - Judge            - Motion to strike is noted and reserved.
2:33:54 PM  - Frawley          - Cross
2:44:50 PM  - Yates            - Re-Direct
2:48:46 PM  - Questions to the -
              witness by the
              Judge
2:50:13 PM  - Witness excused  -
2:50:19 PM  - Yates            - Franklin Reed, Jr., sworn.  Trial Exhibit 11
3:12:17 PM  - Frawley          - Cross (Trial Exh 11)
3:34:37 PM  - Yates            - Re-Direct
3:39:26 PM  - Break - 20 minutes -
3:39:39 PM  -                  -
3:39:42 PM  -                  - Stop Recording
4:05:15 PM  -                  - Start Recording
4:05:17 PM  - Yates            - Michael Bordelon, sworn.  (Trial Exh 1)
                                 (Trial Exh 47) (Trial Exh 13)
4:26:10 PM  - Frawley          - Voir dire questions to the witness
4:33:46 PM  - Yates            - (Trial Exh 20) (Trial Exh 21); Trial Exhibit
                                 23
4:57:45 PM  -                  - Pause
4:57:56 PM  -                  - Resume
4:57:58 PM  -                  -
4:58:39 PM  - Frawley          -
4:59:44 PM  - Judge            - Will allow testimony.  Court will adjourned
                                 until 9:00 a.m., 1/26/2022.
5:05:03 PM  -                  - Stop Recording
```

2

**Trial Exhibit 23**

dmitted
in
vidence
1-26-2022

Attorney Client

**From:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject: Re: <EXTERNAL> Re: Stop work order lifted?**
**Date:** November 5, 2019 at 7:17:21 AM CST
**To:** Mike's Web Mail <mikebcajun@webmail.us>, daniel prickett
<dudeprickett@icloud.com>

I do not have any meeting availability today. I am working on a response to Mr. Taupeka's emails which I
should be able to send later today. We can probably schedule a meeting later in the week if necessaery.

Thanks,

Vince Jackson


Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: Mike's Web Mail <mikebcajun@webmail.us>
Date: 11/5/19 6:07 AM (GMT-06:00)
To: daniel prickett <dudeprickett@icloud.com>
Cc: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> Re: Stop work order lifted?

Hi Vince,
This is Mike Bordelon. We would greatly
appreciate a meeting as soon as possible
to discuss why the Stop Work order has
not been lifted.
Mark Taupeka (my attorney) and Steve Jones (my builder) have also been trying to
reach out to you to get the Stop Work lifted.
Regards,
Mike Bordelon

BORDELON_00000097

Sent from my iPhone

On Nov 4, 2019, at 9:34 PM, daniel prickett <dudeprickett@icloud.com> wrote:

Hello Vince,

Mr. Mike Bordelon  is in town and would like to meet with you Asap. He wants to see why he has not had his stop work oder lifted. The land plan was submitted  over a week ago,  and  the US Fish and Wildlife permits are in place.  We are flexible with your schedule. Let us know a good time and where.

Thanks,

Daniel Prickett
2512090074 cell
18002107914 office
https://link.edgepilot.com/s/f1eb14e6/zmJc8wV8VUCRMxIsb1mO-g?
u=https://gcc02.safelinks.protection.outlook.com/?
url=www.prickettproperties.com%26amp%3Bdata=02%257C01%257C%257C82a08984ef2e4143b6a908
d761e8ca2f%257Ca1dbbb3c47f8420e932cbb4942e61768%257C0%257C1%257C637085524765764155
%26amp%3Bsdata=isLaYBTtFHiz2XPhIgRe4hdsG1n5evn2NLzfEe3nfj1%253D%26amp%3Breserved=
0
Property manager
Realtor

BORDELON_00000098

EH 20-0057-C

Trial Exhibit 11

**Admitted in Evidence**
1-25-2022



APPRAISAL OF REAL PROPERTY

**Breezy Shores Duplex**
Ponce de Leon Court
Gulf Shores, Baldwin County, AL 36542
Client File No.: N/A

Prepared For:
Clark Partington
4725 Main Street, Suite F-222
Orange Beach, AL 36561
Heron File No: 21-01-040

2305 E 2nd Street | Gulf Shores, Alabama 36542
(p) (251) 968-9555 (f) (251) 955-2241 | http://heronvaluation.com/



April 30, 2021

Mr. Kris Anderson
Clark Partington
4725 Main Street, Suite F-222
Orange Beach, AL 36561

Re:   Appraisal of the Real Estate
       Breezy Shores Duplex
       Ponce de Leon Court
       Gulf Shores, Baldwin  County, AL, 36542
       Client File No.: N/A
       Heron File No.: 21-01-040

Dear Mr. Anderson:

At your request, we have prepared an appraisal for the above referenced property. This appraisal report is intended to comply with the reporting requirements outlined under the USPAP for an appraisal report. The report was also prepared to comply with the requirements of the Code of Professional Ethics of the Appraisal Institute and the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Title XI Regulations, Interagency Appraisal Guidelines of December 2010 as well as the guidelines of Clark Partington.

The purpose of this appraisal is to estimate the market value of the fee simple interest of the subject real estate assets. The subject property is a vacant parcel of land containing 0.69-acre that is located on the south side of Ponce de Leon Court on the Fort Morgan Peninsula, and offers 75 front feet on the Gulf of Mexico. A proposed three-story, 9,360± square foot duplex will be constructed on the site that was to offer 14 bedrooms (seven per unit), 14 bathrooms (seven per unit), two pools, and direct beach access.

We certify that we have no present or contemplated future interest in the property beyond this estimate of value. Your attention is directed to the Limiting Conditions and Assumptions section of this report. Acceptance of this report constitutes an agreement with these conditions and assumptions. In particular, we note the following:

2305 E 2nd Street | Gulf Shores, Alabama 36542
(p) (251) 968-9555 (f) (251) 955-2241 | http://heronvaluation.com/

Mr. Kris Anderson
Clark Partington
April 30, 2021
Page 3

As of the report date, the world-wide economy was dealing with the disruption caused by the COVID-19 crisis. The crisis was not a material issue at the time of the effective date of the valuation of the subject property. We note that the current situation suggests that there would be a short-term issue with liquidity as the equity markets have been heavily impacted. We note that the US Government has since passed several stimulus packages including a 2 Trillion-dollar relief package on March 25, 2020 that would benefit the overall economy, business owners, and commercial real estate. In conversations with brokers, it is too early to see if the COVID-19 crisis has impacted long term values. Interest rates are still relatively low and most believe that investor appetite will return once the crisis is over. Overall, we remain cautiously optimistic that the housing and overall economy will rebound from this unforeseen and unfortunate event. At this point in time, there is not enough market evidence to support a negative adjustment to values. The appraiser makes no representation as to the effect on the subject property of any unforeseen event, subsequent to the effective date of the appraisal. The value opinion contained in this appraisal is based on findings of an analysis of market data available to the appraiser at the time of the assignment.

Hypothetical Conditions:

This appraisal includes the hypothetical assumption that the proposed improvements were complete and ready to occupy as of the reported value dates. We note that the improvements were not constructed on the property nor is any construction currently underway. We have also included the hypothetical condition that the proposed improvements are legally permissible. There are no other Hypothetical Conditions for this appraisal.

Extraordinary Assumptions:

There are no Extraordinary Assumptions for this appraisal..

## HYPOTHETICAL MARKET VALUE, AS IF COMPLETE:

Based on the appraisal described in the accompanying report, subject to the Limiting Conditions and Assumptions, Extraordinary Assumptions and Hypothetical Conditions (if any), we have developed an opinion that the "As Complete" hypothetical market value of the Fee Simple estate of the subject property, as of August 1, 2020, of:

**Three Million One Hundred Ninety Thousand Dollars**
**$3,190,000**

Mr. Kris Anderson
Clark Partington
April 30, 2021
Page 4

## HYPOTHETICAL MARKET VALUE, AS IF COMPLETE:

Based on the appraisal described in the accompanying report, subject to the Limiting Conditions and Assumptions, Extraordinary Assumptions and Hypothetical Conditions (if any), we have developed an opinion that the "As Complete" hypothetical market value of the Fee Simple estate of the subject property, as of March 11, 2021, of:

<div align="center">

**Three Million Three Hundred Fifty Thousand Dollars**
**$3,350,000**

</div>

Respectfully submitted,
Heron Valuation Group, LLC


Franklin Reed, MAI
AL Certified General Appraiser
License No. G00633
Expires: September 30, 2021
(251) 968-9555 ext. 1
(251) 955-2241 Fax
frank.reed@heronvaluation.com

Cynthia Stacy
AL Trainee Appraiser
License No. T02229
Expires September 30, 2021
(251) 968-9555 ext. 3
(251) 955-2241 Fax
cynthia.stacy@heronvaluation.com

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................................... 1

SUMMARY OF SALIENT FACTS AND CONCLUSIONS............................................................... 2

DEFINITIONS AND TERMS ............................................................................................................. 5

LIMITING CONDITIONS AND ASSUMPTIONS............................................................................. 8

SCOPE OF WORK ............................................................................................................................ 10

SUBJECT PHOTOGRAPHS............................................................................................................. 12

REGIONAL AREA OVERVIEW ...................................................................................................... 15

LOCAL AREA OVERVIEW ............................................................................................................. 27

SITE DESCRIPTION ........................................................................................................................ 30

IMPROVEMENTS DESCRIPTION.................................................................................................. 33

REAL ESTATE ASSESSMENT AND TAXES ............................................................................... 37

ZONING ............................................................................................................................................ 38

HIGHEST AND BEST USE .............................................................................................................. 39

VALUATION PROCESS................................................................................................................... 41

SITE VALUATION........................................................................................................................... 43

COST APPROACH ........................................................................................................................... 59

SALES COMPARISON APPROACH .............................................................................................. 69

VALUATION PROCESS AND RECONCILIATION ...................................................................... 83

CERTIFICATION ............................................................................................................................. 85

ADDENDA ........................................................................................................................................ 87

# SUMMARY OF SALIENT FACTS AND CONCLUSIONS

| GENERAL IDENTIFICATION OF PROPERTY | |
|---|---|
| Property Name: | Breezy Shores Duplex |
| Property Location: | Ponce de Leon Court, Gulf Shores, Baldwin County, AL, 36542 |
| Property Description: | The subject property is a vacant parcel of land containing 0.69-acre that is located on the south side of Ponce de Leon Court on the Fort Morgan Peninsula, and offers 75 front feet on the Gulf of Mexico. A proposed three-story, 9,360± square foot duplex will be constructed on the site that was to offer 14 bedrooms (seven per unit), 14 bathrooms (seven per unit), two pools, and direct beach access. |
| Legal Description: | 75' X 403'(S) LOT 58 PONCE DE LEON COURT PB5 PG118 GR PB5 PG 118 SEC 1-T9S-R1E (WD) |
| Assessor Identification: | 274000 (PPIN) |
| Date of Report: | April 30, 2021 |
| Date of Property Inspection: | August 1, 2020 |
| Date of Value As Is: | August 1, 2020 |
| Property Interest Appraised: | Fee Simple |
| Intended Use: | The intended use of this appraisal is for litigation purposes and internal business decision making purposes. |
| Intended Users: | Client |

| OWNERSHIP HISTORY | |
|---|---|
| Ownership: | Breezy Shores, LLC |
| Sales & Property History: | The subject sold for $600,000 on February 6, 2018 and is recorded in Instrument 1679484 in the Baldwin County Judge of Probate Office. The sale is noted as being between related parties. |



SUMMARY OF SALIENT FACTS AND CONCLUSIONS

Current Listing/Contract(s):     We are not aware of any current listings or contracts involving the subject property.

| PROPERTY DESCRIPTION | |
|---|---|

Land Area:     0.69± acres (30,225± square feet)

Zoning:     RTF-4, Two-family District

Improvement Type:     The subject property is a vacant parcel of land containing 0.69-acre that is located on the south side of Ponce de Leon Court on the Fort Morgan Peninsula, and offers 75 front feet on the Gulf of Mexico. A proposed three-story, 9,360± square foot duplex will be constructed on the site that was to offer 14 bedrooms (seven per unit), 14 bathrooms (seven per unit), two pools, and direct beach access.

Year Built:     2020

Number of Stories:     3

Gross Building Area (GBA):     9,360± square feet

| 2020 ASSESSED VALUE & PROPERTY TAXES | | | | | | |
|---|---|---|---|---|---|---|

| Real Estate Assessment and Taxes | | | | | | |
|---|---|---|---|---|---|---|
| Tax ID | Land | Improvements | Other | Total Assessment | Tax Rate | Taxes |
| 274000 (PPIN) | $519,800 | $0 | $0 | $519,800 | $28.00 | $2,911 |
| Totals | $519,800 | $0 | $0 | $519,800 | | $2,911 |

Notes:

| HIGHEST AND BEST USE | |
|---|---|

As If Vacant:     Vacation Rental

As Improved:     NA

| EXPOSURE TIME AND MARKETING TIME | |
|---|---|

Exposure Time:     12 months – "As Is" Market Value

Marketing Time:     12 months – "As Is" Market Value

---

Breezy Shores Duplex                    3                    

SUMMARY OF SALIENT FACTS AND CONCLUSIONS

## VALUE INDICATIONS

| SUMMARY OF APPROACHES | | |
|---|---|---|
| | Eff. 8/1/2020 | Eff. 3/11/2021 |
| Cost Approach: | $3,200,000 | $3,510,000 |
| Sales Comparison Approach: | $3,180,000 | $3,280,000 |
| Income Capitalization Approach: | N/A | N/A |



# DEFINITIONS AND TERMS

**Market Value** is defined[1] as:

"Market value means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby,

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their own best interest;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."

**Fee Simple Interest** is defined[2] as:

"Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."

**Leased Fee Interest** is defined[2] as:

"The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires."

**Leasehold Interest** is defined[2] as:

"The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease."

---

[1] Office of the Comptroller of Currency (OCC) under 12 CFR, Part 34, Subpart C-Appraisals, 34.42 Definitions, the Board of Governors of the Federal Reserve System (FRS) and the Federal Deposit Insurance Corporation in compliance with Title XI of FIRREA, as well as by the Uniform Standards of Appraisal Practice as promulgated by the Appraisal Foundation

[2] Appraisal Institute, The Dictionary of Real Estate Appraisal, 6th ed. (Chicago: Appraisal Institute, 2015).



**Market Value of the Going Concern** is defined[2] as:

"The market value of an established and operating business including the real property, personal property, financial assets, and the intangible assets of the business."

**Marketing Time** is defined[2] as:

"An opinion of the amount of time it might lake to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. "

**Exposure Time** is defined as:

1. "The time a property remains on the market."[2]
2. The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. A retrospective estimate based on an analysis of past events assuming a competitive and open market."[2]
3. "Exposure time is always presumed to occur prior to the effective date of the appraisal." "Exposure time is different for various types of property and under various market conditions. The overall concept of reasonable exposure encompasses not only adequate, sufficient and reasonable time but also adequate, sufficient and reasonable effort. Exposure time is different for various types of real estate and value ranges and under various market conditions."[3]

**Gross Building Area (GBA)** is defined[2] as:

"The total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above grade area. This includes mezzanines and basements if and when typically included in the market area of the property type involved."

**Market Rent** is defined[2] as:

"The most probable rent that a property should bring in a competitive and open market reflecting the conditions and restrictions of a specified lease agreement, including the rental adjustment and revaluation, permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs)."

---

[3] Advisory Opinion 35, USPAP 2018-2019



**As Is Market Value** is defined[2] as:

"The estimate of the market value of real property in its current condition, use, and zoning as of the appraisal date. Note that the use of the "as is" phrase is specific to appraisal regulations pursuant to FIRREA applying to appraisals prepared for regulated lenders in the United States. The concept of an "as is" value is not included in the Standards of Valuation Practice of the Appraisal Institute, Uniform Standards of Professional Appraisal Practice, or International Valuation Standards."

**Prospective Market Value "As Completed"** is defined[2] as:

"According to USPAP, an appraisal with a prospective market value reflects an effective date that is subsequent to the date of the appraisal report. Prospective value opinions are intended to reflect the current expectations and perceptions of market participants, based on available data. [...] The prospective market value-as completed-reflects the property's market value as of the time that development is expected to be completed."

**Prospective Market Value "As Stabilized"** is defined[2] as:

"The prospective market value 'as stabilized' reflects the property's market value as of the time the property is projected to achieve stabilized occupancy. For an income-producing property, stabilized occupancy is the occupancy level that a property is expected to achieve after the property is exposed to the market for lease over a reasonable period of time and at comparable terms and conditions to other similar properties."

**As Complete Value** is defined[2] as:

The prospective market value "as completed" reflects the property's market value as of the time that development is expected to be completed.

**Insurable Value/Replacement Cost for Insurance Purposes**

1. "The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design and layout for insurance coverage purposes guaranteeing that damaged property is replaced by new property (i.e. depreciation is not deducted)."[2]
2. "Value used by insurance companies as the basis for insurance. Often considered to be replacement or reproduction cost plus allowances for debris removal or demolition less deterioration and noninsurable items. Sometimes cash value or market value, but often entirely a cost concept."[4]

---

[4] Marshall & Swift LP



# LIMITING CONDITIONS AND ASSUMPTIONS

- Acceptance of and/or use of this report constitutes acceptance of the following limiting conditions and assumptions; these can only be modified by written documents executed by both parties.

- This appraisal is to be used only for the purpose stated herein. While distribution of this appraisal in its entirety is at the discretion of the client, individual sections shall not be distributed; this report is intended to be used in whole and not in part.

- No part of this appraisal, its value estimates, or the identity of the firm or the appraiser(s) may be communicated to the public through advertising, public relations, media sales, or other media.

- All files, work papers and documents developed in connection with this assignment are the property of Heron Valuation Group, LLC. Information, estimates and opinions are verified where possible, but cannot be guaranteed. Plans provided are intended to assist the client in visualizing the property; no other use of these plans is intended or permitted.

- No hidden or unapparent conditions of the property, subsoil, or structure, which would make the property more or less valuable were discovered by the appraiser(s) or made known to the appraiser(s). No responsibility is assumed for such conditions or the engineering necessary to discover them. Unless otherwise stated, this appraisal assumes there is no existence of hazardous materials or conditions, in any form, on or near the subject property.

- Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyl, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, was not called to the attention of the appraiser, nor did the appraiser become aware of such during their inspection. The appraiser has no knowledge of the existence of such materials on or in the property unless otherwise stated. The appraiser, however, is not qualified to test for such substances. The presence of such hazardous substances may affect the value of the property. The value opinion developed herein is predicated on the assumption that no such hazardous substances exist on or in the property or in such proximity thereto, which would cause a loss in value. No responsibility is assumed for any such hazardous substances, nor for any expertise or knowledge required to discover them.

- Unless stated herein, the property is assumed to be outside of areas where flood hazard insurance is mandatory. Maps used by public and private agencies to determine these areas are limited with respect to accuracy. Due diligence has been exercised in interpreting these maps, but no responsibility is assumed for misinterpretation.

- Good title, free of liens, encumbrances and special assessments is assumed. No responsibility is assumed for matters of a legal nature.

---

Breezy Shores Duplex                    8                           

LIMITING CONDITIONS AND ASSUMPTIONS

- Necessary licenses, permits, consents, legislative or administrative authority from any local, state or Federal government or private entity are assumed to be in place or reasonably obtainable.

- It is assumed there are no zoning violations, encroachments, easements or other restrictions which would affect the subject property, unless otherwise stated.

- The appraiser(s) are not required to give testimony in court in connection with this appraisal. If the appraisers are subpoenaed pursuant to a court order, the client agrees to pay the appraiser(s) Heron Valuation Group, LLC's regular per diem rate plus expenses.

- Appraisals are based on the data available at the time the assignment is completed. Amendments or modifications to appraisals based on new information made available after the appraisal was completed will be made, as soon as reasonably possible, for an additional fee.

**Americans with Disabilities Act (ADA) of 1990**

The ADA is a civil rights act passed by Congress guaranteeing individuals with disabilities equal opportunity in public accommodations, employment, transportation, government services, and telecommunications. Statutory deadlines became effective on various dates between 1990 and 1997. Heron Valuation Group, LLC has not made a determination regarding the subject's ADA compliance or non-compliance. **Non-compliance could have a negative impact on value; however, this has not been considered or analyzed in this appraisal**.



# SCOPE OF WORK

According to the Uniform Standards of Professional Appraisal Practice, it is the appraiser's responsibility to develop and report a scope of work that results in credible results that are appropriate for the appraisal problem and intended user(s).

| SCOPE OF WORK | |
|---|---|
| Report Type: | This is an Appraisal Report as defined by Uniform Standards of Professional Appraisal Practice under Standards Rule 2-2(a). This format provides a summary or description of the appraisal process, subject and market data and valuation analyses. |
| Scope of Work: | The scope of this appraisal required collecting primary and secondary data considered relevant to the subject property. Vacant land, improved sales and rental data were researched. The input of buyers, sellers and property owners was also considered. |
| Intended Use: | The intended use of this appraisal is for litigation purposes and internal business decision making purposes. |
| Intended User(s): | Client |
| Property Identification: | The subject has been identified by the legal description and the assessor's parcel number. |
| Inspection: | A complete exterior inspection of the subject property has been made, and photographs taken. |
| Market Area and Analysis of Market Conditions: | A complete analysis of market conditions has been made. |
| Highest and Best Use Analysis: | A complete as vacant and as improved highest and best use analysis for the subject has been made. Physically possible, legally permissible and financially feasible uses were considered, and the maximally productive use was concluded. |
| Valuation Analyses | |
| Cost Approach: | A cost approach was applied as there is adequate data to develop a land value and the depreciation accrued to the improvements can be reasonably measured. |

---



SCOPE OF WORK

| | |
|---|---|
| Sales Comparison Approach: | A sales approach was applied as there is adequate data to develop a value estimate and this approach reflects market behavior for this property type. |
| Income Capitalization Approach: | An income capitalization approach was not applied as the subject is an income producing property but there is inadequate data to develop a value estimate with this approach. |
| Hypothetical Conditions: | This appraisal includes the hypothetical assumption that the proposed improvements were complete and ready to occupy as of the reported value dates. We note that the improvements were not constructed on the property nor is any construction currently underway. We have also included the hypothetical condition that the proposed improvements are legally permissible. There are no other Hypothetical Conditions for this appraisal. |
| Extraordinary Assumptions: | There are no Extraordinary Assumptions for this appraisal. |

## SUBJECT PHOTOGRAPHS



*Image Provided by Baldwin County GIS.*



SUBJECT PHOTOGRAPHS



View of Ponce de Leon Court facing East



View of Ponce de Leon Court facing West



View of Site facing Southwest



View of Site



View of Site facing West



View of Site facing South

SUBJECT PHOTOGRAPHS



View of Site facing North



View of Property Adjacent to the East facing South



View of Property Adjacent to the East facing North, 3468 Ponce de Leon Court

# REGIONAL AREA OVERVIEW

The short- and long-term value of real estate is influenced by a variety of interacting factors. Regional analysis identifies those factors that affect property value, and the role they play within the region. The four primary forces that determine the supply and demand for real property, and consequently affect market value, are environmental characteristics, governmental forces, social factors, and economic trends.

The subject property is located in the Daphne-Fairhope-Foley Metropolitan Statistical Area, which encompasses the entire land area of Baldwin County in extreme southwestern Alabama.   Baldwin County is generally comprised of rural lands which are located between two larger metropolitan areas: Mobile, Alabama and Pensacola, Florida.  As such, it has unique environmental, social, economic, and demographic characteristics as compared to the aforementioned urban centers. A map of the general area is located below:

**LOCATION MAP**





Baldwin County is surrounded by water on almost all sides with the Gulf of Mexico forming its southern boundary, Mobile Bay, the Mobile-Tensaw River Delta and its tributaries forming the western and northern boundaries, and Perdido Bay and the Perdido River forming its eastern boundary.   Its northeastern boundaries, however, are formed by the Florida state line and the Escambia County, Alabama border. Baldwin County is located between two major population centers: Mobile, Alabama and Pensacola, Florida.  The County is comprised of 1,590 square miles of land area.  As such, it is the largest in the State of Alabama and 12th largest county in the Eastern United States.  Given its immense size, Baldwin County is often divided into two distinct areas: the southern areas of Gulf Shores/Orange Beach, and the central/northern portion, which includes the Eastern Shore of Mobile Bay. Due to its proximity to the beaches and the Intracoastal Waterway, the southern portion of Baldwin County is primarily comprised of resort development with supporting commercial uses.  It can generally be characterized as suburban in nature, while the central/northern areas of the County contain more commercial development and traditional residential uses.  Growth in this area is generally attributed to the area's proximity to Interstates 10 and 65, Highway 59, and Downtown Mobile.

The cities of Bay Minette, Daphne, Orange Beach, and Foley are the largest population centers within the County, the largest of which is Daphne.  The City of Bay Minette, located the northern portion of Baldwin County, serves as the county seat.  Other significant population centers within the County include Fairhope, Robertsdale, Gulf Shores, and Spanish Fort.

**Current Economic Climate**

Existing home sales and new home construction activity has remained steady in Baldwin County throughout 2018 and into 2019. Given the steady population growth projections, steady employment in a variety of sectors, we believe long-term demand fundamentals will be strong and, as such, pricing should continue to increase.

Job growth in both Baldwin and Mobile County has increased, which has lowered the unemployment rate. The workforce unemployment rate remains below the national and Alabama averages. According the US Department of Labor and Statistics, the unemployment rate in Baldwin County peaked at 12.3% in January of 2010 but had since fallen to 2.7% as of March, 2020. The reported unemployment rate for Baldwin County in April 2020 rose to 15.7%. As of December, 2020, the unemployment rate dropped to 3.4%.  We note that the COVID-19 pandemic likely caused this spike. However, due to the large percentage of employment in the tourism industry in Baldwin County, the unemployment rate is expected to return to the lower rates experienced prior to the pandemic onset.



REGIONAL AREA OVERVIEW



*Source:  U.S. Bureau of Labor Statistics*

Employment within the region is weighted toward government, trade, manufacturing, and construction; as well as hospitality & leisure. According to the US Census Bureau, nearly 25.4% of the Baldwin County workforce commutes into Mobile County for employment. Below is a graph displaying the major employment sectors found within Baldwin County:



**Tourism- South Baldwin County**

As with many coastal cities, the tourism industry plays a vital role in the municipalities, as well as the County's economy. Despite the permanent population of nearly 12,000 residents and households, totaling approximately 5,200 for the City of Gulf Shores, it is home to a constantly changing population. Over the past fifteen years, the tourism industry has expanded from primary summer months to a 12-



month sustainable industry given the area's increasing popularity with "snowbirds". Snowbirds visit the Gulf Coast for as many as three to five months, usually between November and March, before they return to their primary residences in northern states for the remainder of the year. The chart below represents the current supply of condos, hotels and motels for the Gulf Shores and Orange Beach areas.

**Accommodations Inventory**
**Ft. Morgan, Gulf Shores, Orange Beach**

| | Existing Units August 2019 | Future | TOTAL |
|---|---|---|---|
| **Gulf Shores** | | | |
| Condos | 4,599 | 0 | 4,599 |
| Hotel/Motels | 1,459 | 229 | 1,688 |
| Totals | 6,058 | 229 | 6,287 |
| | | | |
| **Orange Beach** | | | |
| Condos | 8,578 | 312 | 8,890 |
| Hotel/Motels | 1,443 | 192 | 1,635 |
| Totals | 10,021 | 504 | 10,525 |
| | | | |
| **Ft. Morgan** | | | |
| Condos | 1,582 | 0 | 1,582 |
| Totals | 1,582 | 0 | 1,582 |
| | | | |
| **Ala Gulf Coast  Totals** | | | |
| Condos | 14,759 | 312 | 15,071 |
| Hotels | 2,902 | 421 | 3,323 |
| Totals | 17,661 | 733 | 18,394 |

(Revised 8/19)

**Vacation and Hotel Rentals**

Since the BP oil spill in 2010, the Alabama Gulf Coast has continued to experience record-breaking numbers and vacation trends. Occupancy rates, average daily rates, as well as revenue per available room for hotels and condominiums have remained steady between 2017 and into 2020. Vacation rental occupancy rates for summer months in Gulf Shores and Orange Beach have gone from 54.3% in 2017, up to 55.6% in 2019. Unit price has continued to increase over the same period as well, from $182.42 (average daily rate) in 2017 to $192 (average daily rate) in 2019.



REGIONAL AREA OVERVIEW



**GULF SHORES & ORANGE BEACH TOURISM**
Alabama's White-Sand Beaches

**Gulf Shores & Orange Beach Tourism**
## VACATION RENTALS OCCUPANCY SUMMARY
Gulf Shores & Orange Beach

| | OCCUPANCY RATE | | | | AVERAGE DAILY RATE (ADR) | | | | REVENUE PER AVAILABLE ROOM (RevPAR) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2017 | 2018 | 2019 | 2020 | 2017 | 2018 | 2019 | 2020 |
| DEC | 21.4% | 22.3% | 21.3% | 16.6% | $86.00 | $85.00 | $83.00 | $93.00 | $19.00 | $19.00 | $18.00 | $15.00 |
| JAN | 60.1% | 59.4% | 60.1% | 60.4% | $55.00 | $56.00 | $57.00 | $61.00 | $33.00 | $33.00 | $34.00 | $37.00 |
| FEB | 82.2% | 84.5% | 87.0% | 91.9% | $64.00 | $63.00 | $65.00 | $70.00 | $52.00 | $53.00 | $57.00 | $64.00 |
| WINTER | 54.6% | 55.4% | 56.1% | 56.3% | $68.33 | $68.00 | $68.33 | $74.67 | $34.67 | $35.00 | $36.33 | $38.67 |
| MAR | 62.3% | 63.9% | 66.8% | 42.3% | $153.00 | $155.00 | $158.00 | $126.00 | $95.00 | $99.00 | $105.00 | $47.00 |
| APR | 35.5% | 39.3% | 40.5% | 5.8% | $200.00 | $198.00 | $204.00 | $116.00 | $71.00 | $78.00 | $83.00 | $5.00 |
| MAY | 55.5% | 53.3% | 55.4% | 64.9% | $256.00 | $247.00 | $267.00 | $216.00 | $142.00 | $132.00 | $148.00 | $112.00 |
| SPRING | 51.1% | 52.2% | 54.2% | 37.7% | $203.00 | $200.00 | $209.67 | $152.67 | $102.67 | $103.00 | $112.00 | $54.67 |
| JUN | 81.6% | 85.4% | 84.0% | | $339.00 | $338.00 | $359.00 | | $277.00 | $289.00 | $301.00 | |
| JUL | 72.8% | 89.8% | 85.6% | | $356.00 | $355.00 | $377.00 | | $259.00 | $319.00 | $322.00 | |
| AUG | 52.6% | 57.5% | 54.7% | | $234.00 | $232.00 | $248.00 | | $123.00 | $133.00 | $135.00 | |
| SUMMER | 69.0% | 77.6% | 74.8% | | $309.67 | $308.33 | $328.00 | | $219.67 | $247.00 | $252.67 | |
| SEP | 53.6% | 51.3% | 44.8% | | $175.00 | $178.00 | $181.00 | | $94.00 | $91.00 | $81.00 | |
| OCT | 49.1% | 55.3% | 49.2% | | $155.00 | $159.00 | $180.00 | | $76.00 | $88.00 | $89.00 | |
| NOV | 24.7% | 25.3% | 17.6% | | $116.00 | $108.00 | $125.00 | | $29.00 | $27.00 | $22.00 | |
| FALL | 42.5% | 44.0% | 37.2% | | $148.67 | $148.33 | $162.00 | | $66.33 | $68.67 | $64.00 | |
| ANNUAL | 54.3% | 57.3% | 55.6% | 47.0% | $182.42 | $181.17 | $192.00 | $113.67 | $105.83 | $113.42 | $116.25 | $46.67 |

* SOURCE: Copyright Key Data, LLC (2020). Republication or other re-use of this data without the express written permission of Key Data is strictly prohibited.
* NOTE: Metrics updated 3/2020 with data from Key Data.

For the winter months, December to February, an occupancy rate high of 56.1% was noted for 2019 compared to 54.6% in 2017.  In addition to the winter months, these rate increases hold true to the spring, summer, and fall months as well.



REGIONAL AREA OVERVIEW



**GULF SHORES & ORANGE BEACH TOURISM**
Alabama's White-Sand Beaches

**Gulf Shores & Orange Beach Tourism**
**HOTEL OCCUPANCY SUMMARY**
Gulf Shores & Orange Beach

| | OCCUPANCY RATE | | | | AVERAGE DAILY RATE (ADR) | | | | REVENUE PER AVAILABLE ROOM (RevPAR) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2017 | 2018 | 2019 | 2020 | 2017 | 2018 | 2019 | 2020 |
| DEC | 34.6% | 32.7% | 30.0% | 33.3% | $90.02 | $86.11 | $89.74 | $90.84 | $31.17 | $28.17 | $26.97 | $30.21 |
| JAN | 38.6% | 33.0% | 33.7% | 57.1% | $86.35 | $78.23 | $83.52 | $58.00 | $33.37 | $25.82 | $28.12 | $33.00 |
| FEB | 60.3% | 56.8% | 54.6% | 56.4% | $100.15 | $95.05 | $98.80 | $99.67 | $60.37 | $53.95 | $53.94 | $56.17 |
| WINTER | 44.5% | 40.8% | 39.4% | 48.9% | $92.17 | $86.46 | $90.69 | $82.84 | $41.64 | $35.98 | $36.34 | $39.79 |
| | | | | | | | | | | | | |
| MAR | 72.9% | 73.6% | 72.7% | 37.4% | $141.67 | $142.01 | $148.15 | $128.76 | $103.31 | $104.46 | $107.74 | $48.15 |
| APR | 69.7% | 65.6% | 62.0% | 9.2% | $145.00 | $148.40 | $150.39 | $84.67 | $101.11 | $97.28 | $93.29 | $7.83 |
| MAY | 72.9% | 69.3% | 74.4% | 67.4% | $177.27 | $169.11 | $179.74 | $168.70 | $129.18 | $117.18 | $133.65 | $113.67 |
| SPRING | 71.8% | 69.5% | 69.7% | 38.0% | $154.65 | $153.17 | $159.43 | $127.38 | $111.20 | $106.31 | $111.56 | $56.55 |
| | | | | | | | | | | | | |
| JUN | 79.3% | 86.2% | 85.7% | | $188.82 | $203.55 | $207.07 | | $149.68 | $175.43 | $177.44 | |
| JUL | 87.0% | 89.2% | 80.1% | | $215.02 | $222.22 | $211.95 | | $187.08 | $198.32 | $169.86 | |
| AUG | 62.4% | 67.9% | 63.1% | | $146.61 | $158.82 | $156.24 | | $91.45 | $107.81 | $98.65 | |
| SUMMER | 76.2% | 81.1% | 76.3% | | $183.48 | $194.86 | $191.75 | | $142.74 | $160.52 | $148.65 | |
| | | | | | | | | | | | | |
| SEP | 66.2% | 61.7% | 61.5% | | $134.36 | $139.87 | $132.44 | | $88.89 | $86.24 | $81.46 | |
| OCT | 58.4% | 71.4% | 58.2% | | $117.39 | $130.61 | $128.76 | | $68.60 | $93.21 | $74.89 | |
| NOV | 47.6% | 46.4% | 43.1% | | $98.33 | $103.11 | $100.69 | | $46.77 | $47.85 | $43.39 | |
| FALL | 57.4% | 59.8% | 54.3% | | $116.69 | $124.53 | $120.63 | | $68.09 | $75.77 | $66.58 | |
| | | | | | | | | | | | | |
| ANNUAL | 62.5% | 62.8% | 59.9% | 43.5% | $136.75 | $139.76 | $140.62 | $105.11 | $90.92 | $94.64 | $90.78 | $48.17 |

*   SOURCE: Smith Travel Research, Inc. - Republication or other use of this data without the express written permission of STR is strictly prohibited.

Hotel rental occupancy rates for summer months in Gulf Shores and Orange Beach have gone from 76.2% in 2017, up by a very small amount to 76.3% in 2019. Average Daily Rate has continued to increase over the same period, from $183.48 in 2017 to $191.75 in 2019.

For the winter months, December to February, an occupancy rate high of 48.9% was recorded for 2020 compared to 39.4% in 2019. In addition to the winter months, these rate increases hold true to the spring, summer, and fall months as well.

**Job Creation**

The local tourism industry is a major contributor of employment trends in the Baldwin County market. In 2019, it was reported that travel related jobs equated to 54,262 with related wages of $1.7 billion.

**Taxable Retail Sales**

Taxable retail sales increased not only within the Gulf Shores and Orange Beach areas, but extended north into Foley, Alabama. Since 2011, the Gulf Coast has continued to see large increases, depicted by the chart below:



REGIONAL AREA OVERVIEW


**GULF SHORES & ORANGE BEACH TOURISM**
Alabama's White-Sand Beaches

Gulf Shores & Orange Beach Tourism
**TAXABLE RETAIL SALES**
Gulf Shores & Orange Beach

| | 2017 | VAR | 2018 | VAR | 2019 | VAR | 2020 | VAR |
|---|---|---|---|---|---|---|---|---|
| DEC | $42,763,187 | 7.1% | $46,607,948 | 9.0% | $46,865,657 | 0.6% | $49,628,800 | 5.9% |
| JAN | $38,762,231 | 1.4% | $43,254,254 | 11.6% | $47,336,645 | 9.4% | $56,965,333 | 20.3% |
| FEB | $48,401,560 | 8.3% | $51,736,796 | 6.9% | $53,260,831 | 2.9% | $53,685,400 | 0.8% |
| **WINTER** | **$129,926,978** | **5.8%** | **$141,598,998** | **9.0%** | **$147,463,133** | **4.1%** | **$160,279,533** | **9.0%** |
| | | | | | | | | |
| MAR | $77,463,617 | 2.5% | $84,773,947 | 9.4% | $89,005,767 | 5.0% | $59,735,433 | -32.9% |
| APR | $74,592,106 | 13.9% | $77,541,348 | 4.0% | $85,392,981 | 10.1% | $45,456,700 | -46.8% |
| MAY | $88,308,457 | 2.0% | $95,375,447 | 8.0% | $106,910,957 | 12.1% | | |
| **SPRING** | **$240,364,180** | **5.6%** | **$257,690,742** | **7.2%** | **$281,309,705** | **9.2%** | **$105,192,133** | **-39.8%** |
| | | | | | | | | |
| JUN | $110,754,006 | 0.4% | $125,806,347 | 13.6% | $129,975,912 | 3.3% | | |
| JUL | $127,910,322 | 4.0% | $134,802,547 | 5.4% | $143,597,368 | 6.5% | | |
| AUG | $76,771,433 | 10.2% | $87,571,218 | 14.1% | $94,188,629 | 7.6% | | |
| **SUMMER** | **$315,435,761** | **4.1%** | **$348,180,112** | **10.4%** | **$367,761,909** | **5.6%** | | |
| | | | | | | | | |
| SEP | $73,800,941 | 14.0% | $70,871,967 | -4.0% | $73,314,267 | 3.4% | | |
| OCT | $59,252,496 | -4.6% | $71,460,621 | 20.6% | $71,467,511 | 0.0% | | |
| NOV | $45,729,414 | 3.8% | $48,645,886 | 6.4% | $50,478,769 | 3.8% | | |
| **FALL** | **$178,782,851** | **4.6%** | **$190,978,474** | **6.8%** | **$195,260,547** | **2.2%** | | |
| | | | | | | | | |
| **ANNUAL** | **$864,509,770** | **4.9%** | **$938,448,326** | **8.6%** | **$991,795,294** | **5.7%** | **$265,471,666** | **-73.2%** |

\* *SOURCE: Cities' Revenue Departments*

From 2017 to 2019, taxable retail sales in the Gulf Shores and Orange Beach area increased by over $127 million, and is expected to continue to steadily increase in the upcoming years. Surrounding areas, like Foley, have also experienced growth due to the tourism industry. A similar chart for taxable retail sales for the City of Foley is depicted below:





**GULF SHORES & ORANGE BEACH TOURISM**
Alabama's White-Sand Beaches

**Gulf Shores & Orange Beach Tourism**
**TAXABLE RETAIL SALES**
Foley

| | 2017 | VAR | 2018 | VAR | 2019 | VAR | 2020 | VAR |
|---|---|---|---|---|---|---|---|---|
| DEC | $67,625,256 | 10.7% | $69,785,134 | 3.2% | $72,607,575 | 4.0% | $79,040,233 | 8.9% |
| JAN | $49,224,207 | 10.5% | $48,870,132 | -0.7% | $55,597,195 | 13.8% | $61,385,533 | 10.4% |
| FEB | $50,712,113 | -6.8% | $54,761,327 | 8.0% | $58,158,362 | 6.2% | $63,795,639 | 9.7% |
| WINTER | $167,561,576 | 4.7% | $173,416,593 | 3.5% | $186,363,132 | 7.5% | $204,221,405 | 9.7% |
| | | | | | | | | |
| MAR | $67,505,765 | 5.4% | $75,553,543 | 11.9% | $80,387,296 | 6.4% | $68,003,412 | -15.4% |
| APR | $59,730,438 | 3.3% | $62,650,488 | 4.9% | $71,133,673 | 13.5% | $53,307,497 | -25.1% |
| MAY | $61,865,537 | 1.7% | $69,118,925 | 11.7% | $71,898,917 | 4.0% | | |
| SPRING | $189,101,740 | 3.5% | $207,322,956 | 9.6% | $223,419,886 | 7.8% | $121,310,909 | -20.2% |
| | | | | | | | | |
| JUN | $71,253,791 | 3.2% | $78,679,101 | 10.4% | $80,559,799 | 2.4% | | |
| JUL | $69,294,989 | -2.9% | $76,403,559 | 10.3% | $82,600,537 | 8.1% | | |
| AUG | $64,023,933 | 10.9% | $65,795,775 | 2.8% | $73,358,072 | 11.5% | | |
| SUMMER | $204,572,713 | 3.7% | $220,878,435 | 8.0% | $236,518,408 | 7.1% | | |
| | | | | | | | | |
| SEP | $60,129,996 | 6.1% | $64,243,733 | 6.8% | $68,470,849 | 6.6% | | |
| OCT | $57,952,784 | -1.4% | $67,493,521 | 16.5% | $70,383,573 | 4.3% | | |
| NOV | $61,108,669 | 1.8% | $68,689,432 | 12.4% | $69,709,588 | 1.5% | | |
| FALL | $179,191,449 | 2.2% | $200,426,686 | 11.9% | $208,564,010 | 4.1% | | |
| | | | | | | | | |
| ANNUAL | $740,427,478 | 3.5% | $802,044,670 | 8.3% | $854,865,436 | 6.6% | $325,532,314 | -61.9% |

\* **SOURCE: City of Foley**
\*\* **March 2017 - Retail Tax Increase to 3%**

According to the 2017 Annual Report on Tourism, nearly 6.9 million visitors traveled to Baldwin County in 2019, which not only increased spending in the local area but also created job and increased wages, especially within the tourism industry.

The tourism industry plays a vital role in Baldwin County's economy. Exciting growth trends and new developments make the Alabama Gulf Coast a desirable vacation spot. Condominium rentals have continued to show a strong occupancy rate as well as a dominant supply and preference over traditional hotels. Due to the steady population and household growth trends, combined with beaches and vacation attractions, the Cities of Gulf Shores and Orange Beach, as well as Baldwin County are expected to continue to experience record-setting tourist seasons during the upcoming years.

**Environmental**

Another factor that can have a substantial economic and environmental impact on the Alabama Gulf Coast is hurricanes. Hurricane season lasts from June until November, with many of the more powerful and memorable storms occurring in late summer. During the past fifteen years, Hurricanes Ivan and Katrina caused massive amounts of damage to properties in Baldwin County and the surrounding coastal areas. While the rebuilding effort from each storm created a boom to our economy, construction activity and the supporting industries have since stabilized. In 2010, the Gulf Coast was negatively impacted from the BP Deep Water Horizon Oil Spill. The environment and economy seem to have largely recovered.



In addition to the economical ramification of the BP Oil Spill, there were vast-reaching detrimental, non-recoverable environmental conditions at stake.  Fortunately, the marine and wildlife were largely spared.  Mobile Bay and the Tensaw River Delta is a marine estuary that is vital to the health of our coastal waters.  It is where almost all young marine life is fostered, from fish to crabs, before returning to the Gulf waters. Had this fragile ecosystem been badly disrupted or destroyed entirely, the economy of Baldwin County would have suffered greatly.

**Employment**

The following chart shows some of the top employers in Baldwin County.

| Baldwin County MSA Major Employers | |
|---|---|
| Employer | Employees |
| Baldwin County Board of Education | 3,900 |
| Walmart | 1,700 |
| Infirmary Health | 1,250 |
| Collins Aerospace | 1,160 |
| Columbia Southern University | 1,050 |
| South Baldwin Regional Medical Center | 860 |
| Marriott Grand Hotel | 800 |
| Baldwin County Commission | 650 |
| Publix | 560 |
| Standard Furniture | 520 |

**DEMOGRAPHICS**

Baldwin County's demographic traits reflect an area with a strong presence of government; trade, transportation & utilities; as well as hospitality & leisure; which have led to steady growth population that exhibits average income and education levels. The following chart presents the demographic characteristics of Baldwin County as compared to the State of Alabama:



| Regional Demographic Analysis | | |
|---|---|---|
| | **Baldwin County** | **Alabama** |
| **Population** | | |
| 2000 Census | 140,415 | 4,447,100 |
| 2010 Census | 182,265 | 4,779,736 |
| 2020 Estimate | 227,660 | 5,028,316 |
| 2025 Projection | 251,437 | 5,144,798 |
| **Compound Annual Change** | | |
| Change 2020 - 2025 | 2.01% | 0.46% |
| Change 2010 - 2020 | 2.50% | 0.56% |
| Change 2000 - 2010 | 2.64% | 0.72% |
| **Total Change** | | |
| Change 2020 - 2025 | 10.44% | 2.32% |
| Change 2010 - 2020 | 24.91% | 5.20% |
| Change 2000 - 2010 | 29.80% | 7.48% |
| **Households** | | |
| 2000 Census | 55,336 | 1,737,080 |
| 2010 Census | 73,180 | 1,883,791 |
| 2020 Estimate | 91,920 | 1,984,018 |
| 2025 Projection | 101,693 | 2,031,146 |
| **Compound Annual Change** | | |
| Projected 2020 - 2025 | 2.04% | 0.47% |
| 2000 - 2020 | 2.86% | 0.74% |
| **Average Household Income** | | |
| 2020 Est. Average Household Income | $83,311 | $70,573 |
| 2025 Est. Average Household Income | $91,835 | $77,771 |
| Projected Change 2020 - 2025 | 1.97% | 1.96% |
| **Median Household Income** | | |
| 2020 Est. Median Household Income | $57,497 | $50,554 |
| 2025 Est. Median Household Income | $61,113 | $53,473 |
| Projected Change 2020 - 2025 | 1.23% | 1.13% |
| **Average Home Value** | | |
| 2020 Average Home Value | $258,721 | $192,368 |
| 2025 Projected Average Home Value | $271,411 | $204,139 |
| **Occupied Units** | | |
| Total occupied Units | 131,238 | 2,323,319 |
| Owner Occupied | 54% | 58% |
| Renter Occupied | 16% | 28% |
| 2020 Average Persons per HH | 2.45 | 2.48 |
| *Source: ESRI/STDB* | | |

**Population Trends**

With regard to demographic characteristics, Baldwin County generally outpaces those of the United States in many aspects. The County displays average income and education levels and steady growth. Overall, the demographic characteristics of Baldwin County are positive, and along with a low cost of living should continue to boost in-migration trends to the area going forward.





Baldwin County has outpaced the State of Alabama in terms of growth over the past decade and projections indicate it will continue to outpace the State into the future as well. From 2010 to 2020, the Baldwin County grew at a pace of 2.50% annually compared to 0.56% annually for the State of Alabama. *Site To Do Business (STDB)* forecasts the Baldwin County to grow further at 2.01% annually through 2025 while Alabama is forecasted to grow at a rate of 0.46% during that time frame.

**Household Trends**

Over the past twenty years, household formation trends in Baldwin County roughly tracked overall population growth. As the population growth appears to be increasing heading into the future, household formation has followed the same trend.

During the past eighteen years, from 2000 through 2020, Baldwin County saw total households increase by an average annual rate of 2.86%, which only slightly outpaced the population growth indicated over that same period.



Over the following five-year period from 2020 through 2025, household formations are expected to increase in both the U.S. and Baldwin County. Baldwin County is projected to see average annual household growth of 2.04%.

The average household income for Baldwin County in 2020 was $83,311, well above the Alabama State average of $70,573. *STDB* projects the average income within Baldwin County to increase 1.97% annually through 2025.



REGIONAL AREA OVERVIEW



## SUMMARY

As with the rest of the National economy, Baldwin County has been experiencing economic growth since the end of the recession. Thankfully, Baldwin County has seen an increase in tourism activity over the last year along with job expansion in both Mobile and Baldwin Counties. The County's lower cost of living and population growth has helped lead to lower unemployment rates, which has helped shield the region sustain an impressive growth rate. In the long term, Baldwin County should continue to have a stable economy with steady growth trends.



# LOCAL AREA OVERVIEW

By definition, a local area is a group of complementary land uses, or a contiguous grouping of inhabitants, buildings or business enterprises.

In defining boundaries for the subject's area, several factors have been considered. First, the property's location with respect to transportation provides the basis for regional access to the area. Second, regional competition and geographic boundaries help to define the potential size of the trade area as a measure of distance from the property.

## LOCATION/BOUNDARIES

The property is located along the southern side of the Fort Morgan Peninsula in the western portion of the City of Gulf Shores. Generally, the subject's local area is comprised of the areas contained within a three-mile radius of the subject. This is not intended to be construed as an exact concentric boundary, but rather indicates an area whose uses are generally homogenous, complementary, and/or co-dependent in nature.

The local area is depicted in the following map.



*Image Provided by Google Maps*

---



## ACCESS/TRANSPORTATION

Local area accessibility is considered average, relying on the following transportation arteries:

ROADWAYS

Local:       <u>Highway 180</u>:  is an east-west road that provides access to the subject and connects it to Gulf Shores, approximately 18 miles to the east.

OTHER TRANSPORTATION

Air Service:       Most commercial air service is provided via the Pensacola Regional Airport, which is located approximately fifty miles east of the subject.

Public Transit/Other:       The subject's local area is also served by the Mobile Bay Ferry which provides the subject access to Dauphin Island and Mobile County.

Overall, the primary and secondary roadways within the subject's area are considered to be well-developed and are sufficient to support most commercial and residential uses.

## NEIGHBORHOOD CHARACTERISTICS

Based on our review of the neighborhood's current land uses, demographic characteristics, and location attributes, we consider the subject's neighborhood to be predominantly suburban in nature.

The local area is in the growth stage of development as the population base and overall demographic characteristics appear to be stable as demand for property within the area has increased as local real estate and rental markets continue to grow. Improvements within the area appear to be well-maintained and generally well-occupied.

Further, we note that approximately 40% of land in the subject's immediate area is undeveloped, which is also characteristic of an area in the growth stage of development. The most predominant land uses within the immediate area include single-family homes. Most of these homes are utilized as vacation rental properties and second homes. We note that there are a few signs of new development in the subject's immediate area as we observed several homes under construction. The subject's design and functionality will be visually consistent with neighboring structures.

The Fort Morgan Peninsula is located in unincorporated Baldwin County. Portions of the peninsula were annexed into the City of Gulf Shores in April 2003. A lawsuit was filed by the Fort Morgan Civic Association that was a topic of dispute for many years. In March 2014, an Alabama Supreme Court decision reverted all property back to Baldwin County. The ruling voided the annexation of some 80 properties, placing them back into Baldwin County's unincorporated jurisdiction.



## ADJACENT USES

Property uses adjacent to the subject property are summarized below:

North:    Residential

South:    Gulf of Mexico

West:     Residential

East:     Residential

## LAND USE CHANGES

We are not aware of any land use changes in the local area that would have an impact on the subject property.

## SPECIAL HAZARDS OR ADVERSE INFLUENCES

Based on our inspection and research of the local area, we are not aware of detrimental uses in the local area that would impact the subject's use. The general area is subject to flooding with a velocity hazard according to our review of FEMA maps. No unusual noise pollution was observed. No noxious odors were observed at or near the subject and none were reported.  A more detailed analysis and overview of special hazards and adverse influences is provided in the site description portion of this report.

## SUMMARY

The subject's local area appears stable and local demographic trends are indicative of a small population base which exhibits positive growth trends and average income. The long-term outlook for the subject's local market area is one of continual stability with modest economic growth trends forecasted into the foreseeable future. No detrimental land uses in the local and immediate area were noted. We are not aware of any land use changes in the local area that would have an impact on the subject property. After reviewing the local area data, a positive effect on real estate values in the neighborhood is anticipated for the foreseeable future.



# SITE DESCRIPTION

| SITE | |
|---|---|
| Location: | The subject is located on the south side of Ponce de Leon Court on the Fort Morgan Peninsula, east of Gulf Shores, in rural Baldwin County, Alabama. |
| Current Use: | Vacant Land |
| Site Size: | Total: 0.69 acres; approximately 30,225 square feet |
| Shape: | Rectangular |
| Frontage/Access: | The site has 75 feet of frontage along Ponce de Leon Court. Access is considered average. |
| Visibility: | Average |
| Topography: | Level |
| Soil Conditions: | The soil conditions observed at the subject appear to be typical of the region and adequate to support development. |
| Utilities: | Electricity: The site is served by public electricity |
| | Sewer: City sewer |
| | Water: City water |
| | Natural Gas: Riviera Utilities |
| | Adequacy: The subject's utilities are typical and adequate for the market area. |
| Flood Zone: | The subject is located in an area mapped by the Federal Emergency Management Agency (FEMA). The subject is located in FEMA flood zone AE, which is classified as a flood hazard area. The subject is inside the 500 year flood plain. The appraiser is not an expert in this matter and is reporting data from FEMA maps. |
| | FEMA Map Number: 01003C1027M |
| | FEMA Map Date: April 19, 2019 |



SITE DESCRIPTION

| | |
|---|---|
| Wetlands/Watershed: | No wetlands were observed during our site inspection. |
| Environmental Issues: | There are no known adverse environmental conditions on the subject site. Please reference Limiting Conditions and Assumptions. |
| Encumbrance/Easements: | There are no known adverse encumbrances or easements. Please reference Limiting Conditions and Assumptions. |
| Site Comments: | The site has average and typical utility. |

**TAX/PLAT MAP**



SITE DESCRIPTION



**FLOOD MAP**



# IMPROVEMENTS DESCRIPTION

The following description is based on our property inspection, discussions with the property ownership, and assessment records. The subject property is a vacant parcel of land containing 0.69-acre that is located on the south side of Ponce de Leon Court on the Fort Morgan Peninsula, and offers 75 front feet on the Gulf of Mexico. A proposed three-story, 9,360± square foot duplex will be constructed on the site that was to offer 14 bedrooms (seven per unit), 14 bathrooms (seven per unit), two pools, and direct beach access.

| GENERAL DESCRIPTION | |
|---|---|
| Property Name: | Breezy Shores Duplex |
| Property Type: | **Multi-family Residential** |
| Building Description: | The subject property is a vacant parcel of land containing 0.69-acre that is located on the south side of Ponce de Leon Court on the Fort Morgan Peninsula, and offers 75 front feet on the Gulf of Mexico. A proposed three-story, 9,360± square foot duplex will be constructed on the site that was to offer 14 bedrooms (seven per unit), 14 bathrooms (seven per unit), two pools, and direct beach access. |
| Year Built: | 2020 |
| Number of Stories: | 3 stories |
| Gross Building Area (GBA): | 9,360± square feet |
| Construction Type: | D |
| Construction Quality: | Good |
| Effective Age: | 0 years |
| Remaining Useful Life: | 40 years |
| Renovations: | None |
| Condition: | Excellent |
| Appeal/Appearance: | Excellent |



IMPROVEMENTS DESCRIPTION

| FOUNDATION, FRAME & EXTERIOR | |
|---|---|
| Foundation: | Poured concrete slab |
| Basement Size: | N/A |
| Structural Frame: | Wood Frame |
| Exterior: | Concrete Hardiboard |
| Windows: | Double pane in vinyl frames |
| Roof/Cover: | Gable / Metal |

| INTERIOR DESCRIPTION | |
|---|---|
| Interior Layout: | Good |
| Floor Cover: | Ceramic Tile |
| Walls: | Painted Drywall |
| Ceilings: | Painted Drywall |
| Ceiling Height: | 10 to 12 feet |
| Lighting: | A mix of fluorescent and LED lighting. |

| MECHANICAL SYSTEMS | |
|---|---|
| HVAC: | Central heating and air conditioning. |
| Electrical Service: | Low voltage wiring |
| Plumbing Condition: | Good |
| Sprinkler: | The improvements will not be fire sprinklered |
| Elevators: | 1 |
| Emergency Power: | The building's electrical system is not backed by an emergency generator. |

IMPROVEMENTS DESCRIPTION

| SITE IMPROVEMENTS | |
|---|---|
| Landscaping: | The site is not landscaped. |

| PROPERTY ANALYSIS | |
|---|---|
| Design/Functional Utility: | The subject is of contemporary design and appeal, and will be functional for its intended use as a vacation rental duplex. |
| Deferred Maintenance: | None. |
| Planned Capital Improvements: | None |
| Personal Property: | Personal property (furnishings, fixtures and equipment) has not been considered in our value estimate. |
| Improvement Comments: | The subject will be in excellent overall condition. |

**AMERICANS WITH DISABILITIES ACT**
Please reference the Limiting Conditions and Assumptions section of this report on page 9.

**HAZARDOUS SUBSTANCES**
Please reference the Limiting Conditions and Assumptions section of this report on page 9.



IMPROVEMENTS DESCRIPTION



# REAL ESTATE ASSESSMENT AND TAXES

**Taxing Authority**  Baldwin County
**Assessment Year**  2020

| Real Estate Assessment and Taxes | | | | | | |
|---|---|---|---|---|---|---|
| Tax ID | Land | Improvements | Other | Total Assessment | Tax Rate | Taxes |
| 274000 (PPIN) | $519,800 | $0 | $0 | $519,800 | $28.00 | $2,911 |
| Totals | $519,800 | $0 | $0 | $519,800 | | $2,911 |

Notes:

**Comments**

The property taxes are considered reasonable based on assessment trends in the subject's market area. The definition of market value used in this report assumes a sale of the property. In the State of Alabama, a sale or transfer of a property does not trigger an automatic reassessment of the property. This appraisal assumes a sale to a typical, non-exempt investor or owner-user.



## ZONING

The subject property is zoned RTF-4, Two-family District, by Baldwin County. Permitted uses include two-family dwellings, single-family dwellings including manufactured housing and mobile homes, transportation, utility, church, and accessory.. The subject is a legal and conforming use.. These requirements include a maximum building height of 35 feet, a minimum 30 foot front yard setback, and a minimum 10 foot side yard distance.

We have analyzed the zoning requirements in relation to the subject property, and considered the conformance of the existing use. We know of no other deed restrictions, private or public that further limits the subject property's use. The research required to determine whether or not such restrictions exist, however, is beyond the scope of this appraisal assignment. Deed restrictions are a legal matter and only a title examination by an attorney or title company can usually uncover such restrictive covenants. Thus, we recommend a title search to determine if any such restrictions do exist.



# HIGHEST AND BEST USE

Highest and best use, according to the Dictionary of Real Estate Appraisal, 6th Edition, 2015, which is a publication of the Appraisal Institute, is defined as:

"The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.'

## HIGHEST AND BEST OF SITE AS IF VACANT

### Legally Permissible

The site is located in Gulf Shores, Alabama and is zoned RTF-4, Two-family District. The RSF-2, Single-family Residential zoning district is intended is to provide the opportunity for two family residential development.. We are not aware of any legal restrictions that limit the potential uses of the subject.

### Physically Possible

The subject's site consists of 0.69± acres and the overall utility of the site is considered average. The property has average access and average visibility along Ponce de Leon Court. The primary site shape and size are ideal for residential development. The site is served by all public utilities including public water and sewer, gas, electric and telephone. Overall, the site is considered adequate to accommodate most permitted development possibilities.

### Financial Feasibility and Maximum Profitability

After analyzing the physically possible and legally permissible uses of the property, the highest and best use must be considered in light of financial feasibility and maximum profitability.

To be feasible, a potential use would need to provide a sufficient return on capital and a positive net income or acceptable rate of return would indicate that a use is financially feasible. Of the uses that are allowed, the one that is considered to be maximally productive would be considered the highest and best use.

Within the subject's market area, market conditions for residential uses appear to be favorable. We noticed somewhat limited space in the existing multi-family residential properties located in the subject's immediate area. In considering the all of the factors involved, including zoning, physical characteristics, the financial feasibility of these uses, the subject site's size, configuration, topography, location within an established residential neighborhood and good



accessibility to regional interstates, it is our opinion that the highest and best use of the subject site as though vacant is for multi-family residential use.

**HIGHEST AND BEST OF SITE AS IMPROVED**

According to the Dictionary of Real Estate Appraisal, highest and best use of the property as improved is defined as:

"The use of an asset that maximizes the potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use or for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid."

In analyzing the highest and best use of a property as improved, it is recognized that the improvements should continue to be used until it is financially advantageous to alter physical elements of the structure or to demolish it and build a new one. The highest and best use as improved must meet the same criteria as the highest and best use as though vacant.

The subject property is a vacant parcel of land containing 0.69-acre that is located on the south side of Ponce de Leon Court on the Fort Morgan Peninsula, and offers 75 front feet on the Gulf of Mexico. A proposed three-story, 9,360± square foot duplex will be constructed on the site that was to offer 14 bedrooms (seven per unit), 14 bathrooms (seven per unit), two pools, and direct beach access. The current use is a legal and conforming use to the current zoning regulations.

The facility is in excellent condition and the existing improvements are functional for continued multi-family residential use. The building has an estimated effective age of 0 years and 40± years of useful life remaining. Given the ample amount of useful life left in the improvements, it is our opinion that the highest and best use as improved is continuation of its current use as a single-family residence.



# VALUATION PROCESS

The appraisal process is an orderly investigative procedure wherein data are acquired, classified, analyzed and then processed into value indications by various appraisal techniques. The most common methods utilized are the Cost Approach, the Sales Comparison Approach, and the Income Capitalization Approach. We have considered each approach in developing our opinion of the value of the subject property. We will discuss each approach in the following paragraphs and conclude with a summary of their applicability to the subject property.

## COST APPROACH

The Cost Approach is based on the premise that an informed, rational investor or purchaser would pay no more for an existing property than it would cost to replace/reproduce a substitute property with the same utility and without undue delay. The Cost Approach represents the sum of the estimated land value and the depreciated cost of the improvements, which is cost new of the improvements less accrued depreciation. This depreciated cost is based on the estimated cost of replacing the structural and site improvements, less any accrued depreciation from physical deterioration, functional obsolescence, and/or external obsolescence.

## SALES COMPARISON APPROACH

The Sales Comparison Approach is the process of comparing and analyzing prices paid for properties having a satisfactory degree of similarity to the subject property. This approach is based upon the principle of substitution, which implies that a prudent purchaser will not pay more to buy a property than they would to buy a comparable substitute property in a similar location and without undue delay. Since no two properties are ever truly identical, the necessary adjustments for differences in quality, location, size, services, and market appeal between the appraised property and comparable (substitute) properties are a function of the appraiser's experience and judgment.

## INCOME CAPITALIZATION APPROACH

The Income Capitalization Approach first determines the income-producing capacity of a property by using contract rents on existing leases and by estimating market rent from rental activity at competing properties. Deductions are then made for vacancy and collection loss and operating expenses. The resulting net operating income (NOI) is divided by an overall capitalization rate to derive an opinion of value for the subject property. The capitalization rate represents the relationship between net operating income and value. This method is referred to as Direct Capitalization.

## FINAL RECONCILIATION

The appraisal process concludes with the Final Reconciliation of the values derived from the above approaches applied for a single estimate of market value. Different properties require different means



of analysis and may lend themselves to one approach over the others. The approaches that were used in the analysis of the subject are indicated below:

- The Cost Approach was considered and was developed as there is adequate data to develop a land value and the depreciation accrued to the improvements can be reasonably measured.

- The Sales Comparison Approach was considered and was developed because there is adequate data to develop a value estimate and this approach reflects market behavior for this property type.

- The Income Capitalization Approach was considered and was not developed because the subject is an income producing property but there is inadequate data to develop a value estimate with this approach.



# SITE VALUATION

The Sales Comparison Approach is based on the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership. It is based on the principles of supply and demand, balance, substitution and externalities. The following steps describe the applied process of the Sales Comparison Approach.

- The market in which the subject property competes is investigated; comparable sales, contracts for sale and current offerings are reviewed.
- The most pertinent data is further analyzed and the quality of the transaction is determined.
- The most meaningful unit of value for the subject property is determined. For properties similar to the subject, the most commonly used market unit of comparison is the price per front foot of water frontage. All of the comparables used in our analysis have been analyzed on this basis.
- Each comparable sale is analyzed and where appropriate, adjusted to equate with the subject property.
- The value indication of each comparable sale is analyzed and the data reconciled for a final indication of value via the Sales Comparison Approach.

## LAND COMPARABLES

The transactions we have used represent a relatively wide variance in site characteristics, but are considered to provide a reasonable basis of land value for the subject site under its legally allowed use.

We have researched seven comparables for this analysis and these are presented on the following pages followed by a location map. We have identified closed sales of similar zoned vacant land. As seen, the sales reflect a relatively tight range of value. We have adequately adjusted them to narrow the indicated range of value and to reconcile to a reasonable value conclusion.

| Comp | Address | City | Date | Price | Water Frontage | Land SF | Zoning |
|------|---------|------|------|-------|----------------|---------|--------|
| 1 | Lot 2 Pamela Court | Gulf Shores | 2/25/20 | $525,000 | 65 | 29,803 | RTF-4 |
| 2 | Lot 9 Unit 3 Surfside Shores | Gulf Shores | 2/7/20 | $525,000 | 68 | 32,640 | RSF-1 |
| 3 | Lot 8 Unit 3 Surfside Shores | Gulf Shores | 1/7/20 | $485,000 | 68 | 32,640 | RSF-1 |
| 4 | 2211 W Beach Blvd | Gulf Shores | 1/2/20 | $865,000 | 76 | 22,559 | R-1-4 |
| 5 | Lot 75 Ponce de Leon Court | Gulf Shores | 12/19/18 | $530,000 | 75 | 33,000 | RTF-4 |
| 6 | Lot 1 Ponce de Leon Court | Gulf Shores | 5/7/18 | $600,000 | 110 | 34,848 | RTF-4 |
| 7 | 4230 Hwy 180 | Gulf Shores | 4/16/18 | $485,000 | 50 | 44,000 | RTF-4 |



SITE VALUATION

**COMPARABLE LAND SALE NO. 1**



| Transaction | | | |
|---|---|---|---|
| ID | 6495 | Date | 2/25/2020 |
| Address | Lot 2 Pamela Court | Price | $525,000 |
| City | Gulf Shores | Price per Acre | $767,353 |
| State | AL | Price Per Land SF | $17.62 |
| Tax ID | 40133 | Financing | Cash to Seller |
| Grantor | Jeffrey A. Ryder, Leslie P. Ryder | Property Rights | Fee Simple |
| Grantee | Jeff Valentine | Verification | MLS, Public Records |
| Book/Page or | 1814688 | | |

| Site | | | |
|---|---|---|---|
| Acres | 0.7 | Topography | Level |
| Land SF | 29,803 | Zoning | RTF-4 |
| Water Frontage | 65 | Flood Zone | VE |
| Shape | Rectangular | Encumbrance or | None noted |
| Utilities | All Necessary | Environmental Issues | None noted |

| Comments |
|---|
| This vacant gulf-front parcel of land is located at the western end of Ponce de Leon Court on the Fort Morgan Peninsula. The property sold for $525,000. or $8,077 per front foot on February 25, 2020. |



SITE VALUATION

| COMPARABLE LAND SALE NO. 2 |
|---|



| Transaction | | | |
|---|---|---|---|
| ID | 6494 | Date | 2/7/2020 |
| Address | Lot 9 Unit 3 Surfside Shores | Price | $525,000 |
| City | Gulf Shores | Price per Acre | $700,645 |
| State | AL | Price Per Land SF | $16.08 |
| Tax ID | 13406 | Financing | Cash to Seller |
| Grantor | Franklin Tillman | Property Rights | Fee Simple |
| Grantee | Maxwell MD Properties, LLC | Verification | MLS, Public Records |
| Book/Page or | 1810587 | | |

| Site | | | |
|---|---|---|---|
| Acres | 0.7 | Topography | Level |
| Land SF | 32,640 | Zoning | RSF-1 |
| Water Frontage | 68 | Flood Zone | VE |
| Shape | Rectangular | Encumbrance or | None noted |
| Utilities | All Necessary | Environmental Issues | None noted |

| Comments |
|---|

This is the sale of Lot 9 in the Surfside Shores Subdivision, that offers 68 waterfront feet on the Gulf of Mexico, on the Fort Morgan Peninsula. The property sold for $525000. or $7,721 per front foot on February 7, 2020.



SITE VALUATION

**COMPARABLE LAND SALE NO. 3**



| Transaction | | | |
|---|---|---|---|
| ID | 6493 | Date | 1/7/2020 |
| Address | Lot 8 Unit 3 Surfside Shores | Price | $485,000 |
| City | Gulf Shores | Price per Acre | $647,262 |
| State | AL | Price Per Land SF | $14.86 |
| Tax ID | 386148 | Financing | Cash to Seller |
| Grantor | Franklin Tillman | Property Rights | Fee Simple |
| Grantee | Howard Foulks, Linda Foulks | Verification | Public Records |
| Book/Page or | 1806077 | | |

| Site | | | |
|---|---|---|---|
| Acres | 0.7 | Topography | Level |
| Land SF | 32,640 | Zoning | RSF-1 |
| Water Frontage | 68 | Flood Zone | VE |
| Shape | Rectangular | Encumbrance or | None noted |
| Utilities | All Necessary | Environmental Issues | None noted |

| Comments |
|---|
| This is the sale of Lot 8 in the Surfside Shores Subdivision, that offers 68 waterfront feet on the Gulf of Mexico, on the Fort Morgan Peninsula. The property sold for $485,000. or $6,985 per front foot on January 7, 2020. |



SITE VALUATION

| COMPARABLE LAND SALE NO. 4 |
|---|



| Transaction | | | |
|---|---|---|---|
| ID | 6498 | Date | 1/2/2020 |
| Address | 2211 W Beach Blvd | Price | $865,000 |
| City | Gulf Shores | Price per Acre | $1,670,271 |
| State | AL | Price Per Land SF | $38.34 |
| Tax ID | 118681 | Financing | Cash to Seller |
| Grantor | James H. Chustz, Jr., Tammy J. Chustz | Property Rights | Fee Simple |
| Grantee | JLKS Real Estate, LLC | Verification | MLS, Public Records |
| Book/Page or | 1803885 | | |

| Site | | | |
|---|---|---|---|
| Acres | 0.5 | Topography | Level |
| Land SF | 22,559 | Zoning | R-1-4 |
| Water Frontage | 76 | Flood Zone | VE |
| Shape | Rectangular | Encumbrance or | None noted |
| Utilities | All Necessary | Environmental Issues | None noted |

| Comments |
|---|

This is the sale of a vacant gulf-front parcel of land that is located on W Beach Boulevard in Gulf Shores. The property sold on January 2, 2020 for $865,000, or $11,381 per front foot. The property is zoned R-1-4 by the City of Gulf Shores.



SITE VALUATION

| COMPARABLE LAND SALE NO. 5 |
|---|



| Transaction | | | |
|---|---|---|---|
| ID | 6492 | Date | 12/19/2018 |
| Address | Lot 75 Ponce de Leon Court | Price | $530,000 |
| City | Gulf Shores | Price per Acre | $699,596 |
| State | AL | Price Per Land SF | $16.06 |
| Tax ID | 28129 | Financing | Cash to Seller |
| Grantor | The Klimback Living Trust | Property Rights | Fee Simple |
| Grantee | CL Investments, LLC | Verification | MLS, Public Records |
| Book/Page or | 1735959 | | |

| Site | | | |
|---|---|---|---|
| Acres | 0.8 | Topography | Level |
| Land SF | 33,000 | Zoning | RTF-4 |
| Water Frontage | 75 | Flood Zone | VE |
| Shape | Rectangular | Encumbrance or | None noted |
| Utilities | All Necessary | Environmental Issues | None noted |

| Comments |
|---|

This gulf-front vacant parcel of land is on the south side of Ponce de Leon Court between Triple Tail and Pontoon Lanes on the Fort Morgan Peninsula. The property sold for $530,000. or $7,066 per front foot on December 19, 2018 after have been marketed for 3 days at $545,000.



SITE VALUATION

**COMPARABLE LAND SALE NO. 6**



| Transaction | | | |
|---|---|---|---|
| ID | 6497 | Date | 5/7/2018 |
| Address | Lot 1 Ponce de Leon Court | Price | $600,000 |
| City | Gulf Shores | Price per Acre | $750,000 |
| State | AL | Price Per Land SF | $17.22 |
| Tax ID | 43988 | Financing | Cash to Seller |
| Grantor | Kendall Burt, Christa Burt | Property Rights | Fee Simple |
| Grantee | Medical Properties of Mississippi, LLC | Verification | MLS, Public Records |
| Book/Page or | 1694878 | | |

| Site | | | |
|---|---|---|---|
| Acres | 0.8 | Topography | Level |
| Land SF | 34,848 | Zoning | RTF-4 |
| Water Frontage | 110 | Flood Zone | VE |
| Shape | Rectangular | Encumbrance or | None noted |
| Utilities | All Necessary | Environmental Issues | None noted |

| Comments |
|---|
| This is the sale of a vacant gulf-front parcel of land that is located on Ponce de Leon Court between Ebb Tide Lane and 3 Mile Road on the Fort Morgan Peninsula. The property sold for $600,000. or $5,454 per front foot on May 7, 2018. |



SITE VALUATION

**COMPARABLE LAND SALE NO. 7**



| Transaction | | | |
|---|---|---|---|
| ID | 6491 | Date | 4/16/2018 |
| Address | 4230 Hwy 180 | Price | $485,000 |
| City | Gulf Shores | Price per Acre | $480,150 |
| State | AL | Price Per Land SF | $11.02 |
| Tax ID | 22801 | Financing | Cash to Seller |
| Grantor | LA Consulting, INc. | Property Rights | Fee Simple |
| Grantee | David W. Poling, Mary C. Poling | Verification | MLS, Public Records |
| Book/Page or | 1800616 | | |

| Site | | | |
|---|---|---|---|
| Acres | 1.0 | Topography | Level |
| Land SF | 44,000 | Zoning | RTF-4 |
| Water Frontage | 50 | Flood Zone | VE |
| Shape | Rectangular | Encumbrance or | None noted |
| Utilities | All Necessary | Environmental Issues | None noted |

| Comments |
|---|
| This is the sale of a gulf-front vacant lot on Highway 180 on the Fort Morgan Peninsula. The property was on the market for 55 days listed at $495,000. It sold on April 16, 2018 for $485,000, or $9,700 per front foot. |



SITE VALUATION

| LOCATION MAP |
|---|


*Map Provided by Google.*

### LAND SALES ADJUSTMENT PROCESS

The above sales have been analyzed and compared with the subject property's primary site. We have considered adjustments in the areas of:

- Property Rights Sold or Conveyed
- Financing
- Conditions of Sale
- Market Trends
- Location
- Physical Characteristics (Size, Public Utilities, Shape, Zoning, etc.)

### PROPERTY RIGHTS SOLD OR CONVEYED

All of the comparables utilized in this analysis involve the transfer of the fee simple interest. Since we are appraising the fee simple interest of the subject site, no adjustments were required.

### FINANCING

To the best of our knowledge, all of the comparable sales utilized in this analysis were accomplished with cash and/or cash and market-oriented financing. Based on the above information, no adjustment for financial terms is required for the comparables.

---



SITE VALUATION

**CONDITIONS OF SALE**

Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. In many situations the conditions of sale may significantly affect transaction prices. However, all comparables used in this analysis are considered to be "arm's-length" market transactions between both knowledgeable buyers and sellers on the open market. As such, no adjustments for sale conditions are required.

**MARKET TRENDS**

The passage of time does not necessarily warrant an adjustment; however, fluctuations in market conditions (e.g., supply, demand, macro-economic conditions) may result in appreciation (increases in property values), or depreciation (declines in property values) over time.

The comparable sales analyzed are considered representative of the most recent, comparable, arm's-length sales that we were able to obtain. We have found that most local market participants believe the real estate market began to stabilize around January of 2011 and continues to expand. Therefore, we have adjusted all comparables sold prior to the effective date upward by 5.0% per year.

**LOCATION**

An adjustment for location is required when the locational characteristics of a comparable property are different from those of the subject property. Negative adjustments are made to those comparables considered superior in location versus the subject. Conversely, positive adjustments are made to those comparables considered inferior.

**SIZE**

Size adjustments generally reflect the inverse relationship expressed between unit price and lot size. Smaller lots tend to sell for higher unit prices than larger lots, and vice versa. Positive adjustments are made to larger land parcels, and negative adjustments are made to smaller land parcels.

**TOPOGRAPHY**

Adjustments for variances in topography are related to the amount of site work required to prepare a parcel for development. For example, a site with a significant slope would require more site work than a level site, which may have an impact on the reconciled sale price.

**SHAPE**

The shape of a parcel can influence the potential development opportunities with a site. For example, a site that is long and narrow might require a developer to have a more vertical construction design than desired, which raises development costs and reduces the amount of funds available for site acquisition.



SITE VALUATION

**PUBLIC UTILITIES**

The availability of public utilities has a significant impact on the value of a property. Municipal utility providers often – but not always – provide utilities such as gas, water, electric, sewer, and telephone. It is therefore important to understand any differences that may exist in the availability of public utilities to the subject property and its comparables.

**ZONING**

The zoning of a parcel has a direct impact on the land uses, allowable densities, setback allocations, and numerous other compliance issues. Typically, developers will pay a higher price for land with a more favorable zoning such as a high-density multifamily zoning or intense commercial zoning.

A sales comparison grid displaying the subject property, the comparables and the adjustments that were applied is displayed on the following page.



SITE VALUATION

| Land Analysis Grid | | Comp 1 | | Comp 2 | | Comp 3 | | Comp 4 | | Comp 5 | | Comp 6 | | Comp 7 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Address | Ponce de Leon Court | Lot 2 Pamela Court | | Lot 9 Unit 3 Surfside Shores | | Lot 8 Unit 3 Surfside Shores | | 2211 W Beach Blvd | | Lot 75 Ponce de Leon Court | | Lot 1 Ponce de Leon Court | | 4230 Hwy 180 | |
| City | Gulf Shores | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | |
| State | AL | AL | | AL | | AL | | AL | | AL | | AL | | AL | |
| Date | 8/1/2020 | 2/25/2020 | | 2/7/2020 | | 1/7/2020 | | 1/2/2020 | | 12/19/2018 | | 5/7/2018 | | 4/16/2018 | |
| Price | -- | $525,000 | | $525,000 | | $485,000 | | $865,000 | | $530,000 | | $600,000 | | $485,000 | |
| Water Frontage | 75 | 65 | | 68 | | 68 | | 76 | | 75 | | 110 | | 50 | |
| Water Frontage Unit Price | -- | $8,077 | | $7,721 | | $7,132 | | $11,382 | | $7,067 | | $5,455 | | $9,700 | |
| **Transaction Adjustments** | | | | | | | | | | | | | | | |
| Property Rights | Fee Simple | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% |
| Financing | Conventional | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% |
| Conditions of Sale | Cash | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% |
| **Adjusted Water Frontage Unit Price** | | $8,077 | | $7,721 | | $7,132 | | $11,382 | | $7,067 | | $5,455 | | $9,700 | |
| Market Trends Through 8/1/2020 | 5.0% | 2.1% | | 2.4% | | 2.8% | | 2.9% | | 8.2% | | 11.5% | | 11.9% | |
| **Adjusted Water Frontage Unit Price** | | $8,249 | | $7,904 | | $7,332 | | $11,709 | | $7,648 | | $6,084 | | $10,850 | |
| Location | Average | Similar | | Similar | | Similar | | Superior | | Similar | | Similar | | | |
| % Adjustment | | | 0% | | 0% | | 0% | | -25% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $0 | | $0 | | -$2,927 | | $0 | | $0 | | $0 | |
| Land SF | 30,225 | 29,803 | | 32,640 | | 32,640 | | 22,559 | | 33,000 | | 34,848 | | 44,000 | |
| % Adjustment | | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | |
| Topography | Level | Level | | Level | | Level | | Level | | Level | | Level | | Level | |
| % Adjustment | | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | |
| Shape | Rectangular | Rectangular | | Rectangular | | Rectangular | | Rectangular | | Rectangular | | Rectangular | | Rectangular | |
| % Adjustment | | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | |
| Utilities | The site is served by public | All Necessary | | All Necessary | | All Necessary | | All Necessary | | All Necessary | | All Necessary | | All Necessary | |
| % Adjustment | | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | |
| Zoning | RTF-4, Two-family District | RTF-4 | | RSF-1 | | RSF-1 | | R-1-4 | | RTF-4 | | RTF-4 | | RTF-4 | |
| % Adjustment | | | 0% | | 10% | | 10% | | 0% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $790 | | $733 | | $0 | | $0 | | $0 | | $0 | |
| **Adjusted Water Frontage Unit Price** | | $8,249 | | $8,695 | | $8,066 | | $8,782 | | $7,648 | | $6,084 | | $10,850 | |



SITE VALUATION

**LAND VALUE CONCLUSION**

After adjustments, the adjusted pricing of the comparable properties ranges from $6,084 to $10,850 per front foot with an average adjusted price of $8,339 per front foot.

All of the value indications have been considered, and in the final analysis equal weight was given to all the comparables. These are the most recent sales and have highest and best uses most similar to the subject.

Based on the information in consideration of the subject's physical and locational characteristics, we consider a pricing from within the middle portion of the adjusted range to be warranted. From this, we have arrived at a pricing of $7,500 per front foot.

| Land Value Ranges & Reconciled Value | | | |
|---|---|---|---|
| Number of Comparables: 7 | Unadjusted | Adjusted | % Δ |
| Low: | $5,455 | $6,084 | 12% |
| High: | $11,382 | $10,850 | -5% |
| Average: | $8,076 | $8,339 | 3% |
| Median: | $7,721 | $8,249 | 7% |
| Reconciled Value/Unit Value: | | $7,500 | water frontage |
| Subject Size: | | 75 | |
| Indicated Value: | | $562,500 | |
| Reconciled Final Value: | | $560,000 | |
| **Five Hundred Sixty Thousand Dollars** | | | |

SITE VALUATION

**LAND VALUE CONCLUSION- AS OF MARCH 11, 2021**

We have used the same sales in our analysis to derive the current value of the site. The primary difference in the value is the time adjustment. A sales comparison grid displaying the subject property, the comparables and the adjustments that were applied is displayed on the following page.

SITE VALUATION

| Land Analysis Grid | | Comp 1 | | Comp 2 | | Comp 3 | | Comp 4 | | Comp 5 | | Comp 6 | | Comp 7 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Address | Ponce de Leon Court | Lot 2 Pamela Court | | Lot 9 Unit 3 Surfside Shores | | Lot 8 Unit 3 Surfside Shores | | 2211 W Beach Blvd | | Lot 75 Ponce de Leon Court | | Lot 1 Ponce de Leon Court | | 4230 Hwy 180 | |
| City | Gulf Shores | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | |
| State | AL | AL | | AL | | AL | | AL | | AL | | AL | | AL | |
| Date | 3/11/2021 | 2/25/2020 | | 2/7/2020 | | 1/7/2020 | | 1/2/2020 | | 12/19/2018 | | 5/7/2018 | | 4/16/2018 | |
| Price | -- | $525,000 | | $525,000 | | $485,000 | | $865,000 | | $530,000 | | $600,000 | | $485,000 | |
| Water Frontage | 75 | 65 | | 68 | | 68 | | 76 | | 75 | | 110 | | 50 | |
| Water Frontage Unit Price | -- | $8,077 | | $7,721 | | $7,132 | | $11,382 | | $7,067 | | $5,455 | | $9,700 | |
| **Transaction Adjustments** | | | | | | | | | | | | | | | |
| Property Rights | Fee Simple | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% |
| Financing | Conventional | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% |
| Conditions of Sale | Cash | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% |
| **Adjusted Water Frontage Unit Price** | | $8,077 | | $7,721 | | $7,132 | | $11,382 | | $7,067 | | $5,455 | | $9,700 | |
| Market Trends Through 3/11/2021 | 5.0% | 5.2% | | 5.5% | | 5.9% | | 6.0% | | 11.5% | | 14.9% | | 15.2% | |
| **Adjusted Water Frontage Unit Price** | | $8,498 | | $8,142 | | $7,553 | | $12,061 | | $7,878 | | $6,267 | | $11,177 | |
| Location | Average | Similar | | Similar | | Similar | | Superior | | Similar | | Similar | | | |
| % Adjustment | | | 0% | | 0% | | 0% | | -25% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $0 | | $0 | | -$3,015 | | $0 | | $0 | | $0 | |
| Land SF | 30,225 | 29,803 | | 32,640 | | 32,640 | | 22,559 | | 33,000 | | 34,848 | | 44,000 | |
| % Adjustment | | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | |
| Topography | Level | Level | | Level | | Level | | Level | | Level | | Level | | Level | |
| % Adjustment | | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | |
| Shape | Rectangular | Rectangular | | Rectangular | | Rectangular | | Rectangular | | Rectangular | | Rectangular | | Rectangular | |
| % Adjustment | | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | |
| Utilities | The site is served by public | All Necessary | | All Necessary | | All Necessary | | All Necessary | | All Necessary | | All Necessary | | All Necessary | |
| % Adjustment | | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | | $0 | |
| Zoning | RTF-4, Two-family District | RTF-4 | | RSF-1 | | RSF-1 | | R-1-4 | | RTF-4 | | RTF-4 | | RTF-4 | |
| % Adjustment | | | 0% | | 10% | | 10% | | 0% | | 0% | | 0% | | 0% |
| $ Adjustment | | $0 | | $814 | | $755 | | $0 | | $0 | | $0 | | $0 | |
| **Adjusted Water Frontage Unit Price** | | $8,498 | | $8,957 | | $8,309 | | $9,046 | | $7,878 | | $6,267 | | $11,177 | |



**LAND VALUE CONCLUSION**

After adjustments, the adjusted pricing of the comparable properties ranges from $6,267 to $11,177 per front foot with an average adjusted price of $8,590 per front foot.

All of the value indications have been considered, and in the final analysis equal weight was given to all the comparables. These are the most recent sales and have highest and best uses most similar to the subject.

Based on the information in consideration of the subject's physical and locational characteristics, we consider a pricing from within the middle portion of the adjusted range to be warranted. From this, we have arrived at a pricing of $8,000 per front foot.

| Land Value Ranges & Reconciled Value | | | |
|---|---|---|---|
| Number of Comparables: 7 | Unadjusted | Adjusted | % Δ |
| Low: | $5,455 | $6,267 | 15% |
| High: | $11,382 | $11,177 | -2% |
| Average: | $8,076 | $8,590 | 6% |
| Median: | $7,721 | $8,498 | 10% |
| Reconciled Value/Unit Value: | | $8,000 | water frontage |
| Subject Size: | | 75 | |
| Indicated Value: | | $600,000 | |
| Reconciled Final Value: | | **$600,000** | |
| Six Hundred Thousand Dollars | | | |



# COST APPROACH

The Cost Approach is based on the principle of substitution - that a prudent and rational person would pay no more for a property than the cost to construct a similar and competitive property, assuming no undue delay in the process. The Cost Approach tends to set the upper limit of value before depreciation is considered. The applied process is as follows:

- Estimate the replacement cost new of the building and site improvements.  This is generally accomplished through costs provided by recognized cost services, review of actual or proposed costs for the property, or analysis of recent construction costs for similar property types.

- Estimate the physical, functional and/or external depreciation accrued to the improvements.

- Sum the depreciated value of the improvements with the value of the land for an indication of value.  The subject's site value was presented in the previous analysis.

### REPLACEMENT COST NEW (RCN) ANALYSIS

There are three general methods of estimating replacement cost, including review of the actual costs of the subject, review of construction costs of other similar type properties, and estimating costs from published cost data sources.

In our analysis, the replacement cost new of the subject site and building improvements has been based on the Calculator Method developed by Marshall & Swift, a nationally recognized cost estimating service.  The Marshall Valuation Service publication provides revised cost factors on a monthly basis and adjusts them to reflect regional and local cost variations.

### Base Construction Costs

The base building cost reported by the Marshall Valuation Service include all direct costs for the improvements, as well as the costs attributable to plans, specifications, building permits, engineer's and architect's fees, construction loan interest, sales taxes, contractor's overhead and profit, worker's compensation, and fire and liability insurance. The base cost is then adjusted for current conditions, location, story height, and perimeter characteristics.

In referencing the *Marshall Valuation Service* cost manual, the indicated base costs for a D high-value residences in Section 12: Section 12: Residences & Motels/Page 27 ranges from $207.00 per square foot for a low cost improvement to $505.00 per square foot for an excellent quality improvement. We have considered an Good quality in our selection of the base cost.

In addition to Marshall & Swift, we have also interviewed local buildings who are actively constructing vacation rental homes in the region. Per discussions with Mr. Greg Kennedy, typical construction costs for large vacation homes and duplexes in mid-2020 were $220 to $250 per square foot excluding developer profit, soft costs, and land value. He noted a spike in construction costs over the past six months. Mr. Kennedy noted that materials are harder to resource and hard costs have increased approximately 35%. Mr. Kennedy has actively been building in the area since the 1990s.



COST APPROACH

Mr. Greg Miller noted that construction costs of similarly constructed homes in the area have ranged from $275 to $300 per square foot. He concurred with Mr. Kennedy's statement that construction costs have increased approximately 35%. Mr. Miller has been actively building in the Fort Morgan area since the 1980s.

Last, we interviewed Mr. Mike McCurley. Mr. McCurley has been construction homes in the area for nearly thirty years. Mr. McCurley noted that construction costs for similar quality homes and duplexes in the area was approximately $185 per square foot a year ago. He noted that they had recently built the same design home and its total costs were $200 per square foot.

Based on the physical characteristics of the improvements, we consider the subject improvements to best represent an average quality building. Based on this, we have correlated to a blended base cost for the improvements at $200.00 per square foot prior to any multiplier adjustments.

**Site Improvement Costs**

Site improvements include asphalt paving, walkways and trash enclosure. The site improvements including site preparation, utility line extensions, drainage, etc. were estimated at $60,450 or $2.00 per square foot of land area. Total hard costs for the subject structure and site improvements are thus estimated at $2,017,450.

**Personal Property (Furniture, Fixtures and Equipment)**

As a real estate only analysis, FF&E costs were not included.

**Other Indirect Costs**

The base cost figures include architect's fees and contractor's overhead and profit, sales taxes, permit fees and insurance during construction. Interest on interim construction financing is also included. However, Marshall Valuation Service does not include certain financing costs, property taxes, broker's commissions, or legal and consulting fees. Other indirect costs not included in the RCN of building and site improvements are developer overhead, permanent loan fees, developer fees, contingencies, and lease-up and marketing costs.

Research into these costs leads to the conclusion that an average property requires an allowance for other indirect costs of between 7.00% and 12.00% of RCN of building improvements plus site improvements. We have estimated typical soft cost amounts for insurance, taxes and other fees at 5.00% of the total hard costs, with contingency and other miscellaneous items estimated at 5.00% of the total hard costs, for a combined total of 10%. Total costs to place the property into production include marketing/promotional expenses, operating shortfalls, and advertising through the various media channels.

Therefore, the total indirect costs incurred by the subject property are estimated at $201,745.

---



## DEVELOPER (ENTREPRENEURIAL) PROFIT

This factor reflects the profit necessary for the developer to undertake the management, responsibility, risks of construction and lease-up associated with this property type. Market conditions can also have a direct influence on developer's profit.

Current valuation theory states that the four components that create value are land, labor, capital and coordination. Developer's profit as used in the Cost Approach reflects the coordination component of value. Typically, developer's profit runs 10% to 20% within the market and based on the data, we have computed developer's profit at 15.0% of construction costs. In this instance, given the market support for the facility, we have chosen to apply an entrepreneurial profit of 15.0% to the cost estimate. Therefore, our estimated allocation for the developer's incentive for is $417,254.

## COST NEW

Therefore, we have estimated the total cost new of the structure at $2,636,449, or $281.67 per square foot.

| COST APPROACH SUMMARY | | |
|---|---|---|
| Cost Source: | Marshall Valuation Service | |
| Cost Reference: | Section 12    Page 25 | Section 12: Residences & Motels |
| Improvement Class: | D | |
| Construction Quality: | Good | |
| Current Cost Multiplier: | 1.000 | |
| Local Multiplier | 1.000 | |
| Perimeter Multiplier: | 1.000 | |
| Height/ Story Multiplier: | 1.000 | |
| Combined Multipliers | 1.000 | |

| BUILDING IMPROVEMENTS | | | | | |
|---|---|---|---|---|---|
| Item | Unit Type | Cost | Quantity | Multiplier | Total |
| Base Building Cost | Sq. Ft. | $200.00 | 9,360 | 1.000 | $1,872,000 |
| Pool | Lump Sum | $85,000 | 1 | 1.000 | $85,000 |
| **Total Building Improvement Costs** | | | | | $1,957,000 |
| Price per SF Gross Building Area | | | | | $209.08 |

| SITE IMPROVEMENTS | | | | |
|---|---|---|---|---|
| Item | Unit Type | Cost | Quantity | Total |
| Site Preparation & Improvements | Sq. Ft. | $2.00 | 30,225 | $60,450 |
| **Total Site Improvement Costs** | | | | $60,450 |
| **Subtotal: Building & Site Costs** | | | | $2,017,450 |
| Price per SF Gross Building Area | | | | $215.54 |

| TOTAL COSTS | | |
|---|---|---|
| Subtotal: Building, Site Imp. & Soft Costs | | $2,017,450 |
| Indirect Costs | @ 10.0% | $201.745 |
| Subtotal: Building, Site Imp., Soft Costs, & Indirect Costs | | $2,219,195 |
| | | |
| Entrepreneurial Incentive (Land & Building) | @ 15.0% | $417,254 |
| Total Replacement Cost New (RCN) | | $2,636,449 |
| Price per SF Gross Building Area | | $281.67 |



COST APPROACH

## DEPRECIATION ANALYSIS

The Dictionary of Real Estate Appraisal, Sixth Edition (2015) defines Accrued Depreciation as:

1. In appraising, a loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the market value of the improvements on the same date.

2. In accounting, an allowance made against the loss in value of an asset for a defined purpose and computed using a specific method.

Thus, accrued depreciation is the loss in value in the replacement or reproduction cost of improvements from any cause as of the date of appraisal. Depreciation can be caused by physical deterioration (curable and incurable), functional obsolescence (curable and incurable), or external obsolescence. The five basic elements of accrued depreciation of structures are curable physical deterioration, incurable physical deterioration, curable functional obsolescence, incurable functional obsolescence, and external obsolescence. The various forms of depreciation are discussed in the following paragraphs.

## PHYSICAL DETERIORATION

This results from deterioration from aging and use. This type of depreciation may be curable or incurable. Physical deterioration due to age is considered a form of incurable deterioration.

***Curable physical depreciation*** refers to items that are economically feasible to cure as of the effective date of the appraisal. This element of depreciation is commonly referred to as deferred maintenance and is measured as the cost of repairing or restoring the item to new or reasonably new condition.

***Incurable physical deterioration*** refers to items that cannot be practically or economically cured as of the date of appraisal. Physical deterioration due to age is a form of incurable deterioration. Physical incurable items are broken down into short-lived and long-lived component categories. A short- lived item is a component that is expected to have a remaining life that is shorter than the remaining life of the total improvement. Conversely, a long-lived component is a component that is expected to have a remaining life that is the same as that of the entire structure.

We have estimated the effective ages of the short-lived components were 0 years with a total depreciation of $0. Based on the estimated effective age of 0 years for the facility with a total economic life of 40 years, we estimate total long-lived incurable depreciation to be $0.

## FUNCTIONAL OBSOLESCENCE

This results from a lack of utility or desirability due to design or market perception of the improvements. Functional obsolescence may be curable or incurable.

For functional obsolescence to be curable, the cost to correct the deficiency must be equal to or less than the anticipated increase in value. For curable functional obsolescence there are three basic



deficiencies including deficiency requiring addition, deficiency requiring substitution and superadequacy.

A deficiency requiring addition is measured by how much the cost of the addition exceeds the cost of the item if it were installed new during construction.  A deficiency requiring substitution is measured as the cost of the existing component less physical deterioration already charged against the component and salvage value, plus the cost to remove the existing component and the added cost of installation.  A superadequacy is measured as the current reproduction cost of the item minus any physical deterioration already charged plus the cost of removal, less the salvage value.   A superadequacy is curable if correcting it on the date of the appraisal is economically feasible. Based on a personal inspection of the property and our review of the physical characteristics of the subject, we have estimated functional obsolescence at zero (0%) percent.

### EXTERNAL OBSOLESCENCE

External obsolescence is the adverse effect on value due to circumstances outside the property itself, such as industry, demographic and economic conditions or an undesirable proximate use. This type of depreciation is rarely curable.  Based on a review of the locational and market characteristics of the subject, we have estimated external obsolescence at zero (0%) percent.

### TOTAL DEPRECIATION

Therefore, the total accrued depreciation applicable to the improvements is $0 which when deducted from the total RCN of $2,636,449 correlates to a depreciated value for the improvements of $2,636,449.

| DEPRECIATION | | | | | | |
|---|---|---|---|---|---|---|
| **Curable Physical (Deferred Maintenance)** | | | | | | $0 |
| **Incurable Physical (Short Lived):** | **Unit Cost** | **Cost New** | **Effective Age** | **Economic Life** | **Percent Depreciated** | **Amount** |
| Roof: | $3.50 | $32,760 | 0 | 15 | 0% | $0 |
| Flooring: | $1.00 | $9,360 | 0 | 7 | 0% | $0 |
| HVAC: | $2.75 | $25,740 | 0 | 15 | 0% | $0 |
| FF&E | | $0 | 0 | 10 | 0% | $0 |
| Site Improvements: | | $69,518 | 0 | 15 | 0% | $0 |
| Accrued Depreciation (Short Lived) | | $137,378 | | | | $0 |
| | | | | | | |
| **Physical Incurable (Long Lived)** | | | | | | |
| Replacement Cost New | | $2,636,449 | | | | |
| Less: Short Lived Items | | $137,378 | | | | |
| Less: Curable Physical | | $0 | | | | |
| Depreciable Basis: | | $2,499,072 | | | | |
| | | | | | | |
| Physical Depreciation: Building | .............................. | | 0 | 40 | 0% | $0 |
| | | | | | | |
| Functional Obsolescence Building | .............................. | | 0% | | | $0 |
| External Obsolescence Building | .............................. | | 0% | | | $0 |
| | | | | | | |
| | | **Total Depreciation** | | | | $0 |
| | | **Depreciated Value of Improvements** | | | | $2,636,449 |
| | | Cost Per Square Foot Gross Building Area | | | | $281.67 |



## COST APPROACH CONCLUSION

To the contributory value of the improvements, we must add the land value of $560,000. Based on the analysis detailed on the following page, we have reconciled to a hypothetical real estate only value via the Cost Approach as of August 1, 2020 of:

| COST APPROACH CONCLUSION | |
|---|---:|
| Depreciated Value of Improvements | $2,636,449 |
| Primary Site Value | $562,500 |
| Excess Site Value | $0 |
| Cost Approach Value Indication | $3,198,949 |
| Rounded | $3,200,000 |
| Price per SF Gross Building Area | $341.88 |



COST APPROACH

### COST APPROACH SUMMARY

| | |
|---|---|
| Cost Source: | Marshall Valuation Service |
| Cost Reference: | Section 12    Page 27    Section 12: Residences & Motels |
| Improvement Class: | D |
| Construction Quality: | Good |
| Current Cost Multiplier: | 1.000 |
| Local Multiplier | 1.000 |
| Perimeter Multiplier: | 1.000 |
| Height/ Story Multiplier: | 1.000 |
| Combined Multipliers | 1.000 |

### BUILDING IMPROVEMENTS

| Item | Unit Type | Cost | Quantity | Multiplier | Total |
|---|---|---|---|---|---|
| Base Building Cost | Sq. Ft. | $200.00 | 9,360 | 1.000 | $1,872,000 |
| Pool | Lump Sum | $85,000 | 1 | 1.000 | $85,000 |
| **Total Building Improvement Costs** | | | | | **$1,957,000** |
| Price per SF Gross Building Area | | | | | $209.08 |

### SITE IMPROVEMENTS

| Item | Unit Type | Cost | Quantity | Total |
|---|---|---|---|---|
| Site Preparation & Improvements | Sq. Ft. | $2.00 | 30,225 | $60,450 |
| **Total Site Improvement Costs** | | | | **$60,450** |
| **Subtotal: Building & Site Costs** | | | | **$2,017,450** |
| Price per SF Gross Building Area | | | | $215.54 |

### TOTAL COSTS

| | | |
|---|---|---|
| Subtotal: Building, Site Imp. & Soft Costs | | $2,017,450 |
| Indirect Costs | @ 10.0% | $201,745 |
| Subtotal: Building, Site Imp., Soft Costs, & Indirect Costs | | $2,219,195 |
| | | |
| Entrepreneurial Incentive (Land & Building) | @ 15.0% | $417,254 |
| Total Replacement Cost New (RCN) | | $2,636,449 |
| Price per SF Gross Building Area | | $281.67 |

### DEPRECIATION

| | | | | | | |
|---|---|---|---|---|---|---|
| **Curable Physical (Deferred Maintenance)** | | | | | | $0 |

| Incurable Physical (Short Lived): | Unit Cost | Cost New | Effective Age | Economic Life | Percent Depreciated | Amount |
|---|---|---|---|---|---|---|
| Roof: | $3.50 | $32,760 | 0 | 15 | 0% | $0 |
| Flooring: | $1.00 | $9,360 | 0 | 7 | 0% | $0 |
| HVAC: | $2.75 | $25,740 | 0 | 15 | 0% | $0 |
| FF&E | | $0 | 0 | 10 | 0% | $0 |
| Site Improvements: | | $69,518 | 0 | 15 | 0% | $0 |
| Accrued Depreciation (Short Lived) | | $137,378 | | | | $0 |

| Physical Incurable (Long Lived) | | | | | | |
|---|---|---|---|---|---|---|
| Replacement Cost New | | $2,636,449 | | | | |
| Less: Short Lived Items | | $137,378 | | | | |
| Less: Curable Physical | | $0 | | | | |
| Depreciable Basis: | | $2,499,072 | | | | |
| | | | | | | |
| Physical Depreciation: Building | ............................ | | 0 | 40 | 0% | $0 |
| | | | | | | |
| Functional Obsolescence Building | ............................ | | 0% | | | $0 |
| External Obsolescence Building | ............................ | | 0% | | | $0 |

| | |
|---|---|
| **Total Depreciation** | **$0** |
| **Depreciated Value of Improvements** | **$2,636,449** |
| Cost Per Square Foot Gross Building Area | $281.67 |

### COST APPROACH CONCLUSION

| | |
|---|---|
| **Depreciated Value of Improvements** | $2,636,449 |
| **Primary Site Value** | $562,500 |
| **Excess Site Value** | $0 |
| **Cost Approach Value Indication** | **$3,198,949** |
| **Rounded** | **$3,200,000** |
| Price per SF Gross Building Area | $341.88 |

---



**COST APPROACH- AS OF MARCH 11, 2021**

The following analysis considers a slightly higher cost based on the contractor interviews. Also, the cost includes depreciation as the structure would have been nearly a year old. To the contributory value of the improvements, we must add the land value of $600,000. Based on the analysis detailed on the following page, we have reconciled to hypothetical real estate only hypothetical value via the Cost Approach as of March 11, 2021 of:



COST APPROACH

| COST APPROACH SUMMARY | | | | |
|---|---|---|---|---|
| Cost Source: | Marshall Valuation Service | | | |
| Cost Reference: | Section 12    Page 27 | Section 12: Residences & Motels | | |
| Improvement Class: | D | | | |
| Construction Quality: | Good | | | |
| Current Cost Multiplier: | 1.000 | | | |
| Local Multiplier | 1.000 | | | |
| Perimeter Multiplier: | 1.000 | | | |
| Height/ Story Multiplier: | 1.000 | | | |
| Combined Multipliers | 1.000 | | | |

| BUILDING IMPROVEMENTS | | | | | |
|---|---|---|---|---|---|
| Item | Unit Type | Cost | Quantity | Multiplier | Total |
| Base Building Cost | Sq. Ft. | $230.00 | 9,360 | 1.000 | $2,152,800 |
| Pool | Lump Sum | $85,000 | 1 | 1.000 | $85,000 |
| **Total Building Improvement Costs** | | | | | **$2,237,800** |
| Price per SF Gross Building Area | | | | | $239.08 |

| SITE IMPROVEMENTS | | | | |
|---|---|---|---|---|
| Item | Unit Type | Cost | Quantity | Total |
| Site Preparation & Improvements | Sq. Ft. | $2.00 | 30,225 | $60,450 |
| **Total Site Improvement Costs** | | | | **$60,450** |
| **Subtotal: Building & Site Costs** | | | | **$2,298,250** |
| Price per SF Gross Building Area | | | | $245.54 |

| TOTAL COSTS | | |
|---|---|---|
| Subtotal: Building, Site Imp. & Soft Costs | | $2,298,250 |
| Indirect Costs | @ 10.0% | $229,825 |
| Subtotal: Building, Site Imp., Soft Costs, & Indirect Costs | | $2,528,075 |
| Entrepreneurial Incentive (Land & Building) | @ 15.0% | $463,586 |
| Total Replacement Cost New (RCN) | | $2,991,661 |
| Price per SF Gross Building Area | | $319.62 |

| DEPRECIATION | | | | | | |
|---|---|---|---|---|---|---|
| Curable Physical (Deferred Maintenance) | | | | | | $0 |

| Incurable Physical (Short Lived): | Unit Cost | Cost New | Effective Age | Economic Life | Percent Depreciated | Amount |
|---|---|---|---|---|---|---|
| Roof: | $3.50 | $32,760 | 1 | 15 | 7% | $2,184 |
| Flooring: | $1.00 | $9,360 | 1 | 7 | 14% | $1,337 |
| HVAC: | $2.75 | $25,740 | 1 | 15 | 7% | $1,716 |
| FF&E | | $0 | 1 | 10 | 10% | $0 |
| Site Improvements: | | $69,518 | 1 | 15 | 7% | $4,635 |
| Accrued Depreciation (Short Lived) | | $137,378 | | | | $9,872 |

| Physical Incurable (Long Lived) | | | | | |
|---|---|---|---|---|---|
| Replacement Cost New | $2,991,661 | | | | |
| Less: Short Lived Items | $137,378 | | | | |
| Less: Curable Physical | $0 | | | | |
| Depreciable Basis: | $2,854,284 | | | | |
| Physical Depreciation: Building | ................... | 1 | 40 | 3% | $71,357 |
| Functional Obsolescence Building | ................... | 0% | | | $0 |
| External Obsolescence Building | ................... | 0% | | | $0 |
| | **Total Depreciation** | | | | **$81,229** |
| | **Depreciated Value of Improvements** | | | | **$2,910,433** |
| | Cost Per Square Foot Gross Building Area | | | | $310.94 |

| COST APPROACH CONCLUSION | |
|---|---|
| Depreciated Value of Improvements | $2,910,433 |
| Primary Site Value | $600,000 |
| Excess Site Value | $0 |
| **Cost Approach Value Indication** | **$3,510,433** |
| **Rounded** | **$3,510,000** |
| Price per SF Gross Building Area | $375.00 |



**COST APPROACH CONCLUSION**

Based on the analysis detailed on the following page, we have reconciled to a prospective real estate only value via the Cost Approach as of March 11, 2021 of:

| COST APPROACH CONCLUSION | |
|---|---:|
| Depreciated Value of Improvements | $2,910,433 |
| Primary Site Value | $600,000 |
| Excess Site Value | $0 |
| Cost Approach Value Indication | $3,510,433 |
| Rounded | $3,510,000 |
| Price per SF Gross Building Area | $375.00 |



# SALES COMPARISON APPROACH

The Sales Comparison Approach is based on the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership. It is based on the principles of supply and demand, balance, substitution and externalities. The following steps describe the applied process of the Sales Comparison Approach.

- The market in which the subject property competes is investigated; comparable sales, contracts for sale and current offerings are reviewed.
- The most pertinent data is further analyzed and the quality of the transaction is determined.
- Each comparable sale is analyzed and, where appropriate, adjusted to equate with the subject property.
- The value indication of each comparable sale is analyzed and the data reconciled for a final indication of value via the Sales Comparison Approach.

**SALE COMPARABLES**

The subject consists of a proposed 3 story, Class D duplex vacation home building. We researched and verified four closed sales and one listing that are located within the subject's local and regional area. The chosen sale comparables closed between June 2018 and February 2021.

In our analysis of the subject property, we have analyzed the sale comparables through application of an adjustment grid utilizing percentage adjustments. The most meaningful unit of values for properties such as the subject is price per square foot of GBA, so that is the basis on which we have made our adjustments. The comparables utilized in our adjustment grid are summarized and mapped on the following pages.

| Comp | Address | City | Year Built | Price Per SF | Condition |
|---|---|---|---|---|---|
| 1 | 3468 Ponce de Leon | Gulf Shores | 2017 | $418.84 | Good |
| 2 | 583 Our Road | Gulf Shores | 2016 | $442.39 | Good |
| 3 | 9185 A Chewning Lane | Gulf Shores | 2020 | $481.62 | Good |
| 4 | 6550 Seashell Dr | Gulf Shores | 2018 | $451.81 | Good |
| 5 | 4878 Hwy 180 | Gulf Shores | 2017 | $493.42 | Good |



SALES COMPARISON APPROACH



SALE COMPARABLE MAP

SALES COMPARISON APPROACH

**COMPARABLE IMPROVED SALE NO. 1**



| Transaction | | | |
|---|---|---|---|
| ID | 6511 | Date | 3/12/2021 |
| Name | Easy Breezy | Price | $3,499,000 |
| Address | 3468 Ponce de Leon Court | Price Per SF | $418.84 |
| City | Gulf Shores | | |
| County | Baldwin | Transaction Type | Listing |
| State | AL | Financing | Cash to Seller |
| Tax ID | 273993 | Property Rights | Fee Simple |
| Grantor | EZ Breezy, LLC | Book/Page or Reference | TBD (Listing) |
| Grantee | TBD (Listing) | Verification | Daniel Prickett |

| Site | | | |
|---|---|---|---|
| Acres | 0.7 | Land SF | 30525 |
| Topography | Level | Zoning | RTF-4 |
| Road Frontage | 75 | Flood Zone | VE |
| Shape | Rectangular | Encumbrance or | None Noted |
| Utilities | All Necessary | Environmental Issues | None Noted |

| Improvements & Financial Data | | | |
|---|---|---|---|
| Property Major Type | Residential | PGI | NA |
| Year Built | 2017 | EGI | NA |
| No. of Stories | 2 | Occupancy | NA |
| No. of Units | 2 | EGI | NA |
| GBA | 8,354 | EGIM | NA |
| Construction | Wood Frame | Expense Ratio | NA |
| Condition | | NOI | |
| Quality | | Cap Rate | |

| Comments |
|---|
| Easy Breeze is a three-story duplex vacation rental that has nine bedrooms and nine and a half baths on each side. The property, built in 2017, has two pools and 75 feet of beach access. The property is located on the Fort Morgan peninsula, east of Gulf Shores.  Amenities include heated outdoor pool on each side, elevator, and gulf side balconies. The property is currently listed for $3,499,000, or $418.84 per square foot. |

---

Breezy Shores Duplex                                      71                        

SALES COMPARISON APPROACH

| COMPARABLE IMPROVED SALE NO. 2 |
|---|



| Transaction | | | |
|---|---|---|---|
| ID | 6506 | Date | 2/25/2021 |
| Name | Happy Our | Price | $2,150,000 |
| Address | 583 Our Road | Price Per SF | $442.39 |
| City | Gulf Shores | | |
| County | Baldwin | Transaction Type | Closed Sale |
| State | AL | Financing | Cash to Seller |
| Tax ID | 36274 | Property Rights | Fee Simple |
| Grantor | Jeffrey Philip Valentine | Book/Page or Reference | 1863117 |
| Grantee | A. Vincent Vayda | Verification | Tim McCrory |

| Site | | | |
|---|---|---|---|
| Acres | 0.3 | Land SF | 12470 |
| Topography | Level | Zoning | RSF-1 |
| Road Frontage | 58 | Flood Zone | VE |
| Shape | Rectangular | Encumbrance or | None Noted |
| Utilities | All Necessary | Environmental Issues | None Noted |

| Improvements & Financial Data | | | |
|---|---|---|---|
| Property Major Type | Residential | PGI | NA |
| Year Built | 2016 | EGI | NA |
| No. of Stories | 3 | Occupancy | NA |
| No. of Units | 1 | EGI | NA |
| GBA | 4,860 | EGIM | NA |
| Construction | Wood Frame | Expense Ratio | NA |
| Condition | Good | NOI | NA |
| Quality | Average | Cap Rate | NA |

| Comments |
|---|

Happy Our, a single-family vacation rental, offers nine bedrooms and 9.5 bathrooms in three stories. The property is located on the Fort Morgan peninsula, west of Gulf Shores, Alabama. It was built in 2016 and offers 58 feet of frontage on the Gulf. Amenities include beach access, a foosball table, a shuffleboard, an elevator, outdoor shower, and all stainless appliances in the kitchen. The property sold for $2,150,000, or $442.39 on October 1, 2020.



SALES COMPARISON APPROACH

**COMPARABLE IMPROVED SALE NO. 3**



| Transaction | | | |
|---|---|---|---|
| ID | 6505 | Date | 2/25/2021 |
| Name | Chewning Lane House | Price | $1,637,500 |
| Address | 9185 A Chewning Lane | Price Per SF | $481.62 |
| City | Gulf Shores | | |
| County | Baldwin | Transaction Type | Closed Sale |
| State | AL | Financing | Cash to Seller |
| Tax ID | 11589 | Property Rights | Fee Simple |
| Grantor | Stillwater Capital Assets, LLC | Book/Page or Reference | 1893581 |
| Grantee | S & S Partnership, LLC | Verification | Kris Powell |

| Site | | | |
|---|---|---|---|
| Acres | 0.6 | Land SF | 24651 |
| Topography | Level | Zoning | RSF-2 |
| Road Frontage | 83 | Flood Zone | X, AE |
| Shape | Rectangular | Encumbrance or | None Noted |
| Utilities | All Necessary | Environmental Issues | None Noted |

| Improvements & Financial Data | | | |
|---|---|---|---|
| Property Major Type | Residential | PGI | NA |
| Year Built | 2020 | EGI | NA |
| No. of Stories | 2 | Occupancy | NA |
| No. of Units | 1 | EGI | NA |
| GBA | 3,400 | EGIM | NA |
| Construction | Wood Frame | Expense Ratio | NA |
| Condition | Good | | |
| Quality | Average | | |

| Comments |
|---|
| This property is an assemblage of three adjacent parcels, has seven bedroom, 6.5 bathroom single-family vacation rental located on the Fort Morgan peninsula, west of Gulf Shores, Alabama. It was built in 2020 and offers 83 feet of frontage on the Gulf. Amenities include beach access, deck, pool, and a bar on the top floor. The property sold on February 25, 2021 for $1,637,500, or $482 per square foot. |

---



SALES COMPARISON APPROACH

| COMPARABLE IMPROVED SALE NO. 4 |
|---|



| Transaction | | | |
|---|---|---|---|
| ID | 6508 | Date | 1/15/2020 |
| Name | 6550 Seashell Dr | Price | $1,950,000 |
| Address | 6550 Seashell Dr | Price Per SF | $451.81 |
| City | Gulf Shores | | |
| County | Baldwin | Transaction Type | Closed Sale |
| State | AL | Financing | Cash to Seller |
| Tax ID | 13092 | Property Rights | Fee Simple |
| Grantor | Maxwell MD Properties, LLC | Book/Page or Reference | 1807181 |
| Grantee | Justin B Daniels | Verification | Tim McCrory |

| Site | | | |
|---|---|---|---|
| Acres | 0.8 | Land SF | 33320 |
| Topography | Level | Zoning | RSF-1 |
| Road Frontage | 68 | Flood Zone | VE |
| Shape | Rectangular | Encumbrance or | None Noted |
| Utilities | All Necessary | Environmental Issues | None Noted |

| Improvements & Financial Data | | | |
|---|---|---|---|
| Property Major Type | Residential | PGI | NA |
| Year Built | 2,018 | EGI | NA |
| No. of Stories | 2 | Occupancy | NA |
| No. of Units | 1 | EGI | NA |
| GBA | 4,316 | EGIM | NA |
| Construction | Wood Frame | Expense Ratio | NA |
| Condition | Good | | |
| Quality | Average | | |

| Comments |
|---|

This is the sale of a single-family vacation rental on Seashell Drive in the Surfside Shores subdivision on Fort Morgan, west of Gulf Shores. The two-story home, offering eight bedrooms, eight bathrooms, and two half baths was built in 2018. The property offers 68 feet of frontage on the Gulf. Amenities include beach access, two laundry rooms, outdoor cooking area, and an outside pool with deck. The property sold for $1,950,000, or $451.81 on January 15, 2020.



SALES COMPARISON APPROACH

**COMPARABLE IMPROVED SALE NO. 5**



| Transaction | | | |
|---|---|---|---|
| ID | 6509 | Date | 6/7/2018 |
| Name | Shipwrecked | Price | $1,800,000 |
| Address | 4878 Hwy 180 | Price Per SF | $493.42 |
| City | Gulf Shores | | |
| County | Baldwin | Transaction Type | Closed Sale |
| State | AL | Financing | Cash to Seller |
| Tax ID | 98584 | Property Rights | Fee Simple |
| Grantor | Nelson Holdings, LLC | Book/Page or Reference | 1700827 |
| Grantee | Glenn R. Williams | Verification | Becky Springer |

| Site | | | |
|---|---|---|---|
| Acres | 0.5 | Land SF | 22490 |
| Topography | Level | Zoning | RSF-1 |
| Road Frontage | 65 | Flood Zone | VE |
| Shape | Rectangular | Encumbrance or | None Noted |
| Utilities | All Necessary | Environmental Issues | None Noted |

| Improvements & Financial Data | | | |
|---|---|---|---|
| Property Major Type | Residential | PGI | NA |
| Year Built | 2,017 | EGI | NA |
| No. of Stories | 2 | Occupancy | NA |
| No. of Units | 1 | EGI | NA |
| GBA | 3,648 | EGIM | NA |
| Construction | Wood Frame | Expense Ratio | NA |
| Condition | Good | | |
| Quality | Average | | |

| Comments |
|---|
| This is the sale of a single-family vacation rental on Highway 180 on Fort Morgan, west of Gulf Shores. The two-story home, offering eight bedrooms, eight bathrooms, and two half baths was built in 2017. The property offers 68 feet of frontage on the Gulf. Amenities include elevator, outdoor shower, outdoor pool with deck. The property sold for $1,800,000, or $493.42 on June 7, 2018. |



SALES COMPARISON APPROACH

**ADJUSTMENT PROCESS**

The sales we have utilized represent the best available information that could be compared to the subject property. The sales we researched have been analyzed and compared with the subject property. We have considered adjustments in the areas of:

- Property Rights Sold or Conveyed
- Financing
- Conditions of Sale
- Market Trends
- Location
- Physical Characteristics

**PROPERTY RIGHTS SOLD OR CONVEYED**

All of the comparable sales involved the transfer of the Fee Simple interests that were at market rental rates. In this instance no adjustments are required.

**FINANCING**

To the best of our knowledge, all of the sales utilized in this analysis were accomplished with cash and/or cash and market-oriented, conventional financing. Therefore, no adjustment for financial terms is required for the comparables.

**CONDITIONS OF SALE**

Adjustments for conditions of sale usually reflect the motivations of the buyer and the seller. In many situations the conditions of sale may significantly affect transaction prices. The comparables used in this analysis are considered to be "arm's-length" market transactions between both knowledgeable buyers and sellers on the open market. No adjustments were warranted.

**MARKET TRENDS**

The passage of time does not necessarily warrant an adjustment; however, fluctuations in market conditions (e.g., supply, demand, macro-economic conditions) may result in appreciation (increases in property values), or depreciation (declines in property values) over time. The comparable sales analyzed are representative of the most recent, comparable, arm's-length sales that we were able to obtain.

The local multi-family residential market has continued to improve since 2011 and remains strong. Currently, real estate professionals are reporting excess demand as compared to available resale inventory.  Overall, based on market evidence, we have elected to include a market conditions adjustment of 5.0% per year.

---



SALES COMPARISON APPROACH

**LOCATION**

An adjustment for location is required when the locational characteristics of a comparable property are different from those of the subject property. Negative adjustments are made to those comparables considered superior in location versus the subject. Conversely, positive adjustments are made to those comparables considered inferior.

**PHYSICAL CHARACTERISTICS**

Physical factors were analyzed including size age (year built) and condition, etc. When an item was determined to be inferior to the subject, a positive adjustment was applied. When an item was determined to be superior to the subject, a negative adjustment was applied.

The subject construction will have completed in August 2020 and will be considered to be excellent overall condition.

The sales comparison grid displaying the subject property, the comparables and the adjustments is presented on the following page.

Our adjustments and analysis are presented on the following page:



SALES COMPARISON APPROACH

| Analysis Grid | | Comp 1 (Listing) | | Comp 2 | | Comp 3 | | Comp 4 | | Comp 5 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Address | Ponce de Leon Court | 3468 Ponce de Leon Court | | 583 Our Road | | 9185 A Chewning Lane | | 6550 Seashell Dr | | 4878 Hwy 180 | |
| City | Gulf Shores | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | |
| State | AL | AL | | AL | | AL | | AL | | AL | |
| Date | 8/1/2020 | 3/12/2021 | | 2/25/2021 | | 2/25/2021 | | 1/15/2020 | | 6/7/2018 | |
| Price | | $3,499,000 | | $2,150,000 | | $1,637,500 | | $1,950,000 | | $1,800,000 | |
| GBA | 9,360 | 8,354 | | 4,860 | | 3,400 | | 4,316 | | 3,648 | |
| GBA Unit Price | -- | $418.84 | | $442.39 | | $481.62 | | $451.81 | | $493.42 | |
| Per Bedroom | -- | $194,389 | | $238,889 | | $233,929 | | $243,750 | | $225,000 | |
| **Transaction Adjustments** | | | | | | | | | | | |
| Property Rights | Fee Simple | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% |
| Financing | Conventional | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% |
| Conditions of Sale | Cash | Listing | -10.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% |
| **Adjusted GBA Unit Price** | | $376.96 | | $442.39 | | $481.62 | | $451.81 | | $493.42 | |
| Market Trends Through 8/1/2020 | 5.0% | 0.0% | | -2.5% | | -2.5% | | 2.7% | | 11.1% | |
| **Adjusted GBA Unit Price** | | $376.96 | | $431.33 | | $469.58 | | $463.99 | | $548.08 | |
| Location | | Similar | | Similar | | Sl. Superior | | Sl. Superior | | Similar | |
| % Adjustment | | 0% | | 0% | | -5% | | -5% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | -$23.48 | | -$23.20 | | $0.00 | |
| GBA | 9,360 | 8,354 | | 4,860 | | 3,400 | | 4,316 | | 3,648 | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| Year Built | 2020 | 2017 | | 2016 | | 2020 | | 2018 | | 2017 | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| Condition | Excellent | Good | | Good | | Good | | Good | | Good | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| Quality | Good | Similar | | Sl. Superior | | Similar | | Average | | Average | |
| % Adjustment | | 0% | | -10% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | -$43.13 | | $0.00 | | $0.00 | | $0.00 | |
| No. of Bedrooms | 14 | 18 | | 9 | | 7 | | 8 | | 8 | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| No. of Bathrooms | 6 | 18 | | 9 | | 6 | | 8 | | 7 | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| Residential Amenities | Two outside pools | heated outdoor pool on each side, elevator, gulf side balconies | | Elevator, foosball table, shuffleboard | | Deck, pool, bar | | two laundry rooms, outdoor cooking area, pool, deck | | elevator, outdoor shower, outdoor pool | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| Other | - | Duplex | | Single-Family | | Single-Family | | Single-Family | | Single-Family | |
| % Adjustment | | 0% | | -20% | | -20% | | -20% | | -20% | |
| $ Adjustment | | $0.00 | | -$86.27 | | -$93.92 | | -$92.80 | | -$109.62 | |
| **Adjusted GBA Unit Price** | | $376.96 | | $301.93 | | $352.18 | | $347.99 | | $438.47 | |



**SALES COMPARISON APPROACH CONCLUSION – HYPOTHETICAL EFFECTIVE August 1, 2020**

After all adjustments, the adjusted pricing of the comparable properties range from $301.93 to $438.47 per GBA with an average adjusted price of $363.51 per square foot of GBA.

We find that all five sales offer good evidence of value. All five are located in proximity to each other and are subject to similar market conditions. From this, we have concluded a value of $340.00 per square foot of GBA. Our calculations are shown on the following chart:

| Value Ranges & Reconciled Value | | | | |
|---|---|---|---|---|
| Number of Comps: | 5 | Unadjusted | Adjusted | % Δ |
| | Low: | $418.84 | $301.93 | -28% |
| | High: | $493.42 | $438.47 | -11% |
| | Average: | $457.61 | $363.51 | -21% |
| | Median: | $451.81 | $352.18 | -22% |
| Reconciled Value/Unit Value: | | | $340.00 | |
| Subject Size: | | | 9,360 | |
| Indicated Value: | | | $3,182,400 | |
| Reconciled Final Value: | | | $3,180,000 | |
| Three Million One Hundred Eighty Thousand Dollars | | | | |

**SALES COMPARISON APPROACH CONCLUSION – HYPOTHETICAL EFFECTIVE March 11, 2021**

We have used the same sales in our analysis to derive the current value of the site. The primary difference in the value is the time adjustment. Our adjustments and analysis are presented on the following page:

SALES COMPARISON APPROACH

| Analysis Grid | | Comp 1 (Listing) | | Comp 2 | | Comp 3 | | Comp 4 | | Comp 5 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Address | Ponce de Leon Court | 3468 Ponce de Leon Court | | 583 Our Road | | 918S A Chewning Lane | | 6550 Seashell Dr | | 4878 Hwy 180 | |
| City | Gulf Shores | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | | Gulf Shores | |
| State | AL | AL | | AL | | AL | | AL | | AL | |
| Date | 8/1/2020 | 3/12/2021 | | 2/25/2021 | | 2/25/2021 | | 1/15/2020 | | 6/7/2018 | |
| Price | -- | $3,499,000 | | $2,150,000 | | $1,637,500 | | $1,950,000 | | $1,800,000 | |
| GBA | 9,360 | 8,354 | | 4,860 | | 3,400 | | 4,316 | | 3,648 | |
| GBA Unit Price | -- | $418.84 | | $442.39 | | $481.62 | | $451.81 | | $493.42 | |
| Per Bedroom | -- | $194,389 | | $238,889 | | $233,929 | | $243,750 | | $225,000 | |
| **Transaction Adjustments** | | | | | | | | | | | |
| Property Rights | Fee Simple | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% | Fee Simple | 0.0% |
| Financing | Conventional | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% | Cash to Seller | 0.0% |
| Conditions of Sale | Cash | Listing | -10.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% | Normal | 0.0% |
| **Adjusted GBA Unit Price** | | $376.96 | | $442.39 | | $481.62 | | $451.81 | | $493.42 | |
| Market Trends Through  3/11/2021 | 5.0% | 0.0% | | 0.2% | | 0.2% | | 5.8% | | 14.4% | |
| **Adjusted GBA Unit Price** | | $376.96 | | $443.22 | | $482.52 | | $477.96 | | $564.59 | |
| Location | | Similar | | Similar | | Sl. Superior | | Sl. Superior | | Similar | |
| % Adjustment | | 0% | | 0% | | -5% | | -5% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | -$24.13 | | -$23.90 | | $0.00 | |
| GBA | 9,360 | 8,354 | | 4,860 | | 3,400 | | 4,316 | | 3,648 | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| Year Built | 2020 | 2017 | | 2016 | | 2020 | | 2018 | | 2017 | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| Condition | Excellent | Good | | Good | | Good | | Good | | Good | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| Quality | Good | Similar | | Sl. Superior | | Similar | | Average | | Average | |
| % Adjustment | | 0% | | -10% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | -$44.32 | | $0.00 | | $0.00 | | $0.00 | |
| No. of Bedrooms | 14 | 18 | | 9 | | 7 | | 8 | | 8 | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| No. of Bathrooms | 6 | 18 | | 9 | | 6 | | 8 | | 7 | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| Residential Amenities | Two outside pools | heated outdoor pool on each side, elevator, gulf side balconies | | Elevator, foosball table, shuffleboard | | Deck, pool, bar | | two laundry rooms, outdoor cooking area, pool, deck | | elevator, outdoor shower, outdoor pool | |
| % Adjustment | | 0% | | 0% | | 0% | | 0% | | 0% | |
| $ Adjustment | | $0.00 | | $0.00 | | $0.00 | | $0.00 | | $0.00 | |
| Other | - | Duplex | | Single-Family | | Single-Family | | Single-Family | | Single-Family | |
| % Adjustment | | 0% | | -20% | | -20% | | -20% | | -20% | |
| $ Adjustment | | $0.00 | | -$88.64 | | -$96.50 | | -$95.59 | | -$112.92 | |
| **Adjusted GBA Unit Price** | | $376.96 | | $310.25 | | $361.89 | | $358.47 | | $451.67 | |

SALES COMPARISON APPROACH

**SALES COMPARISON APPROACH CONCLUSION – as of 3/11/2021**

After all adjustments, the adjusted pricing of the comparable properties range from $310.25 to $451.67 per GBA with an average adjusted price of $363.51 per square foot of GBA.

We find that all five sales offer good evidence of value. All five are located in proximity to each other and are subject to similar market conditions. From this, we have concluded a value of $340.00 per square foot of GBA. Our calculations are shown on the following chart:

| Value Ranges & Reconciled Value | | | |
|---|---|---|---|
| **Number of Comps:**   5 | **Unadjusted** | **Adjusted** | **% Δ** |
| Low: | $418.84 | $310.25 | -26% |
| High: | $493.42 | $451.67 | -8% |
| Average: | $457.61 | $371.85 | -19% |
| Median: | $451.81 | $361.89 | -20% |
| **Reconciled Value/Unit Value:** | | $350.00 | |
| **Subject Size:** | | 9,360 | |
| **Indicated Value:** | | $3,276,000 | |
| **Reconciled Final Value:** | | **$3,280,000** | |
| **Three Million Two Hundred Eighty Thousand Dollars** | | | |



# VALUATION PROCESS AND RECONCILIATION

The valuation process includes three traditional approaches to value: Cost Approach, Sales Comparison Approach and Income Capitalization Approach. Each of the approaches has its own merits and investors have a wide array of reasons why they rely on one approach over another. Our experience within the multi-family residential sector and interviews with numerous investors suggests that the Cost Approach and Sales Comparison Approach are the approaches of value most useful in creating a market value estimate for the subject. The following table details the results of these two approaches:

| SUMMARY OF APPROACHES | | |
|---|---|---|
| | Eff. 8/1/2020 | Eff. 3/11/2021 |
| Cost Approach: | $3,200,000 | $3,510,000 |
| Sales Comparison Approach: | $3,180,000 | $3,280,000 |
| Income Capitalization Approach: | N/A | N/A |

**COST APPROACH**

The Cost Approach is typically utilized by market participants when reviewing new construction or a proposed housing development. This approach utilized recent land sales that were very similar to the subject site, along with a nationally recognized construction cost manual. Thus, the Cost Approach was given significant weight in our reconciliation process.

**SALES COMPARISON APPROACH**

The Sales Comparison Approach indicates a value estimate based on recent sales transactions involving similar properties that have sold reasonably close to the date of value. This approach directly measures the motivations of the buyers and sellers in the market. It is also the approach best understood by the general public. The reliability of this approach depends upon the availability and comparability of the market data. The sales used in this approach are somewhat similar to subject and required various adjustments for market conditions, age, condition and quality and site sizes. The range of value indicated by the sales after adjustments was considered to be a reliable indicator of value for the subject property due to the nature of the region's multi-family residential market. Since the improved sales reflect properties that are similar to subject, we have placed weight on the approach in our reconciliation process.

## MARKET VALUE, AS IF COMPLETE:

Based on the appraisal described in the accompanying report, subject to the Limiting Conditions and Assumptions, Extraordinary Assumptions and Hypothetical Conditions (if any), we have developed an opinion that the "As Complete" hypothetical market value of the Fee Simple estate of the subject property, as of August 1, 2020, of:

**Three Million One Hundred Ninety Thousand Dollars**
**$3,190,000**



VALUATION PROCESS AND RECONCILIATION

## MARKET VALUE, AS IF COMPLETE:

Based on the appraisal described in the accompanying report, subject to the Limiting Conditions and Assumptions, Extraordinary Assumptions and Hypothetical Conditions (if any), we have developed an opinion that the "As Complete" hypothetical market value of the Fee Simple estate of the subject property, as of $3,350,000, of:

<div align="center">

**Three Million Three Hundred Fifty Thousand Dollars**
**$3,350,000**

</div>

This value estimate is inclusive of real estate only.



# CERTIFICATION

We certify that, to the best of our knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions and our personal, impartial, and unbiased professional analyses, opinions and conclusions.

- We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

- The value conclusion(s) and other opinions expressed herein are not based on a requested minimum value, a specific value or approval of a loan.

- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- The reported analyses, opinions, and conclusions were developed and this report has been prepared in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which includes the Uniform Standards of Professional Appraisal Practice.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- Cynthia Stacy, a trainee appraiser who is supervised by Franklin Reed, provided significant contributions to the property descriptions, local analysis, improved sale analysis, income approach, and reconciliation.

- As of the date of this report, Franklin Reed has completed the Standards and Ethics Education Requirement of the Appraisal Institute for Associate Members.

- As of the date of this report, Franklin Reed, Jr. has completed the Continuing Education Requirements for a designated member of the Appraisal Institute.



CERTIFICATION

- Franklin Reed, MAI and Cynthia Stacy have inspected the subject property. The improved sales were also inspected.

- No other person provided significant professional assistance to the person(s) signing this certification.

- Franklin Reed  nor Cynthia Stacy have performed any services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.


_____

Franklin Reed, MAI
Alabama Certified General Appraiser
License No. G00633
Expires: September 30, 2021
(251) 968-9555 ext. 1
(251) 955-2241 Fax
frank.reed@heronvaluation.com

_____

Cynthia Stacy
AL Trainee Appraiser
License No. T02229
Expires September 30, 2021
(251) 968-9555 ext. 3
(251) 955-2241 Fax
cynthia.stacy@heronvaluation.com



## ADDENDA



ADDENDA

ENGAGEMENT LETTER



## Appraisal Assignment

21-01-040

**DATE OF AGREEMENT:**    March 8, 2021

**PARTIES TO AGREEMENT:**
**Client:**
| | |
|---|---|
| Client Name | Kris Anderson |
| Client Company | Clark Partington |
| Address | 4725 Main Street, Suite F-222 |
| City/State | Orange Beach, Alabama 36561 |
| Phone | (251) 225-4122 |
| Email | kanderson@clarkpartington.com |

**Appraiser:**
| | |
|---|---|
| Appraiser name | Frank L. Reed, Jr., MAI |
| Appraiser company | Heron Valuation Group, LLC. |
| Address | PO Box 6293 |
| City/State | Gulf Shores, Alabama 36547 |
| Phone | 251-968-9555, ext. 1 |
| E-mail | frank.reed@heronvaluation.com |

Client hereby engages Appraiser to complete an appraisal assignment as follows:

**The primary appraiser on this assignment will be Frank L. Reed, Jr., MAI**

### PROPERTY IDENTIFICATION

PPIN Number 274000; located at 3450 Ponce de Leon Court, Gulf Shores, Baldwin County, Alabama 36542.

The appraisal will provide an opinion of value for the residential property, as-complete, with a retrospective date of August 1, 2020, as well as a current value.

### PROPERTY TYPE
Multi-family Residential (Duplex)

### INTEREST VALUED
Fee Simple Interest

### INTENDED USERS

Kris Anderson
Clark Partington
4725 Main Street, Suite F-222
Orange Beach, Alabama 36561

Note: No other users are intended by Appraiser.  Appraiser shall consider the intended users when determining the level of detail to be provided in the Appraisal Report.

### INTENDED USE
To assist Client with internal business decision making.

Note: No other use is intended by Appraiser.  The intended use as stated shall be used by Appraiser in determining the appropriate Scope of Work for the assignment.



**TYPE OF VALUE**
Market value as defined in The Dictionary of Real Estate Appraisal published by the Appraisal Institute.

**DATE OF VALUE**
Date of inspection

**HYPOTHETICAL CONDITIONS, EXTRAORDINARY ASSUMPTIONS**
None anticipated

**APPLICABLE REQUIREMENTS OTHER THAN THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE (USPAP)**
The Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute

**ANTICIPATED SCOPE OF WORK**

**Site visit:**
Interior and exterior observation, on-site.

**Valuation approaches:**
Cost Approach, Sales Comparison Approach, Income Approach

*Note: Appraiser shall use all approaches necessary to develop a credible opinion of value.*

**APPRAISAL REPORT**

**Report option:**
Appraisal Report

**Form or format:**
Narrative

**PROPERTIES UNDER CONTRACT FOR SALE**
If the property appraised is currently under contract for sale, Client shall provide to Appraiser a copy of said contract including all addenda.

**ADDITIONAL DOCUMENTATION**
Client agrees to provide Appraiser with the documentation as indicated in Appendix A to this Agreement.

**DELIVERY DATE**
**Friday, March 12, 2021**

**DELIVERY METHOD**
E-mail, pdf format

**NUMBER OF COPIES**
One

**PAYMENT TO APPRAISER**
**$2,200.** The appraisal fee will allow for up to eight hours of conference calls, consultation, etc. Beyond this period, any additional time for meetings, court testimony, or depositions will be billed at a rate of $350 per hour. If there are any additional travel requirements, Client agrees to reimburse Appraiser for all costs related to travel or accommodation. Travel and accommodation costs will be pre-approved by the Client prior to purchase by Appraiser.



**PAYMENT DUE DATE**
The fee shall invoiced by Appraiser for services rendered to Client pursuant to this Agreement based upon the fees specified in this Agreement.   Appraiser's invoices are considered due upon receipt by Client and shall be deemed delinquent if not paid within 30 days of the date of Appraiser's invoice.

**WHEN APPRAISER'S OBLIGATIONS ARE COMPLETE**
Appraiser's obligations pursuant to this Agreement are complete when the Appraisal Report in the form specified in this Agreement is delivered to Client pursuant to this Agreement.  Appraiser agrees to be responsive to Client's legitimate inquiries regarding the contents of the report after delivery.

**CONFIDENTIALITY**
Appraiser shall not provide a copy of the written Appraisal Report to, or disclose the results of the appraisal prepared in accordance with this Agreement to, any party other than Client, unless Client authorizes, except as stipulated in the Confidentiality Section of the Ethics Rule of the Uniform Standards of Professional Appraisal Practice (USPAP).

**USE OF EMPLOYEES OR INDEPENDENT CONTRACTORS**
Appraiser may use employees or independent contractors at Appraiser's discretion to complete the assignment, unless otherwise agreed by the parties. Notwithstanding, Appraiser shall sign the written Appraisal Report and take full responsibility for the services provided as a result of this Agreement.

**SERVICES NOT PROVIDED**
The fees set forth in this Agreement apply to the appraisal services rendered by Appraiser as set forth in this Agreement.  Any additional services performed by Appraiser not set forth in this Agreement will be performed on terms and conditions set forth in an amendment to this Agreement, or in a separate agreement.

**CHANGES TO AGREEMENT**
Any changes to the assignment as outlined in this Agreement shall necessitate a new Agreement.   The identity of the Client, intended users, or intended use; the date of value; type of value; or property appraised cannot be changed without a new Agreement.

**CANCELLATION**
Client may cancel this Agreement at any time prior to Appraiser's delivery of the Appraisal Report upon written notification to Appraiser. Client shall pay Appraiser for work completed on assignment prior to Appraiser's receipt of written cancellation notice, unless otherwise agreed upon by Appraiser and Client in writing.

**GOVERNING LAW AND JURISDICTION**
This Agreement shall be governed by the law of the state in which Appraiser's office as specified in this Agreement is located, exclusive of that state's choice of law rules.  The parties agree that any legal proceeding brought by either party to interpret or enforce this Agreement, or to enforce an arbitration award entered pursuant to this Agreement, shall be brought in a state or federal court having jurisdiction over the location of Appraiser's office as specified in this Agreement, and the parties hereby waive any objections to the personal jurisdiction of said court.

**APPRAISER INDEPENDENCE**
Appraiser cannot agree to provide a value opinion that is contingent on a predetermined amount. Appraiser cannot guarantee the outcome of the assignment in advance.   Appraiser cannot ensure that the opinion of value developed as a result of this Assignment will serve to facilitate any specific objective of Client or others or advance any particular cause. Appraiser's opinion of value will be developed competently and with independence, impartiality and objectivity.



## NOTICES

Any notice or request required or permitted to be given to any party shall be given in writing and shall be delivered to the receiving party by: a) registered or certified mail, postage prepaid; (b) overnight courier, such as Federal Express, United Parcel Service or equivalent; or ©) hand delivery. The address for delivery of any notice shall be the address for the party as specified in this Agreement, or at such other address as party may designate by written notice to the other party in conformance with this paragraph. Unless otherwise specified herein, notice shall be effective the date it is postmarked or given to a third party for delivery to the receiving party, whether or not the receiving party signs for or accepts delivery of such notice.

## NO THIRD-PARTY BENEFICIARIES

Nothing in this Agreement shall create a contractual relationship between Appraiser or Client and any third party, or any cause of action in favor of any third party.   This Agreement shall not be construed to render any person or entity a third-party beneficiary of this Agreement, including, but not limited to, any third parties identified herein.

## MEDIATION & ARBITRATION

In the event of a dispute concerning the subject matter of this Agreement, the parties shall in good faith attempt to resolve such dispute by negotiation between the parties' principals, or, if such negotiation is unsuccessful, by mediation conducted by a third-party mediator.  If such mediation results in an impasse, the parties shall submit their dispute to binding arbitration.  Such mediation or, if necessary, binding arbitration shall be conducted pursuant to the mediation procedures or the commercial arbitration rules of the American Arbitration Association.  Any arbitration shall be conducted in the city in which Appraiser's office as specified herein is located.  The parties shall share equally the costs of any mediation.  In the event of binding arbitration, the arbitrators shall, in addition to any relief appropriate to be awarded to the prevailing party, enter an award in favor of the prevailing party for that party's costs of the arbitration, including the party's reasonable attorneys' fees and arbitration expenses incurred in prosecuting or defending the arbitration proceeding.  Subject to the right of the prevailing party to recover its share of the costs of the arbitration services pursuant to the arbitrator's award, the costs of the arbitration services shall be borne equally by the parties.  If the prevailing party seeks judicial confirmation of any arbitration award entered pursuant to this Agreement, the court shall, in addition to any other appropriate relief, enter an award to the prevailing party in such confirmation proceeding for its reasonable attorneys' fees and litigation expenses incurred in confirming or successfully opposing the confirmation of such an award.

## SPECIAL OR CONSEQUENTIAL DAMAGES

Neither party shall under any circumstances be liable to the other party for special, exemplary, punitive or consequential damages, including, without limitation, loss of profits or damages proximately caused by loss of use of any property, whether arising from either party's negligence, breach of the Agreement or otherwise, whether or not a party was advised, or knew, of the possibility of such damages, or such possibility was foreseeable by that party. In no event shall Appraiser be liable to Client for any amounts that exceed the fees and costs paid by Client to Appraiser pursuant to this Agreement.

## ASSIGNMENT

Neither party may assign this Agreement to a third party without the express written consent of the other party, which the non-assigning party may withhold in its sole discretion.  In the event this Agreement is assigned by mutual consent of the parties, it shall become binding on the assigning party's permitted assigns.

## SEVERABILITY

In the event any provision of this Agreement shall be determined to be void or unenforceable by any court of competent jurisdiction, then such determination shall not affect any other provision of this Agreement and all such other provisions shall remain in full force and effect.



**CLIENT'S DUTY TO INDEMNIFY APPRAISER**
Client agrees to defend, indemnify and hold harmless Appraiser from any damages, losses or expenses, including attorneys' fees and litigation expenses at trial or on appeal, arising from allegations asserted against Appraiser by any third party that if proven to be true would constitute a breach by Client of any of Client's obligations, representations or warranties made in this Agreement, or any violation by Client of any federal, state or local law, ordinance or regulation, or common law (a "Claim").  In the event of a Claim, Appraiser shall promptly notify Client of such Claim, and shall cooperate with Client in the defense or settlement of any Claim.   Client shall have the right to select legal counsel to defend any Claim, provided that Appraiser shall have the right to engage independent counsel at Appraiser's expense to monitor the defense or settlement of any Claim. Client shall have the right to settle any Claim, provided that Appraiser shall have the right to approve any settlement that results in any modification of Appraiser's rights under this Agreement, which approval will not be unreasonably withheld, delayed or conditioned.

**CLIENT'S REPRESENTATIONS AND WARRANTIES**
Client represents and warrants to Appraiser that (1) Client has all right, power and authority to enter into this Agreement; (2) Client's duties and obligations under this Agreement do not conflict with any other duties or obligations assumed by Client under any agreement between Client and any other party; and (3) Client has not engaged Appraiser, nor will Client use Appraiser's Appraisal Report, for any purposes that violate any federal, state or local law, regulation or ordinance or common law.

**EXTENT OF AGREEMENT**
This Agreement represents the entire and integrated agreement between the Client and Appraiser and supersedes all prior negotiations, representations or agreements, either written or oral.   This Agreement may be amended only by a written instrument signed by both Client and Appraiser.

**EXPIRATION OF AGREEMENT**
This Agreement is valid only if signed by both Appraiser and Client within three (3) days of the Date of Agreement specified.


By Appraiser:

*Frank L. Reed Jr.*

_____
Signature

Frank L. Reed, Jr., MAI

_____
Name

March 8, 2021

_____
Date


By Client:

*[signature]*

_____
Signature

Kris Anderson

_____
Name

3 – 9 – 21

_____
Date

ADDENDA

PROPERTY EXHIBITS



**Baldwin County**
**Revenue Commissioner**

# Property Appraisal Link
## BALDWIN COUNTY, AL

Current Date **3/11/2021**

**Tax Year 2020**
Valuation Date **October 1, 2019**

### OWNER INFORMATION

**PARCEL**          69-08-01-0-003-052.003          **PPIN** 274000   **TAX DIST** 02
**NAME**            BREEZY SHORES L L C
**ADDRESS**         5855 PLANTATION DR
                    ST FRANCISVILLE   LA 70775
**DEED TYPE**   IN   **BOOK**   0000                **PAGE**   1679484
**PREVIOUS OWNER**   EZ BREEZY L L C
**LAST DEED DATE**   2/ 6/2018

### DESCRIPTION

75' X 403'(S) LOT 58 PONCE DE LEON COURT PB5 PG118 GR PB5 PG
118 SEC 1-T9S-R1E (WD)

### PROPERTY INFORMATION

**PROPERTY ADDRESS**                PONCE DE LEON CT
**NEIGHBORHOOD**                    FMGULF      FORT MORGAN GULF
**PROPERTY CLASS**                             **SUB CLASS**
**SUBDIVISION**            02PD   **SUB DESC**   PONCE DE LEON COURT
                                  **SUB DESC**   PLAT BOOK 5 PAGE 118
**LOT   58   BLOCK**
**SECTION/TOWNSHIP/RANGE**         00-00 -00
**LOT DIMENSION**                                         **ZONING**

### PROPERTY VALUES

| | | | | | |
|---|---|---|---|---|---|
| **LAND:** | 519800 | **CLASS 1:** | | **TOTAL ACRES:** | |
| **BUILDING:** | | **CLASS 2:** | 519800 | **TIMBER ACRES:** | |
| | ======== | **CLASS 3:** | | | |
| **TOTAL PARCEL VALUE:** | 519800 | | | | |
| **ESTIMATED TAX:** | $2,910.88 | | | | |

### DETAIL INFORMATION

| CODE | TYPE | REF | METHOD | DESCRIPTION | LAND USE | TC | HsPn | MARKET VALUE | USE VALUE |
|------|------|-----|--------|-------------|----------|----|------|--------------|-----------|
| M | LAND | 1 | FF FF-8250 | 75 X 400 | 9700-VAC WATERFRONT | 2 | N N | 519800 | |

View Tax Record

View Map

Back

Home | Search | Real Property | Appraisals | Terms of Use | Privacy Policy | Contact Us | Help

## LISTING INFORMATION



| | |
|---|---|
| MLS Number | 265600 |
| List Price | $495,000 |
| Property Status | Closed |
| DOM | 55 |
| Cumulative DOM | 2149 |
| Listing Effective Date | 2/15/2018 |
| Listing Expire Date | |
| Broker Commission | 3.00 |
| Commission Type | Percent |
| Bonus | |
| Listing Agent | Susan Miller - PHONE: 251-540-7325 |
| Listing Office 1 | Fort Morgan Property Managemen - Main: 251-540-7325 |
| Listing Agent 2 | |
| Listing Office 2 | |
| Listing Agent 3 | |
| Listing Office 3 | |





## LAND LEASE

| | | | |
|---|---|---|---|
| Lockbox Location | | Minimum Home Sq. Footage REQD | |
| Waterfront Footage | | FIPS Code | 01003 |
| Property Legal Description | | History Remarks | |
| Transfer Fees | No | Expected On Market Date | |
| Selling Office 2 | | Selling Office 3 | |
| Selling Agent 2 | | Selling Agent 3 | |

## PROPERTY DETAIL

| | | | |
|---|---|---|---|
| Tax PPIN # | 22801 | Property Taxes | 1485.1 |
| Address | 0 State Highway 180 | Subdivsn or Commnty | |
| Address 2 | | Class | Lots and Land |
| City | Gulf Shores | Property Type | Land |
| State | AL | Lot Type | Land |
| Zip Code | 36542 | Ownership Type | Whole/Full |
| Intersecting Street | | Named Waterfrnt Y/N | Yes |
| County | Baldwin | Body of Water | Gulf of Mexico |
| Area | Fort Morgan | Flood Zone | AE,VE |
| Parcel ID/Tax ID | 69-08-01-0-001-037.000 | Apx Acreage | 0.8500 |
| Lot/Block/Unit | 1 | Lot Size | 50 x 730 |
| Owner Name | | # Lots | 1 |
| Owner Phone | | Section/Township/Range | |
| Fairhope Single Tax | No | Road Frontage | 50 |
| Owners Association | No | Picture Count | 1 |
| Association Fees | 0 | Price Per ACRE | $570,588.24 |
| Associate Fees Frequency | | Sold Price Per ACRE | $570,588.24 |
| Additional Amenity Fees | | | |
| Incm Producing Potential | Yes | | |
| More than 2 Pets Allowed | | | |
| Elementary School | Gulf Shores Elementary | | |
| Middle School | | | |
| Intermediate School | | | |
| High School | Gulf Shores | | |
| Refer to MLS # | | | |
| Restrictive Covenants | | | |
| Deeded Boat Slip# | | | |
| Geocode Quality | Manually Placed Pin | | |
| Associated Document Count | 0 | | |
| Agent Hit Count | 0 | | |
| Client Hit Count | 4 | | |

## REMARKS/DIRECTIONS

| | |
|---|---|
| Public Remarks | This is one of the very last gulf front lots for sale in Ft. Morgan area. Lot size is 50 x 730 with 50' beach front. Perfect for building your beach front home! |
| Directions | From intersection of Highway 59 and Ft. Morgan Rd. proceed west on Ft. Morgan Rd. for 15.5 miles. Property will be on left hand side |
| Agent Remarks | Please call Susan Miller with any questions on property |
| Office Remarks | |

## FEATURES

| | | | |
|---|---|---|---|
| **Agent Disclosure** | **Road Desc** | **Type of Listing** | **View** |
| Seller Lic RE Agt | County Road | Exclusive Right to Sell | Direct Gulf Front |
| **Governing Municipality** | Paved | **Terms of Sale** | Direct Gulf-Across Rd |
| Gulf Shores | State Road | Cash | **Water Property Type** |
| **Lot Description** | **Suitable Use** | Conventional | Gulf Front |
| Less than 1 acre | Multi-Family | **Utilities** | |
| Water View | Single Family | Other-See Remarks | |

## SYNDICATION SETTINGS

| | | | |
|---|---|---|---|
| **Display on the Internet** | Yes | **Address Display** | Yes |
| **Allow Comments** | Yes | **Allow Realtor.com Syndication** | Yes |
| **Allow Homes.com Syndication** | Yes | **Allow Listhub.com Syndication** | Yes |

## SOLD/CLOSING

| | | | |
|---|---|---|---|
| **Close Date** | 4/12/2018 | **Selling Agent** | Susan Miller - PHONE: 251-540-7325 |
| **Selling Price** | $485,000 | **Selling Office** | Fort Morgan Property Managemen - Main: 251-540-7325 |
| **Financing** | CASH | **Non Member** | No |
| **Seller Contributions** | 0 | **FSBO** | No |

## SYSTEM FIELDS

| | | | |
|---|---|---|---|
| **Update Date** | 7/10/2018 | **Off Market Date** | 4/11/2018 |
| **Price Change Date** | 7/10/2018 | **First Right of Refusal Date** | |
| **Photo TimeStamp** | | | |

## EXTRA FIELDS

| | | | |
|---|---|---|---|
| **Address Display** | 0  State Highway 180   GulfShores AL 36542 | **Cancelled to Expired Date** | |
| **Condo Building Stories** | | **Pending Date** | 4/11/2018 |
| **HotSheet Date** | 7/10/2018 | **Listing Input Date** | 2/15/2018 1:39 PM |
| **Lease Expire Date** | | **Mapping** | |
| **Original Price** | $495,000 | **Previous Asking Price** | |
| **Price per Acre** | | **Price Per Acre** | $570,588.24 |
| **Rental Program** | | **Sale/Rent** | For Sale |
| **School Area** | | **Status Date** | 7/10/2018 |
| **Assoc Management Email** | | **Multiple Lots** | |
| **Seller Disclosure** | No | **Update Date** | 7/10/2018 12:47 PM |
| **Address Unit** | | **Days On MLS** | 55 |

## LISTING INFORMATION



| | |
|---|---|
| MLS Number | 276929 |
| List Price | $545,000 |
| Property Status | Closed |
| DOM | 3 |
| Cumulative DOM | 3 |
| Listing Effective Date | 11/27/2018 |
| Listing Expire Date | |
| Broker Commission | 2.80 |
| Commission Type | Percent |
| Bonus | |
| Listing Agent | Kris L Powell - CELL: 251-752-4692 |
| Listing Office 1 | Century 21 Meyer Real Estate - Main: 251-968-7516 |
| Listing Agent 2 | |
| Listing Office 2 | |
| Listing Agent 3 | |
| Listing Office 3 | |





## LAND LEASE

| | | | |
|---|---|---|---|
| Lockbox Location | | Minimum Home Sq. Footage REQD | |
| Waterfront Footage | | FIPS Code | 01003 |
| Property Legal Description | | History Remarks | |
| Transfer Fees | No | Expected On Market Date | |
| Selling Office 2 | | Selling Office 3 | |
| Selling Agent 2 | | Selling Agent 3 | |

## PROPERTY DETAIL

| | | | |
|---|---|---|---|
| Tax PPIN # | 028129 | Property Taxes | 2383 |
| Address | Ponce De Leon Court | Subdivsn or Commnty | Ponce De Leon Court |
| Address 2 | | Class | Lots and Land |
| City | Gulf Shores | Property Type | Residential Lots |
| State | AL | Lot Type | Lot |
| Zip Code | 36542 | Ownership Type | Whole/Full |
| Intersecting Street | Triple Tail Lane | Named Waterfrnt Y/N | Yes |
| County | Baldwin | Body of Water | Gulf of Mexico |
| Area | Fort Morgan | Flood Zone | |
| Parcel ID/Tax ID | 69-08-01-0-002-036.000 | Apx Acreage | 0.7600 |
| Lot/Block/Unit | Lot 75 | Lot Size | 75' x 440'+/- |
| Owner Name | | # Lots | |
| Owner Phone | | Section/Township/Range | |
| Fairhope Single Tax | No | Road Frontage | 75' |
| Owners Association | No | Picture Count | 16 |
| Association Fees | 0 | Price Per ACRE | $697,368.42 |
| Associate Fees Frequency | | Sold Price Per ACRE | $697,368.42 |
| Additional Amenity Fees | | | |
| Incm Producing Potential | No | | |
| More than 2 Pets Allowed | | | |
| Elementary School | Gulf Shores Elementary | | |
| Middle School | Gulf Shores Middle | | |
| Intermediate School | | | |
| High School | Gulf Shores | | |
| Refer to MLS # | | | |
| Restrictive Covenants | No | | |
| Deeded Boat Slip# | | | |
| Geocode Quality | Manually Placed Pin | | |
| Associated Document Count | 0 | | |
| Virtual Tour 1 | Virtual Tour 1 | | |
| Agent Hit Count | 42 | | |
| Client Hit Count | 13 | | |

## REMARKS/DIRECTIONS

**Public Remarks**  ITP PERMIT IN HAND! 5430 Sq. ft. permitted. Zoned DUPLEX! One of the few 75' undeveloped lots available. Pristine Gulf Front lot with unbelievable views. Sugar White Beaches. Great opportunity to start your dream of owning Gulf Front property. Near World Class Golf, Marina, Charter Fishing, Restaurants, Ferry and Historic Fort Morgan.

**Directions**  West of 5 Mile Marker on Highway 180 West - South on Triple Tail Lane - West on Ponce de Leon Court - Sign on south side or road.

**Agent Remarks**  50/50 Co-Broke split - The commission will be split 50/50 with any company that has signed CENTURY 21 Meyer Real Estate's Co -Brokerage Commission Agreement. Please call Kathy 251-752-9198 or Kris 251-752-4692.

## REMARKS/DIRECTIONS

**Office Remarks**

## FEATURES

| | | | |
|---|---|---|---|
| **Agent Disclosure** | **Lot Description** | **Type of Listing** | **View** |
| Not Applicable | Less than 1 acre | Exclusive Right to Sell | Direct Gulf Front |
| **Boat Facilities** | Level | **Terms of Sale** | **Water Property Type** |
| None | Waterfront | Cash | Gulf Front |
| **Community Amenities** | ITP Permit In Hand | Conventional | **Zoning/Area** |
| None | **Mineral Rights** | **Utilities** | 2+ Family Residence |
| **Governing Municipality** | Unknown | Baldwin Co Sewer Service | |
| Baldwin County | **Road Desc** | Sewage-City Available | |
| | County Road | Water-City | |
| | **Suitable Use** | Baldwin EMC | |
| | Multi-Family | Gulf Shores Utilities | |

## SYNDICATION SETTINGS

| | | | |
|---|---|---|---|
| **Display on the Internet** | Yes | **Address Display** | Yes |
| **Allow Comments** | No | **Allow Realtor.com Syndication** | Yes |
| **Allow Homes.com Syndication** | Yes | **Allow Listhub.com Syndication** | Yes |

## SOLD/CLOSING

| | | | |
|---|---|---|---|
| **Close Date** | 12/20/2018 | **Selling Agent** | Susan Miller - PHONE: 251-540-7325 |
| **Selling Price** | $530,000 | **Selling Office** | Fort Morgan Property Managemen - Main: 251-540-7325 |
| **Financing** | CASH | **Non Member** | |
| **Seller Contributions** | | **FSBO** | |

## SYSTEM FIELDS

| | | | |
|---|---|---|---|
| **Update Date** | 12/26/2018 | **Off Market Date** | 11/30/2018 |
| **Price Change Date** | 12/26/2018 | **First Right of Refusal Date** | |
| **Photo TimeStamp** | | | |

## EXTRA FIELDS

| | | | |
|---|---|---|---|
| **Address Display** | Ponce De Leon Court   GulfShores AL 36542 | **Cancelled to Expired Date** | |
| **Condo Building Stories** | | **Pending Date** | 11/30/2018 |
| **HotSheet Date** | 12/26/2018 | **Listing Input Date** | 11/27/2018 11:53 AM |
| **Lease Expire Date** | | **Mapping** | |
| **Original Price** | $545,000 | **Previous Asking Price** | |
| **Price per Acre** | | **Price Per Acre** | $697,368.42 |
| **Rental Program** | | **Sale/Rent** | For Sale |
| **School Area** | | **Status Date** | 12/26/2018 |
| **Assoc Management Email** | | **Multiple Lots** | |
| **Seller Disclosure** | No | **Update Date** | 12/26/2018 9:10 AM |
| **Address Unit** | | **Days On MLS** | 3 |

## ADDITIONAL PICTURES










   

  

## LISTING INFORMATION



| | |
|---|---|
| **MLS Number** | 281983 |
| **List Price** | $499,000 |
| **Property Status** | Closed |
| **DOM** | 237 |
| **Cumulative DOM** | 237 |
| **Listing Effective Date** | 4/3/2019 |
| **Listing Expire Date** | |
| **Broker Commission** | 3.00 |
| **Commission Type** | Percent |
| **Bonus** | |
| **Listing Agent** | Henry Group Team - PHONE: 251-948-5200 |
| **Listing Office 1** | Coldwell Banker Coastal Realty - Main: 251-948-5200 |
| **Listing Agent 2** | |
| **Listing Office 2** | |
| **Listing Agent 3** | |
| **Listing Office 3** | |



## LAND LEASE

| | | | |
|---|---|---|---|
| **Lockbox Location** | | **Minimum Home Sq. Footage REQD** | |
| **Waterfront Footage** | | **FIPS Code** | 01003 |
| **Property Legal Description** | | **History Remarks** | |
| **Transfer Fees** | No | **Expected On Market Date** | |
| **Selling Office 2** | | **Selling Office 3** | |
| **Selling Agent 2** | | **Selling Agent 3** | |

## PROPERTY DETAIL

| | | | |
|---|---|---|---|
| **Tax PPIN #** | 13406 | **Property Taxes** | 3564.4 |
| **Address** | 0 Sea Shell Dr | **Subdivsn or Commnty** | Surfside Shores |
| **Address 2** | | **Class** | Lots and Land |
| **City** | Gulf Shores | **Property Type** | Residential Lots |
| **State** | AL | **Lot Type** | Lot |
| **Zip Code** | 36542 | **Ownership Type** | Whole/Full |
| **Intersecting Street** | | **Named Waterfrnt Y/N** | Yes |
| **County** | Baldwin | **Body of Water** | Gulf of Mexico |
| **Area** | Fort Morgan | **Flood Zone** | VE,0.2 PCT |
| **Parcel ID/Tax ID** | 68-09-30-0-001-239.000 | **Apx Acreage** | |
| **Lot/Block/Unit** | 8 | **Lot Size** | 68 x 505 |
| **Owner Name** | | **# Lots** | |
| **Owner Phone** | | **Section/Township/Range** | |
| **Fairhope Single Tax** | No | **Road Frontage** | |
| **Owners Association** | No | **Picture Count** | 13 |
| **Association Fees** | 0 | **Price Per ACRE** | |
| **Associate Fees Frequency** | | **Sold Price Per ACRE** | |
| **Additional Amenity Fees** | | | |
| **Incm Producing Potential** | No | | |
| **More than 2 Pets Allowed** | | | |
| **Elementary School** | Gulf Shores Elementary | | |
| **Middle School** | | | |
| **Intermediate School** | | | |
| **High School** | Gulf Shores | | |
| **Refer to MLS #** | | | |
| **Restrictive Covenants** | | | |
| **Deeded Boat Slip#** | | | |
| **Geocode Quality** | Manually Placed Pin | | |
| **Associated Document Count** | 0 | | |
| **Agent Hit Count** | 117 | | |
| **Client Hit Count** | 61 | | |

## REMARKS/DIRECTIONS

**Public Remarks**  GULF FRONT LOT that is perfect for building a Beach House on your own slice of Paradise. Enjoy spectacular views of the Gulf of Mexico while relaxing on your own private beach that is quiet and away from all the hustle and bustle. This beautiful home site is only a short walk away from swimming, fishing and having fun in the sun. This lot extends from Sea Shell Drive to the Gulf. Owners also own 1 /312 interest in community Lot 15 Block P Unit II. Surfside Shores has two deeded beach accesses for your convenience. A short drive away to enjoy Restaurants, Shopping, Amusement Parks, World Class Golf, Marina, Charter Fishing, Ferry & Historic Fort Morgan. This community has a well organized homeowners association that plans social events as well as preserves the value of your investment. The HOA Fee is a voluntary $100 a year. The PPIN 13406/ tax information is for lot 8 and 9 together. LOT 8 IS ONLY FOR SALE NOT LOT 9.

**Directions**  South on 59 to Fort Morgan Road. Travel west onto Fort Morgan Road. Left on Surf Side Drive to right on Sea Shell Drive. Lot on left just before Gulf View Drive.

**Agent Remarks**  Call David Henry for more information 251-752-0902. All information to be verified by buyer and/or buyer's agent.

**Office Remarks**

## FEATURES

| | | | |
|---|---|---|---|
| **Agent Disclosure** | **Lot Description** | **Utilities** | **View** |
| Not Applicable | Less than 1 acre | Sewage-City | Direct Gulf Front |
| **Boat Facilities** | **Type of Listing** | Water-City | **Water Property Type** |
| None | Exclusive Right to Sell | Baldwin EMC | Gulf Front |
| **Community Amenities** | **Terms of Sale** | | |
| Landscaping | Cash | | |
| Pets - Allowed | Conventional | | |

## SYNDICATION SETTINGS

| | | | |
|---|---|---|---|
| **Display on the Internet** | Yes | **Address Display** | Yes |
| **Allow Comments** | No | **Allow Realtor.com Syndication** | Yes |
| **Allow Homes.com Syndication** | Yes | **Allow Listhub.com Syndication** | Yes |

## SOLD/CLOSING

| | | | |
|---|---|---|---|
| **Close Date** | 1/6/2020 | **Selling Agent** | Tera L Stutesman |
| **Selling Price** | $475,000 | **Selling Office** | Roberts Brothers Eastern Shore - Main: 251-928-2109 |
| **Financing** | CASH | **Non Member** | |
| **Seller Contributions** | | **FSBO** | |

## SYSTEM FIELDS

| | | | |
|---|---|---|---|
| **Update Date** | 1/8/2020 | **Off Market Date** | 11/26/2019 |
| **Price Change Date** | 1/8/2020 | **First Right of Refusal Date** | |
| **Photo TimeStamp** | | | |

## EXTRA FIELDS

| | | | |
|---|---|---|---|
| **Address Display** | 0  Sea Shell Dr   GulfShores AL 36542 | **Cancelled to Expired Date** | |
| **Condo Building Stories** | | **Pending Date** | 11/26/2019 |
| **HotSheet Date** | 1/8/2020 | **Listing Input Date** | 4/3/2019 1:03 PM |
| **Lease Expire Date** | | **Mapping** | |
| **Original Price** | $499,000 | **Previous Asking Price** | |
| **Price Per Acre** | | **Price Per Acre** | |
| **Rental Program** | | **Sale/Rent** | For Sale |
| **School Area** | | **Status Date** | 1/8/2020 |
| **Assoc Management Email** | | **Multiple Lots** | |
| **Seller Disclosure** | No | **Update Date** | 1/8/2020 3:54 PM |
| **Address Unit** | | **Days On MLS** | 237 |

## ADDITIONAL PICTURES











   

## LISTING INFORMATION





| | |
|---|---|
| MLS Number | 293935 |
| List Price | $525,000 |
| Property Status | Closed |
| DOM | 3 |
| Cumulative DOM | 3 |
| Listing Effective Date | 1/24/2020 |
| Listing Expire Date | |
| Broker Commission | 3.00 |
| Commission Type | Percent |
| Bonus | |
| Listing Agent | Henry Group Team – PHONE: 251-948-5200 |
| Listing Office 1 | Coldwell Banker Coastal Realty – Main: 251-948-5200 |
| Listing Agent 2 | |
| Listing Office 2 | |
| Listing Agent 3 | |
| Listing Office 3 | |

## LAND LEASE

| | | | |
|---|---|---|---|
| Lockbox Location | | Minimum Home Sq. Footage REQD | |
| Waterfront Footage | | FIPS Code | 01003 |
| Property Legal Description | 136.1' X 560'(S) LOTS 9 UNIT 3 SURFSIDE SHORES PB7 PG224 AND A 2/312 INT IN LOT 15 BLK P SURFSID | History Remarks | |
| Transfer Fees | No | Expected On Market Date | |
| Selling Office 2 | | Selling Office 3 | |
| Selling Agent 2 | | Selling Agent 3 | |

## PROPERTY DETAIL

| | | | |
|---|---|---|---|
| Tax PPIN # | 13406 | Property Taxes | 3923.9 |
| Address | 0 Sea Shell Dr | Subdivsn or Commnty | Surfside Shores |
| Address 2 | | Class | Lots and Land |
| City | Gulf Shores | Property Type | Residential Lots |
| State | AL | Lot Type | Lot |
| Zip Code | 36542 | Ownership Type | Fractional |
| Intersecting Street | | Named Waterfrnt Y/N | Yes |
| County | Baldwin | Body of Water | Gulf of Mexico |
| Area | Fort Morgan | Flood Zone | VE,AE,0.2 PCT |
| Parcel ID/Tax ID | 68-09-30-0-001-239.000 | Apx Acreage | |
| Lot/Block/Unit | 9 | Lot Size | 68x505 |
| Owner Name | | # Lots | |
| Owner Phone | | Section/Township/Range | |
| Fairhope Single Tax | No | Road Frontage | |
| Owners Association | No | Picture Count | 1 |
| Association Fees | 0 | Price Per ACRE | |
| Associate Fees Frequency | | Sold Price Per ACRE | |
| Additional Amenity Fees | | | |
| Incm Producing Potential | No | | |
| More than 2 Pets Allowed | | | |
| Elementary School | Gulf Shores Elementary | | |
| Middle School | | | |
| Intermediate School | | | |
| High School | Gulf Shores | | |
| Refer to MLS # | | | |
| Restrictive Covenants | | | |
| Deeded Boat Slip# | | | |
| Geocode Quality | Manually Placed Pin | | |
| Associated Document Count | 0 | | |
| Agent Hit Count | 1 | | |
| Client Hit Count | 3 | | |

## REMARKS/DIRECTIONS

| | |
|---|---|
| **Public Remarks** | GULF FRONT LOT that is perfect for building a Beach House on your own slice of Paradise. Enjoy spectacular views of the Gulf of Mexico while relaxing on your own private beach that is quiet and away from all the hustle and bustle. This beautiful home site is only a short walk away from swimming, fishing and having fun in the sun. This lot extends from Sea Shell Drive to the Gulf. Owners also own 1 /312 interest in community Lot 15 Block P Unit II. Surfside Shores has two deeded beach accesses for your convenience. A short drive away to enjoy Restaurants, Shopping, Amusement Parks, World Class Golf, Marina, Charter Fishing, Ferry & Historic Fort Morgan. This community has a well organized homeowners association that plans social events as well as preserves the value of your investment. The PPIN 13406/ tax information is for lot 8 and 9 together. LOT 9 IS ONLY FOR SALE NOT LOT 8. |
| **Directions** | South on 59 to Fort Morgan Road. Travel west onto Fort Morgan Road. Left on Surf Side Drive to right on Sea Shell Drive. Lot on left just before Gulf View Drive. |
| **Agent Remarks** | Call David Henry for more information 251-752-0902. All information to be verified by buyer and/or buyer's agent. |
| **Office Remarks** | |

## FEATURES

| | | | |
|---|---|---|---|
| **Agent Disclosure** | **Lot Description** | **Utilities** | **View** |
| Not Applicable | Less than 1 acre | Sewage-City | Direct Gulf Front |
| **Boat Facilities** | **Type of Listing** | Water-City | **Water Property Type** |
| None | Exclusive Right to Sell | Baldwin EMC | Gulf Front |
| **Community Amenities** | **Terms of Sale** | | |
| Landscaping | Cash | | |
| Pets - Allowed | Conventional | | |

## SYNDICATION SETTINGS

| | | | |
|---|---|---|---|
| **Display on the Internet** | Yes | **Address Display** | Yes |
| **Allow Comments** | No | **Allow Realtor.com Syndication** | Yes |
| **Allow Homes.com Syndication** | Yes | **Allow Listhub.com Syndication** | Yes |

## SOLD/CLOSING

| | | | |
|---|---|---|---|
| **Close Date** | 2/7/2020 | **Selling Agent** | Tim McCrory - PHONE: 251-540-7100 |
| **Selling Price** | $525,000 | **Selling Office** | Edgemon Properties - Main: 251-540-7100 |
| **Financing** | CASH | **Non Member** | |
| **Seller Contributions** | | **FSBO** | |

## SYSTEM FIELDS

| | | | |
|---|---|---|---|
| **Update Date** | 2/7/2020 | **Off Market Date** | 1/27/2020 |
| **Price Change Date** | 1/27/2020 | **First Right of Refusal Date** | |
| **Photo TimeStamp** | | | |

## EXTRA FIELDS

| | | | |
|---|---|---|---|
| **Address Display** | 0  Sea Shell Dr   GulfShores AL 36542 | **Cancelled to Expired Date** | |
| **Condo Building Stories** | | **Pending Date** | 1/27/2020 |
| **HotSheet Date** | 2/7/2020 | **Listing Input Date** | 1/27/2020 11:58 AM |
| **Lease Expire Date** | | **Mapping** | |
| **Original Price** | $525,000 | **Previous Asking Price** | |
| **Price per Acre** | | **Price Per Acre** | |
| **Rental Program** | | **Sale/Rent** | For Sale |
| **School Area** | | **Status Date** | 2/7/2020 |
| **Assoc Management Email** | | **Multiple Lots** | |
| **Seller Disclosure** | No | **Update Date** | 2/7/2020 3:51 PM |
| **Address Unit** | | | |

## LISTING INFORMATION



| | |
|---|---|
| MLS Number | 295404 |
| List Price | $549,000 |
| Property Status | Closed |
| Cumulative DOM | 0 |
| Listing Effective Date | 1/29/2020 |
| Listing Expire Date | |
| Broker Commission | 2.50 |
| Commission Type | Percent |
| Bonus | |
| Listing Agent | Doug R Grantham - DIR: 251-424-1405 |
| Listing Office 1 | REMAX OF ORANGE BEACH-CANAL BR - Main: 251-424-1405 |
| Listing Agent 2 | |
| Listing Office 2 | |
| Listing Agent 3 | |
| Listing Office 3 | |





## LAND LEASE

| | | | |
|---|---|---|---|
| Lockbox Location | | Minimum Home Sq. Footage REQD | |
| Waterfront Footage | | FIPS Code | 01003 |
| Property Legal Description | | History Remarks | |
| Transfer Fees | No | Expected On Market Date | |
| Selling Office 2 | | Selling Office 3 | |
| Selling Agent 2 | | Selling Agent 3 | |

## PROPERTY DETAIL

| | | | |
|---|---|---|---|
| Tax PPIN # | 040133 | Property Taxes | 2140.3 |
| Address | 2092 Ponce De Leon Court | Subdivsn or Commnty | Pamela Court |
| Address 2 | | Class | Lots and Land |
| City | Gulf Shores | Property Type | Residential Lots |
| State | AL | Lot Type | Lot |
| Zip Code | 36542 | Ownership Type | Whole/Full |
| Intersecting Street | | Named Waterfrnt Y/N | Yes |
| County | Baldwin | Body of Water | Gulf of Mexico |
| Area | Fort Morgan | Flood Zone | |
| Parcel ID/Tax ID | 040133 | Apx Acreage | 0.6800 |
| Lot/Block/Unit | 2 | Lot Size | 65.5x455 |
| Owner Name | | # Lots | |
| Owner Phone | | Section/Township/Range | |
| Fairhope Single Tax | No | Road Frontage | 65.02 |
| Owners Association | No | Picture Count | 9 |
| Association Fees | 0 | Price Per ACRE | $772,058.82 |
| Associate Fees Frequency | | Sold Price Per ACRE | $772,058.82 |
| Additional Amenity Fees | | | |
| Incm Producing Potential | No | | |
| More than 2 Pets Allowed | | | |
| Elementary School | Gulf Shores Elementary | | |
| Middle School | Gulf Shores Middle | | |
| Intermediate School | | | |
| High School | Gulf Shores | | |
| Refer to MLS # | | | |
| Restrictive Covenants | | | |
| Deeded Boat Slip# | | | |
| Geocode Quality | Exact Match | | |
| Associated Document Count | 0 | | |
| Agent Hit Count | 0 | | |
| Client Hit Count | 0 | | |

## REMARKS/DIRECTIONS

**Public Remarks** For Comp Purposes Only!

**Directions** From Highway 59 and Ft. Morgan Road, drive West on Ft. Morgan Road approx. 18.5 miles. Turn left on Bernard Court E, then Left on Ponce De Leon Court. Property will be on your right.

**Agent Remarks** ADEM and ITP Permits in place. Survey and ADEM located under documents. Call Doug with any questions at 251-747-5710.

**Office Remarks**

## FEATURES

| | | | |
|---|---|---|---|
| **Agent Disclosure** | **Lot Description** | **Terms of Sale** | **View** |
| Not Applicable | Less than 1 acre | Cash | Direct Gulf Front |
| **Boat Facilities** | Waterfront | Conventional | **Water Property Type** |
| None | **Type of Listing** | **Utilities** | Gulf Front |
| **Community Amenities** | Exclusive Right to Sell | Baldwin EMC | |
| None | | | |

## SYNDICATION SETTINGS

| | | | |
|---|---|---|---|
| **Display on the Internet** | Yes | **Address Display** | Yes |
| **Allow Comments** | Yes | **Allow Realtor.com Syndication** | Yes |
| **Allow Homes.com Syndication** | Yes | **Allow Listhub.com Syndication** | Yes |

## SOLD/CLOSING

| | | | |
|---|---|---|---|
| **Close Date** | 2/27/2020 | **Selling Agent** | Doug R Grantham - DIR: 251-424-1405 |
| **Selling Price** | $525,000 | **Selling Office** | REMAX OF ORANGE BEACH-CANAL BR - Main: 251-424-1405 |
| **Financing** | CASH | | |
| **Seller Contributions** | | **Non Member** | |
| | | **FSBO** | |

## SYSTEM FIELDS

| | | | |
|---|---|---|---|
| **Update Date** | 3/2/2020 | **Off Market Date** | 1/29/2020 |
| **Price Change Date** | 3/2/2020 | **First Right of Refusal Date** | |
| **Photo TimeStamp** | | | |

## EXTRA FIELDS

| | | | |
|---|---|---|---|
| **Address Display** | 2092  Ponce De Leon Court   GulfShores AL 36542 | **Cancelled to Expired Date** | |
| **Condo Building Stories** | | **Pending Date** | 1/29/2020 |
| **HotSheet Date** | 3/2/2020 | **Listing Input Date** | 3/2/2020 10:43 AM |
| **Lease Expire Date** | | **Mapping** | |
| **Original Price** | $549,000 | **Previous Asking Price** | |
| **Price per Acre** | | **Price Per Acre** | $772,058.82 |
| **Rental Program** | | **Sale/Rent** | For Sale |
| **School Area** | | **Status Date** | 3/2/2020 |
| **Assoc Management Email** | | **Multiple Lots** | |
| **Seller Disclosure** | No | **Update Date** | 3/2/2020 10:43 AM |
| **Address Unit** | | | |

## ADDITIONAL PICTURES










## LISTING INFORMATION



| | |
|---|---|
| MLS Number | 268111 |
| List Price | $599,000 |
| Property Status | Closed |
| DOM | 25 |
| Cumulative DOM | 609 |
| Listing Effective Date | 4/9/2018 |
| Listing Expire Date | |
| Broker Commission | 3.00 |
| Commission Type | Percent |
| Bonus | |
| Listing Agent | Buddy McDaniel |
| Listing Office 1 | McDaniel Realty Group - Main: 251-223-7334 |
| Listing Agent 2 | |
| Listing Office 2 | |
| Listing Agent 3 | |
| Listing Office 3 | |



## LAND LEASE

| | | | |
|---|---|---|---|
| Lockbox Location | | Minimum Home Sq. Footage REQD | |
| Waterfront Footage | | FIPS Code | 01003 |
| Property Legal Description | | History Remarks | |
| Transfer Fees | No | Expected On Market Date | |
| Selling Office 2 | | Selling Office 3 | |
| Selling Agent 2 | | Selling Agent 3 | |

## PROPERTY DETAIL

| | | | |
|---|---|---|---|
| Tax PPIN # | 43988 | Property Taxes | 3284.4 |
| Address | 0 Ponce De Leon Court | Subdivsn or Commnty | Ponce De Leon Court |
| Address 2 | | Class | Lots and Land |
| City | Gulf Shores | Property Type | Residential Lots |
| State | AL | Lot Type | Lot |
| Zip Code | 36542 | Ownership Type | Whole/Full |
| Intersecting Street | | Named Waterfrnt Y/N | Yes |
| County | Baldwin | Body of Water | Gulf of Mexico |
| Area | Fort Morgan | Flood Zone | |
| Parcel ID/Tax ID | 69-08-01-0-003-102.000 | Apx Acreage | |
| Lot/Block/Unit | | Lot Size | |
| Owner Name | | # Lots | |
| Owner Phone | | Section/Township/Range | |
| Fairhope Single Tax | No | Road Frontage | |
| Owners Association | No | Picture Count | 2 |
| Association Fees | 0 | Price Per ACRE | |
| Associate Fees Frequency | | Sold Price Per ACRE | |
| Additional Amenity Fees | | | |
| Incm Producing Potential | No | | |
| More than 2 Pets Allowed | | | |
| Elementary School | Gulf Shores Elementary | | |
| Middle School | | | |
| Intermediate School | | | |
| High School | Gulf Shores | | |
| Refer to MLS # | | | |
| Restrictive Covenants | | | |
| Deeded Boat Slip# | | | |
| Geocode Quality | Manually Placed Pin | | |
| Associated Document Count | 0 | | |
| Agent Hit Count | 0 | | |
| Client Hit Count | 3 | | |

## REMARKS/DIRECTIONS

**Public Remarks** Beautiful Gulf Front lot with ITP Permit in hand. Great opportunity to build your dream home. Over 90 ft on the Gulf of Mexico!

**Directions** Hwy 59 South to Ft Morgan Rd. West on Ft Morgan (Hwy 180) then Left on Ebb Tide then Left on Ponce de Leon. Lot is on right or Gulf side less than a 1/4 mile.

**Agent Remarks** Call Buddy McDaniel 251-223-7334

**Office Remarks**

## FEATURES

| | | |
|---|---|---|
| **Agent Disclosure** | **Type of Listing** | **Utilities** |
| Not Applicable | Exclusive Right to Sell | Baldwin Co Sewer Service |
| **Docs on File** | | Baldwin EMC |
| Boundary Survey | | Gulf Shores Utilities |
| Environmental Study | | **Water Property Type** |
| | | Gulf Front |

## SYNDICATION SETTINGS

| | | | |
|---|---|---|---|
| **Display on the Internet** | Yes | **Address Display** | Yes |
| **Allow Comments** | Yes | **Allow Realtor.com Syndication** | Yes |
| **Allow Homes.com Syndication** | Yes | **Allow Listhub.com Syndication** | Yes |

## SOLD/CLOSING

| | | | |
|---|---|---|---|
| **Close Date** | 5/7/2018 | **Selling Agent** | Paige Chappelle - PHONE: 251-223-3685 |
| **Selling Price** | $600,000 | **Selling Office** | RE/MAX Paradise - Main: 251-948-8000 |
| **Financing** | CONVENTIONAL | **Non Member** | |
| **Seller Contributions** | | FSBO | |

## SYSTEM FIELDS

| | | | |
|---|---|---|---|
| **Update Date** | 5/8/2018 | **Off Market Date** | 5/4/2018 |
| **Price Change Date** | 5/8/2018 | **First Right of Refusal Date** | |
| **Photo TimeStamp** | | | |

## EXTRA FIELDS

| | | | |
|---|---|---|---|
| **Address Display** | 0 Ponce De Leon Court  GulfShores AL 36542 | **Cancelled to Expired Date** | |
| **Condo Building Stories** | | **Pending Date** | 5/4/2018 |
| **HotSheet Date** | 5/8/2018 | **Listing Input Date** | 4/9/2018 4:30 PM |
| **Lease Expire Date** | | **Mapping** | |
| **Original Price** | $599,000 | **Previous Asking Price** | |
| **Price per Acre** | | **Price Per Acre** | |
| **Rental Program** | | **Sale/Rent** | For Sale |
| **School Area** | | **Status Date** | 5/8/2018 |
| **Assoc Management Email** | | **Multiple Lots** | |
| **Seller Disclosure** | No | **Update Date** | 5/8/2018 8:09 PM |
| **Address Unit** | | **Days On MLS** | 25 |

## ADDITIONAL PICTURES



## LISTING INFORMATION





| | |
|---|---|
| MLS Number | 292014 |
| List Price | $925,000 |
| Property Status | Closed |
| Cumulative DOM | 0 |
| Listing Effective Date | 12/4/2019 |
| Listing Expire Date | |
| Broker Commission | 2.50 |
| Commission Type | Percent |
| Bonus | |
| Listing Agent | Charlie Guy - PHONE: 251-747-1979 |
| Listing Office 1 | RE/MAX of Orange Beach - Main: 251-981-2400 |
| Listing Agent 2 | |
| Listing Office 2 | |
| Listing Agent 3 | |
| Listing Office 3 | |

       

## LAND LEASE

| | | | |
|---|---|---|---|
| Lockbox Location | | Minimum Home Sq. Footage REQD | |
| Waterfront Footage | | FIPS Code | 01003 |
| Property Legal Description | | History Remarks | |
| Transfer Fees | No | Expected On Market Date | |
| Selling Office 2 | | Selling Office 3 | |
| Selling Agent 2 | | Selling Agent 3 | |

## PROPERTY DETAIL

| | | | |
|---|---|---|---|
| Tax PPIN # | 118681 | Property Taxes | 4039 |
| Address | 2211 Beach Blvd | Subdivsn or Commnty | Lillian Callaway |
| Address 2 | | Class | Lots and Land |
| City | Gulf Shores | Property Type | Residential Lots |
| State | AL | Lot Type | Lot |
| Zip Code | 36542 | Ownership Type | Whole/Full |
| Intersecting Street | Highway 59 | Named Waterfrnt Y/N | Yes |
| County | Baldwin | Body of Water | Gulf of Mexico |
| Area | Gulf Shores 1 | Flood Zone | |
| Parcel ID/Tax ID | 6708272001065000 | Apx Acreage | 0.5100 |
| Lot/Block/Unit | 35 | Lot Size | 75.7 x 298 |
| Owner Name | | # Lots | 1 |
| Owner Phone | | Section/Township/Range | |
| Fairhope Single Tax | No | Road Frontage | 75 |
| Owners Association | Yes | Picture Count | 7 |
| Association Fees | 0 | Price Per ACRE | $1,696,078.43 |
| Associate Fees Frequency | | Sold Price Per ACRE | $1,696,078.43 |
| Additional Amenity Fees | 0 | | |
| Incm Producing Potential | No | | |
| More than 2 Pets Allowed | Yes | | |
| Elementary School | Gulf Shores Elementary | | |
| Middle School | | | |
| Intermediate School | | | |
| High School | Gulf Shores | | |
| Refer to MLS # | | | |
| Restrictive Covenants | Yes | | |
| Deeded Boat Slip# | | | |
| Geocode Quality | Street Intersection or Segment Match | | |
| Associated Document Count | 0 | | |
| Agent Hit Count | 0 | | |
| Client Hit Count | 4 | | |

## REMARKS/DIRECTIONS

| | |
|---|---|
| Public Remarks | NICE 75 FOOT GULF FRONT LOT WITH BEACH MOUSE PERMIT FOR LARGEST POSSIBLE FOOT PRINT ALREADY.  COPIES OF PERMITS AVAILABLE UPON REQUEST. THIS LOT IS SURROUNDED BY HIGH END HOMES. |
| Directions | FROM HIGHWAY 59 IN GULF SHORES TURN WEST ON TO WEST BEACH BLVD AND PROCEED TO LOT ON SOUTH SIDE OF ROAD. |
| Agent Remarks | LOT UNDER CONTRACT WITH FINANCING CONTINGENCY.  BACK UP CONTRACTS WELCOME. |
| Office Remarks | |

## FEATURES

| | | | |
|---|---|---|---|
| **Agent Disclosure** | **Lot Description** | **Type of Listing** | **View** |
| Not Applicable | Less than 1 acre | Exclusive Right to Sell | Direct Gulf Front |
| **Boat Facilities** | Water View | **Terms of Sale** | Southern View |
| None | Waterfront | Cash | **Water Property Type** |
| **Community Amenities** | **Mineral Rights** | Conventional | Gulf Accs (Wlk <=1/4 Mi) |
| None | No Rights | **Utilities** | Gulf Front |
| **Docs on File** | **Road Desc** | Cable TV | **Zoning/Area** |
| Boundary Survey | City Street | Sewage-City | Single Family Residence |
| Other-See Remarks | | Water-City | |
| Site Plan | | | |

## SYNDICATION SETTINGS

| | | | |
|---|---|---|---|
| **Display on the Internet** | Yes | **Address Display** | Yes |
| **Allow Comments** | No | **Allow Realtor.com Syndication** | Yes |
| **Allow Homes.com Syndication** | Yes | **Allow Listhub.com Syndication** | Yes |

## SOLD/CLOSING

| | | | |
|---|---|---|---|
| **Close Date** | 1/2/2020 | **Selling Agent** | Charlie Guy - PHONE: 251-747-1979 |
| **Selling Price** | $865,000 | **Selling Office** | RE/MAX of Orange Beach - Main: 251-981-2400 |
| **Financing** | CONVENTIONAL | **Non Member** | |
| **Seller Contributions** | | **FSBO** | |

## SYSTEM FIELDS

| | | | |
|---|---|---|---|
| **Update Date** | 1/3/2020 | **Off Market Date** | 12/4/2019 |
| **Price Change Date** | 1/3/2020 | **First Right of Refusal Date** | |
| **Photo TimeStamp** | | | |

## EXTRA FIELDS

| | | | |
|---|---|---|---|
| **Address Display** | 2211 Beach Blvd  GulfShores AL 36542 | **Cancelled to Expired Date** | |
| **Condo Building Stories** | | **Pending Date** | 12/4/2019 |
| **HotSheet Date** | 1/3/2020 | **Listing Input Date** | 12/5/2019 9:43 AM |
| **Lease Expire Date** | | **Mapping** | |
| **Original Price** | $925,000 | **Previous Asking Price** | |
| **Price per Acre** | | **Price Per Acre** | $1,696,078.43 |
| **Rental Program** | | **Sale/Rent** | For Sale |
| **School Area** | | **Status Date** | 1/3/2020 |
| **Assoc Management Email** | IN FILE | **Multiple Lots** | No |
| **Seller Disclosure** | No | **Update Date** | 1/3/2020 12:53 AM |
| **Address Unit** | | | |

## ADDITIONAL PICTURES

   

 

**MLS #  304426  Closed**          **List Price: $1,750,000**          **9185 A Chewning Lane  GulfShores AL 36542**



| | | | |
|---|---|---|---|
| Bedrooms  7 | | Class  Residential-Single Family | |
| Baths  6 | | Area  Fort Morgan | |
| Half Baths  1 | | Governing Municipality  Baldwin County | |
| Year Built  2020 | | Subdivsn or Commnty  Government | |
| Construction Status:  New Construction | | Condo Complex | |
| Apx Living Area  3400 | | County  Baldwin | |
| SqFtSource  Seller | | School Area | |
| Structure Style  Raised Beach | | Elementary School  Orange Beach Elementary | |
| Stories  2 | | Middle School  Orange Beach Middle | |
| Water Property Type  Gulf Front - Building | | Intermediate School | |
| Intersecting Street  Veterans Road | | High School  Orange Beach | |
| Virt Tour  Virtual Tour 1 | | Zoning/Area  Single Family Residence | |
| | | Lot Size  83' x 132'+/- | |

Schedule a Showing

| Lot/Block/Unit  So 1/2 Lot 47 | Restrictive Covenants | Additional Amenity Fees | Apx Acreage  3,400.0000 |
|---|---|---|---|
| Fairhope Single Tax  No | Tax PPIN #:  011589 | Association Fees  0 | Multiple Lots  No |
| Lead Paint Disclosure  No | Property Taxes:  0 | Associate Fees Frequency | # Lots |
| Refer to MLS # | | AscMgtCo | Lot Description  Less than 1 acre, |
| Community Amenities  None | | Assoc. Phone | Level, Waterfront |

| | Level | Dimension | | | Level | Dimension | | | Level | Dimension | | | Level | Dimension |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balcony | | | Master BR | 2 | 13 x 15 | Bedroom 2 | M | 14 x 19 | Bedroom 3 | M | 14 x 19 |
| Bedroom 4 | 2 | 13 x 15 | Bedroom 5 | 2 | 12 x 12 | Breakfast | | | Den | | |
| Dining Rm | | | Great Room | | | Kitchen | M | 11 x 24 | Living Rm | | |
| Lvg/Dng | M | 12 x 24 | Rec Room | 2 | 13 x 21 | Utility | | | Other Rm | 2 | 12 x 13 |

| Unit # | | Unit Floor: | | Building Total Units | | | Condo Building Stories: | | |
|---|---|---|---|---|---|---|---|---|---|
| Furnished:  Yes | Elevators:  0 | Rental Restricted: | | Rental Program:  No | | Recurring Special Assmt: | | Amt: | |

**Appliances**  Dishwasher, Disposal, Microwave, Range-Electric, Refrigerator w/Ice Maker
**Boat Facilities**  None
**Construction / Foundation**  Wood Frame, Pilings, Slab, Fortified-Gold
**Docs on File**  S/D Plat
**Dining Area**  Lvg/Dng/Ktchn Combo
**Energy Saving Features**  Ceiling Fan(s), Double Pane Windows, Thermal Doors
**Exterior Finish**  Concrete Board
**# of Fireplaces**  0
**Fireplace**  No Fireplace
**Floors**  Tile, Other Floors-See Remarks

**Garage/Parking**  Double Carport
**Heat/Cooling**  Central Electric (Cool), Central Heat
**Master Bed/Bath**  Direct Gulf View - Master
**Mineral Rights**  Unknown
**Other Rooms**  Media Room, Recreation Room
**Property Amenities**  Ceiling Fan(s), En-Suite, Pool-Above Ground (Home), Porch -Front
**Possession**  At Closing
**Roof**  Metal
**Showing**  Appointment/Lockbox, Call Agent/Broker, Lockbox
**Type of Listing**  Exclusive Right to Sell
**Terms of Sale**  Cash, Conventional
**Utilities**  Baldwin Co Sewer Service, Grinder Pump, Sewage-City Available, Total Electric, Water Heater-Electric, Water-City, Baldwin EMC, Gulf Shores Utilities
**View**  Direct Gulf Front, Southern View, Eastern View, Western View

**Public Remarks**  NEW GULF FRONT BEAUTY WITH POOL! This magnificent two story gulf front house has 7 Bedrooms/ 6.5 baths PLUS Media/Rec room with bar upstairs. Main Level has Large Living/Dining/Kitchen opening to deck and pool. Two bedrooms and  private baths and on main level. Upstairs Media/Rec room and Master Bedroom open to second floor balcony. 5 Bedrooms / 4 Baths on upper level. Must see this exceptional house. All baths have very unique tile work. This is still under construction but almost finished. Beautiful kitchen more cabinets than you can imagine. This new house has a very large rental projection.
**Directions**  West of 10 Mile Marker on Highway 180 West - south on Veterans Road - at beach go east on Chewning Road.
**Agent Remarks**  Please call Kathy 251-752-9198 or Kris 251-752-4692 for additional information and showings. This is a construction site. All measurements believed accurate but should be confirmed by purchaser. Fort Morgan residents may pay tuition to attend Gulf Shores Private School System.
**Office Remarks**

This information is deemed reliable, but not guaranteed.                    03/12/2021                    Page 1 of 2

**MLS # 304426**      9185 A Chewning Lane GulfShores AL 36542

| | | | |
|---|---|---|---|
| **LO:** 96 | Century 21 Meyer Real Estate<br>Main: 251-968-7516 | **LA:** 17790 | Kris L Powell - CELL: 251-752-4692<br>Kris@LarryEPowell.com |
| **LO2:** | | **LA2:** | |
| **LO3:** | | **LA3:** | |

**Listing Effective Date:** 9/28/2020      **Listing Expire Date:**      **Days On Market:** 116

**Buyer/Broker Comm:** 2.40      **Terms of Sale:** Cash, Conventional
**Agent Disclosure:** Not Applicable              **Refer to MLS #**
**Display on the Internet:** Yes      **VOWAddressDisplay:** Yes      **Allow Comments:** No

**Selling Price: $1,637,500**      **Close Date: 2/25/2021**      **Financing**    CONV
**SO:** 96      Century 21 Meyer Real Estate         **Seller Contributions:**
**SA:** 17790      Kris L Powell                **FSBO:**      **Non Member:**


NO IMAGE
AVAILABLE


NO IMAGE
AVAILABLE


NO IMAGE
AVAILABLE


NO IMAGE
AVAILABLE



Chewning Ln


NO IMAGE
AVAILABLE


NO IMAGE
AVAILABLE

Google          Map data ©2021


NO IMAGE
AVAILABLE


NO IMAGE
AVAILABLE


NO IMAGE
AVAILABLE


NO IMAGE
AVAILABLE


NO IMAGE
AVAILABLE


NO IMAGE
AVAILABLE


NO IMAGE
AVAILABLE


NO IMAGE
AVAILABLE

Listing - Duplex

**AGENT ALL FIELDS CUSTOMIZABLE**



| | |
|---|---|
| **MLS Number** | 274072 |
| **List Price** | $3,499,000 |
| **Property Status** | Active |
| **DOM** | 919 |
| **Listing Effective Date** | 9/5/2018 |
| **Broker Commission** | 2.50 |
| **Commission Type** | Percent |



Google   Map data ©2021

## LISTING AGENT AND OFFICE INFO

**Agent - Agt Nm Ph**    Daniel Prickett
**List Agt 2 - Agt Nm Ph** Daniel Prickett
**List Agt 3 - Agt Nm Ph**

**List Ofc 1 - Ofc Nm Ph** Prickett Properties, LLC - Main: 251-209-0074
**List Ofc 2 - Ofc Nm Ph** Prickett Properties, LLC - Main: 251-209-0074
**List Ofc 3 - Ofc Nm Ph**

## PROPERTY DETAIL

| | | | |
|---|---|---|---|
| **Associate Fees Frequency** | | **Property Taxes:** | 3785.04 |
| **Tax PPIN #:** | 273993 | **Subdivsn or Commnty** | |
| **Address** | 3468 Ponce De Leon Court | **Condo Complex** | |
| **City** | Gulf Shores | **Year Built** | 2017 |
| **State** | AL | **Apx Living Area** | 8354 |
| **Zip Code** | 36542 | **Square Footage Source** | Seller |
| **Intersecting Street** | | **Class** | Residential-Single Family |
| **County** | Baldwin | **Property Type** | Residential Detached |
| **Area** | Fort Morgan | **Structure Style** | Raised Beach |
| **Lot/Block/Unit** | 1 | **Construction Status:** | Resale |
| **Owner Name** | | **Fairhope Single Tax** | No |
| **Owner Phone** | | **Ownership Type** | Whole/Full |
| **Baths** | 18 | **Named Waterfrnt Y/N** | Yes |
| **Bedrooms** | 18 | **Body of Water** | Gulf of Mexico |
| **Half Baths** | 2 | **Waterfront Footage** | |
| **Owners Association** | No | **Flood Zone** | VE,AE |
| **Association Fees** | 0 | **Deeded Boat Slip#** | |
| **Additional Amenity Fees** | | **Apx Acreage** | |
| **Association Management Co** | | **Multiple Lots** | |
| **Assoc. Phone** | | **Lot Size** | 75X400 |
| **Assoc Management Email** | | **# Lots** | |
| **More than 2 Pets Allowed** | Yes | **Minimum Home Sq. Footage REQD** | |
| **Non-Rental Building** | No | **Refer to MLS #** | |
| **Incm Producing Potential** | Yes | **Restrictive Covenants** | |
| **Property Interior Stories** | 3 | **Lead Paint Disclosure** | |
| **Elementary School** | Gulf Shores Elementary | **Home Warranty** | |
| **Middle School** | | **Furnished** | Yes |
| **Intermediate School** | | **Elevators** | 1 |
| **High School** | Gulf Shores | **# of Fireplaces** | 0 |
| **Seller Disclosure** | No | **# of Garage Spaces** | |
| **Associated Document Count** | 2 | **# of Parking Spaces** | |
| **Display on the Internet** | Yes | **Geocode Quality** | Manually Placed Pin |
| **Address Display** | Yes | **Address 2** | |
| **Allow Comments** | Yes | **Picture Count** | 33 |
| **Allow Realtor.com Syndication** | Yes | **Sold Price Per SQFT** | |
| **Allow Homes.com Syndication** | Yes | **Lockbox Location** | |
| **Allow Listhub.com Syndication** | Yes | **Property Legal Description** | |
| **Agent Hit Count** | 473 | | |
| **Client Hit Count** | 176 | | |

## CONDO INFORMATION

| | | | |
|---|---|---|---|
| **Unit #** | | **Rental Program** | Yes |
| **Unit Floor** | | **Rental Restricted** | |
| **Condo Building Stories** | | **Recurring Special Assmt** | |
| **Building Total Units** | | **Recurring Spec Asmt Amt** | |

## ROOM INFORMATION

| | |
|---|---|
| **Balcony Size** | |
| **Breakfast Level** | 2 |

**Master Bedroom Level**      2
**Master Bedroom Dimensions** 12x14

| | | | | |
|---|---|---|---|---|
| Breakfast Dimensions | 12x14 | | Great Room Level | |
| Bedroom 2 Level | 3 | | Great Room Dimensions | |
| Bedroom 2 Dimensions | 12x11 | | Kitchen Level | 2 |
| Bedroom 3 Level | 3 | | Kitchen Dimensions | 15x10 |
| Bedroom 3 Dimensions | 11x11 | | Living Rm Level | 2 |
| Bedroom 4 Level | 3 | | Living Rm Dimensions | 20x20 |
| Bedroom 4 Dimensions | 11x12 | | Lvg/Dng Level | |
| Bedroom 5 Level | 3 | | Lvg/Dng Dimension | |
| Bedroom 5 Dimensions | 12x12 | | Other Rm Level | |
| Dining Rm Level | | | Other Rm Dimensions | |
| Dining Dimensions | | | Rec Room Level | |
| Den Level | | | Rec Room Dimensions | |
| Den Dimensions | | | Utility Level | |
| | | | Utility Dimensions | |

## REMARKS/DIRECTIONS

**Public Remarks** Completed in late May of 2017, Easy Breezy is ready for you and your group to come and make life long memories in! Easy Breezy is a 18 bedroom, 18 bath, 2 half bath duplex that sleeps 22 (per side). Easy Breezy is direct gulf front and offers amazing views of the white sandy beaches and crystal blue waters of the Alabama Gulf Coast. The home is 3 stories and has balconies on all 3 levels. There is a private pool per side , ample parking, WiFi/Internet, Cable/Satellite, and much more(per side). There is also an elevator that services one side. This house is a Vacation Rental on Prickett Properties Management program. The house is rented most of the time so as much advanced notice as possible please Approx. living area is 8354 with around 1800 feet of porches and 2 pools 2018 Gross Rental Revenue $344,761.68. Don't miss out on this Rental Machine 2019 Gross Rental Revenue $356,694.00. We added a pool Heater in Sept 2019. 2020 Gross Rental Revenue 310k. Would have been closer to 370K without corona and hurricanes

**Directions** Fort Morgan to vacation lane to ponce de leon

**Agent Remarks** buyer to verify all measurements room dementions are approx

**Office Remarks**

## FEATURES

**Agent Disclosure**
Not Applicable
**Appliances**
Dishwasher
Disposal
Dryer
Icemaker
Microwave
Range-Electric
Refrigerator
Refrigerator w/Ice Maker
Smoke Detector
Washer
Cooktop
**Boat Facilities**
None
**Community Amenities**
Fire Sprinkler System
Internet
Pool - Outdoor
Pets - Allowed
Satellite TV
Water Access-Deeded

**Construction / Foundation**
Wood Frame
Piers
Pilings
**Energy Saving Features**
Ceiling Fan(s)
**Exterior Finish**
Concrete Board
**Floors**
Tile
Vinyl
**Garage/Parking**
Other-See Remarks
Three or More Vehicles
**Heat/Cooling**
Central Electric (Cool)
**Lot Description**
Less than 1 acre

**Living Room Group**
Living Room
**Master Bed/Bath**
Other - See Remarks
**Property Amenities**
Cable
Ceiling Fan(s)
Covered Patio
Internet
Pool-Above Ground (Home)
**Possession**
At Closing
**Roof**
Metal
**Showing**
Appointment Only
Lockbox
ShowingTime
Tenant Occupied
Short Term Rental

**Type of Listing**
Exclusive Right to Sell
**Terms of Sale**
Cash
Conventional
**Utilities**
Baldwin EMC
**View**
Direct Gulf Front
Pool Area View
Southern View
**Water Property Type**
Beach Accs (Wlk <=1/4 Mi)
Beach Side - Building
Deeded Access
Gulf Accs (Wlk <=1/4 Mi)
Gulf Front - Building
**Zoning/Area**
2+ Family Residence

## SOLD/CLOSING

| | | |
|---|---|---|
| Close Date | | Selling Agent - Agent Name |
| Selling Price | | Selling Agent - Phone Number |
| Financing | | Selling Office - Office Name |
| Seller Contributions | | Selling Office - Phone Number |
| Non Member | | |
| FSBO | | |

## SYSTEM DATE

| | |
|---|---|
| Listing Input Date | 9/5/2018 1:12 PM |
| Off Market Date | |
| Listing Expire Date | |
| Update Date | 1/20/2021 |
| Price Change Date | 9/5/2018 |
| First Right of Refusal Date | |
| Pending Date | |
| HotSheet Date | 9/5/2018 |
| Status Date | 9/5/2018 |

| General Date | 9/5/2018 |
| Photo TimeStamp | |
| Cancelled to Expired Date | |
| Price | $3,499,000 |

**ADDITIONAL PICTURES**

   

   

   

   

   

   

   

   

#360,000
9.72x

6586

**MLS #   294375   Closed**          **List Price: $2,195,000**          **583 Our Rd  GulfShores AL 36542**



| | Bedrooms 9 | | Class Residential-Single Family |
| | Baths 9 | | Area Fort Morgan |
| | Half Baths 1 | | Governing Municipality Baldwin County |
| | Year Built 2016 | | Subdivsn or Commnty Government |
| | Construction Status: Resale | | Condo Complex |
| | Apx Living Area 4860 | | County Baldwin |
| | SqFtSource Tax Records | | School Area |
| | Structure Style Raised Beach | | Elementary School Gulf Shores Elementary |
| | Stories 3 | | Middle School |
| | Water Property Type Gulf Front - Building | | Intermediate School |
| | Intersecting Street Fort Morgan Road | | High School Gulf Shores |
| | Virt Tour | | Zoning/Area Single Family Residence |
| | | | Lot Size 58 x 215 |

zoned RSF-1

📷 Schedule a Showing     ▣ ◫ ◨ ⟳ M H ⓘ ◰ ◧ S ✕ ▤ ✎

**Lot/Block/Unit** Lot 27          **Restrictive Covenants** No          **Additional Amenity Fees**          **Apx Acreage**
**Fairhope Single Tax** No          **Tax PPIN #:** 36274          **Association Fees** 0          **Multiple Lots**
**Lead Paint Disclosure** No          **Property Taxes:** 7,362          **Associate Fees Frequency**          **# Lots**
**Refer to MLS #**                                                  **AscMgtCo**          **Lot Description** Waterfront
**Community Amenities** None                                        **Assoc. Phone**

| | Level | Dimension | | Level | Dimension | | Level | Dimension | | Level | Dimension |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balcony | | 21x19 | Master BR | 2 | 14x16 | Bedroom 2 | M | 14x11 | Bedroom 3 | 2 | 15x12 |
| Bedroom 4 | 2 | 11x11 | Bedroom 5 | 2 | 11x11 | Breakfast | | | Den | | |
| Dining Rm | | | Great Room | M | 25x19 | Kitchen | M | 24x11 | Living Rm | | |
| Lvg/Dng | | | Rec Room | 3 | 18x14 | Utility | | | Other Rm | 3 | 17x12 |

| Unit # | | Unit Floor: | | Building Total Units | | | | Condo Building Stories: | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Furnished: Yes | Elevators: 1 | Rental Restricted: | | Rental Program: | Yes | Recurring Special Assmt: | | Amt: | | |

**Appliances** Dishwasher, Disposal, Convection Oven, Dryer, Icemaker, Microwave, Range-Gas, Refrigerator w/Ice Maker, Smoke Detector, Washer, Wine Cooler
**Boat Facilities** None
**Construction / Foundation** Wood Frame, Pilings, Fortified-Gold
**Energy Saving Features** Ceiling Fan(s), Double Pane Windows, Energy Star Air Cond, Thermal Doors
**Exterior Finish** Hardboard
**# of Fireplaces** 0
**Floors** Vinyl, Wood

**Garage/Parking** Three or More Vehicles
**Heat/Cooling** Central Electric, Heat Pump (Cool)
**Master Bed/Bath** Double Vanity, Shower Only, Balcony/Patio, Private Water Closet, Direct Gulf View - Master
**Mineral Rights** Owner Conveys If Any
**Other Rooms** Utility Room-Inside
**Property Amenities** Bunk Room, Ceiling Fan(s), Covered Patio, Private Elevator, En-Suite, Handicap Accessible, High Ceilings, Internet, Outdoor Shower, Security System, Wet Bar, Window Treatments, Pool-Above Ground (Home), Porch-Back
**Possession** At Closing, Negotiable
**Roof** Metal
**Showing** Call Agent/Broker, Lockbox, Short Term Rental
**Type of Listing** Exclusive Right to Sell
**Terms of Sale** Cash, Conventional, FHA
**Utilities** Baldwin Co Sewer Service, Gas-Propane, Grinder Pump, Satellite, Water Heater-Electric, Water-City, Baldwin EMC, Gulf Shores Utilities
**View** Direct Gulf Front, Southern View

**Public Remarks** This Gulf front Gold fortified rental monster had $266k gross rental income in 2019. Try to find a better investment on the Gulf Coast while enjoying a luxury 9 bedroom, 9 ½ bathroom beach house that also features a pool and private elevator. Located on the idyllic Fort Morgan Peninsula, Happy Our features numerous amenities including all stainless appliances—plus gas range, convection oven, dual dishwashers and refrigerators—coffee alcove with microwave and ice maker, beautiful granite kitchen countertops, tiled backsplash, and large island. Your family and friends will love entertaining in the large open design great room overlooking the pool or the pool deck looking out over the pristine white sandy beach and Gulf of Mexico. The kids will love the second living area, which includes tables for both foosball and shuffleboard and is also overlooking the Gulf from a large sun deck. This beach house sleeps 25 with its multiple ensuite bedrooms, all with private balconies facing the Gulf so everyone will wake up to the sounds of the waves crashing on the shore. Happy Our almost backs up to the Sassy Bass Restaurant and shopping store, so grabbing a quick bite or a last minute ingredient for your gourmet meal is easy and convenient. Don't delay—call today and start living your dream on the beautiful Gulf Coast.
**Directions** From Hwy 59 in Gulf Shores go approximately 14 miles then take a left onto Our Rd take the next left and you will dead end to the home.
**Agent Remarks** All room dimensions - square footage - etc.. to be verified by Purchaser.
**Office Remarks**

This information is deemed reliable, but not guaranteed.                    03/12/2021                    Page 1 of 2

**MLS #  294375**        **583  Our Rd  GulfShores AL 36542**

| | | |
|---|---|---|
| **LO:  13**  Edgemon Properties  Main: 251-540-7100 | | **LA:  14065**  Tim McCrory - PHONE: 251-540-7100  tim@kivadunes.com |
| **LO2:** | | **LA2:** |
| **LO3:** | | **LA3:** |

**Listing Effective Date:  2/5/2020**        **Listing Expire Date:**            **Days On Market:  143**

**Buyer/Broker Comm:**  2.50        **Terms of Sale:**  Cash, Conventional, FHA
**Agent Disclosure:**  Not Applicable                    **Refer to MLS #**
**Display on the Internet:**  Yes        **VOWAddressDisplay:**  Yes        **Allow Comments:**  Yes

**Selling Price: $2,150,000**        **Close Date: 10/5/2020**        **Financing**    CONV
**SO:  915**    Prickett Properties, LLC                **Seller Contributions:**  0
**SA:  17818**    Daniel Prickett                **FSBO:**        **Non Member:**

 

 

 



Fort Morgan Road

Map data ©2021

   

   

U 5D8

**MLS # 291289   Closed          List Price: $2,050,000                    6550  Sea Shell Dr  GulfShores AL 36542**



**Bedrooms** 8
**Baths** 8
**Half Baths** 2
**Year Built** 2018
**Construction Status:** Resale
**Apx Living Area** 4300
**SqFtSource** Builder / Floorplan
**Structure Style** Raised Beach
**Stories** 2
**Water Property Type** Gulf Front - Building
**Intersecting Street**
**Virt Tour**

**Class** Residential-Single Family
**Area** Fort Morgan
**Governing Municipality** Baldwin County
**Subdivsn or Commnty** Surfside Shores
**Condo Complex**
**County** Baldwin
**School Area**
**Elementary School** Gulf Shores Elementary
**Middle School**
**Intermediate School**
**High School** Gulf Shores
**Zoning/Area** Single Family Residence
**Lot Size** 70' x 490'

Schedule a Showing

**Lot/Block/Unit** Lot 5
**Fairhope Single Tax** No
**Lead Paint Disclosure** No
**Refer to MLS #**
**Community Amenities** Landscaping, Pets - Allowed, Water Access-Deeded, Pets - No Cats

**Restrictive Covenants** Yes
**Tax PPIN #:** 013092
**Property Taxes:** 7,245

**Additional Amenity Fees** 0
**Association Fees** 100
**Associate Fees Frequency** Annually
**AscMgtCo** Surfside Shores HOA
**Assoc. Phone** 2512858104

**Apx Acreage** 0.7800
**Multiple Lots**
**# Lots**
**Lot Description** Less than 1 acre,
Waterfront

| | Level | Dimension | | | Level | Dimension | | | Level | Dimension | | | Level | Dimension |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balcony | | 24x46 | Master BR | M | 13x16 | Bedroom 2 | M | 12x16 | Bedroom 3 | 2 | 11x13 |
| Bedroom 4 | 2 | 12x12 | Bedroom 5 | 2 | 16x14 | Breakfast | | | Den | 2 | 15x20 |
| Dining Rm | M | 14x14 | Great Room | | | Kitchen | M | 15x15 | Living Rm | | |
| Lvg/Dng | M | 17x23 | Rec Room | 2 | 12x10 | Utility | 2 | 5x5 | Other Rm | 2 | 11x11 |

| Unit # | | Unit Floor: | | Building Total Units | | | Condo Building Stories: | |
|---|---|---|---|---|---|---|---|---|
| **Furnished:** Yes | **Elevators:** 1 | **Rental Restricted:** No | **Rental Program:** Yes | **Recurring Special Assmt:** | **Amt:** |

**Association Fees Incl** Association Management, Common Area Insurance, Common Area Maintenance, Taxes-Common Area
**Appliances** Dishwasher, Disposal, Convection Oven, Double Oven, Dryer, Icemaker, Microwave, Range-Gas, Refrigerator w/Ice Maker, Smoke Detector , Washer
**Boat Facilities** None
**Construction / Foundation** Wood Frame, Slab & Piers, Fortified-Gold
**Docs on File** S/D Plat, Site Plan
**Energy Saving Features** Ceiling Fan(s), Double Pane Windows, Power Roof Vent, Thermal Doors
**Exterior Finish** Concrete Board
**# of Fireplaces** 0
**Floors** Tile, Wood

**Garage/Parking** Three or More Vehicles
**Heat/Cooling** Central Electric, Central Heat, Heat Pump, Heat Pump (Cool), Zoned
**Master Bed/Bath** Double Vanity, Garden Tub, Separate Shower, 1st Floor Master, Walk In Closet, Balcony/Patio, Private Water Closet, Direct Gulf View - Master
**Mineral Rights** Owner Conveys If Any
**Other Rooms** Foyer, Media Room, Utility Room-Inside
**Property Amenities** Bunk Room, Ceiling Fan(s), Covered Patio, Private Elevator, En-Suite, Handicap Accessible, High Ceilings, Internet, Porch-Open, Outdoor Kitchen , Outdoor Shower, Security System, Storage-In, Wheelchair Accessible, Window Treatments, Pool-Above Ground (Home)
**Possession** At Closing, Negotiable
**Roof** Metal
**Showing** Appointment/Lockbox, Call Agent/Broker, Short Term Rental
**Type of Listing** Exclusive Right to Sell
**Terms of Sale** Cash, Conventional, FHA
**Utilities** Baldwin Co Sewer Service, Gas-Propane, Grinder Pump, Satellite, Water -City, Baldwin EMC, Gulf Shores Utilities
**View** Direct Gulf Front

**Public Remarks** Gulf Front - Gold Fortified - 8 Bedroom 8 bath with 2 half bath home - built in 2018 with heated gulf front pool and private elevator. You do not want to miss this tremendous opportunity to own a 4300+ sq ft. turn key home / fully furnished - directly on a 70 foot gulf front lot in Surfside Shores with 1st yr rental #'s reaching above $190,000. This Coastal Cottage professionally designed and built will surely impress your family and friends and offer beach front memories for a lifetime. Some features include: wood style tile throughout entire home, All bedrooms have ensuite baths with 4 bedrooms directly facing the gulf, 12 foot ceilings, stainless appliances including Wolf 5 burner gas range, double convection oven, built in microwave and ice maker, two Maytag Refrigerators, two laundry rooms with Maytag Commercial technology, large kitchen island with double sink, wall mounted flat screens, granite counters in kitchen and all baths, bathrooms feature tiled backsplash and rain shower heads, two bedrooms with bunks, additional living room, outdoor cooking area on large pool deck featuring TREX decking and aluminum hand rails and much more. Schedule a showing today. This gulf front beauty will not last long.
**Directions** From Hwy 59 in Gulf Shores go west on Ft. Morgan Rd ( hwy 180 ) approximately 14 miles to the Surfside Shores entrance take a left onto Surfside Drive then take the 4th paved right onto Sea Shell Drive. 6550 Sea Shell will be approximately 1300 feet on then driveway on the gulf
**Agent Remarks** All room dimensions and square footages to be verified by Buyer.
**Office Remarks**

This information is deemed reliable, but not guaranteed.                    03/12/2021                    Page 1 of 2

**MLS # 291289**          **6550 Sea Shell Dr  GulfShores AL 36542**

| | |
|---|---|
| **LO:** 13          Edgemon Properties | **LA:**  14065          Tim McCrory - PHONE: 251-540-7100 |
|                Main: 251-540-7100 |                tim@kivadunes.com |
| **LO2:** | **LA2:** |
| **LO3:** | **LA3:** |

**Listing Effective Date:** 11/12/2019          **Listing Expire Date:**                    **Days On Market: 21**

**Buyer/Broker Comm:**    2.50          **Terms of Sale:** Cash, Conventional, FHA
**Agent Disclosure:** Not Applicable                              **Refer to MLS #**
**Display on the Internet:** Yes          **VOWAddressDisplay:** Yes          **Allow Comments:** Yes

**Selling Price: $1,950,000**          **Close Date:  1/17/2020**          **Financing**      **CONV**
**SO:** 28          **RE/MAX of Gulf Shores**                              **Seller Contributions:** 0
**SA:** 13602          Kandy R Hines                              **FSBO:**          **Non Member:**
















**MLS # 267187   Closed**          **List Price: $1,875,000**          **4878 State Highway 180   GulfShores AL 36542**



| | | |
|---|---|---|
| **Bedrooms** 8 | **Class** Residential-Single Family | |
| **Baths** 7 | **Area** Fort Morgan | |
| **Half Baths** 1 | **Governing Municipality** Gulf Shores, Baldwin County | |
| **Year Built** 2018 | **Subdivsn or Commnty** Government Sub (Veterans) | |
| **Construction Status:** New Construction | **Condo Complex** | |
| **Apx Living Area** 4000 | **County** Baldwin | |
| **SqFtSource** | **School Area** | |
| **Structure Style** Raised Beach | **Elementary School** Gulf Shores Elementary | |
| **Stories** 2 | **Middle School** Gulf Shores Middle | |
| **Water Property Type** Gulf Front - Building | **Intermediate School** | |
| **Intersecting Street** | **High School** Gulf Shores | |
| **Virt Tour** | **Zoning/Area** Single Family Residence, Outside Corp Limits | |

**Lot Size** 65x343

🌀 Schedule a Showing

**Lot/Block/Unit**           **Restrictive Covenants** Yes          **Additional Amenity Fees**          **Apx Acreage**
**Fairhope Single Tax** No      **Tax PPIN #:** 098584              **Association Fees** 0               **Multiple Lots** No
**Lead Paint Disclosure** No    **Property Taxes:** 1955.00          **Associate Fees Frequency**          **# Lots** 1
**Refer to MLS #**                                            **AscMgtCo**                        **Lot Description** Level, Waterfront
                                                            **Assoc. Phone**

| | Level | Dimension | | | Level | Dimension | | | Level | Dimension | | | Level | Dimension |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balcony | | 18x44 | Master BR | M | 12.2x12.8 | Bedroom 2 | M | 11x15 | Bedroom 3 | 2 | 12x15 |
| Bedroom 4 | 2 | 12.2x12.6 | Bedroom 5 | 2 | 12.6x12.6 | Breakfast | | | Den | | |
| Dining Rm | M | 13x14 | Great Room | M | 17x23 | Kitchen | M | 10x15 | Living Rm | 2 | 15x18.8 |
| Lvg/Dng | | | Rec Room | | | Utility | M | 8.4x15 | Other Rm | 2 | 7.1x15 |

| Unit # | | Unit Floor: | | Building Total Units | | | Condo Building Stories: | | |
|---|---|---|---|---|---|---|---|---|---|
| **Furnished:** Yes | **Elevators:** 1 | **Rental Restricted:** No | | **Rental Program:** Yes | | **Recurring Special Assmt:** | | **Amt:** |

**Appliances** Dishwasher, Disposal, Dryer, Icemaker, Microwave, Range -Electric, Refrigerator w/Ice Maker, Smoke Detector, Washer
**Boat Facilities** None
**Construction / Foundation** Pilings
**Docs on File** Boundary Survey, Environmental Study, Site Plan
**Dining Area** Breakfast Bar, Separate Dining Room
**Energy Saving Features** Ceiling Fan(s), Double Pane Windows, Energy Effic Appliances, Energy Star Air Cond, Energy Star Heating, Energy Star Windows, SEER 14, Tankless Water Heater, Thermal Doors
**Exterior Finish** Concrete Board
**# of Fireplaces** 0
**Fireplace** No Fireplace
**Floors** Tile, Wood

**Garage/Parking** Condo: Covered Parking
**Heat/Cooling** Central Electric, Central Electric (Cool), Heat Pump
**Master Bed/Bath** Garden Tub, Separate Shower, 1st Floor Master, Direct Gulf View - Master
**Mineral Rights** No Rights
**Other Rooms** Living Room, Utility Room-Inside
**Property Amenities** Bunk Room, Cable, Ceiling Fan(s), Covered Patio, Private Elevator, High Ceilings, Internet, Outdoor Shower, Split Bedroom Plan, Storage-In, Termite Contract, Wheelchair Accessible, Window Treatments, Pool-Above Ground (Home)
**Possession** Negotiable, Short Term Rental
**Roof** Metal
**Showing** Appointment Only, ShowingTime, Short Term Rental
**Type of Listing** Exclusive Right to Sell
**Terms of Sale** Cash, Conventional
**Utilities** Cable TV, Gas-Propane, Grinder Pump, Sewage-City, Water Heater-Gas, Water Heater-Tankless, Water-City, Baldwin EMC, Gulf Shores Utilities
**View** Direct Gulf Front, Direct Gulf-Across Rd, Southern View

**Public Remarks** "Shipwrecked" is complete! This Amazing new 8 bedroom Beach House was complete and open for rentals this month, March 2018. It already has $185K scheduled rentals with deposits on the books for this year. This stunning home can sleep up to 28 guests. It boast two Master suites down stairs with an additional 6 bedrooms upstairs. The home has an elevator, two laundry rooms, two living rooms, a gourmet kitchen with two refrigerators, ice maker, two ovens and two dishwashers. The breakfast bar is well equipped with seating, but wait until you see this dining room with seating capacity for of your guest! Every bedroom has flat screen TV's, as well as both living rooms. The great room on the main floor has a 70" flat screen. As you walk out on to the deck, you'll surely be amazed! Plenty of space to sit by the pool or in the shade and watch the beautiful Gulf waves roll on to the shore. Enjoy the boardwalk from the door to the white sandy beach! Sunsets are breathtaking from the balcony or on the beach! This is a low density area. Enjoy the peace of having the beach to yourself or with very few others! Weddings, Reunions, or Family Vacations, this is the perfect location and home. Or make it your primary residence and enjoy paradise year round, every day! Shipwrecked, a Beach Home with glorious views, in a perfect environment, that will keep your guests returning year after year..

**Directions** From Gulf Shores, at the intersection of Gulf Shores Pkwy., and State Highway 180, turn West on to State Highway 180. Drive approximately 16 miles, (mile marker 6), to "Shipwrecked", 4878 State Highway 180, Gulf side. Look for the Meyer Vacation Rental sign by the road.

**Agent Remarks** Docs on file: elevation certificate, survey, ITP, build plans, insurance deck page, built Gold certified, and Meyer Vacations Rental projection. The home is being sold fully furnished. Rentals to be transferred at closing or negotiated with a satisfactory time limit for MVR to move guest if the buyer does not want to honor rentals. Buyer or buyers agent to measure square footage for any discrepancies. Schedule showings through showing time. Allow listing agent time to check with MVR for guest approval. Showings preferred on turn around dates, but I will do everything I can to get you and your qualified client in at your requested time.
**Office Remarks**

This information is deemed reliable, but not guaranteed.                    03/12/2021                    Page 1 of 2

**MLS #  267187**　　　　**4878 State Highway 180  GulfShores AL 36542**

| | | | |
|---|---|---|---|
| **LO:**  1263 | Bellator Real Estate & Dev Orange Beach<br>Main: 251-981-3078 | **LA:**  21953 | Becky Springer - PHONE: 251-533-3873<br>BSpringer@gobellator.com |
| **LO2:** | | **LA2:** | |
| **LO3:** | | **LA3:** | |

**Listing Effective Date:**  3/20/2018　　　**Listing Expire Date:**　　　　　　**Days On Market:**  62

**Buyer/Broker Comm:**  3.00　　　**Terms of Sale:** Cash, Conventional
**Agent Disclosure:** Not Applicable　　　　　　　　　**Refer to MLS #**
**Display on the Internet:** Yes　　　**VOWAddressDisplay:** Yes　　　**Allow Comments:** No

**Selling Price: $1,800,000**　　　**Close Date:  6/7/2018**　　　**Financing**　　CASH
**SO:** 28　　　RE/MAX of Gulf Shores　　　　　　**Seller Contributions:**
**SA:** 28_168　　The Kevin Corcoran Team　　　　**FSBO:**　　　**Non Member:**















ADDENDA

APPRAISER QUALIFICATIONS

## PROFESSIONAL QUALIFICATIONS



**FRANK L. REED, JR., MAI**
**Principal**
**Heron Valuation Group, LLC**

OVERVIEW

Since 1997, Mr. Reed has been providing valuation and consulting services to a variety of clients including lending institutions, investors, property managers, as well as government institutions. Mr. Reed gained valuable experience through working for some of the world's largest financial and advisory firms, including PricewaterhouseCoopers and Cushman & Wakefield. In 2012, Mr. Reed formed Heron Valuation Group, providing professional services to his clients that are comparable and competitive with any large firm while having the flexibility and responsiveness of a small company.

Upon graduating from the University of Alabama with a real estate degree, Mr. Reed specialized in the appraisal of healthcare oriented properties with PricewaterhouseCoopers, LLP. Mr. Reed was recruited by Realty Services International (RSI), another national appraisal firm, and gained significant experience in appraising a multitude of commercial property types. At the time that RSI was acquired by CBRE, Mr. Reed was recruited by Cushman & Wakefield in 2003. Mr. Reed returned to his native Alabama and assisted Cushman & Wakefield in the establishment of the Alabama offices. In 2009, Mr. Reed was the founding partner of Salus Valuation Group, Inc. and later formed Heron Valuation Group, LLC in 2012.

EXPERIENCE

Salus Valuation Group 2009 – 2012
Foley, Alabama
Founding Partner/ COO/ Executive Vice President

Cushman & Wakefield of Florida Valuation Advisory Services 2003 – 2009
Tampa, FL/ Birmingham, AL/ Gulf Shores, AL
Director

Realty Services International (RSI) 2001 – 2002
Tampa, Florida (Commercial Real Estate Valuation & Consulting)
Senior Appraiser

PricewaterhouseCoopers, LLP (Gulf/Atlantic Valuation Services, Inc.) 1998 – 2002
Sarasota, Florida (Healthcare & Retirement Real Estate Valuation & Market Studies)
Senior Appraiser

SCOPE OF APPRAISAL EXPERIENCE

Appraisal experience consists of a wide variety of valuation and consulting assignments, including major income-producing commercial properties, industrial and special-use properties, residential subdivision development valuations, vacant tracts of land, litigation valuation assignments, and condemnation or eminent domain appraisal engagements.

# PROFESSIONAL QUALIFICATIONS



**FRANK L. REED, JR., MAI**
**Principal**
**Heron Valuation Group, LLC**

Specialized experience consists of valuation and consulting assignments focused in the healthcare industry. Performed over 1,000 healthcare appraisals nationally, including independent living, assisted living, and skilled nursing facilities. Experienced in providing HUD (LEAN) approved appraisals and market studies as well as other non-traditional appraisal formats (Fannie Mae (DUS) & Freddy Mac).

EDUCATION
The University of Alabama, Tuscaloosa, AL
DEGREE: Bachelor of Arts
MAJOR: Real Estate Finance; Minors – Economics, Spanish (1997)

APPRAISAL EDUCATION
Course 120, Appraisal Procedures
Course 310, Basic Capitalization
Course 410, Uniform Standards of Professional Appraisal Practice (USPAP)
Course 510, Advanced Income Capitalization
Course 520, Highest and Best Use and Market Analysis
Course 530, Advanced Sales Comparison & Cost Approaches
Course 540, Report Writing & Valuation Analysis
Course 550, Advance Applications
"The Appraiser as an Expert Witness" Preparation & Testimony (2016)
Case Studies in Complex Valuation (2016)
Condemnation Appraising:  Principals & Applications (2017)
Subject Matter Expert Round Table (2017)
Compliance, Completeness, and Competency (2018)

Mr. Reed, MAI has completed continuing education courses and seminars sponsored by the Appraisal Institute and other real estate factions on an annual basis to maintain state licensing requirements.

MEMBERSHIPS, LICENSES & PROFESSIONAL AFFILIATIONS

Member of the Appraisal Institute (MAI)

State of Alabama Certified General Real Estate Appraiser, License No. G00633
State of Florida Certified-General Real Estate Appraiser, License No. RZ3624
State of Mississippi Certified General Real Estate Appraiser, License No. GA 993
State of Texas Certified General Real Estate Appraiser, License No. 1380006
State of Tennessee Certified General Real Estate Appraiser, License No. 4309
State of Louisiana Certified General Real Estate Appraiser, License No. 2175
State of Georgia Certified General Real Estate Appraiser, License No. CG328984
State of South Carolina Certified General Real Estate Appraiser, License No. 6809

# PROFESSIONAL QUALIFICATIONS



State of North Carolina Certified General Real Estate Appraiser, License No. A7454
State of Virginia Certified General Real Estate Appraiser, License No. 4001015506

## Other LICENSES & PROFESSIONAL DESIGNATIONS

Licensed USCG Master Captain (MMC 453336)
Licensed Real Estate Salesperson- Alabama (58079-1)

## PERSONAL AFFILIATIONS

Mobile Baykeeper- Board of Directors
St. Paul's Episcopal Church, Foley, Alabama- Vestry Member
Habitat for Humanity Baldwin County Board Member
Leadership Baldwin

# State of Alabama



*This is to certify that*

## Franklin Lamar Reed, Jr.

*having given satisfactory evidence of the necessary qualifications required by the laws of the State of Alabama is licensed to transact business in Alabama as a*

**Certified General Real Property Appraiser**

*With all rights, privileges and obligations appurtenant thereto.*

**LICENSE NUMBER:** G00633

**EXPIRATION DATE:** 09/30/2021

*Lisa Brooks* Executive Director

ALABAMA REAL ESTATE APPRAISERS BOARD

00000 / 120

# State of Alabama



*This is to certify that*

## Cynthia TeeAnne Stacy

*having given satifactory evidence of the necessary qualifications required by the laws of the State of Alabama is licensed to transact business in Alabama as a*

**Trainee Real Property Appraiser**

*With all rights, privileges and obligations appurtenant thereto.*

LICENSE NUMBER: **T02229**
EXPIRATION DATE: **09/30/2021**

*Lisa Brooks* Executive Director
ALABAMA REAL ESTATE APPRAISERS BOARD

Cost Breakdown - Breezy Shores
3450 Ponce de Leon Ct
Gulf Shores, Al. 36542



Trial Exhibit 53
Admitted in Evidence
1-25-2022

| Invoice # | Expense Items | Category | Date | Amount |
|---|---|---|---|---|
| | | | | |
| | SJC - Builders Fee - Startup | Builders Fee | 5/2/2019 | $11,366.00 |
| 25536 | Breeze Reprographics - Plans Copies | Misc / Plans | 3/1/2019 | $49.91 |
| | Utilities Board of Gulf Shores - Water / Sewer Tap Fee | Utilities | 3/21/2019 | $2,750.00 |
| | Baldwin County Building Dept - Plan Review | Permits | 3/24/2019 | $25.00 |
| 637613 | Gulf Coast Building Supply - Pilings | Pilings | 5/31/2019 | $14,231.00 |
| 657880 | GCBS - Windows | Windows | 6/20/2019 | $28,145.41 |
| | | | | |
| | | | | |
| | | | | |
| | Draw #1  Total | | | $56,567.32 |
| | Draw Received | | | $40,000.00 |
| | Balance | | | -$16,567.32 |

BORDELON_00000067

**Steve Jones Contractor**
**23234 Carnoustie Dr..**
**Foley, Al. 36535**
**(251) 209-0383**



### Cost Plan vs Actual

| Sub Contractor | Description | Planned Expenses | Total Pinnned Expenses | Actual Expenses | Difference + / - |
|---|---|---|---|---|---|
| Fortified Inspection | Overhead / Profit | $775.00 | $775.00 | $11,366.00 | $10,591.00 |
| Builders Fee | 12% overhead and profit | $113,668.56 | $113,668.56 | $0.00 | $0.00 |
| Excavation | Additional Sand / Final Grading | $20,000.00 | $20,000.00 | $0.00 | $0.00 |
| Builders Risk Ins | Owner to Provide | $0.00 | $0.00 | $0.00 | $0.00 |
| Permits / Fees / Engineer | | | $10,400.00 | $2,775.00 | -$7,625.00 |
| Building Plan Review | Plan Review | $1,500.00 | | $25.00 | |
| Building Permit | Building roofing stormwater | $5,700.00 | | $2,750.00 | |
| Sewer Tap Fee | Gulf Shores Utilities | $3,200.00 | | $0.00 | |
| Miscellaneous - / Utilities | | | $11,200.00 | $49.91 | -$11,150.09 |
| Utilities | Temporary / Water Meter for Pilings | $3,500.00 | | $0.00 | |
| Misc. Purchases | Cleanup, Silt Fence, etc. | $2,500.00 | | $0.00 | |
| Rental Equipment | | $5,200.00 | | $49.91 | |
| Termite Treatment | | | $1,800.00 | $0.00 | $0.00 |
| Beebee's | Termite if foam add 1800.00 | $1,800.00 | | | |
| Portable | | | $720.00 | $0.00 | $0.00 |
| Baldwin Portable | Sanitation | $720.00 | | | |
| Dumpster | | | $1,400.00 | $0.00 | $0.00 |
| Alabama Container | Dumpster | $1,400.00 | | | |
| Survey | | | $1,014.00 | $0.00 | $0.00 |
| Surveyor | Survey / BFE | $1,014.00 | | | |
| Pilings | | | $28,300.00 | $14,231.00 | $14,069.00 |
| Pilings | 35' Round | $15,000.00 | | $14,231.00 | |
| Pilings Labor | $10 per ft | $13,300.00 | | | |
| Foundation | | | $19,424.00 | $0.00 | $0.00 |
| Labor | | $8,424.00 | | $0.00 | |
| Concrete / Foundation Materials | | $11,000.00 | | $0.00 | |
| Framing Materials / Trim | | | $148,363.00 | $0.00 | $0.00 |
| Floor System | Ground Floor and Girders | $35,248.00 | | $0.00 | |
| 1st Floor | Framing / Elevator Shaft / stair well | $13,365.00 | | $0.00 | |
| 2nd Floor | Framing / Floor System | $29,500.00 | | $0.00 | |
| 3rd Floor | Framing / Floor System | $27,500.00 | | $0.00 | |
| Trusses and Roof Decking | 5/8 Decking | $17,750.00 | | | |
| Nails / Strapping | Allowance for Nails and Straps | $25,000.00 | | | |
| Plumbing | | | $47,500.00 | $0.00 | $0.00 |
| Plumbing and Labor | Contract Amount | $36,600.00 | | $0.00 | |
| Grinder Pump | Sewer | $2,500.00 | | $0.00 | |
| Fixtures | Fixtures / Tubs / Showers | $8,400.00 | | $0.00 | |
| Electrical | | | $45,135.00 | $0.00 | $0.00 |
| Labor | No Fixtures Included | $45,135.00 | | $0.00 | |
| Framing | | | $87,021.00 | $0.00 | $0.00 |
| Labor | Contract @ 9.00 Sq Ft | $87,021.00 | | $0.00 | |
| Sheetrock | | | $28,038.00 | $0.00 | $0.00 |
| Materials | Sheetrock Materials | $10,538.00 | | $0.00 | |
| Labor | | $17,500.00 | | $0.00 | |

BORDELON_00000068

| | | | | | |
|---|---|---|---|---|---|
| Siding & Labor | Siding Soffits and Fascia | | $45,000.00 | $0.00 | $0.00 |
| Material | Siding and underpinning | $21,500.00 | | | |
| Labor | $300 per sq | $23,500.00 | | | |
| Deck / Stairs / Handrails | | | $28,080.00 | $0.00 | $0.00 |
| Material | Porches / Decking | $11,580.00 | | $0.00 | |
| Labor | | $16,500.00 | | $0.00 | |
| Roofing | | | $14,700.00 | $0.00 | $0.00 |
| Roofing Materials / Labor | 26 Gauge Galvalume& Wind and wate | $14,700.00 | | $0.00 | |
| Windows / Doors / Gutters | | | $51,960.00 | $28,145.41 | -$23,814.59 |
| Impact | Windows -impact | $28,900.00 | | $28,145.41 | |
| Therma Tru | Doors / Ext | $21,560.00 | | $0.00 | |
| Shutters | Aluminum Shutters | $1,500.00 | | | |
| Cabinets / Granite - Kitchen | | | $49,130.00 | $0.00 | $0.00 |
| Granite Kitchen and Vanities | Kitchen-Granite / Baths $45.00 sq ft | $14,130.00 | | $0.00 | |
| Hoods Cabinets | Cabinets | $35,000.00 | | $0.00 | |
| Tile and Flooring | | | $68,526.00 | $0.00 | $0.00 |
| Tile and Durock | Tile Material Allowance $4.00 sq ft | $30,576.00 | | $0.00 | |
| Labor | Labor @ $2.50 | $19,110.00 | | $0.00 | |
| Showers - Tile | Material and Labor | $18,840.00 | | $0.00 | |
| Insulation / Fireplace | | | $21,000.00 | $0.00 | $0.00 |
| Foam | Walls Batt / Floor /roof deck/Sound | $21,000.00 | | $0.00 | |
| Painters | | | $52,000.00 | $0.00 | $0.00 |
| Labor / Materials | Interior | $23,000.00 | | | |
| Labor / Materials | Exterior | $29,000.00 | | | |
| Trim / Interior Doors | | | $52,377.00 | $0.00 | $0.00 |
| Material | Trim / Interior Doors Labor | $21,589.00 | | | |
| Labor | Trim Install Labor | $15,288.00 | | | |
| Stairs | Labor and Material | $15,500.00 | | | |
| Lighting | | | $15,000.00 | $0.00 | $0.00 |
| Light Fixtures | AllowanceItem / Cans and Lights | $15,000.00 | | | |
| HVAC | | | $40,825.00 | $0.00 | $0.00 |
| Contract | 6 Units 14 Seer 2.0 Ton | $40,825.00 | | | |
| Appliances | | | $15,000.00 | $0.00 | $0.00 |
| | Allowance Item | $15,000.00 | | | |
| Concrete Pad and Driveway | | | $5,800.00 | $0.00 | $0.00 |
| Concrete | | $3,000.00 | | $0.00 | |
| Labor | | $2,800.00 | | $0.00 | |
| Bath Accessories / Shower / Mirrors | | | $12,500.00 | $0.00 | $0.00 |
| Lowes | Mirrors / Shower Doors/ Toilet Paper | $12,500.00 | | $0.00 | |
| Landscaping | | | $84,250.00 | $0.00 | $0.00 |
| Pool | Irrigation | $84,250.00 | | $0.00 | |
| **Total Expenditures** | | | $1,120,906.56 | $56,567.32 | -$17,929.68 |

7/8/2019                     Cost Plan vs Actual - Breezy Shores

BORDELON_00000069



Trial Exhibit 18   1-25-2022
Admitted
in
COPY Evidence

EXHIBIT

5

# Baldwin County Commission District 4, Board of Adjustment
## December 12, 2019
### Regular Meeting Minutes
### Foley Satellite Courthouse
### Large Meeting Room

The Board of Adjustment for Baldwin County Commission District 4 met in a regular session on December 12, 2019 at 3:30 p.m., in the Baldwin County Foley Satellite Courthouse Large Meeting Room. Chairman, Stuart Arnold called the meeting to order. Members present included: Samuel Mitchell, James Koeppen, Jack Danley, Robert Broseus, Ernie Church and Johanna Moloney. Staff members present were Vince Jackson, Planning Director and Linda Lee, Planner. Also present was Wayne Dyess, County Administrator, Eddie Harper, Building Official and Shawn Alves, County Attorney.

The first order of business was approval of the minutes from the October 10, 2019 meeting. Mr. Mitchell made a motion to approve the meeting minutes. The motion received a second from Mr. Church and carried unanimously.

Ms. Lee introduced county staff members present and the county attorney.

### AD-19003 Breezy Shores LLC Property

Mr. Jackson presented the applicant's request for an appeal to an administrative decision as it pertains to the maximum height in habitable stories for a proposed Two-Family (Duplex) dwelling. Mr. Jackson stated that when the original Land Use Certificate Application was submitted in March 2019, the proposed duplex was proposed to be built to three (3) stories. At that time, under zoning, we didn't have a limit on the number of habitable stories, only a limit in terms of height which was 35 feet. Prior to 2009 the height limit was 2 ½ habitable stories. That was changed in 2009 to only have a height limit in feet.

Mr. Jackson gave the following time line of events leading up to the current appeal:

- On March 27, 2019, the applicant submitted a Land Use Certificate application (LU-190197) for a proposed duplex. The Land Use Certificate was not approved at that time due to the absence of the required ADEM permit. The applicant for the property owner was also informed that required parking spaces should be shown on the submitted site plan.

- Upon receipt of the ADEM permit, the Land Use Certificate was issued on July 17, 2019, and a Building Permit was issued on July 23, 2019. The Land Use Certificate was issued in error due to issues with the required off-street parking.

- After being made aware that construction had commenced, staff revoked the Land Use Certificate and issued a Stop Work Order on July 31, 2019. The owner did not appeal the issuance of the Stop Work Order or the denial of the Land Use Certificate.

- The property owner applied for a revised Incidental Take Permit from the U.S. Fish and Wildlife Service in order to obtain approval for the additional disturbance necessary to meet the off-street parking requirements.

- In the meantime, staff was working on text amendments to the Zoning Ordinance a number of those text amendments were specific to Planning District 25. One was a height limitation for two (2) habitable stories relevant to single family and two-family dwellings in Planning District 25. That was

Baldwin County Commission District 4 Board of Adjustment
Regular Meeting
December 12, 2019

considered by the Planning Commission in September and was unanimously recommended for approval.

- It was approved by the County Commission on October 15, 2019.

- A revised Incidental Take Permit was issued by the U.S. Fish and Wildlife Service on October 25, 2019, with an effective date of October 28, 2019. At that time, it was brought to staff's attention that the proposed dwelling was proposed to be three (3) habitable stories in height. When the Planning Director was made aware of the proposed dwelling height he immediately contacted the County Administrator who in turn consulted with the County Attorney and they determined that the applicant would have to meet the new height limitations which had recently been adopted by the County Commission.

- Because the Land Use Certificate had been rescinded, there was no pending Land Use Certificate. Also, it had been six (6) months since the original submission and Land Use Certificates are only good for six months so we needed a new Land Use Certificate but we informed the attorney for the property owner that we could not approve a dwelling that would be three (3) habitable stories, it would have to meet the requirement of two (2) habitable stories and that is what has brought us to where we are today. Our determination that the dwelling has to be limited to two habitable stories instead of three habitable stories has been appealed to the board.

Mr. Arnold asked what is the basis of the complaint against the ruling. Mr. Jackson stated the attorney for the appellant would be able to address that during the public hearing. Mr. Jackson stated that it is his understanding that because of when they originally submitted for Land Use Certificate approval back in March, they feel they should be entitled to construct three (3) habitable stories but it's our position that there was no pending Land Use approval and because of that and the amendment was approved on October 15th before the revised incidental take permit, it's our position that they would need to meet the two (2) habitable stories limit. We've never told them they can't build on the property.

Mr. Alves reviewed section 18.2.5 of the Baldwin County Zoning Ordinance pertaining to revocation of land use certificate.

> 18.2.5 *Revocation of land use certificate.* The Zoning Administrator may revoke a land use certificate issued in a case where there has been a false statement or misrepresentation in the application or on the site plan for which the Certificate was issued or if after a documented warning has been issued the applicant has failed to comply with the requirements of these zoning ordinances. Revocation of the land use certificate shall also cause suspension of the building permit until such time as in the judgment of the Zoning Administrator, the applicant is in compliance with the requirements of these zoning ordinances.

When the Planning Department revoked the Land Use Certificate, they were unable to build. During the interim, the County changed the regulations in connection to height of duplexes. When they came back to request a new Land Use permit, and Planning & Zoning checked to see if they meet the requirements of the

Defendants' Bates #0056

Baldwin County Commission District 4 Board of Adjustment
Regular Meeting
December 12, 2019

Zoning Ordinance, the plans do not meet the requirements of the Zoning Ordinance.  Their plans do not meet
the requirements of the Zoning Ordinance, they exceed the Zoning Ordinance for District 25.

Mr. Koeppen asked if the construction was started.  Mr. Jackson answered that there were two or three pilings
put in the ground.  Mr. Mitchell asked if the pilings should have been put in.  Mr. Jackson responded that they
briefly had a permit and that was their commencement of construction.

Chairman Arnold opened the public hearing.  Mr. Kris Anderson, attorney for the property owner, addressed
the board.  He stated that what they are asking the board for today is straight forward.  They ask that the
board lift the stop work order and afford their client the due process rights and the vested rights he has in the
permits he was originally issued as mandated by Alabama law.  The facts and timeline as submitted by Mr.
Jackson are not in dispute.

Mr. Anderson stated his client applied for and received a Land Use Certificate on July 17, 2019.  That date is
important because the six months window has not yet run.  That's December 17, 2019.  The Building Permit
was issued on July 23, 2019, both issued correctly by the Baldwin County Planning Department.  Immediately
after those permits issued, his client began construction of a three-story residential duplex consistent with the
zoning regulations and immediately began spending tens of thousands of dollars on that construction plans,
engineering, all of it.

Below is an approximate transcript of Mr. Anderson's comments:
*Now right of way, certain neighbors with short term rental businesses of their own, began opposing
construction in order to stifle competition.  On July 31, 2019, the Planning Department issued a stop work order
declaring that the Land Use Certificate had been issued in error relative to a parking issue.  Now it's important
to note that the zoning ordinance 18.2.5 provides the exclusive mechanism to revoke a Land Use Certificate.
That section was not followed here.  So, the Land Use Certificate was not revoked, rather a stop work order
was issued.  Those are two very different things, and very important for this analysis.  But in truth with respect
to parking, there was no error.  At the urging of certain competing rental owners, the Planning Department
adopted a newly invented interpretation of zoning ordinance 15.3.1 pertaining to parking.  That section
provides off-street parking spaces must be connected with a street or alley by a driveway which affords
unobstructed ingress/egress to each space.  For two years that section was interpreted to allow stacked
parking.  Stacked parking because there are no static or unmovable obstructions between each space and the
road.  It was only in an effort to target my client that that interpretation was changed this summer.  But as you
heard, our client didn't want to dispute and that's not really what we're here about today.  Our client has a
bigger lot than most in Fort Morgan, so he went back and said okay I'll fix this parking issue.  He didn't really
want a problem with the county.  He revised his site plan, went back and had to get an amended Incidental
Take Permit from US Fish and Wildlife.  As soon as he received that amended take permit, he forwarded it to
the Planning Department in order to have the stop work order lifted.  In response, the Planning Department
rejected his request based on a newly passed amendment to Zoning Ordinance 2.3.25.3(e).  The new pertinent
part of that section provides that "the maximum height of single family and two-family structures shall be
limited to two (2) habitable stories".  The rationale discussed by the County Commission for this amendment
was all about safety.  The county heard that the Fort Morgan Volunteer Fire Department didn't have a ladder*

Defendants' Bates #0057

Baldwin County Commission District 4 Board of Adjustment
Regular Meeting
December 12, 2019

*truck high enough to reach three stories above pilings. The problem is, the county did not adopt a height ordinance, this amendment does not address height, it's a story ordinance. Anyone could still build a one or two-story house that's too high for that ladder truck to reach. Still go to thirty-five feet, it can have vaulted ceilings, have higher pilings, etc. This is a story ordinance, it did not resolve the problem that this rationale was all about. If we actually want to affect fire safety, we would pass a height ordinance, or a sprinkler ordinance or a fire escape ordinance. That didn't happen, it was a story ordinance. What we think this was done was to affect our client. It was done at the behest of competing renters to stop my client from building another rental property. This board is part of the packet you received, there was a coordinated email campaign from many of these same rental owners. I'm here to tell you that at least ninety of those emails that you received were from VRBO and Airbnb renters. They weren't voicing good faith concerns about the neighborhood. They're trying to stop additional rentals from coming on and competing with what they already got. I've mentioned fundamental problems with the newly invented interpretation of the parking ordinance and a story ordinance that does nothing to affect safety. If we have to, and we don't want to, we'll litigate those issues in circuit court at further expense to my client as well as the tax payers of the county. But our client pays a lot of money in lodging taxes and property taxes already. He doesn't want to do that. The board doesn't need to decide on any of those issues I have mentioned today, because our client's situation is unique relative to the timing of these permits. Alabama law on this is clear, once our client received permits in July 2019 and began construction our client had vested rights. According to Alabama law he had vested rights in those permits to finish what he started. The Alabama Supreme Court has said the county "may not simply divest a property owner of a vested right without compensation and any attempt to do so violates the most fundamental principles of due process". Our client has not been compensated for the Planning Departments revocation of his vested rights. So, under Alabama law this revocation violates our most fundamental principles of due process. In sum, all we're asking for today, is that the board afford my client the due process he is entitled to as a matter of law. Mr. Bordelon has vested property rights in the original permits that the Corp issued him in July 2019 to build a three-story residential property. We only ask that you uphold those rights by lifting this stop work order and allowing our client to finish what he started. We don't need to resolve the issues of problems with the ordinance or the interpretation of parking we just need to get to where we can finish what we started.*

Mr. Church asked Mr. Anderson if he agrees that the County has a right to pass ordinances to which Mr. Anderson responded of course. He followed with do you think people ought to comply with those ordinances. Mr. Anderson responded yes and his client has complied strictly with that ordinance. He doesn't think that there is anything that shows that his client has violated anything. His client isn't asking for a special exception, he's asking for due process be afforded based on the rights he had at the time he started spending a lot of money to build a home on this piece of property. Mr. Church stated we were told that the Land Use Certificate was issued in error and was revoked. Mr. Anderson stated he believes it was the County's position that it was issued in error because of that parking interpretation. *That parking interpretation was a brand new one targeted at my client so that's a characterization that it was in error but if you look at section 18.2.5 and the reasons why a revocation can occur, their error or their new interpretation is not one of them. It's if the applicant defrauds the Planning Department that's a reason to revoke it. Everything my client told the planning department was true, he told them exactly what the parking layout was going to be which was*

Defendants' Bates #0058

Baldwin County Commission District 4 Board of Adjustment
Regular Meeting
December 12, 2019

*stacked parking. It was only after they issued it they said wait a minute let's change our interpretation to prevent stacked parking and we're going to apply it to this so that's what they are characterizing as an error but truly in my view not an error.*

Mr. Royce Massey spoke in opposition to the appeal. He discussed issues involving traffic and safety. He stated that during construction of the structure on the adjacent property, the construction crew parked their vehicles half way in the road causing county trucks to have to get off the road in order to bypass them and damaged other people's property in the process. He also stated that the last time the current structure was full, people parked in his driveway because they didn't have enough on-site parking.

Ms. Sue Gross spoke in opposition to the appeal. She expressed concerns about parking and safety issues.

Chairman Arnold closed the public hearing.

Mr. Alves stated that nothing in the Zoning Administrators decision is going to stop rentals or stop the building of a residential structure. This doesn't prevent rentals on this property. Mr. Alves also pointed out that although they are two different LLCs the address is the same so he assumes the same person owns those two LLCs. This decision by the Zoning Administrator based on the County's enactment of this new zoning regulation doesn't prevent them from building a two-story duplex and renting it. Vested rights, if the Land Use permit was issued together with the building permit, and it should not have been due to a mistake or it was illegal, there are zero vested rights. If they issue the building permit and the zoning regs change and the county pulls then there is a determination on whether or not there are vested rights. You have to look and see what the applicant has done. If his client had framed out a three-story building he'd have a pretty good argument that his client had some vested rights. I don't believe two pilings in the ground is going to amount to enough for him to have a vested right in that previously issued building permit. Following some discussion of the parking situation witnessed by Mr. Alves he went on to address the issue involving the revocation of the Land Use Certificate because of the parking interpretation. They did not build that and they couldn't have built that. You're only here today to determine if the Zoning Official acted appropriately in denying their new Land Use Permit and building permit to build a three-story duplex in violation of the now existing zoning regulations that only allow two habitable stories.

Mr. Arnold asked about the number of bedrooms and baths in the adjacent duplex. Staff provided the approximate number of bedrooms in each unit. Mr. Anderson stated there are eight bedrooms in each unit of the proposed duplex.

Mr. Alves advised that the board could basically uphold the Zoning Officials determination or reverse it.

Mr. Jackson commented on the existing adjacent structure shown in the presentation with a number of cars parked in the driveway. In 2017 we adopted some additional parking requirements for planning district 25. In the pass, the requirement for single-family and two-family residential dwellings was only two parking spaces per dwelling unit. At the time this was built, that's all they were required to have – four off-street parking spaces. In 2017 we adopted some additional parking requirements for planning district 25 based on the number of bedrooms. The provision that has been referenced in terms of the stacked parking has been part

Defendants' Bates #0059

Baldwin County Commission District 4 Board of Adjustment
Regular Meeting
December 12, 2019

of our zoning ordinance since 1999.  It talks about unobstructed ingress and egress.  When we adopted those new parking requirements people started submitting parking plans that did have their parking spaces stacked.  And there was a point where we realized that you can't say that all of these parking spaces have unobstructed access.  You could only say that those closest to the actual road had unobstructed access.  So, it was nothing to target this applicant.  It was something that had been on the books since at least 1999.  You aren't here to decide on the parking issue.  That could have been appealed back in August and it wasn't.  We're only here to talk about the three habitable stories versus two habitable stories.

Mr. Arnold asked why was the two habitable stories changed to thirty-five feet.  Mr. Jackson explained that we've had the thirty-five feet for a long time.  *Prior to 2009, it was thirty-five feet and two and a half habitable stories.  It's difficult to remember exactly why we made that change, but there were some issues with the half story definition, we were having some problems enforcing that or implementing that and we felt like maybe this would work better if we just left it at a height in feet.  Fast forward ten years later and you're seeing some of these structures that are built to three stories and we started to think maybe that wasn't such a good idea after all.  Our original intent was to bring back two and a half stories but there's a zoning advisory committee for planning district 25.  We've been working on text amendments to their local provisions for about two years, we've attended meetings with citizens so we've been discussing the issues they've been facing.  When we brought up two and a half stories then we hear from the volunteer fire department 'we really need to be limited to two stories' (in the information you were handed this afternoon there's a copy of the letter from the volunteer fire department where they ask that we consider that).  So, in light of the safety concerns presented to us by the volunteer fire department we felt like that was something that we had to consider and so that was what we proposed.  As I stated, this was part of a package of amendments.  It was unanimously recommended for approval by the Planning Commission in September and unanimously approved by the County Commission on October 15th.  As I stated we had several meetings with the advisory committee.  There was one meeting back in the summer where we actually put together some packets of what we were considering and some supporting documentation.  So, this was something that was being discussed quite a bit in the Fort Morgan community.   It was because of input we received from citizens and the volunteer fire department about the issues they face in planning district 25 and ways that we through zoning could help them address those issues.*

There followed a discussion concerning the number of habitable stories for multi-family structures in planning district 25 and how the fire department handles those safety issues.

Mr. Danley asked when was the permit withdrawn?  Mr. Jackson responded, July 31st.  Mr. Danley stated so in essence they would have to reapply for a permit.  Mr. Jackson responded that there were two parts.  There was the stop work order and the revocation of the Land Use Certificate.  With the revocation of the Land Use Certificate, they did not have a pending Land Use Certificate or building permit.

County Administrator Wayne Dyess spoke on the changes made to the height requirement in 2009.  Obviously that change had some unintended consequences with the parking and safety issues.  We look back now and see that was a mistake.  Also, multi-family structures are required by the building code to have sprinklers and

Defendants' Bates #0060

Baldwin County Commission District 4 Board of Adjustment
Regular Meeting
December 12, 2019

other protective measures.   Mr. Dyess expressed that safety issues were the primary concern on the Commissioners' minds when these changes were implemented.

Mr. Church made a motion to uphold the Administrative Decision of the Zoning Administrator and the stop work order be upheld and the appeal denied.  The motion received a second from Mr. Mitchell and carried unanimously.

### Old Business – County Attorney to Discuss Cohen Appeal

Mr. Alves, County Attorney requested the board meet in executive session to discuss pending litigation.  Mr. Mitchell made a motion to go into executive session.  The motion received a second from Mr. Danley and carried unanimously.

The Board adjourned into Executive Session at 4:28pm.  The regular session resumed at 4:49pm.

### New Business – Approval of 2020 Meeting and Deadline Calendar

Mr. Mitchell made a motion to approve the 2020 calendar.  The motion received a second from Mr. Danley and carried unanimously.

### Adjournment

There being no further business to come before the board the meeting was adjourned at 4:51 p.m.


Respectfully Submitted


Linda Lee, Planner


I hereby certify that the above minutes are true, correct and approved this _____ day of _____, 2020.


Stuart Arnold, Chairman


Page **7** of **7**

Defendants' Bates #0061

*CA-20-0057-c*





**Trial Exhibit 49**

*Admitted in Evidence*
*1-24-2022*

# Baldwin County Planning & Zoning Department

## Board of Adjustment Staff Report

Case No. AD-19003

Breezy Shores, LLC, Property

Appeal of Administrative Decision as it Pertains to the Maximum Height in Habitable Stories for a Proposed
Two-Family (Duplex) Dwelling

December 12, 2019

## Subject Property Information

| | |
|---|---|
| **Planning District:** | 25 |
| **General Location:** | South side of Ponce de Leon Court, east of Vacation Lane and west of Pontoon Lane (Lot 58, Fort Morgan Peninsula) |
| **Physical Address:** | 3450 A-B Ponce de Leon Court |
| **Parcel Number:** | 05-69-08-01-0-003-052.003 |
| **Existing Zoning:** | RTF-4, Two Family District |
| **Existing Land Use:** | Residential (Undeveloped, Duplex Proposed) |
| **Square Footage:** | Approximately .609 acres |
| **Appellant:** | Kristopher O. Anderson, Esquire |
| | 4725 Main Street, Suite F-222 |
| | Orange Beach, Alabama 36561 |
| **Owner:** | Breezy Shores, LLC |
| | 5855 Plantation Drive |
| | St. Francisville, Louisiana 70775 |
| **Lead Staff:** | Vince Jackson, Planning Director |
| **Attachments:** | *Within Report* |

| | Adjacent Land Use | Adjacent Zoning |
|---|---|---|
| **North** | Residential | RSF-1, Single Family |
| **South** | Gulf of Mexico | N/A |
| **East** | Residential (Duplex) | RTF-4, Two Family |
| **West** | Undeveloped | RTF-4, Two Family |

## Staff Analysis and Findings

This Appeal of an Administrative Decision is related to the maximum height in habitable stories, for a proposed two-family dwelling.

Staff offers the following time line of events leading up to the current appeal:

- On March 27, 2019, the property owner (appellant) submitted a Land Use Certificate application (LU-190197) for a proposed duplex to be constructed at 3450 A-B Ponce de Leon Court. The property in question is zoned RTF-4, Two Family District. The Land Use Certificate was not approved at that time due

Defendants' Bates #0022

to the absence of the required ADEM permit. The applicant for the property owner was also informed that required parking spaces should be shown on the submitted site plan.

- Upon receipt of the ADEM permit, the Land Use Certificate was issued on July 17, 2019, and a Building Permit was issued on July 23, 2019. The Land Use Certificate was issued in error due to issues with the required off-street parking.

- After being made aware that construction had commenced, staff issued a Stop Work Order on July 31, 2019. In addition, the Zoning Administrator sent a letter to the applicant for the property owner which revoked the previous Land Use approval and denied the Land Use Certificate. As a result, there was no pending Land Use approval for the subject property. The owner did not appeal the issuance of the Stop Work Order or the denial of the Land Use Certificate.

- The property owner applied for a revised Incidental Take Permit from the U.S. Fish and Wildlife Service in order to obtain approval for the additional disturbance necessary to meet the off-street parking requirements. The Incidental Take Permit is required due to the fact that the subject property is located within the Alabama Beach Mouse habitat.

- On October 15, 2019, the Baldwin County Commission unanimously adopted a series of zoning text amendments which were applicable to Planning District 25 (Case TA-19001, Resolution #2020-001). One of the approved provisions limited the maximum height of single family and two-family dwellings to two (2) habitable stories (Section 2.3.25.3 (e) of the *Baldwin County Zoning Ordinance*).

- A revised Incidental Take Permit was issued by the U.S. Fish and Wildlife Service on October 25, 2019, with an effective date of October 28, 2019.

- The applicant for the property owner forwarded the revised Incidental take Permit to the Planning and Zoning Department and requested removal of the Stop Work Order. At that time, the Zoning Administrator was informed that the duplex was proposed to have three (3) habitable stories. The Zoning Administrator consulted with the County Administrator and the County Attorney, and it was determined that the owner would be required to meet the two (2) habitable story height limit as adopted by the County Commission. The attorney for the property owner was notified to this effect on November 5, 2019, resulting in the current appeal (Submitted November 19, 2019).

Pertinent sections of the zoning ordinance are listed as follows:

### 2.3.25  *Planning District 25.*

#### 2.3.25.1  Effective Date

On June 19, 1992, a majority of qualified electors in Planning District 25 voted to institute County Zoning. On November 16, 1993, the County Commission adopted the Planning District 25 Zoning Map and Ordinances.

#### 2.3.25.2    District Boundaries

A legal description of the boundaries for Planning District 25 may be found under Appendix A.

#### 2.3.25.3  Local Provisions for Planning District 25

Defendants' Bates #0023

(a) Multiple family buildings in the "RMF-6, Multiple Family" district may be erected to a maximum height or seven (7) habitable stories. The required side yards shall be increased by 4-feet for each additional story over two (2) habitable stories. The maximum impervious surface ratio shall not exceed .50.

(b) No PRD development is allowed to exceed maximum height requirements by more than 10-feet or 1 story.

(c) Off-street Parking.

As a supplement to Section 15.2, Parking Schedule, the following off-street parking requirements shall be applicable to single family dwellings and two-family dwellings:

1. Up to Four (4) Bedrooms: Two (2) spaces per dwelling unit.

2. Up to Six (6) Bedrooms: Three (3) spaces per dwelling unit.

3. Seven (7) Bedrooms and more: Four (4) spaces per dwelling unit, plus one (1) additional space per dwelling unit for every bedroom over eight (8).

(d) HDR, High Density Residential District, shall not be available in Planning District 25.

(e) The maximum height of single family and two family structures shall be limited to two (2) habitable stories.

**Additional Items for Consideration**

- The Baldwin County Planning and Zoning Commission voted unanimously to recommend approval of the zoning text amendments on September 5, 2019. The Baldwin County Commission unanimously approved the amendments on October 15, 2019.

- The Addendum to Appeal of Administrative Decision submitted by the appellant (see attached) takes issue with several actions of the Planning and Zoning Department which have occurred since July 31, 2019. The only issue for consideration by the Board is the maximum height in habitable stories.

## Current Zoning Requirements

## Section 4.6   RTF-4, Two Family District

4.6.1 *Generally*. The intent of this zoning designation is to provide the opportunity for two family residential development.

4.6.2 *Permitted uses*. Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses shall be permitted:

(a) The following general industrial uses: extraction or removal of natural resources on or under land.

(b) The following transportation, communication, and utility uses: water well (public or private).

(c) The following agricultural uses: Silviculture.

(d) Two family dwellings.

(e) Single family dwellings including manufactured housing and mobile homes.

(f) Accessory structures and uses.

(g) The following institutional use: church or similar religious facility.

4.6.3 *Conditional uses.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following uses and structures designed for such uses may be allowed as conditional uses:

(a) Outdoor recreation uses.

(b) The following institutional uses: day care home; fire station; school (public or private).

(c) The following general commercial uses: country club.

4.6.4 *Special exception.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts*, the following use and structures designed for such use may be allowed as a special exception:

The following local commercial use: bed and breakfast or tourist home (see *Section 13.11: Bed and Breakfast Establishments*).

4.6.5 *Area and dimensional ordinances.* Except as provided by *Section 2.3: Establishment of Zoning in Planning Districts, Section 12.4: Height Modifications, Section 12.5: Yard Requirements, Section 12.6: Coastal Areas, Section 12.8: Highway Construction Setbacks, Section 18.6 Variances,* and *Article 20: Nonconformities,* the area and dimensional ordinances set forth below shall be observed.

| | |
|---|---|
| Maximum Height of Structure in Feet | 35 |
| Maximum Height in Habitable Stories | 2 1/2 |
| Minimum Front Yard | 30-Feet |
| Minimum Rear Yard | 30-Feet |
| Minimum Side Yards | 10-Feet |
| Maximum Density | 4 Dwelling Units per Acre |
| Minimum Lot Area/Dwelling Unit | 7,500 Square Feet |
| Minimum Lot Width at Building Line | 60-Feet |
| Minimum Lot Width at Street Line | 30-Feet |
| Ground Coverage Ratio | .35 |

Defendants' Bates #0025

## Appeal Authorization

The Baldwin County Zoning Ordinance expressly provides for an appeals process when it is believed that the Zoning Administrator (Planning Director), or other administrative official, has erred in any "order, requirement, decision, or determination".

### Section 18.5 Appeals to the Board of Adjustment

18.5.1 The Board of Adjustment shall hear and decide appeals where it is alleged there is an error in any order, requirement, decision or determination made by the Zoning Administrator or other administrative official in the enforcement of these zoning ordinances.

18.5.2 Appeals to the Board of Adjustment may be taken by any person aggrieved or by any officer or department of Baldwin County affected by any decision of any administrative officer representing the County in an official capacity in the enforcement of these zoning ordinances. Such appeal shall be taken within 30 days of said decision by filing with the officer from whom the appeal is taken and with the Board of Adjustment a notice of appeal specifying the grounds thereof. The officer from whom the appeal is taken shall transmit forthwith to the Board of Adjustment all papers constituting the record upon which the action was taken.

18.5.3 An appeal stays all proceedings in furtherance of the action appealed from unless the officer from whom the appeal is taken certifies to the Board of Adjustment after the notice of appeal shall have been filed with him that by reason of facts stated in the certificate a stay would in his opinion cause imminent peril to life or property. Such proceedings shall not be stayed otherwise than by a restraining order which may be granted by the Board of Adjustment or by a Court of Record on application and notice to the officer from whom the appeal is taken and on due cause shown.

## Summary and Recommendation

As stated previously, this Appeal of an Administrative Decision is related to the maximum height in habitable stories, for a proposed two-family dwelling. The Zoning Administrator has determined that the property owner should be required to meet the maximum height limit of two (2) habitable stories. The question before the Board is whether the owner should be allowed to construct the dwelling to three (3) habitable stories as originally proposed, or be limited to two (2) habitable stories as currently required.

Staff recommends that the Administrative Decision of the Zoning Administrator be **UPHELD** and the appeal **DENIED**, based on the comments contained herein. *

*A majority vote of the members of the Board will be necessary to reverse the administrative decision.*

## Property Images



Defendants' Bates #0027



Defendants' Bates #0028

Locator Map

SUBJECT PROPERTY

VACATION LN

B3

RSF-1

PONTOON LN

PONCE DE LEON CT

RTF-4?

0   70   140      280        420
                              Feet

Site Map

SUBJECT PROPERTY

N

0   60   120      240        360
                              Feet

Defendants' Bates #0029

## ADDENDUM TO APPEAL OF ADMINISTRATIVE DECISION

On March 19, 2019, Breezy Shores LLC ("Appellant") submitted a site plan for construction to occur at Parcel ID# 05-69-08-01-0-003-052.003 located off Ponce De Leon Court in Gulf Shores, Alabama (the "Site") to Baldwin County and received approval of the site plan on March 27, 2019. On July 17, 2019, Appellant's land use permit was approved in LU-190197. On July 23, 2019, based on the original site plan, Baldwin County issued Building Permit #126349.

On July 31, 2019, Baldwin County Planning Director Vince Jackson sent Appellant a letter ordering that it stop work immediately at the Site (the "Stop Work Order"). Mr. Jackson's letter demanded that Appellant revise its March 2019 site plan to comply with a new interpretation of Baldwin County Zoning Ordinance 15.3.1, which provides in pertinent part: "Off-street parking spaces may not be located in a street or alley and must be connected with a street or alley by a driveway which affords unobstructed ingress and egress to each space."

As a result of that Stop Work Order, Appellant revised its site plan to comply with the Planning Director's new interpretation of the parking ordinance. Appellant submitted that revised site plan to Baldwin County on August 2, 2019, and also on spent additional funds to apply for an amended incidental take permit from the United States Fish and Wildlife Service ("FWS") to reflect the new site plan.

Appellant received an amended incidental take permit ("ITP") from FWS on October 25, 2019. Appellant forwarded that ITP to Baldwin County, understanding based on prior correspondence that this would resolve all outstanding objections and allow the Stop Work Order to be lifted.

In response, Planning Director Jackson informed Appellant on November 5, 2019 that a new zoning ordinance had been enacted effective October 15, 2019 that applies in Planning District 25 where the Site is located. Mr. Jackson told Appellant that a "duplex (two-family dwelling) with three habitable stories cannot be approved. The new ordinance apparently referenced (without citation) by Jackson is Baldwin County Zoning Ordinance 2.3.25.3.

Appellant contends that the Board of Adjustment must reverse Jackson's decision for several independently sufficient reasons.

First, Appellant had vested rights in the permits issued prior to October 15, 2019, the effective date of the new height ordinance. It was instructed, erroneously, to rectify a parking issue after permits had already been issued. When that occurred,

Defendants' Bates #0030

the permits did not lapse, but rather were held in abeyance until those issues were rectified. After they were, the permits should have been reactivated notwithstanding the changes that occurred on October 15, 2019, given that Appellant's now-non-comforming use (three stories) had already been approved and permitted. *Budget Inn of Daphne, Inc. v. City of Daphne*, 789 So.2d 154, 159 (Ala. 2000) ("an existing nonconforming use is a vested property right that a zoning ordinance may not abrogate except under limited circumstances."); *Port of Mobile v. Louisville & N.R. Co.*, 4 So. 106, 110, 84 Ala. 115, 122 (Ala. 1888) (once a right has vested equity can be invoked to prevent a later-passed ordinance from depriving the owner of that right).

The County's new interpretation of Baldwin County Zoning Ordinance 15.3.1 is facially incorrect, arbitrary, and capriciously enforced to target specific landowners, including Appellant, at the behest of certain competing landowners in Fort Morgan. Zoning Ordinance 15.3.1 does not prohibit "stacked" parking as it is now interpreted. Given that it has previously and consistently been interpreted to allow "stacked" parking configurations, the County is estopped from implementing this new interpretation. Moreover, the County's issuance of the Stop Work Order on July 31, 2019 is in violation of the mandates of Baldwin County Zoning Ordinance 18.2.5, as the Zoning Administrator in this instance had no authority under that section (or any other) to revoke Appellant's land use certificate.

Second, the County's changes to 2.3.25.3(e) are facially unconstitutional and unconstitutional as applied. That section provides that "the maximum height of single family and two family structures shall be limited to two (2) habitable stories." This provision violates due process as it was passed without rational basis.

Specifically, the County's restriction on a certain number of "stories" as opposed to a restriction on physical height, is without rational basis. Baldwin County Zoning Ordinance Article 22 defines "Story" as "That portion of a building included between the surface of any floor and the surface of the next floor above it, or if there is no floor above it, then the space between such floor and the ceiling next above it." A "Story, habitable" is defined as "A story having its floor elevated at or above base flood elevation as determined from the flood insurance rate maps, regardless of the intended use of the story or its floor area."

The County relied on a Staff Report authored by Jackson, which recommended a "height" limitation of two stories, as well as evidence that a volunteer fire truck could not reach a certain physical "height". Yet, the County's

Defendants' Bates #0031

restrictions do not actually address height at all. A builder could erect a 35 foot structure, designed such that it only has two "stories," but with the second "habitable story" abutting the roofline so that it is at the top of the structure. This structure would be conforming under Ordinance 4.6.5 and 2.3.25.3 as amended, but would directly and inarguably violate the same rationale as that underpinning the amendment to 2.3.25.3(e). Since construction that violates the same rationale underlying this amendment remains viable, and a number of "stories" has no rational connection to the concerns underlying the amendment (as opposed to height), the amendment suffers from a fatal lack of rational basis both facially and as applied.

Third, Baldwin County Zoning Ordinance 2.3.25.3(e) as amended violates equal protection as set forth in the 14th amendment to the U.S. Constitution, as well as the mandates of Ala. Code § 11-52-71 in that it treats similarly situated landowners within Planning District 25 differently without rational basis. Specifically, all landowners within planned unit developments within Planning District 25 are exempt from the mandates of 2.3.25.3(e). This explicitly violates Ala. Code § 11-52-71 and treats similarly-situated landowners differently without a rational basis. What rationale does the County have for allowing three story duplexes within PUDs while prohibiting the same outside of PUDs? None. As a result, 2.3.25.3(e) runs afoul of Ala. Code § 11-52-71 and the U.S. Constitution's guarantee of equal protection.

## Fort Morgan Advisory Committee Recommendation

December 2, 2019

VIA EMAIL

TO:        Linda Lee. Planner
           BC Planning & Zoning Department
           llee@baldwincountyal.gov

FROM:      Carol N. Kittrell, Recording Secretary

RE:        Fort Morgan Planning & Zoning Advisory Meeting, December 2, 2019

           CASE No.   AD-19003

The FM Committee met at the Shell Banks Baptist Church Fellowship Hall at 10:00 a.m. with 4 members present.   Member Bonnie Lowry was absent due to travel.

Chair Ernie Church presented the request for discussion.  By a unanimous decision of the committee, the decision was to approve the "Stop Work" order issued by the county.

Defendants' Bates #0032

**Opposition Emails**

| | |
|---|---|
| From: | Greg Strategier |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Case No. AD-19003 - Breezy Shores LLC Property |
| Date: | Monday, December 02, 2019 6:37:17 PM |

Dear Ms. Lee

I writing to express my concerns around the appeal request for Case No. AD-19003.

The request by the appellant to increase the height of Breezy Shores from 2 stories to 3 stories is dangerous. The recent Text Amendments for District 25 as approved by the County Commissioners for Baldwin County were put in place for several reasons. Safety, related to the ability of Fort Morgan's Volunteer Fire Department to adequately protect life and respond to emergency situations on structures above 2-stories, the ability of emergency vehicles to traverse the streets of Fort Morgan when 3-story structures are fully occupied and the renters are parking along the street and not under their rental units, the stress that the density of a 3-story structure and their 44 person capacity places on the utilities in the area, mainly sewer and internet and to preserve the beauty of the area.

This appeal is only concerned with one fact. That is to make the most money possible. The profitability of a 3-story structure compared to a 2-story structure is significant. Below I have outlined the difference in gross income on two properties that are owned by the same out of state investor that is the owner of Breezy Shores LLC and the appellant in this case.

Easy Breezing - 3-stories – 18 bedrooms and 8 bunk beds – Easy Breezy is the exact same design as a 3-story Breezy Shores would and Easy Breezy is next door to the proposed Breezy Shores

Maximum gross income if rented 365 days - $650,400

Big Breezy – 2 stories - 10 bedroom and 4 bunk beds

Maximum gross income if rented 365 days - $348,300

The difference between the two properties is the 3rd floor but the difference in revenue is over $300,000 a year. Both properties are beach front, on Ponce de Leon Court within 600 feet of each other, have swimming pools and large living spaces. This investor can build a very profitable duplex and only build a 2-story structure. This request for a 3rd story is strictly GREED.

As a resident of Fort Morgan that lives 4 houses from the proposed Breezy Shores I am against allowing an exemption for 3 story structures. The Text Amendments for District 25 were developed with the residence of the area. The residences of Fort Morgan want smaller structures and less density and not massive commercial complexes that put a burden on the beach, the utilities, infrastructure and make the residence suffer the consequences of living with these massive 3-story structures.

Please deny this request to build a structure in excess of 2-stories.

Defendants' Bates #0033

From: Joseph Emerson
To: Linda Lee
Subject: <EXTERNAL> RE: Case AD-19003
Date: Tuesday, December 03, 2019 4:30:56 PM

Ms Lee

Please submit this email as comment regarding Case AD-19003:

Baldwin County Board of Adjustment,

I respectfully request that the above mentioned appeal be denied. The local ordinance for District 25 clearly states that (2) story structures are the limit. Any variation from this standard sets a precedent that is detrimental to the countless hours and efforts that were put into drafting the text amendments that were implemented in October 2019.

Thank you for your consideration in this matter.

Joe Emerson
Exit Realty Gulf Shores
251.550.9021

From: Carl Zander
To: Linda Lee
Subject: <EXTERNAL> appeal
Date: Tuesday, December 03, 2019 4:43:04 PM

RE: Case AD-19003, Breezy Shores, LLC is appealing an administrative decision of the Baldwin County Zoning Administrator, issued on November 5, 2019, as it pertains to the maximum height, in habitable stories, for a proposed two-family dwelling located at: 3450 A & B Ponce de Leon Court, in Fort Morgan (District 25).

In regards to the above, please do not allow a three story house in Fort Morgan area.

Carl Zander

From: Warren Marshall
To: Linda Lee
Subject: <EXTERNAL> STOP WORK ORDER
Date: Tuesday, December 03, 2019 4:38:16 PM

We request you uphold the Stop Work Order issued on the Breezy Shores duplex located at 3450 A & B Ponce de Leon Court.

We request that you respect the request of the Fort Morgan Planning & Zoning Advisory Committee.

Thank you

Warren Marshall

Defendants' Bates #0034

| From: | billy.g.lamar@gmail.com |
| --- | --- |
| To: | Linda Lee |
| Subject: | <EXTERNAL> RE: Case AD-19003 |
| Date: | Tuesday, December 03, 2019 4:41:04 PM |

Ms Lee

Please include this email as a comment regarding Case AD-19003:

Baldwin County Board of Adjustment,

I respectfully request that the above mentioned appeal be denied.

A variation to the newly approved ordinance for District 25 would set a precedent that is detrimental to the rationale of the amendments that were approved by the commissioners and implemented in October 2019.

Thank you for your consideration in this matter.

Bill Lamar
12475 State Highway 180 Lot 27
Gulf Shores, AL 36542

| From: | Martin Rollins |
| --- | --- |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Request to Uphold Stop Work Order for "Breezy Shores", located at 3450 A & B Ponce de Leon Court, in Fort Morgan (District 25). |
| Date: | Tuesday, December 03, 2019 5:03:30 PM |

Ms. Lee,

As a property owner at Fort Morgan I am opposed to this effort to circumvent the building height restrictions now applicable in District 25. This is a clear case of disregarding the rules and hoping to get permission after the fact. If this appeal is granted then many more will surely follow.

Martin Rollins, P.E.
H. M. Rollins Company, Inc.
mrollins@hmrollins.com
228-832-1738
cell 228-617-8145

| | |
|---|---|
| **From:** | Charles Hussey |
| **To:** | Linda Lee |
| **Subject:** | <EXTERNAL> Request to Uphold Stop Work Order: Case AD-19003, Breezy Shores, LLC appeal |
| **Date:** | Tuesday, December 03, 2019 5:04:32 PM |

Dear Ms. Lee:

My wife Jolee and I reside at 9285 Marigot Drive in Martinique. Martinique is only a short distance from the planned multistory building on Ponce de Leon Court. We object completely to this planned dwelling, which does not meet our Ft. Morgan zoning restrictions. If this appeal is overturned, then the "horse is out of the barn" so to speak, and other obscene multi-story dwellings will be proposed and approved. Please don't give in to this developer who will destroy the joy of others just to make a fat buck.

Thank you,

Chuck and Jolee Hussey

| | |
|---|---|
| **From:** | Craig Harrington |
| **To:** | Linda Lee |
| **Cc:** | Ernie Church |
| **Subject:** | <EXTERNAL> Fw: Case AD-19003, Breezy Shores, LLC appeal - response |
| **Date:** | Tuesday, December 03, 2019 5:19:51 PM |

Hello Linda Lee .... based on the historic time-line as identified below, I do believe that the "Stop Work Order" is in line with the enforcement of the Baldwin County Planning & Zoning administrator issued "STOP WORK ORDER" due to the Land Use Plan for Breezy Shores Duplex exceeding 2-Story Habitable Building Height Limit on New Construction in District 25.

If the contractor continued to resume work after repeatedly being given stop work orders, why wasn't this individual fined by the County for ignoring the Stop Work Orders that had been issued?

I do not believe that an appeal is warranted .... and that the contractor needs to comply and modify their plans to do so.

Regards,

Craig Harrington
5601 State Hwy 180, Unit 1000, Gulf Shores, AL 36542
e-mail: craigharrington@att.net
phone: (251) 967-1622

Defendants' Bates #0036

| | |
|---|---|
| **From:** | Mary douglas |
| **To:** | Linda Lee |
| **Subject:** | <EXTERNAL> Request to uphold stop work order |
| **Date:** | Tuesday, December 03, 2019 5:30:05 PM |

Construction should not be allowed to continue on the Ponce De Leon structure that has blatantly defied the building ordnance's. If building is allowed to continue this will only send a signal that rules do not have to be followed. They were set up to protect our beaches and to allow emergency access to structures.
Sincerely,
Mary Douglas Collins
3794 Highway 180

Sent from my iPhone

| | |
|---|---|
| **From:** | Tina Dodd |
| **To:** | Linda Lee |
| **Subject:** | <EXTERNAL> Case AD19003 |
| **Date:** | Tuesday, December 03, 2019 5:44:54 PM |

Please do not allow this property to exceed current height and use restrictions in Fort Morgan.

Charles & Justine Dodd
2865 Sea Oats Dr
Gulf Shores AL
760 401 2400

Sent from my iPhone

| | |
|---|---|
| **From:** | Wayne Zeek |
| **To:** | Linda Lee |
| **Subject:** | <EXTERNAL> Case AD-19003, Breezy Shores, LLC appeal |
| **Date:** | Tuesday, December 03, 2019 5:44:56 PM |

As a property owner in Fort Morgan, I _Request to Uphold Stop Work Order_ related to  Case AD-19003, *Breezy Shores, LLC appeal.*

I strongly support the Fort Morgan P&Z Advisory Committee's recommendation to UPHOLD  the Stop Work Order.

Further,  I am appalled and dismayed by the actions that Easy Breezy, LLC has seemingly undertaken without regard to our governing documents, process, approvals, or respect for the Fort Morgan Community, Baldwin County Planning & Zoning, and Baldwin County Commission.

Breezy Shores, LLC proceeded to build at risk without appropriate approvals and therefore the Stop Work Order should be rightfully upheld.

Wayne Zeek
Rookery I & II,
Unit 701
205-534-0753
dwzeek@bellsouth.net

Defendants' Bates #0037

| From: | David Woods |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Case AD-19003, Breezy Shores, LLC |
| Date: | Tuesday, December 03, 2019 5:48:25 PM |

Our understanding is that the property owner is seeking a waiver in order to exceed the building height restriction. Our preferences they not be granted a waiver. We'd prefer the owner follow the rules and build within the parameters set forth by the local zoning ordinances.

We own property on Ponce de Leon Court, under the name of Oceanfront Properties, LLC. Thank you.

David D. Woods

| From: | Jennifer Ishler |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Fort Morgan /Easy Breezy |
| Date: | Tuesday, December 03, 2019 5:51:39 PM |

Please do not allow these folks to build outside of the stated guidelines. It is a matter of time before someone dies in a fire because our fire department cannot reach anything over about 26 feet (with the build up on pylons and then the two allowed stories) it would exceed what our fire department could tend to. I worry about that.

It wouldn't be wise to let folks build something to rent to unsuspecting families that could be a fire hazard.

Please don't allow it.

Thank you
Jennifer Noojin
Fort Morgan resident
9191 Adair Lane

| From: | Ange Holland |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Request to uphold stop work order |
| Date: | Tuesday, December 03, 2019 6:22:29 PM |

I am officially voicing my support to **uphold the stop work order** for the duplex Breezy Shores in Ft Morgan, Case AD-19003. The majority have spoken and now it is law! These developers have thumbed their noses at all levels of reprimand during their entire building process. This will set a precedent for all others, that the law & ordinances don't apply & can be ignored. The danger of the cars parked everywhere effects everyone around there and with Easy Breezy already being there close by, it is a potential disaster waiting to happen. Not to mention that home owners and renters in other houses can't have access to their own houses. Why have rules, laws & ordinances if they are not enforced??

Hoping you do the right thing-

Jim & Ange Holland

Ft Morgan area

Defendants' Bates #0038

| From: | Larry Giggy |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Re Case AD 1900-3 Breezy Shores LLC |
| Date: | Tuesday, December 03, 2019 6:20:59 PM |

Ms Lee

Baldwin County Planning and Zoning has issued a stop work order on this above referenced multi family project. The owner and contractor have appealed this order. My wife and I own a home in Fort Morgan and we are in the process of obtaining the required permits to build a second home here after which we will be selling our present home. It is apparent that this owner and contractor feel they should not have to follow the permitting requirements and land use restrictions that the rest of the residents in Fort Morgan abide by. This owner and contractor have on numerous occasions started work on this project without obtaining the necessary permits and in violation of the Baldwin County Planning and Zoning land use regulations.

I am emailing you this note to let you know that my wife and I are adamately opposed to reversing the current stop work order on this project. We support the efforts of the Baldwin County Planning and Zoning board to improve, through proper regulations, the integrity of the Fort Morgan area while lowering the environmental impact of structures that are attempted to be built outside the lawfully enacted regulations. It is pretty obvious by the previous actions of this owner and builder they feel they are privileged and should not have to follow rules that everyone else must follow. If this stop work order is reversed there would simply be no point in attempting to properly regulate any future building projects in Fort Morgan.

Please uphold the stop work order on this project and enforce the current regulations on the use of this land.

Larry and Kathy Giggy
Sent from Yahoo Mail on Android

| From: | lkehart |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Ad 19003 Breexy Shores |
| Date: | Tuesday, December 03, 2019 8:29:53 PM |

The Mike Kehart family strongly objects to allowing a 3rd story to this building. The ordinance should stand as written. Thanksgiving week is a prime example of expanding logging rooms. More than 25 people, barking dogs. Screaming children. Drunkenness, smoking, illegal.parking took place for days. Renters left early on surrounding houses. Misery abound for our family and guests due to a large rental unit on Our Rd.

Not one person should ever experience overbuilding with the opportunity for this type of large group activity. Stop this action!

Mike. Linda. And Melissa Kehart (owners)
562 Our Rd
Sent from my Verizon, Samsung Galaxy smartphone

Defendants' Bates #0039

| From: | George Gilmore |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Request to Uphold Stop Work Order |
| Date: | Tuesday, December 03, 2019 8:28:40 PM |

Dear Ms. Lee,

I am a resident of Baldwin County, and I own a home on the Fort Morgan Peninsula and am a member of the Fort Morgan Civic Association.

We certainly did not work to implement new building ordinances, only to have them bypassed at the first opportunity. Also, the present builder and owner seem to have repeatedly violated the clearly established county guidelines. They have acted in a manner which is illegal and disrespectful to civil society.

Please add my vote to the "Request to Uphold Stop Work Order" for the Breezy Shores Duplex.

Thank you,

George Gilmore
1467 B Sandy Lane
Fort Morgan Peninsula
Gulf Shores, AL 36546

--
George Gilmore

| From: | Katherine Nichols |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Hold stop order |
| Date: | Tuesday, December 03, 2019 8:30:28 PM |

Please uphold stop order on Ft Morgan !
Thank you
Katherine Nichols
6551 Driftwood Dr
Gulf Shores

| From: | Charlotte Hale |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Height limit |
| Date: | Tuesday, December 03, 2019 9:11:42 PM |

Request to uphold stop work order

Condo owner Ft. Morgan Rd.

Sent from my iPhone

Defendants' Bates #0040

| | |
|---|---|
| **From:** | lksford@gmail.com |
| **To:** | Linda Lee |
| **Subject:** | \<EXTERNAL\> Ft Morgan Building Ordinance |
| **Date:** | Tuesday, December 03, 2019 8:43:12 PM |

To whom it may concern:

Please uphold the Stop Work Order on the duplex (Easy Breezy) construction in Ft Morgan that is in violation of the new ordinance limiting construction size.
I ask that no waiver be issued for this or any other construction project which violates the new restrictions.
Thank you.
Linda Ford
5889 Pizarro Ave
Ft Morgan
334-538-5781
Sent from my iPhone

| | |
|---|---|
| **From:** | Lee Ann Harris |
| **To:** | Linda Lee |
| **Subject:** | \<EXTERNAL\> Case AD-19003 Request to uphold stop work order |
| **Date:** | Tuesday, December 03, 2019 9:17:58 PM |

Ms Lee,

We strongly ask that the county does not allow this property (or any other) to exceed current height and use restrictions in Fort Morgan.

The restrictions in effect should be adhered to. In order to try to maintain the character of the Fort Morgan area, we do not need another huge house (as big as a motel) with the volume of tenants and vehicles that come with it. Hopefully the county will ensure that the rules will be enforced.

James and Lee Ann Harris
2877 Sea Oats Dr
Gulf Shores AL
205-616-1153

| | |
|---|---|
| **From:** | Catherine Barefield |
| **To:** | Linda Lee |
| **Subject:** | \<EXTERNAL\> |
| **Date:** | Tuesday, December 03, 2019 9:18:57 PM |

Please uphold stop work order. Thank you. Paul A. Barefield, 1775 Galloway Lane.

| From: | Ellen Hubley |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Fort Morgan Zoning |
| Date: | Tuesday, December 03, 2019 9:25:33 PM |

Hi Linda, I am a homeowner in the Ponce de Leon Fort Morgan neighborhood and it has been brought to my attention that a contractor is acting in opposition to the new zoning ordinances. Please consider upholding the work order cessation. This contractor is acting neglectfully based on the current zoning ordinances. Continuing to build multi family dwellings in excess of the new 2-story maximum puts the lives of our community and tourists in danger. We do not have the infrastructure to continue to support these types of rental properties, and if this contractor is allowed to continue building despite the multiple requests to cease, a contradictory precedent will be established. As a resident, I am already concerned with evacuation preparations in the event of a storm or other casualty. Please let's ban together to keep Fort Morgan safe, eco-friendly, and enchanting.

Sincerely,
Ellen Hubley

| From: | rtravel man |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Case AD-19003, Breezy Shores, LLC Appeal |
| Date: | Tuesday, December 03, 2019 9:29:34 PM |

I am a home owner in Fort Morgan and I am strongly apposed to the above Appeal . The owners of the property have no respect for the Zoning requirements as evidenced by their past actions:

1. Driving tow pilings on the property without approval from Baldwin County Planning and Zoning Department.

2. Storing/dumped 36 pilings at the above address .Prior to May 7, 2019 –   Without  A Land Use Permit Approval, Without ADEM Authorization, Without USFWS Incidental Take Permit (ITP). This action is in direct violation of USFWS ITP # TE102005-1.

Your cooperation in denying this appeal would support the current Zoning ordinances. Sincerely, Royce D. Massey,  3457 Ponce DeLeon Court, Ft Morgan, AL

PS: Can you have the owners remove the 2 pilings that were illegally driven, and have the pile of 36 pilings removed until such time as the owners have an approved building permit?

| From: | EARL HUBLEY |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> AD-19003 |
| Date: | Tuesday, December 03, 2019 9:43:23 PM |

My wife and I own 3150 hwy 180 and request that zoning for building height to remain at a maximum of 2 stories only.

Defendants' Bates #0042

| | |
|---|---|
| **From:** | Michelle Garmon |
| **To:** | Linda Lee |
| **Subject:** | <EXTERNAL> Re: Case AD-19003 |
| **Date:** | Tuesday, December 03, 2019 10:00:56 PM |

Ms. Lee,

Please submit this email as comment regarding Case AD-19003.

Baldwin County Board of Adjustment.

We submit this email as a request for the board to uphold its previous decision on AD-19003 via a denial of this appeal. Any variance permitted to the ordinance for District 25 that limits structures to two stories would set a dangerous precedent. This ordinance was carefully crafted to ensure the safety and future of our community. To allow someone to ignore it would be a waste of countless hours if effort put forth by many people with District 25s best interests at heart.

Sincerely,

Paul and Michelle Garmon

| | |
|---|---|
| **From:** | Paul Stanton |
| **To:** | Linda Lee |
| **Subject:** | <EXTERNAL> APPEAL - Case AD-19003, Breezy Shores, LLC |
| **Date:** | Tuesday, December 03, 2019 10:18:28 PM |

Mrs. Lee,

I am VERY MUCH OPPOSED to this appeal.

This Developer has continually circumvented the County Rules and Regulations in Fort Morgan! This Developer CLEARLY ONLY CARES about Rental Money versus the Safety of his RENTERS and Neighbors Living Near this "Hotel" he wants to build!

This is not a Beach House it is a HOTEL. Besides that he has another Hotel right next door, one lot to the EAST! This case is all about MONEY not the safety of our Fire Fighters and tax payers of Fort Morgan. Our Fire Chief has already written a letter to the County informing them that they cannot save anyone on a 3rd Story in Fort Morgan. How can this be approved considering he is on record as stating this. This is a Public Safety issue and everyone is aware of it.

RE: Case AD-19003, Breezy Shores, LLC is appealing an administrative decision of the Baldwin County Zoning Administrator, issued on November 5, 2019, as it pertains to the maximum height, in habitable stories, for a proposed two-family dwelling located at: 3450 A & B Ponce de Leon Court, in Fort Morgan (District 25).

Thank you for all your do for our County,

Paul Stanton
3487 Ponce De Leon Court
Gulf Shores, AL 36527

Defendants' Bates #0043

| From: | Corinne Stanton |
|-------|-----------------|
| To: | Linda Lee |
| Subject: | <EXTERNAL> APPEAL - Case AD-19003, Breezy Shores, LLC |
| Date: | Tuesday, December 03, 2019 10:30:16 PM |

Mrs. Lee,

I am VERY MUCH OPPOSED to this appeal.

This Developer has continually circumvented the County Rules and Regulations in Fort Morgan! This Developer CLEARLY ONLY CARES about Rental Money versus the Safety of his RENTERS and Neighbors Living Near this "Hotel" he wants to build!

This is not a Beach House it is a HOTEL. Besides that he has another Hotel right next door, one lot to the EAST! This case is all about MONEY not the safety of our Fire Fighters and tax payers of Fort Morgan. Our Fire Chief has already written a letter to the County informing them that they cannot save anyone on a 3rd Story in Fort Morgan. How can this be approved considering he is on record as stating this. This is a Public Safety issue and everyone is aware of it.

Sincerely,
Corinne Stanton

| From: | Strong, Gillard |
|-------|-----------------|
| To: | Linda Lee |
| Subject: | <EXTERNAL> AD-19003-Breezy Shores |
| Date: | Wednesday, December 04, 2019 5:57:07 AM |
| Importance: | High |

Ms. Lee,

As I understand it the above property has asked to be able to build a three story building after we have just passed a new zoning rules stating that nothing above two stories can be built. As should this should be denied. Please do approve this request. Thanks.

I live at 11321 St. Hwy 180 on the Fort Morgan Rd.

G.C. Strong III
Commissioning Manager
NFE CHP Project
+1-876-402-2372 Jamaica
+1-913-458-6175, office
+1-251-978-6960, mobile
strongg@bv.com

| From: | Joan Latour |
|-------|-------------|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Fort Morgan |
| Date: | Wednesday, December 04, 2019 6:02:26 AM |

Please accept this as my request to uphold work order!

Defendants' Bates #0044

| From: | Carol Pearce |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Fort Morgan / Zoning Variance |
| Date: | Wednesday, December 04, 2019 6:53:24 AM |

As long term homeowners on Fort Morgan Rd. we are adamantly opposed to changing the zoning variance from two to three story at 3450 A and B Ponce de Leon Court.

The current zoning requirement must be maintained to prevent increased usage density that highway infrastructure could not support . Once an allowance is made it opens the door for others and will end up with traffic nightmare situations such as experienced in Orange Beach.

Secondly a trend toward higher and higher buildings will adversely effect wild life and the current pristine beauty of the wonderful Fort Morgan area.

Please let's give future generations the experience of a more natural beach /bay environment . The change in zoning would be a slippery slope that would open a door that could not be closed

Richard and Carol Pearce

8921 Fort Morgan Rd

| From: | Jarrett Crum |
|---|---|
| To: | Linda Lee |
| Cc: | paul.stanton@electrolux.com |
| Subject: | <EXTERNAL> APPEAL - Case AD-19003, Breezy Shores, LLC |
| Date: | Wednesday, December 04, 2019 7:10:28 AM |

Dear Mrs. Lee,

I am VERY MUCH OPPOSED to this appeal.

This Developer has continually circumvented the County Rules and Regulations in Fort Morgan! This Developer CLEARLY ONLY CARES about Rental Money versus the Safety of his RENTERS and Neighbors Living Near this "Hotel" he wants to build!

This is not a Beach House it is a HOTEL.

Besides that he has another Hotel right next door, one lot to the EAST!

This case is all about MONEY, not the safety of our Fire Fighters and tax payers of Fort Morgan.

Our Fire Chief has already written a letter to the County informing them that they cannot save anyone on a 3rd Story in Fort Morgan. How can this be approved considering he is on record as stating this. This is a Public Safety issue and everyone is aware of it.

This is a Public Safety Issue, Environmental Issue and Evacuation Issue for Fort Morgan!

RE: Case AD-19003, Breezy Shores, LLC is appealing an administrative decision of the Baldwin County Zoning Administrator, issued on November 5, 2019, as it pertains to the maximum height, in habitable stories, for a proposed two-family dwelling located at: 3450 A & B Ponce de Leon Court, in Fort Morgan (District 25).

Thank you for all your do for our County,

Jarrett Crum
Sent from my iPhone

Defendants' Bates #0045

| From: | abennett@frontiernet.net |
|---|---|
| To: | Linda Lee |
| Cc: | Paul Stanton |
| Subject: | <EXTERNAL> Stop work order |
| Date: | Wednesday, December 04, 2019 7:28:19 AM |

Ms Lee,

My name is Al Bennett and I own a house at 3442 Highway 180 in Fort Morgan. I am sending this email ask that the Baldwin County P&Z Board of Adjustments UPHOLD the Stop Work Order for "Breezy Shores", located at 3450 A & B Ponce de Leon Court, in Fort Morgan! This area didn't need the first group of "three story Hotels" built on single family lots and certainly doesn't need any more!

My hope is that the Baldwin County P&Z Board of Adjustments will finally put a stop to the intrusion that has been taking place in our fragile beach community.

Thank you,

Al Bennett

| From: | Bill Newberry |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> RE: Case AD-19003, Breezy Shores, LLC appeal - Request to Uphold Stop Work Order |
| Date: | Wednesday, December 04, 2019 7:43:47 AM |

Ms. Lee,
With our family being long time land owners in the Fort Morgan area, I request that the "Stop Work Order" be upheld. We need to preserve the unique lifestyle of this community.

Thank you.

William Newberry

| From: | sandywalker7817 |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Ref. Case AD-19003 Breezy Shores |
| Date: | Wednesday, December 04, 2019 7:45:48 AM |

Ms. Lee,

We oppose the approval of this property at 3450 Ponce De Leon Court.
We chose our home in Ft. Morgan for it's beautiful natural surroundings. If these houses continue to be built we will lose that. It will slowly become like the properties in Gulf Shores & Orange Beach.

Regards,
Sandy & Gene Walker
5551 Beach Blvd.

Defendants' Bates #0046

| From: | Kathryn Emerson, REALTOR |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Ad cash 19003 |
| Date: | Wednesday, December 04, 2019 8:16:59 AM |

Dear Ms Lee,

As a resident of the Fort Morgan community, I adamantly reject any portion of appeal or variances to the height restrictions requested by Breeze Shores LLC.

These restrictions were set in place for the protection of the occupants as well as for the community and should stand as written.

Thank you,

Kathryn Emerson, Realtor
EXIT Realty Gulf Shores
251-942-7170

| From: | wbenn53@aol.com |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Case AD-19003, Breezy Shores,LLC Fort Morgan, Al. |
| Date: | Wednesday, December 04, 2019 9:35:37 AM |

Dear Ms. Lee,

I am writing to OPPOSE the appeal of the above-described project. I have been a resident of Fort Morgan (3479 Ponce De Leon Ct.) for 38 years, and really don't want to see the applicant build another HOTEL across the street. He has already built a structure (not a beach house) on the lot next door to the lot that he is planning to build this one on, and it has created an unsafe traffic situation all summer for the local residents. Now he wants to compound the problem by doubleing down with another HOTEL next door. His first project normally has 18 - 20 cars parked there all summer (because the 3-story duplex sleeps 44 people, but I have witnessed as many as 56 occupants),and now he wants to compound the problem by duplicating this existing structure. Bear in mind that each of these lots are only 75 feet wide, and were never intended to have any structures larger than beach houses on them, NOT HOTELS .
Please don't authorize one property owner to ruin our neighborhood for all the rest of us!! If he wants to build hotels, he needs to build them in areas that were zoned for such structures, not in residential neighborhoods!!!

Thank you for your consideration of this travesty,

W. E. Bennett, Jr.
3479 Ponce De Leon Ct.
Fort Morgan, Al.

| From: | Ian Mills |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Fort Morgan |
| Date: | Wednesday, December 04, 2019 1:58:58 PM |

Request to uphold stop work order.

Defendants' Bates #0047

| From: | J. Stephen Salter |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> SALTER---OBJECTION TO "ZONING REQUEST" Fwd: APPEAL - Case AD-19003, Breezy Shores, LLC |
| Date: | Wednesday, December 04, 2019 10:13:46 AM |

**Law Office of J. Stephen Salter**
Fellow, ABCL        Life Member, NACDL
8975 Pompano Way
Gulf Shores, Alabama 36542-8123
Telephone:205-585-1776
Email: umstakwit@aol.com

GOOD MORNING MS. LEE !

I TRUST YOU HAD A GREAT THANKSGIVING HOLIDAY WITH FAMILY AND FRIENDS.

I LEARNED ON RETURNING FROM BIRMINGHAM FOR MY FAMILY'S THANKSGIVING GATHERINGS ABOUT THE ABOVE REFERENCED "ZONING REQUEST" AND ITS HISTORY.

I AM WRITING TO CONFIRM MY OPPOSITION TO SAME AND REQUEST THAT YOU VOTE ACCORDINGLY. THIS IS DUE IN NO SMALL PART TO THE ACTIONS TAKEN BY THE OWNER AND HIS AGENTS/CONTRACTORS IN CLEAR CONTRAVENTION OF OUR LOCAL ZONING RULES AND REGULATIONS AND IN DEFIANCE OF SAME. THEY DO NOT SEEM WILLING TO UNDERSTAND AND ABIDE BY THEM. THE DEFECTS IN THEIR PROPOSAL DICTATE DENIAL OF THEIR REQUEST AS WELL.

I WILL REMAIN AVAILABLE TO ANY QUESTIONS YOU MAY HAVE.

THANK YOU.

STEVE

| From: | Fran Hopkins |
|---|---|
| To: | Linda Lee |
| Subject: | <EXTERNAL> AD 19003 Breezy Shores, LLC |
| Date: | Wednesday, December 04, 2019 1:16:03 PM |

Referencing the above- we (a lot of residents of Fort Morgan) have voiced our objection to above zoning request.

Please . do not approve this. My objection . and others objection has been voiced many times.

Fran Hopkins
8744 Pompano Way

| From: | WAYNE & MARTHA HOWARD |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Case AD-19003, Breezy Shores, LLC |
| Date: | Wednesday, December 04, 2019 10:43:08 AM |

Dear Ms. Lee,

I am writing to express my opposition to the appeal from Easy Breezy, LLC regarding construction of a multi family structure on Ponce de Leon Ct. Not only would this structure violate newly adopted local ordinances, the previous blatant disregard for and violation of other existing requirements exhibited by this entity should not be rewarded.

I stand in opposition to the appeal and in support of the Board's initial ruling requiring compliance with all local and county ordinances.

Martha Kilborn-Howard
10601 Hwy 180
Gulf Shores, AL 36542
vineyard@gulftel.com
251-550-5601

| From: | Jo mcmahan |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Breezy Shores, case AD-19003 |
| Date: | Wednesday, December 04, 2019 11:21:58 AM |

As a property owner of both a rental AND my retirement home, both located in Ft Morgan proper, I am opposed to the building of this multi family structure! The beauty of our area needs to be protected, and the regulations governing such need to be adhered to so that my children and grandchildren have this piece of paradise to enjoy with their children.

I plan to attend this hearing if at all possible. Thank you for your time and consideration in this matter.

Sincerely,
Jo McMahan
414 Bernard Ct East (mm3)
1414B Sandy Lane (mm2)

| From: | BWC |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Stop Work Order/Breezy Shores |
| Date: | Wednesday, December 04, 2019 1:40:13 PM |

I would respectfully request that the Stop Word Order issued against Breezy Shores be upheld (3450 A & B Ponce de Leon Court). The reasoning behind the recently adopted Baldwin County Zoning Ordinances stands as a thoughtful and reasonable approach to allowing certain types of development while protecting the unique character and eco-system of this area.

It is discouraging to immediately have the new ordinances challenged in this manner and for the enforcement efforts to be summarily ignored.

Thanks.

Brad Caraway

Defendants' Bates #0049

| From: | Madaline Herlong and Don Haycraft |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Request to Uphold Stop Work Order #AD-19003 |
| Date: | Wednesday, December 04, 2019 1:54:34 PM |

Dear Ms. Lee,

I write to request that the Baldwin County Board of Adjustments uphold the Stop Work Order now applicable in case #AD-19003 in the Fort Morgan area.

The Fort Morgan community has had significant support from Baldwin County Planning & Zoning staff and the Baldwin County Commission in the adoption of new text amendments to our local zoning ordinances. These new ordinances will help protect the unique needs of the Fort Morgan community as they relate to safety and infrastructure while also protecting the historic nature and environmental character of the Fort Morgan peninsula. To this end, these text amendments include very specifically the establishment of a two (2) habitable story maximum height for single family and two-family dwellings.

In case #AD-19003, the owner seeks to escape this height limitation. This limitation, however, is now law. This law cannot perform the protective function intended by the Baldwin County Commission if it is not enforced. This particular property has repeatedly flouted the law and has been cited numerous times for proceeding either without or in contravention of required permits. It is time for this complete disregard for the community, the county, and their governance to stop.

The Stop Work Order should be upheld, and the owner required to submit a plan that conforms to the law as it now stands.

Sincerely,

Madaline Herlong

3896 Ponce de Leon Court

Gulf Shores, AL

| From: | Bobby Maness |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Case AD-19003, Breezy Shores, LLC. |
| Date: | Wednesday, December 04, 2019 2:13:21 PM |

We are opposed to this building. We recently finished building our retirement home on Bernard Ct. We was surprised at the rules and regulations(being from the country side in West Tennessee), but we followed them all(with the guidance of South Baldwin Custom Homes).
It only seems fair that they follow the rules, also. We love the beauty of our area and wish it to remain the same, without this high rise house with it's inevitable parking problems. We urge you to prevent this house from being built.

Thanks,

Bobby Maness.
Sent from my iPhone

Defendants' Bates #0050

| From: | windward2 |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Request to Uphold Stop Work Order on Case AD-19003, Breezy Shores, LLC |
| Date: | Wednesday, December 04, 2019 2:41:06 PM |

Ms. Lee

I have a house at 331 Buchanan Court W in Gulf Shores. Prior to purchasing this house in January 2018 we had a house at 3480 State Hwy 180, Gulf Shores. We built our home at 3480 State Hwy 180 in 1998 and sold it in March 2018. In May 2017 before we sold our house a small hotel was built at 3468 Ponce De Leon Court just south of our house. This small 3 story hotel sleeps 44 people with 9 bedrooms and 9.5 bathrooms on each side. I have seen sewage flowing out of one grinder pump walking to the beach. During the spring and summer months it is nearly impossible to drive on Ponce de Leon Court because of the vehicles parked out into the street because there isn't enough parking for 44 people at this house. Fire trucks can not get close enough to the house during peak rental season because of all the vehicles parked in the street and the driveway. I'm sure it is a nightmare for Baldwin County Solid Waste trucks to pick up the garbage twice a week during the spring and summer months. It is fire safety issue with 3 story structures when the Fort Morgan Fire Department doesn't have equipment to reach the third story. This is the layout of the 3rd floor per Prickett Properties rental website:

Fourth Level (Third Floor):

Bedroom (King) with Private Bathroom, Balcony Access

Bedroom (King) with Private Bathroom, Balcony Access

Bedroom (King) with Private Bathroom

Bedroom (Queen) with Private Bathroom

Bunk Room (Twin over Twin Bunks)

Sleeps 22 per side

You will be doubling these issues if you allow another 3 story hotel to be built at 3450 A & B Ponce de Leon Court.
The contractor has had numerous violations on this project:

April 2, 2019 – Contractor was notified by Baldwin County Planning & Zoning office that the Land Use Plan they were working on with Baldwin County was not compliant because the parking spaces on the Plan did not meet the requirements of Baldwin County Zoning Ordinance 15.3.1 & Section 2.3.25.3 (c ) Local Provisions for Planning District 25 Parking Requirements.

Defendants' Bates #0051

Prior to May 7, 2019 – Without A Land Use Permit Approval, Without ADEM Authorization, Without USFWS Incidental Take Permit (ITP), Owner & Contractor purchased, had delivered and unloaded 36 pilings at the above address.

According to USFWS ITP #TE102005-1, Letter G, Number 3, States: "*No Lumber, materials, nor bulk materials will be kept, stored, or accumulated on the property expecting only building materials during the construction.*" The construction period had not yet started since the owner and contractor were still working on an incomplete application and had yet to receive an approved permit from Baldwin County.

Prior to May 23, 2019 – The application for case # BCCAP-18-007 was submitted with multiple non-compliant components, errors and violations.

July 30, 2019 – Two (2) pilings set without an Approved Permit

July 31, 2019 – "Revoked Land Use Certificate" & "Stop Work Order" issued by Baldwin County Planning Director due to non-compliant parking ordinance and for beginning construction prior to permit approval.

July 2019 - Parking Reconsiderations necessitated additional input from USFWS because of an increased footprint.

July 2019 - Building permit REVOKED pending ITP approval by USFWS

August 1, 2019 – "Stop Work Order & Revoked Land Use Certificate"-Construction continued. A report of violation was made to Baldwin County Planning & Zoning Director and Code Enforcement Officer who notified the Contractor to discontinue unauthorized work.

Please uphold the Stop Work Order on this project and deny this appeal.

Kindest regards,
Don E.Ward
331 Buchanan Court W.
Gulf Shores
251-363-8576

| From: | Bud Bratley |
|-------|-------------|
| To: | Linda Lee |
| Subject: | <EXTERNAL> Case #-19003 |
| Date: | Wednesday, December 04, 2019 3:36:13 PM |

I am a property owner in the Fort Morgan area, address 2451 Ponce de Leon I also own lot 3 Ponce de leon court. I ask that the stop work order be upheld. EVERYONE should be accountable for following the guidelines as they stand.

Thank you,
Forrest G. Bratley.

Defendants' Bates #0052

| From: | Debbie Movelle |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Not SO Easy Breezy!! Stop them! |
| Date: | Wednesday, December 04, 2019 10:29:55 PM |

Thank you for your attention to this matter  these people have consistently disobeyed permits!!!  As a Fort Morgan homeowner, i urge you to enforce the Stop Work order until they can comply with proper legal permits, be fined for disregard to building codes, and to top it off have the Gaul to begin construction!

Merry Christmas and Happy New Year.

Thank you.

  Respectfully,

Debbie Movelle

| From: | Don Haycraft |
| To: | Linda Lee |
| Subject: | <EXTERNAL> Case No. AD-19003 - Breezy Shores LLC Property |
| Date: | Wednesday, December 04, 2019 8:52:20 PM |

Dear Ms. Lee,

Today I read Breezy Shores' appeal of the stop work order.  Shocked by the brazen attempt to challenge the County's recently passed ordinance concerning a two story limitation,  I write to request that the Baldwin County Board of Adjustments uphold the Stop Work Order now applicable in case #AD-19003 in the Fort Morgan area.

As a member of the Fort Morgan community I fully support the ordinance that protects our unique area, particularly as it improves the safety and infrastructure while also protecting the historic nature and environmental character of the Fort Morgan peninsula.  To allege no rational basis, Breezy Shores itself ignores that the establishment of a two story maximum height for single family and two-family dwellings provides safety.  And safety is thus the "rational basis" and the County is to be commended for enacting the limitation.

This particular property has been cited numerous times for proceeding either without or in contravention of required permits.  Breezy Shores calls for due process yet it is the party that is an outlaw.

The Stop Work Order should be upheld, and the owner required to submit a plan that conforms to the law as it now stands.

Sincerely,

Don Haycraft

3952 Highway 180W

Gulf Shores, AL 36542

Defendants' Bates #0053

| | |
|---|---|
| **From:** | mac deidra |
| **To:** | Linda Lee |
| **Subject:** | <EXTERNAL> Breezy Shores LLC appeal/ Case AD-19003 |
| **Date:** | Thursday, December 05, 2019 9:15:50 AM |

Dear Ms. Lee,

We have a single family home at 3437 Ponce de Leon Court in Fort Morgan and have owned this home for 21 years. We can speak personally about the disruption that the three story HOTEL already at 3450 Ponce de Leon has caused-

*main road blocked by guests vehicles to the point that NO VEHICLES CAN GET THROUGH...EMERGENCY or personal

*sewage overflow and smell throughout the entire 3400 block due to over capacity (55!) of allowed guests

* a general disregard of rules and regulations by a corporation that we believe located here initially because they could do whatever, whenever and no one would oppose

Our 3400 block CANNOT support another mega structure which is why we rallied and advocated for this ban. Unfortunately we will not be able to attend the public hearing on December 12 but PLEASE uphold this ruling/ban, make no exceptions so we can do our best to live with the nightmare that we currently have on our block!

Sincerely,
Mack and Deidra Bell
3437 Ponce de Leon Ct
Gulf Shores, Al 36542

Defendants' Bates #0054

Office Use Only

**Trial Exhibit 2**

Case No. _____    Accepted By: _____    Date: _____

Application Fee: _____    ☐ Paid

*Admitted*
*in*
*Evidence*
*1-25-2022*

# *Baldwin County*
# *Appeal of Administrative Decision*

Mailing Address
201 East Section Avenue
Foley, AL 36532
Phone: (251) 972-8523    Fax: (251) 972-8520

## Appellant

Are you the property owner? ☐ Yes   ☒ No
(If you are not the property owner, you must submit Owner Authorization Form signed by the property owner)

Appellant Name:  Kristopher O. Anderson, Esquire _____   Date: 11/18/2019 _____

Mailing Address:  4725 Main St., Suite F-222 _____

City:  Orange Beach _____   State:  AL ___   Zip code 36561 _____

Telephone: ( 251 ) 225 - 4122  Fax: ( 251 ) 271 - 0445  e-mail: kanderson@clarkpartington.com

## Owner

Name:  Breezy Shores LLC _____   Date: 11/18/2019 _____

Mailing Address:  5855 Plantation Dr. _____

City:  St. Francisville _____   State:  LA ___   Zip code 70775 _____

Telephone: ( 225 ) 454 - 2117  Fax: (____) ____ - _____  e-mail:  mikebcajun@webmail.com

## Site Information

Parcel ID Number:  05- 6  9 - 0  8 - 0 1 - 0 - 0 0 3 - 0 5 2 . 0 0 3

Zoning Classification:  RTF-4 _____   Planning District:  25 _____

## Appeal

Basis and Facts of Appeal:   See attached Addendum. _____

_____

_____

Requested Action:   Appellant requests that the Board lift the Stop Work order and reinstitute the
Land Use Permit and Building Permit previously issued, or in the alternative take such action
as necessary to allow Appellant to proceed with construction as previously approved.

(Over, Please Continue to Reverse Side)        Page 1 of 2

AD

## Conditions of the Appeals Process

- The Board of Adjustment shall hear and decide appeals where it is alleged there is an error in any order, requirement, decision or determination made by the Zoning Administrator or other administrative official in the enforcement of these zoning regulations.

- Appeals to the Board of Adjustment may be taken by any person aggrieved or by any officer or department of Baldwin County affected by any decision of any administrative officer representing the County in an official capacity in the enforcement of these zoning regulations. Such appeal shall be taken within 30 days of said decision by filing with the officer from whom the appeal is taken and with the Board of Adjustment a notice of appeal specifying the grounds thereof. The officer from whom the appeal is taken shall transmit forthwith to the Board of Adjustment all papers constituting the record upon which the action was taken.

- An appeal stays all proceedings in furtherance of the action appealed from unless the officer from whom the appeal is taken certifies to the Board of Adjustment after the notice of appeal shall have been filed with him that by reason of facts stated in the certificate a stay would in his opinion cause imminent peril to life or property. Such proceedings shall not be stayed otherwise than by a restraining order which may be granted by the Board of Adjustment or by a Court on application and notice to the officer from whom the appeal is taken and on due cause shown.

-Any party aggrieved by a final judgment or decision of the Board of Adjustment may, within 15 days thereafter, appeal there from to the Circuit Court of Baldwin County, Alabama, by filing with the Circuit Court and the Board of Adjustment a written notice of appeal specifying the judgment or decision from which the appeal is taken. In case of such appeal, the Board of Adjustment shall cause a transcript of the proceedings and the action to be certified to the Court to which the appeal is taken, and the action of such court shall be tried de novo.
(Baldwin County Zoning Regulations Section 18.10)

**************************************************************************************

**I have read the above conditions and understand them and agree to abide by them. I hereby certify that the information stated on and submitted with this application is true and correct. I also understand that the submittal of incorrect information will result in the revocation of any approval and any worked performed will be at the risk of the applicant.**

Applicant Signature: _____     Date: 11-19-2019

---

### Office Use Only

Date of Hearing: _____

Board Decision: _____

Conditions: _____

_____

Chairman's Signature: _____     Date: _____

Page 2 of 2

## ADDENDUM TO APPEAL OF ADMINISTRATIVE DECISION

On March 19, 2019, Breezy Shores LLC ("Appellant") submitted a site plan for construction to occur at Parcel ID# 05-69-08-01-0-003-052.003 located off Ponce De Leon Court in Gulf Shores, Alabama (the "Site") to Baldwin County and received approval of the site plan on March 27, 2019. On July 17, 2019, Appellant's land use permit was approved in LU-190197. On July 23, 2019, based on the original site plan, Baldwin County issued Building Permit #126349.

On July 31, 2019, Baldwin County Planning Director Vince Jackson sent Appellant a letter ordering that it stop work immediately at the Site (the "Stop Work Order"). Mr. Jackson's letter demanded that Appellant revise its March 2019 site plan to comply with a new interpretation of Baldwin County Zoning Ordinance 15.3.1, which provides in pertinent part: "Off-street parking spaces may not be located in a street or alley and must be connected with a street or alley by a driveway which affords unobstructed ingress and egress to each space."

As a result of that Stop Work Order, Appellant revised its site plan to comply with the Planning Director's new interpretation of the parking ordinance. Appellant submitted that revised site plan to Baldwin County on August 2, 2019, and also on spent additional funds to apply for an amended incidental take permit from the United States Fish and Wildlife Service ("FWS") to reflect the new site plan.

Appellant received an amended incidental take permit ("ITP") from FWS on October 25, 2019. Appellant forwarded that ITP to Baldwin County, understanding based on prior correspondence that this would resolve all outstanding objections and allow the Stop Work Order to be lifted.

In response, Planning Director Jackson informed Appellant on November 5, 2019 that a new zoning ordinance had been enacted effective October 15, 2019 that applies in Planning District 25 where the Site is located. Mr. Jackson told Appellant that a "duplex (two-family dwelling) with three habitable stories cannot be approved. The new ordinance apparently referenced (without citation) by Jackson is Baldwin County Zoning Ordinance 2.3.25.3.

Appellant contends that the Board of Adjustment must reverse Jackson's decision for several independently sufficient reasons.

First, Appellant had vested rights in the permits issued prior to October 15, 2019, the effective date of the new height ordinance. It was instructed, erroneously, to rectify a parking issue after permits had already been issued. When that occurred,

the permits did not lapse, but rather were held in abeyance until those issues were rectified. After they were, the permits should have been reactivated notwithstanding the changes that occurred on October 15, 2019, given that Appellant's now-non-comforming use (three stories) had already been approved and permitted. *Budget Inn of Daphne, Inc. v. City of Daphne*, 789 So.2d 154, 159 (Ala. 2000) ("an existing nonconforming use is a vested property right that a zoning ordinance may not abrogate except under limited circumstances."); *Port of Mobile v. Louisville & N.R. Co.*, 4 So. 106, 110, 84 Ala. 115, 122 (Ala. 1888) (once a right has vested equity can be invoked to prevent a later-passed ordinance from depriving the owner of that right).

The County's new interpretation of Baldwin County Zoning Ordinance 15.3.1 is facially incorrect, arbitrary, and capriciously enforced to target specific landowners, including Appellant, at the behest of certain competing landowners in Fort Morgan. Zoning Ordinance 15.3.1 does not prohibit "stacked" parking as it is now interpreted. Given that it has previously and consistently been interpreted to allow "stacked" parking configurations, the County is estopped from implementing this new interpretation. Moreover, the County's issuance of the Stop Work Order on July 31, 2019 is in violation of the mandates of Baldwin County Zoning Ordinance 18.2.5, as the Zoning Administrator in this instance had no authority under that section (or any other) to revoke Appellant's land use certificate.

Second, the County's changes to 2.3.25.3(e) are facially unconstitutional and unconstitutional as applied. That section provides that "the maximum height of single family and two family structures shall be limited to two (2) habitable stories." This provision violates due process as it was passed without rational basis.

Specifically, the County's restriction on a certain number of "stories" as opposed to a restriction on physical height, is without rational basis. Baldwin County Zoning Ordinance Article 22 defines "Story" as "That portion of a building included between the surface of any floor and the surface of the next floor above it, or if there is no floor above it, then the space between such floor and the ceiling next above it." A "Story, habitable" is defined as "A story having its floor elevated at or above base flood elevation as determined from the flood insurance rate maps, regardless of the intended use of the story or its floor area."

The County relied on a Staff Report authored by Jackson, which recommended a "height" limitation of two stories, as well as evidence that a volunteer fire truck could not reach a certain physical "height". Yet, the County's

restrictions do not actually address height at all. A builder could erect a 35 foot structure, designed such that it only has two "stories," but with the second "habitable story" abutting the roofline so that it is at the top of the structure. This structure would be conforming under Ordinance 4.6.5 and 2.3.25.3 as amended, but would directly and inarguably violate the same rationale as that underpinning the amendment to 2.3.25.3(e). Since construction that violates the same rationale underlying this amendment remains viable, and a number of "stories" has no rational connection to the concerns underlying the amendment (as opposed to height), the amendment suffers from a fatal lack of rational basis both facially and as applied.

Third, Baldwin County Zoning Ordinance 2.3.25.3(e) as amended violates equal protection as set forth in the 14th amendment to the U.S. Constitution, as well as the mandates of Ala. Code § 11-52-71 in that it treats similarly situated landowners within Planning District 25 differently without rational basis. Specifically, all landowners within planned unit developments within Planning District 25 are exempt from the mandates of 2.3.25.3(e). This explicitly violates Ala. Code § 11-52-71 and treats similarly-situated landowners differently without a rational basis. What rationale does the County have for allowing three story duplexes within PUDs while prohibiting the same outside of PUDs? None. As a result, 2.3.25.3(e) runs afoul of Ala. Code § 11-52-71 and the U.S. Constitution's guarantee of equal protection.



## Baldwin County Planning and Zoning Department

### Agent Authorization Form

I/We authorize and permit ___Kristopher O. Anderson___ to act as my/our representative and agent in any manner regarding this application which relates to property described as tax parcel ID# 05-<u>6</u> <u>9</u> - <u>0</u> <u>8</u> - <u>0</u> <u>1</u> - <u>0</u> - <u>0</u> <u>0</u> <u>3</u> - <u>0</u> <u>5</u> <u>2</u>, <u>0</u> <u>0</u> <u>3</u>, I/We understand that the agent representation may include but not be limited to decisions relating to the submittal, status, conditions, or withdrawal of this application. In understanding this, I/we release Baldwin County from any liability resulting from actions made on my/our behalf by the authorized agent and representative. I hereby certify that the information stated on and submitted with this application is true and correct. I also understand that the submittal of incorrect information will result in the revocation of this application and any worked performed will be at the risk of the applicant. I understand further that any changes which vary from the approved plans will result in the requirement of a new Land Use Certificate.

*NOTE: All correspondence will be sent to the authorized representative. It will be the representative's responsibility to keep the owner(s) adequately informed as to the status of the application.*

### PROPERTY OWNER(S)

Breezy Shores, LLC  c/o Mike Bordelon
_____
Name(s) [printed]

5855 Plantation Drive
_____
Mailing Address

St. Francisville, LA 70775
_____
City/State

(225) 454-2117
_____
Phone                                              Fax #

_____              __11/15/19__
Signature(s)                                    Date

### AUTHORIZED AGENT

Kristopher O. Anderson, Esquire
_____
Name(s) [printed]

4725 Main St., Suite F-222
_____
Mailing Address

Orange Beach, AL 36561
_____
City/State

(251) 225-4122                          (251) 271-0445
_____
Phone                                              Fax #

_____              __11-19-2019__
Signature(s)                                    Date

rev.10/9/2015

**Admitted in Evidence**

1-25-2022

**Trial Exhibit 45**

130

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1    (No response.)

2        PLANNING AND ZONING COMMISSION CHAIRMAN

3    SAM DAVIS:  Passed unanimously.

4            (Applause.)

5        PLANNING AND ZONING COMMISSION CHAIRMAN

6    SAM DAVIS:  Let me ask you to keep the noise down

7    so we can go ahead with the meeting.

8

9        **9 - TEXT AMENDMENTS**

10

11    **9A - TA-19001, ARTICLE 2, SECTION 2.3.25 LOCAL**

12        **PROVISIONS FOR PLANNING DISTRICT 25**

13        PLANNING AND ZONING COMMISSION CHAIRMAN

14    SAM DAVIS:  Next case is TA-19001.  Staff report?

15    Folks, folks, I'll ask again -- If you could

16    clear them on out of here.  If you could ask

17    people to go on outside.

18        MR. VINCE JACKSON:  Okay.  Moving on.

19    Our next items involve some amendments to the

20    text of the zoning ordinance.  You actually have

21    three case numbers.  The first case number --

22        PLANNING AND ZONING COMMISSION CHAIRMAN

23    SAM DAVIS:  DJ, could you ask -- could you help

24    them move on outside to the lobby?

25        MR. VINCE JACKSON:  Case TA-19001 would

26    be an amendment to the Article 2, Section 2.3.25.

27    These are the local provisions for Planning

28    District 25.  And we have a series of amendments

*SUSAN C. ANDREWS, CERTIFIED COURT REPORTER NO. 287*
*2200 US HIGHWAY 98, SUITE 4, PMB 230, DAPHNE, ALABAMA 36526*

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 574 of 800   PageID #: 2588
Case 1:20-cv-00057-C   Document 45-3   Filed 05/21/21   Page 3 of 187   PageID #: 1041

131

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1  which would apply to -- specifically to this

2  planning district.

3      We have received a number of e-mails in

4  support of these proposed amendments.  We have

5  also have begun receiving e-mails that have

6  expressed some opposition or concern.

7      And I want to -- I want to clarify something.

8  One of these items that seems to be biggest

9  concern has to do with the establishment of a

10  maximum height limit in terms of habitable

11  stories.  That is part of the amendment -- the

12  proposed amendment -- that we are considering

13  tonight.

14      Some of the letters of opposition are talking

15  about parking provisions.  We are not considering

16  any changes related to parking with this

17  amendment.

18      We adopted parking standards for Planning

19  District 25 two years ago.  We have an existing

20  provision that applies to the stacked parking

21  issue.  But we are not doing anything with this

22  amendment that further addresses parking at this

23  time.

24      We did initially have a statement in here

25  about stacked parking in some of our initial

26  drafts.  But because of the existing language, we

27  felt like including that would be redundant.

28      And so I want to be clear that we're not --

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 575 of 800  PageID #: 2589
Case 1:20-cv-00057-C  Document 45-3  Filed 05/21/21  Page 4 of 187  PageID #: 1042

132

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1  we're not discussing parking tonight.  That is

2  not part of what is been proposed.

3      There are additional issues related to

4  parking that we would like to discuss with some

5  of the residents in the area, but those will need

6  to be handled under a separate amendment at

7  different time.

8      So getting started, as I stated, these would

9  be amendments to the local provisions for

10  Planning District 25.  This is Article 2, Section

11  2.3.25.3.

12      As you look at the draft of the text, the

13  proposed additions to the text would be

14  highlighted in red.

15      The first amendment that we're proposing --

16  And this was actually touched on already -- would

17  be removal of the HDR, High Density Residential

18  District, as an available zoning designation in

19  Planning District 25.  That, if approved, would

20  be listed as Paren D.

21      And this is something that we heard from some

22  of the residents early on when we first adopted

23  HDR, that the Planning District 25 essentially

24  can't support that kind of density, given the

25  unique environmental and coastal characteristics

26  of the area.

27      We didn't want to, right out of the gate,

28  with a new amendment, immediately exclude one

Case 1:20-cv-00057-C Document 77 Filed 02/02/22 Page 576 of 800 PageID #: 2590
Case 1:20-cv-00057-C Document 45-3 Filed 05/21/21 Page 5 of 187 PageID #: 1043

133

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1　planning district. So we felt like it was a good
2　idea to wait a while.
3　　　But we are bringing that forward now. And
4　that's simple enough. We would just state that
5　HDR is not available in Planning District 25.
6　　　Next, under E, the maximum height of
7　single-family and two-family structures shall be
8　limited to two (2) habitable stories.
9　　　Prior to 2009, for single-family and
10　two-family dwellings, we had a height limit of
11　two-and-a-half stories. In 2009, there was an
12　amendment that removed the limit of
13　two-and-a-half but we retained our height -- our
14　maximum height in feet, which is thirty-five (35)
15　feet. And that would not change.
16　　　In looking back, I think part of the reason
17　that we removed the two-and-a-half story height
18　limit, it had to do the half-story, itself.
19　　　It -- the definition was somewhat difficult.
20　It was difficult to review. It was difficult to
21　enforce. And I think there was a point where we
22　just thought it would be better if we didn't have
23　it at all.
24　　　Looking back at that, we're now ten years
25　removed, we think that really wasn't a good idea,
26　that we should have retained that half -- that
27　two-and-a-half story limit.
28　　　And when we're talking about half-story, what

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1  we're talking about is an area under a sloped
2  roof where half of the area would be finished off
3  for habitation.
4      It wouldn't be the whole area.  It wouldn't
5  be an area that was equal to the floor below, but
6  it would be a half area.  And it would be under a
7  sloped roof.
8      But I want to show some pictures that were
9  provided to us.  This is a picture of a duplex
10  structure that was built without a limit in the
11  number of stories.
12      As you see, there are three stories.  And
13  the -- the area underneath does not count as a
14  habitable story.  This is in a flood zone, so
15  it's required to be elevated.  So we don't count
16  that bottom part as a story; it's the three
17  stories above.
18      And you can see what a massive structure that
19  appears to be.  It's still thirty-five (35) feet,
20  but you have a difference in the way it looks
21  when it's a full story versus a half-story.
22      Our original idea in bringing back
23  two-and-a-half stories was that that would be
24  what got approved throughout the zoning of the
25  county.
26      But in talking with residents of Fort Morgan
27  and attending some of the meetings of the Zoning
28  Advisory Committee, we heard that there was a

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 578 of 800  PageID #: 2592
Case 1:20-cv-00057-C  Document 45-3  Filed 05/21/21  Page 7 of 187  PageID #: 1045

135

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1  concern about a half-story, and that because of
2  safety issues, there was a belief that a limit of
3  two stories would be better.

4      And we actually received a letter from the
5  volunteer fire department.  And I believe a copy
6  of that letter was provided to all of you
7  tonight.

8      In that letter, it states their concerns.
9  And it's not a concern with the height in feet.
10  It's a concern of height in stories.  And it has
11  to do with the ability to rescue people in the
12  event of fires.  But you do have a copy of that
13  letter.

14      We have had concerns expressed about the
15  two-story limit.  And I'm sure there are people
16  who are here who would like to speak with you
17  about that tonight.

18      The next item, under F, would be standards
19  for dune walkovers.  We -- we provide proposed
20  standards for dune walkovers.  We provide a
21  definition and submission requirements.

22      And basically what we're talking about
23  with -- the minimum height would be one (1) foot
24  above the dune.  The maximum height would be
25  three (3).  And we provide different standards
26  about the width.  We also provide some standards
27  about not allowing construction during the sea
28  turtle nesting season.

136

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1    There was a good bit of concern expressed

2    from the residents about dune walkovers.  Because

3    there was a dune walkover that actually extended

4    out from the raised deck of a structure.

5    And I believe that dune walkover is about

6    twelve (12) feet high, give or take.  And that

7    prevents a visual barrier on the beach.

8    At the time, we were not regulating dune

9    walkovers through zoning.  So there was nothing

10   that we could do.  And so that's why we were

11   asked to develop some standards.

12   We've probably been working on the dune

13   walkover section for about two years.  I think at

14   the time there was someone that approached one of

15   our Commissioners.

16   And so we began a dialog.  We began a dialog

17   with some residents.  I did some research into

18   the regulations that the City of Orange Beach

19   had, that the City of Gulf Shores has.  I've

20   looked at regulations from other states.

21   And so I drafted something that I felt like

22   would fit in well with our ordinance, but that

23   would also address the concerns that had been

24   expressed to us as far as the dune walkovers.

25   The last part of our proposed amendments has

26   to do the planning and zoning considerations for

27   the coastal high hazard areas and the flood

28   hazard areas.

SUSAN C. ANDREWS, CERTIFIED COURT REPORTER NO. 287
2200 US HIGHWAY 98, SUITE 4, PMB 230, DAPHNE, ALABAMA 36526

Defendants' Bates #0102

Case 1:20-cv-00057-C Document 77 Filed 02/02/22 Page 580 of 800 PageID #: 2594
Case 1:20-cv-00057-C Document 45-3 Filed 05/21/21 Page 9 of 187 PageID #: 1047

137

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1    And these are areas that are identified on

2    the flood insurance maps. And without reading

3    everything that's in there, coastal high hazard

4    area, in a simplified definition, would be an

5    area that's subject to storm surge.

6    And then the flood hazard area would be the,

7    you know -- the actual flood zones as identified

8    on the flood insurance maps.

9    What we've provided is some definitions and

10   some considerations that we would use for future

11   re-zonings in the coastal high hazard area in

12   Planning District 25 and in the flood hazard

13   areas in Planning District 25.

14   There would also be this accompanying map,

15   which would be adopted as part of this. And we

16   would use this map to identify the locations of

17   the properties in terms of whether or not they

18   are in a flood zone, whether or not it's a flood

19   hazard area, whether or not coastal high hazard

20   area or V Zone.

21   And I think this, going forward, if this is

22   adopted, it will help to give us, the Planning

23   Commission and ultimately the County Commission,

24   some guidance in terms of the appropriate

25   recommendations to make for re-zoning

26   applications in Planning District 25.

27   As we state in the staff report, this is one

28   the most sensitive areas in the county. The area

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 581 of 800   PageID #: 2595
Case 1:20-cv-00057-C   Document 45-3   Filed 05/21/21   Page 10 of 187   PageID #: 1048

138

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1    is facing numerous challenges.  And we have

2    attempted to draft some regulations that we feel

3    like will help to address those issues and

4    concerns.

5        I know and realize there are a number of

6    people who are here tonight.  And so I'm sure

7    some of them would like to address you.

8        So those will be all my comments for now, but

9    I will be glad to answer any questions you may

10   have.

11            PLANNING AND ZONING COMMISSION CHAIRMAN

12   SAM DAVIS:  Any questions for Vince?

13                    (No response.)

14            PLANNING AND ZONING COMMISSION CHAIRMAN

15   SAM DAVIS:  Okay.  Thank you.

16       We'll open the public hearing at this point.

17   There are multiple people signed up here to speak

18   for this.  Who wants to go first?

19                (An audience member indicates.)

20            PLANNING AND ZONING COMMISSION CHAIRMAN

21   SAM DAVIS:  Okay.  And what I would ask for the

22   rest of the people is to listen closely to what

23   he has to say and limit any comments you have, if

24   you still wish to comment to something he has

25   missed.  That way --

26            THE COURT REPORTER:  State your name.

27            MR. JOE EMERSON:  Joe Emerson.

28            PLANNING AND ZONING COMMISSION CHAIRMAN

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 582 of 800  PageID #: 2596
Case 1:20-cv-00057-C  Document 45-3  Filed 05/21/21  Page 11 of 187  PageID #: 1049

139

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1   SAM DAVIS:  -- we can manage our time for all our

2   sakes.

3        MR. JOE EMERSON:  All right.  Now, thank

4   you for letting me speak this evening.  My name

5   is Joe Emerson.  I'm a resident of District 25.

6     I'm not speaking to you tonight as the

7   President of the Civic Association.  I'll be

8   speaking to you as a resident.

9     I really want to thank all of the

10  representatives and people from our district for

11  showing up.  It's a long drive up here.  And

12  thank y'all for hanging.

13    I'd also like to recognize the multiple

14  people from our district and homeowners

15  throughout the area that have written in to you

16  guys, specifically Vince, with e-mails expressing

17  their support for this text amendment.

18    I'm speaking for the text amendments because

19  this is something that the Fort Morgan Planning

20  and Zoning Committee has been working on with the

21  County for multiple years now.

22    These amendments are going to help to resolve

23  some of the serious problems that we have in

24  District 25, if they're properly enforced.

25    These amendments will help to reduce impact

26  to our struggling infrastructure in District 25,

27  but also helping to reduce the constant problem

28  of public access to beaches versus private

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 583 of 800   PageID #: 2597
Case 1:20-cv-00057-C   Document 45-3   Filed 05/21/21   Page 12 of 187   PageID #: 1050

140

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1   property rights by significantly reducing future

2   densities.

3        Finally, these amendments will address public

4   safety concerns named by the Fort Morgan Fire and

5   Rescue in the letter drafted to Mr. Dyess on

6   July the 9th, 2019.

7        Before voting on this, I would like the

8   Commission to seriously consider Act 2015-411,

9   which amended that 91-719.  I'm sure you guys are

10  familiar with, but I'll read it all the same:

11            *In performing its functions related to*

12            *planning and zoning, the Baldwin County*

13            *Planning and Zoning Commission and the*

14            *County Commission·shall specifically*

15            *consider the historic nature of existing*

16            *development within the Fort Morgan*

17            *district, its historical and*

18            *environmental character of the district,*

19            *and the unique needs of the district*

20            *related to hurricane safety and*

21            *infrastructure for potential evacuation.*

22       That's all I have for this evening.

23            PLANNING AND ZONING COMMISSION CHAIRMAN

24  SAM DAVIS:  All right.  Thank you.

25       Anyone else in support that has anything

26  additional to offer?

27            (Two audience members indicating.)

28            PLANNING AND ZONING COMMISSION CHAIRMAN

Case 1:20-cv-00057-C Document 77 Filed 02/02/22 Page 584 of 800 PageID #: 2598
Case 1:20-cv-00057-C Document 45-3 Filed 05/21/21 Page 13 of 187 PageID #: 1051

141

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1    SAM DAVIS:  Okay.  Thank you.  Well, I got you
2    next.  How about that?
3          MR. GREG STRATEGIER:  My name is Greg
4    Strategier.  My wife, Jamie, and I live at 3510
5    Ponce de Leon in Fort Morgan.
6       We have been working closely with the Baldwin
7    County Planning and Zoning department, with
8    Vince, the Civic Association, which I'm treasurer
9    of.  And we've also been working with the Fort
10   Morgan Planning and Zoning Committee over the
11   past several years working on these ordinances.
12      And I'm here as a resident to tell you that I
13   support them and that we need them in our
14   community.
15   *******************************************************
16   *ATTACHMENT 2 - HANDOUT PROVIDED BY MR. GREG STRATEGIER*
17   *******************************************************
18         MR. GREG STRATEGIER:  I have three quick
19   points I'm going touch on.  I have given y'all
20   some handouts real quick.  One I'm not going to
21   spend time on is the letter from our president of
22   our Fort Morgan Volunteer Fire Department, Ernie
23   Church, expressing the safety concerns of any
24   building over two stories.  Mainly, we don't have
25   the equipment to reach anybody over two stories.
26   So anything above that is a danger.
27      My second point, and it goes with pictures.
28   I gave you some pictures of the dune walkovers

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 585 of 800  PageID #: 2599
Case 1:20-cv-00057-C  Document 45-3  Filed 05/21/21  Page 14 of 187  PageID #: 1052

142

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1  that are currently being built.

2       Vince had talked about they're coming from

3  the upper deck.  But it's not just one, it's all

4  the ones that have been built in the last two to

5  three years, so you have got to think all dune

6  walkover that you leave out of your living room

7  onto your back deck and walk down the beach.

8       I don't know everybody else, but my beach

9  stuff is under my house.  And I walk from under

10 my house to the beach.  And I'm pretty sure you

11 don't walk up to your living room with your

12 fishing tackle to go to the beach.

13      What we see -- we live next to this one in

14 particular -- is just that the visitors come.

15 They walk underneath the dune walkover with their

16 equipment.  What that is used for is to take

17 pictures at sunset or to go out at night and look

18 at water.

19      The other thing I want to point out is the

20 structure, how big this thing is.  There

21 thirty-six (36) telephone poles on this site.

22 They're thirty-five (35) feet long and weight

23 seven hundred (700) pounds.

24      We all know someday a hurricane is going to

25 claim this.  And that's going to be in our Gulf.

26 And that's going to be a hazard to marine life

27 and human life.

28      And if y'all recall -- You may not -- in

_SUSAN C. ANDREWS, CERTIFIED COURT REPORTER NO. 287_
_2200 US HIGHWAY 98, SUITE 4, PMB 230, DAPHNE, ALABAMA 36526_

Defendants' Bates #0108

Case 1:20-cv-00057-C  Document 77  Filed 02/02/22  Page 586 of 800  PageID #: 2600
Case 1:20-cv-00057-C  Document 45-3  Filed 05/21/21  Page 15 of 187  PageID #: 1053

143

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

 1 | Tropical Storm Cindy in June '17, a young child
 2 | was killed on the beach by that very fact.  And a
 3 | big piece of the debris came out in the Gulf and
 4 | killed him on the beach.  That's one of the
 5 | reasons not to have this.

 6 |     What I have in the second picture -- And,
 7 | again, it shows you what we hope it looks like as
 8 | we get these ordinances passed -- something that
 9 | starts from underneath the house where your
10 | equipment is, takes you over the dune structure,
11 | drops you off at the beach, protects the beach
12 | mouse, does what it supposed to do.  Also, when
13 | it goes back into the Gulf, not so much debris.

14 |     My third and final point that I just touched
15 | briefly on relates to the two-story limits we're
16 | talking about on the structures.

17 |     I've given you something from Zillow.  This
18 | is a structure that's near my home.  Actually,
19 | the picture of it was up there earlier.  I just
20 | want to point out a few things and make some
21 | quick comments.

22 |     This property is for sale for
23 | three-point-five million dollars ($3,500,000).
24 | When it was finished in May of 2017, I did some
25 | calculations to try to figure out what they put
26 | into the building.

27 |     As a background, I'm a CPA.  I've been a CFO
28 | for over twenty (20) years.  I have real estate

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 587 of 800   PageID #: 2601
Case 1:20-cv-00057-C   Document 45-3   Filed 05/21/21   Page 16 of 187   PageID #: 1054

144

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1    investments.  I knew what the lot was.  I checked
2    with my insurance broker to see what it cost per
3    square foot to build these kind of properties.
4         It came up to two-point-five million
5    ($2,500,000).  So if this sales price is reached,
6    that's a forty percent (40%) return in less than
7    three years.
8         What drives this price is the number of
9    bedrooms that are in these structures.  This
10   particular one has eighteen (18) bedrooms in it.
11   It sleeps forty-four (44) people.
12        And if you look down a little bit lower, it
13   tells you what they made in income on one year's
14   revenue, three hundred forty-five thousand
15   dollars ($345,000).
16        That's a nice return on your investment.
17   That's why these individuals, developers,
18   builders, they want three stories instead of two.
19        Now, what this number tell us me is that they
20   have about a fifty percent (50%) occupancy.  So
21   that means on seventy-five (75) feet of beach
22   there, twenty-two (22) people every night.
23        Average household in the US is
24   two-point-five-three (2.53) people.  That's over
25   eight (8) households living on this
26   seventy-five (75) foot of beach.
27        So my last point with this, I just want to
28   make is that we're not trying to stop

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1  development.  We're trying to make it more
2  reasonable.
3      With a two-story structure, they can still
4  develop property, have twelve (12) bedrooms.
5  It'll still return on investment.  It may not be
6  a the forty percent (40%) level, but it's still
7  available for development.
8      I don't have anything else to add.  Does
9  anyone have any questions for me?
10          PLANNING AND ZONING COMMISSION CHAIRMAN
11  SAM DAVIS:  Any questions for this gentleman?
12                  (No response.)
13          PLANNING AND ZONING COMMISSION CHAIRMAN
14  SAM DAVIS:  Thank you, sir.
15      Does anyone have anything else to offer
16  that's different?
17          MS. THELMA STRONG:  My name is Thelma
18  Strong.  I am a long-time resident of Fort
19  Morgan.  Thank you for listening to me tonight
20  and allowing me to speak.
21      As a member of the Fort Morgan Planning and
22  Zoning Advisory Committee, I ask that you
23  consider passing these changes in our zoning.
24      The committee worked over three years or
25  about three years on these changes, with the help
26  of Vince, who we couldn't have done it without
27  him -- And we want to thank him for that -- and
28  who was always available for us when we needed

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1  him. I also want to thank David and Wayne for

2  their help and their advice.

3       As you know, Fort Morgan is a very unique

4  area. It's different from any other district in

5  Baldwin County. If we don't protect the

6  environmentally fragile area now, we're going to

7  lose it.

8       On behalf of the Fort Morgan Planning and

9  Zoning Advisory Committee and the people of Fort

10  Morgan, I ask you to vote to pass these changes.

11       And, also, if you would, please, recommend

12  them to the County Commission to see that they

13  pass them also. And thank you for your time.

14            PLANNING AND ZONING COMMISSION CHAIRMAN

15  SAM DAVIS: Thank you.

16                    (Applause.)

17            PLANNING AND ZONING COMMISSION CHAIRMAN

18  SAM DAVIS: We have three people signed up in

19  opposition.

20            (An audience member indicating.)

21            PLANNING AND ZONING COMMISSION CHAIRMAN

22  SAM DAVIS: Something different?

23            MR. PAUL STANTON: Yes, sir.

24            THE COURT REPORTER: And state your

25  name.

26            MR. PAUL STANTON: I'm Paul Stan, 3487

27  Ponce de Leon Court, where this nightmare is.

28  Just real quick, this is -- this is not a beach

Case 1:20-cv-00057-C Document 77 Filed 02/02/22 Page 590 of 800 PageID #: 2604
Case 1:20-cv-00057-C Document 45-3 Filed 05/21/21 Page 19 of 187 PageID #: 1057

147

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1   house.

2      When you have nine (9) bedrooms per side,

3   eighteen (18) bedrooms, eighteen (18) bathrooms,

4   sleeps forty-four (44) people, seventy-five (75)

5   foot linear -- that's -- it's basically a mini

6   condominium without a parking lot.

7      We have worked tirelessly. Ms. Thelma and

8   Bill and Beck over here, they've been here for

9   thirty-five (35) years, forty (40) years.

10      We've done everything in our power to fight

11   the condo growth. And we've done a fantastic

12   job. But this is -- this is what's proliferated

13   in the way the development community has gotten

14   around that restriction of condominiums. They

15   basically bought -- build mini condominiums.

16      I would just like to urge you to consider

17   this. Again, the Fort Morgan Fire Marshal has

18   basically come out and said he does not have the

19   ability to remove somebody from anything over two

20   feet -- I'm sorry, two stories.

21      And a lot these structures have bunk-beds

22   that were put in after certificate of occupancies

23   in the hallways. A lot of them spiral staircases

24   to go up to two-and-a-half -- to the third level.

25   It's almost impossible to get somebody out of

26   that.

27      The other thing is with two-and-a-half

28   story -- if we were to reduce it to

Defendants' Bates #0115

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 591 of 800   PageID #: 2605
Case 1:20-cv-00057-C   Document 45-3   Filed 05/21/21   Page 20 of 187   PageID #: 1058

148

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1   two-and-a-half story, generally, that apex is in

2   the middle of the property.  If the fire trucks

3   can't even get to the property, how in the heck

4   are they going get somebody out of a

5   two-and-a-half or three-story property?  You

6   can't even get a fire truck near this thing.

7       The other thing is if you tell them they have

8   to move all the cars, this family -- nobody in

9   this family knows who this family is.  So you

10  can't tell Aunt Carol to go move her car, because

11  they don't know who the heck Aunt Carol is.

12      The other thing that really needs to be

13  emphasized, and I know it's little bit of a

14  parking thing, but this is a tremendous

15  restriction for people that walk.

16      Cars are constantly getting choked at this

17  point where these things are located at.  And

18  this is my driveway right here.  As you can see,

19  one of -- one of the owners of this property over

20  here put a NO PARKING sign up, and I can't

21  even --

22          PLANNING AND ZONING COMMISSION CHAIRMAN

23  SAM DAVIS:  Let me ask you a question before you

24  get too far away from it and I forget.  Are you

25  saying that that picture right there with all

26  those cars, all those people are -- some of those

27  people were strangers to each other?

28          MR. PAUL STANTON:  Yeah, absolutely.

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1   This could be one family here, and this is a

2   completely different family.

3          PLANNING AND ZONING COMMISSION CHAIRMAN

4   SAM DAVIS:  So it's like separated, like in

5   halves?

6          MR. PAUL STANTON:  Oh, yes, sir.  Yes,

7   sir.

8       So this is my driveway right here.  And

9   there's many times I can't even get out of my

10  driveway, much less emergency vehicles, garbage

11  trucks, and stuff like that.

12      It is a nightmare down there.  The residents

13  of Fort Morgan need some relief as well as people

14  that are renting these properties.

15      It's dangerous.  Somebody is going to burn to

16  death in one of the things.  And the fire marshal

17  has come out and stated publically in our Fort

18  Morgan newsletter and in through a letter to the

19  County Commission that he cannot get anybody out

20  of a burning building over two stories.

21      Please help us down in Fort Morgan.  And I

22  just wanted to thank you guys for everything

23  you're doing to try to help.  Thank you.

24          PLANNING AND ZONING COMMISSION CHAIRMAN

25  SAM DAVIS:  All right.  Thank you.

26                  (Applause.)

27          PLANNING AND ZONING COMMISSION CHAIRMAN

28  SAM DAVIS:  We've got three people signed up in

*SUSAN C. ANDREWS, CERTIFIED COURT REPORTER NO. 287*
*2200 US HIGHWAY 98, SUITE 4, PMB 230, DAPHNE, ALABAMA, 36526*

Defendants' Bates #0115

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1  opposition.  Who wants to go first?

2                    (No response.)

3          PLANNING AND ZONING COMMISSION CHAIRMAN

4  SAM DAVIS:  Anybody want to go at all?

5              (An audience member indicating.)

6          PLANNING AND ZONING COMMISSION CHAIRMAN

7  SAM DAVIS:  Okay.  Come on.

8          THE COURT REPORTER:  And state your

9  name, please.

10         MR. TOM MARTIN:  My name is Tom Martin.

11 I own a residence down Fort Morgan, and I'm

12 building.

13    I wasn't aware this was going on until about

14 two o'clock this afternoon.  And so I wrote

15 Mr. Jackson a letter.  Because I kind of -- I

16 just put my words down.  So that's what I've got.

17 Just got the letter to look at the County's

18 intention.

19    According to the RBC IRC codes, there is no

20 half-story definition.  Orange Beach counts

21 ground level under the first half of a floor as a

22 story with two floors above that require a fire

23 sprinkler system.

24    Gulf Shores does not count raised floors, but

25 it requires a fire sprinkler system if there are

26 three inhabitable floors above.  The County has

27 yet to require fire sprinklers in two or three or

28 more floors.

Case 1:20-cv-00057-C Document 77 Filed 02/02/22 Page 594 of 800 PageID #: 2608
Case 1:20-cv-00057-C Document 45-3 Filed 05/21/21 Page 23 of 187 PageID #: 1061

151

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1    Houses with three habitable floors have been

2  built as far as back as 1902, like the picture

3  that y'all have in the hallway.

4    Fish and Wildlife has restricted the

5  footprint, damaging property values.  The only

6  way to re-launch them is to go up three habitable

7  floors.

8    If this passes, property values for those who

9  have three floors will go up, but property values

10  will go down.

11    As far as parking, most all jurisdictions

12  allow stacking.  But it requires so many cars per

13  bedroom.  Again, Fish and Wildlife has been very

14  limited parking without stacking, what cars are

15  stacked, regardless of the size of the house.

16  How will that be monitored and enforced?

17    Three cars on a fifty (50) foot lot is most

18  you can get.  Even with seven bedrooms, three on

19  a fifty (50) foot lot is all you can get; for

20  eight bedrooms, three.

21    So changing the zoning, the way it is, you

22  change the status of many homes to nonconforming,

23  which could be devastating to future repairs and

24  value.

25    So by not allowing stacking, whether or not

26  existing structures with stacking are going on,

27  so by changing the zoning, is this a form of

28  taking property rights to have what others have

Defendants' Bates #0117

Case 1:20-cv-00057-C   Document 77   Filed 02/02/22   Page 595 of 800   PageID #: 2609
Case 1:20-cv-00057-C   Document 45-3   Filed 05/21/21   Page 24 of 187   PageID #: 1062

152

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1   been enjoying for twenty-plus years?

2       Require fire sprinkler system in three

3   stories for sure.  That would take care of the

4   fire department problems of saving people.

5       And on that same note, there's been zero

6   deaths in house fires in three stories in Fort

7   Morgan.

8       Leave it the way -- leave the zoning the way

9   it is, or get the Fish and Wildlife to loosen up

10  on restrictions of their four hundred -- four

11  thousand, three hundred fifty-six (4,356) square

12  foot from the edge of pavement of impacted area.

13      With a driveway of one hundred (100) square

14  foot, it's three thousand, four hundred fifty

15  (3,450) square foot of impacted for dwelling,

16  decks, pools, and this parking pass; not much.

17      The right-of-way access on Fort Morgan Road

18  can be as much as one hundred forty (140) feet to

19  the edge of the pavement.  And you got to pay two

20  dollars thirty cents ($2.30) for State Lands --

21  to access it, to Fish and Wildlife.

22      The new flood maps have many homes also now

23  nonconforming.  Long-term residences there,

24  they'll find out that if their house is -- I've

25  got one in Gulf Shores that went three foot

26  underwater, and it was above water on the flood

27  map.

28      I have another piece of property that came

153

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1   off the flood map, and now it's an X Zone.  A lot

2   of the houses in X zones also are up on stilts.

3   And they consider that not being a story.

4        And Fish and Wildlife has done a good job on

5   requiring dune walks.  And I like the dune walks.

6   I think that is a good answer for the houses to

7   make it, to protect the dune so we can protect

8   our properties.

9        To give you an idea about, you know, we

10  talked about stories.  And a habitable story is

11  one thing.  That says, space, you know, living

12  sleeping, eating, and cooking.  Bathrooms and

13  such are not included.

14       The -- the story is a portion of the

15  building, including the upper surface of the

16  floor and the upper floor or roof above it, any

17  story -- finishing -- finished floor surface and

18  grade plane.  Grade plane would be the -- if it

19  is more than six feet above your head -- I mean

20  above the dirt or more than twelve feet in any

21  corner, that would be considered a story in a

22  non-flood zone.

23       We don't count the flood zone.  So a story --

24  and it even goes on to say that on the height of

25  a story, the vertical distance from the top of

26  two successive tiers or beams or finished floor

27  surface for the topmost story, from the top of

28  the floor finish to the top of the ceiling or

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1   where there is not a ceiling, to the top of the

2   roof rafters.

3        So, in other words, the top of the roof

4   rafters is counted as a story.  And you can't

5   call it a two-and-a-half story, because that's

6   actually a three-story, according to -- And this

7   IRC -- AIRC, Page 18 and 24.

8        And but I know everybody's got their piece of

9   the pie.  And it's nice to have that.  But

10  everybody else has a chance to do it, too.

11       So I don't know how you can take away

12  something that's already there and not call it a

13  taking of somebody else that owns raw land next

14  it, the value of their property.

15            PLANNING AND ZONING COMMISSION CHAIRMAN

16  SAM DAVIS:  That's an argument for another body

17  besides us.

18            MR. TOM MARTIN:  Right.

19            PLANNING AND ZONING COMMISSION CHAIRMAN

20  SAM DAVIS:  But I appreciate your comments.

21            MR. TOM MARTIN:  I do understand.  It's

22  just my opinion.

23            PLANNING AND ZONING COMMISSION CHAIRMAN

24  SAM DAVIS:  Thank you.

25            MR. TOM MARTIN:  Okay.

26            PLANNING AND ZONING COMMISSION CHAIRMAN

27  SAM DAVIS:  Dee Crum or PJ Howard are the only

28  two signed up in opposition.  Where are they?

Defendants' Bates #0120

155

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1       MS. DEE CRUM:  I am not in opposition.

2  I am for the text amendment.

3       PLANNING AND ZONING COMMISSION CHAIRMAN

4  SAM DAVIS:  Okay.  You just signed the wrong

5  form.

6       MS. DEE CRUM:  That's right.  That's the

7  one she pushed in front of me.

8       PLANNING AND ZONING COMMISSION CHAIRMAN

9  SAM DAVIS:  Okay.  How about Mr. Howard?  Where

10  are you?

11         (Mr. PJ Howard indicating.)

12       PLANNING AND ZONING COMMISSION CHAIRMAN

13  SAM DAVIS:  Do you have anything to say?

14       MR. PJ HOWARD:  Not at this time.

15       PLANNING AND ZONING COMMISSION CHAIRMAN

16  SAM DAVIS:  Okay.  Thank you.

17    We'll close the public hearing at this point.

18  Staff have anything else?

19       MR. VINCE JACKSON:  Just to say that we

20  have spent good bit of time working on this.

21  Some of the -- in receiving e-mails that have

22  expressed concerns, I've seen a number of times

23  where it is suggested about the requirement for

24  sprinklers.

25    However, that's not the zoning.  That's not

26  something that we can do to the Zoning Ordinance.

27  That's a Building Code consideration.  And the

28  Planning and Zoning has no authority over the

Case 1:20-cv-00057-C    Document 77    Filed 02/02/22    Page 599 of 800    PageID #: 2613
Case 1:20-cv-00057-C    Document 45-3    Filed 05/21/21    Page 28 of 187    PageID #: 1066

156

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1  Building Code.

2        You know, if people would like to talk to the

3  Building Inspector about that requirement, they

4  can certainly do so.  But there is nothing we can

5  do in zoning.

6        We welcome all comments.  And this will be a

7  recommendation to the County Commission.  So, you

8  know, we will continue to take comments.

9        And it's possible that as we -- as we

10  continue through the process, that there could be

11  some changes or additions to the language, but

12  we're -- we're -- we're satisfied with what we

13  have.

14        We think it addresses the concerns.  And

15  we're hopeful that we can get a positive

16  recommendation on this so that we can carry that

17  forward to the County Commission.

18            PLANNING AND ZONING COMMISSION CHAIRMAN

19  SAM DAVIS:  Okay.  Thank you, Vince.

20        All right.  Staff has recommended approval of

21  this to the County Commission for their -- our

22  recommendation that we recommend approval for the

23  County Commission to consider.  Is there a motion

24  to do?

25            COMMISSION MEMBER BONNIE LOWRY:  So

26  moved, Mr. Chairman.

27            PLANNING AND ZONING COMMISSION CHAIRMAN

28  SAM DAVIS:  Okay.  There's a motion to recommend

157

BALDWIN COUNTY PLANNING AND ZONING COMMISSION REGULAR MEETING 09/05/2019

1   approval to the County Commission, is there a

2   second?

3            COMMISSION MEMBER DANIEL NANCE:  Second.

4            PLANNING AND ZONING COMMISSION CHAIRMAN

5   SAM DAVIS:  There's a second.  All in favor, say

6   aye.

7            (Commission Members say "aye" in unison.)

8            PLANNING AND ZONING COMMISSION CHAIRMAN

9   SAM DAVIS:  Any opposed, same sign.

10                      (No response.)

11           PLANNING AND ZONING COMMISSION CHAIRMAN

12  SAM DAVIS:  Unanimous.

13                      (Applause.)

14

15  <u>9-B - TA-19002, ARTICLE 4, RESIDENTIAL DISTRICT AS IT</u>

16  <u>PERTAINS TO MAXIMUM HEIGHT AND TA-19003, ARTICLE 22,</u>

17  <u>DEFINITIONS AS IT PERTAINS TO THE DEFINITION OF</u>

18  <u>HALF-STORY</u>

19           PLANNING AND ZONING COMMISSION CHAIRMAN

20  SAM DAVIS:  Next case is TA-19002 and case

21  TA-19003.

22           MR. VINCE JACKSON:  Yes.  We have -- we

23  have two separate case numbers that apply to two

24  different sections of the ordinance, but they're

25  related, so we put them under one staff report.

26       This would be an amendment to Article 4 of

27  Baldwin County Zoning Ordinance, Residential

28  Districts, pertaining to the maximum number of

Defendants' Bates #0123

BALDWIN COUNTY PLANNING & ZONING COMMISSION

VOTING SHEET

Case # TA-19001

Text Amendment

Article 2, Section 2.3.25

September 5, 2019

Motion:                  TO RECOMMEND APPROVAL

Made by:                 Bonnie Lowry

Motion Seconded by:  Daniel Nance

| MEMBER | IN FAVOR OF MOTION MADE | OPPOSED TO MOTION MADE |
|---|---|---|
| Sam Davis | - | - |
| Kevin Murphy | X | |
| Bonnie Lowry | X | |
| Daniel Nance | X | |
| Brandon Bias | X | |
| Arthur Oken | X | |
| Nancy Mackey | X | |
| Robert Davis | X | |
| Plumer Tonsmeire | X | |

*The Chairman only votes in the event of a tie          *MOTION CARRIED ON A VOTE OF 8-0*



# Baldwin County Planning & Zoning Department

Baldwin County Commission Staff Report

**Agenda Item**
**Case No. TA-19001**
**Amendments to the *Baldwin County Zoning Ordinance*, Article 2**
**Local Provisions for Planning District 25 (Section 2.3.25.3)**
**October 15, 2019**

## Proposed Amendment Information

| | |
|---|---|
| **General Information:** | Amendments to Article 2 of the Baldwin County Zoning Ordinance, Local Provisions for Planning District 25, pertaining to the removal of HDR, High Density Residential District, establishment of a two (2) habitable story maximum height for single family and two family dwellings, establishment of dune walkover requirements and standards, and establishment of Planning and Zoning considerations for Coastal High Hazard Areas and Flood Hazard Areas (Section 2.3.25.3) |
| **Lead Staff:** | Vince Jackson, Planning Director |
| **Attachments:** | Text of Proposed Amendments |

## Summary and Recommendation

### I.   DISCUSSION:

Planning District 25 (Fort Morgan) is one of the most unique and environmentally sensitive areas in Baldwin County. Recently, the Planning staff has become aware of numerous concerns and issues facing the planning district. Through discussions with and input from the Fort Morgan Planning and Zoning Advisory Committee, the Fort Morgan Civic Association, the Fort Morgan Volunteer Fire Department and various citizens, staff has developed a series of amendments to the Planning District 25 Local Provisions. The amendments include the following:

- Removal of HDR, High Density Residential District, as an available zoning designation in Planning District 25. This will also include a statement under Section 4.10. (See staff report for Case TA-19002 and Case TA-19003).
- Establishment of a maximum building height limit of two (2) habitable stories for single family and two family dwellings.
- Establishment of requirements and standards for dune walkovers.
- Establishment of Planning and Zoning considerations for the Coastal High Hazard Area (CHHA) and Flood Hazard Area (FHA). The section provides definitions and objectives as well as standards for future rezoning requests. A map indicating the Coastal High Hazard Area and Flood Hazard Area is included.

A copy of Section 2.3.25 with the proposed new language underlined and highlighted in red is listed below.

II.   RECOMMENDATION:

Staff recommends **APPROVAL** of the proposed amendments to the *Baldwin County Zoning Ordinance*, Article 2, Local Provisions for Planning District 25 (Section 2.3.25.3). *

*On amendments to the zoning ordinance, the County Commission will make the final decision.*

2.3.25 *Planning District 25.*  (DRAFT)

2.3.25.1   Effective Date

On June 19, 1992, a majority of qualified electors in Planning District 25 voted to institute County Zoning. On November 16, 1993, the County Commission adopted the Planning District 25 Zoning Map and Ordinances.

2.3.25.2   District Boundaries

A legal description of the boundaries for Planning District 25 may be found under Appendix A.

2.3.25.3   Local Provisions for Planning District 25

(a) Multiple family buildings in the "RMF-6, Multiple Family" district may be erected to a maximum height or seven (7) habitable stories. The required side yards shall be increased by 4-feet for each additional

story over two (2) habitable stories. The maximum impervious surface ratio shall not exceed .50.

(b) No PRD development is allowed to exceed maximum height requirements by more than 10-feet or 1 story.

(c) Off-street Parking.

As a supplement to Section 15.2, Parking Schedule, the following off-street parking requirements shall be applicable to single family dwellings and two-family dwellings:

1. Up to Four (4) Bedrooms: Two (2) spaces per dwelling unit.

2. Up to Six (6) Bedrooms: Three (3) spaces per dwelling unit.

3. Seven (7) Bedrooms and more: Four (4) spaces per dwelling unit, plus one (1) additional space per dwelling unit for every bedroom over eight (8).

(d) HDR, High Density Residential District, shall not be available in Planning District 25.

(e) The maximum height of single family and two family structures shall be limited to two (2) habitable stories.

(f) Dune Walkovers.

1. As used in this section, the following definition shall apply:

Dune walkover. A raised walkway constructed for the purpose of protecting the beach and dune system between mean high tide and the construction control (CCL) line from damage that may result from anticipated pedestrian traffic to the beach, and which is no more than six (6) feet in width for multiple family/commercial/public structures, no more than four (4) feet in width for single family/two family structures, constructed without roof or walls, elevated at least one (1) foot above the dune, and extends seaward of the seaward vegetation line.

2. Land Use Certificate.

A. A land use certificate which meets the requirements of Section 18.2, as well as the standards found herein, shall be submitted to and approved by the Zoning Administrator, or his/her designee, prior to the issuance of a building permit.

Defendants' Bates #0127

      B. A recent survey showing the location, size and alignment of all proposed structures and the ADEM CCL and property lines shall be submitted along with the required land use certificate application. Said survey shall be prepared and stamped by a Professional Land Surveyor registered in the State of Alabama.

3. A dune walkover shall be constructed to the following standards:

      A. There shall be no more than one (1) dune walkover per parcel.

      B. Dune walkovers shall begin at the existing ground level elevation of the principal landward structure.

      C. The maximum width of the dune walkover structure shall be no more than four (4) feet for single family/two family structures and no more than six (6) feet for multiple family/commercial/public structures. Maximum widths shall be applicable to all sections of the dune walkover structure, including but not limited to steps, ramps, landings and decks.

      D. The minimum elevation from the bottom of floor joists of the dune walkover shall be no less than one (1) foot and no more than three (3) feet above the maximum elevation of the dune system being traversed.

      E. No vertical or horizontal structures shall be allowed above thirty-eight (38) inches from the walking surface, i.e., roofs, walls, pergolas, etc.

      F. Handrails, if any, shall be no higher than thirty-six (36) to thirty-eight (38) inches above the walking service for Single and Two Family Dwellings.

      G. The dune walkover shall terminate ten (10) feet seaward of the vegetative line of the dune.

      H. The location and length of the dune walkover is to be coordinated through and approved by the delegated authority of the Alabama Department of Environmental Management (ADEM) and the U.S. Fish and Wildlife Service.

      I. No lighting shall be utilized on a dune walkover.

      J. No dune walkover construction shall occur during the sea turtle nesting season from May 1 through November 1.

Defendants' Bates #0128

(g) Planning and Zoning Considerations in the Coastal High Hazard Area and Flood Hazard Areas in Planning District 25 (Fort Morgan).

1. Purpose:

   A. Fort Morgan contains areas of significant natural beauty, history and unique wildlife. With such assets comes unique vulnerabilities. These vulnerabilities include, but are not limited to, tropical storm damage, flooding, wetland habitat, protected or endangered species, Native American archeological sites and National Historic Landmarks. Further, Act 2015-411, which amends Act 91-719, requires "In performing its functions related to planning and zoning, the Baldwin County Planning and Zoning Commission and the Baldwin County Commission shall specifically consider the historical nature of existing development within the Fort Morgan District, the historical and environmental character of the district, and the unique needs of the district related to hurricane safety and infrastructure for potential evacuation."

   B. The most imminent threat is to property and lives subject to tropical storm events. The Coastal High Hazard Area (CHHA) is an area particularly vulnerable to the effects of damage from tropical storm events. The CHHA contains the most vulnerable areas of Fort Morgan and thus protection and oversite is needed and justified to protect future populations and property.

2. Objectives of these considerations in the Coastal High Hazard Area (CHHA) and Flood Hazard Area (FHA) are to:

   A. Limit the amount of infrastructure, both private and public in the Coastal High Hazard Area (CHHA)

   B. Limit the magnitude of public loss and mitigation of private loss and investment

   C. Increase the degree of protection to private property and lives of residents and visitors in storm events

   D. Reduce the risk and exposure of lives and property during storm events

3. Coastal High Hazard Area Defined:

   The Coastal High Hazard Area (CHHA) of Baldwin County is: "the area below the elevation of the Category 1 Storm Surge Line as

established by a Sea, Lake, and Overland Surges from Hurricane (SLOSH) computerized storm surge model." Baldwin County will use the CHHA Map, provided by National Oceanic and Atmospheric Administration (NOAA), as the delineation of the CHHA and will use the most current SLOSH model to maintain the map. Additionally, in the interest of public safety regarding ingress and egress from and through said hazard areas, any "enclaves" which are not located in either the flood zone or Category 1 storm surge areas, but are surrounded by such hazard areas, will be considered as part of the Coastal Hazard Area. The CHHA Map is attached herein as attachment "A". Because the boundaries of the CHHA are subject to change, site design and building typology in the CHHA will be based on the CHHA line in effect at the time of development. In addition to the CHHA, areas subject to this consideration also are V-Zones[1] and Coastal Barrier Resources System[2] (CBRS) areas as indicated on the FEMA Flood Maps.

http://noaa.maps.arcgis.com/apps/MapSeries/index.html?appid=d9ed7904dbec441a9c4dd7b277935fad&entry=1

https://alabamaflood.com/map

4. Rezoning Considerations in the Coastal High Hazard Area of Fort Morgan:

Increases in density and intensity through rezoning or similar land use changes in the Coastal High Hazard Area (CHHA) in Fort Morgan are prohibited.

5. Rezoning Considerations in Flood Hazard Areas of Fort Morgan:

---

[1] According to FEMA and the National Flood Insurance Program, any building located in an A or V zone is considered to be in a Special Flood Hazard Area, and is lower than the Base Flood Elevation. V zones are the most hazardous of the Special Flood Hazard Areas. V zones generally include the first row of beachfront properties. The hazards in these areas are increased because of wave velocity - hence the V designation. Flood insurance is mandatory in V zone areas.

[2] The Coastal Barrier Resources Act (CBRA) of 1982 established the John H. Chafee Coastal Barrier Resources System (CBRS), a defined set of coastal barrier units located along the Atlantic, Gulf of Mexico, Great Lakes, Puerto Rico, and U.S. Virgin Island coasts. These areas are delineated on a set of maps that are enacted into law by Congress and maintained by the Department of the Interior through the U.S. Fish and Wildlife Service (Service). Most new Federal expenditures and financial assistance are prohibited within the CBRS. The prohibition that is most significant to homeowners and insurance agents is the denial of Federal flood insurance through the National Flood Insurance Program (NFIP) for new or substantially improved structures within the CBRS. CBRA does not prevent development, and it imposes no restrictions on development conducted with non-Federal funds. Congress enacted CBRA to minimize the loss of human life, wasteful Federal expenditures, and the damage to natural resources associated with coastal barriers.

Defendants' Bates #0130

Increases in density and intensity through rezoning or similar land use changes in the Flood Hazard Areas (FHA) in Fort Morgan should be limited to low density single family uses.

https://alabamaflood.com/map

6. Development Exemptions and Clustering

Lots of record, as defined by the Baldwin County Subdivision Regulations, may be developed in accordance with subdivision regulations. When properties contain either CHHA or FHA areas, clustering of development through Planned developments, away from areas of highest hazard exposure is strongly encouraged. Lands outside the clustered development should be set aside through conservation easements or similar methods of preservation.

**STATE OF ALABAMA**

**COUNTY OF BALDWIN**

### RESOLUTION # 2020-001

DETERMINATION OF THE BALDWIN COUNTY COMMISSION, REGARDING **Case No. TA-19001, Amendments to Article 2 of the *Baldwin County Zoning Ordinance*, Local Provisions for Planning District 25 (Section 2.3.25.3)**, SUCH DETERMINATION AS AUTHORIZED PURSUANT TO SECTION 45-2-261 THROUGH SECTION 45-2-261.18, CODE OF ALABAMA (1975).

     **WHEREAS**, the need has arisen to amend certain provisions of Article 2 of the *Baldwin County Zoning Ordinance*, Local Provisions for Planning District 25, as these provisions pertain to the removal of HDR, High Density Residential District, establishment of a two (2) habitable story height limit for single family and two family dwellings, establishment of dune walkover requirements and standards, and establishment of Planning and Zoning considerations for Coastal High Hazzard Areas and Flood Hazzard Areas (Section 2.3.25.3); and,

     **WHEREAS**, regulatory language which would amend Article 2, Section 2.3.25.3, in the *Baldwin County Zoning Ordinance*, has been prepared; and,

     **WHEREAS,** the Baldwin County Planning and Zoning Commission held a public hearing on September 5, 2019, and voted to recommend approval of the amendment; and,

     **WHEREAS**, the Baldwin County Commission held a public hearing on October 15, 2019; and,

     **WHEREAS,** the requirements of Section 45-2-261 through Section 45-2-261.18, Code of Alabama (1975), regarding procedures to amend the Zoning Ordinance have been met; now therefore

     **BE IT RESOLVED, BY THE BALDWIN COUNTY COMMISSION, IN REGULAR SESSION ASSEMBLED,** that the text amendments to Article 2, Section 2.3.25.3, of the *Baldwin County Zoning Ordinance*, as found in Attachment "A" and Attachment "B", are hereby **APPROVED**.

     DONE, Under the Seal of the County Commission of Baldwin County, Alabama, on this the **15th** day of **October 2019.**

                                _____

                                  Charles F. Gruber, Chairman

*ATTEST:*


_____

Wayne A. Dyess, County Administrator

Defendants' Bates #0132

**Attachment "A"**

2.3.25 *Planning District 25.* (DRAFT)

    2.3.25.1   Effective Date

On June 19, 1992, a majority of qualified electors in Planning District 25 voted to institute County Zoning. On November 16, 1993, the County Commission adopted the Planning District 25 Zoning Map and Ordinances.

    2.3.25.2   District Boundaries

A legal description of the boundaries for Planning District 25 may be found under Appendix A.

    2.3.25.3   Local Provisions for Planning District 25

        (a) Multiple family buildings in the "RMF-6, Multiple Family" district may be erected to a maximum height or seven (7) habitable stories. The required side yards shall be increased by 4-feet for each additional story over two (2) habitable stories. The maximum impervious surface ratio shall not exceed .50.

        (b) No PRD development is allowed to exceed maximum height requirements by more than 10-feet or 1 story.

        (c) Off-street Parking.

        As a supplement to Section 15.2, Parking Schedule, the following off-street parking requirements shall be applicable to single family dwellings and two-family dwellings:

    1.   Up to Four (4) Bedrooms: Two (2) spaces per dwelling unit.

    2.   Up to Six (6) Bedrooms: Three (3) spaces per dwelling unit.

    3.   Seven (7) Bedrooms and more: Four (4) spaces per dwelling unit, plus one (1) additional space per dwelling unit for every bedroom over eight (8).

    (d)

        HDR, High Density Residential District, shall not be available in Planning District 25.

    (e)

        The maximum height of single family and two family structures shall be limited to two (2) habitable stories.

Defendants' Bates #0133

(f) <u>Dune Walkovers.</u>

1. <u>As used in this section, the following definition shall apply:</u>

<u>*Dune walkover.* A raised walkway constructed for the purpose of protecting the beach and dune system between mean high tide and the construction control (CCL) line from damage that may result from anticipated pedestrian traffic to the beach, and which is no more than six (6) feet in width for multiple family/commercial/public structures, no more than four (4) feet in width for single family/two family structures, constructed without roof or walls, elevated at least one (1) foot above the dune, and extends seaward of the seaward vegetation line.</u>

2. <u>Land Use Certificate.</u>

   A. <u>A land use certificate which meets the requirements of Section 18.2, as well as the standards found herein, shall be submitted to and approved by the Zoning Administrator, or his/her designee, prior to the issuance of a building permit.</u>

   B. <u>A recent survey showing the location, size and alignment of all proposed structures and the ADEM CCL and property lines shall be submitted along with the required land use certificate application. Said survey shall be prepared and stamped by a Professional Land Surveyor registered in the State of Alabama.</u>

3. <u>A dune walkover shall be constructed to the following standards:</u>

   A. <u>There shall be no more than one (1) dune walkover per parcel.</u>

   B. <u>Dune walkovers shall begin at the existing ground level elevation of the principal landward structure.</u>

   C. <u>The maximum width of the dune walkover structure shall be no more than four (4) feet for single family/two family structures and no more than six (6) feet for multiple family/commercial/public structures. Maximum widths shall be applicable to all sections of the dune walkover structure, including but not limited to steps, ramps, landings and decks.</u>

   D. <u>The minimum elevation from the bottom of floor joists of the dune walkover shall be no less than one (1) foot and no more than three (3) feet above the maximum elevation of the dune system being traversed.</u>

Defendants' Bates #0134

E. No vertical or horizontal structures shall be allowed above thirty-eight (38) inches from the walking surface, i.e., roofs, walls, pergolas, etc.

F. Handrails, if any, shall be no higher than thirty-six (36) to thirty-eight (38) inches above the walking service for Single and Two Family Dwellings.

G. The dune walkover shall terminate ten (10) feet seaward of the vegetative line of the dune.

H. The location and length of the dune walkover is to be coordinated through and approved by the delegated authority of the Alabama Department of Environmental Management (ADEM) and the U.S. Fish and Wildlife Service.

I. No lighting shall be utilized on a dune walkover.

J. No dune walkover construction shall occur during the sea turtle nesting season from May 1 through November 1.

(g) Planning and Zoning Considerations in the Coastal High Hazard Area and Flood Hazard Areas in Planning District 25 (Fort Morgan).

1. Purpose:

A. Fort Morgan contains areas of significant natural beauty, history and unique wildlife. With such assets comes unique vulnerabilities. These vulnerabilities include, but are not limited to, tropical storm damage, flooding, wetland habitat, protected or endangered species, Native American archeological sites and National Historic Landmarks. Further, Act 2015-411, which amends Act 91-719, requires "In performing its functions related to planning and zoning, the Baldwin County Planning and Zoning Commission and the Baldwin County Commission shall specifically consider the historical nature of existing development within the Fort Morgan District, the historical and environmental character of the district, and the unique needs of the district related to hurricane safety and infrastructure for potential evacuation."

B. The most imminent threat is to property and lives subject to tropical storm events. The Coastal High Hazard Area (CHHA) is an area particularly vulnerable to the effects of damage from tropical storm events. The CHHA contains the most vulnerable areas of Fort Morgan and thus protection and oversite is needed and justified to protect future populations and property.

2.  Objectives of these considerations in the Coastal High Hazard Area (CHHA) and Flood Hazard Area (FHA) are to:

    A.  Limit the amount of infrastructure, both private and public in the Coastal High Hazard Area (CHHA)

    B.  Limit the magnitude of public loss and mitigation of private loss and investment

    C.  Increase the degree of protection to private property and lives of residents and visitors in storm events

    D.  Reduce the risk and exposure of lives and property during storm events

3.  Coastal High Hazard Area Defined:

    The Coastal High Hazard Area (CHHA) of Baldwin County is: "the area below the elevation of the Category 1 Storm Surge Line as established by a Sea, Lake, and Overland Surges from Hurricane (SLOSH) computerized storm surge model." Baldwin County will use the CHHA Map, provided by National Oceanic and Atmospheric Administration (NOAA), as the delineation of the CHHA and will use the most current SLOSH model to maintain the map. Additionally, in the interest of public safety regarding ingress and egress from and through said hazard areas, any "enclaves" which are not located in either the flood zone or Category 1 storm surge areas, but are surrounded by such hazard areas, will be considered as part of the Coastal Hazard Area. The CHHA Map is attached herein as attachment "A". Because the boundaries of the CHHA are subject to change, site design and building typology in the CHHA will be based on the CHHA line in effect at the time of development.  In addition to the CHHA, areas subject to this consideration also are V-Zones[1] and Coastal Barrier Resources System[2] (CBRS) areas as indicated on the FEMA Flood Maps.

---

[1] According to FEMA and the National Flood Insurance Program, any building located in an A or V zone is considered to be in a Special Flood Hazard Area, and is lower than the Base Flood Elevation. V zones are the most hazardous of the Special Flood Hazard Areas. V zones generally include the first row of beachfront properties. The hazards in these areas are increased because of wave velocity - hence the V designation. Flood insurance is mandatory in V zone areas.

[2] The Coastal Barrier Resources Act (CBRA) of 1982 established the John H. Chafee Coastal Barrier Resources System (CBRS), a defined set of coastal barrier units located along the Atlantic, Gulf of Mexico, Great Lakes, Puerto Rico, and U.S. Virgin Island coasts. These areas are delineated on a set of maps that are enacted into law by Congress and maintained by the Department of the Interior through the U.S. Fish and Wildlife Service (Service). Most new Federal expenditures and financial assistance are prohibited within the CBRS. The prohibition that is most significant to homeowners and insurance agents is the denial of Federal flood insurance through the National Flood Insurance Program (NFIP) for new or substantially improved structures within the CBRS. CBRA does not prevent development, and it imposes no restrictions on development conducted with non-Federal funds. Congress

Defendants' Bates #0136

http://noaa.maps.arcgis.com/apps/MapSeries/index.html?appid=d9ed7904
dbec441a9c4dd7b277935fad&entry=1

https://alabamaflood.com/map

4. Rezoning Considerations in the Coastal High Hazard Area of Fort Morgan:

   Increases in density and intensity through rezoning or similar land use
   changes in the Coastal High Hazard Area (CHHA) in Fort Morgan are
   prohibited.

5. Rezoning Considerations in Flood Hazard Areas of Fort Morgan:

   Increases in density and intensity through rezoning or similar land use
   changes in the Flood Hazard Areas (FHA) in Fort Morgan should be
   limited to low density single family uses.

   https://alabamaflood.com/map

6. Development Exemptions and Clustering

   Lots of record, as defined by the Baldwin County Subdivision Regulations,
   may be developed in accordance with subdivision regulations. When
   properties contain either CHHA or FHA areas, clustering of development
   through Planned developments, away from areas of highest hazard
   exposure is strongly encouraged.    Lands outside the clustered
   development should be set aside through conservation easements or
   similar methods of preservation.

---

enacted CBRA to minimize the loss of human life, wasteful Federal expenditures, and the damage to natural
resources associated with coastal barriers.

Defendants' Bates #0137

# Planning and Zoning

## Department

# Memo

**To:**       Anu Gary, Records Manager

**From:**    DJ Hart

**CC:**       Sharon Grant, Accounting

**Date:**     10/8/2019

**Re:**       TA-19001

Proof of Advertisement for the Baldwin County Planning and Zoning Commission Public Hearing on 9/5/2019.

---

Anu:

Attached is the original Proof of Publication for the Baldwin County Planning and Zoning Commission public hearing for case:

**TA-19001**

The Planning and Zoning Commission meeting was held **Thursday September 5, 2019**.

The County Commission public hearing is scheduled for **Tuesday October 15, 2019**.

Please let me know if you have any questions.

Thank You,

**DJ Hart**

Defendants' Bates #0138

**GULF COAST MEDIA**

A DIVISION OF OPC NEWS, LLC
PO BOX 1677 • SUMTER, SC 29150

FOLEY 251.943.2151
The Courier – The Islander
The Onlooker
The Baldwin Times

LEGAL REP -
251-345-6805

### PROOF OF PUBLICATION
### STATE OF ALABAMA • BALDWIN COUNTY

Before me, the undersigned authority in and for said County, in said State, personally appeared April M. Perry who, by me duly sworn, deposes and says that: she is the Legal Representative of the following newspaper listed below, a newspaper of GENERAL CIRCULATION, PUBLISHED and PRINTED in Baldwin County, Alabama, and that there was published in <u>The Courier, The Islander, The Onlooker, & or The Baldwin Times</u> in the issue/s of:

08/21/2019

a legal notice, a copy of which is hereto attached. The sum charged by the Newspaper for said publication does not exceed the lowest classified rate paid by commercial customers for an advertisement of similar size and frequency in the same newspaper(s) in which the public notice appeared.

There are no agreements between the Newspaper and the officer or attorney charged with the duty of placing the attached legal advertising notices whereby any advantage, gain or profit accrued to said officer or attorney.

X _____
April M. Perry, Legal Ad Representative

X _____
Amber Kimbler, Notary Public
Baldwin County, Alabama
My commission expires April 10, 2022

AMBER KIMBLER
My Commission Expires
April 10, 2022

Sworn and subscribed to on <u>08/21/2019</u>.

BC PLANNING & ZONING- LEGAL

Acct#: 983695

Ad#: 302760

Case No. TA-19001

Amount of Ad: $112.28

Legal File# Case No. TA-190

---

**BALDWIN COUNTY PLANNING & ZONING COMMISSION**
**BALDWIN COUNTY PLANNING & ZONING DEPARTMENT**

Mailing Address
P.O. Box 220
Silverhill, AL 36576
Phone: (251) 580-1655
Fax: (251) 580-1656

Physical Address
22070 Highway 59
Robertsdale, AL 36567
Phone: (251) 580-1655
Fax: (251) 580-1656

Foley Office
201 East Section Avenue
Foley, AL 36535
Phone: (251) 972-8523
Fax: (251) 972-8520

Case No. TA-19001
Text Amendment To the Baldwin County Zoning Ordinance Article 2 Section 2.3.25 Local Provisions for Planning District 25

Notice is hereby given that the Baldwin County Planning & Zoning Commission will conduct a public hearing concerning a proposed amendment to Article 2, section 2.3.25 Local Provisions for Planning District 25, as it pertains to the following:

· Availability of HDR, High Density Residential District, in Planning District 25.
· Maximum height of single family and two family residential structures in terms of the number of habitable stories.
· Dune Walkovers.
· Planning and Zoning Considerations in the Coastal High Hazard areas and Flood Hazard areas.

The public hearing will be conducted during the next regular meeting of the Baldwin County Planning & Zoning Commission which is scheduled for Thursday September 5, 2019, beginning at 6:00 p.m. at the Baldwin County Central Annex, 22251 Palmer St. in Robertsdale, AL.

The said application will be considered by the Baldwin County Planning & Zoning Commission pursuant to Alabama Code 45-2-261. The application materials are available for public review at the office of the Baldwin County Planning & Zoning Department, 22070 Hwy 59 in Robertsdale, AL, or at the Foley Satellite Courthouse, 201 East Section Avenue in Foley, Alabama during normal business hours. If you desire to speak with someone by telephone about this application, please contact the Baldwin County Planning and Zoning Department at (251)580-1655. If you desire to submit written comments, please address your correspondence to:

Baldwin County Planning & Zoning Department
22251 Palmer Street
Robertsdale, AL 36567

You may fax your comments to Planning & Zoning Department at (251)580-1656. If you desire to address the Planning Commission in person about this application, please attend the public hearing at the time and location listed above.

Public participation is solicited without regard to race, color, national origin, sex, age, religion, disability or family status. Persons who require special accommodations under the Americans with Disabilities Act or those requiring language translation services should contact the Baldwin County Planning & Zoning Department at 251-580-1655.
August 21, 2019

---



Defendants' Bates #0139

# Planning and Zoning

# Department

# Memo

**To:**  Anu Gary, Records Manager

**From:**  DJ Hart

**CC:**  Sharon Grant, Accounting

**Date:**  10/8/2019

**Re:**  TA-19001

Proof of Advertisement for the Baldwin County Commission Public Hearing on 10/15/2019.

---

Anu:

Attached is the original Proof of Publication for the Baldwin County Commission public hearing for case:

**TA-19001**

The Planning and Zoning Commission meeting was held **Thursday September 5, 2019**.

The County Commission public hearing is scheduled for **Tuesday October 15, 2019**.

Please let me know if you have any questions.

Thank You,

**DJ Hart**

Defendants' Bates #0140



FOLEY 251.943.2151
The Courier – The Islander
The Onlooker
The Baldwin Times

LEGAL REP -
251-345-6805

A DIVISION OF OPC NEWS, LLC
PO BOX 1677 • SUMTER, SC 29150

## PROOF OF PUBLICATION
## STATE OF ALABAMA • BALDWIN COUNTY

Before me, the undersigned authority in and for said County, in said State, personally appeared April M. Perry who, by me duly sworn, deposes and says that: she is the Legal Representative of the following newspaper listed below, a newspaper of GENERAL CIRCULATION, PUBLISHED and PRINTED in Baldwin County, Alabama, and that there was published in <u>The Courier, The Islander, The Onlooker, & or The Baldwin Times</u> in the issue/s of:

09/18/2019, 09/25/2019, 10/02/2019

a legal notice, a copy of which is hereto attached. The sum charged by the Newspaper for said publication does not exceed the lowest classified rate paid by commercial customers for an advertisement of similar size and frequency in the same newspaper(s) in which the public notice appeared.

There are no agreements between the Newspaper and the officer or attorney charged with the duty of placing the attached legal advertising notices whereby any advantage, gain or profit accrued to said officer or attorney.

x _____
April M. Perry, Legal Ad Representative

x _____
Amber Kimbler, Notary Public
Baldwin County, Alabama
My commission expires April 10, 2022

AMBER KIMBLER
My Commission Expires
April 10, 2022

Sworn and subscribed to on <u>10/02/2019</u>

BC PLANNING & ZONING- LEGAL

Acct#: 983695

Ad#: 303735

Case No. TA-19001 Text Amendment

Amount of Ad: $375.36

Legal File# Case No. TA-190

BALDWIN COUNTY COMMISSION
BALDWIN COUNTY PLANNING & ZONING DEPARTMENT

**Mailing Address**
P.O. Box 220
Silverhill, AL 36576
Phone: (251) 580-1655
Fax: (251) 580-1656

**Physical Address**
22070 Highway 59
Robertsdale, AL 36567
Phone: (251) 580-1655
Fax: (251) 580-1656

**Foley Office**
201 East Section Avenue
Foley, AL 36535
Phone: (251) 972-8523
Fax: (251) 972-8520

**Case No. TA-19001**
Text Amendment
To the Baldwin County Zoning Ordinance
Article 2 Section 2.3.25
Local Provisions for Planning District 25

Notice is hereby given that the Baldwin County Commission will conduct a public hearing concerning a proposed amendment to Article 2, section 2.3.25 Local Provisions for Planning District 25, as it pertains to the following:
· Availability of HDR, High Density Residential District, in Planning District 25.
· Maximum height of single family and two family residential structures in terms of the number of habitable stories.
· Dune Walkovers.
· Planning and Zoning Considerations in the Coastal High Hazard areas and Flood Hazard areas.

The public hearing will be conducted during the next regular meeting of the Baldwin County Commission which is scheduled for Tuesday October 15, 2019, beginning at 8:30 a.m. at the Baldwin County Administration Building, 322 Courthouse Square in Bay Minette, Al.

The said application will be considered by the Baldwin County Commission pursuant to Alabama Code 45-2-261. The application materials are available for public review at the office of the Baldwin County Planning & Zoning Department, 22070 Hwy 59 in Robertsdale, AL, or at the Foley Satellite Courthouse, 201 East Section Avenue in Foley, Alabama during normal business hours. If you desire to speak with someone by telephone about this application, please contact the Baldwin County Planning and Zoning Department at (251)580-1655. If you desire to submit written comments, please address your correspondence to:

Baldwin County Planning & Zoning Department
22251 Palmer Street
Robertsdale, AL 36567

You may fax your comments to Planning & Zoning Department at (251)580-1656. If you desire to address the Planning Commission in person about this application, please attend the public hearing at the time and location listed above.

Public participation is solicited without regard to race, color, national origin, sex, age, religion, disability or family status.

Persons who require special accommodations under the Americans with Disabilities Act or those requiring language translation services should contact the Baldwin County Planning & Zoning Department at 251-580-1655.
September 18-25;
October 2, 2019

RECEIVED
DJ Hart
10/7/19

Defendants' Bates #0141

 **GULF COAST MEDIA**

98

THE COURIER • THE ONLOOKER • THE ISLANDER • THE BALDWIN TIMES

**Printer Affidavit:**

This is to certify the attached advertisement

Appeared in _Wednesday_ Issue of Gulf Coast Media.
_The Courier, The Islander + The Onlooker_
Publication Date(s):

_September 25, 2019_

Account # _987101_     PO # _____

Cost $ _336.00_     Ad # _248690_

_TA-1900_

_Bethany Randall_

**Bethany Randall**

**Sales Representative**

Bill To:

_BC Planning + Zoning_

_____

_____

Mail payments to:

Gulf Coast Media PO Box 1677- Sumter, SC 29151

Sworn to and subscribe before me

This _1st_ day of _October_, 20 _19_

_Amber Kimbler_

**Amber Kimbler**

**Notary Public for Alabama**

 AMBER KIMBLER
My Commission Expires
April 10, 2022

 RECEIVED

**Defendants' Bates #0142**

Gulf Coast Media • September 25, 2019 • The Onlooker • **35**

# Robertsdale police reports

**Sept. 10**
3:27 p.m., Nebraska Street/ Milwaukee Street, Andrea Lauren Mazinga, 21, of Foley, charged with possession of drug paraphernalia, first offense; possession of a controlled substance; possession of drug paraphernalia, first offense.

**Sept. 11**
12:31 a.m., Chicago Street,

Antwaun De Mario Henderson, 39, of Mobile, charged with possession of a controlled substance; possession of drug paraphernalia, first offense.

8:09 p.m., Palmer Street, Gregory Alan Phillips, 35, of Robertsdale, charged with domestic violence – harassment, third degree.

**Sept. 12**
9:53 a.m., property damage,

fourth degree, Courthouse Square, Bay Minette. Case closed, administratively cleared.

**Sept. 13**
11:38 a.m., theft-from public building, fourth degree; illegal possession/use of a credit/ debit card, no address given (time of reported occurrence was between 8:30 and 9:30 a.m.). Case pending.

12:16 p.m., domestic incident, Dunwoody Lane. Case closed, administratively cleared.
12:30 p.m., property damage, Baldwin Farms Place. Case closed, administratively cleared.
5:56 p.m., Bear Drive, Nathan Daniel Hooker, 26, of Robertsdale, charged with domestic violence – harassment, third degree.

**Sept. 14**
11:56 a.m., Baldwin Beach Express, Clarence Lloyd Brunty, 46, of Gautier, Mississippi, charged as fugitive from justice.
5:15 p.m., Robertsdale High School, Laura Mauldin Quinn, 60, of Birmingham, charged with appearing in public place under the influence (alcohol).
11:17 p.m., Chicago Street, Gregory Alan Phillips, 35, of

Robertsdale, charged with public intoxication; illegal possession of prescription drugs.

**Sept. 16**
2:58 a.m., Central Baldwin Thrift, Alabama 59, Robert James Helmly, 35, of Foley, charged with theft of property, fourth degree.
5:13 a.m., domestic incident, Alabama 59. Case closed, administratively cleared.

# Foley police reports

**Sept. 11**
1:15 p.m., Jonathan Hugo Lemus, 21, of Mobile, charged with violation of a domestic protection order.

**Sept. 12**
7:52 a.m., Tammy Kay Wall, 47, of Bay Minette, charged with using false identity of obstruct

justice.
7:52 a.m., Luis Albert Restrepo, 21, of Foley, charged with parole violation.
7:53 a.m., Zonya Haynes, 54, of Foley, charged with possession of a controlled substance; II legal possession of prescription drugs, public intoxication.

**Sept. 13**
7:59 a.m., Herbert Joseph Colburn Jr., 53, of Mobile, fugitive from justice.
4:00 p.m., Bradley David Everett, 34, of Foley, charged with possession of a controlled substance, possession of drug paraphernalia.
4:00 p.m., Darneyune De-

shawn Jemison, 21, of Bay Minette, charged with possession of a controlled substance.
4:01 p.m., Lisa Aleen Ellis, 52, of Robertsdale, charged with possession of a controlled substance, possession of drug paraphernalia, possession of marijuana second degree.
4:01 p.m., Jeffrey Scott Mc-

Farland, 48, of Bay Minette, charged with possession of a controlled substance.
4:01 p.m., Jeffrey Scott McFarland, 48, of Bay Minette, charged with possession of marijuana second degree, failure to appear misdemeanor.

**Sept. 15**
8:24 a.m., Laboran Pickens,

41, of Spanish Fort, federal inmate.

**Sept. 16**
5:52 a.m., Robert Scott Allen, 32, of Bay Minette, charged with possession of a controlled substance, theft of property fourth degree, attempt to elude misdemeanor, resisting arrest.

## Quest Study Club of Bay Minette for program on art

**Submitted BY MARY KELLY**
For The Onlooker

The Quest Study Club of Bay Minette met at the home of Diane Payne on Sept.

11. Payne and Jenny Hammond were the hostesses. The theme for this year's club is hobbies. Alicia Gourley gave a program on her hobby, which is art. The

Bay Minette native is an art instructor for Art Moves at First United Methodist Church in Bay Minette, which is a program for Parkinson patients. She obtained

a grant to fund the instructor and art supplies for the program. She is pictured here with an example of her excellent artwork of a beautiful old hotel in

Marlow on Fish River. Gourley is the daughter of Owen and Virginia Lyles of Bay Minette. The Study Club meets monthly and was organized in 1947.


SUBMITTED PHOTO

---

### ORDINANCE NO. 008-19

AN ORDINANCE TO AMEND ORDINANCE NO. 02-10, ADOPTED BY THE CITY COUNCIL OF THE CITY OF ROBERTSDALE, ALABAMA, SEPTEMBER 23, 2002.

BE IT ORDAINED, by the City Council of the City of Robertsdale, Alabama as follows:

That the Zoning Ordinance and official zoning map as amended, be further amended to rezone the following described property:

**FROM B-1 to B-2:**
Begin at a point 376 feet West and 30 feet North of the Southeast corner of the South half of the Northeast quarter of the Northeast quarter of the Southeast quarter of Section 36, Township 5 South, Range 3 East, and run West 300 feet to a corner at the East margin of the right-of-way of US Highway 90, thence North along the highway 145 feet to a corner, thence East 300 feet to a corner, thence South 145 feet to the point of the beginning, containing one acre, more or less.

BE IT FURTHER ORDAINED THAT THE OFFICIAL ZONING MAP, AS AMENDED, BE FURTHER AMENDED TO REFLECT THIS CHANGE.

APPROVED THIS 16TH DAY OF SEPTEMBER, 2019.

---

### BALDWIN COUNTY COMMISSION
**BALDWIN COUNTY PLANNING & ZONING DEPARTMENT**

**Mailing Address**
22251 Palmer Street
Robertsdale, AL 36567
Phone: (251) 580-1655
Fax: (251) 580-1656

**Physical Address**
22070 Highway 59
Robertsdale, AL 36567
Phone: (251) 580-1655
Fax: (251) 580-1656

**Foley Office**
201 East Section Avenue
Foley, AL 36535
Phone: (251) 972-8523
Fax: (251) 972-8520

**Case No. TA-19001**
**Text Amendment**
**To the**
*Baldwin County Zoning Ordinance*
**Article 2 Section 2.3.25**
**Local Provisions for Planning District 25**

Notice is hereby given that the Baldwin County Commission will conduct a public hearing concerning a proposed amendment to Article 2, section 2.3.25 Local Provisions for Planning District 25, as it pertains to the following:
• Availability of HDR, High Density Residential District, in Planning District 25.
• Maximum height of single family and two family residential structures in terms of the number of habitable stories.
• Dune Walkovers
• Planning and Zoning Considerations in the Coastal High Hazard areas and Flood Hazard areas.

The public hearing will be conducted during the next regular meeting of the Baldwin County Commission which is scheduled for **Tuesday October 15, 2019**, beginning at 8:30 a.m. at the Baldwin County Administration Building, 322 Courthouse Square in Bay Minette, Al.

The said application will be considered by the Baldwin County Commission pursuant to Alabama Code 45-2-261. The application materials are available for public review at the office of the Baldwin County Planning & Zoning Department, 22070 Hwy 59 in Robertsdale, AL, or at the Foley Satellite Courthouse, 201 East Section Avenue in Foley, Alabama during normal business hours. If you desire to speak with someone by telephone about this application, please contact the Baldwin County Planning and Zoning Department at (251)580-1655. If you desire to submit written comments, please address your correspondence to:

Baldwin County Planning & Zoning Department
22251 Palmer Street
Robertsdale, AL 36567

You may fax your comments to Planning & Zoning Department at (251)580-1656. If you desire to address the Planning Commission in person about this application, please attend the public hearing at the time and location listed above.

Public participation is solicited without regard to race, color, national origin, sex, age, religion, disability or family status. Persons who require special accommodations under the Americans with Disabilities Act or those requiring language translation services should contact the Baldwin County Planning & Zoning Department at 251-580-1655.

Baldwin County Commissioners

Honorable Charles F. "Skip" Gruber, Honorable Billie Jo Underwood, Honorable James E. "Jeb" Ball, and Honorable Joe Davis, III

RE: Case # TA-19001, Text Amendments, Article 2, Section 2.3.25, District 25 "Fort Morgan"

October 7, 2019

Dear Honorable Commissioners,

We are Fort Morgan residents, Jamie & Greg Strategier who live at 3510 Ponce de Leon Court, Fort Morgan, AL 36542.  We are respectfully recommending your full support of proposed District 25 Amendments (case #TA-19001) to Baldwin County Zoning Ordinances.  Years of significant research, long hours, respectable amount of effort, and diligent work by Baldwin County staff and directors have gone into the preparation of the proposed Amendments.  Baldwin County Planning and Zoning department and the director, Vince Jackson along with Baldwin County Administrator, Wayne Dyess have put in substantial energy over the years working with Fort Morgan citizens, homeowners, businesses, community leaders, Fort Morgan Planning & Zoning Advisory Committee, Fort Morgan Civic Association, and Fort Morgan Volunteer Fire Department to develop the proposed Amendments for District 25 (case #TA-19001).  These **Fort Morgan Community Leadership assemblages** listed above fully support and Recommend **APPROVAL** of the proposed Amendments for District 25 (case #TA-19001**).  Baldwin County Planning & Zoning department Recommends APPROVAL** of the proposed Amendments for District 25.  On September 5, 2019, **Baldwin County Planning & Zoning Commission UNAMIIOUSLY VOTED to Recommend APPROVAL** of the proposed Amendments (case #TA-19001).

It is clear, the proposed Amendments to Article 2, Section 2.3.25.3 of the Baldwin County Zoning Ordinance, District 25 (case #TA-19001) are necessary to keep Fort Morgan Safe with Planned Development and are fully recommended by ALL.  The Amendments include removal of HDR, High Density Residential District, establishment of a two (2) habitable story maximum height for single family and two-family dwellings in Residential Zoning, establishment of dune walkover requirements and standards, and establishment of Planning & Zoning considerations for Coastal High Hazard Areas and Flood Hazard Areas (Section 2.3.25.3).

We Fully Support and **Recommend APPROVAL** of the Amendments to Residential Zoning Ordinance in District 25 (case #TA-19001) which are necessary for the following reasons:

- **SAFETY RISKS- Fort Morgan Volunteer Fire Department** strongly encourages establishment of two (2) habitable story height limit on residential construction for numerous safety issues. FMVFD recommends a two (2) story residential limitation which reasonably ameliorates both controlled growth and reduced density.
- **SAFETY RISKS - Reasonable emergency access to attic** areas made into extra bedrooms and additional sleeping quarters after certificate of occupancy has made access to third (3rd) stories virtually impossible.

Defendants' Bates #0144

- **SAFETY RISKS** - Hallways blocked with cots and bunk beds making every effort to maximize bedroom count and sleeping numbers; and bunkbeds in rooms the size of closets make it nearly impossible for emergency first responders to assist those in danger.
- **SAFETY RISKS**- Narrow stairways and spiral staircases to an upstairs area causes unnecessary limitations on emergency responders who are there to potentially save lives. roadways
- **SAFETY RISKS**– FMVFD has a ladder capability to second stories but not greater heights.
- **SAFETY RISK**- Parking along narrow roadways limits the ability of first responders to reasonably access homes the need emergency assistance.
- **SAFETY RISKS**- Evacuation during hurricanes becomes nightmarish; road congestion becomes nightmarish during emergency evacuation with only one access road in and out of Fort Morgan.
- **SAFETY RISK**- Parking along narrow roadways not only prevents emergency access to those homes with 2 ½ to 3 stories, but the parking nightmares on these streets also prevents any emergency access to neighboring homes. There is insufficient parking for 44 people. Neighbors attempting to drive on the roadways have been dealing with parking as an OBSTACLE for private vehicles, emergency vehicles and public vehicles alike.
- **SAFETY RISKS** – Parking created by 2 ½ - 3 Story buildings along narrow roadways also prevents neighbors from exiting their own homes for any reason including emergencies. There is Insufficient parking for 44 people under one roof let alone neighboring homes. Roadways are already impassible! What if there were two of these houses next to each other that house 44 people? Where would 88 people park on these roadways? There is another of these "commercial" duplexes planned to be built along side of one of these homes now by the same developer next door. How can this be allowed when a parking nightmare already exists? (See 3450 Ponce de Leon Court – "Breezy Shores, LLC" – Stop Work Order currently issued for construction work beginning without permit.)
- **UNSAFE & UNSANITARY** – Parking Simply does not exist for the Public ACCESS TO Public Beaches! Where does the public park? They park blocking private residential driveways or they park on and get stuck in the sand! We have personally assisted numerous visitors in trying to get their stuck parked car from the soft sandy beach. However, it happens more often that if we are not there to warn them they end up spinning their tires in soft sand until they bust open the Sewage Lines spewing raw sewage along the residential streets, private driveways, private homes, and raw sewage leaks onto our sandy beaches!
- **UNSAFE & UNSANITARY** – Raw Sewage Backing Up! These 2 ½ to 3 Story buildings produce more raw sewage than the sewage lines can handle; therefore, backing up sewage lines for not only these oversized commercial buildings, but everyone in the surrounding area.
- **UNSAFE** – Phone lines not accessible! In District 25, there is limited cellular service providing all of Fort Morgan. When these 2 ½ - 3 Story homes are filled with 44 plus people all using cell phones and wifi, then the neighboring citizens have little to no cellular service and no telephone access. In 2019 and the future, cellular service is in most homes the only telephone service that is permitted, but with an over-populated area this is not always accessible. In times of emergency, there could be no way to contact 911, a doctor, or emergency services. Cellular service has become a necessary public utility, but not dependable in Fort Morgan.
- **UNSAFE** – Evacuation is a dangerous nightmare. Andy Bauer and Mayor Craft, City of Gulf Shores, opening oppose any up-zoning in Fort Morgan due to traffic on Hwy. 180 and potential for bottleneck at Hwy. 180 & Hwy. 59 during evacuation. This would cause traffic accidents to

residents of Baldwin County while also preventing All Citizens of Baldwin County from safely evacuating during an emergency or Hurricane. Nightmares soon become reality if growth and density are not better controlled. A 2-story limit would help considerably.

- **UNSAFE & UNSANITARY – Garbage pick up trucks are prevented from accessing roadways** where these 2 ½ - 3 Story buildings have created parking nightmares. The streets become obstacles for public vehicles and Garbage pick-up is prevented. Where does all this garbage end up? It is usually blown by the strong winds off the Gulf of Mexico into neighboring private properties, into public streets, or onto our sandy public and private beaches. Garbage pick up day has been changed to Saturday mornings in Fort Morgan so that renters who depart on Saturdays may clean out their rentals, but there is no one making sure that garbage pick-up is complete after they leave.

- **ENVIROMENTALLY UNSAFE – Endangered Sea Turtles Attempting to nest must Turn Around without Nesting** on Fort Morgan's shores. Share the Beach Volunteer reported to have a very bad 2019 season predominately due in part by increased debris on our beaches left behind by renters in these oversized 2 ½ to 3 Story Commercially sized buildings renting to over 44 people in 50 linear feet of beach shoreline. Endangered Mama Sea Turtles have been directly affected by over-crowding from these 2 ½ to 3 story commercially sized buildings. Mama Sea Turtles nesting must maneuver around these obstacles left behind on our beaches and end up returning the Gulf of Mexico without nesting. This puts their 100 endangered sea turtle eggs at risk.

- **ENVIROMENTALLY UNSAFE – Volunteers for Share the Beach are prohibited** from carrying their nesting equipment along the beaches due to oversized dune walkovers and beach equipment left on the beaches blocking them from doing their volunteer jobs to assist our Endangered Sea Turtles nesting along Fort Morgan beaches.

- **UNSAFE – Oversized Dune Walkovers prevent emergency vehicles from accessing beach rescues.** Newly built oversized dune walkovers that are reaching wet sand in many places prevent emergency vehicles from rescuing anyone along the beach including those who are in **danger of drowning!** New Dune Walkover Amendments will help to correct this problem and prevent future structures from blocking beach access to emergency vehicles in the future.

- **ENVIROMENTALLY UNSAFE – Bright White Lights are not allowed by USFWS ITP.** Specifically bright lights on oversized 2 ½ - 3 story commercially sized buildings in Residential areas **prevent Endangered Sea Turtles from entering the shore** to nest because the massive bright lights confuse Nesting Sea Turtles. There should be a lighting ordinance for District 25 so that all Gulf Front homes are required to use Amber Lighting as recommended by US Fish & Wildlife Services in their ITP.

- **ENVIROMENTALLY UNSAFE – Bright White Lights are not allowed by USFWS ITP.** Bright Lights on the 2 ½ to 3 Story commercially sized buildings in Residential areas are a glowing beacon preventing Endangered Alabama Beach Mice from nesting on the sandy dunes. Bright lights shining on the beaches outside of the Beach Mice nests lighting up what should be a dark area making it unsafe for the Beach Mice to scamper for food in the dark without being detected easily by other wildlife. Instead, they now have a bright spotlight shining on them alerting other wildlife to exactly where the Endangered Beach Mice are and where their nests are located.

- **COMMERCIAL BUILDINGS in RESIDENTIAL ZONED NEIGHBORHOODS – Safe & Planned Growth in Residential Zoned Neighborhoods is necessary.** There simply is just not a place for a commercially built big business venture in Residentially Zoned areas of Baldwin County. A letter

Defendants' Bates #0146

in opposition to the proposed Amendments is authored by and signed by "Robert J. Isakson, Sr. **Lafayette Land Company** <u>**Developing Commercial and Industrial Real Estate since 1982**</u>"; he wrote "I understand that this [2 story height] does not have to do with fire suppression equipment, but rather with the theory that the volunteers in Ft. Morgan are older than other volunteer firefighters in the county and may have more difficulty removing victims from the second and one half floors of burning buildings." We and majority of Fort Morgan Community truly value our Volunteer Fire Department and wide variety of services they provide to citizens and visitors alike. We could not image why anyone would show such disrespect towards our valued first responders. Why would a Louisiana based Developer of Commercial and Industrial Real Estate since 1982 have any interest building in Baldwin County's Residentially Zoned area? He does not reside in any of the Commercially built properties; these are all built for maximum dollars to be made off Fort Morgan's historical and environmental protected land without any respect to the safety of others or the wildlife that resides in Fort Morgan Community.

- <u>Majority of opposing letters accuse FMCA and "others" of stopping growth or development in Fort Morgan and reducing Tax rolls.</u> There is no interest or intent to stop development and growth or reducing taxes in Baldwin County, District 25. **We whole heartedly support SAFE and PLANNED GROWTH in Fort Morgan. We support and realize the benefits of taxes that also support our community and Baldwin County as a whole.** Eliminating the 2 ½ and 3rd floor certainly reduces an amount of potential rental income, but removing the 3rd floor does not stop development and growth nor does it change the current taxes collected by Baldwin County nor does it stop someone from developing their future home(s) in Fort Morgan. Property owners in Baldwin County can certainly make a very nice investment return on building a Safe Two (2) Story Rental Property; anyone can build a home that is safe for citizens and the environment. **We want to keep Fort Morgan safe and environmentally protected for future generations while it continues to grow and be developed. The proposed Amendments allow for Safe and Planned Growth in District 25 while providing tax dollars for Baldwin County & Alabama State.**

Fort Morgan needs to grow safely for its preservation, environment and future generations. We believe that Vince Jackson, Baldwin County Planning & Zoning Director, is working on an occupancy zoning ordinance which is greatly needed and would support parking, evacuation, fire safety, environment, USFWS regulations, and overall promoting our community while still providing planned growth, development. An occupancy zoning ordinance would greatly benefit Baldwin County as a whole.

For these reasons and the research that has been done by Baldwin County Planning and Zoning staff, we support & recommend the Amendments proposed to Residential Zoning Ordinance (case #TA-19001). **Thank you for your consideration of the proposed Amendments (case #TA-19001). We appreciate your continued service to our Community. We respectfully hope you will Vote to Approve TA-19001.**

Your Proud Residents of Fort Morgan,

Jamie & Greg Strategier

3510 Ponce de Leon Court, Fort Morgan, AL 36542

CC: Vince Jackson, Wayne Dyess, Joe Emerson, Ernie Church, Carol Kittrell, Paul Stanton

Defendants' Bates #0147

**Vince Jackson**

| | |
|---|---|
| **From:** | daniel prickett <dansellsthegulf@yahoo.com> |
| **Sent:** | Monday, October 07, 2019 5:36 PM |
| **To:** | Vince Jackson |
| **Subject:** | <EXTERNAL> Oppose changes in zoning in district 25 |

Hi Vince. Just wanted to go on record to say myself and many others appose  the  proposed zoning changes in district 25.

Respectfully

Daniel Prickett
2512090074 cell
18002107914 office
https://gcc02.safelinks.protection.outlook.com/?url=www.prickettproperties.com&amp;data=02%7C01%7C%7C29ea1fb
612de4735f49008d74b76bbf9%7Ca1dbbb3c47f8420e932cbb4942e61768%7C0%7C0%7C637060845648207381&amp;sd
ata=abfyw0WOMh7kOQocel2CW445BAQOBkNlOYnPoUtbFH8%3D&amp;reserved=0
Property manager
Realtor

1

Defendants' Bates #0148

**Vince Jackson**

| | |
|---|---|
| **From:** | Joseph Emerson <captjoesells@gmail.com> |
| **Sent:** | Monday, October 07, 2019 1:39 PM |
| **To:** | Billie Jo Underwood; Charles F. Gruber; Joe Davis; Jeb Ball |
| **Cc:** | Vince Jackson; Wayne Dyess |
| **Subject:** | <EXTERNAL> Fort Morgan Zoning Amendments (Case No. TA-19001 Amendments to the Baldwin County Zoning Ordinance, Article 2 Local Provisions for Planning District 25 (Section 2.3.25.3) |

Dear Commissioners,

I am a resident of Fort Morgan at 11173 State Highway 180, Gulf Shores, AL 36542.

I am requesting you as elected commissioners to support  Case No. TA-19001 Amendments to the *Baldwin County Zoning Ordinance*, Article 2 Local Provisions for Planning District 25 (Section 2.3.25.3) that you will be seeing tomorrow October 8th
and voting on October 15th.  Please take the following points into consideration when making your decision to support these Text Amendments specifically the 2 story limitation on new construction.

- The current and future impacts that existing and potential future 2.5 and 3 story, multi family residential construction puts on the existing and limited local infrastructure specifically in the subdivisions including but not limited to Laine Court, Pamela Court, Ponce De Leon, Ponce De Leon Annex and other areas.
- The safety concerns voiced in the letter sent to the Baldwin County Commission by the brave First Responders of the Fort Morgan Fire Rescue. I understand that the issue of  the age of the FMFR volunteers has been brought up and how the age of the volunteers may effect the performance of the FMFR. Please keep in mind that the FMFR carries the highest ISO rating that a volunteer Department in the State can have.

Also, these proposed text amendments fit squarely within the charge provided by the Local Act of the Alabama Legislature. Section 45-2-261.64 of the Act, states that the Baldwin County Commission shall specifically consider the historical nature of existing development within the Fort Morgan District, the historical and environmental character of the district, and the unique needs of the district related to hurricane safety and infrastructure for potential evacuation.

It is clear that the "historical nature of existing development" is not these mini-hotels that have sprung up in Fort Morgan. It is one of beach front cottages and low density.

These Text Amendments were presented by Baldwin County Planning & Zoning Department with the full support of the Fort Morgan Planning & Zoning Advisory Committee; and Unanimously recommended by the Baldwin County Planning & Zoning Commission. I hope you will take their advise into
into consideration.

1

Defendants' Bates #0149

Thank you,


Joe Emerson



--



**Capt Joe Emerson**
Exit Realty Gulf Shores
251.550.9021

"Navigating you through the sea of Real Estate"

Defendants' Bates #0150

**Vince Jackson**

| | |
|---|---|
| **From:** | BWC <bwc@charter.net> |
| **Sent:** | Monday, October 07, 2019 10:33 AM |
| **To:** | Vince Jackson |
| **Cc:** | ecaces4@bellsouth.net |
| **Subject:** | <EXTERNAL> Fort Morgan District 25 |

Mr. Jackson,

Prior to the upcoming vote, I would like to voice my strong support for the proposed changes to the Baldwin County Zoning Ordinances, regarding the Fort Morgan peninsula. My family has owned property there since before Hurricane Frederic in 1979. It is a unique historical and ecological area and should be protected as such. If over developed or developed thoughtlessly some of those unique features will be lost or destroyed forever.

Please help us support passage of these sensible and much needed changes.

Thank you.

Brad Caraway


Thanks.

Brad Caraway

1

Defendants' Bates #0151

9/25/2019

**Dear Commissioners,**

I am writing you as a Fort Morgan homeowner and someone who cares deeply for the Fort Morgan community. Fort Morgan is the last remaining place along the Baldwin County Gulf Coast that hasn't been overdeveloped and retains its unique beach front cottage character. However, over the last several years the character has begun to be altered. The beach front cottages are now being torn down and replaced with 3 story, 50 ' tall mini hotels that contain at least 18 bedrooms and sleeps 44 people. The parking generated by these mini hotel is tremendous and causes streets to be routinely blocked. Not only does this effect the residents and other renters, but it also severally impedes emergency services such as fire fighters and EMS staff. This issue is a fundamental critical emergency services issue that directly affects the safety and welfare of visitors and citizens alike.

This exploitation of the zoning rules has diminished the unique character and only benefits a few while the rest are left to deal with the negative consequences it causes over generations. I can't imagine that the citizens that initiated the District 25 zoning process ever envisioned that these small 50'-75' lots would be so overdeveloped with mini hotels destroying the unique character that they fought so hard to protect and which has existed for years in Fort Morgan.

Fortunately, the citizens and homeowners have banded together with a common goal to protect this unique place we all love. Before you on October 15th are several amendments that directly affect Fort Morgan. These zoning amendments demonstrate a great deal of hard work and a reasonable, fair approach to re-establishing and reaffirming the unique character and original vision of Fort Morgan. These amendments fit squarely within the charge provided by the Local Act of the Alabama Legislature. In Section 45-2-261.64 of the Act, its says that the Baldwin County Commission **shall** specifically consider the historical nature of existing development within the Fort Morgan District, the historical and environmental character of the district, and the unique needs of the district related to hurricane safety and infrastructure for potential evacuation.

It is clear that the "historical nature of existing development" is not gigantic mini-hotels that have sprung up in Fort Morgan. It is one of beach front cottages and a family friendly environment. Also, I urge you to consider the public safety associated with hurricane evacuation and the affect that these mini-hotels. I urge you to not only consider the current issues and the negative effects of this overdevelopment, but please consider future generations and their ability to enjoy this unique asset we have in Fort Morgan and the unique beach cottage atmosphere which it represents.

Please support the residents and homeowners and the unique character of Fort Morgan and vote to adopt the zoning amendments as presented by the Fort Morgan Zoning Advisory Committee and **unanimously** recommended by the Baldwin County Planning and Zoning Commission.

Thank you for your consideration.

Paul Stanton

---

The Code of Alabama 1975          Section 45-2-261.64

Enforcement and administration of subpart.

The Baldwin County Commission shall enforce this subpart in the same manner as provided in Section 16 of Act 91-719, and, in performing its functions related to planning and zoning, the Baldwin County Planning and Zoning Commission and the Baldwin County Commission shall specifically consider the historical nature of existing development within the Fort Morgan District, the historical and environmental character of the district, and the unique needs of the district related to hurricane safety and infrastructure for potential evacuation.

(Act 2015-411, §5.)

Defendants' Bates #0152

9/25/2019

Dear Commissioners,

I am writing you as a Fort Morgan homeowner and someone who cares deeply for the Fort Morgan community. Fort Morgan is the last remaining place along the Baldwin County Gulf Coast that hasn't been overdeveloped and retains its unique beach front cottage character. However, over the last several years the character has begun to be altered. The beach front cottages are now being torn down and replaced with 3 story, 50 ' tall mini hotels that contain at least 18 bedrooms and sleeps 44 people. The parking generated by these mini hotel is tremendous and causes streets to be routinely blocked. Not only does this effect the residents and other renters, but it also severally impedes emergency services such as fire fighters and EMS staff. This issue is a fundamental critical emergency services issue that directly affects the safety and welfare of visitors and citizens alike.

This exploitation of the zoning rules has diminished the unique character and only benefits a few while the rest are left to deal with the negative consequences it causes over generations. I can't imagine that the citizens that initiated the District 25 zoning process ever envisioned that these small 50'-75' lots would be so overdeveloped with mini hotels destroying the unique character that they fought so hard to protect and which has existed for years in Fort Morgan.

Fortunately, the citizens and homeowners have banded together with a common goal to protect this unique place we all love. Before you on October 15th are several amendments that directly affect Fort Morgan. These zoning amendments demonstrate a great deal of hard work and a reasonable, fair approach to re-establishing and reaffirming the unique character and original vision of Fort Morgan. These amendments fit squarely within the charge provided by the Local Act of the Alabama Legislature. In **Section 45-2-261.64 of the Act**, its says that the Baldwin County Commission **shall** specifically consider the historical nature of existing development within the Fort Morgan District, the historical and environmental character of the district, and the unique needs of the district related to hurricane safety and infrastructure for potential evacuation.

It is clear that the "historical nature of existing development" is not gigantic mini-hotels that have sprung up in Fort Morgan. It is one of beach front cottages and a family friendly environment. Also, I urge you to consider the public safety associated with hurricane evacuation and the affect that these mini-hotels. I urge you to not only consider the current issues and the negative effects of this overdevelopment, but please consider future generations and their ability to enjoy this unique asset we have in Fort Morgan and the unique beach cottage atmosphere which it represents.

Please support the residents and homeowners and the unique character of Fort Morgan and vote to adopt the zoning amendments as presented by the Fort Morgan Zoning Advisory Committee and **unanimously** recommended by the Baldwin County Planning and Zoning Commission.

Thank you for your consideration.

Paul Stanton

The Code of Alabama 1975        Section 45-2-261.64

Enforcement and administration of subpart.

The Baldwin County Commission shall enforce this subpart in the same manner as provided in Section 16 of Act 91-719, and, in performing its functions related to planning and zoning, the Baldwin County Planning and Zoning Commission and the Baldwin County Commission shall specifically consider the historical nature of existing development within the Fort Morgan District, the historical and environmental character of the district, and the unique needs of the district related to hurricane safety and infrastructure for potential evacuation.

(Act 2015-411, §5.)

Defendants' Bates #0153

# FORT MORGAN NEWS
## November 2017~Issue 129



### PRESIDENT'S MESSAGE

Hi, Folks,

We had a good turnout for the fish fry and collected a good contribution to the benevolent fund. All systems are go for the Fort Morgan Pier!! Hope for a good turnout for the November 13 meeting.

*Paul*
Paul Barefield



## MEMBER NOTICES

Fort Morgan Volunteer Fire Department ...........................................Chief Glenn Stevens



Ponce de Leon Ct. during Hurricane Nate

Your Fire Department had several firefighters stay at Station 1 during Hurricane Nate, just to be on standby if anyone needed assistance. Fortunately, we only took a mild hit from Nate and our firefighters enjoyed all the food that was provided by the community. Following the storm, warnings were issued about the high risk of dangerous rip currents and all the condominium complexes were flying red flags, which warn swimmers not to enter the water. Despite all the alerts and warnings, a 12-year-old boy, supervised by his mother, decided to ignore all the warnings and go into the Gulf. The boy got caught in a rip current. Four adults attempted a rescue. The boy made it to shore, two adults survived, and two men drowned. Unfortunately, similar situations occur far too often.

During September, your Fire Department responded to 21 emergency calls:
~ 11 medical                        ~ 1 bicycle accident
~ 6 false alarms                 ~ 1 swimmer in distress
~ 2 motor vehicle accidents

One of our fire officers has expressed some public safety concerns that the Fire Department has no authority to control. The following are some of these concerns:

### Hazardous Conditions at Duplex Houses
1. Extremely large duplexes with 3 stories above pilings:
    [Editor's Note: one has 22 bedrooms!]
a. The interior stairs from floor to floor are extremely steep and narrow, making it difficult to move patients through the house and down to an ambulance. These narrow, steep stairs would be dangerous in the event of a fire – for both the occupants and the firefighters.
b. The houses are so tall that our ladders do not reach beyond the second floor.
c. Response to these buildings can be impeded by the number of vehicles that park at the structures.

### Driveways Dangerously Impeded
2. Some driveways do not allow fire apparatus access to the structure:
a. Some driveways, especially on the bay side, are so heavily vegetated that fire vehicles are blocked from entering the property. Some driveways have overhanging tree limbs, while other driveways are so narrow that our fire trucks cannot maneuver.
b. Some of the extremely long driveways on the Gulf side do not have enough rock to support a fire truck.

Defendants' Bates #0154

***Illegal Golf Carts on Highway 180***
3. Golf carts driving down Hwy. 180:
a. Illegal.
b. Extremely dangerous.
c. Underage drivers in some cases.
d. Ingredients for a tragic accident.

***Dangerous Swimming Conditions***
4. People that ignore warnings and alerts of dangerous swimming conditions in the Gulf.
a. Weather agencies release daily advisories of surf conditions.
b. When severe rip current advisories are issued.
    i. Fire Dept. posts warnings on the highway sign at Station 1.
    ii. Firefighters patrol the beach on ATVs and advise swimmers to stay out of the water.
c. Condominium complexes fly red flags advising swimmers to stay out of the water.
d. Even with all the warnings and advisories, people still go into the water, and innocent people attempting to rescue them end up drowning.
*The purpose of these comments is to make the community aware of issues that affect you and your family.*

Just a reminder to those who might have an interest in joining the Fire Department: our meetings are on the 1st and 3rd Mondays each month at 6:30 p.m. at Station 1.

## Auxiliary Fish Fry a Resounding Success!

Thanks to everyone who attended our Fish Fry and thanks to all who donated baked goods. We set a record for proceeds on baked goods—double the previous amount--$800!!  Overall we served nearly 300 dinners. From calls for help to donate baked goods in both the Fire Department website and from this Fort Morgan NEWS, there was such a huge response that we had to set up an extra table just for baked goods.  Thanks, everyone. As you know, proceeds go to firefighters in need.

## Fort Morgan Planning & Zoning Advisory Committee.............................Chan West, Chair
### Semi-Annual Meeting Minutes

A semi-annual meeting of the Fort Morgan Planning and Zoning Advisory Committee was held at 9:00 am, October 18, 2017, at the Fellowship Hall of Shell Bank Baptist Church.  Members present were Thelma Strong, Bonnie Lowry, Ernie Church, Chan West, and Commissioner Charles Gruber. Absent were Randy Ulrich and Carol Kittrell (secretary). Also present were Vince Jackson, D. J. Hart, and Linda Lee of the Baldwin County Planning and Zoning Department; David Conner, County Attorney; and Greg and Jamie Strategier, residents of District 25.

Local members had prepared a letter for the County Commission requesting that they reconsider their decision not to include an exemption for District 25, from a new zoning category TA-17001 High Density Residential (HDR) which permits an increased density of 12 units/acre from 6 units/acre.  Discussion focused on the timing of the proposed exemption.  Both David Conner and Vince Jackson indicated that now was not the time to submit this proposal. They suggested that since no applications had been received from District 25 for the new zoning, we wait and see what the potential impact may be when such an application is submitted to the county.  Commissioner Gruber advised the current commission shares our concerns; but would prefer to defer any zoning ordinance exemption at this time. The committee agreed and decided to revisit the issue after the first of the year.

The Strategiers raised their opposition to the recently constructed highly elevated dune walk-overs on Ponce de Leon.  The county contingent agreed to go have a look at the structures following the meeting.

*****

### New Variance Request ~ Meeting
Our advisory committee has received a variance request, V-170040, for a reduction of the wetlands setback for a home to be built at 8837 Bluefish Dr., Cabana Beach. We will meet at the church at 9:00am on Wednesday, November 8, to consider this request. [See the details on  our website www.fortmorgancivic.org  under Planning & Zoning tab.]

Defendants' Bates #0155

**Fort Morgan Pier Update**
Commissioner Gruber reported that a design for the Fort Morgan Pier is being finalized. The old pier will be enclosed with sheet piling and covered with fill, thereby avoiding its removal. As soon as the design is finalized, it is expected that bids will be advertised.

*Please document, with photos, any problems you see with overflow parking along the streets in District 25 due to high-density "duplexes."* Send to Chan West: chan@goefish.com

The Fort Morgan Planning and Zoning Advisory Committee will post on our website [**www.fortmorgancivic.org**] re-zoning and variance request notices received from the county commission. Please refer other non-FMCA property owners who wish to stay up to date to our website.
Notices of rezoning requests are posted on the property involved and mailed to <u>adjacent</u> landowners by the County.
FMCA also will send a special email to all members on our email list of the time and place of our Fort Morgan committee meeting and will post signs on Fort Morgan road near both fire stations. Our email notice to members is to let non-adjacent property owners who may be affected by the request express their concerns to our local committee before it submits a recommendation to the county. Any FMCA member who receives the Fort Morgan NEWS by U.S. Postal Service and wishes to receive these rezoning request notices will have to furnish us with an email address, to be sent to Chan West at: chan@goefish.com
We encourage property owners with vested interests to bring their concerns and comments to these meetings. In most cases these notices are received about 10 days before the county Planning and Zoning Commission or Board of Adjustments meeting.

**Turtle Tracks 2017~~~~~~~~~~~~~~~~~_____ ~~~~~~~~~~~~Total Fort Morgan = 84 Nests!!**
At least 4,991 babies were assisted to the Gulf water this season!!! With no UTV, our non-Refuge beach was walked this year for the first time. All this was accomplished with about 25 active volunteers.

This year there was a rare, healthy leucistic hatchling, resembling an albino but with normal eyes. Only one albino hatchling was reported on Fort Morgan in the last few years. Several years ago a two-headed hatchling did not survive but appeared to be in the latter stages of development.

Nine nests were completely washed away by the two storms we experienced. Only three had been relocated, so the loss of six nests could be attributed to natural disasters and to being laid too close to the water.

**Congratulations to Debbie Harbin and her team of valiant turtle soldiers! Many people did not believe the 9 miles of non-Refuge beach on Fort Morgan peninsula could be covered on foot, but it was done—and superbly!!! [Note: The Refuge still has a UTV to cover their 5 miles of beach. In the past, they provided shared coverage by UTV of all 14 miles of beachfront turtle patrol.]**

**Bon Secour National Wildlife Refuge**......................................................**Chan West**



**Haley's Mosaic**
This week the Bon Secour National Wildlife Refuge is saying "Good Bye" to Haley Lesmerises. She has spent the past six months with the sea turtle program as an intern from Americorps and the Student Conservation Association, which promote conservation and environmental education. Home is Milford, New Hampshire, and she is a graduate of the University of New Hampshire in Wildlife Management and Conservation Biology.

Many hours were spent riding the refuge beaches, where she came to know Connie Smith, a resident of Laguna Key who walks our beaches with his pockets stuffed with plastic bags from the WalMart recycle bin, picking up marine debris and trash left by visitors. He leaves the filled bags beside the track of the UTVs where Haley and others pick them up.

Haley has created a mosaic, now on display in the refuge Visitor Center. This piece of artwork was made almost entirely from plastic bottles, aluminum cans, netting, wood, canvas, Styrofoam, fishing

Defendants' Bates #0156

debris, plastics and other trash and debris collected from the beaches of the Bon Secour National Wildlife Refuge.  She has also posted documentation of the scope of the marine debris problem and some simple steps we all can take to reduce the debris entering our waters:

- ~ Use reusable water bottles and shopping bags instead of disposable ones
- ~ Take along a reusable mug for coffee to avoid Styrofoam or plastic cups
- ~ Don't litter; make sure your garbage is disposed of responsibly
- ~ Get involved in your local beach clean- up
- ~ Avoid using disposable plastics
- ~ Reduce, Reuse, Recycle!

Haley will be returning to New Hampshire as a Conservation Steward intern at Bean Brook State Park. Thank you, Haley, for your service here. Do stop by the refuge office to view the mosaic and the display.

## Community History ~ Indian Canal ~ Fall Excavation ...................................... Harry King

In mid-October Dr. Greg Waselkov and Dr. Bonnie Gums of the University of South Alabama Archaeology Department, Harry King and 15 adventurous volunteers began an excavation of the Indian Canal off Fort Morgan Road. At the site earlier this year, material for carbon-14 dating had been obtained and subsequently verified by a professional lab in Florida—approximately 566 A.D.—or 1450 B.P. [1,450 years ago]. This native socio-economic population was thriving in the Fort Morgan and Bon Secour, Alabama area 1400 to 1500 years ago. Although no artifacts were found at the initial dig site, pottery and other artifacts were found at a mound on the south side of Fort Morgan Road.
**We will reconvene at 9:00 am, Sunday, December 3rd at the last dig site.**

We are fortunate to have such veteran archaeologists volunteering their time and expertise documenting the oldest Trade Canal in North America!  Thank you all for your interest and contributions.

Note from Dr. Waselkov:  *We've looked over the pottery from last Saturday and it is all Middle Woodland, right in the middle of that period, so probably dating around AD 300 to 400. There was modern glass found in the layer we're currently in, so I am hoping that disappears once we get into the shell midden layer.*

[NOTE:  Anyone interested in volunteering for this project should contact Harry King:  harryking1525@gmail.com ]
***\*\*\*\*\****

## Fort Morgan Community History

### Did You Know? ...................................................................................... Bonnie Lowry

#### EARLY LOTS & DEEDS FROM SPAIN

The story of Fort Morgan is fascinating from the time of the Spanish expedition under the command of Admiral Alvarez de Pineda, who, according to history, sailed into Mobile Bay in 1519, twenty-six years after the visit of Columbus to America and one hundred years before the Pilgrims landed.

One of the first tracts of land on the west end of Fort Morgan (Sec. 1, TS 9, Range 1) was 1276 acres granted to Francisco Swarez from Spain.  This is recorded in Deed Book A, pp. 292-294 on November 10, 1818.

One of the more interesting tracts of the early 1800's is that of APK Jones (don't know what the initials stand for) but this was an even larger tract (now known as Navy Cove and Pilot Town) than the Swarez tract – going north from the Gulf of Mexico to the Bay of Mobile.

By 1820 the Swarez tract had been deeded to Joshua Kennedy – Apr. 27, 1820, as recorded in Deed Book A, pp. 352-353.  The APK Jones will is in Deed Book C and dated Jun. 29, 1928.  No mention of the large tract – I presume much, if not all, had been deeded to others, perhaps his family.

Another interesting tidbit:  In March of 1910 the trustees of the Alabama Insane Hospital certified to the governor of Alabama that they had examined the claim of James D. Hand, the lands known as "Swamp and overflow Lands" in Sections 22, 23,& 24 – speaking of a subdivision in Township 9.  (This would be to the east and encompassed 2495 acres near the Bon Secour National Wildlife Refuge office.  Note: J D Hand was the president of Navy Cove Harbor and Railroad Company (1912).  Book ISNS, bag 624.

Defendants' Bates #0157

Way back in the 1900's almost all transactions were "quit title actions." The families owned large tracts of land in Fort Morgan, and according to the books they were both on-shore and off-shore (for example, the gas royalties, thanks to Senator Boykin's reservation of the oil and gas ownership which titles were transferred to the State of Alabama).

## Fort Morgan Crime Report ~ October 2017....................................Sgt. Nathan Lusk, BCSO

We had only one burglary, which was off Ponce De Leon and was during the night at an occupied house. Purse or wallet was stolen from downstairs while the victim was sleeping upstairs. No forced entry to get inside. This was a very rare occurrence. I don't remember anything similar in the last couple of years.

### *[Lock your doors at night and remind your visitors, tenants and neighbors to do the same!]*

**Thefts from unlocked** vehicles and homes are preventable crimes. Remove valuables from your vehicles and lock your doors. Security cameras and exterior lights are encouraged. If you have video cameras and are near a reported crime, please check them and call the Sheriff's Office. As always, report suspicious activity.

---

*We request that a family member notify us of any FMCA member's death and the website where an obituary and funeral arrangements can be found. With over 400 member families, we have no certain way of knowing of a member's death.*

---

## Baldwin County Commission Contacts

Commissioners:

| | | | |
|---|---|---|---|
| Charles "Skip" Gruber | Tucker Dorsey | Chris Elliott | Frank Burt, Jr. |
| cgruber@baldwincountyal.gov | tdorsey@baldwincountyal.gov | cfelliott@baldwincountyal.gov | fburt@baldwincountyal.gov |
| 251-943-5061 | 251-972-8502 | 251-990-4606 | 251-937-0395 |

To speak at a regular commission meeting, you must have signed up before the meeting. Check the dates, times and locations for all meetings at  http://www.baldwincountyal.gov

## FMCA Executive Board Contacts

**If you have questions, need information or would like to volunteer, please contact one of the following board members.**

**Officers**

| | | | |
|---|---|---|---|
| President | Paul Barefield | 540-7727 | csbarefield@gmail.com |
| Vice President | Ernie Church | 334-220-0851 | ecaces4@gmail.com |
| Treasurer | Chan West | 979-4932 | chan@goefish.com |
| Secretary | Carol Kittrell | 251-605-4134 | ckittrell@southalabama.edu |

**Standing Committee Chairs**

| | | | |
|---|---|---|---|
| District 25 Planning & Zoning | Chan West | 979-4932 | chan@goefish.com |
| Incorporation | Paul Barefield | 540-7727 | csbarefield@gmail.com |
| Membership | Bonnie Lowry | 540-9327 | |
| NEWS & Website Editor | Sonja Sanders | 233-6208 | |
| | 39sunnisands@gmail.com | | |
| Sunshine | Vickie Matranga | 543-1555 | vpowers110@gmail.com |

### FMCA 2017 MEETINGS

FMCA Monthly Member Meetings ~ 2nd Monday, 6:30pm, Shell Banks Church:

**November 13 ~ December 11**

## Fort Morgan Civic Association
P. O. Box 5313 ~ Gulf Shores, AL 36547
www.fortmorgancivic.org

Defendants' Bates #0158

Wayne Dyess                                                              July 9, 2019
County Administrator
Baldwin County Administration Building
County Commission Office
322 Courthouse Square
Bay Minette, Alabama 36507

The Ft Morgan Volunteer Fire Department strongly encourages the Planning and
Zoning Department to establish in District 25 a 2 story limit on residential
construction vice the suggested 2 1/2 story proposal discussed at our recent joint
planning and zoning meeting.

Despite the proposed caveat to limit habitability in the additional 1/2 story, our
experience is that people who rent out their homes will go to virtually any length
to maximize bedroom count and sleeping numbers. We have seen cots on top of
cots in hallways, bunk beds in rooms the size of a closet and narrow stairs
leading to attics filled with similar bedding. There are homes here where
reasonable emergency access to attic areas and third stories is virtually
impossible. A spiral staircase to an upstairs area causes unnecessary limitations
on emergency responders who are there to potentially save lives.

Standard 2 story construction is more likely to adhere to traditional stairway width
- not the more narrow stairways we encounter when third stories are used as
sleeping areas, or when attics are used for habitation.

A 2 story limit may not solve all the problems but will at least make firefighting
and medical rescues less problematic. We have a ladder capability to second
stories but not to greater heights. And parking along narrow roadways limits the
ability of first responders to reasonably access homes that need our help. Your
stacking initiative will help alleviate some of the parking situations we encounter -
we agree that needs to be implemented here in District 25.

Other concerns we have in the fire department:

        Is there a fire code review/enforcement as part of the building permit
process?

        Can a reasonable occupancy limit be established for residential rental
properties?

        As homeowners maximize habitability there is a coincidental negative
influence on infrastructure (from sewer to water to garbage collection) as well as
on evacuation during hurricanes. Road congestion becomes nightmarish. Even

Gulf Shores Mayor Craft has stated his concerns about Ft Morgan traffic merging onto highway 59. Nightmares can soon become reality if growth and density are not better controlled. A 2 story limit would help considerably.

Signage is becoming a safety issue. People are putting up signs within the highway centerline right of way and line of sight in areas is severely limited. We know this is a contributing factor to motor vehicle accidents.

Ancillary issues we would like addressed but not necessarily in your purview have to do with driveway construction. Since owners have to abide by US Fish and Wildlife footprint limitations, we notice driveways narrower than many of our fire apparatus' can traverse. As a result, we would have to lay a line from highway 180 all the way up the driveway to fight the fire directly, or lay line to feed hydrant water to a smaller truck with smaller hoses to battle a blaze. Certainly not an ideal scenario.

Evacuation from FHA and CHHA locales is critical during weather events. The additional people (and vehicles) who would be here if a habitable 1/2 story were permitted only exacerbates challenges we are facing to achieve an orderly evacuation.

The bottom line is: a 2 story residential limitation reasonably ameliorates both controlled growth and reduced density.

Ernie Church
President, Board of Directors
Ft Morgan Volunteer Fire Department

Defendants' Bates #0160

Case 1:20-cv-00057-C   Document 45-3   Filed 05/21/21   Page 67 of 187   PageID #: 1105





Photo by Matt Ware

© Taken during permitted stranding/salvage activities

Case 1:20-cv-00057-C   Document 45-3   Filed 05/21/21   Page 69 of 187   PageID #: 1107

Defendants Bates #0163





Defendants' Bates #0164

A7 June 12

Defendants' Bates #0165

PageID #: 1110

Case 1:20-cv-0005... ...nt 45-3   Filed 05/21/21   Page 72 of 187

Defendants' Bates #0166

Case 1:20-cv-00057-C   Document 45-3   Filed 05/21/21   Page 73 of 187   PageID #: 1111



Defendants' Bates #0167



Defendants' Bates #0168



Defendants' Bates #0170



Defendants' Bates #0171



Defendants' Bates #0172

Case 1:20-cv-00057-C   Document   Filed 05/21/21   Page 79 of 187   PageID #: 1117

Defendants' Bates #0173

**Text Amendments**

<u>In Favor</u>
1. Fort Morgan Volunteer Fire Department
2. Carol Kendrick
3. Linda ford
4. Elaine Beacham
5. Judy Newcomb
6. Andy Openshaw
7. Judith Thompson
8. Mike, Linda & Melissa Kehart
9. Craig Harrington
10. John Scruggs
11. Capt. Joe Emerson
12. Paul Stanton
13. Don & Cindy Ward
14. G C Strong III
15. Diedra & Mack Bell
16. Royce Massey
17. Carla Kapeskas
18. Wayne Zeek
19. Laura & Linwood Snell
20. Steve Salter
21. Pat & Ellen Ryan
22. Greg & Jamie Strategier
23. Barbara & Richard Pounds, Jr.
24. Debbie Harbin


<u>Opposed</u>
1. Bill Jones
2. Scott Lewis
3. Trice Hulling
4. Leo Hastings
5. Caleb Hastings
6. Robert Isakson
7. Susan W Harrell, Philip Properties, LLC, two letters included
8. Michael Audemar
9. Jeff Valentine, two letters included
10. Fawzy Sedrak
11. Peter Sedrak
12. Daniel Humphries
13. Tom Martin

Defendants' Bates #0174

# LETTERS IN FAVOR

Defendants' Bates #0175

Wayne Dyess                                                              July 9, 2019
County Administrator
Baldwin County Administration Building
County Commission Office
322 Courthouse Square
Bay Minette, Alabama 36507

The Ft Morgan Volunteer Fire Department strongly encourages the Planning and
Zoning Department to establish in District 25 a 2 story limit on residential
construction vice the suggested 2 1/2 story proposal discussed at our recent joint
planning and zoning meeting.

Despite the proposed caveat to limit habitability in the additional 1/2 story,  our
experience is that people who rent out their homes will go to virtually any length
to maximize bedroom count and sleeping numbers.  We have seen cots on top of
cots in hallways,  bunk beds in rooms the size of a closet and narrow stairs
leading to attics filled with similar bedding.   There are homes here where
reasonable emergency access to attic areas and third stories is virtually
impossible.  A spiral staircase to an upstairs area causes unnecessary limitations
on emergency responders who are there to potentially save lives.

Standard 2 story construction is more likely to adhere to traditional stairway width
- not the more narrow stairways we encounter when third stories are used as
sleeping areas, or when attics are used for habitation.

A 2 story limit may not solve all the problems but will at least make firefighting
and medical rescues less problematic.  We have a ladder capability to second
stories but not to greater heights.  And parking along narrow roadways limits the
ability of first responders to reasonably access homes that need our help.  Your
stacking initiative will help alleviate some of the parking situations we encounter -
we agree that needs to be implemented here in District 25.

Other concerns we have in the fire department:

        Is there a fire code review/enforcement as part of the building permit
process?

        Can a reasonable occupancy limit be established for residential rental
properties?

        As homeowners maximize habitability there is a coincidental negative
influence on infrastructure (from sewer to water to garbage collection) as well as
on evacuation during hurricanes.  Road congestion becomes nightmarish.  Even

Defendants' Bates #0176

Gulf Shores Mayor Craft has stated his concerns about Ft Morgan traffic merging onto highway 59.  Nightmares can soon become reality if growth and density are not better controlled.  A 2 story limit would help considerably.

Signage is becoming a safety issue.  People are putting up signs within the highway centerline right of way and line of sight in areas is severely limited.   We know this is a contributing factor to motor vehicle accidents.

Ancillary issues we would like addressed but not necessarily in your purview have to do with driveway construction.  Since owners have to abide by US Fish and Wildlife footprint limitations, we notice driveways narrower than many of our fire apparatus' can traverse.  As a result, we would have to lay a line from highway 180 all the way up the driveway to fight the fire directly, or lay line to feed hydrant water to a smaller truck with smaller hoses to battle a blaze.  Certainly not an ideal scenario.

Evacuation from FHA and CHHA locales is critical during weather events.  The additional people (and vehicles) who would be here if a habitable 1/2 story were permitted only exacerbates challenges we are facing to achieve an orderly evacuation.

The bottom line is:  a 2 story residential limitation reasonably ameliorates both controlled growth and reduced density.


Ernie Church
President, Board of Directors
Ft Morgan Volunteer Fire Department


Defendants' Bates #0177

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Tuesday, September 3, 2019 11:40 AM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Proposed ordinances for Fort Morgan district 25 |

Not sure if I sent this or not.

-----Original Message-----
From: Carol Kendrick [mailto:cbkendrick@gmail.com]
Sent: Thursday, August 29, 2019 12:42 PM
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Cc: Austin Cook <austinkendrickcook@gmail.com>
Subject: <EXTERNAL> Proposed ordinances for Fort Morgan district 25

Mr. Jackson,

I own property in Fort Morgan and I am very much in favor the proposed ordinances for Fort Morgan.  These ordinances will benefit Fort Morgan and help protect our community by limiting new construction to two stories, limit the size of dune walkover's and help keep the population density of Fort Morgan in line with the current zoning map. These proposals will also help protect the habitat for our unique and sensitive wildlife as well as promote public safety in areas that have excess problems for first responders.

Sincerely,

Carol Kendrick

Sent from my iPad

1

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Tuesday, September 3, 2019 5:19 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Ft. Morgan |

-----Original Message-----
From: lksford@gmail.com [mailto:lksford@gmail.com]
Sent: Thursday, August 29, 2019 7:48 PM
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> Ft. Morgan

I am a property owner in Ft. Morgan and am completely in favor of limiting size of construction, population density, and any other ordinances which will protect our sensitive environment and
wildlife, and secure the quality of life on this peninsula.
Linda Ford
5889 Pizarro Ave
Ft. Morgan
334-538-5781

Sent from my iPhone

1

Defendants' Bates #0179

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Wednesday, September 4, 2019 11:14 PM |
| **To:** | D Hart |
| **Subject:** | Fwd: <EXTERNAL> proposed ordinances for Ft Morgan District 25 |

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: "elaine t. beacham" <beacham.elaine@gmail.com>
Date: 9/4/19 8:41 PM (GMT-06:00)
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> proposed ordinances for Ft Morgan District 25

I wish to add my support for the proposed ordinances for Ft MorganElaine T. Beacham

1

Defendants' Bates #0180

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 5, 2019 10:31 AM |
| **To:** | D Hart |
| **Subject:** | Fwd: <EXTERNAL> Fort Morgan Ordnance |

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Judy Newcomb <judyanewcomb@aol.com>
Date: 9/5/19 10:29 AM (GMT-06:00)
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> Fort Morgan Ordnance

I wanted to let the planning and zoning commission know that I, a Baldwin County Fort Morgan resident, support the proposed ordinance regarding the restrictions for building in Fort Morgan that is on tonight's agenda. Unfortunately I am unable to attend the meeting.

Judy Newcomb

Sent from my iPhone

1

Defendants' Bates #0181

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 5, 2019 1:44 PM |
| **To:** | D Hart |
| **Subject:** | Fwd: <EXTERNAL> District 25 zoning regulations |

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Andy Openshaw <waopenshaw@gmail.com>
Date: 9/5/19 1:40 PM (GMT-06:00)
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> District 25 zoning regulations

Mr. Jackson

I was at the lastT FMCA planning and zoining meeting where the proposed
changed for District 25 were presented. I will not be able to attend
tonight's meeting in Robertsdale but I would like you to know that my
wife and I are in favor of these changes and any other changes or
exemptions that would limit the density and unattended growth in the
Fort Morgan area.

Thank You

Andy Openshaw
8882 Dolphin Lane
Gulf Shores, AL 36542

1

Defendants' Bates #0182

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 5, 2019 11:04 AM |
| **To:** | D Hart |
| **Subject:** | Fwd: <EXTERNAL> District 25 Ordanance |

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Judith Thompson <jthompson2001@yahoo.com>
Date: 9/5/19 10:42 AM (GMT-06:00)
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> District 25 Ordanance

Dear Mr Jackson:  I have a home in Ft Morgan, but I
Am not in Ft Morgan at this time! I will not be at the meeting, but I am for the ordnance you are meeting on at this time .
Thanks for looking out for the owners in Ft Morgan.I feel lots of things go on down there with owners like me are in the dark until it
is too late, an example is the garbage issue I  Thank for listening!
Sent from my iPhone

1

Defendants' Bates #0183

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 5, 2019 7:44 AM |
| **To:** | D Hart |
| **Subject:** | Fwd: <EXTERNAL> County Zoning |

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Linda Kehart <lkehart@midwest.net>
Date: 9/5/19 7:35 AM (GMT-06:00)
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> County Zoning

M. Jackson:  The Kehart family owning property at 562 Our Road wishes to support the zoning changes as suggested for discussion at the zoning committee meeting this evening.  Over six years ago we began the search for a home where our chronically ill daughter could find peace in a quiet neighborhood.  Within six months of our purchase construction began on a series of houses.   Not one holiday or any day of the week is without hammering or tossing of lumber. Our experience has been challenging and certainly curtailed the use of the home.  We do not rent.  Houses were built on areas where turtle nests had existed.  (We have pictures and actually observed with other Our Rd neighbors the hatching of the turtles.)  Noise is constant with no building hours, often for 15 hours per day seven days a week.  Out Rd is unique in its curvature and length ending at a dune at a dead end.  Contractors frequently closed the road for our exit, piled supplies in the street restricting traffic, parked in resident driveways, used water from homes in the area, put their debris in neighbors' garbage cans, let trash blow through0ut the area, destroyed a long established sand dune, built nine bedroom homes and secured logging permits for events that at times included over 50 cars for entire weekends.  The effects on all of this uncontrolled building was devastating to us.  We kindly asked the contractors to consider their activities and, generally, were laughed at or sworn at.  Residents were unable to return to their homes with equipment closures.  One woman was brought home from the hospital and could not reach the residence.  We were aware of the fear of seeking care for our family was always at risk.  We were vocal, visiting the Baldwin County offices in Foley, joining the Ft. Morgan Civic Association, and helping with neighborhood cleanups, etc.

The zoning board has the opportunity to maintain Ft. Morgan in the manner that owners originally made purchase and frequently comment on websites the joy of the "peace" of the area.  Recently more than 80% of the owners at the time of our purchase have sold and left the area.  One owner, in tears, told me she just could not handle the stress of the building, the contractor neglect and the vigilance now required to have a safe and joyful experience.

We cannot express more fully our support for the zoning changes.  We are aware that we are just one family with special needs, but we are a caring, giving family who knows the value of a neighborhood that shares our values.  Please consider carefully the future you will be building for this unique area.

Thank you.

Mike, Linda and Melissa Kehart
lkehart@midwest.net

1

Defendants' Bates #0184

217-433-1890
93 Allen Bend Drive
Decatur, Illinois 62521
562 Our Rd
Gulf Shores, Al

Defendants' Bates #0185

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Tuesday, September 3, 2019 5:20 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Fw: Correction for Proposed Ordinances for Ft Morgan District 25 |

**From:** Craig Harrington [mailto:craigharrington@att.net]
**Sent:** Thursday, August 29, 2019 1:02 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Fw: Correction for Proposed Ordinances for Ft Morgan District 25

Hello Vince …. just wanted you to know that I agree with the proposed Amended Ordinances in District 25 … as attached hereto.

Craig Harrington
5601 State Hwy 180, Unit 1000, Gulf Shores, AL 36542
e-mail: craigharrington@att.net
phone: (251) 967-1622

----- Forwarded Message -----
**From:** Fort Morgan <fortmorgancivic@gmail.com>
**To:** "fortmorgancivic@gmail.com" <fortmorgancivic@gmail.com>
**Sent:** Thursday, August 29, 2019, 10:03:02 AM CDT
**Subject:** Correction for Proposed Ordinances for Ft Morgan District 25

Dear Fort Morgan Civic Association Members

I must apologize for a mistake.  There was typo in the email (see attached below).  **Vince Jackson's CORRECT email address is:  vjackson@baldwincountyal.gov**
If you already sent Vince an email, then please resend it to the CORRECT email address.

You are also invited to show your support in-person during the Baldwin County Planning & Zoning Commission meeting next Thursday, September 5, 2019 @ 6pm.
Baldwin County Central Annex Building
22251 Palmer Street
Robertsdale, AL 36567

Sincerely,
Greg Strategier

Dear Fort Morgan Civic Association Members
Over the past years the FMCA, Fort Morgan Planning and Zoning Committee and Baldwin County have been working toward some much needed changes to Baldwin County Zoning Ordinances in order to protect the Fort Morgan

1

Defendants' Bates #0186

# JOHN E. and JOAN G. SCRUGGS

### 40 Melody Ridge
### Covington, GA 30014
Phone: 770-787-1975   Fax: 800-232-5957

August 29, 2019

Via Email: VJACKSON@baldwincountyal.gov

Baldwin County Planning & Zoning
Attn: Vince Jackson, Director

      Re: Property owned at 8933 Pompano Way, Ft. Morgan, AL

Dear Mr. Jackson:

      This letter is to advise that as property owners in Ft. Morgan, AL, we support the proposed ordinances to Planning District 25 to be presented to the Planning & Zoning Board on September 5, 2019.

      Thank you for your consideration of the above.

                Sincerely,

                John E. Scruggs

                Joan G. Scruggs

Defendants' Bates #0187

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Wednesday, August 28, 2019 4:37 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Ordinance Changes |

Support for the proposed PD 25 zoning text amendments.

**From:** Joseph Emerson [mailto:captjoesells@gmail.com]
**Sent:** Wednesday, August 28, 2019 1:30 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Ordinance Changes

Vince

Thank you for your hard work on the proposed ordinance changes. Please relay this message to the County Planning and Zoning members.


To the Baldwin County Planning and Zoning Commission

I would like to request your approval of the proposed ordinance changes for Fort Morgan/District 25 coming before the commission for vote. The proposed ordinances will, if properly enforced, help to protect the environmental and historical sensitivity of the Fort Morgan peninsula while also supporting public safety of both residents and visitors alike.

Thank you for your service and dedication to the District 25 community and thank you for your consideration.


--



**Capt Joe Emerson**
Exit Realty Gulf Shores
251.550.9021

"Navigating you through the sea of Real Estate"

Defendants' Bates #0188

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Wednesday, August 28, 2019 10:39 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Proposed Amended Ordinances in District 25 |

**From:** Paul Stanton [mailto:paul.stanton@electrolux.com]
**Sent:** Wednesday, August 28, 2019 6:04 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Proposed Amended Ordinances in District 25

Vince
My wife and I own a house at 3487 Ponce De Leon Court (Fort Morgan.)

We have witnessed firsthand what is currently going on in Ft. Morgan with the construction of Easy Breezy a 3 story 18 bedroom house which sleeps 44 people (hotel with no parking) in 2017.

During the summer it is very difficult to drive on Ponce De Leon Court because of all the vehicles on the street because there isn't enough parking at Easy Breezy.

I have seen the raw sewage over flowing from the grinder pump.

As you know, construction has started on another house just like Easy Breezy on the west side of Easy Breezy. Where does this stop with developers putting small hotels on residential lots.

I fully support the proposed Amended Ordinances in District 25 to be presented to the Baldwin County Planning and Zoning board for a vote during the September 5, 2019 meeting.

Sincerely,
Paul Stanton


Paul Stanton
District Sales Manager - Gulf Coast – Contract Sales
(251) 295.5255 - Cell
Electrolux / Frigidaire Major Appliances North America
30082 D'Olive Ridge
Spanish Fort, AL 36527
www.frigidaire.com
www.electroluxappliances.com



1

Defendants' Bates #0189

===================================================================== This message (including any attachments) contains information that may be confidential and/or privileged. It is intended only for the person(s) to whom it is addressed. - If you are not the intended recipient, please notify the sender by replying to this message with "Received in error" as the subject and then delete it from your mailbox. - If you are not the intended recipient, you are not authorized to read, print, retain, copy or disseminate this message or any part of it, and any unauthorized use may be unlawful. The sender is not responsible for the accuracy or completeness of this message when it has been transmitted over a public network, as Internet communication is not secure.
=====================================================================

Defendants' Bates #0190

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, August 29, 2019 12:35 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Proposed Amended Ordinances in District 25 |

**From:** windward2 [mailto:windward2@bellsouth.net]
**Sent:** Thursday, August 29, 2019 12:00 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Proposed Amended Ordinances in District 25

Vince
My wife and I own a house on Buchanan Court W. We purchased this house in January 2018. Prior to that we owned a house at 3480 State Hwy 180 for 20 years (1998 to 2018). We saw first hand what is currently going on in Ft. Morgan with the construction of Easy Breezy a 3 story 18 bedroom house which sleeps 44 people (hotel with no parking) in 2017. During the summer it is very difficult to drive on Ponce De Leon Court due to of all the vehicles on the street because there isn't enough parking at Easy Breezy for 44 people. I have seen the raw sewage over flowing from the grinder pump when walking to the beach. Also it is my understanding that the Ft. Morgan VFD doesn't have ladders to reach 3 stories which is a huge safety problem. I believe construction has started on another house (hotel) just like Easy Breezy on the west side of Easy Breezy. Where does this stop with developers putting small hotels on residential lots.

Cindy and I fully support the proposed Amended Ordinances in District 25 to be presented to the Baldwin County Planning and Zoning board for a vote during the September 5, 2019 meeting.

Sincerely,
Don and Cindy Ward
331 Buchanan Court W.
Gulf Shores, AL
251-363-8576

1

Defendants' Bates #0191

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, August 29, 2019 8:12 AM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Proposed Amendment |

**From:** Strong, Gillard [mailto:StrongG@bv.com]
**Sent:** Thursday, August 29, 2019 8:06 AM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Proposed Amendment

Sirs,
I would like to voice my support for the proposed amendment to the zoning for district 25. We need much lower density than what we have now. I am a fifth generation Fort Morgan resident . I grew up there and my house is at 11321 St. Hwy. 180 (2nd St.) also I own four other lots as well as another house and my home. I have seen the state of the environment go downhill driven by the greed of real estate developers. This has to stop. We large four stories houses with four to six units in each one that are built for tax write offs by people who could care less about the local environment or the people. It is pass time that Baldwin county support the people who live here and not out of area investors. I look forward to your support on this matter. Thank you.

G.C. Strong III
Commissioning Manager
NFE CHP Project
+1-876-402-2372 Jamaica
+1-913-458-6175, office
+1-251-978-6960, mobile
strongg@bv.com

Defendants' Bates #0192

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Wednesday, August 28, 2019 10:40 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Proposed ordinances for District 25 |

**From:** mac_deidra [mailto:mac_deidra@bellsouth.net]
**Sent:** Wednesday, August 28, 2019 9:15 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Proposed ordinances for District 25

Mr. Jackson,
We want to voice our support for the proposed ordinances in District 25 limiting single and 2 family construction to 2 stories and also limiting the size of dune walkovers.
Being Fort Morgan homeowners for 21 years, we are committed to preserving our very special habitat here for generations to come. We thank you in advance for supporting these new proposed provisions that will certainly make a difference in the preservation of Fort Morgan.
Sincerely,
Deidra and Mack Bell
3437 Ponce de Leon Court
Gulf Shores, Al 36542

Sent from my Verizon, Samsung Galaxy smartphone

Defendants' Bates #0193

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, August 29, 2019 8:47 AM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Support for the Proposed Ordinances for Ft Morgan District 25 |

**From:** rtravel man [mailto:rtravelman123@gmail.com]
**Sent:** Thursday, August 29, 2019 8:49 AM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Support for the Proposed Ordinances for Ft Morgan District 25

Dear Mr. Jackson,

   I own a home at 3457 Ponce DeLeon Ct. Ft. Morgan.  I have reviewed the proposed Ordinances and totally agree that they will protect our community from over building, poor or no appropriate planning for new construction.  Thank you for your support the proper development of our community.

Sincerely,
Royce D. Massey
3457 Ponce DeLeon Ct
Ft. Morgan, AL

 Virus-free. www.avast.com

1

Defendants' Bates #0194

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, August 29, 2019 6:34 AM |
| **To:** | D Hart |
| **Subject:** | Fwd: <EXTERNAL> Fwd: Fort Morgan ordinance |

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: carla kapeskas <crkapeskas@gmail.com>
Date: 8/29/19 6:18 AM (GMT-06:00)
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> Fwd: Fort Morgan ordinance

Sent from my iPhone

Begin forwarded message:

> **From:** carla kapeskas <crkapeskas@gmail.com>
> **Date:** August 29, 2019 at 7:17:56 AM EDT
> **To:** VHACKSON@baldwincountyal.gov
> **Subject: Fort Morgan ordinance**
>
> I am a property owner in Fort Morgan and I support the new ordinance limiting building heights and board walks.
> Please help us keep Fort Morgan from real estate exploitation.
> Help protect our wild life.
> Carla Kapeskas
>
> Sent from my iPhone

1

Defendants' Bates #0195

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, August 29, 2019 7:53 AM |
| **To:** | D Hart |
| **Subject:** | Fwd: <EXTERNAL> Proposed Ordinances for Ft Morgan District 25 |

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: Wayne Zeek <dwzeek@bellsouth.net>
Date: 8/29/19 7:48 AM (GMT-06:00)
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> Proposed Ordinances for Ft Morgan District 25

As a member of the FMCA and a property owner at the Rookery I & II, I fully support the proposed changes to the Ordinances as described the FMCA Executive Board's email.

Further in my capacity as President of the Rookery Condominium Owner's Association, I have sent the Board's email to all of the Rookery I & II Owners also requesting their support.

Sincerely,
Wayne Zeek, President
Rookery COA
205-534-0753

1

Defendants' Bates #0196

## D Hart

**From:** Vince Jackson
**Sent:** Thursday, August 29, 2019 6:33 AM
**To:** D Hart
**Subject:** Fwd: <EXTERNAL> Proposed Ordinances

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: LINWOOD H JR SNELL <woodysnell@bellsouth.net>
Date: 8/29/19 5:01 AM (GMT-06:00)
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> Proposed Ordinances

As Fort Morgan homeowners, we fully support the proposed ordinances to be considered at the Sep 5 meeting.

Laura and Linwood Snell
5571 Pizarro Ave
Gulf Shores (Ft Morgan), AL

1

Defendants' Bates #0197

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, August 29, 2019 6:33 AM |
| **To:** | D Hart |
| **Subject:** | Fwd: <EXTERNAL> SALTER----VOTE OF SUPPORT FOR PROPOSED ORDINANCES !! Fwd: Proposed Ordinances for Ft Morgan District 25 |
| **Attachments:** | Planning District 25 Proposed Text  Amendments to Local Provisions 2019 Revised.pdf |

Sent from my Verizon, Samsung Galaxy smartphone

-------- Original message --------
From: "J. Stephen Salter" <umstakwit@aol.com>
Date: 8/29/19 5:02 AM (GMT-06:00)
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> SALTER----VOTE OF SUPPORT FOR PROPOSED ORDINANCES !! Fwd: Proposed Ordinances for Ft Morgan District 25

**Law Office of J. Stephen Salter**
Fellow, ABCL          Life Member, NACDL
8975 Pompano Way
Gulf Shores, Alabama 36542-8123
Telephone:205-585-1776
Email: umstakwit@aol.com

PLEASE KNOW THAT I SUPPORT THE PROPOSED ORDINANCES FOR OUR AREA !

THANK YOU FOR YOUR THOUGHTFUL PROPOSAL !

STEVE

-----Original Message-----
From: ERNIE CHURCH <ecaces4@bellsouth.net>
To: Ernie Church <ecaces4@gmail.com>
Cc: Ernest Church <ecaces4@bellsouth.net>
Sent: Wed, Aug 28, 2019 12:22 pm
Subject: Proposed Ordinances for Ft Morgan District 25

Dear Fort Morgan Civic Association Members
Over the past years the FMCA, Fort Morgan Planning and Zoning Committee and Baldwin
County have been working toward some much needed changes to Baldwin County Zoning

1

Defendants' Bates #0198

Ordinances in order to protect the Fort Morgan community as a whole. Vince Jackson, Baldwin County Planning & Zoning Director, has been working with the County Administrator, Wayne Dyess, to get these proposed changes in front of the Baldwin County Planning and Zoning board for a vote during the September 5, 2019 meeting. If these Ordinances are approved by Planning & Zoning, then the Baldwin County Commissioners will be voting on the Ordinances during October, 2019 for final approval and implementation.

These ordinances will benefit Fort Morgan and help protect our community by limiting new construction to 2 stories, limit the size of dune walkovers and help keep the population density of Fort Morgan in line with the current zoning map. These proposals will also help protect the habitat for our unique and sensitive wildlife as well as promote public safety in areas that have access problems for first responders.

The FMCA Board would like to encourage Fort Morgan residents & property owners to review the proposed ordinances for District 25 (attached below). We also request that you send your support of these ordinances to Baldwin County Planning & Zoning Director, Vince Jackson prior to September 1, 2019. Please Email your support to
:  VHACKSON@baldwincountyal.gov
We appreciate you forwarding this email to other residents & homeowners in our Fort Morgan Community and request their support, too.

Please feel free to contact us if you have any questions related to the proposed Amended Ordinances in District 25.


Sincerely
FMCA Executive Board

Defendants' Bates #0199

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, August 29, 2019 11:37 AM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Proposed Baldwin County Zoning Ordinances |

**From:** Pat Ryan [mailto:wgipatryan@aol.com]
**Sent:** Thursday, August 29, 2019 10:08 AM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Proposed Baldwin County Zoning Ordinances

Dear Mr. Jackson:
As a property owners in Fort Morgan,we would like to voice our support for the proposed changes to Baldwin County Zoning Ordinances in order to protect the Fort Morgan community as a whole.

We appreciate your support in this matter.

Regards
Pat and Ellen Ryan
8839 Dolphin Lane
Cabana Beach Subdivision

Defendants' Bates #0200

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Friday, September 27, 2019 7:21 AM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Baldwin County P&Z Text Amendments District 25 |
| **Attachments:** | attachment 1.xlsx; ATT00001.htm |

**From:** Greg & Jamie Strategier [mailto:samsplace41805@gmail.com]
**Sent:** Monday, September 16, 2019 8:52 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Cc:** Joe Emerson <captjoesells@gmail.com>; Paul Staton <paul.stanton@electrolux.com>
**Subject:** <EXTERNAL> Baldwin County P&Z Text Amendments District 25

Hi Vince & Wayne ~

First, thank you so much for all your long hours, Hard work, and your personal diligence and your staff's research in preparing and recommending the text amendments for District 25. Unfortunately I had an accident and was unable to attend the Planning Commission meeting, but my husband, Greg, stayed until the end along with about 30 other FM Residents to address the Planning Commission. We are all very pleased with the Unanimous Vote to approve your recommendations by Baldwin County Planning Commission!

Can u please confirm what date the text amendments for District 25 will Be on the agenda for the Commissioners Meeting in October? I tried to pull Up agenda online but it must be too far out for the October agendas. I see they have a meeting set on October 1.

You already know all of our valid safety concerns for the 2 story limit in residential neighborhoods in District 25.

I have been hearing a lot of push back about the 2 story limit from "the developers" of these Large Big BUISNESS Developments. I can honestly say their concerns are only of greed!

Below are Publicly Advertised Documented Examples:

 - With a 2 story duplex "Big Breezy" located: 3604 Ponce de Leon Court (approx 10 rooms plus 2 bunk rooms sleeps 22) there is sufficient annual rental income for the developers. If rented 100% the projected annual rental income would be $348,300.00
~ Versus ~
- With a 3 story duplex for example "Easy Breezy" located: 3468 Ponce de Leon (18 rooms plus 4 bunk rooms sleeps 44 plus) there is an over abundance of annual rental income. If rented 100% the projected annual rental income would be $650,400.00.

These numbers come directly from their advertisement with Prickett Properties (See links below). Of course, this rental income also equates to a higher resale value for this COMMERICAL property which Easy Breezy is listed for sale at $3.5 Million Dollars on Zillow (as of this date).

https://www.prickettproperties.com/vacation-rentals/349/Easy-Breezy/Gulf-Shores/AL/West

1

Defendants' Bates #0201

Easy Breezy Rates 9/4/19
Per Website

| | Dates | Rate for all 10 bedrooms | Rate | Weeks | Two Units 100% |
|---|---|---|---|---|---|
| Labor Day | Aug 29, 2019 - Sep 02, 2019 | 1,200/nt, 6,000/wk, 3 nts min | $ 6,000 | 1 | $ 6,000 |
| Early Fall | Sep 02, 2019 - Sept 6 2019 | 500/nt, 3,500/wk, 600/wk end nt, 3 nts min | $ 3,500 | 1 | $ 3,500 |
| Early Fall | Sep 07, 2019 - Oct 4 2019 | 500/nt, 4,200/wk, 700/wk end nt, 2 nts min | $ 4,200 | 4 | $ 16,800 |
| Fall | Oct 05, 2019 - Oct 18, 2019 | 600/nt, 4,200/wk, 800/wk end nt, 7 nts min | $ 4,200 | 2 | $ 8,400 |
| Late Fall | Oct 19, 2019 - Oct 31, 2019 | 600/nt, 4,200/wk, 700/wk end nt, 3 nts min | $ 4,200 | 2 | $ 8,400 |
| Winter | Nov 01, 2019 - Feb 29, 2020 | 500/nt, 3,500/wk, $700 weekend, 2 nts min | $ 3,500 | 14 | $ 49,000 |
| Thanksgiving | Nov 23, 2019 - Nov 29, 2019 | 1,000/nt 7,000/wk, 7 nts min, | $ 7,000 | 1 | $ 7,000 |
| Holidays | Dec 21, 2019 - Jan 01, 2020 | 800/nt, 5,600/wk, 7 nts min | $ 5,600 | 2 | $ 11,200 |
| Spring | Feb 29, 2020 - May 08, 2020 | 1,000/nt, 7,000/wk, 7 nts min | $ 7,000 | 9 | $ 63,000 |
| Spring | May 09, 2020 - May 22, 2020 | 1,000/nt, 7,000/wk, 7 nts min | $ 7,000 | 3 | $ 21,000 |
| Early Summer | May 23, 2020 - Jun 05, 2020 | 1,600/nt, 9,100/wk, 7 nts min | $ 11,200 | 2 | $ 22,400 |
| Summer | Jun 06, 2020 - Aug 15, 2020 | 1,700/nt, 11,900/wk, 7 nts min | $ 11,900 | 10 | $ 119,000 |
| July 4th | Jul 04, 2020 - Jul 11, 2020 | 1,800/nt, 12,600/wk, 7 nts min | $ 12,600 | 1 | $ 12,600 |
| | | | | 52 | $ 348,300 |

Defendants' Bates #0202

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 26, 2019 3:08 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Support of District 25 Proposed Amended Ordinances |

**From:** bppounds [mailto:bppounds@yahoo.com]
**Sent:** Thursday, September 05, 2019 3:42 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Support of District 25 Proposed Amended Ordinances

To:     Vince Jackson
        Baldwin County Planning  & Zoning Director

From:  Barbara P. And Richard H. Pounds, Jr.

Date:   September 5, 2019

We are writing to join other Fort Morgan residents in support of the proposed District 25 ordinance changes, drafted by our Fort Morgan Planning and Zoning Committee.  Instead of addressing each change, item by item, we simply want to tell you how we feel about the ordinances overall.

We are deeply convinced that these ordinance changes are necessary to ensure continued quality of life in our community.  Any future over building of high-density developments will adversely affect the very character of this unique and historic area.  This character is something that we want to know will still be around for our grandchildren to enjoy.

In addition, approval of the amended ordinances will at least keep existing traffic levels on State Highway 180 of local residents as well as visitors from exploding into both unbearable day to day travel and unsafe conditions during hurricane evacuations.  Living here since the late 1980s, we have experienced several evacuations, and know that higher density will only exacerbate the problem.  Since there is one exit north on Highway 59, we already are merging with the heavy traffic from Gulf Shores and some from Orange Beach.

Increased density will also mean that the pleasure of enjoying our less-crowded beaches, a major draw for vacationers, will become just a memory.  Our peninsula supports an incredible amount of wildlife habitat beyond the Bon Secour National Wildlife Refuge borders.  This is another quality of this district which makes it so desireable.  Thousands of birds migrate through our yards year after year.  Overbuilding will only lead to diminished numbers.

Some in opposition to amending the ordinances will argue that restrictions will result in lower property values, that investors and buyers will be too cautious to buy gulf front properties here.  We truly believe that the very attributes mentioned above will continue to make this a very attractive place to visit or live fulltime.  Visitors are almost constantly remarking on facebook how they love this place for the peace and quiet vs bustling crowds in our neighboring towns to the east.

Defendants' Bates #0203

We just want to emphasize what a wonderful existence we have living here, not only because of its remote, quiet, and uncrowded location but because of the people and the small town feel.  It is our opinion that it is paramount that we take steps now to preserve the natural beauty, the historic and quaint character, and above all, the public safety of our home town. We hope you will seriously consider the positive impact that the proposed ordinance changes will have on life in Fort Morgan District 25.

Sent from my Samsung device

2

Defendants' Bates #0204

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 26, 2019 3:07 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Fort Morgan |

**From:** fmseaturtles [mailto:fmseaturtles@gmail.com]
**Sent:** Thursday, September 05, 2019 2:54 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Fort Morgan

Mr. Jackson,
I am a team leader for Fort Morgan Share the Beach team.
I support the new ordinances pertaining the dune walk overs and height of new builds.
Some of the current dune walk overs make it impossible to get around on our UTV that we use for morning patrol and to deliver equipment to nests at times.
We appreciate your support of the concerns of our program.
Debbie Harbin
251-391-8333

Sent via the Samsung Galaxy S7, an AT&T 4G LTE smartphone

1

Defendants' Bates #0205

PageID #: 1150

Case 1:20-cv-00057-C   Document 45-3   Page 10   12 of 187

Defendants' Bates #0206



Comes off
1st Floor of

15
feet



Dune Walkover
In compliance with
the proposed dune walkover
regs

Defendants' Bates #0207

# LETTERS IN OPPOSITION

Defendants' Bates #0208

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 5, 2019 2:16 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Fw: Correction for Proposed Ordinances for Ft Morgan District |

**From:** Bill Jones [mailto:joneswh@bellsouth.net]
**Sent:** Thursday, August 29, 2019 9:14 AM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Fw: Correction for Proposed Ordinances for Ft Morgan District

Vince:

As I read the proposals for dune walkovers I am caused to ask why these, now?  Are existing structures grandfathered in?
I ask because of the  stated "concern" for environmental reasons; but on the other hand gulf front property (rental and otherwise) without any dune walkover  structures of any size or make, daily allow total destruction of the vegetation, and dunes.  So how is regulation of walkovers going to benefit anyone?  Really, am I missing something here?

How does the bureaucratic dictation of handrail height protect or make any better the "environment"?   You can't dictate the height of the sand beneath a dune walkover as it changes in large measure by season and wind. Why would solar lights be prohibited on the walkover for the aged and infirm?

I make these few remarks because  while I support most of what appears on page one the remainder is hardly science based but just some arbitrary crap
dreamed up by some do-gooder.

The bottom line is most of the water front of Ft. Morgan is privately owned.  There is little room for much development period, unless the public and renters gain greater rights to trespass and and trample.

The good people of Ft.  Morgan should start notifying tourists and 2nd tier renters that there is not much public beach available but the laws of trespass in Alabama still exist.

As well intended as this may be you just create more fodder for lawyers.

Thanks

Bill

1

Defendants' Bates #0209

LAW OFFICE OF
WILLIAM HAROLD JONES
849 U.S. HWY 11
PETAL, MS 39465
PH: 601-545-8324
FX: 601-545-8389
whjoneslawoffice@bellsouth.net
joneswh@bellsouth.net


CONFIDENTIAL AND PRIVILEGED
This email (including attachments) is covered by the Electronic Communications Privacy Act, 19 USC Sections 2510-2521, is confidential, and may be legally privileged. If you are not the intended recipient, you are hereby notified that any retention, dissemination, distribution, or copying of the communication is strictly prohibited. This electronic transmission (and any enclosures or attachment thereto) is for the sole use of those identified by the author and is the property of the author. It is confidential and may be legally privileged. Any further distribution or copying of this message is strictly prohibited by law. If you received this transmission in error, please notify the author by telephone at (601) 545 8324 or by email, and destroy the message (and all attachments and enclosures thereto) immediately.


----- Forwarded Message -----
**From:** Fort Morgan <fortmorgancivic@gmail.com>
**To:** "fortmorgancivic@gmail.com" <fortmorgancivic@gmail.com>
**Sent:** Wednesday, August 28, 2019, 10:03:31 PM CDT
**Subject:** Correction for Proposed Ordinances for Ft Morgan District

Dear Fort Morgan Civic Association Members

I must apologize for a mistake.  There was typo in the email (see attached below).  **Vince Jackson's CORRECT email address is:** vjackson@baldwincountyal.gov
If you already sent Vince an email, then please resend it to the CORRECT email address.

You are also invited to show your support in-person during the Baldwin County Planning & Zoning Commission meeting next Thursday, September 5, 2019 @ 6pm.
Baldwin County Central Annex Building
22251 Palmer Street
Robertsdale, AL 36567


Sincerely,
Greg Strategier


Dear Fort Morgan Civic Association Members
Over the past years the FMCA, Fort Morgan Planning and Zoning Committee and Baldwin County have been working toward some much needed changes to Baldwin County Zoning Ordinances in order to protect the Fort Morgan community as a whole.  Vince Jackson, Baldwin County Planning & Zoning Director, has been working with the County Administrator, Wayne Dyess, to get these proposed changes in front of the Baldwin County Planning and Zoning board for a vote during the September 5, 2019 meeting.  If these Ordinances are approved by Planning & Zoning, then the

2

Defendants' Bates #0210

Baldwin County Commissioners will be voting on the Ordinances during October, 2019 for final approval and implementation.

These ordinances will benefit Fort Morgan and help protect our community by limiting new construction to 2 stories, limit the size of dune walkovers and help keep the population density of Fort Morgan in line with the current zoning map. These proposals will also help protect the habitat for our unique and sensitive wildlife as well as promote public safety in areas that have access problems for first responders.

The FMCA Board would like to encourage Fort Morgan residents & property owners to review the proposed ordinances for District 25 (attached below). We also request that you send your support of these ordinances to Baldwin County Planning & Zoning Director, Vince Jackson prior to September 1, 2019.  Please Email your support to
: VJACKSON@baldwincountyal.gov
We appreciate you forwarding this email to other residents & homeowners in our Fort Morgan Community and request their support, too.

Please feel free to contact us if you have any questions related to the proposed Amended Ordinances in District 25.

Sincerely
FMCA Executive Board


--

# Fort Morgan Civic Association

President
Joe Emerson
captjoesells@gmail.com

Vice President
Ernie Church
ecaces4@gmail.com

Treasurer
Greg Strategier
samsplace41805@gmail.com

Secretary
Carol Kittrell
ckittrell@southalabama.edu



3

Defendants' Bates #0211

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 5, 2019 2:11 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Proposed Fort Morgan Zoning Ordinances |

Opposition

**From:** Scott Lewis [mailto:scottl@ncms-inc.com]
**Sent:** Thursday, September 05, 2019 12:49 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Proposed Fort Morgan Zoning Ordinances

Mr Jackson,

My name is Scott Lewis and I'm the President of CL Investments, LLC. an Alabama company.  I own multiple homes down in Fort Morgan and am currently constructing another one.  All my properties are luxury properties that attract renters that spend a tremendous amount hence provide much needed tax revenue for the area.   It has been brought to my attention that the minority, the full time residents that live in Fort Morgan, are driving an agenda that is on the surface claiming to be driven for safety reasons but in reality they are doing it to greatly reduce development of the area so they can keep it the way they want.

3 story houses:

I'm told the reason they want to restrict the building of 3 story houses is for fire safety reasons.   They say the Fort Morgan Fire Department (FMFD) has an issue with being able to save people from the 3rd story if it catches fire.  Currently you have the Beach Club, the Dunes and many other 3 story houses that the FMFD is serving.  They don't have an issue serving those homes why not more homes?  Also if one of these larger structures catches fire the FMFD gets assistance from the GSFD to fight these fires.   The real reason they want to restrict these homes from being built isn't because of safety it's because of how many renters stay in the homes and the view it blocks.  These two reasons have been echoed over and over by the individuals driving this campaign.   With the President of the Fort Morgan Civic Association being the son of the ex fire Chief he's using the scare tactic of horrific fires to get his point across.     How many 2 and story homes have burned down in Fort Morgan over the last 30 years?  How many deaths have occurred?  My research although limited shows that not one death has occurred in Fort Morgan in the last 30 years due to fire.  House fires are extremely rare too.  Yes I know we had two burn down this 4th of July, but that was an anomaly for the area.

Solution:  An easy way to solve this problem is requiring sprinkler systems for any 3 story or higher structure just like Gulf Shores does.  I would even be okay if we did it for 2 story or above houses.  Not only does this solve the problem but it helps the FMFD even more when putting fighting fires.

12ft Driveway's instead of 10ft:

I'm told this is needed for the fire trucks to get to the houses.   Over the years the fire trucks in the area have not got wider so why is this needed?   On a 50 ft lot if you expand the driveway by 2 feet in width you barely

1

Defendants' Bates #0212

have enough square feet to build a decent house based on the calculation Bill Lynn at Fish and Wildlife uses.    However once again the President of the FMCA is using fire safety as a way to push their agenda

Solution:  Require a firm material for the driveway.  Cement, asphalt or packed rock.  By doing this it makes for a more stable base so you don't have to worry about the truck being stopped.

Limit Parking:

Apparently the FMCA wants to limit how many cars can park under the house or in the driveway.  Again they are using fire safety as a reason and scare tactic.  First of all if there is a fire at one of my houses on Ponce de Leon NO fire truck is pulling into the driveway, the truck will be parked in the road for two reasons.  One access to the hydrant and two they will not put the truck within 50-100 feet of an active fire!  I have confirmed this with two different fire departments.  Why does the FMCA want this change?  By doing this is limits the amount of travelers cars that can be on property hence making it more difficult to get renters.  I've heard rumors that the County will tow cars off PRIVATE PROPERTY if this is enforced.  Good luck with that going on private property to tow cars.  Someone will get hurt doing that.  Additionally how are you going to know what houses are grandfathered in?  Whose going to police this?  Whose going to tow cars?  I'm sure this little group called the FMCA will be more than happy to, but I surely wouldn't recommend that.

Solution:  Nothing.  Private property owners have a right to park how many cars they want in their driveway.  With that being said there is a real safety concern for parking in the street so I'm ok with restricting that.

Dune Walk:

Apparently the new ordinance will state that dune walks are mandatory and can only be 2 feet about the highest dune?  The highest dune when?  Before a hurricane, after a hurricane, in the middle of winter etc?  Dunes constantly change.  If you require this after a storm where the dunes are washed away then within a year that 2 ft high beach walk will be buried and now you will have to bring out equipment to uncover it.  Once you do that you are disturbing the dunes around that area which Bill Lynn is NOT going to go for.  Also having dune walks only two feet high is going to cause more debris being launched airborne or being swept into the Gulf or on the beaches after every storm.   This doesn't even have to be a hurricane.  Many times we get surges with un-named storms that come about during a full moon at high tide that batter the dunes

Solution:  I think we should be going the opposite way with this.  Dune walks should be a minimum of 6 feet about the highest dune not to exceed 10 feet.  Dune walks should be mandatory for all new builds.

I am asking that all these measures be tabled tonight.  The minority and their agenda of keeping Fort Morgan from growing is what is driving this.  None of the absentee property owners had any idea this was happening in the shadows.  Growth is a way of live.  Growth generates tax revenue for everyone to benefit.  You cannot pass ordinances that are only being presented to stop growth and make a small amount of residents happy. I've invested millions of dollars in the area, have beautiful houses, construct habit for endangered species, donate nice sums of money to the FMFD and have assisted the Baldwin County Sheriff on multiple times to apprehend criminals in the area by providing surveillance footage and allowing them to use my houses as lookout points for their sting operations.  Even though I don't live there I am a very active participant in the area and do a lot to make it better.

2

Defendants' Bates #0213

You do not have to respond other then letting me know you are read my arguments.

Thank you for all you do,
Scott Lewis
President
CL Investments, LLC
214-673-9100

Defendants' Bates #0214

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Wednesday, September 4, 2019 4:04 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> New Planning and Zoning Draft |

This is a letter of objection to the zoning text amendments. I've received a couple of others today, which I will forward.

I know your busy, but when you have a chance could you send me a list of what I've sent you for the text amendments? I'm not sure if I've sent everything.

**From:** triceyricee@aol.com [mailto:triceyricee@aol.com]
**Sent:** Wednesday, September 04, 2019 3:55 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> New Planning and Zoning Draft

Mr. Jackson,
As a property owner in the Fort Morgan area, I would like to voice my objection to the new draft for changing the structure size from 3 stories to 2 stories. I feel that with the limitations that Fish & Wildlife has placed on the property owners in Fort Morgan to further limit the number of stories is not for the better good of the area. Taking District 25 out of the overall planning and zoning height regulations seems unreasonable. If there continues to be 3 story houses that can be constructed that falls under the same fire department they are just in a Planned Unit Development, then I feel this is discriminating toward other property owners.
Also, not sure how Fish & Wildlife is going to allow additional parking area so that there will be no stacking of cars without taking the square footage out of the house size.
Thank you for noting my objection.

Trice Hulling, Lazy Shores LLC
Managing Member
Lot C  Brandt Lane

Defendants' Bates #0215

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Wednesday, September 4, 2019 4:05 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Changes on ft Morgan |

Opposition to the Fort Morgan amendments.

**From:** Caleb Hastings [mailto:kanineproperties@gmail.com]
**Sent:** Wednesday, September 04, 2019 1:09 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Changes on ft Morgan

As an owner and sometime builder I object to changing from 3 story to 2 story and don't understand since the height remains at 35ft( which it should).  Leo Hastings

1

Defendants' Bates #0216

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 5, 2019 2:12 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> District 25 |

**From:** Caleb Hastings [mailto:calebwhastings@gmail.com]
**Sent:** Wednesday, September 04, 2019 9:41 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> District 25

Good Morning Mr. Jackson,
    I am writing in regards to the building code changes that are proposed in District 25 of Baldwin County - specifically the parking limits and the limit on the number of stories that can be built.
I grew up vacationing to Fort Morgan every summer. My parents eventually moved to Fort Morgan and my father practices veterinarian medicine in Loxley while living in Oyster Bay Village on Fort Morgan. I have owned several properties over the past several years and am in the process of building on Chewning Lane on Fort Morgan.
I say all this because I want to impress that I truly value this area - its a part of my childhood and now a part of my life  (I've been fortunate to purchase and remodel some of the properties I grew up spending the summers in).
I'm concerned that these changes don't improve "safety" at all and are in fact proposed for the purpose of slowing down development on Fort Morgan.

1) How can the limit on the number of stories improve safety when the height restriction of 35' is still the same? Instead this is a proposed change that will limit the number of bedrooms and in effect the number of people vacationing to those homes

2) How does the number of parking spots (not stacked vehicles) improve safety? Again I propose that its a restriction to limit the number of bedrooms built on smaller lots.

3) I'm sure you understand the finances much better than I do with tax revenue, but it doesn't seem like a good business model to restrict the size of a home that can be built. Lowering the values and therefore the tax revenue. Also lowering the number of vacationers to the area and the out of -state revenue.

I value the preservation of Fort Morgan and have always met with regulations to keep that preservation. I've had meetings at various times and sometimes at the same time with US Fish and Wildlife, Corp of Engineers, ADEM, P&Z, etc.to assure that I meet those regulations. I care about the area, but I understand that growth is vital to helping maintain what we have. I'm in favor of regulations that help preserve this beautiful area and keep it and the residents safer. However I object to the proposed changes to District 25 because I don't believe they accomplish either one. I believe they are proposed to restrict growth and I object.

I didn't mean to write such a long email. I've never lived on Fort Morgan, but because men a long time ago were in favor of development and growth I've been able to enjoy it each year for over 30 years.

I appreciate and value your time. So thank you.

Caleb Hastings
270-792-5015

Defendants' Bates #0217

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 5, 2019 9:07 AM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Ft. Morgan Zoning - Gulf Subdivision C |

Another letter.

**From:** Robert J. Isakson, Sr. [mailto:risaksonsr@lafayetteland.com]
**Sent:** Thursday, September 05, 2019 9:03 AM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>; Baldwin Co. - Wayne Dyess, County Administrator <wayne.dyess@baldwin.countyal.gov>
**Cc:** Reed, Mark B. <mbr13151@aol.com>; Miller, Greg <gregmillerfm@gmail.com>
**Subject:** <EXTERNAL> Ft. Morgan Zoning - Gulf Subdivision C

Gentlemen,

My partners and I appreciate the time you spent with us yesterday and the effort you made to understand our dilemma's. Some have been living this nightmare for many years, and unfortunately came into the meeting with a feeling of dispare. We appreciate more than you know, your restraint and understanding.

I think we have come down to two issues:

1.  The stacked parking being not applicable to us. Gulf Subdivision C consists of, I think, 56 lots that run from Ft. Morgan Road to the beach, each being some 50 feet wide and 800 lf to 1,000 lf long. With the requirements for the drive, etc. the stacking prohibition would be devastating to our remaining developments. As we discussed yesterday, we don't believe that we are the subject of the parking complaints. We understand the parking dilemma occurring elsewhere and your attempts to rectify that. However, if it could be possible to exclude our subdivision from these parking regulations, it would help us tremendously; while not exacerbating your parking dilemma.

2.  Two story height. With our 50 ft. lot, the lowering of the stories from 3 to 2 (while passing the previously established 2.5 stories) is debilitating. I believe that this was an act specifically requested by the Fire Dept. but is not required by the other zoning districts. I understand that this does not have to do with the fire suppression equipment, but rather with the theory that the volunteers in Ft. Morgan are older than other volunteer firefighters in the county and may have more difficulty removing victims from the second and one half floors of burning buildings. Perhaps, as an alternative to this punishing restriction you could add that if someone wanted to build a 2.5 story home in Ft. Morgan, then they are required to sprinkler the entire

1

Defendants' Bates #0218

residence. I believe that this would be a fair compromise to the needs of the fire department but still allow the owners to build to where it is economically feasible.

Again, I appreciate the professionalism that you exhibited yesterday and your willingness to receive us and hear our concerns. Anything that you might be able to do to assist would be most appreciated. Bob

Robert J. Isakson, Sr.
Lafayette Land Company
Phone: 1-251-340-6505 x 101
Cellular: 1-251-423-1160

 LAFAYETTE LAND COMPANY

Developing Commercial & Industrial Real Estate since 1982

Historic Preservation since 1975

2

Defendants' Bates #0219

September 27, 2019

Hon. Charles F. "Skip" Gruber
County Commissioner - District 4 (South Baldwin County)
Baldwin County Administration Building (County Seat)
312 Courthouse Square, Suite 12
Bay Minette, Alabama 36507
Phone: 251.937.0264
cgruber@baldwincountyal.gov

Vince Jackson, Planning Director
Planning and Zoning Department
22251 Palmer Street
Robertsdale, AL 36567
Phone: 251.972.8523
vjackson@baldwincoal.gov

Gentlemen,

I am the Managing Member of a family partnership which has owned property in Fort
Morgan, AL since the early 1970's. Recently, my family learned of some activity by the County
Commission and the Planning and Zoning Department/Commission impacting District 25 which
is causing us great concern.

We were advised that at the Regular Meeting of the Planning and Zoning Commission
on September 5th there was a vote to approve of changes to the current zoning of properties in
District 25/Fort Morgan.  The material and substantive changes that were approved included
new restrictions on maximum building height, dune walkovers, and parking. Specifically, the
changes were identified on the Agenda as "Text Amendments" to:
a.) TA-19001, Article 2, Section 2.3.25 Local Provisions for Planning District 25.
b.) TA-19002, Article 4, Residential District as it pertains to maximum height and
c.) TA-19003, Article 22, Definitions as it pertains to the definition of half-story

Our specific concerns:

1. We did not receive any notification of the proposed changes that directly impact the
value of our property and, therefore, we were not provided with any opportunity to be heard in
opposition to these proposed changes.

2. It appears from the Agenda available online that Mr. Ernie Church, Vice President of
the Fort Morgan Civic Association, provided notice to the members of the Fort Morgan Civic
Association via email of August 28, 2019.  Not all owners of property in Fort Morgan are
members of this association.

Defendants' Bates #0220

3. Some persons owning property in Fort Morgan were provided with notice and an opportunity to submit their opinions in writing, all of which supported the proposed changes. Specifically, there were twelve (12) letters from the following persons that were submitted prior to the meeting as they were attached to the Agenda: Mr. Massey, Mr. Strong, Mr. Zeek, Ms. Kapeskas, Mr. Salter, Mr. and Mrs. Snell, Diedre and Mack Bell, Paul Stanton, Joe Emerson, John and Joan Scruggs, Pat and Ellen Ryan, and Don and Cindy Ward.

4. It appears that the new changes to the zoning in Fort Morgan will not impact existing developments such as Martinique, The Dunes, and Kiva Dunes.  It disproportionately impacts private, single-family property owners.

5.  All of the changes approved without notice to all owners of land located in Planning District 25 will directly and negatively impact the value of property in that District.  We strenuously object to these changes and we believe that if appropriate notice was provided, the Commission could be provided with substantive evidence supporting objections that should be considered before approving and implementing such changes to zoning in that District.

We would appreciate your responses to the following questions at your earliest convenience:

1. On what date will the meeting minutes be available from both the August 1 and September 6 Planning and Zoning Commission Meetings?

2. Based on the limited information on the website at this time, it appears that the next regular meeting of this Commission will be October 3, 2019. Assuming this is true, does the Commission intend to provide written notice to all property owners in District 25/Fort Morgan prior to that meeting regarding the changes to District 25 that were approved at the meeting on September 6, 2019?

Sincerely,

*Susan W. Harrell*

Susan W. Harrell
Managing Member
Philip Properties, LLC
2621 Paradise Point Drive
Pensacola, FL 32503
Swharrell56@gmail.com
s.w.harrell@cox.net
(850) 450-5688

Defendants' Bates #0221

September 27, 2019

Mr. Vince Jackson
Planning Director
Planning and Zoning Department
22251 Palmer Street
Robertsdale, Alabama 36567
Phone: 251.972.8523
vjackson@baldwinncountyal.gov

Mr. Jackson,

Thank you for taking the time to speak with us via telephone on September 20, 2019. As property owners in District 25, we have some concerns with the proposed TA-19001 Text Amendment to the Baldwin County Zoning Ordinance Article 2, Section 2.3.25.

Our family has owned property in Fort Morgan (District 25) since the 1970's. We grew up fishing and enjoying the beaches in the area with our parents who were both lifelong northwest Florida residents. We know firsthand the beauty of that stretch of land at Ft. Morgan and embrace the efforts to prevent the peninsula from becoming overbuilt with high-density developments. However, the current changes being proposed (TA-19001) in combination with Fish & Wildlife (F&W) restrictions for protection of the Alabama Beach Mouse will specifically and primarily impact the owners of property in District 25 who wish to build single family houses or sell to those who wish to do the same.

It is our understanding that the proposed text amendments specifically exclude existing high-density properties in Ft. Morgan including Kiva Dunes, The Dunes, Heritage Point, and Martinique. If the proposed text amendments are a matter of safety, then these HDPs should also be required to meet the requirements that are proposed. At the very least, the fire department should have insisted that existing buildings in District 25 which exceed the height limit be required to install sprinkler systems in order to address the safety issues. As a reminder, during our phone conversation, you offered to send us a copy of the letter from the Fire Department outlining the safety concerns the Department had about being able to service properties over 2.5 stories. We would appreciate it if you could send this to us.

Defendants' Bates #0222

The value of currently undeveloped properties in District 25 will be greatly reduced if the changes proposed in TA-19001 are approved. We were advised by our real estate agent that a prospective buyer of our property had recently attempted to secure a "mouse permit" and was told that these proposed text amendments would prohibit him from building a 3-story house (3 habitable floors). We are unsure if a "mouse permit" is another label for the "land use permit." This prospective buyer has nine children and, therefore, would need to build a 3-story house in order to accommodate eleven people (nine children and two adults). This information has kept the prospective buyer from making an offer to purchase our property. We do not believe that an ordinance which prevents a large family from building in District 25 is consistent with the intent of the proponents of this proposal.

F&W already restricts the building footprint of single-family housing to 0.1 acre (including the driveway, parking, deck, and house). Someone wishing to build a home for a large family would need to build more stories in order to accommodate all the bedrooms needed. Our lots are ~340 feet deep and although F&W does make some exceptions in the 0.1-acre restriction for deep lots, the enforcement of the parking requirements would further reduce the habitable square footage someone could build and, thus again reducing the value of the property.

Although the stacked parking ordinance was adopted two years ago, it has not heretofore been enforced. The enforcement of stacked parking further puts current undeveloped property owners at a disadvantage to other property owners who have existing homes since the enforcement will prevent approval of building permits without taking more property for parking away from the footprint of the home.

Text Amendment TA-19001 is not directed at the high-density developers who have already built on Ft. Morgan. In fact, the current high-density developments are specifically excluded. They are not directed at the property owners who built prior to implementation of the more stringent ordinances. The persons to be directly and negatively impacted are the property owners of currently undeveloped property who want to preserve the beauty of Ft. Morgan but who instead are seeing their investment continue to be devalued.

Defendants' Bates #0223

We feel that the proposed TA-19001 goes beyond a simple text amendment. This proposal creates material and substantive changes that negatively impact the value and marketability of currently undeveloped properties at Ft. Morgan. We sincerely hope that you consider our concerns and the impact that this proposal will have upon property in District 25. We respectfully request that TA-19001 be removed from consideration by the County Commission.

Sincerely,

Susan W. Harrell
Managing Member on behalf of
Philip Properties, LLC
2621 Paradise Point Drive
Pensacola, FL 32503
(850) 450-4688
s.w.harrell@cox.net

Cc:
Hon. Charles F. "Skip" Gruber
County Commissioner-District 4 (South Baldwin County)
Baldwin County Administration Building
312 Courthouse Square, Suite 12
Bay Minette, Alabama 36507
Phone: 251.937-0264
cfruber@baldwinncountyal.gov

Defendants' Bates #0224

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Friday, September 27, 2019 7:16 AM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Proposed rule change |

**From:** Michael Audemar [mailto:maudemar@yahoo.com]
**Sent:** Monday, September 09, 2019 11:09 AM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** <EXTERNAL> Proposed rule change

Hello

I am a lot owner in fort morgan and was heard through the grapevine about a proposed rule change to limit new construction to 2 stories.

This comes as a shock to me. I was not informed that this was even in discussion. I'm sure none of the other property owners were informed either.

I feel like this was done secretly and in a disingenuous manner. Most of the lot owners in fort morgan live out of town. To not contact us beforehand is dishonest and illegal.

I hope the members of the board have insurance and lawyers because we will be  primarily suing you individually for your actions, in addition to the city.

M

Defendants' Bates #0225

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 26, 2019 3:06 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Fw: Planning district 25 Fort Morgan |

**From:** Jeff Valentine [mailto:jvbeach@yahoo.com]
**Sent:** Thursday, September 05, 2019 2:34 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Fw: Planning district 25 Fort Morgan

Mr. Jackson,

It's come to my attention that some drastic changes to new construction of beach houses in district 25 have been proposed. I'm writing to express opposition to most of these proposals. I own dozens of properties in Baldwin county and many of them are lots at the beach that haven't been built on. These new changes are going to decrease the value of these properties. (The tax and lodging revenues to the county will also be lessened)

I've heard that the fire department is concerned with being able to handle fires in 3 story houses. How are they planning on servicing existing 3 story houses and condos? I think getting them the proper equipment is a better idea. I expect property owners would rather chip in to help buy the equipment.
I think the current 35 ft height restriction is enough to keep houses to a reasonable size.

I'm told there will no longer be "stacking" of cars under the house and parking pad. Fish and Wildlife request that we use narrower driveways on these sites. No stacking will lead to driveways as wide as possible (detracting from Beach Mouse habitat). Typically we park cars behind the cars under the house. People staying at these houses have access to be able to move the cars if needed.

If the asphalt roads were restored to their original width, vehicles would be able to pass more easily.

It's a dangerous precedent to allow a few voices to encroach on the property rights of many others in Fort Morgan. These voices understood that houses would eventually be built on the beach lots in front of them.

Many of us have owned these lots for years with the plans to develop them.

I ask you to give some additional thought to the negative impacts these changes will bring.

Sincerely,

Jeff Valentine
15946 Keeney dr.
Fairhope, Al. 36532
251-581-3932

1

Defendants' Bates #0226

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 26, 2019 3:13 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> District 25 Planning |

**From:** Jeff Valentine [mailto:jvbeach@yahoo.com]
**Sent:** Friday, September 06, 2019 4:00 PM
**To:** Charles F. Gruber <CGRUBER@baldwincountyal.gov>
**Cc:** Vince Jackson <VJACKSON@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>; Jeb Ball <Jeb.Ball@baldwincountyal.gov>; Joe Davis <Joe.Davis@baldwincountyal.gov>; Billie Jo Underwood <BUnderwood@baldwincountyal.gov>; Teddy J. Faust <TFAUST@baldwincountyal.gov>
**Subject:** <EXTERNAL> District 25 Planning

Baldwin County planning & Zoning Commission members and staff,

I'm writing about last nights meeting about District 25 Text amendments. I was in attendance and am opposed to the proposed changes.

There are many district 25 land owners (who live and vote elsewhere in Baldwin County) that weren't aware of last nights agenda.

I realize it was about 9 pm when these issues were taken up and everyone looked ready to get home.

Surprisingly not one board member asked a single question about the opposition concerns.

I'd like to recap a few points of contention.

1. The main reason given for limiting houses to 2 stories was the fire departments inability to rescue anyone above floor 2.
    What are we to do about the hundreds of 2.5 - 3 story houses and condos that already exist? Are they just out of luck if they have a fire? Shouldn't we
    just buy a ladder truck to access these structures?

Vince Jackson mentioned he's been working on these issues for years. How has this detail been overlooked by everyone involved?

He stated that parking issues were tabled for a future amendment. I would like to point out that the asphalt roads along the beach haven't been maintained for years. Many of them are now 12 ft wide, when originally constructed at 20 ft. This would alleviate most of the concerns for emergency vehicles having access on the roads. Most of the parking issues are at the beach access points. These cars are not associated with the houses on the beach. Maybe parallel parking expansion in the ROW near those points?

Defendants' Bates #0227

We are Not trying to build "Condos" as was contested.  There is a demand for large beach houses for extended families who want to enjoy the beach in a more private setting.  I have an 8 bedroom project currently in the planning stage that has 2.5 stories that I am now unable to move forward with.

I hope you can appreciate that Fish and Wildlife mandate the smallest footprint possible for the house, parking, and decks (to preserve beach mouse habitat).  This is another reason a 3rd story is sometimes necessary.

I understand that people who already have houses in this district want to limit others from accessing this beautiful area.  Did they think these lots would never be built on?  I view these proposals as an infringement on the property rights of lot owners and visitors who hope to enjoy the area in the future.

I know other voters in Baldwin county that own beach lots with plans to build some day.  I expect you will hear their concerns when they learn of the new restrictions.

Have we thought about the lower property values and tax revenues this will create?  Have we gotten feedback from Teddy Faust on this?  If this passes, every beach lot that's not built on should be reassessed at a lower value.

I hope the Baldwin County Commission will take a deeper look than was done last night when they take this matter up.

Anyone receiving this letter has permission to forward it to any interested parties.

Sincerely,

Jeff Valentine
15946 Keeney dr.
Fairhope, Al. 36532
251-581-3932

Defendants' Bates #0228

## D Hart

**From:**  Vince Jackson
**Sent:**  Thursday, September 26, 2019 3:10 PM
**To:**  D Hart
**Subject:**  FW: <EXTERNAL> Code Meetings

-----Original Message-----
From: Fawzy Sedrak [mailto:arlingtongoldandsilver@yahoo.com]
Sent: Thursday, September 05, 2019 4:45 PM
To: Vince Jackson <VJACKSON@baldwincountyal.gov>
Subject: <EXTERNAL> Code Meetings

To whom this concerns,

I was just informed by my realtor that there is a meeting tonight about proposed building changes.  I own several lots on Fort Morgan and this will negatively affect the value of them.  I feel this is illegal as I was not notified.  I have not seen any signs on Fort Morgan stating a meeting regarding proposed building changes nor have I received any notification of any kind via mail, email, etc. (as they do with variances, etc.).  Also, I feel there needs to be some clarification on the parking amendment 15.3.1.  The amendment states "a driveway which affords unobstructed ingress and egress to each space".  This makes no mention of each car needing ingress and egress but we are getting told that we can not stack parking now even with a driveway that provides unobstructed ingress and egress as called for in the amendment.  What systems are going to be put in to place to patrol and see if cars are parked correctly?  Most of the parking on the street occurs where the perpendicular roads hit Ponce De Leon at the beach access points.  I know this was done to promote more parking but it does the opposite by eliminating spaces where people can park.  Please table this until everyone who will be affected can be notified.  I have already contacted a large law firm in Washington D.C. and they are looking into this matter, and I have contacted other property owners to join.  I plan on pursuing this and this will cost the city many funds.  Owners are suppose to receive certified letters informing them of city meetings that will affect their property with new code changes.  I did not receive any advance notice and neither did multiple land owners that I have spoken to.

Regards

Fawzy Sedrak

1

Defendants' Bates #0229

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 26, 2019 3:10 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Meeting tonight |

**From:** peter sedrak [mailto:petesedrak26.2@gmail.com]
**Sent:** Thursday, September 05, 2019 4:13 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>; Wayne Dyess <Wayne.Dyess@baldwincountyal.gov>
**Subject:** <EXTERNAL> Meeting tonight

Hello my name is Peter Sedrak, me and my family own several lots on Fort Morgan.

I was just informed that there was a meeting tonight regarding proposed parking regulations.  Me nor anybody else in my family was informed of this proposed change or this meeting.

Before any rash decisions are made, I would like to discuss this further and really vet this out.  This proposed change if I understand it correctly would truly hinder rental income, and therefore property values. This ultimately would lead to decreased local tax revenues, both for rental taxes and property taxes.

Please table this topic for now until all involved parties are notified and a consensus can be reached.

Thanks and please contact me at any time.

Peter Sedrak
817 975 6722

Defendants' Bates #0230

**D Hart**

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 26, 2019 3:09 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> Building Amendments |

**From:** Daniel Humphries [mailto:danielphumphries@gmail.com]
**Sent:** Thursday, September 05, 2019 3:58 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> Building Amendments

I was eating lunch today and overheard a group of people talking about possible zoning changes that would affect Fort Morgan and that there is a meeting tonight regarding the proposed zoning changes. As someone who owns a property on Fort Morgan and lives full time on Fort Morgan, it was a little disturbing since I was not made aware of any proposed changes. I have not seen any zoning notice signs. I have not seen any information or advertisement of it in any form. I fully believe that all owners of property on Fort Morgan should be notified as the proposed changes can and will affect us all. This situation seems like it was done as quietly as possible in hopes that people were not made aware. I have been in real estate for 9 years in the atea and have sold a lot of clients property in Fort Morgan and I know for a fact none of them know about the proposals. I can only hope that this can get tabled until more property owners areade aware. Open discussion and dialogue should be welcomed.

Respectfully,

Daniel Humphries

Defendants' Bates #0231

## D Hart

| | |
|---|---|
| **From:** | Vince Jackson |
| **Sent:** | Thursday, September 26, 2019 3:09 PM |
| **To:** | D Hart |
| **Subject:** | FW: <EXTERNAL> new restrictions |

**From:** Tom Martin [mailto:martinhomebuilders@gmail.com]
**Sent:** Thursday, September 05, 2019 3:56 PM
**To:** Vince Jackson <VJACKSON@baldwincountyal.gov>
**Subject:** <EXTERNAL> new restrictions

Mr Jackson
just got the letter to look at of the counties intentions.
according to the ibc and irc codes there is no half story
orange beach counts the ground level under the first habitable floor as a story with two floors above they require fire
sprinkler systems
gulf shores does not count the under side of the first raised floor but requires fire sprinkler system if the house has three
habitable floors above
the county has yet to require fire sprinklers on two or three habitable floors
houses with three habitable floors have been built as far back as 2000

fws has restricted the footprint damaging property values the only way to utilize your land is to go up three habitable
floors
if this passes property values for those who have 3 floors will go up but property values will go down

as far as parking most all jurisdictions allow stacking but require so many cars per bedroom
again fws has severely limited parking without stacking
what if cars are stacked regardless of the size of the house how will that be monitored,enforced

so by changing the zoning the way it is you change the status of many homes to nonconforming which could be
devastating to future repairs and value
so by not allowing stacking what about existing structures with stacking going on
so by changing the zoning is this a form of taking property rights to have what others have been enjoying for twenty plus
years
require fire sprinkler systems in 3 stories (habitable)
leave zoning the way it is or get the fws to loosen up on restrictions of 4356 sq ft  from edge of pavement of impacted
are
with a drive over 100 sq ft 3450 sq ft of impact for dwelling decks pools stairs parking pad ( not much)
the right of way access on fort morgan rd can be as much as 140 ft of state park that the owner has to pay fws 2.3
dollars per sq ft in order to use their own property another taking

thanks for letting me give my opinion as a land owner in fort morgan and an active licensed home builder along the
alabama coast
fws has the dune walk under control
Tom Martin

reference irc 2015 pg 18 pg 24

1

Defendants' Bates #0232

# Baldwin County Commission

Baldwin County Commission Regular
Meeting Minutes
Tuesday, October 15, 2019
8:30 AM



Baldwin County Administration Building
County Commission Chambers
322 Courthouse Square
Bay Minette, Alabama  36507

District 1 – Commissioner James E. Ball
District 2 – Commissioner Joe Davis, III
District 3 – Commissioner Billie Jo Underwood
District 4 – Commissioner Charles F. Gruber

Wayne A. Dyess, County Administrator

---

**All supporting documentation for the minutes can be viewed in the File ID link of each item and are denoted by an asterisk.**

## A     WELCOME, INVOCATION AND PLEDGE OF ALLEGIANCE

**Present:**     4 -     Commissioner James E. Ball, Commissioner Joe Davis III, Commissioner
                        BillieJo Underwood, and Commissioner Charles F. Gruber

**Absent:**      0

Also present were, Wayne Dyess, County Administrator, and David Conner, County
Attorney.

The Chairman called the meeting to order at 8:33 a.m. and introduced Reverend Jourdain
Thrash, Pastor 3Circle Church, Daphne, Alabama, who appeared before the Commission,
and led the Commission in prayer.  After the Pledge of Allegiance led by Commissioner
Joe Davis, III, the Commission transacted the following business to-wit:

## ADOPTION OF MINUTES

August 28, 2019, Special Meeting (Budget Deliberations)

Motion by Commissioner James E. Ball, seconded by Commissioner Joe Davis, III, to
approve the minutes of the August 28, 2019, Special Meeting (Budget Deliberations).

The motion passed by the following vote:

**Aye:**        4 -     James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber

**Nay:**        0

**Absent:**     0

**Abstain:**    0

September 24, 2019, Special Meeting (Special BOE Tax Elections)

Motion by Commissioner BillieJo Underwood, seconded by Commissioner James E. Ball, to
approve the minutes of the September 24, 2019, Special Meeting (Special BOE Tax

Elections).

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 0 | |
| **Abstain:** | 0 | |

### October 1, 2019, Regular Meeting

Motion by Commissioner BillieJo Underwood, seconded by Joe Davis, III, to approve the minutes of the October 1, 2019, Regular Meeting.

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 0 | |
| **Abstain:** | 0 | |

**B**    **CONSENT**

Wayne Dyess, County Administrator, said before the Commissioners, in paper form, are replacement attachments for Item BA2 - Alabama Department of Economic and Community Affairs (ADECA) - Alabama Counts 2020 Census Grant Application for 2020 Census Outreach for Baldwin County and Item BA7 - Renewal of Granicus Subscriptions for Agenda Management Software.  Mr. Dyess said staff requests Item BH1 - Vaughn S.A.I.L. Center Lease Agreement, be removed from the Consent Agenda for separate discussion and/or vote.

Motion by Commissioner James E. Ball, seconded by Commissioner Joe Davis, III, to approve the consent agenda including the addendum attachments for Items BA2 and Item BA7 and excluding Item BH1.

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 0 | |
| **Abstain:** | 0 | |

**BA**    **ADMINISTRATION**

**BA1**    Adoption Partner Agreement between Baldwin County Commission        **19-2194**
(Animal Shelter) and PetSmart Charities, Inc.

---

Approve the Chairman and/or Clerk Treasurer to execute an EFT Setup and Notice of Bank Change Form, related to the Commission's previous approval of the Adoption Partner Agreement on October 1, 2019, between the Baldwin County Commission (Animal Shelter) and PetSmart Charities, Inc., for the Baldwin County Animal Shelter to participate in the PetSmart Charities' adoption program.

In addition, authorize the Chairman and Clerk Treasurer to execute any other documents necessary in order to facilitate the County's partnership with PetSmart Charities, Inc.

| | | |
|---|---|---|
| **BA2** | *Alabama Department of Economic and Community Affairs (ADECA) - Alabama Counts 2020 Census Grant Application for 2020 Census Outreach for Baldwin County | 19-2225 |

Confirm, ratify, and approve the submission of the Alabama Counts 2020 Census Grant Program application and the execution of related documents to Alabama Department of Economic and Community Affairs (ADECA), requesting grant funds in the amount of $20,000.00 with up to $20,000.00 match of either cash or in-kind services.  This grant application is in partnership with the Baldwin County Economic Development Alliance (BCEDA) and will be for 2020 Census outreach activities and materials for Baldwin County.

| | | |
|---|---|---|
| **BA3** | Baldwin County Intracoastal Waterway (ICW) Boat Launch Project | 19-2190 |

Make part of the record, the following documentation related to the Purchase and Sale Agreement, originally approved during the October 2, 2018, Baldwin County Commission regular meeting, related to the purchase of approximately 45 acres of property on the Gulf Intracoastal Waterway:

1)  Fifth Amendment to the Purchase and Sale Agreement, dated October 2, 2019, which amended Section 3.2 of the Agreement, extending the inspection date to October 22, 2019.

| | | |
|---|---|---|
| **BA4** | BRATS - Amended Grant Documents for Baldwin Regional Area Transit System | 19-2203 |

At the request of Alabama Department of Transportation:

1)  Approve the amendment of Resolution #2019-100, Local Match Certification, and Application letter for Fiscal Year 2020 - 5311 Grant, originally approved during regularly scheduled Commission meeting on June 18, 2019, Agenda item BM12; and

2)  Approve the Amended Application letter, Local Match Certification and Local Commitment letter for Fiscal Year 2020 - 5307 Grant, originally approved during Regularly Scheduled Commission meeting on June 18, 2019, Agenda item BM13; and

3)  Make the amended document as part of the October 15, 2019, regular meeting record.

**BA5**   BRATS - Request for Baldwin Regional Area Transit System Transit Service from Daphne Senior Center to Baldwin County Coliseum for the 2019 Senior Expo                                                       **19-2205**

Retroactively approve the use of one (1) Baldwin Regional Area Transit System (BRATS) bus for transporting approximately twenty (20) individuals to the 2019 Senior Expo in Robertsdale, Alabama on Wednesday, October 9, 2019.  The cost of the transportation will be approximately $284.00 paid for by the City of Daphne.

**BA6**   BRATS - Request for Baldwin Regional Area Transit System Transit Service from the Fairhope Health and Rehab Facility to the Grimes Fish Nursery in Stapleton, Alabama                                          **19-2204**

Approve the use of one (1) Baldwin Regional Area Transit System (BRATS) bus for transporting approximately ten (10) individuals to the Grimes Fish Nursery in Stapleton, Alabama on Saturday, October 19, 2019.  The cost of the transportation will be approximately $316.00 paid for by the Fairhope Health and Rehab Facility.

**BA7**   *Renewal of Granicus Subscriptions for Agenda Management Software         **19-2240**

Accept the Granicus Proposal and approve the renewal of the annual Granicus fees and subscriptions for the County's agenda management software, effective October 31, 2019, for a period of three (3) years, ending October 30, 2022.  The annual fees and subscriptions for the first year will be in the total amount of $42,000.00, with a 2.5% uplift in cost in year two, and 5.0% uplift in year three.

**BD**   **BUDGET/PURCHASING**

**BD1**   Architectural Services for the Construction of a New Baldwin County Animal Shelter Intake Building Located in Summerdale, Alabama for the Baldwin County Commission                                              **19-2223**

Approve the AIA contract for the architectural services with Allred Stolarski Architects, PA for the construction of a new Baldwin County Animal Shelter Intake Building in the amount of 6% of the construction cost plus normal reimbursable expenses and authorize the Chairman to execute the Contract.

**BD2**   Competitive Bid #WG18-39A - Annual Rental of Portable Toilets for the Baldwin County Commission                                                           **19-2206**

Extend Competitive Bid WG18-39A - Annual Rental of Portable Toilets to A & M Portables, Inc., for an additional twelve (12) months at the same prices and terms stated in the original bid award on November 20, 2018.  The new extension will expire on

November 20, 2020.

**BD3**   Competitive Bid #WG19-52 - Provision of Onsite Document                    **19-2207**
Scanning/Digital Image and Indexing Conversion Services for the Baldwin
County Judge of Probate

Award Bid #WG19-52 to the lowest bidder, Business Systems & Consultants, Inc. for the
provision of onsite document scanning/digital image and indexing conversion services for
the Baldwin County Judge of Probate as follows and authorize the Chairman to execute
the Contract.

Total Cost per image per document:   $0.46 per Image
Image Scanner Model: Canon G-1100/Panasonic KV-S8147 or Book Eye Scanner

**BD4**   Competitive Bid #WG19-53 - Provision of Bituminous Materials for the         **19-2208**
Baldwin County Commission

Award Bid #WG19-53 as per the Award Listings for each category of headings to Mobile
Asphalt Co., and Hosea O. Weaver & Sons, Inc., the provision of bituminous materials.

**BD5**   Competitive Bid #WG19-54 - Provision of Labor and Equipment for            **19-2209**
Asphalt Placement for the Baldwin County Commission

Award Bid #WG19-54 for the provision of labor and equipment for asphalt placement as
per the Award Listing to Ammons & Blackmon Construction, LLC, as the Prime
Contractor and Mobile Asphalt Co., LLC, as the Secondary Contractor and authorize the
Chairman to execute the Contracts.

**BD6**   Competitive Bid #WG19-55 - Provision of Bag Ice for the Baldwin County     **19-2211**
Commission

Authorize the Purchasing Director to re-bid for the provision of bag ice and authorize the
Chairman/Purchasing Division Commissioner for the Baldwin County Commission to
approve any necessary addendums or clarifications if required after the bid is
advertised.

**BD7**   Competitive Bid #WG19-56 - Provision of Closed Top Recycling Roll-off      **19-2218**
Containers for the Baldwin County Commission

Award Bid #WG19-56 to the lowest responsible bidder, Bakers Waste Equipment, Inc.
as follows for the provision of closed top recycling roll-off containers:

Make/Model: ROR-30-22 RC
Amount Bid:   $7,769.00 each
Lots of 10:   $77,690.00

Lots of 20   $155,380.00

**BD8**   Competitive Bid #WG19-57 - Provision of Alternate Daily Cover Material        **19-2219**
for the Baldwin County Commission

Award Bid #WG19-57 to the lowest bidder, LSC Environmental Products, LLC, for the
provision of alternate daily cover material as follows:

Product:  VerDac Landfill Cover
Amount Bid:  $15.50 per 50 lb bag
Delivery Time:  14 days

**BD9**   Competitive Bid #WG20-01 - Provision of Guardrail Installation and Repair      **19-2220**
on County Right-of-Ways for the Baldwin County Commission

Take the following actions:

1)  Approve the specifications and authorize the Purchasing Director to place a
competitive bid for the provision of guardrail installation and repair on County
right-of-ways for the Baldwin County Commission; and

2)  Further, authorize the Chairman/Purchasing Division Commissioner for the Baldwin
County Commission to approve any necessary addendums or clarifications if required
after the bid is advertised.

**BD10**   Competitive Bid #WG20-02 - Provision of Charter Transportation Services      **19-2222**
for the Baldwin County Commission

Take the following actions:

1)  Approve the specifications and authorize the Purchasing Director to place a
competitive bid for the provision of charter transportation services for the Baldwin County
Commission; and

2)  Further, authorize the Chairman/Purchasing Division Commissioner for the Baldwin
County Commission to approve any necessary addendums or clarifications if required
after the bid is advertised.

**BD11**   Contract for Expanding ArcGIS Online Platform and GIS Database        **19-2224**
Support Services for the Baldwin County Commission

Approve the Contract with Keet Consulting Services, LLC, for Expanding ArcGIS Online
Platform and GIS Database Support Services as follows and authorize the Chairman to
execute the Contract.  (Contract effective for thirty-six (36) months commencing on the
same date as full execution.)

Annual Support Cost for Hosting ArcGIS
Year 1: $24,400.00
Year 2: $23,400.00
Year 3: $23,400.00

**BD12**  Rental of One (1) Copy Machine for the Baldwin County Judge of Probate      **19-2227**
Elections Division located in Bay Minette, Alabama

Approve and authorize the Chairman to execute the rental agreement with Sharp
Electronics Corporation for the rental of one (1) new copy/scanner/fax machine off the
State of Alabama bid for thirty-six (36) months effective the date of execution as follows:

Location:  Judge of Probate, Elections Division - Bay Minette, Alabama
Model:  MX-3551
Price: $123.55/month
Excess Charge/copy: $0.0072 BW/ $0.045 Color

**BD13**  Request for Proposals (RFP) for Developing a Baldwin County Solid      **19-2228**
Waste Gas-to-Energy Project Located at the Magnolia Sanitary Landfill

Authorize staff to begin negotiations with AEP Renewable Fuels, LLC, so that a final
recommendation for award can be made to the Baldwin County Commission for the
Baldwin County Solid Waste Landfill Gas-to-Energy project located at the Magnolia
Sanitary Landfill.

**BD14**  Request for Proposals (RFP) for the Development of a Baldwin County      **19-2229**
Strategic Plan for the Baldwin County Commission

Authorize staff to begin negotiations with Managing Results, LLC, so that a final
recommendation for award can be made to the Baldwin County Commission for the
development of a new Baldwin County Strategic Plan.

**BD15**  Alabama Department of Revenue Reciprocal Agreement - Removal and      **19-2238**
Addition of Individuals

Related to the Alabama Department of Revenue Reciprocal Agreement, take the following
actions:

1) Approve the updated list of Commissioners, County officers, and employees who are
authorized to discuss tax information relating to the Reciprocal Agreement between the
Alabama Department of Revenue and Baldwin County; and

2) Forward the State of Alabama Department of Revenue Nonemployee Confidentiality
and Disclosure Statements for Wayne A. Dyess, County Administrator; Adria Cian

Harrison; Clerk/Treasurer; Donna G. Bryars, Senior Accountant; Tracy King, Revenue Clerk I; Terrie Watson, Revenue Clerk II; Susan McCaw, Senior Revenue Clerk; Ashlie Emerson, Senior Revenue Clerk; Samulyn Parker, Revenue Clerk II; and Crystal Rice, Revenue Compliance Officer.

The list below will remove and add the following individuals:

Remove:

Kim Creech, Clerk/Treasurer
Jennifer M. Forsman, Audit Compliance Officer

Add:

Wayne A. Dyess, County Administrator
Adria Cian Harrison, Clerk/Treasurer
Donna G. Bryars, Senior Accountant
Tracy King, Revenue Clerk I
Terrie Watson, Revenue Clerk II
Susan McCaw, Senior Revenue Clerk
Ashlie Emerson, Senior Revenue Clerk
Samulyn Parker, Revenue Clerk II
Crystal Rice, Revenue Compliance Officer

## BI     ELECTED OFFICIALS

**BI1**   Fiscal Year 2019-2020 Agreement for Community Traffic Safety Program          **19-2233**
          Grant Participation

Approve the Fiscal Year 2019-2020 Agreement for Community Traffic Safety Program (CTSP) Grant Participation for the Baldwin County Sheriff's Office to participate in the Southwest Region's Community Traffic Safety Program for reimbursement of overtime traffic safety enforcement (and other time as approved by Alabama Department of Economic and Community Affairs (ADECA) and/or Southwest Alabama Regional Highway Safety Office (SWARHSO). The term of this contract will be October 1, 2019, through September 15, 2020.

Upon approval of grant(s), funding will be made available to the Baldwin County Sheriff's Office through CORE reporting system by SWARHSO as authorized by ADECA. This Agreement for CTSP Grant Participation is not a notice of grant approval but is required for the Baldwin County Sheriff's Office's receipt of CTSP Grant funds if such become available.

## BJ     EMERGENCY MANAGEMENT AGENCY (EMA)

**BJ1**   Fiscal Year 2019 Emergency Management Performance Grant (EMPG)          **19-2212**
          Federal Share Agreement

Approve and authorize the Chairman to execute the Cooperative Agreement with the Alabama Emergency Management Agency providing $65,451.00 in Emergency Management Performance Grant (EMPG) funds (Federal funds passed through the State) to the Baldwin County Emergency Management Agency and any related documents.  The period of performance for this grant is October 1, 2018, to September 30, 2019.

## BK   ENVIRONMENTAL MANAGEMENT

**BK1**   Baldwin County Solid Waste Uncollectible Residential Accounts            **19-2199**

Approve the uncollectible residential garbage accounts list for write-offs in the amount of $234.00.

## BL   FINANCE AND ACCOUNTING

**BL1**   Resolution #2020-012 - Authorization for Chairman and Clerk/Treasurer to   **19-2221**
Sign Bank Documents

Adopt Resolution #2020-012, authorizing Chairman, Charles Gruber, and Adria Cian Harrison, Clerk/Treasurer, to sign all necessary bank documents such as bank signature cards, bank resolutions, bank night depository agreements, etc. that must be updated.

## BO   PERSONNEL

**BO1**   BRATS Department - Position Changes                           **19-2210**

Take the following actions:

1)  Abolish the full-time BRATS Driver Supervisor position (PID #343) (grade H range: $29,631.68 - $48,642.88 annually); and

2)  Create a part-time BRATS Driver Supervisor position (PID #TBD) grade H (grade H range: $14.246 - $23.386 per hour); and

3)  Approve the employment of Lenzy Williams to fill the part-time BRATS Driver Supervisor position (PID #TBD) grade H-15 ($20.659 per hour), with said salary due to experience, to be effective no sooner than November 4, 2019; and

4)  Approve the position description for BRATS Driver Supervisor (part-time); and

5)  Approve the updated organizational chart for BRATS.

**BO2**   Highway Department (Administration) - Employment of One (1) Chief   **19-2213**
Accountant

Approve the employment of Malinda White to fill the Chief Accountant position (PID #364) at a salary grade EC-08 ($60,000.00 annually) to be effective no sooner than October 21, 2019.

**BO3**   Highway Department (Parks) - Employment of One (1) Landscape   **19-2214**
             Technician I Position

Take the following actions:

1)  Approve the employment of Michael Anderson to fill the open Landscape Technician I position (PID #4043) at a grade G-EL ($12.967 per hour/$26,971.36 annually); and

2)  Approve the employment of Randy Williams to fill the open Landscape Technician I position (PID #5138) at a grade G-EL ($12.967 per hour/$26,971.36 annually).

These actions will be effective no sooner than October 21, 2019.

**BO4**   Highway Department (Silverhill) - Employment of Two (2) Laborer   **19-2216**
             Positions

Take the following actions:

1)  Approve the employment of Devin Sellers to fill the open Laborer position (PID #5491) at a grade E-EL ($10.781 per hour/$22,424.48 annually); and

2)  Approve the employment of Ian Hantz to fill the open Laborer position (PID #927) at a grade E-EL ($10.781 per hour/$22,424.48 annually).

These actions will be effective no sooner than October 21, 2019.

**BO5**   Revenue Commission (Re-Appraisal) - Approval of Position Description   **19-2215**
             for Assistant Administrator of Re-Appraisal

Approve the updated position description for Assistant Administrator of Re-Appraisal.

**BO6**   Solid Waste Department - Employment of One (1) Solid Waste Technician   **19-2217**
             Position

Take the following actions:

1)  Approve the employment of Calum Shipp to fill the Solid Waste Technician position (PID #724) at a grade G-EL ($12.967 per hour/$26,971.36 annually) to be effective no sooner than October 21, 2019; and

2) Approve the updated position description for Landfill Supervisor.

## BH    COUNCIL ON AGING

**BH1**    *Vaughn S.A.I.L. Center Lease Agreement*                                          19-2242

Wayne Dyess, County Administrator, said David Conner, County Attorney, is
developing the agreement for this item.  The Vaughn S.A.I.L. Center will be used
by the Stockton community for food preparation and other food issues.  Staff is
currently waiting on one outstanding issue, which Mr. Conner will explain.

Mr. Conner said when this was discussed during the last work session, staff was
of the opinion that the site was either one or two acres in size.  It turns out, the
property is 42 acres in size.  Mr. Conner said staff attached a drawing depicting
the building, and the area around the building, as approximately an acre of land
that would be leased to the community.  He has asked the County Highway
Department to come up with a legal description or a survey and they will try to do
that this week.  Mr. Conner said if the Commissioners deem it necessary, he
recommends the Commission to approve the Lease Agreement subject to the
approval of the legal description by the Chairman and the County Attorney so it
can be substituted as part of the original agreement before it is executed.

Motion by Commissioner James E. Ball, seconded by Commissioner BillieJo
Underwood, to approve and authorize the Chairman to sign a Lease Agreement between
the Vaughn S.A.I.L. Center (Domestic Non-Profit Corporation) and the Baldwin County
Commission, allowing the use of the county facility located at 55210 Canaan Rd. W, in
Stockton, Alabama for the purpose of having a Senior Activities for Independent Living
(S.A.I.L.) Center in the Vaughn Community, subject to the approval of the legal
description by the Chairman and the County Attorney.

The term ("Term") covered by this Lease Agreement shall be for a period of thirty-six
(36) months and shall commence on the 1st day of November, 2019, and shall terminate
at 11:59 p.m. Central Time on the 31st day of October, 2022.

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 0 | |
| **Abstain:** | 0 | |

## C    PRESENTATIONS

## CA    GENERAL

**CA1**    Proclamation - Dysautonomia Awareness Month - October 2019                19-1975

Ms. Hannah Whitson appeared before the Commission to accept the proclamation as presented by Commissioner Ball on behalf of the Commission.

Wayne Dyess, County Administrator, read the proclamation.

Commissioner Ball invited David Conner, County Attorney, to the podium and said Mr. Conner is also dealing with this in his life.

Ms. Whitson read a prepared statement regarding Dysautonomia and its effects.

Ms. Whitson's mother, Ms. Brandy Robertson, appeared before the Commission and thanked the Commissioners for allowing them to come speak for the third year and bring awareness to Dysautonomia. Ms. Robertson said her family has been very fortunate to have friends in the positions they are in with the County Commission to allow them to speak. In doing this, Ms. Robertson said they have helped numerous families. People have reached out to her who work for the County who either have family members suffering from this, or they are suffering from this. Ms. Robertson said Mr. Conner has been here for the last two years that they have come before the Commissioners. Mr. Conner's wife contacted her regarding their daughter, who was recently diagnosed with Dysautonomia. Ms. Robertson said she will let Mr. Conner share his story.

Mr. Conner appeared before the Commission and said Ms. Whitson and Ms. Robertson did a great job in explaining what this is about. As many people in the world have Dysautonomia, very few people in this country know much about it. A lot of times, a person does not know much about it until it happens to them or someone close to them. It is very important to bring attention to this. Mr. Conner said for the last two years, prior to this happening to his daughter, this proclamation was read and he understood a little about it from listening to people talk. He did not delve into this or understand it completely until his daughter was diagnosed with it at the beginning of this year. Mr. Conner said his daughter started having symptoms as early as October, but became severe after an illness. Mr. Conner said his daughter was diagnosed with Postural Orthostatic Tachycardia Syndrome (POTS) and in her case, her heart rate is not regulated by the nerve and the nerve continues for her to purge her food. Mr. Conner said his daughter experienced Complex Regional Pain Syndrome. This is where the body sends a disproportionate amount of pain to a limb or injury to where it could become very debilitating. Recently, she lost the ability to hold her body weight up. Her legs were affected where she could not feel anything below her knees and could not move her toes or feet. Mr. Conner said his daughter has been going through physical therapy and is now able to walk with the assistance of a walker for a short period of time. She was in a wheelchair in school and had to take homebound programs from February to the end of the school year. Mr. Conner said he thanks God and the Baldwin County Board of Education. The school system and staff stepped up and created a plan where his daughter can come to school as much as she can. A homebound teacher comes by in the afternoons to give her lessons and helps her to stay caught up with State standards. He could not thank Spanish Fort High School and the Baldwin County Board of Education any more than he can today. Mr. Conner said like everyone else, their battle continues. It normally takes between two and six years

to get this diagnosed. There is no magic test for Dysautonomia. It is a test of excluding everything else it could possibly be. When nothing can be found that matches up, then doctors start looking at the neurological system to see what is happening. Mr. Conner said at this point in time, there is no FDA medicine available to treat his daughter's digestive system issue. There are no medications or treatment other than physical therapy to help with his daughter's legs, although her legs are improving. Mr. Conner said there are medications out there, but each form of Dysautonomia is different and manifests itself in different ways. Research, continued understanding and development is critical in order to get individualized special care and treatment for people who suffer from it. Often times, it is overlooked as someone having a psychological problem. Mr. Conner said this is the path that his family and many others are on. He has tried to become more aware of this and would be remiss to say that he believes that prayer has helped his daughter. He believes she has movement in her arms because of prayer. There has been no medication that could help other than a pain pill. Mr. Conner said his daughter was told she has to push through the pain and retrain her brain after the attack on the nervous system. There is no medication that can help his daughter right now. Mr. Conner said just like in the Bible where the woman suffered with an illness for 12 years, that is how he feels right now and he is sure others feel the same way. The first thing a parent wants to do is find relief for their child. It is very stressing as a parent to not be able to fix it. Doctors cannot fix it either, but they are working on it. Mr. Conner said anything he can do to bring focus upon this for research is a great thing. However, there is a great physician and that is his Lord and Savior, Jesus Christ. Not only has he been praying for his daughter Lilly, but the Commissioners have been praying for her as well. They have also all been praying for Ms. Robertson and Ms. Whitson. There are also people all over the County and State who are praying. Mr. Conner said he thanks everyone for their prayers. Based on the information they received from the doctors, there is little that can be done at this point in time. If his daughter is going to be healed and made whole, it will be by Jesus. Mr. Conner thanked the Commissioners for giving him the opportunity to do this along with Ms. Robertson and her daughter and he thanks them for the proclamation.

Commissioner Ball thanked Ms. Whitson and Ms. Robertson for speaking out on this and to Mr. Conner for adding to this. This meeting video loops and there could be someone watching who may be suffering from this and are unaware of it. This meeting could bring awareness to them where they can go to a doctor to start the process. Commissioner Ball said the Commissioners know all about it; they have been with Mr. Conner from the start of it. There have been a lot of group huddles and prayers. Everything the Commissioners do is a team effort and he is happy to pass this proclamation.

Commissioner Davis said people have heard stories that most have not experienced. They have had similar things and lost loved ones either quickly or over an extended period of time. These young people are starting their lives and have an uphill battle. Everyone should pray and pull for them. Commissioner Davis said everyone should have something they are involved in and passionate about. This is the sort of thing that touches his heart, to be able to do something to help someone. Commissioner Davis said he is proud the Commissioners have been able to be helpful to Mr. Conner's

family and Ms. Robertson's family.  He said Ms. Whitson will do wonderful things and he is proud of her.

Commissioner Underwood said she is thankful for the opportunity to bring awareness to these types of situations.  Until Mr. Conner started going through his journey, she was not aware of this.  The Commissioners have prayed and she has cried over this.  People are so busy doing other things and are unaware of this until it affects them.  If this little snippet of the County Commission meeting helps one person, then it is worth it.  She hopes it helps many people.  Commissioner Underwood said the Commissioners still have faith that Mr. Conner's daughter and Ms. Whitson will be healed.  Ms. Whitson looks perfect, but it is amazing in knowing the struggles she has gone through.  Commissioner Underwood thanked Ms. Whitson for her courage in attending today's meeting and standing up for other people.

Chairman Gruber thanked Ms. Whitson and Ms. Robertson for bringing awareness to this.  When they first came before the Commission, no one knew what Dysautonomia was.  There has been more progress in getting information out on what it is about.  Chairman Gruber said sometimes parents need something to help them understand what is going on with their children.  It is very heart wrenching to watch a child suffer and know they cannot do anything.  Bringing this forward helps a lot of people understand more about it.  Chairman Gruber thanked Ms. Whitson, Ms. Robertson and Mr. Conner.

Motion by Commissioner James E. Ball, seconded by Commissioner Joe Davis, III, to adopt a Proclamation which sets aside the month of October, 2019 as Dysautonomia Awareness Month in Baldwin County, Alabama.

The motion passed by the following vote:

**Aye:**     4 -   James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber

**Nay:**     0

**Absent:**  0

**Abstain:** 0

**CA2**   Resolution #2020-009 Commending Ms. Peggy Vanover Barnes for Years          **19-2239**
of Distinguished Public Service at the Cindy Haber Center, Inc.

Ms. Peggy Vanover Barnes appeared before the Commission to accept the resolution as presented by Commissioner Underwood on behalf of the Commission.

Wayne Dyess, County Administrator, read the resolution.

Commissioner Underwood said she is honored to stand here today and commemorate Ms. Barnes for all she has done for the Cindy Haber Center, Inc.  She has known Ms. Barnes for a long time and knows what a great leader she is in the community.  Commissioner Underwood said it is her honor to stand with Ms. Barnes today.

Ms. Barnes said she wants to leave a picture in everyone's mind about what the Cindy

Haber Center is.  Most have seen the Gerber baby advertisement, that is the Cindy Haber Center and the group they work with.  The people standing with her today has a heart for the people they help and those people have a heart for the Cindy Haber Center.  Ms. Barnes said she has never experienced such complete joy as working with these people.  They enjoy life while others take so much, so seriously.  Ms. Barnes encouraged everyone to be kind to the clients of the Cindy Haber Center because they will bring blessings and make them feel good inside.  She stayed with the Cindy Haber Center for over 20 years because she felt so good about it.  The Center has done a lot with not a lot of money, political help is always needed when it comes to the Cindy Haber Center.  Ms. Barnes said it is named the Cindy Haber Center because Ms. Haber did all of the work and Ms. Barnes took the credit for it.  The State kept changing their name, so they fixed it where it could no longer be changed.  Ms. Barnes asked if anyone standing with her wanted to say anything.

Ms. Haber appeared before the Commission and introduced Ms. Dawn Lindsey, Director; Ms. Clara Meyer, Ms. Brenda Williams and Judge William Scully.

Ms. Lindsey appeared before the Commission and said she appreciates Ms. Barnes' willingness to stand up and be ready to assist in any way.  She worked with Ms. Haber for almost 20 years and knew anytime Ms. Haber needed assistance, Ms. Barnes was only a phone call away.  Ms. Barnes has always been helpful and Ms. Lindsey appreciates all she has done for the agency throughout the years.

Ms. Meyer appeared before the Commission and thanked Ms. Barnes for her years of service and said she has left them with a great board.  The Cindy Haber Center is a very dedicated group and they appreciate Ms. Barnes' support.

Ms. Barnes said she thanks the Commissioners and everyone from the bottom of her heart.

Motion by Commissioner Joe Davis, III, seconded by Commissioner James E. Ball, to adopt Resolution #2020-009 commending Peggy Vanover Barnes upon the occasion of her completion of nearly 20 years of service to the Cindy Haber Center, Inc. (formerly the MR/DD Board, Inc.) as a Member and President of the Board of Directors and her years of distinguished public service.

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 0 | |
| **Abstain:** | 0 | |

CA3   <u>Proclamation - Chamber of Commerce Week in Baldwin County - October 14-18, 2019</u>                                                                         <u>19-2198</u>

Representatives from the Chambers of Commerce appeared before the Commission

to accept the proclamation as presented by Chairman Gruber on behalf of the Commission.

Wayne Dyess, County Administrator, read the proclamation.

Chairman Gruber thanked the Chambers of Commerce for all they do for Baldwin County. A lot of things would not get accomplished without the Chambers. They are the backbone of the business communities and help in any way they can.

Ms. Ashley Jones Davis, Executive Director of the North Baldwin Chamber of Commerce, appeared before the Commission and thanked the Commissioners for proclaiming this week as Chamber of Commerce Week in Baldwin County. This is the inaugural Chamber Week in the State of Alabama. Ms. Davis said the Governor's Office, the State and the House of Representatives have proclaimed this week as Chamber Week. All week long, chambers across the State will be posting information and telling stories about what they have been involved with. Ms. Davis commented on a book that talks about chambers of commerce throughout America's history. Ms. Davis said she is with the North Baldwin Chamber of Commerce and she thanks the Commissioners.

Ms. Casey Williams, President of the Eastern Shore Chamber of Commerce, appeared before the Commission and said she is delighted to be here and showcase how hard the chambers work for the business community. The chambers convene, share information and work very hard, especially in Baldwin County, on the workforce issues, by connecting education and business needs. The chambers promote the area for tourism and do a lot of different things. People do not realize how hard the chambers work for the communities. Any of the representatives here today would love to share this. Ms. Williams thanked the Commissioners for the recognition and said it is an honor and a privilege to be here.

Mr. Travis Valentine, Vice President of South Baldwin Chamber of Commerce, appeared before the Commission and thanked the Commissioners for this day. Mr. Valentine said the chambers spend a good chunk of their week working hard for the businesses. Having an opportunity to share the work they do with others is a win-win for everyone. Mr. Valentine thanked the Commissioners for allowing them to be here today.

Ms. Gail Quezada, President of Central Baldwin Chamber of Commerce, appeared before the Commission and said everyone summed it up very well. They love their jobs. It is not always the easiest job, but they love making Baldwin County a better place to work and live. They appreciate the Commissioners' support not just for this recognition, but for the support all year long. Ms. Quezada said without the Commissioners, the chambers would not be able to do what they do. Ms. Quezada thanked the Commissioners.

Ms. Davis said Mr. Greg Alexander with the Coastal Alabama Business Chamber had something come up this morning and was unable to attend. He asked that Ms. Davis express his gratitude to the Commissioners, as well.

Chairman Gruber thanked the representatives.

Motion by Commissioner Joe Davis, III, seconded by Commissioner James E. Ball, to adopt a Proclamation which proclaims October 14-19, 2019, as Chamber of Commerce Week in Baldwin County.

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 0 | |
| **Abstain:** | 0 | |

After the motion and before the vote, Commissioner Ball thanked the representatives from the Chambers and said it is an honor and a privilege to work with them.  A lot of things would not get done without the chambers.  He is glad to see the County's Chambers all work together to make sure they do what is best for all of the people of Baldwin County. Commissioner Ball said he commends them for that and it is a privilege to work with them.

Commissioner Davis thanked the representatives from the Chambers and said he personally thanks them for not only what they do, but how they do it.  He grew up in a chamber of commerce family in a small town.  He thought everyone looked at life the same way, but they do not.  Commissioner Davis said that is okay because the chambers make sure what is in the best interest of the citizens, business communities and the future is in the forefront and what drives them every day.  He thanks them for that.

Commissioner Underwood thanked the representatives from the Chambers and said they help bring the businesses of the communities together.  She loves the annual events and tries to make as many as possible to see all the people in the different communities come together.  Without the chambers that would not happen.  Anytime new businesses come to town, the chambers showcase them in order for people to know what is going on. Commissioner Underwood said the Chambers' newsletters are very informative, sometimes it is the first time or the only time she gets that information.  She is thankful for what the Chambers do for the communities and the County as a whole.  Commissioner Underwood said they make Baldwin County a better place to live and she has enjoyed getting to know the Chambers' members.

Chairman Gruber said the Chambers of Commerce help so many businesses with their day-to-day needs.  They help businesses to grow and help the County.

**CA4**   Proclamation - Domestic Violence Awareness Month - October 2019          19-1992

Ms. Rhyon Ervin, Executive Director of The Lighthouse, appeared before the Commission to accept the proclamation as presented by Commissioner Davis on behalf of the Commission.

Wayne Dyess, County Administrator, read the proclamation.

Ms. Ervin said she brings greetings from The Lighthouse, the board and the staff. Ms. Ervin thanked the Commissioners for proclaiming October as Domestic Violence Awareness Month and for recognizing the impact of domestic violence on the community. She thanks them for joining in The Lighthouse's efforts to inform, educate, increase awareness and call the community to action. Domestic violence is not just a crime against families and individuals, it is a crime against the community and against society. Ms. Ervin said domestic violence impacts jobs, attendance and performance. It impacts schools, student behaviors, attendance and grades. It impacts the safety of neighborhoods and workplaces. Ms. Ervin said it impacts the medical community and law enforcement. One of the most dangerous calls law enforcement responds to is a domestic violence call. The Lighthouse is proud of the Baldwin County District Attorney's Office for the successful prosecution and conviction in the case involving the shooting of Corporal Mike Wallace of the Baldwin County Sheriff's Office. Ms. Ervin said domestic violence must stop. There seems to be a slight uptick in domestic violence in Baldwin County and it must stop. According to the National Coalition Against Domestic Violence, on average, 20 people per minute are assaulted by intimate partners in the United States. The Lighthouse is a group of committed individuals with a great staff who are trained to provide intervention and support to victims and survivors of domestic violence. It is a place of refuge for those fleeing, a place of comfort, resources, crisis intervention, education, advocacy, support and referrals. The Lighthouse touches approximately 800 lives through its various services each year. Ms. Ervin said the number of individuals The Lighthouse has sheltered has nearly doubled from last year. Last year, The Lighthouse sheltered approximately 70 adults. This year, The Lighthouse has sheltered approximately 120 adults and 70 children. The court advocates touch approximately 900 lives in the court system. Victims of domestic violence should not have to navigate that system alone. The Lighthouse provides support groups, a 24-hour crisis line, children's advocacy, and community and prevention education in the schools. Ms. Ervin said The Lighthouse knows that it starts with prevention and the young people. Services, information and education have to be provided to the young people to stop domestic violence in the communities. The Lighthouse's mission is the elimination of family violence and sexual assault in the community through education, intervention, prevention, services and collaboration with the community. Ms. Ervin thanked the Commissioners for joining in The Lighthouse's mission. She invited the Commissioners to join The Lighthouse on October 23rd in Robertsdale for a domestic violence vigil to recognize the survivors and honor the victims who have died as a result of domestic violence in the community.

Motion by Commissioner James E. Ball, seconded by Commissioner Joe Davis, III, to adopt a Proclamation which proclaims October 2019, as Domestic Violence Awareness Month in Baldwin County, Alabama.

The motion passed by the following vote:

| | | |
|---|---|---|
| Aye: | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| Nay: | 0 | |
| Absent: | 0 | |
| Abstain: | 0 | |

Commissioner Underwood said she personally knows domestic violence survivors. She received permission to speak on Keri Green, her assistant. Ms. Green and her son are survivors of domestic abuse and this month means a lot to her. It means a lot to others who are survivors and to the families who have lost loved ones to this. Commissioner Underwood said she has a purple ribbon pin given to her last year. She thanks Ms. Green and others as well as The Lighthouse. Ms. Green has been appointed to the board of The Lighthouse and Ms. Ervin now has a warrior and a survivor who will help others. She hopes The Lighthouse will help empower victims of domestic violence. Commissioner Underwood said she hopes this recognition will help bring awareness and help someone stand up and get help from The Lighthouse if needed.

Commissioner Davis said The Lighthouse represents, in many cases, the last opportunity for someone to get help in that particular area. Everyone should be mindful that, as citizens, there is a responsibility to step in and step up and make sure this is stopped. It will take a total effort by everyone. Commissioner Davis said it is not about minding your brother's business, but it is about taking care of those who may be taken advantage of. Everyone knows this is a tough and sad situation, but it is not an insurmountable situation. He wants everyone to pledge to make it better.

Commissioner Ball thanked Ms. Ervin for bringing this to the Commissioners. He has already put on his purple ribbon that was given to him. This is near and dear to his heart. Commissioner Ball said he commends Ms. Ervin for continuing to bring awareness to the public for this horrific crime. He commends the District Attorney's Office and first responders such as Corporal Mike Wallace for what they do. The Lighthouse gives victims hope that it is not over. The County is lucky to have a program like this that deals with this crime.

Chairman Gruber thanked Ms. Ervin and The Lighthouse for what they do and said no one realizes how rampant this is. It is not just in Baldwin County, it is nationwide. A person should not have to endure abuse in their lives. Life is hard enough without dealing with that. Chairman Gruber said the Commissioners commend The Lighthouse for what they do to help the victims.

## D       PUBLIC HEARINGS

### DP       PLANNING AND ZONING

DP1   Case TA-19001 - Amendments to the Baldwin County Zoning Ordinance,        19-2231
        Article 2, Section 2.3.25.3, Local Provisions for Planning District 25

Vince Jackson, Planning Director, appeared before the Commission and provided background information on the subject amendments.

Chairman Gruber opened the public hearing at 9:30 a.m. and asked if there is anyone present who wishes to speak.

Mr. Joe Emerson, President of Fort Morgan Civic Association, appeared before the Commission and said his group is a 400-member group of land owners who are in support of the amendments because it will be beneficial to the community and will help preserve the environmental and historic nature of the Fort Morgan Peninsula.

Mr. Greg Strategier appeared before the Commission and said he is a resident of Fort Morgan and is in support of the amendments.  The amendments will not affect the growth of the area, it will control the growth.

Ms. Susan Harrell appeared before the Commission and said the Commissioners have the letter she sent on behalf of her family.  She and her family are against the proposed amendments.

Ms. Thelma Strong appeared before the Commission and said she is a long-time resident of Fort Morgan and a member of the Fort Morgan Advisory Board.  On behalf of the Fort Morgan Advisory Committee and the people of Fort Morgan, she asks the Commissioners to pass the changes.

Mr. Paul Stanton appeared before the Commission and said he brought a copy of the Fort Morgan letter sent to the Commission from Mr. Ernie Church, President of the Fort Morgan Fire Department's Board of Directors.  Mr. Stanton read Mr. Church's letter, commented on a recent fire on Fort Morgan and the sizes of houses there.  Mr. Stanton asked the Commissioners to help the residents of Fort Morgan.

Ms. Bonnie Lowery appeared before the Commission and said she is here as a voting resident of Fort Morgan.  Ms. Lowery said the residents want to protect the one part of the Alabama Gulf Coast that has not been destroyed.  She hopes the Commissioners will help them protect Fort Morgan.

Mr. Robert Issacson appeared before the Commission and said he is here on behalf of himself and his partner's, Mr. Mark Reid's widow who could not be here today.  Mr. Issacson commented on the limitation on the height of the structures and the number of people in them.  Mr. Issacson asked the Commissioners to either delay the vote or allow for a variance.

Commissioner Ball asked what does it matter if someone is limited to a two-story house?  Mr. Issacson is asking if there can be a variance.  What does he want to build?

Mr. Issacson said he is not building in Baldwin County.  He had a couple of hundred acres, but sold it to the Federal government.

Commissioner Ball asked what is the difference between a two-story home and a

half story?

Mr. Issacson said the difference is approximately 1/3 of the value of the property.

Commissioner Ball said would it be safe to say the bigger the house, the more people in it. Houses in the area rent for $17,000.00 a week. It takes multiple people to pitch in to rent the houses for that amount of money. Mr. Issacson's argument was that a two-story house was unsafe without sprinklers.

Mr. Issacson commented on a two-story building with 56 beds and how unsafe it was.

Commissioner Davis asked how can someone get out of a three-story house that is 35 feet from the ground? He cannot imagine an insurance company covering a four-story building with no fire escape system. He does not understand how this got built and he feels this is the first step in correcting it.

Mr. Issacson said how could a person build a two-story structure without any escapes. Mr. Issacson commented on how the County's Building Code could be modified to include escapes and how sprinklers could be the savior.

Commissioner Ball asked if there was a way to show what a two and a half story structure looks like? He wants the public to see what it looks like.

Wayne Dyess, County Administrator, said he does not believe staff has a picture of a two and a half story structure.

Commissioner Davis commented on the three-story structure and said the top floor is 40 plus feet off the ground because the bottom does not count as a floor.

Mr. Dyess said in the area that has the flood zone, the bottom floor has to be above the minimum base flood elevation. The County's Zoning Ordinance will measure from the base floor up. For example, if there is a maximum height of 35 feet, the maximum height is not measured until the base floor area is reached. Mr. Dyess said many areas are enclosed on the ground floor where parking is. That is allowed by the Building Code as long as they are not bedrooms.

Commissioner Davis said his point is the second floor is not 20 feet off the ground, in the building shown, it is 30 feet. How can someone get down from 30 feet if there is no fire escape or a second route out? He understands that sprinklers have to do with volume and capacity, but he cannot imagine how the structure shown was built.

Mr. Issacson said he cannot imagine building a structure like that with only one escape even if it was sprinkled.

Commissioner Underwood said Mr. Issacson commented on how many people could live in a residential home.  She feels that it is overstepping the bounds of a free society to predict how many people can live in a residential home.  This is still a free society and most of the households have reduced in size.  There is nothing to say how many people can live in a home, if it is someone's residence.  There is a difference between a residence and a rental property.  Commissioner Underwood said with multi-generational families living in one house, there may be 20 plus people.  The definition of a residence is a whole lot different than a rental home.  She does not feel the Commissioners can regulate how many people can reside in a residence.  That is intrusive to say that 20 people in a home is not a residence.  A rental property is different from a residence and the Revenue Commission distinguishes that as well.  Taxes are different between a residence and a rental property.

Mr. Issacson commented on friends who lived in a large residence and said it is still a home as long as it is sprinkled.

Commissioner Underwood said Mr. Issacson made the statement that a residence should not have more than 20 people in it.

Mr. Issacson said maybe he misspoke and he apologizes.

Commissioner Underwood said regarding the sprinkler system, there should be some type of legislation for this regardless of how many stories the structure is.

Mr. Issacson said if the Zoning Department wants to define the word "residential" there are several ways to do so.

Commissioner Ball said Mr. Jackson has a picture of what a two and a half story looks like and said it will sleep upwards of 30 to 40 people.

Commissioner Davis asked if there has to be a business license to operate a motel/hotel or rent out the space?

Commissioner Underwood said there has to be a business license for rental property.

Commissioner Davis said staff needs to make sure all of this is happening.

Mr. Issacson said the two-story structure shown is a death trap if there are 20 or 30 people in there with no exit and no sprinklers.  The sprinklers are the ultimate solution and not just a limitation to the height.

David Conner, County Attorney, said in the interest of full disclosure, his firm

Blackburn and Conner, P.C. has represented Mr. Mark Reid in the past. He does not feel there is a conflict of interest with this group because the class of people is so large on the peninsula. Mr. Conner said he did not want anyone to say he stayed quiet and wanted to make sure it was on the record.

Mr. Bill Bennett appeared before the Commission and said he has a beach home on Ponce de Leon Court. His family home can sleep 14 people. The structure across the street from his home is not a family home, but a hotel. Mr. Bennett said this structure should be called a hotel instead of a family residence.

There being no further requests to address the Commission, Chairman Gruber closed the public hearing at 10:08 a.m.

Mr. Jackson appeared before the Commission and asked if the Commissioners have specific questions for him.

Chairman Gruber said as a part of the Americans with Disabilities Act (ADA), a turnaround will still be needed for a residential home if a walkway is built. He just found out if a structure is built one floor off the ground, the walkway has to be covered up. The U.S. Fish and Wildlife regulates these, it is a part of its job. Is the County trying to trump the U.S. Fish and Wildlife? The County is not supposed to be any stricter than what the U.S. Fish and Wildlife says. Chairman Gruber asked who will oversee this? It is going to be in the County's Zoning Regulations. The Code Enforcement Officer will have to take care of this from now on.

Commissioner Ball asked if Chairman Gruber is saying if the walkway is one foot over the dune, it will have to be covered up?

Chairman Gruber said if it gets covered up, it cannot be uncovered.

Commissioner Ball asked if this is happening, to which Chairman Gruber replied, there is one now that is completely covered. The U.S. Fish and Wildlife has given the County money to go in and extend the walkways in Morgantown. The County will have to build on top of what is already there.

Mr. Jackson said the dune walkover standards is what started this with the amendments for Fort Morgan. One walkover was built 12 feet tall and presented an obstruction of movements and views on the beach. At that time, staff had nothing to address the dune walkovers. When asked to start looking at it, he first looked at the Cities of Gulf Shores and Orange Beach. They did not have a maximum height. The one foot is the minimum to be above the dunes. The maximum height is proposed to be three feet, but if the Commissioners want, staff can go higher. Mr. Jackson said the feedback staff received from Fort Morgan residents was to have a lower maximum height, but there is a precedent for five or

six feet.  He does not feel the Commissioners would want to go higher than that, but five or six feet will be reasonable.  Mr. Jackson said he asked Mr. Bill Lynn with U.S. Fish and Wildlife who said he was happy with what was proposed.  Staff is not trying to trump what U.S. Fish and Wildlife does, but to supplement it.  The Commissioners are the final authority on the zoning text amendments.  If there is something they want staff to do differently, they can do that.  The Commission can approve the amendments subject to changes being made and staff will make sure it is changed appropriately for the resolution.

Chairman Gruber said he wanted to make sure everyone was aware of the things he mentioned because he found that out yesterday.

Commissioner Underwood said she noticed a tall walkover in Fort Morgan.  Can Mr. Jackson speak on the high walkover issue?

Mr. Jackson said that is the one that precipitated this.  At the time, there was nothing to regulate it.  It came off an upper deck and goes out towards the water.  This is what got residents concerned and they contacted staff.  This is the part that staff has worked on the longest.

Commissioner Underwood asked if Mr. Jackson knows of any issues the Cities of Gulf Shores and Orange Beach have had with this?

Mr. Jackson said he does not feel there have been any issues with the maximum height.  He looked at the Cities' ordinances as well as ordinances from other states.  There were a lot of different things that went into this.  Mr. Jackson said one thing that is specifically said is it has to start at the ground level.  It would not start at a deck, which was the issue that got this started.  Staff has attempted to address the concerns expressed and looked at other ordinances.  Mr. Jackson said when there is an issue, one of the first things he likes to do is look at what is being done locally.  He looked at Gulf Shores and Orange Beach first, some of what they have is included in the amendments and formatted to fit the County's Ordinances. The Cities did not have an issue with the maximum height, so staff had to keep looking further in order to include that information.

Commissioner Underwood said the Cities do not have that, to which Mr. Jackson replied the Cities have the minimum one-foot like staff has proposed, but they do not have a maximum.

Mr. Conner said he did not do a lot of work on the habitable shore issue, that was done by staff, but this is one he has worked on with Mr. Jackson and the Fort Morgan Association's Zoning Board.  The issue that arose at the time this particular dune walkover was constructed was the U.S. Fish and Wildlife had a minimum height, but not a maximum height.  There were also no rules regarding the length of the pier or walkover beyond the dune.  That particular pier appeared

to be in compliance with all applicable regulations. The U.S. Fish and Wildlife was not acting fast enough to address this so the County was charged to come up with some way to bridge the gap over what the U.S. Fish and Wildlife had done in order to effect this quicker. Mr. Conner said because the Commissioners are able to adopt zoning regulations, staff began to look at how it could state a maximum height and whether or not the length of the pier could be addressed. Staff was charged to determine the purpose of the walkover and how to get over the dune. The height was a minimum of one foot because that was the U.S. Fish and Wildlife's standard. Mr. Conner said it did not have a height standard and the question was how high should it be made as a maximum in order to accommodate the purpose of a dune walkover and at the same time not creating a situation where there is nothing but 15 to 20 feet dune walkovers all along the beach. That was a part of the discussion as to what the Commissioners wanted it to look like in the future. Mr. Conner said at that point in time, there was no requirement as it relates to the length of the pier. Since that time, the U. S. Fish and Wildlife has adopted regulations to state the pier length can be no more than 10 feet beyond the vegetative line of the pier or walkover. That has helped some and staff has adopted that same standard in this recommendation. The size and width of the pier was also regulated by the U. S. Fish and Wildlife.

Mr. Jackson said that has a maximum of six for a multi-family and commercial and four for a single-family and two-family.

Mr. Conner said the County adopted that same regulation. The only other thing that is a fluctuation is the height. The U.S. Fish and Wildlife does not have a maximum height, so the Commission is imposing a maximum height. The issue the Commissioners raised is real. Eventually the dune walkovers will be covered up. The only way staff has been informed as to how to address it is to build over the dune. He does not know a way to fix this. Mr. Conner said what staff is doing is balancing part aesthetics and the dangers related to having those types of structures blown down and flying debris. An argument could be made that the higher it is, the better it will be. On the flip side, that could mean more debris going in different areas. Mr. Conner said the height is a decision the Commission will have to make. The protection of the dunes is accomplished by having the walkway where it needs to be above the dunes. It is at the Commissioners discretion to determine how high it goes and what they would like to address.

Mr. Dyess said for clarification, U.S. Fish and Wildlife requires a minimum height of one-foot above the dune. The real issue is putting a cap on the height. Mr. Dyess said he and Commissioner Underwood went to Fort Morgan several months ago and there was one walkover that was very elevated and that is the issue staff is trying to solve that came up a couple of years ago.

Commissioner Underwood asked how high is it, to which Mr. Jackson replied it is approximately 12 to 15 feet.

Mr. Conner said it is not just 12 to 15 feet above the dune. It is out almost to the mean high tide.

Commissioner Underwood said she was down there on another occasion and walked along the shoreline and it is way down. The U.S. Fish and Wildlife has addressed that for the future. This will not be something the County is doing that the U.S. Fish and Wildlife is already doing. Commissioner Underwood asked if there is a height that Chairman Gruber is comfortable with or does he want a height?

Chairman Gruber said three feet is not very much. Once the walkover reaches three-feet, then handrails have to be put on them to be under ADA compliance. In the past, the County has built them four feet off the ground.

Commissioner Underwood said the Commission can impose a restriction even though the U.S. Fish and Wildlife has not due to the fact there is a zoning ordinance available.

Mr. Conner said staff would be reluctant to create a rule or regulation that conflicts with the U.S. Fish and Wildlife. He feels the Commission is okay in using this as a supplement to adopt the U.S. Fish and Wildlife standards so that not only can they enforce this, but the Planning and Zoning Department as well. Mr. Conner said the real debate he is hearing is in regards to the height. That discretion is within the Commissioners to decide because the U.S. Fish and Wildlife has not spoken on that issue. It only has a minimum and not a maximum.

Mr. Jackson said if the U.S. Fish and Wildlife had a maximum height of three feet and the Commissioners wanted to adopt a maximum height of five feet, that may be a problem. He feels as long as what the Commission is doing is supplemental he thinks it is fine. Staff recognizes there is a changing nature to the dunes. That changes things in terms of the maximum height above the dune system. At one point, he had the draft written as five feet, but staff received feedback for a lower height.

Commissioner Underwood asked if the feedback was brought to the Commission's attention from the Building Inspection area or from a citizen?

Mr. Jackson said it came from a citizen.

Commissioner Underwood said the feedback she received asked that it start from the first story. They wanted it to walk off the balcony. Commissioner Underwood asked how high would that be?

Mr. Jackson said that was where the problem came in. It depends on what the

first-floor elevation is.

Commissioner Underwood asked what is a normal first floor elevation?

Commissioner Ball said the garage has to be counted so that is 10 feet.

Commissioner Underwood said the goal is responsible growth.  Growth is happening in Baldwin County and the Commissioners are trying to get a grasp on ways to be responsible about it.  She sees this along with the work the citizens of Fort Morgan have done as an avenue to try and be responsible with the growth.  Commissioner Underwood said she cannot say three or five feet is that huge of a difference, but she does see a difference between three feet and 20 feet.

Mr. Jackson said the Commissioners have heard over and over again about requiring sprinklers.  He agrees that it is a good idea, but it is not something that can be addressed through zoning.  That is a Building Code issue and staff cannot make it a requirement through the ordinance.  Mr. Jackson said he spoke with Mr. Issacson on Friday about some of the ideas about reclassifying some of the structures if they exceeded a certain number of bedrooms.  Even then, he is unsure if doing this in zoning is enough.  He feels changes in the Building Code will still be needed in order to make the requirement for sprinklers a reality.  This is something staff can look at in the future.  Mr. Jackson said if this is adopted today, that does not mean staff stops working on it.  They will continue to look at things to potentially make it better.  The Commissioners saw the picture of the two and a half story.  It does not look a whole lot different than a three-story building.  The original idea was to reinstate the two and a half habitable story height limit for all Planning Districts.  The next amendment coming up does address all of the Planning Districts outside of District 25.  The feedback staff received from the Volunteer Fire Department is what swayed them.  In terms of the planned developments down there, those are governed by the approved Planned Residential Development (PRD) Site Plan, the information that is included in there.  Those heights will always be controlled by what was approved by the PRD.  That is a separate issue from what staff is proposing today.  In some of the research done, staff looked at some of the older zoned ordinances prior to 1999 when each Planning District had its own zoning ordinance.  Staff found language pertaining to height that would have been applicable in Planning District 25 where it talks about properties where base flood elevation would apply.  Mr. Jackson said in those cases, prior to 1999, there was a two-story limit.  A two-story limit down there is not a completely new concept.  It has been in place before, prior to 1999.  There was a question about insurance, staff looked into it and the insurance is a non-issue on this.  In terms of rebuilding non-conforming structures, that is a high threshold to have to reach.  Typically, staff does not find that to be an issue and typically, a homeowner would have a year to rebuild.  Mr. Jackson said staff can propose some additional language if that would be something the Commissioners would like to do.  Staff does not feel the two-story limit will create that much of a

problem in terms of conformity.  There are some things that cannot be addressed through zoning.  Staff knows there are a lot of issues down there and have heard discussions about occupancy limits and limits on rentals.  People have previously asked him about that.  Mr. Jackson said prior to coming to Baldwin County, he worked in a college town and there was an occupancy limit in terms of the way a family was defined.  That is difficult to enforce and there can be problems in putting a maximum number as to what a family should be.  He does not feel that is an avenue staff wants to proceed down.  He feels good and confident about what is drafted.  Staff will evaluate it as they work on it and implement it.  If staff sees things need to be changed, they will come back to the Commissioners with changes if there are problems.  Mr. Jackson said staff has spent a lot of time on this and has received a lot of feedback.  Those are all of his comments, but he will be happy to answer any additional questions.

Motion by Commissioner Joe Davis, III, seconded by Commissioner BillieJo Underwood, to adopt Resolution #2020-001, which approves amendments to the text of Amendments to Article 2 of the Baldwin County Zoning Ordinance, Local Provisions for Planning District 25, pertaining to the removal of HDR, High Density Residential District, establishment of a two (2) habitable story maximum height for single family and two family dwellings, establishment of dune walkover requirements and standards, and establishment of Planning and Zoning considerations for Coastal High Hazard Areas and Flood Hazard Areas (Section 2.3.25.3).

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 0 | |
| **Abstain:** | 0 | |

DP2   Case TA-19002 and Case TA-19003 - Amendments to the Baldwin County          19-2232
       Zoning Ordinance, Article 4, Residential Districts, and Article 22,
       Definitions

At this time Commissioner Ball left the Chambers and the meeting and did not participate in any discussion regarding the subject matter.

Vince Jackson, Planning Director, appeared before the Commission and provided background information on the subject amendments.

Chairman Gruber opened the public hearing at 10:32 a.m. and asked if there is anyone present who wishes to speak.

There being no requests to address the Commission, Chairman Gruber closed the public hearing at 10:33 a.m.

Motion by Commissioner BillieJo Underwood, seconded by Commissioner Joe Davis, III,

to adopt Resolution #2020-002, which approves amendments to the text of Article 4 and Article 22 of the Baldwin County Zoning Ordinance, as these articles pertain to the maximum number of stories for residential structures and the definition of "Half-Story."

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 3 - | Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 1 - | James E. Ball |
| **Abstain:** | 0 | |

**DP3** <u>Case No. Z-19025 - Retirement Systems of Alabama Property Rezoning</u>          <u>19-2230</u>

Vince Jackson, Planning Director, appeared before the Commission and provided background information on the subject matter.

Chairman Gruber opened the public hearing at 10:35 a.m. and asked if there is anyone present who wishes to speak.

There being no requests to address the Commission, Chairman Gruber closed the public hearing at 10:35 a.m.

At this time, Commissioner Ball returned to the chambers and the meeting.

Motion by Commissioner BillieJo Underwood, seconded by Commissioner Joe Davis, III, to accept and acknowledge the withdrawal of Case #Z-19025, Retirement Systems of Alabama Property, as it pertains to the rezoning of approximately 1.27 acres, located in Planning (Zoning) District 26, from TR, Tourist Resort District, to HDR, High Density Residential District.

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 0 | |
| **Abstain:** | 0 | |

**DP4** <u>Case No. Z-19037 - Wells Property Rezoning</u>          <u>19-2234</u>

At this time, Commissioner Underwood left the Chambers and the meeting and did not participate in any discussion on the subject matter.

David Conner, County Attorney, said his firm, Blackburn and Conner P.C. has a conflict of issue on this matter.  Mr. Brad Hicks, Conflicts Counsel, handled this at the Planning and Zoning Commission level and he will be handling it this morning.

At this time, Mr. Conner left the Chambers and the meeting and did not participate in any discussion on the subject matter.

Linda Lee, Planner, appeared before the Commission and provided background information on the subject property.

Chairman Gruber opened the public hearing at 10:37 a.m. and asked if there is anyone present who wishes to speak.

Mr. Brian Wells, the applicant, appeared before the Commission and said he would appreciate the approval to build another house on the property.

There being no further requests to address the Commission, Chairman Gruber closed the public hearing at 10:38 a.m.

Motion by Commissioner James E. Ball, seconded by Commissioner Joe Davis, III, to adopt Resolution #2020-004, which approves Case #Z-19037, Wells Property, as it pertains to the rezoning of 1.01 acres, more or less, as located in Planning (Zoning) District 30, from RSF-1, Single Family District, to RSF-3, Single Family District.

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 3 - | James E. Ball, Joe Davis III, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 1 - | BillieJo Underwood |
| **Abstain:** | 0 | |

**DP5**   Case No. Z-19038 - Bankester Family Property Rezoning                **19-2235**

Linda Lee, Planner, appeared before the Commission and provided background information on the subject property.

At this time, Commissioner Underwood and David Conner, County Attorney, returned to the Chambers and the meeting.

Chairman Gruber opened the public hearing at 10:41 a.m. and asked if there is anyone present who wishes to speak.

Ms. Dorothy Smiley appeared before the Commission and said she lives south of the subject property. It is her understanding the businesses along Highway 225 were grandfathered in and there were to be no other businesses there. She would like for the area to remain as the "country." Ms. Smiley asked the Commissioners to not bring a Dollar General into the community.

Ms. Alyssa Carter, a representative of the applicant, the Broadway Group, appeared before the Commission and provided a handout to the Commissioners. Ms. Carter

said they would like to rezone the property to allow for a retail store.  They have worked with the Alabama Department of Transportation and the Baldwin County Highway Department to come up with a solution to make the area safe for drivers and shoppers. Ms. Carter commented on the proposed changes the applicant will make upon approval of the rezoning request and said they want to bring a convenience to the area to allow growth.

Commissioner Davis asked if Ms. Carter has a projection on what the work on River Road will cost, to which Ms. Carter replied she does not have that right now. Commissioner Davis asked how far will it be, to which Ms. Carter replied it will be just past the entrance point and the radius of River Road will be widened.  Commissioner Davis asked who maintains River Road, to which Ms. Carter replied, the County.

Mr. Bob Broadway, the applicant, appeared before the Commission and said this is a development he is excited about and it is a community that needs to be served.  Right now, the residents have to travel approximately 12 miles round trip for any type of grocery needs.  This will bring more convenience to the area.  Mr. Broadway commented on the area around the property.

Commissioner Underwood asked what is the closest other Dollar General around this location, to which Mr. Broadway replied it is approximately 5.6 miles away. Commissioner Underwood said she heard that from some citizens and she wanted to ask Mr. Broadway.

Mr. Broadway said it is great on a day like today when the Chambers of Commerce are celebrated, the Commissioners are considering approving a new business that will bring jobs to the community.

Commissioner Davis asked Mr. Broadway to share any other projects he has had similar to this that led to additional tenants or businesses being part of a cluster.

Mr. Broadway said his company has had experience with both.  There are some areas where not a lot of retail is wanted or can thrive.  There are other areas where retail does thrive.  The neighborhood growth around this area will need some type of service.

Commissioner Davis said this business will be between two existing facilities, and asked Mr. Broadway to explain why having three this close together will be a good model.

Mr. Broadway said most of the shoppers live nearby and do not get in their car with the aim of driving to the store.  Most of the stores are more of a convenience and not a point of destination.  The store will not attract people farther away, the shoppers will be in the community.

Commissioner Underwood said she appreciates Dollar General stores in the right place.  Mr. Broadway chose a site that he knew would have to be rezoned because it is in a part of the County that was zoned.  Mr. Broadway made this request to the Planning and Zoning Department.  Commissioner Underwood said sometimes a

person must look at the area they want to put something in.  This is a community in an unincorporated part of Baldwin County.  This community brought zoning on themselves to protect it from this.  Commissioner Underwood said she feels Mr. Broadway should be attentive to the fact the community went out of its way to become zoned.  There are plenty of places in Baldwin County where he would not have to seek rezoning.  He would just have to abide by the building codes.  How does Mr. Broadway feel about the fact he is requesting something for the area the people do not want?

Mr. Broadway said there will always be a vocal minority anytime there is development in an area.  These are the people who attend meetings like this, the people who are in favor, do not come out to the meetings.  This is to be expected.  When he looked at this property, they reached out to and had the support of the County's Planning and Zoning Department.  There are some good people in the Planning and Zoning Department who studied this.  Mr. Broadway said before he decided to move forward, he wanted to know what they thought about it.

Commissioner Underwood said the Planning and Zoning staff told Mr. Broadway he would probably not get a business reclassification.  It is her understanding that under the RR designation what he is asking for will require a further special exception.  This is really a backdoor way of getting what he wants.  It will put a commercial zoning in the middle of residential properties which is not the right way to zone this area.  Commissioner Underwood said that is why she has a little bit of a problem.  Mr. Broadway is correct, a lot of times, it is only the applicants who come to the meetings.  However, there has been an occasion where there was a room full of people in favor of the rezoning.  It is not always the people who do not want it at the meetings.  Commissioner Underwood asked why did Mr. Broadway not pursue a business designation?

Mr. Broadway said Ms. Lee told him to do it this way.  He was told this would be the best way to do it and he did not want to buck the system.

Commissioner Ball asked if Mr. Broadway knew how the voting body of the Planning and Zoning Commission decided this, to which Mr. Broadway replied "yes." Commissioner Ball asked how did they vote, to which Mr. Broadway replied they voted to deny it.

Mr. Broadway said the Planning and Zoning Commission did not give a reason for the denial.  They studied the project and Ms. Lee has gone through great lengths and still supports it.

Commissioner Underwood said the request is to rezone this to RR, but Mr. Broadway is telling the Commissioners ahead of time what he wants to do with the RR designation.  What Mr. Broadway wants to do with this designation is not allowed by right.  Commissioner Underwood said Mr. Broadway has to seek a special exception.  Therefore, she does not agree with the recommendation and he should not have done it in that direction.  If the Commission did not know he wanted to place a Dollar General Store there, asking for the RR designation may be reasonable.  Commissioner Underwood said she wanted to say this to Mr. Broadway since he was not at the last

meeting.

Mr. Broadway said he takes issue with the fact that Commissioner Underwood stated he tried to take this in the wrong way. He took it the way he was told to take it and he was not trying to be underhanded. Mr. Broadway said he is being very transparent in telling the Commissioners what he wants to do with the property. He could not tell them and do what he wants to do with it.

Commissioner Underwood said she may have misstated that.

Mr. Broadway said the benefit the residents have is if for some reason down the road this business does not exist, for any other business to come back, it would have to come back and see the Commissioners. If the Commission zoned this for commercial, a business would not have to come back.

Commissioner Underwood said if the Commission approved this rezoning as requested to RR, that still does not give Mr. Broadway what he is asking for, he has to have one more step which is not guaranteed. She feels the recommendation for Mr. Broadway to not seek a business classification was a sign that it may not be the right classification for this area.

Mr. Broadway said if the business classification is approved, it will open the doors to all types of businesses that the County would not be able to control.

David Conner, County Attorney, said everyone is concerned about general business zoned in that area. Commissioner Underwood was concerned that the chances of getting a general business zoned in that area are pretty slim. If it was going to happen in the area, staff's recommendation is something that provides protection beyond what the General Business classification would be. If Mr. Broadway went through with the RR process, there would still be another step for the Board of Adjustment to appeal. Mr. Conner said it would not open the door for all the other uses that are allowed by the General Business designation. He feels staff's recommendation to go beyond the General Business designation is a precursor to the concerns that have been expressed regarding this type of business in the area. Since there is a heightened review, it would still have to go through the special exception. That is an indicator of the concern staff has about this particular use even though they have recommended approval.

Chairman Gruber said the special exception is not a given thing. The Planning and Zoning Department tries to help the applicants with their needs. Staff looks at ways to fulfill the applicant's needs and help those who want to do business with an opportunity to look at a way to do it. Chairman Gruber said it does not mean it will happen, but staff is at least giving the applicant the option.

Mr. Broadway said he has been to areas where the planning departments said it would not happen there. However, when the property is on a busy highway, not many people will want to build a home there. That is kind of what the Commission is left with. Mr. Broadway thanked the Commissioners for their time.

Ms. Lynn Harrison appeared before the Commission and said there are currently 251 signatures on a petition left at The Outdoorsman and 129 online signatures, which the Commissioners have copies of.  That is a total of 380 signatures on a petition against the rezoning.  It is not just a vocal few, it is an organized effort to put this issue out in front of the residents of the area.  She has spoken to two people who are in favor of this, everyone else does not support having the area turn into a commercial area.  Ms. Harrison asked everyone in attendance to stand up who are in opposition to the rezoning request and said they are a community united against turning this property into a commercial property.

Mr. Steven Johnson appeared before the Commission and said he lives a half mile away from the subject property.  He appreciates everyone's viewpoints who have spoken.  He is speaking in favor of the rezoning because he would appreciate a retail establishment a short distance away from his home.  Mr. Johnson said he wants to make sure it is done right and it does not affect his property value.  He does not feel it will drive the traffic up because it is not a destination store.  He wants to make sure the intersection is safe and it sounds like there are plans in the works to add a turn lane.  He sees this as an added convenience and is in favor of the rezoning.  Mr. Johnson said he appreciates the Commissioners' consideration.

Ms. Linda Caldwell appeared before the Commission and said she is a long-time resident of Baldwin County and just recently built her home on Akin Court.  She chose Highway 225 because of the peace.  She is not against change, change is great.  The community is surrounded by Dollar General stores, is there a need for another one?

Commissioner Ball said there is also a Dollar General store in Stockton.

Ms. Veronica Smith appeared before the Commission and said Mr. Broadway stated it was a community that needed to be served.  The community is already being served by the other Dollar General stores and The Outdoorsman.  There is no new revenue to be generated tax-wise.  The community deliberately imposed the zoning on themselves to be in a country atmosphere.  Ms. Smith said she would appreciate the Commissioners rejecting this request.

Mr. Howard Franklin appeared before the Commission and said he lives in the Blakeley Oaks development .6 miles south of the subject property.  He is the President of the Blakeley Oaks Property Owners' Association.  He agrees with the comments from those who are opposed to the request.  The area is rural with stores to the north and south and are not far away.  The residents live where they are by choice and do not mind making the drive.  It will be redundant to have the store close by.  He has only heard comments in opposition to this request and he is asking the Commissioners to deny it.

Mr. Chuck Brevitz appeared before the Commission and thanked Commissioner Underwood for bringing up the steps the applicant will have to take in order have a store on that corner.  He does not know why the Planning and Zoning staff would set up an unreasonable set of hoops for this.  He objects to this because the Planning and Zoning Commission made the recommendation to deny the request and the Planning

and Zoning staff recommended approval.  Is this a done deal?  Mr. Brevitz said his objection to this particular development involves traffic safety.

Mr. Michael Allen appeared before the Commission and said he is a long-time resident and business owner in the community and heir to the subject property.  He is in favor of rezoning the property.  The community will need another place to shop and another convenient option.

Ms. Emily Crook appeared before the Commission and said she is in favor of having the store in the community.  It will be convenient for most people, especially the elderly.

Ms. Mary Louise Bankester McMillan appeared before the Commission and said she lives in Huntsville, but was born in the house on the subject property.  The subject property has been in her family for 105 years.  Her family is proud of the property.  Today, the property is being used for nefarious purposes.  Ms. McMillan said the Bankester property was used by the State to help make Highway 225.  She would like to have a store there because it will be very beneficial to the residents there.  She has spoken with residents near the subject property and nearly all of them want a store there.  Ms. McMillan said a Dollar General store will be very beneficial for the people of the community and it will be very fitting for the property to be used in this manner.  It will be a tribute to her grandparents.

Mr. Bob Wills appeared before the Commission and thanked the Commissioners for the opportunity to address this issue.  He represents the Bankester heirs relative to this property.  He appreciates Ms. McMillan giving the Commissioners a little history of the property.  The property along Highway 225 has changed over the years.  Zoning went into place 24 years ago in that area.  Since it has gone into place, a number of subdivisions have been built there.  There has been a major change to the area since the zoning went into place.  Mr. Wills said that is a criteria for the Commissioners to consider when making their decision on the rezoning.  He appreciates staff's recommendation and the work they did.  He knows it is difficult to make decisions like this when numerous people express their personal opinions.  Mr. Wills said the Commissioners' charge and responsibility is to follow the directions and dictates of the zoning regulations.  Mr. Wills commented on the requirements to approve this request and said that is why the Commissioners have a professional staff to help guide them in those decisions.  Ms. Lee presented a number of factors to the Commissioners and recommended approval.  Mr. Wills said he understands Commissioner Underwood's comments on how this was presented, but this is the right way to go.  If it is approved today, a special exception will have to be submitted that will address the concerns raised by the those in opposition.  The Board of Adjustment will have the authority to reject this request if it is not satisfied that it complies with the requirements.  A small retail store is what is planned for the property.  Mr. Wills said all the applicants are asking for is for the property to be rezoned from RSF-E, Single Family Estate District to RR, Rural District.  He respectfully submits that it is appropriate under the Zoning Regulations, it will be a convenience and there is a need.  The store will be compatible with the area.  Mr. Wills said if this is approved, the Broadway Group will do what is necessary to maintain the character of the area.

Ms. Thelia Kelly appeared before the Commission and said she lives south of the subject property. One point that has not been made is the precedence this will set. If this is approved, what will happen when the next developer wants to place a business on one of the other three corners.

Mr. Joe Kovich appeared before the Commission and said he owns The Outdoorsman. The petition in opposition was brought to his store. His store is located two miles north of the subject property. His heart bleeds for the community because they do not want another Dollar General store. Mr. Kovich asked the Commissioners to listen to the residents who voted them in office. They moved to the area to live in the country.

Ms. Nadine Adams May appeared before the Commission and said she lives one mile north of the subject property. She is in favor of having a Dollar General store there. The community is growing and needs retail establishments there. Ms. May asked the Commissioners to accommodate the residents and allow them to have a Dollar General store.

Ms. Edith Johnson appeared before the Commission and said she lives on Highway 225. She is concerned about the safety, large trucks travel along that highway. She moved to the community to get away from the retail stores. Ms. Johnson said she is against the rezoning request.

Ms. Smiley said she lives on the corner and there is no drug dealing on the corner.

There being no further requests to address the Commission, Chairman Gruber closed the public hearing at 11:59 a.m.

Commissioner Underwood said this is a historic and scenic drive with the Historic Blakeley Park and the Veterans Cemetery in close proximity. The character of the area will be disrupted by a new retail and she does not see this parcel of land lending itself to a rezoning request of this nature.

Motion by Commissioner BillieJo Underwood, seconded by Commissioner James E. Ball, to deny the approval for Case #Z-19038, Bankester Family Property, as it pertains to the rezoning of 2.72 acres, more or less, as located in Planning (Zoning) District 4.

The motion passed by the following vote:

| | | |
|---|---|---|
| Aye: | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| Nay: | 0 | |
| Absent: | 0 | |
| Abstain: | 0 | |

# E   COMMITTEE REPORTS

## EA   FINANCE/ADMINISTRATION DIVISION

### EA1   Payment of Bills                                                    19-2200

Motion by Commissioner BillieJo Underwood, seconded by Commissioner James E. Ball, to pay bills totaling $11,002,675.15 (eleven million, two thousand, six hundred seventy-five dollars and fifteen cents) with the exception of Vendor #112, which is listed in the Baldwin County Accounts Payable Payments - October 15, 2019, for a revised total of $11,002,259.35.

Of this amount, $7,294,797.99 (seven million, two hundred ninety-four thousand, seven hundred ninety-seven dollars and ninety-nine cents) is payable to the Baldwin County Board of Education for its portion of the County Sales and Use Tax.

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 0 | |
| **Abstain:** | 0 | |

Motion by Commissioner BillieJo Underwood, seconded by Commissioner James E. Ball, to pay Vendor #112 in the amount of $415.80.

Vendor #112:  Davis, Joseph Lee III

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 3 - | James E. Ball, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 0 | |
| **Abstain:** | 1 - | Joe Davis III |

**EA2**   <u>Notification of Interim Payments Approved by Clerk/Treasurer as Allowed Under Policy 8.1</u>   <u>19-2202</u>

Wayne Dyess, County Administrator, informed the Commission that the Baldwin County Commission Interim Payments - October 15, 2019, made by the Clerk/Treasurer totaling $3,268,776.44 (three million, two hundred sixty-eight thousand, seven hundred seventy-six dollars and forty-four cents) are a part of the record.

**EB**   **ROAD AND BRIDGE DIVISION**

**F**   **ELECTED OFFICIAL REQUESTS**

**G**   **OTHER STAFF RECOMMENDATIONS**

**GM**   **HIGHWAY**

**GM1**   2019 High Risk Rural Roads Program for Repair of Unshielded Bridge             **19-2192**
Ends - Resolution No. 2020-017 and Supplemental Funding Agreement

Frank Lundy, Operations Manager, appeared before the Commission and read the staff recommendation.

Motion by Commissioner James E. Ball, seconded by Commissioner Joe Davis, III, to approve and authorize the Chairman to execute Resolution #2020-017 and Supplemental Agreement #1 to the High Risk Rural Roads Program Project (HRRRP) - Installation of Guard Rail and End Anchors Construction Agreement, (approved during the March 19, 2019, regular meeting) between the Baldwin County Commission and the Alabama Department of Transportation which includes additional construction costs of $84,183.50 with 80% Federal Aid funding ($67,346.80) and the remaining 20% ($16,836.70) funded by Baldwin County.

The motion passed by the following vote:

**Aye:**        4 -   James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F.
Gruber

**Nay:**        0

**Absent:**     0

**Abstain:**    0

**GM2**   2019 High Risk Rural Roads Program for Unshielded Bridge Ends - Bid            **19-2181**
Award and Warrant Payable

Frank Lundy, Operations Manager, appeared before the Commission and read the staff recommendation.

Motion by Commissioner James E. Ball, seconded by Commissioner Joe Davis, III, to take the following actions:

1) Authorize the Chairman to send a letter to the Alabama Department of Transportation (ALDOT) in concurrence of awarding the contract for the 2019 High Risk Rural Roads Program for Unshielded Bridge Ends to C&H Construction Services, LLC; and

2) Authorize the Clerk/Treasurer to process an interim check issued to ALDOT for County funds due in the amount of $35,323.70.

The motion passed by the following vote:

**Aye:**        4 -   James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F.
Gruber

**Nay:**        0

**Absent:**     0

**Abstain:**    0

GM3   License Agreement No. 19013 - 3rd Street Right-of-way in Montrose        19-2226

Frank Lundy, Operations Manager, appeared before the Commission and said staff received a request for the license agreement for the Thomasson family to clear underbrush and a few small trees to access their property.  Mr. Lundy said this is an unopened, non-maintained public right-of-way and was platted to the public in 1847.  The surrounding properties have mostly been annexed into the City of Fairhope.  This particular right-of-way has not been annexed, it is still in the County.  The applicant has to come to the County to request permission to do this work as mentioned.  Mr. Lundy said although it is not inside the City of Fairhope, there are some permits and ordinances that do apply and the applicants would have to follow and adhere to if this were to be approved.

Commissioner Davis asked who will pay for the cost of the brush clearing, to which Mr. Lundy replied the applicant, it would be at no cost to the County.

Commissioner Underwood asked if the County would benefit from trying to make decisions on something that affects the City of Fairhope more than it affects the County.  This right-of-way is old and because it is not specifically deeded to anyone, the County is the entity that has a say so on this.  Commissioner Underwood asked if this should be tabled to see if the City of Fairhope wants to annex this right-of-way in because it affects them more than the County.

Mr. Lundy said he cannot say if this will be a benefit to the County, but the County currently has the authority.  The vast majority of the surrounding parcels are in the City of Fairhope.  Mr. Lundy said the City of Fairhope has the most at stake with what is going on around the right-of-way.  If the Commission chooses, it would be a valid request to see if the City of Fairhope would consider annexing the right-of-way.  Before the Commissioners today, it is a County decision.  The Commissioners can choose to table the decision today.

Commissioner Underwood said she has some other things, but is unsure if people are interested in those avenues.

Mr. Lundy said he had a conversation with one Fairhope representative and based on that one conversation, this may be something that is open for discussion.

Commissioner Davis said if the license agreement is approved, will it enable the County to continue to discuss with the City of Fairhope to take this, to which Mr. Lundy replied "yes."  Commissioner Davis said it would not preclude the Commission to which Mr. Lundy replied that is correct.

Commissioner Ball said as of today, if someone wants to access the rear of the property, they would have to go through the County to cut the grass to get a vehicle there.  They cannot go to the City of Fairhope with this request.

Mr. Lundy said as it stands today, that is correct.

Commissioner Underwood said currently, there is access to this property, just not from that side because of the overgrowth of the woods.

Mr. Lundy said that is correct, the majority of the property lies between 3rd Street and U.S. Highway 98.

Commissioner Underwood said she would never want to preclude someone from getting to their property, but that does not seem to be the main issue. A copy of the plat for a planned unit development (PUD) approved by the City of Fairhope in 2017 was provided to the Commissioners. It shows a road that would go in between the existing parcels rather than opening up old platted right-of-ways. In order to do what the permit requests, will there need to be surveys done or does staff know exactly where it is?

Mr. Lundy said in the license agreement, it is required for the applicant to survey the right-of-way so they will know where they are working and that they are in the place where they are supposed to be and is doing what was requested. Mr. Lundy said regarding the PUD, that will be up to the applicant and the City of Fairhope to make sure no City ordinances, approvals or permit requirements will be violated. The County's license agreement has it written that the applicant has to adhere to any other regulations or permits. If the applicant does not adhere to it, then the applicant will be in violation of the County's license agreement.

Commissioner Underwood said the only permission the County can give the applicant is on the County right-of-way. If the applicant wanted to open up something inside of the PUD, it would go through the City of Fairhope, it would not have anything to do with the County.

Commissioner Ball said technically the end of the right-of-way is called 3rd Street. Does anyone access their homes from 3rd Street?

Mr. Lundy said yes, they use 3rd Street to the end of the pavement.

Commissioner Ball said if more houses were built in the undeveloped part, that could be the roadway to their homes.

Mr. Lundy said that could be in violation of what the City of Fairhope has approved.

Commissioner Ball said if there was no PUD, then it would go in line with a driveway into the property.

Mr. Lundy said he would think so. If the PUD was dissolved, it would change what was previously approved by the City of Fairhope. Commissioner Ball's statement would be correct and a logical assessment.

Commissioner Davis said for the applicant to cut this in order to be able to get to the property, it does not preclude or require the County to open that road. It gives the current property owner the opportunity to see what the property looks like from the west side, to which Mr. Lundy replied that is correct. Commissioner Davis said if in fact from

what the County has been told, to go from a 77 occupancy PUD to an approximate number of 17 would be the logical way to look at it and will be an enhancement to the entire neighborhood that has those types of houses on the other side. To him, it is a no-brainer, if the applicant is going to pay for it. Maybe the County should have kept it cut although he is sure there are people to the west of the property that do now want it cut. Commissioner Davis said right now, it is the County's responsibility to cut it and to grant the request.

Commissioner Ball asked if the applicant could place a barrier up so it could be open to the public?

Mr. Lundy said it is an open public right-of-way.

David Conner, County Attorney, said this is a platted right-of-way. It has the nature of being a public right-of-way, but that does not mean the County maintains the public right-of-way. There are public right-of-ways all over the County that have become public in nature by prescription, statutory dedication or common law dedication. Mr. Conner said in this case the right-of-way does exist by plat. The only portion the County has taken to maintain is the paved portion to the north. The Commissioners are not considering the County to undertake this and maintain it, but to allow the property owner to have access to their property. The Commissioners are within their rights to do it and it is up to them to do so. Mr. Conner said the County's position is by granting this license, the County is not undertaking to maintain the property, it is not creating any public rights that do not already exist and it is not blocking the road from someone else who may want to walk along it.

Commissioner Underwood said the reason the applicant wants to access this property is because it is very wooded. Is there a way for the applicant to access this on their own property from the backside?

Mr. Lundy said that is a question for the applicant to answer. What the applicant brought to staff was that he would take a mulcher and mulch the brush and surface vegetation. Mr. Lundy said he is unsure if he can answer this for the applicant.

Chairman Gruber said being that this is within the City of Fairhope and the County does maintain the right-of-way, he feels the City should have some say so over what happens with this right-of-way. There have been instances where the County was asked to do something along a right-of-way, but could not do it because it was platted within a city's jurisdiction. He does not see how the County can do something for property that is within a municipality's boundary. It is no longer in the County's boundary, that was given up when the annexation took place. It is the municipality's responsibility to do what it sees fit. That is what the law states the County has to do.

Mr. Lundy said the right-of-way in question is still under the County's authority, at this point. The surrounding properties were primarily annexed in 1993 and prior to the law changing in 1995. In researching the annexations, these parcels were specifically identified and the right-of-ways were less and accepted. This right-of-way was intentionally not annexed. Mr. Lundy said given this information, the authority to make

this decision falls to the County Commission.

Commissioner Underwood said if this property was annexed today, would the County have allowed the City of Fairhope to annex it in without taking in those streets?  It puts the County in the middle of something that affects the City more than it affects the County.

Mr. Lundy said the laws are different today than they were in 1993.

Commissioner Underwood said that would not happen today, to which Mr. Lundy replied "correct."

Mr. Conner said the law changed in 1995.  What the law says is prior to 1995, if the County or the municipality was maintaining an area and the city annexed that area, then those parties would continue to maintain the same roads.  It did not change the maintenance responsibility.  After 1995, the law stated if an area was annexed that included a road and if the County maintained it for a period of one-year prior to the date of annexation, then the City was supposed to take over maintenance of the road.  Mr. Conner said if County maintained the road for a minimum of six months and the Municipal Planning Commission had approved the subdivision for that road in its extraterritorial jurisdiction (ETJ), then it would also assume that responsibility.  There is also a provision that states once a municipality annexes both sides of the road, the County Commission could request for the road to be annexed into the city and that maintenance responsibility would shift as well by resolution.

Commissioner Underwood said Mr. Conner is saying "roadway," but this is an unopened right-of-way.

Mr. Conner said any of those things would apply.  The question is about the maintenance and the right-of-way was never maintained by anyone other than a small portion.  It does speak in terms of annexing up to a right-of-way or road.  He feels it would be appropriate to consider asking the City of Fairhope to take over the section where the property is annexed on both sides.  Mr. Conner said based on the law, Mr. Lundy is right.  Prior to 1995 the maintenance responsibility would remain the same.  At some point in time, if the Commission asks the City to take it over, it may be a good thing to do since it is annexed on both sides.  This would give the City the authority to control and regulate what happens in its area as opposed to the Commission as it relates to this item.

Chairman Gruber said if the Commission approved opening it, it would be a County street within a municipality.

Mr. Conner said there are statutes out there that state before any new roads are constructed or opened, approval has to be given under certain circumstances.  He would not go far enough to state those override any public procedures the County may have, but there are things the Commission would need to look at before opening, building or improving a road.

Commissioner Davis asked if there are residences on that road now that are actually in the County?

Commissioner Ball referred to an area of the map shown and said yes, that property is in the County.

Commissioner Davis said the Commission needs to deal with the issue and request at hand.  The Commissioners will work with everyone to make it work.  To grant this at no cost to the County is a no-brainer to him and the Commission needs to move on it.

Commissioner Ball asked if there are other streets or roadways that run through municipalities that the County maintains, to which Mr. Lundy replied "yes."

Mr. Conner said Commissioner Davis is correct.  The real question is not whether the Commission has the authority, but does the Commission want to do this.  That is what the Commissioners have to decide.

Mr. Mark Mathias appeared before the Commission and presented a PowerPoint presentation to address questions the Commissioners had about other access routes.

Mr. Frank Barlow appeared before the Commission and said he is a recent resident of the Eastern Shore.  He chose Montrose because it is a historic community.  Mr. Barlow commented on the PUD approval and said it was platted and agreed to with Fairhope.  The agreement with the property owner for the PUD specifically states the green area will stay.  It was never intended to open 3rd Street from one end to the other.  It was forbidden via the PUD.  It seems like the landowner wants to do an end run around the agreement.  If the landowner wants to formally abandon the PUD, that is fine, but he should do that first.  The City of Fairhope found that extending the curb would have a significant environmental impact on the area and recommended not doing it.  The PUD was agreed to based upon the green space along 3rd Street, it was never envisioned for a road to be there.  He would welcome the subdivision into the neighborhood.  The City of Fairhope has a big stake in this because it approved the PUD, but he does not see the rush.  It merits further discussion with the City of Fairhope or the formal withdrawing of the PUD agreement.

Mr. Clifford Keeton Barnes appeared before the Commission and said he lives on 3rd Street.  He loves living in the Montrose Historic District.  Mr. Barnes showed a slideshow presentation on 3rd Street and said the City of Fairhope approved PUD was known by the neighborhood.  Now, the applicant wants to open more streets in Montrose from Scenic 98 to four-lane Highway 98.  This will be horrible for Montrose and will not do much positively for anyone.  It will be terrible for traffic and safety.  The Commissioners are faced with different things coming into play.  The residents will complain if the Commission approves what is requested.

Mr. Clay Rankin appeared before the Commission and said he is a lawyer in Fairhope and he lives off Taylor Road.  In 2016-2017, he was the lawyer for his property owners' association.  The PUD was something that was heavily negotiated with the City of Fairhope, the developer and the property owners.  The property owners were

guaranteed that the green space would be left intact.  It was a fair compromise for everyone.  Now, the applicant wants to whittle away the green space and ultimately open up whatever is built there back to the scenic highway.  His grave concern is this is another stepping stone towards violating the PUD.  If this happens, then the PUD should be cancelled.  Mr. Rankin said if the applicant is going to have the PUD then he needs to perform the conditions agreed to in the PUD.

Mr. Dale Marston appeared before the Commission and said he lives on Graham Street in Montrose.  The Highway Department does not maintain roads in Montrose, unless it is near the end of the fiscal year and it has to spend money to keep the budget the same.  He has never seen any equipment on Graham Street.  He has maintained the right-of-way there.  The property on 3rd Street will go along the same route as his street.  The moment the applicant starts clearing it is the moment the County will find a place to spend money before the end of the fiscal year.  That creates the exact problem everyone here is trying to put a stop to.  Mr. Marston said Commissioner Davis is his County Commissioner, but Montrose is the red headed stepchild of the Highway Department.  He does not like it because he is tired of taking care of the County's property.  He feels the County should buy the property from the landowner, leave it in its current state and move on.

Commissioner Davis said BP money was spent in Birmingham that should have been spent down here.  The Commission will work on this to get the bridge from Mobile to Baldwin County.  Mr. Marston wants the Commission to not do its job in order to keep the residents from being able to see other properties.  He encourages the residents to buy the property, then they could make it into whatever they want it to be. Commissioner Davis said the Commission's job is to follow the law, be responsible for what it is responsible for and make decisions not based on the numbers, loudness or personal comments, but on something that makes sense.  Everyone is in this together and as the County grows it needs to get better.  The County is growing in every imaginable place including Montrose.

Commissioner Ball said for the record, what Mr. Marston said was not a true statement. He wants to lay cover for the Highway Department, the County Engineer and Mr. Lundy. Unless Mr. Marston can prove his statements, he is wrong.  That is not how the Highway Department works.  It does not spend money in September just to throw asphalt wherever it wants to.

Commissioner Davis said there are 1,053 miles of dirt road in the County.  The Commission uses every penny it can find to improve places that need improving.  The Commissioners' job is to maintain the quality of life and the connectivity with the roads. The County's departments are second to none that deal with a wide spending of tax dollars.  If Mr. Marston has a concern about his street, then he needs to tell the Highway Department and they will come fix it.

Ms. Shana Kowal appeared before the Commission and showed a picture of Taylor Street and said it is the face of Montrose.  Ms. Kowal read her email sent to the Commissioners and said she wrote the email with the intention of not being here today, but she did not want to be a hypocrite and not attend today's meeting to see it through.

Ms. Kowal said she is here as an advocate for herself, her family and her community. This will be the first step in a series of changes in store for the area. The applicant is trying to manipulate the system to meet his goal. She is not against the idea of development, but she wants it to be honest and she wants good planning in order to maintain the integrity of the community. Ms. Kowal said the community has set up a social media account, will keep the community informed and will allow them a platform to voice their concerns.

Mr. Larry Chason appeared before the Commission and said the Thomassons have worked closely with the neighborhood and have had a keen concern about doing something compatible with the people who live there now. There is no interest to maximize the property. It would be the City of Fairhope or the County's decision to create a cut through on Taylor Street. The property was laid out before Highway 98. There are now 15 parcels on Highway 98 and the Department of Transportation will not allow 15 driveways coming out to Highway 98, 3rd Street is the only street that touches all of the parcels. The family is ready to sell this piece of property and all they want is fairness and to be allowed to do what has been done before. Mr. Chason said there has been a concern about why the County has to get involved in this. The applicant spent approximately one-year coming up with the PUD. The City of Fairhope never asked to annex the right-of-ways. The applicant had it rezoned from R-1 to PUD with the intention of developing it. There were a lot of unknowns as to what the PUD would end up being as far as the City of Fairhope is concerned. Mr. Chason said the applicant is not asking to do anything other than mow the right-of-way in order to stake the lots. The applicant has presented a plan that is reasonable and fair and he personally feels the applicant has the right to ask for what he is asking for. He hopes the Commissioners will not punt this down the road, but will allow the applicant to get busy and get the right-of-way mowed and open so the applicant can go to the next step.

Commissioner Ball asked when the PUD was agreed upon with the City of Fairhope was it in that agreement that the right-of-way would not be opened?

Mr. Chason said no, 3rd Street was never discussed. From meeting with the residents, the Thomassons knew the residents did not have a problem with opening the entrance that lines up to Rock Creek. They needed lots on both sides of the street because they would build 1,400 feet of street. It is difficult to build the PUD street and only get the benefit from one side. If the applicant goes back to the Fairhope Planning Commission to rezone the PUD back to R-1 there will be questions as to whether or not to ask the County or the City to accept it for maintenance.

Commissioner Ball asked when will Mr. Chason make a decision to pull the PUD plan from the City of Fairhope?

Mr. Chason said the Thomassons are not developers, they are landowners who want to sell the property. If they did the PUD before Phase One they would probably spend $175,000.00 to engineer it. Here, they want to mow it, go in with a surveyor and mark the corners. After they do this, they will probably go back to the City of Fairhope to rezone it to R-1. Mr. Chason said by that time, the Thomasson will have determined whether the County or the City of Fairhope will want to keep the right-of-way.

Commissioner Underwood asked why is an over 2,000 foot-long stretch needed to be cleared?

Mr. Chason said the part that will be cleared is not over 2,000 feet.

Commissioner Underwood said the permit is requesting that.

Mr. Chason said there is no need to clear it all the way to Rock Creek.

Commissioner Underwood asked how long does Mr. Chason need, to which Mr. Chason replied approximately 1,500 feet. Commissioner Underwood said that is still a substantial amount. Would Mr. Chason not want to stake out with a survey and make a swath through there or do one on the backside of the applicant's property?

Mr. Chason said if the Thomassons did what Commissioner Underwood suggests then they would have to go back and re-subdivide the entire tract. The lots of record would have to be disregarded and they would end up trying to do it with lots on both sides of the street. Mr. Chason said he understands the Thomassons want to keep 3rd Street as a buffer. If they put the street there, instead of having one to three acre lots, they will have half acre lots on both sides of the street.

Commissioner Underwood said Mr. Chason does not know if they want to keep the PUD or if this is an exploratory avenue for them.

Mr. Chason said after two years of trying to get someone to want to do the PUD, the likelihood they would go the route of taking 3rd Street as it exists and continuing down would have a 90 percent probability of happening.

Commissioner Underwood said the ultimate goal most likely is to open this up.

Mr. Bill Smith appeared before the Commission and said he lives at the southwest corner of 3rd Street and Adams Street. He is confused as to where the Thomassons want to go. There is an approved PUD. Have they abandoned the PUD or is it still a possibility?

Commissioner Underwood asked if Mr. Smith heard when Mr. Chason said it has been a year and a half and the Thomassons are unsure if they are going forward with the PUD.

Mr. Chason said yes, the PUD is still a possibility.

Commissioner Underwood said the PUD is still a possibility, but there is an overwhelming probability that the Thomassons may go another route.

Mr. Smith said the layout originally met the City of Fairhope's R-1 designation, but they decided to go with the PUD and the residents of Montrose agreed with it. His main sticking point is the opening of right-of-ways. Mr. Smith said the City issued the PUD

and the residents agreed with it based on having no access except off Highway 98. Now, the Thomassons are coming in through a "backdoor" to have an access off 3rd Street. Mr. Smith said he does not see how the Commission can do this without at least addressing the City of Fairhope to see what its feelings are on it. He is unsure what to believe in this situation.

Ms. Debbie Quinn appeared before the Commission and commented on the three-ring binder of pictures she handed out to the Commissioners. Ms. Quinn said the residents just want the Thomassons to be good neighbors and uphold their end of the PUD. She thanked the Commission staff and said they have been very nice. When this property was annexed in 1993, no one thought of the road. The neighborhood just wanted to get zoning back. Ms. Quinn said the residents appreciate anything the Commission can do for them.

Mr. Paul Klutes appeared before the Commission and said Mr. Chason said he envisioned 3rd Street to be extended for driveway access. The Commission would not be approving a walking trail today. It would be for driveway access. Mr. Klutes referenced the May 18, 2017, meeting and said Mr. Chason's comments about the right-of-ways not being buffers was incorrect also. The owners said they listened to the residents and the right-of-ways were included with the buffer on the back of the PUD agreement. Mr. Klutes said it is shown that way on the map.

Commissioner Davis said he wants to move this forward and he knows it is contentious in many areas and he understands about wanting to keep a buffer. Unfortunately, that buffer lands in the County's lap and the Commissioners have to deal with it. If the residents would want to acquire it, the Commissioners would be willing to listen. Commissioner Davis said that would make it tougher for the Thomassons to deal with it.

Motion by Commissioner Joe Davis, III, seconded by Commissioner James E. Ball, to approve the request and authorize the Chairman to execute License Agreement #19013 permitting Burgess A. Thomasson Jr. and Thomasson Trust A, U/A DTD 2-24-75, Trustees A. Daniel Thomasson and Leigh Thomasson Brown, to clear underbrush and a few small trees on 3rd Street, from end of pavement south 2,106 feet, to access their properties and place markers at the western boundaries of the lots. (This agreement is only valid for clearing to access the property. The term of this agreement shall commence on the date of full execution. License for Installation shall terminate at 11:59 p.m. on February 28, 2020. License for Maintenance shall be indefinite according to the terms of the agreement.)

Commissioner Davis asked for a roll call vote.

The motion failed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 2 - | James E. Ball, and Joe Davis III |
| **Nay:** | 2 - | BillieJo Underwood, and Charles F. Gruber |
| **Absent:** | 0 | |

**Abstain:**     0

After the motion and before the vote, Chairman Gruber said this lies within the city
limits of Fairhope.  It is within its zoning area and the County has nothing to do with
the zoning.  The Commission ended up with a strip of property that was deeded to the
County.  Chairman Gruber said just because the City of Fairhope chose not to annex
this right-of-way in, does not make it right.  He is not for the County getting into the
City's business just like he does not want them telling the County want to do with its
right-of-way.

**H     COMMISSIONER REQUESTS**

**I     ADDENDA**

**J     ADMINISTRATIVE REPORT**

**K     COUNTY ATTORNEY'S REPORT**

David Conner, County Attorney, said he has an item for an executive session.  The
executive session should last for approximately 15 minutes.  There will be no action for the
Commission to take, the Commissioners can adjourn the meeting from the executive
session.

Mr. Conner said this will be his last meeting as County Attorney.  He thanked the
Commissioners for the opportunity to serve them and the previous Commissions.  It has
been a privilege and an honor.  He has enjoyed every moment of it.  Mr. Conner said he
thanks the Commissioners and wishes them the best.

**L     ANNOUNCEMENTS**

**M     PUBLIC COMMENTS**

**N     PRESS QUESTIONS**

**O     COMMISSIONER COMMENTS**

Commissioner Davis said he was boastful about the Commissioners finishing the
meetings in a quick pace, but he wants to point out that it is now 1:32 p.m. and the
meeting is still not finished.

**P     ADJOURNMENT**

David Conner, County Attorney, recommended the Commission enter into an
executive session to discuss the general reputation and character, physical condition,
professional competence, or mental health of individuals, or, subject to the limitations
set out herein, to discuss the job performance of certain public employees, to discuss
with their attorney the legal ramifications of and legal options for pending litigation,
controversies not yet being litigated but imminently likely to be litigated or imminently
likely to be litigated if the governmental body pursues a proposed course of action
and to discuss the consideration the governmental body is willing to offer or accept
when considering the purchase, sale, exchange, lease, or market value of real
property.  Mr. Conner said he makes the oral declaration is appropriate for an

executive session.  It is anticipated the executive session will last approximately 15 minutes and if the Commissioners desire, they can adjourn the meeting from the executive session.

Motion by Commissioner BillieJo Underwood, seconded by Commissioner James E. Ball, to adjourn into an executive session at 1:33 p.m. for approximately 15 minutes, to discuss the general reputation and character, physical condition, professional competence, or mental health of individuals, or, subject to the limitations set out herein, to discuss the job performance of certain public employees, to discuss with their attorney the legal ramifications of and legal options for pending litigation, controversies not yet being litigated but imminently likely to be litigated or imminently likely to be litigated if the governmental body pursues a proposed course of action and to discuss the consideration the governmental body is willing to offer or accept when considering the purchase, sale, exchange, lease, or market value of real property.

The motion passed by the following vote:

| | | |
|---|---|---|
| **Aye:** | 4 - | James E. Ball, Joe Davis III, BillieJo Underwood, and Charles F. Gruber |
| **Nay:** | 0 | |
| **Absent:** | 0 | |
| **Abstain:** | 0 | |

Chairman Gruber said the October 15, 2019, Baldwin County Commission meeting will adjourn into an executive session at 1:33 pm.

```
8:56:05 AM  -                        - Docket No.: 1:20-cv-00057
                                       Judge: Judge William Cassady
                                       Plaintiff Attorney: John Yates, Kristopher
                                       Anderson,
                                       Plaintiff: Breezy Shores, LLC, Mike Bordelon
                                       Defense Attorney: Haley Lyckman, Jamie
                                       Frawley,
                                       Defendant: Baldwin County Commission
                                       District 4 Planning and Zoning Board of
                                       Adjustment, Baldwin County, AL, Vince
                                       Jackson
                                       Notes: Bench Trial - Day Three
8:56:05 AM  -                        - Start Recording
8:56:07 AM  - Judge Cassady         -
8:56:20 AM  - Yates -               - Objection by Frawley. Overruled.  Discussion
              Continuation of         between parties and Judge held.  Objection
              Bordelon Testimony      noted.  Deferred ruling until after all
                                      evidence have been presented.
9:28:47 AM  - Judge - Recessed      - Conform calculations
9:29:32 AM  -                        -
9:29:36 AM  -                        - Stop Recording
11:18:07 AM -                        - Start Recording
11:18:09 AM - Judge - Back from     -
              Break
11:19:31 AM - Investor              - Objections to calculations and responses.
              Calculations
11:31:34 AM - Loss value issues     -
11:39:51 AM - Anderson              - Response
11:43:40 AM - Judge                 - Will reserve rulings on objections until end
                                      of trial.
11:46:55 AM - Yates -               - Trial Exhibit 23 - Admitted (was introduced
              Continuation of         on 1/25/2022)
              Bordelon Testimony
12:00:21 PM - Frawley               - Cross
12:15:03 PM - Anderson              - Voir dire the witness
12:16:55 PM - Frawley -             - (Trial Exh 45)
              Continuation
12:32:54 PM - Recessed for Lunch    -
              Retur at 2:00 p.m.
12:33:17 PM -                        - Stop Recording
1:53:40 PM  -                        - Start Recording
1:53:41 PM  - Back after Lunch      -
              Break
1:53:59 PM  - Frawley               - Post-trial briefing issue
1:54:42 PM  - Frawley               - Continuation of cross.  Trial Exhibit 9;
                                      (Trial Exh 53) (Trial Exh 1) (Trial Exh 11)
                                      (Trial Exh 2)
3:34:24 PM  - Yates                 - Re-Direct
3:37:59 PM  - Witness excused       -
3:38:29 PM  - Frawley               -
3:39:04 PM  - Recessed              -
3:39:09 PM  -                        -
3:39:14 PM  -                        - Stop Recording
4:00:02 PM  -                        - Start Recording
4:00:03 PM  - Back from             -
              Afternoon Break -
              Judge
4:00:29 PM  - Anderson              - No additional witness - Plaintiff rests
4:00:52 PM  - Frawley               - Not calling any additional witnesses -
                                      Defendants
4:01:10 PM  - Judge Cassady         - Plaintiff to submit a brief that meets the
                                      elements of claims.  Defendant to submit a
                                      brief in response to the elements of claims
```

1

```
                                        and submit argument for those objections the
                                        Court held in abeyance.  A briefing period
                                        can be suggested once parties have obtain
                                        copies of transcript.
4:06:26 PM  - Anderson               - Declaratory and Injunctive relief
4:06:50 PM  - Judge                  -
4:07:14 PM  -                        -
4:07:21 PM  - Judge                  -
4:15:31 PM  - Concluded              -
4:15:38 PM  -                        - Stop Recording
```

J.

## EXHIBITS

(List exhibits numerically with a brief description of each exhibit. All exhibits shall be marked to correspond with the exhibit list. See Paragraph 4.J. of the Standing Order. Objections to any witnesses should also be set forth.)

Trial Exhibits

√ 1.    Building Permit (Plaintiff's Exhibit #1 to Vincent Jackson's Deposition Transcript)

√ 2.    Appeal of Administrative Decision, Addendum and Owner Authorization - **Defendants object only to the extent that this document does not constitute independent evidence of the veracity of the statements made therein.**

3.    Public Hearing Notice of Appeal by the Baldwin County Commission #4, Planning & Zoning Board of Adjustment

4.    Notice of Action, upholding administrative decision and denying Appeal

5.    Notice of Appeal filed December 16, 2019 with the Circuit Court for Baldwin County, Alabama - **Defendants object only to the extent that this document does not constitute independent evidence of the veracity of the statements made therein.**

6.    Land Use Certificate Application

7.    Land Use Certificate Application marked "Approved Revoked 7/31/19" (Defendants' Bates #0067-0068)

8.    Presentation of Claim Pursuant to Ala. Code §6-5-20 – **Defendants object on the grounds of relevance and hearsay.**

ID 9.    Declaration of Mike Bordelon (PageId#1745) – **Defendants object that this Declaration contains hearsay and is inappropriate because Bordelon is available to testify.**

10.    Sworn Declaration of Steve Jones – **Defendants object that this Declaration contains hearsay and is inappropriate because Jones is available to testify.**

√ 11.    Expert Witness Report of Frank Reed

12.    Baldwin County Ordinances, 18.1.1 and 18.2.5 (Exhibit #7 to Mike Bordelon's Deposition Transcript)

√ 13.    July 31, 2019 Letter to Steve Jones from Vince Jackson (Defendants' Bates #0069-0070) (Plaintiff's Exhibit #3 to Vincent Jackson's Deposition Transcript)

19

14. Photograph (Plaintiff's Exhibit #8 to Vincent Jackson's Deposition Transcript)

15. Baldwin County Planning & Zoning Department, Staff Report (Plaintiff's Exhibit #13 to Vincent Jackson's Deposition Transcript)

16. Text Amendments, Letters in Favor, and Letters in Opposition (Plaintiff's Exhibit #15 to Vincent Jackson's Deposition Transcript)

17. July 29, 2020 email from Mindy Smith to Eddie Harper (Plaintiff's Exhibit #16 to Vincent Jackson's Deposition Transcript)

18. Baldwin County Commission District 4. Board of Adjustment December 12, 2019 Regula Meeting Minutes (Exhibit #5 to Mike Bordelon's Deposition Transcript)

19. Plaintiffs' Most Recent Damage Disclosure – **Assuming that this Disclosure is the one dated May 21, 2021, Defendants object that this document is not authenticated and constitutes hearsay and further contains hearsay.**

20. Bordelon_00000001-6

21. Bordelon_00000077-78

22. Bordelon_00000089-91

23. Bordelon_00000097-98

24. Bordelon_00000106-108

25. Defendants' Bates # 8074-8077

26. Defendants' Bates # 8135-8136

27. Defendants' Bates # 8141-8154

28. Defendants' Bates # 8156-8159

29. Defendants' Bates # 8170-8176

30. Defendants' Bates # 8189-8190

31. Defendants' Bates # 8199

32. Defendants ESI_00000025-26

33. Defendants ESI_00000034-35 with text format

34. Defendants ESI_00000092-97

35. Defendants ESI_00000100-107

36. Defendants ESI_00000152 with text format

37. Defendants ESI_00000153-154

38. U.S. Fish and Wildlife Touhy Production ("FWS") FSW 0001-3

39. FSW 0005

40. FSW 0073-77

41. FWS 0080-83

42. Baldwin County Zoning Ordinance 18.4.2; 18.10 (version effective December 16, 2019) – **Defendants object because this exhibit has not been previously disclosed and is irrelevant.**

43. Baldwin County Zoning Ordinances (Exhibit A to Defendants' Motion for Summary Judgment)

44. 2017 Parking Ordinance Amendments (Exhibit B to Defendants' Motion for Summary Judgment)

45. 2019 Height Ordinance Amendments (Exhibit C to Defendants' Motion for Summary Judgment)

46. June 2019 Letter re: Determination on Parking Interpretation (Exhibit D to Defendants' Motion for Summary Judgment)

47. Pictures of Stop Work Order dated 7/31/19

48. Emails Requesting Lifting of Stop Work Orders (Exhibit F to Defendants' Motion for Summary Judgment)

49. Board of Adjustment Staff Report, Case No. AD-19002 (Def. Bates No. 22-54)

50. Examples of Other Variance Details (Exhibit M to Defendants' Motion for Summary Judgment)

51. Plaintiff's Bates No. 36

52. Plaintiff's Bates No. 65

53. Plaintiff's Bates No. 67-69

54. Plaintiff's Bates No. 72-73

55. Plaintiff's Bates No. 119-120

56. Plaintiff's Bates No. 121-125

57. Plaintiff's Bates No. 136

58. Plaintiff's Bates No. 141-172

59. Plaintiff's Bates No. 182-184

## K.

## ATTORNEYS

1. Attorneys with the firm of Clark Partington, counsel for Plaintiff:

a. Kristopher O. Anderson

b. Douglas A. Bates

c. Keith L. Bell, Jr.

d. Elizabeth C. Billhimer

e. Judson C. Brandt

f. Jeremy C. Branning

g. J. Troupe Brewer

h. Brut Campbell-Work

i. Scott M. Campbell

21

j.  Mark D. Davis
k.  William J. Dunaway
l.  Megan F. Fry
m.  Cameron Townes Gore
n.  Daniel E. Harrell
o.  Charles F. James, IV
p.  Alfred J. Lojo
q.  Glenn E. Lovett
r.  Ian S. Macdonald
s.  A. Alan Manning
t.  Bruce D. Partington
u.  Jason W. Peterson
v.  Mary Grace Rahm
w.  Scott A. Remington
x.  Michael J. Schofield
y.  Richard N. Sherrill
z.  Colin A. Sigler
aa.  Andrew M. Spencer
bb.  William D. Stokes
cc.  H. Lee Strayhan, III
dd.  Trevor A. Thompson

2.  Attorneys with the firm of Webb McNeil Walker PC, counsel for

Defendant:

a.  Jamie Helen Kidd Frawley
b.  Fred L. Clements, Jr.
c.  J. Mark Crowell
d.  Craig S. Dillard
e.  Haley E. Lyckman
f.  J. Randall McNeill
g.  Kendrick E. Webb
h.  Contance Caldwell Walker
i.  Joshua A. Willis

22

/s/   Jamie Helen Kidd Frawley
(*consent and approval provided* )
JAMIE HELEN KIDD FRAWLEY
AL Bar No. ASB-7661-M76H
WEBB MCNEILL WALKER P.C.
7475 Halcyon Pointe Drive (36117)
P.O. Box 240909
Montgomery, AL  36124
(334) 262-1850
jfrawley@wmwfirm.com
Attorney for Defendants

/s/ Kristopher O. Anderson
KRISTOPHER O. ANDERSON
AL Bar No.: AND112
JUDSON C. BRANDT
Alabama Bar No. BRA151
Clark Partington
4725 Main Street, Suite F-222
Orange Beach, Alabama 36561
(251) 245-8595
(251) 271-0445 facsimile
kanderson@clarkpartington.com
jbrandt@clarkpartington.com
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| MIKE BORDELON, and BREEZY SHORES, LLC, | * * * |
| Plaintiffs, | * * |
| vs. | * * |
| | * Case No. 1:20-cv-00057-C |
| BALDWIN COUNTY, ALABAMA; BALDWIN COUNTY COMMISSION DISTRICT 4 PLANNING AND ZONING BOARD OF ADJUSTMENT; and VINCE JACKSON | * * * * |
| | * * |
| Defendants. | * |

## PLAINTIFFS' EXPERT WITNESS SUMMARY

Plaintiffs, Mike Bordelon and Breezy Shores, LLC, by undersigned counsel, provide the following summary regarding the testimony expected from expert witness, Franklin Reed, MAI:

Mr. Reed opines the lost appreciation of Plaintiffs' completed project as originally planned to be $160,000.00. His full written report provides the basis for this opinion.

/s/ Kristopher O. Anderson
**KRISTOPHER O. ANDERSON**
AL Bar No.: AND112
**JUDSON C. BRANDT**
AL Bar No.: BRA151
CLARK PARTINGTON
4725 Main Street, Suite F-222
Orange Beach, Alabama 36561
(251)-225-4122

1

kanderson@clarkpartington.com
jbrandt@clarkpartington.com

# PROFESSIONAL QUALIFICATIONS



**FRANK L. REED, JR., MAI**
**Principal**
**Heron Valuation Group, LLC**

### OVERVIEW

Since 1997, Mr. Reed has been providing valuation and consulting services to a variety of clients including lending institutions, investors, property managers, as well as government institutions. Mr. Reed gained valuable experience through working for some of the world's largest financial and advisory firms, including PricewaterhouseCoopers and Cushman & Wakefield. In 2012, Mr. Reed formed Heron Valuation Group, providing professional services to his clients that are comparable and competitive with any large firm while having the flexibility and responsiveness of a small company.

Upon graduating from the University of Alabama with a real estate degree, Mr. Reed specialized in the appraisal of healthcare oriented properties with PricewaterhouseCoopers, LLP. Mr. Reed was recruited by Realty Services International (RSI), another national appraisal firm, and gained significant experience in appraising a multitude of commercial property types. At the time that RSI was acquired by CBRE, Mr. Reed was recruited by Cushman & Wakefield in 2003. Mr. Reed returned to his native Alabama and assisted Cushman & Wakefield in the establishment of the Alabama offices. In 2009, Mr. Reed was the founding partner of Salus Valuation Group, Inc. and later formed Heron Valuation Group, LLC in 2012.

### EXPERIENCE

Salus Valuation Group 2009 – 2012
Foley, Alabama
Founding Partner/ COO/ Executive Vice President

Cushman & Wakefield of Florida Valuation Advisory Services 2003 – 2009
Tampa, FL/ Birmingham, AL/ Gulf Shores, AL
Director

Realty Services International (RSI) 2001 – 2002
Tampa, Florida (Commercial Real Estate Valuation & Consulting)
Senior Appraiser

PricewaterhouseCoopers, LLP (Gulf/Atlantic Valuation Services, Inc.) 1998 – 2002
Sarasota, Florida (Healthcare & Retirement Real Estate Valuation & Market Studies)
Senior Appraiser

### SCOPE OF APPRAISAL EXPERIENCE

Appraisal experience consists of a wide variety of valuation and consulting assignments, including major income-producing commercial properties, industrial and special-use properties, residential subdivision development valuations, vacant tracts of land, litigation valuation assignments, and condemnation or eminent domain appraisal engagements.

# PROFESSIONAL QUALIFICATIONS



**FRANK L. REED, JR., MAI**
**Principal**
**Heron Valuation Group, LLC**

Specialized experience consists of valuation and consulting assignments focused in the healthcare industry. Performed over 1,000 healthcare appraisals nationally, including independent living, assisted living, and skilled nursing facilities. Experienced in providing HUD (LEAN) approved appraisals and market studies as well as other non-traditional appraisal formats (Fannie Mae (DUS) & Freddy Mac).

**EDUCATION**
The University of Alabama, Tuscaloosa, AL
DEGREE: Bachelor of Arts
MAJOR: Real Estate Finance; Minors – Economics, Spanish (1997)

**APPRAISAL EDUCATION**
Course 120, Appraisal Procedures
Course 310, Basic Capitalization
Course 410, Uniform Standards of Professional Appraisal Practice (USPAP)
Course 510, Advanced Income Capitalization
Course 520, Highest and Best Use and Market Analysis
Course 530, Advanced Sales Comparison & Cost Approaches
Course 540, Report Writing & Valuation Analysis
Course 550, Advance Applications
"The Appraiser as an Expert Witness" Preparation & Testimony (2016)
Case Studies in Complex Valuation (2016)
Condemnation Appraising: Principals & Applications (2017)
Subject Matter Expert Round Table (2017)
Compliance, Completeness, and Competency (2018)

Mr. Reed, MAI has completed continuing education courses and seminars sponsored by the Appraisal Institute and other real estate factions on an annual basis to maintain state licensing requirements.

**MEMBERSHIPS, LICENSES & PROFESSIONAL AFFILIATIONS**

Member of the Appraisal Institute (MAI)

State of Alabama Certified General Real Estate Appraiser, License No. G00633
State of Florida Certified-General Real Estate Appraiser, License No. RZ3624
State of Mississippi Certified General Real Estate Appraiser, License No. GA 993
State of Texas Certified General Real Estate Appraiser, License No. 1380006
State of Tennessee Certified General Real Estate Appraiser, License No. 4309
State of Louisiana Certified General Real Estate Appraiser, License No. 2175
State of Georgia Certified General Real Estate Appraiser, License No. CG328984
State of South Carolina Certified General Real Estate Appraiser, License No. 6809

## PROFESSIONAL QUALIFICATIONS



State of North Carolina Certified General Real Estate Appraiser, License No. A7454
State of Virginia Certified General Real Estate Appraiser, License No. 4001015506

Other LICENSES & PROFESSIONAL DESIGNATIONS
Licensed USCG Master Captain (MMC 453336)
Licensed Real Estate Salesperson- Alabama (58079-1)

PERSONAL AFFILIATIONS
Mobile Baykeeper- Board of Directors
St. Paul's Episcopal Church, Foley, Alabama- Vestry Member
Habitat for Humanity Baldwin County Board Member
Leadership Baldwin



# State of Alabama

This is to certify that

# Franklin Lamar Reed, Jr.

*having given satisfactory evidence of the necessary
qualifications required by the laws of the State of Alabama
is licensed to transact business in Alabama as a*

## Certified General Real Property Appraiser

*With all rights, privileges and obligations
appurtenant thereto.*

LICENSE NUMBER: **G00633**
EXPIRATION DATE: **09/30/2021**

*Lisa Brooks* Executive Director
ALABAMA REAL ESTATE APPRAISERS BOARD

### D.

### TRIAL TIME

It is estimated that this action will take three days to try. The Plaintiffs expect

to call 7-10 witnesses, and the Defendants expect to call 0-9 witnesses.

### E.

### TYPE OF TRIAL

### NON-JURY

### F.

### MOTIONS

1. There are no currently pending motions.  The Parties contemplate that
   they each will make motions for judgment as a matter of law during the
   trial pursuant to the Federal Rules of Civil Procedure.

### G.

### DEPOSITIONS

(List those portions of depositions to be used at trial. State any objections.
See Paragraph 4.G. of the Standing Order.)

The Parties agree that they do not anticipate any depositions to be used at
trial, other than for the purposes of impeachment.  The following depositions or
portions thereof may be used at trial only in the unlikely, unanticipated event of
any deponent's unavailability.  The Parties agree that they do not intend to waive
any objections to testimony that may be sought to be introduced via deposition
because of a deponent's unavailability.

1. Deposition Transcript of Vince Jackson taken December 29, 2021

15

2. Deposition Transcript of Michael R. Bordelon taken January 29, 2021

3. Deposition Transcript of Linda Lee taken January 27, 2021

4. Deposition Transcript of Crystal Bates taken January 27, 2021

5. Deposition Transcript of Wayne Dyess taken January 27, 2021

6. Deposition Transcript of Franklin Reed taken April 23, 2021

7. Deposition Transcript of Paul Stanton taken April 19, 2021

## H.

## WITNESSES

(List the name and address of each witness expected to testify at trial, including separate "will call" and "may call" lists for each party. All expert witnesses listed should be identified as such, and the additional information required by Paragraph 4.H. of the Standing Order should be provided. Objections to any witnesses, whether lay or expert, should also be set forth.)

1. Michael R. Bordelon, individually and
   as a member of Breezy Shores, LLC and
   Easy Breezy, LLC
   5855 Plantation Dr.
   St. Francisville, LA 70775

2. James S. Jones a/k/a Steve Jones
   23234 Carnoustie Dr.
   Foley, AL 36535

16

3.   Franklin Reed, MAI  (expert witness)
     Heron Valuation Group, LLC
     2305 East 2nd St.
     Gulf Shores, AL  36542
     See Professional Qualifications and Summary of Opinion attached

     **Defendants do not generally object to Mr. Reed testifying as an
     expert witness, nor do they object to the admissibility of his Report;
     however, they object to his expected opinion regarding the lost
     appreciation of the completed project as an inadmissible opinion
     on the ultimate issue and as being insufficiently supported.**

4.   Mark D. Pavey, A.I.A., Architect
     CDG Architecture
     P.O. Box 1365
     Gulf Shores, AL  36547

5.   Paul Stanton
     30082 D'Olive Ridge
     Spanish Fort, AL  36527

6.   Vince Jackson
     1011 Blackburn Ave.
     Bay Minette, AL  36507

7.   Wayne Dyess
     Baldwin County Administrator
     312 Courthouse Square, Suite 12
     Bay Minette, AL  36507

8.   Linda Lee
     201 E. Section Ave.
     Foley, AL  36535

9.   Crystal Bates
     22251 Palmer St.
     Robertsdale, AL  36567

17

10.      Daniel Prickett
           Prickett Vacation Rentals
           4098 Orange Beach Blvd.
           Orange Beach, AL 36561

11.      Commissioner James E. (Jeb) Ball
12.      Commissioner Joe Davis, III
13.      Commissioner Billie Jo Underwood
14.      Commissioner Charles F. (Skip) Gruber
           Baldwin County Administration Building
           312 Courthouse Square, Suite 12
           Bay Minette, AL 36507

15.      Baldwin County Planning and Zoning Director Matthew Brown
           22251 Palmer St.
           Robertsdale, AL 36567

## I.

## DAMAGES

### (See Paragraph 4.1. of Standing Order.)

Plaintiffs seek compensation including : (i) the cost of moving pilings from the Site - $3,000; (ii) the increased cost of building - $125,308.00; (iii) lost rental income in the amount of $13,779.65 per month since July 2020through the date of completion of the project; (iv) lost appreciation in the amount of $160,000; (v) the cost of a 2 story reconfiguration of $64,443, and (v) attorneys' fees and costs. Plaintiffs' future lost rental income will be computed at approximately $3,937.04 per month over the useful life of the project from completion (330 months) in the event that the Court awards monetary compensation but does not permit Plaintiff to resume construction of the project as a 3 story dwelling as originally planned. Defendants dispute that Plaintiffs are entitled to this type and amount of damages even if Plaintiffs prevail.

OPTOUT,SCHEDO

# U.S. District Court
## SOUTHERN DISTRICT OF ALABAMA (Mobile)
## CIVIL DOCKET FOR CASE #: 1:20-cv-00057-C
### Internal Use Only

Bordelon et al v. Baldwin County, AL et al
Assigned to: Magistrate Judge William E. Cassady
Cause: 42:1983 Civil Rights Act

Date Filed: 02/03/2020
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Mike Bordelon**                                   represented by **Kristopher O. Anderson**
                                                    Yates Anderson LLC
                                                    P.O. Box 73
                                                    Orange Beach, AL 36561
                                                    251-500-4853
                                                    Email: kris@yatesanderson.com
                                                    Email: kris@yatesanderson.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Bar Status: Active*

                                                    **John Parker Yates**
                                                    Yates Anderson
                                                    2320 Highland Ave. S.
                                                    Suite 290B
                                                    Birmingham, AL 35205
                                                    205-705-3144
                                                    Email: parker@yatesanderson.com
                                                    Email: parker@yatesanderson.com
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Bar Status: Not Readmit*

**Plaintiff**

**Breezy Shores, LLC**                              represented by **Kristopher O. Anderson**
                                                    (See above for address)
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Bar Status: Active*

                                                    **John Parker Yates**
                                                    (See above for address)
                                                    *ATTORNEY TO BE NOTICED*
                                                    *Bar Status: Not Readmit*

V.

**Defendant**

**Baldwin County, AL**

represented by **Jamie Helen Kidd Frawley**
Webb McNeill Walker PC
7475 Halcyon Pointe Drive
Montgomery, AL 36117
334-262-1850
Email: jfrawley@wmwfirm.com
Email: jfrawley@wmwfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Haley Lyckman**
Webb McNeill Walker PC
7475 Halcyon Pointe Drive
Montgomery, AL 36117
334-262-1850
Fax: 334-262-1889
Email: hlyckman@wmwfirm.com
Email: hlyckman@wmwfirm.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Defendant**

**Baldwin County Commission District 4**
**Planning and Zoning Board of**
**Adjustment**

represented by **Jamie Helen Kidd Frawley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Haley Lyckman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Defendant**

**Vince Jackson**

represented by **Jamie Helen Kidd Frawley**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

**Haley Lyckman**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Active*

Email All Attorneys

Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 02/03/2020 | 1 | NOTICE OF REMOVAL ( Filing fee $ 400, Receipt number BALSDC-2562831, Online Credit Card Payment), filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Vince Jackson, Baldwin County, AL. (Attachments: # 1 Exhibit A) (Kidd, Jamie) (Additional attachment(s) added on 2/4/2020: # 2 Civil Cover Sheet) (eec). (Entered: 02/03/2020) |
| 02/03/2020 | 🔒 | (Court only) Case assigned to Magistrate Judge William E. Cassady (eec) (Entered: 02/04/2020) |
| 02/04/2020 | 2 | Notice of Assignment to Magistrate Judge William E. Cassady for trial. (eec) (Entered: 02/04/2020) |
| 02/10/2020 | 3 | MOTION to Dismiss filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Kidd, Jamie) (Entered: 02/10/2020) |
| 02/10/2020 | 4 | Brief filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson re 3 MOTION to Dismiss filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Kidd, Jamie) (Entered: 02/10/2020) |
| 02/11/2020 | 5 | ENDORSED ORDER taking under advisement 3 Motion to Dismiss. Plaintiffs' response is due not later than 3/10/20. Any reply to the response must be filed not later than 3/17/20. Signed by Magistrate Judge William E. Cassady on 2/11/20. (Cassady, William) (Entered: 02/11/2020) |
| 02/11/2020 | 6 | PRELIMINARY SCHEDULING ORDER entered. Rule 26 Meeting Report due by 3/26/2020. Signed by Magistrate Judge William E. Cassady on 2/11/2020. (eec) (Entered: 02/11/2020) |
| 02/11/2020 | 🔒 | (Court only) Set/Reset Deadlines: Order on Motion to Dismiss, 5 Response to Motion due by 3/10/2020 Replies due by 3/17/2020. (eec) (Entered: 02/11/2020) |
| 03/09/2020 | 7 | Consent MOTION for Extension of Time to File Response/Reply as to 3 MOTION to Dismiss , 5 Order on Motion to Dismiss, filed by Mike Bordelon, Breezy Shores, LLC. (Anderson, Kristopher) (Entered: 03/09/2020) |
| 03/10/2020 | 8 | ENDORSED ORDER granting 7 Motion for Extension of Time to File Response/Reply re 3 MOTION to Dismiss . Responses due by 3/20/2020. Signed by Magistrate Judge William E. Cassady on 3/10/2020. (eec) (Entered: 03/10/2020) |
| 03/20/2020 | 9 | RESPONSE in Opposition re 3 MOTION to Dismiss filed by Mike Bordelon, Breezy Shores, LLC. (Attachments: # 1 Exhibit A - Docket) (Anderson, Kristopher) (Entered: 03/20/2020) |
| 03/26/2020 | 10 | Joint MOTION for Extension of Time filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, |

| | | Vince Jackson. (Kidd, Jamie) (Entered: 03/26/2020) |
|---|---|---|
| 03/26/2020 | 11 | Unopposed MOTION for Extension of Time filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Kidd, Jamie) (Entered: 03/26/2020) |
| 03/26/2020 | 12 | ENDORSED ORDER granting 10 Motion for Extension of Time; granting 11 Motion for Extension of Time. The dates suggested by the moving parties for these extensions are adopted and imposed. Signed by Magistrate Judge William E. Cassady on 3/26/20. (Cassady, William) (Entered: 03/26/2020) |
| 03/27/2020 | 🔒 | (Court only) Set/Reset Deadlines: Order on Motion for Extension of Time, 12 . Response to Motion due by 4/3/2020 Rule 26 Meeting Report due by 4/8/2020. (eec) (Entered: 03/27/2020) |
| 04/03/2020 | 13 | Unopposed MOTION for Extension of Time to File Response/Reply as to 12 Order on Motion for Extension of Time,,, filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Kidd, Jamie) (Entered: 04/03/2020) |
| 04/03/2020 | 14 | ENDORSED ORDER granting 13 Motion for Extension of Time to File Response/Reply Replies due by 4/10/2020.. Signed by Magistrate Judge William E. Cassady on 4/3/20. (Cassady, William) (Entered: 04/03/2020) |
| 04/06/2020 | 🔒 | (Court only) Set/Reset Deadlines: Motion to Dismiss 3 filed by Baldwin County, AL, Vince Jackson, Baldwin County Commission District 4 Planning and Zoning Board of Adjustment. Response to Motion due by 4/10/2020 (eec) (Entered: 04/06/2020) |
| 04/08/2020 | 15 | REPORT of Rule 26(f) Planning Meeting . (Anderson, Kristopher) (Entered: 04/08/2020) |
| 04/10/2020 | 16 | REPLY to Response to Motion 3 filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Kidd, Jamie) (Entered: 04/10/2020) |
| 05/15/2020 | 17 | Order re: 3 MOTION to Dismiss filed by Baldwin County, AL, Vince Jackson, Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, ( Motion Hearing, by telephone, set for 5/28/2020 02:00 PM before Magistrate Judge William E. Cassady.) To access the conference, the parties shall use the following numbers: CALL IN 877-336-1831 ACCESS CODE 8597056. Signed by Magistrate Judge William E. Cassady on 5/15/2020. (eec) (Entered: 05/15/2020) |
| 05/26/2020 | 18 | Order. Oral argument on Defendants' motion to dismiss, presently scheduled for May 28, 2020, is RESCHEDULED for Thursday, June 11, 2020 at 2:00 p.m. It shall be held by telephone conference on that date using the same call-in numbers previously provided. Signed by Magistrate Judge William E. Cassady on 5/26/20. (Cassady, William) (Entered: 05/26/2020) |
| 05/27/2020 | | Set/Reset Hearings: Motion Hearing (by telephone) set for 6/11/2020 02:00 PM before Magistrate Judge William E. Cassady. [See Doc. 18] (eec) (Entered: 05/27/2020) |

| | | |
|---|---|---|
| 06/11/2020 | | Minute Entry for proceedings held before Magistrate Judge William E. Cassady: Motion Hearing (by telephone) held on 6/11/2020 re 3 MOTION to Dismiss filed by Baldwin County, AL, Vince Jackson, Baldwin County Commission District 4 Planning and Zoning Board of Adjustment. DCR Digital Audio Recording. (clr) (Entered: 06/11/2020) |
| 06/11/2020 | 🔒 19 | (Court only) 🔊 RESTRICTED AUDIO FILE (30.8 MB) regarding Motion Hearing held on 6/11/2020 at 2:00 pm before Magistrate Judge William E. Cassady. 00:32:05. (clr) (Entered: 06/11/2020) |
| 06/11/2020 | 20 | Order. Defendants' Motion to Dismiss (Doc. 3) raises both jurisdictional and pleading issues with the current Complaint filed in state court. Since that Complaint was filed under state pleading rules prior to removal by the Defendants and the Court is now asked to consider the claims under federal pleading rules, it is necessary to have Plaintiffs replead pursuant to Rule 81(c)(2), Fed.R.Civ.P. The superseding Complaint should be filed not later than July 2, 2020. Once the replead Complaint is filed, Defendants may renew and supplement, if necessary, the pending motion to dismiss so long as the renewal of the motion occurs within 14 days of the filing of the new Complaint. Signed by Magistrate Judge William E. Cassady on 6/11/20. (Cassady, William) (Entered: 06/11/2020) |
| 06/12/2020 | 🔒 | (Court only) Set/Reset Deadlines: Order, 20 . Amended Pleadings due by 7/2/2020. (eec) (Entered: 06/12/2020) |
| 07/01/2020 | 21 | AMENDED COMPLAINT *(Second Amended Complaint)* against All Defendants, filed by All Plaintiffs. (Attachments: # 1 Exhibit A - Work Stop Order) (Anderson, Kristopher) (Entered: 07/01/2020) |
| 07/15/2020 | 22 | Unopposed MOTION for Extension of Time filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Kidd, Jamie) (Entered: 07/15/2020) |
| 07/15/2020 | 23 | ENDORSED ORDER granting 22 Motion for Extension of Time. Renewed motion to dismiss is due by 7/22/2020.. Signed by Magistrate Judge William E. Cassady on 7/15/20. (Cassady, William) (Entered: 07/15/2020) |
| 07/16/2020 | 🔒 | (Court only) Set/Reset Deadlines: Order on Motion for Extension of Time 23 Motions due by 7/22/2020. (eec) (Entered: 07/16/2020) |
| 07/22/2020 | 24 | MOTION to Dismiss filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Kidd, Jamie) (Entered: 07/22/2020) |
| 07/22/2020 | 25 | ANSWER to 21 Amended Complaint by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Kidd, Jamie) (Entered: 07/22/2020) |
| 07/22/2020 | 26 | ENDORSED ORDER finding as moot 3 Motion to Dismiss; taking under advisement 24 Motion to Dismiss. Defendants' first motion to dismiss (Doc. 3) is moot given the fact that Plaintiffs were required to replead their Complaint and Defendants were given an opportunity to file a second motion to dismiss (Doc. 24). Plaintiff shall respond to this renewed motion to dismiss not later than August 5, 2020. Defendants may reply to the response if it is filed not later than |

| | | August 12, 2020. Signed by Magistrate Judge William E. Cassady on 7/22/20. (Cassady, William) (Entered: 07/22/2020) |
|---|---|---|
| 07/22/2020 | 🔒 | (Court only) Set/Reset Deadlines: Order on Motion to Dismiss, 26 . Response to Motion due by 8/5/2020 Replies due by 8/12/2020. (eec) (Entered: 07/22/2020) |
| 08/05/2020 | 27 | RESPONSE in Opposition re 24 MOTION to Dismiss filed by Mike Bordelon, Breezy Shores, LLC. (Attachments: # 1 Exhibit 1 - Presentation of Claim) (Anderson, Kristopher) (Entered: 08/05/2020) |
| 08/12/2020 | 28 | REPLY to Response to Motion 24 filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Kidd, Jamie) (Entered: 08/12/2020) |
| 08/13/2020 | 29 | Order re: 24 MOTION to Dismiss filed by Baldwin County, AL, Vince Jackson, Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, ( Motion Hearing set for 8/27/2020 02:00 PM in US Courthouse, Courtroom 3A, 155 St. Joseph Street, Mobile, AL 36602 before Magistrate Judge William E. Cassady.). Signed by Magistrate Judge William E. Cassady on 8/13/2020. (eec) (Entered: 08/13/2020) |
| 08/20/2020 | 30 | Order re: 24 MOTION to Dismiss filed by Baldwin County, AL, Vince Jackson, Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, 29 Order, ( Motion Hearing, BY PHONE, set for 8/27/2020 02:00 PM before Magistrate Judge William E. Cassady.) To access the conference, the parties shall use the following numbers: CALL IN 877-873-8018 ACCESS CODE 3291819. Signed by Magistrate Judge William E. Cassady on 8/20/2020. (eec) (Entered: 08/20/2020) |
| 08/26/2020 | 31 | CONSENT to Jurisdiction by US Magistrate Judge by Mike Bordelon, Breezy Shores, LLC.. (Anderson, Kristopher) (Entered: 08/26/2020) |
| 08/27/2020 | | REFERRAL OF 31 Consent to Jurisdiction by US Magistrate Judge to Judge William H. Steele. (eec) (Entered: 08/27/2020) |
| 08/27/2020 | | Minute Entry for proceedings held before Magistrate Judge William E. Cassady: Motion Hearing held on 8/27/2020 re 24 MOTION to Dismiss filed by Baldwin County, AL, Vince Jackson, Baldwin County Commission District 4 Planning and Zoning Board of Adjustment. (Digital Court Recording; Courtroom 3B) (eec) (Entered: 08/27/2020) |
| 08/27/2020 | 🔒 32 | (Court only) 🔊 RESTRICTED AUDIO FILE (75.6 MB) regarding Motion Hearing, held on 08/27/2020 at 2:00 p.m. before Magistrate Judge William E. Cassady. 3:19:50 mins. (eec) (Entered: 08/27/2020) |
| 08/28/2020 | 33 | Order. Not later than September 11, 2020, the parties are to confer and file a supplemental Rule 26(f) Report. The parties are to specifically advise the court of any changes needed to the pretrial schedule suggested on April 8, 2020 (Doc. 15). Once this supplemental report if filed, a Rule 16 scheduling order shall be entered. Signed by Magistrate Judge William E. Cassady on 8/28/20. (Cassady, William) (Entered: 08/28/2020) |
| 08/31/2020 | 🔒 | (Court only) Set/Reset Deadlines: Order, 33 . Supplemental Rule 26 Meeting Report due by 9/11/2020. (eec) (Entered: 08/31/2020) |

| 09/11/2020 | 34 | Supplement to 15 Report of Rule 26(f) Planning Meeting *Supplemental Report*. (Anderson, Kristopher) (Entered: 09/11/2020) |
|---|---|---|
| 09/18/2020 | 35 | The Parties' Consent to Jurisdiction by a United States Magistrate Judge 31 is NOTED. It is hereby ORDERED that this case be referred to the United States Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. §636(c) and Fed.R.Civ.P. 73. (Steele, William) (Entered: 09/18/2020) |
| 02/23/2021 | 36 | Order, ( Status Conference, BY TELEPHONE, set for 3/3/2021 03:30 PM before Magistrate Judge William E. Cassady.) To access the conference, the parties shall use the following numbers: CALL IN 877-873-8018 ACCESS CODE 3291819. Signed by Magistrate Judge William E. Cassady on 2/23/2021. (eec) (Entered: 02/23/2021) |
| 03/03/2021 | 37 | Supplement to 15 Report of Rule 26(f) Planning Meeting *(Second)*. (Anderson, Kristopher) (Entered: 03/03/2021) |
| 03/03/2021 | | Minute Entry for proceedings held before Magistrate Judge William E. Cassady: Telephone Status Conference held on 3/3/2021. DCR Digital Audio Recording. (srd) (Entered: 03/03/2021) |
| 03/03/2021 | 🔒 38 | (Court only) 🔊 RESTRICTED AUDIO FILE (23.4 MB) regarding Status Conference held on 03/03/2021 before Magistrate Judge William E. Cassady. 00:25:00. (srd) (Entered: 03/03/2021) |
| 03/04/2021 | 39 | SCHEDULING ORDER: Pretrial Conference set for 9/9/2021 02:00 PM in US Courthouse, **Courtroom 5B**, 155 St. Joseph Street, Mobile, AL 36602 before Magistrate Judge William E. Cassady. This non-jury action will come on for trial in Mobile, Alabama during the month of October 2021, the specific dates to be set at the Final Pretrial Conference. The parties have estimated that this action will require two (2) trial days. Discovery cutoff 4/30/2021. Amended Pleadings due by 3/31/2021. Motions due by 5/14/2021. Position Regarding Settlement due by 4/30/2021. (See Order for Other Deadlines). Signed by Magistrate Judge William E. Cassady on 3/3/2021. (Attachments: # 1 Standing Pretrial Order) (eec)<br><br>**Pattern Jury Instruction Builder -** To access the latest, up to date changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. (Entered: 03/04/2021) |
| 05/13/2021 | 40 | Joint MOTION for Extension of Time *of Dispositive Motion Deadline* filed by All Defendants. (Frawley, Jamie) (Entered: 05/13/2021) |
| 05/18/2021 | 41 | ORDER granting 40 Motion for Extension of Time. It is so ordered. Signed by Magistrate Judge William E. Cassady on 5/18/21. (Cassady, William) (Entered: 05/18/2021) |
| 05/19/2021 | 🔒 | (Court only) Set/Reset Deadlines: Order on Motion for Extension of Time 41 Motions due by 5/21/2021. (eec) (Entered: 05/19/2021) |

| 05/19/2021 | 42 | Joint MOTION for Leave to File Excess Pages *(with regard to Motions for Summary Judgment)* filed by All Plaintiffs. (Anderson, Kristopher) (Entered: 05/19/2021) |
| 05/20/2021 | 43 | ENDORSED ORDER granting 42 Motion for Leave to File Excess Pages. The requested extension is authorized. Signed by Magistrate Judge William E. Cassady on 5/20/21. (Cassady, William) (Entered: 05/20/2021) |
| 05/21/2021 | 44 | Evidentiary Material *in Support of Plaintiffs' Motion for Partial Summary Judgment* filed by Mike Bordelon, Breezy Shores, LLC. (Anderson, Kristopher) (Entered: 05/21/2021) |
| 05/21/2021 | 45 | Evidentiary Material filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Vince Jackson, Baldwin County, AL. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M) (Frawley, Jamie) (Entered: 05/21/2021) |
| 05/21/2021 | 46 | Evidentiary Material *(Supplemental in Support of Plaintiffs' Motion for Partial Summary Judgment)* filed by Mike Bordelon, Breezy Shores, LLC re: 45 Evidentiary Material,. (Anderson, Kristopher) (Entered: 05/21/2021) |
| 05/21/2021 | 47 | MOTION for Partial Summary Judgment *and Memorandum in Support Thereof* filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Proposed Judgment) (Anderson, Kristopher) (Entered: 05/21/2021) |
| 05/21/2021 | 48 | MOTION for Summary Judgment filed by All Defendants. (Frawley, Jamie) (Entered: 05/21/2021) |
| 05/24/2021 | 49 | ENDORSED ORDER taking under advisement 47 Motion for Partial Summary Judgment; taking under advisement 48 Motion for Summary Judgment; finding as moot 24 Motion to Dismiss. Responses to the pending summary judgment motions are due no later than June 21, 2021. Replies to responses are authorized so long as they are filed not later than June 28, 2021. The partial motion to dismiss (Doc. 24) has been replaced by a supported motion for summary judgment as to all of Plaintiffs' claims. Signed by Magistrate Judge William E. Cassady on 5/24/21. (Cassady, William) (Entered: 05/24/2021) |
| 05/24/2021 | 🔒 | (Court only) Set/Reset Deadlines: Order on Motion for Summary Judgment, 49 Response to Motion due by 6/21/2021 Replies due by 6/28/2021. (eec) (Entered: 05/24/2021) |
| 06/21/2021 | 50 | Joint MOTION Leave to Exceed the Page Limit *for Responses in Opposition and Replies in Support of Motions for Summary Judgment* filed by All Plaintiffs. (Anderson, Kristopher) (Entered: 06/21/2021) |
| 06/21/2021 | 51 | Evidentiary Material *(Evidentiary Submission in Opposition to Defendants' Motion for Summary Judgment)* filed by Mike Bordelon, Breezy Shores, LLC. (Anderson, Kristopher) (Entered: 06/21/2021) |
| 06/21/2021 | 52 | RESPONSE in Opposition re 48 MOTION for Summary Judgment filed by Mike Bordelon, Breezy Shores, LLC. (Anderson, Kristopher) (Entered: 06/21/2021) |

| 06/21/2021 | 53 | RESPONSE in Opposition re 47 MOTION for Partial Summary Judgment *and Memorandum in Support Thereof* filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Frawley, Jamie) (Entered: 06/21/2021) |
|---|---|---|
| 06/28/2021 | 54 | REPLY to Response to Motion 47 filed by Mike Bordelon, Breezy Shores, LLC. (Anderson, Kristopher) (Entered: 06/28/2021) |
| 06/29/2021 | 55 | REPLY Brief filed by Defendants Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson re: 52 Response in Opposition to Motion filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Frawley, Jamie) (Entered: 06/29/2021) |
| 06/29/2021 | 56 | MOTION for Extension of Time to File Response/Reply as to 55 Reply Brief, *File Out of Time* filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Frawley, Jamie) (Entered: 06/29/2021) |
| 06/29/2021 | 57 | ENDORSED ORDER granting 56 Motion for Extension of Time to File Reply 55 Out of Time. Signed by Magistrate Judge William E. Cassady on 6/29/21. (Cassady, William) (Entered: 06/29/2021) |
| 08/18/2021 | 58 | Joint MOTION to Stay filed by All Defendants. (Frawley, Jamie) (Entered: 08/18/2021) |
| 08/19/2021 | 59 | ENDORSED ORDER granting 50 Motion to exceed page limitations.; granting 58 Motion to Stay. The Scheduling Order is temporarily stayed pending a ruling on the motions for summary judgment. Signed by Magistrate Judge William E. Cassady on 8/19/21. (Cassady, William) (Entered: 08/19/2021) |
| 09/23/2021 | 60 | ORDER denying 47 Motion for Partial Summary Judgment; granting in part and denying in part 48 Motion for Summary Judgment. (See Order for further rulings.). Signed by Magistrate Judge William E. Cassady on 9/23/2021. (eec) (Entered: 09/23/2021) |
| 09/23/2021 | 61 | Order, ( Telephone Conference to discuss setting new pretrial conference date is set for 10/4/2021 03:00 PM i Magistrate Judge William E. Cassady.) To access the conference, the parties shall use the following numbers: CALL IN 877-873-8018 ACCESS CODE 3291819. Signed by Magistrate Judge William E. Cassady on 9/23/2021. (eec) (Entered: 09/23/2021) |
| 10/04/2021 | | Minute Entry for proceedings held before Magistrate Judge William E. Cassady: Telephone Conference held on 10/4/2021. (Digital Court Recording; Courtroom 5B) (eec) (Entered: 10/04/2021) |
| 10/04/2021 | 62 | (Court only) RESTRICTED AUDIO FILE (1.5 MB) regarding Telephone Conference held on 10/04/2021 at 3:00 p.m. before Magistrate Judge William E. Cassady. 13 mins. (eec) (Entered: 10/04/2021) |
| 10/04/2021 | 63 | Order. The temporary stay entered on August 19, 2021 (Doc. 59) is lifted. The Scheduling Order (Doc. 39) is modified as follows: The final pretrial conference will be held on December 2, 2021 at 10:00 a.m., in Mobile, Alabama, in Courtroom 3A. The time for making pretrial disclosures shall be November 4, |

| | | |
|---|---|---|
| | | 2021. This non-jury action will come on for trial in January 2022 and will probably last for 2-3 days. Signed by Magistrate Judge William E. Cassady on 10/4/21. (Cassady, William) Modified on 10/4/2021 (eec). (Entered: 10/04/2021) |
| 10/04/2021 | 🔒 | (Court only) Set/Reset Hearings:( Pretrial Conference set for 12/2/2021 10:00 AM in US Courthouse, Courtroom 3A, 155 St. Joseph Street, Mobile, AL 36602 before Magistrate Judge William E. Cassady.), Set/Reset Deadlines: Order, 63 ( Pretrial Disclosures Due 11/4/2021.) (eec) (Entered: 10/04/2021) |
| 11/02/2021 | 64 | MOTION for Reconsideration re 60 Order on Motion for Partial Summary Judgment, Order on Motion for Summary Judgment , MOTION for Reconsideration of District Judge Order filed by All Plaintiffs. (Attachments: # 1 Exhibit 1 - Presentation of Claim) (Anderson, Kristopher) (Entered: 11/02/2021) |
| 11/03/2021 | 65 | ENDORSED ORDER taking under advisement 64 Motion for Reconsideration filed by Mike Bordelon, Breezy Shores, LLC. Defendants shall file a response not later than November 11, 2021. Signed by Magistrate Judge William E. Cassady on 11/3/21. (Cassady, William) (Entered: 11/03/2021) |
| 11/04/2021 | 🔒 | (Court only) Set/Reset Deadlines: Order on Motion for Reconsideration, Order on Motion for Reconsideration of District Judge Order, 65 Response to Motion due by 11/11/2021 (eec) (Entered: 11/04/2021) |
| 11/11/2021 | 66 | RESPONSE to 64 MOTION for Reconsideration re 60 Order on Motion for Partial Summary Judgment, Order on Motion for Summary Judgment MOTION for Reconsideration of District Judge Order filed by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Frawley, Jamie) (Entered: 11/11/2021) |
| 11/19/2021 | 67 | ENDORSED ORDER denying 64 Motion for Reconsideration. See generally the response filed by the Defendants on November 11, 2021 (Doc. 66).. Signed by Magistrate Judge William E. Cassady on 11/19/21. (Cassady, William) (Entered: 11/19/2021) |
| 11/24/2021 | 68 | PRETRIAL MEMORANDUM by Mike Bordelon, Breezy Shores, LLC. (Anderson, Kristopher) (Entered: 11/24/2021) |
| 12/02/2021 | | Minute Entry for proceedings held before Magistrate Judge William E. Cassady: Pretrial Conference held on 12/2/2021. Court Reporter Roy Isbell. (srd). (Entered: 12/02/2021) |
| 12/02/2021 | 🔒 69 | (Court only) 🔊 RESTRICTED AUDIO FILE (7.5 MB) regarding Pretrial Conference held on 12/02/2021 before Magistrate Judge William E. Cassady. 01:05:00. (srd) (Entered: 12/02/2021) |
| 12/06/2021 | 70 | AMENDED ANSWER to 21 Amended Complaint by Baldwin County Commission District 4 Planning and Zoning Board of Adjustment, Baldwin County, AL, Vince Jackson. (Frawley, Jamie) (Entered: 12/06/2021) |
| 12/17/2021 | 71 | PRETRIAL MEMORANDUM by Mike Bordelon, Breezy Shores, LLC. (Attachments: # 1 Exhibit 1 - Ordinance) (Anderson, Kristopher) (Entered: 12/17/2021) |

| 12/23/2021 | 72 | PRETRIAL ORDER Bench Trial set for 1/24/2022 09:00 AM in US Courthouse, Courtroom 3A, 155 St. Joseph Street, Mobile, AL 36602 before Magistrate Judge William E. Cassady. Motions due by 1/10/2022. Status Conference, by telephone, set for 1/18/2022 03:30 PM before Magistrate Judge William E. Cassady. To access the conference, the parties shall use the following numbers: CALL IN 877-873-8018 ACCESS CODE 3291819. See Order for additional deadlines. Signed by Magistrate Judge William E. Cassady on 12/23/2021. (eec) (Entered: 12/23/2021) |
|---|---|---|
| 01/13/2022 | 73 | NOTICE by Mike Bordelon, Breezy Shores, LLC *Notice of Change of Law Firm* (Anderson, Kristopher) (Entered: 01/13/2022) |
| 01/18/2022 | 74 | NOTICE of Appearance by Haley Lyckman on behalf of All Defendants (Lyckman, Haley) (Entered: 01/18/2022) |
| 01/18/2022 | | Minute Entry for proceedings held before Magistrate Judge William E. Cassady: Telephone Scheduling Conference held on 1/18/2022. DCR Digital Audio Recording. (srd) (Entered: 01/18/2022) |
| 01/18/2022 | 🔒 75 | (Court only) 🔊 RESTRICTED AUDIO FILE (2.4 MB) regarding Telephone Scheduling Conference held on 01/18/2022 before Magistrate Judge William E. Cassady. 00:20:00. (srd) (Entered: 01/18/2022) |
| 01/19/2022 | 76 | NOTICE of Appearance by John Parker Yates on behalf of Mike Bordelon, Breezy Shores, LLC (Yates, John) (Entered: 01/19/2022) |

## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| MIKE BORDELON, and BREEZY SHORES, LLC, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 1:20-cv-00057-C |
| | ) |
| BALDWIN COUNTY, ALABAMA; BALDWIN COUNTY COMMISSION DISTRICT 4 PLANNING AND ZONING BOARD OF ADJUSTMENT; and VINCE JACKSON | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## JOINT PRETRIAL DOCUMENT

### A.

### JURISDICTION AND PARTIES

The Parties agree that this Court has jurisdiction over the subject matter of this action except as to the claims stated herein and over the parties to this action, and this Court is the appropriate venue for this action. The parties agree that with respect to Plaintiffs' claims for relief against Vince Jackson in his official capacity, Matthew Brown should be substituted for Vince Jackson as the current official with the decision-making authority previously held by Vince Jackson. Beyond this

substitution, there is no dispute or controversy as to the correctness of the named
Defendants or the named Plaintiffs.

Although Defendants recognize that this Court ruled against them on the issue
at summary judgment, they maintain and do not waive their argument that this Court
does not have subject matter jurisdiction over the claims for negligence or
wantonness under Alabama law because these claims allow a degree of judicial
interference into official government legislative and administrative action that is not
permitted by the doctrine of separation of powers as expressed in the Alabama
Constitution of 1901.

## B.

## STATEMENT OF THE CASE

(See Paragraph 4.B. of Standing Order.)

Since February of 2018, Breezy Shores, LLC ("Breezy Shores") has owned a
beachfront parcel of land at 3450 A&B Ponce de Leon Court, Gulf Shores, Alabama
(the "Subject Property") in the unincorporated portion of Baldwin County, Alabama
known as Fort Morgan. The Subject Property was purchased with plans to develop
a duplex. Breezy Shores, LLC is partially owned by an investment trust belonging
to Mike Bordelon, who managed the development of the duplex project on the
Subject Property.

Development of real property in Fort Morgan is governed by the Baldwin
County Commission, and zoning matters there are governed by the Baldwin County
Zoning Ordinance. Different areas of Baldwin County fall within different Planning
Districts; Fort Morgan and the Subject Property lie within Planning District 25.

Generally, a residential development in Baldwin County requires at least two
permits: first, a land use certificate from the Baldwin County Planning & Zoning

2

Department (the "Zoning Department"), and second, a building permit from the Baldwin County Building Department (the "Building Department").

On March 19, 2019, Plaintiffs submitted a Land Use Certificate Application for their duplex project, containing the site plan for construction of the duplex, to the Baldwin County Planning Director Vince Jackson, and the Zoning Department which accepted the same on March 27, 2019.

After Plaintiffs submitted their initial Land Use Certificate Application, neighbors on the same street as the Subject Property, including Paul Stanton, began pleading with the Zoning Department to halt the project. At the same time, Linda Lee in the Zoning Department was working with Plaintiffs on their application. She advised Plaintiffs that additional parking spaces would be needed on their plan and that they would have to get a permit from the Alabama Department of Environmental Management ("ADEM") before their certificate could be issued.

On July 17, 2019, Plaintiffs submitted their ADEM permit to the Zoning Department and received a land use certificate for their duplex project on the Subject Property on July 17, 2019 (the "Land Use Certificate").

On July 23, 2019, the Building Department issued Building Permit #126349 (the "Building Permit") based upon Plaintiffs' architectural and engineering plans, and the existing Land Use Certificate. After receiving the Building Permit, Plaintiffs began construction on the Subject Property.

On July 31, 2019 at 9:15 a.m., a Baldwin County code enforcement officer posted a stop work notice on the Site ordering that Plaintiffs stop work immediately (the "Stop Work Order").

Jackson also drafted a letter to Plaintiffs' contractor, dated July 31, 2019, stating that Plaintiffs' Land Use Certificate was revoked.

Jackson took the position that Plaintiffs' Land Use Certificate had been erroneously issued on July 17, 2019 because the proposed stacked parking configuration did not comply with the Baldwin County Zoning Ordinance in light of 2017 amendments to the minimum parking requirements in Planning District 25. The Parking Ordinance provides in pertinent part: "Off-street parking spaces may not be located in a street or alley and must be connected with a street or alley by a driveway which affords unobstructed ingress and egress to each space."

3

Plaintiffs were informed that they would need to revise their site plan to provide non-stacked parking spaces, which required an additional incidental take permit from U.S. Fish and Wildlife. Plaintiffs applied for this permit by August 20, 2019, and received it on October 25, 2019

On October 15, 2019, the Baldwin County Commission enacted a new text amendment to the Zoning Ordinance that limited the amount of stories for residential construction in Planning District 25 to two. Plaintiffs were thereafter informed that they would not be allowed to construct a three-story duplex. Plaintiff Breezy Shore, LLC, appealed this decision to the Board of Adjustment, which denied their request for a variance.

Plaintiffs contend that Defendants' actions related to their secret Parking Ordinance re-interpretation, issuance of the Stop Work Order, purported revocation of the Land Use Certificate, and refusal to vacate those actions were negligent, reckless, violative of Plaintiffs' state-law vested rights, and took certain of Plaintiffs' property rights without providing just compensation.

Defendants contend that the original permit was issued in error because stacked parking configurations may not be used to meet the minimum parking requirements in Planning District 25 and was therefore void. Defendants further contend that no variance is warranted, and the limitation on the number of stories does not constitute a regulatory taking, particularly in light of the importance of the public safety concerns it reflects.

C.

## TRIABLE CLAIMS AND AFFIRMATIVE DEFENSES

**1.   Count 1 - Notice of Appeal**

   a.   LEGAL ELEMENTS (See Paragraph 4.C. 1. of Standing Order).

Plaintiff Breezy Shores, LLC, has appealed the Board of Adjustment's denial of its request for a variance from the story restriction that would allow it to construct a three-story duplex on the subject property.

The parties disagree to a limited extent on the elements necessary for Plaintiffs to prove to support a variance. Defendants contend the following:

4

A variance is appropriate when granting it is not contrary to the public interest and the literal enforcement of the provisions will result in an unnecessary hardship. Relevant factors to be considered include:

That the granting of the application is necessary for the preservation of a property right and not merely to serve as a convenience to the applicant or based solely upon economic loss;

That the granting of the variance will not unreasonably increase the congestion in public streets, or increase the danger of fire, or imperil the public safety, or in any other respect impair the health, safety, comfort, morals, or general welfare of the inhabitants of Baldwin County.

Baldwin County Zoning Ordinance 18.6 (Doc. 45-1, PageID.903).

Plaintiffs contend that the following elements apply:
The Court should grant a variance for Plaintiffs to construct their originally planned project if the granting of a variance is necessary for the preservation of a property right, and not merely to serve as a convenience to the applicant or based solely upon economic loss.

Baldwin County Zoning Ordinance 18.4.2; 18.10 (version effective December 16, 2019)

    b. AGREED FACTS (as to this legal claim). **The parties agree to stipulate to the following facts.**

    1. The Alabama Code Section 45-2-261 et seq. generally authorizes the institution of zoning in Baldwin County. Ala. Code § 45-2-261.02 (1975). The Baldwin County Planning and Zoning Commission has jurisdiction over all unincorporated areas of Baldwin County. Ala. Code § 45-2-261.03 (1975).

    2. A Master Plan must be maintained and up-to-date showing the physical development of the unincorporated areas of Baldwin County. § 45-2-261.03 (1975). The Master Plan shows the planning commission's recommendations for the use and development of the unincorporated areas of Baldwin County. *Id.*

3. The County Commission regulates and restricts the height, number of stories, and size of buildings or structures, the percentage of lots that may be occupied, the size of yards, court, and other open spaces, the density of population and the locations and use of buildings, structures and land for trade, industry, residences, or other purposed. § 45-2-261.04 (1975).

4. The County is divided into multiple Planning District. Zoning may not be instituted in any planning district until and unless an election is properly called for, and the measure passes. § 45-2-261.05 (1975).

5. The first step in building a structure in Planning District 3=25 is to obtain a Land use certificate and a building permit. A land certificate must be obtained from the Zoning Administrator prior to the commencement of development and issuance of any building permit. (Zoning Ordinance §18.2.1).

6. An application for the land use certificate must be sent to the Zoning Administrator so that he/she may decide that it applies with all applicable submission requirements (Zoning Ordinance §18.2.2).

7. Each application must have an accurate site plan drawn to scale to make sure that it complies with all applicable zoning ordinances. (Zoning Ordinance §18.2.3).

8. Once approved a land use certificate will be valid for the issuance of a building permit for 180 days. (Zoning Ordinance §18.2.4).

9. The Zoning Administrator can revoke a land use certificate issued if information on the application is false or misrepresented or after a documented warning has been issued the applicant has failed to comply with the requirements of these zoning ordinances. (Zoning Ordinance §18.2.5).

10. The applicant may appeal the denial of the land use certificate to the Board of Adjustments in writing within twenty (20) calendar days after the rejection of the application.

11. Once the land use certificate is issued, construction cannot begin until a building permit is issued.

12. The permit must state that the structure conforms in all aspects with the provisions of the zoning ordinances. (Zoning Ordinance §18.3).

13. Applications for building permits are made to the Building official. (Zoning Ordinance §18.3).

14. If a land use certificate is revoked during the building process, a stop work order will be issued. A stop work order is issued if there is any alleged violation of any provision of the Zoning Ordinance or is being maintained in a dangerous or unsafe manner. (Zoning Ordinance §21.4.1).

15. The Fort Morgan Planning and Zoning Advisory Committee's purpose is to make recommendations to the Baldwin County Planning and Zoning Commission concerning any proposed changes to zoning ordinances or regulations or the master plan, or variances related to the Fort Morgan Zoning District. Ala. Code § 45-2-261.62 (1975).

16. In September of 2017, an amendment was made to the Baldwin County Zoning Ordinance Section 2.3.25 Planning District 25. The previous minimum two (2) spaces per dwelling unit requirements for off-street parking were changed in Planning District 25 to increase the required number of off-street parking spaces per bedroom. (Zoning Ordinance §2.3.25.3(c)).

17. A "story" is defined as that portion of a building included between the surface of any floor and the surface of the next floor above it, or if there is no floor above it, then the space between such floor and the ceiling next above it. A "habitable story" is a story having its floor elevated at or above base flood elevation as determined from the flood insurance rate maps, regardless of the intended use of the story or its floor area. (Zoning Ordinance §22.2).

18. Throughout the Zoning Ordinance, height maximums are commonly express by two limitations: maximum feet and either a number of stories and/or habitable stories. These maximums vary in accordance with factors like the type of building, the zoning designation, the planning district, etc. – but regulation by habitable story or stories in general is by no means new or confined to Planning District 25. (Zoning Ordinance §2.3.24).

19. Section 20.2.2 provides that changes to conform with new ordinances are not required when there is a properly issued building permit, except that if actual construction has not begun under a permit properly issued before the adoption of these ordinances or amendments thereto, within 6 months of the date of issuance of the permit, said permit becomes invalid. (Zoning Ordinance §20.2.2).

20.    On March 19, 2019, Breezy Shores, LLC submitted its Land
       Use Certificate Application, containing the site plan for
       construction of the duplex, to the then Baldwin County
       Planning Director, Vince Jackson, and Baldwin County who
       accepted same on March 27, 2019 (the "Original Site Plan").
       *See* Vincent Jackson Dep. 17:23-18:5[1] (PageID.1628-1629); *see
       also* Defendants' Answer at ¶ 10 (PageID.176).

21.    As the planning director, Jackson was responsible for the
       administration and enforcement of the Baldwin County Zoning
       Ordinance. *See* Jackson Dep. 17:23-18:5 (PageID.1628-1629);
       *see also* Baldwin County Zoning Ordinance 18.1.1
       (PageID.293).

22.    After accepting Plaintiffs' land use certificate application, the
       application went to Baldwin County Planner, Linda Lee. *See*
       Linda Lee Dep. 16:12-20 (PageID.305).

23.    Thereafter, on July 17, 2019, Plaintiffs submitted their ADEM
       permit and were issued a land use certificate for the Site (the
       "Land Use Certificate"). *See* Jackson Dep. at 43:1-11
       (PageId377), *see also* Defendants' Answer at ¶ 13
       (PageID.176).

24.    On July 23, 2019, based on the Original Site Plan, Defendant
       Baldwin County issued Plaintiffs' Building Permit #126349
       (the "Building Permit"). *See* Defendants' Answer at ¶ 14
       (PageID.176).

25.    After being made aware that construction on the Site had
       commenced, and pilings were being installed, former Baldwin
       County Planning Director Vince Jackson instructed a code
       enforcement officer to go onto the Site and issue a stop work
       notice. *See* Jackson Dep. 50:4-19 (PageID.384).

26.    On July 31, 2019 at 9:15 a.m., the code enforcement officer
       posted the stop work notice on the Site ordering that Plaintiffs
       stop work immediately (the "Stop Work Order"). *Id.* at 51:8-17
       (PageID.385).

---

[1] Transcript excerpts referenced herein initially as "Deponent's First and Last Name
Dep. page:line(s)" and thereafter by "Deponent's Last Name Dep. page:line(s),"
along with any deposition exhibit referenced therein as "Deponent Name Dep. Ex.
___."

27. After issuing the Stop Work Order, Jackson drafted a letter to Plaintiffs' contractor, dated July 31, 2019, regarding the stop work order. *See* Jackson Dep. 45:13-21 (PageID.379).

28. Vince Jackson informed Plaintiffs that the issues would be resolved and construction could be resumed upon the submission of a revised site plan and new incidental take permit. *See* Bordelon Dep. at 87:22-89:16 (PageID.553-555); 120:19-122:8 (PageID.559-561); Jones Decl. ¶ 18 (PageID.288).

29. Specifically, in an August 1, 2019 email to Plaintiffs' contractor, Steve Jones, Jackson told Plaintiffs that they could resolve the stop work order issue by revising the plans to show that each space has an unobstructed ingress/egress. *See* Bordelon_00000001-6 (PageID.589-594); Jones Decl. ¶ 18 (PageID.288).

30. In the August 1, 2019 email, Jackson also provided four additional options for resolving the stop work order issue: request a variance from the parking requirements; "[a]ppeal the denial of the land use certificate to the Board of Adjustments, as stated in the letter"; "[a]sk for a staff determination pertaining to parking, which may also be appealed to the Board"; or reduce the number of bedrooms in the planned development, which would reduce the number of parking spaces needed. Bordelon_00000001-6 (PageID.589-594).

31. In an effort to expeditiously resolve the parking concerns and have the Stop Work Order lifted, Plaintiffs opted to revise their plans to show that each space had unobstructed ingress/egress as Jackson suggested. Plaintiffs revised the Original Site Plan and submitted a revised site plan to Baldwin County shortly thereafter. *See* Bordelon Dep. at 120:19-121:10 Bordelon_00000001-6 (PageID.589-594)559-560); *see also* Jackson Dep. Ex. 5 (PageID.1630-1634); Jones Decl. ¶20 (PageID.288); Bordelon_00000077-78 (PageID.595-596).

32. After submitting the revised site plan, Jackson informed Plaintiffs that construction could not resume until they submitted an approved incidental take permit from the United States Fish and Wildlife Service. Jones Decl. ¶21 (PageID.288); Bordelon_00000077-78 (PageID.595-596).

33. Plaintiffs applied for a revised incidental take permit from the United States Fish and Wildlife Service ("FWS") to reflect the

new parking configuration. *See* Bordelon Dep. 87:22-89:16 (PageID.553-555); *see also* Bordelon Dep. Ex. 5 (PageID.571-577).

34. In October 2019, Baldwin County Zoning Ordinance 2.3.25.3(e) was amended to provide that the "maximum height of single family and two family structures shall be limited to two (2) habitable stories" ("Two-Story Ordinance"). *See* Bordelon Dep. Ex. 7 (excerpt 2.3.25.3(e)) (PageID.579-580).

35. Another entity in which Mr. Bordelon held an interest, EZ Breezy, LLC, had previously developed a three-story duplex in Planning District 25, right next door to the Site ("Prior Property"). *See* Bordelon Dep. 21:20-22:6; 28:14-23 (PageID.348-349,550).

36. Members of the Fort Morgan Planning and Zoning Advisory Committee and Fort Morgan Civic Association took issue with the Prior Property. *See* Jackson Dep. 83:17-84:19 (PageID.417-418). They made complaints about the size and parking of the Prior Property to the Defendants. *Id.* at 110:12-111:12 (PageID.427-428). However, at the time the Prior Property was developed, it met the then-existing zoning requirements and the planning department could not do anything in response to the complaints. *Id.* at 110:12-111:3 (PageID.427-428).

37. Part of the rationale for enacting the Two-Story Ordinance was to prevent construction similar to that on Plaintiff Bordelon's Prior Property. *Id.* at 154:22-155:5 (PageID.449-450).

38. Plaintiffs received the new incidental take permit from FWS on October 25, 2019, and immediately forwarded it to Baldwin County. *See* Jackson Dep. Ex. 5 (PageID.1633-1634).

39. On November 5, 2019, Jackson informed Plaintiffs' counsel by email that the Stop Work Order could not be lifted because a "new issue had arisen" involving the enactment of the Two-Story Ordinance. *See* Jackson Dep. 13:14-19 (PageID.366); *see also* Jackson Dep. Ex. 5 (PageID.1632).

40. In addition, Jackson told Plaintiffs' counsel that when the Stop Work Order was issued, Plaintiffs' Land Use Certificate was "rescinded and denied," and as a result, there was no pending application at the time the Two-Story Ordinance was adopted. *Id.*

41. In his November 5, 2019 email, Jackson refused to lift the Stop Work Order and said Plaintiffs would have to either apply for a

new land use certificate with new site plans for construction no more than two stories, apply for a variance from the Two-Story Ordinance, or appeal his decision to the Board of Adjustment. *See* Defendants' Bates 8156 (PageID.625).

42.   Thereafter, Plaintiffs filed an appeal to the Baldwin County Board of Adjustment, which was subsequently denied. *See* AD-19003-NOA (PageID.268).

b.   DISPUTED FACTS

The key disputed facts amongst the Parties that pertain to this claim include the hardship(s) that would be imposed on Breezy Shores, LLC, if the variance is not granted, including the existence and extent of any damage to the property value, and whether allowing the construction of a three-story duplex would be detrimental to the public good.  As stipulated, the Parties agree to some extent regarding the process for the issuance of a stop work order, but maintain disagreements regarding the full extent of this process.

Defendant also disputes that Plaintiff failed to comply with the necessary administrative prerequisites because its original attempt to appeal did not correctly invoke the court's appellate jurisdiction.

## 2.   Count 2 - Declaratory Judgment

a.   LEGAL ELEMENTS (See Paragraph 4.C. 1. of Standing Order).

A bona fide justiciable controversy is the only element required for a declaratory judgment claim. *Creola Land Development, Inc. v. Bentbrooke Housing, L.L.C.,* 828 So.2d 285 (Ala. 2002).

A declaratory judgment is a form of relief; therefore, the legal elements of each claim on which a declaratory judgment is sought are stated in each applicable Count.

11

b.    AGREED FACTS. The parties re-incorporate and restate as if fully set forth herein the agreed facts applicable to Count 1 and agree to stipulate to stipulate to the same as applied to Count 2 of the Complaint.

c.    DISPUTED FACTS. The parties re-incorporate and restate as if fully set forth herein the disputed facts applicable to all other Counts.

## 3.    Count 6 - Just Compensation

a.    LEGAL ELEMENTS.

(1) a regulation that impedes the use of property;
(2) the landowner's right to retain its interest in the use of property outweighs the government's interest in adjusting rights for the public good, considering a complex of factors, which include:

(a) the economic impact of the regulation on the claimant;

(b) the extent to which the regulation has interfered with distinct investment-backed expectations; and

(c) the character of the governmental action.

*Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978); *Murr v. Wisconsin*, 137 S. Ct. 1933, 1947 (2017).

b.    AGREED FACTS. The parties re-incorporate and restate as if fully set forth herein the agreed facts applicable to Count 1 and agree to stipulate to stipulate to the same as applied to Count 6 of the Complaint.

c.    DISPUTED FACTS. The primary disputed facts as to this claim concern the character of the action, including the nature of the public good at stake, and the extent of the economic impact of the regulation.

## 4.    Count 7 – State Law Vested Rights.

a.    LEGAL ELEMENTS.

The Parties disagree regarding the legal elements of this claim. Plaintiffs state that the elements of this claim are as follows:

(1.)   the existence of a validly issued permit;
(2.)   good faith reliance by the developer on such permit; and
(3.)   one of the following: (a) a substantial change of position in relation to the land, (b) substantial expenditures, or (c) the assumption of substantial obligations.

*Greenbriar Vill., L.L.C. v. City of Mountain Brook,* 202 F. Supp. 2d 1279 (N.D. Ala. 2002); *Grayson v. City of Birmingham,* 173 So. 2d 67 (Ala. 1963); *Bingham v. City of Tuscaloosa,* 383 So. 2d 542, 544 (Ala. 1980); *Baker v. State Bd. of Health of Alabama*, 440 So.2d 1098 (Ala.Civ.App. 1983)

Defendants agree that the existence of a validly issued permit is a necessary element of this claim; however, they argue that the existence of vested rights also requires Plaintiff to show that such rights exist in equitable fairness given the totality of the circumstances. Detrimental reliance of the owner is one of the factors to be considered in this analysis, but Defendants maintain that it is not the only factor. The necessity for protecting and promoting the health, safety, morals, and general welfare of the public must also be considered. *Breland v. City of Fairhope,* No. 1180492, 2020 WL 7779223 (Ala. Dec. 31, 2020); *Grayson v. City of Birmingham*, 173 So.2d 67 (Ala. 1963).

b.   AGREED FACTS. The parties re-incorporate and restate as if fully set forth herein the agreed facts applicable to Count 1 and agree to stipulate to stipulate to the same as applied to Count 7 of the Complaint.

c.   DISPUTED FACTS. The parties re-incorporate and restate as if fully set forth herein the disputed facts applicable to Count 1. A key disputed fact as to this claim is whether the Land Use Certificate was validly issued or whether, at the time of issuance, it conflicted with the Zoning Ordinance.

## 5.   Count 9 – Negligence and Wantonness as to Baldwin County Defendants only

a.   LEGAL ELEMENTS OF NEGLIGENCE:

(1)   a duty to a foreseeable plaintiff;
(2)   a breach of that duty;

(3)    proximate causation; and

(4)    damage or injury.

*Taylor v. Smith*, 892 So.2d 887 (Ala. 2004); *Keeton v. Fayette County*, 558 So. 2d 884 (Ala. 1989); *Springer v. Jefferson County*, 595 So.2d 1381 (Ala. 1992).

ADDITIONAL ELEMENT OF WANTONNESS:

(1) defendant was reckless indifference to the consequences, when it intentionally either (a) committed a wrongful act or (b) omitted some known duty.

*Hilyer v. Fortier*, 227 So.3d 13, 22 (Ala. 2017) (internal citations and quotations omitted).

b.    AGREED FACTS. The parties re-incorporate and restate as if fully set forth herein the agreed facts applicable to Count 1 and agree to stipulate to the same as applied to Count 9 of the Complaint.

c.    DISPUTED FACTS. Primary issues of fact include whether the original plans comported with the Parking Ordinance, whether Jackson failed to properly communicate a change in policy regarding the Parking Ordinance, and whether the Stop Work Order was issued arbitrarily for improper reasons.

## 6.    Affirmative Defenses.

Defendant maintains its substantive immunity defense as to all claims brought under State law.   Substantive immunity is appropriate when a function is "so laden with the public interest as to outweigh an incidental duty that activity might create to an individual citizen." *Payne v. Shelby County Com'n*, 12 So.3d 71 (Ala. Civ. App. 2008).  The agreed facts and disputed facts as to this claim are the same as those relevant to Count 9.

14