**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

MIKE BORDELON and BREEZY : 
SHORES, LLC, 

        : 

        Plaintiffs, 

        : 

vs.                           CA 20-0057-C 

        : 

BALDWIN COUNTY, ALABAMA, et al., 

        : 

        Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter came on for a bench trial before the Court on January 24-26, 2022. Upon consideration of the statement of the case and agreed facts set forth by the parties in their final pretrial document, as amended (Doc. 68, PageID.1942-44 & 1945-51; *see also* Doc. 71 (joint supplement to joint pretrial document)), the testimony offered by the witnesses during the bench trial, and the exhibits admitted without objection (Doc. 80 (Plaintiffs' notice of filing trial exhibits admitted during the bench trial submission of additional trial exhibits); *see also* Docs. 84-1-84-26)), and all other relevant pleadings, the Court enters this final memorandum opinion and order pursuant to 28 U.S.C. § 636(c), Fed.R.Civ.P. 73, and S.D. Ala. GenLR 73(c) & (d).[1]

---

[1]      Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Doc. 31 ("An appeal from a judgment entered by a magistrate judge shall be taken directly to the United States court of appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court.")).

## FINDINGS OF FACT

**A.     Land Development in Baldwin County and Issuance of the Land Use Certificate and Building Permit.**

On or about February 6, 2018, plaintiff Breezy Shores, LLC,[2] purchased a lot on the Gulf of Mexico in the Fort Morgan area of Gulf Shores, Alabama, with plans to develop a duplex at that location (the "Site").[3] (*See* Doc. 79, PageID.3169).

Development of real property in Fort Morgan is governed by the Baldwin County Commission, and zoning matters are governed by the Baldwin County Zoning Ordinance. (*See* Doc. 84-18). Different areas of Baldwin County fall within different Planning Districts, with Fort Morgan and the Site lying within Planning District 25. (*See id.,* PageID.3593). Bordelon relied on his architect, Mark Pavey, to ensure that the site plans and designs conformed to the local ordinances. (Doc. 79, PageID.3173).

A residential development in Baldwin County generally requires at least two permits: first, a land use certificate from the Baldwin County Planning and Zoning Department (the "Zoning Department"), and second, a building permit from the Baldwin

---

[2]     Bordelon testified that he has incurred personal expenses "to deal with the trial[.]" (Doc. 80, PageID.3280). This testimony is consistent with Bordelon's earlier representations that he is personally responsible for the costs of litigating this action. (*Compare id. with* Doc. 60, PageID.1879, n.2, citing Doc. 51, PageID.1745 & 1747, ¶¶ 2, 9).

[3]     Breezy Shores, LLC is partially owned by an investment trust (that is, a self-directed IRA) belonging to Mike Bordelon (Doc. 79, PageID.3167; *see also* Doc. 80, PageID.3280 (Bordelon's testimony that he has no direct ownership in Breezy Shores; 50 percent is owned by his self-directed IRA and 50 percent by DLP1, a company owned by a friend)), who managed the development of the duplex project on the Site (*see* Doc. 79*,* PageID.3167-68). Bordelon explained at trial that the purpose of Breezy Shores was the purchase of property on which to build a short-term vacation rental property, "rent it out for a period of three to four years, and then . . . sell that property and then use the proceeds to try to work on another one." (*Id.,* PageID.3168).

County Building Department (the "Building Department").[4] (*See, e.g.,* Doc. 79, PageID.3107 (Plaintiffs' contractor/builder, Steve Jones, testified: "You got to have a building permit and a land use certificate. The land use certificate comes first and then the building permit."); *see id.,* PageID.3174 (Bordelon's testimony that Jones handled the land use certificate application)). In accordance with Section 18.2.1 of the Baldwin County Zoning Ordinance (the "Ordinance"), "[a] land use certificate shall be obtained from the Zoning Administrator prior to the commencement of development and issuance of any building permit including electrical, HVAC and plumbing permits." (Doc. 84-18, PageID.3751). This two-step process gives the Zoning Administrator an opportunity to inspect the property and the application to ensure compliance with the Ordinance prior to allowing the commencement of development of the property and thereby preventing any unnecessary expenses.  By the terms of the Ordinance, a land use certificate is valid for issuance of a building permit for up to 180 days after issuance. (*See id.,* PageID.3752, § 18.2.4 ("After that time a new land use certificate must be obtained."); see Doc. 78, PageID.2941-42 (Jackson's testimony regarding the contents of § 18.2.4, the former Baldwin County planning director testifying that Plaintiffs' 6-month period "kicked off" on March 27, 2019, when the planning and zoning department stamped the application as having been received[5])). A building permit is a mandatory prerequisite to

---

[4]     The zoning and planning department has no responsibilities with respect to building permits. (Doc. 78, PageID.2888).

[5]     However, this testimony by Jackson regarding § 18.2.4 of the Zoning Ordinance is wrong based on the contents of this section. The Court reads this section as "starting" the 180 days to obtain a building permit from the "issuance" of the land use certificate, not from the date of application for the land use certificate. To read this section in the manner suggested by Jackson would be at direct odds with the language in the section. Therefore, as the undersigned reads this section, Plaintiffs' land use certificate, which was approved and issued on July 21, (Continued)

a landowner commencing "the evacuation for or the construction of any building or other structures" in Baldwin County. (*See* Doc. 84-18, PageID.3753, § 18.3). A building permit includes "a statement that the plans, specifications and intended use of such structure in all respects conform with the provisions of these zoning ordinances." (*Id.*).

Plaintiffs submitted their original site plan[6] and land use certificate application to the Baldwin County Planning Director, Vince Jackson (Doc. 78, PageID.2890),[7] and the Zoning Department on March 19, 2019 (*see* Doc. 84-1, PageID.3326; *see also* Doc. 79, PageID.3107 (Steve Jones' testimony)); the site plan and application were reviewed and then accepted on March 27, 2019 (Doc. 84-1, PageID.3326*; see also* Doc. 78, PageID.2852 (Lee's confirming testimony); *id.,* PageID.2897 (Jackson's testimony); Doc. 79, PageID.3175 (Bordelon's testimony that the land use certificate application

_____

2019, was valid for issuance of a building permit for 180 days after that July 21, 2019 issuance (or until January 17, 2020).

[6]    "Each application for a land use certificate shall be accompanied by an accurate site plan drawn to scale showing: the actual shape, dimensions and size of the lot to be built upon, the size, shape, height, floor area and location of the buildings to be erected; dimensions and locations of existing buildings; width of front, side and rear yards; existing and proposed parking; ingress to and egress from the site; and such other information as may be reasonably requested to determine compliance with these zoning ordinances including but not limited to a landscaping plan, erosion control plan, stormwater management plan, and utilities plan." (Doc. 84-18, PageID.3752, § 18.2.3(b)).

[7]    In his capacity as Planning Director, Jackson was responsible for administration and enforcement of the Baldwin County Zoning Ordinance, including receiving applications for and issuing land use certificates. (*See* Doc. 84-18, PageID.3751, § 18.1.2 ("The Zoning Administrator is authorized and empowered to administer and enforce the provisions of these zoning ordinances to include receiving applications, inspecting sites, and issuing land use certificates for projects and uses and structures which are in conformance with the provisions of these zoning ordinances.")); *compare id. with* Doc. 78, PageID.2892 ("[P]rimarily, it was the administration and enforcement of the zoning ordinance, the administration and enforcement of the subdivision regulations[,] and the supervision of the planning and zoning staff.")). With respect to interpretation of the zoning ordinance, Jackson testified that "if there was ever a situation where there might be a question as to the meaning or the applicability of a particular provision of the zoning ordinance, . . . it was the job of the planning director to make those determinations." (*Id.*).

was submitted on March 19, 2019 and accepted on March 27, 2019)).[8] In doing so,

Plaintiffs adhered to the above-delineated published procedures in the Ordinance. Upon

review of Plaintiffs' land use certificate application, Baldwin County Planner Linda Lee[9]

notified them that they needed more parking spaces and that they were required to

obtain a permit from the Alabama Department of Environmental Management ("ADEM")

before the application could be granted. (Doc. 78, PageID.2852-53 (Lee's trial testimony

that she told the contractor, Steve Jones, that an ADEM permit was needed for

completion of the application and, as well, that the site plan needed to comply with the

local provisions for Planning District 25 relative to the number of parking spaces that

were required[10]); *see also* Doc. 84-14, PageID.3520-21 (Lee's April 2, 2019 email to

---

[8]      There is no dispute but that after plaintiffs submitted their application, neighbors
on the same street as the Site, including Paul Stanton (who owned property right across the
street from the Site), began lobbying the Zoning Department to halt the project. (*See* Doc. 84-
15, PageID.3532-33 (Paul Stanton emailed Lee on April 17, 2019, asking for the plans filed with
her office with respect to the Site and also seeking "all plans pertaining to our new Parking
Amendment for this property[,]" to which Lee responded approximately 5 hours later explaining
the brief "history" of the application to date, including that it had yet to be approved because the
ADEM permit had net been submitted, and, as well, that she had requested a parking plan that
included the size of the parking spaces based on the Zoning Ordinance requirements, which
she had not yet received; she attached to her email "copies of the application, the floor plans,
the elevations page and the parking plan submitted.")).

[9]      Lee has been a planner since September of 2012. (Doc. 78, PageID.2851).

[10]      The relevant 2017 amendment to the zoning ordinance directed solely to Planning
District 25, contained in Section 2.3.25.3(c), reads as follows:

         (c) Off-street Parking.

              As a supplement to Section 15.2, Parking Schedule, the following
         off-street parking requirements shall be applicable to single family dwellings and
         two-family dwellings:

                   1.   Up to Four (4) Bedrooms: Two (2) spaces per dwelling unit.
                   2.   Up to Six (6) bedrooms: Three (3) spaces per dwelling unit.

(Continued)

Steve Jones to which she attached the Local Provisions for Planning District 25,

inclusive of the provision addressing off-street parking); *see* Doc. 84-23, PageID.4030-

31 ("The Land Use Certificate was not approved at that time [in late March to early April,

2019] due to the absence of the required ADEM permit. The applicant for the property

owner was also informed that required parking spaces should be shown on the

submitted site plan.")).[11] Based upon Lee's feedback, plaintiffs revised their site plan to

add the requisite parking spaces. (*See, e.g.,* Doc. 78, PageID.2878-80 (Lee's testimony

regarding the revised plan being submitted on or about June 12, 2019); Doc. 79,

PageID.3177 (Bordelon's testimony that Pavey revised the site plan to add the requisite

parking spaces)).[12] After they did so, Baldwin County indicated that the ADEM permit

_____

> 3.  Seven (7) Bedrooms and more: Four (4) spaces per dwelling
>     unit, plus one (1) additional space per dwelling unit for every
>     bedroom over eight (8).

(Doc. 84-18, PageID.3591-92*; see also* Doc. 84-25, PageID.4066 ("The amendment which is
most pertinent to parking in Planning District 25 was approved on August 15, 2017. This was
where the Local Provisions for Planning District 25 were amended to require additional parking
spaces based on the number of bedrooms in single family and two-family dwellings. This
amendment was applicable to Planning District 25 only.")). It was based on this amendment that
Lee instructed Jones to show the parking spaces on the site plan.

[11]     It would have been unusual for the Baldwin Counting zoning and planning
department to deny a land use certificate outright because it was the department's policy to help
landowners meet all prerequisites to issuance of land use certificates. (*See, e.g.,* Doc. 78,
PageID.2843 (testimony of Bates)). Indeed, according to Vince Jackson, when Lee told
Plaintiffs' contractor, Steve Jones, that an ADEM permit and a more detailed parking plan was
needed, there was no expectation in the zoning and planning department that Plaintiffs would
have to reapply for a land use certificate and/or pay a new fee on submission of the requested
information. (Doc. 78, PageID.2898-99).

[12]     According to Steve Jones, this was the first occasion upon which he was
required to submit a parking plan (Doc. 79, PageID.3109-10) and he acknowledged that he did
not know how many parking spaces would be required to construct the duplex or that the
ordinance had changed to increase the number of parking spaces in 2017 (*id.*, PageID.3130;
*see also id.,* PageID.3131 (Jones admitted to being unaware that those changes were publicly
advertised for a number of weeks and are available online)). However, he credibly testified that
he submits applications/permits based on those he has submitted in the past that have been
(Continued)

was the only remaining impediment to issuance of a land use certificate for the Site. (*See id.*).[13]

On July 17, 2019, Plaintiffs submitted their ADEM permit to the Zoning Department and received a land use certificate for their duplex project on the Site that same day. (*See* Doc. 84-1, PageID.3327; Doc. 78, PageID.2837; Doc. 79, PageID.3112). Less than a week later, on July 23, 2019, the Building Department issued Building Permit #126349 for the Site based upon Plaintiffs' architectural and engineering plans and the existing Land Use Certificate. (*See* Doc. 84-1, PageID.3325; Doc. 79, PageID.3178 (Bordelon's testimony that the building permit was issued on July 23, 2019)).

After receiving the Building Permit, Plaintiffs immediately moved forward with development of the Site per the authorized plans. (Doc. 79, PageID.3112-13 (builder's testimony that construction on the project began shortly after receipt of the building permit on July 23, 2019); *see* Doc. 78, PageID.2902 (Jackson agreed that Plaintiffs did nothing wrong in starting to build their duplex, specifically by putting pilings in the ground)).[14] Indeed, Breezy Shores, through the builder, expended monies on building

---

approved and then will provide revisions as directed by the planning and zoning department. (*See id.,* PageID.3132).

[13]    Jones did not know he needed an ADEM permit until he was told by the planning and zoning department that it was an area that could have artifacts. (*See* Doc. 79, PageID.3129-30).

[14]    Steve Jones expected the project to take about a year to construct, with completion expected in July of 2020. (Doc. 79, PageID.3118). The builder's total planned expenses were $1.12 million (more specifically, $1,120,906.00); and with square feet of 8,089 total in the duplex (heating and cooling square footage), that would have been a total cost of $138.00 per square foot. (Doc. 79, PageID.3120 (total expenses divided by square footage renders $138.00 per square foot, actually $138.57)).

materials (principally pilings and windows) and labor, including that Jones' "piling guy got down there and . . . started installing pilings." (Doc. 79, PageID.3114; *but cf. id.,* PageID.3133-34 (Jones' testimony that if none of the costs listed on Trial Exhibit 53 were incurred between July 23, 2019 and July 31, 2019, they were not then incurred); Doc. 79, PageID.3178 (Bordelon's testimony that Plaintiffs spent $68,000 on materials for the project; most of the materials were purchased before the permits were issued but he believed some materials were purchased after Plaintiffs' receipt of the permits)). Jones did testify that $3,000.00 was expended in removing pilings from the Site after the stop-work notice was posted (Doc. 79, PageId.3135) and there were labor costs associated with installing the two pilings on the Site (*see id.*).[15]

**B.      The Stop Work Order and the Parking Ordinance.**

1.      *The City Revokes the Land Use Certificate Citing the Parking Ordinance.*

On July 31, 2019, at 9:15 a.m., a Baldwin County code enforcement officer in the planning and zoning department issued a Stop Work Notice and posted it on the Site, requiring plaintiffs to cease all efforts to improve the Site. (Doc. 84-21, PageID.4024 ("This construction is in violation of the following provisions: **Revoked Land Use Certificate by Baldwin County Planning Director**[.]")).[16] That same day, then-Baldwin

---

[15]      The expenditures included more than $14,000 for pilings for the foundation, and more than $28,000 for windows for the Site. (Doc. 84-24, PageID.4063 (showing expenses incurred from March 1, 2019 through June 20, 2019)). There was no testimony, however, that those materials could not be used during the ultimate construction of Breezy Shores.

[16]      The impetus for issuance of the Stop Work Order was that certain "citizens" (most notably, Paul Stanton) had observed the development activities on the Site and contacted county personnel, including Jackson, and that was the point at which the code enforcement officer was instructed to go to the Site to see what was happening and issue a stop work order. (Continued)

County Planning Director Jackson sent a letter to Plaintiffs' contractor, Steve Jones,

revoking the Land Use Certificate for the Site, same providing, in part, as follows:

> The purpose of this letter is to inform you that the approval granted for the above[-]referenced LU-190197 has been revoked, and the Land Use Certificate is hereby denied. The reason for this denial is based on a failure to meet off-street parking requirements as specified in Section 15.3.1 of the *Baldwin County Zoning Ordinance.* Specifically, two of the required spaces partially extend into the right-of-way of Ponce de Leon Court. In addition, the driveways, as shown on the site plan, do not provide unobstructed ingress and egress to each space.
>
> .      .      .
>
> Please provide a revised Land Use Certificate application and site plan which addresses the above listed requirements. Furthermore, and in accordance with Section 18.2.6 of the zoning ordinance, you may appeal the denial of the Land Use Certificate to the County Commission District No. 4 Board of Adjustment in writing within twenty (20) calendar days after the date of this notice.

(Doc. 84-4, PageID.3470).

The Zoning Ordinance, specifically § 18.2.5. outlines the following procedure for

revocation of a land use certificate: "The Zoning Administrator may revoke a land use

certificate issued in a case where there has been a false statement or misrepresentation

in the application or on the site plan for which the Certificate was issued or if after a

documented warning has been issued the applicant has failed to comply with the

requirements of these zoning ordinances. Revocation of a land use certificate shall also

cause suspension of the building permit until such time as in the judgment of the Zoning

Administrator, the applicant is in compliance with the requirements of these zoning

---

(*Compare* Doc. 84-9, PageID.3489 (July 30, 2019 email penned by Stanton and sent to Jackson) *with* Doc. 78, PageID.2903-07 (Jackson's testimony regarding Stanton's July 30, 2019 email and his response to Stanton's email); *see* Doc. 79, PageID.3180 (Bordelon's testimony that "all of this was driven by Paul Stanton and a couple of neighbors across the street from EZ Breezy and Breezy Shores.")).

ordinances." (Doc. 84-18, PageID.3752-53). Linda Lee testified that apart from this section of the zoning ordinance, she was not familiar with and did not know of any other authority affording the zoning administrator/planning director the right to revoke a land use certificate. (Doc. 78, PageID.2883). Jackson confirmed that there was no other provision of the zoning ordinance governing revocation of land use certificate applications. (Doc. 78, PageID.3012).

It is undisputed that the Stop Work Order and the July 31 letter was a surprise to plaintiffs. (*See* Doc. 79, PageID.3114-15 (Jones' testimony that he learned of the stop-work notice for the first time when his pilings installer called him and told him about it); *see also id.,* PageID.3179 (Bordelon's testimony that he had no idea, at the time, why Baldwin County decided to issue a stop work notice/order on the project)). At no point prior to those events had Baldwin County, Jackson, or anyone else alerted Plaintiffs that they were in jeopardy of losing their Land Use Certificate or that there were lingering parking issues related to the Site plan.  (*See* Doc. 78, PageID.2912 (Jackson's trial testimony); Doc. 79, PageID.3115 (Jones' testimony that the first time he heard that the Site's parking plan was stacked parking that did not allow proper ingress and egress was on or around July 31, 2019); *see id.,* PageID.3179). At no time during the Land Use Certificate application and approval process did Linda Lee inform plaintiffs that their proposed parking configuration would not be permitted at the Site; there was no communication from the planning and zoning department to Plaintiffs in this regard after their submission of the revised site plan on June 12, 2019. Nor did Jackson have any prior communications with plaintiffs about the matter or afford them any opportunity to take corrective action or to be heard on the contemplated revocation of the Land Use

Certificate before issuance of the Stop Work Order and the July 31 letter.  (*See* Doc. 78, PageID.2912 & 2919-20 (Jackson's testimony)). There was simply no advance communication, documentation or warning from Baldwin County or Jackson before these adverse actions were taken. (*See id.*).

Jackson testified that he did not revoke the Land Use Certificate but, instead, revoked the approval of the land use certificate and then denied the land use certificate (*see, e.g.,* Doc. 78, PageID.2938); however, while such language is contained in the letter, it simply cannot be gainsaid that what Jackson did was to revoke Plaintiffs' land use certificate, as reflected by Jackson's own testimony (Doc. 79, PageID.3062 (Jackson's admission that he revoked the land use certificate)), the face of the Stop Work Notice (Doc. 84-21, PageID.4024 ("This construction is in violation of the following provisions [of the zoning ordinance]: **Revoked Land Use Certificate by Baldwin County Planning Director**.")), and the recorded position of the Baldwin County Commission District 4, Board of Adjustment during its regular meeting on December 12, 2019 (*see* Doc. 84-5, PageID.3473-74 & 3476-77). Indeed, the meeting minutes even suggest that Jackson recognized that the Land Use Certificate was revoked. (*See id.,* PageID.3477 ("Mr. Danley asked when was the permit withdrawn? Mr. Jackson responded, July 31st. Mr. Danley stated so in essence they would have to reapply for a permit. Mr. Jackson responded there were two parts. There was the stop work order and the ***revocation*** of the Land Use Certificate. With the ***revocation*** of the Land Use Certificate, they did not have a pending Land Use Certificate or building permit.")) (emphasis supplied). Moreover, planning technician Crystal Bates testified that planning director Vince Jackson "denied and revoked" the land use certificate (Doc. 78,

PageID.2848) and that he otherwise had no ability to change or modify her decision for land use applications (*id.,* PageID.2849). As well, Lee testified that Jackson "revoked the land use[.]" (Doc. 78, PageID.2868).  Accordingly, it is determined that the undisputed evidence supports a conclusion that Jackson's action/letter on July 31, 2019 constituted a revocation of Plaintiffs' land use certificate.

2.   *"Stacked Parking" and the Parking Ordinance.*

The critical feature of plaintiffs' Site development plan culminating in issuance of the Stop Work Order was the "stacked parking" arrangement. "Stacked parking" describes a parking configuration that allows for two (or more) vehicles to be parked one in front of the other on an axis perpendicular to the roadway, such that when both spaces are filled, the vehicle closer to the roadway obstructs the ingress and egress to the roadway from the vehicle further from the roadway. This configuration implicates § 15.3.1 of the Ordinance (the "Parking Ordinance"), which provides that "[o]ff-street parking spaces . . . must be connected with a street or alley by a driveway which affords unobstructed ingress and egress to each space." (Doc. 84-18, PageID.3723).[17] Indeed, the July 31 letter specifically cited § 15.3.1 and the lack of unobstructed ingress and egress to each space as the reason for Jackson's decision to revoke the Land Use Certificate. (Doc. 84-4, PageID.3470).

The Parking Ordinance was not new, having been on the books since 2017. During that time, Baldwin County had never prohibited stacked parking configurations for residential properties within Planning District 25 (where plaintiffs' Site was located)

---

[17]     This section of the zoning ordinance, § 15.3.1, applies to the entirety of Baldwin County; it is not a section limited solely to Planning District 25. (Doc. 78, PageID.2943).

and had in fact approved plans containing such arrangements. (*See generally* Doc. 78,

PageID.2856-58 (Lee's trial testimony); *see also id.,* PageID.2954 ("[W]e knew that

there had [] been some [stacked parking] that had been approved in the past.")). In an

email to Jackson dated May 17, 2019, Lee indicated that § 15.3.1 "has never been used

to require parking plans for residential developments." (Doc. 84-13, PageID.3510; *see*

*also* Doc. 78, PageID.2856-57 (Lee's testimony that § 15.3.1 was "never used when we

were looking at residential parking[.] . . . [N]o one ever applied it that way.")). Jackson

responded to Lee, "You're right about section 15.3. I just believe it's intended for

situations which are different from what we are talking about here.[18]. . . I know we have

probably approved land uses down there with stacked parking. We can't just up and

decide to reverse course." (Doc. 84-13, PageID.3510; *see also* Doc. 78, PageID.2859

(Lee's trial testimony that she agreed with Jackson that the zoning department could not

"just up and decide to reverse course" with respect to its previous interpretation of §

15.3.1)). Lee replied, "I don't think we've required an actual parking plan. . . . I know I

ha[d] one recently where the applicant said they had 4 parking spaces under the house

(had to be stacked) and I approved it." (Doc. 84-13, PageID.3510; *see* Doc. 78,

PageID.2859-60 (Lee's testimony that at one time the zoning department just looked to

see whether "there was enough room for the number of [] parking spaces they said they

had" and, for instance, if they said the parking spaces were under the house, the zoning

department could tell there was enough room but only because they were stacked

under the house)). Thus, the record unambiguously reflects that Baldwin County had an

---

[18]    *See also* Doc. 78, PageID.2858 (Lee's testimony that it was the belief of everyone in the zoning department at that time that § 15.3.1 was intended for commercial parking lots and the like)).

established history of not construing § 15.3.1 to prohibit stacked parking configurations for residential developments (*cf.* Doc. 84-16, PageID.3539 (referencing the "new" interpretation for parking)),[19] and had routinely approved land uses that included such a feature (*see* Doc. 78, PageID.2954 ("[W]e knew that there had [] been some [stacked parking] that had been approved in the past."))). Yet Baldwin County shut down plaintiffs' development (after previously approving their Site plan) for having a stacked parking configuration. (*Compare* Doc. 84-4 *with* Doc. 84-21). Jackson admitted that this is the first time he can remember in his tenure as planning director (from 2011 to 2020) where a determination/change in interpretation of a zoning ordinance caused the revocation of a land use certificate. (Doc. 78, PageID.2959).

What changed between March 2019 (when plaintiffs submitted their Land Use Certificate application with stacked parking arrangement, with no objection or request for revision by Baldwin County) and July 31, 2019 (revocation of Land Use Certificate because of stacked parking arrangement) was that Baldwin County and Jackson, in particular, came under pressure from members of the community to adopt a new interpretation of the Parking Ordinance that would prohibit plaintiffs' planned Site development. (*See* Doc. 78, PageID.2949; *see id.,* PageID.2960 (Jackson testified that Stanton had frequently complained to him and his staff about the EZ Breezy duplex development Plaintiff Bordelon was involved with and, further, that Stanton wanted to prevent the Breezy Shores property from being similarly developed)). In particular, on

---

[19]     Jackson could not specifically recall whether stacked parking had ever been banned by the planning and zoning department in Baldwin County before Breezy Shores (Doc. 78, PageID.2946) but he was certainly unaware of any land use certificate applications, within the thousands he had seen in his tenure, that were turned down for stacked parking (*id.,* PageID.2947).

May 17, 2019, Paul Stanton, a neighboring landowner, who was also a member of the

Fort Morgan Civic Association, sent a series of emails to Lee and Jackson floating the

notion that stacked parking spaces at the Site should be deemed a violation of § 15.3.1.

(*See, e.g.,* Doc. 84-11, PageID.3504; *compare id. with* Doc. 78, PageID.2855 (Lee's

trial testimony that Stanton was expressing his opinion regarding how Section 15.3.1

ought to be interpreted in his emails on May 17, 2019); *id.,* PageID.2950 (Jackson's

testimony that Stanton was advocating for a new interpretation of the parking

ordinance)). Lee's initial reaction was to reject Stanton's interpretation, notifying him

that, "[a]s to Section 15.3.1, it is staff's opinion that the language pertaining to

'unobstructed ingress and egress' refers to a more traditional parking lot found in

commercial settings. . . . [S]tacked parking is not addressed in the parking standards for

Planning District 25." (Doc. 84-11, PageID.3503; *see also* Doc. 78, PageID.2855-56

(same established through the trial testimony of Lee)).[20] Stanton immediately replied

with a follow-up email stating, "I respectfully disagree with this determination. . . . **I**

**respectfully request [] a determination by the Zoning Administrator which is**

**appealable**. . . . I do believe an error has been made in the interpretation of the parking

rules." (Doc. 84-14, PageID.3517). Lee's reaction to Stanton's "barrage of emails" was

that Stanton was "trying to catch us in some kind of trap." (Doc. 84-13, PageID.3510;

*see also* Doc. 78, PageID.2858). Ultimately, Jackson effectively put an end to the May

---

[20] Lee concluded this email with "We are aware that it is an issue and it may be addressed in a text amendment[]" to the zoning ordinance at some point (Doc. 84-11, PageID.3503) because the zoning and planning department was aware of the issue with parking in Planning District 25, specifically, with people blocking the right of way, and wanted Stanton to know that the issue could be addressed in a future text amendment (*see* Doc. 78, PageID.2857).

15

17 email exchange by informing Stanton that no land use certificate or building permit had yet been issued for the Site, and that no final determination had been made as to the proposed duplex's compliance or noncompliance. (Doc. 84-11, PageID.3501).[21] Jackson's email to Stanton made no mention of the Parking Ordinance or Stanton's novel proposed interpretation of it to prohibit stacked parking configurations at residential developments going forward. (*See id.*).

On June 20, 2019 and June 24, 2019, Stanton again contacted Jackson about the Site, demanding "**an official determination regarding whether or not Stacked Parking complies with the requirement in Section 15.3 regarding unobstructed ingress and egress of each parking space to the street."** (*See, e.g.,* Doc. 84-11, PageID.3497-98) (emphasis in original).[22] Jackson responded on June 26, 2019, that he wanted to speak with Stanton in person or by telephone, explaining, "I think you will be pleased[.]" (*See* Doc. 84-15, PageID.3526). And while Stanton emailed Jackson later that afternoon stating a desire to meet with Jackson the following afternoon (*id.*), it is clear from Jackson's trial testimony that he did not meet Stanton in person (Doc. 78, PageID.2964 ("[W]e never did have a meeting.")) or speak to him on the phone (*see id.,* PageID.2981).  Nevertheless, by July 3, 2019, Jackson had prepared a draft letter

---

[21]     Lee testified that Jackson's email to Stanton (which she and others also received) and his specific statement that the land use certificate was denied on April 1, 2019, was correct in the sense that it was incomplete but not a denial in the sense that Plaintiffs would have to reapply or pay another fee. (Doc. 78, PageID.2864-65; *see also id.,* PageID.2961 (similar testimony from Jackson)).

[22]     It is apparent that Stanton was opposed to Plaintiffs' construction on the Site, at least in part because he had a website advertising access to the beach through Plaintiffs' lot. (Doc. 79, PageID.3184 (Bordelon's testimony); *see also id.,* PageID.3185 ("[Stanton] even had a large arrow drawn on his website saying enter the beach here, the arrow pointed right in the middle of our empty lot, which was the Breezy Shores lot.")).

construing the Parking Ordinance, which he forwarded to Stanton with a note reading:

"When you have a chance, please review the attached letter, and let me know if this is

what you are looking for in terms of an interpretation. I'll ask Wayne to review it as well."

(Doc. 84-10, PageID.3493; *see also* Doc. 84-12, PageID.3509 (Jackson also sent the

draft letter to Dyess on July 3); *see id.*  (Dyess' response that the letter looked good to

him, but that Jackson needed to be prepared to debate the meaning of "unobstructed");

*see* Doc. 78, PageID.2971 (Jackson's testimony that he wanted to make sure with

Stanton that the contents of the July 3 letter would suffice Stanton's request for a formal

determination)). Jackson sent a follow-up email to Stanton on July 8, 2019: "This is a

follow-up to see if you have any comments or questions on the attached determination

letter." (Doc. 84-10, PageID.3493)[23] Stanton replied less than two hours later, "Thanks

Vince. This is great." (Doc. 84-10, PageID.3493). In that July 3 letter (which was

addressed to Stanton), Jackson wrote the following:

> After careful consideration, it is my determination, as Zoning
> Administrator, that Section 15.3.1 does in fact prohibit stacked parking
> spaces in a manner which would potentially obstruct ingress and egress to
> each space. This determination is specific to the supplemental parking
> requirements which are found in the Local Provisions for Planning District
> 25, and which are applicable to single-family and two-family properties
> (Section 2.3.25.3(c)).[24]

---

[23]     Despite this follow-up email to Stanton, Jackson's testimony made it clear that
the determination set forth in the July 3 "draft" letter was, in fact, final. (Doc. 78, PageID.2974).

[24]     According to Jackson, his determination was not specific to Planning District 25
(Doc. 78, PageID.2948 ("It applies everywhere.")), but, as well, admitted that this parking issue
is not one that would arise in every planning district because "the additional parking
requirements in Planning District 25 make it more pertinent to Planning District 25." (*Id.* ("[I]t's
very unlikely that that issue would come up somewhere else.")). He later admitted that when the
determination was made, the "focus [at] that point was Planning District 25." (*Id.,* PageID.2968).
Indeed, it is clear to the Court that the focus of the July 3 determination was, more pointedly,
Plaintiffs' Breezy Shores site.

(Doc. 84-20, PageID.4023). Jackson did not inform anyone other than Linda Lee and Wayne Dyess, the County Administrator,[25] of this policy change. (Doc. 78, PageID.2898 (Jackson's testimony that Bates was unaware of "intervening things" from Plaintiffs' initial application to Bates' July 2019 approval of the application); *see also* Doc. 79, PageID.3061 (Jackson's admission that word did not get out to all of his staff members); Doc. 78*, PageID.2964-65 (the policy change was not emailed to the county commissioners, though Lee knew about it)).[26] There was no public announcement (*see id.,* PageID.2965 (the policy change was not published on the zoning and planning department's website)) and no amendments or revisions to the Parking Ordinance itself were made (*see* Doc. 78, PageID.2980 (defense counsel's admission that the determination was never published)). And certainly, Mike Bordelon and Steve Jones were not notified of the policy change when the determination was made by Jackson on

---

[25]   Dyess, County Administrator of the Baldwin County Commission (Doc. 79, PageID.3081), testified that Jackson had the authority to make this determination/interpretation, which was an official interpretation of the zoning ordinance, and appealable to the Board of Adjustment. (*See* Doc. 79, PageID.3082). According to Jackson, he spoke to Dyess before he made the determination and, as well, ***may have*** consulted a book published by the American Planning Association on parking, other zoning ordinances, and internet searches on parking lot requirements/designs. (Doc. 78, PageID.2955-56).

[26]   Indeed, there can be little question but that Jackson's failure in communicating with the zoning staff in general and particularly with respect to this change in policy, led to Jackson being counseled by Dyess. (*Compare* Doc. 78, PageID.2927 (Jackson's testimony that in January of 2020, he was counseled in writing, not formally reprimanded, by his boss, Wayne Dyess, for not holding monthly staff meetings, with Dyess specifically indicating that the issues at the Site subject to this lawsuit could have been avoided had such meetings been held) *with* Doc. 79, PageID.3083 (Dyess' admissions that he counseled Jackson about failing to communicate with staff and immediately after this incident counseled him that monthly staff meetings could have headed the issue off); and *id.,* PageID.3084 ("'A lack of communication was brought to light in a Fort Morgan issue regarding the administrative interpretation that was not conveyed to all staff members.'")), and, ultimately, to his demotion (*see* Doc. 79, PageID.3089 (though Jackson's demotion in September of 2020 was voluntary, one of the factors leading to that demotion involved shortcomings in communication)) and resignation.

July 3, 2019. (Doc. 78, PageID.2966; *see also* Doc. 79, PageID.3115 (Jones' testimony that he did not know about stacked parking until July 31, or thereabouts)). And while Jackson testified that Stanton could have appealed this determination in early July, Bordelon and Jones admittedly could not because they did not know about the determination in early July (Doc. 78, PageID.2969-70) and, of course, then received their land use certificate application approval on July 19, 2019.

As noted, Baldwin County approved plaintiffs' Land Use Certificate (including site plan with a stacked parking configuration)[27] on July 19, 2019, more than two weeks after Jackson's letter to Stanton adopting the new interpretation (albeit unpublished and uncirculated even amongst zoning staff) of the Parking Ordinance. (*See* Doc. 78, PageID.2837). The employee who approved it, Crystal Bates,[28] testified that when she

---

[27]    Bordelon relied on Mark Pavey, his architect, to look at the zoning ordinances and draft the site plans in accordance with what Pavey understood the ordinances to require. (Doc. 80, PageID.3264 (responding to a question asking when he started developing Breezy Shores whether he knew the parking ordinance had changed to require more spaces); *see also id.,* PageID.3276-77 (Bordelon's testimony that prior to March of 2019 he absolutely never personally read the Baldwin County Zoning Ordinance)).

[28]    Bates was and is a planning technician with the Baldwin County Planning and Zoning Department and since her late-2015 hiring date has principally reviewed and approved land use certificate applications, along with zoning verifications. (*See* Doc. 78, PageID.2835-36). At the time she approved the subject land use certificate, she unquestionably had the authority to approve it. (Doc. 78, PageID.2840). Linda Lee testified that it was within Bates' powers and responsibilities in her position as planning technician to review and approve Plaintiffs' land use certificates. (Doc. 78, PageID.2870; *see also id.,* PageID.2887 ("Planning techs issue land use certificates for residential."); *id.,* PageID.2899 (Jackson's testimony that Bates' authority included reviewing and approving land use certificate applications); Doc. 79, PageID.3060-61 (Jackson's  admission that when he delegated authority in his office, it was delegated, and that any action taken by a subordinate pursuant to that delegation binds the planning and zoning director and, as well, binds Baldwin County). Moreover, as explained by Lee, once Bates approved and issued the land use certificate, her decision was/is not reviewed by anyone else, and that approval empowered (or empowers) the landowner to get a building permit. (Doc. 78, PageID.2888; *see also* Doc. 79, PageID.3060-61)). For his part, Jackson explained that a properly approved land use certificate is a "land use certificate where you have approval" (Doc. 79, PageID.3074), which certainly describes Bates' actions vis-à-vis Plaintiffs' application.

did so, stacked parking configurations at residential properties were permitted in Planning District 25. (Doc. 78, PageID.2837; *see id.,* PageID.2846 (Bates' testimony that the subject land use application was subject to a full residential review for Fort Morgan, which included "site plan for parking, building plans showing the elevations, U.S. Fish and Wildlife permits, ADEM permit, and of course sewer, water, and driveway.")). And that Bates made no mistakes in approving the Land Use Certificate (inclusive of the site plan) is apparent from the trial testimony (*see id.; compare id. with id.,* PageID.2901 (Jackson's testimony that in granting approval, Bates did nothing wrong, and that Steve Jones did nothing wrong in taking the modified plan and ADEM certificate to the planning and zoning department)); *see id.,* PageID.2840 (Bates' testimony that she was not reprimanded because of her approval of the land use certificate)), including that of former Zoning Administrator Jackson (*id.,* PageID.2900-01 (Jackson's testimony that Bates was not reprimanded and that in granting approval of Plaintiffs' application she did nothing wrong because she was unaware of the interpretation regarding parking)), since Jackson's policy change to the Parking Ordinance was never communicated to Bates or any other member of the staff, with the exception of Lee  (Doc. 78, PageID.2898 & 2900-01 (Jackson's testimony that Bates did not know about "intervening things," inclusive of the interpretation regarding parking)).

The impetus for the Stop Work Order and the July 31 letter was (once again) correspondence from Stanton.[29] In an email dated July 30, 2019, Stanton notified

---

[29]     Certainly, Jackson did not keep abreast of the status of the land use application of the Plaintiffs, though he certainly could have (Doc. 78, PageID.2933); instead, Jackson was unaware Plaintiffs' land use application had been approved until he received the email from Stanton on July 30, 2019, advising that pilings were going into the ground (*see id.*).

Jackson that pilings were being driven and construction had begun at the Site. Stanton stated, "If this has NOT been approved, Construction and Pyle [sic] driving should stop immediately tomorrow morning (7/31/19.)." (Doc. 84-9, PageID.3489; *see also* Doc. 78, PageID.2903-04 (Jackson's trial testimony regarding Stanton's July 30, 2019 email); *see id.*, PageID.2905-07 (Jackson admits that he responded to Stanton's email at 5:55 p.m. on July 30, 2019, stating "'Paul, I'm aware of the situation. I will send someone down tomorrow to issue a stop-work order. I will contact you tomorrow with more information[,]'" but never identified when he found out that Plaintiffs had their land use certificate and building permit, although he did try to suggest that the code enforcement officer was sent to the Site "to place a stop-work order if it was warranted.")). The following morning, Jackson and Baldwin County issued the Stop Work Order and later the July 31 letter notifying Plaintiffs for the first time of the novel interpretation of the Parking Ordinance to prohibit stacked parking configurations like the one in the Site plans. (*See* Doc. 78, PageID.2910 (Jackson's testimony that it was possible the stop-work notice was placed on the Site prior to issuance of his July 31 letter); *compare id. with id.,* PageID.2921 (Jackson's unequivocal testimony that he did not write his letter on July 30)).

### C.    The Revised Incidental Take Permit and the Story Ordinance.

Understandably surprised by the abrupt posting of the Stop Work Order at the Site with no prior warning on the morning of July 31, 2019 (*see* Doc. 78, PageID.2911, 2921 & 2924 (Jackson's testimony that he did not reach out directly to Steve Jones or Mike Bordelon on July 31—or July 30, by calling them—that there were problems with the project and that a stop-work notice was going to be posted, but simply wrote the

July 31 letter)), Plaintiffs contacted the planning department in an effort to resolve the issue (*see id.,* PageID.2911-12; Doc. 79, PageID.3115-16 (Jones' testimony that he reached out first to Linda Lee and then to Jackson)). At that time, Plaintiffs learned that their Land Use Certificate had been revoked by Jackson.[30] Jackson outlined four options for plaintiffs to resolve the issue in an August 1, 2019 email to Steve Jones: (i) revising the plans to allow unobstructed ingress/egress for each parking space; (ii) requesting a variance from off-street parking requirements; (iii) appealing the "denial" (as clearly established heretofore, a revocation) of the land use certificate (or asking for a staff determination pertaining to parking, which could also be appealed); or (iv) reducing the number of bedrooms in the duplex to reduce the number of required parking spaces. (*See* Doc. 84-6, PageID.3479).[31] Although plaintiffs disagreed with defendants' interpretation of the Parking Ordinance, they elected the first option, and moved forward to resolve the parking issue and obtain a revised incidental take permit ("ITP") from the United States Fish and Wildlife Service ("USFWS"). (*See* Doc. 79,

---

[30]     Bates could not remember a land use certificate being revoked during her tenure in the zoning department (before this revocation) and agreed that it would be unusual to have anything revoked. (Doc. 78, PageID.2840; *see also id.,* PageID.2872-73 (Lee has been in the planning department since 2006 and has been involved with thousands of land use certificate applications, and in none of those cases was the land use certificate revoked)).

[31]     According to Jackson, his purported action in revoking approval and denying the land use simply put the Plaintiffs' land use application back to an incomplete status, with the requirement that the Plaintiffs provide a revised site plan showing they would meet the parking requirements "and that would probably mean a revised Incidental Take Permit." (Doc. 78, PageID.2939). Thus, the planning and zoning department was looking for a revised site plan (*id.,* PageID.2943), no new application or filing fee (*id.,* PageID.2940; *compare id. with id.,* PageID.2941 ("[I]f it had been longer than six months, we might ask for a new application."); *but cf.* Doc. 79, PageID.3075 (Jackson's diametrically opposed testimony that Plaintiffs' land use certificate that had been approved was revoked and denied, such that they no longer had a land use certificate; he went on to testify that the certificate was improper because it did not meet the standard for unobstructed ingress and egress based on his July 3 interpretation/determination)).

PageID.3116 (Jones' testimony that Plaintiffs' quickly drew up a new parking plan); Doc. 84-26, PageID.4068 (notice from attorney that Plaintiffs would not appeal to the BOA)).

A short time after the Stop Work Order was issued, plaintiffs submitted a revised Site plan containing a revised parking configuration that complied with Baldwin County's new interpretation of the Parking Ordinance. (*See* Doc. 78, PageID.2995 (testimony of Vince Jackson); Doc. 79, PageID.3116 (Jones' testimony that the revised Site plan with revised parking configuration was submitted about a week later); Doc. 79, PageID.3186 (Bordelon's testimony that a new site plan was submitted within a few days)). In response, Linda Lee notified Plaintiffs on August 16, 2019, that (per the Planning Director) they would need a revised ITP from the USFWS before they could resume construction on the Site. (Doc. 84-26, PageID.4069; *see also* Doc. 84-7, PageID.3486).[32] It was Lee's understanding that Plaintiffs just had to revise their parking plan and obtain the revised ITP from the USFWS to get the stop-work notice lifted and resume construction on the Site. (*See* Doc. 78, PageID.2868-69).

William Lynn, a biologist at the USFWS, confirmed receipt of plaintiffs' application for a revised incidental take permit on August 20, 2019. (*See* Doc. 79, PageID.3189 (Bordelon testified that the application for the revised ITP permit was submitted on

---

[32]     When Plaintiffs purchased the lot on which they planned to build Breezy Shores, "there was an ITP permit available that was part of the purchase[,]" and all Plaintiffs had to do was a name change to change the permit into the name of Breezy Shores, which occurred in June of 2018. (Doc. 79, PageID.3176; *see also id.,* PageID.3176-77 (the name-change application was submitted to the USFWS on May 31, 2018, and Plaintiffs received the permit back on June 28, 2018)). And the reason a revised ITP permit was required was because the new parking plan increased the size of parking and, therefore, there was a larger "impact" or "take." (Doc. 79, PageID.3185 (Bordelon's testimony); *compare id. with* Doc. 80, PageID.3308-09 ((Bordelon explained that an ITP permit is required if construction is in an area the USFWS has designated a beach mouse habitat and that such designation "limits the amount of the lot you can impact with construction")).

August 20, 2019)). Approximately six weeks later, on October 2, 2019, Lynn notified

Plaintiffs that the incidental take permit "is very close to being issued, hopefully later this

week." (Doc. 44, PageID.599).[33] On October 7, 2019, Lynn indicated that Plaintiffs'

"permit is almost ready for printing," with only two minor additional steps for plaintiff to

take. (Doc. 44, PageID.597).[34] Plaintiffs promptly complied with those requests,

including paying for the permit (Doc. 79, PageID.3189), and received confirmation by

October 10, 2019 (*see id.* (when the check cleared on October 10, 2019, Bordelon

understood that the application was complete, and they were waiting on the actual

physical copy of the permit to be sent)). When days passed without receipt of the

permit, plaintiffs reached out to Lynn on October 15, 2019 to inquire as to the status of

the Site's incidental take permit. (Doc. 79, PageID.3189 (Bordelon emailed Lynn)). Lynn

---

[33]     It remains unclear exactly what happened at the USFWS between August 20 and October 2. The record reflects that certain non-party property owners in Fort Morgan actively lobbied Lynn and the USFWS to delay issuing a determination on plaintiffs' application for a revised incidental take permit. For example, on August 21, 2019, a property owner sent an email to Lynn that included the following passage: "Again, please help us delay [the Site] anyway you can. This new parking interpretation and the proposed 2 story limit will dramatically reduce the size of these mega structures." (Doc. 84-16, PageID.3539). This email attached a copy of a proposed new Baldwin County ordinance limiting single- and two-family structures to two stories and observed that the Site "is the first structure in District 25 to be required to comply with this new 'interpretation' for parking. This is a huge win for the beach." (*Id.*). And while there was no direct evidence offered at trial that Lynn or anyone else at USFWS actively delayed processing plaintiffs' revised incidental take permit application in acquiescence to this request from a community activist, the evidence is that plaintiffs' revised incidental take permit application was not approved by Lynn until after Baldwin County's brand-new zoning ordinance limiting the height of single-family and two-family structures in Planning District 25 to two habitable stories was enacted on October 15, 2019.

[34]     On October 7, 2019, Jackson emailed Lynn about a "series of proposed zoning text amendments pertaining to Planning District 25 (Fort Morgan)[,]" asking that he comment on them and highlighting that his department had received "a good deal of pushback[,] particularly on the proposed two story height limitation for single family and duplex structures." (Doc. 84-17, PageID.3544). Jackson conceded at trial that the pushback came from those people who wanted to construct rental property and their understanding that they likely would not realize as much money from a two-story structure versus a three-story structure. (Doc. 78, PageID.3000).

did not respond. (*See id.,* PageID.3190)). Bordelon emailed Lynn again on October 22, 2019 (*id.*) and the USFWS finally issued the revised incidental take permit on October 25, 2019 (*see* Doc. 84-22, PageID.4028 ("Attached is a digital copy of your ITP permit modification."))[35] Plaintiffs immediately forwarded that permit to Baldwin County and requested that the Stop Work Order be lifted. (Doc. 79, PageID.3191 (Bordelon's testimony that Plaintiffs went back to Jackson and requested removal of the stop-work order); *see* Doc. 84-22, PageID.4028; Doc. 78, PageID.3001-03)). Plaintiffs believed that once the parking was changed and the revised ITP submitted, the stop-work order/notice would be lifted. (Doc. 79, PageID.3186 (Bordelon testimony)).

Unfortunately for plaintiffs, Baldwin County had undertaken other steps antithetical to the proposed Site development in the interim. On October 15, 2019, as plaintiffs awaited issuance of their USFWS incidental take permit after having complied with all prerequisites, Baldwin County enacted a brand-new zoning ordinance limiting the height of single-family and two-family structures in Planning District 25 to two habitable stories (the "Story Ordinance")[36] (*See generally* Doc. 84-19; *see also* Doc. 79, PageID.3057)[37] This Story Ordinance, which had been in the works since at least June

---

[35]     Plaintiffs never received any explanation for why it took more than 8 weeks to get their revised ITP permit. (Doc. 79, PageID.3190-91).

[36]     Bordelon was unaware of the story ordinance until after it was passed; he was unaware of it being noticed or of a comment period. (Doc. 80, PageID.3291).

[37]     The precise language of the Story Ordinance is as follows: "The maximum height of single family and two-family structures shall be limited to two (2) habitable stories." (Doc. 84-18, PageID.3592). But the height of a two-story structure still could be up to 35 feet. (Doc. 78, PageID.3001).

According to Jackson, the pivotal factor that wrought this change was input from the Fort Morgan Volunteer Fire Department, not other members of the community. (*See* Doc. 79, PageID.3055-56). For his part, Bordelon testified that the story ordinance, on its face, reads as (Continued)

19, 2019 (*see id.,* PageID.3073 (meeting Jackson and Dyess had with a Fort Morgan group discussing parking and story limitations)),[38] was of pivotal importance because plaintiffs' Site plan, as previously submitted to and approved by Baldwin County, called for three habitable stories in the duplex (*see* Doc. 79, PageID.3169-70 (Bordelon's testimony that the site plan originally submitted to the zoning and planning department was for a 14-bedroom three-story duplex, just like his property next door, EZ Breezy)).[39] Prior to enactment of the Story Ordinance, numerous (probably more than ten) single or two-story homes in Planning District 25 had been constructed with three or more stories. (*See, e.g.,* Doc. 79, PageID.3170 (Bordelon's testimony that his property next to the Site, EZ Breezy, was a 3-story)). One or more Fort Morgan property owners had

---

though "they no longer want three-story buildings in Fort Morgan[] . . . only [] up to two floors[,]" based on the rationale of fire safety (Doc. 80, PageID.3298) but then set about to demonstrate the absurdity of that rationale (*id.*, PageID.3298-99 ("I can build a two-story building with cathedral ceilings on the first floor and have my second floor be at the same height as what a three-story third floor would be. So, it makes zero difference on height issues for fire safety. So, I do not understand why the ordinance was passed, other than it was a hurried-up measure to try to stop another larger building being built in Fort Morgan.")).

[38]     Yet, neither Jackson nor anyone with the planning and zoning department placed Plaintiffs on notice of this possible significant change to the zoning ordinance, whether in the July 31 letter or at any other time in the interim between July 31, 2019 and October 15, 2019, when the text amendment was adopted. (*See, e.g.,* Doc. 79, PageID.3192 (Bordelon's testimony that prior to October 25, 2019, no one in the zoning and planning department told Plaintiffs that the height ordinance would be applied to their circumstances, and they had no reason to believe that it would be so applied)).

[39]     According to Steve Jones, the original plans drawn up by the architect included a fire suppression system to make the duplex safer. (Doc. 79, PageID.3122-23). Bordelon testified, however, that the sprinkler system was not put into the plans until well after March 27, 2019 (the date when the original plans were received by the planning and zoning department), when he was told by his architect, Mark Pavey, that a sprinkler system would be required. (Doc. 80, PageID.3261-62; *but cf. id.,* PageID.3277 (Bordelon's additional testimony that the sprinklers were integrated into the plan by Pavey before final approval and obtainment of the building permit—so, before July 17, 2019—but the witness could not state exactly when that occurred)).Bordelon's EZ Breezy had been built to withstand hurricanes and it was his intention to build Breezy Shores in the same manner as EZ Breezy was built. (Doc. 79, PageID.3172).

been actively pushing for the Story Ordinance for some time, with the cooperation of defendant Jackson. (*See generally* Doc. 79, PageID.3050-53; *compare id. with* Doc. 68, PageID.1950). Indeed, on August 20, 2019, Jackson sent one property owner "the proposed amendments to the local provisions for Planning District 25," including "[t]he section pertaining to the limit on habitable stories[.]" (Doc. 84-16, PageID.3538). In turn, the property owner contacted Lynn of the USFWS by email on August 21, 2019, as aforesaid (after meeting him in person on August 20, 2019)—while Plaintiffs' incidental take permit application was pending—and wrote, "[T]he ordinance now proposes a limit of 2 stories for all single- and two-family structures. This 2-story limit will greatly reduce the number of bedrooms that can be built in one of these duplexes. ***Again, please help us delay [the Site] anyway you can***. . . . [T]he proposed 2 story limit will dramatically reduce the size of these mega structures." (Doc. 84-16, PageID.3539). In a separate communication, the property owner informed Lynn that the Story Ordinance would likely be voted on by the Baldwin County Commission in October 2019. (Doc. 84-16, PageID.3536-37).  The implication, of course, is that property owners wanted the Story Ordinance to be in place before Plaintiffs could obtain their revised USFWS permit, the last impediment to lifting the Stop Work Order. For his part, Jackson denied asking Lynn to delay issuance of the revised ITP permit pending the new text amendment(s) he was pushing forward. (Doc. 78, PageID.2996).

Because of these intervening developments relating to issuance of the Story Ordinance, defendants did not lift the Stop Work Order when plaintiffs submitted their revised incidental take permit on October 25, 2019. Instead, on November 5, 2019, Jackson sent an email to Plaintiffs' counsel explaining, "A new issue has arisen

regarding this property and the proposed duplex structure."  (Doc. 84-22, PageID.4027).[40] Jackson detailed the Story Ordinance adopted on October 15, 2019, and outlined the ramifications of that amendment for Plaintiffs as follows:

> When the stop work order was imposed, the land use certificate application was rescinded and denied. As a result, there was no pending application at the time the text amendments were adopted.[41] A new land use certificate application, which shows compliance with all current zoning requirements including the [Story Ordinance], will be required to move forward. . . . [A] duplex (two-family dwelling) with three habitable stories cannot be approved.

(*Id.* (footnote omitted)).[42] Jackson advised that the plaintiffs only options were: (i) to revise the Site plan so the structure would be no more than two habitable stories; (ii) to seek a variance from the Story Ordinance from the Board of Adjustment; or (iii) to appeal the determination to the Board of Adjustment. (Doc. 84-22, PageID.4027).

Revising the Site plan to two habitable stories was potentially financially crippling for plaintiffs because of the corresponding reduction in rental revenues the property

---

[40]    Jackson testified that until a building permit is properly issued, applicants are subject to changes in the zoning ordinance. (Doc. 79, PageID.3036).

[41]    Jackson testified that if his department had received those two additional items from Plaintiffs before the two-story text amendment, Plaintiffs' application would have been approved (Doc. 78, PageID.3006), which testimony appears to be in direct contravention to this statement in his email to Plaintiffs. (*Compare id. with* Doc. 84-22, PageID.4027).

[42]    This became Jackson's position in November of 2019, as opposed to August of 2019, because of purportedly being "past" 6 months. (*See* Doc. 78, PageID.3007-09). And while the ordinance only "speaks" to a building permit having to be received/issued within 6 months of approval of a land use certificate application (*see* Doc. 84-18, PageID.3752), Jackson testified that it had always been the policy (certainly unwritten) of the Baldwin County zoning and planning department that a land use certificate is good for only 6 months, specifically, 6 months from when it is originally submitted (Doc. 78, PageID.3008; *id.* at PageID.3010 ("[T]he date that the land use certificate was turned in was more than six months before and it was our position at that point that they would've needed to submit a new application.")). As previously explained, this alleged "policy" is inconsistent with the language contained in the Zoning Ordinance.

could generate.[43] As a result, plaintiffs elected to appeal Jackson's decision to the

Board of Adjustment.[44] (Doc. 84-2; *see also* Doc. 79, PageID.3057 & Doc. 80,

PageID.3295-96).[45] On December 12, 2019, following a hearing, the Board of

---

[43]         In addition, Plaintiffs had already incurred the following costs between March 1, 2019 and June 20, 2019: (i) a builders' fees in the amount of $11,366.00; (ii) copies of plans in the amount of $49.91; (iii) sewer tap fee in the amount of $2,750.00; (iv) a permit fee in the amount of $25.00; (v) $14,231.00 in pilings' cost; and (vi) window costs in the amount of $28,145.41. (Doc. 84-24, PageID.4063). Bordelon testified that he believed the "total" was higher than $56,567.32 and was in the range of $68,000, including $3,000.00 for moving pilings. (Doc. 80, PageID.3271-72). According to Bordelon, he does not personally owe any money for work done on the project (*id.,* PageID. 3273) and that Jones has some funds remaining in the project account from draws totaling $90,000 that Plaintiffs supplied him (*id.*).]

[44]         And while Bordelon understood that he could have built the two-story house at any time (Doc. 80, PageID.3302), all his design plans for a three-story duplex would have been out the window (*id.,* PageID.3310 (he spent $22,000 on site plans and designs); *see also* Doc. 79, PageID.3174 (similar testimony)) and he would still need to have the revised two-story plans reviewed by the USFWS to satisfy that agency that the plans for the two-story duplex were "within the parameters of [their] take." (Doc. 80, PageID.3310).

[45]         The Court reads Plaintiffs' appeal to the Board of Adjustment as seeking a variance (*see* Doc. 84-2, PageID.3330 ("Appellant requests that the Board lift the Stop Work order and reinstitute the Land Use Permit and Building Permit previously issued, ***or in the alternative take such action as necessary to allow Appellant to proceed with construction as previously approved.***")), as did Bordelon (*see* Doc. 80, PageID.3296 ("Sure [this language was a request for a variance], we'd have [it] any way we could.")). Ultimately, Bordelon testified that he is "asking that [Plaintiffs'] building be built because it was already approved to be built before the ordinance was passed." (Doc. 80, PageID.3300). The Addendum to the Appeal reads, in relevant measure, as follows:

        [Brezzy Shores LLC] had vested rights in the permits issued prior to October 15, 2019, the effective date of the new height ordinance. It was instructed, erroneously, to rectify the parking issue after permits had already been issued. When that occurred, the permits did not lapse, but rather were held in abeyance until those issues were rectified. After they were, the permits should have been reactivated notwithstanding the changes that occurred on October 15, 2019, given that Appellant's now-non-conforming use (three stories) had already been approved and permitted. *Budget Inn of Daphne, Inc. v. City of Daphne, 7*89 So.2d 154, 159 (Ala. 2000) ("an existing nonconforming use is a vested property right that a zoning ordinance may not abrogate except under limited circumstances"); *Port of Mobile v. Louisville & N.R. Co.,* 4 So. 106, 84 Ala. 115, 122 (Ala. 1888) (once a right has vested equity can be invoked to prevent a later-passed ordinance from depriving the owner of that right).

(Continued)

Adjustment entered a written Notice of Action reflecting that it upheld the administrative decision of the zoning administrator and denied the appeal. (*See* Doc. 84-5, PageID.3478 ("Mr. Church made a motion to uphold the Administrative Decision of the Zoning Administrator and the stop work order be upheld and the appeal denied. The motion received a second from Mr. Mitchell and carried unanimously."); *see also generally* Doc. 84-23 (Board of Adjustment Staff Report which recommended to the board that the administrative decision be upheld, and the appeal denied)). Plaintiff Breezy Shores filed a Notice of Appeal to the Circuit Court of Baldwin County, Alabama, on December 16, 2019. (*See* Doc. 44, PageID.271). That Notice of Appeal commenced this litigation which, following removal to this Court, now comes before the undersigned for final determination following a three-day bench trial.

**D.     Damages.**

Franklin Reed, a real estate appraiser (Doc. 79, PageID.3138), produced an expert report (*see id.*) and offered expert testimony respecting two credible valuation methods—the cost approach and the sales comparison approach—to develop an overall opinion of value from (or between) two different dates with respect to the subject property, Breezy Shores, LLC (*see id.,* PageID.3138-39). The date of August 1, 2020 was chosen for the sales comparison approach because that was the point in time where there existed "a hypothetical value of completion[]" and Reed's report contained sales prices of comparable properties to Breezy Shores, LLC (*id.,* PageID.3140 ("I

---

(Doc. 84-2*,* PageID.3332-33). Bordelon testified that he had no reason to believe that allowing Breezy Shores to be built as a three-story duplex would unreasonably increase the congestion in public streets, increase the danger of fire, imperil the public safety, or impair the health, safety, comfort, morals, or general welfare of the inhabitants of Baldwin County. (Doc. 80, PageID.3298).

examined the local MLS as well as looked at anything that was off market to find comparably-sized beach front properties that were primarily used for vacation rentals.");[46] *see also id.,* PageID.3040-41 (under this approach he also considered the number of bedrooms, 14)). Under the sales comparison approach, Reed valued the duplex at $3,180,000.00. (Doc. 79, PageID.3143). The expert offered further testimony that the average cost per bedroom can be determined using the sales comparison approach by taking the value of the subject property ($3,180,000.00) and dividing the value by the number or bedrooms at the subject property (14), to arrive at $227,142.00 per bedroom. (*Id.,* PageID.3146-48).[47]  Reed concluded his sales comparison approach testimony with the observations that "[p]rice per bedroom is a valid way for a short-term vacation rental property, because the value is driven by the rents[]" and that the more bedrooms or the more units of any metric that you have, the price associated with each unit goes downward. (*Id.,* PageID.3149).

    With respect to his cost approach analysis, Reed also utilized the anticipated project completion date of August 1, 2020, and calculated the number $281.67 per square foot, signifying the replacement cost new of the subject project per square foot. (*See id.,* PageID.3149-50). Under this approach, multiplying price per square foot

---

[46]     One of the comparables utilized was EZ Breezy (*see* Doc. 79, PageID.3153), which Bordelon sold in July of 2021 for $3,050,000.00 (*id.,* PageID.3172-73). EZ Breezy was built for $1,200,000.00 and the lot cost $450,000. (*Id.*).

[47]     The average price per bedroom of Reed's five comparable properties was an almost identical $227,191.00 (*see id.,* PageID.3148), which told Reed that "the metric of price per bedroom is pretty consistent with [his] concluded value on the price per square foot." (*Id.,* PageID.3149).

($281.67) by the total square footage (9,360) rendered a total value of $2,636,449.00[48] which, when added to the land value of $562,500, renders a total value of approximately $3,200,000.00.[49] (*See id.,* PageID.3151; Doc. 84-3, PageID.3400).[50]  And given that the two values rendered by the two different approaches ($3,200,000.00 and $3,180,000.00) are close (only $20,000.00 apart), this "adds confidence to each approach." (Doc. 79, PageID.3165).

Bordelon expected Breezy Shores to be constructed by July of 2020. (Doc. 79, PageID.3194). And because he believes that it will take at least a year to construct it beginning today, he believes that he has lost approximately 3 years of rental income. (*See id.*). Taking as a reference the 2019 rental of the 18-bedroom EZ Breezy next door, from which Plaintiffs received net revenue of $257,000[51]—the gross revenue was $357,000, but rental management expenses, lodging tax, and repairs took that down to

---

[48]     "[T]he total cost new of the structure [is] $2,636,449, or $281.67 per square foot. (Doc. 84-3, PageID.3400).

[49]     "[W]e have developed an opinion that the 'As Complete' hypothetical market value of the Fee Simple estate of the subject property, as of March 11, 2021," was $3,350,000. (*See* Doc. 84-3, PageID.3339).

[50]     Reed agreed on cross-examination that there was a third general approach to value property, the income approach; however, he did not use that approach because "[s]hort-term vacation rentals are tricky" in regards to this approach because one is often not privy to the expenses associated with management of the properties and, therefore, "when you try to get comparables to help support a cap rate or other metrics for the income approach, it's very fragmented, so it makes that approach less reliable." (Doc. 79*, PageID.3152-53).

[51]     This was Bordelon's net revenue theory. (Doc. 80, PageID.3303).

$257,000^{52}$—$^{53}$and then accounting for the fact that Breezy Shores has only 14 bedrooms (as opposed to 18), Bordelon estimated that the total net revenue he lost per year was $199,888.00, which totals $599,666.00 for three years. (Doc. 79, PageID. 3195-96).

In addition, Bordelon testified that when Steve Jones provided his initial cost plan, the cost of Breezy Shores was estimated at $1.12 million, $138.00 a square foot based on 8,089 square feet. (Doc. 80, PageID.3112-13). However, the cost of building materials and construction costs in general have indisputably risen since July of 2020,$^{54}$ the projected end date of the Breezy Shores duplex, with Jones testifying construction would be $225.00 a square foot and Bordelon testifying that the minimum would be $225.00 a square foot but probably closer to $235.00 a square foot based on his recent experiences. (*Id.* at 3213 & 3248; *compare id. with* Doc. 79, PageID.3197-98; *see* Doc. 79, PageID.3121-22 (Jones estimated that the cost per square foot had risen to $225.00 due to increased costs of materials—lumber, tile, HVAC, etc.—and labor)). Multiplying the Breezy Shores square footage of 8,089 by $225 renders a total of $1.82 million and

---

[52]    The "actual" and "true" numbers were $256,546 for the EZ Breezy duplex of 18 bedrooms, making the estimated net revenue for a 14-bedroom duplex (Breezy Shores) $199,538.28; this latter number multiplied by 3 totals $598,614.84. (Doc. 80, PageID.3210-11).

[53]    In 2020, the gross revenue on EZ Breezy was $315,000, with the net being $198,000 or $200,000. (Doc. 79, PageID.3196). According to Bordelon, however, 2020 was an outlier because it "was the COVID year[.]" (*Id.,* PageID.3197 ("We had a record year in '21 and '22 bookings are really, really strong.")).

[54]    Bordelon admitted that by August of 2021, he was aware that the costs of construction had significantly risen. (*See id.,* PageID.3252). And even before then, in June of 2021, Bordelon was relaying information he received from Steve Jones that the increase in costs had risen from $62,654.00 to a projected $125,308.00. (Doc. 80, PageID.3270; *see also id.* (Bordelon's further testimony that he believed in June of 2021 that the increased costs would be higher, but he could not "substantiate how much.")).

by $235 renders a total of $1.9 million. (Doc. 80, PageID.3213 & 3248). And subtracting

the original costs of $1.12 million from those numbers renders totals of $700,000.00 and

$780,000.00, respectively. (*See id.,* PageID.3213 & 3249*; compare id. with id.,*

PageID.3214 (the "actual" differences are $699,118.44 and $780,008.44)).[55]

## CONCLUSIONS OF LAW

A.    **Whether Certain Evidence Introduced at Trial Should be Deemed**

**Inadmissible and Stricken.** Before substantively addressing Plaintiffs' remaining

claims in this action, the Court must first handle some procedural matters, most of which

touch upon evidence and testimony related to damages purportedly suffered by

Plaintiffs in this matter. The Court will address the damages issues in the order that the

Defendants addressed them in their post-trial brief. (*See* Doc. 89, PageID.4206-23).

1.    **Evidence of Increased Construction Costs.**   Defendants contend that

all evidence Plaintiffs offered at trial regarding increase in construction costs is due to

be stricken from the record because of a failure to disclose. The following represents a

timeline of Plaintiffs' disclosure of information regarding damages for an increase in

costs caused by delay: (1) on April 21, 2020, Plaintiffs produced their initial disclosures,

noting that while damages were not completely determined, they included

---

[55]      Bordelon further testified that if Plaintiffs had to build Breezy Shores as a two-story duplex he would lose 4 bedrooms, with his square footage moving from 8,089 to about 5,550. (Doc. 80, PageID.3214). The diminution in value of a three-story versus a two-story would be calculated by the bedrooms, "[s]o the value would be directly impacted by the reduction in the number of bedrooms from 14 to 10." (*Id.,* PageID.3215). "So, the net revenue . . . that I had testified I predicted for Breezy Shores at 14 bedrooms is actually closer to $200,000 a year. So, if it was 10 bedrooms, we'd take 10 divided by 14 to get the proration. Multiply[ing] that by the 200,000, plus or minus a thousand. I can't remember the exact figures. It would take us to 142,857. So, subtract then 142[,] . . . 857 from the 200,000 and we lose 57,143 a year on the 10 bedrooms at the net revenue level." (Doc. 80, PageID.3220)

"compensatory damages for labor and materials incurred based upon issuance of the initial permit that was erroneously stopped by the Defendants, attorneys' fees, and costs of litigation[]" (Doc. 88-3, PageID.4173);[56] (2) on January 20, 2021, Plaintiffs provided a comprehensive "Updated Damages Disclosure" (Doc. 88-4, PageID.4177-80), inclusive of an "[i]ncreased cost of building" of $62,654.00 (*id.,* PageID.4177 ("Since Plaintiffs' project was initially permitted and under construction, the cost of building materials and labor has risen. Plaintiffs' contractor, Steve Jones, has estimated that this increased cost amounts to approximately $62,654.00, as reflected in the Breezy Shores Cost Plan updated document dated 1/24/2021.")); (3) during the January 29, 2021 Rule 30(b)(6) deposition of Michael R. Bordelon, Bordelon testified that the increased cost of building was $62,654.00 and that he relied upon Steve Jones for the "cost side of building" (Doc. 45-8, PageID.1335 & 1344); (4) on March 15, 2021, Plaintiffs again updated their disclosures regarding damages and, again, advised that the increased cost of building remained at $62,654.00 (Doc. 88-5, PageID.4185); (5) on May 20, 2021, Bordelon executed an affidavit, stating that "since the project was initially permitted and under construction, the cost of building materials and labor has risen significantly, and the project will now cost myself and Breezy Shores, LLC an additional $62,654.00 to build[]" (Doc. 44, PageID.283); (6) on or about May 21, 2021, Steve Jones executed a sworn declaration containing the statement that "since the project was initially permitted and under construction, the cost of building materials and labor has risen significantly, and the project will now cost Mr. Bordelon and Breezy Shores, LLC an additional

---

[56]      Plaintiffs' initial disclosures include an earlier statement regarding "evidence of damages incurred by Defendants['] issuance of the stop work order and denial of Plaintiffs' appeal to the Board of Adjustment." (Doc. 88-3, PageID.4172).

$125,308.00 to build[]" (Doc. 44, PageID.289); (7) in the Joint Pretrial Document filed on November 24, 2021, contains Plaintiffs' damages, including $125,308.00, for increased cost of building (Doc. 68, PageID.1958); and (8) in the Joint Supplement to the Joint Pretrial Document, filed on December 17, 2021, Plaintiffs again sought increased construction costs totaling $128,308.00, "subject to some fluctuation between the present date and trial as market forces dictate." (Doc. 71, PageID.1989). Based on the trial testimony, Plaintiffs now seeks increased construction costs totaling $700,000 (actual number is $699,118.44) to $780,000 (actual number is $780,008.44) (*see* Doc. 80, PageID.3213-14 & 3249), numbers obviously far in excess of the $128,308.00 number (even subject to "***some fluctuation***" between December 17, 2021 and the trial dates of January 24-26, 2022, "as market forces dictate"). In other words, the market did not change in the 38-40 days between December 17, 2021 and the trial dates in this case to such a drastic extent to account for the increase in construction costs Plaintiffs now seek.

Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure requires each party to disclose to all other parties "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34[57] the documents or other evidentiary material . . . on which each computation is

---

[57]     Defendants also served written discovery on Plaintiffs seeking information regarding their damages. (*Compare* Doc. 88-1, PageID.4121 (seeking the production of all documents or records supporting Breezy Shores, LLC's' claims for damages) and *id.,* PageID.4117 (interrogatory seeking an identification and description of all damages and injuries Breezy Shores, LLC claimed were caused by each Defendant, inclusive of a description of the type of such injury or damage, and the nature and amount of relief being sought "for each such injury or damages.") *with* Doc. 88-2, PageID.4148 (seeking the production of all documents or records supporting Mike Bordelon's claims for damages) and *id.,* PageID.4145-46 (interrogatory seeking an identification and description of all damages and injuries Bordelon claimed were (Continued)

based, including materials bearing on the nature and extent of injuries suffered[.]" *Id.*

(footnote added). Moreover, under Rule 26(e), parties are required to supplement or

correct their disclosures and discovery responses "in a timely manner if the party learns

that in some material respect the disclosure or response is incomplete or incorrect, and

if the additional or corrective information has not otherwise been made known to the

other parties during the discovery process or in writing[.]" *Id.* As the Defendants

correctly point out, failure to disclose or supplement as required in the Federal Rules of

Civil Procedure, ordinarily leads to the exclusion of the undisclosed evidence. *See*

Fed.R.Civ.P. 37(c)(1) ("If a party fails to provide information or identify a witness as

required by Rule 26(a) or (e), the party is not allowed to use that information or witness

to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

substantially justified or is harmless."). Indeed, the Eleventh Circuit has utilized Rule

37(c)(1) to uphold the exclusion of undisclosed evidence of damages, including both

undisclosed categories of damages and undisclosed computations. *See, e.g.,*

*Circuitronix, LLC v. Kinwong Electronic (Hong Kong) Co., Ltd.,* 993 F.3d 1299, 1307-08

(11th Cir. 2021) (upholding the exclusion of lost-profit damages due to Circuitronix'

failure to disclose its computation of those damages); *Mee Industries v. Dow Chemical*

*Co.,* 608 F.3d 1202, 1221-22 (11th Cir. 2010) (affirming the district court's exclusion of

loss of goodwill damages because Mee's initial disclosures did not include "loss of

goodwill" as a category of damages), *cert. denied,* 562 U.S. 1138, 131 S.Ct. 936, 178

L.Ed.2d 754 (2011).

---

caused by each Defendant, inclusive of a description of the type of such injury or damage, and the nature and amount of relief being sought "for each such injury or damages.").

Here, of course, as set forth above, Plaintiffs certainly disclosed increased construction costs as a category of damages; however, Plaintiffs obviously never came close to disclosing the amount of this category of damages they were seeking until the dates of trial. And this Court finds that Plaintiffs have not carried their burden of establishing that the failure to disclose the true amount of this category of damages "'was substantially justified or is harmless.'" *Mitchell v. Ford Motor Co.,* 318 Fed.Appx. 821, 824 (11th Cir. Mar. 9, 2009), quoting Fed.R.Civ.P. 37(c)(1). After all, Plaintiffs were aware of the increased costs of construction as this litigation proceeded—as evidenced by the number of times they amended their initial disclosures in this regard—and they should have put pen to paper long before a few days prior to trial to realize the true "upshot" in that increase in the costs of construction. And this failure to disclose the true number was not harmless, particularly when Plaintiffs inability to identify when the massive jump in costs might have occurred is combined with the undeniable fact that the Defendants expected the evidence to be presented at trial would be consistent with that produced over the course of the litigation, evidencing far less drastic increases. Any suggestion by Plaintiffs that the Defendants could have done more respecting this aspect of damages simply cannot be heard because Defendants were entitled to reasonably rely upon Plaintiffs' disclosures, as supplemented. For this Court to make a contrary finding would undermine the contents of Rule 26(e), requiring timely supplementation when a party learns that in some material respect the disclosure is incomplete or incorrect.

And while this Court cannot let Plaintiffs' drastic increase in the costs of construction offered at trial stand, it would be throwing the baby out with the bath water

to wholly strike all evidence regarding increased construction costs. This is not solely because the Defendants were well aware prior to trial that Plaintiffs would produce evidence that they will experience at least $128,308.00 in increased construction costs, "subject to some fluctuation between the present date and trial as market forces dictate[.]" In addition, it is determined that the testimony of Steve Jones, in particular, constitutes admissible evidence that the costs of construction have increased from $138.00 a square foot to $225.00 a square foot,[58] so as to justify an award of damages of $128,308.00. Thus, as discussed in *Circuitronix* and not eschewed, *see* 993 F.3d at 1308, this Court joins the Second, Sixth, and Seventh Circuits and exercises its considerable discretion to fashion a lesser sanction than exclusion of all evidence regarding increase in the costs of construction (despite Plaintiffs' inability to establish substantial justification or harmlessness). Thus, the Court relies upon Jones' testimony, specifically the testimony that the total increase in costs of construction is approximately $128,308.00, which is the last "hard" number provided by Plaintiffs prior to the trial of this cause.

## 2. Evidence Regarding the Purported Difference in Value Between a Two-Story Property and a Three-Story Property. Defendants seek the striking of all

---

[58]    Defendants raise no objection to Jones' testimony beyond that it was not timely disclosed. (*See* Doc. 89, PageID.4209-4212). Even if they did interpose objection to this testimony, that objection would be overruled because Jones, as a building contractor, was competent to give lay opinion testimony regarding the increase in construction costs based on knowledge he gained from building houses and duplexes off Fort Morgan Road and the surrounding Gulf Shores, Alabama area in general and his testimony in this regard was helpful to the Court and probative because it was based on data (actual numbers and easy formulaic calculations), not speculation or unwarranted assumptions. *Compare United States v. Musselwhite, infra,* 709 Fed.Appx. at 972 *with United States v. An Easement and Right-of-Way Over 6.09 Acres of Land, More or Less, in Madison County, Alabama, infra,* 140 F.Supp.3d at 1240-43. Accordingly, the Court declines to strike Jones' testimony regarding increased construction costs.

evidence offered at trial, through the testimony of Mike Bordelon, regarding the

purported difference in value between a two-story property and a three-story, claiming

that Plaintiffs failed to disclose any difference in fair market value and that Mike

Bordelon is not competent to testify regarding the difference in value. (Doc. 89,

PageID.4213-21; *compare id. with* Doc. 92, PageID.4255-59). This Court finds no need

to address this issue, however, because the Defendants' argument in this regard is read

as an attack solely on Bordelon's testimony related to lost value between a two-story

property versus a three-story property (*see* Doc.4213-21), as opposed to also attacking

Bordelon's testimony regarding loss of rental income (*compare id. with* Doc. 79,

PageID.3194-96),[59] and since this Court is not finding a permanent taking in this case

---

[59]     Indeed, the Defendants did not interpose objection to Bordelon's loss of rental income testimony, at least when he initially testified regarding loss of rental income. (*See id.*). To the extent Defendants now object to that testimony, the Court **OVERRULES** all objections.

     Rule 701 of the Federal Rules of Evidence "authorizes 'a lay witness to testify in the form of opinions or inferences drawn from [his] observations when testimony in that form will be helpful to the trier of fact.'" *United States v. An Easement and Right-of-Way Over 6.09 Acres of Land, More or Less, in Madison County, Alabama,* 140 F.Supp.3d 1218, 1240 (N.D. Ala. 2015), quoting *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (other citation omitted); *see also* Fed.R.Evid.701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."). It is well-established that "testimony by a witness relating to the value of his own land or property may be admissible as a lay opinion[,]" 140 F.Supp.2d at 1240-41 (citing numerous cases and quoting from the Advisory Committee Note to the 2000 Amendment to Rule 701), provided this testimony is based "upon commonly understood considerations of worth flowing from his perceptions and knowledge of his property" and not upon more broadly technical or specialized knowledge, *id.* at 1242; *see United States v. Musselwhite,* 709 Fed.Appx. 958, 972 (11th Cir. Sept. 22, 2017) (recognizing more generally that it has "previously held that 'Rule 701 does not prohibit lay witnesses from testifying based on particularized knowledge gained from their own personal experiences.'"), *cert. denied,* U.S. ___, 138 S.Ct. 2611, 201 L.Ed.2d 1005 (2018), and *cert. denied sub nom. Sotolongo v. United States,* ___ U.S. ___, 138 S.Ct. 2587, 201 L.Ed.2d 304 (2018). Finally, "'[q]ualified and knowledgeable witnesses may give their opinion or estimate of the value of the property taken, but to have probative value, that opinion or estimate must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption. It must have a rational foundation.'" (Continued)

but, instead, only a temporary taking and is enjoining the Defendants from enforcing the Baldwin County parking and story ordinances against Plaintiff and instructing Defendants to allow the immediate recommencement of the building of the three-story duplex Breezy Shores, this measure of damages is of no relevance and will not be awarded.

3.      **Whether Additional Evidence Regarding Damages Should be Stricken due to the Failure to Disclose Same.**  As a final matter, Defendants contend that any evidence of expenditures "not reflected in Doc. 84-24, specifically including, but not limited to, any and all evidence of expenditures alleged to have occurred in the interim between the initial issuance of the permit and after the stop work order are due to be excluded." (Doc. 89, PageID.4222-23). Defendants, therefore, seek to exclude all evidence of damages about which Steve Jones and Mike Bordelon gave oral testimony, including the testimony regarding the purported $3,000 expended to move the pilings from the Site (Doc. 79, PageID.3135) and Bordelon's testimony that additional unspecified costs not reflected on Doc. 84-24 were incurred by Plaintiffs (Doc. 79, PageID.3178 ($68,000.00 was spent on materials)). The Court, in its discretion, will **NOT CONSIDER** Bordelon's oral testimony regarding $68,000 spent by Plaintiffs on

---

140 F.Supp.2d at 1243, quoting *United States v. Sowards,* 370 F.2d 87, 92 (10th Cir. 1966) (other citation omitted).

Considering the foregoing, this Court **HOLDS** that Mike Bordelon was competent to give lay opinion testimony regarding loss of rental income based on his knowledge of rental income he gained from managing and renting the EZ Breezy 18-bedroom duplex located next door to the Site of the proposed 14-bedroom Breezy Shores duplex, *see Musselwhite, supra,* 709 Fed.Appx. at 972, and his testimony in this regard was helpful to the Court and probative because it was based on data (actual numbers and easy formulaic calculations), not speculation or unwarranted assumptions. *See United States v. An Easement and Right-of-Way Over 6.09 Acres of Land, More or Less, in Madison County, Alabama,* 140 F.Supp.3d at 1243. Accordingly, the Court will not strike Bordelon's testimony regarding lost rental income.

materials for the project because that testimony is speculative, at best. Instead, the undersigned will hew to the expenses set forth in Doc. 84-24, save for Jones' testimony regarding the $3,000 expended for moving the pilings from the Site. This is a specific sum to which Defendants can hardly confess much surprise since the evidence reflects complaints about the pilings being on the Site until moved (*see* Doc. 79, PageID.3135 (Jones' testimony that the pilings had to be removed from the Site at the request of Fort Morgan)).

B.     __Mike Bordelon has Established Independent Standing in his Individual Capacity__.  The Defendants contend that Mike Bordelon has failed to carry his burden of establishing independent standing in his individual capacity. (*See* Doc. 89, PageID.4223). In support of this argument, Defendants contend that Plaintiffs have not identified any individualized, compensable harm suffered by Bordelon prior to the litigation being filed and there being no evidence that he has a direct ownership interest in Breezy Shores, LLC. (*Id.*; *see also id.* ("Plaintiff Bordelon has not put forth any authority that would support the idea that an individual witness or corporate representative could somehow gain standing __after__ a lawsuit was filed based on his participation in it, and no such authority exists.")). Plaintiffs counter, arguing Bordelon has established individual capacity in this action by virtue of owning a self-directed IRA that owns a part of Breezy Shores, LLC, being personally involved in managing the Breezy Shores project, and by being personally responsible for the costs of litigation. (Doc. 92, PageID.4260).

The Court disagrees with Defendants that Plaintiff Bordelon is trying to gain standing after this lawsuit was filed in the Circuit Court of Baldwin County, Alabama

(and then removed to this Court at the Defendants' instance) because the trial testimony and evidence established not only that Bordelon was personally responsible for the costs of litigation (*compare* Doc. 80, PageID.3280 *with* Doc. 60, PageID.1879, n.2, citing Doc. 51, PageID.1745 & 1747, ¶¶ 2 & 9) but also that he began incurring these costs well before suit was filed in Baldwin County Circuit Court, as his various attorneys were actively "on the job" and pursuing this matter in connection with the revised ITP and the administrative appeal related to the "story ordinance" (*see, e.g.,* Doc. 84-2, PageID.3330, 3335 (Baldwin County Appeal of Administrative Decision dated November 18, 2019 and filed by Kristopher O. Anderson, Esquire, Plaintiffs' attorney then and now); Doc. 84-5, PageID.3474 (Anderson appears before the Baldwin County Commission District 4 Board of Adjustment, at its regular meeting on December 12, 2019);  Doc. 84-7, PageID.3486 (Linda Lee's August 16, 2019 email to Steve Jones advising Jones that the Planning Director told her "the County's attorney, David Conner[,] was supposed to notify ***Mr. Bordelon's attorney*** that you all would not be allowed to start construction without an approved ITP from USFWS." (emphasis supplied)); Doc. 84-8, PageID.3487 (Bordelon's November 5, 2019 email to Vince Jackson referencing his ***attorney, Mark Taupeka***); Doc. 84-22 (November 2019 email exchanges between Bordelon's attorney, Mark Taupeka, and Baldwin County officials— Jackson and Dyess—or attorneys for Baldwin County); Doc. 84-25, PageID.4066-67 (September 19, 2019 email from Mark Taupeka to Vince Jackson and Jackson's October 2, 2019 reply); Doc. 84-26, PageID.4068-72 (email exchanges from August of 2019 establishing that Mark Taupeka was working for Bordelon to facilitate lifting of the Stop Work Order)). Moreover, and for an altogether different reason, this Court is not

convinced that Bordelon cannot sue individually based on his ownership of a self-directed IRA, which owns 50% of Breezy Shores, LLC, and his management of the Breezy Shores project. *See FBO David Sweet IRA v. Taylor,* 4 F.Supp.3d 1282, 1284-85 (M.D. Ala. 2014) (determining that under the facts presented in that case, the owner/beneficiary of a self-directed IRA "acts as a trustee for all intent and purposes[,]" and could, therefore, bring suit on behalf of the IRA). For these separate and independent reasons, therefore, the Court finds that Bordelon has standing and is a proper party plaintiff in this matter.

      **C.**    <u>**Plaintiffs' Appeal—Count I of the Second Amended Complaint**</u>.

Plaintiffs' Second Amended Complaint (filed July 1, 2020) limited their Notice of Appeal under Baldwin County Zoning Ordinance § 18.10 to whether Jackson, Baldwin County, and the Baldwin County Commission 4 Planning and Zoning Board of Adjustment properly rejected their request for the Stop Work Order to be lifted. (Doc. 21, PageID.144-46). In the Joint Pretrial Document filed November 24, 2021, Plaintiff Breezy Shores, LLC described its Count I claim as an appeal of "the Board of Adjustment's denial of its request for a variance from the story restriction that would allow it to construct a three-story duplex on the subject property." (Doc. 68, PageID.1944). In this document, Plaintiffs cited to Baldwin County Zoning Ordinance § 18.6 but in making their variance argument stated the variance was governed by "Baldwin County Zoning Ordinance 18.4.2; 18.10 (version effective December 16, 2019)," (Doc. 68, PageID.1945), which contained different language than the language in §§ 18.6.1 and 18.6.2 (*compare id. with* Doc. 71, PageID.1996-97). In the Joint Supplement to the Joint Pretrial Document, filed on December 17, 2021, Plaintiffs

44

identified the correct version of the Appeal Ordinance as Section 18.10 and supplied a copy thereof (*see* Doc. 71, PageID.1981) but for the first time identified the correct version of the Variance Ordinance at Sections 18.6.1 and 18.6.2 (*see id.,* PageID.1981-82), making no reference to a purported § 18.4.2 (*see id.*).

Based on the foregoing "procedural background," Defendants initially contend that Plaintiffs have "waived their right to put forth a different interpretation of Section 18.6." (Doc. 71, PageID.1982; *compare id. with* Doc. 89, PageID.4224 (maintaining the waiver argument)). To the extent this Court has not been clear in this regard, the Defendants' waiver argument is rejected because if, indeed, Plaintiffs did put forth a different interpretation of Section 18.6 in the supplemental pretrial document that different interpretation was put forth sufficiently in advance of trial, by more than one month (*compare* Doc. 71 (supplement to joint pretrial document filed December 17, 2021) *with* Doc. 78 (bench trial began on January 24, 2022)), that the Defendants had time to prepare for this "version" and meet it head-on. Moreover, as the Defendants themselves recognized in the supplement to the joint pretrial document, "[t]here was not a 'section 18.4.2 (version effective December 16, 2019);' rather, Section 18.6, as reflected in Doc. 45-1, PageID.903, has always governed." (Doc. 71, PageID.1982-83). Therefore, because the Plaintiffs' (§ 18.6.1 and 18.6.2) variance arguments come as no surprise to the Defendants, the waiver argument is not adopted by the Court.

Section 18.6.1 of the Zoning Ordinance provides that "[t]he Board of Adjustment shall authorize upon application in specific cases such variance from the terms of these zoning ordinances as will not be contrary to the public interest where, owing to special conditions, a literal enforcement of the provisions of these zoning ordinances will result

45

in unnecessary hardship and so that the spirit of these zoning ordinances shall be observed and substantial justice done[.]" (Doc. 84-18, PageID.3754).[60] Section 18.6.2 then goes on to outline the "special" conditions upon which a variance "may be authorized," including that "the granting of the application is necessary for the preservation of a property right and not merely to serve as a convenience to the applicant or based solely upon economic loss." (*Id.*).[61]

As set forth at some additional length, *infra*, the Plaintiffs' possessed a vested property right in construction of their three-story Breezy Shores duplex at the time—July 31, 2019—when Vince Jackson improperly revoked Plaintiffs' land use certificate and placed a Stop Work Order on the "Site." Because the face of the Stop Work Order states that it was posted based on Jackson's revocation of the land use certificate, it cannot be gainsaid that Jackson's letter to Plaintiffs' contractor constituted his attempt at revoking the land use certificate, despite the "leeway" he attempted to accord himself

---

[60]     The Court agrees with the Defendant Board of Adjustment that Section 18.6.1 of the Baldwin County Zoning Ordinance is drawn from § 45-2-261.12 of the Alabama Code, which grants boards of adjustments certain enumerated powers, including the power "[t]o authorize upon appeal in specific cases the variance from the terms of the zoning regulations as will not be contrary to the public interest where, owing to special conditions, a literal enforcement of the provisions of the zoning regulations will result in unnecessary hardship and so that the spirit of the ordinance or regulations required shall be observed and substantial justice done." Ala.Code § 45-2-261.12(3).

[61]     To the extent the Defendants mean to suggest in their post-hearing brief that an applicant must establish all conditions identified in Section 18.6.2 before a variance can be approved (*see* Doc. 89, PageID.4225-26; *compare id. with* Doc. 84-18, PageID.3754), the Court rejects this broad reading of this variance section, particularly since Defendants make no mention whatsoever of the condition in subsection (e) (*see id.* ("(e) Any owner of record of real property upon the date of the adoption by the Baldwin County Commission of the zoning ordinances for the planning district in which such property is located shall automatically obtain a variance, if needed, for a single family dwelling notwithstanding the type of dwelling to be placed or constructed on the property.")). This telling omission establishes that a variance can be authorized based upon the existence of any of the listed conditions, not upon the existence of all or a majority of those conditions. (*See id.*).

through the contents of the letter itself. However, as Baldwin County's Zoning Ordinance provides, the only permissible action by Jackson after Bates approved Plaintiffs' application and issued a land use certificate was to follow the procedures in § 18.2.5 of the Zoning Ordinance to revoke the Land Use Certificate. And since it is undisputed that Plaintiffs made no false statement or misrepresentation in the application or on the site plan (Doc. 78, PageID.2860 (Lee's testimony that she was unaware of any false statements in Plaintiffs' land use application); *see also id.,* PageID.2897 (Jackson's trial testimony confirmed his deposition testimony that the land use certificate application submitted by Plaintiffs did not contain any misstatements or misrepresentations)) and Jackson (nor anyone else at his behest) issued a warning to the Plaintiffs after which they failed to comply with the requirements of Baldwin County's zoning ordinances (Doc. 78, PageID.3013), the provision for revocation of the land use certificate had no application in this case (*see* id.); therefore, Jackson had no authority or power to revoke Plaintiffs' Land Use Certificate. And, again, while Jackson attempted to suggest that he possessed the authority to revoke the "approval" of the land use certificate and then deny the land use certificate application, as stated in his letter, the Defendants offered this Court no provision in the Baldwin County Zoning Ordinance granting Jackson the authority to revoke approval of a land use certificate (once granted) and then deny the land use certificate.[62] As somewhat of an aside, it is also

---

[62]   To be sure, the idea was "floated" at the bench trial that § 18.1 of the zoning ordinance gave the planning director the authority to correct mistakes violative of the zoning ordinance. (*See* Doc. 79, PageID.3096-97; *see also id.,* PageID.3101-02 (Dyess could not point to any provision in the zoning ordinances giving the planning director the opportunity to correct perceived mistakes but stated: "I think just as the duty of the administrator and the enforcement of the ordinance, I believe that included those decisions to correct things and that's his primary job is to make those decisions. And ultimately, those decisions are made by him and that's (Continued)

where it stops at, except for the appeals process.")). Section 18.1.1 provides that "[t]he duty of administering and enforcing the provisions of these zoning ordinances is hereby conferred upon the Zoning Administrator[]" (Doc. 84-18, PageID.3751) and Section 18.1.2 provides that "[t]he Zoning Administrator is authorized and empowered to administer and enforce the provisions of these zoning ordinances to include receiving applications, inspecting sites, and issuing land use certificates for projects and uses and structures which are in conformance with the provisions of these zoning ordinances." (*Id.*). These sections say nothing, however, about correcting mistakes and even if they could be implicitly read as allowing correction for mistakes, there was no mistake violative of the zoning ordinance made in this case because when Bates approved Plaintiffs' land use certificate (as she was empowered to do and she did so validly), she was unaware—as were Plaintiffs—of Jackson's July 3, 2019 interpretation/determination regarding the Parking Ordinance (an ordinance, which before Jackson's unpublished July 3, 2019 interpretation had never been read to prohibit stacked parking configurations for residential developments). Therefore, the land use certificate was properly approved and once issued that certificate could only be revoked, thereby "landing" this Court back on Section 18.2.5 of the Baldwin County Zoning Ordinance, not §§ 18.1.1, 18.1.2.

Additionally, and for the first time at trial, the Defendants, through Jackson, offered the theory that § 21.4.1 of the Baldwin County Zoning Ordinance provided other options to him as zoning and planning director to remedy potential violations of the zoning ordinance through a stop-work order. (Doc. 79, PageID.3038 ("'The planning and zoning director may issue or cause to be issued a stop-work order on a premises, lot, or parcel that is in alleged violation of any provision of these ordinances or is being maintained in a dangerous or unsafe manner.'"); *see also id.,* PageID.3039 ("A stop-work order may be issued in place of or [in] conjunction with any other actions or procedure identified in these ordinances.")). Section 21.4.1 reads in its entirety as follows:

> The Planning and Zoning Direction may issue, or cause to be issued, a Stop Work Order on a premises, lot or parcel that is in alleged violation of any provision of these ordinances or is being maintained in a dangerous or unsafe manner. A Stop Work order may be issued in place of or in conjunction with any other actions and procedures identified in these ordinances. Such Order shall be in writing and shall be given to the owner of the property, or to his agent, or to the person doing the work, and shall state conditions under which work may be resumed. Upon receipt of a Stop Work Order, all work associated with the violation shall immediately cease. Any person who continues to work shall be in violation of these ordinances and subject to penalties and remedies contained herein. The Stop Work order may be appealed to the respective Board of Adjustment for which the activity is located.

(Doc. 84-18, PageID.3775). Jackson testified this provision gave him the authority to issue the stop-work order (*id.*) and such orders are flexible (*see id.,* PageID.3039-40). While this Court does not question the general ability of the Planning Director to issue Stop Work Orders on premises that are in violation of any provisions of the Baldwin County Zoning Ordinance, the problem in this case is that the Stop Work Order was based on Section 18.2.5, revocation of a land use certificate, and not based on the Parking Ordinance or any interpretation/determination antecedent thereto. And here is the even bigger problem. Because, as aforesaid, Jackson had no basis to revoke the land use certificate under § 18.2.5. and no other section of the Zoning Ordinance gave him the specific authority to revoke approval of the land use certificate and then

(Continued)

relevant to note that the impetus for Jackson's actions on July 31, 2019 was the specific complaint by Paul Stanton, who (along with a group of homeowners in the area) were intent on preventing the construction of the three-story Breezy Shores duplex. Under these circumstances, which show an improper and impermissible revocation of Plaintiffs' land use certificate, an undeniable hardship was imposed upon the Plaintiffs because this improper action ultimately led to Plaintiffs' inability to comply with Jackson's parking ordinance determination/interpretation until the newly-minted story ordinance was approved in October of 2019.[63] And, finally, there can be no dispute that denial of authorization of a variance in this case will work a significant financial hardship on the Plaintiffs, as the three-story duplex upon which construction had begun in July of 2019 (for use as a 14-room short-term vacation rental property for three to four years and then sold) will now be relegated to a 10-room rental property.

The approval of Plaintiffs' request for a variance in this case will not be contrary to the public interest particularly where, as aforesaid, Plaintiffs had already begun the construction of their three-story duplex well before the story ordinance was passed and were stopped by improper revocation of the land use certificate and there were three-

_____

deny it, his actions on July 31, 2019 were decidedly improper and without basis (or authority). Stated somewhat differently, Jackson certainly had the authority to issue a Stop Work Order on Plaintiffs' project that was not based on Section 18.2.5 and revocation of the land use certificate, since there was no basis to revoke the land use certificate, but that is not what happened here. Plaintiffs' land use certificate was improperly revoked under the Zoning Ordinance.

[63]     It was established during the bench trial that Paul Stanton and other residential property homeowners in District 25 similarly situated to him actively campaigned for the story ordinance and its applications to Plaintiffs' Breezy Shores construction project and, as well, actively campaigned William Lynn to delay approval of Plaintiffs' application for a revised incidental take permit until after the proposed story ordinance for District 25 was approved in October of 2019.

.

story residential properties in Baldwin County Planning District 25 that had been built prior to approval of the story ordinance in October of 2019, including EZ Breezy, a three-story duplex constructed by Bordelon in 2015 (*see* Doc. 80, PageID. 3263). Indeed, a variance in this case will promote the public interest because it should have been apparent to the Board of Adjustment that Plaintiffs were at all times actually in possession of a valid land use certificate (because, as aforesaid, it was improperly/impermissibly revoked) and properly-issued building permit (which, as apparent form the provisions of the Zoning Ordinance, specifically § 18.2.4, could be issued anytime during the six-month period following issuance of the land use certificate on July 19, 2019, that is, anytime until January 19, 2020), and had begun construction of the three-story Breezy Shores duplex under those properly-issued permits before the October 15, 2019 adoption of the story ordinance (that is, the story amendment), such that their building of the three-story Breezy Shores duplex was grandfathered in pursuant to Section 20.2.2 of the Baldwin County Ordinance ("To avoid undue hardship, nothing in these ordinances shall require a change in plans, construction or designed use of buildings on which a building permit has been properly issued prior to the adoption of these ordinances or amendments thereto."). Moreover, and most importantly, the Defendants purported safety concerns, particularly as regards the increase in the danger of fire between three-story properties and two-story properties, is illusory, not real, because, at all times pertinent hereto, the height limitation ordinance (of 35') has remained in effect without change. In other words, a residential structure (of two stories or three stories) can still be built to a height of 35' thereby begging how the story limitation will decrease the fine danger since any fire will have the same area of

coverage. Finally, it would strain common sense and logic to find that a variance granted in this one case (allowing a third story with 4 additional rooms) would unreasonably increase the congestion in the public streets.

These foregoing circumstances and considerations countenance the granting of a variance, as only with a variance can substantial justice in this case be done. *See generally Board of Zoning Adjustment for the City of Lanett,* 265 Ala. 504, 510, 92 So.2d 906, 910-11 (Ala. 1957). Accordingly, this Court **ORDERS and AUTHORIZES** a variance in this case from the terms of the story ordinance in Planning District 25 approved in October of 2019, that allows Plaintiffs to construct their Breezy Shores duplex as a three-story duplex rather than a two-story duplex.  Alternatively, the Defendant Board of Adjustment is **AUTHORIZED** to grandfather-in Plaintiffs' building of their three-story Breezy Shores duplex under the provisions of Section 20.2.2 of the Baldwin County Zoning Ordinance.

### D.     Declaratory Judgment—Count II of the Second Amended Complaint.

In its ruling on summary judgment, the Court specifically determined that this case would proceed to a bench trial on Count Two of Plaintiffs' Second Amended Complaint (Declaratory Judgment) related to Counts Six (taking without just compensation), Count Seven (vested rights respecting equitable remedies against Baldwin County and Vince Jackson in his official capacity), and Count Nine (negligence/wantonness as to equitable remedies against Baldwin County and Vince Jackson in his official capacity). (Doc. 60, PageID.1916).

There can be little question but that in actions brought under the Declaratory Judgment Act, 28 U.S.C. § 2201,"'a declaratory judgment may only be issued in the

case of an actual [or justiciable] controversy.'" *A & M Gerber Chiropractic LLC v. GEICO General Ins. Co.,* 925 F.3d 1205, 1210 (11th Cir. 2019) (citations omitted); *see also Atlanta Gas Light Co. v. Aetna Cas. & Surety Co.,* 68 F.3d 409, 414 (11th Cir. 1995) (holding that in all actions brought under the Declaratory Judgment Act, "the threshold question is whether a justiciable controversy exists."). Alabama law is the same as "[a]ll that is required for a declaratory judgment action is a [b]ona fide justiciable controversy." *Gulf South Conference v. Boyd,* 369 So.2d 553, 557 (Ala. 1979) (citation omitted); *see also Creola Land Dev., Inc. v. Bentbrooke Housing, L.L.C.,* 828 So.2d 285, 288 (Ala. 2002) (same).

> For an actual controversy to exist, "the facts alleged, under all the circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

> Even when an actual controversy exists, the court still has "unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton,* 515 U.S. at 286, 115 S.Ct. 2137. When determining whether to exercise its discretion, the court considers practicality, judicial efficiency, and the "facts bearing on the usefulness of the declaratory judgment remedy[] and the fitness of the case for resolution." *Id.* at 288-89, 115 S.Ct. 2137.

*Bennett v. CIT Bank, N.A.,* 482 F.Supp.3d 1205, 1215 (N.D. Ala. Aug. 27, 2020), *correcting on denial of reconsideration on other grounds,* 544 F.Supp.3d 1225 (N.D. Ala. June 16, 2021); *see also Huff v. Countrywide Home Loans, Inc.,* 2013 WL 2248036, *2 (N.D. Ala. May 22, 2013) (recognizing that "[a] controversy is justiciable where present 'legal rights are thwarted or affected [so as] to warrant proceedings under [Alabama's] Declaratory Judgment statutes.").

52

Here, the Defendants Baldwin County and/or Vince Jackson nowhere contend

that there exists no justiciable controversy between them and the Plaintiffs regarding

Counts Six, Seven, and Nine of the Amended Complaint (*see* Doc. 89, PageID.4247-48

(only discussing whether Plaintiffs have standing to request an injunction regarding the

issuance of non-published zoning determinations[64])); therefore, to the extent this Court

finds that Plaintiffs have established Counts Six, Seven, and Nine, it will consider

whether Plaintiffs are entitled to entry of declaratory judgment relief.

**E.** **Whether Plaintiffs have Established a Temporary Takings Claim.**  The

Takings Clause of the Fifth Amendment prohibits private property from being "taken for

public use without just compensation." U.S.CONST. amend. V. The Fifth Amendment's

Takings Clause is made applicable to the States through the Fourteenth Amendment,

*Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 536, 125 S.Ct. 2074, 2080, 161 L.Ed.2d

876 (2005) (recognizing that "[t]he Takings Clause of the Fifth Amendment[ is] made

applicable to the States through the Fourteenth [Amendment.]"); *see Rivadeneira v.

University of South Florida,* 2022 WL 445661, *2 (M.D. Fla. Feb. 14, 2022) ("A § 1983

claim may be based upon a violation of the Bill of Rights if the right in question has been

incorporated into the Fourteenth Amendment Due Process Clause and made applicable

to the states. The Fifth Amendment's right to just compensation for the taking of

property is incorporated. Thus, the Takings Clause of the Fifth Amendment is applicable

to the states through the Fourteenth Amendment.") (internal citations omitted). While

Plaintiffs make no specific mention of 42 U.S.C. § 1983 in their Second Amended

---

[64]      The Court agrees with the Defendants that Plaintiffs raised their entitlement to
this specific declaratory relief much too late and, therefore, this Court will not enjoin the
Defendants from henceforth issuing non-published zoning determinations.

Complaint (*see* Doc. 21), § 1983 provides the vehicle for the presence of this case in this Court (*compare id. with* Doc. 1, PageID.2 ("The Amended Complaint alleges that, in addition to Alabama law, Defendants violated the 5th and 14th Amendments of the United States Constitution, as made applicable by 42 U.S.C. § 1983.") and Doc. 48, PageID.1728 (in arguing Vince Jackson was entitled to qualified immunity on all federal claims alleged against him, the Defendants quoted from the Supreme Court's decision in *Carroll v. Carman,* 574 U.S. 13, 135 S.Ct. 348, 350 (2014) regarding the clearly established prong of the qualified immunity analysis, inclusive of the statement that "[a] government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.")). *Compare Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing,* 545 U.S. 308, 312, 125 S.Ct. 2363, 2366 (2005) (recognizing that the provision for federal-question jurisdiction set forth in § 1331 "is invoked by and large by plaintiffs pleading a cause of action created by federal law (*e.g.,* claims under 42 U.S.C. § 1983).") *with Knick v. Township of Scott, Pennsylvania,* U.S. ___, 139 S.Ct. 2162, 2177 & 2179, 204 L.Ed.2d 558 (2019) ("We conclude that a government violates the Takings Clause when it takes property without compensation, and that a property owner may bring a Fifth Amendment claim [in federal court] under § 1983 at that time. . . . A property owner may bring a takings claim under § 1983 upon the taking of his property without just compensation by a local government.") and *Pakdel v. City and County of San Francisco, California,* ___ U.S. ___, 141 S.Ct. 2226, 2230, 210 L.Ed.2d 617 (2021) (recognizing that in *Knick,* the petitioners brought their

takings claim under § 1983, "which 'guarantees "a federal forum for claims of unconstitutional treatment at the hands of state officials."'").

Before taking a deeper dive into takings jurisprudence, the Court would be remiss in failing to acknowledge that the defendant subject to liability on Plaintiffs' takings claim is Baldwin County. *Knick, supra,* 139 S.Ct. at 2179 ("A property owner may bring a takings claim under § 1983 upon the taking of his property without just compensation by a local government."); *cf.* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance,  regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]") *with, e.g., McDowell v. Brown,* 392 F.3d 1283, 1289 (11th  Cir. 2004) (recognizing that "the Supreme Court has held that counties . . . are 'persons' within the scope of § 1983, and subject to liability.").  Moreover, the Court also finds that Baldwin County's liability can be traced to the actions of Vince Jackson, to whom the County indisputably gave final decision-making authority with respect to administration (including interpretation) and enforcement of the Zoning Ordinance, and whose actions were taken in implementation and execution of the Zoning Ordinance; therefore, Baldwin County is liable for the actions taken by Jackson, as a final decisionmaker, particularly where, as here, the Board of Adjustment upheld all of Jackson's actions despite being placed on notice of the impropriety of Jackson's actions on July 31, 2019. *See, e.g., McKusick v. City of Melbourne, Florida,* 96 F.3d 478, 483 (11th Cir. 1996) (recognizing municipal

liability can be established "when the allegedly unconstitutional municipal action 'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the body's officers'"); *Little v. City of North Miami,* 805 F.2d 962, 967 (11th Cir. 1986) ("Because we conclude that the resolution in question can be fairly characterized as a 'decision officially adopted and promulgated' by the City Council of North Miami, we conclude that the minimum requirements for imposing municipal liability have been alleged."); *cf. Mandel v. Doe,* 888 F.2d 783, 793 (11th Cir. 1989) (recognizing that "municipal liability may attach to a single decision made by a municipal official if that municipal official is the final policymaker for the municipality with respect to the subject matter in question.").

Returning to Plaintiffs' takings claim, Defendants' are correct that except for a limited set of cases that amount to a *per se* taking of property [that is, where government regulatory action requires an owner to suffer a permanent physical invasion of his property and where the regulation completely deprives an owner of "'*all* economically beneficial us[e]'" of his property], which are not applicable here (*see* Doc. 85, PageID.4077 (in their post-trial brief, Plaintiffs admitted "the regulatory takings analysis set forth in *Penn Central* . . . applies here[.]")), "regulatory takings challenges are governed by the standards set forth in *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)." *Lingle, supra,* 544 U.S. at 538, 125 S.Ct. at 2081; *see KI Florida Properties, Inc. v. Walton County,* 2021 WL 5456668, *5 (N.D. Fla. Oct. 15, 2021) ("A regulatory taking occurs when private property rights are eliminated or ***diminished*** through government regulation. Regulatory takings come in two types. The first is a categorical taking, in which the property owner is

56

deprived of all economically viable use of the property. . . . The second type, a non-categorical taking, includes anything less and is subject to analysis under the balancing test set out in *Penn Central* . . . .") (emphasis supplied), *appeal filed* (Nov. 15, 2021).

> The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Penn Central Transp. Co.*, 438 U.S. at 124, 98 S.Ct. at 2659 (all internal citations omitted); *see also Lingle, supra,* 544 U.S. at 539, 125 S.Ct. at 2082 ("The *Penn Central* factors . . . have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or *Lucas* rules."); *accord Murr v. Wisconsin,* ___ U.S. ___, 137 S.Ct. 1933, 1943, 198 L.Ed.2d 497 (2017) ("[W]hen a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on 'a complex set of factors' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. . . . A central dynamic of the Court's regulatory takings jurisprudence, then, is its flexibility. This has been and remains a means to reconcile two competing objectives central to regulatory takings doctrine. One is the individual's right to retain the interests and exercise the freedoms at the core of private

property ownership. . . . The other persisting interest is the government's well-established power to 'adjus[t] rights for the public good.'").[65]

> Although our regulatory takings jurisprudence cannot be characterized as unified, these three inquires (reflected in *Loretto, Lucas,* and *Penn Central*) share a common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights. The Court has held that physical takings require compensation because of the unique burden they impose: A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests. In the *Lucas* context, of course, the complete elimination of a property's value is the determinative factor. And the *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.

*Lingle, supra,* 544 U.S. at 539-40, 125 S.Ct. at 2082 (all internal citations omitted).

In *First English Evangelical Lutheran Church of Glendale v. Los Angeles County, California,* 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), the Supreme Court held that a property owner may recover compensation for "'temporary' regulatory takings—those takings which are ultimately invalidated by the courts." 482 U.S. at 310, 107 S.Ct. at 2383; *see also id.* at 311, 313 & 318-19, 107 S.Ct. at 2383, 2385 & 2388.

---

[65] In *Lingle,* the Supreme Court determined that the "substantially advances" formula announced in *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), "a case involving a facial takings challenge to certain municipal zoning ordinances," actually prescribed "an inquiry in the nature of a due process, not a takings, test," and, therefore, held "no proper place" in Supreme Court "takings jurisprudence." 544 U.S. at 540, 125 S.Ct. at 2082 & 2083; *see also id.* at 548, 125 S.Ct. at 2087 ("We hold that the 'substantially advances' formula is not a valid takings test, and indeed conclude that it has no proper place in our takings jurisprudence. In so doing, we reaffirm that a plaintiff seeking to challenge a government regulation as an uncompensated taking of private property may proceed under one of the other theories discussed above—by alleging a 'physical' taking, a *Lucas*-type 'total regulatory taking,' a *Penn Central* taking, or a land-use exaction violating the standards set forth in *Nollan* and *Dolan*.").

The holding in *First English* was limited to "the facts presented," with the Court refusing to "deal with the quite different questions that would arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like[,]" which were not before it. 482 U.S. at 321, 107 S.Ct. at 2389. Moreover, *First English* was not just limited to its facts but, as well, that case did not provide any guidance on the "quite different and logically prior question whether the temporary regulation at issue had in fact constituted a taking." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302, 328, 122 S.Ct. 1465, 1482, 152 L.Ed.2d 517 (2002). In *Tahoe-Sierra,* the Supreme Court refused to find that a moratorium on development imposed during the process of devising a comprehensive land-use plan constituted a *per se* taking of property requiring compensation under the Takings Clause of the United States Constitution, *see id.* at 306 & 342, 122 S.Ct. at 1470 & 1489; instead, it was persuaded that "the better approach to claims that a regulation has effected a temporary taking 'requires careful examination and weighing of all the relevant circumstances[,]'" *id.* at 335, 122 S.Ct. at 1486, and concluded that "the interest in 'fairness and justice' will be best served by relying on the familiar *Penn Central* approach when deciding cases like this, rather than by attempting to craft a new categorical rule." *Id.* at 342, 122 S.Ct. at 1489.[66]

---

[66]   The Defendants argue that Plaintiffs cannot make out a temporary regulatory taking "during the pendency of litigation bringing only state law challenges against some regulation that does not amount to a total deprivation." (Doc. 89, PageID. 4238-40). In making this argument, Defendants cite prominently to a California case in which the court concluded that "a regulatory **mistake** resulting in a delay does *not*, by itself, amount to a taking of property." *Landgate, Inc. v. California Costal Comm'n,* 17 Cal.4th 1006, 1018, 953 P.2d 1188 (Cal. 1998) (some emphasis supplied), *cert. denied,* 525 U.S. 876, 119 S.Ct. 179, 142 L.Ed.2d 146 (1998). First, as it relates to the seminal "regulation" in this case (that is, Jackson's July 31, 2019 actions revoking Plaintiffs' land use certificate and posting a stop work order), the (Continued)

Before addressing the *Penn Central* factors and all relevant circumstances in this case, the undersigned identifies the actions that for this Court constitute a regulatory taking. The undersigned recognizes that in *Knick v. Township of Scott, Pennsylvania,* 588 U.S. ___, 139 S.Ct. 2162, 204 L.Ed.2d 558 (2019), the Supreme Court overruled its previous decision in *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (holding that a property owner whose property has been taken by a local government has not suffered a violation of his Fifth Amendment rights—and, therefore, cannot bring a federal takings claim in federal court—until a state court has denied his claim for just compensation under state law), by relying on the "'settled rule [] that exhaustion of state remedies is *not* a prerequisite to an action under 42 U.S.C. § 1983[.]'" *Pakdel, supra,* ___ U.S. at , 141 S.Ct. at 2228, quoting *Knick, supra,* 588 U.S. at ___, 139 S.Ct. at 2167; *see also id.* at ___, 139 S.Ct. at 2167-68 ("We now conclude that the state-litigation requirement imposes an unjustifiable burden on takings plaintiffs, conflicts with the rest of our takings jurisprudence, and must be overruled. A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it.

---

Defendants have identified no regulatory "mistake," as there was certainly no mistake made by Bates when she issued Plaintiffs a valid land use certificate nor was anything about Jackson's improper/impermissible revocation of Plaintiffs' validly-issued land use certificate a mistake. Moreover, under all the circumstances in this case surrounding Jackson's July 31, 2019 actions (particularly in light of what happened shortly before that time and what occurred thereafter with passage of the story ordinance in October of 2019 and the consequential permanent partial taking of Plaintiffs' property due to the reduced profitability of their property), there is no question that Jackson's actions on July 31, 2019 constituted a physical invasion of Plaintiffs' property sufficient to support a temporary takings claim (as do the actions of the County in October of 2019 adopting the story ordinance). Accordingly, for these reasons and those supplied by the Plaintiffs in their reply in support of their post-trial brief (*see* Doc. 92, PageID.4265-67), which are adopted as if fully set out herein, the Court rejects the Defendants argument that Plaintiffs cannot establish a claim for a temporary taking.

That does not mean that the government must provide compensation in advance of a taking or risk having its action invalidated: So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities. But it does mean that the property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under § 1983 at that time."). So, exhaustion of state remedies is not required before bringing a Fifth Amendment takings claim; however, it is just as clear that "[w]hen a plaintiff alleges a regulatory taking in violation of the Fifth Amendment [as the Plaintiffs in this case do], a federal court should not consider the claim before the government has reached a 'final' decision." *Pakdel, supra,* ___ U.S. at ___, 141 S.Ct. at 2228 (citation omitted); *see also id.* ("After all, until the government makes up its mind, a court will be hard pressed to determine whether the plaintiff has suffered a constitutional violation."); *cf. MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986) ("It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the subject property."). The Court in *Pakdel* made clear that "[t]he finality requirement is relatively modest[]" because all plaintiffs must demonstrate is that "'there [is] no question . . . about how the "regulations at issue apply to the particular land in question."'" *Id.* at ___, 141 S.Ct. at 2230.

Here, the Defendants contend that the July 31, 2019, "denial" of Plaintiffs' land use certificate, in conjunction of the issuance of the stop work order, was not an independent final regulatory action that can serve as an independent basis for a takings

claim.[67] (*See* Doc. 89, PageID.4230). The Court disagrees with the Defendants' position

in this regard and here is why. While the Defendants would very much like this Court to

find that the land use certificate was "denied" by Vince Jackson on July 31, 2019,

because that is what his letter to Plaintiffs' contractor stated, there was no procedural

avenue under Baldwin County's Zoning Ordinance by which Jackson could deny a

certificate that had already been approved (as was the case here); instead, his only

means of attack on an already-approved land use certificate was to revoke it under §

18.2.5 of the Zoning Ordinance. Accordingly, Jackson's action on July 31, 2019,

amounted to a revocation of the land use certificate which, in conjunction with the stop

work order,[68] halted all construction on Plaintiffs' Breezy Shores duplex. And since that

revocation was "based" on Jackson's July 3, 2019 interpretation/determination of

Baldwin County's Parking Ordinance (that is, that the Ordinance disallowed stacked

parking at residential properties), it is impossible for this Court to discern how Jackson's

action in revoking Plaintiffs' land use certificate, in conjunction with the stop work order,

was anything other than a final regulatory action since there is no question how Baldwin

County's "top" zoning and planning official felt the Parking Ordinance applied to

Plaintiffs' property. *See Pakdel, supra,* ___ U.S. at ___, 141 S.Ct. at 2230 ("The

rationales for the finality requirement underscore that nothing more than *de facto* finality

is necessary. This requirement ensures that a plaintiff has actually 'been injured by the

---

[67]     The undersigned pretermits, as unnecessary, any discussion of Plaintiffs'
assertion that the Defendants' failure to allow the resumption of construction in October of 2019,
constitutes an independent basis for a takings claim.

[68]     The face of the stop work order references that the construction of the project
was violative of the Planning Director's revocation of the land use certificate. (*See* Doc. 84-21,
PageID.4024).

Government's action' and is not prematurely suing over a hypothetical harm. . . . Along the same lines, because a plaintiff who asserts a regulatory taking must prove that the government 'regulation has gone "too far,"' the court must first 'kno[w] how far the regulation goes.' . . . Once the government is committed to a position, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution."). This is particularly true since § 18.2.6 of the Zoning Ordinance only supplies an appeal from the "**denial** of the land use certificate" (Doc. 84-18, PageID.3753), not the revocation of a land use certificate (which is what happened here). Therefore, the Court will now focus its analysis on the *Penn Central* factors, as they relate to the July 31, 2019 revocation of land use certificate/concurrent stop work order (which the Court has determined to be a final regulatory decision) **and** Baldwin County's admittedly final decision to apply its newly-minted Story Ordinance to prohibit Plaintiffs' construction of a three-story duplex.[69]

> 1. Consideration of the *Penn Central* Factors in Relation to the July 31, 2019 Revocation of Plaintiffs' Land Use Certificate and Issuance of a Stop Work Order.

> a. Economic Impact of Defendants' Actions. With respect to the

economic impact factor, it is clear that this Court should "compare the value that has

---

[69] As to both, this Court considers the takings temporary because, as set forth elsewhere in this opinion, those takings have been invalidated due principally to the fact that Plaintiffs possessed a vested property right in constructing their three-story Breezy Shores duplex before Jackson's improper actions on July 31, 2019, and the equities in this case lead inexorably to preservation of Plaintiffs' vested property right. Moreover, the Court only discusses the decision regarding the Story Ordinance parenthetically given the finding that the July 31, 2019 revocation of land use certificate/concurrent stop work order unequivocally amounted to an improper (temporary) taking of Plaintiffs' property without just compensation.

been taken from the property with the value that remains in the property[.]"  *Keystone*

*Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 1248, 94

L.Ed.2d 472 (1987). And while the Supreme Court has certainly recognized that "a

reduction in the value of property is not necessarily equated with a taking[,]" *Andrus v.*

*Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979), and that a "loss of

future profits—unaccompanied by any physical property restriction—provides a slender

reed upon which to rest a takings claim[,]" *id.,* that reed is not too slender in this case

given that in this case the Stop Work Order constitutes a physical property restriction.

Thus, Jackson's actions on July 31, 2019, improperly revoking Plaintiffs' land use

certificate and issuing the Stop Work Order (which improper taking continued through

the October 15, 2019 amendment to Baldwin County's zoning ordinance), had profound

economic impact on Plaintiffs inasmuch as the credible testimony offered at the bench

trial established that for the three years construction of their three-story duplex has been

delayed, they have and will lose $599,666.00 in net rental income (i.e., they will earn no

rental income for this period and will lose 100% of their projected rental income).

**b.    Interference with Distinct Investment-Backed Expectations**.

The Court agrees with Plaintiffs that their "reasonable investment-backed expectations"

are judged by the regulatory environment in existence as of the time they acquired the

property at issue. *Compare Commonwealth Edison Co. v. United States,* 271 F.3d

1327, 1350 n.22 (Fed. Cir. 2001) (en banc), *cert. denied,* 535 U.S. 1096, 122 S.Ct.

2293, 152 L.Ed.2d 1051 (2002), *with Appolo Fuels, Inc. v. United States,* 381 F.3d

1338, 1349 (Fed.Cir. 2004), *cert. denied,* 543 U.S. 1188, 125 S.Ct. 1406, 161 L.Ed.2d

191 (2005). Relevant to the determination of a party's reasonable expectations are the

following three factors: "(1) whether the plaintiff operated in a 'highly regulated industry;' (2) whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property; and (3) whether the plaintiff could have 'reasonably anticipated' the possibility of such regulation in light of the 'regulatory environment' at the time of purchase." *Appolo Fuels,* 381 F.3d at 1349, citing *Commonwealth Edison, supra,* 271 F.3d at 1348. Each of these factors weigh in favor of a finding of reasonable expectations.

First, the undersigned agrees with Plaintiffs that while real estate development certainly involves compliance with zoning regulations and building codes, it simply does not rise to the level of a "highly regulated" industry of the type recognized in *Appolo Fuels, supra,* (recognizing that the coal mining business is a highly regulated industry) and Supreme Court precedent, *see City of Los Angeles, California v. Patel,* 576 U.S. 409, 424, 135 S.Ct. 2443, 2454, 192 L.Ed.2d 435 (2015) (recognizing that liquor sales, firearms dealing, the mining industry, and running an automobile junkyard are closely regulated industries). Moreover, there was no evidence presented at the bench trial which would indicate that Plaintiffs were aware of any issues at the time of their purchase of the property that would spawn revocation of their land use certificate and concomitant stop work order or, indeed, any evidence suggesting they could have "reasonably anticipated" revocation of their land use certificate (and posting of the stop work order), nor anything suggesting that they anticipated passage of an amendment to the Zoning Ordinance reducing the allowable stories in Planning District 25. Indeed, all credible evidence presented during the bench trial was to the contrary. It was established through the testimony of Mike Bordelon, that the Plaintiffs purchased the

property in 2018 to build a short-term vacation rental property, with plans to rent it for three to four years, and then sell the property and use the sales proceeds to purchase another piece of property, as had been done with the property adjacent thereto. At the time of purchase, there was certainly nothing to suggest to Plaintiffs that there were any parking issues of the type which arose in July of 2019 or that the Baldwin County Planning Director would be influenced by a property owner intent on halting Plaintiffs' project to reverse the interpretation of the parking ordinance and that this new and unique interpretation would then lead to the improper and impermissible revocation of Plaintiffs' validly issued land use certificate and building permit (nor, at the time of purchase, was there anything indicating that Baldwin County would amend its Zoning Ordinance to reduce the allowable stories in Planning District 25). Accordingly, it is found that Defendant Jackson's July 31, 2019 actions in improperly revoking Plaintiffs' land use certificate and placing a stop work order on their project severely interfered with Plaintiffs' distinct investment-backed expectations.

        **c.**    **Character of the Government Action**.  As recently recognized by the Eleventh Circuit in *South Grande View Dev. Co., Inc. v. City of Alabaster, Alabama,* 1 F.4th 1299 (2021), "the 'character of the government action' is another way to examine the severity of the government interference with property rights." *Id.* at 1311, citing *Lingle, supra,* 544 U.S. at 539, 125 S.Ct. 2074. In this case, it is determined that the July 31, 2019 actions of Jackson in revoking Plaintiffs' land use certificate and issuing the Stop Work Order were more akin to a physical invasion by Baldwin County given that one of its officials actually went on-site to post the Stop Work Order after Plaintiffs had a vested property right in constructing their three-story Breezy Shores

duplex. And, as made clear elsewhere, the Defendants' actions were improper because the Baldwin County Zoning Ordinance provided no basis to revoke approval of the land use certificate and then to deny the certificate but only a means to revoke the land use certificate once it was properly issued, as was the case here.[70]  As previously determined and found, the testimony at trial demonstrated that neither of the bases recognized in § 18.2.5 of the Zoning Ordinance to revoke the Land Use Certificate issued on July 17, 2019[71] existed (*compare, e.g.,* Doc. 78, PageID.2860 (Lee's testimony that she was unaware of any false statements in Plaintiffs' land use application) and *id.,* PageID.2897 (Jackson's trial testimony confirmed his deposition testimony that the land use certificate application submitted by Plaintiffs did not contain any misstatements or misrepresentations) *with* Doc. 78, PageID.3013 (testimony establishing that neither Jackson nor anyone else at his behest issued a warning to the Plaintiffs after which they failed to comply with the requirements of Baldwin County's zoning ordinances)), such that the provision for revocation of the land use certificate had no application in this case (*see* id.) and Jackson had no authority or power to revoke Plaintiffs' Land Use Certificate. Thus, the July 31, 2019 Stop Work Order, which

---

[70]     Again, the Defendants insistence that the approval of the land use certificate by Crystal Bates was a mistake is categorically wrong and this argument is rejected both because the clear testimony at trial was that Bates did nothing wrong in approving Plaintiffs' land use certificate on July 21, 2019 (it being clear that the Zoning Department had never read or applied the County's Parking Ordinance to apply to residential properties in Planning District 25 so as to prevent stacked parking at such properties) and because there can be no mistake when an employee of the very department that approves land use certificates (and who has the power and duty to approve land use certificates) is unaware of an unpublished and internally uncirculated interpretation of the Parking Ordinance (or determination regarding the Parking Ordinance) prohibiting stacked parking at all properties in Planning District 25.

[71]     After issuance of the land use certificate on July 17, 2019, the building permit was issued on July 23, 2019, and the Plaintiffs immediately began constructing their three-story duplex, breaking ground with the placement of pilings in advance of pouring the foundation.

was indisputably based on Jackson's ostensible revocation of Plaintiffs' land use

certificate was, itself, improper/impermissible and amounted to a physical invasion of

Plaintiffs' property without just compensation.[72]

On July 31, 2019, Defendant Baldwin County, by and through the actions of

Jackson, improperly (albeit temporarily, since the Court is now invalidating that taking)

---

[72]     In light of the Court's determination that the July 31, 2019 actions by Jackson and Baldwin County amounted to an improper (albeit temporary) taking of Plaintiffs' property without just compensation, the Court does not address Plaintiffs' arguments regarding the Story Ordinance at any significant length; instead, the Court simply notes that the action in October of 2019 respecting the Story Ordinance constituted a continuation of the improper taking of Plaintiffs' property that began on July 31, 2019 and, more importantly, was itself a confiscatory measure and taking because Plaintiffs' land use certificate and building permit should have been (and, indeed, were) in place even if a temporary stop work order was possibly appropriate when the amendment was passed (on a basis other than revocation of the land use certificate, that is). That this Court has properly considered Jackson's actions on July 31, 2019 as inextricably tied to and connected to the County's October 15, 2019 story amendment is inherently appropriate because the individual(s) working behind the scenes to prevail upon Vince Jackson and Baldwin County to interpret the Parking Ordinance to their liking and then to stop Plaintiffs' project were the very same individuals pushing for approval of the Story Ordinance and its immediate application to Plaintiffs' project. Accordingly, it should surprise no one that this Court finds the Story Ordinance produced the following: (1) a significant economic impact on Plaintiffs due to the delay in building and the reduced rental income that will be realized from a two-story project as opposed to a three-story project, as well as the reduced sales price for a two-story duplex versus a three-story duplex; (2) clear interference in distinct investment-backed expectations based upon the analysis previously supplied; and (3) the application of the Story Ordinance to Plaintiffs was nothing more or less than a continuation of the improper physical invasion of Plaintiffs' property wrought by the improper actions of Vince Jackson on July 31, 2019, as reflected by the fact that the same individuals who brought about the initial and improper work stoppage on Plaintiffs' project were the same individuals who successfully campaigned the Defendants to adopt the Story Ordinance and specifically apply it to Plaintiffs' project.  The amendment of the zoning ordinance on October 15, 2019 by Baldwin County (along with Jackson's July 31, 2019 actions) permanently deprived Plaintiffs of building their three-story duplex but for this Court's present action in finding that Plaintiffs should have been granted a variance to build their three-story duplex (or that the Board of Adjustment should have applied Section 20.2.2 of the Zoning Ordinance to grandfather-in Plaintiffs' construction of their three-story Breezy Shores duplex). So, even if the Story Ordinance did not permanently take away Plaintiffs' ability to build a duplex, there was a permanent partial taking because of the reduced profitability of the property (reduced because Plaintiffs faced the loss of one story and 4 rooms that could be rented) and, therefore, the story ordinance qualifies as a temporary taking that can be rectified by the granting of a variance or by the Board of Adjustment's application of Section 20.2.2 of the Zoning Ordinance to grandfather-in Plaintiffs' construction of their three-story Breezy Shores duplex.

took Plaintiffs' property without just compensation, and the application of Baldwin

County's October 15, 2019 "story" amendment to its zoning ordinance constituted a

continuation of the improper taking of Plaintiffs' property that began on July 31, 2019.

2.    <u>Just Compensation Due and Owing to Plaintiffs on Account of</u>

<u>Defendants' Improper Temporary Taking(s</u>).

"[T]he Constitution requires compensation for a temporary regulatory taking[,]"

*Wheeler v. City of Pleasant Grove,* 833 F.2d 267, 270 (11th Cir. 1987) (citation omitted),

and the starting point for inquiry into damages is to ask "'What has the owner lost?'" *Id.,*

quoting *Boston Chamber of Commerce v. City of Boston,* 217 U.S. 189, 195, 30 S.Ct.

459, 460, 54 L.Ed.725 (1910); *see A.A. Profiles, Inc. v. City of Fort Lauderdale,* 253

F.3d 576, 583 (11th Cir. 2001) ("The goal of the Fifth Amendment's just compensation

requirement is to return the affected property owner to 'as good position pecuniarily as

he would have occupied if his property had not been taken.'").

In the temporary takings context, it is well-established that "lost income" is a

proper measure of compensation. *A.A. Profiles, Inc.*, 253 F.3d at 584. Moreover, this

Court agrees with the Federal Circuit in *Yuba Natural Resources, Inc. v. United States,*

904 F.2d 1577 (Fed.Cir. 1990), that because the property is returned to the owners

when the taking ends, "the just compensation to which the owner[s are] entitled is the

value of the use of the property during the temporary taking[,]" *id*. at 1580-81, citing

*First English, supra,* 482 U.S. at 319, 107 S.Ct. at 2388, and, most importantly, that

"[t]he usual measure of just compensation for a temporary taking . . . is the fair rental

value of the property for the period of the taking." *Id.* at 1581, citing *Kimball Laundry Co.*

*v. United States,* 338 U.S. 1, 7, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765 (1949) (finding the

"proper measure of compensation is the rental that probably could have been obtained[.]").

Considering the foregoing, this Court now holds that the just compensation due and owing to Plaintiffs from the Defendant Baldwin County under the unique circumstances of the taking in this case consist of the fair rental value of the property for the period of the taking, as well as the $3,000.00 incurred by Plaintiffs in moving pilings from the property and increased construction costs now facing Plaintiffs, as it is fair to conclude that these latter costs are certainly a part of what the Plaintiffs have lost. And based on the competent evidence offered during the bench trial, the Court **AWARDS** to Plaintiffs the following damages based on the improper (and now invalidated) temporary takings by the Defendants: (1) $128,308.00 in increased construction costs; (2) $632,980.76 in lost rental income/revenue;[73] and (3) $3,000.00 for moving the remaining pilings from the Site.

**F.   Vested Property Rights—Count Seven**.  In Count Seven of the Second Amended Complaint, Plaintiffs aver that the Defendants violated their vested property rights by "(a) issuing the Stop Work Order that caused Plaintiffs to incur additional costs, and (b) by refusing to allow Plaintiffs to complete construction once the Parking Ordinance issue raised in the Stop Work Order was resolved." (Doc. 21, PageID.158). In the summary judgment order it was determined that Count Seven should proceed to trial with respect to equitable remedies against Baldwin County and Vince Jackson in

---

[73]    Given the date of this Order, the fact that Plaintiffs expected their project to be completed in July 2020, in time to be rented in August of 2020 and thereafter, and it being clear that the earliest Plaintiffs' project can be expected to be completed and rented is October of 2023, this number represents the total of lost rental income due and owing Plaintiffs.

his official capacity. (Doc. 60, PageID.1916). With respect to their first vested-rights argument, it is Plaintiffs' undeniable position, based on the entirety of the trial testimony, that they obtained a vested right to construct their three-story duplex on the subject "Site." The Plaintiffs' "vested property rights under [] Alabama law rests in the doctrine of equitable estoppel." *Greenbriar Village, L.L.C. v. City of Mountain Brook,* 202 F.Supp.2d 1279, 1290 (N.D. Ala. 2002), *affirming in part and reversing in part on other grounds,* 345 F.3d 1258 (11th Cir. 2003).

In deciding whether Plaintiffs possessed a vested property right to construct the three-story duplex on the "Site," the Court is guided by the Alabama Supreme Court's recent decision in *Breland v. City of Fairhope,* 337 So.3d 741 (Ala. 2020).

In Grayson v. City of Birmingham, 277 Ala. 522, 173 So.2d 67 (1963) . . ., this Court addressed the framework for evaluating a vested-rights claim. There, a company obtained approval from the Jefferson County Planning and Zoning Commission to have agricultural property rezoned to residential and commercial parcels. The company then improved the commercial parcels by paving streets, adding water pipes and storm sewers, and grading, leveling, and clearing the lots, at a cost (as of the mid 1950s) of $3,518. About two years after that approval, the City of Birmingham annexed the land and rezoned the commercial parcels to residential. The company sued Birmingham to challenge the rezoning of the plaintiffs' property.

On appeal, this Court explained that such a rezoning "must stand or fall on vested rights, which, in the absence of a contract, depend for their existence on equitable fairness, both to the property owner and to the general public." 277 Ala. at 525, 173 So.2d at 69. This Court further held that the question of vested rights is a fact-intensive inquiry in which "changes, investments, and permits" relating to the "structures initiated or completed, are made the criteria of hardships imposed on the property owner and judicially recognized to sustain the claims of vested rights." Id.

This Court noted in Grayson that the plaintiffs' investments in the property, standing alone, might "serve to establish [the plaintiffs'] contention that they have acquired a vested right in the property." 277 Ala. at 526, 173 So.2d at 70. But the Court also weighed the landowner's interests against "the reasonable necessity for protecting and promoting

> the health, safety, morals, and general welfare of the public" underlying
> Birmingham's rezoning of the plaintiffs' property – in that case, minimizing
> traffic hazards near a school, 277 Ala. at 528, 173 So.2d at 72. As such,
> the landowner's loss relating to its "naked lots, which [were] without
> structural initiation thereon" and with "no building permit granted," was of
> "minor weight" compared [to] the city's zoning responsibilities. 277 Ala. at
> 525, 527, 173 So.2d at 69, 71.

337 So.3d at 750.

Here, the Plaintiffs possessed a vested property right in constructing their three-story duplex on the "Site." After all, Plaintiffs were in possession of a validly issued (and valid) land use certificate,[74] as well as a building permit, the sole items necessary to begin construction of their duplex under Baldwin County's Planning and Zoning Ordinance. Moreover, in good faith reliance on these validly-issued documents/permits, Plaintiffs began their construction and improved the "Site" by initiating the duplex by driving pilings into the ground.[75] To the extent the Defendants would argue that revocation of Plaintiffs' land use certificate and posting of the stop work order was reasonably necessary for protecting and promoting the safety of the public because of

---

[74]    To the extent the Defendants argue otherwise (*see* Doc. 89, PageID.4241-42), their arguments are rejected. Moreover, to the extent the parties rely on a "test" different from that set forth in *Breland, supra,* those arguments too are rejected.

    In particular, the Court finds that the Defendants' suggestion that approval/issuance of the land use certificate was a mistake is simply incorrect. Indeed, the evidence at trial revealed not only that Bates had the specific authority to approve and issue land use certificates, as delegated to her (and others) by the Planning Director in accordance with the Planning and Zoning Ordinance, but, as well, that the approval and issuance of the Plaintiffs' land use certificate was not a mistake but, instead, was a reflection of the manner (or custom) in which Bates (and others) exercised their responsibilities and duties vis-à-vis the issuance of such certificates (which, at the time, allowed for stacked parking in terms of residential construction). That no mistake was made is clear considering no less than Vince Jackson's testimony that Bates did nothing wrong in approving and issuing the land use certificate in this case on July 17, 2019.

[75]    Plaintiffs paid the labor costs associated with this activity. (*See* Doc. 79, PageID. 3135 (Jones' testimony that money was expended to put the initial pilings in the ground)).

Jackson's prior (that is, July 3, 2019) interpretation of the Parking Ordinance as disallowing stacked parking on this Site, the Defendants are wrong both because, as explained many times now, the revocation of the land use certificate was improper/impermissible and because the Parking Ordinance (admittedly adopted in 2017) had never before been interpreted to prohibit stacked parking at residential properties in Planning District 25 and the impetus for this change in interpretation had nothing to do with the health, safety and welfare of the general public and everything to do with Paul Stanton (and his fellow owners of property neighboring that of the subject property) requesting a change in interpretation of the Parking Ordinance in order to thwart Plaintiffs' construction of their duplex.

Given the equitable considerations here,[76] this Court concludes that Plaintiffs obtained a vested right to construct their Breezy Shores duplex as initially permitted. Accordingly, the undersigned **ENJOINS** the Defendants from in any manner prohibiting Plaintiffs' construction of their Breezy Shores duplex as initially permitted. Stated somewhat differently, the Court now **DECLARES** that Plaintiffs be allowed to construct their three-story Breezy Shores duplex as initially permitted without any obstruction from the Defendants, principally Defendant Baldwin County.

---

[76] The Defendants' belief that the "equities" in this case favor them is misguided and, indeed, untenable, as it would be decidedly inequitable for this Court to find in favor of Defendants who bent over backwards to place barrier after barrier in Plaintiffs' way to build their three-story duplex at the urging of Paul Stanton and a group of Fort Morgan homeowners whose sole goal was to block the construction of Plaintiffs' Breezy Shores duplex. Instead, the "equites" wholly favor Plaintiffs, who followed Baldwin County's Zoning Ordinance to obtain a validly issued land use certificate, then a building permit, and finally began constructing their three-story duplex until that construction was improperly and impermissibly halted by the Defendants.

**G.** __Negligence and Wantonness__.  In the Second Amended Complaint, Plaintiffs aver that the Defendants had a "duty rooted in Alabama common law to properly perform their duties under the Baldwin County Zoning Ordinance and other applicable laws to administer zoning matters within Planning District 25[;]" breached this duty by, first, "issuing the Stop Work Order," and then by "refusing to lift the Stop Work order[;]" and contend that since "the Stop Work Order was unauthorized by the Baldwin County Zoning Ordinance and predicated upon a new interpretation of the Parking Ordinance, Jackson and Baldwin County acted wantonly with reckless indifference to the property rights of Plaintiffs[;]" and, as a direct result of these actions by the Defendants, Plaintiffs were damaged. (Doc. 21, PageID.160).

The parties agree regarding the legal elements of negligence and wantonness. (*See* Doc. 68, PageID.1953-54). "In Lemley v. Wilson, 178 So.3d 834[, 841-42] (Ala. 2015), this Court set out the elements a plaintiff must prove to establish negligence and wantonness: '"To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury. Albert v. Hsu, 602 So.2d 895, 897 (Ala. 1992). To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains. Smith v. Davis, 599 So.2d 586 (Ala. 1992)."'" *Hilyer v. Fortier,* 227 So.3d 13, 22 (Ala. 2017).

In this case, this Court must first consider the Defendants' argument that they

owed no duty to Plaintiffs because they are entitled to substantive immunity. (*See, e.g.,*

Doc. 89, PageID.4244-45).

> The "substantive immunity" rule is a narrow exception to the general rule
> that a municipality or a county is chargeable with the negligence of its
> employees or agents performed in the line and scope of their duty. *Rich v.
> City of Mobile,* 410 So.2d at 387. This exception is based on

>> "public policy considerations . . . [that] override the general
>> rule and prevent the imposition of a legal duty, the breach of
>> which imposes liability, in those narrow areas of
>> governmental activities essential to the well-being of the
>> governed, where the imposition of liability can be reasonably
>> calculated to materially thwart the City's legitimate efforts to
>> provide such public services."

> *Id.* The court in *Rich* stated that "the substantive immunity rule . . . must be
> given operative effect only in the context of those public service activities
> of governmental entities . . . so laden with the public interest as to
> outweigh the incidental duty to the individual citizens." 410 So.2d at 387-
> 88. Thus, we must determine whether a county's exercise of its zoning
> power is a public-service activity so laden with the public interest as to
> outweigh any incidental duty that activity might create to an individual
> citizen.

> As recognized in *Pollard v. Unus Properties, LLC,* 902 So.2d 18
> (Ala. 2004), "'[t]he authority for zoning laws is found within the bounds of
> the police power, asserted for the public welfare'" and zoning restrictions
> must "'bear some substantial relation to the public health, safety, morals,
> or general welfare, or as otherwise elsewhere expressed, the "public
> convenience or the general prosperity."'" 902 So.2d at 23, 24 . . . .

> Further, in § 11-3A-2, Ala. Code 1975, the legislature granted the
> county commission of each county of this state the authority to "provide for
> its property and affairs; and for the public welfare, health, and safety of the
> citizens throughout the unincorporated areas of the county by exercising
> certain powers for the protection of county and public property under its
> control."

>                                   .        .        .

> [I]t cannot be disputed that zoning powers are a public-service activity and
> may not be exercised for the benefit of individual landowners to the

exclusion of the interests and well-being of all citizens of a county or municipality. Thus, the exercise of the zoning powers granted to a governmental body is a public-service activity to be exercised for the benefit of the governmental entity and the well-being of the governed.

*Payne v. Shelby County Comm'n,* 12 So.3d 71, 77-78 & 78 (Ala. Civ. App. 2008) (footnote omitted).

In light of the foregoing, this Court finds that to the extent Jackson, who was all times relevant hereto responsible for administration and enforcement of the Baldwin County Zoning Ordinance (including approval of land use certificates of the type presented by Plaintiffs and enforcing the Baldwin County Zoning Ordinance, a part of which was the Parking Ordinance), had any duty respecting such administration and enforcement (under which would "fall" issuance of the Stop Work Order, given that such Orders are allowable under the Zoning Ordinance), that duty was owed by Jackson (and Baldwin County) to the general public, and it was not a duty owed simply to the Plaintiffs. *See Payne, supra,* 12 So.3d at 79 ("[W]e conclude that the adoption of the conditional rezoning resolution did not create a duty owed by the County Commission or the Planning Commission to the Paynes over and above that owed to the general public.").[77] Accordingly, Plaintiffs' negligence claims fail.  Their wantonness claims also fail on the basis of substantive immunity and because nothing about the evidence offered at the bench trial "sounds" in wantonness.

## CONCLUSION

---

[77]        In other words, any duty owed by Defendants in interpreting the Parking Ordinance or in applying the written provisions of the Zoning Ordinance (particularly, § 18.2.5) would not be a specific duty owed to Plaintiffs over and above what would be owed to the general public.

For the reasons set forth above, the following **FINDINGS and ORDERS** are entered:

1.  Count One of Plaintiffs' Second Amended Complaint, which is an appeal of "the Board of Adjustment's denial of its request for a variance from the story restriction that would allow it to construct a three-story duplex on the subject property," is decided in Plaintiffs' favor.  A variance from the terms of the story ordinance in Planning District 25, approved in October of 2019, is **GRANTED** and Plaintiffs are authorized to construct their Breezy Shores duplex as a three-story duplex rather than a two-story duplex. Defendant Baldwin County, through its Commission 4 Planning and Zoning Board of Adjustment is **ORDERED** to authorize a variance from the terms of the story ordinance in Planning District 25 approved in October of 2019 or in the alternative, to grandfather-in the right to build a three-story duplex under the provisions of Section 20.2.2 of the Baldwin County Zoning Ordinance;

2.  Plaintiffs prevail on Count Six of the Second Amended Complaint.  It is determined that Defendants Vince Jackson and Baldwin County **TEMPORARILY TOOK** Plaintiffs' property without just compensation based upon actions which initially began on July 31, 2019 (but also include the Story Ordinance actions in October of 2019).  In accord with Count Two of the Second Amended Complaint, it is determined that the July 31, 2019 Stop Work Order amounted to a physical invasion of Plaintiffs' property without just compensation.  In combination, the application of the Stop Work Order and the Story Ordinance would permanently take from Plaintiffs their opportunity to build a three-story duplex;

3.  On July 31, 2019, Plaintiffs had a vested right to construct their Breezy

Shores duplex as initially permitted by the Defendants.  Therefore, Defendant Baldwin County is **ENJOINED** from prohibiting Plaintiffs' construction of their Breezy Shores three-story duplex as initially permitted. To this end, Defendant Baldwin County is **ORDERED** to immediately withdraw the Stop Work Order and reinstate the land use certificate and building permit so that Plaintiffs can resume construction on their Breezy Shores project;

4.  Defendants are **ORDERED** to pay unto Plaintiffs a total sum of **$764,289.00** in accordance with Count Seven of the Second Amended Complaint as compensation for the temporary taking of their property starting on July 31, 2019 and is expected to last at least through October 2023;

5.  The Court determines that Plaintiffs cannot prevail on Count Nine of the Second Amended Complaint (alleging the Defendants' negligence and wantonness) on account of the substantive immunity rule/doctrine; and

6.   Plaintiffs, as prevailing parties in an action brought pursuant to 42 U.S.C. § 1983, are entitled to apply for an award of attorneys' fees provided they file a motion seeking such reimbursement and the authority therefor not later than **November 30, 2022**.

**DONE** and **ORDERED** this the 28th day of October, 2022.

  s/William E. Cassady
**UNITED STATES MAGISTRATE JUDGE**